## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

ETHYPHARM S.A. FRANCE and )
ETHYPHARM S.A. SPAIN, )
      )
       Plaintiffs, )
      )    Civ. No. 04-1300-SLR
      v. )
      )
BENTLEY PHARMACEUTICALS, INC., )
      )
       Defendant. )

## DEFENDANT BENTLEY PHARMACEUTICALS, INC.'S
## OPENING BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

John L. Reed (I.D. 3023)
Denise Seastone Kraft (I.D. 2778)
Joseph B. Cicero (I.D. 4388)
**EDWARDS ANGELL PALMER & DODGE LLP**
919 N. Market Street, 15th Floor
Wilmington, DE 19801
302.777.7770
302.777.7263 (*fax*)

OF COUNSEL:

Craig E. Stewart
Joseph P. Mingolla
Veronica C. Abreu
**EDWARDS ANGELL PALMER & DODGE LLP**
111 Huntington Avenue
Boston, MA 02199
(617) 239-0100

Dated: August 25, 2006

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ...................................................................................................... iii

NATURE AND STAGE OF THE PROCEEDINGS ......................................................... 1

SUMMARY OF ARGUMENT ...................................................................................... 2

STATEMENT OF FACTS ............................................................................................. 4

I.      BENTLEY NEVER CONTRACTED WITH, OR MANUFACTURED ANY
        OMEPRAZOLE OR OTHER PELLET DRUGS FOR, ETHYPHARM OR
        FOR ETHYPHARM'S CUSTOMERS ..................................................................... 4

II.     BELMAC IS A SUBSIDIARY OF BENTLEY THAT INDEPENDENTLY
        RUNS ITS OWN BUSINESS ................................................................................. 5

III.    ETHYPHARM'S CAUSE OF ACTION ARISES OUT OF ITS WRITTEN
        AGREEMENTS AND BUSINESS DEALINGS WITH BELMAC– NOT
        BENTLEY ............................................................................................................. 7

        A.      Belmac and Ethypharm Executed Written Agreements for the
                Manufacture of Omeprazole and other Pellet Drugs on March 23,
                2000 ........................................................................................................ 7

        B.      Belmac's Business Dealings With Ethypharm for the Manufacture
                and Sale of Omeprazole and Other Pellet Drugs Prior to March 23,
                2000 ........................................................................................................ 9

        C.      Belmac, not Bentley, Owns the Technology to Manufacture the Drugs
                at Issue, as well as the Patents and Authorizations from the Spanish
                Government to Manufacture, Market, and Sell Omeprazole and Other
                Pellet Drugs in Spain .............................................................................. 11

        D.      Belmac's Termination of the March 23, 2000 Omeprazole Agreement
                with Ethypharm and Continued Manufacture and Sale of Omeprazole
                and Other Pellet Drugs in Spain .............................................................. 12

IV.     JIM MURPHY'S CONTACTS WITH ETHYPHARM ......................................... 14

V.      BENTLEY NEVER DIRECTED ANYONE AT BELMAC TO STEAL
        ETHYPHARM TRADE SECRETS OR TO INTERFERE WITH
        ETHYPHARM'S CUSTOMER RELATIONSHIPS, NOR DID BELMAC
        HAVE APPARENT AUTHORITY TO ACT ON BEHALF OF BENTLEY ............ 16

VI.     ETHYPHARM HAS ALREADY AVAILED ITSELF OF AN
        ALTERNATIVE – AND MUCH MORE APPROPRIATE – FORUM IN
        WHICH TO RESOLVE ITS DISPUTE WITH BELMAC. .................................. 18

ARGUMENT ..................................................................................................................... 19

I.    BELMAC DID NOT HAVE ACTUAL AUTHORITY TO BIND BENTLEY
      WHEN IT ALLEGEDLY MISAPPROPRIATED ETHYPHARM'S TRADE
      SECRETS AND INTERFERED WITH ETHYPHARM'S CONTRACTUAL
      RELATIONS IN LATE 2001 OR EARLY 2002 ................................................... 21

      A.    Extensive Discovery Confirmed that Belmac Is a Separate and
            Distinct Corporate Entity Whose Activities Pertinent to the
            Underlying Cause of Action Were Not Controlled by Bentley .................. 22

      B.    There is No Evidence That Bentley Directed or Controlled Belmac's
            Conduct When in Late 2001 or Early 2002 Belmac Allegedly
            Misappropriated Ethypharm's Trade Secrets or Interfered with
            Ethypharm's Customer Relationships ...................................................... 25

      C.    Bentley Never Granted Belmac Authority to Act as Its Agent In Its
            Dealings With Ethypharm ...................................................................... 30

II.   NO REASONABLE JURY COULD CONCLUDE THAT BELMAC WAS
      CLOAKED WITH THE APPARENT AUTHORITY OF BENTLEY WHEN
      IT ENGAGED IN THE ALLEGEDLY WRONGFUL CONDUCT IN LATE
      2001 OR EARLY 2002 ....................................................................................... 31

      A.    Bentley Did Not Provide the Requisite Indicia of Apparent authority
            to Ethypharm ........................................................................................ 31

            1.    Ethypharm had no contact with anyone at Bentley in late 2001
                  or early 2002, and therefore can point to no words or actions
                  by Bentley conferring apparent authority upon Belmac with
                  regard to the allegedly infringing conduct ...................................... 32

            2.    Even Mr. Murphy's Attenuated Interactions with Ethypharm
                  fail to create any indicia that Belmac had apparent authority to
                  bind Bentley with regard to the allegedly infringing conduct ......... 33

      B.    Any purported reliance by Ethypharm on Bentley's actions was not
            reasonable ............................................................................................ 37

CONCLUSION ................................................................................................................ 40

# TABLE OF AUTHORITIES

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ................................................................................................ 20

*Billops* v. *Magness Construction Co.,*
  391 A.2d 196 (Del. 1978) ................................................................................ 31, 38

*C.R. Bard Inc.* v. *Guidant Corp. & Advanced Cardiovascular System, Inc.,*
  997 F. Supp. 556 (D. Del. 1998) .............................................................. *passim*

*Celotex Corp.* v. *Catrett,*
  477 U.S. 317 (1986) ................................................................................................ 20

*Finnegan Construction Co.* v. *Robino-Ladd Co.,*
  354 A.2d 142 (Del. 1976) ...................................................................................... 32

*Fletcher* v. *Atex, Inc.,*
  68 F.3d 1451 (2d Cir. 1995) ................................................................................... 35

*In re Elonex Phase II Power Management Litigation,*
  2002 WL 433614 (D. Del. 2002) ......................................................................... 32

*Japan Petroleum Co. (Nigeria) Ltd.* v. *Ashland Oil, Inc.,*
  456 F. Supp. 831 (D. Del. 1978) ............................................................... *passim*

*Jurimex Kommerz Transit G.M.B.H. et al* v. *Case Corp.,*
  *No. Civ. A. 00-83-JJF*, 2006 WL 1995128 (D. Del. July 17, 2006) .............. *passim*

*Messina* v. *E.I. DuPont de Nemours & Co.,*
  308 F. Supp. 2d 491 (D. Del. 2004) .................................................................... 20

*Mobil Oil Corp.* v. *Linear Films, Inc.,*
  718 F. Supp. 260 (D. Del. 1989) ..................................................... 19, 21, 22, 26

*Pearson* v. *Component Tech. Corp.,*
  247 F.3d 471 (3d Cir. 2001) .................................................................................. 22

*Phoenix Canada Oil Co.* v. *Texaco, Inc.,*
  842 F.2d 1466 (3d Cir. 1988) ..................................................................... *passim*

*Taylor* v. *Peoples Natural Gas Co.,*
  49 F.3d 982 (3d Cir. 1995) .............................................................................. 32, 38

## NATURE AND STAGE OF THE PROCEEDINGS

On September 26, 2005, this Court held that the wholly-owned Spanish subsidiary of defendant Bentley Pharmaceuticals, Inc. ("Bentley") is a necessary and indispensable party under Rule 19 of the Federal Rules of Civil Procedure.  (A-496.)[1]  The Court found that Laboratorios Belmac, S.A. ("Laboratorios Belmac" or "Belmac") is a "necessary party because plaintiffs' interactions were almost entirely with Belmac and not with defendant." (*Id.*)  The Court also found that Belmac was an indispensable party whose joinder "would eliminate the basis of the court's diversity jurisdiction and warrant dismissal of the action under Rule 12(b)(1)."  (A-495.)  The Court noted, however, that "to avoid dismissal, plaintiffs assert an agency theory," and permitted plaintiffs (collectively, "Ethypharm") to conduct discovery on the limited issue of whether Bentley "directed the alleged infringing activities at issue."  (A-499.)

The Court also narrowed the "activities at issue" in this case by dismissing counts one and three of Ethypharm's Complaint.  (A-503-504.)  The only matters which remain at issue, therefore, are whether: (1) "[i]n or around late 2001 and early 2002," Bentley directed Belmac to misappropriate Ethypharm's alleged trade secrets (A-461, 475-476); and (2) "[i]n or around March of 2002"  Bentley directed Belmac to interfere intentionally and improperly with Ethypharm's actual and prospective economic relationships.  (A-485, 486.)

Discovery on the issue of agency has been extensive:  Bentley produced nearly 117,000 pages of documents, the vast majority of which were retrieved from its Spanish subsidiary, Belmac, and are in Spanish.  Ethypharm produced 9,312 pages of documents, most of which were either in French or in Spanish.  The parties deposed sixteen witnesses, all

---

[1] References to "A-____" are to the Appendix to Defendant Bentley Pharmaceuticals, Inc.'s Motion for Summary Judgment.

but four of whom came from Europe and speak either French or Spanish as their native language.

As invited by the Court in its decision (A-500), because discovery has failed to produce any evidence that Bentley directed Belmac to misappropriate Ethypharm's trade secrets or to interfere with Ethypharm's customer relationships, Bentley now moves for summary judgment and renews its request that the Court dismiss this case for failure to join Belmac, a necessary and indispensable party under Rule 19.

## SUMMARY OF ARGUMENT

In its September 26, 2005 Memorandum Opinion, this Court noted that "[a] parent company is not liable for the actions of a subsidiary solely because of the parent-subsidiary relationship." Rather, "[i]n order for the parent corporation to be liable under the [agency] test, there must be 'a close connection between the relationship of the corporations and the cause of action.'" (A-498; citations omitted.) The Court went on to find that:

> "[i]t is undisputed that defendant has some control over Belmac because it
> has oversight obligations for Belmac. At some point, it must be able to direct
> Belmac's activities to fulfill these obligations. However, it is unclear whether
> it directed the <u>alleged infringing activities at issue</u>."[2] (A-499; emphasis added
> and citations omitted.)

Nearly a year of discovery has confirmed that it was Belmac, not Bentley, that engaged in the alleged wrongful conduct, and that while Bentley had (and has) sufficient oversight over its subsidiary to fulfill its obligations under the Securities and Exchange Commission's regulations, it neither directed Belmac's activities about which Ethypharm complains, nor did it otherwise provide Belmac with actual or apparent authority to engage in the allegedly wrongful conduct on behalf of Bentley. Notably, it is undisputed that as of "late

---

[2] The Court dismissed counts one and three of Ethypharm's complaint, leaving only two counts which form the "alleged infringing activities at issue" in this case: count 2 (misappropriation of trade secrets) and count 4 (intentional interference with actual and prospective business relationships).

