**Confidential - Attorneys' Eyes Only**

Page 10

1    CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2    for Rimafar?
3 A. It was judicial, a group.
4        MS. ABREU: Objection. Translation.
5 A. A person from the judicial group.
6 Q. Why don't you -- it sounds like there may be
7    a difficulty in the translation there. I
8    agree. Why don't you simply take the Spanish
9    word.
10       MS. ABREU: Can you translate it and
11    ask him to write it down.
12 A. It's like one person representing the --
13    G-A-B-I-N-E-T-E-J-U-R-I-D-I-C-O. And it's a
14    proper name.
15 Q. When Rimafar was founded, what was its
16    corporate purpose?
17       MS. ABREU: Objection. Vague.
18 A. The production, sale and development of
19    products of pharmaceutical products.
20 Q. Did you have experience in the manufacture,
21    production and sale of pharmaceutical
22    products before 1988?
23 A. Yes.
24 Q. What experience had you had?

Page 11

1    CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2 A. Twenty years, twenty years working in a
3    pharmaceutical laboratory, along all the
4    process and finally as general director.
5 Q. Had you ever had personal experience with
6    Omeprazole prior to 1988?
7 A. No.
8 Q. How about had you had any experience with
9    microgranules or pelletization of Omeprazole
10    prior to 1988?
11       MS. ABREU: Objection. Vague and
12    ambiguous. Experience with what?
13 A. No.
14 Q. In September 1988 when Rimafar began, how
15    many employees did you have?
16 A. Three, my secretary, myself, and one person
17    of commercialization at the very, very, very
18    beginning.
19 Q. Did you have any researchers?
20 A. No.
21 Q. Did you add employees to Rimafar after 1988?
22 A. Yes, after 1988, yes.
23 Q. Between 1988 and 1992 how many employees were
24    added to Rimafar?

Page 12

1    CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2 A. Approximately 50 to 60.
3 Q. Did there come a time when Rimafar developed
4    a relationship with Ethypharm?
5 A. At the beginning, no. Towards the end of
6    1991, approximately we had a relationship
7    with Ethypharm.
8 Q. And how did that relationship develop?
9 A. At the very beginning it was just other
10    contacts, you know, conversations and that
11    was it.
12 Q. Do you recall who it was that you dealt with
13    at Ethypharm --
14       MS. ABREU: Objection. Vague.
15    Dealt with.
16 Q. -- at the beginning of the relationship?
17 A. Yes.
18 Q. Who was that?
19 A. Adolfo De Basilio.
20 Q. And what was the business relationship
21    designed to do between Ethypharm and Rimafar?
22       MS. ABREU: Objection. Vague and
23    ambiguous. Relationship.
24 A. There was no design. It's just spontaneous.

Page 13

1    CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2 Q. Was there a specific product that was of
3    interest?
4 A. No. There was a concept of production from
5    Ethypharm.
6 Q. And was this a proposal that Ethypharm made
7    to you at Rimafar, or did you make the
8    proposal to Ethypharm?
9 A. Ethypharm to Rimafar.
10 Q. And what was the nature of the proposal from
11    Ethypharm to Rimafar?
12 A. It was a proposal of collaboration.
13 Q. For what purpose?
14 A. With the purpose of Ethypharm manufacture
15    some products with following a procedure and
16    Rimafar sell or utilize for itself. That was
17    it.
18       MS. ABREU: Objection. Translation.
19 Q. Who was going to perform the manufacturing,
20    Rimafar or Ethypharm?
21       MS. ABREU: Objection. Assumes
22    facts not in evidence.
23 A. Ethypharm.
24       MR. BOSTWICK: Veronica, if you're

4 (Pages 10 to 13)

Confidential - Attorneys' Eyes Only

Page 14

CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY

2 going to make objections, that's fine. I
3 want to hear them. I can't know whether I
4 care about them.
5         MS. ABREU: I apologize. I didn't
6 want to -- the first was an objection to the
7 translation to the answer. The second was
8 objection, facts not in evidence.
9         MR. BOSTWICK: Because, of course, I
10 haven't heard one objection yet, so any of my
11 former questions I wouldn't have had a chance
12 to restate them in a way that's appropriate
13 if I think that's necessary.
14        MS. ABREU: I will speak louder.
15        MR. BOSTWICK: You can say that's
16 just an administrative matter between
17 lawyers.
18        Can you read back the last question.
19        (Question read)
20 Q. Do you recall the products that Rimafar was
21     going to manufacture for Ethypharm?
22 A. There was no product that Rimafar was going
23     to manufacture for Ethypharm, no.
24 Q. I'm sorry. I may have misunderstood. I

Page 15

CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY

2 thought you had stated that Rimafar was going
3 to manufacture certain products for
4 Ethypharm. Is that right or wrong?
5 A. That's not correct. Ethypharm was going to
6 manufacture products for their client and
7 possible for Rimafar. Ethypharm was the
8 manufacturer.
9 Q. Was Ethypharm going to manufacture those
10 products in Rimafar's facilities?
11        MS. ABREU: Objection. Ambiguous.
12 Facilities.
13 A. I use facilities, plant, Rimafar. That was a
14 possibility.
15 Q. How long did you have discussions with Adolfo
16 De Basilio about the relationship with
17 Ethypharm?
18 A. Quite a few days in conversations. I don't
19 know exactly the time, you know. It could be
20 days, a month even.
21 Q. Was this around the time that Belmac
22 Corporation in the United States purchased
23 Rimafar?
24 A. The initial conversations have been prior to.

Page 16

CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY

2 Q. The initial conversations with Ethypharm?
3 A. With Ethypharm. Rimafar and Ethypharm prior
4 to.
5 Q. How did it come about that Belmac Corporation
6 in the U.S. purchased Rimafar?
7 A. I'm sorry. I didn't understand the question.
8 Q. I believe you have testified that in March of
9 1992 Belmac Corporation in the United States
10 purchased Rimafar?
11        MS. ABREU: Objection. Misstates
12 testimony.
13 Q. Is that correct?
14 A. Yes, that's correct.
15 Q. How did that come about? How did those
16 discussions come about?
17        MS. ABREU: Objection. Vague and
18 ambiguous.
19 A. What topics in specific are we talking about?
20 Q. Who from Belmac approached Rimafar to
21 purchase the company?
22 A. Directly to me a person from Belmac France
23 with an initial interest of purchasing
24 Rimafar.

Page 17

CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY

2 Q. Do you know when that first conversation took
3 place?
4 A. Towards the end of the year 1991. I won't be
5 able to tell you exactly dates.
6 Q. I understand. It's a long time ago; and if
7 you just give me your best recollection, that
8 will be perfect. Who was it that had this
9 first conversation with you? Who was the
10 French person?
11        MS. ABREU: Objection. Vague and
12 ambiguous.
13 A. I think it was Mr. Hermet. I had to put two
14 people in contact. One was Mr. Hermet --
15        (Exhibit No. 1, Minutes, so marked)
16 Q. Ask him how to spell Hermet. Actually, you
17 know what, this is Exhibit 1, and it is a
18 document written in English as you can see,
19 and it is minutes of the meeting of the board
20 of directors of Belmac Corporation, and the
21 date is October 24, 1991.
22        And do you see the names listed on
23 the first page of this document?
24 A. Yes.

5 (Pages 14 to 17)

**Confidential - Attorneys' Eyes Only**

Page 18

CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY

2 Q. And right below those names it says, Also
3    present at the invitation of the company was
4    Jean-Pierre Hermet, the general manager of
5    the company's European operations. Is this
6    the person that you met with, Jean-Pierre
7    Hermet?
8 A. Yes.
9 Q. Around the end of 1991?
10 A. Yes.
11 Q. To discuss the purchase by Belmac Corporation
12    of Rimafar?
13        MS. ABREU: Objection. Ambiguous.
14    Belmac Corporation.
15        MR. BOSTWICK: Just for the record,
16    isn't Belmac Corporation the name of the
17    company?
18        MS. ABREU: Counsel, there are two
19    Belmacs. There is Belmac Corporation, and
20    there is Belmac Europe. I believe for the
21    witness's benefit we need to distinguish the
22    two. Jean-Pierre Hermet appears to be the
23    general manager of the European Belmac.
24 Q. Do you see any of the other names on that

Page 19

CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY

2    list that you recognize?
3 A. Yes.
4 Q. Which one or which ones?
5 A. Jean-Francois Rossignol.
6 Q. How is it that you recognize that name?
7 A. When Belmac purchased Rimafar, Jean-Francois
8    Rossignol was the director of Belmac.
9 Q. Belmac Corporation in the U.S.?
10 A. Yes, in the United States.
11 Q. I will turn to page 9 of the document, and
12    I'm going to read you the second paragraph, I
13    guess, and our translator will help me
14    translate this for you. It's right beginning
15    here. It says, The chairman -- and I believe
16    that would be Jean Francois Rossignol --
17        MS. ABREU: Objection. States facts
18    not in evidence.
19 Q. -- then stated that the company was engaged
20    in early stage negotiations for the
21    acquisition of a Spanish based company,
22    Rimafar, SA, a company with manufacturing
23    capability.
24        The chairman indicated that

Page 20

CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY

2    Mr. Ayers, Jean-Pierre Hermet, and he would
3    be meeting officials of Rimafar during the
4    middle of November to further discuss the
5    possibility of acquiring that company.
6        And my question to you is is that
7    consistent with your memory that the
8    negotiations for acquisition took place
9    around the end of 1991?
10 A. Yes.
11 Q. Do you recall whether you were negotiating
12    with Ethypharm about the Ethypharm
13    arrangement around the same time that you
14    were negotiating about the possible
15    acquisition of Rimafar?
16 A. Exactly I don't think the dates coincide, but
17    I'm not sure. I think the dates were in
18    proximity to each other.
19 Q. Mr. Ayala, let me ask you a few questions
20    about your language skills. Do you speak any
21    English?
22 A. No.
23 Q. Do you read in English?
24 A. A little.

Page 21

CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY

2 Q. In the context of business, do you ever
3    conduct business negotiations in English?
4        MS. ABREU: Objection. Ambiguous.
5 A. Yes, with translators, with the assistance of
6    a translator.
7 Q. If you receive documents, for example, in
8    English, you would want them translated
9    before acting on them in the business
10    context?
11 A. I don't understand the question.
12 Q. Would you ever receive a document in English
13    in a business context and not translate it?
14        MS. ABREU: Objection. Ambiguous.
15 A. Never.
16 Q. Do you speak French?
17 A. A little.
18 Q. More than English?
19 A. Yes.
20 Q. For example, when you negotiated the
21    arrangement with Ethypharm with Adolfo De
22    Basilio, I take it that would be in Spanish?
23 A. Yes, in Spanish.
24 Q. When you discussed matters with Rimafar, what

6 (Pages 18 to 21)

Confidential - Attorneys' Eyes Only

Page 22

1    CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2    language was used -- I'm sorry, with Belmac
3    Corporation?
4 A. With Jean-Pierre Hermet initially we spoke
5    French. He knew some Spanish also and then
6    afterwards Spanish all the time, always
7    Spanish.
8 Q. Did any of these individuals, Mr. Ayers,
9    Jean-Pierre Hermet or Mr. Rossignol, did they
10    speak Spanish?
11         MS. ABREU: Objection. Foundation.
12 A. I don't know. I don't know.
13 Q. Do you remember whether you conducted the
14    negotiations about Belmac Corporations
15    acquisition in Spanish?
16 A. In Spain, there was always translators
17    available; and the operation was made in
18    Spain, took place in Spain.
19 Q. I know this has been a relatively short time,
20    but it's been about an hour, and I think
21    maybe we can break until tomorrow.
22 A. As you wish.
23 Q. Shall we start at 9:00 in morning?
24 A. Yes.

