Page 14

1    A.  To my knowledge, it did not.

2    Q.  Okay.  Bentley Pharmaceuticals,
3 Incorporated, never had a fecha, did it?

4    A.  I have no information about the fecha
5 in the name of Bentley Pharmaceuticals for the
6 simple reason that, probably, Bentley
7 Pharmaceuticals as Bentley Pharmaceuticals never
8 had the activity of producing pharmaceuticals.

9    Q.  To your knowledge, Bentley
10 Pharmaceuticals never manufactured any
11 pharmaceutical product for Ethypharm, did it?

12    A.  To my knowledge, the name of Bentley
13 Pharmaceuticals was not registered with the
14 Spanish authorities.  It's not my knowledge.  I
15 don't know.

16        The fecha is not something symbolic;
17 it's something real.  You produce or you want to
18 produce so you ask the authorities to get the
19 fecha.  They come, inspect you.  If you don't
20 intend to produce, you don't need the fecha and
21 you would not obtain it.

22    Q.  And it doesn't -- it wouldn't surprise

Page 15

1 you if I -- if you were to learn that Bentley
2 Pharmaceuticals did not have the fecha to
3 manufacture pharmaceutical products in Spain,
4 would it?

5    A.  I don't -- I don't see your point.

6    Q.  Just to confirm, you have no -- you
7 have no knowledge as to whether Bentley
8 Pharmaceuticals ever obtained a fecha to
9 manufacture pharmaceutical products in Spain?

10    A.  I have no -- no knowledge of that.

11    Q.  And is it your testimony that as far
12 as you understand, Bentley Pharmaceuticals had no
13 facilities for manufacturing pharmaceutical
14 products?

15    A.  Unless Bentley Pharmaceutical is
16 amalgamated with Belmac in which case Bentley
17 Pharmaceutical has a facility with a fecha called
18 Belmac.

19    Q.  Is it fair to say that Bentley
20 Pharmaceuticals owned Laboratorios Belmac which
21 did have manufacturing facilities?

22    A.  Sounds correct.

Page 16

1        MR. STEWART:  Okay.  I'd like to have
2 marked as the next three exhibits three draft
3 agreements, more drafts.  We'll get to the signed
4 documents very soon.  The -- I'm sorry -- The
5 first is a document which begins with Bates number
6 BEL 006381.

7        (The reporter marked Exhibit 11.)

8        MR. STEWART:  The next has Bates
9 number 6372.

10        (The reporter marked Exhibit 12.)

11        MR. STEWART:  And that is Number --

12        THE REPORTER:  12.

13        MR. STEWART:  -- 12?

14        And the third begins with Bates number
15 3 -- 6371.

16        (The reporter marked Exhibit 13.)

17        BY MR. STEWART:

18    Q.  Mr. Debregeas, I would like you to
19 look at these drafts and, if you would, tell me
20 whether you had -- whether you recognize the
21 handwriting on any of these drafts.

22    A.  I don't know.  I don't know this

Page 17

1 handwriting.  It's in Spanish.

2    Q.  Do you know who prepared the
3 typewritten language on Exhibits 11, 12, and 13?

4    A.  No idea.

5    Q.  To your knowledge is this the first
6 time that you have seen these drafts?

7    A.  These ones, yes.  I've seen a lot of
8 them.  I don't know if it's -- I mean, I don't
9 know who typed that.  I don't know whose
10 handwriting it is.  I think you could find,
11 probably, tens.

12    Q.  I'm sorry?

13    A.  You could find tens of these.

14    Q.  We already have.

15    A.  Probably.

16    Q.  Now, you'll notice that at the
17 beginning of each of Exhibits 11, 12, and 13,
18 there is a space for the date.

19    A.  Yeah, and it's September 1997.

20    Q.  Yeah.  To your memory, as of
21 September 1997, did Ethypharm have a signed
22 agreement with Laboratorios Belmac for the

5 (Pages 14 to 17)

Page 18

1 manufacture of pharmaceutical products?

2     A.   For sure, there was at least one

3 document which had been signed up until Article

4 No. 8 by Mr. Perez De Ayala. I think we saw it

5 yesterday.

6     Q.   Yes.

7     A.   We didn't sign the -- the -- the pages

8 so it was -- I think it was signed by me all along

9 and signed by Mr. Perez De Ayala, Articles 1 to 8

10 including 8.

11    Q.   Well, you make specific reference to

12 Article 8.

13    A.   No, no. No, no, no, no. I don't make

14 specific reference to Article 8. It's -- 1, 2, 3,

15 4, 5, 6, 7 and 8 were countersigned by --

16    Q.   Ah.

17    A.   -- Perez De Ayala. And after 8 -- I

18 don't know how many articles there were but after

19 8, they were not -- they were signed by me, not by

20 Mr. Perez De Ayala.

21    Q.   Ah. Okay.

22    A.   And I must say that we have a certain

Page 19

1 number of contracts which have been signed. I'd

2 say it's like building a wall, you know. Get

3 bricks, first one being -- being until Article 8,

4 and then another one, and then another one. And

5 almost the end, there were bits, parts of

6 contracts that were signed.

7     Q.   Was it a concern of yours to obtain a

8 complete agreement between Laboratorios Belmac and

9 Ethypharm for the manufacture of pharmaceutical

10 products?

11    A.   Yes, of course. It's always better to

12 have a contract which can make the reference. In

13 case of doubt, you go back to the contract, but,

14 apparently, these -- our colleagues in Spain and

15 in U.S.A. didn't see the problem the same way.

16 And I must say that vis-a-vis the Spanish

17 authorities, there were short contracts explaining

18 the mode of operation, the way we were working

19 together in order to justify the quality of our

20 productions and to justify that the fecha be

21 maintained.

22         But it's quite frequent in Europe that

Page 20

1 the contract comes after a certain time of working

2 together because you learn, working together, what

3 becomes important and what is less important.

4     Q.   And when an agreement finally is

5 executed, the parties have the benefit of their

6 experience; is that fair?

7         MR. STEWART:  Would -- Would you

8 repeat it, please.

9         THE REPORTER:  "And when an agreement

10 finally is executed, the parties have the benefit

11 of their experience; is that fair?"

12        THE WITNESS:  Let's say that you can

13 have two sides in a contract, what is written and

14 what is oral.  What is written, we have had all

15 that, and what is oral.  In the U.S., you have

16 easily contracts that take one hundred pages.  In

17 Europe we are used to much shorter contracts.  We

18 have been working with Belmac with bits of

19 contracts adding to each other, and I must say

20 that at the end of our relationship, we had a

21 total, complete contract which permitted Belmac

22 and Bentley to -- How do you say?  Rescind the

Page 21

1 contract or terminate -- terminate the contract.

2 So without a contract, there was no possibility

3 for Bentley to terminate the contract.  And we

4 received an official notification of termination.

5         MR. STEWART:  All right.  Let's turn

6 to the -- to the manufacturing agreement that was,

7 indeed, signed.

8         First, let's have marked, please, as the

9 next exhibit a fax cover sheet from Adolfo De

10 Basilio to Mr. Debregeas.

11        (The reporter marked Exhibit 14.)

12        THE WITNESS:  Thank you.

13        MR. STEWART:  This will be Exhibit 14?

14        THE REPORTER:  Yes.

15        MR. STEWART:  Okay.

16        (Mr. Stewart conferred with

17        Ms. Abreu.)

18        BY MR. STEWART:

19    Q.   Mr. Debregeas, do you recognize the

20 handwriting that appears on the cover sheet of

21 Exhibit -- on the first page of Exhibit 14?

22    A.   Yes, it's my --

6 (Pages 18 to 21)

JT-A-373

Page 22

1    Q.  Okay.
2    A.  -- handwriting.
3    Q.  And what does it say?
4    A.  The document should go to RJ.  RJ is
5 Mrs. Rosaline Joannesse.  And below is written
6 "very important," "tres important."
7    Q.  "Tres important."
8        Why did this -- Why should this
9 document have gone to Rosaline Joannesse?
10    A.  Because Rosaline Joannesse was our,
11 say, internal lawyer.  I don't know if the -- that
12 exists.  She was the head of legal department
13 inside Ethypharm.
14    Q.  Okay.
15    A.  And she's trilingual.  I mean --
16    Q.  She was?  I'm sorry?
17    A.  Trilingual.  She speaks French,
18 English --
19    Q.  Ah.
20    A.  -- and Spanish perfectly, the three of
21 them.
22    Q.  Indispensable.

Page 23

1    A.  Yeah.
2    Q.  Okay.  Now, this -- the -- the fax
3 cover sheet references -- referring to Exhibit
4 14 -- pages one plus thirty-nine.
5        Do you see that?
6    A.  Yes.
7    Q.  Okay.  Do you know what those pages
8 refer to?
9    A.  You too know what that means because
10 you got the translation so it means that there
11 were most likely 39 pages of contract to be
12 reviewed, contract coming from Spain.
13    Q.  All right.
14        Let's look at at least one of those
15 contracts.  And may we have the contrato de
16 fabricacion?  And then the carta de compromiso de
17 compra.
18        Thank you.  That's great.
19        Okay.  So as the next exhibit, I'd
20 like the stenographer to mark for identification a
21 document which is in Spanish and it starts with
22 "contrato" and it begins with Bates number EP

Page 24

1 002919.  And that would be Exhibit 15?
2        THE REPORTER:  Yes.
3        (The reporter marked Exhibit 15.)
4        MR. STEWART:  Okay.
5        And then the next document is a document
6 which begins with the -- with the title, Carta de
7 Compromiso de Compra, Bates number EP 002921.
8        THE REPORTER:  16.
9        (The reporter marked Exhibit 16.)
10        (Mr. Stewart conferred with
11         Ms. Abreu.)
12        MR. STEWART:  Okay.
13        16.  I may have to borrow yours.  Yeah.
14 Okay.
15        (Mr. Stewart conferred with
16         Ms. Abreu.)
17        MR. STEWART:  Mr. Debregeas, let me
18 know when you have finished reviewing Exhibits 15
19 and 16, please.
20        THE WITNESS:  Okay.
21        BY MR. STEWART:
22    Q.  Turning first to Exhibit 15, the

Page 25

1 document is signed by Labo -- Laboratorius
2 Ethypharm S.A. by Adolfo de Basilio; is that
3 correct?
4    A.  Yes.
5        Yes.
6    Q.  And the document is signed for
7 Labratorios -- Laboratorios Belmac by Adolfo --
8 Adolfo Herrera; is that correct?
9    A.  At least it's what is written.  I
10 don't know specifically the signature of
11 Mr. Adolfo Herrera.  I know the signature of
12 Mr. Adolfo de Basilio; and it's mentioned at the
13 bottom, Belmac represented by Mr. Adolfo Herrera.
14    Q.  As of March 23 of 2000 and -- of
15 2000 -- had you met Adolfo Herrera?
16    A.  I did, yeah.
17    Q.  And what was your understanding as to
18 his position with Laboratorios Belmac?
19    A.  I think that there is a point that has
20 to be made regarding the responsibilities of
21 executives vis-a-vis the pharmaceutical law in
22 Spain.

7 (Pages 22 to 25)

**ESQUIRE DEPOSITION SERVICES**
**1-866-619-3925**

JT-A-374

Page 26

1    Q.    Before we get into that explanation,
2 what was your understanding of Adolfo Herrera's
3 position with Laboratorios Belmac?
4    A.    He replace Mr. Gonzalez.
5    Q.    Okay. And did you understand that his
6 title was director general?
7    A.    That's what is mentioned.
8    Q.    Exhibit 15, the contrato de
9 fabricacion, was not signed by Ethypharm France,
10 was it?
11    A.    It's signed by the -- the general
12 manager of the Spanish subsidiary of Ethypharm and
13 this representative is a PharmD registered with
14 the Spanish health ministry, the same as I've
15 always been with Ethypharm. I was what is called
16 the responsible person. That means that all the
17 relationship, all communication relating to
18 compliance, relating to marketing approval,
19 relating to inspections and so on, can be signed
20 only by what is called the responsible person; and
21 in France is called le pharmacien responsable.
22 That means that all the relationship in France and

Page 27

1 same -- Usually, all the relationship in Spain is
2 the same with the pharmaceutical authorities. The
3 Ministry of Health are in charge of one individual
4 who is -- who has special credentials and who is
5 accepted by the health ministry as the
6 representative of the company. Today, in
7 Ethypharm, the responsible person is Dr. Pascal
8 Oury. He's not the president. He's not the
9 director general. He's a member of the management
10 committee which is a request by the -- by the
11 law -- but he's the one representing Ethypharm for
12 all pharmaceutical and medical aspects. Gerard
13 Leduc who is the president and CEO doesn't sign
14 vis-a-vis the health ministry.
15    And the responsible person must be one
16 person in the top management so that he can argue
17 with the president or the CEO in case he feels
18 that there is a risk for health inside the company
19 or outside the company.
20    It's a -- I don't -- I don't -- I
21 don't think you have the same system in the U.S.
22 which doesn't mean that you don't have a good

Page 28

1 system, but it's a different approach.
2    And this concept that only a
3 pharmacist or PharmD can be responsible vis-a-vis
4 the health ministry is true in France, Spain,
5 Italy, Belgium, Holland; in the other European
6 countries, this person is called the qualified
7 person. That means that there is a certain number
8 of qualifications which must be fulfilled in order
9 to be the responsible person or the qualified
10 person. And Adolfo De Basilio is the qualified
11 person.
12    I don't remember if Mr. Adolfo Herrera
13 was the qualified person. Maybe. Maybe not. I
14 remember that -- No, I don't remember. I don't
15 know. Don't remember what is his education and I
16 don't remember if he is officially registered with
17 the -- he was officially registered with the
18 health ministry as the qualified person.
19    Q.    Thank you --
20    A.    I'm sorry --
21    Q.    -- for that explanation.
22    A.    -- but it's a -- It's a bit different

Page 29

1 from country to country.
2    Q.    Exhibit 15 does not mention Ethypharm
3 S.A. France, does it?
4    A.    Of course.
5    Q.    Where does it say that?
6    A.    No, no. Of course, it does not.
7    Q.    It does not?
8    A.    And it mentioned Ethypharm is
9 registered with the Spanish FDA as owner, holder
10 of marketing approval.
11    Q.    Okay. And --
12    A.    And the holder of the marketing
13 approval is the one responsible vis-a-vis the
14 local health ministry for the products so it could
15 not be a foreign company having its operations
16 outside of Spain that could be responsible.
17 You're supposed to be able to catch the people,
18 put them in jail if need, so --
19    Q.    And Exhibit 15 nowhere mentions
20 Bentley Pharmaceuticals, Incorporated, does it?
21    A.    Of course. Logical.
22    Q.    Of course not, you mean?

