Page 5

C O N T E N T S

1
2
3 EXAMINATION OF CLAUDE DUBOIS:          PAGE
4 BY MR. STEWART                 11
5 BY MR. BOSTWICK                118
6 BY MR. STEWART                 159
7
8 DEPOSITION EXHIBIT:          Page Identified:
9 1  Letter, 1/20/97, de Basilio to
10   Gonzalez, EP 006617, with English
11   translation              47
12 2  Letter, 1/28/97, Murphy to Debregas,
13   EP 002450, with English translation     49
14 3  Fax with Letter, 2/14/97, from
15   Dubois and Audit of the Ethypharm
16   Production Site in Zaragoza.
17   EP 004676 - 682              58
18 4  Draft, 14 March 1995, Memorandum of
19   Understanding, EP 009082 - 9091,
20   with English translation of 9082      64
21 5  Faxed Agreement, 7/13/95, EP 009008
22   - 9022                  64-65

Page 7

C O N T E N T S  (Contents)

1
2
3 DEPOSITION EXHIBIT:          Page Identified:
4 12  Ethypharm document, 10/2/98,
5    EP 008124              102, 109
6 13  Contrato de Fabricacion, BEL000548
7    - 553                114
8 14  Carta de Compromiso de Compra
9    EP 004863 - 865, A-96 - A-97      118
10 15  EP 002124              127
11 16  EP 002442 - 443            129
12 17  Letter, 2/13/97, Dubois to Murphy
13    EP 004677 - 681          144
14 18  Letter, undated, Murphy to Dubois
15    EP 002445              146
16 19  Fax, 3/31/98, Ethypharm to Belmac,
17    EP 003259 - 261          152
18 20  Fax, 4/6/98, de Basilio to Murphy
19    EP 003262, 628, 629        153
20 21  Letter, 3/20/97, Gonzalez to "Monsieur"
21    EP 002440 - 441, with English
22    translation          170, 176

Page 6

C O N T E N T S  (Contents)

1
2 DEPOSITION EXHIBIT:          Page Identified:
3 6  Letter, 9/3/97, Gonzalez to Dubois
4    EP 002462 - 465, with English
5    translation              68
6 7  Contrato de Fabricacion por
7    Terceros de Productos Farmaceuticos
8    BEL006381 - 388            71
9 8  Contrato de Fabricacion por
10    Terceros de Productos Farmaceuticos
11    BEL006372 - 379            71
12 9  Draft contract sent by Ethypharm
13    Spain to Belmac Spain, beginning of
14    September, BEL006371 - 396, with
15    one page, English translation      71
16 10  Certificate from Laboratorios
17    Belmac signed by Mr. Gonzalez
18    EP 008092              102-103
19 11  Confidentiality Agreement,
20    Ethypharm Spain and Belmac
21    BEL000601 - 603 with English
22    translation          102, 106

Page 8

C O N T E N T S  (Contents)

1
2
3 DEPOSITION EXHIBIT:          Page Identified:
4 22  Letter, 4/1/97, Dubois to "Sir"
5    EP 002769 with English translation    170
6 23  Letter, 4/9/97, Dubois to Murphy
7    EP 002446              170
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

**ESQUIRE DEPOSITION SERVICES**
**1-866-619-3925**

JT-A-434

Page 9

1      PROCEEDINGS
2          * * * * *
3
4         THE VIDEOGRAPHER: On the record with
5 Tape No. 1 of the videotape deposition of Claude
6 Dubois taken by the defendant in the matter of
7 Ethypharm S.A. France and Ethypharm S.A. Spain
8 versus Bentley Pharmaceuticals, Incorporated, in
9 the United States District Court for the District
10 of Delaware, Civil Action No. 04-1300-SLR.
11        This deposition is being taken at the
12 law offices of Baach, Robinson & Lewis located at
13 1201 F Street, Northwest, in Washington, D.C., on
14 July 12th, 2006 at approximately 10:11 a.m.
15        My name is T.J. O'Toole representing
16 Esquire Deposition Services. I am the certified
17 legal video specialist. The court reporter is
18 Marijane Simon also representing Esquire
19 Deposition Services. Will counsel please
20 introduce themselves and indicate which parties
21 they represent.
22        MR. STEWART: Craig Stewart and Joseph

Page 10

1 Mingolla, Edwards, Angell, Palmer & Dodge for the
2 Defendant, Bentley Pharmaceuticals, Inc.
3        MR. BOSTWICK: Dwight Bostwick for the
4 plaintiffs in this action, Ethypharm and Ethypharm
5 S.A. Spain.
6        THE VIDEOGRAPHER: Thank you.
7        Will the court reporter please swear in
8 the interpreter. I'm sorry. Will the interpreter
9 please identify himself and then the court
10 reporter swear him in.
11        THE INTERPRETER: I am Didier Devynck
12 and I am the interpreter.
13        DIDIER DEVYNCK,
14 was sworn to interpret from English into French
15 and French into English to the best of his
16 ability.
17        THE VIDEOGRAPHER: Thank you.
18        Will the court reporter please swear in
19 the witness.
20 Thereupon,
21        CLAUDE DUBOIS,
22 after having been duly sworn (or affirmed) by the

Page 11

1 notary, was examined and testified as follows:
2        EXAMINATION BY COUNSEL FOR THE DEFENDANT
3        BY MR. STEWART:
4   Q.  Good morning, Mr. Dubois.
5        THE WITNESS (IN FRENCH): Bonjour.
6        BY MR. STEWART:
7   Q.  My name is Craig Stewart as you heard
8 and I represent the defendant in this case. And
9 the defendant is Bentley Pharmaceuticals,
10 Incorporated.
11        Before we begin, have you had your
12 deposition taken before?
13   A.  No.
14   Q.  You'll be giving testimony today under
15 oath and that means that there are penalties under
16 U.S. law if your statements are not truthful.
17        Do you understand?
18   A.  Yes.
19   Q.  Okay. And as you provide your
20 testimony, you must give a verbal response to the
21 questions. Do you understand?
22   A.  Yes.

Page 12

1   Q.  So nods of the head one -- one way or
2 the other cannot be taken down.
3   A.  Understood.
4   Q.  If you need to take a break from the
5 questions, please say so. The exception will be
6 if I have a question that I've asked of you and
7 you have not yet answered.
8   A.  Okay.
9   Q.  Yes. And -- And by agreement, when we
10 take a break from the questions -- that you are
11 not permitted to speak to your counsel,
12 Mr. Bostwick, concerning the substance of your
13 testimony.
14        Do you understand?
15   A.  Yes.
16   Q.  Now, you speak English; is that
17 correct?
18   A.  Yes.
19   Q.  And do you read English?
20   A.  Yes.
21   Q.  And do you write English?
22   A.  Yes.

3 (Pages 9 to 12)

Page 13

1    Q.  Do you speak Spanish?

2    A.  A little.

3    Q.  Do you read Spanish?

4    A.  Yes.

5    Q.  And do you write Spanish?

6    A.  Not very well.

7    Q.  All right.  It is up to you as to

8 whether you will need to -- whether you want to or

9 will need to use the services of Monsieur Devynck.

10    A.  I prefer.

11    Q.  Fine.  By whom are you employed?

12    A.  Today?

13    Q.  Yes.

14    A.  Ambrilia BioPharma.

15    Q.  Could you spell that, please.

16    A.  A-m-b --

17    Q.  A-m-b?

18    A.  -- r -- r-o -- No.  Sorry -- r-i --

19 l-i-a. BioPharma.

20    Q.  Bureau?

21    A.  Bio.

22    Q.  Bio?

Page 14

1    A.  B-i-o, Pharma, P-h-a-r-m-a.

2    Q.  How long have you been employed by

3 Ambril -- Ambrilia BioPharma?

4    A.  I've been employed there for six years

5 but the company merged with Ambrilia Bio --

6 BioPharma.

7    Q.  When did you start your job with --

8 What was -- I withdraw that.

9        What was the name of the company

10 before it merged with Ambrilia?

11    A.  Cellpep.

12    Q.  Spell?

13    A.  C-e-l-l-p-e-p.  Oh.  S.A.

14    Q.  Cellpep S.A.  And when did you start

15 your employment with Cellpep?

16    A.  July 2000.

17    Q.  What is your current position with

18 Ambrilia BioPharma?

19    A.  Business development director --

20        THE WITNESS (IN ENGLISH): Senior

21 director.

22        THE INTERPRETER:  Senior director.

Page 15

1        BY MR. STEWART:

2    Q.  What are your duties?

3    A.  Business -- Business development,

4 license agreements, partnerships, business

5 negotiations.

6    Q.  What is the business of Ambrilia

7 BioPharma?

8    A.  Research, research and development, of

9 new pharmaceutical products.

10    Q.  And what was the business of Cellpep

11 S.A.?

12    A.  Research and development of new drugs,

13 peptids in particular.

14    Q.  Where were you employed before your

15 employment with Cellpep?

16    A.  With Ethypharm.

17    Q.  With Ethypharm France or Ethypharm

18 Spain?

19    A.  France.

20    Q.  Where were your offices?

21    A.  In St. Cloud, France.

22    Q.  What was your position?

Page 16

1    A.  Vice president for operations.

2    Q.  When did you begin your employment

3 with Ethypharm?

4    A.  December -- December Ninety -- 1993 as

5 a part-time consultant, and one year later, full

6 time as VP, operations.

7    Q.  What was the reason that you left

8 Ethypharm France?

9    A.  Strategic discrepancies with one of

10 the owners about the products to be developed.

11    Q.  Which owner?

12    A.  Patrice Debregeas.

13    Q.  Were you asked to leave?

14    A.  Yes.

15    Q.  When were you asked to leave?

16    A.  January 2000.

17    Q.  When was your last day at Ethypharm

18 France?

19    A.  I believe -- I believe it was

20 June 30th, 2000, officially.  I was paid until

21 June 30th, 2000.

22    Q.  And when did you last do work for

4 (Pages 13 to 16)

1 Ethypharm France.

2     A.  Beginning, mid February.

3     Q.  Do you have a -- Do you personally --

4 Do you personally have a business -- any business

5 dealings with Ethypharm France at the present

6 time?

7     A.  No.

8     Q.  Are you being paid as a consultant to

9 Ethypharm France?

10     A.  No.

11     Q.  Has Ethypharm France paid your

12 expenses in your coming to the United States for

13 this deposition?

14     A.  I believe so, yes.

15     Q.  Did you buy the plane ticket yourself?

16     A.  No.

17     Q.  Are you currently receiving any

18 compensation from Ethypharm France other than the

19 payment of your expenses?

20     A.  No.

21     Q.  What is your residence address, sir?

22     A.  25 Chemin, C-h-e-m-i-n, du, d-u, Bois,

1 B-o-i-s, des, d-e-s, Arpents, A-r-p-e-n-t-s,

2 78860, S-t -- That's Saint -- S-t -- Nom, N-o-m,

3 as in Mary, La, L-a, Brete, B-r-e-t-e, accent

4 grave, c-h-e -- France.

5     Q.  La Breteche, France?

6     A.  C-h-e.

7     Q.  C-h-e. Grave?

8         Who -- By whom were you employed

9 before Ethypharm?

10     A.  Before I was a consultant?

11     Q.  Yes.

12     A.  Laboratoire Debat, D-e-b-a-t.

13     Q.  Debat. What business was Laboratoire

14 Debois -- Debat in?

15     A.  Pharmaceutical products.

16     Q.  Was your title in 1994 vice president

17 of operations?

18     A.  At the end of the year, yes, when I

19 became full-time.

20     Q.  And when did you become full time?

21     A.  I think it was December 1994.

22     Q.  Who hired you?

1     A.  The two -- The two owners.

2     Q.  That would be Mis -- Monsieur Leduc

3 and Monsieur Debregas?

4     A.  That's it.

5     Q.  Okay. Tell me your duties as vice

6 president of operations from December of 1994

7 until you left.

8     A.  I was in charge of all the development

9 of the company, the business operations. All the

10 directions were reporting to me.

11     Q.  All the? All the?

12     A.  Directions. The departments.

13         THE WITNESS (IN ENGLISH): Departments.

14         THE INTERPRETER: That is to say,

15 business, medical -- oh, registration and

16 development of new products. The only functions

17 that were not depending upon me were finance and

18 administration and manufacturing in France. All

19 the subsidiaries were under me.

20         BY MR. STEWART:

21     Q.  And was one of the subsidiaries

22 Ethypharm Spain S.A.?

1     A.  Yes.

2     Q.  Who at Ethypharm Spain S.A. did you

3 have contact with?

4     A.  With all the employees of Ethypharm

5 Spain but in all -- in particular, of course, the

6 director, Adolfo de Basilio.

7     Q.  And did Adolfo de Basilio report

8 directly to you?

9     A.  Yes.

10     Q.  How often would you confer with Adolfo

11 de Basilio during the course of a week?

12     A.  Some weeks, several times; some other

13 weeks, no contact at all.

14     Q.  Did you have regularly scheduled

15 meetings with Mr. De Basilio?

16     A.  Yes.

17     Q.  When were those meetings scheduled

18 for?

19     A.  About once a month, either by phone or

20 in Paris or in Spain.

21     Q.  Where were Ethypharm Spain's offices?

22     A.  In Madrid. I don't remember the

5 (Pages 17 to 20)

Page 21

1 address but I could go there with my eye closed
2 today.
3    Q.  How often did you visit Ethypharm
4 Spain?
5    A.  Yes, I don't know how many times but
6 dozens of times, maybe.
7    Q.  What was Mr. De Basilio's authority
8 with regard to decisions concerning Ethypharm
9 Spain?
10    A.  He was the general manager and he had
11 the authority of a general manager.
12    Q.  What decisions did Mr. De Basilio
13 require your approval for?
14    A.  Decisions having to do with business
15 negotiation, especially when the price was
16 different, and also decisions having to do with
17 contract negotiations.
18    MR. BOSTWICK:  And, perhaps, a helpful
19 comment.  If you give a long answer, and you're
20 going to give it in French rather than English,
21 you may need to pause for the translator.
22 . . .

