Page 2

```
1    APPEARANCES:
2        Representing the Plaintiffs:
3        BAACH ROBINSON & LEWIS PLLC
4        1201 F Street, NW
5        Suite 500
6        Washington, D.C. 20004
7        BY: JONATHAN D. FINE, ESQUIRE
8
9    Representing the Defendant:
10       EDWARDS ANGELL PALMER & DODGE LLP
11       111 Huntington Avenue
12       Boston, Massachusetts 02199
13       BY: VERONICA C. ABREU, ESQUIRE
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
1        E X H I B I T S, Continued
2   NO.    DESCRIPTION          PAGE NO.
3   7    Copy of E-mail to Mr. Murphy,
        et al. by Mr. Fitzgibbons, dated
4        2-28-02, and Bentley
        Pharmaceutical Project Status
5        Report - January 29, 2002      79
6   8    Copy of E-mail to Mr. Bolling,
        et al. by Mr. Fitzgibbons, dated
7        11-17-00              95
8   9    Copy of E-mail to Mr. Bolling,
        et al. by Mr. Fitzgibbons,
9        dated 12-27-00            100
10  10   Copy of E-mail to Mr. Murphy
        by Mr. Fitzgibbons, dated
11       2-28-01, and Attachment     105
12  11   Copy of E-mail to Mr. Murphy,
        et al. by Mr. Fitzgibbons,
13       dated 3-1-01            110
14  12   Copy of E-mail to Mr. Murphy
        by Mr. Fitzgibbons, dated
15       3-9-01              116
16  13   Copy of E-mail to Mr. Bolling,
        et al. by Mr. Fitzgibbons,
17       dated 1-22-02, and attached
        Bentley Pharmaceuticals
18       Operations Update - 22-
        January 2002          120
19
     14  Copy of E-mail to Mr. Murphy
20       by Mr. Fitzgibbons, dated
        1-7-03              133
21
     15  Presentation to Bentley
22       Pharmaceuticals, Inc.      146
23
24
```

Page 3

```
1        I N D E X
2   WITNESS:          PAGE NO.
3   PAUL FITZGIBBONS
4   BY MR. FINE        5
5   BY MS. ABREU       149
6
7        E X H I B I T S
    NO.   DESCRIPTION       PAGE NO.
8
    1    Copy of E-mail to Mr. Murphy
9        by Mr. Fitzgibbons, dated
        11-8-00, and Attached Project
10       Status Report 24 October     55
11  2    Bentley Pharmaceuticals
        Project Status Report -
12       October 18, 2001         60
13  3    Copy of E-mail to Mr. Price,
        et al. by Mr. Fitzgibbons,
14       dated 12-15-00, and Bentley
        Pharmaceuticals Project Status
15       Report - 11 December       64
16  4    Copy of E-mail to Mr. Murphy
        by Mr. Fitzgibbons, dated
17       11-15-01, and Bentley
        Pharmaceuticals Project Status
18       Report - November 6, 2001     67
19  5    Copy of E-mail to Mr. Murphy, et
        al. by Mr. Fitzgibbons, dated
20       11-30-01, and Bentley
        Pharmaceuticals Project Status
21       Report - November 20, 2001    72
22  6    Copy of E-mail to Mr. Murphy,
        et al. by Mr. Fitzgibbons,
23       dated 1-17-02, and Bentley
        Pharmaceuticals Project Status
24       Report - January 11, 2002     77
```

Page 5

```
1        P R O C E E D I N G S
2        (The New Hampshire driver's license
3        number as identification of the deponent
4        was noted for the record.)
5        PAUL FITZGIBBONS, having duly sworn or
6    affirmed that his testimony would be the truth,
7    the whole truth, and nothing but the truth,
8    testified as follows:
9                * * *
10   EXAMINATION BY MR. FINE:
11  Q.   Thank you for coming here this morning,
12       Mr. Fitzgibbons. As you may know, I represent
13       the Plaintiffs in this matter, Ethypharm France
14       and Ethypharm Spain. My name is Jonathan Fine.
15       And Ethypharm France and Ethypharm Spain have
16       brought a lawsuit against Bentley
17       Pharmaceuticals, Incorporated. You understand
18       that?
19  A.   Yes.
20  Q.   I believe Ms. Abreu is here representing Bentley
21       Pharmaceuticals, Incorporated.
22       MS. ABREU: I am.
23  Q.   The court reporter -- have you been deposed in a
24       lawsuit before?
```

2 (Pages 2 to 5)

Page 6

1   A.  No, first time.
2   Q.  Well, the way that this works is I ask you
3       questions and you have to answer truthfully.  Do
4       you understand that?
5   A.  Yes, I do.
6   Q.  Okay.  If you don't understand a question,
7       please let me know and we'll see if we can clear
8       it up or I can ask it in a way that helps you
9       understand it.  You have to answer verbally, not
10      with a gesture or a nod of the head because the
11      court reporter can't take down those things.
12          And do you know of any reason you
13      might not be able to understand my questions
14      easily or answer fully today?
15  A.  No.
16  Q.  Is there any medical condition that might
17      interfere with your understanding my questions
18      or giving complete answers?
19  A.  Yes.  My hearing in my left ear is impaired
20      right now, so I might have to ask you to repeat
21      if I don't hear properly.
22  Q.  Okay.  I understand.  And if you don't hear a
23      question completely or your hearing gives you
24      trouble, please do immediately ask me to

Page 7

1       clarify.
2   A.  Yes.
3   Q.  If you don't, I'll assume you have heard the
4       question.  Is that all right?
5   A.  Yes, it is.
6   Q.  Let me know also if you need to take a break at
7       any time during the day.  I expect to be taking
8       some breaks, and this is not a marathon session
9       that's meant to keep us here and uncomfortable.
10      Do you understand?
11  A.  Yes.
12  Q.  The only condition that is that we will not
13      take a break while a question is pending, that
14      is, while I've asked a question but before
15      you've given an answer.  Do you understand?
16  A.  Yes, I do.
17  Q.  And by agreement of the lawyers today, we've
18      agreed that you will not discuss the substance
19      of your testimony with your lawyer during any of
20      the breaks.  Is that understood?
21  A.  Yes.
22  Q.  Okay.  Very good.  Are you presently employed at
23      Bentley Pharmaceuticals, Incorporated?
24  A.  Yes, I am.

Page 8

1   Q.  How long have you been employed at Bentley
2       Pharmaceuticals?
3   A.  Close to six years.  It'll be six years in
4       October.
5   Q.  When were you hired?
6   A.  October 2nd, 2000.
7   Q.  And how did you come to be hired at Bentley
8       Pharmaceuticals?
9   A.  I was approached by the president, CEO of the
10      company at that time, and he needed assistance
11      in business, project management.
12  Q.  And who was the president and CEO at that time?
13  A.  Jim Murphy.
14  Q.  And how did Mr. Murphy approach you?
15  A.  Primarily by phone call.
16  Q.  Did you know Mr. Murphy previously?
17  A.  Yes, I did.
18  Q.  How did you know Mr. Murphy previously?
19  A.  He's my brother-in-law.
20  Q.  So are you married to his sister or is he
21      married to your sister?
22  A.  I am married to his sister.
23  Q.  And how long have you been married to
24      Mr. Murphy's sister?

Page 9

1   A.  Thirty-one years.
2   Q.  And were you interviewed for your position at
3       Bentley Pharmaceuticals?
4   A.  Yes.
5   Q.  And who interviewed you?
6   A.  Mike Price and Mike McGovern and Robert Gyurik.
7   Q.  Did you meet with anyone else during your
8       interview process?
9   A.  Not that I recall.
10  Q.  What did you understand your position at Bentley
11      Pharmaceuticals would be?
12  A.  Well, I was being hired under the title of
13      director of special projects, which primarily
14      the focus was to be on outside contracts with
15      educational universities and so forth,
16      University of New Hampshire in Dartmouth,
17      University of Alabama at Birmingham, and duties
18      were to be added to the job as we got acclimated
19      to the company here.  I did not have a
20      background in pharmaceuticals, so that was -- it
21      was a little bit of an initial learning curve.
22  Q.  And specifically with regard to outside
23      educational institutions, what were your
24      responsibilities to be?

3 (Pages 6 to 9)

Page 10

1   A.  To engage the universities and state agencies in
2       working up cooperative agreements between the
3       company, the state, and the university.
4   Q.  Okay.  And a few moments ago, you mentioned that
5       you did not have the background in the
6       pharmaceutical industry; is that correct?
7   A.  I did.
8   Q.  What do you consider your background to be?
9   A.  Rather a generalist.
10  Q.  What kind of generalist?
11  A.  In business, project management, and program
12      management, and financial matters.
13  Q.  Had you been employed anywhere before Bentley
14      Pharmaceuticals?
15  A.  Yes.
16  Q.  Okay.  Where were you employed before Bentley
17      Pharmaceuticals?
18  A.  I was employed at SAIC, which is short for
19      Science Applications International Corporation.
20  Q.  And for how long were you employed at SAIC?
21  A.  Approximately three years.
22  Q.  And what was your position at SAIC?
23  A.  I was an information technology manager.
24  Q.  And what were your responsibilities as

Page 11

1       information technology manager at SAIC?
2   A.  My responsibilities were to support the
3       information technology director for the
4       Government at Fort Belvoir, Virginia.
5   Q.  And what support did that consist of as
6       information technology director?
7   A.  It consisted of a multitude of enterprise-type
8       support functions for the agency, which was the
9       Defense Logistics Agency.  Brought them through
10      the Y2K debacle.  The nature of the job changed
11      with time, but I was an on-site support
12      representative working with a defense
13      contractor, but on site with the Government.
14  Q.  And that was with the Department of Defense?
15  A.  Yes.
16  Q.  And before you were employed as an information
17      technology manager at SAIC, were you employed?
18  A.  At General Scientific Corporation.
19  Q.  And what did -- I'm sorry.  I didn't mean to cut
20      you off.
21  A.  No.  Go ahead.
22  Q.  What was your position at General Scientific
23      Corporation?
24  A.  I was a program manager.

Page 12

1   Q.  And what were your responsibilities as a program
2       manager?
3   A.  To manage a group of -- varied anywhere from ten
4       to eighteen people in support of a government
5       project for what we called EDMICS, which was the
6       Engineering Data Management Information Control
7       System.  It was an engineering and high-tech
8       system for automating engineering drawings
9       throughout all components of the services.
10  Q.  And what were the main clients that you had at
11      General Scientific Corporation?
12  A.  The main client was the -- it was through the
13      Naval Air Systems Command initially, which spun
14      off into a joint program.  So it was a
15      multiservice agency referred to as JEDMICS,
16      Joint Engineering Data Management Information
17      Control System.
18  Q.  And before you were at General -- or how long
19      were you at General Scientific Corporation?
20  A.  About five -- a little over five years.
21  Q.  And before you were at General Scientific
22      Corporation, were you employed?
23  A.  I was in the U.S. Navy.  There was one more
24      short period of employment prior to that for a

Page 13

1       six-month employment with a -- if I can remember
2       the name of the company.  It was just a short
3       stint.  Another defense contractor in the
4       Washington, D.C. area.
5   Q.  Do you recall the name of that contractor?
6   A.  It'll come to me in a minute.
7   Q.  Okay.  In the Navy, did you hold a position or a
8       rank?
9   A.  Yes.
10  Q.  What was your rank?
11  A.  I was a commander, which is an O-5 is the rank.
12  Q.  And what year did you leave the Navy?
13  A.  February 1st, 2000 -- not 2000.  I should know
14      this.  I think it was '98.  No, it couldn't have
15      been '98.  I was employed with them --
16  Q.  So far you've said --
17  A.  '91.  I'm sorry.  '91.  There we go.  February
18      1st, 1991.
19  Q.  So you left the Navy February 1st, 1991; is that
20      correct?
21  A.  Yes.
22  Q.  And what were your duties as a commander in the
23      U.S. Navy?
24  A.  Varied over time.  The last position was working

4 (Pages 10 to 13)

JT-A-498

Page 14

1   for the director of Naval Reserve at the
2   Pentagon. I was a director of all the surface
3   programs for the Naval Reserve.
4   Q.  And do you have any particular expertise in
5       technology or information technology?
6   A.  I would say yes.
7   Q.  What is your expertise in information
8       technology?
9   A.  Well, having worked with it in all -- well, the
10      two last defense-contractor-type positions, one
11      for General Scientific Corporation and one for
12      SAIC, both of those projects that I was involved
13      with would be classified as an IT project.
14  Q.  Okay. And when did you join the Navy?
15  A.  When did I join the Navy? Wow. November 10th,
16      1964. Marine Corps birthday.
17  Q.  And how did you come to join the Navy?
18  A.  I enlisted.
19  Q.  Where were you living at that time?
20  A.  Lynn, Massachusetts.
21  Q.  And had you finished high school at that point?
22  A.  Yes.
23  Q.  When did you finish high school?
24  A.  1964.

Page 15

1   Q.  Where were you stationed while you were in the
2       Navy, if you could start in 1964?
3   A.  Initially, recruit training, which was in
4       Illinois. Followed by that -- you want every
5       tour of duty?
6   Q.  The big ones, the ones that stand out.
7   A.  Well, as an enlisted person, following recruit
8       training, I was sent to what they call the Naval
9       Academy preparatory school for a year, whereupon
10      I was accepted to the Naval Academy after that.
11      I did four years at the Naval Academy,
12  Q.  In Annapolis?
13  A.  In Annapolis. Graduated in 1970. Embarked on a
14      career. Initial assignments were onboard ship,
15      varying positions, for about five years.
16      Following that, I got involved with the Naval
17      Reserve program, and I had several assignments
18      of increasing importance with the Naval Reserve
19      until I retired in 1991.
20  Q.  And during the time that you were with the Naval
21      Reserve, where were you stationed?
22  A.  I was stationed -- ran the reserve center at
23      Chicopee, Massachusetts, which is north of
24      Springfield. I was a training director at their

Page 16

1   reserve readiness command at the Great Lakes
2   Training Center in Illinois. I ran another
3   larger reserve center in Pittsburgh,
4   Pennsylvania, and I became the director of
5   surface programs for the Naval Reserve at the
6   Pentagon. I missed one initial assignment prior
7   to the Chicopee one, and that was as a navigator
8   and operations officer onboard ship in Rota,
9   Spain.
10  Q.  What ship was that?
11  A.  It was the U.S.S. SIMON LAKE ship.
12  Q.  What class ship was that?
13  A.  It was a submarine tender.
14  Q.  Do you sail?
15  A.  Not lately, but I have.
16  Q.  It's fun. I enjoy it.
17  A.  Boating.
18  Q.  Do you have a boat now?
19  A.  Yes.
20  Q.  What kind of boat do you have?
21  A.  It's a 21-foot Sea Ray, open bow. Kind of a
22      lake boat.
23  Q.  What attracted you to Bentley Pharmaceuticals?
24  A.  A switch, a change in career, a challenge. I

Page 17

1   was kind of getting wary (sic) of the type of
2   work that I was doing, wanted to essentially see
3   a change.
4   Q.  How so wary?
5   A.  Excuse me?
6   Q.  How so wary?
7   A.  Just the defense contractor work was getting a
8       little boring for me. I was probably within one
9       to two years facing another change to another
10      defense contractor, which I would not have had
11      any problem doing that, but -- and I also wanted
12      to get out of the Washington, D.C. area, which
13      is where I was located. So the idea of coming
14      to New Hampshire with a change of employment was
15      attractive to me.
16  Q.  Okay. Did anyone at Bentley give you a formal
17      description of your responsibilities as director
18      of special projects?
19  A.  Yes.
20  Q.  And who did that?
21  A.  It was provided in my offer of employment by
22      Mike Price.
23  Q.  And was your offer of employment a written
24      document?

