UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

ETHYPHARM S.A. FRANCE AND
ETHYPHARM S.A. SPAIN,

Plaintiffs,

v.

BENTLEY PHARMACEUTICALS, INC.,

Defendant.

Civil Action No. 04-1300-SLR

## JOINT APPENDIX OF DEPOSITION TRANSCRIPTS

### VOLUME V
### (PAGES A-1012 – A-1230)

Francis J. Murphy (I.D. 223)
**MURPHY SPADARO & LANDON**
1011 Centre Road
Suite 210
Wilmington, DE 19805
(302) 472-8100
(302) 472-8135

*Attorneys for Plaintiffs*

OF COUNSEL:

Dwight P. Bostwick
Jonathan D. Fine
**BAACH ROBINSON & LEWIS PLLC**
1201 F Street, NW.
Suite 500
Washington, D.C. 20004
(202) 833-8900
(202) 466-5738

Dated: August 25, 2006

John L. Reed (I.D. 3023)
Denise Seastone Kraft (I.D. 2778)
Joseph B. Cicero (I.D. 4388)
**EDWARDS ANGELL PALMER & DODGE LLP**
919 N. Market Street, 15th Floor
Wilmington, DE 19801
(302) 777-7770
(302) 777-7263

*Attorneys for Defendant*

OF COUNSEL:

Craig E. Stewart
Joseph P. Mingolla
Veronica C. Abreu
**EDWARDS ANGELL PALMER & DODGE LLP**
111 Huntington Avenue
Boston, MA 02199
(617) 239-0100
(617) 227-442-

## INDEX TO JOINT APPENDIX OF DEPOSITION TRANSCRIPTS

|  | Deponent | Page Nos. |
|---|---|---|
| 1. | Ignacio Alvarez | JT-A-1 – JT-A-57 |
| 2. | Angel Perez de Ayala | JT-A-58 – JT-A-97 |
| 3. | Clemente Gonzalez Azpeitia | JT-A-98 – JT-A-197 |
| 4. | Adolfo de Basilio | JT-A-198 – JT-A-309 |
| 5. | Patrice Debregeas | JT-A-310 – JT-A-432 |
| 6. | Claude Dubois | JT-A-433 – JT-A-494 |
| 7. | Paul Fitzgibbons | JT-A-495 – JT-A-550 |
| 8. | Pierre Germain | JT-A-551 – JT-A-619 |
| 9. | Adolfo Herrera | JT-A-620 – JT-A-702 |
| 10. | Roseline Joannesse | JT-A-703 – JT-A-821 |
| 11. | Gerard Leduc | JT-A- 822 – JT-A-893 |
| 12. | Yves Liorzou | JT-A-894 – JT-A-955 |
| 13. | Lawrence G. Meyer | JT-A-956 – JT-A-1011 |
| 14. | James R. Murphy | JT-A-1012 – JT-A-1113 |

| 15. | Michael D. Price | JT-A-1114 – JT-A-1200 |
|-----|------------------|-----------------------|
| 16. | Concha Sanchez | JT-A-1201 – JT-A-1230 |

Page 1

1                UNITED STATES DISTRICT COURT

2                    DISTRICT OF DELAWARE

3    - - - - - - - - - - - - - - - -

4    ETHYPHARM S.A. FRANCE and        :

5    ETHYPHARM S.A. SPAIN,            :

6              Plaintiffs,            :

7    VS.                             :    CASE NO.

8    BENTLEY PHARMACEUTICALS,         :    04-13000-SLR

9    INC.,                           :

10              Defendant.            :

11   - - - - - - - - - - - - - - - -

12

13        VIDEOTAPED DEPOSITION OF JAMES R. MURPHY,

14   a witness called by and on behalf of the

15   Plaintiffs, taken pursuant to the applicable

16   provisions of the Federal Rules of Civil

17   Procedure, before Sandra L. Bray, Registered

18   Diplomate Reporter, CSR Number 103593, and

19   Notary Public in and for Commonwealth of

20   Massachusetts, at the offices of Edwards Angell

21   Palmer & Dodge LLP, 111 Huntington Avenue,

22   Boston, Massachusetts, on Wednesday, July 19,

23   2006, commencing at 9:25 a.m.

24

JT-A-1012

Page 2

```
1   APPEARANCES:
2     Representing the Plaintiffs:
3       BAACH ROBINSON & LEWIS PLLC
4       1201 F Street, NW
5       Suite 500
6       Washington, D.C. 20004
7       BY: JONATHAN D. FINE, ESQUIRE
8
9     Representing the Defendant:
10      EDWARDS ANGELL PALMER & DODGE LLP
11      111 Huntington Avenue
12      Boston, Massachusetts 02199
13      BY: CRAIG E. STEWART, ESQUIRE
14
15    Representing Laboratorios Belmac S.A.:
16      IBERFORO
17      28014 Madrid-Cl
18      Marques de Cubas, 6
19      Madrid, Spain
20      BY: REBECA CORRAL GREGORIO, ESQUIRE
21          RAFAEL GARCIA-PALENCIA, ESQUIRE
22
23    ALSO PRESENT:
24      Kristin Zarnetske, Videographer
```

Page 4

```
1        E X H I B I T S, Continued
2   NO.     DESCRIPTION        PAGE NO.
3   11    Fax to Mr. De Basilio from
            Mr. Murphy, dated 11-19-95      89
4
    12    Letter of Intent          97
5
    13    Draft of Manufacturing
6           Agreement           107
7   14    3-28-95 Diary Entry        109
8   15    Fax to Mr. De Basilio from
            Mr. Murphy, dated 4-4-95        110
9
    16    4-18-95 Diary Entry        112
10
    17    5-2-95 Diary Entry        114
11
    18    Fax to Mr. De Basilio from
12          Mr. Murphy, dated 6-26-95       115
13  19    Fax to Mr. DeBregeas from
            Mr. Murphy, dated 7-13-95       116
14
    20    Bentley Pharmaceuticals Board
15          of Directors 10-8-96 Meeting
            Minutes          122
16
    21    Fax to Mr. Dubois, et al.
17          from Mr. Murphy, dated
            1-21-97, and Translation      125
18
    22    Fax to Mr. DeBregeas from
19          Mr. Murphy, dated 1-28-97       130
20  23    2-5-97 Diary Entry        140
21  24    Letter to Mr. Murphy from
            Mr. Dubois, dated 2-13-97       144
22
    25    8-28-97 Diary Entry        151
23
    26    Fax to Ms. Vaquero from
24          Ms. Laura, dated 3-31-98        154
```

Page 3

```
1          I N D E X
2   WITNESS:             PAGE NO.
3   JAMES R. MURPHY
4   BY MR. BOSTWICK            8, 278
5   BY MR. STEWART            265, 283
6
7          E X H I B I T S
8
    NO.    DESCRIPTION      PAGE NO.
8
9   1   Declaration of James R. Murphy      10
9
10  2   Bentley Pharmaceuticals Board
10        of Directors 11-13-97 Meeting
          Minutes          21
11
11  3   Bentley Pharmaceuticals Board
12        of Directors 7-29-98 Meeting
          Minutes          23
12
13  4   2-page Document, Bates Nos.
14        EP 002865 - EP002866, and
          Translation          36
15
15  5   Bentley Pharmaceuticals Board
16        of Directors 10-13-00 Meeting
          Minutes          42
16
17  6   2-page Document and
18        Translation          46
18  7   Presentation to Perrigo       52
19  8   Confidentiality & Non-
20        Disclosure Agreement        75
21
21  9   Letter to Mr. De Basilio from
22        Mr. Murphy, dated 12-6-94       80
22  10  Belmac Corporation Board
23        of Directors 12-8-94 Meeting
24        Minutes          85
```

Page 5

```
1        E X H I B I T S, Continued
2   NO.     DESCRIPTION        PAGE NO.
3   27    4-2-98 Diary Entry        155
4   28    Fax to Mr. Rodriguez from
            Ms. Joannesse, dated 4-8-99     168
5
    29    Letter to Mr. DeBregeas from
6           Mr. Murphy, dated 4-9-99        170
7   30    Fax to Mr. DeBregeas from
            Mr. Murphy, dated 4-9-99,
8           and Enclosure        171
9   31    Contrato de Fabricacion and
            Translation          174
10
    32    Carta de Compromiso de Compra
11          and Translation        174
12  33    Fax to Mr. Germain from
            Mr. Murphy, dated 10-6-00       182
13
    34    Letter to Mr. De Basilio from
14          Mr. Herrera, dated 11-14-01,
            and Translation        189
15
    35    Copy of E-mail to Mr. Horvath
16          from Mr. Fitzgibbons, dated
            11-2-00, and Attachment      197
17
    36    Diary Entry headed "Action
18          Items - for Friday 02-16-01"     202
19  37    Copy of E-mail to Mr. Murphy,
            et al. from Mr. Fitzgibbons,
20          dated 3-1-01         205
21  38    3-27-01 Diary Entry        208
22  39    5-22 and 5-23-01 Diary Entries   211
23  40    Fax to Mr. Murphy from
            Mr. Leduc, dated 6-8-01,
24          and Draft of Agreement      214
```

2 (Pages 2 to 5)

JT-A-1013

Page 6

```
 1       E X H I B I T S, Continued
 2   NO.    DESCRIPTION          PAGE NO.
 3
     41    Fax to Mr. Murphy from
 4         Mr. Herrera, dated 6-15-01    216
 5   42    7-13-01 Diary Entry          219
 6   43    Diary Entry          223
 7   44    Fax to Mr. Murphy from
           Ms. Joannesse, dated 8-10-01   228
 8
     45    Bentley Pharmaceuticals Board
 9         of Directors 8-30-01 Meeting
           Minutes              230
10
     46    Fax to Mr. Murphy from
11         Ms. Joannesse, dated 9-17-01    233
12   47    Copy of E-mail to Mr. Price,
           et al. from Mr. Simmons,
13         dated 10-23-01, and Attachment  234
14   48    Press Release, dated 11-14-01    239
15   49    Confidentiality Agreement      245
16   50    Copy of E-mail to Mr. Murphy,
           et al. from Mr. Fitzgibbons,
17         dated 11-30-01, and Attachment   247
18   51    Diary Entry              250
19   52    Contrato de Transferencia de
           Tecnologia y Cesion de Know
20         How and Translation        252
21   53    Copy of E-mail to Mr. Murphy
           from Ms. Sanchez, dated 1-3-02   260
22
     54    Copy of E-mail to Mr. Bolling,
23         et al. from Mr. Fitzgibbons,
           dated 1-22-02, and Attachment   262
24
```

Page 7

```
 1       P R O C E E D I N G S
 2   (The New Hampshire driver's license
 3   number as identification of the deponent
 4   was noted for the record.)
 5       THE VIDEOGRAPHER: This is Tape Number
 6   1 of the videotaped deposition of Mr. James R.
 7   Murphy, taken by Plaintiffs in the matter of
 8   Ethypharm S.A. France and Ethypharm S.A. Spain,
 9   Plaintiffs, versus Bentley Pharmaceuticals, Inc.
10   Defendants, in the United States District Court,
11   District of Delaware, Case Number 04-13000(SLR).
12   This deposition is being held on July 19th, 2006
13   at approximately 9:25 a.m.
14       My name is Kristin Zarnetske. I'm a
15   legal videographer representing Esquire
16   Deposition Services. The court reporter, also
17   in association with Esquire, is Sandra Bray.
18   This deposition is being held at the law firm of
19   Edwards Angell Palmer & Dodge at 111 Huntington
20   Avenue, Boston, Massachusetts.
21       Will counsel present please introduce
22   themselves for the record?
23       MR. BOSTWICK: Yes, Dwight Bostwick on
24   behalf of Ethypharm S.A. France and Ethypharm
```

Page 8

```
 1   S.A. Spain, and with me is Jonathan Fine.
 2       MR. STEWART: Craig Stewart on behalf
 3   of Bentley Pharmaceuticals, INC. Also present
 4   is Rafael Garcia-Palencia and Rebeca Corral of
 5   the law firm of IberForo, counsel for
 6   Laboratorios Belmac S.A.
 7       THE VIDEOGRAPHER: Thank you. Will
 8   the court reporter please swear in the witness?
 9       JAMES R. MURPHY, having duly sworn or
10   affirmed that his testimony would be the truth,
11   the whole truth, and nothing but the truth,
12   testified as follows:
13              *  *  *
14   EXAMINATION BY MR. BOSTWICK:
15   Q.  Mr. Murphy, could you give us your full name for
16       the record, please?
17   A.  James R. Murphy.
18   Q.  That's M U R P H Y?
19   A.  Correct.
20   Q.  You are employed by Bentley Pharmaceuticals,
21       Inc.?
22   A.  Correct.
23   Q.  What is your current position there?
24   A.  Chairman and CEO.
```

Page 9

```
 1   Q.  And that's a publicly traded company?
 2   A.  Yes, it is.
 3   Q.  Have you had your deposition taken before?
 4   A.  Never.
 5   Q.  The process is a relatively straightforward one
 6       where I'll ask you questions and you are
 7       required to answer. Correct?
 8   A.  Okay.
 9   Q.  And you need to answer in -- verbally because
10       the court reporter can't take down a nod of the
11       head. All right?
12   A.  Okay.
13   Q.  The parties have agreed in this case that once
14       the deposition begins you're not permitted to
15       consult with your counsel about the substance of
16       the testimony. Do you understand that?
17   A.  Yes.
18   Q.  And you can take a break at any time. The only
19       exceptions to that is that we won't be breaking
20       in between a question and an answer.
21   A.  Yes. I might have to take quite a few breaks
22       because of heart medication. I drink a lot of
23       water.
24   Q.  Certainly if you have any issues in terms of
```

Page 10

1    that, just tell me immediately. All right?
2    A. Sure.
3    Q. Now, you've just been sworn in by the court
4       reporter, correct?
5    A. Yes, that's correct.
6    Q. And that means that the testimony today is given
7       under penalty of perjury, which is a criminal
8       statute. Do you understand that?
9    A. Yes.
10   Q. And this means that you can't testify falsely
11      and can't leave out important material
12      information from your answers. Do you
13      understand that?
14   A. Yes.
15   Q. Now, given your official position in a publicly
16      traded company, you may have other duties to
17      shareholders to tell the truth and be forth-
18      coming in the lawsuit. Do you understand that
19      as well?
20   A. Yes, I do.
21   Q. Now, I'm going to show you an exhibit that I'm
22      going to mark as Exhibit 1.
23          (Declaration of James R. Murphy was
24          marked Exhibit Number 1 for

Page 11

1        identification.)
2    Q. And I'll ask you if you recognize that document.
3    A. Yes, I recognize it.
4    Q. You recognize that document to be a declaration
5       that you signed in this case?
6    A. Yes.
7    Q. And if you look at Paragraph 27 on Page 8, that
8       also indicates that you signed this under
9       penalty of perjury as well; is that correct?
10   A. Yes.
11   Q. And the next page, Page 9, that was -- that's
12      your signature there?
13   A. Yes, it is.
14   Q. Okay. And that was executed on the 3rd of
15      November, 2004, correct?
16   A. That is correct.
17   Q. Okay. Did you review that document carefully
18      before you signed it?
19   A. Yes, I did.
20   Q. Okay. And have you reviewed it in anticipation
21      of your deposition here today?
22   A. Yes, I have.
23   Q. Okay. Are all of the statements in this
24      document true and correct?

