Page 114

1    at all.
2    Q.  Let's go to the next document.
3            (May 2, 1995 Diary Entry was marked
4            Exhibit Number 17 for identification.)
5    Q.  And I'll ask you if you recognize that as well
6        as your handwriting.
7    A.  Yes.
8    Q.  And that's another page from your diaries, dated
9        May 2nd, 1995, correct?
10   A.  Yes.
11   Q.  Does that appear -- that top portion, does that
12       appear to reference a telephone conversation
13       with Patrice DeBregeas with his telephone number
14       there?
15   A.  I'm not sure.  I believe that this could have
16       been -- since there's no notes next to it, this
17       could have been only an attempted phone call,
18       and I wanted to discuss three items with him.
19       This leads me to believe that I did not get
20       through to him because had I gotten through, I
21       probably would have filled in comments for each
22       of the categories of the things that I wanted to
23       discuss.
24   Q.  And what are the three items -- the three

Page 115

1        categories of items that you wanted to discuss
2        with Mr. DeBregeas at Ethypharm?
3    A.  We've been trying to get a contract, as you can
4        see, going back and forth, so I would probably
5        ask him what's the status.  Somebody has alerted
6        me that there might be a problem with
7        omeprazole.  It could be a factory problem or
8        quantity.  I don't know.  And I wanted to talk
9        to him about transdermal activities.
10   Q.  Okay.
11   A.  So it might be talking both Bentley on some
12       issues and Laboratorios Belmac on the others.
13   Q.  I'll show you another document from this time
14       period.
15           (Fax to Mr. De Basilio from Mr. Murphy,
16           dated June 26, 1995 was marked Exhibit
17           Number 18 for identification.)
18   Q.  Exhibit 18, and I'll ask if you recognize that
19       document.
20   A.  Yeah.
21   Q.  Mr. Murphy, that's a document that was sent on
22       Belmac Corporation U.S. letterhead from you as
23       president and CEO of the U.S. entity, but it's
24       signed by Mr. Stote; is that correct?

Page 116

1    A.  Dr. Stote.
2    Q.  Dr. Stote.  That's correct?
3    A.  That's correct.
4    Q.  And I'll refer you to the second sentence.  It
5        says, "Therefore, I did not have the opportunity
6        to meet with Mr. DeBregeas to discuss further
7        negotiations regarding the contract."  Do you
8        see that?
9    A.  Yes.
10   Q.  And the contract you're referring to is some
11       version of the manufacturing contract relating
12       to omeprazole in Spain?
13   A.  Probably is.
14   Q.  Is that correct?
15   A.  Probably.
16   Q.  And let's look at another item.
17           (Fax to Mr. DeBregeas from Mr. Murphy,
18           dated July 13, 1995 was marked Exhibit
19           Number 19 for identification.)
20   Q.  This is Exhibit 19.  And I'll ask you if you
21       recognize that document.
22   A.  Yes.
23   Q.  You do recognize that document?
24   A.  Yes.

Page 117

1    Q.  And what is that?
2    A.  This is one of the drafts that went back and
3        forth in an attempt --
4    Q.  Between?
5    A.  Between Ethypharm and Laboratories Belmac in an
6        attempt to get an agreement between our
7        companies.
8    Q.  Okay.  And this is sent to you -- I'm sorry, to
9        Mr. DeBregeas at Ethypharm from you on or around
10       July 13th, 1995; is that correct?
11   A.  Yes.
12   Q.  All right.  And it says -- the enclosure says,
13       "With this cover sheet, I enclose the contract
14       with some modifications."  Do you see that?
15   A.  Yes.
16   Q.  And that's your signature there?
17   A.  Yes.
18   Q.  Do -- the modifications here that are in
19       English, is that your handwriting?
20   A.  Yes.
21   Q.  Now --
22   A.  I'm not sure if that's all mine.  I want to make
23       sure, but --
24   Q.  Take your time.

30 (Pages 114 to 117)

JT-A-1041

Page 118

1  A.  Yeah. I'm not sure if all the handwriting is
2      mine.
3  Q.  It's good to be specific on that. Let's look at
4      the first page of this Exhibit 19. At the top,
5      I take it -- that looks like it's written in
6      French. That's not your handwriting, correct?
7  A.  That's not my handwriting.
8  Q.  So we've established there's nothing on the
9      first page that's your handwriting, correct?
10         MR. STEWART:  The first page, you're
11     talking about the Bates Page EP 00908?
12         MR. BOSTWICK:  Right.
13 Q.  Other than your signature?
14 A.  Correct.
15 Q.  So the handwritten indications other than your
16     signature are not yours on the first page,
17     correct? Correct?
18 A.  Correct.
19 Q.  So the second page, is that your handwriting?
20     It's 9009.
21 A.  Yes.
22 Q.  How about 9010? Is that all your handwriting?
23 A.  I'm not sure of the bottom part here, which I
24     can't read, on Clause 1, the bottom part.

Page 119

1  Q.  Okay.
2  A.  I'm not sure if that's my handwriting. I mean
3      normally I can read my own handwriting.
4  Q.  The rest of it is on the first page?
5  A.  I believe --
6  Q.  I'm sorry. On Page 9010.
7  A.  I believe it is.
8  Q.  How about -- there's nothing on the next page.
9      So 9012, is that all your handwriting?
10         MR. STEWART:  Actually, there is
11     something on the next page, but it is a
12     strike-out.
13         MR. BOSTWICK:  I apologize. Yes, we
14     wouldn't be able to tell that.
15 Q.  9012, is that all your handwriting?
16 A.  I'm not sure of that.
17 Q.  Okay. How about the next page, 9013?
18 A.  Again, I'm not sure of all of it. Some of it is
19     mine.
20 Q.  Okay. 9014?
21 A.  I believe that's mine.
22 Q.  Okay. 9015?
23 A.  I believe that's mine.
24 Q.  9016?

Page 120

1  A.  I'm not sure of that.
2  Q.  Okay. How about 9017?
3  A.  I don't believe that's mine at all.
4  Q.  Okay. 9019?
5  A.  That's mine.
6  Q.  Now, this document, Exhibit 7 -- is it 19,
7      Exhibit 19, shows that you were directly
8      involved in the negotiation of the terms of this
9      relationship with Ethypharm at least in July of
10     1995; is that correct?
11 A.  In the attempt, in the attempts to get an
12     agreement.
13 Q.  In the negotiations, correct?
14 A.  Yes, yes.
15 Q.  When you say in your declaration, 18 --
16     Paragraph 18 that the terms of any agreements
17     between Belmac and Ethypharm were negotiated by
18     representatives of Belmac, specifically the
19     Belmac general managers, not Bentley; that's not
20     accurate given this -- given what we've just
21     looked at; is it?
22 A.  It's still accurate.
23 Q.  Why? What makes it accurate?
24 A.  This is not an attempt. This is a draft, and an

Page 121

1      attempted agreement was never signed.
2  Q.  Did Ethypharm and Belmac continue to manufacture
3      throughout this period?
4          MR. STEWART:  When you say Belmac,
5      you're referring to Laboratorios Belmac?
6          MR. BOSTWICK:  Yes, let me ask a
7      different question.
8  Q.  Throughout 1995, did Laboratorios Belmac
9      continue to manufacture omeprazole and other
10     products for Ethypharm?
11 A.  I believe they did.
12 Q.  And did they do so based on the understandings
13     that were generally recognized in discussions
14     with you, Mr. DeBregeas, Mr. Adolfo de
15     Basilio --
16         MR. STEWART:  Objection.
17 Q.  -- Clemente Gonzalez and others?
18         MR. STEWART:  Objection. It is vague
19     as applied -- vague with respect to any specific
20     document, and it calls for a generalized
21     conclusion from this witness.
22 Q.  Do you need her to read back the question?
23 A.  Please read it back.
24         (Reporter read back the last question.)

31 (Pages 118 to 121)

JT-A-1042

Page 122

1  A.  I believe they kept manufacturing based upon
2  discussions between the Spanish management group
3  and the -- of both companies, Laboratorios
4  Belmac and Ethypharm Spain.
5  Q.  I'll show you another document.
6          (Bentley Pharmaceuticals Board of
7          Directors October 8, 1996 Meeting
8          Minutes were marked Exhibit Number 20
9          for identification.)
10  Q.  Before I ask you to look at that specifically,
11  is it true that you are participating in these
12  negotiations regarding Laboratorios Belmac
13  because that's part of the corporate objective
14  at Bentley?
15          MR. STEWART: Objection.
16  A.  No.
17  Q.  Okay. Is it consistent or inconsistent with the
18  corporate objectives of Bentley to have this
19  manufacturing relationship with Ethypharm?
20  A.  Bentley is -- during this time period was not a
21  profitable organization. So maintaining a
22  relationship was important to both companies.
23  Q.  Does -- did Bentley at this time describe and
24  define itself as a company engaged in

Page 123

1  manufacturing in Spain?
2  A.  The company when it was talking on
3  a consolidated basis would describe itself as a
4  manufacturer of products of branded and generic
5  nature and also doing basic research.
6  Q.  Let me refer you to the next exhibit, which I
7  guess is Exhibit 20. Am I right on that?
8  A.  Yes.
9  Q.  And these, I take it, you recognize as board
10  minutes of Bentley Pharmaceuticals, Inc.?
11  A.  Yes.
12  Q.  Dated October 8th, 1996?
13  A.  Yes.
14  Q.  And you're participating in this meeting as
15  chairman and CEO of Bentley, correct?
16  A.  Yes.
17  Q.  All right. Let me refer you to 2756. And I'm
18  going to read to you the corporate description
19  in the Bentley board minutes of October 8th,
20  1996. It says, "Bentley Pharmaceuticals, Inc.
21  is an international pharmaceutical and health
22  care company, engaged in manufacturing,
23  marketing, and distribution of ethical
24  pharmaceuticals, orphan drugs, biotech products,

Page 124

1  and fine chemicals in France and Spain." And
2  I'll cut it short there for now. Is that an
3  accurate statement of the description of the
4  corporation Bentley Pharmaceuticals in 1996?
5  A.  Part of it.
6  Q.  So as of 1995 and 1996, is it your recollection
7  that there was no global overarching agreement
8  signed between Ethypharm and Belmac or Bentley;
9  is that correct?
10  A.  That's my --
11          MR. STEWART: Objection as to the term
12  "global and overarching agreement" as vague,
13  indefinite.
14  A.  I was going to answer my belief is there was not
15  a large, global agreement in place.
16  Q.  But the work between the companies did continue,
17  correct?
18  A.  Yes.
19  Q.  Okay. And I want to turn your attention to the
20  beginning of 1997 and ask you if you recall
21  whether Ethypharm around that time made a
22  decision to terminate the existing working
23  relationship regarding the manufacture of
24  omeprazole and other microgranulated products.

Page 125

1  A.  I believe that they did alert me that they'd
2  like to terminate.
3  Q.  Okay. Let me show you another exhibit.
4          (Fax to Mr. Dubois, et al. from
5          Mr. Murphy, dated January 21, 1997, and
6          Translation were marked Exhibit Number
7          21 for identification.)
8  Q.  This Exhibit 21, Mr. Murphy, this is a document
9  that's in Spanish. Thankfully, we've had very
10  few of those today, but what we've done in those
11  occasions is we try to provide a rough
12  translation for you, and I'm not going to ask
13  you to verify, obviously, whether the
14  translation is correct. It's just a protocol
15  that Mr. Stewart and I have agreed on for this
16  case so that we can actually talk about the
17  nature of these documents. Okay?
18          MR. STEWART: I'm going to ask to go
19  off the record for a minute while I get --
20          MR. BOSTWICK: Sure.
21          MR. STEWART: I was not provided with
22  an English translation, so I want to go off the
23  record and get my own copy.
24          MR. BOSTWICK: Okay.

32 (Pages 122 to 125)

JT-A-1043

Page 126

1    THE VIDEOGRAPHER: The time is
2    12:36 p.m. We're going off the record.
3    (Discussion off the record)
4    THE VIDEOGRAPHER: The time is
5    12:38 p.m. We're back on the record.
6    Q. Okay. Do you recognize the document that you're
7    holding in your hand there, Exhibit 21?
8    A. No, I don't recognize it, but I've read the
9    translation.
10   Q. Okay. Do you remember -- obviously, you aren't
11   reading the Spanish version initially, but it is
12   clearly a fax dated January 20th, 1997 from
13   Adolfo de Basilio to Clemente Gonzalez? Is that
14   fair?
15   A. Yes.
16   Q. Just reading the translation of this -- and I
17   realize it's rough -- do you have a memory of
18   this event?
19   A. I don't remember the specific, but I do remember
20   the time period and the problems they were
21   encountering.
22   Q. Why don't you just -- setting that document
23   aside or using it as you like, describe for me
24   your own personal memory of this event.

Page 127

1    A. All right. I remember that Adolfo Basilio was
2    having communication problems and differences
3    with Clemente and --
4    Q. And that would be Clemente Gonzalez, the general
5    manager of Laboratorios Belmac?
6    A. Correct. So the two Spanish general managers
7    were having problems communicating and agreeing
8    with each other, and I believe that this then
9    was sent to me essentially as a request, "Will
10   you step in and try to resolve this issue?" We
11   had concerns. We had concerns about costs. We
12   had concerns about GMP, good manufacturing
13   practice, standards and bringing it up. "Can
14   you get in and help us resolve it?"
15   Q. And who is making that request of you when you
16   say --
17   A. Well, I think it was in various meetings I had
18   with Adolfo.
19   Q. Adolfo de Basilio?
20   A. Basilio of Ethypharm. It was expressed to me
21   and essentially asked for me to intercede and
22   try to get communications and things going for
23   them.
24   Q. Did Clemente Gonzalez agree with that or also

Page 128

1    request? What was his position on your
2    involvement?
3    A. Clemente at that time period felt pretty firm
4    that he was doing the best that he could do to
5    try to, you know, meet the wishes.
6    Q. And so am I correct that this letter, this
7    January 20th, 1997 letter basically comes as a
8    statement from Ethypharm that we are going to
9    end this relationship? Is that accurate?
10   A. Well, what I read into this is Ethypharm's
11   attempt -- an expression of frustration probably
12   with Mr. Gonzalez and, "Please tell your mother
13   company about this as well," probably trying to
14   get Clemente to be more responsive to them.
15   Q. Did you take the threat of -- strike that. Did
16   you take the possibility that Ethypharm was
17   actually going to end the relationship relating
18   to manufacturing Ethypharm's products in Spain
19   seriously?
20   A. Of course, I took it seriously.
21   Q. And what -- strike that. Did you consider this
22   a very important juncture in the relationship
23   between these various companies?
24   A. Yes.

