Page 66

1  Q.  And were you deposed in those suits?
2  A.  I was.
3  Q.  Were those the six suits that you were deposed
4      in?
5  A.  Yes, they were.
6  Q.  All six?
7  A.  You know, I speculated that it's been six times
8      that I've been deposed, but it could have been
9      more or less, but, you know, in round numbers,
10     that's probably about right.
11 Q.  Were you deposed in any matters other than
12     matters relating to the wrongful termination of
13     officers of Bentley Pharmaceuticals?
14 A.  There was a matter where we had entered into a
15     joint venture with a company called Maximed, and
16     there was litigation involved there; and I was
17     involved in not only depositions but trial
18     testimony in that as well.
19 Q.  And where was that case tried?
20 A.  In New York.
21 Q.  Do you recall if it was in federal or state
22     court?
23 A.  I think it was in federal court there in South
24     Manhattan.

Page 67

1  Q.  And do you recall what the claims in that case
2      were or what the allegations in that case were?
3  A.  Primarily breach of -- breach of agreement, and
4      then we alleged fraud and deceit; and we were
5      awarded a judgment in that case.
6  Q.  And is that judgment disclosed in the company's
7      SEC filings?
8  A.  It is.  We were unable to collect.  It was not
9      able to satisfy the judgment.
10 Q.  Okay.  I'd like to show you another document.
11         (1999 10-K was marked Exhibit Number 4
12          for identification.)
13 Q.  Do you recognize this document?
14 A.  I do.
15 Q.  What is this document?
16 A.  This is Bentley Pharmaceuticals, Inc.'s annual
17     report on Form 10-K filed with the Securities
18     and Exchange Commission for the year ended
19     December 31st, 1999.
20 Q.  Did you prepare this document?
21 A.  I was involved with the preparation of this
22     document, yes.
23 Q.  Is this document a document that's kept in the
24     ordinary course of Bentley's business?

Page 68

1  A.  This is a document that's required to be filed
2      annually by the Securities and Exchange
3      Commission as required of all publicly traded
4      companies.
5  Q.  And so it is a document that Bentley keeps in
6      its ordinary course of business?
7          MR. MINGOLLA:  I'll object.
8  A.  Bentley --
9          MR. FINE:  Basis?
10         MR. MINGOLLA:  Vague, "keeps."
11 A.  I guess I'm trying to understand the meaning of
12     the word "keeps," but my position is that
13     Bentley has filed this document and has a copy
14     of it in its corporate records.
15 Q.  Is this an accurate statement of Bentley's
16     position at the end of 1999?
17 A.  Yes, it is.
18 Q.  And has any portion of this document been
19     restated since it was filed?
20 A.  I don't recall any restatements.  It's possible
21     that as subsequent financial statements are
22     filed that reclassifications occur, but there
23     have been no restatements.
24 Q.  But if we get into an area where something has

Page 69

1      been reclassified and you recall that, will you
2      let me know?
3  A.  Sure, sure.
4  Q.  Thanks.  I'd like you to turn to the third page
5      of this document, which has actually got the
6      Page Number 2 on it.  And if you look at the
7      paragraph right above the number 2, the final
8      sentence says, "All of the registrant's revenues
9      for the year ended December 31, 1999 are derived
10     from its operating subsidiary Laboratorios
11     Belmac S.A. in Spain."  Is that a correct
12     statement?
13 A.  One moment.
14         I flipped over to Page F-26, which is
15     the footnote that details the geographic
16     breakdown of the company's revenues, expenses,
17     and assets and liabilities, and for some reason,
18     this copy that you have doesn't have the
19     right-hand column that would include the
20     consolidated results.  It got cut off, but I can
21     see that all of the revenues for 1999 totaled
22     15,148,000, and they were all generated in Spain
23     by Laboratorios Belmac and its subsidiaries.
24 Q.  And that's a little bit different than --

Page 70

1  actually, you know, you might want -- I think
2  you're looking at the wrong page.
3  A.  You're right.  20,249,000 was the total, and it
4  was all generated in Spain.
5  Q.  And there was a net income in Spain of 905,000;
6  is that accurate?
7  A.  That is correct.
8  Q.  And there's a corporate consolidation or
9  elimination of a loss of 1,995,000?
10  A.  That's correct, and if the consolidated column
11  were on here, you'd see probably the net of
12  those two numbers would be the net loss for the
13  year 1999.
14  Q.  I apologize for this.  The SEC's Web site is not
15  all of what you want.
16  A.  No, you have to do a landscape print to be able
17  to get that.
18  Q.  You're familiar with the problem?
19  A.  I am.  And you can see the net loss for the year
20  was 1,998,000 on Page F-3.
21  Q.  So if I understand this correctly, 100 percent
22  of Bentley, that's the registrant's, revenues
23  came from Laboratorios Belmac?
24  A.  During the year 1999, that's true.

Page 71

1  Q.  Okay.  And I'd like you to turn to another page
2  of this document, Page -- it's the page with a
3  number 5 on it.  I'm not sure if that means Page
4  5 is above it or Page 5 is below it.  It
5  actually is in the section marked Pharmaceutical
6  Manufacturing and Marketing in Spain, which I
7  think starts the page before that.
8  A.  Okay.
9  Q.  Under Pharmaceutical Manufacturing and Marketing
10  in Spain, the document says, "Among the products
11  Laboratorios Belmac manufactures and are
12  distributed, each of which is registered with
13  Spain's Ministry of Health, are," and the first
14  one is Belmazol; is that correct?
15  A.  That's correct.
16  Q.  And there are a number of other products listed
17  under Belmazol, for example, Controlvas,
18  Belmalax and others; is that accurate?
19  A.  That's true.
20  Q.  And is the order of this list, does that reflect
21  the importance of the product to the revenues of
22  Laboratorios Belmac and, by extension, Bentley
23  Pharmaceuticals?
24      MR. MINGOLLA: Objection, foundation.

Page 72

1      MR. FINE:  I'm asking a foundational
2  question.
3      MR. MINGOLLA:  Well...
4  A.  I can't tell you for sure if the order of these
5  indicates in declining order the value of the
6  sales of each of those products, but I can tell
7  you that if you look on the following page, that
8  the first two products listed, Controlvas and
9  Belmazol, together represented 52 percent of the
10  sales of Laboratorios Belmac.
11  Q.  Can you tell me what percentage of that
12  52 percent is attributable to Belmazol in 1999?
13  A.  I don't know there's any place else in the
14  document you would see it, and I certainly can't
15  tell you off the top of my head.
16  Q.  Do you know if it was more than Controlvas?
17  A.  I don't recall.
18  Q.  Do you know what proportion of revenues
19  attributable to Belmazol and Controlvas within
20  that 52 percent approximately might be?  Are
21  they about equal?
22  A.  I couldn't tell you.  I really don't know.  The
23  concept here that we were trying to comply with
24  is a requirement by the SEC that if you have any

Page 73

1  specific concentration of risk or have any
2  significant dependence on a specific product,
3  that the shareholders should be aware of the
4  fact that X percent of your revenues come from a
5  product or group of products so they can gauge
6  the level of risk that may be involved if any of
7  those products are no longer marketed, for
8  example, but I couldn't tell you as of right
9  now.
10  Q.  I'd like to skip ahead to the 2000 10-K for just
11  a second.
12      (2000 10-K was marked Exhibit Number 5
13      for identification.)
14  Q.  But before I do, you have no recollection of the
15  relative importance of Belmazol or Controlvas?
16  A.  All I can tell you is the two of them
17  represented 52 percent of the revenues that
18  year, but I couldn't tell you the breakdown
19  between the two of them.
20  Q.  And why did you choose to report those two to
21  the SEC as opposed to, say, Belmalax and
22  Senioral?
23      MR. MINGOLLA:  Objection, vague,
24  "you."

19 (Pages 70 to 73)

JT-A-1132

Page 74

1  Q.  Bentley Pharmaceuticals.
2  A.  Bentley Pharmaceuticals, to be in compliance
3      with the SEC requirements that you disclose
4      investment of risk and concentration of risk,
5      disclosed, I'm assuming, the two largest
6      products and indicated to the shareholders how
7      much of the company's revenues came from sales
8      of those two products so they could understand
9      the risk involved.
10  Q.  You indicated that you were involved in the
11      drafting of this document for 1999; is that
12      correct?
13  A.  That's right.
14  Q.  Did you ask anyone what the two most important
15      products were?
16  A.  I'm sure that we had schedules depicting what
17      they were, and I'm sure we were able to look at
18      the schedules and determine that.
19  Q.  And did those schedules show the -- what do
20      those schedules show?  What do you recall those
21      schedules showing?
22  A.  Sales by product.
23  Q.  So there were in 1999 documents that showed
24      sales by product?

Page 75

1  A.  Yes, yes.
2  Q.  And the two most important products were
3      Belmazol and Controlvas from your perspective?
4  A.  The two products with the largest amount of
5      sales were Belmazol and Controlvas.
6  Q.  And actually let's stay with this one for a
7      moment.  If you look a page later after the
8      statement that says Belmazol or -- Controlvas
9      and Belmazol together represent approximately
10      52 percent of the sales of Laboratorios Belmac,
11      you see a section called Contract Manufacturing.
12      Is that accurate?
13  A.  Right, I see that.
14  Q.  And that section indicates that Laboratorios
15      Belmac uses less than 100 percent of its plant
16      capacity to manufacture its own products.  Is
17      that accurate?
18  A.  That's right.
19  Q.  And so it engages in contract manufacturing of
20      pharmaceuticals owned by other companies.  Is
21      that accurate?
22  A.  True.
23  Q.  And one of those companies is Ethypharm; is that
24      right?

Page 76

1  A.  That's right.  Italpharmaco, Radiopharm, Juste,
2      and Ethypharm.
3  Q.  How much of Laboratorios Belmac's revenues were
4      generated by contract manufacturing in 1999 as a
5      percentage?
6  A.  I don't think we gave a breakdown.  I don't
7      think the contract manufacturing contributed a
8      material part of our revenues.
9  Q.  Okay.  If we look back at the table I think it
10      was F-25, is that accurate -- F-25, it indicates
11      that 20 -- approximately 20. or -- $20 million
12      of revenues was generated by Laboratorios Belmac
13      in 1999.
14  A.  That's right.
15  Q.  And 52 percent of that is attributable to two
16      products, Belmazol and Controlvas; is that
17      accurate?
18  A.  That's correct.
19  Q.  Okay.  But you don't remember which product
20      accounts for which percentage approximately of
21      that 52 percent?
22      MR. MINGOLLA:  Objection, asked and
23      answered.
24  A.  I don't recall.

Page 77

1  Q.  Do you think it would be important to know that?
2      MR. MINGOLLA:  Objection as to form.
3  A.  I think it was important that we comply with the
4      SEC reporting requirements that requires us to
5      explain concentration of risk for the
6      shareholders, and I think we complied with that
7      by putting that statement in there, that those
8      two products comprise 52 percent of the
9      revenues.
10  Q.  Would a shareholder -- well, let me back off
11      that.  And it's your testimony that contract
12      manufacturing was not a material contributor to
13      revenue in 1999?
14  A.  That's right.
15  Q.  And on what basis do you recall that?
16  A.  I recall that while it took up excess capacity,
17      it didn't contribute a lot of revenue to the top
18      line and it wasn't very profitable, but it was a
19      way to absorb excess capacity.
20  Q.  And do you know what products were manufactured
21      under contract manufacturing arrangements?
22      MR. MINGOLLA:  This is back in '99?
23      MR. FINE:  In 1999.
24  A.  I don't know.  I don't know.

20 (Pages 74 to 77)

Page 78

1  Q.  Do you know what products were manufactured for
2       Ethypharm in 1999?
3  A.  I could assume that it was omeprazole, but I
4       don't know for a fact.
5  Q.  Do you know if it was any other products?
6  A.  I have no idea.
7  Q.  Did you ever see a breakdown of contract
8       manufacturing by product in 1999?
9  A.  Not that I recall.
10  Q.  Did you ever see a document indicating the
11       proportion of revenue attributable to contract
12       manufacturing for 1999?
13  A.  I'm sure that there is a report that indicates
14       how much revenues came from contract
15       manufacturing, but I don't specifically recall
16       how much it was.
17  Q.  Was it more than 10 percent?
18  A.  I don't know.
19  Q.  What amount would you consider to be material to
20       the revenue of Belmac and, by extension,
21       Bentley?  What's the minimum threshold?
22           MR. MINGOLLA:  I'm sorry.  Finish your
23       question.  And can I ask to hear the question
24       back again, please?

