<u>Anexo A</u>

A título indicativo, pero no limitativo:
- Leciva, S.A. República Checa.

Cualquier cambio en este Anexo será comunicado inmediatamente a BELMAC.

CONFIDENTIAL

BEL000603

A-61

13

<u>CONFIDENTIALITY AGREEMENT</u>

BETWEEN:

**\*ETHYPHARM ESPAÑA** with headquarters at Marqués de la Ensenada, 16, 28004 Madrid, represented by its Managing Director, Mr. Adolfo de Basilio

Hereinafter **ETHYPHARM,**

party of the first part,

AND:

**\*BELMAC,** *with headquarters at Montearagón, 9, 28033 Madrid, represented by its* Managing Director, Mr. Clemente González Azpeitia.

Hereinafter **BELMAC,**

*party of the second part.*

[initials]

BELMAC has provided to ETHYPHARM the following documentation obtained from the Registration of the medication BELMAZOL 20 mg (omeprazole microgranules):

- Production method and validation of the same.
- Analysis method and validation of the same.

This information is only provided so that ETHYPHARM can give deliver it to its customers listed in Appendix A and continue its business relationship with them. For a period of 10 (ten) years, and in any case, during all commercial collaboration, ETHYPHARM, commencing on the date of this agreement, agrees to keep this information confidential and only provide it to collaborators and advisors that are also committed to the professional secrecy.

However, this obligation shall not be applicable:

*To information in the public domain at the time provided by BELMAC.

*Or to information that, after disclosure, becomes part of the public domain without having been disclosed by ETHYPHARM or its collaborators.

*Or information that ETHYPHARM can show was in its possession when BELMAC transmitted it to it, unless this information was acquired directly or indirectly under another confidentiality agreement.

Also and as a result of this business relationship, BELMAC and ETHYPHARM may continue to exchange confidential information, which shall be kept as such by both parties, during the ten-year period referenced above.

In the event of a disagreement between the parties on the interpretation and performance of the clauses of this confidentiality agreement, BELMAC and ETHYPHARM shall seek the means necessary to resolve the problem amicably.
If there is no agreement on resolving the conflict, ETHYPHARM and BELMAC shall submit their disputes to Spanish Courts.

In two counterparts:                    Date: September 30, 1998

[signature]                             [signature]
For ETHYPHARM                           For BELMAC
                                        [stamp:] LABORATORIOS BELMAC, S.A.
                                        Montearagón, No. 9 1st Floor
                                        28033 MADRID

Appendix A

For illustration purposes, but not limited:
- Leciva, S.A. Czech Republic

BELMAC shall be informed immediately of any changes to this appendix.

[two sets of initials]

<u>ACUERDO DE SECRETO</u>

ENTRE:

\* **ETHYPHARM ESPAÑA**, con domicilio social en Marqués de la Ensenada,16 28004 Madrid, representada por su Director General: D.Adolfo de Basilio

A partir de ahora denominada **ETHYPHARM,**

de una parte,

Y:

BELMAC, con domicilio en Montearagón,9 28033 Madrid, representada por su Director General D. Clemente González Azpeitia

A partir de ahora denominada BELMAC,

de otra parte,





CONFIDENTIAL
EP 008124

A-65

ETHYPHARM ha transmitido a BELMAC muestras sobre el producto:

- Cápsulas de omeprazol 20mg (fórmula acuosa).

Estas muestras se entregan únicamente con el fin de que Laboratorios Belmac, S.A pueda verificar inicialmente la calidad del producto.

Durante un período de 10 (diez) años, BELMAC, a partir de la fecha de este acuerdo, se compromete a guardar secreto sobre los resultados del análisis y sobre la existencia de estas muestras, y transmitir estos resultados únicamente a colaboradores y a consejeros comprometidos igualmente al secreto profesional.

En caso de desacuerdo entre las dos partes, sobre la interpretación y la ejecución de las cláusulas de este acuerdo de secreto, BELMAC y ETHYPHARM buscarán los medios necesarios para solucionar el problema de forma amistosa.
Si no existiese avenencia en la solución del conflicto, ETHYPHARM Y BELMAC llevarán sus desacuerdos ante los Tribunales Españoles.

En dos ejemplares                          Fecha 2 de Octubre de 1998.

Por ETHYPHARM

LABORATORIOS BELMAC, S.A.
Por BELMAC    Marie Curie, No. 9 Primera Planta
28033 MADRID

CONFIDENTIAL
EP 008125

A-66

SECRET AGREEMENT

BETWEEN :

**ETHYPHARM ESPAÑA, S.A.,** with registered office at Marqués de la Ensenada, 16 28004 Madrid and its General Manager Mr. Adolfo de Basilio

Hereinafter called **ETHYPHARM,**

of the first part,

And,

BELMAC, with registered office at C/Montearagón, 9 28033 Madrid, represented by its General Manager D. Clemente Gonzalez Azpeitia.

Hereinafter call **THE LABORATORY**

of the second part,

1

**ETHYPHARM** has transmitted to **BELMAC** samples about the product:

Omeprazol 20mg capsules (aqueous formula)

These samples are delivered only so that Laboratorios Belmac, S.A. can verify initially the quality of the product.,

During a period of 10 (ten) years, BELMAC, as from the date of this agreement, agrees to keep secret about the results of the analysis and the existence of these samples, and to transmit these results only to collaborators and counselors also committed to the professional secret.

In case of disagreement between both parties, about the interpretation and the execution of the clauses of this secret agreement, **BELMAC** and **ETHYPARM** will look for the necessary means to solve the problem in an amicable way.

If an amicable solution cannot be reached, **ETHYPHARM** and **BELMAC** will take their disputes to the Spanish Courts.

In two copies                                 Date 2nd October 1998


By **ETHYPHARM**                          By **BELMAC**


2

ETHYPHARM

**14**

# CONFIDENTIALITY AGREEMENT

BETWEEN THE UNDERSIGNED :

■ **BELMAC CORPORATION** – One Urban Center Suite 550 – 4830 West Kennedy Blvd – TAMPA, FL 33609-2517 – USA

Represented by : Mr James MURPHY – President – Chief Executive Officer

Hereinafter called **BELMAC**

OF THE FIRST PART

■ ETHYPHARM S.A. of 21, rue Saint Matthieu, 78550 HOUDAN, FRANCE

Represented by : Mr Patrice DEBREGEAS – President

Hereinafter called **ETHYPHARM**

OF THE SECOND PART





EP 002533

A-69

ETHYPHARM

BELMAC has informed ETHYPHARM that BELMAC is presently examining the possibility of acquiring a US company which researches and develops transdermal products.

