OCT. 4. 2004  2:25PM    BENTLEY PHARM INC                    NO. 313   P. 22

67.    Within Bentley's Spanish operations, Omeprazole was by far the single most important drug. For example, in Bentley's Form 10-K Annual Report for the fiscal year ending December 31, 2002, Bentley noted that Omeprazole accounted for approximately 49% of Bentley's net sales in 2002. In a Form S-3 filed with the S.E.C. on February 15, 2002, Bentley stated that Omeprazole accounted for 56% of Bentley's net sales in 2001.

68.    For years, and to this day, Bentley has been lying to the public and to Bentley's shareholders to create the false and misleading impression that Bentley, rather than Ethypharm, holds a proprietary interest in the technology, trade secrets, know-how and the production, manufacturing, regulatory and marketing procedures relating to the manufacture and sale of Omeprazole.

69.    For example, in Bentley's Form 10-K Annual Report for the fiscal year ended December 31, 2000, Bentley made the following incomplete, misleading, and deceptive statement about Omeprazole:

> the Registrant [Bentley] has developed and is in the process of registering its own pharmaceutical products in Spain. Among the products Laboratorios Belmac manufactures and/or distributes, each of which is registered with Spain's Ministry of Health, are: Belmazol(R). Belmazol, whose generic name is Omeprazole, is used primarily for hyperacidity problems related to ulcers and, secondarily, for the treatment of gastroesophageal reflux disease. Omeprazole is a proton pump inhibitor, which inhibits the hydrogen/potassium ATPase enzyme system at the secretory surface of gastric parietal cells. Because this enzyme system is regarded as an acid pump within the gastric mucosa, it has been characterized as a gastric acid pump inhibitor in that it blocks the final step of acid production. This compound has been used in combination with antibiotics for the treatment of ulcers when it is suspected that Helicobacter pylori bacteria are the etiologic agent.

70.    Even though Bentley thought it important to describe in great detail the technical basis for Omeprazole's efficacy, Bentley omitted a key material fact -- Bentley was and is

16

114034

A-472

manufacturing Omeprazole using Ethypharm's machinery, processes, trade secrets and know-how.    Instead, Bentley gives the false impression that the Omeprazole manufactured for Ethypharm and subsequently sold under the trade name Belmazol is "its own pharmaceutical product..."

71.    This Form 10-K Annual Report is consistent with Bentley's long history of falsely representing that it holds a proprietary interest in the technology, processes, machinery, and know-how necessary to manufacture Omeprazole.

72.    For example, in April 1999, Patrice Debrégeas, President of Ethypharm, wrote directly to James Murphy, who was then Chairman and Chief Executive Officer of Bentley Pharmaceuticals, Inc.    Mr. Debrégeas wrote to Mr. Murphy after reviewing various articles and advertisements relative to Belmazol and Belmac technology, which had then recently been published in Spanish newspapers.

73.    In his April 1999 letter to Mr. Murphy, Mr. Debrégeas noted that these advertisements and articles "state that Belmac is the owner of the technology, the know-how and equipment used to develop and to manufacture the [Belmazol] product."

74.    Mr. Debrégeas went on to state as follows concerning the true status of the ownership of this valuable intellectual property:

> As you surely know, and, as evidenced by numerous documents, this is the sole property of Ethypharm, and Belmac has only been authorized by Ethypharm to use this property to supply Ethypharm's customers.

75.    Mr. Debrégeas also went on in the same letter to note that he was confident that Bentley, "as a public company" would wish to correct any misunderstanding regarding the ownership of the Omeprazole technology, know-how and manufacturing formula and process.

17

114034

A-473

76.    On the following day, Mr. Murphy, writing in his capacity as Chairman and Chief Executive Officer of Bentley Pharmaceuticals, Inc., a Delaware corporation, and writing from the New Hampshire headquarters of Bentley, responded directly to Mr. Debrégeas.

77.    Mr. Murphy did not dispute Mr. Debrégeas' statement that Ethypharm owned the technology, know-how, and equipment used to develop and manufacture Belmazol. To the contrary, Mr. Murphy acknowledged these facts by stating, "I have received your letter concerning reference to Ethypharm technology and understand your concerns."

78.    Mr. Murphy conceded that Bentley had purposefully concealed Ethypharm's ownership of the Omeprazole intellectual property. He said:

> Honoring your wishes since that time, we have been careful not to disclose Ethypharm name in our public announcement.

(Emphasis in original.)

79.    Contrary to the implication in Mr. Murphy's letter regarding Ethypharm's "wishes", Ethypharm at no time suggested to or otherwise consented to Bentley making misleading, false, and deceptive statements concerning the ownership of the technology, know-how, and equipment used to develop and manufacture Belmazol and other Omeprazole products.

80.    Mr. Debrégeas' letter expressly demanded that Bentley, as a public company, cease and desist from misleading the public as to the true ownership of the Omeprazole intellectual property.

81.    Neither Mr. Murphy, Bentley, nor Belmac S.A. ever made any correction following Mr. Debrégeas' letter but, instead, continued to make misleading and false statements to the public.

18

114034

A-474

82.     By making misleading, false, and incomplete statements in its public filings with the Security and Exchange Commission, Bentley created and continues to create the misleading impression that it -- and not Ethypharm -- is the owner of the technology, know-how, trade secrets and equipment used to develop and manufacture Belmazol.

83.     By making these false, deceptive, and incomplete statements, Bentley gives the impression that the drug that accounts for by far the most significant portion of its revenues is a drug that it owns when, in fact, Bentley well knows that Ethypharm is the owner of the technology, the know-how, the trade secrets, the processes, and the equipment used to develop and to manufacture Belmazol and other products such as Lansoprazole.

