UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

ETHYPHARM S.A. FRANCE AND
ETHYPHARM S.A. SPAIN,

                    Plaintiffs,

          v.                                    Civil Action No. 04-1300-SLR

BENTLEY PHARMACEUTICALS, INC.,

                    Defendant.

## APPENDIX TO DEFENDANT BENTLEY PHARMACEUTICALS, INC.'S

## MOTION FOR SUMMARY JUDGMENT

### VOLUME III
### (PAGES A-507 – A-703)

> John L. Reed (I.D. 3023)
> Denise Seastone Kraft (I.D. 2778)
> Joseph B. Cicero (I.D. 4388)
> **EDWARDS ANGELL PALMER & DODGE LLP**
> 919 N. Market Street, 15th Floor
> Wilmington, DE 19801
> (302) 777-7770
> (302) 777-7263
>
> *Attorneys for Defendant*

**OF COUNSEL:**

Craig E. Stewart
Joseph P. Mingolla
Veronica C. Abreu
**EDWARDS ANGELL PALMER & DODGE LLP**
111 Huntington Avenue
Boston, MA 02199
(617) 239-0100

**INDEX TO APPENDIX IN SUPPORT OF DEFENDANT**
**BENTLEY PHARMACEUTICALS, INC.'S**
**MOTION FOR SUMMARY JUDGMENT**

Page Nos.

I.   March 23, 2000 Agreements between Belmac
     and Ethypharm:

     a.   Contrato de Fabricacion                               A-1 – A-7
          (Manufacturing Agreement for omeprazole)

     b.   Carta de Compromise de Compra                         A-8 – A-12
          (Letter of Purchase Undertaking for omeprazole)

     c.   Contrato de Fabricacion – Indometacina                A-13 – A-20

     d.   Contrato de Fabricacion – Vincamina                   A-21 – A-28

     e.   Contrato de Fabricacion – Aspirina                    A-29 – A-36

     f.   Contrato de Fabricacion – Piroxicam                   A-37 – A-44

II.  November 14, 2001 Notices                                  A-45 – A-48

III. Confidentiality Agreements between Belmac and Ethypharm    A-49 – A-68

IV.  Confidentiality Agreements between Bentley and Ethypharm   A-69 – A-74

V.   Draft Agreements concerning Belmac's manufacture,
     marketing and sale of omeprazole and other pellet
     drugs to and on behalf of Ethypharm                        A-75 – A-338

VI.  Agreements between Belmac and Ethypharm's
     Customers                                                  A-339 – A-344

VII. Correspondence and Other Documents                        A-345 – A-456

VIII. Pleadings:

     a.   Complaint                                             A-457 – A-487

     b.   Memorandum Opinion dated September 26, 2005           A-488 – A-506

IX.  Declarations:

     a.   Declaration of Rafael Garcia-Palencia in Support of
          Defendant Bentley Pharmaceuticals, Inc.'s Motion
          to Dismiss                                            A-507 – A-547

|   | b. | Declaration of Adolfo Herrera in Support of Defendant Bentley Pharmaceuticals, Inc.'s Motion to Dismiss | A-548 – A-606 |
|---|----|-----|-----|
|   | c. | Declaration of James R. Murphy in Support of Defendant Bentley Pharmaceuticals, Inc.'s Motion to Dismiss | A-607 – A-615 |
|   | d. | Supplemental Declaration of Adolfo Herrera in Support of Defendant Bentley Pharmaceuticals, Inc.'s Motion for Summary Judgment | A-616 – A-619 |
|   | e. | Supplemental Declaration of James R. Murphy in Support of Defendant Bentley Pharmaceuticals, Inc.'s Motion for Summary Judgment | A-620 – A-623 |
| X. |  | Juicio Ordinario, Juzgado de lo Mercantil de Mardrid (Spanish lawsuit with translation) | A-624 – A-703 |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ETHYPHARM S.A. FRANCE & | ) | |
| ETHYPHARM S.A. SPAIN, | ) | |
| | ) | |
| Plaintiffs | ) | C.A. No. 04-1300 (SLR) |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| BENTLEY PHARMACEUTICALS, INC. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DECLARATION OF RAFAEL GARCÍA-PALENCIA IN SUPPORT OF
## DEFENDANT BENTLEY PHARMACEUTICALS, INC.'S MOTION TO DISMISS

Richard L. Horwitz (#2246)
David E. Moore (#3898)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
Telephone: (302) 984-6000

Of Counsel:
Craig E. Stewart
Marc J. Goldstein
PALMER & DODGE LLP
111 Huntington Avenue
Boston, MA 02199
Telephone: (617) 239-0100

*Attorneys for Defendant*

Dated: November 2, 2004

A-507

I, Rafael García-Palencia, declare under penalty of perjury as follows:

1.    I am a lawyer with the Spanish law firm of Alzaga, Caro, G. Palencia, Sánchez-Terán & Asociados, which was founded in 1967. I have personal knowledge of the facts stated in this declaration, and if called as a witness, could competently testify to them. I make this declaration in support of Bentley's Motion to Dismiss for Failure to Join a Necessary Party.

2.    Alzaga, Caro, G. Palencia, Sánchez-Terán & Asociados is a member of IberForo, a network of Spanish law firms providing legal advice and services throughout Spain.