2001 or early 2002" – the time period identified by Ethypharm in its Complaint as the time when Bentley and Belmac allegedly embarked on a "bold scheme" to misappropriate Ethypharm's trade secrets and to interfere with Ethypharm's economic relationships (A-461, 475, 485-486) – there had been no direct communications between the employees and officers of Bentley and Ethypharm for many months.  Simply put, Ethypharm is unable to point to any words or actions of anyone employed at Bentley that could lead a reasonable jury to find that Belmac was acting as Bentley's agent with respect to the alleged scheme.

Faced with this reality, Ethypharm has expended considerable effort during discovery attempting to patch together snippets of evidence that it hopes will keep this case in the United States:  overlapping directors on the Bentley and Belmac board; a Belmac officer, Mr. James Murphy, who also serves as Bentley's CEO; sporadic communications between Ethypharm representatives and Mr. Murphy; and a handful of Mr. Murphy's responses to Ethypharm written on Bentley letterhead in the mid-1990s.  Ethypharm's efforts fall far short of the mark.  A closer examination of the items garnered by Ethypharm reveal that they are either remote, isolated events that predate (in most cases, by several years) the "bold scheme" alleged by Ethypharm, or are entirely unrelated to the matters at issue in this case.

Discovery also confirmed that the plaintiffs will suffer absolutely no prejudice by the dismissal of this action, since they have already filed suit against Belmac in the Commercial Court in Madrid, based upon the same allegedly wrongful conduct that underlies this action:  Belmac's use of certain technology to continue to manufacture, market, and sell omeprazole and other pellet drugs in Spain after March 2002.  (A-508; JTA-726, 727, 743, 743, 746.)[3] The Spanish court is not only an adequate, but a much more appropriate forum for this case,

---

[3]  References to "JTA-___" are to the Joint Appendix of Deposition Transcripts, filed herewith.

since it can review, without the need for expensive translation, the 116,040 pages of documents produced by Bentley – the overwhelming majority of which came from Belmac in Spain and are in Spanish – and has both proximity to and the ability to compel Belmac's Spanish-speaking witnesses to testify as to Belmac's continued manufacture of omeprazole and other pellet drugs in Spain after the alleged "bold scheme" began. Simply put, extensive discovery has confirmed that Ethypharm's cause of action, if any, is against Belmac, not Bentley, and it is now time to send this case to Spain where it belongs.

## STATEMENT OF FACTS

### I. BENTLEY NEVER CONTRACTED WITH, OR MANUFACTURED ANY OMEPRAZOLE OR OTHER PELLET DRUGS FOR, ETHYPHARM OR FOR ETHYPHARM'S CUSTOMERS

Bentley, a publicly traded pharmaceutical company whose sole office is located in Exeter, New Hampshire, is in the business of researching, developing and licensing drug delivery technologies. (A-464 at ¶ 29; A-608 at ¶¶ 3-4; JTA-1027.) Bentley has never entered into any agreement with Ethypharm for the manufacture, marketing, or sale of omeprazole or other pellet drugs in Spain. (A-175, 185; JTA-334, 335-337, 375, 380, 772-779, 1084.) Bentley never received any machinery or technical protocols or dossiers containing trade secrets from Ethypharm, and it never executed any confidentiality agreement concerning such alleged trade secrets with Ethypharm. (A-622 at ¶ 10; JTA-333, 747, 750, 861, 919.) Bentley never manufactured omeprazole or any other pellet drug, either in Spain or in the United States. (JTA-333, 352, 372, 721, 770-773, 917.) Bentley has never sold omeprazole or other pellet drugs to Ethypharm, nor has it ever contacted any of Ethypharm's customers concerning their purchase of pharmaceutical products from Belmac. (A-623 at ¶ 11; JTA-372, 721, 770-775, 917.)

It is undisputed that Bentley, which has only 17 employees, lacks the experience, equipment, patents, or authorizations required under Spanish law to manufacture, market and sell omeprazole and other pellet drugs in Spain.  (A-617 at ¶ 22; JTA-229, 333, 352, 371-375, 394, 742-743, 771, 917, 1070.)  Even if Bentley decided to manufacture omeprazole (or other micro- pellet drugs) tomorrow, it could not do so: Bentley is legally barred from attaining an authorization from the Spanish Ministry of Health to manufacture omeprazole and other pellet drugs in Spain because, under Spanish law, only pharmaceutical companies who have manufacturing plants in Spain are allowed to do so.  (A-613 at ¶ 3; A-621 at ¶3; JTA-371, 375.)

## II.  BELMAC IS A SUBSIDIARY OF BENTLEY THAT INDEPENDENTLY RUNS ITS OWN BUSINESS

Laboratorios Belmac, a company with 350 employees, is headquartered in Madrid and incorporated under the laws of Spain.  (A-617 at ¶ 2; JTA-60, 62, 1079.)  Belmac is in the business of developing, selling and marketing pharmaceutical products, and has two subsidiaries of its own in Spain.  (A-608, 609 at ¶ 5; A-617 at ¶ 2; JTA-60-62.)  In early 1992, Bentley's predecessor, Belmac Corporation, a Tampa, Florida based company, purchased Laboratorios Rimafar, S.A. ("Rimafar") and changed Rimafar's name to Laboratorios Belmac S.A. ("Belmac").  (A-621 at ¶ 6.)  Rimafar was incorporated in 1988 by its general manager, Angel Perez de Ayala, who remained as General Manager of Belmac, until late 1994.  (A-621 at ¶ 6.)  Belmac kept its administrative offices in Madrid, and continues to own and operate Rimafar's manufacturing facility, warehouse, laboratory and related offices located in an 80,000 square foot facility in Zaragoza, Spain.  (A-621 at ¶ 6; JTA-60, 83.)  Since the late 1990s, Belmac has earned substantial revenue from its manufacture, development, sale and marketing of pharmaceutical products in Spain.  In the period 1998 – 2001, its net sales ranged from $15.1 to $26.4 million per year.  (A-617 at ¶ 4.)

5

Since June of 1999, Belmac has been run by Mr. Adolfo Herrera, the company's general manager in Spain. (A-461; JTA-622, 623-624, 662.) Belmac has its own board of directors, the members of which Belmac's shareholders elect, through Belmac's President, in accordance with Spanish law. (JTA-1019-1020, 1030.) Since late 1994 or early 1995, Mr. Murphy has been the President of Belmac, and from 1999 to the present, he has served on Belmac's board of directors alongside Mr. Herrera (Belmac's general manager) and Michael Price (Bentley's Chief Financial Officer). (JTA-628, 1016-1021, 1029, 1045, 1116-1119, 1122.) In his capacity as Belmac's President and member of Belmac's board of directors, Mr. Murphy has delegated broad powers to Belmac's general managers, including Mr. Herrera, in accordance with Spanish law. (JTA-630-632, 1021.) These powers include the power to negotiate and enter into Belmac's contracts and agreements. (JTA-679.)

Since 1991, the general managers of Belmac, and its predecessor Rimafar, have run the day-to-day operations of the Spanish company. (A-550 at ¶ 5; A-551 at ¶ 8; JTA-86, 105, 628-630, 665, 1023-1024, 1046, 1075-1076, 1162.) Bentley's board of directors does not direct or control Belmac's day-to-day operations. (A-612 at ¶ 16; JTA-86.) As Belmac's President, Mr. Murphy has no involvement in the day-to-day operations of the company, but rather receives periodic updates from Belmac's general manager about Belmac's business and strategy. (JTA-630-632, 656, 663, 673-674, 1029, 1032, 1046-1047.) While Mr. Murphy, in his capacity as Belmac's President, has been involved in the hiring and firing of some of Belmac's general managers, Belmac's general managers hire and fire Belmac's employees. (A-549 at ¶ 4; JTA-118, 665, 1017, 1019.)

Belmac has bank accounts in its own name in Spain. (A-617 at ¶ 5.) Belmac pays its own taxes to the Spanish taxing authorities. (A-617 at ¶ 6.) Belmac is not dependent upon Bentley for funding, pays its own rent for its offices in Madrid, and pays the salaries of its own employees from its own bank accounts. (A-551; A-549 at ¶¶ 3-4; JTA-104, 327-328,

331, 627-629, 659, 678-679, 1019.)  Bentley has never guaranteed any Belmac loans with banks or with any organization, or otherwise loaned money to Belmac for operating expenses, capital improvements or any other purpose.  (JTA-629, 679.)  Nor does Belmac need such loans:  since the late 1990s, Belmac has earned substantial revenue from its own business in Spain which surpassed the earnings of Bentley in the United States.  (A-549 at ¶ 3; A-617 at ¶ 4;  JTA-628-629, 1139-1140.)   In the late 1990s, Belmac entered into Management Fee Agreements with Bentley for tax-planning purposes, whereby Belmac pays pro-rated fees to Bentley for overhead expenses which are attributable to Belmac's business. (JTA-628-629, 1023-1024, 1029, 1075-1076, 1162.)   Belmac prepares its own financial statements, which are audited by Belmac's independent auditors, Deloitte & Touche, and filed with the proper authorities in Spain.  (A-551 at ¶ 9.)  These financial statements are then forwarded by Belmac to Bentley for inclusion in Bentley's consolidated financial statements as required by SEC regulations.  (A-609 at ¶ 6; JTA-1162, 1175-1176.)

In short, Belmac is an independent foreign subsidiary of Defendant Bentley, and has its own management team, personnel, assets, expenditures, investments, budget, liabilities, patents, and bank accounts.  (A-549 at ¶ 3.)

### III.    ETHYPHARM'S CAUSE OF ACTION ARISES OUT OF ITS WRITTEN AGREEMENTS AND BUSINESS DEALINGS WITH BELMAC, NOT BENTLEY

#### A.    Belmac and Ethypharm Executed Written Agreements for the Manufacture of Omeprazole and other Pellet Drugs on March 23, 2000.

The two surviving counts of Ethypharm's complaint are based on wrongful acts that Belmac allegedly undertook after it terminated its written agreement concerning the manufacture of omeprazole with Ethypharm S.A. Spain ("Ethypharm Spain") in "late 2001 or early 2002."  (A-457 at ¶ 1; A-461 at ¶ 15; A-475 at ¶ 84; A-476 at ¶ 88; A-485 at ¶¶ 135-136; JTA-347.)  To understand the nature of those allegations, it is important to understand

the relationship between Belmac and Ethypharm for the manufacture of omeprazole and other pellet drugs in Spain leading up to that time frame.