Page 23

1    CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2         MR. BOSTWICK: Maybe 8:45 we meet
3    here or 8:50.
4         THE VIDEOGRAPHER: The time is 4:59
5    p.m. on June 28, 2006. This is the end of
6    tape number one of Mr. Angel Perez De Ayala.
7    This deposition will be adjourned until June
8    29, 2006.
9         (Whereupon the deposition was
10         suspended at 4:59 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 24

1    CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2         C E R T I F I C A T E
3
4    COMMONWEALTH OF MASSACHUSETTS
5
6
7         I, Tina M. Sarcia, a Registered
8    Professional Reporter and Notary Public in
9    and for the Commonwealth of Massachusetts, do
10    hereby certify that the foregoing transcript
11    of the deposition of ANGEL PEREZ DE AYALA
12    having been duly sworn on Wednesday, June 28
13    2006 is true and accurate to the best of my
14    knowledge skill and ability.
15         IN WITNESS WHEREOF I have hereunto
16    set my hand and seal this 11thday of June
17    , 2006.
18
19
20
21         Tina M. Sarcia, RPR
22         Notary Public
23
24    My commission expires: March 13, 2009

Page 25

1    CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2    DEPONENT'S ERRATA SHEET
3    AND SIGNATURE INSTRUCTIONS
4
5         The original of the Errata Sheet has
6    been delivered to Veronica Abreu, Esq.
7         When the Errata Sheet has been
8    completed by the deponent and signed, a copy
9    thereof should be delivered to each party of
10    record and the ORIGINAL delivered to Dwight
11    Bostwick, Esq. to whom the original
12    deposition transcript was delivered.
13
14    INSTRUCTIONS TO DEPONENT
15
16         After reading this volume of your
17    deposition, indicate any corrections or
      changes to your testimony and the reasons
      therefor on the Errata Sheet supplied to you
18    and sign it. DO NOT make marks or notations
      on the transcript volume itself.
19
20    REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE
21    COMPLETED AND SIGNED ERRATA SHEET WHEN
22    RECEIVED.
23
24

7 (Pages 22 to 25)

**Confidential - Attorneys' Eyes Only**

Page 26

1      CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2      ATTACH TO THE DEPOSITION OF ANGEL PEREZ DE
       AYALA
3      CASE: ETHYPHARM V BENTLEY PHARMACEUTICALS
4              ERRATA SHEET
5      INSTRUCTIONS: After reading the transcript
       of your deposition, note any change or
6      correction to your testimony and the reason
       therefor on this sheet.  DO NOT make any
7      marks or notations on the transcript volume
       itself.  Sign and date this errata sheet
8      (before a Notary Public, if required).  Refer
       to Page 25 of the transcript for errata sheet
9      distribution instructions.
10     PAGE LINE
               CHANGE:
11             REASON:
               CHANGE:
12             REASON:
               CHANGE:
13             REASON:
               CHANGE:
14             REASON:
               CHANGE:
15             REASON:
               CHANGE:
16             REASON:
               CHANGE:
17             REASON:
               CHANGE:
18             REASON:
               CHANGE:
19             REASON:
               CHANGE:
20             REASON:
21         I have read the foregoing transcript
       of my deposition and except for any
22     corrections or changes noted above, I hereby
       subscribe to the transcript as an accurate
23     record of the statements made by me.
24         ANGEL PEREZ DE AYALA  DATE

8 (Page 26)

**ESQUIRE DEPOSITION SERVICES**
**1-866-619-3925**

JT-A-65

**A**

ability 24:14
able 17:5
Abreu 2:13 4:24,24
 8:22 10:4,10,17
 11:11 12:14,22
 13:18,21 14:5,14
 15:11 16:11,17
 17:11 18:13,18
 19:17 21:4,14
 22:11 25:6
accurate 24:13
 26:22
acquiring 20:5
acquisition 19:21
 20:8,15 22:15
acting 21:9
action 5:16
active 8:8
actual 8:24
add 11:21
added 11:24
addition 7:5
adjourned 23:7
administrative 8:8
 14:16
Adolfo 12:19 15:15
 21:21
afternoon 5:14
ago 17:6
agree 10:8
agreement 7:15
ALZAGA 3:5
ambiguous 11:12
 12:23 15:11 16:18
 17:12 18:13 21:4
 21:14
Angel 1:15 4:4 5:7
 7:17 23:6 24:11
 26:2,24
Angell 1:22 2:14
 4:18
answer 6:16,17,23
 14:7
answers 6:15
anticipate 7:12
apologize 14:5
**APPEARANCES**
 2:2 3:2
appears 18:22
approached 16:20
appropriate 14:12
approximately 4:12
 9:9 12:2,6
arrangement 20:13
 21:21

**ASOCIADOS** 3:6
assistance 21:5
association 4:16
assume 6:7,10
Assumes 13:21
**ATTACH** 26:2
**ATTORNEYS** 1:1
 2:1 3:1 4:1 5:1
 6:1 7:1 8:1 9:1
 10:1 11:1 12:1
 13:1 14:1 15:1
 16:1 17:1 18:1
 19:1 20:1 21:1
 22:1 23:1 24:1
 25:1 26:1
available 22:17
Avenue 1:23 2:15
Ayala 1:15 4:4 5:7
 5:14 7:16,17,20
 20:19 23:6 24:11
 26:2,24
Ayers 20:2 22:8
A-Y-A-L-A 7:19

**B**

**BAACH** 2:5
back 14:18
based 19:21
Basilio 12:19 15:16
 21:22
began 9:19 11:14
beginning 9:20
 11:18 12:5,9,16
 19:14
beginnings 9:5
behalf 1:16 4:23 5:2
 8:8
believe 9:13,15 16:8
 18:20 19:15
Belmac 6:10 9:2,2,4
 9:6,7,10,15 15:21
 16:5,9,20,22
 17:20 18:11,14,16
 18:19,20,23 19:7
 19:8,9 22:2,14
Belmacs 18:19
benefit 5:23 6:20
 18:21
Bentley 1:11 4:7
 5:2 6:6 26:3
best 17:7 24:13
board 17:19
Boston 1:23 2:16
 4:19
Bostwick 2:3 4:22
 4:22 5:13,15

13:24 14:9,15
 18:15 23:2 25:11
break 7:6 22:21
breaks 7:5
brought 6:3
business 12:20 21:2
 21:3,9,13

**C**

C 2:13 3:8 24:2,2
called 5:8
capability 19:23
care 14:4
case 4:9 26:3
certain 15:3
certify 24:10
chairman 19:15,24
chance 14:11
change 9:12 26:5
 26:10,11,12,13,14
 26:15,16,17,18,19
changed 8:19,21
 9:2
changes 25:17
 26:22
Civil 1:17
client 15:6
coincide 20:16
collaboration 13:12
colleague 6:2
come 12:3 16:5,15
 16:16
commencing 1:24
commercialization
 11:17
commission 24:24
Commonwealth
 1:20 24:4,9
company 8:10,17
 9:18 16:21 18:3
 18:17 19:19,21,22
 20:5
company's 18:5
completed 25:8,21
concept 13:4
conduct 21:3
conducted 22:13
**CONFIDENTIAL**
 1:1 2:1 3:1 4:1
 5:1 6:1 7:1 8:1
 9:1 10:1 11:1
 12:1 13:1 14:1
 15:1 16:1 17:1
 18:1 19:1 20:1
 21:1 22:1 23:1
 24:1 25:1 26:1

consistent 20:7
contact 17:14
contacts 12:10
context 21:2,10,13
contract 9:21
conversation 17:2,9
conversations
 12:10 15:18,24
 16:2
copy 25:8
corporate 10:16
corporation 8:3 9:7
 9:11,21,22 15:22
 16:5,9 17:20
 18:11,14,16,19
 19:9 22:3
Corporations 22:14
Corral 3:4
correct 5:16 8:17
 8:18 15:5 16:13
 16:14
correction 26:6
corrections 25:16
 26:22
counsel 4:20 5:8
 18:18
course 14:9
court 1:5 4:8,15 5:3
 6:13
courts 6:4
Cubas 3:8
currently 7:20,22
C.A 1:7

**D**

D 2:4
date 17:21 26:7,24
dates 8:23 9:13
 17:5 20:16,17
days 15:18,20
DC 2:7
Dcha 3:8
de 1:15 3:5,8 4:4
 5:7 7:17 12:19
 15:16 21:21 23:6
 24:11 26:2,24
dealt 12:12,15
defendant 1:12
 2:19 3:11 4:8
Delaware 1:6,17
 4:9
delivered 25:6,9,10
 25:12
deponent 25:8,14
**DEPONENT'S**
 25:2

deposition 1:15 4:3
 4:11,17 5:17,18
 23:7,9 24:11
 25:12,16 26:2,5
 26:21
**Depositions** 4:15
describe 8:6
design 12:24
designed 12:21
develop 12:1
developed 12:3
development 10:18
difficulty 10:7
Directly 16:22
director 11:4 19:8
directors 17:20
discuss 18:11 20:4
discussed 21:24
discussions 15:15
 16:16
distinguish 18:21
distribution 26:9
district 1:5,6 4:8,9
document 17:18,23
 19:11 21:12
documents 9:24
 21:7
Dodge 1:22 2:14
duly 5:9 24:12
Dwight 2:3 4:22
 5:14 25:10
dwight.bostwick...
 2:9
D-E 7:19

**E**

E 24:2,2
early 19:20
Edwards 1:21 2:14
 4:18
employees 11:15,21
 11:23
endurance 7:9
engaged 19:19
English 17:18 20:21
 20:23 21:3,8,12
 21:18
errata 25:2,5,7,17
 25:21 26:4,7,8
Escalera 3:13
Esq 25:6,11
Esquire 2:3,4,12,13
 3:3,4 4:14,16
Ethypharm 1:8,9
 4:5,6,23 5:15 6:3
 12:4,7,13,21 13:5

Confidential - Attorneys' Eyes Only

Page 28

13:6,8,9,11,14,20
13:23 14:21,23
15:4,5,7,9,17 16:2
16:3,3 20:12,12
21:21 26:3
**Europe** 18:20
**European** 18:5,23
**evidence** 13:22 14:8
19:18
**exactly** 9:19 15:19
17:5 20:16
**EXAMINATION**
5:13
**examined** 5:10
**example** 21:7,20
**Excuse** 9:12
**Executive** 8:11
**Exhibit** 17:15,17
**EXHIBITS** 1:4
**experience** 10:20
10:24 11:5,8,12
**expires** 24:24
**explain** 5:22
**EYES** 1:1 2:1 3:1
4:1 5:1 6:1 7:1
8:1 9:1 10:1 11:1
12:1 13:1 14:1
15:1 16:1 17:1
18:1 19:1 20:1
21:1 22:1 23:1
24:1 25:1 26:1

**F**

**F** 2:6 24:2
**facilities** 15:10,12
15:13
**facts** 13:22 14:8
19:17
**finally** 11:4
**fine** 2:4 4:23 6:2
14:2
**firm** 4:17
**first** 9:17 14:6 17:2
17:9,23
**focus** 9:17
**following** 13:15
**follows** 5:11
**foregoing** 24:10
26:21
**former** 14:11
**found** 8:14 9:5
**Foundation** 8:22
22:11
**founded** 9:8,13,17
10:15
**founder** 8:15

**founding** 9:24
**foundings** 9:23
**France** 1:8 4:6
16:22
**Francois** 19:16
**French** 17:10 21:16
22:5
**full** 7:16
**further** 20:4

**G**

**G** 3:5,5
**Garcia-Palencia**
3:3
**general** 11:4 18:4
18:23
**give** 17:7
**go** 7:12
**going** 13:19 14:2,21
14:22 15:2,5,9
19:12
**Good** 5:14
**Grapa** 8:4,6,13
**Gregorio** 3:4
**group** 8:8,9 10:3,5
**guess** 19:13
**G-A-B-I-N-E-T-E**
10:13

**H**

**hand** 24:16
**hear** 14:3
**heard** 14:10
**held** 4:11,17
**help** 19:13
**hereunto** 24:15
**Hermet** 17:13,14,16
18:4,7,22 20:2
22:4,9
**hour** 7:13 22:20
**Huntington** 1:22
2:15 4:18

**I**

**identified** 5:9
**indicate** 25:16
**indicated** 19:24
**individuals** 22:8
**initial** 15:24 16:2
16:23
**initially** 22:4
**instructions** 25:3
25:14 26:5,9
**interest** 13:3 16:23
**interpreter** 3:13 5:4
5:6
**introduce**

4:21
**invitation** 18:3
**Ivelissa** 3:13

**J**

**Jean** 19:16
**Jean-Francois** 19:5
19:7
**Jean-Pierre** 18:4,6
18:22 20:2 22:4,9
**jmingolla@eapdl...**
2:18
**job** 6:13
**Jonathan** 2:4 4:23
6:2
**Joseph** 2:12 5:2
**judicial** 10:3,5
**June** 1:24 4:12 23:5
23:7 24:12,16
**J-U-R-I-D-I-C-O**
10:13

**K**

**kept** 8:24
**knew** 22:5
**know** 12:10 14:3
15:19,19 17:2,17
22:12,12,19
**knowledge** 24:14
**Kristin** 3:14 4:13

**L**

**Laboratories** 8:4
9:2
**Laboratorios** 6:10
8:5,13 9:4
**laboratory** 8:2 11:3
**language** 20:20
22:2
**law** 1:21 4:17
**lawsuit** 5:20
**lawyers** 6:6,9 14:17
**legal** 4:13
**LEWIS** 2:5
**LINE** 26:10
**list** 19:2
**listed** 17:22
**little** 20:24 21:17
**live** 7:20
**LLP** 2:14
**long** 8:12 15:15
17:6
**louder** 14:14

**M**

**M** 1:18 24:7,21
**Madrid** 3:7 7:21

**manager** 18:4,23
**manufacture** 10:20
13:14 14:21,23
15:3,6,9
**manufacturer** 15:8
**manufacturing**
13:19 19:22
**March** 9:9,16 16:8
24:24
**marked** 17:15
**marks** 25:18 26:7
**Marques** 3:8
**Massachusetts** 1:21
1:23 2:16 4:19
24:4,9
**matter** 4:5 6:3
14:16
**matters** 21:24
**Mayoral** 7:17
**meet** 23:2
**meeting** 17:19 20:3
**memory** 20:7
**MERCADO** 3:5
**met** 6:7,11 18:6
**microgranules** 11:9
**middle** 20:4
**Mingolla** 2:12 5:2
**minutes** 17:15,19
**Misstates** 16:11
**misunderstood**
14:24
**moment** 7:21
**month** 15:20
**morning** 7:14 22:23
**M-A-Y-O-R-A-L**
7:19

**N**

**name** 4:13 7:16,18
8:3,4,19,24 10:14
18:16 19:6
**named** 8:17
**names** 17:22 18:2
18:24
**nature** 13:10
**necessary** 14:13
**need** 7:6 18:21
**negotiated** 21:20
**negotiating** 20:11
20:14
**negotiations** 19:20
20:8 21:3 22:14
**never** 5:16 21:15
**nod** 6:18
**Notary** 1:19 5:10
24:8,22 26:8

**notations** 25:18
26:7
**note** 26:5
**noted** 26:22
**November** 20:4
**number** 4:3,9 23:6
**NW** 2:6

**O**

**objection** 8:22 10:4
10:17 11:11 12:14
12:22 13:18,21
14:6,8,10 15:11
16:11,17 17:11
18:13 19:17 21:4
21:14 22:11
**objections** 14:2
**October** 17:21
**offices** 1:21
**official** 9:24
**officially** 9:23
**officials** 20:3
**Okay** 5:24 6:5 7:8
7:15
**Omeprazole** 11:6,9
**once** 7:5
**ones** 19:4
**operation** 22:17
**operations** 18:5
**organize** 9:19,22
**original** 25:5,10,11