8 (Pages 26 to 29)

JT-A-375

Page 30

1    A.  Of course not.  This document is
2 intended to be produced to the health ministry
3 according to me because it's extremely short.
4 It's the kind of document that we submit to the
5 authorities.  What are the relationship between
6 the one giving the instruction, giving the orders,
7 placing the orders, and the one doing the
8 pharmaceutical production?  The -- The authorities
9 must know in order to be able to evaluate the
10 responsibility, the liabilities, of the different
11 partners.
12    Q.  Are you aware -- So it is your
13 testimony that the purpose of Exhibit 15 was a
14 document to be submitted to the Spanish Ministry
15 of Health?
16    A.  That's what I imagined.
17    Q.  Okay.
18    A.  I cannot confirm that this is what it
19 is but I know that there is a need vis-a-vis the
20 health ministry of a contrato de fabricacion.
21    Q.  And are you aware of any memorandum,
22 any piece of correspondence that -- between --

Page 31

1 internal to Ethypharm that says that the purpose
2 of Exhibit 15 is so that there is an official
3 document on file or to be submitted to the Spanish
4 Ministry of Health?
5    A.  I know what are the regulations in
6 Spain.  These document might pretty well be what I
7 said.
8    Q.  But my question is:  Is there anything
9 in the documentation at Ethypharm, internal, that
10 says that is the purpose of this document?
11    A.  I have no idea.  There may be
12 documents.
13    Q.  Are you aware of any letter to
14 Laboratorios Belmac or to Bentley which says that
15 the purpose of Exhibit 15 is to satisfy
16 requirements of -- official requirements of the
17 Spanish Ministry of Health?
18    A.  I have no idea.  The only point I see
19 is that this present agreement will have a
20 duration of two years.  It was signed March 23rd,
21 2000, and I know that the commercial agreement we
22 had with Bentley/Belmac was canceled at a date

Page 32

1 which was the official date and that was canceled
2 in November 2001.  That's why I have the
3 impression that this may be a document for
4 administrative reasons.
5    Q.  Well, let's --
6    A.  But -- But I cannot -- honestly tell
7 you more than that.
8    Q.  Let me see if I can help you with
9 that.  Turn, if you would, to -- There's an
10 English translation that appears at page 552.
11 Could you -- And I know that you read Spanish but
12 if you look at --
13    A.  I don't write it.  I read it.
14    Q.  I understand.
15    A.  Okay.
16    Q.  But if you take a look at 552 or at
17 page 2920 -- I'm sorry.  Yeah, 2920.  Paragraph G.
18 And I will read --
19    A.  Mm-hmm.  Okay.
20    Q.  I will read what is written at 552 in
21 English.
22    A.  Mm-hmm.

Page 33

1    Q.  (Reading) The present agreement shall
2 remain into effect for a period of two, number 2,
3 years.  And it will be renewed for the same period
4 except any of the parties denounce in written
5 before the expiration date, noting -- notifying it
6 at least four months before.
7        Without regard to the beauty of the
8 translation, have I read that correctly?
9    A.  Yeah.  It's okay.
10    Q.  Okay.
11    A.  Yeah.
12    Q.  And it's your understanding, is it
13 not, that this agreement was -- was canceled --
14 was canceled in -- sometime late November --
15    A.  No, early.
16    Q.  -- early November of 1991?
17    A.  (The witness nodded).
18    Q.  Okay.  And that would be providing --
19 I believe we'll get to that.  That was a -- a
20 notice of cancellation effective at the end of
21 March of 2002 --
22    A.  Mm-hmm.

9 (Pages 30 to 33)

Page 34

1   Q.  -- isn't that so?

2       MR. STEWART:  Oh, did I say 1991?

3       THE INTERPRETER:  Yes.

4       MR. STEWART:  I meant 2001.

5       THE WITNESS:  Yeah.

6       MR. STEWART:  Sorry.  Thank you.

7   Let me -- Let me start again.

8       THE INTERPRETER:  Okay.

9       MR. STEWART:  Okay.

10      BY MR. STEWART:

11      Q.  The notice -- There was a notice that

12  was sent in early November of 2001 advising

13  Ethypharm that this agreement would be terminated

14  as of March 23 of 2002; is that correct?

15      A.  That means, maybe, that it was already

16  in the mind of the people who signed the contract

17  that the expiring was already considered.

18      Q.  Is it correct that there was a notice

19  that was sent in November of 2001 that advised

20  Ethypharm that the agreement would be terminated

21  as of March 23 of 2002?

22      A.  Indeed, we received a letter -- When

Page 35

1   was it?  November -- maybe 14 or something like

2   that -- notice of termination of contract and we

3   received and we found in the -- the press on the

4   exact same day that Bentley had filed for patents

5   concerning the products manufactured -- patents

6   infringing our intellectual property.  So my

7   opinion is that all this was organized.  There was

8   a need of not far from two years to file the

9   patents so I don't know what the expression in

10  the -- in the U.S. -- and I don't want to mention

11  an expression that might be improper but for me

12  this is something perfectly organized.

13      Q.  Let's -- Let's focus for the moment

14  not on your -- not on your impressions but on the

15  facts that we can establish through the documents,

16  please.  Let's --

17      MR. GRACE:  Excuse me.  We've been

18  going for about an hour.  I need to take a -- a

19  short break.  It seemed like you were going to go

20  on to the document.  Could we do that now just for

21  four minutes, five minutes?  Or if -- If I'm

22  interrupting, you go ahead.

Page 36

1       MR. STEWART:  Yeah.  Let me just --

2       MR. GRACE:  Just sometime in the --

3       MR. STEWART:  Yeah.  Let me just --

4   Let me just go on to --

5       MR. GRACE:  Okay.

6       MR. STEWART:  -- to one other document

7   and then we can -- And then I'll be happy to take

8   a break.

9       MR. GRACE:  Okay.

10      BY MR. STEWART:

11      Q.  Refer, please, if you would, to

12  Exhibit 16.  Okay?

13      A.  Yes.

14      Q.  Do you recognize this as a Letter of

15  Purchase Undertaking that was executed -- signed

16  by Adolfo Basilio, Adolfo De Basilio, on behalf of

17  Ethypharm S.A. and signed by Adolfo Herrera on

18  behalf of Laboratorios Belmac?  Yes, sir?

19      A.  Yes.

20      Q.  There's no requirement -- Let me

21  ask -- Let me -- Let me withdraw that.

22      Is it your belief that this document,

Page 37

1   this -- this Letter of Purchase Undertaking was

2   written to satisfy requirements of the Spanish

3   Ministry of Health?

4       A.  It's not the concern of the Spanish

5   health ministry, the pricing of the product.

6       Q.  So the answer is no?

7       A.  Probably no.  I --

8       MR. STEWART:  Okay.  Can we take a --

9   You want --

10      MR. BOSTWICK:  Okay.

11      MR. STEWART:  You want to take a short

12  break?

13      MR. GRACE:  Yeah.

14      MR. STEWART:  Okay.

15      THE VIDEOGRAPHER:  The time is ten

16  o'clock a.m. and forty-eight seconds.  Off the

17  record.

18      (Recess.)

19      (Mr. Bostwick replaced Mr. Grace.)

20      THE VIDEOGRAPHER:  On the record.  The

21  time is 10:17:26.

22      MR. STEWART:  Okay.

10 (Pages 34 to 37)

Page 38

1      BY MR. STEWART:
2      Q.  Mr. Debregeas, you mentioned a letter
3  that was received early in 2001 providing notice
4  of cancellation.  And let me have marked as the
5  next exhibit a letter dated November 14th of 2001
6  from Adolfo Herrera of Labora -- Laboratorios
7  Belmac.
8          (The reporter marked Exhibit 17.)
9      THE REPORTER:  17.
10     MR. STEWART:  Okay.
11     THE WITNESS:  Yes.
12     BY MR. STEWART:
13     Q.  Is this the letter that you were
14 referring to?
15     A.  Yes.
16     Q.  Okay.  Now, turning back to Exhibit 15
17 and -- Well, did you review this agreement before
18 it was signed?
19     A.  I don't remember.
20     THE REPORTER:  I didn't hear you.
21     THE WITNESS:  I -- I don't remember.
22     THE REPORTER:  Thank you.

Page 39

1      BY MR. STEWART:
2      Q.  Rosaline Joannesse was the person that
3  Ethypharm relied on for -- internally -- relied on
4  for legal matters inside the company; is that
5  right?
6      A.  Yes.
7      Q.  What -- What is her education and
8  legal background?
9      A.  She's a graduate in Political Sciences
10 from the Paris institute, Socialite Politique.
11 She is a trademark attorney.  She has legal
12 education although I don't think she obtained a
13 degree in law but she has a number of years of
14 practice of contractual law inside the company.
15     Q.  Okay.
16     A.  She left the company.  I don't
17 remember when but --
18     Q.  Do you know whether she is licensed to
19 practice law outside of the company?
20     A.  As a trademark attorney, yes.
21     Q.  Where does the license come from?
22     A.  That's an official license from the

Page 40

1  French -- French or European authorities.  I think
2  she's probably -- she's probably a European
3  trademark attorney.
4      Q.  And I -- I don't know the official
5  licensure bodies.  Who would -- Who would the --
6  Who would license her as a trademark attorney?
7      A.  The European authorities.
8      Q.  Do you know what authority that would
9  be?
10     A.  I'd say, when you are in the U.S., the
11 U.S. Patent Office, and we have in Europe the
12 European Patent and Trademark Office.
13     Q.  Okay.
14     A.  I think its headquarters are in
15 Alicante in -- in Spain.
16     Q.  Was it your practice to have Rosaline
17 Joannesse review contracts?
18     A.  Of course.
19     Q.  Was it her responsibility from time to
20 time to prepare contracts?
21     A.  Yes.
22     Q.  And especially if contracts were

Page 41

1  important, would she review them before they were
2  signed?
3      A.  Yes, of course.
4      Q.  Exhibit 15, can we agree, was an
5  important contract?
6      A.  It proved later to be important.
7      Q.  Was -- At the time did -- did -- Were
8  you -- You don't recall reviewing Exhibit 15
9  before it was signed; is that right?
10     A.  I don't have this reminiscence.
11     Q.  Did you see the contract at any time
12 before it was signed?
13     A.  That's possible.
14     Q.  Would you expect that Rosaline
15 Joannesse would have seen this contract before it
16 was signed, Exhibit 15?
17     A.  That's possible.
18     Q.  Did, in fact, Rosaline Joannesse draft
19 Exhibit 15?
20     A.  I don't think so.
21     Q.  Do you know who did?
22     A.  No.

11 (Pages 38 to 41)

Page 42

1   Q.  Do you know whether Mr. Leduc drafted
2 the contract?

3   A.  No, he doesn't speak nor write nor
4 read Spanish so --

5   Q.  Do you know whether -- Did Mr. Leduc
6 review Exhibit 15 before it was signed?

7   A.  Possible.

8   Q.  But you don't know?

9   A.  I don't know.

10      MR. STEWART: I'd like to have marked
11 as the next exhibits a series of contracts and
12 manufacturing -- yeah, a series of contracts.
13 First agreement -- a contract regarding vincamina
14 with Bates number EP 008113.

15      That would be 17?

16      THE REPORTER:  18.

17      MR. STEWART:  18.

18      (The reporter marked Exhibit 18.)

19      THE WITNESS:  Thank you.

20      MR. STEWART:  Next a contrato
21 pertaining to aspirina, Bates number EP 008108.

22      THE REPORTER:  19.

Page 43

1      MR. STEWART:  Thank you.

2      (The reporter marked Exhibit 19.)

3      MR. STEWART:  Next a contrato
4 pertaining to piroxicam, EP 008103.

5      (The reporter marked Exhibit 20.)

6      THE REPORTER:  20.

7      MR. STEWART:  And next, contrato
8 pertaining to indometacina, EP 008098.

9      THE REPORTER:  21.

10      (The reporter marked Exhibit 21.)

11      BY MR. STEWART:

12   Q.  Now, Mr. Debregeas, do you recognize
13 Exhibits 18, 19, 20, and 21 as contracts signed
14 between Ethypharm S.A. Spain and Lab --
15 Laboratorios Belmac?

16   A.  That's what it looks like for sure.

17   Q.  Okay.  And you recognize the signature
18 of Adolfo De Basilio on each of these contracts;
19 is that right?

20   A.  Yes.

21   Q.  And each of these contracts were
22 signed on or about March twenty -- Let me

Page 44

1 withdraw.