Page 22

1    BY MR. STEWART:
2    Q.  Did you -- During the time that you
3 were vice president of operations, were you aware
4 of a company called Laboratorios Belmac S.A.?
5    A.  Yes, naturally.
6    Q.  And did you understand that
7 Laboratorios Belmac was a subsidiary of Bentley
8 Pharmaceuticals, Incorporated?
9    A.  At the beginning -- At the beginning,
10 it was a subsidiary of Belmac Corporation, United
11 States, then it changed its name to Bentley
12 Corporation, I believe, in 1996.
13    Q.  Were you involved in matters
14 concerning the production of Omeprazole by
15 Laboratory Belmac -- by Laboratorios Belmac?
16    MR. BOSTWICK:  Objection to form.
17    THE WITNESS:  Yes, I was involved.
18    BY MR. STEWART:
19    Q.  What was the nature of your
20 involvement?
21    A.  To do -- do things so that it would
22 work.

Page 23

1    Q.  Did you -- Were you involved in
2 negotiating the price that Ethypharm -- Let me
3 withdraw that.
4    Were you involved with negotiating the
5 price that Laboratorios Belmac charged Ethypharm
6 for manufacture of Omeprazole?
7    A.  Yes.
8    Q.  And were you also involved in
9 negotiating price and the price which Ethypharm
10 charged Lab -- Laboratorios Belmac for the supply
11 of Omeprazole?
12    A.  I was informed but there were no
13 negotiations.  It was a common price for all of
14 the partners although Belmac had a -- a slight
15 discount compared to the common price.
16    Q.  Were you ever involved in matters
17 concerning quality assurance at the facility of
18 Laboratorios Belmac?
19    A.  Yes, I requested twice audits.
20    Q.  Were those audits requested by you or
21 by Adolfo de Basilio?
22    A.  By me because they were performed by

Page 24

1 France.
2    Q.  Were you involved in dealing with
3 customers of Ethypharm Spain?
4    A.  Yes.
5    Q.  Were you involved in the transfer of
6 technology from Ethypharm France to -- and --
7 Withdraw that.
8    Did you become involved in the
9 transfer of Ethypharm's technology to Laboratorios
10 Belmac?
11    A.  Technology transfer is -- is an
12 ongoing process.  The largest part had been done
13 before my arrival.  And during the year -- During
14 the years I was there, we had to re -- Hmmh --
15 re -- re -- readjust fabrications --
16    THE WITNESS (IN ENGLISH):  Reengineer.
17    THE INTERPRETER:  -- reengineer
18 fabrications, manufacturing.  And I was involved
19 at that point.
20    BY MR. STEWART:
21    Q.  Were you involved in requesting
22 confidentiality agreements from anyone in

6 (Pages 21 to 24)

Page 25

1 connection with Ethypharm technology?
2    A.  Yes.
3    Q.  What was your involvement?
4    A.  The whole -- The whole Ethypharm
5 company was involved -- was concerned about this
6 confi -- confidentiality.  My responsibility was
7 to make sure that Adolfo de Basilio follow and
8 signed on this responsibility -- this
9 confidentiality --
10    THE WITNESS (IN ENGLISH):  Obtain,
11 obtain.
12    THE INTERPRETER:  -- obtain it.
13    BY MR. STEWART:
14    Q.  What other aspects of the relationship
15 between Ethypharm Spain and Laboratorios Belmac
16 were you involved?
17    MR. BOSTWICK:  Objection.  Form.
18 Vague.
19    THE INTERPRETER:  Do I translate?
20    MR. STEWART:  Yes.
21    THE INTERPRETER:  Okay.
22    THE WITNESS:  I do not understand the

Page 26

1 question very well.
2    MR. STEWART:  Sure.
3    BY MR. STEWART:
4    Q.  Were there any other activities that
5 you had specif -- that you had specific
6 involvement in, activities that were between
7 Ethypharm Spain and Laboratorios Belmac?
8    A.  The only activities that were between
9 Belmac Spain and -- and Ethypharm Spain were that
10 Belmac was manufacturing products for Ethypharm
11 and so it was just contract manufacturing.  And,
12 of course, Belmac was a customer of Ethypharm
13 Spain for Omeprazole.
14    Q.  How many employees did Laboratorios
15 Belmac have, to your knowledge?
16    A.  It is difficult to answer this
17 question because in the plant, I believe, there
18 were maybe 50 or 60 people.  Gradually, Belmac has
19 developed business teams, and I don't know how
20 many representatives they had in Spain, and it
21 grew; and to cover the Spanish market, it probably
22 takes about 70 or 80 representatives.

Page 27

1    And, of course, at the Ethypharm
2 headquarters in Madrid, there was a --
3    Q.  Does he mean Ethypharm headquarters or
4 Laboratorios Belmac?
5    THE WITNESS (In English):  Belmac
6 headquarters.
7    THE INTERPRETER:  Belmac headquarters.
8 There were the normal administrative team.
9    BY MR. STEWART:
10    Q.  At any time did you know the number of
11 employees employed by Bentley Pharmaceuticals in
12 the United States?
13    A.  No, I believe there was only a -- a
14 major staff.
15    Q.  Only a --
16    A.  Tough staff, senior staff.
17    Q.  Who at Laboratorios Belmac did you
18 have direct contact with?
19    A.  Mainly, Mr. Gonzalez, Clemente
20 Gonzalez; Mr. Berenguer.
21    Q.  What was Mr. Berenguer's position?
22    A.  Legal and administrative director.  Of

Page 28

1 course, I had contacts with Mateo Gasca.
2    Q.  What was Mr. Gasca's position as you
3 understood it?
4    A.  Mr. Gasca had to do -- Mainly, he was
5 responsible for manufacturing, especially for the
6 Ethypharm product.  He all -- He also had quality
7 control responsibilities.  He was responsible for
8 all the quality control for the Zaragoza plant,
9 the Belmac Zaragoza plant until, following our
10 inspections, somebody else -- somebody else was in
11 charge of the quality control.  I believe
12 Mr. Cabodevilla.
13    And, of course, I had contact with
14 Mr. Monterde, the manufacturing manager at
15 Belmac --
16    THE WITNESS (IN ENGLISH):  Plant
17 manager.
18    THE INTERPRETER:  Plant manager, yeah.
19    And, of course, in the later years,
20 contacts with Mr. Adolfo Herrera who eventually
21 replaced Mr. Gonzalez.
22 . . .

7 (Pages 25 to 28)

Page 29

1    BY MR. STEWART:
2    Q.  Did you have any contact with Juan
3  Carlos Asensio?
4    A.  No, I don't remember.
5    Q.  Okay.  And did you have any contact
6  with Jose-Maria Esteve?
7    A.  I know one Jose-Maria Esteve who is a
8  founder and a general manager of the Esteve
9  Laboratories but I don't think it's the same one.
10    Q.  Did you have any dealings with
11  Miss Concha Sanchez?  Sanchez.
12    THE INTERPRETER:  Sanchez.
13    THE WITNESS:  The name seems familiar.
14  Maybe it was Mr. Gonzalez's assistant.  I don't
15  recall.
16    BY MR. STEWART:
17    Q.  What was the nature of your contacts
18  between yourself and Clemente Gonzalez?
19    A.  I was trying to negotiate the
20  manufacturing contract which was on hold when I
21  arrived at the head of the Ethypharm operations.
22    Q.  Any other contacts -- Any other

Page 30

1  specific purposes of contacts with Mr. Gonzalez
2  that you can recall?
3    MR. BOSTWICK:  Objection.  Form.
4    THE WITNESS:  I intervened during
5  negotiations that were stalled to unstall them.
6    BY MR. STEWART:
7    Q.  And what was the nature of your
8  contacts with Adolfo Herrera?
9    MR. BOSTWICK:  Same objection.
10    THE WITNESS:  It was then later in
11  1999-2000, I -- The first time I saw Adolfo
12  Herrera -- I believe it was in 1998.  He -- He
13  took part as Mr. Gonzalez's deputy in
14  negotiations.  And after that, we had contacts
15  to --
16    THE WITNESS (IN ENGLISH):  Finalize.
17    THE INTERPRETER:  -- finish, finalize
18  the negotiations when he was himself manager.
19    BY MR. STEWART:
20    Q.  Did negotiation -- Were negotiations
21  over a contract completed when you were there?
22    MR. BOSTWICK:  Objection.  Vague.

Page 31

1    THE WITNESS:  The negotiations were
2  completed.  We were agreeing on the principle
3  since 1997 but the legal documents have not been
4  done until the time of my leaving.
5    BY MR. STEWART:
6    Q.  Until after?
7    THE WITNESS (IN ENGLISH):  About the
8  time of my leaving.  I believe just after.
9    THE INTERPRETER:  Just about that
10  time.  I believe -- I believe just after I left.
11    MR. STEWART:  I may have misunderstood
12  your translation.  You translated a phrase that
13  Mr. Dubois used and I think you said that the
14  negotiations -- that there was something in
15  principle since 1997.
16    THE INTERPRETER:  Right.
17    MR. STEWART:  I didn't understand what
18  you --
19    MR. BOSTWICK:  Do you want to read
20  back the answer?
21    MR. STEWART:  Yeah, that would
22  probably be best.

Page 32

1    THE WITNESS:  In principle, yeah.
2    MR. BOSTWICK:  Let's -- Let's -- Let's
3  try to do it so that as much is on the record as
4  possible.
5    MR. STEWART:  Right.
6    MR. BOSTWICK:  Maybe -- I would
7  suggest we read back the answer and then you can,
8  maybe, ask a direct question for clarification.
9  Does that make sense?
10    MR. STEWART:  Yes.  May we have the
11  translation of the conversation you just had.
12    THE INTERPRETER:  Okay.  I was
13  repeating.  I was just asking him if it was -- you
14  know, he said yeah.  The question was whether --
15  whether negotiations completed.  And he said there
16  was an agreement in principle.
17    THE REPORTER:  "The negotiations were
18  completed.  We were agreeing on the principle
19  since 1997 but the legal documents have not been
20  done until the time of my leaving."
21    THE INTERPRETER:  Mm-hmm.
22 . . .

8 (Pages 29 to 32)

Page 33

1    BY MR. STEWART:
2    Q. "Agreeing on the principle." Is it --
3 Is it correct to say that there had been an
4 agreement reached in principle since 1997?
5    A. Yes.
6    Q. What were the nature of your
7 communications with Jose Luis Monterde?
8    A. He gave me a tour of the Zaragoza
9 plant.
10    Q. Anything else?
11    A. No. No.
12    Q. Since becoming vice president of
13 operations, can you estimate the number of
14 communications you had with Clemente Gonzalez
15 Azpeitia?
16    THE INTERPRETER: What is the name?
17    MR. STEWART: It's Clemente Gonzalez
18 and there's a last name, Azpeitia.
19    THE WITNESS: My contacts with
20 Clemente Gonzalez were during meetings for
21 negotiations; otherwise, it was Adolfo De Basilio
22 who had contact with Clemente Gonzalez. So in

Page 34

1 all, there were maybe three or four meetings in
2 Madrid and two or three in Paris.
3    BY MR. STEWART:
4    Q. And that was from 19 -- say
5 January 1995 until February of 2000?
6    A. Yes.
7    THE WITNESS (IN ENGLISH): Excuse me.
8 No.
9    THE INTERPRETER: No. No, because I
10 didn't see Mr. Gonzalez after 1999.
11    BY MR. STEWART:
12    Q. 1995 to 1999?
13    A. I believe he was replaced at the
14 beginning of 1999 or maybe at the end of 1998. I
15 don't remember exactly the date of his
16 replacement.
17    Q. During that time period, 1995 to 1999,
18 did you have telephone conversations with
19 Mr. Gonzalez?
20    A. I don't recall because Mr. --
21 Mr. Gonzalez spoke very little French and I was
22 not comfortable enough in Spanish to have a phone

Page 35

1 conversation with him.
2    Q. Did you have written communications
3 with Mr. Gonzalez during this time period?
4    A. Yes, surely.
5    Q. Can you estimate how many?
6    MR. BOSTWICK: Objection.
7    THE WITNESS: I don't recall. There
8 were letters, faxes, letters of quickix (phonetic)
9 on the legal negotiation.
10    BY MR. STEWART:
11    Q. Can you estimate the approximate
12 number of written communications you would have
13 with Mr. Gonzalez during the course of a month?
14    MR. BOSTWICK: Objection. Form.
15    THE WITNESS: As much as possible,
16 our -- our -- I preferred that written
17 communications would happen between Mr. De Basilio
18 and Mr. Gonzalez.
19    BY MR. STEWART:
20    Q. From time to time, you would have
21 direct communication with Mr. Gonzalez; is that
22 so?

Page 36

1    A. No, only I -- I remember writing
2 letters at critical moments of our cooperation.
3    Q. And tell me the number of contacts you
4 had with Mr. Herrera.
5    A. I had, maybe, two or three meetings
6 with Mr. Herrera, maybe four, if you count the one
7 in 1998.
8    Q. Did you have written communications
9 with Mr. Herrera?
10    A. I don't recall. I -- I think at
11 that -- at that time since we didn't have any more
12 disagreements, I didn't need to write to him.
13    Q. And what were the nature of your
14 communications with Mateo Gasca?
15    A. I saw him at the plant. That's all.
16    Q. Would you see him at the plant when
17 you visited the plant?
18    A. Yes.
19    Q. Was it your practice to -- I'm sorry.
20 Was it your practice to meet Mr. Gasca when you
21 visited the Zaragoza plant?
22    MR. BOSTWICK: Objection. Form.

9 (Pages 33 to 36)

Page 37

1    THE WITNESS: Yes. I was there only
2 twice to the Zaragoza plant and Mr. Gasca was in
3 charge of the manufacturing of the Ethypharm
4 product but I didn't -- I didn't have to have
5 direct discussions with him.
6    BY MR. STEWART:
7    Q. And how many -- What was the nature of
8 your discussions -- of your contacts with Fernando
9 Berenguer?
10    A. He took part in negotiations on the
11 contract.
12    Q. What estimate do you have for the
13 number of times you met with Mr. Berenguer?
14    A. Two or three times.
15    Q. And what was the nature of your
16 contacts with Antonio Capodevilla?
17    A. None. I don't think I met him.
18    Q. Okay. Who did you have contact -- Who
19 were the persons at Belmac Corporation, and then
20 after the name change, Bentley Pharmaceuticals,
21 Incorporated, that you had contact with?
22    MR. BOSTWICK: Objection. Timeframe.