5 (Pages 14 to 17)

JT-A-499

Page 18

1   A.  Yes.
2   Q.  And was your offer of employment signed by Mike
3       Price?
4   A.  Yes.
5   Q.  And did you understand your offer of employment
6       to be an employment contract?
7   A.  No, it was not a contract.
8   Q.  What were the terms of your offer of employment?
9   A.  I was hired as an employee at will, and the
10      terms were a salary, some initial options, and
11      the standard benefit components that were
12      authorized at that time, always subject to
13      change.  There was no length of employment
14      specified.
15  Q.  You testified a few moments ago that that
16      document also provided a description of your
17      responsibilities.  Do you recall that
18      description?
19  A.  Portions of it.  It was more a bulletized list
20      of responsibilities.
21  Q.  And what responsibilities do you recall?
22  A.  The ones I mentioned prior regarding engagement
23      of universities and state agencies for
24      monitoring of contracts, for setting up

Page 19

1       tracking, monitoring projects for the company,
2       eventually to get involved with various filings
3       of drug applications in the U.S.  Those are the
4       ones that come to mind.
5   Q.  Do you recall any others?
6   A.  Not right now.
7   Q.  A moment ago, you testified that one of the
8       responsibilities you recall was setting up
9       tracking monitoring projects.  What do you mean
10      by that?
11  A.  Just getting our arms around all of the very
12      projects that the company was engaged in at the
13      time and trying to prioritize them, work them
14      into management meetings to properly discuss
15      them, potentially set up project management
16      tracking of each one or at least the major
17      projects through project management software,
18      that type of thing, which involved also the
19      recordation of action items and tracking of
20      those and monitoring of their completion or
21      noncompletion.
22  Q.  Did you use any project management software?
23  A.  Primarily Microsoft Project.
24  Q.  What is Microsoft Project?

Page 20

1   A.  It's a project management software.
2   Q.  And had you had experience with Microsoft
3       Project before?
4   A.  Yes.
5   Q.  Where had you had that experience?
6   A.  At my prior jobs, more than one.
7   Q.  And so I'm sure I understand, Microsoft Project
8       is project management software that indicates
9       how -- what stage of a project something is in
10      or --
11  A.  It lays out a time line.  It lays out PERT
12      charts.  It lays out resources, just to complete
13      project management control of a project.
14  Q.  And did you ever use Project -- Microsoft
15      Project while you were at Bentley between the
16      years 2000 and 2003?
17  A.  Yes.
18  Q.  Do you recall the year in which you began using
19      Microsoft project?
20  A.  2000 -- it was either 2000 or 2001.  Early 2000s
21      time frames.
22  Q.  Did you propose using Microsoft Project?
23  A.  Yes, I did.
24  Q.  Had the company -- and by the company, I mean

Page 21

1       Bentley Pharmaceuticals, Incorporated -- had any
2       experience with Microsoft Project before you
3       proposed it?
4   A.  No, no other person there at the time had any
5       sufficient experience with it other than myself.
6   Q.  Did you use any other tools to track projects at
7       Bentley Pharmaceuticals between the years 2000
8       and 2003?
9           MS. ABREU:  Objection, vague.
10  A.  Yes.
11  Q.  What other tools did you use?
12  A.  Primarily tabular listings.
13  Q.  Did you use -- what do you mean -- strike that.
14      What do you mean by a tabular listing?
15  A.  A tabular listing of projects mostly generated
16      as after-action-type reports from monthly
17      management meetings that were conducted at the
18      company.
19  Q.  And what form did those tabular listings of
20      projects take?
21  A.  Could you clarify?
22  Q.  Sure.
23  A.  What do you mean by form?
24  Q.  Were they charts?  Were they Word documents?

6 (Pages 18 to 21)

JT-A-500

Page 22

1    Were they in notebooks?
2   A.  Primarily in Word tables.
3   Q.  And by Word, you mean Microsoft Word?
4   A.  Yes.
5   Q.  And who had access to your Microsoft project
6       files at Bentley Pharmaceuticals, Incorporated?
7   A.  Can you clarify what you mean by access?
8   Q.  Were those program files that you kept on your
9       work computer?
10  A.  Yes, they were.
11  Q.  Were they kept on a shared server?
12  A.  Yes, they were.
13  Q.  Did you e-mail those projects to anyone else?
14  A.  Yes, I did.
15  Q.  To whom did you e-mail them?
16  A.  Members of the management team.
17  Q.  And who is a member or -- who was a member of
18      the management team between 2000 and 2003?
19  A.  The CEO and president at that time, Jim Murphy;
20      Michael Price, our CFO; Robert Gyurik, our head
21      of pharmaceutical development; Dr. Bob Stote,
22      who is the head of our clinical development, and
23      Dr. James Hand, who is the head of our business
24      development, and Jordan Horvath, who was our

Page 23

1       in-house counsel, our general counsel.
2           MR. FINE:  Could the reporter please
3       read back that last answer?
4           (Reporter read back the last answer.)
5   Q.  Have any additional responsibilities been added
6       to your job responsibilities since the year
7       2000?
8   A.  Yes.
9   Q.  What responsibilities are those?
10  A.  Could I clarify that?  Ask you a question?  Are
11      you referring all the way up to the present or
12      up to what time?
13  Q.  Yes, to the present.
14  A.  There have been numerous changes in my
15      responsibilities over the time that I've been at
16      the company.  In addition to the ones I
17      mentioned prior, I began support for Dr. Bob
18      Stote in clinical matters, assisting him with
19      the tracking -- the setup, the tracking, and the
20      reports for clinical trials; assisting him for
21      presentation work that he would take to
22      appropriate conferences to promote our projects.
23      I was involved with some initial regulatory --
24      setup of regulatory files since we didn't have

Page 24

1       an on-site regulatory person.  We had a contract
2       regulatory person, so I assisted her.  I was
3       involved with developing -- in addition to
4       the -- this was right from the very beginning.
5       I may have said this before.  The setup,
6       scheduling, monitoring, format, facilitating of
7       our management meetings, which took place mostly
8       on a monthly basis from 2000 until the present.
9           I also was tasked to draft and put
10      together an operations summary to the board of
11      directors on a recurring basis.  The schedule
12      wasn't set.  It was quarterly at the most
13      frequent, but in actuality, probably
14      semi-annual.
15          In 2004, I had a complete change of
16      responsibilities.  By the way, there was a job
17      title change in that period.  About two years
18      after I was at the company, my job title changed
19      from director of special projects to director of
20      programs and project management.  It was purely
21      a title change to more accurately reflect what I
22      was doing.
23          Then, in 2004, I was asked to take
24      over human resources, management of all of our

Page 25

1       facilities and grounds, management of all the
2       information technology, yet to retain some of
3       the responsibilities that I still had in the
4       former position.
5   Q.  That's quite a big portfolio.  Do you recall
6       what year you began assisting with presentations
7       at conferences?
8   A.  The best I can recall is 2003.
9   Q.  And the year that you began assisting with
10      regulatory matters?
11  A.  I would say 2002.
12  Q.  And the year that you began drafting operational
13      summaries for the board of directors?
14  A.  I don't recall the exact time I started that.
15      So I would be speculating as to -- I'd have to
16      refer back to when the first report was done,
17      and that would tell me when it was.
18  Q.  And in 2004, along with your complete change of
19      responsibilities, you testified that you took
20      over human resources and management of Bentley's
21      facilities and grounds; is that right?
22  A.  That's true.
23  Q.  All right.  Which facilities and grounds does
24      that encompass?

7 (Pages 22 to 25)

JT-A-501

Page 26

```
1    A.  It's at Two Holland Way in Exeter, New
2        Hampshire.  We had in 2003 -- in February 2003,
3        we purchased the former headquarters of Tyco and
4        took over the building.  So shortly thereafter,
5        in August of 200- -- it was a year later and
6        four months.  In August of 2004, I took over the
7        function and the position.
8    Q.  Any other facilities?
9    A.  No, that's it.
10   Q.  Any facilities outside the United States?
11   A.  No.
12   Q.  And IT facilities, are those housed in Bentley's
13       facilities in Exeter, New Hampshire?
14   A.  Yes, they are.
15   Q.  And where were they housed before 2004?
16   A.  We contracted out for assistance, IT support.
17   Q.  And with whom did Bentley Pharmaceuticals
18       contract out IT support?
19   A.  It was with somewhat of a freelance IT
20       specialist, running his own consulting company.
21   Q.  And what was the IT specialist's name?
22   A.  Lance Aughey.
23   Q.  And does Bentley Pharmaceuticals have any
24       relationship with Lance Aughey at the present
```

Page 27

```
1        time?
2    A.  Yes, we do.
3    Q.  What is that relationship?
4    A.  He's my IT manager.  He reports to me.
5    Q.  So would it be fair to say that Mr. Aughey was
6        brought in-house?
7    A.  Yes, it would be fair to say that.
8    Q.  And when was Mr. Aughey brought in-house?
9    A.  January 1st of 2003 -- that's not correct.  It
10       would have had to be 2004.
11   Q.  And at the start of your deposition, you
12       testified that Mr. Murphy had called you about
13       coming to work at Bentley Pharmaceuticals --
14   A.  Yes.
15   Q.  -- is that correct?  What did Mr. Murphy explain
16       to you on that phone call?
17   A.  I can't recall everything that was said in the
18       phone call, but the general nature of the phone
19       call was to feel me out for my interest in
20       possibly coming to work for Bentley and
21       relocating to New Hampshire.
22   Q.  Did Mr. Murphy explain that Bentley had any
23       particular needs for your expertise?
24   A.  Yes, he did.
```

Page 28

```
1    Q.  What were those needs?
2    A.  He needed help in managing the multiple projects
3        that they were involved in.
4    Q.  So when you accepted employment at Bentley
5        Pharmaceuticals, did you report directly to
6        Mr. Murphy?
7    A.  No, never.
8    Q.  To whom did you report at Bentley
9        Pharmaceuticals?
10   A.  I reported to Robert Gyurik.
11   Q.  And did anyone report to you at Bentley
12       Pharmaceuticals?
13   A.  No, not at that time.
14   Q.  And do you understand why you were to report to
15       Mr. Gyurik?
16   A.  Because that was the most appropriate place for
17       me to report to for the type of work that they
18       needed to be completed.
19   Q.  And did Mr. Gyurik provide Mr. Murphy with
20       assistance in managing the projects that Bentley
21       Pharmaceuticals had?
22           MS. ABREU:  Objection, time frame.
23   Q.  At the time you were hired.
24   A.  Could you repeat that?
```

Page 29

```
1    Q.  Did Mr. Murphy -- strike that.  When you were
2        hired, did Mr. Gyurik assist Mr. Murphy with
3        managing the projects that Bentley
4        Pharmaceuticals had?
5    A.  I would have to say indirectly from the work
6        that I produced.  In that he was my reporting
7        senior, my work was reviewed by him.
8    Q.  Why did you understand it was the most
9        appropriate reporting relationship to have you
10       reporting to Mr. Gyurik?
11   A.  Because we were a small company, we had no more
12       than seven employees at the time, and his duties
13       and things that he did were most -- the best
14       aligned to the type of work that I would be
15       doing.
16   Q.  Did your reporting relationship have anything to
17       do with a potential impropriety in reporting to
18       your brother-in-law?
19           MS. ABREU:  Objection.
20   Q.  You may answer the question.
21   A.  Not to my knowledge.
22   Q.  So would it have been appropriate for you to
23       report to Mr. Murphy, your brother-in-law?
24           MS. ABREU:  Objection, calls for
```

ESQUIRE DEPOSITION SERVICES
1-866-619-3925

JT-A-502

Page 30

1    speculation.
2  Q.  You may answer.
3  A.  I don't know the answer to that, whether it
4      would be appropriate or not. Personally, I saw
5      no impropriety in any of my employment with
6      Bentley.
7  Q.  Did you receive any employment evaluations while
8      you were at Bentley Pharmaceuticals -- have you
9      received any employment evaluations during your
10     employment at Bentley Pharmaceuticals?
11 A.  Yes, I have.
12 Q.  From whom did you receive performance
13     evaluations?
14 A.  From Robert Gyurik while I was reporting to him,
15     and subsequent to that, by the new president of
16     the company, John Sedor.
17 Q.  Do you report to Mr. Gyurik today?
18 A.  No, I don't.
19 Q.  To whom do you report today?
20 A.  The president, John Sedor.
21 Q.  And while Mr. Gyurik provided your performance
22     evaluations, how often did you receive them?
23 A.  Annually.
24 Q.  Did you receive one for the year 2000?

Page 31

1  A.  Yes.
2  Q.  Did you receive one for the year 2001?
3  A.  Yes.
4  Q.  '02?
5  A.  Yes.
6  Q.  '03?
7  A.  Yes.
8  Q.  '04?
9  A.  Yes.
10 Q.  '05?
11 A.  Yes.
12 Q.  And '06?
13 A.  Yes -- we're not there on '06 yet.
14 Q.  What is the first employment evaluation that you
15     received from Mr. Sedor?
16 A.  What is it?
17 Q.  When was the employment evaluation you received
18     from Mr. Sedor?
19 A.  It was in October of last year, 2005.
20 Q.  October 2005?
21 A.  Yes.
22 Q.  And when did Mr. Sedor join Bentley
23     Pharmaceuticals, Incorporated?
24 A.  August of 2005.