Page 12

1    A. I believe, yes.
2    Q. Now, Bentley also files public disclosures with
3       the SEC; is that correct?
4    A. Yes.
5    Q. And press releases to the public to give
6       shareholder -- shareholders information about
7       the company?
8    A. Yes.
9    Q. Is this sworn declaration consistent with the
10      positions you've taken before the SEC and in the
11      public?
12   A. I believe they are.
13   Q. Does Bentley have a compliance officer in charge
14      of complying with Sarbanes-Oxley --
15   A. Yes.
16   Q. -- and other similar regulations?
17   A. Yes, they do.
18   Q. What's the name of that individual?
19   A. That would be Bob Hebert.
20   Q. How do you spell that last name?
21   A. H E B E R T.
22   Q. How long has he held that position?
23   A. I believe he's been there about three years.
24   Q. Has he been apprised of the facts and

Page 13

1        circumstances of this lawsuit?
2    A. He is aware of the lawsuit. He does not know
3       any of the details. He has not sat down and
4       heard any of the details.
5    Q. If you look at the first page of Exhibit 1 here
6       and the title of that document, was that sworn
7       declaration submitted in support of the motion
8       to dismiss this lawsuit?
9    A. I do not know.
10   Q. Okay. Is that what it says here, "Declaration
11      of James Murphy in Support of Defendant Bentley
12      Pharmaceuticals' Motion to Dismiss"?
13   A. That's what it says.
14   Q. And you're aware this lawsuit seeks $40 million
15      in damages?
16   A. Yes.
17   Q. Is it fair to say that one of the main purposes
18      for this declaration was to convince the court
19      that Laboratorios Belmac is a separate and
20      distinct operation from Bentley in the U.S.?
21          MR. STEWART: Objection to the extent
22      that it calls for -- that it calls for
23      information that this witness has through
24      discussions and conversations with counsel.

4 (Pages 10 to 13)

Page 14

1  A.  I don't know what the intent of this was, if it
2     was only for that or was to present other facts
3     or accumulation of facts. I don't know.
4  Q.  Let's take a look at some of these statements in
5     this declaration. And before we do, in your
6     declaration, you have referred throughout to
7     Bentley Pharmaceuticals, Inc. simply as Bentley;
8     is that correct?
9  A.  Could you repeat that?
10 Q.  Well, let's look at the first paragraph. Okay?
11    And that reads, "I'm chairman, president, chief
12    executive officer, and director of Bentley
13    Pharmaceuticals, Inc.," and then in parentheses,
14    it has a quote "Bentley." Do you see that?
15 A.  I see that.
16 Q.  My question is, throughout this affidavit or --
17    this sworn declaration, you referred to
18    headquarters in the U.S. Bentley
19    Pharmaceuticals, Inc. as Bentley; is that
20    correct?
21 A.  That is correct.
22 Q.  I'm going to do the same thing in my questions
23    to you, all right, for consistency sake. Is
24    that fair?

Page 15

1  A.  Sure.
2  Q.  And that's -- I just want to point out that
3     that's true even though at one point in time
4     Bentley Pharmaceuticals, Inc. was called Belmac
5     Corporation U.S.A.; is that right?
6  A.  It was.
7  Q.  So if you have any problems understanding the
8     question because of that, you just tell me right
9     away. All right?
10 A.  Yes, I will.
11    MR. STEWART: Just for --
12 A.  And also, I might on occasion say "we" when I'm
13    referring to Laboratorios Belmac or to Bentley
14    because when I go on to Wall Street, I talk
15    about us on a consolidated basis. So I could
16    make that same error, and I'll try to correct
17    it.
18 Q.  As we're going through, we'll both try to be
19    mindful of that.
20 A.  Okay.
21 Q.  If there seems to be any misunderstanding
22    developing, let's try to clear it up
23    immediately. Okay?
24 A.  Yes.

Page 16

1  Q.  And you've also referred to Laboratorios Belmac
2     in this affidavit as just Belmac; is that
3     correct? I'll use the term "declaration."
4  A.  Where?
5  Q.  Paragraph 5, and it's on the next page,
6     Laboratorios Belmac, S.A., and then you refer to
7     it as just Belmac. Do you see that?
8  A.  Yes, I see that.
9  Q.  So I'll do the same for purposes of my
10    questioning. All right?
11 A.  Thank you.
12    MR. STEWART: Just as a short point of
13    clarification, to my knowledge, there is -- the
14    predecessor company name is Belmac Corporation,
15    not Belmac Corporation U.S.A.
16    MR. BOSTWICK: Okay. The predecessor
17    corporation of Bentley Pharmaceuticals, Inc.?
18    MR. STEWART: In name, yes.
19 Q.  But generally when I'm referring to
20    headquarters, I'll say Bentley. Okay?
21 A.  Okay.
22 Q.  And generally when I'm referring to the
23    subsidiary in Spain, I'll say Belmac or
24    Laboratorios Belmac. Okay?

Page 17

1  A.  Yes.
2  Q.  Let's look at Paragraph 8 of that declaration.
3     Now, the last sentence of that paragraph -- the
4     second sentence of that paragraph reads, "Belmac
5     hires its own employees and makes employment
6     decisions regarding these employees, including
7     salaries." Do you see that?
8  A.  Yes.
9  Q.  The general manager of Laboratorios Belmac is an
10    employee of Laboratorios Belmac, correct?
11 A.  Yes.
12 Q.  And is it your view that the general manager of
13    Laboratorios Belmac is the most important
14    employee of Laboratorios Belmac?
15 A.  Yes.
16 Q.  In 1994 and 1995, didn't you make the decision
17    to fire Perez de Ayala, the general manager of
18    Spain?
19 A.  Yes.
20 Q.  What was the date of that?
21 A.  I don't remember.
22 Q.  Okay.
23 A.  But it was in that time frame that you say.
24 Q.  And you were the president of Bentley at that

Page 18

1   time, correct?
2   A. I was the president of Belmac Corporation, now
3       Bentley.
4   Q. Okay. And thanks for that clarification. In
5       1995, you made the decision to hire Clemente
6       Gonzalez as general manager of Laboratorios
7       Belmac, correct?
8   A. Not correct.
9   Q. Okay. What is current?
10  A. He was already an employee. He was an employee,
11      and I don't know who hired him; and I just moved
12      him into that position.
13  Q. Okay. So you made the decision to move
14      Mr. Gonzalez to the position of general manager
15      of --
16  A. Yes.
17  Q. -- Laboratorios Belmac?
18  A. Yes.
19  Q. And at that time, you were chairman and CEO of
20      Bentley?
21  A. Yes, yes --
22  Q. Which --
23  A. No, I take that back. At that time, I think I
24      was just president of Belmac Corporation.

Page 19

1   Q. Which --
2   A. I was elevated to the position of chairman and
3       CEO I believe it was in '95 sometime, late '95.
4       I'm not sure of the exact date.
5   Q. Okay. And when you said Belmac Corporation just
6       then, you meant the Belmac Corporation that then
7       became Bentley, correct?
8   A. That is correct.
9   Q. Headquarters in the U.S.A.?
10  A. Correct.
11  Q. In 1999, you made the decision to replace
12      Clemente Gonzalez Azpetia with Adolfo Herrera,
13      correct?
14  A. No, that is not correct.
15  Q. What is correct?
16  A. Clemente Gonzalez felt that Adolfo was more
17      qualified and asked for Adolfo to become general
18      manager, and I looked at the situation and
19      agreed with Clemente's decision and
20      recommendation for such.
21  Q. Okay. Did you hold the authority to make that
22      decision?
23  A. I was president of Laboratorios -- and still am
24      of Laboratorios Belmac, and in my capacity as

Page 20

1   president, he would come to me and ask me, and I
2   would give him the authorization go ahead and do
3   it because he had -- Clemente had operational
4   control of the company. He consulted with me.
5   I agreed and allowed him to do it.
6   Q. Okay. You were chairman and CEO of Bentley
7       Pharmaceuticals at the time?
8   A. Yes.
9   Q. Okay. And just to clarify, that's at the time
10      Mr. Herrera became general manager of
11      Laboratorios Belmac, correct?
12  A. Yes.
13  Q. Is it true that you currently have the legal
14      authority to fire Adolfo Herrera at any time?
15  A. Yes.
16  Q. Now, let me read the sentence I read to you
17      again, in Paragraph 8. "Belmac hires its own
18      employees and makes employment decisions
19      regarding the employees, including salaries."
20      Do you see that?
21  A. Yes.
22  Q. The portion of that statement relating to
23      salaries, isn't it true that the Bentley board
24      of directors approves the salary of the general

Page 21

1   manager at Laboratorios Belmac?
2   A. Yes.
3   Q. Let's look at Exhibit 2. We'll keep that
4       Exhibit 1 to the side because we'll be referring
5       back to it.
6           (Bentley Pharmaceuticals Board of
7           Directors November 13, 1997 Meeting
8           Minutes were marked Exhibit Number 2 for
9           identification.)
10  Q. Okay. I'm going to show you this document and
11      ask you, just by looking at the first page, if
12      you recognize what that document is.
13  A. I recognize what is minutes of the meeting of
14      board of directors.
15  Q. So these are Bentley board minutes that are
16      produced by Bentley Pharmaceuticals in the
17      ordinary course of its business?
18  A. Yes.
19  Q. And on the first page, it says this is a meeting
20      held on November 13th, 1997. Do you see that?
21  A. Yes.
22  Q. And it says that you're present as a board
23      member; is that correct?
24  A. Yes.

6 (Pages 18 to 21)

JT-A-1017

Page 22

1    Q.   And in 1997, you're attending that board meeting

2         as the chairman of the board and the CEO of the

3         company, correct?

4    A.   Yes.

5    Q.   When I say the company, I mean Bentley.

6    A.   Bentley.

7    Q.   Now, let me direct your attention to Page 2678.

8         And the first paragraph down, it says, "The

9         meeting was then recessed in order to

10        accommodate a meeting of the compensation

11        committee of the board." And that's the Bentley

12        board, correct?

13   A.   Yes.

14   Q.   "Upon the conclusion of the compensation

15        committee meeting, the board meeting was

16        reconvened. The compensation meeting presented

17        Mr. Murphy's proposal for Mr. Gonzalez's

18        compensation adjustment along with its

19        recommendation to the members of the board that

20        its proposal be approved." Do you see that?

21   A.   Yes.

22   Q.   And then you see how it was approved by the

23        Bentley board of directors that Clemente

24        Gonzalez would be given a 10 percent bonus and

Page 23

1         salary increase?

2    A.   He would be given a salary increase of

3         10 percent and an equivalent -- a bonus

4         equivalent of that award in a prior year.

5    Q.   I see. And thank you for that. That is a

6         clarification. So this is an increase of

7         10 percent plus a bonus; is that correct?

8    A.   Yes, uh-huh.

9    Q.   So it's true that the salary of the top employee

10        at Laboratorios Belmac is set by the Bentley

11        board, correct?

12   A.   Yes, it is. The increases and bonuses are set

13        by the board.

14   Q.   Now, let me show you -- isn't it true that the

15        Bentley board of directors also awards Bentley

16        stock options to Laboratorios Belmac employees?

17   A.   Yes.

18   Q.   Let me show you a third exhibit.

19             MR. BOSTWICK: That should be Number

20        3.

21             (Bentley Pharmaceuticals Board of

22        Directors July 29, 1998 Meeting Minutes

23        were marked Exhibit Number 3 for

24        identification.)

Page 24

1    Q.   And I'll ask you if you recognize that to be

2         Bentley board of directors minutes from

3         July 29th, 1998.

4    A.   Yes.

5    Q.   And again, you were attending as the chairman

6         and CEO of Bentley, correct?

7    A.   Yes.

8    Q.   Let me turn your attention to Page 2619. And

9         midway down the page, do you see the indication

10        that Mr. Murphy then informed the members of the

11        board that the company had granted a total of

12        56,000 stock purchase options to various members

13        of the Spanish team? Do you see that?

14   A.   Yes.

15   Q.   And by the board, that means the Bentley board,

16        not the Belmac board, correct?

17   A.   The Bentley board of directors.

18   Q.   And do you see on these -- Page 2619 and 2620,

19        there's approximately fifteen employees who

20        receive stock options, both Bentley stock,

21        correct?

22   A.   Yes.

23   Q.   And that's a true statement that that's, in

24        fact, what occurred?

Page 25

1    A.   Yes.

2             MR. STEWART: I would just ask that

3         you offer to the witness the opportunity to

4         review the entirety of the document in the event

5         that he feels the need. I understand you

6         directed his attention to a particular portion.

7         I want that to be made clear.

8    Q.   Look, there's a lot -- Mr. Murphy, there's a lot

9         in these board minutes. I believe this is the

10        only portion that discusses the salary increase,

11        but you're free -- if my questions don't make

12        sense to you based on what you're reading,

13        you're certainly free to look at it further.