Page 129

1    Q. Okay. Did Clemente Gonzalez send you a copy of
2    this January 20th, 1997 letter or did he call
3    you?
4    A. I don't know.
5    Q. How did you become aware this was an issue?
6    A. I don't know. I don't remember receiving a call
7    or receiving any communication with regard to
8    this.
9    Q. Now, you had the option, I take it, when you
10   became aware of this issue to say, "I'm not
11   involved in negotiating the terms of these
12   relationships. Don't speak to me. Talk to
13   Dr. Gonzalez," correct?
14   A. I would try to always have them deal with
15   Dr. Gonzalez. He had more intimate knowledge of
16   manufacturing, quantities, capacity that I
17   didn't have, and I wasn't there on a day-to-day
18   basis. So I'd always try to get Gonzalez to
19   deal with his counterpart at Ethypharm.
20   Q. But in this circumstance, you chose not to deal
21   with that -- with the negotiations in that
22   manner, correct, in other words, by referring
23   them back to Mr. Gonzalez?
24   A. I would always refer them back to Mr. Gonzalez,

33 (Pages 126 to 129)

JT-A-1044

Page 130

1    but I also would be responsive to Ethypharm if
2    they asked me to be responsive and to help.
3    Q.  Okay.  Let me show you another document.  In
4        this instance, do you recall specifically
5        referring them back to Mr. Gonzalez to resolve
6        this issue or did you take it upon yourself to
7        help?
8    A.  No, I think I would do both.  I think I would
9        refer this back to Gonzalez, keep him alerted of
10       any discussions that I would have, and I would
11       also reach out to try to resolve an issue or
12       dispute the disagreements.
13   Q.  Okay.  You say, "I would do this."  That was
14       your testimony.  I want to know if you have an
15       actual, specific recollection in this instance
16       of --
17   A.  I don't.
18   Q.  -- whether you referred to that?
19   A.  I don't have a specific recollection.
20            (Fax to Mr. DeBregeas from Mr. Murphy,
21            dated January 28, 1997 was marked
22            Exhibit Number 22 for identification.)
23   Q.  I show you this document, and I'll ask you if
24       you recognize it.

Page 131

1    A.  Yes.
2    Q.  Okay.  What is this letter?
3    A.  I think this is a response back to DeBregeas.
4    Q.  To Mr. DeBregeas at Ethypharm?
5    A.  Yeah.
6    Q.  In other words, is it a response to the
7        January 20th letter that we just looked at as
8        Exhibit 21?
9    A.  I believe it is.
10   Q.  And so the initial letter went from the local
11       general manager to the other local general
12       manager, correct?
13   A.  Yes.
14   Q.  And then the response comes back from
15       headquarters of Bentley to the headquarters of
16       France; is that correct?
17   A.  Yes.
18   Q.  And you're listing yourself as James R. Murphy,
19       chairman and CEO of Bentley Pharmaceuticals,
20       Inc., correct, on the from line?
21   A.  This, I was responding from the United States
22       and, obviously, had no stationery from
23       Laboratorios Belmac, and they had apparently
24       sent a fax to me.  They had contacted me in the

Page 132

1    United States.
2    Q.  Well, you hadn't said that before.  What is
3        your --
4    A.  No, I'm just reading this on here.  "I'm writing
5        with regard to a fax that I received from your
6        Spanish office."
7    Q.  Do you have a specific recollection of that?
8    A.  No.  I'm wondering if it could be this.
9    Q.  Okay.  When you say "this," Exhibit 21?
10   A.  This, Exhibit 21.
11   Q.  Now, is it reasonable for Ethypharm upon
12       receiving this letter to understand that you
13       have Bentley's authority to act for Laboratorios
14       Belmac?
15           MR. STEWART:  Objection, competency.
16   A.  I do not know what Ethypharm would be thinking.
17   Q.  The second sentence says, "I am confused because
18       ever since I assumed control of Laboratorios
19       Belmac, I have received nothing but extremely
20       positive comments from your Spanish staff."  Do
21       you see that?
22   A.  Yes.
23   Q.  And that's true, you had taken control of
24       Laboratorios Belmac around late '94 or early

Page 133

1    '95?
2    A.  Yes, as I became president, president of
3        Laboratorios Belmac.
4    Q.  And is it reasonable for Ethypharm to understand
5        that you have Bentley's authority to assume
6        control of Laboratorios Belmac as -- that's the
7        question.
8            MR. STEWART:  And I object on the
9        grounds of competency of this witness to surmise
10       as to what was reasonable or not in the minds of
11       Ethypharm.  You may answer.
12   A.  I do not know what Ethypharm was thinking.
13   Q.  Let me ask you.  If you as the CEO of Bentley
14       received a letter from the chairman and CEO of
15       headquarters of U.S.A. of Johnson & Johnson and
16       the chairman and CEO of Johnson & Johnson said,
17       "I have assumed control of my Japanese
18       subsidiary," wouldn't you understand that
19       headquarters U.S.A. had authorized that takeover
20       of control?
21           MR. STEWART:  Objection, hypothetical.
22   A.  I don't know how I'd respond to that.
23   Q.  Is it reasonable to think that the contents of
24       this letter are approved and in concert with the

34 (Pages 130 to 133)

JT-A-1045

Page 134

1    interests of Bentley Pharmaceuticals, Inc.?
2    A.  The contents of this letter, as I read it, the
3        subject is Laboratorios Belmac manufacturing for
4        Ethypharm.  I'm stating that ever since I
5        became, essentially, control of president of
6        Laboratorios Belmac, I think a reasonable reader
7        would recognize this as Laboratorios Belmac.
8    Q.  Why didn't you write as James Murphy, president
9        of Laboratorios Belmac on the from line if that
10       was your position?
11   A.  This was the boilerplate facsimile in the
12       computer, and I was in the United States
13       responding.
14   Q.  You propose, do you not, to have a discussion
15       about the future relationship between the
16       organizations and an agenda to discuss on
17       Page 2; is that correct?
18   A.  Yes.
19   Q.  And you propose that the discussion involve
20       arrangements to receive payments long overdue,
21       correct?
22   A.  Yes.
23   Q.  Belmac's proposal for a structure that would
24       provide a profitable operation for Ethypharm in

Page 135

1        Spain, correct?
2    A.  Yes.
3    Q.  And obtain an understanding of what problems, if
4        any, exist with Ethypharm, correct?
5    A.  Yes.
6    Q.  And the possible orderly departure of Ethypharm
7        from Belmac facilities, correct?
8    A.  Yes.
9    Q.  And that's a negotiation that you are proposing
10       to participate in, correct?
11   A.  Yes.
12   Q.  And, in fact, a discussion and a meeting does
13       take place relating to those topics and others,
14       correct?
15   A.  Yes.
16   Q.  And that takes place in the United States?
17   A.  Could be or it could be in France.
18   Q.  Do you recall meeting with Claude Dubois in
19       Philadelphia in the United States on this topic?
20   A.  I know that I met with Claude Dubois.  I do not
21       remember a specific meeting in Philadelphia.
22          MR. BOSTWICK:  Okay.  Why don't we go
23       off the record?
24          THE VIDEOGRAPHER:  The time is

Page 136

1        12:55 p.m.  We're going off the record.
2          (Luncheon recess)
3          THE VIDEOGRAPHER:  The time is
4        2:09 p.m.  We're back on the record.
5    Q.  Good afternoon, Mr. Murphy.
6    A.  Good afternoon.
7    Q.  Let me ask you to take out two exhibits here
8        just to look at.  The first one is right on top.
9        I think that's your declaration, number one.
10   A.  Yes.
11   Q.  And actually, the second one is right below
12       that.  So that's exactly right.  What is that,
13       Exhibit 22?
14   A.  22.
15   Q.  Okay.  So we're looking at your declaration as
16       Exhibit 1 and then the January 28th, 1997 letter
17       as Exhibit 21.  Correct?
18   A.  Correct -- 22.
19   Q.  Or as Exhibit 22, 22.  Looking at Exhibit 1, I
20       had read you earlier a sentence from your
21       declaration that says, "I am not and was not
22       involved in Bentley's -- in Belmac's
23       operations."  Do you see that?
24   A.  What number?  What page?

Page 137

1    Q.  Page 5, Paragraph 12.  And it's about midway
2        through that paragraph.  It says, "I am not and
3        was not involved in Belmac's operations."  Do
4        you see that?
5    A.  Yes.
6    Q.  Now, in the letter on January 28th, you say, "I
7        have assumed control of Laboratorios Belmac."
8        You see that sentence?
9    A.  Right.
10   Q.  Isn't the fact that you assumed control of
11       Laboratorios Belmac an important fact that
12       you're leaving out of this declaration to the
13       court?
14   A.  No, it's not.  This is Belmac's operations.  I
15       was not involved in operations.  I mean it's
16       pretty hard to be involved in day-to-day
17       operations when you're only there three times a
18       year and the people don't speak English.
19   Q.  Is it your testimony that throughout this period
20       from '95 to 2002 you were only in Spain three
21       times a year?
22   A.  No, I was more.  It says in the same thing
23       you're referring to -- this is with Mr. Herrera
24       in the same section.  Since Mr. Herrera is

35 (Pages 134 to 137)

Page 138

1    there, I'm not needed as frequently.
2    Q.  Well, actually, the Paragraph Number 12 of your
3       sworn declaration starts, "Since 1994," correct?
4       Isn't that what that paragraph refers to?
5    A.  No, I thought you were referring to here, "I am
6       not and was not involved with Belmac's
7       operations." You're referring to a different
8       line?
9    Q.  Is it correct -- is your declaration correct
10      since 1994, you were not and was -- you are not
11      and were not involved in Belmac's operations?
12      Is that -- do you think that's a fair
13      characterization of the situation?
14   A.  In operations, I believe that is fair.
15   Q.  And even though you have assumed control of
16      Laboratorios Belmac, you don't think that fact
17      is important to alert the court to?
18   A.  Assumed control as president of Laboratorios
19      Belmac.
20   Q.  So I take it your answer is that you felt it was
21      not important to raise that fact in your
22      declaration?
23   A.  I felt it was not important.
24   Q.  Now, I had asked you right before we broke about

Page 139

1    an incident where Ethypharm was going to
2    terminate the relationship between the companies
3    relating to the manufacture of omeprazole. Do
4    you recall that?
5    A.  Yes.
6    Q.  And I believe we had agreed that there was a
7       meeting on that topic that did take place
8       between you and Mr. Dubois. Am I correct on
9       that?
10   A.  Yes.
11   Q.  And do you -- do you recall where this meeting
12      was held?
13   A.  No, I do not.
14   Q.  So you don't have any recollection --
15   A.  You --
16   Q.  I'm sorry.
17   A.  I know from preparing for this that apparently
18      it happened in Philadelphia, but to further
19      answer your question, no, I don't remember the
20      meeting.
21   Q.  So sitting here in the chair --
22   A.  Yes.
23   Q.  -- you can't draw a recollection of where you
24      met him?

Page 140

1    A.  Can't picture the hotel or wherever we met. No,
2       I cannot.
3    Q.  Can you picture Mr. Dubois?
4    A.  Yes, I can picture him, and the only reason I
5       can picture him is because recently I
6       encountered him in a meeting in Madrid and he
7       introduced himself to me and I looked at his
8       name tag, and then I recognized him.
9    Q.  Let me show you a document here.
10          (February 5, 1997 Diary Entry was marked
11          Exhibit Number 23 for identification.)
12   Q.  And do you recognize Exhibit 23, Mr. Murphy, to
13      be another page of the diary that you have
14      produced in this litigation?
15   A.  Yes.
16   Q.  Okay. And do you recognize these as notes from
17      this meeting in Philadelphia or not?
18   A.  I don't recognize them as notes from the
19      meeting, but I believe that it is.
20   Q.  Okay. Now, you said you don't have a memory of
21      the specific meeting place or the location. Do
22      you recall the issues that were discussed at the
23      meeting independently of looking at this
24      Exhibit 23 or not at all?

Page 141

1    A.  You mean if these notes would --
2    Q.  If the notes aren't in front of you, do you have
3       any memory of the --
4    A.  Without the notes or documents, no, I would not
5       remember this.
6    Q.  Meeting at all?
7    A.  No. I apologize. I wouldn't.
8    Q.  So looking at -- now that we've established
9       that, let's see if this document helps refresh
10      any aspect of your memory. Okay?
11   A.  Uh-huh.
12   Q.  Do you recall a discussion that there were GMP
13      procedural problems and processing problems and
14      handling and storage problems, analytical and
15      control problems?
16   A.  Yes, during this time period, there were issues
17      surrounding that.
18   Q.  At Laboratorios Belmac?
19   A.  That's correct.
20   Q.  Relating to the products of omeprazole and other
21      products for Ethypharm?
22   A.  Well, not just at Ethypharm, but it was an issue
23      of bringing the facility into compliance with
24      good manufacturing practices. It was the whole

36 (Pages 138 to 141)

JT-A-1047

Page 142

1    facility, which, of course, would affect
2    Ethypharm products as well as other products.
3    Q.  Do you recall -- looking at that next line, do
4       you recall there was discussion or agreement
5       surrounding the production of 40 batches a year
6       of omeprazole?
7    A.  I would believe that he was relaying information
8       to me concerning batches because I really didn't
9       know that much detail in manufacturing for
10      myself to talk about 40, 18 or any other
11      capacity.  So I'm assuming that he is alerting
12      me to something here.
13   Q.  Okay.  How about this proposal down here?  Do
14      you see that?  About two-thirds of the way down,
15      it says "proposal" on the side, "40 million
16      pesetas per year equals 20 batches."  Do you
17      recall any proposal, either you making a
18      proposal to him or him making a proposal to you?
19   A.  Well, he must have made a proposal to me
20      because, as I just stated, I'm not familiar
21      enough with manufacturing issues to be able to
22      say or make a proposal for any capacity for any
23      production, so he must be making this or
24      alerting me of this in these notes.

Page 143

1    Q.  Now, as I understand it, there is nobody else at
2       this meeting that you recall?
3    A.  I don't know.  I don't recall.  Unfortunately, I
4       don't recall where this took place.
5    Q.  How about on the next page, does any -- does
6       your review of any of that trigger any
7       memories about this meeting in February of 1997?
8    A.  No.  You know -- I'm just giving you my gut
9       reaction to this.  It appears as though I'm
10      getting an education.  So somebody is filling me
11      in here.  That's the best explanation I can give
12      you on this.
13   Q.  Were you negotiating the terms of a continued
14      relationship?
15   A.  No, I don't believe I was.  I believe I was
16      listening and taking notes and finding out what
17      his issues were.
18   Q.  Do you recall making any counterproposals to
19      Mr. Dubois?
20   A.  No.
21   Q.  And I guess what you're indicating with
22      Exhibit 23 is that really isn't helping you
23      refresh a present memory of this event; is that
24      right?