Page 79

1           (Reporter read back the last question.)
2  Q.  Let me rephrase that.  What percentage of
3       revenue would you consider to be material to the
4       revenue of Laboratorios Belmac and, by
5       extension, Bentley as a minimum threshold?
6           MR. MINGOLLA:  Are we talking back in
7       1999?
8           MR. FINE:  Now.
9           MR. MINGOLLA:  I'll object as beyond
10       scope of Phase 1.
11           MR. FINE:  Are you instructing him not
12       to answer?
13           MR. MINGOLLA:  No.
14  Q.  You can answer.
15  A.  Well, materiality is a -- to me, it's a gray
16       concept.  Essentially, materiality means an
17       amount or percentage that would impact
18       somebody's decision to buy or sell or hold
19       securities, and I think depending upon the
20       context of what you're talking about, different
21       people would probably come up with a different
22       figure for what materiality means.  I'm trying
23       to answer your question, but, you know, probably
24       10 or 15 percent of our revenues is, I'm

Page 80

1       assuming -- if something was excess of that, I'm
2       assuming it's something somebody would want to
3       know about.
4  Q.  Okay.  If you look at F-25 again, interest
5       expense is listed as 147,000.  Is that a
6       material amount?
7  A.  No, it's very immaterial, but it's a requirement
8       that the Securities and Exchange Commission has
9       for being in full compliance with the
10       disclosure.
11  Q.  And depreciation and amortization is 289,000.
12       Is that a material amount?
13  A.  It's not material, but again, that line item is
14       a required line item regardless of the
15       materiality of the amount.
16  Q.  And net income or loss before income taxes is
17       approximately 1.6 million.  Is that material?
18  A.  Is it material?  It's less than 10 percent of
19       revenues, but, again, the purpose of this note
20       is to be in compliance with generally accepted
21       accounting principles and SEC reporting
22       requirements, and each of those specific line
23       items are required to be disclosed, whether --
24       for example, interest in common in Spain was

Page 81

1       zero in 1999, but you still had to indicate it
2       was zero.
3  Q.  So it's your testimony that anything less than
4       10 or 15 percent of revenue would not be a
5       material item?  Is that accurate?
6  A.  Again, I was trying to answer in the context of
7       how you're asking.  I don't know if you can as a
8       blanket statement say 10 percent of something is
9       material or not material.  I'm trying to be
10       helpful.  I'm not sure what you're asking me.
11  Q.  Let me see if I can try and get a better handle
12       on this.  I'm trying to understand approximately
13       how much of Belmac's revenue in 1999 is
14       attributed to the different pharmaceutical
15       products that it makes, and I'm asking it
16       because I don't think it's entirely clear in the
17       10-K; and I was hoping you could help me out to
18       get a handle on that.  So I'm trying to figure
19       out what you recall from 1999 as the amounts of
20       revenue that are attributable to the different
21       pharmaceutical products that are reported here
22       in the 10-K and to the contract manufacturing.
23           MR. MINGOLLA:  I'm just going to
24       object to the commentary as to what is clear and

21 (Pages 78 to 81)

Page 82

1  what isn't clear to counsel's opinion. I don't
2  know if there's a question pending, but if there
3  is, I'd like to hear it.
4  Q.  So when you look at the statement on Page 5, I
5  guess, that Controlvas and Belmazol together
6  represent 52 percent of the sales of
7  Laboratorios Belmac, that's material?
8  A.  Well, certainly it's material, but also it was a
9  required disclosure with respect to
10  concentration of risk.
11  Q.  Okay. Where's the threshold for disclosing
12  concentration of risk?
13  A.  I don't know that there is a specific dollar or
14  percentage threshold, but, again, it's something
15  that an informed shareholder would want to know
16  to be able to make a decision about whether to
17  buy, sell or hold the securities.
18  Q.  Okay. But the contract manufacturing, it's your
19  testimony, is not something that a shareholder
20  would want to know about in terms of its
21  percentage of revenue in 1999, is that accurate,
22  as material?
23  A.  At that time, based on my recollection of how we
24  went through in putting together the document, I

Page 83

1  would say that contract revenues didn't
2  constitute a material percentage of revenues or
3  contribution to profit.
4  Q.  Okay. How do you understand that Belmazol was
5  manufactured?
6       MR. MINGOLLA: Objection, vague.
7  Q.  In 1999, did Laboratorios Belmac manufacture its
8  own omeprazole independently of its relationship
9  with Ethypharm?
10  A.  It's my understanding that in 1999 omeprazole
11  was manufactured by Belmac.
12  Q.  Okay. I don't think that was quite my question.
13       MR. FINE: Could you read back my
14  question?
15       (Reporter read back the last question.)
16       MR. MINGOLLA: I'll interpose an
17  objection to that question as vague.
18  A.  I was not directly involved with the operations
19  or the manufacturing, but it's my understanding
20  that Belmac did produce its own omeprazole.
21  Q.  Outside of its relationship with Ethypharm?
22       MR. MINGOLLA: Objection, vague.
23  A.  Yeah, I'm not sure -- I'm not sure about the
24  relationship with Ethypharm, but my

Page 84

1  understanding is it produced its own omeprazole.
2  Q.  And it sold its own omeprazole?
3  A.  That's right.
4  Q.  And that was Belmazol in 1999?
5  A.  That is right.
6  Q.  Okay. And that was all of Belmazol in 1999?
7  A.  That was all of Belmazol?
8  Q.  In fact, all Belmazol in 1999 was omeprazole
9  that was manufactured independently of the
10  relationship with Ethypharm; is that correct?
11  A.  That's my understanding.
12  Q.  Okay. I'd like you to look at another document,
13  and that is the 2000 -- actually, the 2000 10-K.
14  And do you recognize this document?
15  A.  I do.
16  Q.  Okay. And what is this document?
17  A.  This is Bentley Pharmaceuticals, Inc.'s annual
18  report on Form 10-K for the year ended
19  December 31st, 2000, and it was filed with the
20  Securities and Exchange Commission.
21  Q.  It was filed with the Securities and Exchange
22  Commission?
23  A.  Yes, it was.
24  Q.  Okay. Is this a business record of Bentley

Page 85

1  Pharmaceuticals?
2  A.  Yes, it is.
3  Q.  And it's accurate?
4       MR. MINGOLLA: Objection.
5  A.  When it was filed, it was accurate. I can't say
6  if things may have changed since that date, but
7  at the date of its filing, yes, it was accurate.
8  Q.  Has any portion of it been restated?
9  A.  It's possible as subsequently put together that
10  reclassifications of line items established, but
11  there's been no restatements.
12  Q.  But you'll let me know if we come across one of
13  those areas where a line item has been
14  reclassified?
15  A.  Sure.
16  Q.  I'd like you to turn to, again, Page 2, and it
17  says 99 percent of the registrant -- that's
18  Bentley Pharmaceuticals, is that accurate --
19  revenues? The registrant is Bentley
20  Pharmaceuticals; is that correct?
21  A.  The registrant is Bentley Pharmaceuticals, Inc.
22  Q.  99 percent of the registrant's revenues for the
23  year ended December 31, 2000 were derived from
24  its operating subsidiaries, Laboratorios Belmac

22 (Pages 82 to 85)

Page 86

1  S.A. and Laboratorios Davur in Spain?
2       MR. MINGOLLA: Can you tell me from
3  where you're read something?
4       MR. FINE: It's the next page.
5       MR. MINGOLLA: It's on the bottom of
6  our page.
7       MR. FINE: Yeah, I'm reading from the
8  top of a different page, and I'm sorry about
9  that. We printed it out two different times.
10      MR. MINGOLLA: So that sentence you
11 just read is actually at the bottom of Page 1?
12      MR. FINE: At the bottom of Page 1.
13 A.  Yes, the statement says, "99 percent of the
14     registrant's revenues for the year ended
15     December 31st, 2000 were derived from its
16     operating subsidiaries Laboratorios Belmac and
17     Laboratorios Davur in Spain."
18 Q.  And if you look on Page 6, which is probably
19     going to be somewhere on Page 5 on the
20     exhibit --
21 A.  Okay.
22 Q.  -- the sentence right before the page break is
23     "Belmazol and Controlvas represent approximately
24     35 percent and 12 percent, respectively, of the

Page 87

1  sales of the Registrant during the year ended
2  December 31, 2000." Is that accurate?
3  A.  That's true.
4  Q.  Does that refresh your recollection of what the
5      approximate proportion of sales might have been
6      in 1999 for Belmazol and Controlvas?
7  A.  No. All I can tell you is that the combined
8      total is 52 percent in 1999, and the combined
9      total in 2000 is 47 percent, of which 35 percent
10     was Belmazol and 12 percent was Controlvas.
11 Q.  And you have no recollection what the
12     approximate percentages were in years earlier?
13 A.  I couldn't tell you.
14 Q.  And it's not clear whether it's approximately
15     the same?
16      MR. MINGOLLA: Objection, asked and
17      answered.
18 A.  You know, we could -- if I could see the
19     records, I can tell you, but I would be
20     guessing.
21 Q.  Okay. And if you turn to -- let me understand
22     this actually in a little more detail. In 2000,
23     if you turn to Footnote 25 again, net sales were
24     approximately 18.4 or .5 million dollars; is

Page 88

1  that accurate?
2  A.  In Spain, that's true.
3  Q.  In Spain. And in the United States, they were
4      approximately 130,000?
5  A.  That's right.
6  Q.  Is 130,000 material?
7  A.  Would I consider it material to the consolidated
8      revenue total?
9  Q.  Yes.
10 A.  No.
11 Q.  So 35 percent of approximately 18.5 million is
12     attributable to Belmazol; is that accurate?
13 A.  Actually, 35 percent of 18,617,000, which is the
14     combined total that consolidated revenues.
15 Q.  And what is approximately 35 percent of that?
16      MR. MINGOLLA: I'll object to the
17      extent you're asking him to do a math
18      calculation in his head.
19 Q.  Is it a little bit -- is it approximately 6
20     million but less than 7 million?
21 A.  It's more than two-thirds -- I would say it's
22     more than 6 million.
23 Q.  More than 6 million?
24 A.  Probably less than 7 million, but I would say

Page 89

1  more than 6 million.
2  Q.  Somewhere between 6 to 7?
3  A.  If you want me to calculate it, I can calculate
4      it.
5  Q.  No, that's not necessary. Somewhere between 6
6      to 7 million?
7  A.  I didn't do the calculation, but I'm guessing
8      somewhere in the 6 to 7 million range.
9  Q.  And if you look at -- well, let me backtrack for
10     a second. So 6 to 7 million or 35 percent of
11     the sales of Bentley is a pretty important
12     revenue item; is that accurate?
13      MR. MINGOLLA: Objection, "pretty
14      important."
15 Q.  Is an important revenue item; is that accurate?
16      MR. MINGOLLA: Same objection. It's
17      vague.
18 A.  It's more than one-third of the revenues. It's
19     a significant number.
20 Q.  And if you look at contract manufacturing for
21     that year --
22      MR. MINGOLLA: Where are you referring
23      to?
24      MR. FINE: The bottom of page --

23 (Pages 86 to 89)

JT-A-1136

Page 90

1    actually, right below Page 6, called Product
2    Supply.
3            MR. MINGOLLA: Okay. Yes.
4    Q.  "Since Laboratorios Belmac currently utilizes
5        less than 100 percent of its plant capacity to
6        manufacture its own products, Laboratorios
7        Belmac has engaged in contract manufacturing of
8        pharmaceuticals owned by the companies." Is
9        that accurate?
10   A.  That's true.
11   Q.  And those amounts are not material, is that
12       accurate, for 2000? Are those amounts reported
13       here?
14   A.  I don't think you'll see those amounts anywhere.
15       I don't think they were considered significant
16       enough to spell out separately.
17   Q.  So the amounts of pharmaceuticals owned by or --
18       manufactured for other companies, including
19       Ethypharm, were not material to Laboratorios
20       Belmac's and, by extension, Bentley's 10-K for
21       2000?
22   A.  I think it was important to indicate to the
23       shareholders what the type of operations were
24       that we conducted, but I don't think the

Page 91

1    individual amounts for the individual companies
2    were material for disclosure.
3    Q.  Okay. And do you know what those amounts were?
4    A.  Sitting here today, I couldn't tell you what
5        they were back then.
6    Q.  Did you know what those amounts were in 2000 --
7        well, let me say in 2001, while this was being
8        drafted and when it was filed?
9    A.  I'm sure I knew at least what the product supply
10       totals were. I don't know if I knew by
11       individual company or not, but I knew in total
12       that they were not material.
13   Q.  And how did you know that?
14   A.  I was able to see how much product revenue came
15       from product sales versus how much came from
16       manufacturing arrangements.
17   Q.  And that's broken out differently on financial
18       reports?
19   A.  That's right.
20   Q.  And those financial reports are from
21       Laboratorios Belmac?
22   A.  That's right.
23   Q.  And they were provided to Bentley
24       Pharmaceuticals?

Page 92

1    A.  Yes.
2    Q.  Were those financial reports audited?
3    A.  They probably were included in the audit
4        procedures. I doubt that those specific reports
5        in those formats were audited, but they were
6        used as a basis for creating the audited
7        financial statements.
8    Q.  And those audits were done by Deloitte & Touche?
9    A.  That's right.
10   Q.  And Deloitte & Touche was satisfied that those
11       amounts were not material?
12           MR. MINGOLLA: Objection.
13           MR. FINE: Okay. I'll withdraw the
14       question. Could we take a brief break if you
15       don't mind?
16           THE WITNESS: That's fine with me.
17           MR. MINGOLLA: Go off the record.
18       (Recess taken from 11:23 a.m. to
19           11:32 a.m.)
20   Q.  So for 2000, about 35 percent of Bentley's
21       revenues are attributable to omeprazole; is that
22       right?
23   A.  That's right.
24   Q.  And that's an important product then?

Page 93

1    A.  That's right.
2    Q.  If we -- let me give you another document.
3        Actually, I've already given it to you, the 2001
4        10-K, if you'd look back to Exhibit 1. Just to
5        go over this again, you recognize this; is that
6        accurate?
7    A.  This is Exhibit 1?
8    Q.  Yes.
9    A.  Yes.
10   Q.  And it's a business record of Bentley
11       Pharmaceuticals? It was filed with the SEC?
12   A.  That's correct.
13   Q.  And it's a public document?
14   A.  That's correct.
15   Q.  If you -- I think your reporting changed a
16       little bit in 2001, looking through this
17       document. Do you recall that the way in which
18       you reported the 10-K changed a little bit?
19           MR. MINGOLLA: I'll object as vague.
20   A.  Well, there are requirements that the Securities
21       and Exchange Commission has, and as long as you
22       meet all of the disclosure requirements, it's
23       really up to the author of the documents to put
24       it in whatever order they think makes the most

24 (Pages 90 to 93)

JT-A-1137

Page 94

1    sense for the reader of the document. One thing
2    the SEC doesn't want you to do is just use
3    exactly the same format and just change the
4    numbers and regurgitate the same information the
5    following year. They want it to be a meaningful
6    document to the reader, so it's possible that
7    the format changed to try to improve the
8    document.
9    Q.  Do you recall any specific discussions about the
10   format changing in 2001 or for the 2001 report?
11        MR. MINGOLLA:  I'll object as to
12   foundation. I don't think it's been established
13   there's a specific change.
14   Q.  Do you recall any discussions about changing the
15   format for the report in 2001?
16   A.  I can't recall any specific discussion regarding
17   that year. I can just recall trying to make
18   sure that we had a meaningful document that was
19   constantly improving. It was a dynamic process.
20   Q.  Okay. If you turn to Page 21. And I apologize
21   if it's printed out slightly different than this
22   one. I think you'll see a heading that says,
23   "We operate a significant portion of our
24   business in, and plan to expand further into,

Page 95

1    markets outside the United States, which
2    subjects us to additional business risks," is
3    that right?
4    A.  I see that.
5    Q.  You see that. And the first sentence of that
6    is, "In the year ended December 31st, 2001,
7    substantially all of our revenues were derived
8    from sales made by our Spanish subsidiaries in
9    Spain and a small portion of those revenues, 1
10   to 2 percent, were derived from sales made by
11   the subsidiaries in customers in other foreign
12   countries." Is that accurate?
13   A.  Yes.
14   Q.  So substantially all, 99 percent or something
15   like that, of Bentley's revenues -- "our" is
16   Bentley; is that right?
17   A.  "Our" refers to Bentley consolidated results.
18   Q.  "Of Bentley's revenues were derived from sales
19   made by our Spanish subsidiaries in Spain and a
20   small portion of those revenues were derived
21   from sales made by the subsidiaries." Is that
22   also the Spanish subsidiaries?
23   A.  Yes, that's referring to those Spanish
24   subsidiaries.