ETHYPHARM is interested in considering a participation in the acquisition of said company.

In order to help ETHYPHARM take a decision in that respect, BELMAC is prepared to communicate to ETHYPHARM certain information concerning the terms of acquiring said US company under the following conditions :

1. Name, address and details relative to this US company and its business will be indicated by BELMAC to ETHYPHARM in a separate Addendum to the present Confidentiality Agreement.

2. ETHYPHARM commits itself not to have direct or indirect contact with the US company otherwise than through BELMAC.

3. The information is transferred only for the purpose of evaluation by ETHYPHARM of the possibility of investing in the US Company.

4. For a period of 5 years from this date, ETHYPHARM undertakes to keep the information secret, and to divulge it only to collaborators and advisers who are themselves bound by a similar undertaking.

5. Nevertheless, the above mentioned obligations shall not apply where :

☐ the information can be shown by ETHYPHARM to have been in the public domain at the time it was received from BELMAC.

☐ the information, having been transferred, subsequently comes into the public domain other that by way of ETHYPHARM or its collaborators

☐ ETHYPHARM can show that the information was already in its possession at the time it was transferred by BELMAC, provided that it had not been obtained directly or indirectly from BELMAC under a contract of secrecy still in force,

- 2 -

EP 002534

A-70

ETHYPHARM

◻ ETHYPHARM has already received the information from a third party without any obligation to secrecy, provided that this third party did not obtain the information directly or indirectly under a contract of secrecy still in force,

◻ ETHYPHARM undertakes to make the evaluation within a maximum period of two months from receipt of each information, and to inform BELMAC of the result of its assessment.

6. BELMAC and/or ETHYPHARM undertake not to divulge to third parties, without the prior agreement of the other party, the content of their discussions regarding the acquisition of said US company.

The present Confidentiality Agreement does not confer any obligation to reach or sign an agreement.

In the event of a dispute arising between the parties concerning the interpretation or execution of this Confidentiality Agreement, the parties will look for any possible way to resolve the issue amicably, if a mutually satisfactory resolution cannot be found, ETHYPHARM and BELMAC submit the dispute to a French court of Law (PARIS).

Signed in : Saint Cloud (France)

Date : July 11th, 1995

For BELMAC
Mr James MURPHY
President
Chief Executive Officer

For ETHYPHARM
Mr Patrice DEBREGEAS
President

- 3 -

EP 002535

A-71

# DOCUMENTO Nº 14

EP 002532

## CONFIDENTIALITY & NON-DISCLOSURE AGREEMENT 

This **CONFIDENTIALITY AND NON-DISCLOSURE AGREEMENT** is made this –10ᵗʰ day of Feb. 2000, by and between **BENTLEY PHARMACEUTICALS, INC.,** with offices located at 65 Lafayette Road, 3ʳᵈ Floor South, North Hampton, NH 03862 ("Bentley") and Ethypharm and affiliates with headquarters located at 21 rue Saint Matthieu, 78550 HOUDAN, FRANCE ("Ethypharm").

Whereas, Bentley and Ethypharm agree each to allow the other access to certain confidential information, trade secrets or proprietary information relating to the affairs of each Company with respect to enhancement of absorption and permeation of drugs through biological membranes and only for the purpose of contemplating some form of business relationship and;

Whereas, the parties and their agents, attorneys, accountants or advisors may review, examine, inspect, have access to or obtain such information only for the purposes described above, and to otherwise hold such disclosed information confidential pursuant to the terms of this agreement and further not disclose to any third party except for the receiving party's employees or those of its affiliates and consultants provided they have a need-to-know and require access to the confidential information for the purpose of this agreement understanding they are bound by a similar undertaking of confidentiality.

The confidential information transmitted will be listed by the disclosing party in a letter accompanying said information. If disclosed otherwise, the information shall be identified as being confidential at the time it is disclosed and confirmed as such in writing within thirty (30) days thereafter.

The present agreement confers neither any right of utilization of the information other than for the purpose mentioned in the Whereas nor any obligation to enter any further agreement.

BE IT ACKNOWLEDGED, that the parties shall furnish each to the other certain confidential information, and each party may further allow the other the right to inspect the business of the other and/or interview suppliers, customers, employees or representatives of the other, only on the following conditions:

1.   Each party agrees to hold all of the other party's disclosed confidential or proprietary information or trade secrets ("Information") in trust and confidence and agrees that it shall be used only for the contemplated purpose, and shall not be used for any other purpose nor disclosed to any third party without written consent of the other party.

2.   No copies or abstracts will be retained of any written information supplied. Upon demand by either party, all information, including written notes, photographs, or memoranda shall be returned to the demanding party.

3.   The disclosed information shall not be disclosed to any employee, consultant, or third party unless said party agrees to execute and be bound by the terms of this agreement. Each party shall

*James R. Murphy*

EXHIBIT
MURPHY
8
7/19/06

EP 002453

A-73

6947-EX00080060

protect the confidentiality of the other's documents and materials with diligence no less than that with which it protects its own confidential information.

4.    It is understood that the receiving party shall have no obligation to hold confidential any information known by the receiving party or generally known within the industry prior to the date of this agreement, or that shall become common knowledge within the industry thereafter as said information shall not be deemed protected under this agreement.

5.    Each party acknowledges the information disclosed herein constitutes proprietary and trade secrets and in the event of unlawful use or wrongful disclosure, the Company shall be entitled to injunctive relief as a cumulative and not necessarily successive remedy without need to post bond.

6.    This agreement shall be binding upon and inure to the benefit of the parties, their successor, assigns and personal representative and shall expire five years (5) from the date of this agreement.

7.    In the event of a dispute arising between the parties concerning the interpretation of execution of this Agreement, the parties will look for any possible way to resolve the issue amicably. If a mutually satisfactory resolution cannot be found, Bentley and Ethypharm will submit the dispute to an English Court of Law where resolution will be made according to English Law.