### Bentley's Fraud on Ethypharm, Its Theft of Ethypharm's Customers, Its Intellectual Property and the Unlawful Use of Ethypharm's Machinery

84.     In or around late 2001 or early 2002, Bentley and its agent, Belmac S.A., embarked on a bold scheme to steal Ethypharm's machinery, know-how, trade secrets, technology (including pellet technology), processes, formulae, and analytical methods. Through its scheme, Bentley and its agent, Belmac S.A., sought to use Ethypharm's proprietary machinery, know-how, trade secrets, technology, processes, formulae and analytical methods to manufacture Omeprazole just as it had for the past decade but without acknowledging Ethypharm's proprietary rights and without compensation to Bthypharm. Through this scheme, Bentley and its agent, Belmac S.A., also sought to use Ethypharm's trade secrets, intellectual property and know-how including its pellet technology in order to develop, produce and manufacture other products including, but not limited to, Lansoprazole.

114034

19

85.     Until on or about March 23, 2002, Bentley, directly and through its agent, Belmac S.A., continued to manufacture Omeprazole for Ethypharm using the Ethypharm technology, trade secrets, processes, machinery, formulae, techniques, and data.

86.     Until on or about March 23, 2002, Bentley, directly and through its agent, Belmac S.A., purchased 100% of its requirements for Omeprazole from Ethypharm, and in so doing compensated Ethypharm for its use of the Ethypharm machinery, technology, trade secrets, processes, and know-how.

87.     To facilitate the scheme to steal Ethypharm's intellectual property, on or about March 23, 2002, Bentley, directly and through its agent, Belmac S.A., continued to manufacture Omeprazole using, without authority or compensation, Ethypharm's technology, machinery, trade secrets, processes, and know-how, yet ceased to purchase Omeprazole from Ethypharm.

88.     After approximately March 23, 2002, and perhaps prior to this time, Belmac S.A. wrongfully misappropriated Ethypharm's technology, trade secrets, machinery, processes, and know-how.

89.     In a further effort to facilitate this scheme, Bentley, directly and through its agent, Belmac S.A., falsely and fraudulently stated to Ethypharm on repeated occasions in late 2001 and early 2002 that: they would not take direct or indirect action to prejudice Ethypharm's rights; they would not compete unfairly with Ethypharm; and they would not use Ethypharm's machinery, technology, and processes to manufacture Ethypharm's formulation of Omeprazole except for limited supplies for Ethypharm's existing customers.

90.     In reasonable reliance upon these false statements and omissions by Bentley and its agent, Belmac S.A., Ethypharm permitted Bentley and its agent, Belmac S.A., to keep Ethypharm's machines at Belmac S.A.'s manufacturing plant.

114034

20

91.    In reasonable reliance upon these false statements and omissions by Bentley and its agent, Belmac S.A., Ethypharm continued to utilize Belmac S.A. with the understanding that Bentley and its agent, Belmac S.A., would be manufacturing limited amounts of Omeprazole as necessary to service certain of Ethypharm's customers.

92.    In reasonable reliance upon these false statements and omissions by Bentley and its agent, Belmac S.A., Ethypharm did not immediately initiate legal proceedings in response to the misappropriation of Ethypharm's valuable intellectual property.

93.    Bentley's public description in S.E.C. filings of its strategic plans for manufacturing and marketing Omeprazole products and its current overwhelming reliance upon revenue from the sale of Omeprazole products corroborates Bentley's interest in these transactions with Ethypharm.

94.    Since approximately March 23, 2002, by use of the stolen Ethypharm machinery, processes, technology, trade secrets and know-how, Bentley, through its agent, Belmac S.A., has generated significant revenues from the sale of Omeprazole.  In 2002, Bentley had sales of Omeprazole within Spain of $14.8 million.  In 2003, these sales increased to $19.9 million.

95.    Since March 23, 2002, largely as a result of revenues generated by the sale of Omeprazole and the promise of new products such as Lansoprazole using Ethypharm's stolen intellectual property and trade secrets, Bentley has operated at a profit, and has seen its stock nearly triple in price from a low of $4.40 in fiscal year 2001 to a high of $18.80 in fiscal year 2003.

96.    On information and belief, Bentley plans to continue to sell Omeprazole using the stolen Ethypharm processes, trade secrets, technology, formulae, analytic procedures, and know-how into the future, thereby generating significant revenues for itself.

21

114034

A-477

## COUNT 1
### (Fraud)

97.    Plaintiffs repeat and re-allege paragraphs 1 through 96 as if fully set forth herein.

98.    Bentley, through its agent, Belmac S.A., has, since approximately March 2002, manufactured Omeprazole wrongfully using Ethypharm's intellectual property and trade secrets. Bentley, through its agent, Belmac S.A., has also misappropriated Ethypharm's intellectual property and trade secrets in order to develop other products such as Lansoprazole.

99.    Bentley, both directly and through its agent, Belmac S.A., has made various false, misleading, and incomplete statements to Ethypharm to the effect that: they would not take direct or indirect action to prejudice Ethypharm's rights; they would not compete unfairly with Ethypharm; and they would not use Ethypharm's machinery, technology, and processes to manufacture Ethypharm's formulation of Omeprazole except for limited supplies for Ethypharm's existing customers.  These false statements and assurances were made on numerous occasions throughout the relationship and, in particular, from January 2002 through April of 2002.

100.    As one example, Adolpho Herrera, General Manager of Belmac, S.A., sent a letter dated January 2, 2002 to Ethypharm falsely stating that Belmac S.A. had never and would never compete unfairly or prejudicially against Ethypharm.