3.    Since 2000, I have represented Laboratorios Belmac, S.A. ("Belmac"), a Spanish corporation headquartered in Madrid, Spain, with a pharmaceutical manufacturing facility in Zaragoza, Spain. A copy of Belmac's official articles of incorporation is attached to this affidavit as Exhibit A. Belmac is in the business of manufacturing and distributing pharmaceutical products.

**Ethypharm Legal Action in Spain against Belmac**

4.    On October 9, 2002, Ethypharm, S.A. ("Ethypharm") instituted an action pursuant to Spanish patent law in the Court of First Instance No. 72 of Madrid, Spain ("Madrid Court"), requesting that the Court investigate whether Belmac was infringing Ethypharm's manufacturing patent according to Spanish intellectual property law ("Ley 11/1986, de Patentes") and/or Spanish legislation on unfair competition ("Ley 3/1991, de Competencia Desleal"), in the Belmac manufacturing facility in Zaragoza.



2

5.      In connection with these proceedings, Ethypharm made no allegations against Bentley Pharmaceuticals, Inc. ("Bentley"), which was not even mentioned in Ethypharm's action. Ethypharm did not seek to join Bentley as a respondent in the Spanish proceedings.

6.      As part of these proceedings, the Madrid Court requested that the Court of First Instance No. 14 of Zaragoza, Spain ("Zaragoza Court") visit the Zaragoza facility. On December 19, 2002, the Zaragoza Court, accompanied by Ethypharm's lawyer and two alleged experts, visited the Zaragoza facility, made several inquiries, and obtained documents. Prior to the December 19, 2002 inspection of the Zaragoza facility, Belmac had not been aware of Ethypharm's action. Spanish intellectual property law did not require that Belmac be notified prior to this inspection.

7.      On December 30, 2002, on behalf of Belmac, we responded to this action by filing a written brief in the Madrid Court claiming that Belmac did not infringe Ethypharm's patent or trade secret rights. Our brief also argued that Ethypharm's real motive for initiating these proceedings was to uncover Belmac's confidential trade secrets regarding its manufacturing process. We also asked the Court to refrain from disclosing the results of the Court's investigation in Zaragoza to Ethypharm.

8.      On January 10, 2003, in response to these arguments, Ethypharm alleged that it needed such information in order to file a suit against Belmac. On February 3, 2003, the Judge convened both parties to a hearing. During this hearing, Ethypharm's attorney asked that the Belmac samples and documents be handed over to Ethypharm. Attorneys representing Belmac opposed this request at least partially on the basis that this



3

was an attempt for Ethypharm to gain Belmac's confidential trade secrets concerning its manufacturing processes. Belmac's samples and documents were being held by the Court in a sealed envelope to protect their confidentiality.

9.    On August 19, 2003, Belmac and Ethypharm signed an agreement whereby, on September 9, 2003, Ethypharm proceeded to dismantle and remove its machinery from Belmac's facility in Zaragoza. This dismantling and removal was duly documented in a written agreement signed in Zaragoza on September 9, 2003. This agreement included a release between the parties, in which Belmac and Ethypharm acknowledged that they had no claim to make against each other. This agreement in its original version and a certified translation into Spanish are attached as Exhibit B.

10.    On October 2, 2003, on behalf of Belmac, we informed the Madrid Court of these developments and asked the Court to dismiss the proceedings. In response, Ethypharm submitted a brief to the Court on October 15, 2003, again asking the Court for access to the documents obtained during the inspection carried out in Zaragoza. As of today's date, the Madrid Court Judge has not issued any decision in this case.

11.    In any case, regardless of the outcome of these proceedings in Spain, Ethypharm has the right to pursue claims against Belmac before the Spanish courts. Ethypharm can file a new lawsuit alleging that Belmac infringed its rights under Spanish intellectual property law and/or Spanish unfair competition law. Depending on the cause of action, Belmac could raise the release in the September 9, 2003 agreement as a defense to any such action.



4

**Belmac's Intellectual Property and Proper Location for Intellectual Property Dispute Resolution**

12.    Belmac has filed the following patents in Spain:

(a)    Patent Application No. 200100825: "Improved process for the manufacturing of stable and gastroprotected omeprazole pellets, pellets obtained thereof and other applications." This invention provides for a new formulation of omeprazole pellets. It is applicable both in human and veterinary medicine. Belmac filed this patent application before the Spanish Patent and Trademark Office ("Oficina Espanola de Patentes y Marcas") on April 6, 2001. This application was published by the Spanish Patent and Trademark Office on October 16, 2003. This patent has not been granted yet.

(b)    Patent Application No. 200002653: "Novel dispersible and soluble galenic parecetamol formulation, method for its preparation and its applications." The novel galenic paracetamol formulation consists of a base mixture of paracetamol and citric acid and can be used in human and veterinary medicine. Belmac filed this patent application before the Spanish Patent and Trademark Office on November 3, 2000. This patent was granted on September 4, 2003.



(c)    Patent Application No. 200002685: "Method for vacuum production of controlled release pharmaceuticals and/or gastrointestinal resistant pharmaceuticals." This method comprises pelletizing of an active principle by vacuum drying a mixture incorporating pharmaceutical excipients. The excipients confer gastrointestinal resistance on the pharmaceuticals. This method is especially appropriate for active principles such as omeprazole, diclofenac, aspirin, and ibuprophen. Belmac

5

filed this patent application before the Spanish Patent and Trademark Office on November 7, 2000, and the patent was granted on November 11, 2003.