Both Belmac and Ethypharm Spain are Spanish companies headquartered in Madrid. (A-464 at ¶ 27; A-617 at ¶ 2; JTA-60, 62, 314.)  On or about March 23, 2000, the general manager of Belmac, Mr. Herrera, and of Ethypharm Spain, Mr. Adolfo de Basilio, executed written agreements for the manufacture of omeprazole and other pellet drugs (vincamine, aspirin, piroxicam and indometacine) which they had negotiated with each other.  (A-1-44; JTA-215-224, 379-380, 662-664, 678, 739, 746-747, 749, 1056, 1080-1081.)  The March 23, 2000 manufacturing agreement for omeprazole (the "Manufacturing Agreement") had a term of two years, and was renewable unless terminated by either party with four months' prior notice.  (A-1-7.)  The Manufacturing Agreement for omeprazole also provided that it would not limit Belmac's right to manufacture and sell omeprazole to its own customers.  (*Id.*)  On that same day, Mr. Herrera and Mr. Basilio also executed a Letter of Purchase Undertaking, pursuant to which Belmac agreed to purchase for its own use a certain amount of the omeprazole it manufactured for Ethypharm.  (A-8-12; JTA-217, 377.)  The March 23, 2000 agreements were the first and only agreements ever executed concerning Belmac's manufacture and sale of omeprazole and other pellet drugs for Ethypharm and Ethypharm customers.  (JTA-663, 739, 1050.)

Bentley was not a party to the March 23, 2000 agreements, including the Manufacturing Agreement, or to the Letter of Purchase Undertaking, nor did it have any rights or obligations under them.  (A-1-44, A-554-555 at ¶¶ 18-22, A-612 at ¶ 17; JTA-380, 662-663, 740-741, 744, 746-749.)  Neither Rosaline Joannesse, who was Ethypharm's in-

house counsel at the time,[4] nor anyone else employed at Ethypharm ever suggested to Mr. Basilio that he include Bentley as a party to the March 23, 2000 agreements or to the Letter of Purchase Undertaking.  (A-8-12; JTA-744, 749.)  No one employed at Bentley, including Mr. Murphy, ever directed, controlled, or was otherwise involved in the negotiation of the March 23, 2000 agreements or of the Letter of Purchase Undertaking.  (JTA-631, 662-663, 679, 1080-1081.)  Moreover, each of the March 23, 2000 agreements clearly states that any dispute arising out of those agreements was to be litigated in the courts of Madrid, Spain – and nobody at Ethypharm, including Ms. Joannesse, ever suggested to Mr. Basilio that he include a clause in the March 23, 2000 agreements conferring jurisdiction upon United States courts over such disputes.  (A-2, 5, 16, 20, 24, 28, 32, 36, 40, 44; JTA-678, 741, 748, 1056.)

    **B.**    **Belmac's Business Dealings With Ethypharm for the Manufacture and Sale of Omeprazole and Other Pellet Drugs Prior to March 23, 2000.**

Pursuant to an unwritten arrangement between Belmac and Ethypharm, prior to the execution of the March 23, 2000 agreements, and starting in the early 1990's, Belmac had manufactured and sold omeprazole and other pellet drugs in its Zaragoza plant for Ethypharm and its customers and for Belmac's own customers.  (A-458 at ¶ 5; A-617, 618 at ¶ 7; JTA-61-62, 72, 334, 373, 651-652, 661, 663-664, 672, 676, 739, 831, 1050.)  In particular, Belmac manufactured omeprazole under its own brand, "Belmazol," since the 1990s and marketed it to wholesalers, hospitals, and pharmacies.  (A-617, 618 at ¶ 7; JTA-61-62, 72, 831.)  This unwritten arrangement began in 1991 when Ethypharm approached Mr. Ayala, the general manager of Rimafar – before Rimafar had been purchased by Bentley's predecessor, Belmac Corporation – concerning the manufacture of pharmaceutical products, including

---

[4] Ms. Joannesse served as Ethypharm's in-house counsel from approximately 1996 or 1997 until August 2003.  (JTA-378, 709, 739.)  Her responsibilities included drafting and reviewing contracts entered into by Ethypharm.  (*Id.*)

omeprazole, lansoprazole, aspirin, vincamine and felodipine in Rimafar's Zaragoza facility using machinery and technology to be provided by Ethypharm. (A-75-83, 84-174, 345-349; JTA-60-62, 72-73, 80, 327-329, 395, 831.) Ethypharm dealt directly with Mr. Ayala in the early 1990s, and had installed its machinery for micropelletization in Rimafar's manufacturing plant in Zaragoza before Rimafar was acquired by Belmac Corporation. (A-75-174, 345-349; JTA-72, 80, 327-329, 395.) At that time, Rimafar had already applied, under the direction of Mr. Ayala, for authorization from the Spanish Ministry of Health to market omeprazole in Spain. (JTA-76, 77.)

In the 1990s, Ethypharm transferred some technical dossiers and other information which it alleges contained its trade secrets to Belmac personnel employed at the plant in Zaragoza and in the Madrid headquarters. (A-255-274; JTA-78, 345-347, 741-750.) In the mid to late 1990s, the general manager and several employees of Belmac in Spain executed confidentiality agreements with Ethypharm concerning omeprazole and/or micropellet technology which Belmac and Ethypharm had exchanged. (A-49-57, 59-68, 392.) Throughout the 1990's and early 2000's, the general managers and other employees of Belmac in Madrid and in Zaragoza, Spain, with the knowledge and approval of Ethypharm, had direct contact with some of Ethypharm's customers for omeprazole and other pellet drugs. (A-339-344, 434-436; JTA-162, 351, 651, 655, 670-672, 730, 920.) In fact, on several occasions, Ethypharm coordinated visits by several of its customers to Belmac's plant in Zaragoza, Spain. (JTA-351-352.)

Throughout the 1990s and early 2000s, the general managers of Belmac and its predecessor, Rimafar, conducted the day-to-day business,[5] communications, negotiations, and other dealings with Ethypharm and Ethypharm customers for the manufacture, marketing, and sale of omeprazole without any direction, guidance, or control from Bentley.[6] During that time period, Belmac and Ethypharm also exchanged several draft agreements, "Manifestations" and "Certifications" concerning Belmac's manufacture of omeprazole and other pellet drugs for and on behalf of Ethypharm in Spain.  (A-45-46, 75-101, 129-338; JTA-329-334, 634-635, 775.)

> **C.    Belmac, not Bentley, Owns the Technology to Manufacture the Drugs at Issue, as well as the Patents and Authorizations from the Spanish Government to Manufacture, Market, and Sell Omeprazole and Other Pellet Drugs in Spain.**

When Belmac began to manufacture omeprazole using the alleged trade secret technology it received from Ethypharm, it soon discovered that Ethypharm's technology did not work to manufacture stable omeprazole pellets.  (A-553; JTA-164, 636.)   Under the guidance of its general managers – first, Clemente Gonzalez Azpeitia and then Adolfo Herrera – and without any direction, instruction, or guidance from Mr. Murphy or from Bentley, Belmac undertook its own efforts to create a manufacturing method for producing stable omeprazole pellets.  (A-553, at ¶ 15; A-613 at ¶ 20; JTA-669, 1066-1067.)   When

---

[5] For example, all invoices pertaining to Belmac's manufacture of omeprazole and other pellet drugs for Ethypharm were issued by Belmac in Spain and paid to Belmac in Spain.  (JTA-394-395.)  Likewise, the price charged by Belmac for the manufacture of the pellet drugs, including omeprazole, and the price charged by Ethypharm to Belmac for the sale of the finished omeprazole pellets was negotiated by employees of Ethypharm and Belmac's general managers.  (A-390-391, 423-425, 429-433, 442-445; JTA-279-281.)  The agreements that arose from those negotiations were all signed by Ethypharm employees and Belmac employees.  (*Id*).  No one at Bentley, including Mr. Murphy, ever decided the prices to be charged for the manufacture and sale of omeprazole by Belmac.  (*Id*.)  Likewise, Belmac's Zaragoza plant was audited several times for quality control by Ethypharm and Ethypharm customers – and only Belmac's Spanish employees interacted with Ethypharm and its customers at such audits.  (A-371-376.)

[6]  A-1-48, 59-68, 84-101, 129-174, 255-292, 345-362, 377-382, 384-387, 390-396, 422-433, 437-445; JTA-73, 80-81, 85-86, 279-281, 327-331, 343-345, 351, 371, 394-395, 631, 633-634, 651-652, 655, 662-663, 674, 729, 745, 1036, 1039, 1053, 1059.

Belmac succeeded in developing a manufacturing process which produced stable omeprazole pellets, it conducted several clinical trials on the omeprazole – again, under the sole direction and guidance of its Spanish general managers.  (A-553 at ¶ 14; A-613 at ¶ 21.)

Under Spanish law, authorization is required from the Spanish Ministry of Health for a pharmaceutical company to manufacture and market omeprazole or any other drug in Spain.  (A-617 at ¶ 3; JTA-371.)  As a result, after Belmac developed its own technology, it once again applied for authorization to market omeprazole and other pellet drugs in Spain from the Spanish Ministry of Health, under the direction of its general managers.  (JTA-86-87, 177.)  Belmac is currently authorized by the Spanish Ministry of Health to manufacture, market and sell omeprazole and other pellet drugs in Spain.  (JTA-76-78, 86, 226-228, 371-372.)  It is undisputed that Belmac applied for these authorizations from the Spanish Ministry of Health without any direction, instruction, or guidance from Mr. Murphy or anyone else employed at Bentley.  (JTA-76-77, 177.)

Under the guidance of its general managers and without any direction, instruction, or guidance from Mr. Murphy or Bentley, Belmac also filed for and obtained Spanish patents in its own name concerning the manufacturing process for omeprazole and other pellet drugs based on the technology developed by employees of Belmac in Spain.  (A-550-551 at ¶ 7; JTA-668-669, 743, 745, 763, 1026, 1064-1065, 1068, 1070-1071, 1073, 1079-1080.)

**D.    Belmac's Termination of the March 23, 2000 Omeprazole Agreement with Ethypharm and Continued Manufacture and Sale of Omeprazole and Other Pellet Drugs in Spain.**

On November 14, 2001, Mr. Herrera sent a notice, pursuant to the terms of the March 23, 2000 Manufacturing Agreement for omeprazole, advising Ethypharm that Belmac elected not to renew the Manufacturing Agreement after its expiration on March 23, 2002.  (A-45-46; JTA-279, 388.)  On that same day, Mr. Herrera also sent a notice to Ethypharm canceling the "Letter of Purchase Undertaking."  (A-47-48.)  Mr. Herrera sent these notices under his

signature and on Belmac stationery.  (A-45-48.)  Nowhere in Mr. Herrera's notices did he refer to Bentley or indicate that Bentley was in any way involved in his decision to terminate Belmac's relationship with Ethypharm for the manufacture of omeprazole.  (*Id.*)  Mr. Herrera made the decision not to renew the Manufacturing Agreement for omeprazole and the "Letter of Purchase Undertaking" with Ethypharm without any instruction, direction, or approval from either Mr. Murphy or anyone else employed at Bentley.  (JTA-666, 668, 1059-1061, 1081.)  After Mr. Herrera decided to cancel the March 23, 2000 omeprazole contract with Ethypharm, he informed Mr. Murphy of his decision.  (JTA-666, 668, 1059-1060, 1068.)