**P**

**P** 2:3
**page** 17:23 19:11
25:20 26:8,10
**PAGES** 1:3
**PALENCIA** 3:5
**Palmer** 1:22 2:14
**paragraph** 19:12
**party** 25:9
**pelletization** 11:9
**people** 17:14
**Perez** 1:15 4:4 5:7
7:17 23:6 24:11
26:2,24
**perfect** 6:24 17:8
**perform** 13:19
**Permit** 5:22
**person** 8:7 10:5,12
11:16 16:22 17:10
18:6
**personal** 11:5
**pharmaceutical** 8:2
10:19,21 11:3
**Pharmaceuticals**

| | | | | |
|---|---|---|---|---|
| 1:11 4:7 26:3 | R 24:2 | **S** | sure 20:17 | type 5:19 |
| **place** 17:3 20:8 | **Rafael** 3:3 | SA 4:5,6 19:22 | suspended 23:10 | |
| 22:18 | read 14:18,19 19:12 | sale 10:18,21 | swear 5:4 | **U** |
| plaintiff 4:6 | 20:23 26:21 | Sarcia 1:18 4:16 | sworn 5:6,9 24:12 | understand 8:16 |
| plaintiffs 1:9,16 | reading 25:16 26:5 | 24:7,21 | S.A 1:8,9 | 16:7 17:6 21:11 |
| 2:10 4:5 5:8 | reason 26:6,11,12 | satisfactorily 5:9 | | United 1:5 4:8 6:4 |
| plan 7:5 | 26:13,14,15,16,17 | says 18:2 19:15 | **T** | 15:22 16:9 19:10 |
| plant 15:13 | 26:18,19,20 | seal 24:16 | T 24:2,2 | use 15:13 |
| please 4:20 5:4 7:3 | reasons 25:17 | second 14:7 19:12 | take 6:14 7:5 10:8 | utilize 13:16 |
| position 8:5,10 | Rebeca 3:4 | secretary 11:16 | 21:22 | U.S 5:20 16:6 19:9 |
| possibility 15:14 | recall 12:12 14:20 | see 6:19 17:18,22 | taken 1:16 4:4 5:17 | |
| 20:5 | 20:11 | 18:24 | 5:20 | **V** |
| possible 15:7 20:14 | receive 21:7,12 | sell 13:16 | talking 16:19 | V 26:3 |
| present 4:20 18:3 | RECEIVED 25:22 | September 9:14 | tape 4:2 23:6 | Vague 10:17 11:11 |
| previously 8:16 | recognize 19:2,6 | 11:14 | tell 7:7 17:5 | 12:14,22 16:17 |
| prior 11:6,10 15:24 | recollection 17:7 | set 24:16 | terms 9:12,22 | 17:11 |
| 16:3 | record 4:21 7:18 | sheet 25:2,5,7,17,21 | test 7:9 | Veronica 2:13 4:24 |
| procedure 1:17 | 18:15 25:10 26:23 | 26:4,6,7,8 | testified 5:11 16:8 | 13:24 25:6 |
| 13:15 | Refer 26:8 | short 22:19 | testimony 5:20 | versus 4:7 |
| process 11:4 | Registered 1:18 | sign 25:18 26:7 | 16:12 25:17 26:6 | videographer 3:14 |
| product 13:2 14:22 | 24:7 | SIGNATURE 25:3 | Thank 7:4 | 4:2,14 5:3 23:4 |
| production 10:18 | relationship 12:4,6 | signed 25:8,21 | therefor 25:17 26:6 | videotape 4:3 |
| 10:21 13:4 | 12:8,16,20,23 | simply 6:17 7:3,6 | thereof 25:9 | volume 1:2 25:16 |
| products 10:19,19 | 15:16 | 10:8 | things 5:22 | 25:18 26:7 |
| 10:22 13:15 14:20 | relatively 22:19 | skill 24:14 | think 14:13 17:13 | vs 1:10 |
| 15:3,6,10 | remember 22:13 | skills 20:20 | 20:16,17 22:20 | |
| Professional 1:19 | REPLACE 25:20 | sold 9:6,10,15 | thought 15:2 | **W** |
| 24:8 | reporter 1:19 4:15 | sorry 14:24 16:7 | Three 11:16 | want 14:3,6 21:8 |
| proper 10:14 | 5:4 6:13 24:8 | 22:2 | time 6:22 12:3 | Washington 2:7 |
| proposal 13:6,8,10 | represent 5:15 6:2 | sounds 10:6 | 15:19,21 17:6 | way 14:12 |
| 13:12 | representing 4:14 | Spain 1:9 4:6 6:10 | 20:13 22:6,19 | Wednesday 1:23 |
| proximity 20:18 | 10:12 | 7:21 9:2 22:16,18 | 23:4 | 24:12 |
| Public 1:19 5:10 | represents 8:7 | 22:18 | Tina 1:18 4:16 24:7 | we'll 7:7 |
| 24:8,22 26:8 | required 26:8 | Spanish 6:23 10:8 | 24:21 | WHEREOF 24:15 |
| purchase 16:21 | researchers 11:19 | 19:21 21:22,23 | today 6:15 | wish 22:22 |
| 18:11 | restate 14:12 | 22:5,6,7,10,15 | tomorrow 22:21 | witness 5:5,7 24:15 |
| purchased 15:22 | rgarciapalencia... | speak 14:14 20:20 | tonight 7:13 | witness's 18:21 |
| 16:6,10 19:7 | 3:10 | 21:16 22:10 | top 8:10 | word 10:9 |
| purchasing 16:23 | right 15:4 18:2 | specific 13:2 16:19 | topics 16:19 | work 7:22,24 9:3 |
| purpose 10:16 | 19:14 | spell 7:18 17:16 | transcript 24:10 | worked 8:16 |
| 13:13,14 | Rimafar 8:17,19 | spoke 22:4 | 25:12,18,20 26:5 | working 8:12 11:2 |
| pursuant 1:16 | 9:3,5,6,8,10,13,15 | spontaneous 12:24 | 26:7,8,21,22 | wouldn't 14:11 |
| put 17:13 | 9:17,18,21 10:2 | stage 19:20 | translate 6:22 | write 10:11 |
| P-E-R-E-Z 7:19 | 10:15 11:14,21,24 | start 22:23 | 10:10 19:14 21:13 | written 17:18 |
| p.m 1:24 4:12 23:5 | 12:3,21 13:7,9,11 | state 7:16 | translated 21:8 | wrong 15:4 |
| 23:10 | 13:16,20 14:20,22 | stated 15:2 19:19 | translation 10:4,7 | |
| | 15:2,7,13,23 16:3 | statements 26:23 | 13:18 14:7 | **Y** |
| **Q** | 16:6,10,20,24 | States 1:5 4:8 6:4 | translator 6:19,21 | year 8:14 17:4 |
| question 6:15,17,21 | 18:12 19:7,22 | 15:22 16:9 19:10 | 19:13 21:6 | years 11:2,2 |
| 7:3 14:18,19 16:7 | 20:3,15 21:24 | 19:17 | translators 21:5 | |
| 20:6 21:11 | Rimafar's 15:10 | stop 7:7 | 22:16 | **Z** |
| questions 6:14 7:2 | ROBINSON 2:5 | Street 2:6 4:19 | true 24:13 | Zarnetske 3:14 |
| 7:10 14:11 20:19 | Rossignol 19:5,8,16 | subscribe 26:22 | turn 19:11 | 4:13 |
| Quite 15:18 | 22:9 | suite 2:6 | twenty 11:2,2 | |
| | RPR 24:21 | summer 9:14 | two 6:6,9 17:13 | **0** |
| **R** | Rules 1:17 | supplied 25:17 | 18:18,22 | 02199 2:16 |
| | | | | 04-1300-SLR 1:7 |

Confidential - Attorneys' Eyes Only

Page 30

| 041300SOR 4:10 | 9:00 22:23 | | | |
|---|---|---|---|---|
| | 91 3:9 | | | |
| **1** | | | | |
| 1 1:3,4 17:15,17 | | | | |
| 11thday 24:16 | | | | |
| 111 1:22 2:15 4:18 | | | | |
| 1201 2:6 | | | | |
| 13 24:24 | | | | |
| 1988 10:22 11:6,10 | | | | |
| 11:14,21,22,23 | | | | |
| 1991 12:6 17:4,21 | | | | |
| 18:9 20:9 | | | | |
| 1992 9:16 11:23 | | | | |
| 16:9 | | | | |
| 1996 8:14 | | | | |
| 1998 9:9,14 | | | | |
| **2** | | | | |
| 2 3:8 | | | | |
| 20004 2:7 | | | | |
| 2006 1:24 4:12 23:5 | | | | |
| 23:8 24:13,17 | | | | |
| 2009 24:24 | | | | |
| 202.659.6744 2:8 | | | | |
| 24 17:21 | | | | |
| 25 26:8 | | | | |
| 26 1:3 | | | | |
| 28 1:24 4:12 23:5 | | | | |
| 24:12 | | | | |
| 28014 3:7 | | | | |
| 29 23:8 | | | | |
| **3** | | | | |
| 360 3:9 | | | | |
| **4** | | | | |
| 4:10 1:24 | | | | |
| 4:12 4:12 | | | | |
| 4:59 23:4,10 | | | | |
| **5** | | | | |
| 50 12:2 | | | | |
| 500 2:6 | | | | |
| 51 3:9 | | | | |
| **6** | | | | |
| 6 3:8 | | | | |
| 60 12:2 | | | | |
| 617.239.0577 2:17 | | | | |
| **8** | | | | |
| 8:45 23:2 | | | | |
| 8:50 23:3 | | | | |
| 83 3:9 | | | | |
| **9** | | | | |
| 9 19:11 | | | | |

Page 1

1      CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY

2             Confidential         VOLUME II

         For Attorney's Eyes Only    PAGES 1 - 75

3                         EXHIBITS: 2-7

4   IN THE UNITED STATES DISTRICT COURT FOR THE

               DISTRICT OF DELAWARE

5

               C.A. NO. 04-1300-SLR

6

7 ETHYPHARM S.A. FRANCE and     )

   ETHYPHARM S.A. SPAIN,       )

8      Plaintiffs,        )

                        )

9 vs.                  )

                        )

10 BENTLEY PHARMACEUTICALS,   )

   INC.,                )

11      Defendant.       )

12

13

14      CONTINUED DEPOSITION OF ANGEL PEREZ DE

15 AYALA, taken on behalf of the Plaintiffs,

16 pursuant to the Delaware Rules of Civil

17 Procedure before Tina M. Sarcia, Registered

18 Professional Reporter and Notary Public

19 within and for the Commonwealth of

20 Massachusetts, at the law offices of Edwards,

21 Angell, Palmer & Dodge, 111 Huntington

22 Avenue, Boston, Massachusetts, on Thursday,

23 June 29, 2006, commencing at 9:10 a.m.

24

Page 2

1  CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2  APPEARANCES
3  Dwight P. Bostwick, Esquire
4  Jonathan D. Fine, Esquire
5  BAACH, ROBINSON & LEWIS
6  1201 F Street, NW, suite 500
7  Washington, DC  20004
8  202.659.6744
9  dwight.bostwick@baachrobinson.com
10 For the Plaintiffs
11
12 Veronica C. Abreu, Esquire
13 EDWARDS, ANGELL, PALMER & DODGE, LLP
14 111 Huntington Avenue
15 Boston, Massachusetts  02199
16 617.239.0577
17 vabreu@eapdlaw.com
18 For the Defendant
19
20
21
22
23
24 APPEARANCES

Page 3

1  CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2  Rafael Garcia-Palencia, Esquire
3  Rebeca Corral Gregorio, Esquire
4  ALZAGA, G. PALENCIA, G. DE MERCADO &
5  ASOCIADOS
6  28014 Madrid
7  C/. Marques de Cubas, 6, 2 Dcha
8  91 360 51 83
9  rgarciapalencia@iberforno.net
10 For the Defendant
11
12 THE INTERPRETER: Ivelissa Escalera
13 THE VIDEOGRAPHER:  Kristin Zarnetske
14
15
16
17
18
19
20
21
22
23
24

Page 4

1        I N D E X
2  DEPONENT
3  ANGEL PEREZ DE AYALA              PAGE
4  Examination by Mr. Bostwick      5, 70
5  Examination by Ms. Abreu          62
6
7        E X H I B I T S
8
9  NO.  DESCRIPTION                 PAGE
10 2   Declaration of intentions, EP 2542    6
11 3   Letter, EP 2715              20
12 4   Letter, EP 2466              26
13 5   Document, EP 9095            39
14 7   Document, EP 3317            60
15
16
17
18
19
20
21
22
23
24

Page 5

1  CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2        THE VIDEOGRAPHER:  The time is 9:10
3  a.m. on June 29, 2006.  This is tape number
4  one, volume two of the continued videotaped
5  deposition of Mr. Angel Perez De Ayala.
6        EXAMINATION BY MR. BOSTWICK
7  Q.  Good morning, Mr. Ayala.
8  A.  Good morning.
9  Q.  We discussed yesterday that you are currently
10    employed by Laboratorios Grapa, correct?
11 A.  Grapa, correct.
12 Q.  Since you have been working at Laboratorios
13    Grapa, have you done business with Bentley
14    Pharmaceuticals?
15 A.  No, not at all.
16 Q.  Since you have been working at Laboratorios
17    Grapa, have you done business with
18    Laboratorios Belmac?
19 A.  No, not at all.
20 Q.  Am I correct that you have no current
21    business relationship with either
22    Laboratorios Belmac or Bentley
23    Pharmaceuticals?
24 A.  Yes, that's correct.