2      Each of these contracts are dated
3 March 23, 2000; correct?

4   A.  Yes, apparently that was a busy day.
5 Yeah?

6   Q.  Apparently.

7      Now, did you review any of these
8 contracts before they were signed?

9   A.  None.  None of them.

10   Q.  All right.  Do you know who prepared,
11 who drafted, these agreements?

12   A.  No.

13   Q.  Do you know whether Rosaline Joannesse
14 reviewed these agreements before they were signed?

15   A.  I hope so.

16   Q.  Is -- Is it fair to say that you would
17 have expected her to re -- to have reviewed these
18 contracts?

19   A.  Exact, but it doesn't look like her
20 writing.

21   Q.  I'm sorry?

22   A.  It doesn't look like the things she --

Page 45

1 she did, you know.  Doesn't seem to be written by
2 her but --

3   Q.  But you don't know; is that right?

4   A.  I don't know.  Absolutely.

5   Q.  Was it your understanding that the
6 letter of November 14th of 2001 from Adolfo De
7 Basilio gave notice --

8      MR. BOSTWICK:  I'm sorry.

9      THE WITNESS:  No, no, no, no.

10      MR. BOSTWICK:  Refer him to the
11 exhibit number.

12      MR. STEWART:  Oh, Exhibit 17.

13      THE WITNESS:  Adolfo --

14      MR. STEWART:  I'm sorry.

15      THE WITNESS:  Adolfo Herrera.

16      MR. STEWART:  Of Adolfo Herrera.
17 Adolfo Herrera, yeah, yeah.

18      I'm sorry.  Let me start again.

19      THE WITNESS:  Yes.

20      BY MR. STEWART:

21   Q.  Is it your understanding that the
22 letter from Adolfo Herrera which we've marked as

12 (Pages 42 to 45)

Page 46

1 Exhibit 17 gave notice of Laboratorios Belmac's
2 intention not to renew all contracts between
3 Ethypharm and Laboratorios Belmac?
4    A.  "Carta de compromiso de compra." It's
5 not contrato de fabricacion so I think it refers
6 to carta de compromiso de compra -- de compra.
7 This is the Document No. 16.  It refers to
8 Document No. 16.
9    Q.  My question is whether it was your
10 understanding that the intention of Laboratorios
11 Belmac -- Was the intention, to your
12 understanding, of Laboratorios Belmac to revoke
13 all of it agreements with Ethypharm as of March 23
14 of 2002?
15       MR. BOSTWICK:  Objection.  Asked and
16 answered.
17       THE WITNESS:  I read what is on
18 Exhibit 17 and I see that it refers to Exhibit 16.
19   BY MR. STEWART:
20    Q.  I understand that and what -- my
21 question goes beyond that.  And so let me -- Let
22 me try -- Let me try it this way.

Page 47

1       After March 23 of 2002, did
2 Laboratorios Belmac continue to manufacture
3 pharmaceutical products for Ethypharm?
4    A.  To my knowledge, yes.
5    Q.  Which products did it manufacture?
6    A.  Omeprazole, indometacina, piroxicam,
7 vincamina.
8    Q.  And aspirina?
9    A.  Aspirina.  And probably other products
10 too.
11    Q.  Okay.  Now, we have seen in -- as of
12 March 23 of 2002 --
13    A.  Nnh-nnh.
14    Q.  Sorry -- March 23 of 2000 --
15    A.  Yeah.
16    Q.  -- March 23 of 2000 -- that there are
17 seven agreements between -- (To the interpreter)
18 Go ahead -- between Ethypharm France and
19 Laboratorios Belmac; correct?
20    A.  Well, documents until Document No. 21,
21 Laboratorios Belmac and Ethypharm Spain.  Maybe
22 the documents you have here are different but

Page 48

1 those that I have in my hands are between
2 Ethypharm in Spain and Belmac in Spain.
3    Q.  Yes.  And there are seven of them; is
4 that right?
5    A.  Are they the ones you have in front of
6 you?
7    Q.  They're the ones that I have in front
8 of me and the ones that I think you have in front
9 of you, Exhibits 15 through 21.
10    A.  Right.
11    Q.  Okay.
12    A.  Spain and Spain.
13    Q.  Tell me all of the documents that you
14 are aware of that were signed between Ethypharm
15 and Bentley Pharmaceuticals, Incorporated.
16       MR. BOSTWICK:  Objection.  Vague.
17       Was the question "the documents"?  The
18 question was documents.
19       MR. STEWART:  Contracts.  Do you want
20 me to restate?
21       THE WITNESS:  Yes, please.
22       MR. STEWART:  Sure.

Page 49

1       BY MR. STEWART:
2    Q.  Tell me all of the contracts that were
3 signed between Ethypharm and Bentley
4 Pharmaceuticals.
5    A.  I'm unable to tell you that.  Keep in
6 mind, I'm no more in the company since
7 November 10, 2005, so I don't have access to all
8 those documents.  I'm here as a witness.  I'm not
9 here as the -- the president of Ethypharm.
10    Q.  I'd ask you to search your memory and
11 tell me if there is any document that you know of
12 that exists between Bentley Pharmaceuticals,
13 Incorporated, and -- that was signed -- any
14 contract that was signed between Bentley
15 Pharmaceuticals, Incorporated, and Ethypharm.
16    A.  For sure, there are documents which
17 have been signed.  Early to that, there are a lot
18 of oral agreements.  There were a lot of
19 conversations, so as always in our relationship
20 with Belmac U.S.A., Bentley U.S.A., and there were
21 a lot of contracts, and -- between Jim Murphy and
22 myself, Jim Murphy and my management team people.

13 (Pages 46 to 49)

Page 50

1 You can see in the file that documents were
2 exchanged back and forth, ultimately were signed,
3 part of it, and then another part of it, and so
4 on;
5     So if your question is, was the boss
6 Bentley Pharmaceutical, my answer is yes.
7   Q.  You know that wasn't my question.
8     Can you tell --
9   A.  Well, it's --
10  Q.  Can you --
11  A.  I'm sorry.
12  Q.  Is there -- Is there --
13  A.  I'm sorry.
14  Q.  You were the president and chairman of
15 Ethypharm France, really, from its inception --
16  A.  Mm-hmm.
17  Q.  -- isn't that right?
18  A.  That's right.
19  Q.  So my question is:  Are you aware
20 in -- Are -- Are you aware of any agreement that
21 was signed that bears the signature of Ethypharm
22 on the one hand and Bentley Pharmaceuticals,

Page 51

1 Incorporated, on the other which pertained to the
2 manufacturer of Omeprazole or other pharmaceutical
3 products?
4     MR. BOSTWICK:  Objection.  Asked and
5 answered.
6     THE WITNESS:  Extremely difficult to
7 reply to this question.  If you ask me my
8 understanding, the -- my -- my reply is yes.  If
9 you want me to cite the documents, I'm unable.
10 Memory, lack of information, but I think you have
11 all this in -- in the files.
12     BY MR. STEWART:
13  Q.  Did you review documents in
14 preparation for your deposition?
15  A.  Very few documents.
16  Q.  And your testimony remains that you
17 have no memory of a specific document; is that
18 right?
19  A.  I don't have problems of memory but I
20 have so many things in my head, you know, after
21 almost 30 years managing that company -- that
22 Spain was just one part.

Page 52

1   Q.  Is it, perhaps, that your memory is
2 fine but that such a document does not -- that
3 such a contract does not exist?
4     MR. BOSTWICK:  Craig, Craig, I've got
5 to object to that -- that argumentative --
6     THE WITNESS:  This what is easy.
7     MR. BOSTWICK:  This has been asked and
8 answered a number of times.  You're not saying,
9 for example, that he could have remembered the
10 seven documents specifically, the titles and the
11 dates of those, if you hadn't showed them to him.
12 I -- I mean -- it's not a game.  He's asked --
13     MR. STEWART:  It's an important --
14 It's an important issue.  And this witness has
15 told us that he has no memory.  I'll let it go at
16 that.
17     THE WITNESS:  I didn't say I have no
18 memory.  I have no specific memory of that but I
19 have memory.  You know, I don't have impaired
20 memory.  Yeah?
21     BY MR. STEWART:
22  Q.  Let's go to -- Oh, you mentioned

Page 53

1 that -- that on the same -- I -- I believe it was
2 your testimony that on -- on or about the same day
3 that you learned that Laboratorios Belmac was
4 terminating its purchase agreement with Ethypharm
5 that you also learned that -- I think you said --
6 Bentley had applied for patents.  Is that right?
7   A.  Yeah, published in the newspaper.
8   Q.  Was it Bentley who was the patent
9 applicant or was it Laboratorios Belmac?
10  A.  The author of the communication was
11 Mr. Jim Murphy.  His name is mentioned on the --
12 in the newspaper --
13  Q.  Mm-hmm.
14  A.  -- so --
15  Q.  Do you remember whether the applicant
16 was Laboratorios Belmac or whether it was --
17  A.  No, but I'm -- I'm sure that you have
18 the document.
19  Q.  But you -- you don't remember it; you
20 don't remember yourself; is that right?
21  A.  I remember Jim Murphy, the name of Jim
22 Murphy, yeah.

14 (Pages 50 to 53)

**ESQUIRE DEPOSITION SERVICES**
**1-866-619-3925**

JT-A-381

1    Q.  Do you remember whether it was Belmac
2 or Bentley that applied for the patent?
3    A.  For me it's the same.
4    Q.  I understand, but do you remember
5 whether it was Belmac or Bentley that applied?
6    A.  But one thing that I see here is that
7 there was a knowledge of the patents of Ethypharm
8 relating to Omeprazole in the Document No. 15.
9 It's mentioned, microgranules of Omeprazole
10 according to Patent No. 9,270,249.
11    Q.  You haven't answered -- my -- my
12 question, though.
13    A.  No, no.
14    Q.  Do you remember whether the applicant
15 was Belmac or Bentley?
16    A.  No, I don't know.
17    Q.  Okay.
18    A.  Honestly, I don't know.  I remember
19 that it was communicated officially by Mr. James
20 Murphy.
21    Q.  And, Mr. Murphy, of course, was
22 president of Laboratorios Belmac as well as

1 president of Bentley?
2    A.  I think -- I think it's no problem to
3 find who filed and to whose benefit.
4        THE REPORTER:  22.
5        (The reporter marked Exhibit 22.)
6        (Mr. Stewart conferred with
7        Ms. Abreu.)
8        MR. BOSTWICK:  So this will be 23.  Is
9 that --
10        THE REPORTER:  23, yes.
11        MR. STEWART:  One more.
12        MS. ABRUE:  23.
13        MR. STEWART:  Okay.
14        (The reporter marked Exhibit 23.)
15        MS. ABRUE:  24.
16        (The reporter marked Exhibit 24.)
17        BY MR. STEWART:
18    Q.  I'm going to ask you, Mr. Debregeas,
19 to refer to Exhibit 22.
20    A.  Yes.
21    Q.  All right.  And is that a -- Does
22 that -- Does Exhibit 22 bear your signature?

1    A.  No, it's not my signature but there is
2 "PO." That means per order with the
3 authorization --
4    Q.  Okay.
5    A.  -- so signed by somebody who was
6 permitted to sign for me.
7    Q.  Do you know who that was?
8    A.  No, but the other signature is Gerard
9 Leduc, my partner, so authentification is
10 sufficient, I would say.
11    Q.  And you -- you were aware of this
12 letter when it went out; is that fair?
13    A.  Yes, because Document 24 is signed by
14 me confirming the meeting so I --
15    Q.  And there was a letter from -- a
16 letter dated -- a letter dated February 6, 2002.
17 This is a copy which appears to be -- Well, it
18 was -- has Adolfo Herrera's name on the bottom.
19    A.  Mm-hmm.
20    Q.  Did you -- Did you receive a signed
21 letter from Adolfo Herrera?
22        MR. BOSTWICK:  Objection to the form.

1        THE WITNESS:  I don't know but it
2 seems obvious in the sense that I replied to him
3 February 11 -- February 1st for Document No. 22,
4 February 6th for No. 23, and February 11 for
5 No. 24 so it seems to be sequentially correct.
6        MR. STEWART:  Just give me one moment
7 here.
8        BY MR. STEWART:
9    Q.  We don't seem to -- If you refer,
10 please, to Exhibit 22, in the first sentence, it
11 says, We have received through Mr. Adolfo De
12 Basilio copy of your letter dated January 2, 2002
13 addressed to our subsidiary, Ethypharm S.A., in
14 Spain.
15        Have I read that correctly?
16    A.  Yes.
17    Q.  Do you recall the contents of that
18 letter of January 2, 2002?
19    A.  We don't -- I don't seem
20 to have a copy of that.
21        THE WITNESS:  You don't have a copy of
22 it?

15 (Pages 54 to 57)

Page 58

1    MR. STEWART: Okay.

2    THE WITNESS: No --

3    MR. STEWART: Okay.

4    THE WITNESS: -- but seems obvious.

5    BY MR. STEWART:

6    Q. Okay. Well, what was the purpose of

7 the -- of the meeting that was agreed to?

8    MR. BOSTWICK: Objection to form.

9    THE WITNESS: I imagine it may have

10 been in order to define how their clients and our

11 clients could be taken care of, countering that

12 these clients were having products on the market,

13 were needing the supplies, and so how to handle

14 this situation without harming our clients and the

15 ultimate clients who are the consumers of

16 pharmaceutical products.

17    BY MR. STEWART:

18    Q. Did you attend the -- Well, let me

19 withdraw that.

20    There in fact was a meeting held on

21 February 21 of 2002; is that correct?

22    A. Oh, yeah, probably.

Page 59

1    Q. Okay.

2    A. You know, I don't have any of the

3 documents or things like that. You know, keep in

4 mind, I'm officially a retired man --

5    Q. I understand.

6    A. -- but seeing that the meeting was

7 organized in such a way, confirmed by me, and

8 thought, so it's clear that it took place.

9    Q. Did you attend that meeting?

10    MR. BOSTWICK: Objection.

11    MR. STEWART: Basis?

12    MR. BOSTWICK: I'm not sure we've

13 established the foundation in his mind that he

14 recalls the specific meeting you're talking about.

15 He -- He says that he thinks a meeting had taken

16 place but I -- I don't --

17    MR. STEWART: I'll put it very -- as

18 simply as I can.

19    BY MR. STEWART:

20    Q. Did you attend a meeting with Adolfo

21 Herrera on February 21 of 2002?

22    A. I would assume it would be a

Page 60

1 reminiscence that I attended a meeting with Adolfo

2 Herrera around these days. For sure, Adolfo

3 Herrera and one of his colleagues came to

4 St. Cloud.

5    Q. And was -- Do you recall that one of

6 the -- that the colleague that Mr. Herrera came

7 with was a Fernan -- a Fernando -- Dr. Fernando

8 Berenguer, also Fernando Berenguer Zuniga?

9    A. Probably. I don't know.

10    Q. Does that -- Does that -- Does that

11 sound familiar? No?