Page 38

1    MR. STEWART: From Nineteen Ninety --
2 from Dec -- December of 1994 until Mr. Dubois left
3 the company in February of 2000.
4    THE WITNESS: I met Mr. Murphy with
5 whom I had to negotiate. And outside the
6 business, in pharmaceutical meetings, I think I
7 saw him once or twice with one of his
8 collaborators.
9    THE WITNESS (IN ENGLISH): Colleague.
10    THE INTERPRETER: Colleagues, but I
11 don't recall the name of the person.
12    BY MR. STEWART:
13    Q. What do you mean by "outside the
14 business"?
15    A. Without having to negotiate anything
16 specific, it was in the -- in a -- in a trade
17 meeting. It was more of a -- a civil and --
18 mundane.
19    THE WITNESS (IN ENGLISH): Civil --
20    THE INTERPRETER: Yeah.
21    BY MR. STEWART:
22    Q. So is it fair to say that those

Page 39

1 meetings did not involve the -- did not involve
2 directly the business of Ethypharm or of -- of
3 Laboratorios Belmac or of Bentley.
4    MR. BOSTWICK: Objection. What
5 meetings?
6    MR. STEWART: The meetings that he
7 just mentioned.
8    THE WITNESS (IN ENGLISH): Trade
9 meeting.
10    MR. STEWART: Trade meeting. Okay.
11    THE INTERPRETER: Ethypharm business
12 had to be involved because everybody was meeting
13 their customers and -- and Mr. Murphy, like other
14 customers, met with us on the Ethypharm booth but
15 we didn't discuss -- What I mean "business," we --
16 we didn't negotiate. There was no agenda,
17 specific agenda.
18    BY MR. STEWART:
19    Q. How many trade meetings do you recall
20 meeting -- How many trade meetings were there at
21 which you met Mr. Murphy?
22    A. Ethypharm was going to this meeting I

Page 40

1 mentioned. It was called CPHE -- CPHI and every
2 year had a booth there. I think I saw Mr. Murphy
3 twice.
4    Q. Did you attend the CPHI trade show
5 every year?
6    A. Yes, but I was not always on the
7 Ethypharm booth.
8    Q. In addition to the meetings at the two
9 trade shows, how many meetings did you have with
10 Mr. Murphy?
11    MR. BOSTWICK: Objection. Time
12 period.
13    MR. STEWART: At any time from
14 December of 2004 to February of Two Thousand --
15    THE INTERPRETER: December.
16    MR. STEWART: From December of -- I'm
17 sorry. December of 1994 until February of 2000.
18    THE WITNESS: I recall two important
19 meetings, one in February 1997, the other in April
20 '98.
21    MR. BOSTWICK: Craig, before you move
22 on to this, would it be okay to say that the other

10 (Pages 37 to 40)

Page 41

1 translator can leave? I mean, I think it's
2 working reasonably well and there's no reason to
3 sit around and incur double costs. Do you -- Do
4 you agree with that?
5      MR. STEWART: I do.
6      MR. BOSTWICK: Okay.
7      MR. STEWART: I do. Thank you.
8      MR. BOSTWICK: I don't -- Thank you.
9 Thank you very much for your help.
10      MR. STEWART: Thank you.
11      BY MR. STEWART:
12      Q.   Other than Mr. Murphy, do you
13 recall -- Withdraw that.
14         You mentioned that there was -- that
15 you -- that at one of the trade meetings -- that
16 there was someone with Mr. Murphy that you
17 believed was employed by Bentley; is that correct?
18      A.   That's correct.
19      Q.   But you don't know the name of that
20 person?
21      A.   I think this person introduced himself
22 or herself but I don't remember the name and I

Page 42

1 don't remember receiving a card.
2      Q.   And other than Mr. Murphy and this
3 other person that -- whose name you cannot
4 remember, did you meet any other people from
5 Bentley Pharmaceuticals?
6      A.   No.
7      Q.   During the course of your employment
8 as vice president of operations, did you have any
9 contact with any persons at Bentley
10 Pharmaceuticals or Belmac Corporation other than
11 Mr. Murphy?
12      A.   No.
13      MR. BOSTWICK: Objection. Form.
14      THE WITNESS (IN ENGLISH): No, no, no,
15 that I can remember. No.
16      THE INTERPRETER: No, I don't recall.
17      MR. STEWART: Okay.
18      BY MR. STEWART:
19      Q.   What was the purpose of your meeting
20 with Mr. Murphy in February of 1997?
21      A.   Since we couldn't negotiate with
22 Mr. Gonzalez and his team, I asked Mr. De Basilio

Page 43

1 to send a letter stating the end of our
2 cooperation with Belmac.
3      Q.   Let me -- Why could you not negotiate
4 with Mr. Gonzalez and his team?
5      A.   I was negotiating with Mr. Gonzalez
6 and his team but I could not reach an agreement.
7      Q.   What were the -- What were the areas
8 of dispute that you had with Mr. Gonzalez and his
9 team?
10      A.   Manufacturing costs and compliance
11 with GMP standards or some minor items having to
12 do with sums, amounts that Ethypharm thought being
13 owed to --
14      THE WITNESS (IN ENGLISH): That
15 Belmac --
16      THE INTERPRETER: Okay. So Belmac
17 thought that Ethypharm owed them money and
18 Ethypharm didn't want to pay that money but it was
19 minor.
20      BY MR. STEWART:
21      Q.   And how long had you been trying to
22 reach an agreement with Mr. Gonzalez?

Page 44

1      A.   From the end of 1994 until the end of
2 1996.
3      Q.   Did you understand at that time that
4 Mr. Gonzalez had authority to negotiate for
5 Laboratorios Belmac?
6      THE INTERPRETER: Gonzalez. Right?
7      MR. STEWART: Yes.
8      THE WITNESS: I thought that in fact
9 as general manager Mr. Gonzalez had the authority
10 to negotiate but since we couldn't reach an
11 agreement I was questioning his ability to
12 negotiate.
13      MR. BOSTWICK: Let me interpose an
14 objection to the translation there. I heard you
15 ask, Craig, about whether he had authority for
16 Laboratorios Belmac and I heard the translation as
17 Belmac Corporation.
18      THE INTERPRETER: Oh, the Laboratorios
19 Belmac. I'm sorry.
20      MR. BOSTWICK: And it was Belmac --
21      THE INTERPRETER: Oh.
22      MR. BOSTWICK: -- Corporation U.S. so

11 (Pages 41 to 44)

Page 45

1 I think there's --
2    THE INTERPRETER: Oh. Okay.
3    MR. BOSTWICK: -- a potential for a
4 discrepancy --
5    THE INTERPRETER: Okay. Sorry about
6 that.
7    MR. STEWART: Thank you.
8    MR. BOSTWICK: -- because they're
9 different entities.
10   THE INTERPRETER: Yeah, right.
11   MR. BOSTWICK: Perhaps you can maybe
12 ask that question again and --
13   MR. STEWART: Mm-hmm.
14   MR. BOSTWICK: -- and just break it
15 out. I just don't want there to be any confusion
16 on that point.
17   MR. STEWART: Well -- Yeah.
18   BY MR. STEWART:
19   Q. Did you understand my question to be
20 that -- Did you unders -- Did you believe that
21 Mr. Gonzalez had authority to negotiate for
22 Laboratorios Belmac?

Page 46

1    A. Yes.
2    Q. Okay.
3       And to make sure that we have your
4 testimony -- And is it your testimony that --
5 that -- that you did believe that Mr. Gonzalez had
6 that authority?
7    MR. BOSTWICK: Objection. Vague.
8    MR. STEWART: It's the same question.
9 I -- I was simply trying to -- to make sure that
10 we had the -- we had the -- the complete answer.
11   THE WITNESS: What I can say is that I
12 had to negotiate with him because, apparently, he
13 was the proper party but I realize that since the
14 situation was stalled, it had to be unstalled at
15 another level.
16   MR. STEWART: Okay.
17   BY MR. STEWART:
18   Q. Now, you were saying that you had
19 Mr. De Basilio send a letter; is that right?
20   A. I believe I recall that, yes.
21   Q. And who did --
22   A. Since it was about terminating a

Page 47

1 contract between Ethypharm Spain and Belmac Spain.
2    MR. STEWART: Can we have marked as
3 the first exhibit a letter of January 20, 1997.
4       (The reporter marked Exhibit 1.)
5    THE REPORTER: Dubois 1.
6    BY MR. STEWART:
7    Q. Mr. Dubois, showing you a document
8 that we have marked as Exhibit 1, is that the
9 letter that you had Mr. De Basilio send?
10   A. Yes.
11   Q. What happened after the letter was
12 sent?
13   A. There were discussions between
14 Mr. Gonzalez and Mr. De Basilio and it was
15 suggested -- I suppose by Mr. Gonzalez -- that a
16 meeting be held with Mr. Murphy.
17   Q. If you look at the letter and at the
18 second to the -- the -- the second sentence from
19 the bottom --
20   THE WITNESS (IN ENGLISH): Mm-hmm.
21   BY MR. STEWART:
22   Q. And you are free to read the Spanish

Page 48

1 or the English translation. And my understanding
2 from the English translation is that the sentence
3 says: We ask you to transmit these decisions to
4 your mother company in the United States -- in the
5 U.S.
6    A. That's correct.
7    Q. Can we agree that Mr. De Basilio asked
8 Mr. Gonzalez to transmit the matter to the parent
9 company in the United States?
10   A. No, it was not about trans --
11 transmitting matters to the mother company but to
12 inform the company of the decisions.
13   Q. And the decision was to terminate the
14 relationship --
15   THE WITNESS (IN ENGLISH): Yes.
16   BY MR. STEWART:
17   Q. -- unless an agreement could be
18 reached?
19   A. At the time -- At the time, the
20 decision was made to terminate the relationships
21 since there was no agreement.
22   Q. After the -- After this letter was

12 (Pages 45 to 48)

Page 49

1 sent, what then occurred?

2    A.  I think there were exchanges between
3 Mr. Gonzalez and Mr. De Basilio as I said.  There
4 was some kind of agenda of items to be discussed
5 and it was suggested to discuss them with
6 Mr. Murphy.

7        And following this, I met with
8 Mr. Murphy in the United States; in Philadelphia,
9 if I recall correctly; in the first days of
10 February.  It was then there was, therefore, very
11 quick activity.

12        THE WITNESS (IN ENGLISH):  A response.

13        THE INTERPRETER:  A response.

14        THE WITNESS:  And I believe there was
15 a letter from Mr. Murphy following these letters
16 to Mr. Debregeas.

17        MR. STEWART:  Can we have marked as
18 the next exhibit a letter dated January 28, 1997
19 EP 002450.

20        (The reporter marked Exhibit 2.)

21        BY MR. STEWART:

22    Q.  Mr. Dubois, is Exhibit 2 that I have

Page 50

1 just handed you the letter from Mr. Murphy to
2 Mr. Debregeas that you were referring to?

3    A.  Yes.

4    Q.  At the time that you wrote the
5 letter -- I'm sorry.  At the time that it was
6 suggested that you meet with Mr. Murphy, did you
7 know who Mr. Murphy was?

8        THE WITNESS (IN ENGLISH):  Of course.
9 Yeah.  Oui.

10        THE INTERPRETER:  Yeah.  Oui.  Yeah.
11 Of course, yes.

12        BY MR. STEWART:

13    Q.  And -- And how did you know that?

14    A.  Because I think there had already been
15 frequent contacts between Mr. Murphy and
16 Mr. Debregeas because, of course, we knew that
17 Belmac Corporation, then Bentley Pharmaceuticals,
18 were -- Mr. Murphy at its head.

19    Q.  Did you also understand that
20 Mr. Murphy was president of Laboratorios Belmac?

21    A.  No, it's possible but I always
22 considered Mr. Murphy as the chairman and CEO

Page 51

1 of -- of Belmac Corporation and then Bentley
2 Pharmaceuticals.

3    Q.  Did you speak to Mr. Debregeas --
4 to -- to Mr. Debregeas with regard to Mr. Murphy's
5 letter to him?

6    A.  Yes, of course.

7    Q.  What did Mr. Debregeas -- What did
8 Mr. Debregeas say to you?

9    A.  Or either I told Mr. Debregeas what I
10 was going to propose during the meeting.

11    Q.  What did you -- What did you propose
12 to say to Mr. Murphy in the meeting?

13        MR. BOSTWICK:  Objection.  Are we
14 talking about what he told Mr. Debregeas he was
15 going to propose --

16        MR. STEWART:  Yes.

17        MR. BOSTWICK:  -- or what he actually
18 proposed at the meeting?

19        MR. STEWART:  No.

20        MR. BOSTWICK:  I think the question
21 was unclear.

22 . . .

Page 52

1        BY MR. STEWART:

2    Q.  Is what you told Mr. Debregeas that
3 you were going to propose the same as what you
4 ultimately told Mr. Murphy?

5    A.  Of course, there is always some
6 exchange before the final propo -- proposition,
7 proposal, but since I was scheduled to go several
8 days later to see Mr. Murphy, I wanted to make
9 sure that Mr. Debregeas agreed with what I was
10 going to propose.

11    Q.  And what did you propose?

12        MR. BOSTWICK:  Same objection.

13        THE WITNESS:  I believe I -- I wrote a
14 report about this meeting and that all the details
15 of my proposal should be in this report.

16        BY MR. STEWART:

17    Q.  We -- We certainly can get to that --
18 to that written report later but I'm interested
19 now in -- in coming to the meeting with Mr. Murphy
20 in Philadelphia.