Page 32

1  Q.  And how have your performance evaluations been?
2  A.  Very good.
3  Q.  On a scale of 1 to 10?
4  A.  8.
5  Q.  Did Mr. Gyurik while he gave you performance
6      evaluations identify any particular strengths?
7  A.  I'm sure he did, but I don't recall any
8      specifics.
9  Q.  Any general strengths?
10 A.  Again, I'd be speculating on exactly what he
11     said. I do know personally that he thought very
12     highly of me.
13 Q.  Did Mr. Gyurik identify any weaknesses that you
14     recall?
15 A.  Not directly as weaknesses, but he would always
16     point out areas where, you know, further work
17     was necessary.
18 Q.  And what were those areas?
19 A.  I can't recall.
20 Q.  You testified a few moments ago that you thought
21     your evaluations on a scale of 1 to 10 were
22     about an 8. Why do you say 8?
23 A.  It's a generalization. We changed our appraisal
24     process over the -- when I took over human

Page 33

1      resources. I instituted a more standardized
2      appraisal process. Prior to that, they were
3      less formal. Now, they're more formal. We have
4      a formalized grading process now.
5  Q.  How does that grading process work?
6  A.  Well, it's a matrix of various areas of grading,
7      probably about fifteen different areas, where a
8      person is graded from 0 to 4. They're tabulated
9      to give a total score, and then performance
10     objectives are factored in as well; and a
11     complete score is given for each individual.
12 Q.  And do those performance evaluations serve as a
13     basis for salary increases?
14 A.  Certainly, yes.
15 Q.  Bonuses?
16 A.  Yes.
17 Q.  Grants of stock options?
18 A.  They factor into it, yes.
19 Q.  Any other compensation?
20 A.  They could involve -- based on someone's
21     exemplary performance, there could be
22     on-the-spot awards or grants or increases
23     outside of the annual process.
24 Q.  I want to come back to one point. Is Mr. Gyurik

9 (Pages 30 to 33)

JT-A-503

Page 34

1  still with Bentley Pharmaceuticals,
2  Incorporated?
3  A. Yes, he is.
4  Q. What position does he hold?
5  A. He's the vice president of scientific
6     development.
7  Q. And did he hold that position --
8  A. Excuse me, scientific innovation is his official
9     title.
10 Q. And did Mr. Gyurik hold that position before
11    2004?
12 A. Before 2004. He had a different title at that
13    time. His title at that time was vice president
14    of pharmaceutical development.
15 Q. Did Mr. Gyurik's change of title involve any
16    change in responsibilities?
17 A. Yes, it did.
18 Q. And what change in responsibilities did his
19    change in title entail?
20 A. Well, we brought in another person that
21    essentially became the vice president of
22    research and development, which was a good chunk
23    of the responsibilities that Bob Gyurik had. We
24    rechanneled Bob Gyurik's responsibilities more

Page 35

1  into working with outside collaborations,
2  working with patents, things of that nature,
3  intellectual property.
4  Q. Did you do any work in research and development
5     between 2000 and 2005?
6  A. Not directly other than support for, you know,
7     Bob Gyurik.
8  Q. When you say support, what do you mean by
9     support?
10 A. It's more general support. I'm not a scientist,
11    and I was not involved in the technical aspects
12    of what they did in research and development.
13 Q. And did you provide any other support in regards
14    to Bentley Pharmaceuticals employees?
15 A. I'm sure I did. I can't recall specifically.
16 Q. Did you provide any support to Mr. Murphy?
17 A. Of course, yes.
18 Q. Mr. Price?
19 A. Periodically.
20 Q. Mr. Stote?
21 A. Yes.
22 Q. Mr. Hand?
23 A. Yes.
24 Q. Okay. When you joined Bentley Pharmaceuticals

Page 36

1  in 2000, do you recall what your salary was?
2  A. 93,500.
3  Q. And was that more or less than you'd been
4     receiving at SAIC?
5  A. Yes, more.
6  Q. More. Okay. What was your salary when you left
7     SAIC?
8  A. 82,000.
9  Q. Did you receive a bonus in 2000?
10 A. Not that I recall, not for 2000.
11 Q. You testified earlier that when you were offered
12    your job at Bentley Pharmaceuticals, you
13    received stock options.
14 A. Yes.
15 Q. Approximately how many stock options did you
16    receive?
17 A. Upon initial --
18 Q. Upon initial arrival at the company.
19 A. 10,000.
20 Q. And did you receive any other stock options in
21    the year 2000?
22 A. No.
23 Q. Did you receive any stock --
24 A. No.

Page 37

1  Q. -- in Bentley when you arrived?
2  A. No.
3  Q. Did you receive any stock in the year 2000 as
4     compensation for services to Bentley?
5  A. No.
6  Q. So if you had to estimate all in, what would you
7     estimate your compensation for the year 2000 at
8     Bentley was?
9  A. 93,500 as prorated for three months, so divide
10    that by -- one-quarter of that, essentially.
11 Q. And I'm not asking you to do the math on that.
12    What value would you attach to the stock
13    options?
14 A. That's really difficult to say. You have a
15    strike price for options, and the value could be
16    a lot or it could be zero. So -- and you really
17    cannot answer that question as to value.
18 Q. Has your compensation increased since the year
19    2000?
20 A. Yes, it has.
21 Q. What is your salary at present?
22 A. At present, it is just under 176,000.
23 Q. And have you received any additional stock
24    options at Bentley Pharmaceuticals,

10 (Pages 34 to 37)

Page 38

1    Incorporated?
2    A.  Yes, I have.
3    Q.  And how many stock options have you received
4        since 2000?
5    A.  I don't recall the specific number, but it
6        varied between 5 and 10,000 annually, no more
7        than 10,000 during a year.
8    Q.  How many stock options do you own now?
9    A.  50 to 60,000.
10   Q.  And were all of those stock options granted to
11       you as compensation by Bentley Pharmaceuticals,
12       Incorporated?
13   A.  Yes.
14   Q.  Have you purchased any stock options yourself?
15   A.  Have I exercised them?  Is that what you're
16       saying?
17   Q.  No.  Have you purchased any additional options
18       other than those granted to you?
19   A.  No, I have not.
20   Q.  Have you exercised any of the options granted to
21       you?
22   A.  No, I have not.
23   Q.  Do you own any stock in Bentley Pharmaceuticals,
24       Incorporated?

Page 39

1    A.  Yes, I do.
2    Q.  Did you purchase that stock?
3    A.  Yes, I did.
4    Q.  When did you purchase that stock?
5    A.  Prior to joining the company.
6    Q.  Do you recall approximately the year that you
7        purchased that stock?
8    A.  Probably -- not exactly, but if I had to guess,
9        it would have been early in the year of 2000.
10   Q.  And how many shares of Bentley Pharmaceuticals
11       did you purchase early in the year 2000?
12   A.  Approximately 500.
13   Q.  And do you own 500 shares today?
14   A.  Yes, I do.
15   Q.  Have you ever sold shares in Bentley
16       Pharmaceuticals, Incorporated?
17   A.  No, I have not.
18   Q.  Have you received any other shares in Bentley
19       Pharmaceuticals, Incorporated from any other
20       person or corporation?
21   A.  From any other corporation?
22   Q.  From any other person or corporation.  Has
23       anyone given you a gift of shares in Bentley
24       Pharmaceuticals, Incorporated?

Page 40

1    A.  No, no.
2        MS. ABREU:  Jonathan, we've been going
3    for about an hour now.  Whenever it's convenient
4    for you, if you wouldn't mind taking a break.
5        MR. FINE:  We can absolutely take a
6    break.  Should we go off the record?
7        THE STENOGRAPHER:  Yes.
8        (Recess taken from 10:03 a.m. to
9        10:16 a.m.)
10       MR. FINE:  Could you read me back the
11   last question and answer?
12       (Reporter read back the last question and
13       answer.)
14   Q.  I'd like to ask you a little bit about a subject
15       that you testified about earlier, and you
16       testified earlier that you had developed or
17       facilitated management meetings at Bentley
18       Pharmaceuticals, Incorporated.  Is that correct?
19   A.  That is correct.
20   Q.  Do you know if Bentley Pharmaceuticals,
21       Incorporated held management meetings before you
22       were hired?
23   A.  Yes, they did, but they were rather informal.
24   Q.  And how did you develop or facilitate the

Page 41

1    management meetings at Bentley Pharmaceuticals
2    after you were hired?
3    A.  I came up with a format for recording the
4        various projects of interest that the company
5        was working on and proposed that to management
6        of the company.  It was initially used, as I
7        recall, at a board meeting, and then it kind of
8        became a fact of life.  We continued using it
9        and improved upon it, and it became the format
10       that we used at what then became our monthly
11       management meetings.
12   Q.  And how often did Bentley Pharmaceuticals hold
13       management meetings before you arrived, if you
14       know?
15   A.  I don't recall.  As I said, the most I can
16       remember is that they were informal, and I don't
17       know whether there was a set schedule or not.
18   Q.  Was there a set schedule after you arrived?
19   A.  Yes.
20   Q.  And who set that schedule?
21   A.  I did, with agreement from the management team.
22   Q.  And who was on the management team?
23       MS. ABREU:  Objection, asked and
24       answered.

11 (Pages 38 to 41)

JT-A-505

Page 42

1    Q.  And who was on the management team when you set
2        the schedule?
3    A.  Jim Murphy, CEO and president at the time;
4        Michael Price, our CFO; Dr. Bob Stote, our head
5        of clinical matters; Bob Gyurik, our head of
6        pharmaceutical development; Jordan Horvath,
7        general counsel; Jim Hand, head of business
8        development.  I think I got them all.
9    Q.  Were you a member of the management team?
10   A.  Yes.
11   Q.  And where did those monthly meetings take place?
12   A.  Usually in our conference room.
13   Q.  And would that be a conference room in Bentley
14       Pharmaceuticals' offices in New Hampshire?
15   A.  Yes.
16   Q.  Anywhere else?
17   A.  Perhaps Jim Murphy's office from time to time.
18   Q.  And what was the format of those management
19       meetings?
20   A.  Format was a meeting with a set time.  We would
21       have an agenda in the form of a template of
22       projects, which served two purposes.  It served
23       as the agenda for each meeting, and it also
24       served as an after-action report with all the

Page 43

1        action items included in it for follow-up after
2        each meeting.  The meetings lasted approximately
3        anywhere from an hour to two hours, sometimes
4        longer.
5    Q.  And to whom -- were those template of projects
6        or templates of projects that you referred to
7        earlier circulated to the management team?
8    A.  Yes, they were.
9    Q.  How were they circulated?
10   A.  Normally by e-mail.
11   Q.  And would you send those e-mails?
12   A.  Yes, I would.
13   Q.  And what was the internal format of those
14       management meetings?
15   A.  Can you clarify what you mean by "internal"?
16   Q.  Did a member of the management team open the
17       meeting?
18   A.  Yes.  Well, I opened the meetings.
19   Q.  And did you follow the template of projects as
20       an agenda in the meetings?
21   A.  Yes.  Normally, they would -- at the opening,
22       they'd set the ground rules, remind people of
23       what we're doing, hopefully stick to a certain
24       time frame, mostly unsuccessful, and generally

Page 44

1        discuss them in order that they appeared in the
2        template.
3    Q.  And how would they be -- how would the items be
4        discussed?
5    A.  They were primarily an update on the status of
6        the particular project from the primary
7        responsible person or persons for the actions
8        related to that project.
9    Q.  And was there a time limit to how long the
10       person could discuss that?
11   A.  There was no set time limit, no, on each.
12   Q.  Would other members of the management team ask
13       questions of that person?
14       MR. FINE:  Objection, vague.
15   A.  If necessary.  If it was appropriate, sure, they
16       would ask questions.
17   Q.  When would it be appropriate?
18   A.  Whenever there was -- somebody had a question
19       that needed to be answered.
20   Q.  Earlier, you mentioned that there were ground
21       rules for these meetings.  What were those
22       ground rules?
23   A.  Those are more housekeeping ground rules; being
24       there on time, no food fights, breaks, you know,

Page 45

1        when we intend to complete the meeting, things
2        of that nature.
3    Q.  Were there food fights?
4    A.  I think there are in all meetings.
5    Q.  Hopefully, we won't have any food fights today.
6        Were these meetings ever heated?
7        MS. ABREU:  Objection, vague.
8    A.  What do you mean by heated?
9    Q.  Do you recall any heated discussion during those
10       meetings?
11   A.  There was lively discussion at several meetings.
12   Q.  Do any particular meetings stand out as having
13       been lively?
14   A.  No, not that I recall, nothing particular.
15   Q.  Do you recall the subjects of the lively
16       discussions?
17   A.  No, I don't recall.
18   Q.  And how would you describe a lively discussion?
19   A.  A lively discussion where we would have two or
20       more people with their thoughts and ideas
21       wanting to be presented, often all wanting to
22       talk at the same time.
23   Q.  Did anyone present at those Bentley management
24       meetings ever raise his or her voice?

12 (Pages 42 to 45)

JT-A-506

Page 46

1   A.  Not inordinately, no.
2   Q.  But some?
3   A.  Sure, some spoke firmly, with resolve.
4   Q.  Who do you recall speaking firmly, with resolve?
5   A.  Probably everyone.
6        MS. ABREU:  Objection, time frame.
7   A.  From time to time, everyone -- every member of
8        the management meeting, including myself.
9   Q.  Do you recall which subjects you felt you needed
10       to speak firmly on, with resolve?
11  A.  They weren't subject related.  My part in that
12       was more of a facilitator role to not let things
13       get too far out of hand or off track or too far
14       on a tangent from what we were there to discuss.
15  Q.  When you say out of hand, what do you mean?
16  A.  Just spending too much time on a particular
17       topic, too much nonproductive discussion, that
18       type of thing.
19  Q.  Would subjects ever come up other than the
20       subjects listed on the template of projects?
21  A.  Periodically, yes.
22  Q.  Did you recall those -- do you recall what those
23       subjects were?
24  A.  No, I can't recall specifically.

Page 47

1   Q.  Were the subjects included on subsequent
2        templates of projects?
3   A.  Only if directed to be included.
4   Q.  And would you include those if directed?
5   A.  Sure, yes.
6   Q.  And who would direct you to include those, those
7        other subjects?
8   A.  Generally, in most cases, it would be Jim Murphy
9        himself would direct that they be included on
10       the report.  From time to time, others would as
11       well in their particular areas of
12       responsibility, for example, Mike Price for
13       financial matters.
14  Q.  Were you responsible for keeping the template of
15       projects?
16  A.  Yes, I was.
17  Q.  Did you ever remove anything -- any items from
18       the templates of projects?
19  A.  Yes.
20  Q.  When did you remove items from the template of
21       projects?
22  A.  Upon direction during the management meetings.
23  Q.  So you would be directed during the management
24       meetings to remove an item from the template of

Page 48

1        projects?
2   A.  Yes, or I would offer it up for deletion if
3        there was no more action associated with that
4        particular item or if it was overcome by events
5        or whatever.
6   Q.  And did you delete those items during the actual
7        management meetings?
8   A.  It was a paper-based thing.  I would cross them
9        out.
10  Q.  Would you bring or -- did you bring those
11       templates of projects to the meetings
12       themselves?
13  A.  Yes.
14  Q.  How many copies of the templates of projects did
15       you bring to the meetings?
16  A.  Nine to ten.  Enough to cover the people
17       attending.
18  Q.  Did you retain templates of projects after the
19       meetings?
20  A.  Yes.
21  Q.  Where did you retain those templates of
22       projects?
23  A.  Primarily on my computer and the company network
24       drive where I stored my files.