14        Okay? Do you understand that?

15   A.   Yes.

16   Q.   But basically the point is that the Bentley

17        board, not the Laboratorios Belmac board,

18        authorized Bentley stock options for

19        approximately fifteen top Belmac employees; is

20        that correct?

21   A.   Yes.

22   Q.   And that's in 1998, correct?

23   A.   Yes.

24   Q.   Did that happen at other times?

7 (Pages 22 to 25)

JT-A-1018

Page 26

1  A.  Yes, it has.
2  Q.  Okay.  Approximately how many Laboratorios
3     Belmac employees have been given stock options
4     of Bentley stock?
5  A.  I don't know exactly.
6  Q.  Okay.  It's more than these fifteen?
7  A.  It's approximately fifteen.
8  Q.  Who has the most from Laboratorios Belmac?
9          MR. STEWART:  At the present time?
10         MR. BOSTWICK:  At the present time,
11    yes.
12         MR. STEWART:  At the present time in
13    aggregate?
14         MR. BOSTWICK:  Yes.
15         MR. STEWART:  I'm sorry.  When you say
16    the most --
17         MR. BOSTWICK:  I'll rephrase the
18    question.
19  Q.  Who within Laboratorios Belmac has received the
20    most Bentley shares in the aggregate from
21    Bentley Pharmaceuticals, Inc.?
22  A.  I'm not sure because Clemente Gonzalez was with
23    us for a longer period of time.  Adolfo --
24    probably Adolfo.

Page 27

1  Q.  Adolfo Herrera?
2  A.  Right.
3  Q.  So it would likely be one of the two last
4     general managers, either Adolfo Herrera or
5     Dr. Clemente Gonzalez?
6  A.  The largest portion has gone to the general
7     manager.
8  Q.  Let me have you take a look at Paragraph 8 again
9     of your declaration.  It says -- that sentence I
10    read you earlier says, "Belmac hires its own
11    employees and makes employment decisions
12    regarding these employees, including salaries."
13    Do you see that?
14  A.  Yes.
15  Q.  Mr. Murphy, when you swore under penalty of
16    perjury that Belmac hires its own employees and
17    makes employment decisions regarding these
18    employees, including salaries, didn't you think
19    it was important to disclose to the court that
20    you as the CEO and chairman of the board have
21    hired or fired every single general manager of
22    Laboratorios Belmac since 1994?
23  A.  That's not correct.  I already explained that to
24    you.

Page 28

1  Q.  Okay.  And didn't you think it was important to
2     disclose to the court that Bentley's board of
3     directors and its compensation committee, not
4     Belmac, approves the general manager's salary
5     for Laboratorios Belmac's general manager?
6  A.  The board approves the general manager's salary.
7  Q.  Okay.  And didn't you think it was important to
8     inform the court that Bentley's board of
9     directors has given shares of stock to at least
10    fifteen of Bentley's top employees?
11  A.  The shares of stock were given to the employees
12    upon the recommendation of the general manager
13    in each year.  The general manager made the
14    recommendation.
15  Q.  In other words, the general manager, like Adolfo
16    Herrera, recommends that he receives a bonus?
17  A.  No.  The general manager, as I said, is reviewed
18    by the board of directors.  The general manager
19    makes recommendations for all the other
20    employees.
21  Q.  Okay.  And Bentley votes to approve or
22    disapprove of that, correct?
23  A.  Correct.
24  Q.  My question to you is, don't you think this is

Page 29

1     at best a very misleading statement, that Belmac
2     hires its own employees and makes employment
3     decisions regarding these employees, including
4     salaries?
5  A.  No.
6          MR. STEWART:  Objection,
7     argumentative.  You may answer.
8  A.  No.
9  Q.  You do not think it's true?
10 A.  I do not think it's true.
11 Q.  Let's take a look at another of these sworn
12    statements in the declaration.  Why don't you
13    look at Paragraph 7?  And the second to last
14    line reads, "Belmac elects its own board of
15    directors."  Do you see that?
16 A.  Yes.
17 Q.  Okay.  That's not really a true statement; is
18    it?
19 A.  By way of the statutory rules of Spain, we
20    followed that and --
21 Q.  Isn't it true -- I'm sorry.
22 A.  And we file.
23 Q.  I'm sorry?
24 A.  We make the elections and we file everything

8 (Pages 26 to 29)

JT-A-1019

Page 30

1  properly in Spain.
2  Q. When you say "we," who do you mean?
3  A. The board of Belmac.
4  Q. Isn't it true that the members of the
5  Laboratorios Belmac board are elected at a
6  Bentley shareholder meeting?
7  A. I believe that they are probably ratified at the
8  meeting.
9  Q. Bentley has been the sole shareholder of
10  Laboratorios Belmac since 1993 or 1994, correct?
11  A. I think it's been before that. I think it was
12  1992.
13  Q. Okay. And Bentley as the sole shareholder
14  elects the Belmac board of directors; doesn't
15  it?
16  A. I don't recall.
17  Q. In fact, Mr. Murphy, at these Bentley
18  shareholder meetings where the board of
19  directors of Belmac is chosen, you are the one
20  who's personally designated to vote the shares
21  of Bentley; isn't that true?
22  A. I'm not sure.
23  Q. Isn't it also true that Bentley's choice for the
24  board of directors of Laboratorios Belmac has

Page 31

1  always been to elect a majority of Bentley
2  officers to the board of directors of
3  Laboratorios Belmac?
4  A. I don't know that for a fact.
5  Q. In other words --
6  A. I mean that is the way it is because there are
7  two members from the U.S., but I don't know if
8  that is necessarily a policy.
9  Q. Okay. Isn't it true that it's always --
10  Laboratorios Belmac in Spain has always had a
11  majority of Bentley officers and directors on
12  the Laboratorios Belmac board?
13  A. I believe so.
14  Q. And this means that Bentley has the authority to
15  control the actions of Belmac; doesn't it?
16      MR. STEWART: Objection.
17  A. There is a majority of U.S. employees -- Bentley
18  employees on the board.
19  Q. I'm going to refer you back to this sentence in
20  Paragraph 7 of your sworn declaration. It says,
21  "Belmac elects its own board of directors."
22  That's false; isn't it?
23  A. No.
24  Q. Okay. Mr. Murphy, when you swear under penalty

Page 32

1  of perjury that Belmac elects its own board of
2  directors, don't you think it's important to
3  make it clear to the court that you as the
4  chairman and CEO of Bentley vote 100 percent of
5  the shares at the shareholders meeting to choose
6  the Belmac board of directors?
7      MR. STEWART: Objection,
8  argumentative.
9  A. I am Belmac's president -- Laboratories Belmac's
10  president and a board member.
11  Q. But that's not how you vote the shares to
12  determine who becomes a Laboratorios Belmac
13  board member; is it?
14      MR. STEWART: Objection, asked and
15  answered.
16  A. I don't know.
17  Q. Don't you think it's important to inform the
18  court that Bentley has always elected a
19  Laboratorios Belmac board that has a majority of
20  Bentley officers and directors?
21      MR. STEWART: Objection,
22  argumentative.
23  A. Can you ask me again?
24      MR. BOSTWICK: Could you read back the

Page 33

1  question, please?
2      (Reporter read back the last question.)
3  A. No.
4  Q. The current board today of Laboratorios Belmac,
5  does that consist of four people; you,
6  Mr. Price, Mr. Herrera, and Mr. or Ms. Esteve?
7  Is that correct?
8  A. No, I believe there are three.
9  Q. Who are the three?
10  A. It's Mike Price, myself, and Adolfo Herrera, I
11  believe.
12  Q. And you're the number one person at Bentley,
13  correct?
14  A. Yes.
15  Q. And Mr. Price is the CFO of Bentley?
16  A. Yes.
17  Q. And that's, effectively, the number two person
18  at Bentley?
19  A. No.
20  Q. Okay. Who would you consider to be the number
21  two person at Bentley?
22  A. The president.
23  Q. Who is?
24  A. John Sedor.

9 (Pages 30 to 33)

JT-A-1020

Page 34

1   Q.  That's S E --
2   A.  D O R.
3   Q.  -- D O R?  And at any rate, Mr. Price is a top
4       official of Bentley, correct?
5   A.  He is an executive.
6   Q.  Of Bentley?
7   A.  Bentley.
8   Q.  All right.  And Adolfo Herrera, is he also a
9       vice president of Bentley?
10  A.  Yes.
11  Q.  Was he a vice president of Bentley when you
12      signed this affidavit in November of 2004?  And
13      I should say declaration, not affidavit.
14  A.  I don't know whether he was at that time or not.
15  Q.  Let me turn your attention to Paragraph 9 of the
16      affidavit, this sworn declaration.  You state,
17      "Adolfo Herrera has significant autonomous
18      authority over the operations of Belmac."  Do
19      you see that?
20  A.  Yes.
21  Q.  "And the extent of Mr. Herrera's authority is
22      contained in the delegation of power from the
23      Belmac board of directors."  Do you see that?
24  A.  Yes.

Page 35

1   Q.  Isn't it true that the delegation of power
2       doesn't come from the Belmac board of directors,
3       but it comes from you as the consejero delegado
4       unico?
5   A.  Yes.  You understand that that means that I am a
6       director.
7   Q.  Okay.  What do you understand --
8           MR. BOSTWICK:  Let me spell this just
9       so -- it's in Spanish.
10  A.  Consejero delegado.
11          MR. BOSTWICK:  But for the court
12      reporter's benefit, let me make sure we have
13      that correct.  Consejero, I believe, would be
14      C O N S E J E R O.  Delegado would be
15      D E L E G A D O, and unico would be U N I C O, I
16      believe.
17  Q.  Okay.  And why don't you tell me what you
18      understand that term to mean?
19  A.  That is the highest position in a board member.
20  Q.  The highest position of the Spanish company and
21      a board member?
22  A.  Uh-huh.
23  Q.  And you have held this position of consejero
24      delegado unico at Laboratorios Belmac since

Page 36

1       February of 1995; is that correct?
2   A.  Approximately.
3   Q.  Isn't the consejero delegado unico the sole
4       person with complete power over the company to
5       delegate as he requests?
6   A.  I believe.
7   Q.  Okay.  So the authority that Mr. Herrera is
8       given is not given from the Belmac board of
9       directors; it's given by you as the consejero
10      delegado unico; isn't it?
11  A.  I never thought of the distinguishment of where
12      that came from, whether as me as the chief
13      executive of Laboratorios Belmac or whether from
14      consejero delegado.
15  Q.  Just a moment.  I want to show you a document
16      that I don't have in front of me.
17          MR. STEWART:  Off the record just for
18      a moment.  A water break.
19          MR. BOSTWICK:  Fine.
20          THE VIDEOGRAPHER:  The time is 10 a.m.
21      We're going off the record.
22          (Recess)
23          (2-page Document, Bates Nos.
24      EP 002865 - EP002866, and Translation

Page 37

1       was marked Exhibit Number 4 for
2       identification.)
3           THE VIDEOGRAPHER:  The time is
4       10:01 a.m.  We're back on the record.
5   Q.  Okay.  I'm going to show you what's been marked
6       as Exhibit 4, and I'll represent that this is
7       what was given to us by your counsel as being
8       directly responsive to the legal document that
9       conferred power on Mr. Herrera.  Okay?  And I
10      realize it's in Spanish, which is difficult for
11      both you and me, but we've translated just the
12      first couple of paragraphs of it on the back
13      there.  Do you see that?
14          MR. BOSTWICK:  And, Craig, I'm sorry,
15      you may have to look over his shoulder; we only
16      have two of the translations.  We just made a
17      mistake in copying.  I apologize for that.
18          MR. STEWART:  If I can have a moment
19      to look at the translation.
20          MR. BOSTWICK:  Sure.
21          MR. STEWART:  First, I'll let the
22      witness look at it.
23          MR. BOSTWICK:  Maybe you can both do
24      it at the same time.  It's short.

10 (Pages 34 to 37)

JT-A-1021

Page 38

1  Q.  Really, I'm only concerned with the top two
2      paragraphs, not the third one for my question.
3          Okay? Let me ask you whether it's
4      your understanding that that says that
5      Mr. Murphy as the delegated counselor or the
6      consejero delegado unico is delegating the
7      limited powers to Mr. Herrera.
8          MR. STEWART: Objection to the extent
9      that this calls for a legal conclusion from this
10     witness with respect to the laws of Spain.
11  A.  I hesitate to comment on this because when this
12     was being granted -- the powers were being
13     granted, there was an interpreter -- there was
14     an interpreter telling me this entire document.
15     You've got only one paragraph here. I don't
16     feel comfortable answering this.
17  Q.  Well, you have held this position of consejero
18     delegado unico for over ten years, correct?
19  A.  Yes.
20  Q.  Okay. And isn't it true that this document
21     doesn't refer to the Belmac board of directors
22     delegating powers; it refers to you, Mr. Murphy,
23     as the consejero delegado unico delegating
24     powers; is that correct?

Page 39

1  A.  I respond exactly as I have in the previous. I
2      had an interpreter that was guiding me through
3      sentence by sentence of this when these powers
4      were granted, and I don't have the advantage of
5      having the complete knowledge of what this
6      entire document says. You've only given me one
7      paragraph.
8  Q.  Okay. Tell -- setting that document aside,
9      setting Exhibit 4 aside, you have provided in
10     Paragraph 11 of your sworn declaration a
11     rather -- I'm sorry. It's Paragraph 9 of your
12     declaration. You have provided a rather lengthy
13     description of Mr. Herrera's powers; is that
14     correct?
15  A.  Yes.
16         MR. STEWART: Objection to the
17     characterization of lengthy.
18  Q.  Didn't you feel it was important in your sworn
19     declaration to note that for over ten years you
20     alone have held the power to give or revoke the
21     general manager's authority?
22         MR. STEWART: Objection,
23     mischaracterization of testimony.
24  A.  No.

Page 40

1  Q.  Okay. Didn't you feel it was important to
2      disclose to the court that you have held the
3      position of consejero delegado unico for
4      approximately ten years?
5          MR. STEWART: Objection,
6      argumentative.
7  A.  No.
8  Q.  And you didn't feel, I take it, that it was
9      important to describe those duties of consejero
10     delegado unico to the court?
11         MR. STEWART: Objection,
12     argumentative.
13  A.  No.
14  Q.  Is it also -- strike that. Is it significant to
15     you that today you hold the sole power of
16     consejero delegado unico with someone other than
17     Mr. Herrera?
18         MR. STEWART: Objection, assumes facts
19     not in evidence.
20  A.  I don't understand your question.
21  Q.  Does Mr. Price hold this power with you
22     currently?
23         MR. STEWART: Objection.
24  A.  Not that I know of.