Page 144

1    A.  That is correct.
2    Q.  And what you can tell me about that event is
3       just what you're surmising from taking a look at
4       those notes?
5    A.  Yes.
6    Q.  Okay.  Let me give you something a little more
7       concrete.
8          (Letter to Mr. Murphy from Mr. Dubois,
9          dated February 13, 1997 was marked
10         Exhibit Number 24 for identification.)
11         MR. STEWART:  This is Exhibit 24?
12         MR. BOSTWICK:  Yes.
13   Q.  Okay.  Is this a document that you recognize?
14   A.  This appears to be a summary document of our
15      meeting.
16   Q.  Do you recall receiving that letter?
17   A.  I don't recall, but I must have.  It's got my
18      name on it.
19   Q.  Turning to the second paragraph there, it says,
20      "We," presumably meaning Ethypharm, right --
21   A.  Uh-huh.
22   Q.  -- "can only maintain manufacturing" -- pardon
23      me.
24   A.  Easy for you to say.

Page 145

1    Q.  Yes, exactly.  "We can only maintain
2       manufacturing there," meaning Spain, "if we're
3       sure that an economical number of MHB batches
4       can be produced."  Do you know what MHB stands
5       for?
6    A.  No.
7    Q.  Do you believe that that refers to omeprazole as
8       related in your notes?
9    A.  MHB?  I don't know.  I don't even know what
10      MHB -- I couldn't even take a wild stab at it.
11   Q.  And the target he notes is 40 batches.  Does
12      that stir any recollections here?
13   A.  He's apparently summarizing again and alerting
14      me because it's consistent with my notes of 40
15      batches.  I would imagine so.
16   Q.  And the next item he's got there is the GMP
17      procedures are improved, in other words, they
18      must be improved, correct?
19   A.  Yes.
20   Q.  And then the cost has to remain economically
21      viable; is that correct?
22   A.  Yes.
23   Q.  And then he says, "We propose for the next six
24      months we continue manufacturing in Zaragoza 20

37 (Pages 142 to 145)

JT-A-1048

Page 146

1    batches," is that correct?
2  A.  Yes.
3  Q.  "With all priorities given to this objective,"
4      correct?
5  A.  Yes.
6  Q.  And the next paragraph down there is, "You
7      suggested that your consultant in quality should
8      visit Zaragoza." Do you have any memory of
9      suggesting that a consultant from Bentley come
10     to Zaragoza?
11  A.  No. This was during a time of the GMP issues
12      that affected not only their products but ours,
13      and we internally talked about trying to find a
14      consultant in GMPs in the United States to send
15      over to assist in Zaragoza. GMPs were enacted
16      in the United States quite a few years before
17      Europe had to enact similar qualities of GMP.
18      So really your consultants and experts were
19      throughout the United States, and that's what
20      that would be referring to.
21  Q.  And the next sentence there is, "Monthly rent
22      will be maintained at the present level for six
23      months." Do you see that?
24  A.  Yes.

Page 147

1  Q.  Do you remember discussing or negotiating that
2      aspect with Mr. Dubois?
3  A.  No.
4  Q.  How about the last portion, "After the six
5      months, if the objectives are met, we shall
6      re-evaluate the monthly rent on a yearly basis,
7      et cetera"? Do you remember that the framework
8      was kind of a six-month trial period to see if
9      the objectives could be met in order to continue
10     this relationship?
11  A.  That's what I would read out of this, but I do
12      not have a direct recollection of that from the
13      meeting.
14  Q.  Okay. Let me refer you back to Exhibit 1 here,
15      and you say in your sworn declaration that -- on
16      Page 18 in the middle of the paragraph, "The
17      terms of any agreements between Belmac and
18      Ethypharm were negotiated by representatives of
19      Belmac, specifically the Belmac general
20      managers, not Bentley." Do you see that?
21  A.  Yes.
22  Q.  Isn't this an example of when you specifically
23      negotiated --
24  A.  No.

Page 148

1  Q.  -- the terms of an agreement and a modification
2      of the existing relationship with Ethypharm?
3  A.  No.
4  Q.  And why isn't that true?
5  A.  Because, as I said before, he was alerting me as
6      to what batches MHB and all of that. I didn't
7      know. I wouldn't negotiate that. I would
8      listen to him and then call our management, give
9      them a report, and then if these quantities were
10     renegotiated and agreed to, it would be done
11     between the general manager and the
12     manufacturing unit. I only listened to his
13     problems and essentially then followed up with
14     our management, saying, "Try to solve these
15     things." So he came to me asking for help.
16  Q.  Isn't it simpler than that in the sense that
17      Ethypharm had said, "We're going to terminate,"
18      then you met with Mr. Dubois and agreed to their
19      proposal that, "We'll do a trial six-month run,
20      here are the terms, and let's continue and see
21      if it works"?
22  A.  I don't agree with that because it appears as
23      though it was his proposal and that he was
24      saying, "Okay. If you're going to try to work

Page 149

1      to solve this problem, we will give you another
2      six months," is the way I read this and I think
3      is probably a more accurate portrayal of what's
4      happened.
5  Q.  Did Mr. Dubois, to your knowledge, discuss this
6      with any of the Belmac general managers as
7      opposed to just yourself?
8  A.  I don't know. I don't know. He certainly would
9      have discussed it with Adolfo Basilio, who was
10     in constant contact with our people.
11  Q.  Let's take a look at Paragraph 24 of your
12      declaration, and that paragraph discusses your
13      interaction with Ethypharm, correct?
14  A.  Yes.
15  Q.  And your contact with Ethypharm, correct?
16  A.  Yes.
17  Q.  And the last sentence reads, "These contacts
18      were sporadic and did not concern the omeprazole
19      business between Ethypharm and Belmac." Do you
20      see that?
21  A.  Yes.
22  Q.  Isn't this 1997 meeting a prime example of a
23      contact with an Ethypharm representative that
24      specifically related to the omeprazole business

38 (Pages 146 to 149)

JT-A-1049

**Page 150**

1 between Ethypharm and Belmac?
2 A. He was telling me his problems and addressing
3 his problems to me. So the resolution in any
4 sort of thing would have been directly by Spain,
5 not by me.
6 Q. Isn't it just easier than that, that this is a
7 contact, it's a meeting that's taking place and
8 there are letters that are passing back and
9 forth, direct contact with you relating to the
10 omeprazole business between Ethypharm and
11 Belmac?
12 A. It had to do with omeprazole and Belmac.
13 Q. Now, do you recall specifically being involved
14 in -- six months later in discussing the
15 specifics of a contract between Ethypharm and
16 Belmac relating to the omeprazole business?
17 A. When? Repeat that, please.
18 Q. Six months later.
19 A. I don't recall.
20 Q. Okay. In other words, according to this letter,
21 there were going to be a six-month trial period
22 from February to six months later, correct?
23 A. Uh-huh.
24 Q. Around August or so, do you recall being

**Page 151**

1 specifically involved in negotiations at that
2 six-month juncture with Ethypharm?
3 A. I don't recall, no.
4 Q. Let me show you a document.
5     (August 28, 1997 Diary Entry was marked
6     Exhibit Number 25 for identification.)
7 Q. I'll ask you if you recognize Exhibit 25 as
8 another page from your diaries that Bentley has
9 produced in this case?
10 A. Yes, I do.
11 Q. And this is notes of yours from a telephone call
12 with someone from Spain?
13 A. I believe it is.
14 Q. And I can represent to you that there were
15 contracts exchanged during this period, draft
16 contracts. This says, "Ethypharm, many
17 changes," and then there's some issues down
18 here, "Microgranulation, future limitation." Is
19 that what that says?
20 A. I don't know.
21 Q. How would you read that first bullet point
22 there?
23 A. "Microgranulation and future limitation."
24 Q. How about Number 2?

**Page 152**

1 A. "Exclusivity."
2 Q. 3?
3 A. "Omeprazole."
4 Q. 4?
5 A. "Too restrictive."
6 Q. And 5?
7 A. "Any changes in shareholders clause."
8 Q. And are those your -- is that your articulation
9 of issues that are present in the drafts of the
10 contracts sent back and forth with Ethypharm
11 around this time?
12 A. No. No, I don't believe it is. I believe that
13 somebody from Spain has phoned and has debriefed
14 me of these issues.
15 Q. Do you think you were reviewing this contract
16 yourself at this time, reviewing manufacturing
17 contracts between Ethypharm and Belmac?
18 A. I may have seen one, but I'm not -- I cannot
19 recollect. I think that there was definitely a
20 phone call from somebody in Spain, filling me in
21 as to what issues there were in this, whatever
22 draft of a contract would be.
23 Q. And these are your notes, and it says, "Tell
24 them we have previously spent tremendous amount

**Page 153**

1 of time and money in contract attempts. We will
2 not review such a restrictive and ludicrous
3 contract that includes control of Belmac
4 shareholders, et cetera." Is that correct?
5 A. Yes.
6 Q. And then does the rest read, "Until a new, more
7 reasonable version is received and then
8 become" -- "and they become current on their
9 bills." Have I read that correctly?
10 A. You've read that correctly.
11 Q. And is my understanding correct that's you
12 saying, "Here's what we need to tell them"?
13 A. Yes.
14 Q. Now, let's take a look at another document.
15 Actually, let's go to 1998. Do you recall that
16 no global agreement was signed in 1997? Is that
17 your recollection?
18     MR. STEWART: Objection. Objection as
19 to the term "global agreement."
20 Q. No global agreement between Ethypharm and Belmac
21 was signed?
22 A. I'm not familiar with any global agreement.
23 Q. And do you recall a meeting at Ethypharm's
24 offices in Paris in the spring of 1998 that you

39 (Pages 150 to 153)

ESQUIRE DEPOSITION SERVICES
1-866-619-3925

JT-A-1050

Page 154

1  were involved in?
2  A.  There may have been a meeting there.
3  Q.  Okay.  Let me give you a document that may help
4     frame a reference.
5        (Fax to Ms. Vaquero form Ms. Laura,
6        dated March 31, 1998 was marked Exhibit
7        Number 26 for identification.)
8        MR. STEWART:  Does this document have
9  a translation?
10       MR. BOSTWICK:  It does not, but I'm
11 only going to ask him about the people there,
12 which are in universal language.
13 Q.  The only reason I'm showing you this document,
14    Mr. Murphy, is so you can check the names.  It
15    appears to be hotel reservations for Paris.
16       MR. STEWART:  So this is to refresh
17 his recollection as to whether he was in Paris
18 at that time?
19       MR. BOSTWICK:  Yes, exactly.
20       MR. STEWART:  I see.
21 Q.  I'm not going to ask you about the substance of
22 this actual document.
23       MR. STEWART:  And this is Exhibit 26?
24 Or is this Exhibit 26?

Page 155

1        MR. BOSTWICK:  Yes.
2        MR. STEWART:  Okay.
3  A.  What are you asking me, the names on here?
4  Q.  Well, I'll do it this way:  On the second page
5     of this exhibit, there appear to be hotel
6     reservations made for five people or so around
7     March -- late March or early April of 1998.  And
8     do the names on that list help refresh your
9     recollection --
10 A.  No.
11 Q.  -- about whether you attended a meeting --
12 A.  No.
13 Q.  -- in Paris --
14 A.  Doesn't help me at all.
15 Q.  -- around this time?
16 A.  As a matter of fact, they don't even list my
17    name.
18 Q.  Okay.  You do see it says, "Mr. Murphy,"
19    correct, which may be a misspelling of your
20    name?
21 A.  Yes.  I just don't recollect.
22 Q.  Let me show you another document that may or may
23    not help refresh your memory.
24       (April 2, 1998 Diary Entry was marked

Page 156

1        Exhibit Number 27 for identification.)
2  Q.  I'll ask you to take a look at Exhibit 27 and
3     also verify that that is a couple of pages from
4     your diary, which has been produced to us in
5     this litigation.
6        MR. STEWART:  What's the exhibit
7  number of this?
8        THE STENOGRAPHER:  27.
9  A.  Okay.
10 Q.  Is that from your diary?
11 A.  It's from my diary.
12 Q.  And it's your handwriting, in other words?
13 A.  Yes.
14 Q.  And the date on the top is April 2, 1998.  Do
15    you see that?
16 A.  Yes.
17 Q.  And it indicates Ethypharm and then there are
18    three names.  What are those names there?
19 A.  Mr. Basilio, Mr. Dubois, Mr. Bernard Denube.
20 Q.  And would that be Mr. Adolfo de Basilio of
21    Ethypharm Spain?
22 A.  Yes.
23 Q.  Mr. Claude Dubois of Ethypharm France?
24 A.  Yes.

Page 157

1  Q.  And then another individual?
2  A.  Yes.
3  Q.  Okay.  Do you know a Bernard Denube?
4  A.  He was in manufacturing of some sort, I believe.
5  Q.  Could you -- I'm having trouble with that first
6     sentence there.  I see the word "omeprazole," is
7     that correct?
8  A.  Yes.
9  Q.  Can you read the sentence in the little bullet
10    point there?
11 A.  "Not largest enough to manufacture."
12 Q.  So, in other words, it says, "Ethypharm only" is
13    that product?
14 A.  "Only product in Spain."
15 Q.  PDT is product?
16 A.  Yes.
17 Q.  So "omeprazole only product in Spain not largest
18    enough to manufacture"?
19 A.  Yes.  My English is not too good.
20 Q.  Do you know what that means at all?
21 A.  I don't know what it means.
22 Q.  Does looking at this first page at all refresh
23    your memory of the events of that meeting or
24    whether you attended?

40 (Pages 154 to 157)

JT-A-1051

Page 158

1    A. No, it's really not helping me at all.
2    Q. Let's turn --
3         MR. STEWART: Do you have a date, a
4    specific date in mind for this meeting?
5         MR. BOSTWICK: It says April 2, 1998
6    on the top page.
7         MR. STEWART: I understand that's what
8    it says on that, but do we know -- I don't know
9    that you've asked me whether this is a meeting,
10   whether this is a telephone call because I know
11   during this time period there were -- well, let
12   me withdraw. What I know and what I don't know
13   is totally irrelevant.
14        MR. BOSTWICK: That's fair enough.
15   Let me ask him a few more foundation questions
16   to establish a foundation of what you know or
17   don't know about this.
18   Q. Does the indication of these three gentlemen at
19   the top and the indication of Ethypharm indicate
20   to you that this was probably a meeting or a
21   telephone call with Ethypharm or not?
22   A. When I look at this together with the previous
23   Exhibit 26, I would believe this to be a
24   meeting.