Page 96

1    Q.  So substantially all of the revenues were
2    derived -- Bentley's revenues were derived from
3    the Spanish subsidiaries? Would that be a fair
4    characterization of that?
5    A.  That's a fair statement.
6    Q.  If you look at Page -- I think it's Page 11.
7    It's the section called Product Sales and
8    Marketing in Spain.
9    A.  Yes.
10   Q.  And this refers to the product sales and
11   marketing in Spain but not the small 1 to
12   2 percent of revenues that were sold by the
13   Spanish subsidiaries outside of Spain; is that
14   right?
15   A.  I would probably have to spend some time reading
16   this section to confirm whether that is or is
17   not true.
18   Q.  Okay. Feel free to take a few minutes to have a
19   look at it.
20   A.  Okay.
21        MR. FINE:  Could you read back the
22   question?
23        (Reporter read back the last question.)
24   A.  I think this is making reference to -- if I take

Page 97

1    a look at the last sentence in that first
2    paragraph of that section, I think it's making
3    reference to all of the revenues of the company,
4    both those within Spain and the sales outside of
5    Spain because that sentence says, "Revenues from
6    products whose active ingredient is omeprazole
7    accounted for approximately 56 percent of our
8    net sales in 2001," and that's referring to
9    consolidated net sales.
10   Q.  Okay. Does that also include generic products,
11   that 56 percent, generic omeprazole?
12   A.  My understanding of that sentence is that it is
13   talking about revenues of all products whose
14   active ingredient is omeprazole comprise
15   56 percent of consolidated net sales in '01,
16   whether they're branded, generic, inside or
17   outside of Spain.
18   Q.  Does that also include contract manufacturing?
19   A.  I'm assuming it includes contract manufacturing
20   as well.
21   Q.  So between 2000 and 2001, omeprazole went from
22   being approximately 35 percent of Bentley's
23   revenues to about 56 percent of net sales?
24   A.  In 2001, it was 56 percent, and I don't recall

25 (Pages 94 to 97)

JT-A-1138

Page 98

1  if the last document we were looking at was
2  2000. Was that 2000?
3  Q. I believe it was.
4      MR. MINGOLLA: It's Exhibit 5.
5  A. Yes, it went from 35 percent in 2000 to
6  56 percent in 2001.
7  Q. Okay. And if you look at Note F-25 again --
8  actually, I'm not sure whether it's Note 13 --
9  it might be Note 13 in the business segment
10  information. That indicates that net sales in
11  Spain were about 26,411?
12  A. That's actually 26,411,000, but that's true.
13  Q. 26,411,000. Thank you for correcting me. And
14  there were no net sales in the United States; is
15  that accurate?
16  A. That's correct.
17  Q. Okay. So approximately 56 percent of that
18  26,411,000 net sales figure is attributable to
19  products whose active ingredient is omeprazole?
20  A. That's correct.
21  Q. Okay. That also, you think, includes generic
22  omeprazole marketed by Laboratorios Davur; is
23  that right?
24  A. That's correct.

Page 99

1  Q. And contract manufacturing?
2  A. That's right.
3  Q. So it's a pretty important product?
4      MR. MINGOLLA: Objection, vague.
5  A. It's a product that made up more than 50 percent
6  of the company's revenues.
7  Q. And it's the single most important product for
8  Bentley; is that accurate?
9  A. At that time, it was the largest selling
10  product.
11  Q. Do you recall what the second most important
12  product was?
13  A. Until the time that it was disposed of, I'm
14  assuming it was Controlvas.
15  Q. I think Controlvas was disposed of in the year
16  before. I think it was sold before.
17      MR. MINGOLLA: Objection to form.
18  Q. Okay. We don't have to go into that. I'd like
19  you to look at another document, and this is
20  Exhibit 6.
21      (2002 10-K was marked Exhibit Number 6
22      for identification.)
23  Q. And do you recognize this document?
24  A. I do.

Page 100

1  Q. What is this document?
2  A. This is Bentley Pharmaceuticals, Inc.'s annual
3  report on Form 10-K for the year ended
4  December 31st, 2002 filed with the Securities
5  and Exchange Commission.
6  Q. And did you participate in writing and filing
7  this document?
8  A. I did.
9  Q. Okay. And is this document a business record of
10  Bentley Pharmaceuticals?
11  A. It is.
12  Q. And does this document or did this document
13  accurately reflect the position of Bentley
14  Pharmaceuticals when it was filed?
15  A. It was accurate when it was filed.
16  Q. And has any portion of this document been
17  restated?
18  A. There have been no restatements, although when
19  these financial statements were filed
20  subsequently as compared to financial
21  statements, it's possible that some of the line
22  items were reclassified.
23  Q. And you'll help me out if we come across one of
24  those items that has been reclassified?

Page 101

1  A. I will.
2  Q. I'd like you to let me know. Do you recall any
3  discussions about changing the format of
4  reporting in this document for the 2002 10-K?
5  A. Not specifically, but the SEC is always
6  promulgating new disclosure requirements, so
7  it's possible there may have been new disclosure
8  requirements that may not have been included
9  earlier, and again, we were continuing our
10  improvement process to try to make the document
11  a better document.
12  Q. If you turn to Page 22, there's a section that
13  says, "We operate a significant portion of our
14  business in, and plan to expand further into,
15  markets outside the United States," et cetera.
16  Do you see that? I apologize that again if it's
17  been printed out in a way that's slightly
18  different than mine.
19  A. No problem. I have it now.
20  Q. Th first sentence of that section says, "In the
21  year ended December 31, 2002, 99% of our
22  revenues were derived from sales made by our
23  Spanish subsidiaries in Spain and a small
24  portion of those revenues (six percent) were

26 (Pages 98 to 101)

Page 102

1 derived from sales made by the subsidiaries to
2 customers in other foreign countries." Is that
3 an accurate statement?
4 A. Yes, it is.
5 Q. So approximately 99 percent of Bentley's
6 revenues were derived from sales by the Spanish
7 subsidiaries?
8 A. That's right.
9 Q. Okay. And of that, approximately 6 percent were
10 derived from sales made by the subsidiaries to
11 customers outside of Spain; is that accurate?
12 A. That's right, that's right.
13 Q. And I'd like you to turn to Page 11, which
14 says -- and there's a section that says Product
15 Sales and Marketing in Spain.
16 A. Okay.
17 Q. And the last sentence of that section or of that
18 first paragraph says, "Revenues from products
19 whose active ingredient is omeprazole accounted
20 for approximately 49 percent of our net sales in
21 2002." Is that accurate?
22 A. That is.
23 Q. Was -- does this 49 percent figure also include
24 generic products or revenues from generic

Page 103

1 products?
2 A. Yes, this is before the discussion about
3 generics versus branded. So this is on a
4 consolidated basis all revenues, regardless of
5 the source, from omeprazole made up 49 percent
6 of the consolidated revenues in 2002.
7 Q. You just referred to a discussion about generics
8 versus brandeds. What discussion was that?
9 A. If you continue on that page, you'll see the
10 next section describes generic pharmaceuticals,
11 and on the following page, you'll see a
12 discussion of branded pharmaceuticals.
13 Q. So that discussion is discussion within this
14 document?
15 A. That's right.
16 Q. So including generic and branded
17 pharmaceuticals, approximately 49 percent of
18 Bentley's net sales for 2002 were from products
19 whose active ingredient is omeprazole?
20 A. Well, regardless of whether they're branded or
21 generics or contract manufacturing or whatever
22 the source.
23 Q. So that also includes contract manufacturing?
24 A. Everything that was based on omeprazole.

Page 104

1 comprised 49 percent of revenues in 2002.
2 Q. And was that the single most important product
3 for Bentley in 2002?
4 A. I speculate that it was.
5 Q. Do you know of another product that was more
6 important in 2002?
7 A. I don't think there was another product whose
8 revenues were greater than 49 percent.
9 Q. Okay. If you look at Footnote 3, which is
10 towards the back of the document, you'll see a
11 table for the consolidated statements of
12 operations and comprehensive income. Do you see
13 that?
14 A. On Page F-3?
15 Q. F-3. I'm sorry.
16 A. Okay. I do. I see that.
17 Q. And net product sales in 2002 were approximately
18 $38.7 million?
19 A. Net product sales in 2002, 38.7 million.
20 Q. So approximately 49 percent of that 38.7 million
21 is attributable to products whose active
22 ingredient is omeprazole?
23 A. Actually, I think it's 49 percent of the number
24 that is two lines below that, which is the

Page 105

1 39,136,000.
2 Q. Okay. So forgive my math. Around $20 million?
3 A. I would say --
4 Q. A little bit less --
5 A. I would say more than 19 million.
6 Q. More than 19 million, possibly less than 20
7 million -- less than 20 million. Okay. Forgive
8 me, but SEC filings are an important --
9 A. It's okay.
10 Q. -- set of things to actually understand. So in
11 the years 2000 -- just to sort of sum up, in the
12 years 1999, 2000, and 2001 -- I'm sorry. In the
13 years 2000, 2001, and 2002, products whose
14 active ingredients contain omeprazole accounted
15 for -- and correct me if I'm wrong -- 35 percent
16 of Bentley's revenues, 56 percent of Bentley's
17 revenues, and 49 percent of Bentley's revenues,
18 respectively?
19 A. That's correct.
20 Q. Okay. I'd like you to -- show you another
21 document. Actually, before we do that, you've
22 mentioned you're responsible for Bentley's
23 investor relations and public relations; is that
24 correct?

27 (Pages 102 to 105)

Page 106

1  A. · Primarily investor relations. I don't think we
2     truly have a public relations function.
3  Q. How many people work for Bentley in investor
4     relations?
5        MR. MINGOLLA: Objection. Time frame?
6        MR. FINE: From 1999 to 2002.
7  A. Between 1999 and 2002, my recollection is that I
8     was probably performing the investor relations
9     function in-house and we had an outside investor
10    relations group that was doing consulting work
11    for us.
12 Q. And in 1995, do you recall?
13 A. It's possible that I was doing or it's possible
14    that somebody was helping me do it, but I
15    couldn't tell you precisely who, if anybody,
16    during 1995.
17 Q. Okay. I'd like to show you a document, and it's
18    marked Exhibit 7.
19       (Fax to Mr. De Basilio from Mr. Murphy,
20       dated January 19, 1995 was marked
21       Exhibit Number 7 for identification.)
22 Q. And I'd like you to turn to the second page of
23    that document. Do you recognize that document?
24 A. I recognize this document because I've seen it

Page 107

1     recently in preparing for this deposition.
2  Q. Outside of context with your attorneys, do you
3     recognize this document?
4  A. No, I don't.
5  Q. It has your name on the bottom; is that
6     accurate?
7  A. It does.
8  Q. And it says, "For further information, please
9     contact"?
10 A. Right.
11 Q. What does this document appear to be?
12 A. It appears to be a draft of a press release that
13    perhaps would be distributed once finalized,
14    announcing the formation of a joint venture with
15    Ethypharm.
16 Q. And this document also has the name of someone
17    named Jill Perrone on it?
18 A. Jill Perrone.
19 Q. Jill Perrone. And who was Jill Perrone?
20 A. Jill Perrone is a person I mentioned earlier,
21    although I used either her maiden name or
22    married name, Figuerdo. She was performing
23    investor relations activities for us in this
24    time frame.

Page 108

1  Q. Do you recall drafting or being involved in the
2     drafting of this contract -- sorry, the drafting
3     of this press release?
4  A. No, I don't.
5  Q. Do you know who might have been?
6        MR. MINGOLLA: Objection, calls for
7     speculation.
8  A. I have no idea.
9  Q. Do you recall any conversations about this press
10    release with Jim Murphy?
11 A. No, I don't.
12 Q. Do you recall any conversations about this draft
13    press release with anyone else?
14 A. No, I have no knowledge of this.
15 Q. Was it usual for your name to be put on the
16    bottom of press releases from 1995 to 1999?
17 A. Yes, from probably sometime in 1992 through the
18    year 2006, you'll probably find my name on
19    virtually every press release that's gone out.
20 Q. And who drafted those press releases?
21 A. It depends on the subject matter of each of the
22    releases. If it was financial in nature, I
23    probably was involved in drafting it.
24 Q. And what other natures might press releases --

Page 109

1     would press releases during that time period
2     have been related to?
3  A. For announcement of product approvals for
4     commercialization, in which case it might be
5     drafted by Jim Murphy, along with the assistance
6     of Adolfo Herrera.
7  Q. Would you ever have been consulted on those?
8  A. The draft would have been passed by me typically
9     for my approval and comments.
10 Q. And would you provide approval -- would you
11    provide comments?
12 A. Typically, yes.
13 Q. Typically, yes. Would you provide -- who
14    ultimately approved or did not approve press
15    releases from 1995 to 2002?
16 A. I would say that Jim Murphy, president, would
17    have been primarily involved in the approval
18    process. I would have. Bob Stote, our senior
19    VP and chief medical officer. Depending upon
20    the subject matter, if it related to Spanish
21    operations or activities, Adolfo Herrera
22    probably would have been involved, and prior to
23    him, I'm not sure how the process would have
24    worked with Clemente, whose English was not very

28 (Pages 106 to 109)

Page 110

1   good. I don't know if he would have or not been
2   involved. Certainly our attorneys at Parker
3   Chapin. We did have an in-house attorney that
4   came to work for us in 2000 who had previously
5   been employed by Parker Chapin as a partner.
6   Q.  And who was that?
7   A.  Jordan Horvath.
8   Q.  And if you did not approve of a press release --
9       did you know of any press releases that you did
10      not approve of that were issued?
11  A.  There were times when either I was not available
12      or the subject matter was not financial in
13      nature that press releases went out that I did
14      not see.
15  Q.  But you were in charge of investor relations?
16  A.  Right.
17  Q.  Did you -- what steps did you take to
18      familiarize yourself with press releases that
19      you did not approve that were issued?
20  A.  I would typically read the document, make sure
21      that I could understand it and be able to answer
22      questions that investors may typically call up
23      and ask.
24  Q.  Do you recall any specific instances of press

Page 111

1   releases being issued that you did not approve?
2   A.  I couldn't tell you specifically which ones were
3       or were not, but I know that on occasion it did
4       happen.
5   Q.  Do you recall any press releases relating to
6       omeprazole that were issued that you did not
7       approve?
8   A.  I can't recall.
9   Q.  I'll show you another document.
10          (Press Release, dated November 10, 2000
11          was marked Exhibit Number 8 for
12          identification.)
13  Q.  Do you recognize this document?
14  A.  I can tell you what it is. I cannot say that I
15      specifically recall it.
16  Q.  Is this -- what is this document?
17  A.  This is a press release that was distributed on
18      November 10th of the year 2000, where Bentley
19      announces that it receives the second approval
20      to manufacture and market generic omeprazole in
21      Spain and plans to launch it by the first
22      quarter of 2001.
23  Q.  And is this a business record of Bentley
24      Pharmaceuticals?