BENTLEY PHARMACEUTICALS, INC.          Ethypharm

By:    _James R Murphy_                    By:    _____

Printed:    James R. Murphy                Printed:    _GERARD  LEDUC._

Title:    Chairman and CEO                 Title:    _CEO_

Dated:    4 April 2000                     Dated:    _7 April 2000._

EP 002454

A-74

6947-EX00080061

29/11/91

## CONTRATO DE FABRICACION

- ETHYPHARM,S.A con domicilio social en; Marqués de la Ensenada,16 28004 Madrid, representada por su Presidente D.Patrice Debregeas, en lo siguiente denominada ETHYPHARM.

Y la firma:

- LABORATORIOS RIMAFAR,S.A con domicilio social en; Zurbano,4 28010 Madrid.

Representada por su Director General D.Angel Pérez de Ayala en lo siguiente denominada RIMAFAR.

Acuerdan lo siguiente:

## PREAMBULO

ETHYPHARM y RIMAFAR han convenido la fabricación, encapsulado y eventualmente el acondicionamiento final en España de los productos de ETHYPHARM.

Con este fin firman el presente contrato:

### 1. DEFINICIONES

#### 1.1. Productos contractuales
Productos para uso humano indicados en el Anexo 1. El Anexo 1 es parte integrante de este contrato y puede ser aumentado o reducido, en caso necesario, por medio de un adendum debidamente firmado por ambas partes.

#### 1.2. Territorio del contrato
España.

#### 1.3. Materias primas y excipientes
Sustancias activas y no activas, necesarias para la fabricación de los productos objeto de este contrato, que se definen en el Anexo 4, que puede ser aumentado o reducido en caso necesario y aprobado por ambas partes.

#### 1.4. Productos terminados
Son los microgránulos que debidamente encapsulados se envían a los clientes. Eventualmente podrán ser acondicionados en blister y estuchado.

#### 1.5 Sustancias auxiliares
Excipientes propiamente dichos utilizados para la microgranulación y otros empleados necesarios para el correcto funcionamiento de pailas, encapsuladoras y demás maquinaria que se definen en el Anexo 3,que puede ser aumentado o reducido en caso necesario y aprobado por ambas partes.

1

EP 002542



A-75

29/4/91

### 1.6 Know-How

Es toda la información que ETHYPHARM proporciona por escrito a RIMAFAR sobre el proceso de fabricación y métodos de análisis de las materias primas suministradas por ETHYPHARM así como del producto terminado y también eventualmente sobre condiciones técnicas diseño de envases, presentación, embalaje, particularidades del empaquetamiento y conservación de dichos productos así como toda la información farmacológica, clínica y analítica (estabilidad, caducidad) de los mismos.

### 1.7 Mejora

Es cada modificación del Know-How que permite mejorar la calidad del producto o la economía del proceso y de la que pueden disponer las partes contratantes y que se basa directa o indirectamente, en datos y/o indicaciones que son conocidas por las partes contratantes de acuerdo con el Know-How conocido por una de ellas y/o que estén contenidos en la solicitud de patente o patentes de los dos Laboratorios.

### 2. FABRICACION

2.1 RIMAFAR fabricará los productos contractuales indicados en el Anexo 1, según las normas de ETHYPHARM de fecha Enero 1991, para la fabricación y control de calidad de los productos objetos del contrato (véase Anexo 2). Los cambios de estas especificaciones necesitan la conformidad escrita de ETHYPHARM.

2.2 RIMAFAR garantiza a ETHYPHARM la observación de lo dispuesto para la fabricación de todos los productos objeto de este contrato.

2.3 A continuación de la entrada en vigor del contrato, ETHYPHARM y RIMAFAR y los titulares de los productos solicitarán las autorizaciones oficiales para la fabricación de los productos contractuales.

2.4 RIMAFAR garantiza a ETHYPHARM que cumplirá (por sus medios y en el tiempo acordado) todos los requisitos necesarios para la fabricación y control de los productos contractuales. RIMAFAR cumplirá con las "normas básicas de la Organización Mundial de la Salud para la fabricación de medicamentos y la garantía de su calidad, así como las de NBF (Normas de buena fabricación) comunitarias". ETHYPHARM podrá inspeccionar las instalaciones de RIMAFAR antes de comenzar cada producción, para comprobar si se cumplen los requisitos mencionados sin que RIMAFAR se oponga a ello.

ETHYPHARM asistirá tecnicamente a RIMAFAR para obtener que sus instalaciones cumplan con las normas GMP (Good Manufacturing Practices) comunitarias. Los gastos debidos a esta asistencia técnica serán a cargo de RIMAFAR.

2

EP 002543

A-76

29/11/91

2.5 Para mantener la calidad se obliga RIMAFAR a tomar como base para la fabricación de los productos contractuales las especificaciones que se señalan en el Anexo 2. ETHYPHARM se reserva el derecho de modificar dichas especificaciones y RIMAFAR puede solicitar el cambio de las mismas por razones de mejora de la calidad, método de trabajo o por razones comerciales o imposición oficial.

2.6 RIMAFAR será responsable de la calidad de los productos contractuales fabricados según las normas indicadas en el Anexo 2. No obstante, ETHYPHARM como responsable del control químico y analítico asumirá la responsabilidad de todo problema que tenga claramente por origen las normas que la misma ha establecido.

2.7. ETHYPHARM o sus clientes, suministrarán a RIMAFAR principios activos declarados conformes con las especificaciones indicadas por ETHYPHARM a sus clientes.
RIMAFAR procederá a la identificación cualitativa y cuantitativa de dichos principios activos, según normas facilitadas por ETHYPHARM.
En caso de que el resultado de un análisis de identificación realizado por RIMAFAR, sea no conforme (dichos análisis deben realizarse dentro de los cinco (5) primeros días después de la recepción de los principios activos), RIMAFAR informará por escrito inmediatamente a ETHYPHARM, la cual tomará las medidas oportunas para reemplazar o hacer reemplazar por sus clientes dichos principios activos no conformes.

2.8 ETHYPHARM determinará las especificaciones de los excipientes necesarios para la fabricación de los productos y RIMAFAR se comprometerá a utilizar únicamente excipientes conformes a dichas especificaciones.

2.9 RIMAFAR Y ETHYPHARM convienen en el presente contrato que buscarán solidariamente la cobertura mediante los seguros oportunos, para que sean compensadas las posibles pérdidas de materia prima que pudieran producirse por la mala manipulación de cualquier lote.