101.    As another example, representatives from Bentley and its agent, Belmac S.A., met on or about February 21, 2002 with Ethypharm representatives at Ethypharm's offices outside Paris in St. Cloud, France for a few hours. Adolpho Herrera, General Manager of Belmac S.A., and Berenguer Zuniga were present for Belmac S.A. and its principal, Bentley.  Ethypharm

114034

representatives included Patrice Debregeas, Gerard Leduc, Roseline Joannesse and U.S. counsel, Lawrence G. Meyer, Esquire.

102.    At this February 21, 2002 meeting, Ethypharm repeated a previously expressed concern that Bentley and its agent, Belmac S.A., were damaging Ethypharm by stealing its core technologies, know-how, trade secrets and customer base relating to Ethypharm's Omeprazole product. Ethypharm also insisted that Bentley and its agent, Belmac S.A., return Ethypharm's machinery. Finally, Ethypharm representatives, including U.S. counsel, stated that, under the circumstances, it appeared that in order to protect its valuable assets, Ethypharm would be forced to bring a lawsuit against Bentley in the United States.

103.    At this February 21, 2002 meeting, and in response to the concerns raised by Ethypharm representatives, Adolpho Herrera of Belmac S.A. falsely represented numerous times that Bentley and its agent, Belmac S.A., were not using Ethypharm's machinery for their own purposes; that they were not using Ethypharm's technology; that they had their own technology and machinery; and that Ethypharm's machinery was in the way. With Mr. Zuniga remaining silent and indicating his tacit agreement on all points, Mr. Herrera falsely assured Ethypharm that Bentley and its agent, Belmac S.A., did not and would not take steps to unfairly compete with Ethypharm and they had not and would not engage in unauthorized or improper use of Ethypharm machinery, technology, know-how, trade secrets or processes to manufacture Ethypharm's formulation of Omeprazole or for any other improper purpose.

104.    As yet another example, around February of 2002, Adolpho Herrera, General Manager of Bentley's agent, Belmac S.A., had lunch with Adolpho De Basillo of Ethypharm at a restaurant and falsely stated that Ethypharm's concern about the theft and misuse of its machinery and intellectual property was nonsense; that Bentley and Belmac S.A. were not using

114034

23

Ethypharm's machinery, technology or know-how for their own purpose, and that Ethypharm could have their machinery back at any time. In fact, Ethypharm made arrangements to recover its machinery and was blocked from doing so by Bentley and its agent, Belmac S.A.

105.   Ethypharm's concerns about the theft and misuse of its customers and intellectual property were also set forth directly to James Murphy at Bentley in the United States. On or about April 18, 2002, Gerard Leduc of Ethypharm sent a letter to James Murphy enclosing a statement of Ethypharm's concerns. James Murphy never contradicted the false statements of Bentley's agent to the effect that neither Bentley nor Belmac S.A. were acting to compete unfairly by stealing Ethypharm's intellectual property and Ethypharm's customers.

106.   In addition to their affirmative false statements and assurances, Bentley and its agent, Belmac S.A., omitted material facts during their numerous contacts with Ethypharm during this late 2001, early 2002 time period; namely, that they were planning to, and did, use Ethypharm's proprietary machinery, know-how, technology, processes, formulae and analytical methods to manufacture Omeprazole just as they had for the past decade but without acknowledging Ethypharm's proprietary rights.

107.   In reasonable reliance upon these false statements and omissions by Bentley and its agent, Belmac S.A., Ethypharm permitted Bentley and its agent, Belmac S.A., to keep Ethypharm's machines at Belmac S.A.'s manufacturing plant.

108.   In reasonable reliance upon these false statements and omissions by Bentley's agent, Ethypharm continued to utilize Belmac S.A. with the understanding that Bentley and its agent, Belmac S.A., would be manufacturing limited amounts of Omeprazole as necessary to service certain of Ethypharm's customers.

114034

24

A-480

109.    In reasonable reliance upon these false statements and omissions by Bentley's agent, Ethypharm did not immediately initiate legal proceedings in response to Bentley's agent's theft, misuse and misappropriation of Ethypharm's valuable intellectual property and trade secrets.

110.    Since approximately March 23, 2002, by use of the stolen Ethypharm machinery, processes, technology, trade secrets and know-how, Bentley, through its agent, Belmac S.A., has generated significant revenues from the sale of Omeprazole.  In 2002, Bentley had sales of Omeprazole within Spain of $14.8 million.  In 2003, these sales increased to $19.9 million.

111.    As a result of these fraudulent acts by Bentley and its agent, Belmac S.A., and Ethypharm's reasonable reliance, Ethypharm has suffered damages in an amount to be determined at trial.

112.    As a result of Bentley's malicious, willful, and fraudulent conduct, plaintiffs are entitled to punitive damages in an amount not less than $40 million.

### COUNT 2
(Violation of 6 Del. C. § 2001 et seq)

113.    Plaintiff repeats and re-alleges paragraphs 1 through 112 as if fully set forth herein.

114.    Ethypharm's process, "know-how" and the other intellectual property and trade secrets described herein are trade secrets under 6 Del. C. § 2002(4).  As a result of its research and development efforts, Ethypharm developed a unique process and specialized equipment to manufacture Omeprazole to its particular set of standards.  Among the other technical, analytical know-how that Bentley and its agent, Belmac S.A. have stolen, misappropriated and misused are trade secrets associated with quality assurance, production, improvements, procedures used to

25

114034

comply with GMP regulations, regulatory and other studies, pellet technology, confidential
formulae and analytic procedures used to obtain registration with the requisite health authorities,
confidential information relating to marketing approval techniques, customer contacts/lists and
pricing information.