(d)    Patent Application No. 200002797: "Novel galenic omeprazole tablets formulation, method for its preparation and its applications in human and veterinary medicine." The tablets made with this formulation consist on a core including the omeprazole, an isolation layer and a gastrointestinal resistant layer. Belmac filed this patent application before the Spanish Patent and Trademark Office on November 22, 2000 but it has not been granted yet.

(e)    Patent Application No.PCT/ES01/00402: "Novel dispersible and soluble galenic parecetamol formulation, method for its preparation and its applications." Belmac filed this patent on October 24, 2001 via Patent Cooperation Treaty on the basis of the Spanish patent 200002653. Belmac designated the following countries in the application: Austria, Belgium, Switzerland, Cyprus, Germany, Denmark, Spain, Finland, France, United Kingdom, Greece, Ireland, Italy, Luxembourg, Monaco, Netherlands, Portugal, Sweden and Turkey (to be examined by the European Patent Office) and Japan, Poland and United States (to be granted by the corresponding national patent offices). This patent was issued to Belmac as European Patent EP 1331001 B1 on July 21, 2004.

(f)    Patent Application No. 200300976: "Pellet formulation of acid-labil anti-ulcer benczimidazole compounds." The pellets made with this formulation consist of inert sugar/starch granules covered by three layers. They remain stable over time and are suitable for oral administration. Belmac filed this patent application before



6

the Spanish Patent and Trademark Office on April 29, 2003. The patent has not yet been granted.

       (g)    Patent application No. PCT/EP2004/050618. "Pellet formulation of acid-labil anti-ulcer benczimidazole compounds." Belmac filed this patent application before the European Patent Office, on April 27, 2004, via Patent Cooperation Treaty on the basis of the Spanish priority 200300976 above-mentioned. It has not been granted yet.

       13.    During the patent review and approval process, the Spanish Patent and Trademark Office provides third parties the opportunity to comment on the validity of the patents. The patent application filed by Belmac on April 6, 2001, which referred to the manufacturing of omeprazole (Patent No. 200100825), has been published and subjected to third-party objections. The time for such objections has ended, and the Spanish Patent and Trademark Office has not received any objections from Ethypharm contesting the validity of this patent.

       14.    Under Spanish law the Spanish Courts have jurisdiction to adjudicate claims arising out of Spanish patents or alleged violations of Spanish intellectual property law and Spanish unfair competition law. As a consequence, Ethypharm has the right to sue Belmac in Spain for allegedly violating its manufacturing patent or for otherwise unlawfully using Ethypharm's confidential information in the manufacture of omeprazole in Zaragoza.



7

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 2nd day of November, 2004 at Madrid, Spain.

Rafael García-Palencia

8



**AFFIDAVIT OF ACCURACY**

This is to certify the document, **Rimafar's Incorporation Documents, 1989,** has been translated from Spanish into English by staff members of TransPerfect Translations familiar with both the Spanish into English languages and is to the best of our knowledge, ability and belief, a true and accurate translation.



Susan Christian
TransPerfect Translations, Inc.
15 Broad St., Suite 305
Boston, MA 02109

Sworn to before me this
22nd day of October 2004

Signature, Notary Public
Commonwealth of Massachusetts
Commission Expires August 14, 2009

A-515

[left side of page]

9053   3    7885   75,425
MARGINAL NOTES          ORDER REGISTRATION NUMBER

[illegible stamp]

[handwritten:] January 10, 1989

[illegible marginal note]

[right side of page]

171

"RIMAFAR, S.A.", domiciled in El Encinar de Sol Development, 19, Ctra., Las Rozas-El Escorial, Km. 18,500 (Galapagar) Madrid.- Began operations on November 28, 1988 and will be governed by the following        BYLAWS:

## TITLE I

## GENERAL PROVISIONS

Article 1.-      This company will be named RIMAFAR, S.A., and it will be governed by these Bylaws, by the Corporations Law and by the other complementary provisions or those replacing it in the future.

Article 2.-      Its corporate purpose is-----

a)      Basic research in medicine and pharmacy to develop, patent, experiment, conduct clinical trials, health records, manufacture and market drugs and any other patent product or medicine that, in compliance with the current provisions in each country, have positive effects on the health and welfare of human beings, as well as similar activities of research, manufacture and marketing of any patent products or medicines designed to prevent and treat illnesses in the veterinary specialty.

b)      Creation and commercial exploitation of chemical products, cosmetics, beauty products and, in general, all kinds of commercial and financial operations related to or necessary for them.

c)      Promotion, construction, lease and installation of buildings designed to produce and manufacture all kinds of pharmaceutical products or patent medicines, whether developed themselves or by others.

d)      Import of pharmaceutical products and the raw materials needed to manufacture or

[left side of page]

[illegible handwriting]

[illegible marginal note]

[right side of page]

prepare in Spain the new drugs as well as to export them.

        e)      Publication of texts, books and brochures related to the corporate activity.

        f)      Development and execution of preventive sanitary plans or epidemic control plans, as well as professional consulting for Health Authorities, corporations, regional entities or governments in implementing preventive health plans or plans to combat diseases and epidemics or in planning and developing public or private health infrastructure.

        g)      Sale and export of the technology needed to obtain, prepare and manufacture the drugs or patent medicines whose patents the company holds.

        h)      Promote medical and pharmaceutical research through creating or participating in non-for-profit Scientific Foundations or study and research scholarships from allocations from its own funds.

        i)      Contracting and financing basic and applied research projects in biochemistry, medicine or pharmacy with universities, Official Research Centers and Scientific Foundations.

        j)      All legal business directly or indirectly related to the foregoing.