Mr. Herrera also advised Ethypharm that Belmac intended to continue to manufacture, market and sell omeprazole pursuant to Belmac's own technology after Belmac's manufacturing contract with Ethypharm terminated on March 23, 2002, and that Belmac was willing to continue to manufacture omeprazole for Ethypharm and for Ethypharm's customers.  (A-45-46; JTA-668, 675-676, 745, 763.)

On February 21, 2002, Mr. Herrera and Fernando Berenguer of Belmac met with the two owners of Ethypharm, Mr. Debregeas and  Mr. Leduc, and with Ethypharm's in-house lawyer, Ms. Joannesse, along with Ethypharm's U.S. lawyer, Mr. Lawrence Meyer, in France.  The meeting was held at the request of Ethypharm to discuss the termination of the March 23, 2000 omeprazole agreement between Belmac and Ethypharm.  (A-437-438; JTA-383-384, 674-675, 762.)  While representatives of Belmac and Ethypharm attempted to re-negotiate an agreement at the February 21, 2002 meeting, Belmac and Ethypharm never reached a new accord.  (A-437-448; JTA-388, 674-676.)  It is undisputed that neither Mr. Murphy nor anyone else at Bentley either attended the February 21, 2002 meeting or communicated with anyone at Ethypharm following Mr. Herrera's decision to terminate Belmac's March 23, 2000 omeprazole Manufacturing Agreement.  (A-293-325, 437-448; JTA-383-384, 667-668, 674-675, 752-754, 762, 866, 1066, 1069-1070, 1083.)

Notwithstanding the absence of a new written agreement, for several months after March 23, 2002, Belmac continued to fulfill omeprazole orders for Ethypharm clients at Ethypharm's request.  (A-442-445; JTA-281, 380, 676, 767.)  By September 9, 2003, however, Ethypharm had removed all of its machinery from Belmac's plant in Zaragoza and Belmac ceased to manufacture omeprazole for Ethypharm.  (A-454-456.)  On September 9, 2003, Eric Igonet of Ethypharm France and Antonio Cabodevilla of Belmac executed a release.  (*Id*.)

Belmac continues to manufacture, market, and sell omeprazole, according to its own technology, at its plant in Zaragoza.[7]

## IV.    JIM MURPHY'S CONTACTS WITH ETHYPHARM

In the mid-1990s and in 2000, Ethypharm had periodic contacts with Mr. James Murphy, who is (and was) both the Chairman and CEO of Bentley and the President of its wholly-owned Spanish subsidiary, Belmac.  (A-175-193, 208-222, 293-325, 384-387; JTA-1017, 1029, 1032-1038, 1040-1041, 1045, 1081, 1083-1084.)  The officers and employees of Ethypharm knew that Mr. Murphy was the President of Belmac, as well as the Chairman and CEO of Belmac's "mother company," Bentley.  (A-175-193, 208-222; JTA-339, 341, 391, 393, 718-719, 754, 785, 852, 1081, 1083-1084.)  Most of Mr. Murphy's interactions with Ethypharm were either initiated by the officers of Ethypharm France to resolve specific problems in Ethypharm's relationship with Belmac or were completely unrelated to Belmac's manufacture of omeprazole and other pellet-based drugs.[8]  Ethypharm France's officers, who

---

[7] A-45-46, 454-456; A-550-551 at ¶ 17; A-553 at ¶ 15; A-613 at ¶ 20; JTA-164, 279, 380, 388, 652, 668-670, 672-673, 676, 743, 745, 763, 1026, 1064-1068, 1070-1071, 1073, 1079-1080.

[8]  A-69-74, 175-185, 208-222, 293-325, 357-358, 363-364, 371-376, 383, 397-421, 446-453; JTA-337, 340, 342, 380, 390-393, 398-399, 442-444, 453, 455, 633-634, 661-662, 667, 777, 785-786, 1031, 1034, 1042-1049, 1051-1055.

kept close control over the business of Ethypharm's Spanish subsidiary, often requested Mr. Murphy's involvement in Ethypharm's relationship with Belmac because they preferred to negotiate with Mr. Murphy, whom they perceived as an "equal," rather than with the general managers of Belmac. (JTA-313, 315, 330, 335-336, 341-342, 852.) Thus, in 1997 when Ethypharm was unhappy with Belmac's manufacturing efficiency and quality and threatened to terminate the business relationship, they contacted Mr. Murphy. (JTA-1048-1049.) And in 1999, when Ethypharm took offense at a trade publication's interview with Belmac's general manager, they complained to Mr. Murphy. (A-399.) In both of these instances Mr. Murphy responded to the immediate demand for action, and then deferred to Belmac's general manager to handle the situation.[9]

On occasion, Mr. Murphy met with Mr. Debregeas and Mr. Leduc to discuss potential collaborations between Bentley and Ethypharm, which had nothing to do with Belmac's manufacture of omeprazole for Ethypharm and which did not involve Ethypharm's Spanish subsidiary. On one occasion in 1995, for example, Mr. Murphy discussed with Mr. Debregeas the possibility of acquiring a United States company that developed transdermal products, and on another occasion in 2000 he had discussions with Mr. Leduc concerning a potential collaboration with regard to enhancement of absorption and permeation of drugs through biological membranes. (A-622 at ¶ 10.) In connection with these discussions, which were unrelated to Ethypharm's allegations of misconduct in this case, Mr. Murphy executed mutual confidentiality agreements with Ethypharm France in his capacity as CEO of Bentley, dated July 11, 1995 and April 4, 2000 respectively.[10] In contrast, Mr. Murphy never

---

[9] A-293-325, 357-58, 363-364, 371-376, 383, 397, 421, 446-453; JTA-342, 392-393, 398-399, 442-444, 453, 661-662, 667, 786, 1043-1049, 1051-1055.

[10] A-69-74; JTA-390-391, 400-401, 777, 785, 1031-1033.

executed any agreements with Ethypharm concerning Belmac's manufacture of omeprazole and other pellet drugs in Spain, either in his role as Belmac's President or in his capacity as the Chairman and CEO of Bentley.  (A-69-74; JTA-334-335, 375, 380, 390-391, 772-773, 775, 777, 779, 1084.)  More importantly, there is no evidence of a single interaction, let alone agreement, between Ethypharm and Mr. Murphy, or anyone else at Bentley, during the critical timeframe of late 2001 and 2002, when Bentley allegedly embarked on the "bold scheme" to direct Belmac to misappropriate Ethypharm trade secrets and to interfere with Ethypharm's customer relationships.  (A-293-325; JTA-631, 667-668, 752-754, 756, 866, 1066, 1069-1070, 1083.)

## V.  BENTLEY NEVER DIRECTED ANYONE AT BELMAC TO STEAL ETHYPHARM TRADE SECRETS OR TO INTERFERE WITH ETHYPHARM'S CUSTOMER RELATIONSHIPS, NOR DID BELMAC HAVE APPARENT AUTHORITY TO ACT ON BEHALF OF BENTLEY

Despite nearly a year of discovery, Ethypharm cannot point to an iota of evidence that anyone employed at Bentley, including Mr. Murphy, ever told or directed Mr. Herrera or any other Belmac general manager to steal Ethypharm trade secrets or to continue to sell omeprazole or other pellet drugs to Ethypharm clients after the manufacturing agreement expired on March 23, 2002.  (JTA-87, 180, 631, 673, 1074.)  Neither Mr. Herrera nor any other Belmac general manager was ever directed or instructed by either Mr. Murphy or anyone else employed at Bentley concerning what technology Belmac should use to manufacture omeprazole in Spain.  (JTA-87, 180.)  Belmac's general managers, including Mr. Herrera, ran the day-to-day operations of the company and never sought or received any authorization, guidance, direction or instructions from Bentley, its predecessor Belmac Corporation, or from Mr. Murphy concerning Belmac's negotiations, agreements, or other

dealings with Ethypharm for the manufacture of omeprazole or other pellet drugs in Spain.[11] Bentley never authorized anyone at Belmac to act on behalf of Bentley, or to serve as Bentley's agent, in Belmac's agreements, negotiations, dealings, relationship and interactions with Ethypharm for the manufacture, marketing, and sale of omeprazole and other pellet drugs in Spain.  (A-556 at ¶ 24; A-612 at ¶ 16; JTA-86, 179-180, 679.)

Moreover, the officers and employees of Ethypharm were well aware that Belmac was a subsidiary of Bentley.[12]  (A-608-69 at ¶ 5; JTA-86, 718.)  No one at Bentley or Belmac ever told anyone at Ethypharm that anyone at Belmac had the authority to bind Bentley in Belmac's agreements, negotiations, dealings, and relationship with Ethypharm for the manufacture, marketing, and sale of omeprazole and other pellet drugs in Spain.  (JTA-335, 339, 342, 402, 679, 754, 779, 1082.)  No one at Ethypharm ever thought that the general managers of Belmac, including Mr. Herrera, had the power to bind Bentley in Belmac's negotiations, agreements, or other dealings with Ethypharm for the manufacture of omeprazole or other pellet drugs in Spain.  (JTA-87, 330.)  Moreover, no one at Bentley, including Mr. Murphy, ever told anyone at Ethypharm that Bentley would guarantee any of Belmac's obligations toward Ethypharm.  (JTA-779.)

---

[11]  A-365-370; A-551 at ¶¶ 8, 12, 20, 23; A-554 at ¶ 20; A-610 at ¶ 11; A-612-613; JTA-73, 86-87, 105, 122-123, 177-178, 330, 630-631, 656, 662, 665-666, 679, 1036, 1046.

[12]  Gerard Leduc, for example, Ethypharm France's General Manager until 2003 and current President and CEO, had his own law practice for six or seven years, and understood that Belmac was Bentley's wholly-owned subsidiary (JTA-828-830.)  On a number of draft agreements, prepared by both Belmac and Ethypharm, Mr. Murphy's name appears as the "Executive Director" or "President" of Laboratorios Belmac, S.A.  (A-194, 296.)

**VI.    ETHYPHARM HAS ALREADY AVAILED ITSELF OF AN ALTERNATIVE – AND MUCH MORE APPROPRIATE – FORUM IN WHICH TO RESOLVE ITS DISPUTE WITH BELMAC**

Ethypharm has commenced legal proceedings against Belmac in the Mercantile Court of Madrid, Spain (the "Spanish Lawsuit") over the same allegedly wrongful conduct that underlies the case at bar.  (A-508 at ¶ 4; JTA-726-727, 743, 746.)  Ethypharm's Spanish Lawsuit alleges that Belmac's continued manufacture of omeprazole in Spain since March 2002 infringes upon Ethypharm's Spanish patent (ES9301319) for omeprazole.  (*Id.*)  The Madrid Court not only has jurisdiction over the controversy between those two Spanish companies, but it is a much more appropriate forum than this Court to resolve issues concerning conduct which took place in Spain and which involves a Spanish contract, Spanish patents,[13] Spanish companies, Spanish witnesses and Spanish documents.

---

[13] One of the central elements of Ethypharm's claim for misappropriation of trade secrets is whether the alleged trade secrets – which Ethypharm has steadfastly refused to identify with any particularity during the nearly two years in which this case has been pending – are indeed secret.  If Bentley's Motion for Summary Judgment under Rule 19 is not granted and the merits of this case are reached, Bentley will be forced to ask this Court to determine, under Spanish patent law, whether the claims of Ethypharm's or Belmac's Spanish Patents encompass the alleged trade secrets and are therefore in the public domain.