2 (Pages 2 to 5)

Page 6

1    CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2 Q. Let me draw your attention to 1991. You
3    began your business relationship with
4    Ethypharm in 1991; is that correct?
5 A. Correct.
6 Q. Before Rimafar began its business
7    relationship with Ethypharm in 1991, did
8    Rimafar have any experience in manufacturing
9    Omeprazole?
10 A. No.
11 Q. Manufacturing Lansoprazole?
12 A. No.
13 Q. In manufacturing pellets?
14 A. No.
15 Q. In microgranulation or pelletization?
16 A. No.
17        (Exhibit No. 2, Declaration of
18        intentions, EP 2542, so marked)
19 Q. Let me show you a document which we will mark
20    as Exhibit No. 2, and I would ask you to take
21    a look at that document, and tell me if you
22    recognize it.
23        Mr. Ayala, have you reviewed that
24    document sufficiently to tell me whether you

Page 7

1    CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2    recognize it?
3 A. I need to read it.
4 Q. That's fine. Take your time. Mr. Ayala,
5    you've had an opportunity to review Exhibit
6    No. 2?
7 A. Yes, correct.
8 Q. Is that a document you recognize?
9 A. Yes.
10 Q. What is that document?
11 A. A declaration of intentions.
12 Q. Is a declaration of intentions the same thing
13    in your mind as an agreement or a contract?
14 A. Yes.
15 Q. The title of the document is "Contracto De
16    Fabricacion" which in English would be
17    manufacturing contract?
18        MS. ABREU: Objection.
19 A. But it's not the reality of the content of
20    this agreement. During my time, Rimafar
21    never manufactured but for Ethypharm.
22 Q. Mr. Ayala, can you explain to me why you
23    believe that Exhibit No. 2 is not a contract
24    but is a declaration of intention?

Page 8

1    CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2 A. At the very beginning both parties we have
3    common interests. That's why I said it was
4    intention. That later on we had to write
5    down and organize on a formal contract for it
6    to be definitely.
7 Q. Do you remember -- first of all, is one of
8    these your signatures on the first page of
9    Exhibit 2?
10 A. Yes.
11 Q. Which one? There's one on the side and one
12    at the bottom, a signature at the side and a
13    signature at the bottom?
14 A. The one on the left side.
15 Q. Does each page contain your signature?
16 A. More than a signature. More like initials,
17    but yes, they're mine, just to point I have
18    read it.
19 Q. Now, on page 6 of the document, there is some
20    handwriting near the top above number eight?
21 A. Yes.
22 Q. Is that your handwriting as well?
23 A. Yes.
24 Q. Could you tell me what that says, the

Page 9

1    CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2    handwriting at the top of page 6?
3 A. That my initials or signatures are up to this
4    point, nothing else.
5 Q. Do I understand correctly that you have not
6    agreed to points 8, 9, 10 and 11 on page 6?
7 A. Exactly. I was not in agreement.
8 Q. With those sections?
9 A. Yes. My intentions in this declarations is
10    to tell the truth as a witness. So I'm
11    trying to remember as best as I can, you
12    know, with the benefits of my collaboration
13    to be as clear as possible. At the beginning
14    we came to an agreement of this intentions
15    with interest of continuing the project. A
16    project that it never got completed during my
17    time.
18 Q. Tell me if my understanding is not correct,
19    but my understanding based on what you have
20    just said is that for the pages up to page 6
21    and for the portions of the agreement that
22    are sections 1 through 7, there was an
23    intention to agree with Ethypharm; is that
24    correct?

3 (Pages 6 to 9)

Page 10

CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY

2  MS. ABREU: Objection. Misstates
3  testimony. Leading as to matters of
4  substance.
5 A. Yes.
6 Q. And as to 8, 9, 10 and 11, there was no
7  intention?
8      MS. ABREU: Same objection.
9 Q. Is that correct?
10 A. No, it's not correct. The discussion and
11  review of the entire agreement we didn't get
12  to complete it, so what end up in practice
13  was completely different.
14 Q. Am I correct that the date of the document is
15  November 29, 1991?
16 A. I don't remember.
17 Q. Do you have a memory of a meeting with
18  Ethypharm representatives when you signed
19  this agreement or this document?
20 A. I had various meetings with Ethypharm, yes.
21 Q. Do you remember the specific date that you
22  signed this document, Exhibit 2?
23      MS. ABREU: Objection. Asked and
24  answered.

Page 11

1  CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2 A. No, I'm sorry. I don't remember.
3 Q. Do you know whose signature or initials are
4  at the bottom of page 1?
5 A. No, I don't remember.
6 Q. Can I direct your attention to Section 1.6 on
7  page 2. At the very top, the paragraph
8  entitled "Know-How." Do you see that
9  paragraph?
10 A. Yes.
11 Q. What is your understanding of the intention
12  of that paragraph?
13 A. It refers to the information of the know-how
14  of the process of manufacturing. It's
15  referring to the information of the
16  manufacturing process.
17 Q. Was that information the property of
18  Ethypharm?
19 A. If the manufacturing had happened, the
20  information and the process belonged to
21  Ethypharm, but at this point, nothing had
22  been manufactured yet.
23 Q. Did Ethypharm provide -- strike that.
24      In accordance with the intentions of

Page 12

1  CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2  the parties, did Ethypharm provide
3  Laboratorios Belmac information --
4      MS. ABREU: Objection. Laboratorios
5  Belmac was not in existence at the time.
6  This is Rimafar.
7      MR. BOSTWICK: It would be better if
8  the objections come at the end of the
9  question.
10      MS. ABREU: I apologize.
11 Q. In accordance with the intentions of the
12  parties, did Ethypharm give to Rimafar
13  know-how and information relating to
14  Omeprazole?
15 A. No.
16 Q. Did Ethypharm provide any information or
17  know-how to Rimafar regarding Omeprazole from
18  1991 to 1994?
19 A. No.
20 Q. Let me ask you: Did you have any discussions
21  with Belmac Corporation before initializing
22  this document, Exhibit No. 2?
23 A. With Belmac Corporation, no.
24 Q. Who were your contacts at Belmac Corporation

Page 13

1  CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2  in the United States from 1991 through 1994?
3      MS. ABREU: Objection. Foundation.
4 A. Different people.
5 Q. Can you tell me the names of those people?
6 A. Ronald Stuart and Michael Hansberger between
7  the years of 1992 and 1994, and for the most
8  part, Michael.
9 Q. How often did you contact or how often did
10  you have conversations with Ronald Stuart and
11  Michael Hansberger from 1992 to 1994?
12 A. Very few. You know, more of it was just
13  information that I was passing to them. You
14  know, maybe just once a month or so,
15  approximately.
16 Q. Did you pass this information by mail or
17  through telephone calls or meetings?
18 A. It was usually a written statement via
19  e-mail.
20 Q. Did you have e-mail in 1991 to 1994?
21      THE INTERPRETER: He meant the years
22  1992.
23 Q. Let's go back. I think you have to finish
24  the answer.

4 (Pages 10 to 13)

Page 14

1    CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2 A. 1991, no. Towards the end of 1992 on, yes,
3    we had e-mail service.
4 Q. So your contact with Belmac U.S.A. during the
5    periods 1992 to 1994 was generally by e-mail?
6 A. No. Usually it was via phone with my
7    bilingual secretary or Mr. Hansberger's
8    secretary, which was native Spanish. In the
9    year 1992, and I don't remember if it was at
10   the beginning or the end, the caring
11   (phonetic) director, administrator at that
12   time proposed an electronic address or
13   communication. It was the very beginnings of
14   the e-mail way of communicating.
15       I don't know if the technology then
16   was exactly as we know it today, but it was a
17   direct way of communication.
18       MS. ABREU: Objection. Translation.
19 Q. I have a suggestion about the translations.
20   If you have a longer answer, if you are able
21   to pause in between the sentences of the
22   answer, then it will give the translator an
23   opportunity to do a good job.
24 A. Correct. I apologize.

Page 15

1    CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2 Q. That's okay. Did you have meetings with
3    people from Belmac U.S.A. during the 1992 to
4    1994 time period?
5 A. Yes.
6 Q. With whom?
7 A. Mr. Stuart, Mr. Hansberger.
8 Q. Anyone else?
9 A. Always bilingual secretary.
10 Q. Do you recall the name of your secretary who
11   translated?
12 A. My secretary?
13 Q. Yes.
14 A. Christina.
15 Q. Do you recall her last name?
16 A. No.
17 Q. How about the secretary in the USA? Do you
18   recall her name?
19 A. Yes.
20 Q. What was her name?
21 A. Noriega.
22 Q. You had indicated you did hold some meetings
23   with Mr. Hansberger and Mr. Stuart; is that
24   correct?

Page 16

1    CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2 A. Correct.
3 Q. How often did you have those meetings?
4 A. Very few and long time between one and
5    another.
6 Q. How many times per year in general?
7 A. No more than two.
8 Q. Did you have weekly telephone conversations
9    with them?
10 A. No.
11 Q. Where would you meet? In the United States
12   or in Spain?
13 A. In Spain and in United States. Twice I went
14   to Tampa.
15 Q. Who did you meet with in Tampa?
16 A. Mr. Stuart and Mr. Berenguer, Ms. Noriega,
17   and maybe some other people from the office
18   that I just did not know them.
19 Q. Do you recall what you discussed on those
20   occasions?
21 A. No. You know, it was nothing special. The
22   first time that I went to Tampa it was more
23   out of courtesy, just to meet them.
24 Q. Do you recall the second visit?

Page 17

1    CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2 A. Yes.
3 Q. And what was the topic of discussion -- what
4    was the topic -- pardon. Strike that.
5        What did you speak of during that
6    second meeting?
7 A. Fundamentally it was to complete my function
8    as president of Belmac Laboratories in
9    France.
10 Q. So is it my understanding that you were both
11   president of Laboratorios Belmac in Spain and
12   Laboratorios Belmac in France at a certain
13   time?
14       MS. ABREU: Objection. Foundation.
15 A. It did coincide at some point.
16 Q. Do you recall when you became president of
17   Laboratorios Belmac in France?
18 A. Yes.
19 Q. When was that?
20 A. Approximately either March or April of 1993.
21 Q. Who appointed you to that position?
22 A. Mr. Stuart and Mr. Berenguer, and I don't
23   remember somebody else, maybe Mr. Neff.
24 Q. Can you tell me a little bit about the

5 (Pages 14 to 17)

Page 18

CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY

1 operations of Laboratorios Belmac in France?
2 For example, was it manufacturing? Was it
3 sales? What was the business?
4 A. When I took the position as president, there
5 was no operation. There was nothing. There
6 was no commercialization. They were waiting
7 for registration of a product which wasn't in
8 existence yet.
9 Q. Were there any employees of Laboratorios
10 France?
11 A. Initially when I took over as president, no.
12 Q. And later?
13 A. Not either, because the operation in France
14 ended.
15 Q. When did the operation in France end?
16 A. I ended as president. It was approximately
17 one year beginning of 1994, and from there on
18 I don't know anything else of France.
19 MS. ABREU: Objection. Translation.
20 Q. Whose decision to close the operations in
21 France?
22 A. I have no idea. I don't know. It wasn't an
23 operation. It was a project.

Page 19

CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY

1 Q. As president of Laboratorios Belmac in
2 France, was it your decision to stop that
3 project?
4 MS. ABREU: Objection. French
5 subsidiary is called Belmac Europe, not
6 Laboratorios Belmac France.
7 THE INTERPRETER: He said no. And
8 you mean to suppress? And now he's
9 requesting to, please, ask the question
10 again.
11 Q. Could you ask the question again?
12 (Question read)
13 A. No. No, there was no project. No, my
14 decision was to resign of the position as
15 president. That was my decision.
16 Q. Did the project terminate or end?
17 A. When I finish, there was nothing. You know,
18 I don't know if they continued, but the year
19 that I ended, yes.
20 Q. Did Belmac Corporation in the United States
21 make the decision to terminate the project in
22 France?
23 MS. ABREU: Objection. Asked and

Page 20

CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY

1 answered.
2 A. I don't know. I do know that I voluntarily
3 resigned as president. There is nothing for
4 me to be president of.
5 Q. I apologize. I had forgotten whether you had
6 mentioned the date you resigned in France.
7 A. I didn't say a date. I do know it was the
8 beginnings of 1994 approximately.
9 (Exhibit No. 3, Letter, EP 2715, so
10 marked)
11 Q. Let me show you another document, and this is
12 Exhibit 3. Do you read French?
13 A. Yes.
14 Q. As you can see, this is a document that is
15 written in French, and it appears to be a
16 letter dated June 23, 1992; is that correct?
17 A. Yes, 23rd of June, 1992.
18 Q. And it appears to be sent to you from a
19 Mr. Gerard Leduc from Ethypharm. Do you
20 recall this letter?
21 A. No.
22 Q. I would like to go over certain paragraphs in
23 this letter. Okay. Why don't you take a

Page 21

CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY

1 moment to read it in its entirety first, and
2 then I will ask you my questions. Okay. You
3 have had an opportunity to review Exhibit
4 No. 3?
5 A. Yes, correct.
6 Q. In the first paragraph the letter says that
7 the conditions suggested by Rimafar for the
8 reimbursement of investments that we have
9 made in your factory for your benefit in
10 order to bring the manufacturing norms to an
11 operational pharmaceutical standard --
12 A. They're not norms. They're rooms,
13 manufacturing rooms.
14 Q. -- are unacceptable. Do you recall a
15 discussion about -- well, strike that.
16 Do you recall that Ethypharm made
17 investments in manufacturing rooms in
18 Rimafar's factory?
19 MS. ABREU: Objection. Time frame.
20 A. Installations.
21 Q. So Ethypharm did make investments in
22 installations at Rimafar's factory; is that
23 correct?