12    A. No. No, not specifically but --

13    Q. Okay.

14    A. -- maybe, you know.

15    Q. Do you --

16    A. He was not alone.

17    Q. He was not alone.

18    Do you recall ever meeting a Fernando

19 Berenguer?

20    A. I was meeting about one of the people

21 a week.

22    Q. I understand.

Page 61

1    A. So -- So, apparently, he was in that

2 meeting so I must have met him.

3    Q. All right. In any event, what you --

4 what you remember is a meeting where Herrera was

5 present, someone else was present on behalf of

6 Laboratorios Belmac. And who was present on

7 behalf of Ethypharm?

8    A. On a logical point of view, there

9 should have been, apart from myself; Gerard Leduc,

10 my partner; normally, Rosaline Joannesse; most

11 likely a lawyer. And I don't know if I remember

12 well but I think it might have been Mr. Lawrence

13 Meyer.

14    Q. And that meeting was in St. Cloud?

15    A. That meeting was in St. Cloud.

16    Q. Tell me what happened at that meeting.

17    A. I think that one of the -- this

18 meeting or another meeting in this time area with

19 these people -- I think that we reminded

20 Mr. Herrera that he was having some

21 responsibilities -- responsibilities that were

22 transferred to him by his headquarters in the U.S.

16 (Pages 58 to 61)

Page 62

1 as far as -- it's a U.S. company even if its the
2 Spanish operations. And I think that I asked
3 Mr. Lawrence Meyer to explain what the situation
4 was seen at a global point of view. And my
5 recollection is that Mr. Herrera asked for a break
6 in order to call Mr. Murphy, so we left him alone
7 with his colleague in the meeting room, gave him a
8 telephone but there is always a telephone in
9 there, the meeting room, so that he could review
10 the points for -- don't -- don't remember what he
11 said. We are -- We were not attending while he
12 was calling.
13    Q.  So Mr. Murphy was not at that meeting?
14    A.  According to me, was not at that
15 meeting; according to me, he could have reached by
16 phone and was reached by phone by Mr. Herrera.
17    Q.  What were the points that had been
18 discussed before the telephone call that you
19 believe Mr. Herrera made to Mr. Murphy?
20    A.  I'd say continuity of supply of the
21 clients. We probably explained to these gentlemen
22 the fact that we were very surprised by what

Page 63

1 con -- we considered might be patent
2 infringements.
3        I probably expressed that I was
4 extremely shocked.
5    Q.  What else?
6    A.  I think it's already a lot.
7    Q.  No, but I have to ask you to -- to be
8 as complete as your memory will allow.
9    A.  Yeah. I think my memory's not too bad
10 this time. Ah?
11    Q.  So you talked about continuity of
12 supply with customers. You expressed your
13 surprise at what you believed were infringements
14 of Ethypharm patents. Anything else?
15    A.  Yeah, and would say a kind of breach
16 of law, of business law.
17    Q.  What was the breach of -- I with --
18 I --
19    A.  No, no, I think it's too deep.
20    Q.  I -- I withdraw that.
21        Was anything said with regard to the
22 removal of Ethypharm machinery from Labora --

Page 64

1 Laboratorios Belmac's facility in Zaragoza?
2        MR. BOSTWICK:  If he recalls.
3        THE WITNESS:  Well, I'll just say, if
4 Belmac was to continue supplying its needs, the
5 needs of its clients, the needs of our clients,
6 they needed the machinery but, obviously, if it
7 was to supply their needs, the needs of their
8 clients and the needs of our client, excluding us
9 from our property, excluding us from our know-how,
10 technology, and so on, that probably requested
11 another type of action. That means potentially
12 removal and potentially the reason why we are here
13 today.
14        BY MR. STEWART:
15    Q.  Tell me what was said between you and
16 Mr. Herrera or any of the other people in
17 attendance at the meeting regarding Ethypharm's
18 machinery.
19    A.  I think I just told you. If we
20 proceed with the agreement which had just bean
21 canceled in November -- You need the machinery.
22 You need technology. You need all what we

Page 65

1 brought. If you don't proceed, we have to take
2 our machinery, put it somewhere else, in order to
3 be able to supply our clients.
4    Q.  Okay. And what was the response by
5 Mr. Herrera or others?
6    A.  I think he had to call Mr. Murphy but
7 he did.
8    Q.  And then happened?
9    A.  And then they left.
10    Q.  So -- So did they give you a response?
11    A.  I -- Well, I don't remember if I
12 stayed all along that meeting -- I think so but --
13 No, we got some news afterwards, you know.
14 They -- They had to -- That was a very important
15 decision for Bentley/Belmac, Ethypharm.
16    Q.  What was a very important decision?
17    A.  Breaching a big agreement, potentially
18 infringing patents. I think it's a very big
19 decision.
20    Q.  Did you say breaching the agreement,
21 breaching an agreement? Is that what you said?
22    A.  Yes.

17 (Pages 62 to 65)

Page 66

1    Q.  What agreement did it breach?  What
2 agreement did Laboratorios Belmac breach, or
3 Bentley breach?
4    A.  They had the agreement with us saying
5 that all the technology, know-how, was our
6 property, was in their hands in order to satisfy
7 the clients, so this is a very big breach of -- of
8 agreement.
9    Q.  So you believe that they breached an
10 agreement with regard to the use of Ethypharm's
11 technology?
12    A.  Let's say I feel -- I don't know what
13 the opinion of the lawyer is but I feel that we
14 are now discussing problems which are -- which go
15 beyond the testimony.
16    Q.  Well, see, I just --
17    A.  Keep in mind, I'm -- I'm a retired
18 executive.
19    Q.  I understand -- I was -- No -- but
20 I -- You said -- You were the one who said "breach
21 of the agreement."
22    A.  Yeah.

Page 67

1    Q.  And I want to make clear or to make
2 sure I -- I understand that by sending notice of
3 termination of the written agreement of March 23,
4 2000, you don't regard that act as a breach -- do
5 you?
6        MR. BOSTWICK:  Well, I -- I'm going to
7 object to the extent it calls for a legal
8 conclusion.
9        THE WITNESS:  Okay.
10       MR. STEWART:  Well, I'm asking
11 whether -- whether the -- simply --
12       MR. BOSTWICK:  Just get it translated.
13       MR. STEWART:  Okay.
14       MR. BOSTWICK:  That's my only
15 objection.
16       THE WITNESS:  The letter from Belmac
17 mentions "carta de compromiso de compra," concerns
18 only one document which is No. 16.  This is just
19 one part of the agreement of the contracts that we
20 have -- we had with your -- with that group
21 limited to Document 16.
22 . . .

Page 68

1        BY MR. STEWART:
2    Q.  And, therefore, what is -- what is
3 your answer to my question?
4        MR. BOSTWICK:  Objection.  Asked and
5 answered.
6        THE WITNESS:  I have already answered
7 one, two, three, four times.  I'm sorry.  But --
8 Can you please repeat your question.  I'm sorry
9 but --
10       MR. STEWART:  Yeah.
11       BY MR. STEWART:
12    Q.  Did you regard -- Do -- Do you regard
13 Laboratorios Belmac's notice of canceling the
14 purchase agreement to be a breach of that
15 agreement?
16       MR. BOSTWICK:  Objection.  That calls
17 specifically for a legal conclusion and he's given
18 you a factual answer.  He's -- that's directly on
19 point.  He specifically -- he specifically --
20       MR. STEWART:  All he's -- All he's
21 done is, he's directed my attention to a
22 particular document.  And I'm just asking whether

Page 69

1 he -- whether he, as the -- as the former
2 president and chairman and a 42.5 percent
3 shareholder --
4        THE WITNESS:  Sorry.  Go ahead.  Go
5 ahead.
6        MR. STEWART:  Whether you consider the
7 refusal to extend the purchase agreement to be a
8 breach.
9        MR. BOSTWICK:  Objection.  He
10 specifically -- That specifically calls for a
11 legal conclusion.
12       THE WITNESS:  I think I'm -- I'm
13 incompetent to reply to that as a -- on the legal
14 point of view.  On a business point of view, I was
15 awfully shocked.
16       MR. STEWART:  Okay.
17       THE WITNESS:  Okay?
18       MR. STEWART:  I'll take "awfully
19 shocked" as the -- as the answer to that.
20       BY MR. STEWART:
21    Q.  At the meeting -- At the meeting on
22 February 21, 2002, did you or Mr. Leduc or

18 (Pages 66 to 69)

JT-A-385

Page 70

1 Mr. Meyer --
2        THE INTERPRETER: Oh.
3        (The interpretation proceeded).
4        BY MR. STEWART:
5    Q.  -- threaten to sue Bentley?
6    A.  Oh, clearly not. We are -- We were
7 faced with a problem so we had to solve it as
8 business people first. It's only, ultimately, if
9 we can't find a solution but at that time I would
10 say that suing -- chancy -- that we would have
11 thought of suing -- were not exceeding 5 percent,
12 you know. We were -- We considered that we should
13 be able, among adults and a responsible business
14 men, to solve the -- the problems as we had always
15 done in the past.
16        1997, we threatened to get out of the
17 Belmac facility because they were not respecting
18 the Good Manufacturing Practice. I addressed this
19 problem directly to my colleague, Jim Murphy.
20 While we did not completely agree, finally, we
21 agree. Everything was corrected. And we were
22 happy again.

Page 71

1        You know, it's -- it happens normally
2 in business.
3    Q.  So in that -- at that meeting that
4 there -- you have no memory of anyone threatening
5 to sue Bentley; is that your testimony?
6    A.  No, I --
7        MR. BOSTWICK: Objection to form.
8        THE WITNESS: No, I would never accept
9 any of my people to make a threat to a business
10 partner.
11        BY MR. STEWART:
12    Q.  Okay. At that meeting of February 21,
13 did Rosaline Joannesse become upset and leave the
14 meeting?
15    A.  Everything is possible, you know. I
16 don't -- I don't remember exactly all the
17 specifics. I remember what was the -- the logic
18 for this meeting, that we tried to find solution.
19 Did somebody upset her? That's possible but, you
20 know, we are like soldiers, you know. We -- We
21 don't --
22    Q.  Okay.

Page 72

1    A.  -- We -- We don't have feelings or
2 anything like that. We are here to work.
3    Q.  Do you have a memory of her becoming
4 upset and leaving the meeting?
5    A.  I have no such specific souvenir but
6 keep in mind, we are Mediterranean people so we
7 express a lot, we move, and it doesn't mean that
8 we are --
9    Q.  So it's -- Is it your testimony it's
10 possible but you don't remember?
11    A.  It's possible and I don't remember,
12 honestly --
13    Q.  Okay.
14    A.  -- but sometimes you can see me upset,
15 too. Not here but --
16    Q.  When -- You -- You -- You have a
17 memory of meeting with Adolf -- with Adolfo
18 Herrera on -- on or about February 21 of 2002.
19 Did you have a meeting with him at any other time?
20        MR. BOSTWICK: Objecting to form and
21 timeframe.
22        THE WITNESS: Well, the meeting took

Page 73

1 place in February 2002.
2        MR. STEWART: 2002.
3        BY MR. STEWART:
4    Q.  Did I say 2001?
5    A.  Yeah.
6    Q.  I -- I beg your pardon. I meant 2001.
7    A.  It's not very important. I met him
8 several times for sure but --
9    Q.  Where did you meet him?
10    A.  In Madrid, somewhere else. You know,
11 I have been for years flying. I'd say maybe 20
12 times -- 20 percent of my time, 25 percent of my
13 time, you know, so I'm -- I'm among the top 2,000
14 clients of Air France, you know, so it means it's
15 not my second house but --
16    Q.  So you met him. You have a memory of
17 meeting him in Madrid and in St. Cloud?
18    A.  Maybe somewhere else.
19    Q.  Would you turn, please, to Exhibit 1,
20 the complaint.
21    A.  Pardon.
22    Q.  It's somewhere at the bottom.

19 (Pages 70 to 73)

Page 74

1        Okay. Take a look, please, at
2 paragraph 102 on page 23 of the complaint. I'm
3 going to read paragraph 102 and then I have a
4 question.
5        (Reading) At this February 21, 2002
6 meeting, Ethypharm repeated a previously expressed
7 concern that Bentley and its agent, Belmac S.A.,
8 were damaging Ethypharm by stealing its core
9 technologies, know-how, trade secrets, and
10 customer base relating to Ethypharm's Omeprazole
11 product. Ethypharm also insisted that Bentley and
12 its agent, Belmac S.A., return Ethypharm's
13 machinery. Finally, Ethypharm representatives,
14 including U.S. counsel, stated that under the
15 circumstances, it appeared that in order to
16 protect its valuable assets, Ethypharm would be
17 forced to bring a lawsuit against Bentley in the
18 United States.
19        Have I read that correctly, sir?
20    A.  Yes, sir.
21    Q.  Okay. Now, is it your testimony that
22 in fact there was no threat that Ethypharm would

Page 75

1 be forced to bring a lawsuit against Bentley in
2 the United States? Does that remain your
3 testimony?
4    A.  Ethypharm de la fine (phonetic) should
5 be read: Ethypharm would be forced by Bentley's
6 behavior to bring a lawsuit.
7    Q.  Do you --
8    A.  So the threat is coming from Bentley,
9 not from Ethypharm.
10    Q.  Do you --
11    A.  We are the victim.
12    Q.  Do you remember at that meeting -- Is
13 it -- Is it your testimony now that at that
14 meeting Ethypharm said that it would be forced to
15 bring a lawsuit against Bentley in the United
16 States?
17    A.  I think that what may have been said
18 is that we weren't --
19    Q.  I'm asking you for your memory.
20    A.  Yeah, but it's my memory. Yeah? That
21 probably we explained to Mr. Herrera that this was
22 not only a problem in Spain but it was a

Page 76

1 problem -- his mother company behaving in
2 disagreement with the law. Personally, I don't
3 know the U.S. law. Lawrence Meyer, Mr. Meyer,
4 knows it. And that was essential to having that
5 meeting, a lawyer knowing the law that was
6 applicable between a U.S. company, its branch in
7 Spain, a French company, its branch in Spain. We
8 were really in front of big international problem.
9 And Mr. Herrera understood it. That's why he
10 called his boss, Mr. Murphy.
11    Q.  Because Ethypharm said that it would
12 be forced to bring a lawsuit against --
13    A.  No.
14    Q.  -- Bentley in the United States?
15    A.  Ethypharm didn't say that. Ethypharm
16 said, Hey, Mr. Herrera. You're not the number one
17 of the group. The number one of the group, of
18 your group, is somewhere else and may be involved,
19 you know. I was number one of my group. I had my
20 number two, Mr. Leduc. We felt that it was
21 important that Mr. Herrera get the opinion of his
22 boss.