21    A.  When I arrived at this meeting, I
22 wanted to make sure that Mr. Murphy was

13 (Pages 49 to 52)

Page 53

1 considering pursuing the relationship with
2 Ethypharm and it's -- his letter to Mr. Debregeas
3 suggested that he wanted an agreement. I then
4 first had to confirm what his intentions were and
5 after that propose a certain number of steps so
6 that Ethypharm would agree with pursuing the
7 meeting.
8         THE WITNESS (IN ENGLISH): I mean the
9 cooperation.
10        THE INTERPRETER: The cooperation.
11        THE WITNESS: We had to settle the
12 items that were still on hold since the
13 discussions with Mr. Gonzalez.
14        MR. BOSTWICK: Can --
15        THE WITNESS (IN ENGLISH): From the
16 beginning of the discussions.
17        THE WITNESS: From the beginning of
18 discussions with Mr. Gonzalez.
19        MR. BOSTWICK: I'm sorry. I just see
20 a mistake in the translation on the screen. He
21 said "cooperation" and she put "corporation."
22        THE INTERPRETER: Oh, oh.

Page 54

1 Cooperation. Okay.
2         MR. BOSTWICK: I believe the
3 translator said cooperation. Is that your memory?
4         MR. STEWART: It is.
5         Let's go off the record for a minute.
6         THE VIDEOGRAPHER: The time is
7 11:31:03. Off the record.
8         (Discussion off the record.)
9         THE VIDEOGRAPHER: On the record. The
10 time is 11:33:24.
11        THE WITNESS (IN ENGLISH): Shall I
12 continue my response?
13        MR. STEWART: Yes, please.
14        THE WITNESS: -- for these texts were
15 to enable the resolution of the items that were on
16 hold since the beginning of the negotiations with
17 Mr. Gonzalez, resume manufacturing of Omeprazole
18 at -- in economical conditions, acceptable
19 conditions for Ethypharm, set up the GMP
20 procedures for which Belmac was deficient, and in
21 return, of course, settle the issue of the amounts
22 owed by -- by Ethypharm.

Page 55

1         BY MR. STEWART:
2     Q.  What did Mr. Murphy respond to this
3 proposal?
4     A.  Before this proposal, Mr. Murphy had
5 given me a proposal that was not acceptable but it
6 was in his best interests which was to -- to
7 resume --
8         THE WITNESS (IN ENGLISH): Not to
9 resume, to take over.
10        THE INTERPRETER: Oh, to take over.
11 Take over for Belmac the manufacturing of the
12 product -- of Ethypharm products in Spain. And my
13 counterproposal seemed acceptable to Mr. Murphy.
14 It was depending, of course, on the realization of
15 the steps that I mentioned whose purpose was not
16 only to prove the feasibility of the cooperation
17 but also Belmac's goodwill.
18        BY MR. STEWART:
19    Q.  Where did the meeting take place?
20    A.  In Philadelphia in the lobby of a
21 hotel. I don't remember which one. It's the
22 hotels where Mr. Murphy was staying.

Page 56

1     Q.  You mentioned that as part of the
2 proposal that there was to be GMP procedures put
3 in place in which -- as to which Belmac was
4 deficient; is that right?
5     A.  That's correct.
6     Q.  And you mentioned earlier that -- that
7 you ordered two audits conducted of the Bel --
8 Laboratorios Belmac facilities; is that right?
9     A.  That's correct.
10    Q.  Did those audits occur before the
11 meeting with Mr. Murphy?
12    A.  The first one, yes.
13    Q.  And was Mr. Murphy, to your knowledge,
14 aware that that audit had occurred?
15    A.  He pretended not to be and the audit
16 report was sent to him upon my return to Paris.
17    Q.  When you say, "he pretended," you mean
18 he was --
19        THE WITNESS (IN ENGLISH): He said.
20        MR. STEWART: I'm sorry?
21        THE INTERPRETER: He said.
22        MR. STEWART: Okay.

14 (Pages 53 to 56)

1      BY MR. STEWART:

2      Q.  In English, for a person to pretend
3 means that he -- he knew something but acted in a
4 different way.  Is that what you meant?

5      A.  No, because I cannot judge what he
6 knew and what he didn't know.

7      Q.  So he said that he was not aware of
8 that audit; is that right?

9      A.  That's correct.

10     Q.  He didn't -- He wasn't present for the
11 audit, was he?

12     A.  Of course not.

13     Q.  There were employees of Laboratorios
14 Belmac who were present for the audit; correct?

15     A.  Of course.  It was an audit of the
16 employees as well as the plant of Labora -- of
17 Belmac laboratories.

18     Q.  Do you remember who those employees
19 were who were present at the audit?

20     A.  I was not myself presence -- present
21 or joined the audit.  This audit was performed on
22 one of the -- Mrs. Gavoille's colleagues.

1 Mrs. Gavoille is responsible or in charge of the
2 quality at Ethypharm.  And as -- And I assume that
3 an audit and report must exist -- reviewed all the
4 procedures concerning manufacturing of the
5 Ethypharm products.  I remember sending myself
6 upon my return a letter to Mr. Murphy with a copy
7 of the report.

8      MR. STEWART:  Let me have marked,
9 please, as the next exhibit a fax front page dated
10 February 14th, 1997 with the following letter from
11 Mr. Dubois and a -- a document titled Audit of the
12 Ethypharm Production Site in Zaragoza.

13     (The reporter marked Exhibit 3.)

14     BY MR. STEWART:

15     Q.  Mr. Dubois, is the letter -- is the
16 fax cover sheet, the letter, and the audit that
17 we've marked as Exhibit 3 the document that you
18 were referring to in your testimony?

19     A.  That's correct.  That's it.

20     Q.  After you sent the letter to
21 Mr. Murphy, what happened?  What happened next?

22     A.  There were exchanges and meetings with

1 the Belmac Spain team.  Well, many exchanges
2 between Mr. De Basilio and the team of Belmac
3 Spain and a meeting that happened in April with
4 the people from Belmac.

5      Q.  A meeting in April of 1997?

6      A.  Yes.  Yeah.

7      Q.  Who was at that meeting?

8      A.  Mr. Murphy was to come to this meeting
9 but at the last minute, he couldn't come, and
10 there was, I think, Clemente Gonzalez, probably
11 Berenguer, then perhaps another person or -- or
12 two from Belmac.  And on our side, of course,
13 myself and Adolfo De Basilio and the Ethypharm --
14 Ethypharm team.

15     Q.  What occurred at that meeting?

16     A.  I remember that we had to clarify
17 again what I told Mr. Murphy but that there
18 was during this meeting a certain delay observed
19 in the realization of the scheduled steps -- or,
20 rather, under time table for the realization of
21 the scheduled steps.

22     Q.  Was this -- I -- I don't -- I don't --

1 I don't understand the delay in the scheduled
2 steps.

3      A.  One of the critical points was the
4 manufacturing of 20 lots of Omeprazole.

5      THE WITNESS (IN ENGLISH):  Before
6 the -- the end of the summer.

7      THE INTERPRETER:  Before the end of
8 the summer.

9      And we realized in April that it could
10 not be the case.

11     BY MR. STEWART:

12     Q.  You realized that as a result of
13 discussions with the Belmac people?

14     A.  Yes, but I -- I think there were
15 exchanges already between the Clemente Gonzalez
16 and Adolfo De Basilio that indicated that.

17     Q.  Please continue with -- My question
18 was what happened at the -- at the April 1997
19 meeting.

20     A.  What I told you, there were delays and
21 Ethypharm's accepted these delays as form of
22 goodwill going towards what we wanted in the hope

15 (Pages 57 to 60)

**Page 61**

1 that we would reach a solution based on what had
2 been discussed with Mr. Murphy.
3    Q.  And was a solution reached?
4    A.  I remember that in September we made a
5 proposal for an agreement.  I think it was
6 September.  I don't recall.  And that the -- the
7 complete proposal included even a price for the
8 manufacturing of the product.  And, of course, the
9 reimbursement of the amounts due.  We had at that
10 time the feeling that Belmac could manage to
11 manufacture the required lot -- number of lots of
12 Omeprazole.  And we had indications that the GMP
13 rules were beginning to be put in place.  And I
14 think that there was a GMP audit that was
15 performed at the end of the year.
16    Q.  That would be the end of 1997?
17    A.  Yes, I believe.
18    Q.  Who was present at that audit?
19    A.  Not me.  It was performed by Marcelle
20 Gavoille herself, I believe, of the Zaragoza plant
21 with all the people from the plant.  And,
22 probably, maybe Mr. De Basilio had to be present.

**Page 62**

1    Q.  Was Mr. Murphy present?
2    A.  Neither Mr. Murphy nor Mr. Gonzalez.
3 An audit is not performed in the presence of the
4 managers.
5    THE WITNESS (IN ENGLISH):  General
6 manager.
7    THE WITNESS:  General manager.
8    BY MR. STEWART:
9    Q.  Is that by rule or just by
10 convenience?
11    A.  The general management doesn't have to
12 be audited for -- for such an audit which has to
13 do only with the procedures and manufacturing
14 criteria.
15    MR. BOSTWICK:  Craig, we've been going
16 about an hour and a half, two hours.  Will you --
17 Do you have a -- I mean -- I don't mean to -- If
18 you -- If you're --
19    MR. STEWART:  No.  This is --
20    MR. BOSTWICK:  -- at a section and you
21 could --
22    MR. STEWART:  No, no, this is -- this

**Page 63**

1 is a -- This is a good time.  I'll be moving on to
2 a couple other things so this is a good time to
3 stop.
4    MR. BOSTWICK:  Okay.
5    THE VIDEOGRAPHER:  This ends Tape No.
6 1 of the Dubois deposition.  The time is 11:50:25.
7 Off the record.
8    (Recess.)
9    THE VIDEOGRAPHER:  On the record with
10 Tape No. 2 of the testimony of Claude Dubois in
11 the matter of Ethypharm versus Bentley
12 Pharmaceuticals.  The date is July 12th, 2006.
13 The time is 12:17 -- Oh, well -- 01.
14    MR. STEWART:  Mr. Dubois, I'm going to
15 show you two -- two draft agreements.  And first I
16 want to have our stenographer mark as the next
17 exhibits a document that begins with the Bates
18 number 9082 -- EP 009082 with a cover sheet from a
19 Javier Santos and as the next -- as the exhibit
20 following -- I believe it would be Exhibit 5 -- a
21 document that begins with an Ethypharm Bates
22 number, 009008.

**Page 64**

1    (The reporter marked Exhibit 4.)
2    (The reporter marked Exhibit 5.)
3    BY MR. STEWART:
4    Q.  Mr. Dubois, I -- I don't intend to ask
5 you questions in detail on either Exhibit 4 or
6 Exhibit 5.
7    THE WITNESS (IN ENGLISH):  Okay.
8    BY MR. STEWART:
9    Q.  So I would propose that I put to you
10 my question and then take whatever time you need
11 to review the document if you -- if you feel
12 that's necessary.  Is that agreeable?
13    A.  Yes.
14    Q.  Referring to Exhibit -- what we have
15 marked as Exhibit 4, have you seen the Draft 14
16 March 1995 Memorandum of Understanding before
17 today?
18    (Discussion off the record.)
19    THE WITNESS:  I'm looking.
20    There were many drafts of our agreements
21 that were exchanged.  I don't recall
22 specifically -- specifically this one.  I think

16 (Pages 61 to 64)

Page 65

1 this one is a draft that were -- that was written
2 by Spanish attorneys on the instructions by Adolfo
3 De Basilio.
4      BY MR. STEWART:
5      Q.  Would you look at Exhibit 5, please.
6 And have you seen the document that is titled
7 "Agreement" which --
8      A.  Yeah.  This document seems familiar to
9 me.  In fact, it is dated July, and that's what I
10 thought was sent in September.
11     Q.  Who prepared the original -- Who
12 prepared the typewritten portion of this document?
13     A.  I think it -- I think it is Ethy --
14 Ethypharm Spain.
15     Q.  Was this document done under your
16 direction?
17     A.  Yes, probably.  Yes.
18     Q.  And let me direct your attention to
19 the parties to the agreement.  The first party is
20 Ethypharm S.A. Spain; is that correct?
21     A.  Yes.
22     Q.  And Ethypharm Spain is represented by

Page 66

1 its president, Mr. Patrice Debregeas; correct?
2      A.  Yes, that's what's written.
3      Q.  Yes.  And the second party is
4 Laboratorios Belmac S.A.?
5      A.  Yes.
6      Q.  Is that -- And is that correct?  Okay.
7      A.  Yes.
8      Q.  And it is represented by, according to
9 the agreement, its executive director, Mr. James
10 R. Murphy.
11     A.  Yes.  Again, that's what's written.
12     Q.  When was the first time that you
13 understood that Mr. Murphy was the executive
14 director of Laboratorios Belmac S.A.?
15     MR. BOSTWICK:  Objection.  Foundation
16 and the form of the question's -- assumes a fact
17 not in evidence.
18     MR. STEWART:  Well, let me see if I
19 can clear that up a little bit.
20     MR. BOSTWICK:  It's a
21 when-did-you-beat-your-wife.
22     MR. STEWART:  At some -- No, I don't

Page 67

1 think so.
2      BY MR. STEWART:
3      Q.  At some point did you understand that
4 Mr. Murphy was the executive director of
5 Laboratorios Belmac?
6      A.  I just realized that I thought it was
7 the document that was sent in 1997 but it was sent
8 in 1995.  And I don't recall these documents.
9      Q.  In 19 -- In July of 1995, you were
10 vice president of operations of Ethypharm France;
11 is that correct?
12     A.  That's correct.
13     Q.  And matters of contract were under
14 your jurisdiction; is that right?
15     A.  That's correct.
16     Q.  Is it probable that this document came
17 to your attention in July of 1995?
18     A.  It's probable.
19     MR. STEWART:  Now I would like to turn
20 to September of 1997.  And I'd like to have marked
21 as the next exhibit a letter of 3 September 1997
22 to Mr. Dubois.