Page 49

1   Q.  Did he retain the copies of the templates of
2        projects that you actually brought with you to
3        the meetings?
4   A.  Could you clarify whether you mean paper or
5        electronic or what?
6   Q.  Okay.  You testified a few moments ago that you
7        would bring nine to ten copies of the templates
8        of projects to the meeting.  Were those paper
9        copies?
10  A.  Yes.
11  Q.  And you also testified that if directed during a
12       meeting on an item, you would cross it
13       out on your paper copy; is that correct?
14  A.  Uh-huh.
15  Q.  Did you retain that paper copy after the
16       management meeting?
17  A.  Only for a period of time as necessary to
18       incorporate the updates and changes in the
19       subsequent template, which would be used and
20       distributed as an after-action report to follow
21       up on the action items.  And subsequently, that
22       template would be used for the next management
23       meeting, and then I would dispose of any rough
24       copies with my notes and things like that on it.

13 (Pages 46 to 49)

JT-A-507

Page 50

1  Q.  Did you take notes during those management
2      meetings?
3  A.  Certainly, yes.
4  Q.  Did you take notes on the templates of projects?
5  A.  Yes.
6  Q.  Did you take notes anywhere else?
7  A.  Yellow tablet.
8  Q.  And by yellow tablet, you mean a yellow pad of
9      paper or a writing tablet; is that correct?
10 A.  Yes.
11 Q.  Did you retain those notes?
12 A.  No.
13 Q.  What did you do with those notes?
14 A.  I destroyed them.
15 Q.  When did you destroy those notes?
16 A.  Shortly after I incorporated all the changes
17     into the electronic copy, which I did retain.
18 Q.  So the electronic copy of those templates of
19     projects would be or were accurate reflections
20     of your notes from the meeting and those things
21     that you were directed to add or delete from the
22     template of projects at the meetings; is that
23     correct?
24 A.  To the best of my recollection. If you're

Page 51

1      asking me whether the whole thing was completely
2      accurate, I can't answer that, but they were my
3      accurate reflection of what took place during
4      the meeting, yes.
5  Q.  But you tried to keep them accurately, is that
6      correct?
7  A.  Yes.
8  Q.  Not inaccurately?
9  A.  Uh-huh.
10 Q.  Was your compilation or -- was your keeping of
11     those templates of projects part of your regular
12     responsibilities at Bentley Pharmaceuticals --
13 A.  Yes, it was.
14 Q.  -- Incorporated? Did you base them on -- strike
15     that. You've testified you based your changes
16     to those templates of projects on events that
17     happened during Bentley's management meetings;
18     is that correct?
19 A.  Yes.
20 Q.  Did you receive information that you included in
21     those templates of projects from any other
22     employees or executives at Bentley than the ones
23     who were involved in the management meetings?
24 A.  No.

Page 52

1  Q.  Did you receive information that you included in
2      those templates of projects from any events that
3      took place outside of the management meetings?
4      MS. ABREU: Objection, vague.
5  Q.  Do you understand my question?
6  A.  If you could be more specific what you mean.
7  Q.  Did any of the persons on Bentley's management
8      team ask you to include items or events on the
9      template of projects outside of the context of
10     management meetings?
11 A.  No.
12 Q.  So are you testifying that Mr. Price or
13     Mr. Murphy never asked you to include something
14     on the template of projects outside of the
15     context of the management meeting?
16 A.  To the best of my recollection, that would not
17     normally occur. Any direction to put anything
18     in the report, as I recall, occurred during the
19     management meetings.
20 Q.  Do you think you would recall any directions to
21     include things on the template of projects that
22     occurred outside of the management meetings?
23     MS. ABREU: Objection, calls for
24     speculation.

Page 53

1  A.  I probably would not recall.
2  Q.  Okay. Did anyone assist you in compiling the
3      template of projects?
4  A.  No.
5  Q.  You did that yourself?
6  A.  Yes, I did.
7  Q.  Did a secretary assist you with that?
8  A.  No.
9      MR. FINE: Let the record reflect that
10     the witness pointed to himself.
11 Q.  So it's your testimony that no secretary
12     assisted you with putting together the template
13     of projects?
14     MS. ABREU: Objection, asked and
15     answered.
16 A.  No.
17 Q.  Did you communicate with anyone at Bentley
18     Pharmaceuticals, Incorporated about the contents
19     of the template of projects?
20 A.  Yes.
21 Q.  With whom did you communicate?
22 A.  Members of the management team.
23 Q.  Did you communicate with anyone at Laboratorios
24     Belmac about the contents of the management

14 (Pages 50 to 53)

JT-A-508

Page 54

1    meetings?
2    A.  No.
3    Q.  How much time did you spend compiling the
4        template of projects?
5    A.  Per each meeting, approximately two to two and a
6        half hours.
7    Q.  And after you made changes to the template of
8        projects following a management meeting, did you
9        seek to confirm the accuracy of your changes
10       with anyone on the management team?
11   A.  No.
12   Q.  Did anyone on the management team ever inform
13       you that a change that you had made was
14       inaccurate?
15   A.  Not that I recall.
16   Q.  Do you recall whether the template of projects
17       was kept in the ordinary course of
18       of Bentley's business activities?
19   A.  I don't understand your question.
20   Q.  Would you describe the template of projects as a
21       document that was kept in the ordinary course of
22       Bentley's business?
23   A.  Yes.
24   Q.  You testified earlier that the purpose of the

Page 55

1    template of projects was to assist Mr. Murphy
2    in -- strike that.  What was the purpose of
3    keeping the project -- sorry, the template of
4    projects?
5    A.  I think I answered that earlier, but it was
6        basically to keep track of all of the major
7        discussion items and projects that the company
8        was working on, Bentley Pharmaceuticals.
9    Q.  And was it to keep the management team apprised
10       of the status of those projects?
11   A.  Yes, it was, essentially to keep us all on the
12       same page, if you understand what I mean.
13   Q.  Was it to facilitate management meeting
14       discussions?
15   A.  Certainly, yes.
16   Q.  Okay.  I'd like to show you a document.  And the
17       process for this is I'll hand it to the court
18       reporter, who will mark it as an exhibit, and
19       she'll then hand it to you.  I'll also hand a
20       copy to Miss Abreu, and then we'll discuss it.
21   A.  Okay.
22       (Copy of E-mail to Mr. Murphy by
23       Mr. Fitzgibbons, dated November 8, 2000,
24       and Attached Project Status Report 24

Page 56

1    October were marked Exhibit Number 1 for
2    identification.)
3    Q.  And while you're taking a moment to review that,
4        I'd like to identify the exhibit as an e-mail
5        and attached document bearing Production Numbers
6        BENTL 022861 through 865.
7    A.  Yes.
8    Q.  Mr. Fitzgibbons, have you had a chance to look
9        at this exhibit?
10   A.  Yes, I have.
11   Q.  Do you recognize this exhibit?
12   A.  I recognize it, sure.
13   Q.  What is this document?
14   A.  This is a report from our 24, October, 2000
15       management meeting.
16   Q.  And so the record is clear, the report begins on
17       the page marked BENTL 022862; is that correct?
18   A.  Yes.
19   Q.  And the page before that marked 861 is an
20       e-mail; is that correct?
21   A.  That's correct.
22   Q.  And that's an e-mail from you?
23   A.  Yes, it is.
24   Q.  To Mr. Murphy?

Page 57

1    A.  That's what it appears to be.
2    Q.  And do you recognize the report that you
3        referred to a moment ago as an attachment to
4        that e-mail?
5    A.  It doesn't say attachment, but I assume it is.
6    Q.  Is this report what you've been referring to in
7        our discussions a moment ago as a template of
8        projects?
9    A.  Yes, it is.
10   Q.  And did you compile this template of projects?
11   A.  Yes, I did.
12   Q.  Did you compile this template of projects based
13       on information that you received at a Bentley
14       management meeting from other Bentley employees?
15   A.  To the best of my recollection, this was from
16       the management meeting of 24, October, 2000, as
17       it states on the title of that Page 862.
18   Q.  And did you compile this template of projects in
19       or around October 24 --
20   A.  Yes.
21   Q.  -- 2000?  And was it part of your job to compile
22       this template of projects?
23   A.  Yes.  I made it part of my job.  This was one of
24       the first, initial ones, as I only reported to

JT-A-509

Page 58

1  the company on the 2nd of October.
2  Q.  Okay. And this is -- is this the first report
3  that you recall doing?
4  A.  I'm not sure. It may be the first or the
5  second, but it's close to the startup.
6  Q.  And the report is divided into three columns; is
7  that correct, a column marked Topic --
8  A.  Correct.
9  Q.  -- a column marked Schedule, and a column marked
10  Priority? And if you look at the column marked
11  Priority, there are a number of letters for each
12  row in that column?
13  A.  Yes.
14  Q.  And what do those letters correspond to?
15  A.  That was my attempt to prioritize the projects,
16  and as I recall, purely my attempt to prioritize
17  them, A being the highest, C being the lowest.
18  Q.  Did you discuss that attempt to prioritize
19  them -- the projects indicated in this template
20  of projects with anyone else at Bentley
21  Pharmaceuticals?
22  A.  As I recall, it was either the first or the
23  second management meeting where it was directed
24  that we try, attempt to prioritize them. So I

Page 59

1  was instructed to do that, and I did my best to
2  do that.
3  Q.  And do you recall who instructed you to
4  prioritize these topics?
5  A.  Not exactly. I think it was a consensus of the
6  team.
7  Q.  Okay. And do you recall anyone expressing any
8  disagreement about your prioritization of these
9  topics?
10  A.  Not immediately.
11  Q.  But subsequently?
12  A.  Subsequently, the priority was dispensed with as
13  somewhat meaningless. It became irrelevant.
14  Q.  And do you recall when it was determined that
15  the priority was irrelevant?
16  A.  Not exactly. I would guess probably after three
17  to four management meetings at the most.
18  Q.  And do you recall why it was determined that
19  prioritization of these projects was irrelevant?
20  A.  Because the priority kept changing, which made
21  it become irrelevant.
22  Q.  Can you tell me anything about the October 24th
23  management meeting?
24  A.  No.

Page 60

1  Q.  Do you recall that meeting at all?
2  A.  No, not really.
3  Q.  Do you recall who attended that meeting?
4  A.  Not -- I would be guessing. I don't know
5  specifically. I didn't -- it wasn't a matter of
6  record to document the attendees at each
7  meeting. We were generally -- it was generally
8  the management team as I specified earlier,
9  perhaps from time to time with one or two
10  persons absent.
11  Q.  Do you recall if anyone was absent at the
12  October 24th meeting?
13  A.  No, I don't.
14  Q.  And your job was to compile this template of
15  projects accurately; is that correct?
16  MS. ABREU: Objection, asked and
17  answered.
18  A.  Yes.
19  Q.  Okay. I'd like to show you another document, if
20  that's all right. Actually, do you recall --
21  I've asked that. Strike that, please.
22  MR. FINE: If you could mark this as
23  Exhibit 2.
24  (Bentley Pharmaceuticals Project Status

Page 61

1  Report, October 18, 2001 was marked
2  Exhibit Number 2 for identification.)
3  MR. FINE: And while the witness is
4  reviewing the document, I'll identify it for the
5  record. It's a document indicated -- labeled
6  with production numbers BENTL 023097 through
7  100, so through BENTL 023100.
8  Q.  Mr. Fitzgibbons, do you recognize this document?
9  A.  Yes.
10  Q.  Have you seen this document before?
11  A.  I'm sure I have since I drafted it.
12  Q.  Okay. What is this document?
13  A.  It's a project status report from our
14  October 18th, 2001 management meeting.
15  Q.  And is a project -- is this project status
16  report another one of the templates of projects
17  that we were referring to earlier?
18  A.  Yes, it is.
19  Q.  And did you draft this project status report
20  based on information that you received from
21  other Bentley employees in the management
22  meeting?
23  A.  Yes.
24  Q.  And it was part of your job at Bentley to

16 (Pages 58 to 61)

JT-A-510

Page 62

1   compile this report; is that correct?
2        MS. ABREU: Objection, asked and
3   answered.
4   A. Yes.
5   Q. And was this project status report kept as a
6   record of Bentley's regular business?
7   A. Yes.
8   Q. Now, I showed you a few moments ago a project --
9   I think it was called a management meeting,
10  Bentley Pharmaceuticals, Incorporated,
11  management meeting which you identified as a
12  template of projects; is that correct?
13  A. Yes.
14  Q. And the format appears to have changed between
15  that template of projects and this project
16  status report; is that correct?
17  A. That's correct.
18       MS. ABREU: And, Jonathan, to clarify
19  for the record, can we agree that what you
20  referred to as the prior management meeting
21  template is Exhibit 1 and the subsequent is
22  Exhibit 2?
23       MR. FINE: That's correct.
24  Q. And could you explain the changes in format to

Page 63

1   me?
2   A. Sure. You will find that the format changes
3   over time. This won't be the last change. That
4   we eliminated the priority. We eliminated the
5   schedule, and we just changed that with an
6   action calling. So we had the project and
7   status, which was equated to the previous topic,
8   and just combined everything in an action.
9   That's all we were interested in at the time.
10  Q. Okay. And had you written Bentley
11  Pharmaceuticals project status reports for each
12  management meeting that had taken place between
13  November 2000 and October 2001?
14  A. Yes.
15  Q. Do you recall any management meetings at which
16  you did not present a template of projects or
17  Bentley Pharmaceuticals project status report?
18  A. No.
19  Q. Okay. And do you recall making any changes to
20  this project status report after the
21  October 18th, 2001 meeting, before the
22  meeting -- before the next management meeting?
23  A. No, I don't recall any changes that I've made to
24  this.