Page 41

1  Q.  Okay. Let me have you turn to Paragraph 7 of
2      your sworn declaration. And the third to last
3      sentence in that, the last portion says, "Belmac
4      is not dependent on Bentley for funding." Do
5      you see that?
6  A.  Yes.
7  Q.  Now, let me also have you turn to Paragraph 21
8      of your declaration. And it says, "Belmac
9      developed its own omeprazole manufacturing
10     process in Spain without Bentley's involvement.
11     Belmac used its own funds to finance the
12     manufacture of omeprazole and the necessary
13     clinical trials of the omeprazole manufacturing
14     process that Belmac developed." Do you see
15     that?
16  A.  Yes.
17  Q.  Okay. Mr. Murphy, isn't it true that Bentley
18     set up a bank account in Spain to accept U.S.
19     dollars for the purpose of creating a line of
20     credit that Laboratorios Belmac could access for
21     funding?
22  A.  No.
23  Q.  Okay. Let me show you an exhibit. Tell me what
24     your understanding of that is.

11 (Pages 38 to 41)

Page 42

1    MR. STEWART: Of what?
2  Q.  When you say that's not the correct answer, what
3      is the correct answer on that?
4  A.  The correct answer is that the board granted
5      Mike Price the ability to open up a credit
6      facility or an account it needed for expansion
7      or anything like that. It did not happen.
8  Q.  Okay. No account was ever --
9  A.  Not that I know of.
10 Q.  -- opened? Let me show you this document.
11         (Bentley Pharmaceuticals Board of
12         Directors October 13, 2000 Meeting
13         Minutes was marked Exhibit Number 5 for
14         identification.)
15 Q.  I'll ask you if recognize Exhibit 5 as minutes
16     of a Bentley board meeting on October 13th,
17     2000.
18 A.  Yes.
19 Q.  And, again, you're in attendance as the chairman
20     and CEO of Bentley?
21 A.  Yes.
22 Q.  On the second page of that, it says that,
23     "Mr. Price asked the board to authorize the
24     opening of a commercial bank account in Spain

Page 43

1      which would accept U.S. dollars, for the purpose
2      of creating a line of credit that the Spanish
3      subsidiary could access for working capital
4      purposes, if necessary."
5  A.  Yes, that's what I've just answered before.
6  Q.  And you've said that it was -- is it true that
7      it was -- that the Bentley board resolved to
8      take that action?
9  A.  They did allow Mike Price the ability to open a
10     commercial bank account in Spain if he needs to,
11     which he didn't do.
12         MR. BOSTWICK: Okay. Mr. Stewart,
13     I'll just note that this is something you-all
14     put at issue in your affidavit. We have
15     requested specific documentation regarding this,
16     and it has not been provided. I'll request
17     again. We're going to need to compel it before
18     Mr. Price's deposition or, in addition, to set
19     up another meeting to discuss it with
20     Mr. Murphy, if necessary.
21         MR. STEWART: Well, we have responded
22     in writing to the request, and you have our
23     objection; and you have our position.
24 Q.  Mr. Murphy, isn't it true that Bentley loaned

Page 44

1      Laboratorios Belmac approximately 6 million
2      euros?
3  A.  No, I don't think it was a loan.
4          MR. STEWART: Time?
5  Q.  Isn't it -- over what time period did this take
6      place?
7          MR. STEWART: Well, not over what this
8      takes place. The time period your question
9      encompasses.
10         MR. BOSTWICK: I'm asking him.
11     When -- because we haven't received documents
12     relating to this, Mr. Stewart, I'm having to ask
13     him.
14 Q.  When did Bentley loan 6 million euros, which is
15     approximately 6 to $7 million U.S., when did
16     they loan that to Laboratorios Belmac?
17 A.  Bentley did not -- from my recollection, Bentley
18     did not loan money. There's management fees
19     that we charge for our overhead expenses, and
20     that came to approximately $6 million.
21 Q.  Isn't it -- and over what period?
22 A.  I don't know what period of time that would be.
23 Q.  Isn't it true that in 2003 or 2004, Bentley
24     forgave this loan in its entirety and took

Page 45

1      shares of stock --
2  A.  That could be.
3  Q.  -- in place?
4  A.  That could be. I don't know exactly, but it
5      could be.
6  Q.  So, in other words, your understanding is
7      Bentley gave 6 to $7 million U.S. to
8      Laboratorios Belmac and, in return, ultimately
9      received more shares of Laboratorios Belmac,
10     correct?
11 A.  I'm not familiar --
12         MR. STEWART: Objection. Objection.
13     mischaracterization of testimony.
14 Q.  I'm sorry. Your answer was?
15 A.  I'm not familiar with what you're talking about.
16 Q.  As the CEO and chairman of the board of Bentley,
17     you don't understand the circumstances of this 6
18     to $7 million U.S. loan to Laboratorios Belmac;
19     is that your testimony?
20         MR. STEWART: Objection to the
21     characterization of loan. He testified it
22     wasn't a loan, whatever it was.
23         MR. BOSTWICK: Well, I don't think
24     that's his testimony.

12 (Pages 42 to 45)

JT-A-1023

Page 46

1   A.  It was not a loan. There was money due to us
2       for management fees.
3           MR. STEWART: Mr. Murphy, if there's
4       no question pending --
5           MR. BOSTWICK: I'm asking him exactly
6       to describe it.
7   Q.  Please continue.
8   A.  That was it.
9   Q.  Well, Mr. Murphy, you were clearly giving an
10      answer, and I would like to hear the end of that
11      answer.
12  A.  There's management fees that we charge to them,
13      and I believe it came to approximately 5 or
14      $6 million. How that was accounted for or used,
15      I don't understand how it would have -- and the
16      CFO might be able to tell you exactly.
17  Q.  Okay. Let me show you another exhibit.
18          (2-page Document and Translation were
19          marked Exhibit Number 6 for
20          identification.)
21  Q.  I'm going to give you the Spanish document and
22      then a rough translation that we've provided you
23      with. This is Exhibit 6. And I'd ask you to
24      take a look at that.

Page 47

1       Have you had an opportunity to take a
2       look at that?
3   A.  Not yet.
4       Yes.
5   Q.  Okay. The first paragraph here indicates that
6       certain agreements are unanimously adopted by
7       the entity's sole shareholder of Laboratorios
8       Belmac. Do you see that?
9   A.  Yes.
10  Q.  And the entity's sole shareholder, Laboratorios
11      Belmac's sole shareholder, is Bentley, correct?
12  A.  Yes.
13  Q.  And your name is registered and referenced
14      there, correct?
15  A.  Yes.
16  Q.  And this is an official document from the
17      Registration Mercantile of Madrid?
18  A.  Yes.
19  Q.  And under the first paragraph, it notes that
20      there was compensation in credit. Do you see?
21      And it says, "It is declared that the credits,"
22      in parentheses, "loans," "are liquidated." Do
23      you see that?
24  A.  Yes.

Page 48

1   Q.  And below, the second portion says, "The new
2       shares are subscribed in favor of the following
3       entities that renounce any rights they may have
4       regarding the credits," meaning the loans. Do
5       you see that?
6   A.  Uh-huh.
7   Q.  And then Bentley Pharmaceuticals is renouncing
8       rights to credits or loans of approximately
9       6 million euros. Do you see that?
10  A.  Uh-huh.
11  Q.  In favor of stock, that's Belmac stock; is that
12      correct?
13          MR. STEWART: Objection.
14  A.  I don't know.
15  Q.  Okay. Is it your testimony that you don't
16      really understand what the arrangement between
17      Bentley and Belmac was with this 6 million euro
18      transaction?
19  A.  I really do not understand the accounting issues
20      that was involved in this.
21  Q.  All right. What was the 6 million euros used
22      for by Laboratorios Belmac?
23  A.  I don't know.
24  Q.  All right. So you're the chief executive

Page 49

1       officer of Bentley, which extends 6 million
2       euros to Laboratorios Belmac, which you're also
3       the president of, but you don't know why and how
4       they used that funds --
5   A.  Do not know.
6           MR. STEWART: Objection. Objection as
7       to the characterization of extending 6 million
8       euros to Belmac and argumentative. You may
9       answer.
10  Q.  You can answer.
11  A.  I did. I don't know. It's an accounting issue.
12  Q.  Did you discuss this accounting issue with
13      Michael Price before you signed this -- before
14      you gave your permission to register this
15      official document in Spain's registry?
16          MR. STEWART: Objection as to
17      foundation. There's been no testimony with
18      respect to whether the witness understands or
19      has thoroughly read or, frankly, whether the
20      translation that is provided is a complete
21      translation of the Spanish document.
22  Q.  My question stands.
23  A.  I don't know whether I spoke with Mike Price
24      about this or not. I do not recollect.

13 (Pages 46 to 49)

JT-A-1024

Page 50

1  Q.  I mean, do you make it a practice to understand
2       types of documents that you're signing in your
3       capacity as Bentley's CEO and chairman of the
4       board?
5              MR. STEWART:  Objection.  This
6       document refers to Laboratorios Belmac.  Do you
7       mean --
8              MR. BOSTWICK:  It says it's been
9       adopted by the entity's sole shareholder, which
10      he testified was Bentley.
11             Can I have the question read back,
12      please?
13             (Reporter read back the last question.)
14  A.  I depend on the executives and the talent around
15      me to guide me.  If it is an accounting issue,
16      then I would go to Mike Price.  He would guide
17      me because I do not know finance and accounting.
18      If it's scientific, I would have a scientist
19      give me a summary.  So it is not my practice to
20      know every detail about every document I sign.
21  Q.  It is your -- is it your practice to understand
22      in general terms documents you sign on behalf of
23      Bentley or Belmac?
24             MR. STEWART:  Objection, relevancy.

Page 51

1  A.  I refer back to my previous answer.  I rely upon
2       people to guide me in their particular areas of
3       expertise.
4  Q.  And what was Mr. Price's guidance about this
5       specific document, if you recall?
6  A.  As I said before, I don't recall whether I
7       talked to him about this or not.
8  Q.  Don't you -- let me take a look again at this
9       statement in Paragraph 7 of your sworn
10      declaration.  "Belmac is not dependent on
11      Bentley for funding."  Do you see that?
12  A.  Yes.
13  Q.  Isn't this extension of approximately 6
14      million -- 6 to $7 million U.S. to Laboratorios
15      Belmac being dependent on Bentley for funding?
16  A.  No.
17             MR. STEWART:  Objection.
18  Q.  And didn't you think that the extension of 6 to
19      $7 million of funding to Laboratorios Belmac by
20      Bentley was an important thing to mention and
21      disclose to the court when you made your
22      statements in your affidavit?
23             MR. STEWART:  Objection, assumes facts
24      not in evidence.

Page 52

1  A.  No.
2  Q.  Okay.  Let's look at another sentence in
3       Paragraph 7.  At the end of the first sentence,
4       it says, "Belmac operates independently of
5       Bentley."  Do you see that?
6  A.  Yes.
7  Q.  Is that the position you take when you make
8       representations to your business partners?
9  A.  Yes.
10  Q.  I'll show you a document.
11             (Presentation of Perrigo was marked
12             Exhibit Number 7 for identification.)
13  Q.  I'll ask you to take a look at Exhibit 7 and
14      tell me if you recognize it.
15  A.  Yes.
16  Q.  Okay.  What is this document?
17  A.  This document was probably used in the meeting
18      with Perrigo, an introductory type meeting.
19  Q.  Who is Perrigo?
20  A.  They are a manufacturer of OTC and generic
21      products.
22  Q.  What is OTC?
23  A.  Over the counter.
24  Q.  Let's look at the second page of that document.

Page 53

1       Is that a picture of Bentley's headquarters in
2       the U.S., the entryway?
3  A.  Yes.
4  Q.  And Page 3 of the document says Bentley
5       Operations, and under Bentley Operations, it has
6       Bentley headquarters U.S. and Bentley divisions,
7       one in Belmac?
8  A.  Yes.  This presentation wasn't made by me.  This
9       presentation was made by Jim Hand, who was with
10      us for a short time in business development.
11  Q.  Does Jim Hand have Bentley's authority to give
12      presentations of this type?
13  A.  He did at the time to make introductions, and
14      that's what he was doing here.
15  Q.  Were you a part of this meeting?
16  A.  I'm not sure if I was part of this meeting or
17      not.  This could have been the very first
18      meeting.  I don't know.
19  Q.  Have you seen this document before?
20  A.  I'm not sure if I've seen -- I think I have
21      seen.  I certainly have seen some pages of this.
22      I recollect some pages of this.  Others, I don't
23      recognize.
24  Q.  Did you ever provide any edits or changes to

14 (Pages 50 to 53)

JT-A-1025

Page 54

1    this document?

2    A.   No.

3    Q.   Let's go to the next page of the document, which

4        is 22785, I believe. And that's a photograph?

5    A.   Yes.

6    Q.   It's difficult to see from the copier, but what

7        is that a picture of?

8    A.   It's a picture of the headquarters building.

9    Q.   In the U.S.?

10   A.   Yes.

11   Q.   And the next page says Bentley Management. Do

12       you see that?

13   A.   Yes.

14   Q.   And under Bentley Management, it has you as

15       chairman, president, and CEO, correct?

16   A.   Yes.

17   Q.   And that was true in 2003?

18   A.   Yes.

19   Q.   And it has Michael Price as the vice president

20       and CFO of Bentley?

21   A.   Yes.

22   Q.   And that's correct as of 2003?

23   A.   Yes.

24   Q.   And under that, it has Adolfo Herrera as VP of

Page 55

1        Spain divisions. Do you see that?

2    A.   Yes.

3    Q.   So was Adolfo Herrera Bentley's vice president

4        of the Spanish divisions of Bentley in 2003?

5    A.   I would not have written it this way. This is

6        the way Jim Hand apparently put it down. I

7        wouldn't have written it that way.