Page 159

1    Q. Okay. Probably at the offices of Ethypharm in
2    Paris?
3    A. Yes.
4    Q. Or St. Cloud, as they call it?
5    A. Probably, yes.
6    Q. And does the -- okay. We've asked that
7    question. Let's go to the second page. And the
8    second page says, "Ethypharm problems solved,"
9    correct?
10   A. Yes.
11   Q. And Number 1 says -- is that "Good raw
12   material"?
13   A. "Good raw material."
14   Q. And Number 2 says, "Good formulation," "stable"
15   in parentheses?
16   A. Stable.
17   Q. Okay. And then what are the indications below
18   40?
19   A. It's $40 -- 40,000 per kilo.
20   Q. Okay. So I see. 40K is $40,000 per kilogram?
21   A. Yes.
22   Q. And the next one is 55K per kilogram, other?
23   A. Yes.
24   Q. Do you have any idea what that refers to?

Page 160

1    A. No, I really don't. I mean it sounds like an
2    awful high figure for any raw material, so I
3    really -- I don't know.
4    Q. Could it relate to omeprazole?
5    A. I don't know. It seems awful high.
6    Q. Could that be pesetas or -- would that be more
7    appropriate?
8    A. 1998. I really -- I don't know.
9    Q. Okay. Under that, it indicates "future" --
10   well, actually, before we get to that, do you
11   know what this means, "Ethypharm problems
12   solved" as of April 2, 1998, and "good
13   formulation, stable"? Do you know what that
14   means?
15   A. I must have run out of space and gone onto the
16   next page. You can see on the previous page we
17   are talking about raw material and a source of
18   raw material for three different potential
19   sources.
20   Q. For omeprazole?
21   A. For the API, the active pharmaceutical
22   ingredient, and then --
23   Q. Excuse me. Of the omeprazole product?
24   A. Yes, it would probably be omeprazole, yes,

Page 161

1    omeprazole. Then if you go to the next page,
2    apparently whatever they were discussing, which
3    was really the manufacturing people there at the
4    meeting, they agreed on a good source of raw
5    material.
6    Q. And the formulation was stable at this point?
7    A. Apparently the formulation is stable now.
8    Q. Okay. And it says, "Future, new relationship,
9    Ethypharm supply raw material, 20 to 24 batches,
10   enter 8 batches supply, enter today." Do you
11   see that?
12   A. Yes.
13   Q. Is that an indication of a framework of a new
14   modification of the existing relationship
15   between Ethypharm and your company?
16   A. It appears that this is the new number of
17   batches that the companies agreed on. If you
18   remember, this ties back to the previous two
19   documents you've given to me where they're
20   requesting for a certain number of batches.
21   Q. Okay. And going back to your declaration, on
22   Paragraph 24, when it says, "These contacts with
23   Ethypharm did not concern the omeprazole
24   business between Ethypharm and Belmac," this

41 (Pages 158 to 161)

JT-A-1052

1  meeting, to the best of your understanding, did
2  relate to omeprazole between Ethypharm and
3  Belmac, correct?
4      MR. STEWART: Objection. You're
5  reading -- this is the second time you've done
6  this. You've taken a quotation -- a piece of
7  Exhibit 24 without the context of the entire
8  paragraph.
9  Q. Okay. You can answer.
10 A. This -- these participants that were at this
11 meeting, Gonzalez, Herrera, Berenguer, are all
12 capable of addressing the concerns, the
13 commitments and the details of the relationship
14 with Ethypharm. If I'm present at this meeting,
15 I'm not negotiating anything, nothing to do with
16 omeprazole manufacturing in batches. I wasn't
17 qualified to negotiate that nor would I
18 negotiate that. I would leave that to the
19 experts, which, as you can see from your list
20 you just gave me, were here in this meeting.
21 Q. My question is more limited, though. This is a
22 contact with Ethypharm that you're involved with
23 that does concern the omeprazole business
24 between Ethypharm and Belmac, correct?

1  A. I would be talking to Ethypharm about many
2  things, and I would take the opportunity during
3  my visits to Paris to talk about drug delivery,
4  to talk about other collaborations, expanding
5  opportunities between our organizations, whether
6  it be Laboratorios Belmac or Bentley and drug
7  delivery. So specific details on the
8  omeprazole, I would just leave that to my
9  management and let them do that. The fact that
10 I was in attendance at this meeting, I was not
11 an active participant in this.
12 Q. Okay. You've said yourself you don't remember
13 the meeting; is that correct?
14 A. Right.
15 Q. So my question is more limited. This is an
16 actual meeting that you're involved in, you're
17 taking notes at it, correct?
18 A. Uh-huh.
19 Q. That's correct?
20 A. Yes, yes.
21 Q. And it's a meeting that does concern the
22 omeprazole business between Ethypharm and
23 Belmac, correct?
24 A. That may have been one item on the agenda.

1  Q. Now, the last portion of this document,
2  Exhibit 27, says, "Action Plan, switch to
3  aqueous." Do you know what that refers to?
4  A. That's an aqueous formulation of omeprazole.
5  Q. What does that mean?
6  A. The formulation that we were working with
7  Ethypharm was an organic formulation. This is a
8  water-based, aqueous, formulation, which
9  Laboratorios Belmac was working themselves on a
10 new formulation and Ethypharm was working
11 independently to develop their formulation, as
12 was many other companies. So I'm not whether --
13 what this means, whether Ethypharm was telling
14 us that they would like to talk to us about the
15 aqueous, I'm not sure.
16 Q. Okay. The second item listed under the Action
17 Plan says, "Draft letter, BNT, noncompete using
18 knowledge of Ethypharm." Do you see that?
19 A. Yes.
20 Q. BNT means Bentley?
21 A. No. BNT, like I said earlier in our
22 discussions, I frequently use BNT as "we" on a
23 consolidated basis. So Bentley would not be
24 using that. It would be Laboratorios Belmac

1  Q. Is BNT the -- strike that. Are the letters B N
2  T the three letters used on the stock exchange
3  to identify Bentley?
4  A. Yes.
5  Q. And just so I understand, your testimony is that
6  when you wrote "draft letter, BNT, noncompete,
7  using language of Ethypharm," you meant
8  Laboratorios Belmac, not Bentley?
9  A. That is correct, and that was a request from
10 Ethypharm wanting this.
11 Q. Okay. Just to finish up with Exhibit 27,
12 Mr. Murphy, I take it that looking at this
13 document doesn't help you draw in your own mind
14 an actual personal memory of this meeting in
15 Paris; is that correct?
16 A. That is correct.
17 Q. And you don't recall being shown in that meeting
18 a draft confidentiality and noncompete agreement
19 for Bentley and Belmac's signature?
20 A. I don't. I don't recall.
21     MR. BOSTWICK: Let's go off the
22 record.
23     THE VIDEOGRAPHER: The time is
24 2:51 p.m. on July 19th, 2006. This is the end

ESQUIRE DEPOSITION SERVICES
1-866-619-3925

JT-A-1053

Page 166

1  of Tape Number 2 in the videotaped deposition of
2  James Murphy.
3        (Off the record)
4        (Recess)
5        THE VIDEOGRAPHER:  The time is
6  2:57 p.m. on July 19th, 2006.  This is Tape
7  Number 3 in the videotaped deposition of
8  Mr. James Murphy.
9  Q.  Mr. Murphy, I'd like to turn our attention to an
10  incident that occurred in 1999, and before
11  showing you the documents, I just want to see if
12  you have a present memory of an issue that
13  Mr. DeBregeas raised with you about Clemente
14  Gonzalez's statements in the press about the
15  ownership of omeprazole.  Do you have a memory
16  of that?
17  A.  Yes.
18  Q.  Could you just tell me from your own perspective
19  off the top of your head what you recall about
20  that incident?
21  A.  I remember that I got a fax, I believe, alerting
22  me to the fact that there had been an interview
23  in a newspaper and he he -- if I remember
24  correctly, he was raising objection that we

Page 167

1  never mentioned Ethypharm's name.  And in that
2  interview, I think he was -- Clemente was
3  promoting our product, our Belmazol, our
4  trademark, our registration, our product that
5  was on the market, and I responded strongly back
6  to -- I don't know if Leduc or DeBregeas, one of
7  the two -- saying, "You didn't want us ever to
8  mention your name," and essentially trying to
9  explain we were promoting our trademark, our
10  Belmazol, our product, our registration, and
11  that it would bring in -- visibility and
12  increasing revenues and sales would be
13  beneficial to both companies.
14  Q.  What do you mean by that Ethypharm didn't want
15  their name mentioned?  You said something like
16  that.
17  A.  If you remember, in the past, I had attempted to
18  expand -- in my role as president of
19  Laboratorios Belmac, I tried to increase
20  activities; manufacturing activities, contract
21  activities, bringing new products into the
22  company, by collaborating with Ethypharm, and as
23  you can see in the history here, it didn't go
24  anywhere.  On other occasions, I had tried to

Page 168

1  have collaboration with them in drug delivery;
2  we have common interests from Bentley's side and
3  your drug delivery side from Europe, let's see
4  if we can get together and let's see if we can
5  do something, recognizing any sort of
6  collaboration like that would be beneficial in a
7  press release and would help bring visibility
8  and validation to our companies.  And I was not
9  over the years successful in being able to do
10  that.  They did not want their name affiliated
11  with Laboratorios Belmac or Bentley.
12        You saw that I tried even to draft a
13  press release.  That didn't go anywhere and was
14  not approved.  This --
15  Q.  Is this the one early in '95?
16  A.  Yes.  This had been going on for years.  So in
17  this light, we honored their wishes of not
18  making public their name.  So that's how I
19  responded in so many years.
20  Q.  Okay.  Let me show you a document.
21        (Fax to Mr. Rodriguez from
22        Ms. Joannesse, dated April 8, 1999 was
23        marked Exhibit Number 28 for
24        identification.)

Page 169

1  Q.  And I'll ask you to tell me if you recognize it.
2  A.  Is there something missing down at the bottom of
3  it?
4  Q.  Well, it appears -- not to be in the role of
5  answering questions here, but it appears that
6  the second page is a fax transmission.  It
7  doesn't have a full --
8  A.  Okay.
9  Q.  -- text.
10  A.  Yes.
11  Q.  Is that the fax that you were referring to from
12  Mr. DeBregeas raising this issue with you
13  directly?
14  A.  Yes.
15  Q.  Do you remember speaking with Mr. DeBregeas
16  about this issue apart from sending him a
17  written response?
18  A.  No, I don't.
19  Q.  Do you believe you did do that or do you just
20  have no memory one way or the other?
21  A.  I really have no memory, but I would have -- I
22  think I would have remembered had he called me
23  or responded, and I don't think that he ever did
24  call me; and I don't think we ever talked about

43 (Pages 166 to 169)

JT-A-1054

Page 170

1    it directly.
2    Q.  Let's talk about your options when you received
3        this April 8th, 1999 letter. You could have
4        responded by saying, "Clemente Gonzalez is
5        responsible for this. He's the general manager
6        of Spain. Take up your issues with him,"
7        correct?
8    A.  I could have.
9    Q.  You could have responded and said,
10       "Mr. DeBregeas, you've got this wrong. This is
11       our intellectual property; it's not yours."
12       Correct?
13   A.  Yes, I could have.
14   Q.  But you didn't do either one of those things,
15       correct?
16   A.  I don't know. I don't remember what I did other
17       than what I tried to summarize in the --
18       whatever letter I sent to him.
19   Q.  All right. Let's take a look at another
20       document.
21           (Letter to Mr. DeBregeas from
22           Mr. Murphy, dated April 9, 1999 was
23           marked Exhibit Number 29 for
24           identification.)

Page 171

1    Q.  I'm going to show you two, actually.
2           (Letter to Mr. DeBregeas from
3           Mr. Murphy, dated April 9, 1999, and
4           Enclosure were marked Exhibit Number 30
5           for identification.)
6    Q.  Mr. Murphy, before you get too far along, let me
7        explain why I've given you two documents. I've
8        given you Exhibit 29 and Exhibit 30. Exhibit
9        29, I believe you'll find, is the same letter.
10       There may be a couple of additional markings on
11       it. It's the same letter. 29 is simply easier
12       to read because it's larger text. I showed you
13       Exhibit 30 not to strain your eyes, but just to
14       show you that there was an attachment apparently
15       with it that isn't a part of Exhibit 29. Do you
16       understand what I'm saying?
17   A.  Not yet.
18   Q.  Why don't you take a look at them both? I think
19       you'll find the first one is actually easier to
20       read the text of the letter.
21   A.  Yes.
22   Q.  Do you understand what I mean by that? I'm just
23       giving you that second document to show you that
24       there may have been an attachment to this first

Page 172

1    letter, but I've given you Exhibit 29 because
2    that one's easier to read.
3    A.  Okay.
4    Q.  Okay? Does that -- do you recognize that --
5    A.  Yes --
6    Q.  -- document?
7    A.  -- I do.
8    Q.  And that's sent a day after the letter
9    Mr. DeBregeas faxed to you, correct?
10   A.  Yes.
11   Q.  And it's sent on Bentley letterhead, correct?
12   A.  Yes.
13   Q.  And it's sent from you as chairman and CEO of
14       Bentley Pharmaceuticals, correct?
15   A.  Yes.
16   Q.  And the first line says, "I have received your
17       letter concerning reference to Ethypharm
18       technology and understand your concerns." Is
19       that a fair statement of your point of view at
20       the time?
21   A.  Yes, I understand his concerns that he would
22       like to have visibility, as we would like to
23       have visibility. That's -- yes.
24   Q.  Does that first sentence relate to all of the

Page 173

1    concerns that Mr. DeBregeas expresses in his
2    first letter?
3    A.  I don't know if it expresses all of his
4    concerns. I was just clearly saying -- pointing
5    out to him this is the promotion of Belmazol.
6    Again, Belmazol is a product, our product, our
7    own issue.
8    Q.  It's true, isn't it, that you understood that
9    the omeprazole that was being manufactured at
10   Zaragoza in April of 1999 was being manufactured
11   with Ethypharm know-how and technology? Isn't
12   that correct?
13   A.  No, that's wrong.
14        MR. STEWART: Objection.
15   Q.  What is your view about that issue?
16   A.  In 1998, Ethypharm signed a letter acknowledging
17   that we had our own technology and our own
18   product.
19   Q.  Were you manufacturing according to two
20   different methods and protocol?
21        MR. STEWART: At what time?
22   Q.  In 1998 and 1999.
23   A.  I do not know.
24   Q.  Okay. Did you consider writing back and saying

44 (Pages 170 to 173)

JT-A-1055

**Page 174**

1      "this is not your technology"?