Page 112

1   A.  This is a press release that was issued by
2       Bentley Pharmaceuticals.
3   Q.  And was distributed to the public?
4   A.  That's right.
5   Q.  And you have no reason to think that this wasn't
6       a document of Bentley Pharmaceuticals?
7   A.  I can tell you that based on the background, it
8       looks as if this document was printed off of our
9       corporate Web site, off of the home page. And
10      so I have to believe that it's authentic and
11      accurate.
12  Q.  Do you have any specific reason to think it's
13      not accurate?
14  A.  No, I don't.
15  Q.  I'd like you to look at the bottom. Your name
16      is on that. Is that correct?
17  A.  It is.
18  Q.  And it says VP and CFO contact?
19  A.  Right.
20  Q.  And then a phone number. Is that your phone
21      number? At that time, was that your phone
22      number?
23  A.  That was the office phone number in North
24      Hampton, New Hampshire, yes.

Page 113

1   Q.  And a couple lines above that, it says from
2       Michael J. Porter, President; Sean Leous,
3       VP-Media, L.B. Stauffer. Do you see those
4       names?
5   A.  I do.
6   Q.  Who are those people?
7   A.  Those are all employees of Porter LaVay & Rose.
8       That is an outside consultant, IR consulting
9       company, who you can outsource investor
10      relations activities to.
11  Q.  What's an outside IR consultant?
12  A.  And they assist you with investor relations.
13      They talk to investors. They perhaps even set
14      up meetings with investors for you, et cetera.
15  Q.  Did Bentley outsource investor relations to this
16      company?
17  A.  We did.
18  Q.  At about what time did Bentley outsource
19      investor relations to this company?
20  A.  I think we've used this company in particular on
21      three separate occasions dating back into the
22      mid-1990s and would perhaps terminate the agreement with
23      them, perhaps bring on another consulting group,
24      and then at some point go back to Porter LaVay &

29 (Pages 110 to 113)

JT-A-1142

Page 114

1  Rose, but I think we've used them on three
2  separate occasions.
3  Q.  What were the three occasions?
4  A.  Maybe "occasions" is not the right word.  During
5  three separate time frames.
6  Q.  What were the three time frames, as best you can
7  recall?
8  A.  I couldn't tell you.  I would say for two for
9  the three years at a time, one time during the
10  mid-'90s, one time in the late '90s, and one
11  time in the early 2000s.
12  Q.  And were there other firms that you used?
13  A.  There were.
14  Q.  And what were the names of those firms?
15  A.  There was one group called FD, as in Frank
16  David.  FD Financial it was called.  There was
17  another group whose name escapes me.  I can't
18  recall.
19  Q.  And did you review this press release before it
20  was issued?
21  A.  I cannot specifically recall this press release,
22  so I can't specifically say if I did or did not.
23  Q.  Do you have any reason to think you didn't
24  review this press release before it was issued?

Page 115

1  A.  I have no reason to think that I either did or
2  didn't.  I really have no basis for it.
3  Q.  Do you recall anything about the process of
4  drafting this press release?
5  A.  Not of drafting this specific press release, no.
6  Q.  Do you recall anyone telling you anything
7  about -- do you recall anyone at Bentley
8  Pharmaceuticals telling you anything about the
9  drafting of this press release?
10  A.  No.  I honestly can't recall anything specific
11  about this press release.
12  Q.  Do you recall anything generally about this
13  press release?
14  A.  No.
15  Q.  Okay.  The first paragraph, the first sentence
16  reads, "Bentley Pharmaceuticals, Incorporated,"
17  and then it gives the stock symbol for Bentley;
18  is that right?
19  A.  That's right.
20  Q.  BNT is the stock symbol for Bentley; is that
21  right?
22  A.  That's right.
23  Q.  "A drug delivery company with a commercial
24  presence in Europe announced today that it has

Page 116

1  been granted a second approval by the Spanish
2  Ministry of Health to manufacture and market a
3  generic version of omeprazole in Spain."  Is
4  that accurate?
5  MR. MINGOLLA:  Are you asking if
6  you've read that sentence correctly?
7  MR. FINE:  No.  I'm asking if his
8  understanding of whether Bentley Pharmaceuticals
9  was granted a second approval by the Spanish
10  Ministry of Health to manufacture and market a
11  generic version of omeprazole in Spain.
12  MR. MINGOLLA:  I'd just like to
13  object.  Go ahead and answer.
14  A.  I'd like to clarify that when Bentley
15  Pharmaceuticals puts out press releases, it's
16  speaking about its consolidated operations.  So
17  when it says, "Bentley Pharmaceuticals, Inc., a
18  drug delivery company with a commercial presence
19  in Europe announced today that it has been
20  granted," the grant was not in the name of
21  Bentley Pharmaceuticals, Inc.  It was in the
22  name of, I'm assuming, Belmac or Davur or both.
23  I'd have to read farther to see which one, but
24  it was Belmac and/or Davur who received the

Page 117

1  approval.
2  Q.  Okay.  But the next sentence down says, "The
3  company plans to launch the product through its
4  subsidiary, Laboratorios Belmac, by the first
5  quarter of 2001."  Is that right?
6  A.  That's what it says.
7  Q.  And the company there refers to Bentley
8  Pharmaceuticals?
9  A.  The company refers to Bentley Pharmaceuticals,
10  Inc.  Again, I think just to put it in the
11  proper context, this press release was being
12  distributed to the shareholders of the company
13  in order to give those shareholders an
14  understanding of what the company's business is.
15  It's too confusing to try to segregate and say
16  Belmac or Davur or Rimafar or Bentley API, so
17  you're talking about the consolidated operations
18  of the company, and that's what shareholders
19  have invested in, are the consolidated
20  operations of the company.
21  Q.  So -- go on.  I'm sorry.
22  A.  I'm trying to understand if you're trying to
23  differentiate between Belmac and Bentley here.
24  Q.  No, I'm just trying to get a sense of what these

30 (Pages 114 to 117)

JT-A-1143

Page 118

1    sentences mean. It says, "The company" -- and
2    that's Bentley Pharmaceuticals, Incorporated --
3    "plans to launch the product through its
4    subsidiary Laboratorios Belmac by the first
5    quarter of 2001," is that accurate?
6              MR. MINGOLLA: Objection.
7    A.  It's accurate if you're looking at the
8    consolidated operations, but if you're trying to
9    distinguish between what Belmac does versus what
10   Bentley does, I think you have to put it in the
11   proper context.
12   Q.  Okay. How is it inaccurate?
13             MR. MINGOLLA: Objection.
14             MR. FINE: Basis?
15             MR. MINGOLLA: I think you're
16   characterizing the document.
17             MR. FINE: Well, no, the witness just
18   said --
19             MR. MINGOLLA: The witness has
20   testified. Let the witness' testimony stand.
21             MR. FINE: And I'd like to ask the
22   witness how it is inaccurate.
23             MR. MINGOLLA: My objection stands.
24   Q.  You can answer.

Page 119

1    A.  Again, I think in the context of which -- if I
2    understand the question, you're trying to
3    differentiate between what Bentley does and what
4    Belmac does, and Bentley Pharmaceuticals, Inc.
5    is a company that owns shares of stock of a
6    Spanish company, and in that respect, when
7    you're speaking to the shareholders, if you're
8    telling the shareholders what they've invested
9    in and what the operations of that company are
10   and you're looking at it as a consolidated
11   entity, then you say, "we," "our," "the
12   company," and that's what this sentence is
13   speaking to. But if you want to ask me by the
14   company, are you talking about Belmac or are you
15   talking about Bentley, this is on a consolidated
16   basis, but I can tell you that the approval was
17   granted in the name of -- and I'd have to
18   read -- either Belmac or Davur.
19   Q.  Okay. But the next sentence down says, "In
20   July, Bentley announced its Spanish
21   subsidiary, Laboratorios Davur, had been granted
22   approval by the Spanish Ministry of Health to
23   manufacture and market its generic version of
24   omeprazole in Spain." Am I reading that

Page 120

1    correctly?
2    A.  That's right. What this paragraph is saying is
3    that the company has just now recently received
4    an approval in the name of Belmac, but earlier
5    in the year, in July, three months prior, four
6    months prior, they had received approval in the
7    name of Davur.
8    Q.  And the quote on the third paragraph is from Jim
9    Murphy; is that right?
10   A.  That's right.
11   Q.  Okay. Do you know if you drafted that quote?
12             MR. MINGOLLA: I'll object to the
13   extent that the copy of Exhibit 8 that we have
14   has the quote being cut off in mid-sentence, so
15   it's difficult to ask the witness about a quote
16   that we can only see fragments of.
17             MR. FINE: Understood.
18   Q.  To the extent that you can see that quote, do
19   you recall who drafted that?
20   A.  You know, I can't recall this press release
21   specifically, so I can't tell you who
22   participated in drafting the quote.
23   Q.  But that's Jim Murphy, and he's -- the title
24   he's there under is chairman and CEO, and that's

Page 121

1    of Bentley; is that accurate?
2    A.  That's correct.
3    Q.  Okay. I'd like to ask you about another
4    document.
5              (Press Release, dated November 14, 2001
6              was marked Exhibit Number 9 for
7              identification.)
8    Q.  Do you recognize this document?
9              MR. MINGOLLA: Give him a chance to
10   review it first.
11   Q.  Sure. Take all the time you need.
12   A.  I recognize that it is a copy of a press release
13   that was issued by Bentley Pharmaceuticals. I
14   don't specifically recall anything about this
15   press release.
16   Q.  Do you know who drafted this press release?
17   A.  I don't.
18   Q.  Your name is not listed as a contact person on
19   this list; is that correct?
20   A.  I do not see my name on this page. However, I
21   don't think this is a complete printout of the
22   document, and I think if you went back and
23   looked at the original document, the original
24   hard copy of the document, I think it's probable

31 (Pages 118 to 121)

JT-A-1144

Page 122

1    that my name would be on there.
2  Q.  Looking back at Exhibit 8, I notice that your
3       name as a contact is put above the safe harbor
4       statement. Is that accurate?
5  A.  It is on that document.
6  Q.  And why do you think your name would have been
7       put below the safe harbor statement on Exhibit
8       9, if that's what you've just suggested?
9              MR. MINGOLLA: Objection,
10      mischaracterizes his testimony.
11 A.  I make that statement because I don't see any
12      names on there, I don't see any contact
13      information and I don't think we've ever
14      produced a press release with no contact
15      information on there and I'm not sure that it
16      always shows up. As a matter of fact, if you go
17      back and take a look at our press releases, the
18      contact information is always at the top of the
19      press release. So I think this is just an
20      electronic formatting that somebody has
21      undertaken to put these press releases on the
22      Web site.
23             MR. MINGOLLA: For the record, also
24      just note my objection to Exhibit 9. As is the

Page 123

1       case with Exhibit 8, it's a printout but
2       portions of the paragraph are missing on the
3       right-hand side of the exhibit.
4              MR. FINE: I apologize.
5  Q.  Were you consulted about a press release
6       concerning four new patents for improved orally
7       delivered products, including omeprazole and
8       lansoprazole, in or around late 2001?
9  A.  I cannot recall if I was or was not.
10 Q.  Do you have a reason to think that you were not?
11             MR. MINGOLLA: Objection as to form.
12 A.  No, I really have -- I have no recollection of
13      this press release specifically, so I just don't
14      know.
15 Q.  And in your responsibilities for investor
16      relations, do you ever present or make
17      presentations to third-party investors?
18 A.  I do.
19 Q.  And when have you done that?
20 A.  When have I done that. Do you mean on what
21      occasion or on specific dates?
22 Q.  On what occasions have you done that?
23 A.  For example, if -- for example, if an investment
24      bank sets up an investors conference, an

Page 124

1       institutional investors conference, or I might
2       make a presentation to institutional investors.
3       We may actually have what's called one-on-one
4       roadshow meetings with individual institutional
5       investors. I may have made presentations to
6       them as well.
7  Q.  Do you recall the dates of approximately when
8       you did this?
9  A.  We did an offering back in 2002, I think in
10      February of 2002. So leading up to that
11      offering, I would have done that, and other than
12      that, there are just various institutional
13      investors conferences scheduled throughout the
14      year, and I can't tell you specific dates of
15      when those are.
16 Q.  Do you draft presentations for those meetings?
17 A.  Presentations are put together in conjunction
18      with either the investment bankers or with the
19      investor relations groups, et cetera.
20 Q.  And who puts those together?
21 A.  It's a collaborative effort of the IR consultant
22      as well as with input from the officers of the
23      company.
24 Q.  And do you make presentations to other third

Page 125

1       parties, possibly potential business partners or
2       joint venture partners?
3  A.  I don't specifically recall doing that, but it's
4       possible that it's been done, but I don't recall
5       doing it.
6  Q.  Do you recall making any presentations in 2003
7       or '4 to anyone?
8  A.  I'm sure I did institutional investor
9       conferences during '03 and '04. Perhaps UBS
10      conference. I don't know.
11 Q.  What was your role in putting together those
12      presentations? Did you approve them? You said
13      it was collaborative, but I'm just trying --
14 A.  I think in order for me to go through the slide
15      show or the deck, I would have to make sure I
16      understood the information on it and could speak
17      to it and answer questions about it. So it's a
18      matter of whether it was the INR group or the
19      investment bank or the other officers of the
20      company, everybody looked at it, reviewed it,
21      made comments, and made sure it was correct.
22 Q.  Okay. I'd like to show you another document.
23             (Presentation to Perrigo was marked
24             Exhibit Number 10 for identification.)