3. ASISTENCIA DE TECNICOS Y OPERARIOS

3.1 ETHYPHARM se encargará de facilitar la asistencia de un técnico para instruir al personal en la fabricación de los productos contractuales. Todos los gastos que ello ocasione serán por cuenta de ETHYPHARM.

3.2 ETHYPHARM tendrá el derecho de cerciorarse del cumplimiento de todas las disposiciones de este contrato. Además tendrá el derecho de convencerse de que todas las informaciones de RIMAFAR referente a su Laboratorio de Control y parte de la fabrica destinada a los productos contractuales, sean correctas. A este fin, RIMAFAR garantizará al personal de ETHYPHARM la posibilidad de las comprobaciones pertinentes durante el tiempo de la fabricación.

3

29/0/9/

## 4. SUMINISTRO DE MATERIAS PRIMAS

4.1 RIMAFAR mantendrá una calidad constante de acuerdo con las normas exigidas por ETHYPHARM para los excipientes y las sustancias auxiliares de cuya adquisición se responsabilice.

4.2 ETHYPHARM suministrará a RIMAFAR en tiempo y forma suficiente, las materias primas necesarias o autorizará o gestionará el suministro de otra procedencia. En caso de que ETHYPHARM o el mandatario no pudiesen efectuar la entrega en tiempo y forma suficiente, podrá autorizar por escrito a RIMAFAR a comprar las sustancias activas necesarias a otra firma proveedora si la hubiere. Estas sustancias tendrán la calidad exigida por cliente de ETHYPHARM. RIMAFAR dejará de adquirir a otros proveedores tan pronto como ETHYPHARM pueda entregarlas nuevamente. RIMAFAR proporcionará, de cada entrega de materia prima de otra casa proveedora de muestras suficientes para que sean examinadas por ETHYPHARM o el cliente de ETHYPHARM.

4.3 RIMAFAR comprará libremente las sustancias auxiliares necesarias y los excipientes habituales para las fabricaciones, siempre que cumplan la calidad prescrita por ETHYPHARM en sus disposiciones y se compromete a tener dichas sustancias en cantidad suficiente para asegurar la fabricación de los productos contractuales, de acuerdo con los programas facilitados por ETHYPHARM.

4.4 RIMAFAR mantendrá un espacio de almacenamiento mínimo que garantice la capacidad de recepción de las materias primas enviadas por ETHYPHARM. Además asegurará las materias primas y otros materiales entregados por ETHYPHARM o en su lugar por una tercera persona, contra los riesgos usuales durante el tiempo en que estas mercancías estén almacenadas por RIMAFAR. El seguro cubrirá los riesgos a partir de la recepción de la mercancía en el punto de destino.

4.5 RIMAFAR se compromete a enviar una lista de existencias de los productos de ETHYPHARM o relacionados con ETHYPHARM cada mes.

## 5. ENTREGA

5.1 ETHYPHARM entregará antes del final de cada año las necesidades previstas para cada trimestre. Después, ETHYPHARM hará pedidos trimestrales por lo menos 1 mes antes del principio del trimestre, indicando las cantidades de productos contractuales a fabricar cada mes durante este periodo trimestral. Estos pedidos trimestrales no deberán variar en más o menos 25% con respecto a las cantidades previstas.

5.2 Las materias primas y las sustancias auxiliares necesarias para la fabricación de los productos contractuales se comprarán y venderán a los precios convenidos entre RIMAFAR y ETHYPHARM.

4

EP 002545

A-78

29/6/91

5.3 El cliente de ETHYPHARM tiene que hacer los pedidos a ETHYPHARM o alguien designado por ella, de tal forma que RIMAFAR pueda proceder a la adquisición de las materias primas de forma económica y continua.
RIMAFAR debe conocer las necesidades previstas contractualmente de los clientes de ETHYPHARM una vez al año y posibles correcciones trimestrales.

5.4 Las ordenes de fabricación y entregas serán únicamente emitidas y reguladas por ETHYPHARM o quien esta designe.

## 6. ENCAPSULADO Y ACONDICIONAMIENTO FINAL

6.1 RIMAFAR dispondrá de los medios necesarios para fabricar y encapsular los productos terminados, según las normas de ETHYPHARM.

6.2 Los productos terminados fabricados por RIMAFAR, si se da el caso, llevarán en el embalaje o etiqueta las marcas e indicaciones que el cliente de ETHYPHARM proponga y los textos conforme a las exigencias legales, proporcionadas por el cliente en los materiales correspondientes.

## 7. DISTRIBUCION

### 7.1 Garantia

RIMAFAR garantiza que los productos fabricados serán de calidad conforme a las especificaciones comunicadas por ETHYPHARM. Cualquier producto expedido por RIMAFAR habrá sido controlado en el laboratorio, para responder a las normas de control de calidad, según las normas, reglas y procedimientos de las Autoridades Sanitarias. Se responsabiliza también RIMAFAR por los daños causados por malas condiciones de almacenamiento de los productos y materias primas bajo su custodia o por uso impropio o abusivo.

ETHYPHARM garantiza que los métodos de fabricación transmitidos a RIMAFAR son los aceptados por el Ministerio de Sanidad Español, y RIMAFAR declara conocerlos perfectamente.

### 7.2 Seguro

RIMAFAR contratará, para todo el tiempo que dure este contrato y durante un periodo de por lo menos dos (2) años después de su rescisión, un seguro general de responsabilidad civil, comprendiendo un seguro global de responsabilidad contractual, un seguro de responsabilidad para el producto y un seguro contra las reclamaciones cubiertas por las disposiciones del presente contrato, por un importe global de por lo menos cien millones de pesetas (100.000.000 ₧). Este seguro deberá ser suscrito en una compañía de seguros competente reconocida, la o las pólizas deberán entrar en vigor a la fecha de la firma del presente contrato y designarán como asegurados suplementarios a ETHYPHARM sobre los productos objeto del presente contrato.

5

EP 002546

29/11/91

Estipularán que los importes de seguro no serán reducidos o anulados sin previo aviso escrito de treinta (30) días a ETHYPHARM. Un ejemplar o prueba de este seguro de responsabilidad profesional será transmitido a ETHYPHARM sin demora después de la firma del presenta contrato.