115.    Ethypharm derived value from its access to Ethypharm's intellectual property and
confidential trade secrets, generating substantial profits between 1991 and 2002.

116.    At least part of this value was derived from the access to the proprietary nature of
the Ethypharm's process, and its access to other trade secrets and intellectual property owned by
Ethypharm that allowed Bentley and Belmac S.A. consistently to manufacture its product to
precise specifications and to produce it in such a way that created advantages over competing
products. Bentley and Belmac S.A. also improperly used Ethypharm's trade secrets and
intellectual property to develop improvements and new products such as Lansoprazole without
compensation to Ethypharm.

117.    The specific processes, trade secrets and intellectual property owned by
Ethypharm was not generally known or readily ascertainable by proper means. The process
results from Ethypharm's individual research and development efforts.

118.    Ethypharm took steps to ensure the continued confidentiality of its processes,
intellectual property and trade secrets, imposing secrecy obligations on its own employees and
providing the processes, analytical procedures, formulae, and other intellectual property to
Bentley and its agent, Belmac S.A., on the condition that they maintain its confidentiality.

119.    Bentley, through its agent, Belmac S.A., was aware that the trade secrets and
information provided to it by Ethypharm between 1991 and 2002 was proprietary. Belmac S.A.
had an affirmative obligation to preserve the confidentiality of that information.

26

114034

120.    Belmac S.A. was also aware that under its arrangement with Ethypharm, Belmac S.A.'s use of the manufacturing process and its trade secrets and intellectual property was strictly limited to products manufactured at Ethypharm's request.

121.    In the face of its knowledge of these restrictions, Belmac S.A. decided to use Ethypharm's proprietary process, trade secrets and intellectual property to manufacture Omeprazole for Belmac S.A.'s own sale and to make new products and improvements to existing products without compensation to Ethypharm.

122.    Subsequent to its unilateral termination of the manufacturing contract with Ethypharm, Belmac S.A. continued to manufacture Omeprazole using the processes, intellectual property and trade secrets it had acquired while manufacturing Omeprazole for Ethypharm under the contract. At that time, Belmac S.A. was in possession of Ethypharm's manufacturing equipment, the Omeprazole formulae, and the technical specifications for Ethypharm's proprietary manufacturing process.

123.    Such conduct constituted misappropriation of trade secrets, technical know-how, trade secrets and other proprietary information.

124.    By virtue of the conduct of Belmac S.A., acting as Bentley's agent, Bentley is liable to Ethypharm for the damages that Ethypharm has suffered as a result of Bentley's actions in an amount to be determined at trial.

## COUNT 3
### (Unjust Enrichment)

125.    Plaintiff repeats and re-alleges paragraph 1 through 124 as if fully set forth herein.

126.    Belmac's misappropriation of Ethypharm's technology, trade secrets and intellectual property allowed it to enter the marketplace and compete on an equal footing with

27

114034

A-483

Ethypharm and others, without incurring the considerable expense of developing an efficient and effective manufacturing process of its own. According to reports filed with the Securities and Exchange Commission, Omeprazole was a substantial component of Bentley's business and produced a significant share of its revenues.

127.    Further, Belmac S.A.'s actions deprived Ethypharm of the opportunity to benefit from its Omeprazole production process. Hijacking Ethypharm's technology, trade secrets and intellectual property effectively destroyed Ethypharm's ability to sell the product it had developed, effectively destroyed Ethypharm's Spanish subsidiary, and made it impossible for Ethypharm to recoup its research and development expenses and to profit from its innovation.

128.    Bentley was thereby unjustly enriched at the expense of Ethypharm and is required in equity and good conscience to compensate Ethypharm for the use of Ethypharm's property and for the losses Ethypharm incurred and continues to incur as a result of Bentley's wrongful conduct.

129.    By virtue of Bentley's conduct, and the conduct of its subsidiary Belmac S.A., acting on its behalf, Bentley is liable to Ethypharm for the damages that Ethypharm suffered as a result of Bentley's actions (including the actions of Belmac S.A. acting as Bentley's agent), and for the benefits conferred upon Bentley by its misappropriation and misuse of Ethypharm's property, in an amount to be determined at trial.

## COUNT 4
### (Intentional Interference with Actual and Prospective Business Relationships)

130.    Plaintiff repeats and re-alleges paragraph 1 through 129 as if fully set forth herein.

131.    From approximately 1992 to 2002 and before, Ethypharm worked to cultivate relationships with a number of companies to be in a position to sell Omeprazole and similar

28

114034

products that were manufactured using Ethypharm's machinery, technology, processes, formulae, analytical methods and know-how.

132.   From approximately 1992 to 2002, Ethypharm entered into economic relationships with a number of third party customers who wished to purchase Omeprazole and similar products were manufactured using Ethypharm's machinery, technology, processes, formulae, analytical methods and know-how.

133.   Throughout the period from 1992 to 2002, Ethypharm also permitted Bentley and its agent, Belmac S.A., to develop certain economic relationships with Ethypharm's prospective clients based upon the arrangement whereby Ethypharm would obtain economic benefits from the sale of Ethypharm's Omeprazole to third party customers by Bentley and its agent, Belmac S.A.

134.   Throughout the period from 1992 to 2002, Bentley and its agent, Belmac S.A., knew of Ethypharm's efforts to cultivate customers and of the economic relationships that Ethypharm developed with third parties who were purchasing – and who were interested in making future purchases – of Omeprazole and other products that were manufactured using Ethypharm's machinery, technology, processes, formulae, analytical methods and know-how.