        Article 3.- Its duration will be indefinite and it will begin its operations on the day the articles of incorporation are signed, notwithstanding the stipulations of article 7 of the Corporations Law.

A-517

[left side of the page]

MERCANTILE REGISTER OF
VOLUME 9053
SECTION 3
BOOK
7885
PAGE 75,425

MARGINAL NOTES
REGISTRATION ORDER NUMBER

[column is blank]

[right side of page]

172

Article 4.- Its corporate domicile is established in the El Encinar Development, c/ Del Sol, 19, Ctra. Las Rozas-El Escorial, Km. 18,500 (Galspagar) Madrid.

The Management Body of the company may establish as many branches, agencies or dependencies it sees fit and to vary the corporate headquarters within the city in which it is domiciled.

## TITLE II

### ON CAPITAL STOCK

Article 5.- The capital stock is set at 5,000,000 Pesetas.

It is represented by 5,000 shares with a face amount of 1,000 Pesetas each, in numerical order from 1 to 5,000, both inclusive, and are totally subscribed and paid-in.

The Management Body of the company may determine the terms and manners in which the passive dividends will be paid, and it will also have the power to adjust the text of this article to the reality of the paid-out capital.

Article 6.- The capital stock may be increased and decreased upon agreement of the General Meeting legally called for this purpose, with the attendance quorum stipulated by Law. The General Shareholder's Meeting, at the request of the company's Management Body, will determine the terms and conditions of each new stock issue, and the Board of Directors, the Sole Administrator or the two

A-518

Joint Administrators will have the precise powers to comply with the decisions adopted by the General Meeting in this regard.

Notwithstanding the stipulations in the paragraph above, the company's Management Body has the power to increase the capital stock in the terms, time periods and conditions established in article 96 of the Corporations Law.

Article 7.- The shares, which will be in numerical order and be issued in stub books, are registered shares and will be registered in a registration book in which the name and address of each stockholder, the passive payouts made, the subsequent stock transfers and, if any, the creation of taxes thereon will be written.

In any event, the stock title will be signed by an Administrator. The signatures on the titles may also be printed, and in this case the requirements found in the Decree of February 21, 1958 or the law replacing it must be complied with.

Article 8.- The stock representing the capital stock may be transferred by all means admitted in Law.

Any shareholder, before selling his shares, must notify the President and inform him at the same time of the minimum sales price he would like to obtain, so that the President may immediately notify the other shareholders, who within thirty days from the date they receive mail certificate where the transferring shareholder notifies

[left side of page]

MERCANTILE REGISTER OF
VOLUME 9053
SECTION 3
BOOK
7885
PAGE 75,425

MARGINAL NOTES
REGISTRATION ORDER NUMBER

[column is blank]

[right side of page]

173

the President, will have the option of acquiring these shares for the same price as the one set.

If several shareholders opt to buy all or part of the shares up for sale, they will be distributed on a prorated basis in proportion to the capital stock held by the stockholders interested in acquiring them. If there is just one shareholder interested in acquiring them, he may purchase as many shares in the package up for sale as he would like.

If no shareholder opts to acquire the offered shares, the Board of Directors may acquire them, on behalf of the company, thirty days later in order to amortize them and perform the subsequent capital reduction.

If these periods expire without the Board or any shareholder using the option regulated under this article, the transfer will be freely performed.

If the transfer takes place without the formalities established above having taken place, any shareholder or the Board may retract the transferred shares, which must be done within one month's time from the day they learned about the transfer.

Until the requirements established in the paragraphs above have been complied with, the shares involved in the transfer that was not conducted pursuant to these procedures will be devoid of the right to attend the General Meetings until these procedures are complied with.

The option and retraction regulated in this article will be applicable to all transfer, including those

for profit, except for those conducted between shareholders.

Article 9.- Each share will give its holder the right to one vote, to participate in profit sharing and in the assets resulting from liquidation, the preferential right to acquire stock in the event new shares are issued, and to all the other rights inherent to being a stockholder.

## TITLE III

### ON THE GOVERNMENT OF THE COMPANY

Article 10.- The government and management of the company falls to the General Shareholder's Meeting and to the Management Body.

The Management Body will consist, as agreed by the General Meeting, of a Board of Directors, a Sole Administrator or two Joint Administrators.

Article 11.- The General Meeting is the meeting of shareholders that is duly called and constituted. Its decisions will be binding for all shareholders, even those dissenting, absent or who have abstained from voting.

Article 12.- The General Meetings may be regular or special and must be called by the company's Administrators.