## **ARGUMENT**

Where, as here, the non-moving party has the burden of proof at trial, a motion for summary judgment must be granted unless the non-moving party can come forward with evidence which could be the basis for a reasonable juror's finding in that party's favor. *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 264 (D. Del. 1989). To survive a summary judgment motion, the non-moving party must do more than show "some metaphysical doubt as to the material facts." *Jurimex Kommerz Transit G.M.B.H. et al v. Case Corp.*, No. Civ. A. 00-83-JJF, 2006 WL 1995128, at *3 (D. Del. July 17, 2006) (hereinafter, "*Jurimex III*"). Instead, the non-moving party must cite to specific facts demonstrating that there is a genuine issue for the finder of fact to resolve. *Id.* The mere existence of some evidence in support of the non-movant will not suffice to support a denial of a motion for summary judgment; rather, there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue. *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). Mere speculation does not constitute evidence sufficient to withstand summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Messina v. E.I. DuPont de Nemours & Co.*, 308 F. Supp. 2d 491, 495 n. 10 (D. Del. 2004).

In order to create jurisdiction where it would not otherwise exist, Ethypharm complains about Belmac's behavior and then attempts to attribute Belmac's alleged misconduct to its parent in the United States. Ethypharm has sued only Bentley despite the overwhelming evidence that Belmac is independent from Bentley and that it is Belmac's, not Bentley's, actions that are at issue: (1) Belmac, not Bentley, was the signatory to the executed agreements with Ethypharm concerning the production of omeprazole and other pellet drugs, including any confidentiality and nondisclosure agreements (A-1-44; JTA-215-219, 379-380, 662-663, 739, 740-741, 746, 749, 1056); (2) only Belmac's representatives negotiated the agreements signed by Belmac and Ethypharm (JTA-217-221, 223-224, 631, 662-664, 678-

679, 1056, 1080-1081); (3) Ethypharm installed its equipment in Belmac's plant in Zaragoza, Spain, and never installed any equipment in any Bentley facility in the United States (A-75-174, 345-349; JTA-72, 80, 327-329, 333, 395, 861); (4) Belmac, not Bentley, received the protocols and technical documentation which contain Ethypharm's alleged trade secrets (A-255-274; JTA-78, 345-347, 736, 747, 749-750, 919); (5) Belmac manufactured and marketed omeprazole and other pellet drugs in its facility in Zaragoza, Spain with its own funds, technicians and technology, and continues to do so (A-598-606; JTA-380, 670, 672-673, 676, 769); (6) Belmac applied for and obtained Spanish patents in its own name concerning omeprazole and other pellet drugs (JTA-668-669, 743, 745, 763, 1026, 1064-1065, 1070-1071, 1079-1080); (7) Belmac, not Bentley, obtained the requisite authorizations from the Spanish Ministry of Health to manufacture and market omeprazole and other pellet drugs in Spain (A-621 at ¶ 5; JTA-76-78, 86, 226-229, 371-372, 771); and (8) Belmac, not Bentley, sold and continues to sell omeprazole to a few former Ethypharm customers and is allegedly wrongfully interfering with Ethypharm's business relationships (JTA-372, 651, 669, 721, 769-770, 773, 917).

As this Court has already held, Belmac cannot be joined in this action and this action would be dismissed on summary judgment if, after an opportunity to conduct discovery, Ethypharm fails to find evidence from which a reasonable juror could conclude that Belmac was an agent of Bentley when, "in late 2001 or early 2002," it allegedly embarked on a bold scheme to misappropriate Ethypharm trade secrets and to interfere with Ethypharm's customer relationships. A-495-496, 500; A-457 at ¶ 1; A-461 at ¶ 15; A-475 at ¶ 89; *Mobil Oil Corp.*, 718 F.Supp. at 271-72. Because Ethypharm has failed to produce any such evidence after nearly a year of discovery, Bentley is now entitled to summary judgment. *See* A-495-496, 500; *Jurimex III*, 2006 WL 1995128, at * 3 n.1 (deciding that where the parties had the opportunity to conduct discovery on agency and plaintiffs failed to put forward any

evidence of such a relationship, summary judgment should be granted and the case dismissed).

**I.    BELMAC DID NOT HAVE ACTUAL AUTHORITY TO BIND BENTLEY WHEN IT ALLEGEDLY MISAPPROPRIATED ETHYPHARM'S TRADE SECRETS AND INTERFERED WITH ETHYPHARM'S CONTRACTUAL RELATIONS IN LATE 2001 OR EARLY 2002**

Ethypharm has failed to adduce even a scintilla of evidence that "in late 2001 or early 2002," Bentley directed Belmac to misappropriate Ethypharm's alleged trade secrets or to interfere with Ethypharm's alleged customer relationships.  Under the agency theory, a parent corporation will not be held liable for the obligations of its subsidiary in the absence of evidence that the parent company dominated and directed the *specific conduct* of its subsidiary which is *at issue* in the case.[14]  *See Jurimex III,* 2006 WL 1995128, at *3; *C.R. Bard Inc. v. Guidant Corp. et. al*, 997 F. Supp. 556, 560 (D. Del. 1998) (quoting *Mobil Oil*, 718 F. Supp. at 271); *Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil, Inc.,* 456 F. Supp. 831, 838-39, 841 (D. Del. 1978).  To determine whether the requisite domination or control exists, "a court should focus its inquiry on the arrangement between the parent and the subsidiary, the authority given in that arrangement, and the relevance of that arrangement to the plaintiff's claim [of wrongdoing]."  *C.R. Bard Inc.*, 997 F. Supp. at 560.  It is undisputed that the conduct "at issue" in this case is Belmac's alleged misappropriation of Ethypharm trade secrets and alleged interference with Ethypharm's customer relationships "in late 2001 or early 2002."  (A-476 at ¶ 88; A-485 at ¶ 135.)  Ethypharm has failed to find any evidence

---

[14] While a parent corporation will also be held liable for the actions of a subsidiary which amounts to nothing other than its "alter ego," Ethypharm would be hard-pressed to argue that it has any evidence that would even come close to meeting that stringent standard.  Courts have found parent corporations liable under an "alter ego" theory only where there is substantial proof of complete inattention to corporate formalities which leads to fraud, injustice, or abuse in the use of the corporate form.  *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484-85 (3d Cir. 2001); *C.R. Bard Inc. v. Guidant Corp. & Advanced Cardiovascular Sys., Inc.*, 997 F. Supp. 556, 559 (D. Del. 1998).  As this Court correctly noted in its Memorandum Opinion of September 2005, Ethypharm does not allege an alter ego theory. (A-498.)

from which a reasonable juror could conclude that Belmac was Bentley's actual agent when it allegedly engaged in such conduct.

>    **A.    Extensive Discovery Confirmed That Belmac Is a Separate and Distinct Corporate Entity Whose Activities Pertinent to the Underlying Cause of Action Were Not Controlled by Bentley.**

The undisputed facts show that Belmac is an independent subsidiary that runs its own day-to-day business and is not dominated or controlled by Bentley. As this Court noted in its Memorandum Opinion on Bentley's Motion to Dismiss, some level of oversight is expected of any parent corporation in the United States. (A-499.) Sorely missing, however, is any evidence that Bentley assumed a controlling role over the aspects of Belmac's business that are pertinent to the two surviving counts of Ethypharm's Complaint.

Bentley does not, and did not, "completely dominate or control" the actions of Belmac with regard to the more generalized factors which can evidence dominion and control: financing, responsibility for day to day operations, arrangements for payment of salaries and expenses, and origin of subsidiary's business and assets. *See Japan Petroleum Co.*, 456 F. Supp. at 841, 845 (noting that control must be actual, participatory, and total). Belmac's general manager has had broad responsibilities, including the power to negotiate and sign contracts, which were delegated to him by the Belmac board of directors.[15] (JTA-630-632, 679, 1021.) Belmac has its own board of directors, in which Mr. Murphy and Mr. Price serve alongside Mr. Herrera. (JTA-628, 1019-1020, 1030, 1116, 1118-1119, 1122.) Belmac maintains its own separate accounting records; hires, fires, and pays its own employees; maintains its own bank accounts; and is funded by its own operations, not by Bentley. (A-549 at ¶¶ 3-4; A-551 at ¶ 9; A-617 at ¶ 5; JTA-118, 665, 667, 1017.) Belmac

---

[15] Indeed, Mr. Herrera testified that during his term as general manager at Belmac he has negotiated and executed between 300-400 contracts with companies other than Ethypharm, and has never requested permission from Mr. Murphy before negotiating or signing any of them. (JTA-679.)

runs its own day-to-day business in Spain without any direction or control from its parent company. (A-550 at ¶ 5; A-551 at ¶ 8; A-612 at ¶ 16; JTA-86, 105, 630-632, 665, 1046-1047.) Indeed, Bentley would be hard-pressed to provide guidance to Belmac's general managers, as Belmac's products are distinct from those developed and marketed by Bentley, and Bentley lacks any experience in the manufacture and marketing of omeprazole or the other pellet drugs produced by Belmac in Spain. (A-608 at ¶¶ 3-4; JTA-333, 352, 372, 917, 1027.) Under similar facts and circumstances this Court has granted summary judgment on the absence of an agency relationship. *See Japan Petroleum Co.*, 456 F. Supp. at 841 (when a subsidiary is otherwise independent, "the fact that a parent and a subsidiary have common officers and directors [does not] necessarily indicate an [] agency relationship.").

More importantly, Bentley did not dominate or direct the portions of Belmac's business that pertain to the remaining counts of Ethypharm's complaint. *See Phoenix Canada Oil Co. v. Texaco, Inc.*, 842 F.2d 1466, 1478 (3d Cir. 1988) (agency inquiry must focus on the relationship between the parent and subsidiary as it bears on the *particular cause of action*). In order to manufacture, market, and sell omeprazole and the other pellet drugs at issue in this case, Belmac had to: obtain authorizations from the Spanish Ministry of Health; operate its own manufacturing facility in Zaragoza; develop its own process to manufacture stable gallenic (organic) omeprazole micropellets; seek and receive patents concerning omeprazole and other pellet drugs in its own name; and negotiate and enter into third-party agreements with its own customers and, later, some former customers of Ethypharm. (A-339-344, 434-436, 551, A-617 at ¶ 3; JTA-76-78, 86, 104, 162, 226-228, 327-328, 331, 371-372, 651, 655, 670-672, 730, 1079.) It is undisputed that Belmac undertook each of these activities under the direction of its general managers and without any direction, control, instructions or guidance from either Mr. Murphy or anyone else employed at Bentley. (JTA-76-77, 177.) It is likewise undisputed that Bentley lacks the experience, facilities, patents, or

authorizations from the Spanish Ministry of Health to manufacture omeprazole and other pellet drugs in Spain.[16]  (A-550-551 at ¶ 7; A-553 at ¶ 15; A-613 at ¶ 20; JTA-76-77, 169, 177, 652, 668-669, 1026, 1064-1068, 1070-1071, 1073.)