6 (Pages 18 to 21)

Page 22

1    CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2 A.  Yes, there's some space.
3 Q.  And do you recall a discussion about how
4    those investments would be reimbursed?
5 A.  Yes. There was no reimbursement. The
6    installations were ownership of Ethypharm,
7    the machinery also.
8 Q.  So Rimafar did not reimburse Ethypharm for
9    the installations or the machinery; is that
10    correct?
11 A.  Correct.
12 Q.  And the installations and the machinery were
13    the property of Ethypharm, correct?
14 A.  Correct.
15 Q.  Now, if we go to the second paragraph, it
16    reads, I remind you without investment it
17    would have been impossible to fulfill the
18    requirements of the authorities and the
19    clients in terms of GMP or good manufacturing
20    practices.
21        Do you recall that investment by
22    Ethypharm was required to fulfill the
23    requirements of GMP?
24 A.  To be able to install and make production for

Page 23

1    CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2    Ethypharm, it was required, the installations
3    of GMP.
4 Q.  Can you describe for us what the term "GMP"
5    means?
6 A.  They're international norms of installation
7    to process pharmaceutical products.
8 Q.  What types of products were Rimafar and
9    Ethypharm preparing to manufacture at Rimafar
10    during this time period?
11 A.  Ethypharm had projects of various substances
12    or active substances, you know. It's called
13    beginnings, active of beginnings.
14 Q.  Prinsipios (phonetic), does that mean
15    ingredients or substances in English or do
16    you know?
17 A.  Yes, ingredients and active substances.
18 Q.  Was Omeprazole one of the products that was
19    going to be manufactured at Rimafar?
20 A.  No. Ethypharm had a process of pelletization
21    or like the coverage of the active
22    substances, process to protect very diverse
23    active substances, among them, Omeprazole,
24    but not to manufacture none of the

Page 24

1    CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2    substances.
3 Q.  Is the process you're referring to
4    pelletization?
5 A.  Yes, it's also called pellet -- in Spanish --
6    pelletization.
7 Q.  Or microgranulation?
8 A.  Correct.
9 Q.  In the third paragraph on the letter it
10    reads, I suggest that you insist with
11    Mr. Jean-Francois Rossignol so that I can
12    finally have a direct relation in order to
13    solve this problem. I have left many
14    messages at Belmac both in France and in the
15    States for more than three months without any
16    response.
17        Do you recall Mr. Leduc wanting to
18    have a direct relation with Mr. Rossignol in
19    the United States?
20        MS. ABREU:  Objection. Ambiguous.
21    Confusing. And it's the witness who should
22    testify as to the meaning of the letter.
23 A.  The question is if I remember that Mr. Leduc
24    wanted to have a meeting with Mr. Rossignol?

Page 25

1    CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2    Is that the question?
3 Q.  Yes.
4 A.  I don't know.
5 Q.  You don't recall?
6 A.  I don't know. I just don't know.
7 Q.  The next paragraph reads, I remind you in
8    addition that the know-how relating to the
9    manufacturing of the microgranules which we
10    are carrying out in your factory is
11    absolutely not your property. In particular,
12    none of the elements regarding Omeprazole has
13    been transferred or entrusted to you, and you
14    do not have the possibility to use in whole
15    or in part for your own use.
16        Do you recall -- do you agree with
17    that statement?
18 A.  Yes.
19 Q.  The next paragraph says, We agree, however,
20    to collaborate in case you would wish to
21    register this product in Spain.
22        My question to you is do you recall
23    registering the Omeprazole product in Spain
24    as Rimafar?

7 (Pages 22 to 25)

Page 26

1    CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2 A. Yes.
3 Q. Do you recall when you did that?
4 A. Approximately 1989, the process and
5    administration of the process are very long,
6    and I believe that we began in 1989.
7 Q. Did you -- strike that.
8        Let me show you another document.
9 A. I don't remember this one. I want to make
10    sure it's constant I don't remember this one.
11 Q. You're talking about Exhibit 3? You don't
12    have a memory of that letter; is that
13    correct?
14 A. No.
15        (Exhibit No. 4, Letter, EP 2466, so
16        marked)
17 Q. Now, I'm going to show you Exhibit 4, and
18    this is a document that is in English,
19    correct?
20 A. Correct.
21 Q. Is this a letter from you to Mr. Leduc at
22    Ethypharm?
23 A. It seems like it, yes.
24 Q. Now, before I ask you questions about this

Page 27

1    CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2    document, I had asked before whether you
3    registered the product of Omeprazole as
4    Rimafar. Do you recall that question?
5 A. Correct.
6 Q. No. Do you recall the question?
7 A. Yes.
8 Q. Was it registered as Rimafar or Laboratorios
9    Belmac or Belmac or do you recall?
10        MS. ABREU: Objection. Belmac what?
11 A. Rimafar.
12 Q. When did the name Rimafar change to
13    Laboratorios Belmac?
14 A. After the purchase.
15 Q. Do you recall what date that would be?
16 A. The purchase was March 1992, and afterwards,
17    there was a process of change of name.
18 Q. Do you recall when the registration of
19    Omeprazole was finalized?
20 A. The authorization of commercialization
21    happened afterwards, about 1993, beginnings
22    of 1993, I believe, the authorization.
23 Q. Does that change your understanding of the
24    name in which Omeprazole was registered?

Page 28

1    CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2 A. Yes. We began with a name, you know, when he
3    was registering Rimafar, and it was Ulzus
4    Rima, meaning Rimafar.
5 Q. Could you spell that for the court reporter?
6 A. I think this was the initial name. I think
7    it was a commercial name, U-L-Z-U-S R-I-M-A.
8 Q. Is it -- strike that.
9        So you began the process of
10    registration before Belmac in the U.S.
11    purchased Rimafar; is that correct?
12 A. Yes.
13 Q. Is it possible to register a product
14    generally with general knowledge and without
15    being actually able to manufacture that
16    product?
17        MS. ABREU: Objection. Calls for
18    speculation.
19 A. Yes. It's not possible to manufacture before
20    authorization.
21 Q. And is it possible to obtain authorization to
22    register a product without having the
23    understanding of how to actually manufacture
24    that product?

Page 29

1    CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2        MS. ABREU: Objection. Confusing.
3    Leading.
4 A. No, it's not possible.
5 Q. Let me refer you to this letter which is, I
6    believe, Exhibit 4. Can you recognize -- do
7    you recognize this document?
8 A. I recognize my signature.
9 Q. So this is a document that you signed and
10    sent to Mr. Leduc, correct?
11 A. I don't know. You know, I recognize my
12    signature, but I don't recognize the
13    document, so I don't know.
14 Q. This document is written in English. Do you
15    ever write letters in English?
16 A. Not me directly. Sometimes through my
17    secretary.
18 Q. So, in other words, sometimes you write a
19    letter in Spanish, and then your secretary
20    translates it for your signature?
21 A. It's possible. But always with the original
22    copy in Spanish.
23 Q. In other words, you send the original Spanish
24    copy as well?

8 (Pages 26 to 29)

Page 30

1     CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2 A. No, for my files.
3 Q. Let me address your attention to the second
4     paragraph of the letter. First, at the very
5     top it says, Dear, Sir, I'm gladly going to
6     answer your fax dated 6/23/92.
7          And do you understand that refers to
8     Exhibit 3?
9 A. It's possible.
10 Q. And the second paragraph says, Second,
11     Rimafar did not have the intention of
12     adapting its facilities to meet the GMP rules
13     to manufacture pellets. Is that true?
14 A. Yes, it's correct. He just repeated exactly
15     what I said.
16 Q. If we drop down one line, it says, We have
17     assigned 216 M of our laboratories and hired
18     five people only and specially to manufacture
19     for Ethypharm, based on your insistence and
20     the promises of millionaire orders and
21     contracts with third parties which would
22     represent a profitable deal.
23          Is that a true statement?
24 A. The concept is truth.

Page 31

1     CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2 Q. Do you recall hiring five people -- pardon.
3 A. Only that is not manufacturing for Ethypharm,
4     is manufacturing by Ethypharm. Ethypharm was
5     the one manufacturing.
6 Q. Did you hire five people to assist with the
7     manufacturing of Omeprazole around 1992?
8 A. It's possible. Machinery maintenance or
9     cleaning of machinery, the cleaning of the
10     installations, transporting of merchandise of
11     what could have been manufactured. This was
12     practically it.
13 Q. Turning to paragraph 5 or the paragraph
14     marked fifth, it says, We don't need
15     Ethypharm technology to register and
16     commercialize our Omeprazole. Our registered
17     dossier has not been prepared based on your
18     technology. We have received offers of
19     pellets even in capsules. Do you see that,
20     those two lines?
21 A. Yes, of course.
22 Q. Can you explain that to me in anymore detail?
23 A. Yes. It is necessary when you request the
24     registry of the product to the Spanish

Page 32

1     CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2     ministry of health to present dossier in
3     amplitude with all the details of the product
4     that we're interested or pretending to
5     register, and everything, all the process of
6     collaboration, prime material or active
7     substance and other ingredients, secondary
8     ingredients, a conditioning process and all
9     the practical detail of manufacturing that we
10     presented in the year 1989 I believe for the
11     registry of our Omeprazole.
12 Q. Where did you get that information that
13     formed the basis of the dossier?
14          MS. ABREU: Objection. Time frame.
15 Q. For Omeprazole?
16 A. At the pharma copy.
17 Q. What is the pharma copy?
18 A. It's a conjunction of instructions and
19     references that exists to treat the
20     pharmaceutical products, pharm copy, American
21     pharm copy, European pharm copy and Spanish
22     pharm copy.
23 Q. Is this all public information?
24 A. Yes, public.

Page 33

1     CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2 Q. This is not proprietary know-how?
3 A. No. It's public. The know-how is the
4     application of the knowledge of the pharm
5     copy.
6 Q. Let me take you to paragraph 4, and this
7     paragraph reads, Fourth, we have never said
8     that the savoir-faire -- does that mean
9     know-how?
10 A. You know, it's kind -- it could be know-how.
11     It's like meaning that you know how to do it,
12     but what is the translation of know-how
13     exactly.
14 Q. Why don't I ask you what your understanding
15     of the word "know-how" means?
16          MS. ABREU: Objection. Confusing.
17 A. I understand it's the conjunction of
18     knowledge of a topic. Saffair means to know
19     how to do something.
20 Q. And is some know-how that companies create
21     secret?
22 A. Yes.
23 Q. And is some know-how that companies create
24     valuable?

9 (Pages 30 to 33)

Page 34

CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY

1
2     MS. ABREU: Objection. Calls for
3  speculation.
4 A. Yes.
5 Q. And sometimes pharmaceutical companies enter
6    into agreements that acknowledge that --
7 A. Sometimes it's possible.
8 Q. -- that recognize that one party holds secret
9    know-how as its own property?
10     MS. ABREU: Objection. Calls for
11  speculation.
12 A. That one of the parties --
13 Q. Let me strike this; and I'll ask the question
14    in a slightly different way. I'm asking now
15    a very general question for people who do not
16    work in the pharmaceutical industry. I don't
17    work in the pharmaceutical industry, and I'm
18    trying to understand a concept.
19 A. We're in agreement.
20 Q. Is it common in the pharmaceutical industry
21    for one company to develop know-how that is
22    valuable about manufacturing a product and to
23    enter into agreements with other companies to
24    keep that know-how secret?

Page 35

CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY

1
2     MS. ABREU: Objection. Confusing.
3  Calls for speculation.
4 A. Yes, it's possible. Yes, it's possible.
5 Q. What is the purpose of that?
6     MS. ABREU: Same objections.
7 A. In each case it probably is a different
8    purpose. There's not a common purpose.
9 Q. As the head of Laboratoires Grapa, for
10    example, do you hold -- have you developed in
11    that company any know-how that is your
12    property?
13 A. Yes.
14 Q. And are you very careful to guard that
15    know-how?
16 A. Yes.
17 Q. Why?
18 A. Because it's a consequence of a work.
19 Q. And is it also an asset of the company?
20 A. Yes.
21 Q. And so you don't want to simply give that
22    property to someone else, correct?
23     MS. ABREU: Objection.
24  Argumentative.

Page 36

CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY

1
2 A. No, not necessarily.
3 Q. And if you do share that information, that
4    valuable know-how, you will often enter into
5    an agreement that says that the other party
6    can't use it without your permission?
7 A. Yes, it will be part of the text of the
8    agreement of the conditions. I always sign a
9    contract. Always a contract would be signed.
10 Q. About the know-how?
11 A. Decision of the know-how utilization of the
12    know-how and other reciprocal concept.
13    That's how I do things.
14 Q. Let me refer you to paragraph six or the
15    paragraph marked six. It says, Sixth, the
16    relationship between Rimafar and Ethypharm is
17    previous to the appearance of our president
18    Mr. Rossignol, and I am obliged to clarify
19    this point by myself.
20     I do not understand that sentence.
21    Do you know what you meant by that in this
22    letter?
23 A. Although I don't remember the letter in
24    relation to the text, it is clear that it is

Page 37

CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY

1
2    referring to the commentary that Mr. Leduc
3    makes.
4 Q. And you're pointing to Exhibit 3 now?
5 A. Yes, on document 3, in relationship with
6    Mr. Rossignol. That's what I understand by
7    paragraph 6.
8 Q. And can you explain a little more of how
9    paragraph 6 responds to Mr. Leduc's question?
10 A. I don't know what Mr. Leduc's intentions by
11    this question. I can just apply common sense
12    if I read this two text. Although I
13    recognize my signature, I just don't
14    remember.
15 Q. What is your common sense reading of
16    paragraph six? What does it mean?
17 A. When I read paragraph six, I'm indicating to
18    Mr. Leduc that the decision of what we have
19    commented is only mine, only my comment.
20 Q. Back on paragraph five, did you ever use
21    Ethypharm know-how and technology to register
22    Omeprazole?
23     MS. ABREU: Objection. Time frame.
24 A. Excuse me. Ethypharm technology?