Page 77

1    Q.  You told him to call his boss?
2    A.  No. We said --
3    Q.  Oh.
4    A.  -- it might be wise. We didn't say --
5    Q.  You suggested that it might be wise?
6    A.  I think we talked to him that it
7 was -- the situation was too complex for him.
8    Q.  Let me read the last sentence here:
9 Finally, Ethypharm representatives, including U.S.
10 counsel, stated that under the circumstances, it
11 appeared that in order to protect its valuable
12 assets, Ethypharm would be forced to bring a
13 lawsuit against Bentley in the United States.
14        Is this sentence correct or is it not?
15 Yes or no.
16        MR. BOSTWICK: Objection to form.
17        THE WITNESS: Yes, is correct for me.
18        MR. STEWART: I'm sorry?
19        THE WITNESS: It's correct for me.
20        MR. STEWART: Okay. I understand from
21 our videographer that we have only a -- a few
22 minutes left in the tape and this would be a good

20 (Pages 74 to 77)

Page 78

1 time to take a break.

2       THE VIDEOGRAPHER:  This ends Tape No.

3 1 of Volume II of the Debregeas deposition.  The

4 time is 11:25:09.  Off the record.

5       (Recess.)

6       THE VIDEOGRAPHER:  On the record with

7 Tape No. 2 of Volume II of the testimony of

8 Mr. Patrice Debregeas in the matter of Ethypharm

9 versus Bentley Pharmaceuticals.  The date is

10 July 11th, 2006.  The time is 12:02:34.

11       MR. STEWART:  Like our stenographer to

12 mark as the next exhibit a letter dated

13 November 14th, 2001 from Mr. Adolfo Herrera to

14 Adolfo De Basilio.

15       THE REPORTER:  25.

16       (The reporter marked Exhibit 25.)

17       BY MR. STEWART:

18    Q.  Mr. Debregeas, have you had an

19 opportunity to read Exhibit 25?

20    A.  Yes.

21    Q.  And can we agree that this is the

22 letter that Mr. Herrera wrote --

Page 79

1       MR. BOSTWICK:  Objection. Form.

2       BY MR. STEWART:

3    Q.  -- to a Mr. De Basilio --

4    A.  Oui.  Yes.

5    Q.  -- term -- yeah -- terminating the

6 manufacturing contract identified as Exhibit 15 --

7       MR. BOSTWICK:  Objection to form.

8       BY MR. STEWART:

9    Q.  -- as of March 23, 2002?

10    A.  Yes.

11    Q.  Okay.  Did you see a copy of this

12 letter on or about November 14th of 2001?

13    A.  Most likely, yes.

14    Q.  In -- At the bottom of Mr. Herrera's

15 letter, and I'm going to read the English

16 translation at Document 008365.

17       (Reading) Since the manufacturing

18 contract of Omeprazole microgranules of March 23,

19 2000 will be canceled on March 23, 2002, I am

20 communicating that as of now we are completely

21 available to negotiate with you a new

22 manufacturing contract in which, taking into

Page 80

1 account the current circumstances -- hyphen --

2 which are different than those that motivated the

3 2000 contract -- hyphen -- the needs of

4 Laboratorios Ethypharm S.A. may be fully

5 satisfied.

6       Have I read that translation

7 correctly?

8    A.  Yes.

9    Q.  Was a new manufacturing contract ever

10 signed between Ethypharm S.A. and Laboratorios

11 Belmac S.A.?

12    A.  I don't think so.

13       (Mr. Stewart conferred with

14       Ms. Abreu).

15       MR. STEWART:  Like to mark as the next

16 exhibit a -- an email from Rosaline Joannesse

17 dated March 21, 2002.

18       THE REPORTER:  26.

19       (The reporter marked Exhibit 26.)

20       BY MR. STEWART:

21    Q.  Mr. Debregeas, you are a -- are a

22 noted recipient of this email from Rosaline

Page 81

1 Joannesse; and in the email, she says, Please find

2 attached anticipated copy by email of Mr. Leduc's

3 letter and of your revised proposal.

4       And have I read that sentence

5 correctly?

6    A.  Yes.

7    Q.  Okay.  Can you tell me what the

8 attachments are, what the documents are, that

9 have -- that are referenced in Miss Joannesse's

10 email?

11    A.  I'm sorry.  I have to explain you that

12 at that time I was in -- was very shocked in the

13 sense that my brother who was 18 months older than

14 me had informed me early 2002 that he was going to

15 die --

16    Q.  Ah.

17    A.  -- of a stomach cancer.  Indeed, he

18 died on July 13th.

19    Q.  I'm sorry.

20    A.  So that really shocked me and I tried

21 to spend as much time as possible with him and his

22 family rather than -- than being on the job.

21 (Pages 78 to 81)

Page 82

1    I'm sorry.
2    Q.   All right.
3    A.   And it looks strange that I'm unable
4 to answer questions but that's what happened.
5    Q.   Not strange at all in the sense that
6 this is an email that contains certain documents
7 and, certainly, during that time, your -- your
8 attention obviously was elsewhere.
9    A.   Yeah, it would be --
10    Q.   That's perfectly understandable.
11    A.   -- and I was taking care more.
12    MR. STEWART:  Let me -- let me say
13 that we do not have the attachments which are
14 referenced in this email from Rosaline Joannesse
15 so I would ask that you contact the people at
16 Ethypharm that you need to see if we can get those
17 attachments.
18    THE WITNESS:  It wouldn't be that
19 difficult.
20    MR. BOSTWICK:  It may be that they
21 were viewed as being attorney/client-privileged.
22 I'll check into it.

Page 83

1    MR. STEWART:  Ah, all right.
2    MR. BOSTWICK:  I'm not sure but given
3 the fact --
4    MR. STEWART:  Well, certainly --
5    MR. BOSTWICK:  -- the fact that it
6 seems to say, Here's-a-draft-type thing, it may
7 be -- or there may be revisions.  I'll check into
8 it, though.
9    MR. STEWART:  But it's going -- It's
10 going to Herrera, though, Adolfo Herrera, so I
11 wouldn't think that -- that the -- that
12 attorney-client privilege would apply.
13    MR. BOSTWICK:  Oh.  Oh, I see.  It's
14 going to Herrera.
15    MR. STEWART:  Right.
16    MR. BOSTWICK:  Okay.  Yeah, that
17 would -- that certainly wouldn't --
18    MR. STEWART:  Okay.
19    MR. BOSTWICK:  That certainly wouldn't
20 be true.  Maybe somebody made the same mistake I
21 just did.  I'll check into it.
22    MR. STEWART:  Yeah.  Okay.  Yeah,

Page 84

1 we -- we -- we'd want that.  And I think, if -- if
2 you can, I -- I -- I would ask that we get that in
3 time for Mr. Leduc's deposition.
4    MR. BOSTWICK:  Sure.  Yeah.  I'll --
5 I'll --
6    Do you have an extra sticky on -- on --
7 I see there.
8    MS. ABRUE:  Sure.  Would you like one
9 of these?
10    MR. BOSTWICK:  Yeah.  Thanks.  Make a
11 note of it.
12    BY MR. STEWART:
13    Q.   At -- At any -- At some point past
14 the -- past March 21 of 2002 -- did you -- did you
15 become aware of what these two documents were?
16    A.   Honestly, I don't remember.
17    Q.   Okay.
18    A.   Things were becoming increasingly
19 difficult, you know, so --
20    Q.   Sure.
21    A.   -- so it's -- I enjoyed having a
22 partner.

Page 85

1    Q.   Following the February 21st, 2002
2 meeting, did you have any conversations with Jim
3 Murphy?
4    A.   I think yes.
5    Q.   When did you have such conversations?
6    A.   Unable to say when exactly.
7    Q.   Can you recall the substance of
8 whatever conversation it was that you had?
9    A.   I would say that -- confirmation by
10 Jim Murphy -- that I would know how our trade
11 secrets would be respected -- there would be
12 absolutely no problem.
13    Q.   Is that a conversation that you have a
14 specific memory of or a conversation that you
15 believe that you must have had?
16    A.   No, it's a conversation I had.  I'm
17 unable to tell you exactly when but I had it.
18    Q.   Okay.  Was that in person or by
19 telephone?
20    A.   Telephone.  Telephone.
21    Q.   Did you call him or did he call you?
22    A.   Don't remember.

22 (Pages 82 to 85)

Page 86

1    Q.  Where were you when you made the call?
2    A.  I almost did not travel at that time
3 so -- from the office, most likely.
4    Q.  In St. Cloud?
5    A.  St. Cloud.  St. Cloud.
6    Q.  Do you remember where Jim Murphy was?
7    A.  No.
8       MR. STEWART:  Next document is a --
9 email from Rosaline Joannesse, October 15, 2002.
10      (The reporter marked Exhibit 27.)
11      THE REPORTER:  27.
12   BY MR. STEWART:
13   Q.  Mr. Debregeas, will you agree with me
14 that Exhibit 27 is an email to you from Rosaline
15 Joannesse?
16   A.  Yes.
17   Q.  And she apparent -- appears to have
18 attached a -- a press release from Bentley
19 Pharmaceuticals; correct?
20   A.  Yes.  She's forwarding me an email
21 received by her from Adolfo De Basilio which has
22 the communication.  Yeah.

Page 87

1    Q.  Okay.  What, if anything, did you do
2 upon receipt of this email from Miss Joannesse?
3    A.  I don't think I had any special
4 reaction.  I thought it was interesting.
5    Q.  Had you requested that employees send
6 to you press releases from Bentley?
7    A.  Not specifically but it's normal that
8 we -- we receive press release, you know.  It's on
9 the Web, so I see the name of Bentley.  It's
10 interesting.
11   Q.  In the press release, if you turn to
12 page 8699, at the bottom of the press release, it
13 states, As part of the agreement -- As part of the
14 agreement Pfizer has access to Bentley's drug-
15 delivery platform through a research license.
16      Do you see that?
17   A.  Mm-hmm.
18   Q.  Did you have a understanding as to
19 what Bentley's drug-delivery platform was?
20   A.  I think on the previous page -- Well,
21 on page 8699, it's mentioned, Bentley and Pfizer
22 would continue to evaluate certain Pfizer

Page 88

1 compounds for enhanced delivery.  Improved
2 delivery, improved absorption.
3    Q.  Was Pfizer in the business of
4 manufacturing Omeprazole in Two Thousand -- in
5 October of 2002?
6    A.  Not to my knowledge.
7       MR. STEWART:  All right.  I'd now like
8 to go back and pick up a couple of things back in
9 1995 and 1997 and 1999.
10      THE REPORTER:  28.
11      (The reporter marked Exhibit 28.)
12      MR. STEWART:  Okay.
13      BY MR. STEWART:
14   Q.  And, Mr. Debregeas, is this -- is that
15 your signature on page 3 of Exhibit 28?
16   A.  Yes.
17   Q.  Okay.  And this agreement is between
18 Belmac Corporation, One Urban Center, Suite 550,
19 Tampa, Florida and Ethypharm S.A. of Houdan,
20 France; correct?
21   A.  Yes.
22   Q.  And it is a confidentiality agreement;

Page 89

1 correct?
2    A.  Yes.
3    Q.  Okay.  Let me read to you the first
4 sentence on page 2 of the agreement.  Belmac has
5 informed Ethypharm that Belmac is presently
6 examining the possibility of acquiring a U.S.
7 company which researches and develops transdermal
8 products.
9       Have I read that correctly?
10   A.  Yes, sir.
11   Q.  And you will agree with me that --
12 won't you -- that the Belmac that is referred to
13 is the U.S. corporation, Belmac Corporation;
14 correct?
15   A.  Yes.
16   Q.  And that was prior to the time that
17 Belmac Corporation changed its name to Bentley;
18 correct?
19   A.  Yes.
20   Q.  At the time -- Oh, then, reading the
21 second -- the second paragraph -- the second
22 sentence on page 2:  Ethypharm is interested in

23 (Pages 86 to 89)

Page 90

1 considering a participation in the acquisition of
2 said company.
3        Have I read that correctly?
4    A.  Yes.
5    Q.  And do you remember the name of the
6 company that Belmac was examining the possibility
7 of acquiring and that Ethypharm was interested in?
8    A.  No, no.
9    Q.  Okay.  If I suggested that the name
10 was Conrex company of Phoenixville, Pennsylvania,
11 does that refresh your recollection?
12    A.  No, it doesn't.
13    Q.  If I suggested that the reason for the
14 interest was the acquisition of something known as
15 CPE215 technology -- would that refresh your
16 recollection?
17        MR. BOSTWICK:  Objection.
18        THE WITNESS:  No.
19        MR. BOSTWICK:  Objection.  Form.
20        MR. STEWART:  Okay.
21        BY MR. STEWART:
22    Q.  And you signed this agreement as

Page 91

1 president of Ethypharm; correct?
2    A.  Yes.
3    Q.  And Mr. Murphy signed the agreement as
4 president and chief executive officer of Belmac,
5 meaning Belmac Corporation; correct?
6    A.  Yes.
7    Q.  Okay.  Did this confidentiality
8 agreement have anything to do with the manufacture
9 of Omeprazole or other pharmaceutical products for
10 Ethypharm?
11    A.  Can you repeat your question.  I'm
12 sorry.
13    Q.  Did this confidentiality agreement
14 concern the manufacture by Laboratorios Belmac of
15 any pharmaceutical products for Ethypharm?
16    A.  This is a confidentiality agreement.
17 We were supposed to receive confidential
18 information from Belmac regarding another company
19 which had developed a technology and Jim wanted to
20 know if we would be interested in joining
21 Belmac/Bentley in this acquisition.  In order to
22 be aboard to give an answer, we had to have

Page 92

1 technical information.  This technical information
2 could be transmitted to us only assuming that we
3 would commit to keeping the confidentiality so
4 that's all what it is.  There was no name of
5 product, nothing.  It's --
6    Q.  Okay.
7    A.  There's nothing but the name of the
8 company, of the target for acquisition, involved
9 but we have bought several companies in the past
10 to buy technology so --
11    Q.  Is it fair to say that this
12 confidentiality agreement had nothing to do with
13 Laboratorios Belmac?
14    A.  I don't think that we have any reason
15 to say that or to say that it would have something
16 to do with Laboratorios Belmac.  I don't know.
17        MR. STEWART:  Okay.  Let's turn to --
18 see here -- Turn back to January of 1997.
19        Mark as the next exhibit, please, a
20 letter from Adolfo De Basilio to Clemente Gonzalez
21 dated January 20th, 1997.
22        THE REPORTER:  29.