Page 68

1      (The reporter marked Exhibit 6.)
2      BY MR. STEWART:
3      Q.  Mr. Dubois, do you recognize Exhibit 6
4 as a letter that was sent to you by Mr. Clemente
5 Gonzalez in September of 1997?
6      A.  Yes.
7      Q.  You mentioned earlier in the morning
8 that in September there were -- I believe you said
9 progress toward agreement including agreement on
10 price.  Do I under -- Do I understand that -- Have
11 I understood that testimony correctly?
12     A.  I don't remember seeing this.
13     Q.  Right.
14     A.  I remember seeing that following my
15 meeting with Mr. Murphy in February.  We were in
16 agreement on the procedure to get out of the
17 stalling -- and that during our meeting in April
18 with Mr. Gonzalez and his team --
19     THE WITNESS (IN ENGLISH):  We still
20 were --
21     THE INTERPRETER:  We still had delays
22 in our progress.  Our progress was still delayed.

17 (Pages 65 to 68)

ESQUIRE DEPOSITION SERVICES
1-866-619-3925

JT-A-449

Page 69

1 And that in September we sent a -- a -- a draft
2 agreement, probably following this letter, from
3 Mr. Gonzalez. So it was -- it was September in my
4 memory, my recollection, and not July, since the
5 document that you showed previously --
6      THE WITNESS (IN ENGLISH): Were in
7 fact July 1995.
8      THE INTERPRETER: Were July 95.
9      MR. STEWART: Right.
10      BY MR. STEWART:
11   Q.   Who -- Who was involved in the
12 drafting of the agreement that was sent in
13 September of 1997?
14      MR. BOSTWICK: I'm just going to
15 object. We don't have it.
16      THE WITNESS: I would have -- have to
17 review this draft but in theory would have been
18 the legal department of Ethypharm with --
19      MR. STEWART: Okay --
20      THE WITNESS: -- with instructions
21 from Adolfo De Basilio and myself.
22 . . .

Page 70

1      BY MR. STEWART:
2   Q.   Who was in the legal department at
3 that time?
4   A.   Mrs. Joannesse.
5   Q.   Was Madame Joannesse a lawyer?
6   A.   Not -- Not -- Not a lawyer but a --
7 Hmm. JD. Yeah. That's -- That's -- In English I
8 think that's the -- She didn't have -- She didn't
9 pass the bar. She didn't have the bar. She
10 didn't pass the bar exam but she was -- she had a
11 law degree.
12      MR. STEWART: Is that what he said?
13      THE INTERPRETER: Yeah.
14      THE WITNESS (IN ENGLISH): Jurist.
15      THE INTERPRETER: Jurist.
16      (Mr. Stewart conferred with
17      Mr. Mingolla.)
18      MR. STEWART: I'd like to mark as the
19 next three exhibits what I have -- what I believe
20 to be three drafts of the same typewritten
21 agreement, one of which contains -- is a facing
22 page notes. And so Exhibit 7 will be -- will

Page 71

1 start with Belmac -- Belmac Bates number 006381.
2      (The reporter marked Exhibit 7.)
3      THE REPORTER: Whoops.
4      MR. STEWART: And Belmac Exhibit 8
5 starts with Belmac Bates number 006372.
6      (The reporter marked Exhibit 8.)
7      MR. STEWART: And Exhibit 8 is Belmac
8 006371.
9      MR. BOSTWICK: No.
10      THE REPORTER: Nine.
11      MR. BOSTWICK: I think you just marked
12 two No. 8 so --
13      MR. STEWART: Oh, I -- I beg your
14 pardon. I'm sorry. No. 9.
15      MR. BOSTWICK: So this next one --
16 this next one --
17      MR. STEWART: I misspoke. Exhibit 9
18 has as -- 006371 as its first page.
19      (The reporter marked Exhibit 9.)
20      BY MR. STEWART:
21   Q.   Mr. Dubois, let me know when you've
22 had a chance to look through those documents.

Page 72

1   A.   All right. I'm done.
2   Q.   Do you recognize either Exhibit 7,
3 Exhibit 8, or Exhibit -- Exhibit 9?
4   A.   I recognize Exhibit 9. I believe it
5 was the draft contract that was sent by Ethypharm
6 Spain to Belmac Spain at the beginning of
7 September. This is the contract I was referring
8 to earlier in my testimony.
9      MR. STEWART: May I have Mr. Dubois'
10 answer back, please.
11      THE REPORTER: "I recognize Exhibit 9.
12 I believe it was the draft contract that was sent
13 by Ethypharm Spain to Belmac Spain at the
14 beginning of September. This is the contract I
15 was referring to earlier in my testimony."
16      BY MR. STEWART:
17   Q.   And what involvement, if any, did you
18 have with respect to Exhibit 9?
19   A.   So Exhibit 9 is the contract plus
20 comments which I believe came from Belmac and that
21 I was not aware of. Exhibits 7 and 8 are the same
22 contract as far as I can judge with the changes

18 (Pages 69 to 72)

Page 73

1 and I don't know if they came before or after the
2 changes that are mentioned on Exhibit 9.
3    Q.   Where was the -- Where was Exhibit --
4 Where was the contract which is part of Exhibit 9
5 drafted?
6    A.   I think it was drafted by Ethypharm
7 Spain since it is a Spanish -- it is in Spanish --
8 that it was done from a draft made by
9 Mrs. Joannesse.
10    Q.   Was that draft -- Was the -- Was the
11 draft done in consultation with you?
12    A.   This draft was made in consultation
13 with me even in its Spanish form.
14    Q.   Do you recognize the handwriting on
15 Exhibit 9 that is on the page that has the number
16 006371?
17    A.   No.
18    Q.   Do you recognize any of the
19 handwriting on Exhibit 9 from pages 6389 to the
20 end of the document?
21    A.   Seems -- There seem to be handwriting
22 from different authors and based on the place

Page 74

1 where they are, I think these are mentions by
2 Belmac.
3       MR. STEWART:  These are what?
4       THE INTERPRETER:  These are comments.
5       MR. STEWART:  Comments.
6       THE INTERPRETER:  Comments by Belmac.
7       MR. BOSTWICK:  I'm going to interpose
8 an objection having had an opportunity to review
9 7, 8, and 9 simply because it appears that this is
10 not the order in which these were produced from
11 the files of Belmac.  I -- I see on Exhibit 9,
12 it's -- 6371 is the Bates number and then the next
13 Bates number is 6389.  And to the extent we're
14 purporting to say that these are the same or part
15 of one document -- I would need some form of
16 representation on that.  If anything, it looks
17 like the first page, 6371, was attached to
18 Exhibit 8, not Exhibit 9.  But I'll stop there.
19       THE WITNESS:  That's what I said in my
20 testimony, that I didn't know if Exhibit 7 and 8
21 came before or after Exhibit 9.
22

Page 75

1       THE INTERPRETER:  My assumption.
2       THE WITNESS (IN ENGLISH):  My
3 assumption.
4
5       THE INTERPRETER:  Mm-hmm.  My
6 assumption is that the first document is the one
7 that has the -- word "Borrador, 3/09/97,"
8 because "borrador" in Spanish means draft -- and
9 that this indication has disappeared from the
10 other documents.
11       MR. STEWART:  Mm-hmm.  Furthermore,
12 this contract was the one that was sent by fax on
13 September 14th from Ethypharm.
14       THE WITNESS (IN ENGLISH):  Probably to
15 Belmac Spain.
16       THE INTERPRETER:  Probably to Belmac
17 Spain.
18       BY MR. STEWART:
19    Q.   Is it your belief, Mr. Dubois, that
20 what we have marked as Exhibit 9 -- the first
21 draft of this contract?
22    A.   That's what I just said, except, of

Page 76

1 course, the cover page --
2    Q.   Yeah.
3    A.   -- the facing page.
4    Q.   And which in your -- in your view, is
5 the second draft -- Do you have any -- any -- any
6 view with regard to that point?
7    A.   I have no idea.  I didn't see the
8 other draft, I think.
9    Q.   So you have a recollection of seeing
10 Exhibit 9; is that right?
11       MR. BOSTWICK:  Object.
12       THE WITNESS:  Except for the facing
13 page.
14       BY MR. STEWART:
15    Q.   Okay.  But you have no recollection of
16 seeing the drafts that are -- we've identified as
17 Exhibit 7 and Exhibit 8; is that right?
18    A.   That is correct but I must -- I must
19 also add that in the exhibit that you have marked,
20 the document that you have marked, as Exhibit 9, I
21 haven't seen the document with the handwritten
22 comments.

19 (Pages 73 to 76)

Page 77

1    Q.  Briefly, if you would turn to
2 Exhibit 7.  Do you recognize the handwriting in
3 Exhibit 7?
4    A.  No.
5    Q.  And turn to Exhibit 8, please.  Do you
6 recognize the handwriting in Exhibit 8?
7        THE WITNESS (IN ENGLISH):  Not really.
8        THE INTERPRETER:  No, not either.
9        BY MR. STEWART:
10   Q.  Turning to Exhibit 9 --
11   A.  I must say that all these comments are
12 in Spanish.  Nobody at the Ethypharm headquarters
13 would have made comments in Spanish.
14   Q.  Okay.
15   A.  And these comments in Spanish probably
16 come from somebody at Belmac or at Ethypharm Spain
17 and I'm not familiar with anybody's handwriting at
18 Ethypharm Spain.  They never wrote to me in
19 handwriting -- in handwritten form and in Spanish.
20   Q.  My questions now will only concern the
21 typewritten portion of the draft contract.
22       MR. BOSTWICK:  On Exhibit 9?

Page 78

1        MR. STEWART:  On Exhibit 9, yes.
2        THE WITNESS:  Understood.
3        BY MR. STEWART:
4    Q.  Who was the -- Who was the draft
5 contract that we've marked as Exhibit 9 between?
6    A.  It could only be between Ethypharm
7 Spain and Belmac Laboratories, Spain since
8 Ethypharm Spain was the order giver, manufacturing
9 order giver, and the -- Laboratories Belmac Spain
10 was the contract manufacturer.
11   Q.  When you say it could only be between
12 Laboratorios Belmac Spain and Ethypharm S.A.
13 Spain, what is the reason that it could only be
14 between those two companies?
15   A.  For the reasons I just gave.  It's a
16 legal document so it's a contract between the
17 Spanish companies on the Spanish territory.
18   Q.  Are you aware of any contracts between
19 Ethypharm France and Bentley Pharmaceuticals,
20 Incorporated, which duplicate the terms that are
21 in Exhibit 9?
22       THE WITNESS (IN ENGLISH):  No.

Page 79

1
2        THE INTERPRETER:  No.
3        MR. BOSTWICK:  Objection to form.
4        BY MR. STEWART:
5    Q.  If you had so desired -- could you
6 have added Bentley Pharmaceuticals, Incorporated,
7 as one party -- as an additional party and
8 Ethypharm S.A. France as an additional party?
9    A.  Again, this is a legal document
10 between the Spanish companies for which neither
11 Ethypharm France and Bentley Pharmaceutical, even
12 though everything is made under their decisions,
13 cannot be parties.
14       Correction of what I said.
15       THE WITNESS (IN ENGLISH):  If I -- If
16 I had the desire --
17
18       THE INTERPRETER:  The answer was, even
19 if we had the desire, the will, to -- to be part
20 of this contract, legally, we could not be part of
21 this contract.
22       And even if it was the -- a decision to

Page 80

1 get into the contract was made by Ethypharm France
2 and Bentley Pharmaceutical, the legal documents
3 had to be made between Spanish companies.
4        BY MR. STEWART:
5    Q.  If you so desired, was there anything
6 to prevent you from having a separate agreement
7 between Bentley Pharmaceuticals and Ethypharm
8 France if that was your intention?
9    A.  I don't really understand the
10 question.  I don't think this is about contract
11 manufacturing.  I think this concerns other
12 cooperations.  And in this case, it was possible
13 but for things that do not concern Spain.
14 Correction.  Manufacturing in Spain.
15   Q.  Mm-hmm.  If the obligation for payment
16 between -- If -- If you wanted the obligation of
17 payment to be between Bentley Pharmaceuticals,
18 Incorporated, and Ethypharm France, could there
19 have been a document created which would express
20 that?
21       MR. BOSTWICK:  Objection.  Objection.
22 Calls for a legal conclusion and speculation.

20 (Pages 77 to 80)

Page 81

1      THE WITNESS: I do not understand
2 which payment obligation is referred to.
3      MR. STEWART: Okay. The obligation
4 of, for example, Ethypharm to pay Bentley
5 Pharmaceuticals, Inc., for the product which
6 Laboratorios Belmac would supply.
7      MR. BOSTWICK: Same objection.
8      THE WITNESS: This seems perfectly
9 illegal to me.
10      MR. STEWART: Perfectly?
11      THE WITNESS: Illegal --
12      MR. STEWART: Illegal.
13      THE WITNESS: -- to me -- because
14 Belmac performs some work for Ethypharm Spain.
15 And I don't see why it would be Ethypharm Spain,
16 and even more, Ethypharm France that would pay the
17 mother company of Belmac for work performed in
18 Spain by its Spanish subsidiary.
19      MR. STEWART: Okay.
20      BY MR. STEWART:
21      Q.  Did you ever contemplate a contract
22 between Ethypharm Spain, Ethypharm France, and

Page 82

1 Ethypharm -- and -- Sorry -- Ethypharm France and
2 Bentley Pharmaceuticals to guarantee that
3 Laboratorios Belmac would keep its obligations to
4 Ethypharm Spain?
5      MR. STEWART: Can we clarify whether
6 that's written or oral?
7      MR. STEWART: Either one.
8      THE WITNESS: Written confirmation
9 doesn't seem to have any legal value since, again,
10 it's between two Spanish companies contracting for
11 work done in Spain; but, of course, Ethypharm --
12 or Ethypharm wanted to make sure that Bentley was
13 in agreement for its subsidiary to get into this
14 contract and that is even how we unstalled the
15 situation.
16      MR. STEWART: How we?
17      THE WITNESS: How we got the situation
18 out of stalling.
19      THE WITNESS (In English): Unblock.
20      THE INTERPRETER: Unblocked, yeah.
21      MR. STEWART: Okay.
22 . . .