Page 64

1   Q. Okay. I'd like to show you another exhibit.
2        (Copy of E-mail to Mr. Price, et al. by
3        Mr. Fitzgibbons, dated December 15,
4        2000, and Bentley Pharmaceuticals
5        Project Status Report - 11 December was
6        marked Exhibit Number 3 for
7        identification.)
8        MR. FINE: While the witness is
9   reviewing the document, I'll identify it for the
10  record. It's a document consisting of an e-mail
11  and a project status report marked -- and the
12  entire document is marked BENTL 022269 through
13  275.
14  Q. Mr. Fitzgibbons, do you recognize this document?
15  A. Yes.
16  Q. Have you seen this document before?
17  A. Yes.
18  Q. Where have you seen this document before?
19  A. I drafted this report.
20  Q. Is this another of the template of projects for
21  Bentley Pharmaceuticals project status reports
22  to which we've been referring earlier?
23  A. Yes, it is.
24  Q. And did you compile this Bentley Pharmaceuticals

Page 65

1   project status report based on information that
2   you received in a Bentley Pharmaceuticals
3   management meeting?
4   A. Yes, I did.
5   Q. Okay. And was it part of your job to compile
6   this report?
7   A. Yes, it was.
8   Q. And this is a report that's a little bit earlier
9   than Exhibit 2, which I showed you earlier.
10  A. That's correct.
11  Q. And can you tell me the date of this report?
12  A. 11th, December, 2000.
13  Q. 2000. And the cover e-mail is from you,
14  Mr. Fitzgibbons; is that correct?
15  A. Yes, it is.
16  Q. And it's sent to a number of persons. Could you
17  identify those persons?
18  A. Mike Price, the chief financial officer; Jim
19  Murphy, the president and CEO; Jordan Horvath,
20  general counsel; Bob Stote, head of clinical
21  affairs.
22  Q. Part of the text -- do you recall sending this
23  e-mail?
24  A. No.

17 (Pages 62 to 65)

JT-A-511

Page 66

1   Q. Part of the text of the e-mail asks, "Please let
2      me know if there are any changes required." Do
3      you know to what you were referring?
4   A. Initially, this is one of the early reports. It
5      appears that it may have been the second or
6      third report. As I recall, I was seeking input
7      as to the accuracy of information that I
8      recorded since I was relatively new to this
9      responsibility.
10  Q. Do you recall receiving any response to your
11     e-mail?
12  A. No, I don't.
13  Q. Sitting here today, do you recall any response
14     to your e-mail?
15  A. No.
16  Q. And so as best you understand, this project
17     status report of Bentley Pharmaceuticals was
18     accurate to the satisfaction of Mr. Price,
19     Mr. Murphy, Mr. Horvath, and Mr. Stote?
20        MS. ABREU: Objection, calls for
21     speculation.
22  A. I don't know if they were satisfied with it, and
23     I'm unaware of any changes that were recommended
24     or made to this.

Page 67

1   Q. Do you recall them expressing any
2      dissatisfaction with this report?
3   A. No, I don't.
4   Q. Okay. I'd like to show you another exhibit.
5         (Copy of E-mail to Mr. Murphy by
6         Mr. Fitzgibbons, dated November 15,
7         2001, and Bentley Pharmaceuticals
8         Project Status Report - November 6, 2001
9         was marked Exhibit Number 4 for
10        identification.)
11        MR. FINE: While the witness is
12     reviewing this exhibit, I'll identify it for the
13     record. It's a covering e-mail and Bentley
14     Pharmaceuticals project status report, and the
15     document -- the exhibit is numbered
16     consecutively BENTL 022454 through 459.
17  Q. Mr. Fitzgibbons, do you recognize this document?
18  A. Yes.
19  Q. Have you seen this document before?
20  A. Yes.
21  Q. What is this document?
22  A. It's a report from the November 6th, 2001
23     management meeting that I drafted.
24  Q. And is this report -- this Bentley

Page 68

1      Pharmaceuticals project status report a template
2      of projects that we've been discussing earlier
3      today?
4   A. Yes, it is.
5   Q. And did you receive the information in this
6      report from other Bentley Pharmaceuticals
7      employees at a management meeting?
8   A. Yes, I did.
9   Q. Okay. And did you compile this report in or
10     around the time of the November 6th, 2001
11     management meeting?
12  A. Yes, I did.
13  Q. And was it part of your job to compile this
14     report?
15  A. Yes, it was.
16  Q. And is this report a business record of Bentley
17     Pharmaceuticals that was kept in its ordinary
18     course of business?
19  A. Yes, it is.
20  Q. Do you recall anything about the November 6th,
21     2001 management meeting?
22  A. No.
23  Q. Do you recall who attended the management
24     meeting?

Page 69

1   A. No.
2   Q. Do you recall any communications you had with
3      anyone on the management team after this
4      management meeting?
5   A. No, I don't.
6   Q. As best you can recall, this project status
7      report of Bentley Pharmaceuticals is your best
8      contemporaneous recollection of what occurred at
9      that management meeting?
10        MS. ABREU: Objection, calls for
11     speculation. The witness has stated he does not
12     recall anything about that meeting.
13  Q. You can answer.
14  A. As stated, I don't recall anything specific
15     about this meeting.
16  Q. But this document reflects your understanding at
17     the time, is that correct?
18        MS. ABREU: Objection, calls for
19     speculation.
20  A. It reflects what occurred at that meeting, not
21     my understanding, to the best of my ability.
22  Q. And it was your job to write those things down
23     accurately, not inaccurately; is that correct?
24  A. It was.

18 (Pages 66 to 69)

JT-A-512

Page 70

1    MR. FINE: Okay. We can take a short
2  break, if you'd like.
3    MS. ABREU: Sure.
4    (Recess taken from 11:00 a.m. to
5    11:13 a.m.)
6  Q. Mr. Fitzgibbons, before the break, we were
7    discussing a number of Bentley Pharmaceuticals
8    project status reports, and I'd like to ask you
9    a little bit about how you recall discussions
10   about these projects and their status.
11     Earlier today, you testified that
12    individuals at Bentley's management meetings
13    discussed the subjects that they were
14    responsible for; is that correct?
15  A. Yes.
16  Q. How is their responsibility indicated, if you
17    look at Exhibit 4, in the Bentley
18    Pharmaceuticals project status report?
19  A. In two ways. In the text of the left-hand
20    column, it may indicate responsibility by name,
21    and also in the Action column, it would normally
22    indicate a person's name, one or more persons.
23  Q. And if you look at the first item, Pfizer, do
24    you recall who reported on that item?

Page 71

1  A. Mostly -- let's see -- Bob Gyurik.
2  Q. And did you have any reporting responsibility on
3    that subject?
4  A. Only with regard to a contractual agreement.
5  Q. And the second subject, do you recall who
6    reported on that?
7  A. Number 2, Glaxo SmithKline?
8  Q. That's correct.
9  A. No, I don't recall specifically who talked about
10    that subject.
11  Q. If you look at the fifth subject, Novartis, that
12    appears to be broken down into two large bullet
13    points, and under the first of those large
14    bullet points, three separate items. Is that
15    correct?
16  A. Yes, it is.
17  Q. Do you recall who reported on those items?
18  A. Only by what I read here in the Action column.
19  Q. And what's your understanding of who reported on
20    the first bullet point, antifungal lacquer?
21  A. Could you repeat that, please? I'm sorry.
22  Q. Who do --
23    MR. FINE: Actually, could the court
24    reporter read back the question?

Page 72

1    (Reporter read back the last question.)
2    MS. ABREU: And I'm going to object as
3    calling for speculation.
4  A. I really don't recall any discussion related to
5    this. I can only read from the text that I see
6    of the people responsible for the action most
7    likely would have been involved with the
8    discussion. That's the only thing I can deduce.
9  Q. Thank you. I'd like to show you another
10    exhibit.
11    (Copy of E-mail to Mr. Murphy by
12    Mr. Fitzgibbons, dated November 15,
13    2001, and Bentley Pharmaceuticals
14    Project Status Report - November 6, 2001
15    was marked Exhibit Number 5 for
16    identification.)
17    MR. FINE: And while the witness is
18    reviewing the exhibit, I'll identify it for the
19    record as a cover e-mail and Bentley
20    Pharmaceuticals project status report,
21    consecutively numbered beginning BENTL 022401
22    through 406.
23  A. Sorry.
24  Q. Mr. Fitzgibbons, do you recognize this document?

Page 73

1  A. Yes, I do.
2  Q. Have you seen this document before?
3  A. Yes, I have.
4  Q. Can you identify this document?
5  A. It's the project status report from our
6    November 20th, 2001 management meeting.
7  Q. And did you prepare this project status report?
8  A. Yes.
9  Q. And did you prepare this Bentley Pharmaceuticals
10    project status report around -- at or around the
11    time November 20th, 2001?
12  A. Yes, I did.
13  Q. And was it part of your job to prepare this
14    project status report?
15  A. Yes.
16  Q. And was this project status report kept by
17    Bentley Pharmaceuticals in the ordinary course
18    of its business?
19  A. Yes.
20  Q. Do you recall anything about the November 20th,
21    2001 management meeting?
22  A. No, I don't.
23  Q. Do you recall who attended the management
24    meeting?

19 (Pages 70 to 73)

JT-A-513

Page 74

1    MS. ABREU: Objection, calls for
2    speculation.
3    Q.  You can answer the question.
4    A.  I don't recall specifically. I might add that
5        the e-mail is directed to members of the
6        management meeting at that time. Whether they
7        were present or not, they would receive a copy
8        of the report.
9    Q.  And this is your best recollection from the
10       time -- are there any other documents at the
11       time that would better reflect your
12       understanding of what occurred at that
13       management meeting?
14       MS. ABREU: Objection, vague.
15   A.  The short answer, no.
16   Q.  Do you know of any notes that reflect what took
17       place at that meeting?
18   A.  No.
19   Q.  Do you recall seeing any e-mail about what took
20       place at that meeting?
21   A.  No.
22   Q.  Do you recall speaking with anyone at Bentley
23       Pharmaceuticals about what took place at that
24       meeting?

Page 75

1    A.  No.
2    Q.  Do you know if there were any management
3        meetings between November 20th, 2001 and
4        November 6th, 2001?
5    A.  Between the 6th and the 20th of November, 2001?
6    Q.  Uh-huh.
7    A.  No, I don't know of any other meetings that took
8        place.
9    Q.  You testified earlier today that Bentley
10       Pharmaceuticals management meetings took place
11       on a monthly basis; is that correct?
12   A.  That's correct.
13   Q.  Do you know why there were two management
14       meetings in November of 2001?
15   A.  No, I don't. This was -- appears to be a little
16       unusual that we had two in one month, but I
17       don't know the reason for it.
18   Q.  And you testified earlier today that you were
19       responsible for scheduling management
20       meetings --
21   A.  Yes.
22   Q.  -- is that correct? Do you recall why you
23       scheduled two management meetings for November
24       2001?

Page 76

1    MS. ABREU: Objection, asked and
2    answered.
3    A.  No, I don't.
4    Q.  Did anyone ask you to schedule a management
5        meeting in -- at the end of November of 2001?
6    A.  At the end of November?
7    Q.  On November 20th, 2001.
8    A.  I don't understand your question.
9    Q.  Okay. Did anyone ask you to schedule two
10       management meetings in November 2001?
11   A.  Not that I recall.
12   Q.  Did -- was it more usual to have a management
13       meeting at the beginning of a month or the end
14       of a month?
15   A.  Neither.
16   Q.  And sitting here today, you have no recollection
17       of why there were two management meetings in
18       November 2001 --
19       MS. ABREU: Objection, asked and
20       answered.
21   Q.  -- is that correct?
22   A.  No, I don't have any recollection.
23   Q.  I'd like to turn your attention to another
24       document.

Page 77

1        (Copy of E-mail to Mr. Murphy, et al. by
2        Mr. Fitzgibbons, dated January 17, 2002,
3        and Bentley Pharmaceuticals Project
4        Status Report - January 11, 2002 was
5        marked Exhibit Number 6 for
6        identification.)
7        MR. FINE: And while the witness is
8    reviewing the document that the court reporter
9    has marked as Exhibit 6, I will identify it for
10   the record. It is a document consisting of a
11   cover letter and Bentley Pharmaceuticals project
12   status report, consecutively Bates-numbered
13   BENTL 022497 through BENTL 022502.
14   Q.  Mr. Fitzgibbons, do you recognize this document?
15   A.  Yes, I do.
16   Q.  Have you seen this document before?
17   A.  Yes, I have.
18   Q.  Can you identify this document?
19   A.  It's a project status report from a management
20       meeting conducted on January 11th, 2002.
21   Q.  Did you draft this document?
22   A.  I did, yes.
23   Q.  Did you draft this document on or around
24       January 11th, 2002?

20 (Pages 74 to 77)

JT-A-514

Page 78

1   A.  Yes.
2   Q.  Did you draft this document based on information
3       that was discussed at the January 11th, 2002
4       management meeting?
5           MS. ABREU:  Objection, foundation.
6   Q.  You can answer the question.
7   A.  The answer is yes.
8   Q.  And was it part of your job to draft this
9       Bentley Pharmaceuticals project status report?
10  A.  Yes.
11  Q.  And just to be completely clear, is this project
12      status report one of the templates of projects
13      that we were discussing earlier this morning?
14  A.  Yes.
15  Q.  And just to clean up the record, that was also
16      true for Exhibit 5; is that correct?
17  A.  Yes, it was -- yes, it is.
18  Q.  So Exhibit 5 was one of the templates of
19      projects that we discussed earlier today?
20  A.  Yes.
21  Q.  And turning again to Exhibit 6, was this
22      document a document that was kept by Bentley
23      Pharmaceuticals in the ordinary course of its
24      business?