8    Q.   This -- how would you put it?

9    A.   I would put him as general manager of

10       Laboratorios Belmac.

11   Q.   Okay. Was Adolfo Herrera a vice president at

12       Bentley in 2003?

13   A.   I don't know. I don't know when he became vice

14       president of Bentley.

15   Q.   But he did become vice president of Bentley?

16   A.   Yes. Yes, he did. I just don't know when.

17   Q.   What are his duties as the vice president of

18       Bentley?

19   A.   It's just a title, an executive of Bentley.

20   Q.   Aren't his responsibilities as Bentley's vice

21       president to carry out Bentley's goals in Spain?

22   A.   We're looking to expand beyond the borders of

23       Spain, looking into Ireland. We're looking into

24       other areas.

Page 56

1    Q.   So Spain and other European countries?

2    A.   Right -- not only just European countries.

3    Q.   So Spain and other countries?

4    A.   Other countries, yes.

5    Q.   So that statement is correct?

6    A.   Uh-huh.

7    Q.   Let me have you go to the last page of that

8        document. And it says the Bentley Patent

9        Estate, Omeprazole/Lansoprazole Patents. Is

10       that correct?

11   A.   You want to repeat that?

12            MR. BOSTWICK: I'll have the court

13       reporter do that.

14            (Reporter read back the last question.)

15   A.   That's down at the bottom. That's Spain's

16       patents, yes. And this is Bentley collectively,

17       including its subsidiaries. It's a summary of

18       patents.

19   Q.   Looking back at your sworn declaration, which

20       says, "Belmac operates independently of

21       Bentley." You see that?

22   A.   What page?

23   Q.   This is Paragraph 7, the end of the first line.

24   A.   Yes, yes.

Page 57

1    Q.   "Belmac operates independently of Bentley."

2    A.   Yes.

3    Q.   That statement is certainly inconsistent with

4        the presentation to Perrigo; isn't it?

5            MR. STEWART: Objection,

6        argumentative.

7    A.   I don't see that.

8    Q.   When the presentation says that Belmac is a

9        Bentley division of the Bentley operations, that

10       Adolfo Herrera is the vice president of Spanish

11       divisions under Bentley management, don't you

12       think that that suggests that Belmac does not

13       operate independently of Bentley?

14            MR. STEWART: Objection.

15   A.   Absolutely not.

16            MR. STEWART: Objection, asked and

17       answered, argumentative.

18   Q.   Your answer to that question is absolutely not?

19   A.   Yes, absolutely not.

20   Q.   Let's look at Paragraph 2 of your sworn

21       declaration. This says you've been the director

22       of Bentley since 1993, president since 1994, and

23       the chairman and CEO since 1995. Is that

24       correct?

15 (Pages 54 to 57)

JT-A-1026

Page 58

1    A.  Yes.
2    Q.  Okay.  Could you describe for me your duties as
3        president of Bentley?
4    A.  In which year?
5    Q.  Since 1994.  Have those changed?
6    A.  My focus, my responsibilities have evolved
7        tremendously over that time.
8    Q.  Why don't you start by giving me -- I'm sorry.
9        Are you finished?
10   A.  In 1994, we were a research-based organization
11       here in the U.S., and we were struggling --
12   Q.  This is Bentley you're talking about?
13   A.  Bentley, yes.  We had some subsidiaries in
14       France and in Spain.  And then we moved the
15       company from Tampa to New Hampshire.  We
16       acquired drug delivery technology, expanded our
17       research activities a great deal.  Our portfolio
18       product in Europe grew a great deal.  So it's
19       evolved and changed from 1994 to today.
20   Q.  Did your duties include defining scope of the
21       enterprise of Bentley and the nature of the
22       business strategy?
23   A.  Of course.  You're always -- the strategic focus
24       is key for the CEO.

Page 59

1    Q.  So are the -- what is the difference between the
2        duties of president of Bentley and CEO of
3        Bentley, if there are any?
4    A.  There's really -- there's no distinction between
5        CEO and president.  I mean the responsibilities
6        are very similar.
7    Q.  Can you tell me when you began -- I want to get
8        a sense of your salary, bonus, and stock while
9        you've been employed by Bentley.
10          MR. STEWART:  And the relevance of
11   this would be what?
12          MR. BOSTWICK:  The relevance of this?
13   Is there a specific objection to that?
14   Objection to relevance in a discovery deposition
15   as to his salary?  I don't understand your
16   objection.
17          MR. STEWART:  The objection goes to
18   confidential information pertaining to this
19   individual's individual compensation.
20          MR. BOSTWICK:  This is a publicly
21   traded company on the stock exchange.  They're
22   required to disclose this publicly.  I don't
23   understand your objection.
24          MR. STEWART:  Well, the objection

Page 60

1        continues with respect to I don't understand
2        what the relevance of this witness' compensation
3        is to the issue of agency.
4           MR. BOSTWICK:  Are you instructing him
5    not to answer?
6           MR. STEWART:  I'm not.
7    Q.  Can you give me a sense of your salary, bonus,
8        and stock from 1994 to the present within
9        Bentley?
10   A.  I probably could not do an accurate job of
11       describing it.  I don't know the number of
12       options issued at different times, its value.
13       The compensation consisted of stock options and
14       bonus and salary.  In some years, there was
15       options; some years, there was no options; some
16       years, there was cash bonus, and in other years,
17       there was not.  Off the top of my head to give
18       you year by year, impossible.  As you said,
19       everything is all publicly available.  We could
20       get that for you.  I certainly can't rattle it
21       off the top of my head.
22   Q.  I'll accept that, and I would like to receive a
23       breakdown of that, but just for an
24       approximation -- and I'll do that so we don't

Page 61

1        waste time in this deposition, but as an
2        approximation, approximately what was your
3        salary when you began in '94 or '95 as president
4        of Bentley?
5    A.  Approximately 175,000 in salary.
6    Q.  And there would have been some stock options or
7        bonuses with that?
8    A.  Yes, and I don't know the amount.  I really
9        don't know.  I mean I can -- it's available.  I
10       just don't know the answer.
11   Q.  Let's take '97 as a random intermediate year,
12       '96 or '97.  Approximately what was your salary
13       during that period of time?  Did it go up?
14   A.  Yes, it went up, yes, but I could not with any
15       degree of comfort even give you an estimate.  I
16       could be off tremendously.
17   Q.  What is it more recently?  Like last year, for
18       example, what was your salary?
19   A.  About 600,000.
20   Q.  And was there also stock and bonuses tied --
21   A.  Yes.
22   Q.  -- to that?  And that's in addition to the
23       $600,000?
24   A.  Yes, uh-huh.

16 (Pages 58 to 61)

JT-A-1027

Page 62

1  Q.  What is the largest cash bonus you ever received
2     during this period 1994 to the present from
3     Bentley?
4        MR. STEWART: Objection. Objection,
5     relevancy.
6  A.  It's approximately 300,000.
7  Q.  That would have been for a given year?
8  A.  Yes.
9  Q.  Okay. And in terms of cumulative stock of
10    Bentley that has been given to you, do you have
11    a rough -- rough general estimate of the value
12    of that?
13 A.  No, I do not.
14 Q.  Okay. How much stock in Bentley do you own?
15 A.  I have approximately -- I think we report around
16    4 percent.
17 Q.  Around 4 percent of the company?
18 A.  Yes.
19 Q.  All right. So in addition to -- let me ask you
20    this about the salary. You began at 175
21    roughly, and last year was approximately
22    $600,000. I'm just talking about salary, not
23    bonuses or stock. Correct?
24 A.  Yes.

Page 63

1  Q.  Was -- the increase in that salary between '94
2     or '95 and currently, was it relatively steady
3     or was there a specific year where it changed or
4     reduced dramatically?
5  A.  I believe it was relatively steady.
6  Q.  Okay. The increase, in other words, was
7     relatively steady in salary?
8  A.  I believe so. I mean I would actually have to
9     see it listed out like you're trying to get
10    there so I could answer you correctly.
11 Q.  Okay. In terms of bonuses, like this $300,000
12    bonus, do you remember when that -- what year
13    that was?
14 A.  That would have been for probably 2005, yeah,
15    2005.
16 Q.  Were there any other years where you received
17    more than, say, $100,000 in bonus?
18       MR. STEWART: Objection. I'm going to
19    put a continuing objection to the questions
20    regarding compensation and bonuses on grounds of
21    relevancy to the issues in this phase of
22    discovery.
23 A.  I really don't know. I don't know. I don't
24    know the amounts and the dates. I really don't

Page 64

1  know.
2  Q.  Because --
3        MR. STEWART: Let me just interrupt.
4     I'm going to want to take a break in a couple of
5     minutes, so whenever would be a good stopping
6     point.
7  Q.  Mr. Murphy, if you own 4 percent of Bentley, am
8     I correct that that means you effectively own
9     4 percent of Laboratorios Belmac as well because
10    Bentley is 100 percent shareholder of
11    Laboratorios Belmac?
12 A.  I never looked at it that way. The only
13    publicly traded entity is Bentley. That's the
14    only vehicle that's publicly traded, and Bentley
15    has wholly owned subsidiaries. So I've never
16    viewed it that way. I've always viewed it as
17    Bentley, owning Bentley stock.
18 Q.  Okay. Would it be fair to say that you hold a
19    4 percent interest in the activities of
20    Laboratorios Belmac?
21       MR. STEWART: Objection; A, asked and
22    answered, and B, mischaracterization of any
23    prior testimony on that question.
24 A.  I own 4 percent of Bentley stock.

Page 65

1  Q.  I'll just ask you a couple questions about
2     Bentley's employees, the number, and then we'll
3     take a break. Is that fair?
4  A.  Sure.
5  Q.  Okay. You say in Paragraph 4 that as of
6     November of 1998, Bentley had 17 employees. Is
7     that correct?
8  A.  Yes.
9  Q.  And what was the number of Bentley's employees
10    in 1994 or 1995 when you began as president of
11    Bentley?
12 A.  I don't know. I don't remember the exact
13    numbers.
14 Q.  Was it lower than 17?
15 A.  Yes, it was, but in those early years, it was
16    higher -- not higher than 17, but it was higher
17    than, I think -- in '94, '95, I think it was a
18    higher number, and then we tailed back and then
19    rose again. I just don't know the specific
20    dates or the times or the numbers.
21 Q.  Was it -- has the number of Bentley employees
22    ever been more than 17 since 1994?
23 A.  I don't think so.
24 Q.  Okay. What is the lowest number, you think, of

17 (Pages 62 to 65)

JT-A-1028

Page 66

1   Bentley's employees that there's been since
2   1994?
3   A.  Probably about six or eight.
4   Q.  So is it accurate to say that the number of
5   employees at Bentley in the U.S. has ranged
6   between approximately 6 and 17 or 18 for the
7   entire time since 1994?
8   A.  Yes.
9           MR. BOSTWICK:  Okay.  We can take a
10  break now if you'd like.
11          MR. STEWART:  Before we take a break,
12  I just want to correct the record.  I didn't
13  want to interrupt.  I think you asked him or --
14  you asked him a question which as part of the
15  question, my memory is, that you said so in
16  1998, Bentley -- you said that Bentley had 17
17  employees.  I didn't know where the 1998 came
18  from.
19          MR. BOSTWICK:  Thank you for that
20  clarification.  I think I meant to say at the
21  time -- and let's just ask the question again.
22  Q.  At the time of your declaration in November of
23  2004, it indicates -- you've stated that Bentley
24  had 17 employees, right?

Page 67

1   A.  Right.  That's the way I understood your
2   question.
3   Q.  And maybe I had simply misspoke in terms of the
4   date, but thanks for clarifying that.
5           THE VIDEOGRAPHER:  The time is
6   10:43 a.m.  We're going off the record.
7           (Recess)
8           THE VIDEOGRAPHER:  The time is
9   10:52 a.m.  We're back on the record.
10  Q.  Okay.  Mr. Murphy, we had been talking a little
11  bit about Bentley in the U.S., and now I'd like
12  to talk a little bit about the positions you
13  hold at Laboratorios Belmac in Spain.  Okay?
14  A.  Okay.
15  Q.  I take it you're president of Laboratorios
16  Belmac in Spain?
17  A.  Yes.
18  Q.  How long have you held that position?
19  A.  I believe it was from 1995.
20  Q.  What are your duties as president of Belmac in
21  Spain?
22  A.  It's probably easiest to describe it as a
23  figurative position where, you know, I do
24  participate in looking at the strategic focus of

Page 68

1   the company, looking to build the company with a
2   portfolio of product and expand beyond the
3   borders of Spain, but all operational aspects
4   and day-to-day and not, of course, speaking
5   Spanish, is left to management.
6   Q.  We've talked also about the fact that you hold
7   the title of consejero delegado unico at
8   Laboratorios Belmac.  Is that correct?
9   A.  Yes.
10  Q.  How would you describe your duties in that role?
11  A.  It's essentially the same.  It's a board member
12  and executive position.
13  Q.  And that's the top position in the company?
14  A.  Yes.
15  Q.  And by "the company," I mean Laboratorios Belmac
16  now.
17  A.  Right.
18  Q.  Do you hold any other position at Laboratorios
19  Belmac in Spain?
20  A.  I don't believe so, no.
21  Q.  And has that been true since 1994?  You've never
22  held another position?
23  A.  No, I don't believe I've ever had a different,
24  another position.