2   A.   I don't know if I considered that or not.

3   Q.   Let's take a look at another document.

4      MR. BOSTWICK: Here's what I'm going

5      to do. I'm going to mark these as two separate

6      documents, and I'll represent that they're two

7      agreements that appear to have been signed on

8      the same day. Okay? And I just want you to

9      take a look at them together for that reason.

10      (Contrato de Fabricacion and Translation

11      was marked Exhibit Number 31 for

12      identification.)

13      (Carta de Compromiso de Compra and

14      Translation was marked Exhibit Number 32

15      for identification.)

16   Q.   What I'm going to do is they're in Spanish, so

17      I'm going to paper-clip a rough translation to

18      the back of each one.

19      MR. STEWART: While the witness is

20      reading that document, I looked at the

21      translation that was attached -- this is the

22      Ethypharm document, Ethypharm label. Anyway,

23      the translation I looked at was not a very good

24      translation, so I had another translation

**Page 175**

1      prepared. What I would like to do is offer this

2      translation along with the translation that's

3      attached. I have a copy. I'm happy to have you

4      take a look at the copy as well.

5      MR. BOSTWICK: Why don't we go off the

6      record for just a second.

7      THE VIDEOGRAPHER: The time is

8      3:14 p.m. We're going off the record.

9      (Recess)

10      (Discussion off the record)

11      THE VIDEOGRAPHER: The time is

12      3:17 p.m. We're back on the record.

13   Q.   My question to you is simple. Have you ever

14      seen these contracts before?

15   A.   Yes.

16   Q.   In what context?

17   A.   I believe after these were executed --

18      negotiated and executed by Adolfo Herrera, he

19      notified me of that, and I think in a visit to

20      Spain, he showed them to me or explained what

21      they meant.

22   Q.   I believe -- and we can show it to you in a

23      minute here, but I believe in the responses that

24      Bentley has made to our formal interrogatories,

**Page 176**

1      which I believe you signed, it indicates that

2      you did confer -- I think the word was

3      "confer" -- with Mr. Herrera regarding these

4      agreements or at least the manufacturing

5      agreement. Can you tell me everything you

6      remember -- and that statement, by the way,

7      stands on its own. I'm not asking you to adopt

8      that or not. Can you simply tell me everything

9      you can recall about when you discussed these

10      contracts with Mr. Herrera and the specifics of

11      those discussions?

12   A.   All I remember is that he said that he had

13      negotiated a supply agreement which gave us the

14      rights to produce omeprazole for Ethypharm, for

15      ourselves, for any of our customers, and that if

16      there was any dispute arising, that it would be

17      heard in Spanish courts.

18   Q.   Do you recall conferring with him before he

19      actually signed the agreements or after or is it

20      that you don't recall the time frame

21      specifically?

22   A.   No, I don't remember discussing this beforehand

23      with him to any degree, but I do remember him

24      explaining this to me after, and it was only --

**Page 177**

1      I think only several days after these were

2      endorsed.

3   Q.   I take it then it's -- well, let me ask the

4      question. Did you have any discussions with

5      anyone from Ethypharm about these agreements at

6      any time?

7   A.   Not that I remember at all. No.

8   Q.   Other than later, they were subsequently

9      terminated, correct?

10   A.   These were subsequently terminated.

11   Q.   Right. In other words -- let me clarify my

12      question. Around the time that these were

13      signed, Exhibits 31 and 32, do you recall having

14      any discussions with anyone from Ethypharm Spain

15      or Ethypharm France about these documents?

16   A.   I do not -- no, I do not recall having any

17      discussions with anybody from Ethypharm France

18      or Spain with regard to these before or after

19      they were signed.

20   Q.   Okay. Anything else you want to say about those

21      documents, 31 and 32?

22      MR. STEWART: Objection.

23   A.   No.

24      MR. STEWART: Which was Exhibit 30 and

45 (Pages 174 to 177)

JT-A-1056

Page 178

1  which was Exhibit 31?
2      MR. BOSTWICK: 31 has the 9 on top of
3  it.
4      THE WITNESS: It was 31 and 32, wasn't
5  it?
6      MR. BOSTWICK: Yes, it was 31 and 32.
7  Q.  How are you holding up?
8  A.  Fine.
9  Q.  You want to take a little break?
10 A.  How are you doing? You've got to be just as bad
11    as I am.
12 Q.  The difference is they're paying me, and you're
13    paying him. That makes it easier to me.
14 A.  You guys are all --
15     THE WITNESS: Just kidding, just
16   kidding, Craig.
17     MR. STEWART: No, he's just trying to
18   make up for going off the record so the
19   stenographer can recoup the money she lost when
20   you were going off the record. Enough of this
21   chitchat, Gentlemen, let's get back to business.
22     MR. BOSTWICK: Fair enough.
23 Q.  Let me give you another document, another
24   exhibit. Before I show you this specific

Page 179

1  document, I believe you said in the response to
2  the interrogatories that Bentley filed that you
3  have a recollection of meeting with Pierre
4  Germain on more than one occasion, and I would
5  just like your memory as you sit here today of
6  those different meetings. Can you separate them
7  in your mind? Can you tell me -- why don't we
8  start with the first meeting? Do you have a
9  separate memory of a first meeting?
10 A.  I can remember two distinct locations, and I
11   don't know whether it's the first or the second.
12 Q.  Okay. Fair enough.
13 A.  One was in his office soon after he arrived.
14 Q.  Mr. Germain's office?
15 A.  Mr. Germain's. And I was teasing him and giving
16   him a hard time about the selection of
17   furniture, which he selected himself. And I
18   remember we were talking. In a joking fashion,
19   I said, "There's somebody water-skiing down
20   the" -- what's that river, Rhein, Rhone? What
21   the one through Paris?
22 Q.  The Seine?
23 A.  Yes, the Seine. There's a guy water-skiing at
24   lunchtime. I said, "Geez, it's been a couple of

Page 180

1  years since I've done that. I'd like to do
2  that." He said, "Let's do it this afternoon.
3  I've got a boat down there." I said, "Are you
4  serious?" He said, "Yeah, we'll go
5  water-skiing." I thought he was pulling my leg.
6  I said, "Yeah, okay. Let's go." And realized
7  that he was very serious, and he was going to
8  take me water-skiing down that dirty river. So
9  then --
10 Q.  I have to ask you before we go on. Did you
11   actually go water-skiing?
12 A.  No, no, I didn't. I wasn't going to. I would
13   have liked to. I was tempted. I didn't bring
14   my swimming trunks.
15 Q.  That would be an historic event. I don't know
16   that many people have done that.
17 A.  We talked there. It was a nice view from his
18   office, and we got along quite well. We had
19   long conversations there. I don't remember all
20   the details, but the primary focus that I had at
21   the time was to promote drug delivery and see
22   where there could be some interests between the
23   two companies, wearing the Bentley hat.
24     And then another time, I met with him

Page 181

1  at a restaurant/bar, and we were sitting in
2  couches. It was a very nice place, but it was
3  strange you had couches to sit in rather than
4  barstools. And at that time, we were discussing
5  the fact that Ethypharm was considering going
6  public, and I said maybe there's some
7  opportunities here for the two companies and
8  maybe we ought to look. We're already a
9  publicly traded company. Maybe we ought to look
10   at least on an informal basis whether merging
11   these two companies would make sense since we
12   had common interests. So those are two distinct
13   locations I remember having meetings with him.
14 Q.  Let's go to the meeting in Paris when you
15   initially talked about the water-skiing. Is
16   there anything else of substance relating to
17   Ethypharm, Belmac, Bentley that you can recall
18   that was discussed at that meeting?
19 A.  With regard to -- let me understand your
20   question correctly. With regard to Laboratorios
21   Belmac and Ethypharm?
22 Q.  Anything related to any of the four companies;
23   Ethypharm France, Ethypharm Spain, Bentley or
24   Laboratorios Belmac. Is there anything

ESQUIRE DEPOSITION SERVICES
1-866-619-3925

JT-A-1057

Page 182

1    substantive you can recall about discussions on
2    any of those topics?
3  A.  No.
4  Q.  Okay.  How about the second meeting in the
5    couches?  Is there anything substantive or
6    specific you can remember about any of those
7    four companies other than what you've told me?
8  A.  No.
9        (Fax to Mr. Germain from Mr. Murphy,
10        dated October 6, 2000 was marked Exhibit
11        Number 33 for identification.)
12  Q.  Okay.  Let me give you Exhibit 33.
13  A.  Yes, I now remember discussing this.
14  Q.  So the first thing is you recognize that as a
15    fax sent from you at Bentley Pharmaceuticals to
16    Pierre Germain at Ethypharm, correct?
17  A.  Yes.
18  Q.  And the date is October 6th, 2000?
19  A.  Yes.
20  Q.  Is this something that you had -- strike that.
21    Did you discuss the substance of this fax at one
22    of the two meetings we were just talking about?
23  A.  Yes.
24  Q.  Which one?

Page 183

1  A.  I don't know.
2  Q.  Okay.  Why don't you provide me with more
3    detail, if you can, about these three topics
4    that are specifically listed?  Do you see the
5    first one?
6  A.  Yes.
7  Q.  All right.  Why don't you describe for me in
8    your own words what you mean by Point Number 1?
9  A.  Okay.  Point Number 1, that should read is -- I
10    often make a mistake and say Bentley.  That
11    should read "Laboratorios Belmac."
12        And we had spoken at one of our
13    meetings about the fact that he wanted to close
14    down the Spanish operation, and I had said to
15    him, "You have a portfolio of products.  I don't
16    know how many.  You have revenues.  I don't know
17    what that is.  You have personnel and overhead.
18    We're looking for opportunity to acquire
19    additional product.  We're looking for
20    opportunity to expand."  Maybe there is an
21    opportunity here that we should be exploring
22    about letting our Spanish operation administer
23    their Spanish operation since they were going to
24    close the offices anyway.  And we were searching

Page 184

1    in our discussions about how and if this would
2    make sense.
3  Q.  Do you recall anything he said about this --
4  A.  He was encouraging.
5  Q.  How about Number 2?  And I guess before we go on
6    to Number 2, you said he was encouraging.  Do
7    you specifically recall anything he said?
8  A.  I don't recall any of his words.  I do recall
9    his attitude and his response to this; that he
10    thought this was a reasonable and could be a
11    viable idea.
12  Q.  How about Number 2?  What -- can you express to
13    me --
14  A.  This is a continuation of the same discussion.
15    What we're essentially saying here is that, you
16    know, if you are, in fact, not in a highly
17    profitable position in Spain, by eliminating
18    office personnel and other expenses but being
19    able to maintain distribution of some sort in
20    Spain, the elimination of the overhead and
21    everything may make it more interesting for you.
22  Q.  Can you explain for me what your Point Number 3
23    means?
24  A.  Yes.  He was -- his offices in Spain really,

Page 185

1    from my understanding, consisted of only
2    business development and an oversight function
3    of manufacturing, and that seemed to be,
4    according to my understanding, the core business
5    that they had.  And I thought that we might be
6    able to help them expand their customer base.  I
7    mean we were manufacturing, I think, five or six
8    other products for them.  We thought we might be
9    able to expand -- eliminate their office,
10    eliminate their overhead, and expand their basic
11    customers.
12  Q.  What do you mean by that -- the paragraph after
13    Point Number 3?  It says, "With regard to
14    omeprazole opportunities, utilizing the organic
15    formulation or the aqueous formulation and
16    either Belmac Labs' formulation or a new
17    formulation."  That seems to be not a complete
18    sentence.
19  A.  The mechanics of Belmac's registration was for
20    an organic formulation and for new improvement.
21    He said they were working on a new aqueous
22    formulation.  So that's really responding to
23    those two different products.
24  Q.  It says, "I await response from Mr. Gerard Leduc

47 (Pages 182 to 185)

Page 186

1    and dates in the U.S.A." Do you see that?
2  A.  Yes. I don't know what that means.
3  Q.  Do you recall meeting with Mr. Leduc shortly
4       after October 6th, 2000?
5  A.  I do not recall that.
6  Q.  Do you recall discussing the substance of this
7       fax with Mr. Germain after October 6th, 2000?
8  A.  No, I do not recall that.
9  Q.  Would it refresh your memory to be told of a
10      meeting with Mr. Leduc and Mr. Germain at a
11      restaurant where you all sat at one table and
12      Adolfo de Basilio, Adolfo Herrera, and Yves
13      Liorzou sat at another table?  Does that help
14      refresh your memory?
15 A.  No. I don't know if that would be the same time
16      that I was meeting with Pierre on other
17      occasions. I really don't remember.
18 Q.  Do you recall an issue around that time of
19      whether additional equipment would be or
20      additional machines might be put in place at
21      Zaragoza by either Ethypharm or Belmac?
22 A.  I remember there were discussions concerning
23      additional equipment, but I don't remember
24      discussing that with Ethypharm. I remember

Page 187

1    discussing that with Adolfo Herrera or being
2    debriefed by Adolfo Herrera on that.
3         MR. BOSTWICK: Okay. This would be a
4    good time for me to take a break. Is that all
5    right?
6         THE WITNESS: Sure.
7         MR. STEWART: Fine.
8         THE VIDEOGRAPHER: The time is
9    3:36 p.m. We're going off the record.
10        (Recess)
11        THE VIDEOGRAPHER: The time is
12   3:55 p.m. We're back on the record.
13 Q.  Okay. Mr. Murphy, around November of 2001,
14      Ethypharm received a notice of the termination
15      of the manufacturing agreement for the
16      production of omeprazole. Are you familiar with
17      that time frame --
18 A.  Yes.
19 Q.  -- and that issue?
20 A.  Yes, I am.
21 Q.  Taking you back to the end of 2000 or early
22      2001, about a year before that termination, at
23      that point in time, this was a very profitable
24      relationship for both Ethypharm and Bentley and

Page 188

1    Belmac; is that correct?
2         MR. STEWART: What time period are we
3    talking about now?
4         MR. BOSTWICK: The end of 2000, early
5    2001.
6  A.  It was profitable. I don't know what you mean
7       by "very profitable." It was profitable for
8       both companies.
9  Q.  Didn't omeprazole account -- the manufacture --
10      strike that.
11          Didn't the manufacturing relationship
12      with Ethypharm account for a substantial portion
13      of the revenues of both Laboratorios Belmac and
14      Bentley in, say, 1998, 1999, 2000?
15 A.  Yes.
16 Q.  Now, that manufacturing relationship could have
17      continued presumably if payments had been made
18      and the arrangement wasn't terminated, correct?
19 A.  Could you please repeat that?
20          (Reporter read back the last question.)
21 A.  Yes.
22 Q.  Ultimately, a decision was made to terminate
23      that arrangement, to file and announce patents
24      relating to omeprazole, lansoprazole, and other

Page 189

1    products. My question to you is, who made the
2    decision to sever the ties with Ethypharm?
3  A.  It was Adolfo Herrera.
4  Q.  When was that decision made?
5  A.  I believe he made the decision around
6       November -- when the termination letter was
7       sent. It was around November. Was it 200--
8  Q.  Let me show you the termination letter to fix
9       the time frame in mind.
10          (Letter to Mr. De Basilio from
11          Mr. Herrera, dated November 14, 2001,
12          and Translation were marked Exhibit
13          Number 34 for identification.)
14 A.  I believe his decision was made just prior to
15      this letter being issued. I don't know the
16      exact date.
17 Q.  Just to be clear, I've handed you what's been
18      marked as exhibit what?
19 A.  34.
20 Q.  34. And I take it you recognize that to be a
21      termination letter giving notice that the ties
22      between the companies and Ethypharm would be
23      severed; is that correct?
24 A.  Yes.