32 (Pages 122 to 125)

JT-A-1145

Page 126

1   Q. Do you recognize this document?
2   A. No, I don't.
3   Q. What does this document appear to be?
4       MR. MINGOLLA: I'll object to the
5   extent it calls for speculation.
6   Q. Do you recognize any documents like this
7   document?
8   A. I can flip through there and tell you some -- I
9   recognize some of the slides. This apparently
10  is a presentation to Perrigo. I don't know if
11  the presentation was made or not made. I was
12  certainly not involved in any meetings where it
13  was presented to them.
14  Q. What is Perrigo?
15  A. Perrigo is a large private label manufacturing
16  company located in the Midwest. For example, if
17  you go to CVS or Walgreen's or Wal-Mart and pick
18  up the store brand OTC product, vitamins or
19  supplements or whatever, and look on the side,
20  probably two-thirds of the time, you'll see
21  manufactured by Perrigo.
22  Q. Do you recall making a presentations to Perrigo?
23  A. We have -- we, Bentley Pharmaceuticals, Inc.,
24  has entered into a collaboration with Perrigo,

Page 127

1   whereby we're entering into a collaboration on a
2   generic product here in the U.S.
3   Q. What is that product?
4   A. That product has not been disclosed publicly.
5   Can I disclose it here or not?
6       MR. MINGOLLA: Obviously, this portion
7   of the transcript will be labeled highly
8   confidential. Can we go off the record a
9   second?
10      (Discussion off the record.)
11  Q. Does the product that Bentley is collaborating
12  with Perrigo on relate to omeprazole?
13  A. No, it does not.
14  Q. Lansoprazole?
15  A. No, it does not.
16  Q. Any microgranulated product?
17  A. No.
18  Q. Okay. You said that you recalled certain slides
19  from this deck as slides -- is that accurate?
20  A. That's right.
21  Q. And how do you recall those slides? Were they
22  slides that you drafted?
23  A. I don't know if I drafted them or not, but they
24  are the format of the slides that are included

Page 128

1   in my presentations to institutional investors,
2   for example, the slide that says Financial
3   Highlights, Consistent Revenue Growth on Page
4   BENTL 016018.
5   Q. Any other slides?
6   A. And the next page, the Strong Balance Sheet
7   slide, I recognize as well.
8   Q. The Stock Performance slide?
9   A. I don't recognize that.
10  Q. The Bentley Patent Estate slide?
11  A. No.
12  Q. No, you don't recognize that?
13  A. No, I don't. I'm flipping through. I don't
14  think there are any other slides in here that I
15  recognize.
16  Q. Do you know who might have developed any of
17  these slides? Why don't we start from the
18  beginning? Do you know who might have developed
19  the first slide?
20      MR. MINGOLLA: Objection. Calls for
21  speculation.
22  A. The first slide being --
23  Q. Do you know who developed the first page of this
24  presentation after the cover?

Page 129

1   A. I don't know who did that.
2   Q. Okay. Do you know who developed the page after
3   that titled Bentley Operations?
4   A. Before I go any farther, other than the year
5   2003, there's no date on here anywhere, I guess.
6   Q. No, I haven't seen any other date on here.
7   A. No, I don't know who put that together.
8   Q. Do you know who put together the picture of what
9   appears to be a building with an American flag
10  after that?
11  A. That is our corporate headquarters building in
12  Exeter, New Hampshire, but I don't know who put
13  that together.
14  Q. And the next slide, do you know who put the
15  slide that said Bentley Management at the top
16  together?
17  A. I do not.
18  Q. The Financial Highlights slide, you said, is
19  identical to a slide that you use or used.
20  A. I recognize the format of that as being a slide
21  we use in our roadshow presentations.
22  Q. Did you review that format for accuracy?
23  A. I know that the slides that I used were
24  accurate. I couldn't tell you if these

33 (Pages 126 to 129)

Page 130

1    depictions are accurate or not. I have not seen
2    this presentation.
3  Q. The Financial Highlights slide, do you recognize
4    that?
5  A. I recognize the format of the slide, but I would
6    have to verify the numbers to tell you if
7    they're accurate or not.
8  Q. Are there any other slides in here that you
9    recognize the format or the content of?
10  A. I've looked through the balance of the slides.
11    I recognize a couple of the photographs at the
12    back. I recognize what's in the photographs,
13    but I don't know who put these together or where
14    it came from.
15  Q. What's in those photographs? Why don't we -- if
16    you give me the Bates number at the bottom of
17    the document, that would be helpful.
18  A. It's in the third page from the back of the
19    document. The page number is 016045; is a
20    photograph of the manufacturing facility that's
21    owned by Belmac in Zaragoza, Spain.
22  Q. And the next page?
23  A. And the next page is a photograph of
24    manufacturing equipment located in that

Page 131

1    facility.
2  Q. And you recognize that because?
3  A. I've seen it.
4  Q. You've seen it. And do you know what kind of
5    equipment that is?
6  A. I think that is a piece of equipment that
7    manufactures Simvastatin.
8  Q. And what is Simvastatin?
9  A. Simvastatin is an anticholesterol cardiovascular
10    product.
11  Q. And is that a microgranulated product?
12  A. It is not.
13  Q. Do you know who else at Bentley put together
14    presentations such as this?
15         MR. MINGOLLA: At any time or at any
16    specific time frame?
17  Q. From 1999 to -- I think you've said -- from 1999
18    to 2004.
19  A. Other than Jim Murphy, our president and CEO,
20    the only other person I can think of that may
21    have done something like this would be a person
22    who worked for us for about a one-and-a-half or
23    two-year period named Jim Hand, H A N D, who was
24    doing business development for us. In fact, his

Page 132

1    name is right here on this organizational chart.
2  Q. When was Jim Hand hired?
3  A. I'm guessing that it was in 2002 or 2003.
4  Q. And he no longer works for Bentley
5    Pharmaceuticals?
6  A. He does not.
7  Q. When did his employment relationship with
8    Bentley Pharmaceuticals end?
9  A. I think it was probably one or two years ago.
10  Q. And you've testified that Mr. Hand worked in
11    business development for Bentley
12    Pharmaceuticals?
13  A. That's right.
14  Q. What were his responsibilities?
15  A. To either identify opportunities to in-license
16    products or to out-license products.
17  Q. Did you say end license?
18  A. In-license, I N.
19  Q. What is in-licensing?
20  A. Where you actually bring in something from the
21    outside, you license it in from somebody on the
22    outside to create a revenue stream or if you
23    have intellectual property that you may want to
24    outlicense to somebody else to generate revenue

Page 133

1    for you.
2  Q. Why did Mr. Hand leave Bentley Pharmaceuticals?
3  A. I was not directly involved with his
4    termination, so I would be guessing if I
5    speculated on that.
6  Q. Have you heard anything about why Mr. Hand left
7    Bentley Pharmaceuticals?
8  A. I think it was mutual. I think he was not being
9    very productive in his role there, and I think
10    it was mutually agreed that he would leave the
11    company.
12  Q. And you testified that he was terminated?
13  A. His employment was terminated, but I think it
14    was mutually. I don't think he was fired. I
15    think it was by mutual agreement.
16  Q. And who terminated him?
17         MR. MINGOLLA: Objection.
18  A. I think that was an agreement between him and
19    Jim Murphy.
20  Q. Okay. Do you know where he is now?
21  A. At the time, he resided in Pennsylvania, in the
22    Philadelphia area of Pennsylvania, but I don't
23    know who he's working for or if he's retired.
24  Q. About how old was he when he worked for Bentley

34 (Pages 130 to 133)

JT-A-1147

Page 134

1  Pharmaceuticals?
2  A. I would say late 50s, probably late 50s, maybe
3      60ish.
4  Q. Okay. What steps do you take to ensure that
5      presentations to third parties are accurate?
6          MR. MINGOLLA: Objection, vague.
7      Whose presentations?
8  Q. Bentley Pharmaceuticals' presentations.
9          MR. MINGOLLA: I'll still object as
10     vague.
11 A. For presentations that I'm involved with, I look
12     through the presentation, look at all of the
13     slides, and make sure the information is
14     accurate as far as my knowledge goes and take
15     whatever steps are necessary to verify the
16     accuracy of the information.
17 Q. What steps are those?
18 A. Based on firsthand knowledge or the ability to
19     go compare with original documents.
20 Q. And are there any controls or procedures within
21     Bentley Pharmaceuticals to generally assure that
22     presentations to third parties are accurate?
23         MR. MINGOLLA: Objection, vague.
24 Q. Or policies?

Page 135

1          MR. MINGOLLA: Objection, compound and
2      vague.
3  A. I think there are controls in place to make sure
4      that financial presentations and investor
5      presentations are accurate and complete, but I
6      can't really speak to this document because I
7      didn't even know this document existed.
8  Q. Okay. What are those controls and procedures?
9  A. The people in the financial department read the
10     slide deck, have a chance to verify the accuracy
11     of the information, check it, provide comments,
12     revisions as necessary.
13 Q. And business development?
14 A. I have no idea.
15 Q. Do you think it's important to ensure that
16     presentations to third parties for business
17     development are accurate?
18         MR. MINGOLLA: Objection.
19         MR. FINE: Basis?
20         MR. MINGOLLA: Vague.
21 A. I think any presentation made to anybody should
22     be accurate and complete.
23 Q. And if you knew of a presentation that was
24     inaccurate, what steps would you take to correct

Page 136

1      it?
2  A. I would --
3          MR. MINGOLLA: Objection, calls for
4      speculation.
5  A. I guess I'm sort of speculating because I don't
6      think it's happened, but at the same time, if I
7      knew it was inaccurate, I would take steps to
8      correct it.
9          MR. MINGOLLA: Can we go off the
10     record for one second?
11         (Discussion off the record)
12         (Luncheon recess taken from 12:32 p.m. to
13          1:37 p.m.)
14 Q. Mr. Price, welcome back. I'd like to turn your
15     attention to the relationship with Ethypharm.
16     And prior to 2002, Belmac was producing
17     omeprazole in or under an agreement with
18     Ethypharm; is that right?
19 A. I was not familiar with the operations or the
20     manufacturing arrangements over in Spain. I
21     know at some point there was an oral agreement
22     from what I understand, and then at some point,
23     the agreement was reduced to writing for a
24     two-year period, but I wasn't directly involved

Page 137

1      with it. So I can't tell you the exact dates.
2  Q. Well, the relationship ended in 2002 or that
3      contract was terminated in 2002; is that
4      correct?
5          MR. MINGOLLA: Objection, compound.
6  A. I think that's right, but I'd have to look at
7      the document to verify that.
8  Q. And the relationship -- the producing
9      relationship had gone back to the early '90s; is
10     that right?
11         MR. MINGOLLA: Objection, vague.
12 A. I'm not sure when it began. It began -- we
13     bought the Spanish operations in 1992, and it
14     started sometime after that, but I don't know
15     when.
16 Q. The relationship with Ethypharm started after
17     you bought the Spanish company?
18 A. I think that's right. I don't think it was in
19     existence, but, again, I'm not positive about
20     that.
21 Q. What do you understand the relationship with
22     Ethypharm to have been?
23         MR. MINGOLLA: Objection as to which
24     entity the relationship is with.

35 (Pages 134 to 137)

JT-A-1148

Page 138

1 A. Well, my understanding is that there was never
2 any relationship with Bentley Pharmaceuticals,
3 but it was my understanding that Belmac had an
4 arrangement whereby Belmac did manufacture
5 omeprazole for Ethypharm's customers.
6 Q. And Ethypharm provided Belmac with know-how and
7 the machines to manufacture the omeprazole; is
8 that accurate?
9    MR. MINGOLLA: I don't know.
10 A. I don't know what the arrangement was.
11 Q. Did you inform yourself about whose know-how was
12 being used to manufacture the omeprazole?
13 A. No.
14 Q. Did you inform yourself about whose intellectual
15 property was being used to manufacture the
16 omeprazole?
17 A. No, I can't say that I did.
18 Q. Did you inform yourself to know whose technology
19 was being used to manufacture the omeprazole?
20 A. No.
21 Q. Did you inform yourself to know whose patents
22 were being used to manufacture the omeprazole?
23 A. I was not involved with the IP aspect of our
24 business, no.

Page 139

1 Q. As the CFO, you reported that the omeprazole
2 product accounted for a substantial portion of
3 Bentley's revenues from '99 to 2002. Did you
4 take any steps to inform yourself as to the
5 basis or the security of that revenue stream?
6    MR. MINGOLLA: Objection as to the
7 form.
8 A. I'm not really sure I understand the question.
9 I can answer it this way, and you tell me if I'm
10 answering your question. As the CFO who had the
11 responsibility for making the filings for the
12 Securities and Exchange Commission and to the
13 shareholders, I made sure that we described our
14 business to the shareholders accurately. To do
15 that, we involved other people that were
16 involved with the company, including management
17 and our attorneys and those involved with the IP
18 of the company, but I did not have direct
19 responsibility or an understanding of the IP
20 involved.
21 Q. Did you have an indirect understanding of the IP
22 involved?
23 A. I did not have a direct understanding, but I was
24 present when the IP was being discussed.

Page 140

1 Q. When was the IP being discussed?
2 A. Well, I'm not speaking in -- I'm not speaking of
3 a specific instance. I'm just speaking in
4 generalities, that I knew that Belmac
5 manufactured omeprazole for Ethypharm. At some
6 point, Ethypharm was discontinuing its
7 operations in Spain and that Belmac developed
8 its own IP with respect to production of
9 omeprazole and began selling omeprazole to
10 customers of Belmac. And beyond that, I wasn't
11 involved in the IP process.
12 Q. I'm sorry. You said customers of Belmac. Did
13 you mean customers of Ethypharm?
14 A. Belmac had already been producing and selling
15 omeprazole to its own customers, and that's what
16 I was making reference to.
17 Q. And who else was present when the IP was being
18 discussed?
19 A. Like I said, I can't even recall any specific
20 instances. I'm just drawing on my general
21 understanding based on things I had heard over
22 the years.
23 Q. Who do you recall hearing them from?
24 A. I would say Jim Murphy primarily.