*Hasta el punto 8.-, 29.11.91*

## 8.  ACONDICIONAMIENTO.  SALAS  DE  FABRICACION  ALMACENAJE  Y ENCAPSULADO

8.1 RIMAFAR se compromete a la realización de estas operaciones según Anexo 2.

8.2 Pailas y otros útiles necesarios para la fabricación serán definidos en el Anexo 3.

8.3. Supervisión. RIMAFAR se compromete a la realización de estas operaciones.

8.4. Encapsuladora y otros útiles necesarios para el encapsulado, serán definidos en el Anexo 2.

## 9. COSTOS DE PRODUCCION

RIMAFAR facturará a ETHYPHARM cada lote de los productos fabricados según las condiciones descritas en el Anexo 2 y aceptadas por ambas partes.

## 10. DERECHOS COMERCIALES

Intercambio de experiencias

Las partes contratantes se comprometen a llevar a cabo un intercambio contínuo y gratuito durante la duración del presente contrato, con el fin de que RIMAFAR tenga la posibilidad de evaluar los productos contractuales en la mejor forma posible. Por consiguiente, las partes contratantes se comprometan a poner a disposición mutua y en forma gratuita el *know-how* que obtengan mientras dure el presente contrato.

Se hace constar, que todos los clientes compradores de los productos, pertenecen a ETHYPHARM y que RIMAFAR actúa únicamente como fabricante. RIMAFAR no tendrá ningún derecho sobre los clientes de ETHYPHARM, compradores de los productos que fabrique después de la terminación del presente contrato.

## 11. DISPOSICIONES LEGALES

11.1 Con la firma de este contrato, ETHYPHARM y RIMAFAR declaran que han examinado y contratado que el mismo se encuentra en conformidad con la Ley española.

11.2 RIMAFAR y ETHYPHARM se informarán mutuamente de una forma inmediata sobre todas las disposiciones y modificaciones de leyes

6

EP 002547

A-80

## MANUFACTURING AGREEMENT

ETHYPHARM, S.A., with its corporate domicile at Marqués de la Ensenada, 16 28004 Madrid, represented by its President Mr. Patrice Debregeas, hereinafter referred to as ETHYPHARM,

and the company named;

LABORATORIOS RIMAFAR, S.A., with its corporate domicile at Zurbano, 4 28010 Madrid, represented by its Director General, Mr. Angel Pérez de Ayala, hereinafter identified as RIMAFAR,

agree as follows:

### PREAMBLE

ETHYPHARM and RIMAFAR have agreed upon the manufacture, capsulation, and potentially the final processing of ETHYPHARM's products in Spain.

To that end they sign this agreement:

1. <u>DEFINITION</u>

1.1. <u>Contractual products</u>

Products for human use indicated in Exhibit 1. Exhibit 1 is an integral part of this agreement, and may be expanded or reduced, if necessary, through an addendum duly signed by both parties.

1.2. <u>Contractual territory</u>

Spain.

1.3. <u>Raw materials and excipients</u>

Active and inactive substances required for the manufacture of the products to which this agreement refers, defined in Exhibit 4, which may be expanded or reduced, if necessary and with the approval of both parties.

1.4. <u>Finished products</u>

The microgranules which, duly enclosed in capsules, are sent to the customers. They may potentially be processed into blister wrappings and boxed.

1.5. <u>Auxiliary substances</u>

Excipients as such, used for microgranulation, and others needed for the proper operation of boilers, encapsulators, and other machinery defined in Exhibit 3, which may be expanded or reduced, if necessary, and with the approval of both parties.

EP 002542

**A-81**

2.5. To maintain quality, RIMAFAR undertakes to use the specifications provided in Exhibit 2 as a basis for the manufacture of the contractual products. ETHYPHARM reserves the right to modify said specifications, and RIMAFAR may request changes therein for purposes of improved quality or work methods, for commercial reasons. or in response to official imposition.

2.6. RIMAFAR shall be responsible for the quality of the contractual products manufactured in accordance with the standards stipulated in Exhibit 2. However, ETHYPHARM, as the party responsible for chemical and analytical control, shall bear the responsibility for all problems clearly arising from the standards it has itself prescribed.

2.7. ETHYPHARM or its customers shall supply RIMAFAR with the declared active ingredients in accordance with the specifications stipulated by ETHYPHARM to its customers.
RIMAFAR shall perform a qualitative and quantitative identification of said active ingredients, in accordance with ETHYPHARM's standards.
In the event the result of an analysis for purposes of identification performed by RIMAFAR is unacceptable (said analysis must be performed within the first five (5) days after the reception of the active ingredients), RIMAFAR shall inform ETHYPHARM thereof immediately and ETHYPHARM shall take timely measures to replace said unacceptable active ingredients or cause them to be replaced by its customers.

2.8. ETHYPHARM shall determine the specifications for the excipients needed for the products' manufacture, and RIMAFAR shall undertake to use only excipients acceptable pursuant to said specifications.

2.9. RIMAFAR and ETHYPHARM agree in this agreement that they shall jointly seek coverage under timely insurance policies, so as to be compensated for potential losses of raw materials which may occur due to mishandling of any batch.

3. ASSISTANCE OF TECHNICAL PERSONNEL AND LINE WORKERS

3.1. ETHYPHARM shall be responsible for providing the assistance of a technical expert to instruct the personnel in the contractual products' manufacture. All the expenses arising therefrom shall be paid by ETHYPHARM.

3.2. ETHYPHARM shall be entitled to verify compliance with all the provisions of this agreement. It shall likewise be entitled to assure itself that all the information received from RIMAFAR in regard to its Control Laboratory and the portion of the factory used to manufacture the contractual products is correct. To that end, RIMAFAR shall allow the ETHYPHARM personnel to make pertinent verifications during the period of manufacture.

EP 002544

**A-82**

5.3. ETHYPHARM's customer must place its orders with ETHYPHARM or the party designated by ETHYPHARM in such a way that RIMAFAR can proceed to acquire the raw materials in an economical and continuous fashion.

RIMAFAR must be apprised of the contractually anticipated needs of ETHYPHARM's customers once each year, with possible quarterly corrections.

5.4. The manufacturing and delivery orders shall only by issued and regulated by ETHYPHARM or the party designated by it.

## 6. ENCAPSULATION AND FINAL PROCESSING

6.1. RIMAFAR shall have the necessary means to manufacture and encapsulate the finished products in accordance with ETHYPHARM's standards.