135.   In or around March of 2002, Bentley and its agent, Belmac S.A., intentionally and improperly interfered with Ethypharm's actual and prospective economic relationships by stealing Ethypharm's proprietary machinery, know-how, technology, processes, formulae and analytical methods to manufacture Omeprazole just as they had for the past decade but without acknowledging Ethypharm's proprietary rights and without paying Ethypharm any royalty or other form of payment.

114034

29

A-485

136. Since approximately March of 2002, Bentley and its agent, Belmac S.A. has damaged Ethypharm by such interference. Hijacking Ethypharm's technology effectively destroyed Ethypharm's ability to sell the product it had developed, effectively destroyed Ethypharm's Spanish subsidiary, and made it impossible for Ethypharm to recoup its research and development expenses and to profit from its innovation. Bentley and its agent, Belmac S.A., on the other hand, have watched their profits and revenues soar as a result of the sales of the hijacked Omeprazole to actual and prospective customers of Ethypharm.

137. By virtue of Bentley's conduct, and the conduct of its subsidiary Belmac S.A., acting on its behalf, Bentley is liable to Ethypharm in an amount to be determined at trial for the damages that Ethypharm suffered as a result of Bentley's intentional and improper interference with Ethypharm's actual and prospective customers.

## RELIEF SOUGHT

WHEREFORE, plaintiff demands judgment against the defendant as follows:

(a)  On each of Counts 1 through 4, awarding plaintiffs: (1) actual, compensatory, and consequential damages in an amount to be determined but in no event less than $40 million; (2) injunctive relief; and (3) punitive damages in an amount to be determined but in no event less than $40 million;

(b)  On each of Counts 1 through 4, awarding plaintiffs their attorneys' fees, costs, expenses, pre-judgment and post-judgment interest, and such other and further relief as the Court deem just and proper.

114034

30

A-486

OCT. 4. 2004 2:37PM    BENTLEY PHARM INC                    NO. 313   P. 37

## JURY DEMAND

Plaintiff hereby provides notice of its demand for a trial by jury.

Dated:  September 27, 2004                    Respectfully submitted,

OF COUNSEL:                              MURPHY SPADARO & LANDON

Dwight P. Bostwick, Esquire
Bruce R. Grace, Esquire                  Francis J. Murphy, Esquire (No. 223)
Baach, Robinson & Lewis PLLC             1011 Centre Road, Suite 210
1201 F Street, NW, Suite 500             Wilmington, DE 19805
Washington, DC 20004                     Tel: (302) 472-8100
Tel: (202) 833-8900                      Fax: (302) 472-8135
Fax: (202) 466-5738                      E-Mail: Fmurphy@msllaw.com

31

114034

A-487

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ETHYPHARM S.A. FRANCE and )
ETHYPHARM S.A. SPAIN, )
                                 )
            Plaintiffs, )
                                 )
      v. )   Civ. No. 04-1300-SLR
                                 )
BENTLEY PHARMACEUTICALS, INC.,)
                                 )
            Defendant. )

---

Francis J. Murphy, Esquire, of Murphy Spadaro & Landon,
Wilmington, Delaware. Counsel for Plaintiffs. Of Counsel: Dwight
P. Bostwick, Esquire, of Baach Robinson & Lewis, Washington, DC.

Richard L. Horwitz, Esquire, and David E. Moore, Esquire, of
Potter Anderson & Corroon, Wilmington, Delaware.  Counsel for
Defendant.  Of Counsel: Craig E. Stewart, Esquire, and Marc J.
Goldstein, Esquire, of Palmer & Dodge, Boston, Massachusetts.

---

MEMORANDUM OPINION

Dated: September 26, 2005
Wilmington, Delaware

ROBINSON, Chief Judge

## I.    INTRODUCTION

On September 27, 2004, plaintiffs Ethypharm S.A. France and
Ethypharm S.A. Spain filed this suit against defendant Bentley
Pharmaceuticals, Inc. alleging fraud, violation of the Delaware
Uniform Trade Secret Act ("DUTSA"), unjust enrichment and
intentional interference with actual and prospective business
relationships.  (D.I. 1)

The court has jurisdiction over this action pursuant to 28
U.S.C. § 1332.  Pending before the court is defendant's motion to
dismiss for failure to join an indispensable party, pursuant to
Fed. Rule Civ. P. 19(a) and (b), and to dismiss counts one, three
and four as preempted by the DUTSA.  (D.I. 9)

## II.    BACKGROUND

Plaintiff Ethypharm S.A. France is a French corporation with
its principal office in France.  (D.I. 1 at ¶ 27)  Plaintiff
Ethypharm S.A. Spain is a majority owned subsidiary of Ethypharm
S.A. France organized under the laws of Spain with its principal
office in Madrid.  (D.I. 1 at ¶ 28)  Plaintiffs are engaged in
developing proprietary drug delivery systems and formulating,
clinically testing, registering, manufacturing, marketing and
licensing pharmaceutical products based on their drug delivery
systems.  (Id.)  Defendant Bentley Pharmaceuticals, Inc. is a
Delaware corporation in the pharmaceutical industry.  (D.I. 1 at
¶ 4)  Belmac S.A. ("Belmac") is a wholly-owned Spanish subsidiary

of defendant.  (D.I. 1 at ¶ 5)

According to plaintiffs, in the early 1990's, they entered
into an arrangement with defendant Bentley "directly and through
Bentley's agent . . . Belmac."  (D.I. 1 ¶ 5)  According to the
arrangement, plaintiffs supplied access to intellectual property
and trade secrets regarding the production, manufacture and sale
of Omeprozole and other products.[1]  (D.I. at ¶ 6)  According to
the complaint, in exchange for plaintiffs' information and