MERCANTILE REGISTER OF
VOLUME 9053
SECTION 3
BOOK
7885
PAGE 75,425

MARGINAL NOTES
REGISTRATION ORDER NUMBER

[column is blank]

[right side of page]

174

CLASS 3. The General Shareholder's Meeting must be held at least once per year in the six months following the close of each fiscal year.

The Special General Meeting will meet when decided by the company's Management Body or when a number of shareholders representing at least one-tenth of the paid-in capital so request, expressing in their petition the issues to be discussed in the Meeting.

Article 12.- The General Meetings, both regular and special, must be called via a notice published in the Official Bulletin of the State and in one of the largest circulating daily newspapers in the province, at least fifteen days prior to the date set for the meeting, stating the date, if applicable, that the Meeting will be held in a second meeting notice. The notice will state the issues to be discussed.

In the event the shareholders representing at least one-tenth of the paid-out capital stock request the company's Management Body to call a Special General Meeting, it must be held within thirty days from the day the Administrators were requested by notary to call the meeting.

Notwithstanding the stipulations in the paragraphs above, the General Meeting may be held without having been called in advance if those in attendance, representing all the paid-out capital, unanimously agree to hold it.

Article 14.- The Regular or Special General Meeting will be validly constituted in the first meeting notice when the majority of the

A-522

shareholder or any number of shareholders are present if those in attendance represent at least one-half of the paid-in capital stock. In a second meeting notice, the Meeting will be valid regardless of the number of shareholders attending it.

Notwithstanding the stipulations in the paragraph above, for the General Regular or Special Meeting to validly decide to issue obligations, increase or decrease the capital stock, transformation, merger or dissolution of the company and, in general, any modification of the corporate bylaws, in the first meeting notice the shareholders of at least two-thirds of the paid-in stock must be in attendance, and in the second call to meeting, the holders of one-half of the paid-in stock.

Article 15.- All shareholders may personally attend the General Meetings or be represented by another person, even if this person is not a shareholder. The representation must be granted in writing and in particular for each Meeting.

It will be a necessary requirement for each shareholder to attend the Meetings to have deposited his shares five days before the Meeting is going to be held.

Article 16.- The Chairman of the Board, if any, or in his absence the Vice President, will preside over the General Shareholder's Meetings.

The Secretary of the Board will serve as Secretary of the Meeting.

If the Board does not attend or does not exist, the Meeting itself will elect its President and its Secretary for the meeting.

A-523

MERCANTILE REGISTER OF
VOLUME 9053
SECTION 3
BOOK
7885
PAGE 75,425

MARGINAL NOTES
REGISTRATION ORDER NUMBER

[column is blank]

[right side of page]

175

The Chairman will direct the deliberations, giving the floor in strict order to all shareholders having so requested in writing and then to those requesting verbally.

Each point of the agenda will be voted on individually. The decisions will be adopted by the majority of shares present or represented at the Meeting, each share having one vote.

Article 17.- The powers of the General Meetings are all those vested in it by the Corporations Law and, in general, all those necessary for the normal, abnormal or special development of the company, as under Law.

The following fall exclusively to the General Regular Meeting:

a)     To examine and, if applicable, approve the Report and Balance Sheet of the most recent fiscal year, along with the Statement of Profits and Losses, submitted by the Company's Management Body.

b)     To censure corporate management.

c)     To decide of the distribution of earnings.

d)     To appoint Account Auditors.

Any other issue legally or statutorily reserved for the Board may be decided on by it in its regular of special meetings.

Article 18.- The deliberations of the General Meetings, both Regular and Special, will be recorded

A-524

in minutes posted in a special registration book and will be signed by the President and the Secretary of by those persons replacing them. The minutes may be approved by the same Board following the meeting or, in its absence, within the period of fifteen days by the President and two Auditors, one appointed by the majority and one appointed by the minority.

Article 19.- The Board of Directors, the Sole Administrator or the Joint Administrators will make up the body in charge of directing, administering and representing the company, all of this notwithstanding the attributes falling to the General Meeting.

Article 20.- The Board of Directors, if the Meeting so decides to appoint one, will consist of a number of Board Members no less than 3 and no greater than 7. The determination of the number of Board Members falls to the General Shareholder's Meeting. The provisions of article 71 of the Corporations Law and complementary norms will be abided by in order to elect the Board Members.

Article 21.- It is not essential to be a shareholder to be a Board Member or Administrator.

The Board Members, the Sole Administrator or the two Joint Administrators will hold their position for the term they were appointed for by the Meeting and may be indefinite. If the term is not specified in the act of appointment, it will be understood as indefinite. The Board Members may always be reelected; the separation of their position may be agreed upon at any moment by the General Meeting.

As an exception, the administrators appointed in the articles of incorporation will hold their position for a period of

MERCANTILE REGISTER OF
VOLUME 9053
SECTION 3
BOOK
7885
PAGE 75,425

MARGINAL NOTES
REGISTRATION ORDER NUMBER

[column is blank]

[right side of page]

176

four years, but if the management body appointed is a Board of Directors, half of its members will serve for three years and the other half four years, and if it has an uneven number of members, the remainder will be calculated in the second route.

Article 22.- the Board of Directors will meet when the interests of the company so require and at least once per year. It will be called by the Chairman or by whomever holds similar duties.

The Board will be considered validly gathered when one-half plus one of its members are present or represented at the meeting.