        The above facts render this case remarkably similar to precedents in which this Court has held that plaintiffs failed to garner sufficient evidence of agency to withstand summary judgment on the issue of agency and the failure to join an indispensable party.  In *Japan Petroleum*, whose teachings were reaffirmed by this Court a mere two months ago,[17] the Court granted summary judgment to the parent corporation and dismissed the case for failure to join the subsidiary under Rule 19.  456 F.Supp. at 847-48.  In that case, the parent company had overlapping officers and directors with the subsidiary who were directly involved in signing agreements relevant to the dispute, had incorporated the subsidiary for the very purpose of engaging in the transaction at issue and to pursue its worldwide corporate strategy, and financed the operations of the subsidiary.  *Id.* at 834-35, 841-43.  The Court nevertheless held that the subsidiary was not an agent of the parent because the subsidiary owned the requisite government authorizations to engage in the conduct at issue and it was the subsidiary, and not the parent, who had rights and obligations under the contract at issue. *Id.* at 843-44.

---

[16] For instance, when Mr. Debregeas, Ethypharm's CEO and Chairman until 2005, was asked whether Bentley was in the business of manufacturing micropellets, whether it had any experience in manufacturing micropellets or microgranules, or whether it had any equipment capable of manufacturing micropellets, he replied, unequivocally, "No."  (JTA-333.)

[17] In *Jurimex III,* 2006 WL 1995128 (Farnan, J.), this Court relied on *Japan Petroleum* in granting summary judgment for failure to garner evidence from which a reasonable jury could find that a subsidiary was the actual or apparent agent of the parent corporation.  *Jurimex III* was on remand from the Third Circuit opinion, 65 Fed. Appx. 803, upon which Ethypharm heavily relied in its Opposition to Bentley's Motion to Dismiss.

Bentley exerted far less control over Belmac than the parent in *Japan Petroleum* had over its subsidiary. Unlike the parent in *Japan Petroleum*, Bentley did not incorporate Belmac for the purposes of entering into business dealings with Ethypharm – Rimafar had begun its arrangement with Ethypharm to manufacture and market omeprazole and other pellet drugs even before it was purchased by Bentley's predecessor. More importantly, like the subsidiary in *Japan Petroleum*, it was Belmac, not Bentley, that had the rights and obligations under the March 23, 2000 contracts. Likewise, it is Belmac, not Bentley, which has the requisite authorizations from the Spanish Ministry of Health to manufacture and market omeprazole and the other pellet drugs at issue. To survive summary judgment under such circumstances, Ethypharm must effectively convince this Court to disregard the teachings of *Japan Petroleum*, even though this Court reaffirmed that opinion a mere two months ago. *See Jurimex III*, 2006 WL 1995128, at * 3-4.

**B.    There is No Evidence That Bentley Directed or Controlled Belmac's Conduct When in Late 2001 or Early 2002 Belmac Allegedly Misappropriated Ethypharm's Trade Secrets or Interfered with Ethypharm's Customer Relationships.**

Fatal to Ethypharm's agency theory is its failure to adduce any evidence that, "in late 2001 and early 2002," Belmac was acting as Bentley's agent when it allegedly embarked on a scheme to misappropriate Ethypharm trade secrets and to interfere with Ethypharm's customer relationships. Both this Court and the United States Court of Appeals for the Third Circuit have repeatedly emphasized that, to hold a parent company liable under an agency theory, plaintiffs must show that the parent "directed the *specific actions* of the alleged agent . . . which resulted in [the allegedly infringing conduct]." *E.g., Mobil Oil Corp.*, 718 F.Supp. at 272; *see Phoenix Canada Oil Co.*, 842 F.2d at 1478. There is no evidence that Belmac had actual authority to act as Bentley's agent when it allegedly embarked on such a scheme in late 2001 or early 2002.

The undisputed record shows that Belmac undertook each action relevant to the alleged scheme under the direction of its Spanish general manager, Mr. Herrera, without any direction, instruction, and guidance from Bentley and without any actual authority to act on Bentley's behalf.  (A-550-551 at ¶ 7; A-556 at ¶ 29; A-559 at ¶ 20; A-612 at ¶ 17; JTA-76-77, 177, 179-180, 631, 656, 662-663, 666, 679, 1065, 1068, 1073, 1080-1081.)  Belmac, not Bentley, executed and had rights and obligations under the March 23, 2000 agreements with Ethypharm for the manufacture of omeprazole and other pellet drugs, which agreements were negotiated exclusively by Mr. Herrera and Mr. Basilio in Spain.  (A-1-44, A-554-555 at ¶¶ 18-22; A-612 at ¶ 17; JTA-215-219, 379-380, 662-663, 739, 746-747, 749, 1056.)  The termination of the March 23, 2000 omeprazole agreement in "late 2001 and early 2002" is a centerpiece of Ethypharm's allegations in the two surviving counts of its Complaint.  (A-457 at ¶ 1; A-461 at ¶ 15; A-475 at ¶ 84; A-485 at ¶ 135.)  Belmac, not Bentley, executed the Manufacturing Agreement and Letter of Purchase Undertaking with Ethypharm on March 23, 2000 which governed Belmac's purchase of omeprazole pellets – as Ethypharm's biggest customer – in late 2001 and early 2002.[18]  (A-8-12; JTA-217, 377, 662, 719.)  It was Mr. Herrera, not anyone from Bentley, who sent two notices to Ethypharm, on Belmac stationery, indicating his decision not to renew Belmac's Manufacturing Agreement for omeprazole and Letter of Purchase Undertaking with Ethypharm.  (A-45-48.)  Mr. Herrera neither took any direction from Bentley or Mr. Murphy, nor had the actual authority to act as Bentley's agent with regard to any of these steps.  (A-556 at ¶ 24; A-612 at ¶¶ 16-17; JTA-86, 179-180, 666, 679, 1061, 1081.) [19]

---

[18] Belmac manufactured omeprazole pellets for Ethypharm and Ethypharm customers, but it was also Ethypharm's largest customer for omeprazole in Spain.

[19] For example, when asked about the negotiations of the March 23, 2000 agreements, Mr. Herrera responded "it was a direct relationship between two general managers of two Spanish companies, and the

(continued)

Moreover, in late 2001 and early 2002, it was Belmac which was in possession of the technical protocols and dossiers which allegedly contained Ethypharm's trade secrets. (A-255-274; JTA-78, 345-347, 749-750.) In late 2001 and early 2002, Belmac was applying for patents in its own name, under the direction of its general manager, concerning the technology that Belmac's employees in Zaragoza had developed in order to manufacture stable omeprazole and other pellet drugs. (A-550-551 at ¶ 7; JTA-668-669, 743, 745, 763, 1026, 1064-1065, 1068, 1070-1071, 1073, 1079-1080.) Belmac manufactured, marketed, and sold omeprazole in its facility in Zaragoza, Spain with its own funds – and continues to do so. (JTA-380, 670, 672-673, 676.) Under the direction of its general manager, Belmac had sought and attained authorization from the Spanish Ministry of Health to manufacture and market omeprazole. (JTA-76-78, 86-87, 177, 226-228, 371-372.) Further, only Belmac, and not Bentley, had the ability to obtain a "free sales certificate" to export omeprazole to Ethypharm customers outside of Spain.[20] (JTA-232.) Belmac invoiced Ethypharm for the omeprazole and other pellet drugs which it manufactured for Ethypharm and Ethypharm clients, and Belmac handled all the day-to-day business with Ethypharm concerning the production and sale of those drugs. (JTA-394-395, 729, 745.) Belmac was in possession of Ethypharm's equipment which it allegedly used to further its bold scheme in late 2001 and early 2002. (A-454-456; JTA-771.) Since late 2001 or early 2002, Belmac has continued to

_____

(continued)

contracts were signed according to the law and courts." (JTA-663.) When asked if he had discussed the March 23, 2000 agreements with Mr. Murphy during March of 2000, Mr. Herrera responded "No." (*Id.*) Mr. Herrera later explained that "[t]hese documents were negotiated and signed directly from me with Mr. Basilio. *After* they were signed, during my usual conversation with my president, the president of Belmac, I explained to him that I have signed a manufacturing contract and a supply contract." (*Id.*; emphasis added.)

[20] When asked if Bentley had such authorizations from the Spanish government, the general manager of Ethypharm Spain, Mr. Basilio, responded, "No. It would be absurd." (JTA-232.)

sell omeprazole and other pellet drugs, using its own technology, to its own customers and, after March 23, 2002, to some former customers of Ethypharm in alleged infringement of Ethypharm rights.  (JTA-380, 670, 672-673, 676, 769.)  Once again, the undisputed record shows that Belmac was acting under the direction and leadership of Mr. Herrera, who neither took any direction from Bentley or Mr. Murphy, nor had the actual authority to act as Bentley's agent with regard to any of these facts.[21]  (JTA-87, 156-157, 159-160, 180, 631, 673, 1074.)  Under such circumstances, no reasonable juror could conclude that Belmac was acting as Bentley's actual agent when it allegedly embarked on the bold scheme to infringe upon Ethypharm's rights in late 2001 or early 2002.  *See, e.g., C.R. Bard, Inc.*, 997 F.Supp. at 561 (subsidiary who controlled relevant production activities and day-to-day business is not an agent of parent); *Japan Petroleum Co.*, 456 F.Supp. at 841, 843-44 (no agency relationship where foreign subsidiary, and not the parent, had the local government authorizations which gave it the power to engage in the allegedly wrongful conduct, sold the product at issue, and had the rights and obligations under the pertinent contract).

Moreover, the mere fact that Mr. Murphy had some attenuated and sporadic interactions with Ethypharm representatives in the 1990s and in 2000 does not suffice to create a genuine issue of material fact with regard to actual agency.  First, it is undisputed that Mr. Murphy had no interactions with Ethypharm in late 2001 and early 2002 – the timeframe Ethypharm identifies in the Complaint as the time when Belmac allegedly embarked on its scheme to misappropriate Ethypharm trade secrets and to interfere with Ethypharm's customer relationships.  (A-457 at ¶ 1; A-461 at ¶ 15; A-475 at ¶ 84.)  Most of

---

[21] For example, when asked if he "discussed [Belmac's research and development of omeprazole technology] with Mr. Murphy," Mr. Herrera responded that "what I informed him was that we were developing our own formulations."   (JTA-669.)

Mr. Murphy's interactions with Ethypharm occurred in the 1990s, several years before Belmac allegedly embarked on its scheme to misappropriate Ethypharm trade secrets. (A-186-193, 208-222; JTA-1032-1038, 1040-1041, 1045.) The last meeting Ethypharm can point to between Mr. Murphy and anyone at Ethypharm occurred almost a full year prior to Mr. Herrera's cancellation of Belmac's manufacturing agreement with Ethypharm in late 2001.[22] *Even if* Mr. Murphy had interacted with Ethypharm as a representative of Bentley concerning Belmac's manufacture of omeprazole and other pellet drugs – which he did not – the above facts would still not suffice to meet the requirement that Bentley directed the *specific actions* of Belmac that resulted in the misappropriation of Ethypharm trade secrets and interference with Ethypharm customer relationships in late 2001 and early 2002. *Phoenix Canada Oil Co.*, 842 F.2d at 1478; *see also C.R. Bard Inc.*, 997 F. Supp. at 560 ("only the *precise conduct* shown to be instigated by the parent is attributed to the parent.") (quotations omitted and emphasis added).