10 (Pages 34 to 37)

Page 38

1    CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2 Q. Yes. Did you ever -- ever is the time frame.
3     Did you ever use Ethypharm technology or
4     know-how to register Omeprazole?
5 A. He's saying not in absolute. Not in
6     absolute.
7 Q. Absolutely no?
8 A. Absolutely no. Clearly no.
9         MR. BOSTWICK: Why don't we take a
10     five-minute break.
11         THE VIDEOGRAPHER: The time is 10:45
12     a.m. We're going off the record. Actually,
13     this completes tape number one of volume two.
14         (Recess)
15         THE VIDEOGRAPHER: The time is 11:01
16     a.m. on June 29, 2006. This is tape number
17     two, volume two.
18         MS. ABREU: Before we begin, I just
19     wanted to put on the record a discussion that
20     counsel have had and agreed to that we will
21     preserve all objections, except as to form,
22     and motions to strike. Is that your
23     understanding as well?
24         MR. BOSTWICK: That's an accurate

Page 39

1    CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2     statement. So we don't have to do this for
3     all the depositions, why don't we just say at
4     this portion that's going to be the case
5     unless we state or agree otherwise.
6         MS. ABREU: For phase one
7     depositions, unless stated otherwise, that's
8     agreeable.
9         (Exhibit No. 5, Document, EP 9095,
10         so marked)
11 Q. Mr. Ayala, that was a simple matter of
12     administration between lawyers. Mr. Ayala,
13     I'm going to show you another, and I believe
14     this is number 5, correct?
15 A. Correct.
16 Q. And I would ask you to look at that document,
17     the first two pages of that document, and
18     when you're comfortable, tell me.
19         Let me first ask if you recognize
20     Exhibit 5?
21 A. Yes.
22 Q. What do you recognize it to be?
23 A. From Rimafar, it is recognizing the
24     installations inside the manufacturing plant

Page 40

1    CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2     of Rimafar that Ethypharm did. Installations
3     and machinery and utilities, elements,
4     complementary elements so Ethypharm could
5     manufacture the products. It is recognizing
6     that the installation has taken place and
7     their machinery of Ethypharm, installation of
8     machinery of Ethypharm.
9 Q. What was the purpose of Ethypharm installing
10     machinery in the Rimafar plant?
11 A. Ethypharm did not have facilities,
12     installations in Spain, and they wanted to
13     manufacture their procedures and they needed
14     a space, adequate space.
15 Q. They wanted to manufacture their procedures
16     or their products?
17         MS. ABREU: Objection. Calls for
18     speculation.
19 A. Their procedures in order to finalize the
20     product.
21 Q. And you and I have just used the term
22     "Rimafar," but I notice that the document
23     Exhibit 5 says Laboratorios Belmac; is that
24     correct?

Page 41

1    CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2 A. By that time it was Laboratorios Belmac
3     Spain.
4 Q. Let me read you the first paragraph of that
5     document, and this is Don Angel Perez De
6     Ayala declaring that Laboratorios Belmac is
7     negotiating with Ethypharm SA, the signature
8     of a manufacturing contract and collaboration
9     agreement following the projects of contracts
10     and the relations that both parties --
11         There's no need for you to
12     translate. I'm sorry. Why don't we have the
13     translator simply read you the portion in
14     Spanish, that first paragraph.
15         Do I understand from that paragraph
16     that during the period November of 1992
17     Laboratorios Belmac was negotiating a
18     manufacturing contract with Ethypharm; is
19     that correct?
20         MS. ABREU: Objection.
21 A. It was negotiating a manufacturing contract,
22     Ethypharm, at the facilities of Belmac.
23 Q. Who did you negotiate that -- who did you
24     negotiate with at Ethypharm with respect to

11 (Pages 38 to 41)

Page 42

CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY

1    the manufacturing agreement?

2 A. With Mr. De Basilio.

3 Q. Was Mr. Leduc involved at all?

4 A. Usually, no. Mr. De Basilio and myself were

5    in Spain. He was the delegated person from

6    Ethypharm.

7 Q. The second paragraph says, and you can read

8    that part, In parallel to these negotiations

9    and as those negotiations were unfolding,

10    Ethypharm had financed and completed some

11    work in installations, one of the sections of

12    the building owned by Laboratorios Belmac and

13    the costs -- I'm skipping a little portion --

14    the costs of the completed installations and

15    modifications amount so far, and then the

16    figure is a little over 20 million pesetas,

17    plus taxes.

18        Is that consistent with your memory?

19        MS. ABREU: Dwight, I would like to

20    put an objection on the record. You have

21    delved into phase two issues early today, and

22    it appears as though you're headed that way

23    right now with your questions.

Page 43

CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY

1        As you know, the scheduling order

2    provides for phase one depositions at this

3    point, and Bentley reserves its rights with

4    regards to questions that delve into phase

5    two and reserves its right to do the same

6    with Ethypharm witnesses when we depose them.

7        MR. BOSTWICK: For something that is

8    not a speaking objection, that was a pretty

9    long speaking objection, and I'll respond

10    because of that, that I don't see how we can

11    pursue the phase one discovery without

12    delving to some extent in a generalized way

13    *into this issue.*

14        And, in fact, it's usually Craig

15    Stuart who is usually telling me that, and

16    I'm the one who is saying we shouldn't go too

17    far, but I can't imagine that this is an

18    objectionable area. I'm simply asking him

19    whether Ethypharm had paid 27 million

20    pecestas.

21        MS. ABREU: I stand by the

22    objection.

23        MR. BOSTWICK: I'll just note that

Page 44

CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY

1    for the record. You can tell him that too

2    was an administrative matter between lawyers.

3 Q. Is that consistent with your recollection?

4        And if you need the question read back, we

5    can do that.

6 A. It's correct.

7 Q. Let me draw your attention to paragraph 4

8    which is not marked in the original. It's on

9    the top of the page. It's on the top of the

10    second page. Laboratorios Belmac likewise

11    recognizes receiving from Ethypharm SA the

12    technical documentation necessary for its

13    application to the health department in order

14    to obtain the humble location and approval of

15    the surface of the building where the

16    installations made by Ethypharm have been

17    taken place and where have been placed the

18    machines which belong to this company for the

19    manufacturing and production of the

20    microgranules and its packaging.

21        Is that accurate?

22 A. It's correct. It's technical documentation

23    of technical engineer of environment, the

Page 45

CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY

1    humidity, temperature, the ceiling of the

2    walls, and the ceiling of the rooms; and it

3    was elaborated by a third party, contracted

4    by Ethypharm.

5 Q. Now, there's also attached to this document

6    Exhibit 5, a list of items that were given by

7    Ethypharm to Laboratorios Belmac; is that

8    correct?

9 A. Correct.

10 Q. And so is my understanding correct that the

11    remaining pages of the document are lists of

12    items provided to Laboratorios Belmac by

13    Ethypharm?

14 A. No.

15 Q. What is that?

16 A. We always have to distinguish that the

17    elements, machinery elements -- complimentary

18    machinery elements are not of Belmac, all of

19    Belmac's. They are of Ethypharm, from and to

20    Ethypharm.

21        MR. FINE: Excuse me. I'd like to

22    put on the record and I think it's probably

23    inadvertent, but Mr. Palencia is nodding at

12 (Pages 42 to 45)

Page 46

CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY

1  certain points when the witness is
2  translating -- when the witness's answers are
3  being translated, and I would just like to
4  ask him if he could to be, please, careful
5  not to indicate his either assent or
6  disagreement with any of the witness's
7  answers.
8        MR. BOSTWICK: Why don't we go off
9  the record for just a moment.
10       THE VIDEOGRAPHER: The time is 11:20
11 a.m. We're going off the record.
12       (Recess)
13       THE VIDEOGRAPHER: The time is 11:21
14 a.m. We're back on the record.
15 Q. I believe, Mr. Ayala, that we were looking at
16 document No. 5, Exhibit 5, and you were
17 explaining to me that it is important to
18 recognize that Ethypharm was providing itself
19 information and technical documentation in
20 the context of producing or manufacturing
21 within Laboratorios Belmac?
22       MS. ABREU: Objection. Misstates
23 testimony.

*(note: numbering continues)*

Page 47

CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY

1 A. And machinery.
2 Q. Is my understanding correct?
3 A. Yes, correct.
4 Q. You were also, I think, explaining what the
5  last six pages of Exhibit No. 5 is and could
6  you do that?
7 A. That I was starting and revising -- not in
8  detail but generally speaking. General
9  speaking is yes.
10 Q. Can you give me a little more detailed
11 understanding about the contents of the last
12 six pages of Exhibit 5?
13 A. Yes, correct.
14 Q. Is it possible to describe in more detail
15 what these six pages are?
16 A. Machinery details of accessories and, et
17 cetera, of Ethypharm. That they were
18 installing in the space that Belmac
19 Laboratories Spain had given them their
20 access to at the plant at Zaragoza. And the
21 technical documentation, so Laboratories
22 Belmac Spain could request to the Spanish
23 ministry of health the authorization and

Page 48

CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY

1  evolution of the installations.
2 Q. Is it accurate to say that all of the items
3  listed in the last six pages were the
4  property of Ethypharm?
5 A. Correct, all the articles were property of
6  Ethypharm.
7 Q. Let me show you document number 6, and this
8  is a document in Spanish, correct?
9 A. Correct.
10 Q. And it appears to be dated January 12, 1993;
11 is that correct?
12 A. Yes, correct.
13 Q. Is this a document that you recognize?
14 A. I recognize it as being one of the many
15 projects, contract projects that we did with
16 Ethypharm, that, I believe, we didn't get to
17 sign.
18 Q. Do you -- when you say you didn't get to sign
19 this, what do you mean?
20 A. That we had an agreement problem. We
21 couldn't get to an agreement in order to sign
22 regarding all the terms that were drafted in
23 the contract.

Page 49

CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY

1 Q. Do you recall any specific terms that were a
2  particular problem?
3 A. I will have to read it in detail, but
4  generally speaking, the problem I had with
5  Ethypharm was the conditions. The politics
6  of contracts I wasn't in agreement. They
7  never convinced me. To me, they were always
8  like statements, and there's a word we use in
9  Spain meaning "leoninos" which I'm not sure
10 if there's a translation.
11      Basically they were unacceptable,
12 the conditions were unacceptable, generally
13 speaking. In specific, I will have to go
14 through it very carefully, but generally
15 speaking -- there were not a document, an
16 actual document proposed by Ethypharm that I
17 as a responsible party of operations of
18 Belmac Laboratory Spain operations will
19 consider acceptable. That's why I didn't
20 sign. That's what I remember in general.
21 Q. Could you look at 3.4, Section 3.4, and if
22 you could just read that to yourself for a
23 moment, 3.4.

13 (Pages 46 to 49)

Page 50

1 CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2      Did you ever have a problem with
3   that provision Section 3.4?
4      MS. ABREU: Objection. Phase two.
5 A. We never got to the point of completing this
6   condition. It was a point that it was
7   proposed, but it never took place by
8   Laboratorios Belmac Spain. It didn't take
9   place.
10      MR. BOSTWICK: Based on the
11   objection, I'll reserve going into that in
12   more detail for a later date.
13 Q. One moment. Mr. Ayala, did there come a time
14   when you were fired as the general manager of
15   Laboratorios Belmac?
16 A. Yes.
17 Q. Do you recall when that was?
18 A. Yes, clearly, 1994.
19 Q. Do you recall the month?
20 A. After the summer, I believe it was in
21   September, you know, September or towards the
22   end of 1994. I cannot remember exactly the
23   month. It could be November, September. You
24   know, I know it was towards the end of 1994.

Page 51

1 CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2 Q. I'm going to just say again if you have
3   longer answers you'll have to pause in the
4   middle of them.
5      MR. BOSTWICK: And for you, perhaps
6   you can hold up your hand at a point in time
7   when you need to stop.
8      THE INTERPRETER: If I can add, if
9   I'm translating for him not to speak because
10   that's when more information gets into me
11   when I'm speaking.
12 A. I apologize. I'm just trying to make an
13   effort to remember.
14 Q. It's very difficult for all parties, and we
15   appreciate your efforts. We were discussing
16   that your recollection is that you were fired
17   somewhere around September of 1994; is that
18   correct?
19 A. No.
20 Q. What is correct?
21 A. The correct is towards the end of 1994 I came
22   to an agreement to leave Belmac Laboratories
23   Spain.
24 Q. You had referred to being fired in September

Page 52

1 CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2   of 1994 earlier?
3      MS. ABREU: Objection.
4 Q. And my question is --
5 A. Terminated. I terminated my relationship
6   with Belmac.
7 Q. Can you tell me the circumstances that led to
8   your termination?
9 A. Of course. There was a difference of
10   criterias. In specifics or concrete,
11   Mr. Murphy wasn't in agreement in general
12   terms with my gestures.
13 Q. This is the first time in this deposition
14   that you have mentioned Mr. Murphy. You have
15   discussed other people at Belmac Corporation,
16   correct?
17 A. Yes.
18 Q. When did you first meet Mr. Murphy?
19 A. During the time of my exit from Belmac.
20 Q. And do you recall how many meetings you had
21   with Mr. Murphy?
22 A. Very few, one or two.
23 Q. And were those meetings in Spain or in the
24   United States?