Page 93

1        (The reporter marked Exhibit 29.)
2        BY MR. STEWART:
3    Q.  Mr. Debregeas, did you receive a copy
4 of Mr. De Basilio's letter or fax to Clemente
5 Gonzalez on or about January Twenty -- on or about
6 January 1st of 1997?  I'm sorry.  On or about
7 January 21st of 1997.
8    A.  Most likely.
9    Q.  Okay.  Did you speak to -- Let me
10 withdraw that.  If you'd take -- I'm -- I'm going
11 to be reading from the English translation that
12 Ethypharm's attorneys provided at a previous
13 deposition.  And that translation says, at -- It
14 should be attached.
15        Do you have that translation attached?
16    A.  Yes.
17    Q.  Okay.  (Reading) We have been summoned
18 by our mother com -- company to take a decision
19 regarding the pending matters with Belmac and for
20 the presentation of the 1997 budgets.  After an
21 extended debate, we have reached the following
22 conclusions.

24 (Pages 90 to 93)

Page 94

1    And then the text continues.
2         My question is: Did you speak to
3  Mr. De Basilio with respect to a request that
4  Laboratorios Ethypharm contact Laboratorios Belmac
5  and instruct them to be in touch with their parent
6  company?
7         MR. BOSTWICK: Objection to the form
8  of the question.
9         MR. STEWART: Yeah, that's a -- That's
10 a little -- That's -- That's kind of a lengthy
11 question. Let me -- Let me withdraw that.
12        Let me start over.
13        BY MR. STEWART:
14    Q.  Mr. Debregeas, tell me: What
15 involvement, if any, did you have with respect to
16 Mr. De Basilio's request of Clemente Gonzalez?
17        MR. BOSTWICK: Objection. Vague.
18        THE WITNESS: There are two main
19 points in this letter. One concerned the
20 profitability; and, apparently, Belmac was
21 overcharging. And the other one concerns, more
22 important, GMP, so it's normal that I was informed

Page 95

1  and I took part in a -- the discussion, previous
2  discussion, which led to this letter.
3         BY MR. STEWART:
4     Q.  So you had discussions with
5  Mr. De Basilio regarding the topics contained in
6  this letter?
7     A.  Yes.
8     Q.  Yes. And given your previous
9  relationship with Jim Murphy, did you advise
10 Mr. De Basilio that he should have Clemente
11 Gonzalez contact Belmac Corporation, the parent
12 company?
13    A.  I did not ask that, internal
14 organization of Bentley/Belmac. And that's not --
15 it's -- The way Bentley/Belmac is working is not
16 my concern.
17    Q.  Who -- Who decided that -- to request
18 Clemente Gonzalez as it says in the letter to
19 transmit these decisions to your mother company in
20 the United States -- in the U.S.?
21        MR. BOSTWICK: It just -- It looks
22 like he's struggling in terms of --

Page 96

1         MR. STEWART: Ah.
2         MR. BOSTWICK: -- where the -- where
3  the sentence is you've referred to in the letter.
4         MR. STEWART: Yeah. In the
5  translation, it's the second-to-the-last sentence
6  on the bottom. And I think it's the
7  second-to-the-last sentence on page 6617.
8         MR. BOSTWICK: "Rogamos"?
9         MR. STEWART: "Rogamos transmitan
10 estas."
11        THE WITNESS: Well, we brought in a
12 client, HMR, that -- That's Hoechst Marion Rousell
13 which is a big U.S. company which intended to
14 source some products from us from Zaragoza. And
15 the audit conducted by them and by us showed that
16 all our instructions had not been respected, so
17 U.S. -- U.S., You know, HMR -- Jim Murphy for --
18 it was important for Jim Murphy that we could get
19 this contract.
20        MR. STEWART: I see.
21        BY MR. STEWART:
22    Q.  So H -- The -- The -- The "HMR" that

Page 97

1  is referred to is Hoechst --
2     A.  Marion.
3     Q.  -- Marion Roussel?
4     A.  Yes.
5     Q.  All right.
6     A.  Which later became Aventis.
7     Q.  Aventis. Okay.
8         You wanted Jim Murphy to be involved
9  in this issue; is that fair?
10    A.  Of course, yes.
11        (Mr. Stewart conferred with
12        Ms. Abreu.)
13        MR. STEWART: I'm going to have marked
14 as the next exhibit a letter of January 27, 1997.
15        (The reporter marked Exhibit 30.)
16        THE REPORTER: 30.
17        MR. STEWART: Let me know when you've
18 finished looking at the exhibit, please.
19        THE WITNESS: Okay.
20        BY MR. STEWART:
21    Q.  Okay. And is this letter from Adolfo
22 De Basilio concerning the -- the audit from HMR?

25 (Pages 94 to 97)

Page 98

1    A. Yes, it's continuation. That's a --
2 Continuing.
3    Q. Continuing the --
4    A. The previous.
5    Q. -- the earlier letter?
6    A. Yes.
7        MR. BOSTWICK: Just object to the
8 characterization as a letter that was sent if
9 that's what the --
10        MR. STEWART: Okay. Well --
11        MR. BOSTWICK: To the extent that your
12 question assumes that.
13        MR. STEWART: That's a good point.
14        MR. BOSTWICK: I'll just object on
15 foundation.
16        MR. STEWART: Yeah.
17        BY MR. STEWART:
18    Q. Do you know whether -- Yeah. I -- I
19 see that this letter from -- to Clemente
20 Gonzalez -- I say letter. It looks like a fax --
21 to Clemente Gonzalez from Adolfo De Basilio has a
22 fax Post-it going to Mr. Leduc, Mr. Dubois, and --

Page 99

1 and Mr. -- and you?
2    A. Mm-hmm.
3    Q. Was this letter to Clement --
4 addressed to -- or this fax addressed to Clemente
5 Gonzalez sent by Mr. De Basilio?
6    A. I assume it was.
7    Q. Whose -- Whose handwriting is that at
8 the top?
9    A. Me.
10    Q. That's you. What does -- What does --
11 what does it say?
12    A. "Seen." First line, "Seen." Second,
13 my initials, PD, PD. "OK." And the arrow means
14 to be transferred to "CD." That's Claude Dubois.
15    Q. Okay. Why were you transferring this
16 to Claude Dubois?
17    A. Well, Claude Dubois was the -- What?
18 Director of operations. Speaks perfect English.
19 I think with possible ears (phonetic).
20        MR. STEWART: Okay. And next I'm
21 going to show you a -- a letter that has been
22 marked before but it's a letter from Jim Murphy to

Page 100

1 you dated January 28, 1997.
2        THE REPORTER: 31.
3        (The reporter marked Exhibit 31.)
4        BY MR. STEWART:
5    Q. And you're familiar with this letter,
6 are you not?
7    A. Mm-hmm. I've seen it for sure.
8    Q. Okay.
9    A. My initials are on it.
10    Q. Yeah. Would you translate what --
11 what the writing is at the top of the page, of the
12 page, 002450.
13    A. The initials are "CD," Claude Dubois.
14 To. The arrow, to "EI," Eric Igonet. "RT."
15 "RT." I don't remember who that is. Copy. And
16 there are my initials. Send back to Claude
17 Dubois. "GL," Gerard Leduc. "PO," Pascal Oury.
18 And AD -- "ADB," Adolfo De Basilio.
19    Q. Copies to those people?
20    A. Yeah.
21    Q. Okay. Okay.
22        In the second sentence of his letter

Page 101

1 to you, Mr. Murphy says, I am confused because
2 ever since I assumed control of Laboratorios
3 Belmac, I have received nothing but extremely
4 positive comments from your Spanish staff,
5 specifically Senor Basilio, who said that the
6 Belmac operation is now more efficient, more
7 cooperative, more pleasant to work with. And
8 beyond this, he noted our high degree of sincerity
9 and integrity.
10        Have I read that -- that correctly,
11 sir?
12    A. Mm-hmm.
13    Q. All right. I assume that's a yes.
14    A. Yes.
15    Q. Okay. Now, at the time of this letter
16 in January of 1997, you had been aware that
17 Mr. Murphy had the title of president of
18 Laboratorios Belmac as well as his title of CEO
19 and chairman of Bentley or Belmac Corporation;
20 correct?
21    A. Correct.
22    Q. Okay. And if you take a look at

26 (Pages 98 to 101)

Page 102

1 the -- the third paragraph, he makes the complaint
2 that Laboratorios Belmac has not received payment
3 from Ethypharm in the past year. Do you see that?
4   A.  Mm-hmm.
5   Q.  And he says that:  We have continued
6 to provide Ethypharm with product in a diligent
7 and highly professional manner.
8       And the "we" that he is referring to
9 there is Laboratorios Belmac; correct?
10      MR. BOSTWICK:  Objection.
11      THE WITNESS:  Your question is
12 precisely what?  I'm sorry.
13      MR. STEWART:  Sure.
14      THE WITNESS:  I got lost in the --
15      MR. STEWART:  Lost in the translation?
16      THE WITNESS:  No, no, no, no, no.  No.
17      BY MR. STEWART:
18   Q.  Now, the second -- It's the second
19 line of the third paragraph.  He says, We have
20 continued to provide Ethypharm with product.
21   A.  Mm-hmm.
22       Yes, and what is your question?

Page 103

1   Q.  And my question is:  When -- The
2 "we" -- The "we" that is referred to there is
3 Laboratorios Belmac; isn't that correct?
4       MR. BOSTWICK:  Objection.  Form.
5       THE WITNESS:  We, James Murphy,
6 chairman and CEO of Bentley Pharmaceuticals --
7 Louis XIV was always saying "we."
8       BY MR. STEWART:
9   Q.  We've agreed, haven't we, that Bentley
10 Corporation has no manufacturing facilities and
11 was unable to provide Ethypharm with any product
12 from its own facilities?
13      MR. BOSTWICK:  Objection.
14      Objection.  Recharacterization of
15 testimony.
16      THE WITNESS:  Honestly, I don't catch
17 your point.
18      BY MR. STEWART:
19   Q.  Bentley or Belmac Corporation in the
20 U.S. had no manufacturing facilities; correct?
21   A.  Correct.
22   Q.  All right.  So when he says, "We have

Page 104

1 continued to provide Ethypharm with product,"
2 Mr. Murphy is referring to its wholly-owned
3 subsidiary, Laboratorios Belmac?
4   A.  Not clear for me.  He says "we."  He
5 doesn't say Laboratorios Belmac has no deef
6 (phonetic) or -- not done that, you know.  "We."
7 That's -- That's an entity.  That's a company, you
8 know.  It's a -- headquartered in the U.S., I
9 agree with you, but it's Bentley Corporation.
10   Q.  All right.  So you're saying that
11 when -- that you understood this "we" to mean --
12 to mean what?
13      MR. BOSTWICK:  Objection.  Asked and
14 answered.
15      BY MR. STEWART:
16   Q.  What did you understand "we" to mean?
17   A.  "We," the company, Bentley and its
18 subsidiary, the -- the -- Belmac.  Why didn't he
19 write on their -- Belmac Laboratorios' --
20 headline?
21   Q.  You mean stationery?
22   A.  Yeah.

Page 105

1       MR. STEWART:  Maybe because he didn't
2 have any.
3       MR. BOSTWICK:  Objection.
4       THE WITNESS:  Sorry.
5       MR. STEWART:  Let's -- Let's --
6       MR. BOSTWICK:  I'm not --
7       MR. STEWART:  Let's move on.
8       MR. BOSTWICK:  I think maybe counsel's
9 strick -- counsel's answer should be stricken --
10      MR. STEWART:  I agree.
11      MR. BOSTWICK:  -- from the record.
12      MR. STEWART:  I agree.  Strike that
13 answer.  Strike -- Strike that comment.  I
14 apologize.
15      Okay.
16      BY MR. STEWART:
17   Q.  On the second page of the letter, page
18 002451, Mr. Murphy says in the third paragraph, I
19 suggest we schedule a meeting in Madrid to discuss
20 the future of the relationship between our
21 organizations and on the agenda we will be
22 prepared to discuss.

27 (Pages 102 to 105)

Page 106

1      Have I read that correctly?

2      A.   Yes.

3      Q.   And the first point is:  Arrangements
4 to receive payments that are long overdue.

5

6      Do you see that?

7      A.   Mm-hmm.  Yes.

8      Q.   And these were payments that were owed
9 from Ethypharm to Laboratorios Belmac for product
10 that was delivered by Laboratorios Belmac; is that
11 correct?

12      A.   These were payments that were due,
13 yes, by Ethypharm.  Ethypharm was late in paying.

14      Q.   And those payments were paid to Lab
15 Belmac in Zaragoza; correct?

16      MR. BOSTWICK:  Objection.  Form.

17      THE WITNESS:  I'm sorry.  Loss a
18 (phonetic) Madrid or -- don't know.

19      BY MR. STEWART:

20      Q.   Those payments were never made to the
21 United States, were they?

22      A.   The invoices were made in Spain so the

Page 107

1 payment was made in Spain.