Page 83

1      BY MR. STEWART:
2      Q.  Did -- Did Mr. -- Did Jim Murphy, to
3 your knowledge, make any comments or changes to
4 the -- to Exhibit 9?
5      MR. BOSTWICK: Objection. Objection
6 to the Exhibit 9 and he has said he never saw it
7 in this form.
8      MR. STEWART: Let me -- Let me -- Let
9 me make clear. When I'm referring to -- I'll --
10 I'll refer to the typewritten portion of the draft
11 contract as part of Exhibit 9.
12      THE WITNESS: I don't remember having
13 received any comments, either from Ethypharm or
14 from Bentley Pharmaceuticals; in other words --
15 Belmac, Belmac or Ethypharm.
16      THE WITNESS (IN ENGLISH): No, Belmac
17 or Bentley.
18      THE INTERPRETER: Bentley. I'm sorry.
19 Belmac or Bentley. In other words -- So I never
20 received any comments on this draft contract which
21 was not followed by official changes.
22 . . .

Page 84

1      BY MR. STEWART:
2      Q.  Did -- Do you know whether Mr. Murphy
3 directed anyone at Laboratorios Belmac to make
4 changes to the written -- to the typewritten
5 portion of Exhibit 9?
6      MR. BOSTWICK: Objection. Form.
7      THE WITNESS: I have no way to know
8 that.
9      BY MR. STEWART:
10      Q.  Are you aware of any employee at
11 Bentley Pharmaceuticals that had any involvement
12 in making comments to the draft typewritten
13 contract that is part of Exhibit 9?
14      MR. BOSTWICK: Same objection. Form,
15 and the -- to the exhibit.
16      THE WITNESS: Same answer for me. I
17 have no way to know that.
18      MR. STEWART: Okay.
19      BY MR. STEWART:
20      Q.  After the exchange -- After -- Let me
21 withdraw that.
22      Describe, please, what happened

21 (Pages 81 to 84)

JT-A-453

1 following the draft of the contract which is part
2 of Exhibit 9; that is, following the receipt by
3 Laboratorios Belmac of the draft of Exhibi -- the
4 draft contract that's part of Exhibit 9.
5         MR. BOSTWICK: Objection to the form
6 of the question. It's also vague. And to
7 Exhibit 9.
8         THE WITNESS: Okay. And I did not
9 receive any comments on the draft contract as it
10 is in the typewritten portion in Exhibit 9.
11        BY MR. STEWART:
12   Q.  Okay. What occurred with respect to
13 contract negotiations between Laboratorios Belmac
14 and Ethypharm Spain?
15        MR. BOSTWICK: Objection. Vague.
16 Timeframe.
17        MR. STEWART: Timeframe --
18        MR. BOSTWICK: And --
19        MR. STEWART: The timeframe -- The
20 timeframe following the receipt of the contract
21 that is part of Exhibit 9 and continuing -- and
22 continuing through February of 2000.

1         MR. BOSTWICK: Same objection with the
2 exhibit objection.
3         THE WITNESS: Pardon?
4         MR. BOSTWICK: The same objection with
5 the objection to the exhibit.
6         THE WITNESS: It's a typewritten
7 exhibit that we're talking about.
8         BY MR. STEWART:
9    Q.  Yeah, just so we don't -- we don't
10 have to continue to have Mr. Bostwick have to
11 object, when I'm asking you with respect to the
12 draft contract dated September of 1997, I am
13 referring only to the typewritten portion of that
14 contract and I am not referring to the handwritten
15 notes that are part of Exhibit 9. Do you
16 understand?
17   A.  Understood.
18        MR. STEWART: Okay.
19        MR. BOSTWICK: And -- And if it's
20 okay, I'll just maintain those objections for your
21 next series of questions with respect to Exhibit 9
22 and then I won't have to interrupt you.

1         MR. STEWART: That's fine.
2         MR. BOSTWICK: Is that acceptable?
3         THE WITNESS: So now I can answer the
4 question as I understand it? We did not get -- We
5 did not receive feedback on this proposal. The
6 work continued at Belmac Spain. Based on what we
7 had agreed upon -- Based on what was agreed upon
8 after the meeting with Mr. Murphy and the letter
9 from Mr. Gonzalez dated September, we performed a
10 new quality audit and we worked with the other --
11 through other meetings towards the writing of this
12 contract. A meeting occurred in April 1998 and --
13 and we resolved a number of important items
14 through separate agreements concerning compliance
15 with confidentiality by Belmac -- and their
16 recognition of the ownership of no-how and
17 technology of Ethypharm by Belmac but no contract
18 settling the issue of manufacturing was done
19 before the beginning of 2000.
20        BY MR. STEWART:
21   Q.  Okay. First, you say you did not
22 receive any feedback on this proposal. By "this

1 proposal," do you mean the typewritten contract
2 dated March 9, 1997?
3         THE INTERPRETER: It's September 3rd.
4
5         THE WITNESS (In English): September
6 3rd.
7         MR. STEWART: I'm sorry. I beg your
8 pardon -- September 3, 1997 which is part of
9 Exhibit 9.
10        THE INTERPRETER: Yes.
11        BY MR. STEWART:
12   Q.  And yet there appears to be a great
13 deal of feedback in the form of notes.
14   A.  It is not customary to -- to give as
15 feedback a copy of the document with handwritten
16 notes but, rather, to create a new draft, a new
17 written draft, and I don't know who this -- these
18 copies with handwritten notes were transmitted to.
19 And there was never any meeting to discuss
20 suggestions of changes to this contract.
21        THE WITNESS (IN ENGLISH): To the best
22 of my knowledge.

22 (Pages 85 to 88)

Page 89

1     MR. STEWART: Okay.
2     BY MR. STEWART:
3     Q.  And you stated that a meeting
4 occurred -- Now, let me withdraw that.
5          You stated that "we" performed a new
6 audit --
7     A.  I seem to recall that the new audit,
8 like the previous one, was performed by Marcelle
9 Gavoille to confirm that GMP procedures were being
10 put in place because based on the letter from
11 Mr. Gonzalez dated September 3rd which indicated
12 that the quality assurance experts had performed
13 an audit, we had to confirm that it was the case
14 and that it was being put in place.
15    Q.  And that audit was formed by Ethypharm
16 France?
17    A.  Yes, as always.
18    Q.  Was Mr. Murphy involved in any way
19 with that audit?
20    A.  Like I said previously, general
21 managers, whether it be Mr. Murphy, Mr. Gonzalez,
22 Mr. Debregeas, or myself are never present for an

Page 90

1 audit.
2     Q.  And what conclusions were reached
3 through the audit?
4     A.  I think that I recall that many points
5 had been improved but there were still -- there
6 were still things to do.
7     Q.  Was there any communication with
8 respect to that conclusion to Mr. Murphy?
9     A.  I do not recall.
10    Q.  What was the purpose of the meeting in
11 April of 1998?
12    A.  Again, we had to face a situation that
13 was not moving forward for the realization of the
14 contract and it seemed critical to have a meeting
15 to unblock the situation.
16    Q.  Was the situation -- Is the situation
17 that you're referring to the fact that no
18 manufacturing agreement had been signed?
19    A.  More generally, it's the fact that
20 everything that was proposed and agreed between
21 the party could not find a legal transcription.
22    Q.  That is, nothing was put in writing?

Page 91

1     THE WITNESS (IN ENGLISH):  We had put
2 something in writing.
3     THE INTERPRETER:  We had put,
4 ourselves, something in writing.
5     MR. STEWART:  I don't understand what
6 you mean, then, that there was no juridica --
7 no -- no -- no jurida -- no juridical.
8     THE WITNESS:  Legal transcription.
9     MR. STEWART:  No legal transcription.
10    BY MR. STEWART:
11    Q.  What do you mean by "legal
12 transcription"?
13    A.  A duly written agreement signed by
14 both parties.
15    Q.  And it was your -- It was an -- It
16 was -- Did you consider it part of your job to
17 obtain a written agreement signed by both parties?
18    THE WITNESS (In English):  Yes.  Yes.
19    THE INTERPRETER:  Yes.
20    BY MR. STEWART:
21    Q.  And who were the parties that you
22 wanted a written agreement between?

Page 92

1     A.  As I said previously, it could only be
2 Belmac Spain and Ethypharm Spain.
3     Q.  And what did you do to further your
4 goal of getting a written agreement?
5     A.  As previously, I called upon
6 Mr. Murphy and the mother company to obtain a
7 meeting between -- between them, us, Belmac, and
8 Ethypharm Spain.
9     Q.  And that was because the people you
10 were dealing with at Laboratorios Belmac in Spain
11 were not providing the cooperation you needed?
12    A.  I don't know if we can talk about
13 cooperation but they didn't seem to have any
14 instructions to sign an agreement.
15    Q.  Did they ever tell you that they had
16 no instructions?
17    A.  No, because, as I just said, it seemed
18 to me that --
19    Q.  So who attended the meeting?
20    MR. BOSTWICK:  And this is the -- Just
21 for the record, this is the April '98.
22    THE WITNESS (IN ENGLISH):  '98.

23 (Pages 89 to 92)

JT-A-455

Page 93

1      MR. BOSTWICK: Yeah.
2      THE WITNESS (IN ENGLISH): As -- On --
3  On -- On the Belmac side, Clemente Gonzalez. I
4  think Adolfo Herrera was there and, also,
5  Berenguer. On the Bentley side, Jim Murphy. On
6  our side, myself and Adolfo De Basilio. And maybe
7  Domingo Barnabe was there because every time we
8  had a meeting --
9      THE INTERPRETER: It was in English so
10 I don't have to translate.
11     As usual at each meeting we felt the
12 need to -- to have a history; that is, to repeat
13 everything that had been said and done before.
14 That's why I think Domingo Barnabe was there
15 because he was the one who had put together the
16 new manufacturing.
17     MR. STEWART: As -- I'm sorry. He was
18 the one who had put together?
19     THE WITNESS: Put together, set up,
20 the new manufacturing/fabrication business.
21     THE WITNESS (IN ENGLISH): New
22 formulation.

Page 94

1      THE WITNESS: New formulation, okay.
2      BY MR. STEWART:
3  Q.  You say the "new formulation." What
4  do you mean by "new formulation"?
5  A.  A stable formulation that was put in
6  place beginning in 1995 and adapted to a new
7  manufacturing equipment. GS turbines.
8  Q.  GS what?
9  A.  Turbine, turbine.
10     THE WITNESS (IN ENGLISH): Drums.
11 Turbines. Turbines.
12     THE INTERPRETER: Turbines, drums,
13 and -- pans.
14     So I think that's why we were asked to
15 be there. Maybe there was Marcelle Gavoille but
16 I'm not sure. And -- And, of course, Gerard Leduc
17 and Patrice Debregeas probably made appearances
18 during the meeting but did not stay permanently
19 for the whole -- continuously.
20     BY MR. STEWART:
21 Q.  Where was -- Where was the meeting
22 held?

Page 95

1  A.  In St. Cloud.
2      MR. BOSTWICK: I'll leave it to you,
3  Craig, but if you want to finish this topic or if
4  you want to break before getting into it, it's
5  about 1:15 which is what you had said before, but
6  it's -- it's your --
7      MR. STEWART: Well --
8      MR. BOSTWICK: It just depends on what
9  you want to.
10     MR. STEWART: Let's go off the record
11 just for a moment. Sure.
12     THE VIDEOGRAPHER: The time is
13 13:18:35. Off the record.
14     (Discussion off the record.)
15     THE VIDEOGRAPHER: On the record. The
16 time is 13:19:17.
17     BY MR. STEWART:
18 Q.  Okay. So what happened? What
19 occurred at the April 1998 meeting?
20 A.  I don't recall all the details but the
21 following points were discussed.
22     First, we had a reminder of all that

Page 96

1 had been done and the problems that had arisen, of
2 all the solutions that were already put in place,
3 warranties on the consistency of manufacturing
4 quality of Omeprazole, the new formula, the new
5 equipments, the new specifications for raw
6 materials, and the number of lots manufacturing
7 each -- manufactured each month.
8      Since we restated the --
9      THE WITNESS (IN ENGLISH):
10     Requirements.
11     THE INTERPRETER: -- requirements that
12 had been indicated many times. Several. The
13 first time after our termination letter, during my
14 meeting with Mr. Murphy, and after that, and
15 during our different exchanges, our concern about
16 the confidentiality about what had been
17 transmitted to Belmac, the technology and the
18 know-how; therefore, to prepare a document for the
19 recognition of the ownership by Ethypharm of all
20 these points and the compliance by Belmac about
21 the confidentiality of all that had been
22 transmitted. The topic was a very -- very

24 (Pages 93 to 96)

1 delicate topic. Omeprazole had become an

2 important product or was to become an important

3 product; that is to say, that Omeprazole was very

4 important product for its inventor and was to

5 become a very important product for Ethypharm

6 which was manufacturing it but also for Belmac

7 which was selling this product under its trademark

8 and Ethypharm wanted to make sure that everything

9 that had to do with industrial and intellectual

10 property was well protected. And this was in fact

11 more important for us than to reach an agreement

12 on the manufacturing price.

13      BY MR. STEWART:

14      Q.  Can I just interrupt just one moment.

15 Did you have a concern that Ethypharm's

16 intellectual property had not been protected prior

17 to this meeting?

18      A.  No.  No, that was a preventative

19 action, measure, and so the -- to finish, it was

20 then more -- more important to us to protect this

21 intellectual property than to reach a written

22 agreement on the manufacturing price since we were

1 already functioning under the terms that had been

2 accepted by Mr. Gonzalez in his letter. And I

3 think at this meeting we submitted a document

4 to -- for Mr. Murphy and Mr. Gonzalez's signature

5 with respect to the protection of confidentiality

6 and intellectual property.

7      Q.  Was that document signed?

8      A.  This document was discussed and -- and

9 we -- we made some changes to it and we sent it to

10 Mr. Murphy and Mr. Gonzalez something like two

11 days after the meeting.  I don't recall exactly.

12 Immediately after the meeting but I did not see a

13 signed copy of this document.