Page 79

1   A.  Yes.
2   Q.  Thank you.  Do you recall anything about the
3       January 11th, 2002 management meeting?
4   A.  The weather was cold.  No, I don't recall.
5   Q.  How do you recall that?
6   A.  I don't recall.
7   Q.  Okay.  Do you recall who attended that
8       management meeting?
9   A.  I do not.
10  Q.  Did you discuss the contents of this Bentley
11      Pharmaceuticals project status report with any
12      other employees of Bentley Pharmaceuticals?
13  A.  No.
14  Q.  Did you receive any comments on this Bentley
15      Pharmaceuticals project status report from any
16      other employees of Bentley Pharmaceuticals?
17  A.  No, I did not.
18  Q.  And I'd like to show you one more document.
19          MR. FINE:  And if the court reporter
20      could mark the exhibit as Exhibit 7.
21          (Copy of E-mail to Mr. Murphy, et al. by
22          Mr. Fitzgibbons, dated February 28,
23          2002, and Bentley Pharmaceuticals
24          Project Status Report - January 29, 2002

Page 80

1       was marked Exhibit Number 7 for
2       identification.)
3           MR. FINE:  And while the witness is
4   reviewing the exhibit, I'll identify it for the
5   record.  It is a cover e-mail and Bentley
6   Pharmaceuticals project status report,
7   consecutively Bates-numbered BENTL 023091
8   through 096.
9   Q.  Are you ready?
10  A.  I am ready.
11  Q.  Mr. Fitzgibbons, do you recognize this document?
12  A.  I do.
13  Q.  Have you seen this document before?
14  A.  Yes.
15  Q.  Can you identify this document?
16  A.  It's the project status report from our
17      management meeting conducted on January 29th,
18      2002.
19  Q.  Mr. Fitzgibbons, did you write this Bentley
20      Pharmaceuticals project status report?
21  A.  Yes.
22  Q.  And to be clear, this project status report of
23      Bentley Pharmaceuticals is one of the templates
24      of projects that we were discussing earlier

Page 81

1       today?
2   A.  Yes, it is.
3   Q.  And did you write this Bentley Pharmaceuticals
4       project status report as part of your ordinary
5       job responsibilities?
6   A.  Yes, I did.
7   Q.  And was this Bentley Pharmaceuticals project
8       status report based on information that you
9       received or was communicated to you in the
10      Bentley Pharmaceuticals January 29th, 2002
11      management meeting?
12  A.  Yes.
13  Q.  Okay.  Was this document -- this Bentley
14      Pharmaceuticals project status report kept by
15      Bentley Pharmaceuticals in the ordinary course
16      of its business?
17  A.  Yes.
18  Q.  What do you recall about -- if anything, about
19      the January 29th, 2002 management meeting?
20  A.  I do not recall anything from that meeting.
21  Q.  Do you recall who attended that meeting?
22  A.  No, I do not.
23  Q.  Do you recall the weather at that meeting?
24  A.  I'm sure it was cold as well, colder.

21 (Pages 78 to 81)

JT-A-515

Page 82

1  Q.  Okay. Do you recall communicating with anyone
2     at Bentley Pharmaceuticals, Incorporated about
3     the contents of this project status report?
4  A.  No.
5  Q.  Do you recall having any feedback, written,
6     e-mail, from anyone at Bentley Pharmaceuticals
7     about the contents --
8  A.  No --
9  Q.  -- of this project status report?
10  A.  -- I do not.
11  Q.  And this project status report was prepared in
12     or around the time of January 29, 2002?
13  A.  Yes.
14  Q.  Just to clarify the record, do you recall any
15     Bentley Pharmaceuticals management meetings
16     before the year 2004?
17  A.  What do you mean by "recall"?
18  Q.  Do you recall the contents of any Bentley
19     Pharmaceuticals management meetings before the
20     year 2004?
21  A.  Only by reviewing the document that summarized
22     that meeting, this template.
23  Q.  This template?
24  A.  Off the top of my head, I don't recall the

Page 83

1     discussion or the contents of any of the
2     meetings unless I were to review these
3     documents. That might spur some recall, but...
4  Q.  Has reviewing these documents today spurred any
5     recall of any of these meetings?
6  A.  It spurs some memory of the particular projects.
7     It doesn't spur the discussion that occurred.
8  Q.  Which particular projects does it spur a memory
9     of?
10  A.  Most of them, all of them.
11  Q.  So as I've been asking you if you recall any of
12     the particular management meetings, has that --
13     and your response, as I understand it, has been
14     that you do not, that response is not quite
15     accurate; is that correct?
16        MS. ABREU: Objection,
17     mischaracterizes testimony.
18  A.  That's not true. My response was accurate. I'm
19     just saying as I read the particular projects in
20     here, it spurs some recall of the topic. I
21     don't recall any of the discussion relevant to
22     that topic.
23  Q.  Are there any particular topics here that you
24     recall -- when I say "here," I'm referring to

Page 84

1     Exhibit 7 -- that you recall?
2  A.  Nothing stands out as unique.
3  Q.  When you say that nothing stands out that's
4     unique, do you mean nothing stands out about the
5     project or nothing stands out -- well, what do
6     you mean by nothing stands out as unique?
7  A.  Well, to be specific, none of the 32 items and
8     the complete end list items of another 7 or 8
9     can I differentiate as one being more important
10     than the other.
11  Q.  Do you recall any -- strike that. What do you
12     recall, if anything, about Project Number 1?
13  A.  I don't recall anything from memory. It's just
14     that, as I stated earlier from reading the
15     context of this, I do recall some action that
16     was assigned to me and what I was to do with it.
17  Q.  And what do you recall about that action?
18  A.  I sent some tox studies to Pfizer.
19  Q.  So would it be fair to say that you have no
20     independent recollection of any of these items
21     here on Exhibit 7 other than what's written here
22     on the page?
23  A.  That's true, yes.
24  Q.  And for Exhibit 6, do you have any independent

Page 85

1     recollection of these items other than what's
2     written here on the page?
3  A.  No, I don't.
4  Q.  And for Exhibit 5, do you have any independent
5     recollection of these projects --
6  A.  No --
7  Q.  -- other than what's written on the page?
8  A.  -- I do not.
9  Q.  And for Exhibit 4, do you have any independent
10     recollection of these projects other than what's
11     written on the page?
12  A.  No.
13  Q.  And by that, I mean any of the projects.
14  A.  No, I don't.
15  Q.  And for Exhibit 3, do you have any independent
16     recollection of these projects and items other
17     than what's written on the page?
18  A.  No, I don't.
19  Q.  And Exhibit 2, do you have any independent
20     recollection of these projects or items other
21     than what's written on the page?
22  A.  No, I don't.
23  Q.  And for Exhibit 1, do you have any independent
24     recollection of these items or these projects

22 (Pages 82 to 85)

JT-A-516

Page 86

1    other than what's written on the page?
2  A.  No, I do not.
3  Q.  Earlier today, you testified that it was one of
4    your responsibilities to draft operational
5    summaries on a recurring basis for Bentley
6    Pharmaceuticals' board of directors; is that
7    correct?
8  A.  That's correct.
9  Q.  And you testified earlier that these were
10    quarterly but -- or they were supposed to have
11    been drafted quarterly, but in practice,
12    sometimes semi-annually; is that correct?
13  A.  To the best of my recollection, yes.
14  Q.  Do you recall what triggered the need to draft
15    an update to the board on a quarterly or
16    semi-annual basis?
17  A.  I recall that the board of directors had asked
18    Jim Murphy that he prepare a summary report of a
19    recurring nature to keep them advised of
20    operational matters in the company.
21  Q.  And did Mr. Murphy task you with preparing that
22    report?
23  A.  Yes, he did.
24  Q.  Okay. And do you recall when the board asked

Page 87

1    Mr. Murphy to prepare summary reports about
2    Bentley Pharmaceuticals' operations?
3  A.  Not specifically. I can't recall when it
4    started.
5  Q.  Do you know if before you were employed at
6    Bentley Pharmaceuticals any executive or officer
7    of Bentley Pharmaceuticals prepared summary
8    reports of Bentley Pharmaceuticals' operations
9    for Bentley's board of directors?
10  A.  I would only be speculating. I don't know that,
11    whether that occurred or not.
12  Q.  And after Mr. Murphy tasked you to prepare
13    summary reports of Bentley's operations for
14    Bentley's board of directors, did that become
15    one of your responsibilities?
16  A.  Yes, it did.
17  Q.  And do you recall if these reports were to be
18    prepared in advance of board of directors
19    meetings?
20  A.  Not necessarily in advance. They were -- it
21    didn't necessarily -- it wasn't a precursor to
22    board meetings, if that's what you're asking.
23    It was done -- sometimes they did occur prior to
24    a board meeting. Sometimes it was in between

Page 88

1    board meetings. It wasn't directly related to
2    board meetings.
3  Q.  From -- tell me a little bit about the process
4    of drafting these summary reports.
5      MS. ABREU: Objection, vague.
6  Q.  Would -- I'm sorry to cut you off.
7  A.  I was going to ask you if you could clarify
8    that, what you mean about the process.
9  Q.  Would Mr. Murphy, for example, ask you in a
10    particular month, "Hey, Paul, it's time to draft
11    another operations update for the board. Would
12    you send me a draft," or something like that?
13  A.  Initially, that's a true statement. When we
14    started up the report, it took a little bit of
15    time to determine what format I was to prepare
16    it in. I think we ended up on the three general
17    areas topics in the report. I would normally --
18    when it was time for a new one to be submitted
19    and prepared, I would normally prepare a draft,
20    usually using the prior report as a basis to
21    start from, and update it to the best of my
22    knowledge from information that I was aware of
23    on that topic, and the primary source of that
24    information was from my template report from the

Page 89

1    management meetings. That draft, I would then
2    send that to Mr. Murphy, Mr. Murphy would mark
3    it up, we'd have a little back and forth on
4    correction of things, sometimes just editorial,
5    and complete the report. Then once it was
6    approved by him, I would send it out normally by
7    e-mail, sometimes by fax to the board of
8    directors.
9  Q.  When you sent Mr. Murphy draft summary reports
10    for Bentley Pharmaceuticals' board, did you send
11    them to him by e-mail or on paper?
12  A.  Both.
13  Q.  And would he send them back to you with markups
14    via e-mail or in paper?
15  A.  Both.
16  Q.  And how would he mark up an e-mail or how did he
17    mark up his e-mails?
18  A.  Normally, he would add or cross out text, add
19    text, highlight it in different colors.
20  Q.  And in paper, how would he send you corrections?
21  A.  Just a standard markup if it were paper. I
22    think most of them were done by e-mail. There
23    may have been from time to time they were done
24    on paper copy.

23 (Pages 86 to 89)

JT-A-517

Page 90

1   Q.  Did you retain those drafts?
2   A.  No.
3   Q.  Do you know if Mr. Murphy retained any of those
4       drafts?
5   A.  No, I'm sure he did not.
6   Q.  Why are you sure he did not?
7   A.  Because I know Jim and I know he doesn't like to
8       keep a lot of paper, so I would speculate he
9       didn't retain them.
10  Q.  How many drafts would go back and forth
11      typically?
12  A.  Probably no more than two.
13  Q.  Would Mr. Murphy usually okay your first draft?
14  A.  No.
15  Q.  He never okayed your first draft?
16  A.  No.
17  Q.  And what typically would his comments be?
18  A.  Typically, he would add information normally
19      that I was totally unaware of, embellish on
20      topics that I had no knowledge of, or cross out
21      things I was inaccurate about.
22  Q.  So would it be fair to say that it was a -- that
23      these summary reports to Bentley
24      Pharmaceuticals' board of directors were

Page 91

1       partially drafted by you and partially by
2       Mr. Murphy?
3           MS. ABREU:  Objection,
4       mischaracterizes his testimony.
5   Q.  You can answer.
6   A.  They weren't partially.  It was a final approved
7       document by Jim Murphy.  I had no responsibility
8       for the approval of it.  My responsibility was
9       to just collect the input, put it in the
10      document in the form of a draft, and then take
11      his changes and make those changes.
12  Q.  Okay.  And what did you understand the purpose
13      of these summary reports to Bentley
14      Pharmaceuticals' board of operations -- board of
15      directors were?
16  A.  Just as a general update on the status of things
17      going on at the company of interest to the
18      board.
19  Q.  Anything else?
20  A.  No.
21  Q.  Do you know if they were shared with the entire
22      board of directors?
23  A.  Yes, they were.
24  Q.  Okay.  Do you know if they were shared with

Page 92

1       anyone other than you, Mr. Murphy, and the
2       entire board of directors?
3   A.  Yes, they were from time to time.
4   Q.  With whom were they shared in addition to the
5       board?
6   A.  Mike Price reviewed a few.  Jordan Horvath, as I
7       recall, in the past.
8   Q.  Anyone else?
9   A.  I think that's it that I recall.
10  Q.  Did you take any steps to ensure that the
11      information that you were providing to the board
12      of directors was accurate?
13  A.  Yes.
14  Q.  What steps did you take?
15  A.  I sent it to Mr. Murphy.
16  Q.  And were you aware of any steps that Mr. Murphy
17      took to ensure that the information you were
18      providing to the board of directors was
19      accurate?
20          MS. ABREU:  Objection, calls for
21      speculation.
22          MR. FINE:  No, I'm asking him if he
23      was aware of any.
24  A.  No, I was not aware.

Page 93

1   Q.  Okay.  Are you -- are you okay?
2   A.  Oh, I'm fine.
3   Q.  Okay.
4   A.  Do I look something?
5   Q.  Are you aware of any inaccuracies in the
6       information that was presented to Bentley
7       Pharmaceuticals' board of directors in these
8       summary reports?
9   A.  No, I'm not.
10  Q.  Do you still prepare summary reports for Bentley
11      Pharmaceuticals' board of directors?
12  A.  I do not, no.
13  Q.  When did your responsibility for drafting
14      reports or preparing reports for Bentley
15      Pharmaceuticals' board of directors end?
16  A.  I don't recall.  I'd have to look back in my
17      electronic records to find out when the last one
18      I submitted was.
19  Q.  Do you recall if it was in or around 2005?
20  A.  No, I don't recall 2005.  To the best of my
21      recollection, I think it was earlier than that,
22      prior to that.
23  Q.  Do you think that it was in or around the time
24      that your responsibilities changed?

24 (Pages 90 to 93)

JT-A-518

Page 94

1          MS. ABREU: Objection, calls for
2     speculation.
3  A.  I really don't recall when. It had no relevance
4     on my responsibilities -- my responsibility
5     changed. Since I carried that responsibility
6     with me from its inception to the date that it
7     ended.
8  Q.  Do you know if anyone prepares summary reports
9     for Bentley Pharmaceuticals' board of directors
10    now?
11 A.  I'm not aware of.
12         MR. FINE: Okay. Could we take a
13    quick break? Thanks.
14         (Discussion off the record)
15         (Recess taken from 11:50 a.m. to
16          11:57 a.m.)
17 Q.  Mr. Fitzgibbons, we've been discussing some of
18    the -- we've been discussing the subject of
19    reports that Mr. Murphy asked you to prepare to
20    keep Bentley Pharmaceuticals' board of directors
21    informed about Bentley Pharmaceuticals
22    operations; is that correct?
23 A.  Yes, that's right.
24 Q.  Okay. And I'd like to show you a document.