Page 69

1   Q.  At Laboratorios Belmac in Spain?
2   A.  At Laboratorios Belmac.
3   Q.  That's correct?
4   A.  That's correct.
5   Q.  Do you receive a salary from Laboratorios Belmac
6   in Spain?
7   A.  No.
8   Q.  Have you ever received a salary from
9   Laboratorios Belmac in Spain?
10  A.  No.
11  Q.  Have you ever received bonuses of any type from
12  Laboratorios Belmac in Spain?
13  A.  No.
14  Q.  I guess you couldn't receive stock options
15  because they're not --
16  A.  They're not publicly traded.
17  Q.  So, in other words, the answer to that is no as
18  well?
19  A.  No.
20  Q.  When you travel over to Spain -- well, strike
21  that.  I take it you have traveled to Spain many
22  times since 1994; is that correct?
23  A.  Yes.
24  Q.  All right.  When you travel to Spain, does

18 (Pages 66 to 69)

**Page 70**

1  Bentley pay for that travel?
2  A. Part of it.
3  Q. How does that work?
4  A. When I travel, Bentley will issue me my ticket,
5     my airline ticket. When I'm over there,
6     Laboratorios Belmac picks up the expenses of the
7     hotels and food while I'm there.
8  Q. Okay. So generally the breakdown is the flights
9     and the specific travel arrangements are paid
10    for by Bentley and then the expenses over in
11    Spain are picked up by Belmac?
12 A. Yes.
13 Q. Do you have a secretary at Bentley?
14 A. Yes.
15 Q. Who is that?
16 A. That would be -- how do I lose my secretary's
17    name? Give me a second. Don't tell --
18        MR. STEWART: She is going to kill
19    you.
20 A. Jean DeRoche. The first name that came to my
21    mind was my wife's name. Oh, dear.
22 Q. I'll tell you what, we won't show this to either
23    your wife or your secretary. I don't think
24    that's getting better.

**Page 71**

1        MR. STEWART: By agreement.
2  A. Jean DeRoche.
3  Q. Jean DeRoche. How long has Jean been your
4     secretary?
5  A. Approximately one year.
6  Q. Who was your secretary at Bentley before Jean?
7  A. That would be Celia Thompson.
8  Q. How do you spell that first name?
9  A. C E L I A.
10 Q. And how long was Ms. Thompson your secretary at
11    Bentley?
12 A. Since 1994.
13 Q. And do you have a formal secretary at Belmac?
14 A. No.
15 Q. Do you have -- you have Bentley stationery,
16    correct, that you send letters out on?
17 A. Yes.
18 Q. Do you have Belmac stationery that you send
19    letters out on?
20 A. No, I do not.
21 Q. So you've never sent a letter out on Belmac
22    letterhead, for example?
23 A. I don't have any here. The Belmac stationery is
24    in Spain.

**Page 72**

1  Q. Have you ever sent a letter out on Belmac
2     letterhead that you recall?
3  A. I don't know. I don't know.
4  Q. You can't recall any?
5  A. I can't recall any.
6  Q. Okay. Do you have -- you have a Bentley
7     business card that you give out --
8  A. Yes.
9  Q. -- to people? That's correct?
10 A. Yes.
11 Q. Do you have a Belmac -- a Laboratorios Belmac
12    business card?
13 A. Yes.
14 Q. When -- on what occasions do you give that out?
15 A. When I go to Europe, I routinely would give out
16    both cards and I still do give out both cards.
17    It depends -- you know, when I'm meeting with
18    somebody, I may be acting as the representative
19    of Laboratorios Belmac, as its agent, trying to
20    bring business in, and other times I'm looking
21    for drug delivery type activity and I have the
22    Bentley card.
23 Q. In your relationship with Ethypharm, do you
24    recall what types of business cards you gave

**Page 73**

1     out, if any, to Bentley -- to Ethypharm people?
2  A. I feel very confident in saying that I would
3     have given them both.
4  Q. Why?
5  A. Because my discussions with Ethypharm had to do
6     sometimes with Laboratorios Belmac and sometimes
7     to do with Bentley.
8  Q. Let's talk about the Belmac board of directors.
9     Okay?
10 A. Yes.
11 Q. All right. Do you hold regular meetings with
12    the people on the Laboratorios Belmac board of
13    directors like you do at Bentley?
14 A. No. It's more of a formality.
15 Q. Can you explain that?
16 A. It means that the statutory documents are
17    drafted each year or whatever period of time
18    would be required by Spanish law. We would --
19    the three directors would sign them -- review
20    them, sign them, and they'd be submitted.
21 Q. And that's a once-a-year process approximately?
22 A. I think it is once a year.
23 Q. I want to talk now about a theme that runs
24    through your sworn declaration as I read it, and

19 (Pages 70 to 73)

JT-A-1030

Page 74

1    the theme I'm referring to is the idea you
2    express in several different sentences that
3    Bentley generally and you specifically had
4    little or no involvement in either the
5    Bentley -- I'm sorry, the Belmac operations or
6    in negotiating with Ethypharm. And let me refer
7    you to some of the specific statements that I'm
8    talking about. Okay? I'll throw you -- I'll
9    show you three as examples of this. In
10   Paragraph 12 -- again, we're back on
11   Exhibit 1 -- in the middle of that paragraph, it
12   says, "I" -- and I take it that means you, Jim
13   Murphy -- "I am not and was not involved in
14   Belmac's operations." Do you see that?
15   A. Yes.
16   Q. In Paragraph 18, again in the middle, the
17   sentence reads, "The terms of any agreements
18   between Ethypharm and Belmac were negotiated by
19   representatives of Belmac, specifically the
20   Belmac general managers, not Bentley." Do you
21   see that?
22   A. Yes.
23   Q. And on 24, you describe some of your
24   interactions in two distinct contexts, and you

Page 75

1    end that paragraph about contacts with Ethypharm
2    by saying, "These contacts were sporadic and did
3    not concern the omeprazole business between
4    Ethypharm and Belmac." Do you see that?
5    A. Yes.
6    Q. Let me show you a document.
7         (Confidentiality and Non-Disclosure
8         Agreement was marked Exhibit Number 8
9         for identification.)
10   Q. I'm going to ask you to take a look at that, if
11   you will, and see if you recognize it.
12   A. Yes.
13   Q. Okay. This is a confidentiality agreement
14   between Bentley Pharmaceuticals, Inc. and
15   Ethypharm; is that correct?
16   A. Yes.
17   Q. And the date is April 7th, 2000?
18   A. No. This looks like it's the 10th day of
19   February, 2000.
20   Q. I see. You're reading from the first page,
21   right, the first sentence?
22   A. Uh-huh.
23   Q. And I was reading from the last.
24   A. Okay.

Page 76

1    Q. But at any rate, it was signed sometime in the
2    year 2000? Is that your best memory?
3    A. Yes.
4    Q. And that's your signature on the second page?
5    A. Yes.
6    Q. Is your position that this confidentiality
7    agreement doesn't have anything to do with the
8    business of omeprazole with Ethypharm?
9    A. Absolutely nothing to do with omeprazole.
10   Q. And nothing to do with lansoprazole?
11   A. Correct.
12   Q. Or the pelletization or microcapsulization of
13   omeprazole and lansoprazole?
14   A. Correct. It's specific in the second paragraph.
15   Q. What does this confidentiality and nondisclosure
16   agreement have to do with?
17   A. This had to do with Bentley talking with
18   Ethypharm about its confidential information
19   concerning enhancement and absorption of
20   permeation of drugs through biological
21   membranes, such as transdermal.
22   Q. Such as transdermal?
23   A. Transdermal delivery of drugs.
24   Q. Transdermal meaning through the skin?

Page 77

1    A. Correct.
2    Q. Let me get back to the nature of your contacts
3    with Ethypharm generally. Okay? I take it from
4    1994 through 2002 or so, you had a number of
5    meetings, telephone calls, and contacts with
6    people from Ethypharm; is that correct?
7    A. Yes.
8    Q. And some of the people who you either spoke with
9    by phone or met with would have been Patrice
10   DeBregeas, the CEO of Ethypharm France?
11   A. Yes.
12   Q. Gerard Leduc, one of the other main officers at
13   Ethypharm France?
14   A. Yes.
15   Q. Claude Dubois, the general manager of Ethypharm
16   France?
17   A. Yes.
18   Q. Pierre Germain, another general manager of
19   France?
20   A. Yes.
21   Q. Adolfo de Basilio, general manager of Ethypharm
22   Spain?
23   A. Yes.
24   Q. Are there others that you recall meeting with

20 (Pages 74 to 77)

Page 78

1    and speaking with from Ethypharm?
2  A.  There were others that had come into meetings,
3    but I don't remember their name nor their role.
4  Q.  Okay. Do you remember Roseline Joannesse? Did
5    you met her?
6  A.  I believe I did meet her.
7  Q.  What position did you understand she held, if
8    any?
9  A.  I thought she was the attorney.
10  Q.  All right. I take it from 1994 to, say, 2002,
11    you had regular telephone calls with the general
12    managers at Laboratorios Belmac?
13  A.  Yes.
14  Q.  And with staff at Laboratorios Belmac?
15  A.  Not as much with staff. My contact with the vast
16    majority of times, with the general manager.
17  Q.  Do you speak Spanish?
18  A.  No.
19  Q.  We took Mr. Gonzalez Azpetia's deposition a few
20    weeks ago, and it struck me that he didn't speak
21    very good English.
22  A.  Right.
23  Q.  How is it that you were able to converse with
24    Clemente Gonzalez Azpetia when he was general

Page 79

1    manager?
2  A.  Through his secretary.
3  Q.  What secretary was that?
4  A.  Laura Peterson.
5  Q.  Did you also have weekly telephone conversations
6    with him?
7  A.  No.
8  Q.  Okay. Did you have conversations where he and
9    others who spoke English at Laboratorios Belmac
10    attended?
11  A.  Yes.
12  Q.  Who were those people?
13  A.  Fernando Berenguer.
14  Q.  And he -- am I correct to say he is now
15    deceased?
16  A.  Yes.
17  Q.  Anyone else?
18      MR. STEWART: What time are we
19    talking?
20  Q.  Any time from '94 to 2002.
21  A.  Oh, yes, Adolfo Herrera.
22  Q.  So Adolfo Herrera speaks English; is that
23    correct?
24  A.  Yes.

Page 80

1  Q.  Certainly better than Mr. Gonzalez Azpetia?
2  A.  Mr. Gonzalez really didn't speak English much at
3    all, about the same way I speak Spanish, just a
4    few words.
5  Q.  How is Mr. Herrera's English?
6  A.  It's good.
7  Q.  Does he write in English; do you know?
8  A.  Yes.
9  Q.  How -- let's go to some specific discussions
10    that you had with Ethypharm. I believe maybe
11    some documents will help in this regard.
12      (Letter to Mr. De Basilio from
13      Mr. Murphy, dated December 6, 1994 was
14      marked Exhibit Number 9 for
15      identification.)
16  Q.  I'm showing you Exhibit 9, and I'd ask you to
17    take a look at that document.
18      Do you recognize that document?
19  A.  I don't remember it, but I obviously wrote this.
20  Q.  And is it fair to say that this is a
21    December 6th, 1994 letter from you to Mr. Adolfo
22    de Basilio?
23  A.  Yes.
24  Q.  And this is on Belmac Corporation letterhead,

Page 81

1    correct?
2  A.  Yes.
3  Q.  And Belmac Corporation, as we've discussed, is
4    the early name for Bentley, correct?
5  A.  Yes.
6  Q.  So that's the U.S.A. headquarters?
7  A.  Yes.
8  Q.  At this time, were you president of Belmac
9    Corporation in the U.S.?
10  A.  I was president of Belmac U.S., yes.
11  Q.  I want to refer you to the last paragraph there,
12    and it seems to reference the first paragraph
13    where you're going to travel to France on
14    December 12th. It says, "During my visit to
15    Paris, I'm most anxious to speak about
16    opportunities to expand our collaborative
17    relationship in the areas of manufacturing,
18    microgranulation of products, erythromycin,
19    Portugal, and other ways in which our companies
20    can grow and prosper together." Do you see
21    this?
22  A.  Yes.
23  Q.  Isn't this a contact with Ethypharm that does
24    concern the omeprazole business between

21 (Pages 78 to 81)

Page 82

1    Ethypharm and Laboratorios Belmac?

2  A. I don't think that's the restricted -- I don't

3    think it is.

4  Q. Aren't --

5  A. Because I think we were doing -- at this time,

6    we being Laboratorios Belmac, was doing

7    manufacturing and contract manufacturing of

8    products, and I don't believe the only

9    microgranulated product was that.

10  Q. So one microgranulation -- strike that. Am I

11    correct to say that one product that used

12    microgranulation -- the process of

13    microgranulation was omeprazole?

14  A. Yes.

15  Q. And that there were others, such as

16    lansoprazole?

17  A. No.

18  Q. What's wrong about that statement?

19  A. Lansoprazole was never produced there.

20  Q. Is lansoprazole a product that uses

21    microgranulation?

22  A. Yes.

23  Q. So am I correct in understanding your testimony

24    that omeprazole is one product that used

Page 83

1    microgranulation, but there were other products

2    that used microgranulation as well?

3  A. That's my understanding.

4  Q. Well -- so doesn't a portion of this contact

5    concern the manufacturing of microgranulation of

6    products such as omeprazole?

7  A. It could be.

8  Q. Did -- weren't you acting as the president of

9    Belmac Corporation when you wrote this letter?

10  A. In this case, this is combining. This would be

11    an occasion where I would be looking at the

12    interests of both of our companies because in

13    that last sentence -- the last paragraph,

14    erythromycin is a research program we had in the

15    United States, and I wanted to know if they were

16    interested in maybe collaborating. The

17    microgranulation and the manufacturing is

18    certainly a Laboratorios Belmac discussion.

19  Q. Okay.

20  A. But looking back at the date of this, this is

21    really almost like an introductory. This is

22    right when I began. This is almost an

23    introductory meeting to talk about who we are on

24    both sides.

Page 84

1  Q. And when you say who we are on both sides, you

2    mean both Bentley as --

3  A. Bentley Corporation and what its research

4    activity is and what Laboratorios Belmac had

5    underway.

6  Q. So let me ask you this question: Putting aside

7    for the moment whether you're also acting as --

8    in some capacity as Laboratorios Belmac, it's

9    true, is it not, that you are acting for Belmac

10    Corporation in the U.S., later Bentley, when you

11    write this letter?

12  A. When I write this letter, I'm acting on behalf

13    of both companies, both entities.

14  Q. Did you have Bentley's authorization to act for

15    Laboratorios Belmac in negotiations regarding

16    transactions with the Spanish subsidiary?

17        MR. STEWART: Objection, vague.

18  Q. You were going -- let me ask the question again.

19        MR. BOSTWICK: That's a fair

20    objection.

21  Q. You were going to travel to Paris to meet with

22    representatives of Ethypharm in December of

23    1994, correct?