JT-A-1059

Page 190

1    Q.   And the date of that letter is November 14th,
2         2001?
3    A.   Yes.
4    Q.   And it's your testimony that Mr. Herrera made
5         this decision around -- shortly before this
6         letter was sent?
7    A.   I'm assuming. That's when he notified me
8         surely, that he felt this was in the company's
9         best interests.
10   Q.   Can you place in time whether it was in October,
11        early November? What's the earliest it could
12        have been?
13             MR. STEWART: The "this" meaning when
14        Mr. Herrera notified him?
15             MR. BOSTWICK: When Mr. Herrera made
16        the decision --
17             MR. STEWART: Oh, made the decision.
18             MR. BOSTWICK: -- to terminate this
19        agreement.
20   A.   I really do not know.
21   Q.   When did he tell you?
22   A.   I believe that he told me that he was going to
23        do this sometime right before this date, and I
24        don't know whether it was weeks or month, a

Page 191

1         month, two months. I don't know. I really
2         don't know.
3    Q.   Would the earliest have been September, for
4         example?
5    A.   I don't know.
6    Q.   Okay. Do you remember the specific conversation
7         you had when he told you he had decided to
8         terminate this agreement?
9    A.   I don't remember the specific conversation, but
10        I believe it was probably in one of his periodic
11        updates of what's going on in Spain.
12   Q.   Am I right that this is a pretty big deal in the
13        life of Laboratorios Belmac, to sever ties in
14        this Ethypharm relationship? Is that correct?
15   A.   I think it was a significant event.
16   Q.   In fact, is there another commercial
17        relationship that Laboratorios Belmac has had in
18        the last ten years that has been more profitable
19        than the relationship with Ethypharm?
20   A.   I don't know. There are other relationships. I
21        just don't have a breakdown of those.
22   Q.   Would you say it's certainly one of the top
23        commercial --
24   A.   Yes.

Page 192

1    Q.   -- relationships of all time that Laboratorios
2         Belmac has been involved with?
3    A.   Going back in time, yes. Going back in recent
4         time, I'd say probably not.
5    Q.   As of 2000, 2001, when it was terminated, when
6         the relationship was severed?
7    A.   Are you asking me if this was a very profitable
8         relationship at this time of termination?
9    Q.   Yes.
10   A.   I don't believe it was.
11   Q.   Okay. Over the course of the lifetime of the
12        agreement -- the manufacturing agreements with
13        Ethypharm, was it one of the most profitable
14        relationships that Laboratorios Belmac had ever
15        been involved in?
16   A.   Going back in time, yes, it was.
17   Q.   So you think that the year 2000 was not a
18        particularly profitable year with respect to the
19        Ethypharm relationship?
20   A.   I don't know that for a fact. I don't know it
21        was as profitable as in previous years or not.
22   Q.   But at any rate, that's all publicly reported,
23        correct?
24   A.   Yes.

Page 193

1    Q.   Why did Mr. Herrera make the decision to sever
2         ties with Ethypharm?
3    A.   I believe it was in the best interests of the
4         company to go forward independently since we had
5         our own technology and we were working on
6         other -- new improvements.
7    Q.   What was that decision based on?
8    A.   I believe that was based on his projections that
9         he would do periodically.
10   Q.   Do you believe that there were projections that
11        were actually generated within Laboratorios
12        Belmac that showed the difference between how
13        you would do if you were with Ethypharm and how
14        you would do if you severed ties with Ethypharm?
15   A.   I don't know. I don't know.
16   Q.   Did you ever see anything like that from
17        Laboratorios Belmac?
18   A.   I think we discussed what the effect would be,
19        but I don't remember any of the figures nor
20        seeing any sort of a formal breakout of that.
21   Q.   Did Bentley do any analysis of that?
22   A.   No, no, we did not.
23   Q.   Do you recall ever discussing the decision to
24        terminate the relationship in November of

49 (Pages 190 to 193)

Page 194

1    2000 -- strike that.
2        Do you recall ever discussing the
3    decision to terminate this relationship with
4    Ethypharm or to sever ties with Ethypharm with
5    anyone other than Mr. Herrera?
6    A.  I do not recall.
7    Q.  Mr. Price?
8    A.  Oh, probably Mr. Price.
9    Q.  Can you draw up a specific recollection of that?
10   A.  No, I cannot.
11   Q.  When --
12   A.  But I'm sure him being the CFO, it must have
13       been discussed.
14   Q.  Do you recall whether you discussed the issue
15       with him before the November 14th termination
16       letter or after?
17   A.  No, I do not recall.
18   Q.  Were you in agreement with the decision to
19       terminate this relationship and continue to sell
20       omeprazole under a different or allegedly
21       different formulation?
22   A.  I had a lot of confidence in Adolfo, in his
23       decisions and his growing the company, so I had
24       no objection to his decision.

Page 195

1    Q.  Did you feel -- I'm sorry.  Strike that.  Did
2        Mr. Herrera need to seek your approval in order
3        to take this action?
4    A.  No.
5    Q.  Not as Bentley?
6    A.  No.
7    Q.  And not in your capacity as president and
8        consejero delegado unico of Laboratorios Belmac?
9    A.  He did seek and tell me about it, but I believe
10       his powers would have allowed him to be able to
11       do it regardless, if he felt that was best.
12   Q.  But at any rate, you were consulted before he
13       took the action and you agreed, is that correct?
14   A.  He told me that he was considering doing this,
15       yes.
16   Q.  And you agreed?
17   A.  I did not disagree.
18   Q.  Did you just remain silent on an issue this
19       large or did you actually express an opinion?
20   A.  I think what I probably said was, "Adolfo,
21       you've made all the right decisions.  You've
22       done a good job of guiding the company.  If you
23       feel this is the best interests of the company,
24       then you can do what you feel is appropriate."

Page 196

1    Q.  Do you actually remember -- sitting here today,
2        do you remember saying that or is that something
3        you think you would have said?
4    A.  No, that's something I would have said.
5    Q.  Something you think you would have said?
6    A.  Uh-huh.
7    Q.  That's a yes?
8    A.  That's a yes.
9    Q.  Did you tell anybody else at Bentley that this
10       was going to happen before the November 14th,
11       2001 notice letter was sent out?
12   A.  I don't recall, but possibly Mike Price, and I'm
13       not even sure of that.
14   Q.  Did you have any type of formal Laboratorios
15       Belmac board meeting to discuss and decide this
16       issue?
17   A.  No.
18   Q.  Isn't it true that, in fact, Bentley and you
19       made this decision many, many months before
20       November 14th, 2001 --
21           MR. STEWART:  Objection.
22   Q.  -- to sever the ties with Ethypharm?
23   A.  Bentley did not make the decision.
24   Q.  Did you?

Page 197

1    A.  Did I make the decision?
2    Q.  Right.
3    A.  No.  As I said before, I allowed Adolfo to make
4        the decision and do what he felt was best for
5        the company.
6            (Copy of E-mail to Mr. Horvath from
7            Mr. Fitzgibbons, dated November 2, 2000,
8            and Attachment were marked Exhibit
9            Number 35 for identification.)
10   Q.  Let me show you Exhibit 35.  Do you recognize
11       this document?
12   A.  Yes.
13   Q.  What is this document?
14   A.  This is a management meeting summary that's put
15       together for me by Paul Fitzgibbons.
16   Q.  How long have these project status reports been
17       prepared inside Bentley?
18   A.  Let's see.  I don't know, but I believe Paul
19       joined the company in -- I think he joined the
20       company in the year 2000 or around 2000 so --
21   Q.  Why did you begin to generate these types of
22       management meeting reports?
23   A.  This is so we could just track -- Paul would
24       help me keep abreast of all the different things

50 (Pages 194 to 197)

JT-A-1061

Page 198

1 and activities and hot issues that I should look
2 at or be aware of at status. He was trying to
3 keep me up to date.
4 Q. So these management meeting reports will have a
5 topic or a subject which is defined of something
6 that needs to be done, correct?
7 A. Or he might just tell me just the status, and we
8 might see it from month to month to month with
9 no action taken, nothing's been done. It's just
10 like a tickler.
11 Q. Okay. And it'll have a schedule -- that's the
12 second column -- about when something needs to
13 be done if something needs to be done, correct?
14 A. Yes.
15 Q. And the last column is a priority level; is that
16 correct?
17 A. Yes.
18 Q. Is C a low priority and A is a high priority?
19 A. I believe so.
20 Q. This is to a Mr. Horvath. Who is Mr. Jordan
21 Horvath?
22 A. He was in-house counsel.
23 Q. He's no longer with Bentley?
24 A. No.

Page 199

1 Q. What was -- how long did he hold that position?
2 A. I think he held the position for approximately
3 three years, maybe a little longer than three
4 years.
5 Q. When did he leave?
6 A. Yes.
7 Q. I'm sorry. When did he leave?
8 A. Oh, I don't remember the exact date.
9 Q. Was it a year or two years ago approximately?
10 Do you have any idea?
11 A. I would think it's -- I would think it's two
12 years ago or more.
13 Q. What is the reason he was let go or that he
14 left?
15 A. He didn't have an ability to fit into the
16 management team, tended to be argumentative and
17 difficult to work with.
18 Q. Was there any specific issue that he crossed
19 swords on that caused the problem?
20 A. No, no.
21 Q. He was involved in assessing the technological
22 and other capacities for Laboratorios Belmac
23 continuing on in the manufacture and sale of
24 omeprazole after the relationship with

Page 200

1 Ethypharm; wasn't he?
2 A. After the relationship with Ethypharm?
3 Q. In other words, he was involved in assessing
4 whether Laboratorios Belmac could continue on
5 with the sale of omeprazole after severing ties
6 with Ethypharm; wasn't he?
7 A. I do not recall that.
8 Q. Was he involved in reviewing patents and other
9 technical aspects of omeprazole and
10 lansoprazole?
11 A. He was involved in coordinating and maintaining
12 a handle on IP, all IP for Bentley and
13 Laboratorios Belmac. He would just keep -- keep
14 us up to date as to the status. He acted on the
15 U.S. side as an intermediate -- intermediary
16 between the company and outside patent counsel.
17 He only reviewed status of patents in Europe,
18 did not interact in between patent counsel in
19 Europe and Laboratorios Belmac.
20 Q. Now, he's a Bentley lawyer, correct?
21 A. Correct.
22 Q. And not a Laboratorios Belmac lawyer?
23 A. That's correct.
24 Q. Didn't speak Spanish?

Page 201

1 A. No.
2 Q. Was he involved on an operational level in terms
3 of helping to organize the change from being
4 tied to Ethypharm in a manufacturing
5 relationship and Laboratorios Belmac moving out
6 on its own?
7 A. Not that I recall.
8 Q. Let's look at Page 23179. I'll refer you to 11,
9 12, 13, 14. Those topic areas relate to
10 omeprazole, correct?
11 A. Yes.
12 Q. And the action items are for J. Horvath and Jim
13 Murphy, correct?
14 A. Yes.
15 Q. And your task is to handle some of these
16 omeprazole issues with -- during a visit to
17 Ethypharm in November of 2000, correct?
18 A. Repeat that? And where are you referring to?
19 Q. I'm referring to the boldfaced type at the
20 bottom of 11, 12, 13, and 14, which says, "Jim
21 to handle during visit to Ethypharm in
22 November." Do you see that?
23 A. Yes.
24 Q. Does that refresh your memory about whether, in

51 (Pages 198 to 201)

Page 202

1    fact, you went to Ethypharm in November to talk
2    with them about the omeprazole relationship.
3    A.  I have no memory of visiting with them in
4    November.
5    Q.  All those items are listed as a top priority,
6    correct?
7    A.  Yes.
8    Q.  And, again, these are Bentley management meeting
9    notes, not Laboratorios Belmac management
10   meeting notes, correct?
11   A.  That's correct.
12   Q.  Let's take a look at another document.
13       (Diary Entry headed "Action Items - for
14       Friday 02-16-01" was marked Exhibit
15       Number 36 for identification.)
16   Q.  I'm going to show you Exhibit 36, and I'm going
17   to ask you if that's something you recognize as
18   being from your diary which has been produced to
19   us by Bentley in this lawsuit.
20   A.  Okay.
21   Q.  That's correct?
22   A.  I'm sorry.  What was the question again?
23   Q.  I'm asking you if this document, Exhibit 36, is
24   from your diaries that have been produced to us

Page 203

1    in the context of this lawsuit.
2    A.  Yes, it is.
3    Q.  So this is your handwriting?
4    A.  Yes, it is.
5    Q.  This is action items for Friday, February 16th,
6    2001, correct?
7    A.  Yes.
8    Q.  And who are the people who you're with here?  Is
9    this -- it says compensation committee report.
10   Who are those individuals?
11   A.  This is tickler file notes for myself, and
12   that's probably Mike Price.
13   Q.  Yeah.
14   A.  I don't know which Bob that would be.
15   Q.  Jim?
16   A.  That's me.  And Adolfo.
17   Q.  And that would be Adolfo Herrera?
18   A.  Yes.
19   Q.  And so these are notes -- this page and a half
20   is notes to yourself about things you need to
21   do, like a tickler?
22   A.  A tickler file.  It was to refresh my memory to
23   get updated on certain things.
24   Q.  If you look down two-thirds of the way, there's

Page 204

1    a designation that says Ethypharm.  Do you see
2    that?
3    A.  Yes.
4    Q.  It says, "Meeting sever tie."
5    A.  Uh-huh.
6    Q.  And it says something omeprazole, "Announce
7    omeprazole"?
8    A.  Yes.
9    Q.  Is one of your action items to sever ties with
10   Ethypharm as of 2-16-2001?
11   A.  I think it was a tickler for me to ask about it,
12   to ask Adolfo about it.
13   Q.  It doesn't say, "Ask Adolfo," does it?  It says,
14   "Ethypharm meeting, sever tie, announce
15   Ethypharm," correct?
16   A.  See the question marks under it?  Which is a
17   tickler for me, saying these are things that I
18   wanted to ask him.
19   Q.  There's a question mark next to "announce
20   omeprazole," whether to announce omeprazole?  Is
21   that what that says?
22   A.  Well, probably what the status is and whether we
23   had progressed to a point we can announce.  This
24   may be with regard to the aqueous formulations.