Page 141

1 Q. Anyone else?
2 A. No.
3 Q. Did you ever hear the IP being discussed by
4 Clemente Gonzalez?
5 A. No, because Clemente didn't speak English. I
6 can't imagine I would have been sitting in on a
7 conversation with him on that.
8 Q. Adolfo Herrera?
9 A. It's possible. I don't specifically recall, but
10 it's possible.
11 Q. Jordan Horvath?
12 A. It's possible, but I don't specifically recall a
13 conversation with him about it.
14 Q. General recollection, what -- your general
15 recollection, what kind of conversation or
16 meeting are you recalling generally? Is it a
17 phone conversation?
18 A. No, not even -- like I said, no specificity.
19 Just with respect to my understanding of the
20 disclosures we needed to make in the annual
21 reports on 10-K and the quarterly reports on
22 10-Q.
23 Q. I want to go back for just a moment. Do you
24 speak Spanish?

36 (Pages 138 to 141)

JT-A-1149

Page 142

1  A.  I do not.
2  Q.  So there was some general discussion in the
3      context of preparing Bentley's 10-Ks and 10-Qs
4      of ownership or of the IP for omeprazole?
5          MR. MINGOLLA: Objection as to form.
6  A.  Like I said, I cannot recall any specific
7      conversations, but just in general, recognizing
8      that that is a section that has to be disclosed
9      to the shareholders, a section in the business
10     part of the Form 10-K, Item 1, regarding patents
11     and IP.  So our attorneys and those people
12     involved with IP in the company were involved in
13     reviewing and making sure that those disclosures
14     were accurate.
15 Q.  And you thought there was a risk that had to be
16     disclosed to Bentley's shareholders and to the
17     public because of the percentage of revenues
18     that were dependent on omeprazole; is that
19     right?
20 A.  Yes.  I think that any concentration of business
21     risk, whether it's sales to one customer, sales
22     of one product, amounts due from one customer,
23     things of that -- exposure to any particular one
24     item that can impact the operating results,

Page 143

1      those kinds of things need to be disclosed to
2      the shareholders so they can understand what
3      kind of risks are involved.
4  Q.  And what kind of risks were involved in
5      relationship to omeprazole from 1999 to 2002?
6  A.  I don't know it was specific just to those
7      years, but recognizing that omeprazole was a
8      very large driver of our revenues, I hoped to
9      make sure that the shareholders were aware that,
10     "Hey, X percent of our revenues come from sales
11     of this one product."
12 Q.  What could happen with that one product?  What's
13     the risk?
14         MR. MINGOLLA: Objection to the form,
15     calls for speculation.
16 A.  It could be recalled for safety.  There could be
17     a manufacturing problem with it.  There could be
18     any numbers of things that happened that the
19     product is withdrawn from the market.
20 Q.  So the risk was that omeprazole could be
21     withdrawn from the market?
22 A.  It was certainly a risk.
23 Q.  Was the nature of the risk that Ethypharm might
24     terminate its relationship with Belmac and

Page 144

1      Belmac might be unable to produce omeprazole?
2          MR. MINGOLLA: Objection as to form.
3  A.  I don't know.
4  Q.  Was the nature of the risk different than that?
5          MR. MINGOLLA: Objection as to form.
6  A.  My perception of the risk was that this one
7      product made up -- and you saw the numbers -- 35
8      to 56 percent of the revenues and if, for
9      whatever reason, the company was unable to sell
10     that product, the revenues would decline by
11     those percentages.
12 Q.  Why might the company have been unable to sell
13     that product?
14         MR. MINGOLLA: Objection, calls for
15     speculation.
16 A.  In recognizing that, I'll tell you there are any
17     number of things that can happen to a product.
18     It can be subject to generic competition that
19     takes away market share, subject to other
20     competitors coming in and taking away market
21     share, subject to safety recalls, subject to
22     manufacturing problems, subject to anything that
23     prevents the product from getting to market.
24 Q.  So it's the nature or -- it's your testimony

Page 145

1      that the risks could have been anything?
2          MR. MINGOLLA: Objection as to form.
3  A.  I can tell you that my primary objective was to
4      make sure that the reader of the financials
5      understood that if this product was not
6      marketed, revenues could decline substantially.
7      I never contemplated that the risk involved some
8      issue with Ethypharm.  That was not my objective
9      when we disclosed that risk.
10 Q.  Okay.  What's -- if it wasn't Ethypharm, what
11     did you understand the risk to be?
12         MR. MINGOLLA: Objection, asked and
13     answered.
14 A.  Those risks I laid out for you; whether it's
15     competition that takes away our market share,
16     whether you have manufacturing product,
17     whatever -- whatever could keep the product from
18     getting to market.
19 Q.  Did Ethypharm threaten to terminate the
20     relationship with Belmac for the production of
21     omeprazole in 1997?
22         MR. MINGOLLA: Objection, foundation.
23 A.  I don't know.  I was not involved with that.
24 Q.  Do you recall anyone mentioning that Ethypharm

37 (Pages 142 to 145)

JT-A-1150

Page 146

1    had threatened to terminate the relationship in
2    1997?
3  A. I don't recall that.
4  Q. Do you recall any discussion within Bentley of
5    the relative importance of omeprazole?
6  A. I think I had the ability to recognize the
7    relative importance of omeprazole, which is why
8    we disclosed the percentage of revenues in our
9    file.
10 Q. Did you recall -- do you recall any discussion
11   within Bentley from 1999 to 2002 about
12   Ethypharm?
13 A. I don't think I was directly involved with that,
14   so no, I don't recall any specific discussion of
15   that.
16 Q. Do you remember any general discussion of that?
17 A. At some point -- and I can't tell you the time
18   frame. At some point, it was brought to the
19   level of disclosure to the board of directors,
20   but I couldn't tell you if it's in the time
21   frame that you're asking about or not.
22 Q. What was brought to the level of disclosure to
23   the board of directors?
24 A. That there were some threats or claims that

Page 147

1    there may be some litigation or some legal
2    issues or something involved with Ethypharm.
3  Q. And what was disclosed to the board of
4    directors?
5  A. That the relationship with Ethypharm had been
6    terminated or something like that and there were
7    some rumblings that there may be legal issues.
8  Q. And did you ask for any further information on
9    that?
10 A. Not that I recall.
11 Q. Did you do the disclosing to the board of
12   directors?
13 A. It was -- I would have to go back and look at
14   the minutes. I don't recall. It could have
15   been Jim Murphy. It could have been Jordan
16   Horvath. It could have been me. I don't
17   recall. I'd have to look at the minutes.
18 Q. Do you recall when that was disclosed?
19          MR. MINGOLLA: Objection as to form.
20 A. I don't recall, but I'm sure if we look at the
21   minutes, we could find it.
22 Q. You said it could have been you. Do you
23   remember specifically discussing the need to
24   disclose this to the board of directors with

Page 148

1    anyone?
2  A. There was a typical agenda item on the board
3    agenda each time the board met to give an update
4    to the board members with respect to legal
5    issues. They weren't necessarily litigation
6    issues, but either threats of litigation or
7    potential litigation or things that needed to be
8    brought to the attention of the board.
9  Q. And did you prepare the agendas?
10 A. The agenda was typically sent out by me after
11   consultation with Jim Murphy.
12 Q. Did you consult with anyone else about those
13   agendas?
14 A. Our legal counsel.
15 Q. So did Jim Murphy bring to your attention the
16   need to disclose this to the board of directors?
17 A. Well, I can't remember specifically, but in
18   general, the way it would happen is I would say,
19   "Here's a proposed agenda. Do you see anything
20   that needs to be added, deleted, changed?" He
21   would look through them. I'd say, "What do we
22   need to talk to them about with respect to
23   financial updates, legal updates, human resource
24   updates, et cetera," and then go through the

Page 149

1    list and discuss things that needed to be
2    disclosed.
3  Q. Do you recall any financial results as a result
4    of the termination of the relationship with
5    Ethypharm?
6          MR. MINGOLLA: Objection, foundation.
7  A. No, I don't recall anything like that.
8  Q. Did you look into what the financial results of
9    the termination of the relationship with
10   Ethypharm might have been?
11 A. No.
12 Q. Did you ask anyone whether terminating the
13   relationship with Ethypharm would affect
14   Bentley's revenues from omeprazole?
15 A. I can't say that I recall specifically asking
16   that question, but as we went through the
17   drafting process and the review process, we
18   tried to raise any potential issues that needed
19   to be disclosed. So I'd like to think that we
20   raised that issue, but I can't specifically
21   recall if we did or not.
22 Q. But you don't know?
23 A. I don't know.
24 Q. Did you ask for any financial analysis from

38 (Pages 146 to 149)

JT-A-1151

Page 150

1　　Belmac about what the effect of terminating the
2　　relationship with Ethypharm might be?
3　A.　Not that I recall.
4　Q.　Did you ask for any financial analysis from your
5　　own finance department or anyone else at Bentley
6　　about what the effect of terminating the
7　　relationship with Ethypharm might be?
8　A.　I don't think anybody in our finance department
9　　in the U.S. would have any basis for determining
10　　that.
11　Q.　Determining what?
12　A.　What the financial impact would be of
13　　terminating the relationship with Ethypharm.
14　Q.　Well, you've testified that omeprazole accounts
15　　for in excess of one-third of Bentley's revenues
16　　for the years from 1999 to 2002. Did you know
17　　that the relationship with Ethypharm related to
18　　omeprazole?
19　A.　No. It's my understanding that the production
20　　of Belmac's omeprazole is not related to
21　　Ethypharm.
22　Q.　Okay. When did Belmac begin to develop its own
23　　omeprazole?
24　A.　I don't know. I wasn't involved with that.

Page 151

1　Q.　Well, research and development has been a
2　　significant cost to Bentley from 1994 to 2003.
3　　Is that accurate?
4　A.　I think we've spent relatively modest amounts on
5　　research and development.
6　Q.　It's been an area that the officers and board
7　　have focussed on; is that accurate?
8　　　MR. MINGOLLA: Objection as to form
9　　and vague.
10　A.　I'm not sure where you're going. Let me say
11　　this: I think that as we put together our
12　　operating budgets for each year, we allocate
13　　resources to research and development
14　　activities, to G and A activities, et cetera.
15　　If you take a look at the percentage of our
16　　revenues that are devoted to research and
17　　development facilities -- to services, I think
18　　you'd probably see that it's less than an
19　　average pharmaceutical company spends on
20　　research and development as a percentage of its
21　　revenues. So in that regard, I think it's
22　　relatively modest, but does the company pay
23　　attention to where it allocates its resources?
24　　Absolutely.

Page 152

1　Q.　And how much effort has there been to contain
2　　research and development costs at Bentley from
3　　1995 to 2003?
4　　　MR. MINGOLLA: Objection, foundation.
5　A.　I can tell you that being the chief financial
6　　officer and recognizing where the company had
7　　come from in '93, '94, '95, when it was in dire
8　　financial straits, I tried to make sure that we
9　　didn't get back in that position, tried to make
10　　sure that we allocated our resources wisely,
11　　tried to make sure that we could afford to
12　　invest the dollars that we were investing in
13　　research and development activities and not
14　　jeopardize the future of the company. It was a
15　　balancing act.
16　Q.　And research and development is expensive; is
17　　that correct?
18　　　MR. MINGOLLA: Objection.
19　A.　Research and development activities can consume
20　　a tremendous amount of resources.
21　Q.　And do you know of any efforts by Belmac to
22　　engage in research and development?
23　A.　Included in Belmac's budget each year were
24　　expenditures for research and development.

Page 153

1　Q.　And approximately how much each year was
2　　included in Belmac's budget for research and
3　　development --
4　A.　I couldn't tell you dollar amounts.
5　Q.　-- from 1995 to the present? You can estimate.
6　A.　I think a relatively modest amount, but I
7　　couldn't tell you the dollar amounts.
8　Q.　Did you see how much -- did you see allocations
9　　within research and development for specific
10　　projects?
11　　　MR. MINGOLLA: Are we dealing with
12　　Bentley or Belmac or both?
13　A.　Which one?
14　Q.　Let's start with Belmac.
15　A.　It's possible that included in their budgeting
16　　process was an allocation or breakdown of their
17　　research and development expenditures.
18　Q.　Did you see the Belmac budget for research and
19　　development for the years 1995 -- for each year
20　　from 1995 to 2003?
21　A.　I saw the Belmac budget for each of those years.
22　Q.　When did you see the budget? Was it before the
23　　fiscal year or was it after the fiscal year was
24　　over?