6.2. The finished products manufactured by RIMAFAR, if any, shall bear the trademarks and indications proposed by ETHYPHARM's customer on their packaging or labels, as well as the legally required texts furnished by the customer in the corresponding materials.

## 7. DISTRIBUTION

### 7.1 Warranty

RIMAFAR warrants that the products it manufactures shall have a quality consistent with the specifications given it by ETHYPHARM. Any products issued by RIMAFAR shall have been subjected to control at the laboratory, to assure their compliance with the quality control standards in accordance with the Health Authorities' standards, rules, and procedures. RIMAFAR is likewise liable for any damage caused by poor storage conditions for the products and raw materials in its custody or for improper and abusive use thereof.

ETHYPHARM warrants that the manufacturing methods transferred to RIMAFAR are those accepted by the Spanish Ministry of Health, and RIMAFAR declares that it is perfectly familiar with them.

### 7.2 Insurance

RIMAFAR shall retain, for the entire duration of this agreement and a period of at least two (2) years after its rescission, a general civil liability insurance policy providing an overall contractual liability insurance coverage, a product liability insurance coverage, and insurance coverage against claims covered by the provisions of this agreement, in an overall amount not less than one hundred million pesetas (100,000,000 pts). Said insurance must be acquired from a competent and prestigious insurance company, and the policy or policies must enter into force as of the date on which this agreement is signed and must designate ETHYPHARM as an additional insured in respect of the products to which this agreement applies.

EP 002546

**Rough Translation for use by Attorneys During Depositions**
**May not be Submitted to Court without Permission of Baach, Robinson & Lewis, PLLC**

A-83

_Revisado y cumplido el 24.3.92_

## CONTRATO DE FABRICACION

- ETHYPHARM, S.A con domicilio social en; Marqués de la Ensenada, 16 28004 Madrid, representada por su Presidente D. Patrice Debregeas, en lo siguiente denominada ETHYPHARM.

Y la firma:

- LABORATORIOS BELMAC, S.A con domicilio social en; Zurbano, 4 28010 Madrid.

Representada por su Director General D. Angel Pérez de Ayala en lo siguiente denominada BELMAC.

Acuerdan lo siguiente:

### PREAMBULO

ETHYPHARM y BELMAC han convenido la fabricación, encapsulado y eventualmente el acondicionamiento final en España de los productos de ETHYPHARM.

Con este fin firman el presente contrato:

## 1. DEFINICIONES

### 1.1. Productos contractuales
Productos para uso humano indicados en el Anexo 1. El Anexo 1 es parte integrante de este contrato y puede ser aumentado o reducido, en caso necesario, por medio de un adendum debidamente firmado por ambas partes.

### 1.2. Territorio del contrato
España.

### 1.3. Materias primas y excipientes
Sustancias activas y no activas, necesarias para la fabricación de los productos objeto de este contrato, que se definen en el Anexo 3.

### 1.4. Productos terminados
Son los microgránulos que debidamente encapsulados se envían a los clientes. Eventualmente podrán ser acondicionados en blister y estuchado.

### 1.5 Sustancias auxiliares
Excipientes propiamente dichos utilizados para la microgranulación y otros empleados necesarios para el correcto funcionamiento de pailas, encapsuladoras y demás maquinaria que se definen en el Anexo 3.



-1-

CONFIDENTIAL

BEL006919

A-84

### 1.6 *Know-How*

Es toda la información que ETHYPHARM proporciona por escrito a BELMAC sobre el proceso de fabricación y métodos de análisis de las materias primas suministradas por ETHYPHARM así como del *producto terminado y también eventualmente sobre condiciones* técnicas diseño de envases, presentación, embalaje, particularidades del empaquetamiento y conservación de dichos productos así como toda la información farmacológica, clínica y analítica (estabilidad, caducidad) de los mismos.

### 1.7 Mejora

Es cada modificación del *Know-How* que permite mejorar la calidad del producto o la economía del proceso y de la que pueden disponer las partes contratantes y que se basa directa o indirectamente, en datos y/o indicaciones que son conocidas por las partes contratantes de acuerdo con el *Know-How* conocido por una de ellas y/o que estén contenidos en la solicitud de patente o patentes de los dos Laboratorios.

## 2. FABRICACION ENCAPSULADO Y ACONDICIONAMIENTO FINAL. CONTROL DE CALIDAD

2.1 BELMAC fabricará de forma exclusiva los productos contractuales indicados en el Anexo 1, según las normas de ETHYPHARM de fecha Enero 1991, para la fabricación y control de calidad de los productos objetos del contrato (véase Anexo 2). Los cambios de estas especificaciones necesitan la conformidad escrita de ETHYPHARM. ETHYPHARM igualmente se compromete a *fabricar en exclusiva con BELMAC* ofreciendo además un derecho de primera opción en caso ~~de necesidad, por parte de ETHYPHARM,~~ de requerir una mayor capacidad para sus fabricaciones. *o por dificultad del poseer*

2.2 BELMAC garantiza a ETHYPHARM la observación de lo dispuesto para la fabricación de todos los productos objeto de este contrato. BELMAC, no podrá fabricar productos que incumplan las buenas normas de fabricación (BNF) y si lo hiciere, deberá tomar todas las precauciones que exijan las Autoridades Administrativas y Sanitarias.

2.3 A continuación de la entrada en vigor del contrato, ETHYPHARM y BELMAC y los titulares de los productos solicitarán las autorizaciones oficiales para la fabricación de los productos contractuales.

2.4 BELMAC garantiza a ETHYPHARM que cumplirá (por sus medios y en el tiempo acordado) todos los requisitos necesarios para la fabricación y control de los productos contractuales. BELMAC cumplirá con las *"normas básicas de la Organización Mundial de la Salud para la fabricación de medicamentos y la garantía de su calidad, así como las de NBF (Normas de buena fabricación)* comunitarias. ETHYPHARM podrá inspeccionar las instalaciones de BELMAC antes de comenzar la producción, para comprobar si se cumplen los requisitos mencionados sin que BELMAC se oponga a ello.

2

CONFIDENTIAL

BEL006920

A-85

ETHYPHARM asistirá tecnicamente a BELMAC para obtener que sus instalaciones cumplan con las normas GMP *(Good Manufacturing Practices)* comunitarias. Los gastos debidos a esta asistencia técnica serán a cargo de BELMAC.