-------

[1]According to plaintiffs, the intellectual property and
trade secrets include:
   (a)  The process, know-how and machinery necessary for
        the manufacture of Omeprozole and other products
        including Lansoprazole;
   (b)  Specifications, trade secrets, and technical,
        analytical know-how associated with quality
        assurance, production and improvements of
        Omeprazole and other products including
        Lansoprazole;
   (c)  Know-how and trade secrets including procedure,
        studies and instructions necessary for Bentley
        and its agents, Belmac S.A., to obtain full
        compliance with GMP regulations relating to the
        manufacture of Omeprazole and other products such
        as Lansporazole;
   (d)  Know-how and trade secrets relating to the
        confidential formulae and analytic procedures
        necessary for Bentley and its agent, Belmac S.A.,
        to obtain registration with the requisite health
        authorities for Omeprazole and other products
        such as Lansoprazole; and
   (e)  Know-how and trade secrets relating to marketing
        approval techniques, customer contacts/lists and
        pricing information for Omeprazole and other
        products such as Lansoprazole.
(D.I. 1 at ¶ 6)  Omeprazole is a medication used in the treatment
of heart burn and acid reflux.  (D.I. 1 at ¶ 1)  Plaintiffs
include Lansoprazole sporadically in the complaint, but
Omeprazole is the product mentioned with specificity.

2

A-490

machinery, Omeprozole was manufactured exclusively for plaintiffs
at Belmac's facilities in Spain. (D.I. 1 at ¶ 54, 53, 59)
Plaintiffs allege this arrangement was negotiated by defendant
"directly and through its agent, Belmac." (D.I. 1 at ¶ 53)
Specifically, plaintiffs allege James Murphy, as an officer of
defendant, visited Spain and France to meet with plaintiffs'
representatives to discuss the arrangement. (D.I. 1 at ¶ 49)
Plaintiffs assert that Belmac entered into the arrangement at
defendant's direction and as part of a unified business strategy
developed by defendant. (D.I. 1 at ¶ 63) Plaintiffs assert that
"[a]t all times relevant to this complaint, Belmac S.A. has acted
as Bentley's agent with actual and/or apparent authority in its
interactions and communications with Ethypharm." (D.I. 1 at ¶
63)

   In its motion to dismiss, defendant argues the arrangement
with plaintiffs was negotiated completely by Belmac and Belmac
was not acting on defendant's behalf. (D.I. 10 at 3) According
to defendant, at the time of the relationship between Belmac and
plaintiffs, defendant had no role in the day-to-day operations of
Belmac and did not participate in the business relationship
between Belmac and plaintiffs. (D.I. 10 at 3) In support of
this assertion, defendant attached to its motion declarations by
Adolfo Herrera, the general manager of Belmac, and James Murphy,
chairman, president, chief executive officer and a director of

3

defendant.  (D.I. 11 at A-42, A-101)  Defendant further asserts

that the contracts and negotiations between Belmac and plaintiffs

were conducted on behalf of Belmac by its general manager, Adolfo

Herrera, and his predecessors.  (D.I. 10 at 3)  According to

defendant, it had no rights, obligations, or duties under any

agreements executed by Belmac with plaintiffs.  (D.I. 11 at 3)

Furthermore, defendant asserts "Belmac never acted on Bentley's

behalf during these negotiations or during contracting with

Ethypharm."  (Id.)

Belmac manufactured Omeprazole for plaintiffs from 1992

through 2002.[2]  (D.I. 1 at ¶ 10, 84)  Plaintiffs assert that

during this time, "Bentley and its agent, Belmac S.A., clearly

and repeatedly confirmed and acknowledged that the machinery,

know-how, processes, and technology used in the manufacturing of

Omeprazole were proprietary to Ethypharm."  (D.I. 1 at ¶ 62)  For

example, plaintiffs state that Belmac employees were required to

sign confidentiality statements to that effect.  (Id.)

Plaintiffs assert that "Bentley has been lying to the public and

to Bentley's shareholders to create the false and misleading

impression that Bentley, rather than Ethypharm, holds a

proprietary interest in the technology, trade secrets, know-how .

. . relating to the manufacture and sale of Omeprazole."  (D.I. 1

---

[2]The terms of the agreement have not been made a part of the
record to date.

4

at ¶ 68)  Plaintiffs assert that "Bentley and its agent, Belmac

S.A., embarked on a bold scheme to steal Ethypharm's machinery,

know-how, trade secrets, technology, . . . processes, formulae,

and analytical methods."  (D.I. 1 at ¶ 84)

Defendant counters, by way of declaration, that shortly

after Belmac began to manufacture Omeprazole, Belmac discovered

that plaintiffs' patented process was not adequate and, thus,

"proceeded to develop its own manufacturing process, utilizing

its own funds, including conducting all necessary clinical

trials."  (D.I. 11 at 4)  Furthermore, defendant asserts it had

no involvement in these efforts by Belmac.  (Id.)  Defendant

states that Belmac eventually developed a successful organic

process and formulation for manufacturing Omeprazole.  (Id.)

III. STANDARD OF REVIEW

Because the parties have referred to matters outside the

pleadings, defendant's motion to dismiss shall be treated as a

motion for summary judgment.  See Fed. R. Civ. P. 12(b)(6).  A

court shall grant summary judgment only if "the pleadings,

depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party

is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(c).  The moving party bears the burden of proving that no

genuine issue of material fact exists.  See Matsushita Elec.