Any Board Member may grant, in writing, his representation to another Board Member. To adopt decisions, the favorable vote of the absolute majority of the Board Members attending the meeting will be necessary, but the permanent delegation of any power of the Board Member in the Executive Committee or in the Delegated Board Member and the designation of the administrators that are to occupy these positions will require for them to be valid the favorable vote of two-thirds of the members of the Board.

Discussions and decisions of the Board will be kept in a Book of Minutes, and each minutes will be signed by the President and Secretary or by whomever replaced them.

The Secretary, even if he is not a Board Member, in addition to the functions naturally inherent to his position, will have the power to take the decisions adopted by the General Meetings or by the Board of Directors, whichever the case may be, to a notarized document.

A-526

Article 23.-    The Regular General Meeting may establish every year the form and amount of the remuneration for Administrators, within the limits established in the Law.

This participation may consist of a fixed monthly allocation, in fees for attending Board meetings or in a share of the liquid earnings, and these modalities may be simultaneous. If it is a share in the liquid earnings, its maximum amount will be 10%. In the latter case, the priorities indicated in article 74 of the Corporations Law will be met.

Article 24.-    The Board of Directors, the Sole Administrator or the Joint Administrators, if any, will be vested with the broadest powers to direct, administer, dispose of goods and represent the company, in trial and out of trial, and may execute all kinds of acts and contracts, even those involving the sale and lien on properties, financing foreign businesses or transaction with no limit whatsoever, except for the acts that the Law or these Bylaws reserve exclusively for the General Meeting.

The above powers will also be replaceable in full or in part without any limitation whatsoever in favor of Board members, and the Board of Directors, Sole Administrator of the Joint Administrators may also grant powers of attorney with the powers detailed above and revoke the substitutions and powers of attorney that have been granted.

A-527

MERCANTILE REGISTER OF
VOLUME 9053
SECTION 3
BOOK
7885
PAGE 75,425

MARGINAL NOTES
REGISTRATION ORDER NUMBER

[column is blank]

[right side of page]

177

It will have the powers including and not limited to those listed below, without this implying a restriction of the general nature of its powers.

a)    In the event there is a Board of Directors, to designate from among its members a President, a Vice President and a Secretary who may or may not be a Board Member; to designate the Board Members that are to sign the shares representing the capital stock; to name from its members an executive commission or one or several Delegated Board Members and to delegate in them, according to Law, the faculties it deems appropriate; to regulate the operation of the Board in everything that is not expressly provided for by Law or these Bylaws.

b)    To decide on calling Meetings, both ordinary and special ones, how and when they are necessary, pursuant to these Bylaws, and to prepare the Agenda and formulate the proposals that are applicable, depending on the nature of the meeting to be called.

c)    To represent the company in trial and outside of trials, in all kinds of matters and acts of an administrative, judicial, civil, mercantile and criminal nature before the State Government and Public Corporations of any order, as well as before any jurisdiction (ordinary, administrative, special, labor-related, etc.), including the Supreme Court and court of any instance, exercising all kinds of actions to defend its rights, with the express faculty of absolving positions in judicial confession, giving and granting powers of attorney to Lawyers and appointing Lawyers to represent and defend the company before said Courts and Bodies.

A-528

d)      To direct and administer the businesses, constantly taking care of the managerial aspects.

For this purpose, it will establish the rules of governing and the system of administration and operation of the company, organizing and regulating its technical and administrative services.

e)      To execute all kinds of contracts and perform acts of administration and disposition on any kind of asset or right, by way of agreements or conditions it deems appropriate, and to constitute and pay off mortgages and other encumbrances or taxes on company property, and also to waive, by way of a consideration, all kinds of privileges or rights; it may also decide on the participation of the company in other companies or corporations, undersigning shares, contributing tangible and intangible property, accepting positions and exercising as many rights as there are in favor of the company in their capacity of shareholder.

f)      To sign and act on behalf of the company in all kinds of bank operations, opening and closing checking accounts, having them available, signing checks, promissory notes or any other drafted documents or payments, intervening in exchange letters as issuer, accepting party, guarantor, endorser, endorsee or holder thereof; to open credits or securities, using any draft or money movement process; to approve balances of closed accounts, to make and withdrawal deposits or bonds, to offset accounts, to formalize changes, etc., all of this realizable with Banco de España and the Official Bank, as well as with private banking entities and any entity of State Administration. It may also

A-529

MERCANTILE REGISTER OF
VOLUME 9053
SECTION 3
BOOK
7885
PAGE 75,425

MARGINAL NOTES
REGISTRATION ORDER NUMBER

[column is blank]

[right side of page]

178

obtain all kinds of stable credits, subventions and all kinds of concessions or administrative and mercantile rights; it may take part in state, provincial, autonomous, local or private bids and auctions once the legally established requisites are met in each case.

g)    To appoint, designate and dismiss all company personnel, assigning them the applicable wages and bonuses.

h)    To substitute the above faculties, except for the ones that cannot be legally delegated, granting powers of attorney with the faculties described therein and revoking them if applicable.

## TITLE IV

### FISCAL YEAR AND PROFIT SHARING

Article 25.-    The fiscal year of the company will end on the last day of every year.