Second, this Court has found that sporadic interactions with persons who hold positions at both the parent and the subsidiary to be insufficient, in light of other factors, to hold the parent liable for the actions of its subsidiary. *See Jurimex III*, 2006 WL 1995128, at *4; *Japan Petroleum*, 456 F. Supp. at 842-48. This is particularly true here, where Mr. Murphy's contacts with Ethypharm, most of which occurred several years before the alleged misconduct took place, fall far short of the type of evidence of "actual, participatory, and total" control by the parent company which is necessary for a reasonable fact finder to conclude that the "precise conduct" at issue was "instigated by the parent." *C.R. Bard Inc.*, 997 F. Supp. at 560; *Japan Petroleum*, 456 F.Supp. at 841. Moreover, as discussed in more

---

[22] That meeting took place on November 22, 2000 in St. Cloud, France and was attended by Mr. Murphy, Mr. Herrera, and Ethypharm representatives. (JTA-255-256.)

detail *infra*, many of Mr. Murphy's interactions with Ethypharm in the 1990s and in 2000 were unrelated to Belmac's manufacture, marketing, and sale of omeprazole and other pellet drugs. (A-69-74; JTA-390-391, 400-401, 777, 785, 1031-1033.)

  **C. Bentley Never Granted Belmac Authority to Act as Its Agent In Its Dealings With Ethypharm.**

  Ethypharm cannot point to a shred of evidence that Bentley ever granted Mr. Herrera or anyone else at Belmac the authority to act on its behalf with respect to Belmac's allegedly infringing conduct. (A-365-370; JTA-73, 86-87, 122-123, 180, 631, 673, 1036, 1074.) It is axiomatic that "only the precise conduct shown to be instigated by the parent," which pertains to the precise infringing acts at issue, "is attributed to the parent." *C.R. Bard Inc.*, 997 F. Supp. at 560 (quotations omitted). Here, Bentley never authorized Belmac, either verbally or in writing, to act on Bentley's behalf when it allegedly misappropriated Ethypharm trade secrets and interfered with Ethypharm customer relationships in late 2001 and early 2002. (JTA-87, 180.) Indeed, Belmac had no authority to act as Bentley's agent in any of its dealings with Ethypharm concerning the manufacture, marketing, and sale of omeprazole and other pellet drugs. (A-365-370; JTA-73, 86-87, 122-123, 330, 1036.) Because Belmac lacked actual authority to bind Bentley with regard to the allegedly infringing conduct at issue, Ethypharm's theory of actual agency fails as a matter of law. *Jurimex III*, 2006 WL 1995128, at *3 (no reasonable jury can find actual authority to bind parent where there is no written or oral record of such authorization being granted by the parent to the subsidiary with regard to the specific allegedly wrongful conduct at issue).

## II. NO REASONABLE JURY COULD CONCLUDE THAT BELMAC WAS CLOAKED WITH THE APPARENT AUTHORITY OF BENTLEY WHEN IT ENGAGED IN THE ALLEGEDLY WRONGFUL CONDUCT IN LATE 2001 OR EARLY 2002

No jury could reasonably find that Belmac had the apparent authority to act on Bentley's behalf when it allegedly misappropriated Ethypharm's trade secrets and interfered with Ethypharm customer relationships in late 2001 and early 2002. In order to hold a parent company liable for the actions of its subsidiary on the basis of apparent agency, a litigant must show: (1) reliance on the indicia of authority *originated by the principal*; and (2) that such reliance was reasonable. *Billops v. Magness Constr. Co.*, 391 A.2d 196, 198 (Del. 1978); *Jurimex III*, 2006 WL 1995128 at *3. Ethypharm cannot establish either of these elements as a matter of law.

### A. Bentley Did Not Provide the Requisite Indicia of Apparent authority to Ethypharm

This Court has held that in order to establish an agency relationship by apparent authority, "Plaintiffs must point to words or actions *of the principal*" demonstrating that the subsidiary had apparent authority to take the "acts 'relevant to the plaintiff's claim of wrongdoing.'" *Jurimex III*, 2006 WL 1995128 at *4 (emphasis in original); *accord Taylor v. Peoples Natural Gas Co.*, 49 F.3d 982, 989 (3d Cir. 1995) (applying the same rule under federal common law). Acts or representations of the alleged *agent* are insufficient to establish apparent agency. *See Finnegan Constr. Co. v. Robino-Ladd Co.*, 354 A.2d 142, 144 (Del. 1976); *In re Elonex Phase II Power Mgmt. Litig.*, 2002 WL 433614 at *5 (D. Del. 2002). Therefore, the apparent agency analysis in this case hinges on whether Bentley, through its words or actions, gave Ethypharm reasonable cause to believe that Belmac was taking the actions enumerated in the preceding section (Argument, Section I.B.) in

furtherance of the alleged "bold scheme" on behalf of Bentley.[23]  The record is devoid of any

such evidence.

> 1.    **Ethypharm had no contact with anyone at Bentley in late 2001 or early 2002, and therefore can point to no words or actions by Bentley conferring apparent authority upon Belmac with regard to the allegedly infringing conduct.**

As detailed in Section I.B. above, every single action cited by plaintiffs as seminal to

Belmac's alleged misappropriation of Ethypharm trade secrets and interference with

Ethypharm customer relationships in late 2001 and early 2002 was taken by or under the

direction of Mr. Herrera.  Ethypharm cannot point to a single word or action by anyone at

Bentley at *any* time – including Mr. Murphy – that indicated to anyone at Ethypharm that the

allegedly unlawful conduct by Mr. Herrera or anyone else at Belmac was taken on behalf of

Bentley, or that Belmac otherwise had power to bind Bentley in Belmac's dealings with

Ethypharm.  (JTA-335, 339, 342, 402, 679, 754, 779, 1082.)  This undisputed fact alone

torpedoes any Ethypharm claim of apparent agency.

Furthermore, it is undisputed that no one at Bentley, not even Mr. Murphy, had *any*

contacts with anyone from Ethypharm during the time period when Belmac allegedly

embarked on the scheme to misappropriate Ethypharm trade secrets and interfered with

Ethypharm's customer relationships.  (JTA-756.)  The last meeting evidenced between

anyone employed at Bentley and Ethypharm occurred in November 22, 2000, when Mr.

Murphy, who was also President of Belmac, met with representatives of Ethypharm and

Belmac in France.  (JTA-906-907.)  This last meeting occurred nearly a year before the

alleged scheme began.  (A-461 at ¶ 15; A-475 at ¶ 84; A-485 at ¶ 135.)  Likewise, the last

---

[23] Under the principles of apparent agency established in *Jurimex III*, actions by Bentley that do *not* concern Belmac's manufacture, marketing and sale of omeprazole or other pellet drugs in late 2001 or early 2002 are irrelevant to the apparent authority analysis.  *See* 2006 WL 1995128 at *4.

written communication concerning Belmac's manufacture of omeprazole and other pellet drugs between anyone employed at Bentley and Ethypharm was sent *by Ethypharm* to Mr. Murphy on June 8, 2001[24] – again, months before the alleged scheme was initiated.  (A-293-325.)  Ethypharm can point to no phone call, e-mail, meeting or other contact between anyone at Ethypharm and anyone employed at Bentley during the time period when the alleged scheme occurred.   This complete lack of any contact with anyone at Bentley forecloses the possibility that Ethypharm can point to any words or actions *of the principal* which would cause Ethypharm to believe that Belmac was acting for Bentley when it allegedly took the "acts 'relevant to the plaintiff's claim of wrongdoing'." *Jurimex III*, 2006 WL 1995128 at *4 (emphasis in original).

In addition, the absence of any communication by or with Bentley underscores that Belmac, not Bentley, was dealing with Ethypharm in the running of its business of manufacturing omeprazole and other pellet drugs in Spain.

### 2.    Mr. Murphy's Attenuated Interactions with Ethypharm fail to demonstrate that Belmac had apparent authority to bind Bentley with regard to the allegedly infringing conduct.

Nor can Ethypharm create a genuine issue of material fact concerning apparent agency by pointing to Mr. Murphy's sporadic interactions with Ethypharm in the 1990s and in 2000.  First, Ethypharm's own witnesses admitted, and it is undisputed, that in all of Mr.

---

[24] On that date, Ethypharm sent Mr. Murphy a draft contract prepared by Ms. Joannesse, Ethypharm's in-house counsel, at the direction of Mr. Leduc, the General Manager of Ethypharm France.  (A-293-325; JTA-667-668, 752-754, 866, 1066, 1069-1070, 1083.)   Ms. Joannesse admitted that, when she drafted that agreement, she knew that Mr. Murphy was both the President or "Executive Director" of Belmac and the Chairman and CEO of Bentley. (JTA-339, 341, 391, 393, 718-719, 754, 852, 1081.)  The June 2001 draft contract was between *Belmac* and Ethypharm Spain and concerned *Belmac's* manufacture of omeprazole and other pellet drugs for Ethypharm.  Most tellingly, the draft agreement had a signature block for Mr. Murphy to sign as the "Executive Director" of *Belmac*, not Bentley.  (A-296; 321.)  Mr. Murphy never responded to this draft, and instead sent it to Mr. Herrera, who was in charge of Belmac and its dealings with Ethypharm, without any instructions on what Mr. Herrera should do with it.  (JTA-631.)

Murphy's attenuated interactions with Ethypharm he never uttered any words or otherwise created the impression that Mr. Herrera or anyone working under Mr. Herrera at Belmac had the apparent authority to bind Bentley in *any* of Belmac's dealings with Ethypharm.  (JTA-87, 330, 335, 339, 342, 402, 679, 754, 779, 1082.)  This undisputed fact alone is fatal, as a matter of law, to any claim by Ethypharm of apparent agency because, as described in Section I.B. above, Belmac engaged in each act relevant to the allegedly wrongful scheme under the direction of Mr. Herrera.

Faced with this reality, Ethypharm is left only with the argument that *Mr. Murphy* was cloaked with the authority of Bentley and, in his attenuated interactions with Ethypharm, he somehow created an aura that, years later, cloaked *Belmac* and its general manager with the apparent authority to bind Bentley with respect to Belmac's alleged tortious conduct. Stated another way, Ethypharm must argue that because Jim Murphy was both the CEO of Bentley and the President of Belmac, and because on occasion he acted on behalf of Belmac, whatever actions Belmac allegedly took in furtherance of the alleged scheme must have been on behalf of Bentley, even in the absence of any direction or involvement by Bentley in those actions.  This theory is so far-fetched that no reasonable jury could possibly find that such apparent authority existed.