Page 53

1 CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2 A. In Spain.
3 Q. Do you recall the dates of those meetings?
4 A. No. I remember it was towards the end of my
5   term of my collaboration with them.
6 Q. Had you ever spoken to Mr. Murphy by
7   telephone before the meetings in Spain?
8 A. No, I don't remember. I don't remember.
9 Q. Do you recall the very first time you met
10   Mr. Murphy?
11 A. I think the first time was when Mr. Murphy
12   came to Spain to Madrid to communicate to me
13   that there was a change of property at the
14   Belmac Corporation.
15 Q. One moment. What was the word you used in
16   Spanish, "property"?
17 A. Belmac Corporation were bought by Bell Trade,
18   were bought by Bell Trade.
19      MS. ABREU: Objection. Translation.
20 Q. Is it your testimony that in 1994 Belmac
21   Corporation in the United States was
22   purchased by another company?
23 A. I don't know for sure. I know there were
24   certain changes, but I don't know the

14 (Pages 50 to 53)

Page 54

1 CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2 details.
3 Q. Was this a change of leadership within Belmac
4 in the United States?
5 A. Possible. It is possible.
6 Q. Was it your understanding that Mr. Murphy was
7 taking over certain duties for other people
8 at Belmac Corporation in the United States?
9 MS. ABREU: Objection. Foundation.
10 A. Correct.
11 Q. What position did you understand Mr. Murphy
12 to hold when you first spoke with him?
13 A. I don't remember his title. What I
14 understood was that he was the person
15 responsible, et al. There were a lot of
16 changes happening.
17 Q. When you say that he was the person
18 responsible, do I understand you to mean that
19 he was the head of the United States
20 corporation?
21 A. I don't know. It was the person that United
22 States plays as intermediary with Spain, the
23 person from United States that is responsible
24 for the relationships with Spain.

Page 55

1 CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2 Q. I believe I heard you say that we -- strike
3 that.
4 What company was Mr. Murphy
5 representing when he came and spoke to you?
6 A. What company was Murphy representing? I
7 believe it was Belmac Corporation.
8 Q. Belmac Corporation in the United States?
9 A. Yes, in the United States.
10 Q. And did Mr. Murphy -- what did Mr. Murphy
11 tell you about any plans that existed for
12 Laboratorios Belmac?
13 A. He didn't inform me of no projects or no
14 plans.
15 Q. What did you discuss with Mr. Murphy?
16 A. My understanding was that Spain was very well
17 disconnected from United States, and there
18 have been changes in the United States, and I
19 was very disconnected. I was preoccupied
20 with the operations in Spain and
21 uncomfortable because I basically had no
22 relationships with United States.
23 And at one determined moment
24 Mr. Murphy came over as the person

Page 56

1 CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2 representing United States. I believe that
3 was the first meeting that we had, and he
4 expressed he was not happy in general terms
5 with the way that I administered Belmac
6 Spain, and I had wishes of leaving Belmac
7 Spain. So these two parties got together,
8 and we dissolved the contract.
9 Q. In this case, Bentley has stated in formal
10 answers to our questions that the reason you
11 were fired by Mr. Murphy was due to
12 philosophical differences --
13 MS. ABREU: Objection. Confusing.
14 Bentley Pharmaceuticals. I apologize,
15 Dwight. I didn't realize you weren't
16 finished.
17 Q. In corporate direction between -- let's read
18 back the question --
19 (Question read)
20 Q. In this case we have a procedure where we can
21 ask Bentley certain questions and they
22 respond. Do you understand?
23 A. Yes.
24 Q. And Bentley has provided a formal answer, and

Page 57

1 CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2 the formal answer was that Mr. Murphy fired
3 you due to philosophical differences in
4 corporation direction?
5 MS. ABREU: Objection. Confusing.
6 A. No. Of Belmac of Spain directions.
7 Q. Could you explain that? Do you mean that it
8 was a difference of agreement of the
9 direction that Laboratorios Belmac would
10 take?
11 A. No. Let me explain.
12 Q. Please explain your understanding of the
13 reason you were fired.
14 A. I have my own criterias, commercial criterias
15 and of directionship, leadership; and they
16 were only of Belmac Laboratory Spain. It had
17 nothing to do with Belmac Corporation of
18 Tampa. The differences with Mr. Murphy were
19 criterias in terms of the general procedures
20 of the operations in Spain.
21 Q. Do you recall what Mr. Murphy told you
22 specifically about why you were being fired?
23 A. No. And it wasn't like the usual fire way.
24 It was an agreement. Mr. Murphy was not in

15 (Pages 54 to 57)

Page 58

CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY

1  agreement with some aspects of my gestures,
2  and he made it clear to me; and also, I had
3  wishes that I wanted to leave Belmac. You
4  know, in reality you can consider it being
5  fired.
6      It was a proposal, and since there
7  was not a clear, you know, understanding or
8  agreement, then I had to do my own thing and
9  resolve my own thing.
10 Q. Who took over for you as general manager when
11    you left the company?
12      MS. ABREU: Objection: Ambiguous.
13    General manager of what?
14 A. I don't know. I don't know.
15 Q. Do you know who took over your duties?
16 A. I don't know. I had a very important project
17    going on, and it was very important to me,
18    and I just focused on the project and forget
19    about Belmac completely.
20 Q. When you say you had a very important project
21    going on, what do you mean?
22 A. I had a project to develop a job, very
23    different from pharmaceutical laboratories.

Page 59

CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY

1  Just in my own mind, you know, it was just
2  mentally I had it in my mind; and when I exit
3  from Belmac Spain, I dedicated myself just to
4  develop this project.
5  Q. Did you receive any e-mails from Mr. Murphy
6    about being fired or leaving the company?
7      MS. ABREU: Objection. Time frame.
8  A. No. I don't think so, but I don't remember.
9    I know that I resigned from the position, but
10   I don't remember if there was any
11   correspondence.
12 Q. So you don't remember any correspondence or
13   any e-mails relating to your firing?
14 A. No, it was a verbal conversation.
15 Q. How long did it last?
16 A. Not long. You know, maybe, I don't know,
17   maybe like half an hour, an hour, you know,
18   not long.
19 Q. Did you sign any documents, resigning or a
20   severance agreement?
21 A. No. I did sign a document resigning to the
22   position.
23 Q. Can you describe that document for me?

Page 60

CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY

2 A. It was a document almost like testifying that
3    I was resigning as president of Belmac
4    Laboratories Spain.
5      MR. BOSTWICK: I don't believe we
6    have that document produced, so I'd request
7    that it be produced if it existed.
8      MS. ABREU: We'll look into it.
9      (Exhibit No. 7, Document, EP 3317,
10     so marked)
11 Q. Let me show you an exhibit. This would be
12   Exhibit 7. This is a document in English,
13   and it's dated January 19, 1995, correct?
14 A. Correct.
15 Q. And let me first ask do you recall whether
16   you had left the company of Laboratorios
17   Belmac as of January 19, 1995?
18 A. Yes, correct. Yes, I do remember well.
19 Q. You remember well that you were gone?
20 A. Yes, perfectly.
21 Q. So if you look at the second page of this
22   document, Exhibit No. 7, and this discusses
23   Belmac announcing the formation of a joint
24   venture with Ethypharm. Would it be correct

Page 61

CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY

1  to say that you were not involved in that
2  process?
3  A. Correct.
4  Q. So you didn't participate in the press
5    release?
6  A. No, absolutely not.
7  Q. Or the discussions with Ethypharm officials?
8  A. Excuse me.
9  Q. Or the discussions with Ethypharm officials
10   about a joint venture?
11 A. At this date?
12 Q. At this date.
13 A. I wasn't there, and I was not participant of
14   nothing at all.
15 Q. When do you think your last contact was with
16   Ethypharm officials while you were still
17   general director of Laboratorios Belmac?
18 A. I think that frequently we were trying to
19   achieve an agreement. I don't remember
20   exactly, but most likely the same year that I
21   left Belmac Spain I was still communicating
22   with Ethypharm, with Adolfo De Basilio.
23     MR. BOSTWICK: Why don't we break.

16 (Pages 58 to 61)

Page 62

CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY

1    THE VIDEOGRAPHER: The time is 12:05
2  p.m. We'll go off the record.
3
4        (Discussion off the record)
5        THE VIDEOGRAPHER: The time is
6  12:17 p.m. We're back on the record.
7        MR. BOSTWICK: Mr. Ayala, I'm
8  finished with my questions for the moment,
9  and what will happen now is Bentley attorneys
10 have an opportunity to ask you some
11 questions, and then I may have a few after
12 that. Thank you.
13       EXAMINATION BY MS. ABREU
14 Q. Good afternoon, Mr. Ayala. As you know, my
15    name is Veronica Abreu, and I represent
16    Bentley Pharmaceuticals in this case. I
17    would like to also, as Dwight did earlier,
18    thank you for coming all this way to the
19    United States to testify in these
20    proceedings.
21 A. You're welcome.
22 Q. I just have a few questions for you today.
23    It should not take very long. You mentioned
24    earlier that you worked for Rimafar which

Page 63

CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY

1
2  then became Laboratorios Belmac; is that
3  correct?
4 A. Correct.
5 Q. And you also mentioned that Laboratorios --
6    that happened after Belmac Corporation
7    purchased Laboratorios Rimafar?
8 A. So what is the question?
9 Q. Did Belmac Corporation purchase Laboratorios
10    Rimafar?
11 A. Correct.
12 Q. Is that when Laboratorios Rimafar became
13    Laboratorios Belmac in Spain?
14 A. Correct.
15 Q. Was Laboratorios Belmac in Spain a subsidiary
16    of the American Belmac Corporation?
17 A. Correct.
18 Q. After the U.S. company Belmac Corporation
19    purchased Rimafar and it became Laboratorios
20    Belmac, who ran the day-to-day operations of
21    Laboratorios Belmac in Spain?
22 A. I personally.
23 Q. Did anybody at Belmac Corporation in the
24    United States instruct you on how you should

Page 64

CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY

1    run the day-to-day operations of Laboratorios
2    Belmac SA?
3
4 A. No.
5 Q. After the Belmac Corporation purchased
6    Rimafar and it became Laboratorios Belmac,
7    who communicated with Ethypharm with regard
8    to manufacture of Omeprazole in Zaragoza or
9    the agreement?
10       THE INTERPRETER: Can you repeat the
11    last part of the question.
12       (Question read)
13 A. Who communicated with? Always I communicated
14    with Ethypharm.
15 Q. After 1992, did anyone at Belmac Corporation
16    instruct you on how you should deal with
17    Ethypharm or negotiate with Ethypharm?
18 A. No. It was my decision, and it was part of
19    my responsibilities.
20 Q. You mentioned earlier that while you were at
21    Laboratorios Belmac and Rimafar earlier that
22    you had applied for marketing authorizations
23    to the Spanish ministry of health, is that
24    correct, for Omeprazole?

Page 65

CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY

1
2 A. That's correct.
3 Q. And just to clarify for the record, when the
4    ministry of health authorized the manufacture
5    of Omeprazole, in whose name was that
6    authorization issued? Was it Laboratorios
7    Belmac?
8       MS. ABREU: Objection.
9 A. The authorization was requested on the
10    Rimafar, and it was granted sometime later on
11    under Laboratorios Belmac.
12 Q. And who made the decision to apply for
13    marketing authorization with the Spanish
14    ministry of health for Omeprazole?
15 A. I did it with my team when we were on
16    Rimafar.
17 Q. And who else was on your team?
18 A. Technical director, commercial director,
19    medical director, manufacturing director, a
20    team; and there were also many other people,
21    but generally speaking, my decisions, I take
22    my decisions consulting with this team of
23    people.
24 Q. Was anyone from Belmac Corporation part of

17 (Pages 62 to 65)

**ESQUIRE DEPOSITION SERVICES**
**1-866-619-3925**

JT-A-86

Page 66
1    CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2    that team that you just referred to?
3 A. No, absolutely not.
4 Q. After 1992 were you ever instructed by anyone
5    at Belmac Corporation to apply for marketing
6    authorizations to the Spanish ministry of
7    health for Omeprazole?
8 A. No, because the application had been done
9    prior to.
10 Q. After 1992 were you ever instructed by anyone
11    at Belmac Corporation to steal Ethypharm's
12    intellectual property with regards to
13    Omeprazole or pellet technology?
14 A. No, absolutely. We had our own technology in
15    regards to Omeprazole, through other sources.
16 Q. After 1992, were you ever instructed by the
17    Belmac Corporation in the United States to
18    sell Omeprazole to Ethypharm customers or to
19    Ethypharm?
20 A. To sell Omeprazole? The operations in Spain
21    were my own operations. I didn't have any
22    concrete instruction from the corporation,
23    Belmac.
24        MR. BOSTWICK: Can we clarify when

Page 67
1    CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2    you have been saying since 1992 that means
3    from 1992 to 1994 when he was fired?
4        MS. ABREU: Absolutely.
5        MR. BOSTWICK: We should clarify
6    with the witness.
7 Q. When I say since 1992, I mean, of course,
8    from 1992 to 1994 when you left Laboratorios
9    Belmac?
10 A. Correctly.
11        MR. BOSTWICK: And his prior answers
12    relate.
13 Q. Do your prior answers relate to that time
14    period that we just explained to you?
15 A. Yes, of that period of time.
16        MR. BOSTWICK: Thank you.
17 Q. Were you ever -- apart from Ethypharm, were
18    you ever given any written or verbal
19    instructions from anyone at Belmac
20    Corporation regarding the manufacture of
21    Omeprazole between 1992 and when you left in
22    1994?
23 A. Never.
24 Q. Between 1992 and when you left in 1994, were

Page 68
1    CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2    you ever given any written or verbal
3    instructions from Jim Murphy regarding the
4    manufacture of Omeprazole or any other pellet
5    drug?
6 A. No.
7 Q. And just to amend my prior question as well,
8    between 1992 and when you left in 1994, were
9    you ever given any written or verbal
10    instructions from Belmac Corporation with
11    regard to the manufacture of any pellet drug?
12 A. No. I have projects, but it was office space
13    itself.
14 Q. Between 1992 and when you left Laboratorios
15    Belmac in 1994, were you ever given any
16    written or verbal instructions by anyone at
17    Belmac Corporation concerning what technology
18    you should use to manufacture Omeprazole?
19 A. No.
20 Q. From -- strike that.
21        At any time when you were working
22    for Laboratorios Rimafar from the beginning
23    through when you left Laboratorios Belmac in
24    1994, did anyone at Ethypharm ever tell you