2      Q.   Okay.  And the second point in that
3 third paragraph, Mr. Murphy, as part of his
4 agenda, says, Belmac's proposal for a structure
5 that would provide a profitable operation for
6 Ethypharm in Spain.

7      Do you see that?

8      A.   Mm-hmm.

9      Q.   What was the -- What was Belmac's
10 proposal?

11      A.   It was going to -- to -- to be
12 discussed but it was a problem of profitability
13 for Ethypharm.  That's what was mentioned in the
14 previous documents.

15      Q.   A problem of the profitability in the
16 manufacture of pharmaceutical product by
17 Laboratorios Belmac; correct?

18      A.   Correct.

19      Q.   Okay.  Then third point -- Sorry.
20 Fourth point.  He then mentions:  And if you wish,
21 discuss the orderly departure of Ethypharm from
22 the Belmac facilities.

Page 108

1      Have I read that correctly?

2      A.   Mm-hmm.

3      Q.   And Ethypharm had its machinery in the
4 Belmac facilities at Laboratorios Belmac in
5 Zaragoza, Spain; correct?

6      A.   Yes.

7      Q.   Okay.  And then he suggests that the
8 following people be in attendance at the very
9 bottom.  And from Lab Belmac, he lists Jim Murphy,
10 Clemente Gonzalez, Dr. Monterde, and Mateo Gasca;
11 correct?

12      A.   Yes.

13      Q.   And was there anyone there that you
14 recognize as being an employee of Belmac
15 Corporation U.S. -- as it later became known,
16 Bentley?

17      A.   I would say Jim Murphy.

18      Q.   And for Ethypharm, you and Adolfo
19 Basilio?

20      A.   Yes.

21      Q.   Okay.  Now, is it your understanding
22 that Mr. Dubois had a meeting with Jim Murphy

Page 109

1 regarding this -- regarding the issue of
2 profitability and GMP?

3      A.   Yes.

4      MR. STEWART:  Okay.  Let's -- We'll
5 mark the letter from Claude Dubois.

6      MS. ABRUE:  This one.

7      MR. STEWART:  Yeah.  Actually, can we
8 go off the record just for a moment?

9      THE VIDEOGRAPHER:  The time is
10 12:57:55.  Off the record.

11      (Recess.)

12      THE VIDEOGRAPHER:  On the record.  The
13 time is 1300 hours, 31 seconds.

14      MR. STEWART:  Like to have marked as
15 the next exhibit a fax dated February 14th, 1997
16 with attached documents.

17      THE REPORTER:  Thirty -- 32.

18      (The reporter marked Exhibit 32.)

19      MR. STEWART:  Okay.  Okay.  Thank you.

20      Dwight, we can give you the first -- the
21 fax cover sheet and the first letter, but the --
22 the attachment, you're going to have to look on

28 (Pages 106 to 109)

Page 110

1 with Mr. Debregeas although I'm not going to spend
2 a -- much of any time with it.  Thanks.
3      BY MR. STEWART:
4      Q.  Mr. Debregeas, did you receive -- did
5 you receive a copy of Mr. Dubois' letter to Jim
6 Murphy dated February 13th of 1997?
7      A.  It's not mentioned that I receive it
8 but I must have received it.
9      Q.  And attached to Mr. Dubois's letter
10 there is a document that says, Audit of the
11 Ethypharm Production Site in Zaragoza.
12      Do you see that?
13      A.  Yes.
14      Q.  All right.  Can you tell us what that
15 is?
16      A.  That the report of audit of compliance
17 with Good Manufacturing Practices which has been
18 performed by Messieurs Marcelle Gavoille and --
19 and No. 2, Pascal Fortani -- De -- De Fortani
20 auditing the production site in Zaragoza.  And
21 this audit was only calling to the EEC GMP -- That
22 means Good Manufacturing Practice currently

Page 111

1 applicable in the EEC, European Economic
2 Community.
3      Q.  Was this audit done after the HMR
4 visit?
5      A.  I don't know.  This has to be checked.
6 Would probably think that it was done before the
7 visit of HMR.
8      Q.  If you'd take a look at the document,
9 the first page of -- Sorry -- the second page of
10 the audit, EP 004679.  Let me know when you've
11 had -- when you've had -- Do you have it?
12      A.  4679?
13      Q.  4679.
14      A.  Yes.
15      Q.  Okay.  The paragraph 2.1, Technical
16 Documentation on H -- on MHB.  Do you see that?
17      A.  Yes.
18      Q.  What does "MHB" stand for?
19      A.  The code name for Omeprazole.
20      Q.  Okay.
21      A.  You see it sometimes in the file,
22 "MHB."

Page 112

1      Q.  And under 2.1, there is a -- there are
2 two items that are referenced as critical defect.
3      Do you see that?
4      A.  Mm-hmm.
5      Q.  Okay.
6      The -- The second paragraph under 2.1
7 says:  Control of starting materials, intermediate
8 product, and finished products.
9      A.  Mm-hmm.
10      Q.  There are no official Ethypharm
11 documents, parenthetical, critical defect.  The
12 documents used are Belmac documents with UQUIFA
13 methods and specifications.
14      Do you see that?
15      A.  Mm-hmm.
16      Q.  And did that come to your attention in
17 February of 1997 or -- in or around -- in this --
18 in this time period in late -- in December of 1996
19 or in early 1997?
20      A.  There were official Ethypharm
21 documents but they were not present in the
22 facility where they were -- they were supposed to

Page 113

1 be at the point.
2      Q.  Mm-hmm.
3      A.  Certain number of procedures, I
4 remember, were found in a box in the storage room,
5 documents that should be in the manufacturing
6 room, in the QC lab.
7      Q.  And whose -- whose fault was that?
8 Was that Ethypharm's fault or was that
9 Laboratorios Belmac's fault?
10      MR. BOSTWICK:  Objection.  Form.
11      THE WITNESS:  It was the fault of
12 Belmac.
13      BY MR. STEWART:
14      Q.  Why do you say that?
15      A.  Because they had all the document,
16 they had all the instructions, they'd been
17 trained, and they had to respect Spanish
18 pharmaceutical law.
19      Q.  They had in -- respect what?
20      A.  The Spanish pharmaceutical law.
21      At that point, too, one and the same
22 person is in charge of manufacture and control.

29 (Pages 110 to 113)

ESQUIRE DEPOSITION SERVICES
1-866-619-3925

JT-A-396

Page 114

1 Do you see the critical defect? There is a
2 production department, there is a QC department,
3 each of them headed by competent people. And,
4 apparently, only Dr. Mateo Gasca in charge of both
5 manufacture and control.
6        MR. STEWART: Let's turn to the next
7 document. Okay. A -- Looks like a draft fax
8 dated April -- dated April 8th of 1997.
9        THE REPORTER: 33.
10        THE WITNESS: Thank you.
11        (The reporter marked Exhibit 33.)
12        BY MR. STEWART:
13    Q.  Mr. Debregeas, can you identify the
14 handwriting that appears on Exhibit 33?
15    A.  Yes.
16    Q.  Who is that? Whose is it that?
17    A.  Eric Igonet.
18    Q.  Did you receive a copy of this
19 document?
20    A.  No specific --
21        THE INTERPRETER: Recollection.
22        THE WITNESS: Recollection.

Page 115

1        BY MR. BOSTWICK:
2    Q.  Next I'd like you to look at a -- a
3 letter which I don't see a date on but it's from
4 Jim Murphy to Claude Dubois: Thank you for your
5 fax dated April 9th, 1997.
6        THE REPORTER: 34.
7        (The reporter marked Exhibit 34.)
8        MR. STEWART: Let me know when you've
9 finished looking at the letter.
10        THE WITNESS: Yes.
11        BY MR. STEWART:
12    Q.  Okay. Did you receive a copy of
13 Mr. Murphy's letter in April of 1997?
14    A.  I think I did.
15    Q.  And in the third paragraph of
16 Mr. Murphy's letter, he says that --
17 Unfortunately, I'm not able to assist at the
18 meeting that will be held at your Paris office but
19 we certainly wish to find together the best
20 solution for both companies and I believe that you
21 will find the most flexible position in Clemente
22 Gonzalez and his collaborators.

Page 116

1        Have I read that portion correctly?
2    A.  Yes, sir.
3    Q.  And did that meeting take place
4 between Mr. Dubois and Mr. Clemente Gonzalez and
5 others -- I'm sorry -- and others?
6    A.  Don't remember.
7    Q.  Did you attend that meeting?
8    A.  Don't remember -- but is good. This
9 letter, it shows that Jim is taking care of the
10 business. It's good.
11        MR. STEWART: Let's go off the record
12 just for a couple moments.
13        THE VIDEOGRAPHER: The time is
14 13:13:36. Off the record.
15        (Recess.)
16        THE VIDEOGRAPHER: This ends Tape
17 No. 2 of Volume II of the Debregeas deposition.
18 The time is 13:50:19. Off the record.
19        (The recess continued.)
20        THE VIDEOGRAPHER: On the record with
21 Tape No. 3 of Volume II of the testimony of
22 Patrice Debregeas in the matter of Ethypharm

Page 117

1 versus Bentley Pharmaceuticals. The date is
2 July 11th, 2006. The time is 14:08:21.
3        MR. STEWART: Okay. Good afternoon,
4 Mr. Debregeas.
5        THE WITNESS: Good afternoon.
6        MR. STEWART: I'm going to have marked
7 as the next exhibit a document which begins
8 EP 009112 and consists of a letter from you to
9 Bentley Pharmaceuticals, Inc., Attention:
10 Mr. James Murphy -- and some attached photocopies.
11        THE REPORTER: 35.
12        (The reporter marked Exhibit 35.)
13        BY MR. STEWART:
14    Q.  Have you had a chance to review
15 Exhibit 35?
16    A.  Yes, sir.
17    Q.  First, the fax cover sheet or the fax
18 sheet from Maria-Jose Rodriguez to Rosaline
19 Joannesse. Can you tell me who Mr. Maria-Jose
20 Rodriguez is or Miss Maria-Jose Rodriguez?
21    A.  I don't know. I imagine she must be
22 a -- What you say? A clerk? (Continuing in

30 (Pages 114 to 117)

Page 118

1 French).

2     THE INTERPRETER: Administrative
3 assistant.

4     THE WITNESS: Administrative
5 assistant.

6     BY MR. STEWART:

7     Q.   Does this -- Does the communication to
8 Rosaline Joannesse with the address of Bentley
9 Pharmaceuticals and Jim Murphy have anything to do
10 with the letter that you wrote to Jim Murphy?

11     MR. BOSTWICK: Objection. Vague.

12     THE WITNESS: I don't know. I think
13 it's -- don't know specifically what it is.

14     BY MR. STEWART:

15     Q.   Okay. Turning to your letter dated
16 April 8th, 1999, you say in the first sentence, We
17 have discovered with great surprise various
18 enclosed articles and advertisements relative to
19 Belmazol and Belmac technology recently published
20 in Spanish newspapers and magazines by your
21 subsidiary, Belmac.

22     How did these articles and

Page 119

1 advertisements come to your attention?

2     A.   Newspapers.

3     Q.   Did you see them or were they brought
4 to your attention by somebody?

5     A.   Oh, they were brought to me, yeah.

6     Q.   By -- By whom?

7     A.   Probably Adolfo De Basilio.

8         Diario Medico. That the medical
9 newspaper.

10     Q.   Would they have been brought to you --
11 Could they have been brought to your attention by
12 Ignacio Alvarez?

13     A.   No, because the Diarico Medico, I
14 think that we probably had a subscription to this
15 newspaper in the office in Madrid.

16     Q.   Do you know whether -- Well, let me
17 take -- Take a look at 009116.

18     A.   Yes.

19     Q.   You see at the top of the photocopy
20 there's the word "Ignacio" and there's also the
21 word "Rosaline Joannesse."

22     A.   Yes.

Page 120

1     Q.   Whose handwriting is that?

2     A.   Don't know. I think at that time
3 Ignacio was working for Ethypharm.

4     Q.   Working for Ethypharm. Well, I
5 believe so, yeah.

6     A.   Yeah. Yeah.

7     Q.   So --

8         MR. BOSTWICK: Again, I'll move to
9 strike the answer of the lawyer.

10     BY MR. STEWART:

11     Q.   Well, do you -- Can -- Can you tell me
12 when Ignacio Alvarez left the employ of Ethypharm?

13     A.   I don't re -- don't know.

14     Q.   Was it before or after the termination
15 of the manufacturing agreement?

16     A.   I don't know.

17     Q.   Any event, the articles and
18 advertisements were brought to your attention by
19 employees of Ethypharm; is that correct?

20     A.   Yes.

21     Q.   And in your letter you say that: Our
22 Spanish lawyers have prepared and addressed a

Page 121

1 letter on the same subject to Mr. Clemente
2 Gonzalez and suggested an urgent meeting to review
3 the situation; is that correct?

4     A.   Yes.

5     Q.   Did you instruct your lawyers to
6 prepare and address a letter to Mr. Clemente
7 Gonzalez?

8         THE INTERPRETER: I'm sorry. To
9 prepare a request?

10     MR. STEWART: Can I have that back,
11 please.

12     THE REPORTER: "And in your letter you
13 say that: Our Spanish lawyers have prepared and
14 addressed a letter on the same subject to
15 Mr. Clemente Gonzalez and suggested an urgent
16 meeting to review the situation; is that correct?"

17     THE WITNESS: Maybe.

18     BY MR. STEWART:

19     Q.   If you --

20     THE WITNESS: Maybe I did it myself.
21 Maybe it was done by Adolfo but I assume the
22 responsibility of what he -- what was done.