14      Q.  Have you completed your testimony as

15 to what occurred at that meeting?

16      MR. BOSTWICK:  Objection to form.

17      THE WITNESS:  For the moment I don't

18 remember anything else about what happened but I'm

19 ready to answer other questions.

20      BY MR. STEWART:

21      Q.  Okay.  I just have one question now

22 and then we can break for lunch.

1      Referring to Exhibit 6, the proposal

2 by Mr. Gonzalez --

3      THE WITNESS (IN ENGLISH):  Mm-hmm.

4      BY MR. STEWART:

5      Q.  -- were the prices proposed by

6 Mr. Gonzalez accepted?

7      A.  These prices were the prices that we

8 had ourselves proposed during previous meetings

9 and, therefore, they were accepted.

10      Q.  And these were the prices that

11 Ethypharm would pay to Laboratorios Belmac;

12 correct?

13      A.  That is correct.  Per manufacturing,

14 not for each product.

15      MR. STEWART:  Thank you.  Okay.  Why

16 don't we take our luncheon break.

17      THE VIDEOGRAPHER:  The time is

18 13:27:21.  Off the record.

19      (Lunch recess.)

20      THE VIDEOGRAPHER:  On the record.  The

21 time is 14:22:29.

22 . . .

1      BY MR. STEWART:

2      Q.  Now, Mr. Dubois, before the break, you

3 were telling us your recollection of what occurred

4 at the meeting in April 1998.  Do you recall that?

5      THE WITNESS (IN ENGLISH):  Mm-hmm.

6      THE INTERPRETER:  Yes.

7      BY MR. STEWART:

8      Q.  And in your testimony, you said that

9 you had a particular concern over the

10 confidentiality of Ethypharm's technology and

11 know-how; is that correct?

12      MR. BOSTWICK:  Objection to

13 characterization.

14      THE WITNESS:  That's correct.

15      BY MR. STEWART:

16      Q.  And I believe your testimony was that

17 you prepared a document to be signed Belmac.  Am I

18 correct in that?

19      A.  Yeah, that is correct except that this

20 document had to be discussed first.

21      Q.  Okay.  And who -- Did you give a draft

22 of that document to anyone?

25 (Pages 97 to 100)

Page 101

1    A.  I think this document was prepared by
2  Mrs. Joannesse and then it was given during the
3  meeting, during the exchanges, and then it had to
4  be reviewed later by Mr. Leduc.
5       You must remember that Gerard Leduc is
6  trained as a consultant in the patent and the
7  industry -- counsel.
8    Q.  And what happened after Mr. Leduc
9  reviewed that document?
10   A.  Like I said before, I think it was
11  sent in the days -- in the few days that followed
12  the meeting both to Mr. Gonzalez and to
13  Mr. Murphy.
14   Q.  And did that -- Was that document ever
15  signed?
16   A.  I don't know since I haven't seen a
17  signed copy but we were in agreement during the
18  meeting about its contents.  There hadn't been any
19  rejection.
20   Q.  Did anyone at Laboratorios Belmac make
21  any comments or -- written comments or changes to
22  the document prepared by Rosaline Joannesse?

Page 102

1    A.  I don't think so.
2       MR. STEWART:  Like to mark as the next
3  three exhibits a document on Belmac stationery,
4  EP 008092.
5       (The reporter marked Exhibit 10.)
6       MR. STEWART:  And the next document, a
7  document which --
8       (Conferring.)
9       MR. STEWART:  -- which has Bates
10  numbers 000602.
11      (The reporter marked Exhibit 11.)
12      MR. STEWART:  And the third document
13  which has a date of October 2 of 1998, Ethypharm
14  document number 008124.
15      THE REPORTER:  May I have that paper
16  clip or do you need it?
17      (The reporter marked Exhibit 12.)
18      MR. STEWART:  So these are 10, 11 and
19  12?
20      THE REPORTER:  Yes.
21      BY MR. STEWART:
22   Q.  Mr. Dubois, I'd like to start with

Page 103

1  Exhibit 10.  Can you tell us what that is?
2    A.  Apparently, it's a statement, a
3  certificate, by -- from Laboratorios Belmac signed
4  by Mr. Gonzalez but I don't know who is the
5  recipient of this certificate.
6    Q.  Who drafted the certificate?
7    A.  I don't know.
8    Q.  Have you seen this document before?
9    A.  No, I don't recall seeing this
10  document.
11   Q.  In your position as vice president of
12  operations, did you, from time to time, ask that
13  confidentiality agreements be signed by
14  Laboratorios Belmac?
15   A.  I think that we asked several times,
16  several individuals from Belmac, to sign
17  confidentiality agreements but there was no
18  general agreement until the one that was --
19      THE WITNESS (IN ENGLISH):  No, I said
20  in the absence.
21      THE INTERPRETER:  In the ab -- Yeah.
22  That's right.  I'm sorry.  In the absence of a

Page 104

1  general confidentiality agreement.
2       THE WITNESS (IN ENGLISH):  We asked
3  them to sign the individual.
4       THE INTERPRETER:  Yeah.  They had to
5  sign individual agreements.
6       BY MR. STEWART:
7    Q.  And the agreement that you were
8  referring to that was distributed at the
9  April 1998 meeting was a general agreement; is
10  that correct?
11   A.  That is correct.  This agreement had
12  been -- was to be signed both by Belmac and by
13  Bentley.
14   Q.  Why did you have the agreement -- Oh,
15  let me withdraw that.
16      Was there a -- Was there a place for
17  the signature of a representative of Bentley on
18  the document?
19   A.  If I recall correctly, both Mr. Murphy
20  from Bentley and Mr. Gonzalez from Belmac were
21  mentioned in the document -- in the body of the
22  document.

26 (Pages 101 to 104)

Page 105

1    Q.   Why did you want to have Bentley's
2 signature on the confidentiality agreement?
3    A.   Since we had discussions in our
4 relations with -- with Mr. Murphy, we realized
5 that Bentley had to know --
6        THE INTERPRETER:  Oh.  Bentley had to
7 know -- Bentley had to know what was transmitted
8 to Belmac by Ethypharm.
9        THE WITNESS (In English):  Or "knew"
10 rather than "had to know."
11       THE INTERPRETER:  Bentley knew what
12 was transmitted by Belmac --
13       THE WITNESS (IN ENGLISH):  To Belmac.
14       THE INTERPRETER:  To Belmac by
15 Ethypharm.
16       BY MR. STEWART:
17    Q.   And is it fair to say that you did not
18 consider the signature by Laboratorios Belmac to
19 be sufficient with respect to confidentiality, a
20 confidentiality obligation by Bentley?
21       MR. BOSTWICK:  Objection.  Objection
22 to characterization.

Page 106

1        THE WITNESS:  It is customary to have
2 all the companies that -- that must know the
3 confidential documents sign the confidentiality
4 paper.
5        BY MR. STEWART:
6    Q.   Did you recognize then that in
7 addition to dealing with Laboratorios Belmac, at
8 that time you were also dealing with Bentley?
9    A.   But it is not at that time that I
10 realized that but when we had managed to unblock
11 the situation through the discussions with
12 Mr. Murphy from Bentley.
13       MR. BOSTWICK:  Mr. Dubois, when you
14 have a long answer, you may want to shorten it a
15 little bit --
16       THE WITNESS (IN ENGLISH):  Yes.
17       MR. BOSTWICK:  -- so he's having a
18 little less difficulty.
19       THE WITNESS (IN ENGLISH):  Yeah.
20 Yeah.
21       BY MR. STEWART:
22    Q.   And turning to Exhibit 11, have you

Page 107

1 seen this document before?
2    A.   I don't recall precisely.
3    Q.   Do you recall that there was a
4 confidentiality agreement that Belmac requested
5 Ethypharm Spain to sign?
6    A.   No.
7    Q.   Turning to page 000602 --
8    A.   I only see that this agreement was
9 related to products made from the microgranules
10 made by Ethypharm.
11       THE WITNESS (IN ENGLISH):  No.
12       THE INTERPRETER:  Oh.  Sold -- I'm
13 sorry -- sold by Belmac to Ethypharm.
14       THE WITNESS (IN ENGLISH):  No.
15       THE INTERPRETER:  Sold from Ethypharm
16 to Belmac.
17       THE WITNESS (In English):  No.
18       THE INTERPRETER:  Okay.  Sorry.
19       Products -- The products sold by Belmac
20 under their brand name, Omeprazole, are made from
21 granules made by Ethypharm.  And this product was
22 to be sold by Ethypharm to its partner, Leciva.  I

Page 108

1 remember that we had negotiated for the Omeprazole
2 license to -- the -- the sale of the Omeprazole
3 license to -- to Leciva but I was not usually
4 involved in the details of this agreement.
5        It was Ethy -- Ethypharm Spain that was
6 dealing with its customers -- its customers.
7        BY MR. STEWART:
8    Q.   So is it your testimony that you were
9 not involved in the preparation of this -- of this
10 agreement; that is, Exhibit 12?
11       THE INTERPRETER:  Did you say 12?
12       MR. STEWART:  I said -- I'm sorry.  I
13 misspoke.  Exhibit 11.
14       THE WITNESS (IN ENGLISH):  No.
15       THE INTERPRETER:  No, I was not
16 involved in the preparation of this document which
17 was concerning Ethypharm Spain and one of its
18 customers.
19       BY MR. STEWART:
20    Q.   Do you have any knowledge as to
21 whether Mr. Murphy directed that this
22 confidentiality agreement be drafted and signed

27 (Pages 105 to 108)

Page 109

1 by -- drafted and then signed by Ethypharm?

2    A.  I don't see why it would have been the
3 case because in this case it was Ethypharm that
4 was committing -- committing to comply with the
5 confidentiality in order to have access to
6 documents allowing registration by its client
7 Leciva.

8    Q.  How do you spell Leciva?

9    A.  It's L-e-c-i-v-a but it's -- In Czech
10 the C probably has some kind of a little tilde or
11 accent on it.

12    Q.  And please look at Exhibit 12.  Did
13 you have any involvement in the preparation of
14 Exhibit 12?

15    A.  No, I don't remember this.

16    Q.  Have you seen Exhibit -- Have you seen
17 Exhibit 12 before?

18    A.  I do not remember.

19    Q.  Following the meeting on April -- in
20 April of 1998 did you have any -- did you have
21 further communications with Mr. Murphy?

22    A.  I don't recall any meeting precisely

Page 110

1 and -- mail -- Mail, it's possible.

2    Q.  Were there any -- any events or crises
3 that you believed required you to contact
4 Mr. Murphy?

5    A.  After '98?

6    Q.  Yes.

7    A.  No, we were working at the time on the
8 manufacturing but I think I recall that in 1999
9 there were some problems following the publication
10 by a Spanish newspaper by Belmac -- Yeah.  I think
11 it was in 1999 -- by Belmac on its product,
12 Belmazol.

13    Q.  Were you involved with that issue?

14    A.  Yes.

15    Q.  What was your involvement?

16    A.  Adolfo De Basilio sent me the
17 newspaper articles.  It were -- They were articles
18 and advertisements -- statements, then, by Belmac
19 on the Belmazol product that they were launching
20 vigorously.  I think they had obtained a new
21 reimbursement price and because of a -- probably,
22 a -- price war with the -- with the

Page 111

1 competition -- they had obtained a reimbursement
2 price that was lower than that of the competitors.

3    Q.  Reimbursement price from whom?

4    A.  By the Spanish Social Security to the
5 patient or government's health insurance --
6 government's health insurance.  This allowed
7 Belmac to start a -- to launch a very aggressive
8 advertising campaign and at the same time to make
9 some noise about Belmac Spain.  Our issue was that
10 they were saying in these articles that the
11 technology was -- the technology was theirs or,
12 rather, that they were manufacturing Omeprazole
13 follow -- following their technology in their
14 plant without mentioning Ethypharm in any way,
15 neither as the true manufacturer which we were nor
16 as inventors of the technology.  And I think at
17 that time, with Patrice Debregeas, a letter was
18 sent which we had discussed together but I know
19 the one who signed it.  He is the one who sent it
20 to Jim Murphy.

21    Q.  He is -- He is who?  He's who?

22    A.  Patrice Debregeas.

Page 112

1    Q.  Following the April 1998 meeting, did
2 you have any further meetings with Adolfo Herrera?

3    A.  Yes, I think in -- once or twice
4 during -- during a trip to Madrid.

5    Q.  What were the -- What were the
6 substance of those meetings?

7    A.  I don't remember the details.  Adolfo
8 Herrera had become the general manager of Belmac.
9 The first visit -- The first visit was then a
10 friendly visit to make sure that we would be able
11 get along with Adolfo Herrera and I think I saw
12 him again in -- in a future trip without any
13 specific agenda for the meeting.

14    Q.  Okay.  Did you understand that as
15 general manager of Laboratorios Belmac -- that
16 Adolfo Herrera had the authority to take actions
17 on behalf of Belmac?

18    MR. BOSTWICK:  Objection.  Vague.
19 What actions?

20    THE WITNESS:  I think he was acting as
21 Belmac's general manager.  I think at the time his
22 responsibilities, his concerns, were to -- to

28 (Pages 109 to 112)

Page 113

1 improve Belmac's sales among the things for the --
2 through the launch of Belmazol.
3        BY MR. STEWART:
4    Q.   Did you understand that Adolfo Herrera
5 had the authority to make agreements on behalf of
6 Laboratorios Belmac?
7        MR. BOSTWICK: Objection. Vague.
8        THE WITNESS: As far as the -- the --
9 the -- the agreements that we were wishing, in
10 particular, the finalization of a manufacturing
11 agreement that was still not signed, based on my
12 prior experience with Clemente Gonzalez, it was
13 more a wait-and-see policy.
14       THE WITNESS (IN ENGLISH): On my part.
15       THE INTERPRETER: On my part.
16       And I -- And I wanted to know if we
17 would really be able to conclude with Adolfo
18 Herrera; whereas, we hadn't been able to do it
19 with Clemente Gonzalez.
20       BY MR. STEWART:
21    Q.   Yes, but did you -- did you believe
22 that Adolfo Herrera himself had the authority to

Page 114

1 enter into the -- enter into an agreement on
2 behalf of Laboratorios Belmac?
3        MR. BOSTWICK: Objection. Vague.
4        THE WITNESS: I had no more reason to
5 believe that, to believe that, than I believed it
6 from Clemente Gonzalez but after that point, I
7 hadn't seen it so I was not convinced.
8        BY MR. STEWART:
9    Q.   Are you aware that there is a written
10 agreement that -- between Ethypharm Spain and
11 Laboratorios Belmac that is signed by Adolfo
12 Herrera?
13   A.   I don't know which agreement it's
14 about.
15       MR. STEWART: Let me show you two
16 documents, one document which has the Bates number
17 of BEL000548. Sorry. Yeah, 548.
18       (The reporter marked Exhibit 13.)
19       MR. STEWART: Okay. And what exhibit
20 number is that?
21       THE REPORTER: 13.
22       THE WITNESS (IN ENGLISH): 13.