Page 95

1          (Copy of E-mail to Mr. Bolling, et al.
2     by Mr. Fitzgibbons, dated November 17,
3     2000 was marked Exhibit Number 8 for
4     identification.)
5          MR. FINE: And while the witness is
6     reviewing the document, I will identify it for
7     the record as a document that has been marked
8     with Production Numbers BENTL 003065 through 66.
9  A.  Okay.
10 Q.  Do you recognize this document?
11 A.  Yes, I do.
12 Q.  Have you seen this document before?
13 A.  Yes.
14 Q.  What is this document?
15 A.  This is the first operations update that was
16    drafted and sent to the board of directors.
17 Q.  Okay. And is this document an e-mail?
18 A.  Yes, it is.
19 Q.  And did you write this document?
20 A.  Yes, I did.
21 Q.  And did you send this document?
22 A.  Let me clarify that. I drafted this document,
23    and it was ultimately approved by Jim Murphy
24    before it was sent out.

Page 96

1  Q.  And did you draft this document on or around
2     November 17th, 2000?
3  A.  Yes.
4  Q.  Okay. And was it part of your job
5     responsibilities to draft this document?
6  A.  Yes, it was.
7  Q.  And was this document a record of Bentley
8     Pharmaceuticals or its board that was kept in
9     the ordinary course of the company's business?
10 A.  Yes.
11 Q.  Okay. You testified a moment ago that this was
12    the first operations update that was provided to
13    the board of directors by you; is that correct?
14 A.  It was delivered by me. It was a report,
15    essentially, from Jim Murphy.
16 Q.  And did -- and it was a report sent to the
17    members of Bentley Pharmaceuticals' board of
18    directors?
19 A.  Yes, it was.
20 Q.  And Mr. Bolling was a member of the board of
21    directors at the time?
22 A.  Yes, he was.
23 Q.  Mr. Cleveland Russell as well?
24 A.  Yes.

Page 97

1  Q.  And Mr. Miguel Fernandez?
2  A.  Yes.
3  Q.  Mr. Bob Gyurik?
4  A.  Yes.
5  Q.  Mr. Jim Murphy was a member of the board?
6  A.  Yes.
7  Q.  Was Mr. Packer a member of the board?
8  A.  He was, yes.
9  Q.  And was Mr. Price a member of the board?
10 A.  Yes, he was.
11 Q.  And Mr. Stote as well?
12 A.  Yes, he was.
13 Q.  Do you know if this e-mail was sent BCC to
14    anyone else?
15 A.  No, it was not.
16 Q.  The -- is this the kind of summary report that
17    Mr. Murphy tasked you with preparing for the
18    Bentley Pharmaceuticals board of directors that
19    we had discussed earlier?
20 A.  Yes, it's typical of a report that would go to
21    him.
22 Q.  Is this one of the reports that we were
23    discussing earlier?
24 A.  It's the first report. It is one of them.

25 (Pages 94 to 97)

Page 98

1  Q.  And in this report, the first subject is Spain
2     activities; is that correct?
3  A.  Yes.
4  Q.  As a percentage, if you had to estimate, what
5     percentage of the information relating to Spain
6     activities did you receive from Mr. Murphy?
7        MS. ABREU:  Objection, calls for
8     speculation.
9  A.  I mean it's kind of hard to answer that.  I
10    don't know.
11 Q.  Okay.  Did you receive information relating to
12    Spain activities, the first topic in this
13    report, from anyone other than Mr. Murphy?
14 A.  Are you speaking about this specific report?
15 Q.  This specific report, that's correct.
16 A.  As I read the text of this, I would have to say
17    no, that it most likely was 100 percent from Jim
18    Murphy on this.
19 Q.  Okay.  And if you look at the second topic of
20    the report, product development, there are five
21    lettered subheadings under that; is that
22    correct?
23 A.  Yes.
24 Q.  And that's the second subject in this report; is

Page 99

1     that correct?
2  A.  That's correct.
3  Q.  And as a percentage, what percentage of
4     information about that subject did you receive
5     from Mr. Murphy?
6  A.  I can't give you percentages.  I like to stay
7     away from percentages on this report because I
8     think it's irrelevant.  The material under
9     Item 2 was partially drafted by me from
10    information taken from monthly management
11    meeting reports and partially corrected,
12    changed, edited by Jim Murphy to arrive at
13    what's here in the final report.  So I can't
14    really give you a percentage.
15 Q.  Do you recall any of the information under
16    subject product development or -- Subject 2,
17    product development, coming from any source
18    other than Mr. Murphy or Bentley Pharmaceuticals
19    management meetings?
20 A.  No.
21 Q.  Okay.  If you look at the third subject in this
22    report, the U.S. licensing activities --
23 A.  Yes.
24 Q.  -- do you recall any of the information under

Page 100

1     that subject coming from any individuals other
2     than Mr. Murphy or members of the Bentley
3     Pharmaceuticals management committee --
4     management team?
5  A.  No.
6  Q.  At this point in time in November 2000, was any
7     member of -- was any employee of Laboratorios
8     Belmac on the Bentley Pharmaceuticals management
9     team?
10       MS. ABREU:  Objection, foundation.
11 A.  No.
12 Q.  Earlier today, you testified about the summary
13    reports for Bentley Pharmaceuticals' board of
14    directors and said there were three general
15    areas or topics in the reports.  Are those three
16    general areas Spain activities, product
17    development, and U.S. licensing activities?
18 A.  Yes, they are, at least in the first report
19    here.  I'd have to review the other reports to
20    see if those three areas were consistent.
21 Q.  Okay.  I'd like to show you another document.
22       (Copy of E-mail to Mr. Bolling, et al.
23       by Mr. Fitzgibbons, dated December 27,
24       2000 was marked Exhibit Number 9 for

Page 101

1     identification.)
2        MR. FINE:  While the witness is
3     reviewing the document, I'll identify it for the
4     record as a document marked with Production
5     Numbers BENTL 019989 through 90.
6  Q.  Mr. Fitzgibbons --
7  A.  Yes.
8  Q.  -- do you recognize this document?
9  A.  Yes.
10 Q.  Have you seen this document before?
11 A.  Yes.
12 Q.  Can you identify this document?
13 A.  It's another operations update submitted by me
14    to the board of directors.
15 Q.  And did you prepare this report?
16 A.  I did.
17 Q.  Did you --
18 A.  I drafted the report, the same as before, as
19    approved by Jim Murphy for the final draft.
20 Q.  Did you prepare this report on or about
21    December 27th, 2000?
22 A.  Yes.
23 Q.  And was it part of your job to prepare this
24    report?

26 (Pages 98 to 101)

JT-A-520

Page 102

1  A.  It was, yes.
2  Q.  And was this report kept as a record in the
3      ordinary course of the business of Bentley
4      Pharmaceuticals?
5  A.  Yes.
6  Q.  Okay.  The first -- do you know if this was sent
7      to any individuals other than members of the
8      Bentley Pharmaceuticals board?
9  A.  I don't know that it was.  To the best of my
10     recollection, it was not.  This was primarily a
11     report just to the board of directors.
12 Q.  And when you say primarily, do you know if it
13     was anything other than a report to the board of
14     directors?
15 A.  The only thing I recall is that Jordan Horvath
16     was included on the distribution.  He was not
17     actually a member of the board of directors, but
18     he was serving as the counsel.
19 Q.  And at this time, was Mr. Horvath counsel -- if
20     you know, was Mr. Horvath counsel to Bentley
21     Pharmaceuticals, Incorporated?
22 A.  Yes, he was.
23 Q.  Did he hold a position inside Bentley
24     Pharmaceuticals, Incorporated or was he outside

Page 103

1      counsel?
2  A.  He was in-house counsel.
3  Q.  Do you know if he was also counsel to the board
4      of directors at Bentley Pharmaceuticals?
5  A.  I don't know what his official function or title
6      was in relation to the board members.  I do know
7      that he attended all the board meetings and
8      acted as counsel during those board meetings.
9  Q.  Did you attend any board meetings?
10 A.  No, I never did.
11 Q.  You never attended a board meeting of Bentley
12     Pharmaceuticals?
13 A.  Never.
14 Q.  Did you attend any board meetings of any
15     subsidiaries of Bentley Pharmaceuticals,
16     Incorporated?
17 A.  No, I did not.
18 Q.  Did you hold any positions at any subsidiaries
19     of Bentley Pharmaceuticals, Incorporated?
20 A.  No.
21 Q.  Again, the first subject in this report is
22     titled Spain activities; is that correct?
23 A.  That's correct.
24 Q.  And do you recall whether you received the

Page 104

1      information under Spain activities from
2      Mr. Murphy?
3  A.  I don't recall if he gave it to me directly or
4      not.
5  Q.  Do you recall receiving information about Spain
6      activities from any persons other than
7      Mr. Murphy?
8  A.  No, I don't recall receiving any from anyone
9      else.
10 Q.  Okay.  The second subject in this report is
11     product development; is that correct?
12 A.  It is, yes.
13 Q.  Okay.  And you testified with regard to
14     Exhibit 8, which was a report to the Bentley
15     Pharmaceuticals board of directors from November
16     2000, that the information under product
17     development was compiled by you with the
18     supervision of Mr. Murphy from Bentley
19     Pharmaceuticals management meetings.  Is that
20     accurate?
21 A.  That's accurate, yes.
22 Q.  Is the product development information here in
23     Exhibit 9 also compiled by you under the
24     supervision of Mr. Murphy based on Bentley

Page 105

1      Pharmaceuticals management meetings?
2  A.  For product development, Number 2, and most
3      likely 3.
4  Q.  Do you recall why Jordan Horvath was included on
5      this Bentley Pharmaceuticals operations update
6      for the board of directors?
7  A.  Because he attended all the board meetings and
8      he needed to be aware of the information that
9      was being sent to board members.
10 Q.  Do you recall being made aware of that fact,
11     that Mr. Horvath required information that was
12     being sent to the board members?
13 A.  Yes.
14 Q.  Okay.  How was that brought to your attention?
15 A.  By Jim Murphy.
16 Q.  And how did Mr. Murphy bring that to your
17     attention?
18 A.  Told me to send it, put him on the distribution.
19 Q.  And did Mr. Murphy tell you to put Mr. Horvath
20     on the distribution list personally or did
21     Mr. Murphy send you an e-mail?
22 A.  I can't recall.
23 Q.  I'd like to show you another document.
24     (Copy of E-mail to Mr. Murphy by

27 (Pages 102 to 105)

JT-A-521

Page 106

1           Mr. Fitzgibbons, dated February 28,
2    2001, and Attachment were marked Exhibit
3    Number 10 for identification.)
4         MR. FINE: And while the witness is
5    reviewing this exhibit, I'd like to identify it
6    for the record. It is a document that appears
7    to consist of a cover e-mail and another e-mail,
8    consecutively marked BENTL 022584 through 586.
9  Q. If you turn to the second page of this exhibit,
10    Mr. Fitzgibbons, do you recognize this document?
11  A. Yes, I do.
12  Q. Have you seen this document before?
13  A. Yes.
14  Q. When have you seen this document before?
15  A. When preparing the draft for approval by Jim
16    Murphy.
17  Q. Okay. Have you seen this document at any other
18    time?
19  A. When it was finalized and I sent it out to the
20    board of directors.
21  Q. Any other time?
22  A. No.
23  Q. Mr. Fitzgibbons, you prepared this document; is
24    that correct?

Page 107

1  A. I prepared the first draft of it for review by
2    Mr. Murphy.
3  Q. Is this document here the first draft?
4  A. It appears to be from reading my e-mail.
5  Q. And to which e-mail are you referring?
6  A. Your Exhibit 10, the first page.
7  Q. The first page which is marked BENTL 022584?
8  A. Yes.
9  Q. Was this Bentley Pharmaceuticals operations
10    update sent to the board of directors -- let me
11    rephrase that. Strike that.
12        Was this document a draft of a Bentley
13    Pharmaceuticals operation update to be sent to
14    the board of directors?
15  A. Yes, it was a draft.
16  Q. And you prepared this draft in the ordinary
17    course of your job; is that correct?
18  A. Yes.
19  Q. And this document was kept by Bentley
20    Pharmaceuticals as a record in the ordinary
21    course of its business; is that correct?
22  A. Well, if this was a draft -- I'm not sure --
23    obviously, it was kept; you have a copy of it,
24    but the normal course of business was not to

Page 108

1    retain the drafts but to retain the final
2    approved copy.
3  Q. Okay. If you look at the cover e-mail, is this
4    an example of you making changes to a draft in
5    preparation for sending it to the board of
6    directors?
7  A. I don't know the answer to that. I can't recall
8    from, you know -- the basis when this was put
9    together. I just know from reading the text
10    that this was something I sent to Jim Murphy.
11    As it states there, this is new draft text to
12    send out to the board of directors. I don't
13    recall whether this was the first time. It
14    implies there that I may have even sent a prior
15    one. "If you got a prior version of this,
16    ignore it." That's all I can recall is what's
17    stated there.
18  Q. If you look at the last sentence of your cover
19    e-mail, you wrote, "Suggest we get this out NLT
20    Friday. Let me know when you want to go over
21    it." Is that correct?
22  A. That's correct.
23  Q. Do you know what NLT means?
24  A. Not later than.

Page 109

1  Q. And where you write, "Let me know when you want
2    to go over it," was it your practice to meet
3    with Mr. Murphy to discuss these drafts?
4  A. It was our practice to either meet personally
5    and go over it or, more often, it was by his
6    response by e-mail with a markup.
7  Q. Do you know why you were asking him to let you
8    know when he would want to go over it?
9  A. Because he's a busy man and he's hard to pin
10    down to go over things like this. I wanted to
11    pin him down to a time so we could get it out.
12  Q. And if you look again at the content of your
13    draft, the first topic is Spain activities; is
14    that correct?
15  A. Uh-huh, that's correct.
16  Q. And the second topic is product development; is
17    that correct?
18  A. Yes.
19  Q. And the third topic is licensing activities; is
20    that correct?
21  A. Yes.
22  Q. Just as in the earlier -- the two earlier
23    reports we looked at?
24  A. That's correct.