24  A. Apparently, I was.

Page 85

1  Q. Did you have Bentley's authority to negotiate

2    transactions for Laboratorios Belmac at that

3    time?

4  A. My position as probably president of the parent

5    company would give me the authority to negotiate

6    for either of the two entities.

7  Q. Let me show you another exhibit here.

8        (Belmac Corporation Board of Directors

9    December 8, 1994 Meeting Minutes were

10    marked Exhibit Number 10 for

11    identification.)

12  Q. And I'll ask you if you recognize Exhibit 10 as

13    minutes of the Bentley board meeting on

14    December 8th, 1994, which was then called Belmac

15    Corporation in the U.S.

16  A. Yes.

17  Q. And you attended that meeting as an official of

18    Belmac Corporation, which later changed its name

19    to Bentley?

20  A. Yes.

21  Q. Let me ask you to look at Page 2840. And I'm

22    going to read you the middle paragraph there.

23    It says, "Mr. Murphy asked for authority to

24    negotiate transactions involving the Spanish

22 (Pages 82 to 85)

JT-A-1033

Page 86

1    subsidiary. The board affirmed that the
2    authority to negotiate has already been vested,
3    but any agreement must be subject to board
4    approval." Do you see that?
5    A.  Yes.
6    Q.  Is that a correct reflection of what happened at
7        that board meeting?
8    A.  I don't remember this discussion at the board
9        meeting.
10   Q.  Do you have any reason to doubt that that's an
11       accurate translation of what happened?
12   A.  This is probably accurate minutes. Our minutes
13       are normally very accurate. I just don't
14       remember what this involved. Was it a single
15       transaction; what it was, I don't know.
16   Q.  Do you have any knowledge of this delegation of
17       authority ever being revoked or amended?
18   A.  No, I don't.
19   Q.  I'm sorry. That was no, you don't?
20   A.  No.
21   Q.  This is -- the minutes of these board meeting --
22       this board meeting is December 8th, 1994,
23       correct?
24   A.  Yes.

Page 87

1    Q.  So that's two days after you send your letter to
2        Mr. De Basilio?
3    A.  Uh-huh.
4    Q.  And four days before you travel to Paris?
5    A.  I don't know. I don't know when I went to
6        Paris.
7    Q.  Is that correct based on your reading of
8        Exhibit 9, the letter to Mr. De Basilio?
9    A.  He didn't -- I don't have his response. If this
10       meeting was -- these dates were okay, whether
11       I've got a hotel. I assume that these dates are
12       probably correct, but I'm not sure.
13   Q.  All right. In December 1994, you did travel to
14       Paris and to Spain to meet with Ethypharm
15       representatives; didn't you?
16   A.  I may have.
17   Q.  Did you fire Mr. De Ayala as general manager at
18       that time?
19   A.  We negotiated his departure.
20   Q.  Around that time period, December of 1994?
21   A.  Probably around that time period. I don't know
22       that exact date either, but around that time
23       period.
24   Q.  Did you authorize the increase in the number of

Page 88

1    shifts for the manufacture of omeprazole during
2    that time?
3    A.  I don't remember.
4    Q.  Did you increase the staff for the increased
5        production of omeprazole during that time?
6    A.  I didn't do any of the hiring, and I was not
7        directly involved in any of the manufacturing.
8        So to answer your question, no, I did not.
9    Q.  Did you discuss reopening the Galenic Department
10       in Zaragoza with Belmac personnel?
11   A.  Belmac management may have been during that
12       time. I don't know manufacturing. I don't know
13       the formulations. I would not get directly
14       involved in any of that.
15   Q.  Did you, in essence, restructure the operations
16       of Belmac --
17   A.  No.
18   Q.  -- during that December '94 period?
19   A.  Only with regard to Ayala and Clemente.
20   Q.  Gonzalez?
21   A.  Gonzalez.
22   Q.  Did you enter into negotiations regarding
23       omeprazole and other matters with Ethypharm in
24       December of 1994?

Page 89

1    A.  I know I met with Adolfo Basilio on several
2        occasions around that time period.
3    Q.  Do you recall meeting with Mr. DeBregeas in
4        Paris during that time period?
5    A.  I believe so, yes.
6    Q.  What do you recall about the negotiations that
7        occurred during that period with either Mr. De
8        Basilio or Mr. DeBregeas?
9    A.  I don't remember any of it.
10   Q.  Okay.
11   A.  It was a long time ago.
12   Q.  Let me show you another document.
13       THE VIDEOGRAPHER:  Counselor, five
14       minutes.
15       MR. BOSTWICK:  Okay.
16       (Fax to Mr. De Basilio from Mr. Murphy,
17       dated November 19, 1995 was marked
18       Exhibit Number 11 for identification.)
19   Q.  Let me show you that document, and I'll ask if
20       you recognize it.
21       Do you recognize that document,
22       Exhibit 11?
23   A.  No, I don't remember it, but I know what it's
24       about.

23 (Pages 86 to 89)

JT-A-1034

Page 90

1  Q.  What's it about?
2  A.  This is apparently a draft of a press release
3      when I was trying to develop a relationship with
4      Ethypharm to develop an amorphous form of
5      erythromycin.
6  Q.  Was the relationship also one where you were
7      trying to define a manufacturing relationship
8      with Ethypharm relating to omeprazole and other
9      microgranulated products?
10 A.  This was an attempt to try to bring the two
11     companies together in a research and development
12     collaboration, which was not successful.
13 Q.  What two companies?
14 A.  Ethypharm and Bentley for the amorphous
15     erythromycin. The manufacturing of that product
16     would be done at Belmac.
17 Q.  Didn't -- I'm sorry. Are you finished?
18 A.  Yes.
19 Q.  Didn't this also relate -- this related to a
20     joint venture of Ethypharm with France and
21     Belmac at its manufacturing facilities in
22     Zaragoza, Spain, correct? I'm reading from the
23     first paragraph of the press release.
24 A.  It says it's a wholly owned subsidiary of

Page 91

1      Belmac.
2  Q.  Okay. But am I reading this? It says it's the
3      first stage agreement to establish a joint
4      venture with Ethypharm of France in the Belmac
5      manufacturing facilities in Zaragoza, Spain,
6      correct?
7  A.  Yes. This was an attempt at doing it, yes.
8  Q.  Okay. And my understanding is you were
9      negotiating with Ethypharm representatives both
10     in France and Spain, correct?
11 A.  I don't remember whether I was negotiating with
12     both France and Spain.
13 Q.  You know you were negotiating with France and
14     you're not sure about Spain or vice versa?
15 A.  Well, this only went to Adolfo Basilio. So this
16     was discussions apparently with the director
17     general of Ethypharm Spain.
18 Q.  And does it -- does this negotiation that you
19     had also include the expansion of the
20     manufacturing relationship that it already had
21     with Ethypharm relating to omeprazole?
22 A.  I think you're making a leap of faith by saying
23     negotiating. It never got that far because
24     negotiations would be a definition of terms and

Page 92

1      conditions and relationships. It never got that
2      far.
3  Q.  So you never sent draft agreements back and
4      forth?
5  A.  I hate to say and acknowledge your term
6      "negotiation." It didn't get that far.
7  Q.  Do you recall sending documents back and forth
8      with terms and conditions?
9  A.  No.
10         THE VIDEOGRAPHER: Counselor, one
11     minute.
12         MR. BOSTWICK: Why don't we go ahead
13     and change the tape? That's risky to ask a
14     question at that stage.
15         THE VIDEOGRAPHER: The time is
16     11:32 a.m. on July 19th, 2006. This is the end
17     of Tape Number 1 in the videotaped deposition of
18     Mr. James Murphy.
19         (Recess)
20         THE VIDEOGRAPHER: The time is
21     11:33 a.m. on July 19th, 2006. This is Tape
22     Number 2 in the videotaped deposition of
23     Mr. James Murphy.
24 Q.  Mr. Murphy, let's take a look at this letter and

Page 93

1      press release a little more carefully. Okay?
2  A.  Yes.
3  Q.  All right. The first thing is on the first
4      page, it's sent from Belmac Corporation, the
5      headquarters in the U.S. that later becomes
6      Bentley, correct?
7  A.  Yes.
8  Q.  And you designate -- you're writing this as
9      James R. Murphy, president and CEO of Bentley,
10     correct?
11 A.  Yes.
12 Q.  And you are saying to Adolfo de Basilio that you
13     are attaching a public disclosure which you want
14     to release on January -- on or around
15     January 19th, 1995, correct?
16 A.  Yes, and in anticipation if we could come to
17     terms.
18 Q.  And you're discussing the basic framework of the
19     future relationship between Bentley,
20     Laboratorios Belmac, and Ethypharm, correct?
21         MR. STEWART: Objection, mis-
22     characterization. You're saying discussing in
23     connection with this document or in connection
24     with other meetings?

24 (Pages 90 to 93)

JT-A-1035

Page 94

1   Q.  In the context of this letter that you're
2       sending.
3   A.  No, this is describing a potential in drug
4       delivery, which did not occur.
5   Q.  Let's see if some of these things occurred or
6       didn't. Let's look at the announcement. You're
7       indicating in this announcement -- and let's
8       look at the second to last paragraph. "Under
9       the agreement, Belmac will also further expand
10      the manufacturing relationship which it already
11      has with Ethypharm." Do you see that?
12  A.  Yes.
13  Q.  And that's a manufacturing relationship relating
14      to omeprazole and other products, correct?
15  A.  Yes.
16  Q.  Okay. And you're going to expand that
17      manufacturing relationship by training more
18      Belmac personnel, correct?
19  A.  No.
20  Q.  Well, isn't that what that line says? Did I
21      read that correctly?
22  A.  Well, this is trying to expand our relationship
23      with them, and it would be, as you see in the
24      second paragraph, new oral dosage forms, new

Page 95

1       products, products that are not currently there.
2       All right? So I don't see where you're talking
3       about the hiring of people here. Explain that
4       to me again.
5   Q.  Well, it's not just talking about doing new
6       products; is it? It's talking about expanding
7       the existing products by training more Belmac
8       personnel to fulfill an increasing demand in
9       contract manufacturing based on Ethypharm
10      technologies, correct?
11  A.  I'm not sure if I understand the meaning of that
12      at this late date. I'm looking at this, and my
13      recollection is we were trying to look to new
14      products. New oral dosage forms, okay, would be
15      a new product, erythromycin, which was not being
16      produced, and new -- and extended release
17      formulations of spironolactone were not being
18      produced for research; and extended omeprazole
19      was not being produced and not researched, and
20      that combining our technologies and our ideas
21      may require more personnel. This was all in
22      contemplation that could happen or may. It
23      didn't.
24  Q.  Do you recall authorizing -- you specifically

Page 96

1       authorizing the training of more Belmac
2       personnel to fulfill the increased demand in
3       contract manufacturing based on Ethypharm
4       technology, meaning existing omeprazole?
5   A.  Not in this context of this product -- of this
6       release, no.
7   Q.  Do you recall authorizing the extension of
8       Belmac personnel to increase the demand for
9       additional omeprazole around the time frame in
10      December, January of 1994 and '95?
11  A.  No. If it was increased, it would be by way of
12      Clemente Gonzalez.
13  Q.  Okay. When was Clemente Gonzalez put in as a
14      general manager?
15  A.  Around this time frame. Maybe a little earlier.
16  Q.  Did Mr. Gonzalez participate in discussions with
17      Adolfo de Basilio and Patrice DeBregeas around
18      this time, January and December of --
19  A.  I do not know.
20  Q.  Isn't it true that you were the only one who
21      spoke to Ethypharm representatives during these
22      December and January trips to Spain and France?
23  A.  I don't recall.
24  Q.  Let's show you another document.

Page 97

1            (Letter of Intent was marked Exhibit
2            Number 12 for identification.)
3   Q.  Okay. This is Exhibit 12. I'll ask you if you
4       recognize that document.
5   A.  I do not remember this document. Who produced
6       this? Who's the author?
7   Q.  That's my question to you.
8   A.  Oh, it's the same question I have to you. I
9       don't know.
10  Q.  Do you -- okay. You don't recall Bentley
11      sending this letter -- this letter of intent to
12      Ethypharm in or around early 1995?
13  A.  I do not recall this.
14  Q.  Okay. Let's read the first sentence. It says,
15      "This letter of intent is presented to Ethypharm
16      by Belmac Corporation." Do you see that?
17  A.  Yes.
18  Q.  So that would be Belmac Corporation in the U.S.,
19      correct?
20  A.  Yes.
21  Q.  So it's your understanding that this letter of
22      intent was presented to Ethypharm by head-
23      quarters U.S.A.?
24           MR. STEWART: Objection.

25 (Pages 94 to 97)

JT-A-1036

Page 98

1    A.  I don't remember this.

2    Q.  Okay. And it says here that it's presented in

3        good faith to ensure that Belmac Corporation --

4        that's the U.S. headquarters, correct?

5    A.  I don't --

6        MR. STEWART:  Are you asking to

7        agree --

8    A.  I don't agree that I know this document. So if

9        you're asking me to testify to anything in this

10       document, I do not know this document. I don't

11       know if this was produced by us. It appears --

12       it gives the appearance of being produced by us.

13       I don't think it was. I don't recognize this.

14   Q.  You don't --

15   A.  And this is not in my writing, and I don't know

16       whose writing is on there or where this comes

17       from. This font doesn't even look familiar that

18       we would use or ever have used. I don't know

19       this document.

20   Q.  Okay. Do you recall whether -- strike that. I

21       understand as you sit here today you don't

22       recall this document. What I'm going to ask you

23       about is whether or not this document is a fair

24       expression of some of the things that were going

Page 99

1        on around January of 1995 and December of 1994.

2        Okay?

3    A.  How do you know this is 1995? I'd like to know

4        where this came from. I don't know it. Where's

5        1995?

6    Q.  Let's -- do you see the press release that we

7        just looked at?

8    A.  Yes.

9    Q.  That's exhibit --

10   A.  Yes, the one you just gave me.

11       MR. STEWART:  11.

12   Q.  11. Don't you think this relates to the same

13       subject matter as that document? In other

14       words, Exhibit 11 and Exhibit 12 relate to the

15       same subject matter, don't they?