Page 205

1    Q.  What do you mean whether we could announce
2    omeprazole?
3    A.  If we had filed patents, and once a patent is
4    issued, it's a disclosable event.  So we must
5    keep abreast of it.
6    Q.  So it's "Ethypharm meeting, sever tie," and then
7    a question about whether to announce omeprazole;
8    is that correct?
9    A.  To the best of my recollection.
10   Q.  Now, let's show you another document, also from
11   February.
12       (Copy of E-mail to Mr. Murphy, et al.
13       from Mr. Fitzgibbons, dated March 1,
14       2001 was marked Exhibit Number 37 for
15       identification.)
16   Q.  Mr. Murphy, I'm showing you Exhibit 37, and I'll
17   ask you if that's a -- well, if you recognize
18   that document.
19   A.  Yes.
20   Q.  What is that document?
21   A.  It's the periodic update that Paul summarizes
22   for the board of directors.
23   Q.  Okay.  And that's the Bentley board of
24   directors, not the Laboratorios Belmac board of

52 (Pages 202 to 205)

Page 206

1  directors, correct?
2  A. Yes.
3  Q. So this is an operational update, correct?
4  A. Yes.
5  Q. That means operations that you're -- that
6     Bentley is involved in, correct?
7  A. Yes.
8  Q. All right. If you look down at Number 1 --
9     well, let's actually take a look at that first
10    sentence there in the e-mail. "Below is the
11    Bentley Pharmaceuticals operational update which
12    is periodically distributed to the directors."
13    And that's the board of directors of Bentley
14    Pharmaceuticals, correct?
15 A. Yes.
16 Q. The next sentence says, "The update highlights
17    our activities as discussed at our operations/
18    staff meetings," correct?
19 A. Yes.
20 Q. So these are operational issues discussed at
21    Bentley staff meetings, correct -- Bentley
22    operations/staff meetings, correct?
23 A. Yes.
24 Q. So if you look under Item Number 1, Spain

Page 207

1  Activities, do you see that?
2  A. Yes.
3  Q. And you look under E, it says, "Ethypharm,
4     negotiations terminated due to lack of full
5     commitment from Ethypharm." Do you see that?
6  A. Yes.
7  Q. So is it true that you had decided to terminate
8     the negotiations with Ethypharm and sever ties
9     with Ethypharm as early as February or March of
10    2001?
11 A. I do not know what this means. And negotiations
12    on what? This might be drug delivery. I don't
13    know what this is. It could be anything.
14 Q. If you look at G, one of the operations issues
15    to be dealt with here is "A new patent is being
16    prepared for our organic formulation process for
17    omeprazole and should be finished on March 9th."
18    Do you see that?
19 A. Yes.
20 Q. So Bentley is preparing to -- preparing to move
21    forward with this patent as part of its global
22    strategy; is that fair?
23    MR. STEWART: Objection.
24 A. Yes.

Page 208

1  Q. Let me show you another document.
2     MR. STEWART: The document we've just
3  been looking at, that's Exhibit 36?
4     THE STENOGRAPHER: 37.
5     MR. STEWART: 37. Sorry.
6     MR. BOSTWICK: So this would be 38.
7     MR. STEWART: And Exhibit 36 is what?
8  That's the diary?
9     THE STENOGRAPHER: Yes.
10    (March 27, 2001 Diary Entry was marked
11    Exhibit Number 38 for identification.)
12 Q. And I'll hand you Exhibit 38 and ask you to tell
13    me whether that is also from your diary of
14    events which has been produced or -- your diary
15    which has been produced by Bentley in this case?
16 A. Yes.
17 Q. And the date on that appears to be March 27th,
18    2001. Do you see that?
19 A. Yes.
20 Q. And that says Adolfo meeting. Would that be a
21    meeting with Adolfo Herrera?
22 A. Yes.
23 Q. If you look at the second page there, there's a
24    topic area of Patents omeprazole?

Page 209

1  A. Yes.
2  Q. And you have microtablet -- Number 1 is
3     "microtablet omeprazole or" what? How does that
4     read?
5  A. I don't know. RES tablet. I don't know.
6  Q. "Or RES tablet" perhaps. And that says
7     "submitted." So that patent is submitted; is
8     that correct?
9  A. Yes.
10 Q. And Number 2 is "Micropellets, new improved
11    process for granulation under vacuum," is that
12    correct?
13 A. Yes.
14 Q. And that patent has been submitted, correct?
15 A. Yes.
16 Q. And Number 3, "Omeprazole - eliminating step."
17    Do you see that?
18 A. Yes.
19 Q. Then, there's a patent for lansoprazole, process
20    patent, correct?
21 A. Yes.
22 Q. And you need API source, correct?
23 A. Yes.
24 Q. Is that all in anticipation of severing the tie

53 (Pages 206 to 209)

Page 210

1    with Ethypharm, you're going to need a new API
2    source for omeprazole?
3  A.  No, the API source that you just referred to is
4    not lansoprazole -- I mean was not omeprazole,
5    was lansoprazole.
6  Q.  So you need an API source for lansoprazole is
7    your understanding of those notes?
8  A.  Yes.
9  Q.  And "need DMF"?
10  A.  Drug master file.
11  Q.  What is that? Can you --
12  A.  Drug master file is all of the process and
13    analytical procedures needed to produce API.
14  Q.  Is Mr. Herrera following Bentley's operational
15    plan when he files these omeprazole and
16    lansoprazole patents?
17        MR. STEWART:  Objection.
18  A.  No, not following Bentley's operational plan.
19  Q.  This is -- it's your testimony that he's
20    following his own plan?
21  A.  He's following the plan for Laboratorios Belmac.
22  Q.  Are you directing that plan in any capacity?
23  A.  I am participating in that plan, of course, as
24    both president of Laboratorios Belmac and for

Page 211

1    the interests of the parent company.
2  Q.  Let me show you another document.
3        (May 22 and May 23, 2001 Diary Entries
4        was marked Exhibit Number 39 for
5        identification.)
6  Q.  That's Exhibit 39, and my first question to you
7    will be the same, which is, can you confirm for
8    me that those are notes you took from your diary
9    that has been produced to us by Bentley in this
10    lawsuit?
11  A.  Yes.
12  Q.  And do you see the May 23rd, 2001 entry halfway
13    down the page?
14  A.  Yes.
15  Q.  That says what, "Spain," something, "Mike
16    Price"?
17  A.  Yes.
18  Q.  What's the little squiggle there? Do you know?
19  A.  Slash.
20  Q.  Oh, "Spain/Mike Price." What -- can you give me
21    any context for that?
22  A.  No, I can't. I don't know what this means.
23  Q.  Could the "Spain/Mike Price" -- does it mean
24    that you're talking to Mike Price or that Mike

Page 212

1    Price has to do something with the Spanish
2    operations? Do you know?
3  A.  I don't know.
4  Q.  Could it be either of those?
5  A.  I don't know what it is, to tell you the truth.
6    I don't know whether this was a conversation
7    with Mike or whether this was notes I wanted to
8    ask Mike. I don't know.
9  Q.  Usually you write "Adolfo" at the top if it's a
10    telephone call with Adolfo; don't you?
11  A.  Yes.
12  Q.  So you don't think this 5-23-2001 notation is a
13    telephone call with Adolfo; do you?
14  A.  I don't think so because Adolfo's name may have
15    been put there otherwise.
16  Q.  Let me ask you to look at Item Number 4. It
17    says, "Ethypharm-expire March 2002. Six-month
18    notice required September." Do you see that?
19  A.  Uh-huh. Yes.
20  Q.  Is that your indication that the manufacturing
21    agreement that we looked at earlier dated March
22    of 2000 was set to potentially expire in March
23    2002 and that you believed that there was a
24    six-month notice requirement in September?

Page 213

1  A.  I don't know, or maybe Mike Price -- I don't
2    know.
3  Q.  But that's what it refers to? It refers to the
4    manufacturing agreement -- the March 2000
5    manufacturing agreement that would expire
6    potentially in March 2002?
7  A.  I believe it does.
8  Q.  And the six-month notice would refer to a notice
9    that would have to be given early to Ethypharm,
10    correct?
11  A.  Yes.
12  Q.  So is it fair to say that you're noting in
13    May -- as early as May 23rd, 2001 in your own
14    notes that you've got to be aware of this
15    six-month notice deadline or what you perceive
16    to be a six-month notice deadline? Isn't that
17    correct?
18  A.  Yes.
19  Q.  Let's look at the next document. Now,
20    Mr. Murphy, the people at Ethypharm have no idea
21    you're going to sever your tie with them at this
22    stage in May -- February, March, April, May
23    2001; isn't that true?
24        MR. STEWART:  Objection.

54 (Pages 210 to 213)

Page 214

1  A. I don't know.
2        MR. STEWART: The witness doesn't have
3    any ability to read the minds of Ethypharm.
4  Q. Well, you certainly didn't tell them that at
5    this point; did you?
6  A. I did not tell them.
7  Q. And no one else did; to your knowledge, correct?
8  A. I don't know if anybody else did.
9  Q. I show you this document.
10        (Fax to Mr. Murphy from Mr. Leduc, dated
11        June 8, 2001, and Draft of Agreement
12        were marked Exhibit Number 40 for
13        identification.)
14  Q. This is Exhibit 40. I'll ask you if you
15    recognize that document.
16  A. Yes.
17  Q. All right. What do you recognize that document
18    to be?
19  A. This is a document apparently sent to me by
20    Mr. Leduc.
21  Q. From Ethypharm?
22  A. From Ethypharm.
23  Q. And it encloses a draft agreement relating to
24    the manufacture of omeprazole at Belmac,

Page 215

1    correct?
2  A. Yes.
3  Q. Okay. Let's look at the third page of that
4    document, which actually has a letter from
5    Mr. Leduc, which is dated June 8th, 2001. Do
6    you see that?
7  A. The third page?
8  Q. It's the third page of the exhibit. Well, maybe
9    I'm wrong.
10        MR. STEWART: It's Ethypharm 002011.
11        MR. BOSTWICK: Exactly.
12  Q. Now, Mr. Leduc refers to certain relations
13    becoming strained, and he requests that you
14    review this proposed agreement; and then he
15    says, "I propose that" -- in the third
16    paragraph, "I propose that you and me alone or,
17    if necessary, assisted by one of our lawyers
18    discuss this draft agreement." Do you see that?
19  A. Yes.
20  Q. And he's sending this to you at Bentley
21    Pharmaceuticals, correct?
22  A. Yes.
23  Q. Now, one option you have when you receive this
24    document, of course, is to write Mr. Leduc back

Page 216

1    and say, "As you know, I'm not the person that
2    negotiates these agreements. That's my general
3    manager. Talk to him"? You could do that?
4  A. Yes.
5  Q. But you didn't do that?
6  A. No.
7  Q. Did you contact Mr. Leduc at all about this
8    letter?
9  A. Not that I remember.
10  Q. Did you call him to say, "Hey, we've made a
11    decision at Bentley here in our operation update
12    to terminate the negotiations, to sever the ties
13    with Ethypharm, and we're contemplating giving
14    notice in September"? Did you write him back
15    and do that?
16        MR. STEWART: Objection.
17  A. No.
18  Q. Do you recall giving Mr. Leduc or anyone at
19    Ethypharm any indication of Bentley's or
20    Belmac's plans about the continued relationship
21    around June 8th, 2001?
22  A. I don't recall giving any news.
23  Q. Let's look at the next document.
24        (Fax to Mr. Murphy from Mr. Herrera,

Page 217

1    dated June 15, 2001 was marked Exhibit
2    Number 41 for identification.)
3  Q. This is Exhibit 41. I ask you to take a look
4    and tell me if you recognize it.
5  A. I do not recognize or recall it.
6  Q. Do you believe this is something you received
7    from Adolfo Herrera around June 15th, 2001?
8  A. I probably did receive this.
9  Q. Now, this is on Laboratorios Belmac stationery
10    from Adolfo Herrera, correct?
11  A. Yes.
12  Q. And Mr. Herrera is writing you at Bentley
13    Pharmaceuticals, correct?
14  A. Yes.
15  Q. And he says, "Dear Jim," and then if you skip
16    down, it says, "In our development plan" -- he's
17    talking about registering certain products in
18    Europe in the near future, correct?
19  A. Yes.
20  Q. And it says, "In our development plan, they are
21    included the following," and he includes
22    lansoprazole, omeprazole tablets, the aqueous
23    formulation of omeprazole as well, correct?
24  A. Yes.