39 (Pages 150 to 153)

Page 154

1   A.   It would typically be right at the end of the
2        fiscal year.
3   Q.   So you wouldn't see the budget --
4   A.   For the following year.
5   Q.   -- in advance? For the following year. Did you
6        have to approve that budget?
7   A.   I didn't have to approve it, but the budget
8        would then be consolidated with the U.S.
9        operating budget, which was called Bentley, and
10       then the consolidated budget would be presented
11       to the board of directors of Bentley for
12       approval.
13  Q.   So the board of directors of Bentley had to
14       approve the budget for Belmac?
15            MR. MINGOLLA: Objection.
16  A.   They didn't have to. They didn't have to do it,
17       but they did it.
18  Q.   Are you aware of any instance where they didn't
19       approve the budget for Belmac?
20  A.   I could go back and review the minutes to see if
21       in the early to mid-'90s if the budget was
22       approved. I think at some point they started
23       the practice of approving the budget, but I
24       don't think they have always approved the

Page 155

1        budget.
2   Q.   Are you aware of any instance between 1995 and
3        2003 where the Bentley board did not approve the
4        Belmac budget?
5   A.   I couldn't tell you if there was one year or two
6        years that they did not. I'd have to go back
7        and look at the minutes to verify that.
8   Q.   And how was the budget presented to the Bentley
9        board?
10  A.   It was presented typically by me on a
11       consolidated basis to say, "Hey, these are the
12       revenues that we budget for the year. These are
13       our budgeted expenditures. This is the impact
14       on the bottom line. This is what we think the
15       balance sheet and cash flow is going to look
16       like."
17  Q.   And was that a relatively lively board meeting?
18            MR. MINGOLLA: Objection.
19  A.   I wouldn't say it was a lively board meeting.
20  Q.   Were you asked questions about the budget items?
21  A.   Sure.
22  Q.   Okay. Who would ask questions about the budget
23       items?
24            MR. MINGOLLA: I'll object as vague to

Page 156

1        time frame. You can go ahead and answer if you
2        can.
3   A.   You know, I can't tell you specific questions I
4        was asked, but in general, the issues that would
5        be involved would be what are the drivers for
6        our growth, how much of the revenues are coming
7        from new product launches as opposed to existing
8        product launches, what are we doing to control
9        our expenditures, how does this compare to last
10       year's operating results, et cetera.
11  Q.   The new versus old products, would you break
12       those out by product?
13  A.   We would.
14  Q.   Do you remember any particular directors
15       questioning the research and development budget
16       closely from 1995 to 2003?
17  A.   I can't say that I do.
18  Q.   Did that budget break out the projects that were
19       to be researched and developed?
20  A.   No.
21  Q.   No. Was it a lump sum?
22  A.   It was comprised of both fixed costs that
23       included the salaries and benefits, et cetera of
24       the research and development staff as well as

Page 157

1        the allocation of billing overhead, for example,
2        to those activities and then incremental
3        expenditures with respect to whatever projects
4        they were working on, whether it was CPE 215 or
5        whether it was nano technology, et cetera.
6   Q.   And do you remember what those specific projects
7        were other than CPE 215 and nano technology?
8             MR. MINGOLLA: I'll object, vague as
9        to time frame.
10  A.   Of those budgets over the years, I can't recall
11       specifically, but if I had the budgets in front
12       of me, I could go back and look at them.
13  Q.   I don't think we've had the budgets in front of
14       us. In 1995, do you remember what specific
15       projects were being researched and developed?
16  A.   I don't, but I can recall that in 1995, it was a
17       tough year. We had limited cash resources. So
18       I would hazard a guess that we didn't spend a
19       lot of resources on research and development in
20       1995.
21  Q.   In '96?
22  A.   By 1996, we had done an offering, raised cash,
23       so it's possible that the research and
24       development expenditures were higher in that

40 (Pages 154 to 157)

JT-A-1153

Page 158

1    year, but I couldn't tell you what they were off
2    the top of my head.
3    Q.   Do you recall any particular projects from the
4        research and development in 1996?
5    A.   No.
6    Q.   '97?
7    A.   No.
8    Q.   What about patents?  Are patents included in the
9        research and development budget?
10   A.   Pursuing patents and patent applications and
11       prosecution of those patents are budgeted, but
12       typically those costs can be capitalized on the
13       balance sheet as opposed to expensed through
14       research and development.
15   Q.   And --
16   A.   But they are treated as a capital expenditure
17       item.
18   Q.   And the patents for omeprazole that were
19       announced in 2001, when were those first
20       capitalized?
21           MR. MINGOLLA:  Objection, foundation.
22   A.   I don't know.
23   Q.   Was it 2001?
24           MR. MINGOLLA:  Objection, foundation.

Page 159

1    A.   I really don't know.  I'd have to go back and ·
2        look at the costs involved and see how they were
3        treated.
4           MR. FINE:  I don't think we've seen
5        documents on that either.
6    Q.   The lansoprazole patents that Bentley announced,
7        do you recall when those were first capitalized?
8    A.   I don't.
9    Q.   Was it before or after 2000?
10   A.   I have no idea.
11   Q.   Was there any discussion with Mr. Murphy or
12       Mr. Herrera about budgeting for these patents?
13           MR. MINGOLLA:  Objection as to form,
14       what "these patents" are.
15   Q.   Or did you ever discuss with Mr. Murphy or
16       Mr. Herrera budgeting for these patents?
17           MR. MINGOLLA:  Same objection.
18   A.   I don't know --
19   Q.   To be clear, it's the second question I'm
20       interested in, not the first.
21           MR. FINE:  If you could read back the
22       second question.
23           (Reporter read back the last question.)
24   A.   No, I don't recall any specific discussion about

Page 160

1        that.
2    Q.   Do you recall any discussion about these patents
3        with Mr. Murphy or Mr. Herrera?
4           MR. MINGOLLA:  Objection.
5    A.   I don't.
6    Q.   Do you recall any financial analysis of the pros
7        or cons of the relationship with Ethypharm?
8           MR. MINGOLLA:  Objection, vague.
9    A.   I don't recall any financial analysis about the
10       Ethypharm relationship.
11   Q.   Do you recall any financial analysis of the
12       effect on Bentley's revenues inside the
13       relationship with Ethypharm?
14           MR. MINGOLLA:  Objection.
15   A.   I don't.
16   Q.   Do you recall any discussion about the effect on
17       Bentley's revenues if the relationship with
18       Ethypharm were terminated?
19   A.   I don't recall any specific discussion about
20       that.  It's my understanding -- my general
21       understanding that there was no impact from the
22       termination of the Ethypharm relationship.
23   Q.   In November 2001, Adolfo Herrera sent two
24       letters to Ethypharm; one canceling a

Page 161

1        manufacturing arrangement for omeprazole and the
2        other canceling a supply contract with Ethypharm
3        relating to omeprazole.  And I'll show you those
4        two exhibits or those two documents.
5           (Letter to Mr. De Basilio from
6        Mr. Herrera, dated November 14, 2001 was
7        marked Exhibit Number 11 for
8        identification.)
9           (Letter to Mr. De Basilio from
10       Mr. Herrera, dated November 14, 2001 was
11       marked Exhibit Number 12 for
12       identification.)
13   Q.   And just to go back to the budgets for a second,
14       the budgets presented to the board of directors
15       are consolidated.  Do they break out
16       Laboratorios Belmac items?
17   A.   They do.
18   Q.   They do?
19   A.   Uh-huh.
20   Q.   And those are -- and the approval, is that an
21       omnibus approval or is it a line-item approval?
22   A.   It is an omnibus approval.
23   Q.   And if the board of directors disapproves the
24       budget, is it disapproved on an omnibus basis or

41 (Pages 158 to 161)

JT-A-1154

Page 162

1   a line-item basis?
2   A.   During the time frame we're talking about --
3   Q.   Let's say 1998 to 2002.
4   A.   There were no disapprovals during that period.
5   Q.   Do you recall being told about the cancellation
6        of the relationship with Ethypharm?
7   A.   At some point, I can recall becoming aware of
8        the cancellation of the agreement.
9   Q.   And when did you become aware of it?
10  A.   I don't know exactly.
11  Q.   Was it before the cancellation or afterwards?
12  A.   I think it was afterwards.
13  Q.   It's been represented to us that Adolfo Herrera
14       had conversations with Mr. Murphy as early as
15       April or May in 2001 about terminating the
16       relationship with Ethypharm.
17       When did you first hear of any discussion of
18       terminating these contracts?
19            MR. MINGOLLA: I'll object to the
20       preamble to the question.
21  A.   I was not involved in the Ethypharm matter, so,
22       you know, when Adolfo and Jim Murphy may have
23       been discussing it isn't really relevant to my
24       knowledge, but honestly, I don't know when I

Page 163

1   first became aware of it. I really don't know.
2   Q.   Was it in spring of 2001?
3   A.   I don't know.
4   Q.   Did you ever discuss the termination of the
5        relationship with Ethypharm with anyone?
6   A.   My recollection was that in one of the board
7        meetings that it was disclosed that the
8        relationship had been terminated with Ethypharm.
9   Q.   Outside of a board meeting, did you ever discuss
10       the termination of the relationship with
11       Ethypharm?
12  A.   Not that I recall.
13  Q.   Mr. Price, you're a member of at least two
14       boards of directors. You've testified here that
15       you're a member of the Laboratorios Belmac board
16       of directors, and you've also testified that up
17       until a certain point in time, I think in 2004,
18       you were a member of the Bentley board of
19       directors. Which board was this discussed at?
20  A.   At the Bentley Pharmaceuticals board.
21  Q.   Are you aware of any discussions of the
22       termination of the relationship in the Belmac
23       board?
24  A.   No.

Page 164

1   Q.   Are you aware of any discussion of the
2        termination of the relationship in the
3        Laboratorios Davur board?
4   A.   No.
5   Q.   Did you ever fail to attend a meeting of the
6        Laboratorios Belmac board of directors?
7   A.   The Laboratorios Belmac board meets, I would
8        say, annually when it comes time to sign the
9        accounts, and that meeting takes place on paper.
10       It's not a physical meeting.
11  Q.   So it's your testimony that the termination of
12       the relationship with Ethypharm was never
13       discussed at the Belmac board of directors?
14  A.   That's right.
15  Q.   What did you understand the reasons or factors
16       to be that supported the decision to terminate
17       the relationship with Ethypharm?
18            MR. MINGOLLA: Objection, foundation.
19  A.   I didn't have an understanding or nobody ever
20       shared that with me.
21  Q.   Did you develop your own understanding of what
22       the reasons for the termination of the
23       relationship with Ethypharm were?
24  A.   No, I can't say that I did.

Page 165

1   Q.   Did you have any sense of what the reasons for
2        the termination of the relationship were?
3            MR. MINGOLLA: Objection, form.
4   A.   I didn't know. I had no idea why.
5   Q.   When was the decision made to terminate the
6        relationship with Ethypharm?
7   A.   I can tell you what the English translation of
8        this letter says and the date of the letter, but
9        beyond that, I don't know.
10  Q.   So you have no knowledge of when the
11       relationship -- when the decision was reached to
12       terminate the relationship regarding omeprazole
13       other than what's in this?
14  A.   That's right.
15  Q.   You had no conversations with Jim Murphy about
16       terminating the relationship with Ethypharm?
17  A.   No, I did not.
18  Q.   You had no conversations with Adolfo Herrera
19       about terminating the relationship with
20       Ethypharm?
21  A.   No.
22  Q.   You had no conversations with anyone at Bentley
23       about terminating the relationship with
24       Ethypharm?

42 (Pages 162 to 165)

JT-A-1155

Page 166

1  A.  Not that I know of, no.
2  Q.  You had no conversations with anyone at Belmac
3      about terminating the relationship with
4      Ethypharm?
5  A.  No, not that I recall.
6  Q.  You had no conversations with anyone at Davur
7      about terminating the relationship with
8      Ethypharm?
9  A.  No.
10 Q.  Did you have any conversations with anyone else
11     about terminating the relationship with
12     Ethypharm?
13 A.  Only in the legal disclosures that we've made in
14     our SEC filings.
15 Q.  So it's your testimony that you discussed
16     terminating the relationship with Bentley's
17     attorneys in the context of developing your SEC
18     filings?
19 A.  Absolutely.
20 Q.  When did those conversations take place?
21 A.  I can't tell you specifically, but as each of
22     our SEC filings was put together, I discussed
23     disclosures that needed to be included in the
24     legal proceedings section, and we drafted what

Page 167

1      we considered to be the appropriate disclosures.
2      And I know at some point we disclosed the
3      Ethypharm litigation.
4  Q.  And who were the attorneys with whom you
5      discussed that?
6  A.  I would say that it was Nate Gardiner with at
7      the time Palmer & Dodge, but now Edwards Angell
8      Palmer & Dodge, and I can't remember if Jordan
9      Horvath was on staff or if he had left the
10     company by then.  I can't recall.
11 Q.  When did Jordan Horvath leave the company?
12 A.  I know it was on April 1st, but I don't know if
13     it was in -- I think it may have been April 1st
14     of '04.
15 Q.  And why did he leave?
16 A.  He was terminated for nonperformance.
17 Q.  Okay.  Who terminated him?
18 A.  I think Jim Murphy did.
19 Q.  Were there any particular issues that were
20     germane to determining that he was
21     nonperforming?
22        MR. MINGOLLA:  Can I have that
23     question back, please?
24        (Reporter read back the last question.)

Page 168

1  A.  I'm not sure.  Can you help me understand what
2      you're looking for there?
3  Q.  I'm just trying to find out why he was
4      terminated.
5  A.  I think it was a matter of the company feeling
6      like it was expending resources but not getting
7      the benefit of the resources that were being
8      expended.
9  Q.  How much was his salary?
10 A.  I think it was 350 or $375,000.
11 Q.  Per year?
12 A.  Per year.
13 Q.  Did he receive any additional compensation?
14 A.  He probably received bonuses and stock options.
15 Q.  Do you recall what the value of those bonuses
16     and stock options was for the --
17 A.  I don't recall, but I think they were disclosed
18     in the proxy statements.
19 Q.  So if I'm understanding this, there was a
20     decision reached -- what -- actually, can we
21     take a quick break?
22 A.  Sure.
23        (Recess taken from 2:21 p.m. to
24        2:30 p.m.)

Page 169

1  Q.  I'd like to go back in to Jordan Horvath for a
2      second.  What years was Jordan Horvath employed
3      at Bentley?
4  A.  I think he came there in August of 2000, and I
5      think he left in April of 2004.
6  Q.  And before 2000, he'd been outside counsel to
7      the company?
8  A.  Yes, he was at Parker Chapin Flautau & Klimpl.
9  Q.  And he'd worked for Bentley as an attorney as
10     outside counsel?
11 A.  That's right, since 1992.
12 Q.  And what was he hired to do at Bentley in August
13     of 2000?
14 A.  He was hired to be general counsel.
15 Q.  Had Bentley had a general counsel before that?
16 A.  No.
17 Q.  Does Bentley have a general counsel now?
18 A.  No.
19 Q.  Were part of Mr. Horvath's responsibilities
20     overseeing Bentley's patents?
21        MR. MINGOLLA:  Objection, vague.
22 A.  I can't tell you specifically what he
23     concentrated his efforts on.  He was based in
24     New York, officed out of his home, and I

43 (Pages 166 to 169)

JT-A-1156

Page 170

1  couldn't tell you what -- you know, what he
2  spent his time on, to be honest with you.
3  Q. How frequently did you speak with Mr. Horvath?
4  A. Each week.
5  Q. How frequently did Mr. Horvath speak with other
6  executives at Bentley?
7  A. I don't know.
8  Q. Was your conversation with Mr. Horvath each week
9  a regularly scheduled meeting --
10  A. No.
11  Q. -- or teleconference?
12  A. It was impromptu.
13  Q. Would you call him or would he call you?
14  A. It would happen both ways.
15  Q. Do you know if Jim Murphy spoke regularly with
16  Mr. Horvath?
17  A. I would say they spoke frequently. There may be
18  periods of time that would elapse without them
19  speaking.
20  Q. Do you know if Mr. Horvath had oversight
21  concerning Bentley's patents for omeprazole?
22       MR. MINGOLLA: Objection, foundation.
23  A. I don't know. I don't know what he was
24  responsible for.