2.5 Para mantener la calidad se obliga BELMAC a tomar como base para la fabricación de los productos contractuales las especificaciones que se señalan en el Anexo 2. ETHYPHARM se reserva el derecho de modificar dichas especificaciones y BELMAC puede solicitar el cambio de las mismas por razones de mejora de la calidad, método de trabajo o por razones comerciales o imposición oficial.

2.6 BELMAC será responsable de la calidad de los productos contractuales fabricados según las normas indicadas en el Anexo 2. No obstante, ETHYPHARM como responsable del control químico y analítico asumirá la responsabilidad de todo problema que tenga claramente por origen las normas que la misma ha establecido.

2.7. ETHYPHARM o sus clientes, suministrarán a BELMAC principios activos declarados conformes con las especificaciones indicadas por ETHYPHARM a sus clientes.
BELMAC procederá a la identificación cualitativa y cuantitativa de dichos principios activos.
En caso de que el resultado de un análisis de identificación realizado por BELMAC, sea no conforme (dichos análisis deben realizarse dentro de los cinco (5) primeros días después de la recepción de los principios activos), BELMAC informará por escrito inmediatamente a ETHYPHARM, la cual tomará las medidas oportunas para reemplazar o hacer reemplazar por sus clientes dichos principios activos no conformes.

2.8 ETHYPHARM determinará las especificaciones de los excipientes necesarios para la fabricación de los productos y BELMAC se comprometerá a utilizar únicamente excipientes conformes a dichas especificaciones.

2.9 Se conviene en el presente contrato que BELMAC cambiará gratuitamente cualquier lote de fabricación considerado definitivamente como no conforme con las especificaciones indicadas por ETHYPHARM y aceptadas por BELMAC.

2.10 ETHYPHARM pone a disposición de BELMAC los medios y máquinas necesarias para fabricar y encapsular los productos contractuales, según las normas de ETHYPHARM. BELMAC dispondrá eventualmente del acondicionamiento final de los productos contractuales.

2.11 Los productos terminados fabricados por BELMAC, si se da el caso, llevarán en el embalaje o etiqueta las marcas e indicaciones que el cliente de ETHYPHARM proponga y los textos conforme a las exigencias legales, proporcionadas por el cliente en los materiales correspondientes.

3

CONFIDENTIAL

BEL006921

A-86

## 3. ASISTENCIA DE TECNICOS Y OPERARIOS

3.1 ETHYPHARM se encargará de facilitar la asistencia de un técnico para instruir al personal en la fabricación de los productos contractuales. *Todos los gastos que ello ocasione serán por cuenta de ETHYPHARM.*

3.2 ETHYPHARM tendrá el derecho de cerciorarse del cumplimiento de todas las disposiciones de este contrato. Además tendrá el derecho de convencerse de que todas las informaciones de BELMAC referente a su Laboratorio de Control y parte de la fabrica destinada a los productos contractuales, sean correctas. A este fin, BELMAC garantizará al personal de ETHYPHARM la posibilidad de las comprobaciones pertinentes durante el tiempo de la fabricación.

## 4. SUMINISTRO DE MATERIAS PRIMAS

4.1 BELMAC mantendrá una calidad constante de acuerdo con las normas exigidas por ETHYPHARM para los excipientes y las sustancias auxiliares de cuya adquisición se responsabilice.

4.2 ETHYPHARM suministrará a BELMAC en tiempo y forma suficiente, las materias primas necesarias o autorizará o gestionará el suministro de otra procedencia. *En caso de que ETHYPHARM o el mandatario no pudiesen efectuar la entrega en tiempo y forma suficiente,* podrá autorizar por escrito a BELMAC a comprar las sustancias activas necesarias a otra firma proveedora si la hubiere. Estas sustancias tendrán la calidad exigida por cliente de ETHYPHARM. BELMAC dejará de adquirir a otros proveedores tan pronto como ETHYPHARM pueda entregarlas nuevamente. BELMAC proporcionará, de cada entrega de materia prima de otra casa proveedora de muestras suficientes para que sean examinadas por ETHYPHARM o el cliente de ETHYPHARM.

4.3 BELMAC comprará libremente las sustancias auxiliares necesarias y los excipientes habituales para las fabricaciones, siempre que cumplan la calidad prescrita por ETHYPHARM en sus disposiciones y se compromete a tener dichas sustancias en cantidad suficiente para asegurar la fabricación de los productos contractuales, de acuerdo con los programas facilitados por ETHYPHARM.

4.4 BELMAC mantendrá un espacio de almacenamiento mínimo definido en el Anexo 3 que garantice la capacidad de recepción de las materias primas enviadas por ETHYPHARM. Además asegurará las materias primas y otros materiales *entregados por ETHYPHARM o en su lugar por una tercera persona,* contra los riesgos usuales durante el tiempo en que estas mercancías estén almacenadas por BELMAC. El seguro cubrirá los riesgos a partir de la recepción de la mercancía en el punto de destino.

4.5 BELMAC se compromete a enviar una lista de existencias de los productos de ETHYPHARM o relacionados con ETHYPHARM cada mes.

CONFIDENTIAL

BEL006922

## 5. LOGISTICA

5.1 ETHYPHARM entregará antes del final de cada año las necesidades previstas para cada trimestre. Después, ETHYPHARM hará pedidos trimestrales por lo menos 1 mes antes del principio del trimestre, indicando las cantidades de productos contractuales a fabricar cada mes durante este periodo trimestral. Estos pedidos trimestrales no deberán variar en más o menos 25% con respecto a las cantidades previstas.

5.2 Las materias primas y las sustancias auxiliares necesarias para la fabricación de los productos contractuales se comprarán y venderán a los precios convenidos entre BELMAC y ETHYPHARM.

5.3 El cliente de ETHYPHARM tiene que hacer los pedidos a ETHYPHARM o alguien designado por ella, de tal forma que BELMAC pueda proceder a la fabricación de las materias primas de forma económica y continua.
BELMAC debe conocer las necesidades previstas contractualmente de los clientes de ETHYPHARM una vez al año y posibles correcciones trimestrales.