5

<u>Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 n.10 (1986).
"Facts that could alter the outcome are 'material,' and disputes
are 'genuine' if evidence exists from which a rational person
could conclude that the position of the person with the burden of
proof on the disputed issue is correct." <u>Horowitz v. Fed. Kemper
Life Assurance Co.</u>, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal
citations omitted).  If the moving party has demonstrated an
absence of material fact, the nonmoving party then "must come
forward with 'specific facts showing that there is a genuine
issue for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (quoting Fed. R.
Civ. P. 56(e)).  The court will "view the underlying facts and
all reasonable inferences therefrom in the light most favorable
to the party opposing the motion." <u>Pa. Coal Ass'n v. Babbitt</u>, 63
F.3d 231, 236 (3d Cir. 1995).  The mere existence of some
evidence in support of the nonmoving party, however, will not be
sufficient for denial of a motion for summary judgment; there
must be enough evidence to enable a jury reasonably to find for
the nonmoving party on that issue.  See <u>Anderson v. Liberty
Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).  If the nonmoving party
fails to make a sufficient showing on an essential element of its
case with respect to which it has the burden of proof, the moving
party is entitled to judgment as a matter of law.  See <u>Celotex
Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

IV. DISCUSSION

6

If Belmac is deemed a necessary and indispensable party under Fed. R. Civ. P. 19, diversity jurisdiction would be extinguished and the case dismissed.[3]  To avoid dismissal, plaintiffs have asserted an agency theory.  If plaintiffs can establish that Belmac acted as an agent of defendant, defendant would be held vicariously liable for Belmac's acts.  Plaintiffs, in their briefs, do not contest that Belmac is a necessary and indispensable party under a Rule 19 analysis.  Rather, plaintiffs assert that Belmac is the agent of defendant and, therefore, need not be joined.  The court concludes discovery is necessary to develop this claim.

### A. Joinder of Indispensable Parties

Federal Rule of Civil Procedure 19 dictates when potential parties to an action must be joined.  The rule requires a two-step process.  First, a court must determine whether a party is "necessary."  See Fed. R. Civ. P. 19(a).  A party is necessary when,

> in the person's absence complete relief

---

[3]Joining Belmac would eliminate the basis of the court's diversity jurisdiction and warrant dismissal of the action under Rule 12(b)(1).  See Karazanos v. Madison Two Assocs., 147 F.3d 624, 626-27 (7th Cir. 1998) (citing cases for the principle that diversity does not exist when a resident of the United States and a foreign entity constitute one party and the opposing party is all foreign entities); Dresser Industries, Inc. v. Underwriters at Lloyd's of London, et al., 106 F.3d 494, 499 (3d Cir. 1997) (concluding applying complete diversity rule in suits between alien on one side and aliens and citizens on the other "makes sense").

7

> cannot be accorded among those already
> parties, or . . . the person claims an
> interest relating to the subject of the
> action and is so situated that the
> disposition of the action in the person's
> absence may . . . impede the person's ability
> to protect that interest or . . . leave any
> of the persons already parties subject to
> substantial risk of incurring . . .
> inconsistent obligations by reason of the
> claimed interest.

Fed. R. Civ. P. 19(a). Second, if diversity jurisdiction would

be destroyed by the joinder of a necessary party, the court must

determine if the potential party is an indispensable party. See

Fed. R. Civ. P. 19(b). When deciding whether a party is

indispensable, a court should consider four factors:

> [F]irst, to what extent a judgment rendered in the
> person's absence might be prejudicial to . . . those
> already parties; second, the extent to which, by
> protective provisions in the judgment, by the shaping
> of relief or other measures, the prejudice can be
> lessened or avoided; third, whether a judgment rendered
> in the person's absence will be adequate; fourth,
> whether the plaintiff will have an adequate remedy if
> the action is dismissed for nonjoinder.

Fed. R. Civ. P. 19(b).

### 1. Rule 19 Joinder

Under a Rule 19 analysis, Belmac is a necessary and

indispensable party. Belmac is a necessary party because

plaintiffs' interactions were almost entirely with Belmac and not

with defendant. Belmac will possess the necessary witnesses and

information pertinent to determining what acts were performed, by

whom, and whether the acts were wrongful. Because of its

8

conduct, Belmac may be the only party liable for the obligations under the agreement.  Therefore, complete relief cannot be afforded among the present parties.[4]  See Japan Petroleum Co. (Nigeria), Ltd. v. Ashland Oil, Inc., 456 F.Supp. 831, 836 (D. Del. 1978) (holding that when subsidiary, not parent, signed a contract, the subsidiary may be the only party liable for the obligations under the contract and is therefore a necessary party under Rule 19(a)); Freeman v. Northwest Acceptance Corp., 754 F.2d 553 (5th Cir. 1985) (holding joinder of subsidiary necessary when subsidiary was key participant in alleged conversion); Johnson & Johnson v. Coopervision, Inc., 720 F.Supp. 1116, 1128 (D. Del. 1989) (finding a wholly owned subsidiary was an indispensable party to parent's fraud and breach of contract action).

### 2. Agency

To avoid dismissal, plaintiffs assert an agency theory. Plaintiffs argue that defendant is vicariously liable for the acts of Belmac because Belmac acted as defendant's agent and, therefore, Belmac need not be joined.[5]  (D.I. 13 at 13-14)

---

[4]In April of 2005, Ethypharm S.A. Spain filed suit in the Mercantile Court of Madrid against Belmac alleging infringement of its Spanish Omeprazole patents.  (D.I. 23 at 2)  Plaintiffs would not be prejudiced by a dismissal because an alternative forum exists for them to seek judgment against Belmac.

[5]Plaintiffs also advance the theory of liability based on defendant's role as a joint tortfeasor.  However, the briefs focus solely on the agency relationship.