Article 26.-    The earnings resulting from each year, after all expenses and charges of the company have been deducted, after the necessary previsions have been made to pay contributions and taxes for the same fiscal year, and after the amortizations that the Management Body agrees to have been made, will be allocated, in the order and manner that the General Meeting, at the proposal of the Board of Directors, the Sole Administrator or the two Joint Administrators determine, notwithstanding what the Law provides in this regard. The amounts

[left side of the page]

Sole Administer ceased [illegible] folio 192, volume [illegible] general.- Madrid, July 24, 1989. [initials]

[right side of the page]

the Board does not give an express allocation for will be understood to be carried forward to a new account.

## TITLE V

## DISSOLUTION OF THE COMPANY

Article 27.- The company will be dissolved for any of the reasons listed in the Law.

Article 28.- The General Meeting, at the proposal of the Administrative Body, will regulate how the liquidation, division and payment of the corporate assets will be done, pursuant to Law.

The instrument was granted in the presence of: JULIAN SAN CRISTOBAL IGUARAN, of legal age, married, resident of Madrid, Paseo de la Habana 72.- ANA MARIA ALFARO MARCO, of Spanish nationality, of legal age, single, resident of Madrid, [illegible] Eslava 27.- AND CARLOS MANUEL VALOR GONZALEZ, of Spanish nationality, of legal age, married, resident of Alcobendas (Madrid), Pintor Rosales 6.- INTERVENING PARTIES: The first person mentioned appears on behalf and representation of, as Sole Administrator, the mercantile entity "INTERMEDIARIOS MERCANTILES, S.A.", of Spanish nationality and indefinite duration, with domicile in Boadilla del Monte (Madrid), Paseo de los Tilos, Velagua Development, Chalat 34, registered in the Mercantile Registry of Madrid. His appointment as Sole Administrator of the above cited Company and representative powers for this act, derived from the articles of incorporation, granted in Madrid on February 2, 1987 before Ramón Fernández Purón, number 485, and his general information is transcribed in this instrument to be recorded. And the latter two appear on their own behalf and right.- They sign and fully paid-in the capital stock in cash in the Corporate Treasury in the following manner: THE ENTITY "INTERMEDIARIOS MERCANTILES, S.A.", four thousand nine hundred ninety-eight shares, numbers 1 to 4,998, inclusive.- MS. ANA MARIA ALFARO MARCO, one share, number 4,999.- AND MR. CARLOS MANUEL VALOR GONZALEZ, one share, number 5,000.- The grantors, giving this act the nature of a Universal General Shareholder's Meeting, agreed to appoint as SOLE ADMINISTRATOR of the Company MS. ANA MARIA ALFARO MARCO, in whose favor they confer all faculties that the Corporate Bylaws assign to said position. She accepts the position and states that she is not in one of the incompatible situations discussed in Law 25/83 of December 26 and 7/84 of March 14.- A Negative Certification from the General Register of Mercantile Companies dated October 19, 1988 is attached hereto.- IN VIRTUE WHEREOF THE COMPANY NAMED "RIMAFAR, S.A." IS REGISTERED AND THE SHARE REPRESENTING THE CAPITAL STOCK ARE ISSUED, SUBSCRIBED AND PAID-IN, AND THE SOLE ADMINISTRATOR IS APPOINTED AND ACCEPTS THE POSITION.- This is the result of the first copy of the instrument granted in Madrid, November 28, 1988 before Notary José Arisónico García, number 3635, which is presented at 1:39 p.m.

MERCANTILE REGISTER OF
VOLUME 9053
SECTION 3
BOOK
7885
PAGE 75,425

MARGINAL NOTES
REGISTRATION ORDER NUMBER

[column is blank]

[right side of page]

179

on December 26, 1988, entry 946 of diary 26.- Taxes Paid.- Madrid, January the tenth, nineteen eighty-nine.

NOTE.- Due to a change of address, the history of this page continues on page 190, Volume 9,175 general, 7983 Section 3, Book of Corporations, Sector one, registration 2, page number 87,572-1.- Madrid, March the sixth, nineteen eighty-nine. [initials]

MERCANTILE REGISTER OF
VOLUME 9175
SECTION 34
BOOK 7983
PAGE 87572-1
MARGINAL NOTES
REGISTRATION ORDER NUMBER

Change of address      2

POWER OF ATTORNEY
Revoked by the 4th entry below.- Madrid, July 24, 1989.

[right side of page]

190

"RIMAFAR, S.A. ".- Comes from folio 179, Volume 9,053 general, 7,885 of Section 3 of the Book of Corporations, page number 75,425.3.