First, it is undisputed that many of Mr. Murphy's interactions with Ethypharm in the 1990s and in 2000 were not even *related* to Belmac's manufacture, marketing, and sale of omeprazole and other pellet drugs on behalf of Ethypharm–they instead pertained to the potential purchase of a U.S. Company and to potential joint ventures concerning transdermal drug delivery technology.  (A-69-74; JTA-390-391, 400-401, 777, 785, 1031-1033.)  Such unrelated transactions are insufficient, as a matter of law, to create apparent authority with regard to the matters at issue in this case.  *Jurimex III*, 2006 WL 1995128, at *4.  Second, in those instances in which Mr. Murphy discussed Belmac's manufacture, marketing, and sale

of omeprazole and other pellet drugs with Ethypharm,[25] Ethypharm was well aware that Mr. Murphy was Belmac's President, as evidenced by Ethypharm's references to Mr. Murphy as "Executive Director" of Belmac. (A-175-193, 208-222, 293-325, 384-387; JTA-1081, 1083-1084.) Mr. Murphy's mere use of Bentley stationery to respond to letters sent to him by Ethypharm concerning the business of Belmac in the 1990's does not, as a matter of law, cloak him with the apparent authority of Bentley. *See Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1455, 1462 (2d Cir. 1995) (no apparent agency despite the fact that subsidiary used parent's name in its advertising, promotional and packaging materials); *C.R. Bard Inc.*, 997 F. Supp. at 561 (no apparent agency as a matter of law where parent did not control the manufacture of relevant product, despite the fact that the parent's name appeared on cartons and brochures of the subsidiary's products at issue).

Even presuming, *arguendo*, that Mr. Murphy *had* been cloaked with the apparent authority of Bentley when he interacted with Ethypharm in the 1990's and in 2000 concerning Belmac's manufacture, marketing, and sale of omeprazole, that *still* would not suffice to establish apparent authority with regard to the wrongful conduct at issue in this case. The Third Circuit and this Court have both repeatedly emphasized that neither actual nor apparent agency can be established unless the authority can be linked to the precise wrongful conduct at issue. *See Phoenix Canada*, 842 F.2d at 1478; *Jurimex III*, 2006 WL 1995128, at *4. That crucial link is missing here. All of the specific conduct which

---

[25] Significantly, most of Ethypharm's interactions with Mr. Murphy during the 1990s and in 2000 concerning Belmac's manufacture of pellet drugs *were initiated by Ethypharm* to resolve problems, real or perceived, in Ethypharm's relationship with Belmac. (A-293-325, 357-358, 363-364, 371-376, 383, 397-421, 446-453; JTA-342, 392-393, 398-399, 442-444, 453, 455, 661-662, 667, 786, 1043-1049, 1051-1055.) The officers of Ethypharm France – who kept tight control over Ethypharm Spain's relationship with Belmac – preferred to negotiate with Mr. Murphy, whom they perceived as an "equal." (JTA-313, 315, 330, 335-336, 341-342, 852.) It would be a perverse result indeed if Ethypharm were essentially allowed to create apparent agency because *it* repeatedly dragged Mr. Murphy into Ethypharm's disputes and negotiations with Belmac and its general managers in Spain.

Ethypharm claims is wrongful was committed by Belmac, not Bentley. (A-554 at ¶ 20; JTA-87, 631, 656, 662, 666, 673, 679, 1074.) But Ethypharm is unable to stretch Mr. Murphy's cloak of Bentley authority to cover Mr. Herrera or anyone else at Belmac: who possessed the dossiers and protocols in Zaragoza containing Ethypharm's alleged trade secrets; who allegedly used Ethypharm trade secrets to continue manufacturing omeprazole and other pellet drugs in Zaragoza after March 23, 2002; or who allegedly wrongfully continued to sell omeprazole and other pellet drugs from Belmac's plant in Zaragoza to Ethypharm's customers after the manufacturing agreement expired. (A-255-274; JTA-78, 345-347, 749-750.) The fact that Mr. Murphy was both CEO of Bentley and on occasion acted on behalf of Belmac on certain matters in his capacity as President, does not carry with it the conclusive presumption that any of the wrongful acts allegedly committed by Mr. Herrera or other Belmac employees must have been committed at the direction of or on behalf of Bentley. This Court has been very clear that an agency relationship cannot be established simply by showing that the parent and subsidiary have common officers and directors. *Japan Petroleum Co.*, 456 F. Supp. at 841. Much more is required. Here, it is undisputed that Mr. Murphy, whether as CEO of Bentley or President of Belmac, had no involvement with the dossiers and protocols containing Ethypharm's alleged trade secrets, nor did he direct anyone at Belmac to use Ethypharm's alleged trade secrets to manufacture omeprazole or other pellet drugs in Zaragoza. (A-255-274; JTA-78, 87, 180, 345-347, 749-750.) Likewise, it is undisputed that Mr. Murphy had no involvement in Belmac's continuing to sell pellet drugs to any Ethypharm customers, nor did he direct anyone at Belmac to do so. (A-622 at ¶ 8; JTA-631, 673, 1074.)

Given these undisputed facts, even if Mr. Murphy had been cloaked with Bentley's apparent authority in every one of his interactions with Ethypharm concerning Belmac – which he was not – his cloak cannot, as a matter of law, be stretched by any reasonable juror

to cover the alleged infringing actions which were undisputedly undertaken by Mr. Herrera and others at Belmac in late 2001 or early 2002, without Mr. Murphy's direction or guidance. *See C.R. Bard*, 997 F.Supp. at 560 ("under the agency theory [whether actual or apparent] 'only the *precise conduct* shown to be instigated by the parent is attributed to the parent.'") (emphasis added).

This Court has held that no apparent authority existed in similar circumstances. In *Jurimex III*, the Court granted summary judgment and dismissed the case for failure to join an indispensable party (the defendant's subsidiary) after concluding that the subsidiary was neither an actual or apparent agent of the defendant. 2006 WL 1995128, at *4. Like Mr. Murphy, a member of the parent company's board in *Jurimex III* was also the president of the alleged agent. *Id.* Further, the parent in *Jurimex III* had entered into previous transactions with the plaintiff that were unrelated to the transaction at issue, just as Mr. Murphy, in his capacity as a representative of Bentley, had executed two confidentiality agreements with Ethypharm concerning unrelated matters, such as transdermal technology and the purchase of a U.S. Corporation. *Id.*; *see also* A-69-74, 622 at ¶ 10; JTA-390-391, 400-401, 777, 785, 1031-1033. None of these facts sufficed, as a matter of law, to establish apparent agency with regard to the conduct at issue.

**B.    Any purported reliance by Ethypharm on Bentley's actions was not reasonable.**

Even if Ethypharm had been able to point to any words or actions on the part of Bentley that might support its claim that Belmac was cloaked with Bentley's apparent authority when it embarked on its alleged bold scheme in late 2001 and early 2002, any reliance upon such indicia would be manifestly unreasonable. Summary judgment is warranted unless the plaintiff reasonably relied upon the indicia of apparent agency. *See Billops*, 391 A.2d at 198 ("[A] litigant must show reliance on the indicia of authority

originated by the principal; and such reliance must have been reasonable" (internal citations omitted)); *Taylor*, 49 F.3d at 989 ("apparent authority… 'exists only to the extent that it is reasonable for the third person dealing with the agent to believe that the agent is authorized'") quoting RESTATEMENT (SECOND) OF AGENCY, § 8 cmts a & c (1958).

The undisputed facts referenced above indicate that any reliance by Ethypharm was not reasonable: (1) Ethypharm is a sophisticated pharmaceutical company whose owners, officers, and employees are well aware of the distinction between a corporate parent and its subsidiaries, and it is undisputed that Ethypharm itself has many subsidiaries located in a number of countries (JTA-314); (2) by admission of Ethypharm's officers and legal counsel, Ethypharm knew that Belmac was a subsidiary of Bentley; (3) the officers and employees of Ethypharm were well aware that it was Belmac, not Bentley, which manufactured, marketed and sold omeprazole and other pellet drugs to Ethypharm and Ethypharm customers in Spain, and the conduct of Ethypharm's officers and employees throughout their relationship with Belmac evidences such awareness; (4) the officers and employees of Ethypharm knew that every executed agreement concerning Belmac's manufacture, marketing and sale of omeprazole and other pellet drugs for Ethypharm was signed by Belmac and Ethypharm, and *not* by Bentley or Mr. Murphy; (5) Ethypharm's officers and legal counsel never once sought to obtain a manufacturing or supply agreement for pellet drugs in Spain that names Bentley as a party; (6) by the admission of Ethypharm's own witnesses, Ethypharm knew that neither Mr. Herrera nor anyone else working under him at Belmac had any authority to act on behalf of Bentley (JTA-87, 330, 335, 339, 342, 402, 679, 754, 1002); (7) Ethypharm's witnesses admitted that they never thought that Mr. Herrera or anyone else working under him at Belmac had any authority to act on behalf of Bentley (*id.*); (9) it is undisputed that each Ethypharm representative who interacted with Mr. Murphy in the 1990's and in 2000 knew that Mr. Murphy was the President of Belmac, as well as CEO of Bentley (A-175-185, 202-

222; JTA-339, 341, 391, 393, 718-719, 754, 852, 1081); and (10) the text of draft manufacturing agreements concerning Belmac's manufacture of omeprazole and other pellet drugs which Ethypharm presented for Mr. Murphy's signature in the 1990's and again in June of 2001 plainly refer to Mr. Murphy as "Executive Director" of Laboratorios Belmac, S.A. or as acting "in representation" of Belmac. (*E.g.*, A-194, 296.)

The evidence is overwhelming that Ethypharm knew and – up until it decided to sue Bentley in the United States – was content that its contractual and business dealings with regard to the manufacture of omeprazole and other drugs in Spain were with Belmac, not Bentley. In the face of this evidence, Ethypharm's asserted reliance on Jim Murphy's dual positions with Bentley and Belmac, as it tries to salvage jurisdiction in the United States for this lawsuit, was (and is) unreasonable as a matter of law.

For all these reasons, no reasonable juror could conclude that Belmac was acting as Bentley's apparent agent when it allegedly embarked on the bold scheme to misappropriate Ethypharm trade secrets and to interfere with Ethypharm's customer relationships starting in late 2001 or early 2002.

## CONCLUSION

For the foregoing reasons, this Court should grant Bentley's Motion for Summary Judgment and dismiss the remaining two counts of Ethypharm's Complaint for failure to join a necessary and indispensable party under Rule 19. Ethypharm will not be prejudiced by such a dismissal of its Complaint, as it can continue to seek relief in an alternate – and much more appropriate – forum: the Mercantile Court of Madrid.

Dated:  August 25, 2006                **EDWARDS ANGELL PALMER & DODGE LLP**

 _/s/ Joseph B. Cicero_
John L. Reed (I.D. 3023)
Denise Seastone Kraft (I.D. 2778)
Joseph B. Cicero (I.D. 4388)
919 N. Market Street, 15th Floor
Wilmington, DE  19801
302.777.7770
302.777.7263
jreed@eapdlaw.com
dkraft@eapdlaw.com
jcicero@eapdlaw.com


**OF COUNSEL:**

Craig E. Stewart
Veronica C. Abreu
Joseph P. Mingolla
**EDWARDS ANGELL PALMER & DODGE LLP**
111 Huntington Avenue
Boston, MA  02199
(617) 239-0100