Page 69
1    CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2    that they thought you were acting on behalf
3    of Belmac Corporation?
4 A. From Ethypharm to Rimafar, is that the
5    question?
6 Q. Let me clarify that. Did anyone who worked
7    for Ethypharm or any officials, anyone at
8    Ethypharm either in Spain or in France, did
9    they ever tell you during the time period I
10    mentioned earlier that they thought that you
11    were working on -- you were acting on behalf
12    of Belmac Corporation?
13 A. No. I don't remember nothing, absolutely
14    not.
15 Q. Now, I'd like to bring your attention back to
16    Exhibit 4 for one minute.
17        MR. BOSTWICK: Which one is that?
18    Mine aren't marked.
19        MS. ABREU: Exhibit EP 00426.
20        MR. BOSTWICK: Okay. I see it.
21    Thank you.
22 Q. Would you mind taking a look at paragraph 6
23    again, and I will read that to you because
24    it's in English and if you wouldn't mind

18 (Pages 66 to 69)

Page 70

CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY

1    translating. It states, Sixth, the
2    relationship between Rimafar and Ethypharm is
3    previous to the appearance of our president
4    Mr. Rossignol, and I am obliged to clarify
5    this point by myself.
6 A. Correct.
7 Q. During your relationship while you were still
8    at Rimafar in 1994 when you left Laboratorios
9    Belmac, did Mr. Rossignol ever give you any
10   instructions on how you should relate to
11   Omeprazole -- pardon me. Strike that -- on
12   how you should negotiate with Ethypharm with
13   regard to the manufacture of Omeprazole or
14   any other pellet truck?
15 A. No, absolutely not.
16    MS. ABREU: Thank you very much,
17   Mr. Ayala. I have no further questions.
18    MR. BOSTWICK: Only a few questions,
19   Mr. Ayala.
20    EXAMINATION BY MR. BOSTWICK
21 Q. You mentioned that you had a team of people
22   at Rimafar, and I believe you mentioned one
23   of the people on your team was a technical
24

Page 71

CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY

1    director?
2 A. Yes, you're obligated.
3 Q. Who was the technical director?
4 A. At that time it was Juan Carlos Asensio.
5 Q. Did Mr. Asensio stay with Laboratorios
6    Belmac?
7 A. When I left, yes.
8 Q. You also mentioned you had a manufacturing
9    director?
10 A. Yes, correct.
11 Q. Who was that?
12 A. Mr. Monterde.
13 Q. And you mentioned that there was a commercial
14   director as well?
15 A. Yes.
16 Q. And who was that?
17 A. Clemente Gonzalez Azpeitia.
18 Q. I believe you also mentioned you had a
19   medical director; is that correct?
20 A. Yes, that's correct.
21 Q. Who was the medical director?
22 A. Dr. Manual Espauelas.
23    MR. BOSTWICK: Mr. Ayala did refer
24

Page 72

CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY

1    to technology issues in his response, but
2    I'll simply reserve that, if that's,
3    acceptable for phase two.
4     MS. ABREU: That's fine.
5     MR. BOSTWICK: I'll reserve any
6    questions I have on that issue of him later.
7    Thank you very much for coming to the United
8    States, and I hope this wasn't too
9    disagreeable to you.
10    THE WITNESS: No, it wasn't that
11   bad, absolutely at all. It was a good
12   experience.
13    MR. BOSTWICK: Well, thank you very
14   much.
15    THE VIDEOGRAPHER: The time is 12:40
16   p.m. on June 29, 2006. This is the end of
17   tape number two.
18    (Whereupon the deposition was
19     concluded at 12:40 p.m.)
20
21
22
23
24

Page 73

CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY

1    C E R T I F I C A T E
2
3
4 COMMONWEALTH OF MASSACHUSETTS
5
6
7    I, Tina M. Sarcia, a Registered
8 Professional Reporter and Notary Public in
9 and for the Commonwealth of Massachusetts, do
10 hereby certify that the foregoing transcript
11 of the deposition of ANGEL PEREZ DE AYALA,
12 having been duly sworn, on Thursday, June 29,
13 2006, is true and accurate to the best of my
14 knowledge, skill and ability.
15    IN WITNESS WHEREOF, I have hereunto
16 set my hand and seal this 12th day of
17 June, 2006.
18
19
20
21    Tina M. Sarcia, RPR
22    Notary Public
23
24 My commission expires: March 13, 2009

19 (Pages 70 to 73)

Page 74

1    CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2    DEPONENT'S ERRATA SHEET
3    AND SIGNATURE INSTRUCTIONS
4
5        The original of the Errata Sheet has
6    been delivered to Veronica Abreu, Esq.
7        When the Errata Sheet has been
8    completed by the deponent and signed, a copy
9    thereof should be delivered to each party of
10   record and the ORIGINAL delivered to Dwight
11   Bostwick, Esq. to whom the original
12   deposition transcript was delivered.
13
14       INSTRUCTIONS TO DEPONENT
15
16       After reading this volume of your
     deposition, indicate any corrections or
17   changes to your testimony and the reasons
     therefor on the Errata Sheet supplied to you
18   and sign it. DO NOT make marks or notations
     on the transcript volume itself.
19
20   REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE
21   COMPLETED AND SIGNED ERRATA SHEET WHEN
22   RECEIVED.
23
24

Page 75

1    CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
2    ATTACH TO THE DEPOSITION OF ANGEL PEREZ DE
     AYALA
3    CASE: ETHYPHARM V BENTLEY PHARMACEUTICALS
            ERRATA SHEET
4    INSTRUCTIONS:  After reading the transcript
     of your deposition, note any change or
5    correction to your testimony and the reason
     therefor on this sheet. DO NOT make any
6    marks or notations on the transcript volume
     itself. Sign and date this errata sheet
7    (before a Notary Public, if required). Refer
     to Page 74 of the transcript for errata sheet
8    distribution instructions.
9    PAGE LINE
            CHANGE:
10          REASON:
            CHANGE:
11          REASON:
            CHANGE:
12          REASON:
            CHANGE:
13          REASON:
            CHANGE:
14          REASON:
            CHANGE:
15          REASON:
            CHANGE:
16          REASON:
            CHANGE:
17          REASON:
            CHANGE:
18          REASON:
            CHANGE:
19          REASON:
20
         I have read the foregoing transcript
21   of my deposition and except for any
     corrections or changes noted above, I hereby
22   subscribe to the transcript as an accurate
     record of the statements made by me.
23
24          ANGEL PEREZ DE AYALA  DATE

20 (Pages 74 to 75)

**A**

ability 73:14
able 14:20 22:24
  28:15
Abreu 2:12 4:5 7:18
  10:2,8,23 12:4,10
  13:3 14:18 17:14
  18:20 19:5,24
  21:20 24:20 27:10
  28:17 29:2 32:14
  33:16 34:2,10
  35:2,6,23 37:23
  38:18 39:6 40:17
  41:20 42:20 43:22
  46:23 50:4 52:3
  53:19 54:9 56:13
  57:5 58:13 59:8
  60:8 62:13,15
  65:8 67:4 69:19
  70:17 72:5 74:6
absolute 38:5,6
absolutely 25:11
  38:7,8 61:7 66:3
  66:14 67:4 69:13
  70:16 72:12
acceptable 49:20
  72:4
access 47:21
accessories 47:17
accurate 38:24
  44:22 48:3 73:13
  75:22
achieve 61:20
acknowledge 34:6
acting 69:2,11
active 23:12,13,17
  23:21,23 32:6
actual 49:17
adapting 30:12
add 51:8
addition 25:8
address 14:12 30:3
adequate 40:14
administered 56:5
administration
  26:5 39:12
administrative 44:3
administrator
  14:11
Adolfo 61:23
afternoon 62:14
agree 9:23 25:16,19
  39:5
agreeable 39:8
agreed 9:6 38:20
agreement 7:13,20
  9:7,14,21 10:11
  10:19 34:19 36:5

36:8 41:9 42:2
  48:21,22 49:7
  51:22 52:11 57:8
  57:24 58:2,9
  59:21 61:20 64:9
agreements 34:6,23
al 54:15
ALZAGA 3:4
Ambiguous 24:20
  58:13
amend 68:7
American 32:20
  63:16
amount 42:16
amplitude 32:3
Angel 1:14 4:3 5:5
  41:5 73:11 75:2
  75:24
Angell 1:21 2:13
announcing 60:23
answer 13:24 14:20
  14:22 30:6 56:24
  57:2
answered 10:24
  20:2
answers 46:3,8 51:3
  56:10 67:11,13
anybody 63:23
anymore 31:22
apart 67:17
apologize 12:10
  14:24 20:6 51:12
  56:14
appearance 36:17
  70:4
APPEARANCES
  2:2,24
appears 20:16,19
  42:23 48:11
application 33:4
  44:14 66:8
applied 64:22
apply 37:11 65:12
  66:5
appointed 17:21
appreciate 51:15
approval 44:15
approximately
  13:15 17:20 18:17
  20:9 26:4
April 17:20
area 43:19
Argumentative
  35:24
articles 48:6
Asensio 71:5,6
asked 10:23 19:24
  27:2

asking 34:14 43:19
ASOCIADOS 3:5
aspects 58:2
assent 46:6
asset 35:19
assigned 30:17
assist 31:6
ATTACH 75:2
attached 45:6
attention 6:2 11:6
  30:3 44:8 69:15
attorneys 1:7 2:1
  3:1 5:1 6:1 7:1
  8:1 9:1 10:1 11:1
  12:1 13:1 14:1
  15:1 16:1 17:1
  18:1 19:1 20:1
  21:1 22:1 23:1
  24:1 25:1 26:1
  27:1 28:1 29:1
  30:1 31:1 32:1
  33:1 34:1 35:1
  36:1 37:1 38:1
  39:1 40:1 41:1
  42:1 43:1 44:1
  45:1 46:1 47:1
  48:1 49:1 50:1
  51:1 52:1 53:1
  54:1 55:1 56:1
  57:1 58:1 59:1
  60:1 61:1 62:1,9
  63:1 64:1 65:1
  66:1 67:1 68:1
  69:1 70:1 71:1
  72:1 73:1 74:1
  75:1
authorities 22:18
authorization 27:20
  27:22 28:20,21
  47:24 65:6,9,13
authorizations
  64:22 66:6
authorized 65:4
Avenue 1:22 2:14
Ayala 1:15 4:3 5:5
  5:7 6:23 7:4,22
  39:11,12 41:6
  46:16 50:13 62:7
  62:14 70:18,20
  71:24 73:11 75:2
  75:24
Azpeitia 71:18
belong 44:19
a.m 1:23 5:3 38:12
  38:16 46:12,15

**B**

B 4:7
BAACH 2:5

back 13:23 37:20
  44:5 46:15 56:18
  62:6 69:15
bad 72:12
based 9:19 30:19
  31:17 50:10
basically 49:12
  55:21
Basilio 42:3,5 61:23
basis 32:13
began 6:3,6 26:6
  28:2,9
beginning 8:2 9:13
  14:10 18:18 68:22
beginnings 14:13
  20:9 23:13,13
  27:21
behalf 1:15 69:2,11
believe 7:23 26:6
  27:22 29:6 32:10
  39:13 46:16 48:17
  50:20 55:2,7 56:2
  60:5 70:23 71:19
Bell 53:17,18
Belmac 5:18,22
  12:3,5,21,23,24
  14:4 15:3 17:8,11
  17:12,17 18:2
  19:2,6,7,21 24:14
  27:9,9,10,13
  28:10 40:23 41:2
  41:6,17,22 42:13
  44:11 45:8,13,19
  46:22 47:19,23
  49:19 50:8,15
  51:22 52:6,15,19
  53:14,17,20 54:3
  54:8 55:7,8,12
  56:5,6 57:6,9,16
  57:17 58:4,20
  59:4 60:3,17,23
  61:18,22 63:2,6,9
  63:13,15,16,18,20
  63:21,23 64:3,5,6
  64:15,21 65:7,11
  65:24 66:5,11,17
  66:23 67:9,19
  68:10,15,17,23
  69:3,12 70:10
  71:7
Belmac's 45:20
belonged 11:20
benefit 21:10
benefits 9:3
Bentley 1:10 5:13
  5:22 43:4 56:9,14
  56:21,24 62:9,16

75:3
Berenguer 16:16
  17:22
best 9:11 73:13
better 12:7
bilingual 14:7 15:9
bit 17:24
Boston 1:22 2:15
Bostwick 2:3 4:4
  5:6 12:7 38:9,24
  43:8,24 46:9
  50:10 51:5 60:5
  61:24 62:7 66:24
  67:5,11,16 69:17
  69:20 70:19,21
  71:24 72:6,14
  74:11
bottom 8:12,13
  11:4
bought 53:17,18
break 38:10 61:24
bring 21:11 69:15
building 42:13
  44:16
business 5:13,17,21
  6:3,6 18:4

**C**

C 2:12 3:7 73:2,2
  24:5
called 19:6 23:12
  24:5
calls 13:17 28:17
  34:2,10 35:3
  40:17
capsules 31:19
careful 35:14 46:5
carefully 49:15
caring 14:10
Carlos 71:5
carrying 25:10
case 25:20 35:7
  39:4 56:9,20
  62:16 75:3
ceiling 45:2,3
certain 17:12 20:23
  46:2 53:24 54:7
  56:21
certify 73:10
cetera 47:18
change 2:7,12,17,23
  53:13 54:3 75:4,9
  75:10,11,12,13,14
  75:15,16,17,18
changes 53:24
  54:16 55:18 74:17
  75:21
Christina 15:14
circumstances 52:7