31 (Pages 118 to 121)

Page 122

1        BY MR. STEWART:
2     Q.  And in the letter you are requesting
3 Mr. Murphy to, as you put it, remind your Spanish
4 subsidiary of its obligations so that our two
5 companies can work together in an appropriate
6 spirit of cooperation.  Correct?
7        Yes?
8     A.  Yes.
9     Q.  All right.  And in your letter you do
10 not accuse Mr. Murphy of placing the articles or
11 the advertisements; is that so?
12     A.  Yes.
13     Q.  Did you have any in -- Was there any
14 information that you had that Mr. Murphy
15 instructed Belmac to place those articles or
16 advertisements?
17     A.  Not at all.
18        MR. BOSTWICK:  Can we just clarify
19 that that's at the time of this letter?  At --
20        MR. STEWART:  Yeah.  Yeah.
21        THE WITNESS:  Mm-hmm.
22        MR. STEWART:  I'm sorry?

Page 123

1        THE INTERPRETER:  Oh.  I just recited
2 that it was --
3        MR. STEWART:  I see.
4        THE INTERPRETER:  -- at the time of
5 the letter.
6        BY MR. STEWART:
7     Q.  And to your knowledge, did anyone at
8 Bentley, in the United States, instruct Belmac to
9 author the articles or advertisements?
10     A.  This never -- This never came to my
11 mind.
12     Q.  Do you have any information today as
13 you -- as you sit in this room to indicate or to
14 suggest to you that Mr. Murphy instructed Belmac
15 to place these advertisements or articles?
16     A.  No, none at all.
17     Q.  Do you -- And, similarly, do you have
18 any information to suggest that any other person
19 at Bentley in the United States instructed Belmac
20 to place these articles or advertisements?
21     A.  No, not at all.
22        MR. STEWART:  If we can mark as the

Page 124

1 next exhibit -- letter from Mr. Murphy to
2 Mr. Patrice Debregeas.  Actually, you know what?
3 Let's see -- Do I -- Yeah.  That's what I want.
4 Ah.  April 9th.  So -- if we can have the next
5 exhibit marked as 36.
6        THE REPORTER:  Yes.
7        (The reporter marked Exhibit 36.)
8        BY MR. STEWART:
9     Q.  Okay.  Have you -- Have you had a
10 chance to review Exhibit 36?
11     A.  Yes, sir, not all of it.  I read the
12 first page and the second page too, quickly.
13     Q.  In Mr. Murphy's -- First, do you
14 recognize the handwriting at the top, Dr. Clemente
15 A. Herrera?
16     A.  No.
17     Q.  Okay.  In his letter, Mr. Murphy says,
18 I have received your letter concerning reference
19 to Ethypharm technology and understand your
20 concerns.
21        He then goes on to say, To refresh
22 your memory, extending back many years ago to

Page 125

1 1995, I wanted to publicly announce the
2 relationship between our organizations by way of a
3 press release and a promotional program but your
4 company did not want us to mention Ethypharm.
5        Do you recall the -- Do you recall
6 that Mr. Murphy, in 1995, had wanted to announce
7 the relationship between Ethypharm and --
8     A.  I think -- I think I remember.
9     Q.  Explain to me if you would what --
10 Explain to me what you recall regarding
11 Mr. Murphy's desire to announce a collaboration
12 between Ethypharm and Belmac Corporation.
13     A.  Bentley or Belmac Corporation at that
14 time was a -- I think -- a public company so they
15 had to communicate in order to be able to raise
16 money, be able to appear on the financial
17 information.
18        Ethypharm is a private company.  We
19 intended in -- at the end of second quarter, 2001,
20 to become a public company, to do an IPO, so
21 communication is an extremely important point.  It
22 can be positive; it can be negative.  And it has

32 (Pages 122 to 125)

Page 126

1 to be mastered very carefully. 1995 for me was
2 too early to announce anything. We had to have
3 gained enough success in the mutual achievements.
4        1999, let's assume that the people at
5 Bentley -- they called me to know if I had any
6 objection to this kind of information.
7        We might have agreed but we would have
8 wanted to have an eye and to work with them to
9 define this communication. This is not what
10 happened. It could have hurt us.
11        And if Jim replied very fast --
12 because Jim understood it was extremely important.
13    Q. In his letter, Mr. Murphy attaches
14 a -- what he refers to as a summary of
15 technologies and worldwide patents recently
16 acquired by Belmac -- by Bentley Pharmaceuticals
17 in the drug delivery area.
18        Have you had a chance to look at that
19 material?
20    A. Quick.
21    Q. Okay. And at the time that you
22 received this letter, did you look at that

Page 127

1 material?
2    A. Yes --
3    Q. Okay.
4    A. -- quickly. I must say, I've had more
5 time to -- today to look at it but I think that
6 the -- the first paragraph deserves being read.
7    Q. The overview, you mean?
8    A. Yeah, first paragraph of the overview.
9 Yeah.
10    Q. The --
11    A. Although the company's a domestic,
12 publicly-traded organization, the vast majority of
13 revenues are derived from Europe where the company
14 manufactures and markets more than 40 product
15 presentation.
16    Q. Right.
17    A. Which company? Bentley.
18    Q. He then goes on to say, Our
19 commercialized products are concentrated in four
20 therapeutic categories, of: cardiovascular,
21 gastrointestinal, anti-infective, and central
22 nervous system; correct? Is that right?

Page 128

1    A. It's what is written, for sure.
2    Q. Okay. And Mr. Murphy describes
3 Bentley Pharmaceuticals as a drug-delivery company
4 specializing in the development and
5 commercialization of products based upon
6 innovative drug-delivery systems; correct?
7    A. Mm-hmm.
8    Q. Yes?
9    A. I'm not following with you. You read.
10 I -- I believe that what you read is here -- is
11 here.
12        MR. STEWART: Well, I want you to
13 confirm that what I'm reading is accurate.
14        MR. BOSTWICK: That it's just an
15 accurate transcription --
16        MR. STEWART: That's correct. That's
17 right.
18        MR. BOSTWICK: -- or an actual
19 statement?
20        MR. STEWART: Okay.
21        MR. BOSTWICK: Not -- In other words,
22 not an accurate --

Page 129

1        THE WITNESS: I would say the accuracy
2 of what is written, you know.
3        MR. STEWART: I understand. You're
4 not a --
5        THE WITNESS: Accuracy of reading.
6        MR. STEWART: I'm not -- I'm not
7 asking you to agree with what is written but just
8 I'm asking you to agree that I have correctly read
9 what is written. Okay?
10        BY MR. STEWART:
11    Q. And then the third paragraph, Bentley
12 recently initiated a domestic strategy with the
13 acquisition of proprietary permeation excipient
14 technology and the establishment of a product
15 development laboratory capable of creating and
16 optimizing pharmaceutical formulations.
17        Do you see that? Page 002814.
18    A. Oh, yes. Paragraph 3. Yeah. Yeah.
19    Q. Okay.
20    A. Mm-hmm.
21    Q. Then he goes on to say, Our technology
22 consists of a series of chemicals, some of which

33 (Pages 126 to 129)

Page 130

1 are GRAS (Generally Recognized As Safe) excipients
2 that enhance the permeability of drugs
3 administered through skin, across mucosa, through
4 the cornea or the blood-brain barrier in a variety
5 of independent pharmaceutical formats.
6      That's what is written at page 002814;
7 correct?
8      A.  Mm-hmm.
9      Q.  Now, Laboratorios Belmac, would you
10 agree with me; was not involved in the acquisition
11 of proprietary permeation-excipient technology?
12      MR. BOSTWICK:  Objection.  Foundation.
13      THE WITNESS:  Do you know this page --
14 I don't see the name Belmac.  I -- We have it
15 here.
16      MR. STEWART:  No.  I'm asking you the
17 question based on your knowledge of Laboratorios
18 Belmac.
19      THE WITNESS:  I have -- I have no
20 knowledge of that.
21      BY MR. STEWART:
22      Q.  The business, is it -- The business of

Page 131

1 Laboratorios Belmac --
2      A.  Mm-hmm.
3      Q.  -- was that of a contract manufacturer
4 of pharmaceutical products?
5      A.  No, Belmazol is a product which is
6 marketed by Belmac.  Same product is marketed by
7 Davur.  And I think there was another company so
8 Belmac is not only a contract manufacturer; Belmac
9 operates as a contract manufacturer with us but
10 has its own activity.
11      Q.  And that activity --
12      A.  They market its own products that it
13 sells for us.  It has an activity.
14      Q.  And -- But to your knowledge, Belmac
15 was not involved in the acquisition of transdermal
16 technology, was it?
17      MR. BOSTWICK:  Objection.  Asked and
18 answered.
19      THE WITNESS:  I don't know.  It was
20 not my problem.  Not at all.
21      MR. STEWART:  Okay.  Let's go off the
22 record just for a minute.

Page 132

1      THE VIDEOGRAPHER:  The time is
2 14:35:01.  Off the record.
3      (Recess.)
4      THE VIDEOGRAPHER:  On the record.  The
5 time is 14:36:22.
6      MR. STEWART:  Marked as the next
7 exhibit documents beginning with 009105, Belmac --
8 Lab -- Laboratorios Belmac S.A. presentation.
9      THE REPORTER:  37.
10      (The reporter marked Exhibit 37.)
11      MR. STEWART:  Oh, you know what?  I
12 handed over my stapled copy.  Here.  Can we --
13 Let's see.  Yeah.  Just --
14      Okay.  I think by agreement we're going
15 to remove -- When you make up the final exhibits,
16 I think you're going to wind up removing the
17 translation.  Isn't that what we agreed to do?
18      MR. BOSTWICK:  Yeah.  I mean, if you
19 want to just tear it off right now --
20      MR. STEWART:  Yeah.  Okay.
21      MR. BOSTWICK:  And keep it your --
22      MR. STEWART:  All right.  Just do

Page 133

1 that.
2      MR. BOSTWICK:  -- that'd be fine.  You
3 haven't showed it to him yet.
4      MR. STEWART:  Yeah.  Okay.  I don't
5 know that I have a paper clip anyplace here.  Oh,
6 yeah.  Here is.  I see one right in front of me.
7      THE REPORTER:  It's 37.
8      THE WITNESS:  Thank you.
9      MR. STEWART:  Okay.
10      BY MR. STEWART:
11      Q.  Okay.  Have you had a chance to look
12 at Exhibit 37?
13      A.  Yes.
14      Q.  All right.  And have you seen the --
15 what appears to be a slide presentation by Belmac
16 S.A, by -- by Laboratorios Belmac?
17      MR. BOSTWICK:  Object.
18      Objection to form.
19      MR. STEWART:  You may answer.
20      THE WITNESS:  What is the document?
21      BY MR. STEWART:
22      Q.  I was about to ask --

34 (Pages 130 to 133)

1    A.  Dated from when?

2    Q.  Yeah.

3       Do you recognize this document?

4    A.  No.

5    Q.  All right.  The -- The document was

6  produced from Ethypharm's files as indicated by

7  the fact that it has a -- a Bates -- a number, EP,

8  the first page, 009105.  So my -- (To the

9  interpreter)  Go ahead.

10    A.  It's not a document that was made by

11  Ethypharm.  It's a document that was submitted in

12  the inquiry by Ethypharm.  Is that what you said?

13    Q.  It -- It -- It -- It comes from the

14  files of Ethypharm.

15    A.  Okay.

16    Q.  And my question is:  Can you tell me

17  what it is?

18    A.  Seems to be an advertising document

19  mentioning that Belmac does controlled release of

20  drugs, produces Omeprazole.  Never mentions the

21  name Ethypharm.  I don't like to see these

22  documents.  It reminds me the -- the previous one.

1    Q.  Have you ever seen it prior to today?

2    A.  No.

3       MR. STEWART:  Okay.

4       And may I have the last document,

5  please, the last --

6       Okay.  Mark for identification, please,

7  memorandum from Ignacio Alvarez de la Gala dated

8  January 11th, 2001.

9       THE REPORTER:  38.

10       (The reporter marked Exhibit 38.)

11       THE WITNESS:  Thank you.

12       MR. STEWART:  Okay.

13       THE WITNESS:  Okay.

14       BY MR. STEWART:

15    Q.  The translation of the first page of

16  Exhibit 38 reads, Dear Mr. Cailleret, Please find

17  attached the price agreement signed with Belmac

18  for the year 2001.  Best regards, Ignacio Alvarez

19  de la Gala; is that correct?

20    A.  Yes.

21    Q.  All right.  And the price agreement

22  that is referred to is found at page 002918;

1  correct?

2    A.  Yes.

3    Q.  And that is signed by Adolfo De

4  Basilio who's director general of Ethypharm.  And

5  that's Ethypharm Spain; correct?

6    A.  Yes.

7    Q.  And it's also signed by Adolfo Herrera

8  who's the director general of Belmac.  And that's

9  Laboratorios Belmac; correct?

10    A.  Yes.

11    Q.  Now, did Mr. Murphy ever tell you that

12  Adolfo Herrera had the authority to act on behalf

13  of Bentley Corporation?  On behalf of Bentley

14  Pharmaceuticals, Inc.?

15    A.  He didn't tell me one thing nor the

16  opposite.

17    Q.  Did anyone at Bentley ever tell you

18  that Adolfo Herrera had the authority to act on

19  behalf of Bentley Pharmaceuticals?

20    A.  Nobody told me that.  I was not

21  interested in having that information either.

22    Q.  Did Mr. Murphy, going back to 1995,

1  ever tell you that Clemente Gonzalez Azpeitia had

2  the authority to act on behalf of Belmac

3  Corporation and, later, Bentley Pharmaceuticals,

4  Inc.?

5    A.  I have no souvenir of that.

6    Q.  You have no memory of that?

7    A.  No, no recollection.  No memory.

8    Q.  No recollection?  All right.

9    A.  Pardon.

10    Q.  And, similarly, was there anyone at

11  Belmac Corporation; as it later became known,

12  Bentley Pharmaceuticals; that ever told you that

13  Clemente Gonzalez Azpeitia had the authority to

14  act for Bentley.

15    A.  No, and I had no such need.

16    Q.  And, finally, did anyone at Belmac

17  Corporation, including Mr. Murphy, ever tell you

18  that Perez De Ayala had the authority to act for

19  the U.S. Belmac Corporation?

20    A.  No.

21       MR. STEWART:  That's all I have at

22  this time.

35 (Pages 134 to 137)

JT-A-402