Page 115

1        MR. STEWART: And one document which
2 has as its title, Carta de Compromiso de Compra,
3 with Ethypharm number, 004863.
4        BY MR. STEWART:
5    Q.   Have you seen Exhibit 13 before?
6    A.   This document was made -- was done
7 after I left Ethypharm.
8    Q.   Do you recognize the signature of
9 Adolfo Herrera on this agreement?
10   A.   It's possible. I -- I am not aware of
11 the signature.
12   Q.   Do you recognize the signature of
13 Adolfo De Basilio for Laboratorios Ethypharm S.A.?
14   A.   Yes.
15   Q.   Did Jim Murphy ever tell you that
16 Adolfo Herrera -- Herrera had the authority to
17 enter into agreements on behalf of Bentley
18 Pharmaceuticals?
19   A.   No, Bentley, Bentley Pharmaceuticals.
20   Q.   Yes.
21   A.   No. Sorry.
22   Q.   Did you understand at any time that

Page 116

1 Adolfo Herrera had the authority to enter into
2 agreements with Ethypharm on behalf of Bentley
3 Pharmaceuticals, Inc.?
4    A.   No, of course not.
5    Q.   And did you -- Did Mr. Murphy ever
6 tell you that Clemente Gonzalez had authority to
7 make agreements on behalf of Bentley
8 Pharmaceuticals, Inc., or on behalf of Belmac
9 Corporation?
10   A.   No, of course not.
11   Q.   And did you have an un -- did you --
12 did you ever have an understanding that Clemente
13 Gonzalez could enter into agreements on behalf of
14 Bentley Pharmaceuticals, Incorporated?
15   A.   No, but I don't see what this has to
16 do with these documents.
17       MR. STEWART: I -- I didn't say that
18 it did.
19       THE WITNESS (IN ENGLISH): Show me the
20 document.
21       BY MR. STEWART:
22   Q.   When you were still at Ethypharm, did

29 (Pages 113 to 116)

Page 117

1 you ever hear anyone at Ethypharm say that they
2 believed Bentley Pharmaceuticals had directed
3 Laboratorios Belmac to steal Ethypharm's secret
4 technology?
5     A.  No, I didn't hear such things.
6     Q.  Did you ever hear anyone say that they
7 believed that Jim Murphy had directed Laboratorios
8 Belmac to steal Ethypharm's secret technology?
9     A.  No, of course not.
10    Q.  What was the disagreement that you had
11 with Mr. Debregeas which led to your termination?
12    A.  Mr. Debregeas wanted to take on the
13 manufacturing of very large quantities of
14 Vitamin C as contract manufacturer for a large
15 laboratory and I was totally opposed to that and I
16 said it publicly.
17        MR. STEWART:  Give me just a moment.
18 Let's go off the record just a moment.
19        THE VIDEOGRAPHER:  The time -- This
20 ends Tape No. 2 of the Dubois deposition.  The
21 time is fifteen hundred hours, nine seconds.  Off
22 the record.

Page 118

1     (Recess.)
2     (The reporter marked Exhibit 14.)
3        THE VIDEOGRAPHER:  On the record with
4 Tape No. 3 of the testimony of Claude Dubois in
5 the matter of Ethypharm versus Bentley
6 Pharmaceuticals.  The date is July 12th, 2006.
7 The time is 15:02:03.
8        MR. STEWART:  Mr. Dubois, I have no
9 further questions at this time.  I may have a few
10 questions after Mr. Bostwick has his turn with his
11 examination of you.  Thank you.
12        THE WITNESS:  Thank you.
13        MR. BOSTWICK:  Shall we go off the
14 record?
15        THE VIDEOGRAPHER:  The time is
16 15:02:35.  Off the record.
17    (Recess.)
18        THE VIDEOGRAPHER:  On the record.  The
19 time is 15:23:43.
20  EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
21        BY MR. BOSTWICK:
22    Q.  Good afternoon, Mr. Dubois.  And I

Page 119

1 extend my thanks and I'm -- and I'm sure the
2 thanks of the other party as well for your coming
3 in, especially given that you're no longer with
4 either of these companies.
5     A.  Thank you.
6     Q.  When Mr. Murphy introduced himself to
7 you, did he give you a business card?
8     A.  Yes, I remember having business cards
9 from Jim Murphy.
10    Q.  And where was the business card from?
11 What company?
12    A.  The first one, I'm not sure if it was
13 made from Belmac Corporation but I think it was
14 from Bentley because it was in '97 -- I think in
15 February '97 -- and I think at that time Bentley
16 was the identity of the company.
17        In fact, I recall -- I remember
18 precisely that during this meeting, Mr. Murphy
19 told me that he was raising funds for Bentley.
20    Q.  Okay.  And just so we're absolutely
21 clear, when you say Belmac Corporation, you mean
22 Belmac in the U.S.A.?

Page 120

1     A.  Yes.
2     Q.  Did he ever give you a business card
3 from Laboratorios Belmac?
4     A.  Never.
5     Q.  What position did you understand that
6 Mr. Murphy held at Bentley Pharmaceuticals?
7        THE WITNESS (IN ENGLISH):  Chairman
8 and CEO.
9        THE INTERPRETER:  Chairman and CEO.
10 Yeah.
11        BY MR. BOSTWICK:
12    Q.  And is that consistent with the
13 business card that Mr. Murphy gave to you?
14    A.  Yes.
15    Q.  Okay.  I'd ask you to look at Exhibit
16 No. 1 in that pile.  I believe that's No. 2.
17        THE WITNESS (IN ENGLISH):  Yes.
18        BY MR. BOSTWICK:
19    Q.  Is it there?
20    A.  I don't know where No. 1 went to.
21        MR. BOSTWICK:  Check -- Check behind
22 No. 2.  Is it --

30 (Pages 117 to 120)

Page 121

1      THE WITNESS (IN ENGLISH): Oh, wait.
2      MR. BOSTWICK: Is it stuck back there?
3 Mine has as well.
4      BY MR. BOSTWICK:
5    Q.   And you'll recall Mr. Stewart asked
6 you some questions about this document?
7    A.   Yes.
8    Q.   And as I understand your testimony,
9 this letter in January 20th, 1997 from Adolfo De
10 Basilio to Clemente Gonzalez told Laboratorios
11 Belmac that Bentley -- I'm sorry -- that Ethypharm
12 was prepared to terminate the relationship; is
13 that correct?
14      MR. STEWART: Objection. Document
15 speaks for itself.
16      BY MR. BOSTWICK:
17    Q.   You can answer.
18    A.   Yes, that is correct.
19    Q.   Okay. What were the reasons that
20 Ethypharm had come to the point where they were
21 prepared to terminate the relationship between --
22 with -- with the Spanish entity?

Page 122

1    A.   These are the reasons expressed in
2 this letter, mainly, the fact -- mainly, the fact
3 that we couldn't agree on a manufacturing price
4 that -- that would be acceptable for Ethypharm and
5 the issue of compliance with the GMP -- GMP
6 standards which had become especially critical
7 after the audit. The issue of the improvement of
8 the manufacturing mark -- manufacturing margin
9 depended also upon the manufacturing price.
10    Q.   Was this a critical point in the
11 relationship between Ethypharm and Bentley and
12 Belmac?
13    A.   Quite. We were forced to terminate
14 the relationship and we -- we were then unable to
15 manufacture Omeprazole in Spain.
16    Q.   Okay. Let me have you look at
17 Exhibit 2.
18      MR. STEWART: Sorry. Was that -- Was
19 that "unable to manufacture"?
20      THE WITNESS: Mm-hmm. Yes.
21      BY MR. BOSTWICK:
22    Q.   And I believe you testified already

Page 123

1 that the Exhibit 2 is the response that came from
2 Belmac and Bentley or -- Strike that.
3      I believe you testified already that
4 Exhibit 2 is the response that came to the letter
5 marked as Exhibit 1; is that correct?
6    A.   That's correct. The reference is
7 mentioned in the letter.
8    Q.   Okay. And whose letterhead does that
9 response come on?
10      THE WITNESS (IN ENGLISH): Bentley
11 Pharmaceutical, Inc.
12      BY MR. BOSTWICK:
13    Q.   Okay. And the "From" line -- who --
14 who is sending that letter?
15    A.   Mr. Murphy himself.
16    Q.   And what does Mr. Murphy himself say
17 about his own position, the -- the position that
18 he's writing this letter as?
19      MR. STEWART: Objection. The language
20 in the letter is evident from the face of the
21 letter. Document speaks for itself.
22 . . .

Page 124

1      BY MR. BOSTWICK:
2    Q.   You can -- You can answer that
3 question.
4    A.   He -- He states himself as being the
5 chairman and CEO.
6    Q.   Of Bentley Pharmaceuticals, Inc., in
7 the United States?
8      MR. STEWART: Objection.
9      THE WITNESS: I assume so since it is
10 on the letterhead from Bentley Pharmaceuticals.
11      BY MR. BOSTWICK:
12    Q.   And is this consistent with the
13 business card Mr. Murphy gave to you when he
14 introduced himself?
15    A.   Yes.
16    Q.   I want to refer your attention to the
17 first and second lines of this letter. And I'll
18 just read you the first and second lines.
19      Dear Patrice, I am writing with regard
20 to the fax that I received from your Spanish
21 office. I am confused because ever since I
22 assumed control of Laboratorios Belmac, I have

31 (Pages 121 to 124)

Page 125

1 received nothing but extremely positive comments
2 from your Spanish staff, specifically Senor
3 Basilio, who said that the Laboratorio -- I'm
4 sorry -- that the Belmac operation is now more
5 efficient, more cooperative, more pleasant to work
6 with, and beyond this; he noted our high degree of
7 sincerity and integrity.
8        Now, as I understand it, Mr. --
9 Mr. Murphy at Bentley Pharmaceuticals is
10 responding to Ethypharm's statement that it will
11 likely terminate the relationship; correct?
12    A.    Correct.
13    Q.    And what does his comment that ever
14 since he assumed Laboratorios -- control of
15 Laboratorios Belmac -- indicate to you about
16 whether Bentley Pharmaceuticals intends to direct
17 and control the negotiations with Ethypharm?
18        MR. STEWART: Objection.
19        Objection. Are you asking him for his
20 understanding today or his understanding at the
21 time of the letter, and if the latter --
22        MR. BOSTWICK: His understanding at

Page 126

1 the time of the letter.
2        MR. STEWART: Okay. Do we have any
3 foundation that he's actually seen the letter?
4        MR. BOSTWICK: You established that.
5        You can answer.
6        THE WITNESS: I can see that I had
7 seen this letter because I'm among the recipients
8 of this letter that had been sent to me by
9 Debregeas since my initials are on it. And I
10 myself transmitted to Eric Igonet.
11        THE WITNESS (IN ENGLISH): Mm-hmm.
12        THE INTERPRETER: Eric Igonet and
13 Rosaline Joannesse.
14        BY MR. BOSTWICK:
15    Q.    I see. And that's the occasion in the
16 handwriting at the top of the letter.
17    A.    That's correct.
18    Q.    "CD" is you?
19    A.    Yes.
20    Q.    "EI" is Eric Igonet?
21    A.    Yes.
22    Q.    Oh, and that's -- So -- So "R" -- "R"

Page 127

1 That's an "RJ" for Rosaline Joannesse --
2    A.    Yes.
3    Q.    Okay. Not an RT?
4    A.    No.
5        THE WITNESS (IN ENGLISH): No "RT."
6        THE INTERPRETER: So upon receipt of
7 this letter, my understanding was that Bentley and
8 Mr. Murphy wanted to reach an agreement and that
9 it was with Mr. Murphy that I had to discuss this
10 agreement.
11        MR. BOSTWICK: Now let me show you
12 another document which we have not marked. There
13 you go, and I believe that will be Exhibit 15.
14        (The reporter marked Exhibit 15.)
15        THE WITNESS (IN ENGLISH): 14. Here.
16 You're right. I have a 14 already.
17        (Mr. Bostwick conferred with
18        Mr. Fine.)
19        BY MR. BOSTWICK:
20    Q.    Do you recognize that as a fax that
21 was sent to you by Jim Murphy?
22    A.    Yes.

Page 128

1    Q.    And this fax confirms -- In this
2 facsimile, am I correct that Jim Murphy is
3 confirming a meeting with you?
4    A.    Yes.
5    Q.    And what is the heading on the top of
6 that facsimile; in other words, what company is he
7 sending it from?
8    A.    "Bentley" is all the way at the top as
9 the sender of the fax; and, of course, Bentley is
10 mentioned in the -- on the fax itself.
11    Q.    And did you understand from receiving
12 this fax that Mr. Murphy was responding as the CEO
13 and chairman of Bentley?
14    A.    Yes, of course.
15    Q.    For purposes of the meeting you were
16 about to have in the U.S.?
17    A.    Quite.
18    Q.    Okay. Now, I believe -- Did you
19 ultimately meet in the U.S. with -- with
20 Mr. Murphy?
21    A.    Yes, on February 3rd, but it did not
22 occur in New York but in Philadelphia.

32 (Pages 125 to 128)