28 (Pages 106 to 109)

JT-A-522

Page 110

1  Q.  I'd like you to look at another document.
2         (Copy of E-mail to Mr. Murphy, et al. by
3         Mr. Fitzgibbons, dated March 1, 2001 was
4         marked Exhibit Number 11 for
5         identification.)
6  Q.  Let me go back to Exhibit 10 for a moment.  Do
7       you recall if Mr. Murphy gave you any changes to
8       the draft that you prepared?
9  A.  I don't recall.
10 Q.  Turning ahead to Exhibit 11, do you recognize
11      Exhibit 11?
12 A.  Yes.
13 Q.  Have you seen Exhibit 11 before?
14 A.  Yes.
15 Q.  Can you tell me what Exhibit 11 is?
16 A.  It's the operations update that was sent to the
17      board of directors in February 2001.
18 Q.  Did you prepare the operations update?
19 A.  I prepared the draft for final approval by
20      Mr. Murphy.
21 Q.  And did you send a final approved draft to the
22      board of directors?
23 A.  Yes, I did.
24 Q.  Okay.  And is this the final draft that you sent

Page 111

1       to the board of directors?
2  A.  It appears to be, yes.
3  Q.  And did you prepare this report in the ordinary
4       course of your job responsibilities?
5  A.  Yes.
6  Q.  As part of your job responsibilities?
7  A.  Yes.
8  Q.  And is this a record of Bentley Pharmaceuticals,
9       Incorporated that was kept in the ordinary
10      course of the company's business?
11 A.  Yes, it is.
12 Q.  And, again, if you look at this report, the
13      first subject area is Spain activities; is that
14      correct?
15 A.  Yes.
16 Q.  And the second subject area is product
17      development; is that correct?
18 A.  That's correct.
19 Q.  And the third subject is licensing activities --
20 A.  That's correct.
21 Q.  -- is that correct?  And I note that the third
22      subject is no longer United States licensing
23      activities as in the prior operations updates
24      that we looked at.  Does that reflect a

Page 112

1       substantive change in the operations update?
2  A.  I don't recall whether it's a substantive change
3       or not.
4  Q.  Do you receive -- or do you recall receiving any
5       questions about this operations update from
6       anyone on the Bentley Pharmaceuticals board of
7       directors?
8  A.  No, I don't recall.
9  Q.  Do you recall receiving any questions or
10      comments about this report from anyone on the
11      Bentley Pharmaceuticals management team?
12 A.  No, I don't recall, no.
13 Q.  And so I'm clear, anyone on the Bentley
14      Pharmaceuticals management team other than
15      Mr. Murphy in the preparation of this report?
16 A.  That's correct.  Mr. Murphy was the only one who
17      would have commented on all this.
18 Q.  Do you know if Jordan Horvath ever commented on
19      this?
20 A.  I don't recall him ever commenting.
21 Q.  What did you understand Mr. Horvath's
22      responsibilities to be at Bentley
23      Pharmaceuticals, Incorporated?
24 A.  He was our general counsel, in-house general

Page 113

1       counsel.
2  Q.  And for what was he responsible as in-house
3       general counsel?
4  A.  Whatever general counsel is responsible for.
5       All legal concerns, matters, issues related to
6       the operation of the company.
7  Q.  Do you know if Mr. Horvath had any other
8       responsibilities at the company?
9  A.  Just in relation to the board of directors, and
10      that was hand in glove with his responsibilities
11      as general counsel, to be the counsel at board
12      meetings.
13 Q.  Do you know if Mr. Horvath was general counsel
14      when you were hired at Bentley Pharmaceuticals,
15      Incorporated?
16 A.  Yes, he was.
17 Q.  Is Mr. Horvath general counsel at Bentley
18      Pharmaceuticals today?
19 A.  No, he's not.
20 Q.  Do you know when Mr. Horvath left Bentley
21      Pharmaceuticals?
22 A.  Yes.
23 Q.  When did Mr. Horvath leave Bentley
24      Pharmaceuticals?

29 (Pages 110 to 113)

JT-A-523

Page 114

1    A.  I believe that was April of 2004.
2    Q.  And do you know why Mr. Horvath left Bentley
3        Pharmaceuticals, Incorporated?
4    A.  Yes.
5    Q.  Why did Mr. Horvath leave Bentley
6        Pharmaceuticals, Incorporated?
7    A.  He just no longer fit with the CEO's desires for
8        a general counsel.  They did not see eye to eye
9        on many, many topics and just determined that it
10       was best that he leave the company.
11   Q.  Do you recall what the topics were on which
12       Mr. Horvath and the CEO --
13   A.  Not specifically.
14   Q.  -- did not see eye to eye?  Generally?
15              MS. ABREU:  Objection.
16   A.  Just all I know is there were many, many areas
17       that they disagreed on.  I can't be specific.
18   Q.  Were those areas ever discussed at Bentley
19       Pharmaceuticals management meetings?
20   A.  No.
21   Q.  How were you aware that they did not see eye to
22       eye on many areas?
23   A.  Probably when this was made known to Jordan that
24       they were no longer going to renew his contract,

Page 115

1        and when that was made as public information to
2        the people at the companies.
3    Q.  And that came as a surprise to you?
4              MS. ABREU:  Objection, calls for
5        speculation.
6    A.  Somewhat -- not totally, but somewhat.  I mean
7        I'd be speculating whether it was a surprise or
8        not.
9    Q.  Do you recall being surprised?
10   A.  No, I don't recall being surprised.
11   Q.  Okay.  This may sound a little speculative.  Why
12       do you recall not being surprised?
13              MS. ABREU:  Yes, that is speculative,
14       and I'll put an objection on the record.
15   Q.  You can still answer.
16   A.  I don't know.  To be as truthful as I can on
17       this, I don't recall being surprised or not
18       surprised.  I just know it was a matter of
19       importance when you relieve your general counsel
20       of duties, so it's a major event of interest to
21       everybody at the company.
22   Q.  Did you ever discuss Mr. Horvath leaving the
23       company with Mr. Murphy?
24   A.  No.

Page 116

1    Q.  Did you ever discuss the reasons for Mr. Horvath
2        leaving the company with anyone else at Bentley
3        Pharmaceuticals, Incorporated?
4    A.  No, I did not.
5    Q.  Did you ever discuss the reasons for Mr. Horvath
6        leaving with your spouse?
7    A.  No.
8    Q.  Does Bentley Pharmaceuticals, Incorporated have
9        a general counsel today?
10   A.  Not an in-house counsel, general counsel, no.
11   Q.  If you look at the first topic under Exhibit 11,
12       do you recall where you got the information for
13       Spain activities?
14   A.  I don't recall directly where the information
15       would have come.  I can only say it would have
16       come from Mr. Murphy.  I would not have had any
17       knowledge of this.
18   Q.  I'd like to show you another document.
19              (Copy of E-mail to Mr. Murphy by
20          Mr. Fitzgibbons, dated March 9, 2001 was
21          marked Exhibit Number 12 for
22          identification.)
23              MR. FINE:  While the witness is
24       reviewing the exhibit, I'll identify it for the

Page 117

1        record as a document, three pages, consisting of
2        pages production-numbered BENTL 00590 through
3        92.
4    Q.  Mr. Fitzgibbons, do you recognize this document?
5    A.  I do.
6    Q.  Have you seen this document before?
7    A.  Yes.
8    Q.  When have you seen this document before?
9    A.  On or about the time that it was drafted and
10       send out to the board of directors, and I can't
11       recall.  Let's see.  Around the beginning of
12       March of 2001.  The e-mail was sent around the
13       9th of March.
14   Q.  And what is this document?
15   A.  It's a copy of the March 1st, 2001 -- excuse me.
16       It's a copy of the February 2001 operations
17       update to the board of directors.
18   Q.  And is it also an e-mail forwarding that copy of
19       the Bentley Pharmaceuticals operations update to
20       the board of directors?
21   A.  It's an e-mail from me to Jim Murphy with a copy
22       of what was -- that was sent out to the board of
23       directors on March 1st.
24   Q.  And did you prepare that report to the board of

30 (Pages 114 to 117)

JT-A-524

Page 118

1  directors as part of your job responsibilities
2  at Bentley Pharmaceuticals, Incorporated?
3  A.  I prepared the draft of this report, which was
4  subsequently approved by Jim Murphy and sent
5  out.
6  Q.  And did you prepare that report on or around
7  March 1st, 2001?
8  A.  Yes.
9  Q.  And was that report a record of Bentley
10  Pharmaceuticals, Incorporated, kept in the
11  ordinary course of the company's business?
12  A.  Yes.
13  Q.  If you notice, again, the first subject is Spain
14  activities; is that correct?
15  A.  Yes.
16  Q.  The second subject is product development again;
17  is that correct?
18  A.  Yes.
19  Q.  And the third subject is licensing activities;
20  is that correct?
21  A.  Yes.
22  Q.  Did Mr. Murphy ever explain to you how he wished
23  the report structured?
24  A.  Yes.

Page 119

1  Q.  When did Mr. Murphy do that?
2  A.  As occurring, as the reports were developed.  I
3  mostly settled into a format with minor changes
4  here and there.  I pretty much stuck to the
5  three areas, focus areas.
6  Q.  And did Mr. Murphy propose those three focus
7  areas to you in the first report?
8  A.  Yes.
9  Q.  And the information on Spain activities, do you
10  recall when you received that?
11  A.  I don't recall, but, again, I would have
12  received most of that from Mr. Murphy.
13  Q.  Do you recall receiving any of that information
14  from anyone other than Mr. Murphy?
15  A.  No.
16  Q.  And if you look at product development, you
17  testified with regard to earlier reports to the
18  Bentley Pharmaceuticals board of directors that
19  that information was compiled based on Bentley
20  Pharmaceuticals management meetings.  Is that
21  accurate?
22  A.  Mostly.  It was compiled from -- all of the
23  information taken under 2, product development,
24  was primarily sourced from the management

Page 120

1  meeting reports, again, as edited or changed by
2  Mr. Murphy.
3  Q.  And licensing activities was also sourced from
4  management meeting reports?
5  A.  Similar to my comment that I had for product
6  development, same process.
7  Q.  And I'd like to show you an additional document.
8      (Copy of E-mail to Mr. Bolling, et al.
9      by Mr. Fitzgibbons, dated January 22,
10     2002, and attached Bentley
11     Pharmaceuticals Operations Update -
12     22 January 2002 were marked Exhibit
13     Number 13 for identification.)
14     MR. FINE:  And while the witness is
15  reviewing the exhibit, I'll identify it for the
16  record as a covering e-mail and document
17  consecutively Bates-numbered BENTL 003104
18  through 08.
19  Q.  Mr. Fitzgibbons, do you recognize this document?
20  A.  I do, yes.
21  Q.  Have you seen this document before?
22  A.  Yes.
23  Q.  Can you identify this document?
24  A.  It's the operations update of 22, January, 2002

Page 121

1  to the board of directors.
2  Q.  And did you prepare this operations update for
3  the Bentley Pharmaceuticals board of directors?
4  A.  Yes, I did.  I prepared the draft for subsequent
5  approval by Mr. Murphy.
6  Q.  And do you recall whether -- strike that.  And
7  you prepared this draft -- strike that.  Was
8  this draft sent out to the board of directors?
9  A.  Yes, it was.
10  Q.  And you prepared this report in the ordinary
11  course of your job at Bentley Pharmaceuticals;
12  is that correct?
13  A.  Yes.
14  Q.  And this report is a record of Bentley
15  Pharmaceuticals, Incorporated kept in the
16  ordinary course of the company's business; is
17  that correct?
18  A.  Yes.
19  Q.  And if you look again at the report, it
20  indicates that there are three areas; is that
21  correct?
22  A.  That's correct.
23  Q.  The first again, as in the reports to the
24  Bentley Pharmaceuticals board of directors that

31 (Pages 118 to 121)

JT-A-525

Page 122

1  we've looked at today, is Spain activities; is
2  that correct?
3  A.  Yes.
4  Q.  And the second is product development; is that
5  correct?
6  A.  Yes.
7  Q.  And the third is licensing activities; is that
8  correct?
9  A.  Yes.
10  Q.  And if you look at Spain activities, do you
11  recall who provided you with the information
12  included there?
13  A.  Mostly Jim Murphy.  I may have done some
14  research on my own to get the information on
15  generic drug submissions as subitem K under 1K.
16  Q.  Why do you think you did some research on your
17  own to get that information on generic drugs?
18  A.  Because I recall going through press releases
19  that would identify drug submissions.
20  Q.  Did you ordinarily go through the process of
21  doing your own research on these reports?
22  A.  No.
23  Q.  Do you recall why you went through the process
24  of doing your own research on this report?

Page 123

1  A.  It was to reduce the amount of work for
2  Mr. Murphy, to edit it, and to think on my own a
3  little bit and come up with things that were
4  public information that had already occurred.
5  Q.  Is there anything else under subheading 1, Spain
6  Activities, that reflected your own activity or
7  your own research?
8  A.  No, I would say not.
9  Q.  Did you show a draft of this report to
10  Mr. Murphy?
11  A.  Yes.
12  Q.  Did he review that draft report?
13  A.  Yes.
14  Q.  Did he approve that draft report?
15  A.  Yes.
16  Q.  If you look at product development, can you tell
17  me what the source of the information under the
18  subjects in product development were?
19  A.  Again, mostly from reports of our management
20  meetings and, again, as edited and perhaps
21  changed here and there by Mr. Murphy.
22  Q.  And the third subject, licensing activities?
23  A.  The same comment for that.  Mostly from the
24  management report and, again, as edited or

Page 124

1  changed by Mr. Murphy.
2  Q.  Do you recall anything specific about the
3  circumstances of drafting this operations update
4  for January 22nd, 2002?
5  A.  If I recall -- I'm not sure if it's the first
6  one, but it's a departure from the prior ones.
7  The prior ones were sent out as e-mails.  This
8  was sent out as a Word document, which was an
9  attachment to an e-mail.
10  Q.  Do you recall why this was sent out as a Word
11  document as an attachment to an e-mail?
12  A.  It was getting too lengthy for just text in an
13  e-mail, so we decided to put it into an
14  attachment.
15  Q.  When you say we, do you mean you and Mr. Murphy?
16  A.  Yes.
17  Q.  Did Mr. Murphy approve that change?
18  A.  Yes.
19  Q.  Do you recall anything else about the
20  circumstances of drafting this operations report
21  to the board of directors of Bentley
22  Pharmaceuticals, Incorporated?
23  A.  No, I do not.
24  Q.  Earlier today, you testified that you were

Page 125

1  involved in regulatory work for Bentley
2  Pharmaceuticals; is that correct?
3  A.  Well, yes, but -- I'll just say yes for now.  If
4  you have a follow-on question, I might explain
5  it.
6  Q.  What was your involvement in regulatory work for
7  Bentley Pharmaceuticals?
8  A.  Just to periodically deal with our outside
9  contracted assistance for regulatory work, to
10  maintain certain regulatory files resident at
11  the company premises, and to periodically sit in
12  on any meetings where regulatory planning was
13  accomplished.
14  Q.  And when you say regulatory, do you mean
15  corporate regulatory, Securities and Exchange
16  Commission matters?
17  A.  No.
18  Q.  Do you mean pharmaceutical regulatory?
19  A.  Pharmaceutical regulatory, things pertaining to
20  files to the FDA.
21  Q.  Do you recall being involved in any regulatory
22  matters involving any filings to entities other
23  than the FDA?
24  A.  No.

32 (Pages 122 to 125)

JT-A-526