16   A.  Yes, they do.

17   Q.  Okay. So let's see if this doesn't refresh your

18       memory about the activities that you in your

19       capacity as Belmac Corporation's head official

20       took around December 1994 and January of 1995.

21       Okay?

22       MR. STEWART:  You're asking him

23       whether Exhibit 12 is going to refresh his

24       memory with respect to that subject?

Page 100

1        MR. BOSTWICK:  I'm going to say let's

2        take a look and see if it does.

3    Q.  Okay?

4    A.  Yes.

5    Q.  Do you remember you as someone from Belmac

6        Corporation telling Ethypharm that Belmac

7        Corporation would employ its best efforts to

8        enter and conclude negotiations for a joint

9        venture relationship around this time frame?

10   A.  I do not remember that.

11   Q.  Okay. And do you recall -- I'm referring to the

12       second paragraph now -- that it was the

13       intention of both parties, meaning Ethypharm and

14       Belmac Corporation U.S.A., to enter into mutual

15       secrecy agreements to ensure proprietary rights

16       of each party?

17   A.  I don't remember that either.

18   Q.  Okay. And how about the third paragraph? Do

19       you recall discussing with Ethypharm

20       representatives a contract for the occupancy of

21       space by Ethypharm in the Zaragoza facilities?

22   A.  Yes.

23   Q.  You do recall that?

24   A.  Yes.

Page 101

1    Q.  So it has helped refresh your recollection?

2    A.  But this hasn't helped refresh it. If you had

3        asked that without this, I would have remembered

4        that.

5    Q.  What do you recall about that level of

6        discussion around 1994, 1995?

7    A.  I had asked to have a -- I felt there should be

8        a contractual relationship between our

9        companies, and engaged Cremides & Associates,

10       Javier Santos, to draft an agreement, and I

11       presented that negotiation, and I presented that

12       agreement -- I'm not sure if it was to DeBregeas

13       or whomever, and we attempted for years to get

14       an agreement. And it never worked.

15   Q.  So an overarching agreement that defined the

16       relationship between Ethypharm and Laboratorios

17       Belmac, correct?

18       MR. STEWART:  Objection.

19   A.  It was to define how they were going to be in

20       the Zaragoza facility.

21   Q.  And let's look at the next paragraph. "Belmac

22       wishes to" --

23       MR. STEWART:  That's the fourth?

24       MR. BOSTWICK:  Yes, that's the fourth.

26 (Pages 98 to 101)

Page 102

1    Q.    "Belmac wishes to establish" -- and, again,
2          that's Belmac Corporation, U.S.A., correct,
3          "wishes to establish a joint relationship with
4          Ethypharm, including but not limited to," and
5          one you mentioned, "erythromycin;" and
6          omeprazole is listed at the end of the sentence.
7          Do you see that?
8    A.    I see that.
9    Q.    Does that refresh your memory about what was
10         discussed in 1995 -- early 1995 or late 1994?
11   A.    No.
12   Q.    Do you think that's incorrect?
13   A.    As I compare this to this --
14   Q.    To the press release, in other words --
15   A.    -- I'd say this is incorrect, and I don't know
16         where this document came from, who authored it.
17   Q.    In other words, as you compare -- just for the
18         record, as you compare Exhibit 11 to
19         Exhibit 12 --
20   A.    Yes.
21   Q.    -- you question Exhibit 12; is that correct?
22   A.    That's correct.
23   Q.    Let's look at the fifth paragraph in the middle.
24         It says, "It is the intent of both companies" --

Page 104

1          products above, omeprazole, spironolactone,
2          erythromycin cannot be delivered transdermally.
3          Why that would be in here, I don't know.  I'm
4          questioning this document.
5    Q.    Do you agree that your contacts in December of
6          1994 and January of 1995 concerned the
7          omeprazole -- in part, the omeprazole business
8          between Ethypharm and Belmac -- Laboratorios
9          Belmac?
10   A.    Please repeat that.
11            (Reporter read back the last question.)
12   A.    In part, yes.
13   Q.    And in looking at what is exhibit -- let's put
14         the document that you have questions about to
15         the side for a minute, and I'll ask you about
16         the Exhibit 11, which is the January 19th, 1995
17         letter, and the December 4th letter, Exhibit
18         Number 9.  Let's just take a look at those.
19   A.    Exhibit 9 and?
20   Q.    Right.
21   A.    9 and?  Which one was it?
22   Q.    9 and 11.  Now, both of those are from you,
23         correct?
24   A.    Yes.

Page 103

1          do you see that?
2    A.    Yes.
3    Q.    -- "to develop the transdermal products for the
4          Spanish market as well as" -- "and to perform at
5          least a portion of the research and development
6          within the Belmac Ethypharm's facilities in
7          Zaragoza."  Is that correct?
8              MR. STEWART:  Are you asking him
9          whether it's correct that your reading of that
10         is correct or whether that was the intent of
11         both companies at the time?
12             MR. BOSTWICK:  That's a fair
13         objection.
14   Q.    I'm asking you the latter.  I'm asking whether
15         you recall that when you went over as -- to
16         discuss these matters with Ethypharm in December
17         of 1994 or January of 1995, whether this was a
18         subject matter of those discussions.
19   A.    I don't recall whether it was a subject at that
20         time.  This further -- I question this further
21         because to develop transdermal products for the
22         Spanish market, okay, and if you look up at the
23         products that are referenced, again, I'm
24         questioning this document because looking at the

Page 105

1    Q.    And both of those indicate right on the
2          letterhead and in the front line that you're
3          writing on behalf of the U.S. headquarters,
4          correct?
5    A.    No.
6    Q.    Okay.  Why do you say no?
7    A.    I wouldn't be writing on behalf of Belmac if I
8          was talking about a relationship in
9          manufacturing.  So it would be on behalf of
10         Laboratorios Belmac, and there may be some
11         interest here for Bentley or Belmac Corporation.
12   Q.    And, in fact -- well, strike that.  Wouldn't it
13         be reasonable for Ethypharm upon receiving these
14         two documents, Exhibits 9 and 11, to believe
15         that headquarters in the U.S. authorized you to
16         take these steps?
17             MR. STEWART:  Objection as to his --
18         as to the competency of this witness to surmise
19         or testify as to what someone else is going to
20         believe.
21   A.    I don't know how they take it.
22   Q.    I'm sorry.  I think it's because you're --
23   A.    I don't know how they take it.  I'd given them
24         two cards, two business cards.

27 (Pages 102 to 105)

JT-A-1038

Page 106

1  Q.  All right. It's your testimony on those dates
2      you specifically recall giving two business
3      cards to Mr. --
4  A.  No, no. At some occasion, probably in the
5      introductory meeting, I would have.
6  Q.  But you don't have a specific recollection as
7      you sit here today of actually giving two
8      business cards to anybody at Ethypharm; do you?
9  A.  Yes.
10  Q.  You do have a specific --
11  A.  I have given -- I know that I've given business
12      cards. I don't know what specific date and
13      where it was, but I know I have, yes.
14  Q.  Okay. And who did you -- I'm going to track
15      into your specific memory now that you have that
16      you've said. Tell me who you recall giving both
17      business cards to.
18  A.  I can't recall the exact date or who it was, but
19      it's my routine, normal way.
20  Q.  So you don't have a specific memory. You have a
21      general belief that that's what you did; is that
22      correct?
23              MR. STEWART: Objection.
24  A.  I do not have a specific date nor place nor

Page 107

1      person in mind.
2  Q.  Okay. Let me show you another document.
3      (Draft of Manufacturing Agreement was
4      marked Exhibit Number 13 for
5      identification.)
6              THE WITNESS: Before we do that, can I
7      run to the bathroom?
8              MR. BOSTWICK: Certainly.
9              THE VIDEOGRAPHER: The time is
10      11:54 a.m. We're going off the record.
11      (Recess)
12              THE VIDEOGRAPHER: The time is
13      12:03 p.m. We're back on the record.
14  Q.  Okay. Mr. Murphy, I had said I would hand you
15      another exhibit. I'm sure you're happy to hear
16      that, but there it is. And I'll ask you if you
17      recognize that document.
18  A.  I do not recognize the document.
19  Q.  This document appears to be a draft of a
20      manufacturing agreement, dated March 21st, 1995.
21      Is that something that we can -- at least from
22      appearances we can agree on that?
23  A.  It appears to be a draft that says March 21st in
24      the text. I don't recognize it. That's not my

Page 108

1      handwriting. I don't know whose that is. I do
2      not recognize this.
3  Q.  So this handwriting in English here is not your
4      handwriting?
5  A.  No.
6  Q.  It does include your name in the first paragraph
7      there. Do you recall taking the negotiations
8      with Mr. DeBregeas relating to the transfer of
9      know-how regarding various products and the
10      manufacturing of various products, including
11      omeprazole, to this level around March of 1995?
12  A.  No, I do not. My recollection was that the
13      negotiations and discussions were between our
14      general manager and the general manager in
15      Spain. I do not remember getting into the
16      details of such an agreement.
17  Q.  You don't think this would be Clemente Gonzalez
18      who would write this to you?
19  A.  He doesn't speak English. This is written in
20      English.
21  Q.  All right. So I take it you just can't help me
22      in terms of whose handwriting that is on this
23      document, correct?
24  A.  No. I know my own handwriting, and that is not

Page 109

1      my handwriting, not to the best of my
2      recollection.
3  Q.  Do you remember participating in reviewing
4      drafts of these manufacturing agreements
5      relating to Ethypharm around this time period,
6      March of 1995?
7  A.  I do not remember participating in any specific
8      one. During this time period, I would have been
9      debriefed.
10      (March 28, 1995 Diary Entry were marked
11      Exhibit Number 14 for identification.)
12  Q.  Exhibit 14 --
13              MR. BOSTWICK: Did you give that to
14      Mr. Stewart?
15              MR. STEWART: Yes, got it.
16  Q.  This is your handwriting, correct?
17  A.  Yes.
18  Q.  And this is a page from the diaries that you
19      have -- that your counsel has provided to us in
20      the context of this case; is that correct?
21  A.  Yes.
22  Q.  And when it says 3-28-95, that's an indication
23      of March 28th, 1995?
24  A.  Yes.

28 (Pages 106 to 109)

Page 110

1  Q.  All right.  Does this -- do the statements there
2       "Ethypharm, Adolfo de Basilio, final draft
3       reviewed with both lawyers, tomorrow their
4       lawyers, sign Spanish contract," does that
5       refresh your memory that you were involved in
6       the negotiations of this type of manufacturing
7       agreement about this March 1995 time frame?
8  A.  No, but it does refresh my memory exactly as I
9       said previously.  Somebody has debriefed me, and
10      this is probably a telephone call, and they're
11      debriefing me they've met -- this is the best
12      recollection I can make out of this.  With
13      regard to Ethypharm, somebody has met with
14      Adolfo Basilio, and a final draft has been
15      reviewed by both lawyers tomorrow,
16      which is consistent with somebody debriefing me.
17  Q.  Okay.
18  A.  And somebody is notifying me here that Mr. Leduc
19      was in China or will be in China for ten days.
20  Q.  Okay.  Let me go to the next document.
21            (Fax to Mr. De Basilio from Mr. Murphy,
22            dated April 4, 1995 was marked Exhibit
23            Number 15 for identification.)
24  Q.  Do you believe you participated in the

Page 111

1       negotiations specifically in the sense of
2       reviewing and commenting on the specifics of
3       manufacturing agreement around 1995?
4  A.  I think had I commented on it, I believe it
5       would probably be written here, that I had my
6       comments or something notation.  I think they
7       were just -- I'm not sure of this now, but from
8       what I'm reading here, somebody is debriefing me
9       as to what is happening.
10  Q.  I show you Exhibit 15.  I'll ask if you
11      recognize that document.
12  A.  Yes.
13  Q.  And this is a document that is signed by you as
14      the president and CEO of Belmac Corporation in
15      the U.S., which later became Bentley, correct?
16  A.  Yes.
17  Q.  And it's dated April 4th, 1995, correct?
18  A.  Yes.
19  Q.  And it's to Adolfo de Basilio at Ethypharm?
20  A.  Yes.
21  Q.  And you indicate that you'd like to see the memo
22      of understanding and provide input into the
23      concept.  Do you see that in Paragraph 2?
24  A.  Yes, yes.

Page 112

1  Q.  Do you recall providing input into the concept?
2  A.  I don't recall receiving it, the memo of
3       understanding.  So I don't know if I did provide
4       input.
5  Q.  Let's take a look at the next document.
6            (April 18, 1995 Diary Entry was marked
7            Exhibit Number 16 for identification.)
8  Q.  I'm showing you Exhibit 16, and I ask if that's
9       also your handwriting.
10  A.  Yes.
11  Q.  That's also from your diaries that have been
12      produced in this case?
13  A.  Yes.
14  Q.  And this is your notation from April 18th, 1995,
15      correct?
16  A.  Yes.
17  Q.  Could you read that to us?  I'm not sure I can
18      read all that.
19  A.  What do you want me to read, the whole thing?
20  Q.  If you would.
21  A.  "A fixed monthly amount of 3,774,000 pesetas
22      would be invoiced.  Total amount" -- "total
23      annual amount of 42 million pesetas and will
24      correspond to Belmac's commitment to provide

Page 113

1       capacity to manufacture," blank, "production
2       units per month.  In the event Ethypharm" --
3  Q.  What's that little character there?
4  A.  Paragraph.
5  Q.  Okay.
6  A.  "In the event Ethypharm is unable to provide
7       manufacturing orders for production, then the
8       minimum amount will become," blank, "pesetas per
9       month.  If the lack of orders occur for three
10      months in any twelve-month period, then the
11      contract will become void, requiring
12      renegotiation."
13  Q.  Is this your -- a notation from you about
14      something to include in the manufacturing
15      contract with Ethypharm?
16  A.  I'm not sure where this came from, whether
17      somebody was essentially reading this to me in
18      debriefing.  I don't really know where this came
19      from or really what this would be inserted into.
20      I don't recall.
21  Q.  So that's not an expression of your idea of what
22      ought to be put into that manufacturing
23      agreement?
24  A.  It may be.  I don't know.  I don't recall this

29 (Pages 110 to 113)

JT-A-1040