55 (Pages 214 to 217)

JT-A-1066

Page 218

1   Q.  Now, when Mr. Herrera says, "Our development
2       plans," does Laboratorios Belmac generate
3       operational or development plans?
4   A.  Yes.
5   Q.  They do?
6   A.  They develop the development plan for each of
7       these products.
8   Q.  So they have written development plans for
9       lansoprazole, omeprazole tablets, and omeprazole
10      aqueous?
11  A.  I don't know if they have a written plan but
12      they have a schedule of R and D, which is a
13      developmental pathway.
14  Q.  Now, Bentley --
15  A.  I've never seen the written developmental plan.
16  Q.  But Bentley has written developmental plans or
17      operational plans that we've just seen, correct?
18  A.  We have it for drug delivery products, yes.
19  Q.  Okay.  Mr. Herrera is referring to Bentley's
20      development plan, isn't he, in this letter, in
21      this fax?
22  A.  No.
23  Q.  That's not your understanding?
24  A.  My understanding is that he's referring to

Page 219

1       Laboratorios Belmac's development plan to go
2       beyond the borders of Spain into other EU
3       nations with Laboratorios Bentley --
4       Laboratorios Belmac products.
5   Q.  And that development plan, that isn't a
6       development plan that's generated, strategically
7       conceived by headquarters in the U.S.A.?
8   A.  No.
9   Q.  That's independently decided and developed
10      strategically by Mr. Herrera --
11  A.  Yes.
12  Q.  -- at Laboratorios Belmac?
13  A.  Yes.
14  Q.  Let's look at the next document.
15          (July 13, 2001 Diary Entry was marked
16          Exhibit Number 42 for identification.)
17  Q.  Again, I'll ask you if you recognize that to be
18      yet another of your handwritten notes from your
19      diary.
20  A.  Yes, it is.
21  Q.  Okay.  And this is a telephone call with Adolfo
22      Herrera on July 13th, 2001?
23  A.  I believe it is.
24  Q.  Okay.  And if you go down partway, it says, I

Page 220

1       think, "Helm - Patent review omeprazole."  Do
2       you see that?
3   A.  Yes.
4   Q.  Who is Helm?
5   A.  Helm is a -- I believe they are a broker.
6   Q.  A broker of what?
7   A.  A broker of what products, pharmaceutical
8       products.
9   Q.  So why are you showing -- why are they doing a
10      patent review of omeprazole --
11          MR. STEWART:  Objection.
12  Q.  -- at this point in time?
13          MR. STEWART:  There's no indication
14      that Helm is doing a patent review.
15  Q.  Just a minute.  The words say, "Helm - patent
16      review omeprazole."  Does that mean that Helm, a
17      broker, is doing a patent review of omeprazole?
18  A.  I don't know what this -- what it really means.
19      I really don't know.
20  Q.  How about do you see omeprazole -- a little
21      further down, it says, "Ethypharm, 1.5 million
22      more profit if break."  Do you see that?
23  A.  Yes.
24  Q.  Does that mean there's 1.5 million more profit

Page 221

1       if you break or terminate or sever the ties with
2       Ethypharm?
3   A.  I believe it is.
4   Q.  And it says, "23rd November, cancel contracts.
5       Four months' notice."  Am I reading that
6       correctly?
7   A.  Four months' notice --
8   Q.  Oh, maybe four months before.  Does it say, "23
9       November, cancel contract four months before"?
10  A.  Yes.
11  Q.  So that would be four months before the
12      March 23rd, 2002 date of the potential end of
13      the manufacturing agreement with Ethypharm,
14      correct?
15  A.  Yes.
16  Q.  So it says, "23 March, supply agreement cancel,"
17      correct?  Did I read that correctly?
18  A.  I don't know what that means, "Supply agreement
19      cancel."
20  Q.  Wasn't there a supply agreement and a
21      manufacturing agreement signed on the same date
22      we looked at, a purchase agreement, supply and
23      purchase agreement?
24  A.  Yes, it probably does mean that.

56 (Pages 218 to 221)

JT-A-1067

Page 222

1  Q. Okay. And then I'm having a little trouble with
2     this next line, "But," something, "agreement
3     will remain for another two years." Does that
4     mean manufacturing agreement will remain for
5     another two years?
6  A. That's what that says.
7  Q. Is that what you and Adolfo were discussing and
8     considering on July 13th, 2001, that you would
9     cancel the supply agreement and let stand the
10    manufacturing agreement?
11        MR. STEWART: Objection.
12 A. Adolfo was alerting me of what his decisions and
13    what actions he wanted to take.
14 Q. Okay. And then if you go over on the next page,
15    it says, "New Patents, aqueous lansoprazole,
16    organic omeprazole, and aqueous omeprazole." Do
17    you see that?
18 A. Yes.
19 Q. And is that an indication that you're -- part of
20    this decision to break a contract, as it's put
21    here --
22        MR. STEWART: Excuse me? Did you say
23    "break"?
24        MR. BOSTWICK: Yes, it says "break."

Page 223

1  Q. -- is wound up in having new patents so that
2     Laboratorios Belmac can continue to manufacture
3     lansoprazole and omeprazole in both its organic
4     and aqueous formulas?
5  A. No.
6  Q. What does it mean "New patents, aqueous
7     lansoprazole, organic omeprazole, and aqueous
8     omeprazole."
9  A. I don't know what that means, but what you said
10    would the break result in, and my answer is no.
11    I don't know what this is, probably just an
12    update on filing new patents.
13        (Diary Entry was marked Exhibit Number
14        43 for identification.)
15 Q. I'll ask you the same question about Exhibit 43.
16    Just if you can confirm that that's from your
17    diaries.
18 A. Yes.
19 Q. On Exhibit 43, this is -- this says "Glaxo" --
20 A. "Glaxo."
21 Q. "Glaxo SK." What is that?
22 A. SmithKline.
23 Q. "Mike Shaw and"?
24 A. "Paracetamol."

Page 224

1  Q. What does that refer to?
2  A. That's confidential. That has nothing to do
3     with this case.
4  Q. So that doesn't refer to anything related to
5     Ethypharm on the next line?
6  A. No.
7  Q. Fair enough. The next line says, "Ethypharm,
8     current status, plans for giving notice,"
9     correct?
10 A. Yes.
11 Q. So that's giving notice of termination?
12 A. Yes.
13 Q. On the next page, it says, "Spain," and then
14    refers to generic marketing, lansoprazole,
15    aqueous formulation of omeprazole, lansoprazole,
16    file the patent in September, and then it has a
17    list of five patents or activities. Do you see
18    that?
19 A. Yes.
20 Q. All right. Is that an expression of Bentley's
21    operational plan -- global operational plan for
22    how to move forward with respect to omeprazole
23    and lansoprazole?
24 A. No. This document that you've got here, these

Page 225

1     three pages, you notice there's no name --
2     there's no name, no phone call, no date. These
3     are just tickler notes to myself of things that
4     I wanted to follow up on or ask about or get
5     brought up to date on. And you'll see there's
6     quite a variety of things. Glaxo SmithKline,
7     Bristol Myers Squibb, on and on.
8  Q. These five items listed, these patents, is that
9     an expression of yours of things to do in your
10    hat as Bentley, in your hat as Laboratorios
11    Belmac or both?
12 A. This was just notes only for me to follow up and
13    become familiar with --
14 Q. Okay.
15 A. -- this data set. If it had to do with
16    Laboratorios Belmac, some issues, then it was as
17    president of Belmac. In other regards, it may
18    be Bentley's activities and coming up to date on
19    Bentley's activities. This is just notes to
20    myself.
21        MR. STEWART: Do we have a date for
22    these notes?
23        MR. BOSTWICK: This is the way they
24    were produced in the file.

57 (Pages 222 to 225)

Page 226

1  MR. STEWART: Well, I'm going to
2  object, and I'm going to call for -- I'm going
3  to call that Mr. Murphy's diaries that attend
4  these notes be in the deposition room so that we
5  can see what the date of these particular diary
6  entries are. So I think -- we can either take a
7  break now or we can take it in a couple moments,
8  but I'm going to want to have Mr. Murphy have an
9  opportunity to take a look and so we can see --
10  we can see what the date of these entries are.
11  MR. BOSTWICK: Well, they were his
12  notes. You produced them. You have them here
13  in the law office, but I've asked my questions
14  on this document. I didn't hide a date. It
15  just doesn't have one on it.
16  MR. STEWART: I understand, but seeing
17  as how we're at a time in the sequence where
18  you've asked a number of questions pertaining to
19  cancellation or nonrenewal of the contract, that
20  I think it's only fair that we have some
21  indication as to, as you've done before, where
22  we are in that sequence.
23  MR. BOSTWICK: Well, I'm prepared to
24  move on to another document. That's all the

Page 227

1  questions that I had on this document. I don't
2  think I asked a question about termination on
3  that, but maybe I did.
4  MR. STEWART: Let me ask. I'm going
5  to want to take a break in any event because
6  we've been going about an hour now since the
7  last break. In fact, a little bit more, and I
8  think what I want to do is to get the -- have
9  the document -- have the diaries in the
10  conference room in the event that the witness
11  needs to refresh his memory with respect to
12  dates and so forth. So whether this is the
13  appropriate time or within the next couple of
14  minutes doesn't much matter, but I'm going to
15  want to take a break shortly.
16  MR. BOSTWICK: It strikes me as two
17  separate issues. One is whether we need to
18  collect those. I'm looking now. Every other
19  item I have has a date on it. I have two more,
20  I think.
21  The other is if you'd like a break now
22  and go off the record.
23  MR. STEWART: Yes, let's go off the
24  record.

Page 228

1  MR. BOSTWICK: Is that something you'd
2  like?
3  MR. STEWART: That's good. Okay.
4  THE VIDEOGRAPHER: The time is
5  4:57 p.m. We're going off the record.
6  (Recess)
7  THE VIDEOGRAPHER: The time is
8  5:04 p.m. on July 19th, 2006. This is the end
9  of Tape Number 3 of the videotaped deposition of
10  Mr. James Murphy.
11  (Recess)
12  (Discussion off the record)
13  THE VIDEOGRAPHER: The time is 5:19 on
14  July 19th, 2006. This is Tape Number 4 of the
15  videotaped deposition of Mr. James Murphy.
16  (Fax to Mr. Murphy from Ms. Joannesse,
17  dated August 10, 2001 was marked Exhibit
18  Number 44 for identification.)
19  Q. Mr. Murphy, you'll be happy to know I've only
20  got a dozen more documents here or so.
21  A. Okay.
22  Q. Here's one of them, Exhibit 44. And I just ask
23  if you recognize that document.
24  A. Yes.

Page 229

1  Q. And that's a -- what is that?
2  A. This is Miss Roseline Joannesse sent a fax to
3  me, essentially saying we have not received any
4  response to Mr. Leduc's letter of June 8th,
5  which --
6  Q. And that's the --
7  A. -- I believe had the attachment of a draft
8  contract.
9  Q. Right. And she requests some news on this and
10  to organize a meeting between the two companies,
11  correct?
12  A. Yes.
13  Q. Did you respond to this letter?
14  A. I do not remember responding to this letter.
15  Q. Do you recall that you, in fact, didn't respond
16  to the letter?
17  A. I believe that I did not respond to the letter.
18  Q. Why not?
19  A. We already had a contract with Ethypharm, and
20  the previous letter of the 8th of June said we'd
21  like to regularize our relationship we already
22  had. Adolfo had already signed an agreement
23  with them, so there was no need for me to
24  respond.

ESQUIRE DEPOSITION SERVICES
1-866-619-3925

JT-A-1069

Page 230

1  Q.  You also knew by this point, August 10th, 2001,
2      that you were going to sever the ties with
3      Ethypharm; didn't you?
4  A.  Yes.
5  Q.  And did you discuss responding through
6      Mr. Herrera with Mr. Herrera?
7  A.  I don't recall doing that, but I would believe
8      that if I received this directly, I would send
9      it over to the Spanish management for
10     appropriate response.
11 Q.  But in this instance, you don't recall doing
12     that? You just didn't respond; is that correct?
13 A.  I don't recall.
14 Q.  You don't recall. I show you the next document.
15         (Bentley Pharmaceuticals Board of
16          Directors August 30, 2001 Meeting
17          Minutes was marked Exhibit Number 45 for
18          identification.)
19 Q.  Sir, by looking at the second page of Exhibit
20     45, can you confirm for me that these are
21     minutes of a Bentley board meeting held on
22     August 30th, 2001?
23 A.  Yes.
24 Q.  And you attended in your capacity as CEO and

Page 231

1      chairman of the board of Bentley?
2  A.  Yes.
3  Q.  I ask you to look at 02354, and there's a
4      resolution made at the bottom of the page, which
5      reads, "Resolved that the officers of the
6      company are hereby authorized to establish a
7      wholly owned Delaware subsidiary, the initial
8      directors which shall be Messrs. Murphy, Price,
9      and Horvath, which shall own and operate the
10     company's intellectual property and that the
11     officers are hereby authorized to take all
12     necessary action to carry out the intent of such
13     resolution."
14         Do you see that?
15 A.  Yes.
16 Q.  Can you tell me about what that refers to?
17 A.  I actually don't remember. I think it has to do
18     with tax planning.
19 Q.  At this point, your -- Bentley and Belmac are
20     collecting behind the scenes a number of patents
21     relating to omeprazole and lansoprazole; is that
22     correct?
23         MR. STEWART: Object to the
24     characterization of "behind the scenes" as vague

Page 232

1      and unsupported by anything in the evidence.
2  Q.  Well, let me ask the question a different way.
3      At this point in time, Bentley and Belmac are
4      collecting or filing a number of patents
5      relating to lansoprazole and omeprazole; is that
6      correct?
7  A.  At this time, I'm not sure. We may have already
8      filed all those patents.
9  Q.  Who -- sorry.
10 A.  Yeah.
11 Q.  Who is going to own that intellectual property,
12     whether it's the know-how relating to omeprazole
13     and lansoprazole, the patents relating to it?
14     Who owns that property?
15 A.  It's owned by -- the lansoprazole, the
16     omeprazole, and variations are all owned and
17     filed by Laboratorios Belmac. The intranasal
18     and transdermal are filed by Bentley.
19 Q.  So when it says here that there's a resolution
20     that you, Mr. Price, and Mr. Horvath are
21     authorized to establish a wholly owned Delaware
22     subsidiary that shall own and operate the
23     company's intellectual property, what
24     intellectual property are we talking about

Page 233

1      there? Do you know?
2  A.  I don't know exactly. I believe this had to do
3      with tax planning. If intellectual property is
4      owned and managed in different countries around
5      the world, there is different tax implications.
6      And so I'm not aware whether this was ever done.
7  Q.  Okay. Who looked into that issue for you for
8      Bentley?
9  A.  I believe it was Jordan Horvath.
10 Q.  How about Michael Price? Did he have anything
11     to do with that?
12 A.  I don't know. I don't think so.
13         (Fax to Mr. Murphy from Ms. Joannesse,
14          dated September 17, 2001 was marked
15          Exhibit Number 46 for identification.)
16 Q.  Mr. Murphy, do you recognize Exhibit 46?
17 A.  Yes.
18 Q.  What is that document?
19 A.  This is another fax from Roseline to myself,
20     asking for an answer of her fax from June 8th
21     and 10th -- August 10th.
22 Q.  So does that confirm for you that you didn't
23     respond to the earlier June 8th and August 10th
24     faxes from Mr. Leduc?

59 (Pages 230 to 233)