Page 171

1  Q. I'd like to show you another document.
2       (Copy of E-mail to Mr. Murphy from
3       Mr. Fitzgibbons, dated November 30,
4       2001, and Attachment was marked Exhibit
5       Number 13 for identification.)
6  Q. Do you recognize this document?
7  A. I recognize the format of the document. I can't
8  say that I recall this document in particular,
9  but I do recognize the format.
10  Q. What is this document?
11  A. This is a document that was prepared by Paul
12  Fitzgibbons, documenting subjects that were on
13  the table and being discussed at management
14  meetings.
15  Q. And there's a cover e-mail to this document; is
16  that correct?
17  A. That's right.
18  Q. And that's an e-mail that was sent from Paul
19  Fitzgibbons to Jim Murphy, Mike Price -- that's
20  you -- Bob Gyurik, Bob Stote, and Jordan
21  Horvath; is that correct?
22  A. That's right, the management group.
23  Q. The management group. And Paul Fitzgibbons sent
24  this document as part of his responsibilities at

Page 172

1  Bentley?
2  A. I guess you could say it that way.
3  Q. How would you say it?
4  A. He distributed this summary of topics
5  summarizing what was discussed at the last
6  management meeting and in preparation for the
7  upcoming management meeting.
8  Q. Was he tasked to do that?
9  A. He was.
10  Q. So this is a record of Bentley's management team
11  meeting; is that correct?
12  A. That's right.
13  Q. And the meeting took place when?
14  A. Well, it looks like this meeting took place on
15  the 20th of November, and this was distributed
16  in preparation for the meeting that was going to
17  be coming up on December 6th.
18  Q. And who was in the management team?
19  A. Murphy, Price, Gyurik, Stote, Horvath.
20  Q. Anyone else?
21  A. Well, that's a dynamic group and it's since been
22  expanded, but during this time frame, I would
23  say it was limited to the people mentioned
24  there.

Page 173

1  Q. So 2001, it consisted of Murphy, you, Gyurik,
2  Stote, and Horvath?
3  A. That's right.
4  Q. And Jim Murphy is the CEO and president of
5  Bentley?
6  A. At that time, he was chairman, president, and
7  CEO.
8  Q. And we've gone over your positions at this time.
9  And Bob Gyurik's positions at this time?
10  A. Bob Gyurik was president of research and
11  development or maybe it was called vice
12  president of pharmaceutical development.
13  Q. And what were his responsibilities?
14  A. Primarily to research, develop, and advance
15  toward commercialization potential products or
16  projects.
17  Q. Do you know what projects he worked on around
18  this time frame, say, from 2000 to 2002?
19  A. I could speculate, but specifically, no.
20  Q. Do you know any of them?
21  A. I know projects that I would assume were
22  underway at that time, but I would be guessing
23  if that's where he expended his efforts.
24  Q. Where were those efforts?

44 (Pages 170 to 173)

JT-A-1157

Page 174

1  A.  CPE 215 primarily.
2  Q.  Anything else?
3  A.  A project going on with University of New
4      Hampshire with respect to nano technology.
5  Q.  Anything else?
6  A.  I think there was one other project going on in
7      conjunction with Dartmouth with respect to
8      fibromyalgia treatment.
9  Q.  Anything else?
10 A.  A research project with Pfizer where we were
11     combining our drug delivery technology with some
12     of their proprietary compounds.
13 Q.  And was that technology microgranulation?
14 A.  No, it was CPE 215 related.
15 Q.  Anything else?
16 A.  Not to my knowledge.
17 Q.  How long has Mr. Gyurik been with Bentley
18     Pharmaceuticals?
19 A.  I think he became an employee in 1999.
20 Q.  Does he hold any position with Laboratorios
21     Belmac?
22 A.  I don't think so.
23 Q.  Does he serve on the board of directors of
24     Laboratorios Belmac?

Page 175

1  A.  No.
2  Q.  Does he serve on the boards of any other Bentley
3      subsidiaries?
4  A.  Not to my knowledge.
5  Q.  Okay. I'd like you to turn to Page 3 of the
6      project status report, and Item 15, I'd like to
7      draw your attention to that.
8  A.  Okay.
9  Q.  And that describes one, two, three, four, five,
10     six patents, is that correct, for Spain and then
11     two patents for Bentley?
12 A.  That looks right.
13 Q.  Okay. And Patent Spain A relates to
14     granulation -- vacuum and granulation; is that
15     correct?
16 A.  The description is general procedure, vacuum and
17     granulation for other products.
18 Q.  And Patent B, the description is tablet
19     formulation for omeprazole and other gastric-
20     sensitive drugs, direct compression?
21 A.  That's right.
22 Q.  And Patent C relates to the organic formulation
23     process for omeprazole?
24 A.  Okay.

Page 176

1  Q.  And it says after that, "Also protection from
2      Ethypharm." Do you see that?
3  A.  It does say that.
4  Q.  And Patent Number 4 says, "Aqueous process to be
5      submitted, a patent extension of the tablet
6      formulation patent from last year to be
7      submitted early November 2001," is that right?
8  A.  That's what it says.
9  Q.  And the fifth, do you know if the fifth patent
10     relates to microgranulation?
11 A.  I don't know.
12 Q.  And if you look over to the action column to the
13     right of the project and status column, you'll
14     see "Jordan and Bob G to review patent issues.
15     Jordan to have more oversight on patents." Do
16     you know what that refers to?
17 A.  Only what I can derive from what it says.
18 Q.  What can you derive from what it says?
19 A.  That I know that we were spending a lot of money
20     on patent prosecution, and I felt that there was
21     nobody controlling that process and controlling
22     those expenditures. And I had mentioned to Jim
23     that we didn't have anybody on staff that was
24     doing that and that Jordan should take ownership

Page 177

1      of that process. And perhaps here they're
2      suggesting that Jordan's going to do that.
3  Q.  And why did you suggest Jordan to do that?
4          MR. MINGOLLA: Objection, foundation.
5  A.  It seemed like a logical -- a logical decision
6      from my standpoint, him being a legal guy.
7  Q.  And the oversight that you envisioned was what?
8  A.  To make sure that we were spending our resources
9      appropriately.
10 Q.  Okay. Then it says, "Jordan to visit Spain week
11     of 6th, January, Jordan to call and coordinate."
12     Do you recall what that refers to?
13 A.  I can recall Jordan going over to Spain, but I
14     didn't accompany him, so I'm not sure what he
15     did while he was there.
16 Q.  And I'd like to draw your attention back to Item
17     C, third patent, "Also protection from
18     Ethypharm." Do you know what that refers to?
19 A.  I don't.
20 Q.  Do you recall any discussion of that?
21 A.  I don't, but my understanding and experience
22     with IP is so limited that this is not something
23     that would have directly been under my purview.
24     So I can't say that I paid a lot of attention to

45 (Pages 174 to 177)

JT-A-1158

Page 178

1    this.
2  Q.  And this was a discussion that took place in a
3    management meeting with the team specified on
4    the front of the e-mail; is that right?
5  A.  That's right.
6  Q.  Was this subject ever discussed at the Bentley
7    board of directors, these patents?
8  A.  It's possible. I'd have to go back and review
9    the minutes to tell you for sure if it was.
10  Q.  Do you recall this subject ever being discussed
11    at the Bentley board of directors?
12  A.  I don't recall it, no.
13  Q.  Do you ever -- did you ever discuss these
14    patents at the Belmac board of directors?
15       MR. MINGOLLA: Objection, vague.
16  A.  No. Again, the meetings of the Belmac board of
17    directors were just a paper meeting. There was
18    no physical meeting taking place. It was
19    just a document on paper.
20  Q.  Okay. So there was no Belmac board meeting to
21    discuss these patents?
22  A.  That's right.
23  Q.  Okay. And there was -- just so I'm
24    understanding correctly, there was no Belmac

Page 179

1    board meeting, referring back to an earlier
2    subject, for the purpose of approving a Belmac
3    budget?
4  A.  There was a meeting on paper, essentially, like
5    a unanimous written consent where all of the
6    directors sit and agree and approve, indicating
7    that they reviewed and approved the
8    documentation, and actions being taken place --
9    being taken by the entity --
10  Q.  And what's the paper --
11  A.  -- but there was no --
12  Q.  -- when you refer to the paper?
13  A.  Board minutes.
14  Q.  Board minutes. Okay. I'd like to draw your
15    attention to another document.
16       (Copy of E-mail to Mr. Bolling, et al.
17       from Mr. Fitzgibbons, dated November 17,
18       2001 was marked Exhibit Number 14 for
19       identification.)
20  Q.  Do you recognize this document?
21  A.  I don't recall the document specifically, but I
22    recognize the format of the document.
23  Q.  What is the document?
24  A.  This is a document that was prepared for

Page 180

1    distribution to the board of directors and
2    possibly to management, but primarily the board
3    of directors, that essentially summarized in
4    executive summary form the topics that were
5    described on the previous document that we
6    looked at.
7  Q.  Okay. And this says periodic --
8  A.  Operations update.
9  Q.  -- operations update. And sent by Paul
10    Fitzgibbons?
11  A.  Right.
12  Q.  Was this another document Mr. Fitzgibbons
13    prepared in the course of his responsibilities
14    at Bentley?
15  A.  It was, and I think the source of this document
16    came, again, from the format of the previous
17    document we looked at.
18  Q.  So the Bentley board of directors would receive
19    periodic updates of Bentley's operations from
20    Paul Fitzgibbons; is that correct?
21  A.  This was something that was initiated at some
22    point after Mr. Fitzgibbons arrived at the
23    company, which I think was in 1999, and I think
24    it was done a few times, but I think it was a

Page 181

1    process that went by the wayside. I don't think
2    it lasted very long.
3  Q.  When did it stop?
4  A.  I couldn't tell you.
5  Q.  Is Mr. Fitzgibbons still employed by the company
6    now?
7  A.  He is.
8  Q.  Does he still produce these?
9  A.  I don't think he does. He still produces the
10    previous document.
11  Q.  You're no longer a board member; is that
12    correct?
13  A.  I'm not.
14  Q.  Would you receive these if they were sent to
15    board members?
16  A.  It's possible, but if it was distributed only to
17    the board, no -- at this point, no, I would not.
18  Q.  What's Mr. Fitzgibbons' title?
19  A.  I think he is vice president of human resources
20    and facilities.
21  Q.  And what do you understand his responsibilities
22    to be?
23  A.  Today?
24  Q.  Uh-huh.

46 (Pages 178 to 181)

Page 182

1  A.   He is responsible for all the human resources
2       for Bentley Pharmaceuticals, Inc., from hiring
3       to terminations to employee benefit plans,
4       compensation programs, et cetera.
5  Q.   How many people are employed by Bentley
6       Pharmaceuticals, Inc.?
7  A.   I think there are 21 or 22.
8  Q.   And what's his salary?
9  A.   I think it's in the 165, $175,000 range.
10 Q.   So for 21 people, he's paid about 165 to
11      $175,000?
12 A.   I think that's right, but he's also responsible
13      for facilities, maintenance, and things of that
14      nature.
15 Q.   Okay.  What were his responsibilities in 2000?
16 A.   In 2000, I think his title was director of
17      special projects, and he was essentially acting
18      as a scribe, documenting these topics that were
19      discussed at the management meetings and doing
20      what I would call project management in terms of
21      the research and development programs that were
22      underway.
23 Q.   How often were there management meetings?
24 A.   They were typically held monthly.

Page 183

1  Q.   Monthly.  And what is a special project?
2  A.   It was just a title that was arrived at because
3       we couldn't think of a better title.
4  Q.   Who hired him?
5  A.   I would have to say it was the decision of Jim
6       Murphy.
7  Q.   Okay.  How long have you known Jim Murphy?
8  A.   I've known him since I came to work at the
9       company in March of 1992.
10 Q.   Did you know him before then?
11 A.   No.
12 Q.   Did he hire you?
13 A.   No.
14 Q.   Okay.  How would you describe your relationship
15      with Jim Murphy?
16 A.   Today?
17 Q.   Uh-huh.
18 A.   I would describe it as a good working
19      relationship.  I think we've been a good team
20      together since 1992, except for the two years he
21      was not with the company.
22 Q.   Are you the number two guy at Bentley?
23 A.   No.
24 Q.   Who is?

Page 184

1           MR. MINGOLLA:  Objection.
2  A.   Today?
3  Q.   Yes.
4  A.   I would say the number two guy today is John
5       Sedor.
6  Q.   And when was he hired?
7  A.   August of 2005.
8  Q.   And why was he hired?
9           MR. MINGOLLA:  Objection as to form.
10 A.   My understanding is that he was hired at the
11      direction of the board of directors to provide
12      succession planning for Jim and to have a more
13      hands-on role in terms of the day-to-day
14      operations of the company.
15 Q.   Was there a perception at the level of the board
16      of directors at Bentley that Jim didn't have a
17      hands-on involvement in the day-to-day
18      operations at Bentley Pharmaceuticals?
19 A.   I don't know.
20 Q.   Did you ever hear any discussion of that?
21 A.   I wouldn't say it was a discussion of him not
22      having a hands-on role in managing the company.
23      I think there was discussion about just his
24      management style.

Page 185

1  Q.   And what was that discussion?
2  A.   Just that he -- I think he's the eternal
3       optimist.
4  Q.   And particular members of the board of directors
5       were less optimistic?
6  A.   I think certainly there are more people that are
7       more skeptical -- take a more skeptical approach
8       and view toward things.
9  Q.   Before Mr. Sedor was hired, were you the number
10      two person at Bentley Pharmaceuticals?
11          MR. MINGOLLA:  Objection.
12 A.   I don't know that I ever considered myself the
13      number two person.  I think I probably always
14      viewed Bob Stote as the number two person.
15 Q.   Who is Bob Stote?
16 A.   He's the senior vice president and chief medical
17      officer.
18 Q.   Why would you have viewed him as the number two
19      guy or why did you view him as the number two
20      guy?
21 A.   He was a medical doctor.  He had been in the
22      pharmaceutical industry for thirtysomething
23      years.  Older, wiser, more experience.  That was
24      just always my perception.  He made more than I