5.4 Las ordenes de fabricación y entregas serán únicamente emitidas y reguladas por ETHYPHARM o quien esta designe.

5.5 ETHYPHARM garantizará una producción mínima que permita al menos cubrir sus gastos, para estas fabricaciones, en caso contario se producirá una compensación que cubra estos mínimos. Se realizará una revisión de forma semestral. *de dotacion de personal adscritos a las elaboraciones de etryph.*

## 6. DISTRIBUCION

6.1 Garantía *Belmac cargara a etryph dichos gastos cuando se generen.*

BELMAC garantiza que los productos fabricados serán de calidad conforme a las especificaciones comunicadas por ETHYPHARM. Cualquier producto expedido por BELMAC habrá sido controlado en el laboratorio, para responder a las normas de control de calidad, según las normas, reglas y procedimientos de las Autoridades Sanitarias. Se responsabiliza también BELMAC por los daños causados por malas condiciones de almacenamiento de los productos y materias primas bajo su custodia o por uso impropio o abusivo.

ETHYPHARM garantiza que los métodos de fabricación transmitidos a BELMAC son los aceptados por el Ministerio de Sanidad Español, y BELMAC declara conocerlos perfectamente.

## 6.2 Exportación

Las partes contractuales se comprometen a conseguir los dossieres de exportación correspondientes a los productos objeto de este contrato cuando sea necesario. *Laboratorio Belmac facilitara a etrypharm el apoyo logistico para la obtencion de registros de exportacion de los productos contenidos en el Anexo 1. Esta colaboracion se hara extensiva a la comercializacion de dichos productos a clientes de etrypharm en otros paises previo acuerdo de las condiciones entre ambas contrapartes.*

CONFIDENTIAL

BEL006923

A-88

### 6.3 Seguro

BELMAC contratará, para todo el tiempo que dure este contrato y durante un periodo de al menos el equivalente a la caducidad del último lote fabricado, un seguro general de responsabilidad civil, comprendiendo un seguro global de responsabilidad extracontractual, un seguro de responsabilidad para el producto y un seguro contra las reclamaciones cubiertas por las disposiciones del presente contrato, por un importe global de por lo menos cien millones de pesetas (100.000.000 ₧). Este seguro deberá ser suscrito en una compañía de seguros competente reconocida, la o las pólizas deberán entrar en vigor a la fecha de la firma del presente contrato y designarán como asegurados suplementarios a ETHYPHARM sobre los productos objeto del presente contrato. *Una copia de este seguro será remitida a ethyphar a continuación de la firma del presente contrato* Estipularán que los importes de seguro no serán reducidos o anulados sin previo aviso escrito de treinta (30) días a ETHYPHARM. Un ejemplar o prueba de este seguro de responsabilidad profesional será transmitido a ETHYPHARM sin demora después de la firma del presente contrato. El mantenimiento de este seguro y la ejecución por el fabricante de sus obligaciones a los términos del presente párrafo no liberará a BELMAC de su responsabilidad.

### 7. ACONDICIONAMIENTO, SALAS DE FABRICACION ALMACENAJE Y ENCAPSULADO

7.1 BELMAC ha realizado estas operaciones según Anexo 2.

7.2 Pailas y otros útiles necesarios para la fabricación están descritos en el Anexo 3. Serán actualizados con regularidad.

7.3. Encapsuladora y otros útiles necesarios para el encapsulado, serán definidos en el Anexo 3.

7.4. Supervisión. BELMAC se compromete a la realización de estas operaciones.

### 8. COSTOS DE PRODUCCION

BELMAC facturará a ETHYPHARM cada lote de los productos fabricados según las normas descritas en el Anexo 2 aceptadas por ambas partes y según las condiciones fijadas en el Anexo A.

### 9. DERECHOS COMERCIALES

Intercambio de experiencias

Las partes contratantes se comprometen a llevar a cabo un intercambio continúo y gratuito durante la duración del presente contrato, con el fin de que BELMAC tenga la posibilidad de evaluar los productos contractuales en la mejor forma posible. Por consiguiente, las partes contratantes se comprometen a poner a disposición mutua y en forma gratuita el *know-how* que obtengan mientras dure el presente contrato.

6

CONFIDENTIAL

Se hace constar, que todos los clientes compradores de los productos, pertenecen a ETHYPHARM y que BELMAC actúa únicamente como fabricante. BELMAC no tendrá ningún derecho sobre los clientes de ETHYPHARM, compradores de los productos que fabrique después de la terminación del presente contrato.

## 10. DISPOSICIONES LEGALES

10.1 Con la firma de este contrato, ETHYPHARM y BELMAC declaran que han examinado y comprobado que el mismo se encuentra en conformidad con la Ley española.

10.2 BELMAC y ETHYPHARM se informarán mutuamente de una forma inmediata sobre todas las disposiciones y modificaciones de leyes y decretos que establezca la autoridad sobre la fabricación de productos farmacéuticos, así como sobre derecho de marcas, registros y patentes y proporcionará el texto de dichas disposiciones lo más pronto posible.

## 11. OBLIGACION DE GUARDAR SECRETO

Durante la duración de este contrato y ~~para~~ *por* un tiempo ilimitado después de su terminación, el LABORATORIO debe mantener toda la información obtenida de forma secreta, y divulgar ésta exclusivamente a colaboradores ligados por la misma obligación de secreto.

Más especificamente el LABORATORIO y estos colaboradores no tendrán el derecho, cualquiera que sea, de utilizar esta información recibida directa o indirectamente de ETHYPHARM para su propio beneficio o el de terceras partes o en sus relaciones con terceros laboratorios o para trabajar sobre otros productos que no sean de ETHYPHARM.
De cualquier forma, está especificado que el LABORATORIO o sus colaboradores no pueden, en ningún caso, hacer referencia al contenido de sus relaciones con ETHYPHARM en sus discusiones con terceros laboratorios, sin previa autorización escrita de ETHYPHARM.

Además de la información transmitida por ETHYPHARM al LABORATORIO, éste se compromete a guardar el secreto durante el mismo período, los resultados de pruebas y ensayos realizados conjuntamente.

Esta obligación de secreto no se aplicará en caso de que:

* Pueda ser demostrado que la información era de dominio público en el momento de ser entregada por ETHYPHARM.

* La información, habiendo sido transferida, consecuentemente se haga de dominio público por otros medios que no sean del LABORATORIO o sus colaboradores.

CONFIDENTIAL

BEL006925

A-90