9

A parent company is not liable for the actions of a subsidiary solely because of the parent-subsidiary relationship. See United States v. Bestfoods, 524 U.S. 51, 61 (1998). A finding of liability requires piercing the corporate veil. Id. Prior case law establishes two distinct tests for determining when piercing the corporate veil is appropriate: (1) the alter ego test; or (2) the agency test. See, e.g., Pearson v. Component Tech. Corp., 247 F.3d 471, 484-486 (3d Cir. 2001); C.R. Bard Inc. v. Guidant Corp., 997 F. Supp. 556, 559-560 (D. Del. 1998); Mobil Oil Corp. v. Linear Films, Inc., 718 F. Supp. 260, 265-272 (D. Del. 1989). Plaintiffs assert only the agency approach.

If a parent corporation directs the allegedly infringing activity of a subsidiary, the parent can be liable for its subsidiary's infringement. The focus of this test is on "the arrangement between the parent and the subsidiary, the authority given in that arrangement, and the relevance of that arrangement to the plaintiff's claim." C.R. Bard, Inc., 997 F. Supp. at 560. In order for the parent corporation to be liable under this test, there must be "a close connection between the relationship of the corporations and the cause of action." Id.

Because it is unclear what the relationship is between defendant and Belmac, it is unclear how much control defendant has over Belmac. It is undisputed that defendant has some

10

control over Belmac because it has oversight obligations for
Belmac. (D.I. 11 at A-105 ¶ 12) At some point, it must be able
to direct Belmac's activities to fulfill these obligations.
However, it is unclear whether it directed the alleged infringing
activities at issue. Plaintiffs are entitled to discovery on
this issue. Manchak v. Rollins Enviornmental Services, Inc.,
1996 WL 790100, *4 (D. Del. 1996) (concluding discovery on the
issue of agency is warranted).

Defendant asserts that plaintiffs have not sufficiently
alleged an agency relationship in the complaint. (D.I. 17 at 2)
In federal civil cases, "a claimant does not have to set out in
detail the facts upon which a claim is based, but must merely
provide a statement sufficient to put the opposing party on
notice of the claim." Weston v. Pennsylvania, 251 F.3d 420, 428
(3d Cir. 2001). "All the Rules require is a short and plain
statement of the claim that will give the defendant fair notice
of what the plaintiff's claim is and the grounds upon which it
rests." Conley v. Gibson, 355 U.S. 41, 47 (1957) (citations
omitted); see, e.g., Lear v. Equitable Life Assurance Co. of
U.S., 798 F.2d 1128, 1131 n.4 (8th Cir. 1986) (concluding that a
statement in a complaint that person was an insurance agent
employed by defendant with either actual or apparent authority to
transact defendant's business is sufficient to plead agency in
compliance with Fed. R. Civ. P. 8). Plaintiffs' complaint

11

includes the language, "Bentley, directly and through its agent,
Belmac S.A." This language is sufficient to put defendant on
notice of plaintiffs' claim of vicarious liability for the acts
of its alleged agent, Belmac.

Therefore, defendant's motion to dismiss is denied without
prejudice to renew if, as discovery proceeds, it becomes evident
that defendant cannot be liable either as a joint tortfeasor or
under the agency test.

### B. Preemption of Common Law Claims By DUTSA

Plaintiff alleges fraud (count one), violation of 6 Del. C.
§ 2001 et seq (count two), unjust enrichment (count three) and
intentional interference with actual and prospective business
relationships (count four). Defendant moves to have counts one,
three and four dismissed as preempted by the DUTSA. The DUTSA
"displaces conflicting tort, restitutionary and other law of this
State providing civil remedies for misappropriation of a trade
secret." 6 Del. C. § 2007(a).[6] The court concludes that counts
one and three are preempted by the DUTSA, but count four cannot
be dismissed at this stage.

The court, in <u>Leucadia, Inc. v. Applied Extrusion
Technologies, Inc.</u>, 755 F.Supp. 635 (D. Del. 1991), addressed the

_____

[6]Only a few case have interpreted the displacement provision
of the DUTSA, which was adopted from the Model Trade Secret Act.
However, several other jurisdictions, with identical provisions,
have analyzed the clause. This court considers some of those
cases as illustrative.

12

issue of common law preemption by the DUTSA.  In that case, the
court noted that the legislature's professed purpose in adopting
the DUTSA was to "make uniform the law with respect to" trade
secrets.  Id. at 637 (citing 6 Del. C. § 2008).  "Section 2007
was intended to preserve a single tort cause of action under
state law for misappropriation as defined in 6 Del. C. § 2001(2)
and thus to eliminate other tort causes of action founded on
allegations of trade secret misappropriation."  Id. at 637; see
also, Savor, Inc. v. FMR Corp., 2001 WL 541484, *4 (Del. Super.
2001) (holding the "displacement" of section 2007 applies to
claims "grounded in the same facts which purportedly support the
misappropriation of trade secrets claim").  Because all claims
stemming from the same acts as the alleged misappropriation are
intended to be displaced, a claim can be displaced even if the
information at issue is not a trade secret.  Thus, a
determination of whether the information at issue constitutes a
trade secret under the DUTSA need not be addressed prior to
making a determination of displacement.  Bliss Clearing Niagara,
Inc. v. Midwest Brake Bond Co., 270 F.Supp.2d 943, 948-49
(W.D.Mich. 2003) ("[T]he Court concludes that the disputed status
of information as a trade secret does not preclude a court from
determining whether a claim or claims are displaced by the
MUTSA."); Automed Technologies, Inc. v. Eller, 160 F.Supp.2d 915,
921-22 (N.D.Ill. 2001) (rejecting the reasoning that plaintiff

13