"RIMAFAR, S.A.".- Mrs. Ana María Alfaro Marco, on behalf and representation as Sole Administrator of this Company, empowered for this purpose by the General Universal Shareholder's Meeting held on February 2, 1989, in which the decisions that are being executed were unanimous voted on, according to the inserted certificate, has awarded the document registered that establishes: Change of the Company's corporate domicile, establishing it in Madrid, Calle Zubano, number 4, floor 2 left.- To modify therefore modify article four of the Bylaws so that they will read as follows: "Article 4.- Its corporate address is at 28010 Madrid, calle Zurbano number 4, floor 2 left.- The Management body of the Company may establish as many branches, agencies or dependencies it deems appropriate and vary the corporate headquarters within the same town as its domicile".- IN VIRTUE WHEREOF THE CHANGE OF ADDRESS OF THE COMPANY IS REGISTERED ON THIS PAGE, AS WELL AS THE AMENDMENT TO ARTICLE FOUR OF ITS BYLAWS.- This is shown in the instrument extended in Madrid on February 13, 1989 before Notary José Aristóico García Sánchez, number 615, which was presented in this Office last February 23, according to record number 672 of Diary 79.- Madrid, March sixth, nineteen eighty-nine. [initials]

"RIMAFAR, S.A.".- Ms. Ana María Alfaro Marco, on behalf and representation as Sole Administrator of this Company, making use of the powers vested in her by reason of her position, has issued the instrument registered GRANTING POWER OF ATTORNEY in favor of ANGEL PEREZ DE AVALA MAYORAL so that he may on behalf and representation of the Company on this sheet make use of the following powers:

1. To coordinate all kinds of contracts relative to the corporate purpose up to 5,000,000 Pesetas, lease agreements except industry leases, in the conditions that are freely determined, as well as to terminate them, charge prices, rents and fees, evict lessees, and pay contributions and taxes.
2. To sign and act on behalf of the company in all kinds of bank transactions, opening and closing checking accounts, disposing of them, signing checks, promissory notes or any other draft payment, intervening in exchange letters as issuer, accepting party, guarantor, endorser, endorsee or holder thereof; to open credits or securities, using any draft or

A-533

to make and withdrawal deposits or bonds, to offset accounts, to formalize changes, etc., all of this realizable with Banco de España and the Official Bank, as well as with private banking entities and any entity of State Administration. It may also obtain all kinds of state and autonomous credits, subventions and all kinds of administrative and mercantile concessions and rights; she may take part in state, provincial, autonomous, local or private bids and auctions after complying with the legal requirements established for each case.

3. Enter into, under conditions freely coordinated, all kinds of contracts to purchase technology and for technical assistance, as well as, in general, all kinds referring to patents, marks, models and other industrial property rights, representing the company before the Register of Industrial Property and other Agencies, national or international, related thereto.

4. To file suit and cases and claims of any kind or nature, be they governmental, administrative, economic, economic/administrative and cases under administrative law before Ministers, Economic/Administrative and Administrative Law Courts, Central, Provincial, Governmental, Civil, Treasury Delegations, Health Ministry and any other office and dependency of the State, Autonomous, Provincial or Municipal Communities, Public Corporations and Companies, with the faculties to represent the Company where

A-534

[left side of page]

MERCANTILE REGISTER OF
VOLUME 9175
SECTION 34
BOOK 7983
PAGE 87572-1
MARGINAL NOTES
REGISTRATION ORDER NUMBER

Change of address        2

POWER OF ATTORNEY
Revoked by the 4th entry below.- Madrid, July 24, 1989.

[right side of page]

it suits its interests; to hear notifications, to bring and follow recourses until the administrative proceeding has been exhausted and to continue the claim before the corresponding Economic/Administrative Court; to attend hearings and to perform whatever is appropriate according to the type of proceeding brought.

To present to the Delegations of the Housing Ministry, Treasury Delegations, National Housing Institute and any other official agency or dependency of the State, Autonomous, Provincial or Municipal Communities all kinds of instruments, instances, petitions and files, as well as to obtain all kinds of subventions and/or administrative and mercantile concessions or rights; she may collect at the State Treasury, Statutory Treasuries or their Delegations and, in general, at the Main Offices indicated above, as many amounts of subventions granted by the State, those who were formally pre-autonomous, Autonomous, Provincial and Municipal Communities, agencies with competence in relation to housing and any others, and all this for any reason; to pay the corresponding Taxes, even the Physical License, and to sign as many letters of payment instruments and receipts that are necessary or required for this purpose.

5. To intervene in suspensions of payment, bankruptcy and bankruptcy proceedings; to attend Judicial or Extra-judicial Meetings that are held; to accept or reject proposed agreements; to acknowledge and grant credits; to appoint interveners; to accept the position if nominated by the principal company; to collect

credits corresponding to the Company [illegible] the acts and decisions that are taken.

6. To claim, perceive and collect as many amounts that must be paid to the Company for any reason, and especially for failure of the Company to pay for supplies, as well as to return amounts unduly paid by reason of liquidations that have been made by the company or for another reason, regardless of what it is, and may make those claims and collect those sums even at the Public Offices of the State, Autonomous, Provincial, and Municipal communities and Official Corporations and, for this purpose, she may conduct the acts, processes and proceedings that are necessary and exercise the broadest faculties for this purpose, signing as many receipts or letters of payment that must be given in connection with the amounts so perceived.

7. Receive from the Customs office, train station, post office, telephone and telegraph office all packages, postal packages, folders with declared values, certificates, letters, telegrams and telephones, and to sign correspondence, invoices, insurance policies for fire or other kinds, manifests, bills of lading and other similar documents.

8. To represent the Company before the Customs Administrations and any official offices and dependencies regarding all kinds of imports and exports and, for this purpose, to perform the necessary acts and processes; to present and sign petitions, waybills and as many instruments and documents that are necessary to duly perform her duties, file protests, make deposits and [text ends here]

A-536