Name change

[illegible stamp]

[left side of page]

[no preceding page]

with the appropriate entities, the provision by these of guarantys, bonds or avals on all kinds of documents, public or private, as well as to sign on behalf of the guarantor entity the corresponding guaranty policy or counter-guaranty.

5.-    To claim, perceive and collect as many amounts that must be paid to the company for any reason, and especially for failure to pay for supplies made by the company, as well as to return amounts unduly paid by reason of liquidations that have been made by the company or for another reason, regardless of what it is, and may make those claims and collect those sums even at the Public Offices of the State, Autonomous, Provincial, and Municipal communities and Official Corporations and, for this purpose, she may conduct the acts, processes and proceedings that are necessary and exercise the broadest faculties for this purpose, signing as many receipts or letters of payment that must be given in connection with the amounts so perceived.

6.-    To receive from the Customs office, train station, post office, telephone and telegraph office all packages, postal packages, folders with declared values, certificates, letters, telegrams and telephones, and to sign correspondence, invoices, insurance policies for fire or other kinds, manifests, bills of lading and other similar documents.

7.-    To represent the Company before the Customs Administrations and any official offices and dependencies regarding all kinds of imports and exports and, for this purpose, to perform the necessary acts and processes; to present and sign petitions, waybills and as many instruments and documents that are necessary to duly perform her duties, to file protests, make deposits and income of any nature; file claims against liquidations made and request the return of amounts unduly paid.

8.-    To represent the company in court and outside of court, in all kinds of matters and administrative, judicial, civil, mercantile and criminal actions, before the State Administration and Public Corporations of all orders, as well as before any ordinary, administrative, special, labor-related and other jurisdictions, even the Supreme Court and any instance, exercising all kinds of actions to defend its rights, with the express power to absolve positions in judicial confession, giving and granting powers to the Public Defenders and appointed Attorneys to represent and defend the company before said Courts and Agencies.

9.-    To file and bring suit and claims of any kind or nature, be they governmental, administrative, economic, economic/administrative and courts of administrative law, before the Ministries, Economic/Administrative Courts and Courts of Administrative Law, State, Provincial, Civil Government, Delegations of [illegible] and any other offices and dependencies of the State, Autonomous, Provincial, or Municipal Communities, Public and [illegible] Corporations, with the power to represent the company when it is suitable to its interests; to hear notifications, to file and follow recourses until the administrative proceeding has been exhausted, and to [illegible] the

claim before the corresponding Economic/Administrative Court; attend hearings and to perform whatever is appropriate according to the type of proceeding brought.

10.-    To intervene in suspensions of payments, bankruptcy and bankruptcy proceedings; to attend Judicial or Extra-judicial Meetings that are held; to accept or reject proposed agreements; to recognize and grant credits; to appoint interveners; to accept the position if appointed by the principal company; to collect the [illegible] corresponding to the [illegible] or object to [illegible]

11.-    To hire and dismiss employees and workers and to set their salaries and remunerations; to organize and distribute work.

IN WITNESS WHEREOF, THE DIVISION, APPOINT AND ACCEPTANCE OF SOLE ADMINISTRATOR AND THE REVOCATION AND CONCESSION OF POWER OF ATTORNEY IS RECORDED.- This is taken from the copy of one instrument issued in Madrid on July 5, 1989 before Notary Jose Aristonico Garcia Sanchez, number 2584, which was presented at 10:42 a.m. last July 18, according to entry 1075 of the diary [illegible].- Madrid, July twenty-fourth, nineteen eighty-nine.- [initials]

[illegible] four thousand seventy-five pesetas.

"LABORATORIOS BELMAC, S.A.", formerly "RIMFAR, S.A.".- Mr. Angel Perez de Ayalo Mayoral, in representation of the company as its Sole Administrator, especially empowered vial a unanimous agreement of the General Universal Shareholder's Meeting in its meeting held on January 28, 1992, who minutes were approved on the same date, according to the inserted certification, has issued the instrument that is registered so that the name of the company be changed to "LABORATORIOS BELMAC, S.A.". The wording of Article 1 of the Corporate Bylaws is amended to read as follows: "ARTICLE 1.- This company will be named "LABORATORIOS BELMAC, S.A." and will be governed by these Bylaws, by the Corporations Law and by those complementary ones or those replacing them in the future. Certification of the Main Mercantile Registry is inserted on the line with the

[left side of page]

CAPITAL INCREASE
[illegible stamp]

[right side of page]

[top half is illegible]

by the attached document, prepared in English, along with its Spanish translation, prepared by Ms. Maria Luisa Ferre Sole, Sworn Interpreter/Translator, on May 4, 1993, duly notarized by Notary Public of the State of Florida, USA, Ms. Maribel [illegible] Noriega, in which the following is recorded: The company Belmac Corporation appoints as its representative on the Board of Directors of the company on this sheet Mr. Marcus Stephen Ayers, as has been consigned in its corresponding place, and by means of the enclosed minutes authorized on February 7, 1992 by Madrid Notary Ms. Maria Rosario Algora Wesolowski, number 344, in which it is recorded that the company Belmac Europe SA appoints as its representative to the company of this sheet Mr. Merva Michel Francois Malsonneuve, as consigned in its corresponding places.- These gentlemen accept their positions.- IN WITNESS WHEREOF THE DECISIONS STATED ABOVE ARE RECORDED.- This is copies from the instrument notarized by MADRID Notary ALGORA WESOLOWSKI N. ROSARIO on FEBRUARY 7, 1192, bearing the number 349 of her Protocol. Another instrument notarized by MADRID Notary ALGORA WESOLOWSKI M. ROSARIO on FEBRUARY 7, 1992, bearing the number [illegible] of her Protocol, presented in this Registry at 10:24 a.m. on MAY 6, 1993, bearing the number 1483, as recorded under 544 in Diary 350.- Madrid, on MAY THE TWENTIETH, NINETEEN NINETY-THREE.
[illegible] [initials]
SEVEN THOUSAND ONE HUNDRED pesetas.

7        "LABORATORIOS BELMAC SA",.- VOLTA TORRAS ANTONIO, on behalf and representation of the Company of this Sheet, as Secretary non-board member thereof and empowered by the UNIVERSAL GENERAL SPECIAL SHAREHOLDER'S MEETING in its meeting held on FEBRUARY 11, 1991, executes the following decisions: UNIVERSAL GENERAL SPECIAL SHAREHOLDER'S MEETING of FEBRUARY 11, 1991, decisions adopted unanimously; CAPITAL INCREASE. Subscribed capital [illegible] totally paid-in. The above cited amount of capital is represented by the issue of eighty-five thousand regular ordinary shares,

[left side of page]

MERCANTILE REGISTER OF
VOLUME 9175
SECTION 34
BOOK 7983
PAGE 87572
MARGINAL NOTES
REGISTRATION ORDER NUMBER

[illegible stamp]

[right side of page]

numbered consecutively from 5,001 to 90,000, both inclusive, with a fact value of one thousand pesetas each. After all other shareholders waived their preferential right to subscribe the shares issued, they are subscribed and paid-in by the company Belmac Europe S.A., who deposits their amount in the Corporate Safe, as verified by the corresponding certificate of deposit into checking account number 10.002202.4, open in the name of this company at the office located in Madrid of Banco Bankinter, Paseo de la Castellana 123; another certificate issued by Societe Generale Branch in Spain is inserted which also shows the contribution abroad. As a result of the above, article 5 of the corporate bylaws is AMENDED to read as follows: ARTICLE 5.- The capital stock is set at ninety million pesetas. It is represented by ninety thousand shares of one thousand pesetas face value each, consecutively numbered from 1 to 90,000, both inclusive, and are totally subscribed and paid-in. IN WITNESS WHEREOF the decisions stated above to INCREASE THE CAPITAL is REGISTERED. THIS IS TAKEN from a copy of the instrument notarized by BARCELONA Notary VENTURA TRAVESET HERNANDEZ ANTONIO on MAY 4, 1992, bearing the number 1126 of his Protocol. A certification issued by VOLTA TORRAS ANTONIO is made public with the approval of HENRY HERMET JEAN PIERRE, whose signatures are duly legalized. A copy is presented to this Registry at 10:24 a.m. on MAY 6, 1993, bearing the number 1484, as found in presentation entry 545 of Diary 350.
Fees Paid NINETY-FOUR THOUSAND FIVE HUNDRED pesetas. [signature]

NOTE: FOR ADAPTATION PURPOSES, the history on this sheet is continued on page 60, volume 6271, sheet number M-102225, registration 8.- Madrid, May 31, 1993.- [initials]

A-540

[left side of the page]

NAMING

Regulatory information sent to the Mercantile Registry.- Madrid, June 29, 1999.

[right side of page]

RICHARD MURPHY.
    THE SECRETARY, NON-BOARD MEMBER, IS: MR. JOSE MARIA ESTEVE SERRANO, whose personal data is found in the Mercantile Registry. His position is ratified for the period of five years from this date.
    Those appointed accept their respective positions.

IN WITNESS WHEREOF I REGISTER the decisions expressed above regarding NAMING.- TAKEN from a copy of the instrument notarized by MADRID Notary VALLEJO ZAPATERO RAFAEL, on FEBRUARY 3, 1999, bearing the number 357 of his Protocol. Copy presented at this Registry on FEBRUARY 11, 1999 with the number 4614, according to the presentation entry 1111 of Diary 852.- WITHDRAWN DUE TO A DEFECT on FEBRUARY 22, 1999. REENTERED OFFICIALLY on MARCH 5, 1999.- Madrid, March tenth, nineteen ninety-nine.
[signature]
Fee [illegible]

    35    "LABORATORIOS BELMAC SA".- Mr. James Richard Murphy, on behalf and in representation of the company, as Delegated Board Member thereof, making use of the powers vested in him by reason of said position, granted the instrument registered which reads:

    It CONFERS POWER OF ATTORNEY in favor of Mr. ADOLFO HERRERA MALAGA, of legal age, married, resident of Las [illegible], Madrid, c/ Esparta [illegible], with Identity Document number [illegible], so that he may on behalf and in representation of "Laboratorios Belmac, S.A." perform the following powers:
    1.-    Convene, coordinate, execute and comply with all contracts referring to the corporate purpose, directly and indirectly. Direct, abide by and govern the businesses, tangible and intangible property, rights and, in general, the assets of the company, and in this sense ensure that the properties are well taken care of. To exercise and comply with all kinds of rights and obligations; [illegible], stipulate and liquidate contracts of any type, even lease agreements, insurance contracts, labor and transport agreement. Appoint, [illegible] and dismiss all kinds of employees and workers for the company and establish their salaries, retributions, labor regulations and rules of situation and action. Attend Meetings of any kind, with the power to deliberate and vote. To open, create and sign correspondence. To remove from the Postal and Communications Office any letters, certificates, dispatches, packages, postal drafts or telegraphs or declared securities, and from the train company, [illegible] transport in general. In addition, [illegible] merchandise and file protests of [illegible], take part in biddings and auctions, both public and private, and accept awards, signing instruments involving the agreements established, even to subsequently send them to third parties; all of this is with full liberty and broad [illegible], agreements, conditions and determinations, without any limitation whatsoever.
    2.-    To issue, accept, guaranty, endorse, [illegible], pay, intervene, negotiate and discount letters of exchange, checks, stubs and other draft documents. To formulate as many [illegible] and protests for failure to accept payment or guaranty or for better security up to a maximum limit of TWENTY MILLION PESETAS [20,000,000] per transaction.

A-541

3.- To endorse, guarantee and finance all kinds of transactions, debts and obligations and loans on account of and in representation of the company, with no limitation whatsoever as for time or amount, from individuals, banks, even from the Bank of Spain, [illegible], savings accounts and Pawn Shops and others pertinent ones, and to sign and accept and grant for the stated purposes the instruments, policies, letters and public and private documents required, without any limitation whatsoever, up to a maximum limit of TWENTY MILLION PESETAS (20,000,000) per transaction.

4.- To operate with Official Funds, Savings Funds

A-542

[left side of page]

MERCANTILE REGISTER OF
VOLUME 6271
SECTION 8
BOOK
PAGE M-102225
MARGINAL NOTES
REGISTRATION ORDER NUMBER

[right side of page]

and Pawn Brokers and banks, even the Official Bank, doing everything legislation and bank policy permit. To open, follow, dispose of, use and cancel in Banca de España, in any branch or at any other Bank or Credit or Savings Establishment, as many ordinary accounts or credit accounts needed, apply for and obtain loans with personal collateral, for securities for commercial purposes and Safety Deposit Boxes. To approve and object to as many debts, credits, collections, balances and liquidations. To acquire under any title securities, collect their dividends and amortizations and sell their coupons. To modify, transfer, [illegible], withdraw and make deposits in cash or in provisional or definitive securities up to a maximum limit of [illegible] pesetas per transaction.

5.-    To request, sign and [illegible] checks, [illegible], transfers and other documents and pick up check books from any Bank or Credit or Savings Institution, as well as to acknowledge and pay debts, accept and collect credits, both for principle and interest, dividends and amortizations; to approve and reject accounts; to accept payments and [illegible] awarded by any title and on behalf of or against any person, entity or Corporation, including the State, Autonomous, Provincial or Municipal [illegible] and Official Agencies or individual or artificial persons, public or private, signing receipts, balances, confirmations, requirements and letters of payment, up to a maximum limit of TWENTY MILLION PESETAS per transaction.

6.-    To dispose of, alienate, sell, transfer, barter, buy, acquire, encumber, mortgage and contract, actively or passively, all kinds of property, patents, registrations, brand names and vehicles, [illegible] in such sense with the conditions and for the cash price, [illegible]. To exercise, grant, concede and accept [illegible], sales, transfers, alienations, acquisitions, permutations, contributions, assignments in payment or for payment, up to the maximum limit of [illegible] MILLION PESETAS [illegible] per transaction.

7.-    To coordinate, perform and rescind joint ventures or intervene in companies, civil or mercantile, both in the constitution phase and thereafter, and accept, perform and resign from the applicable positions.

8.-    To represent the company before the Ministry of the Economy and Treasury, [illegible] in all and every one of the Autonomous Communities, Delegations and Sub-Delegations, tax collection or payment offices and before any [illegible] or Entity or Dependence of such competence; and for this purpose to receive freely any amounts that for any other concept the Company is to receive; to pay contributions and file claims against issues that are not acceptable; to sign affidavits or instances and to file and follow all kinds of recourses through all proceedings, and to grant letters of payment and sign receipts.

9.-    To appear before and act with full legal standing representing the Company as petitioner, grantor, deponent, plaintiff, defendant, assistant, complainant or any other concept in granting, provisions, matters, acts of conciliation, lawsuits, causes, claims, processes, actions of any kind; before all types of Ministries, Departments, Institutes, Offices and dependences of the State, Province and Municipality, Courts, Tribunals, Authorities and Labor Registers, [illegible], Unions, Delegations, Committees, Board, Juries, [illegible], officers and any other Civil,

Criminal, Mercantile, Administrative, Government or Labor center of any other nature, order or degree, in all their jurisdictions, degrees or instances, intervening even before the Constitutional Court, and for all kinds of matters, issues, processes, proceedings, processes or instances, until the complete [illegible] and completion of the provisions, granting, decisions, solutions, resolutions, sentences, conclusions and final rulings, with all kinds of powers and possibilities, including to [illegible], file ordinary and extraordinary recourses, and also to [illegible], review and nullify, file exceptions and defenses, gather testimonies, copies and certifications or [illegible]; to request and process all kinds of proceedings until the [illegible] in the instruments; to request, [illegible] and accept [illegible], to prepare notary minutes and intervene in the [illegible]

and notifications and to respond to them; to dismiss actions and appeals or recourses taken and [illegible] waivers and [illegible], as well as all kinds of processes and proceedings brought, and to even make declarations, absolve positions and remove [illegible] and bonds. To represent the company in arrangements with creditors, suspension of payments, [illegible] and bankruptcy of debtors; to attend Meetings, [illegible] and administrators, to perform all positions, accept and reject the proposals of debtors, [illegible] processes until the end of the proceeding. To transfer rights and shares; to [illegible] arbitrators of equity, settlement of third parties, etc., all of this with full powers and competence, without [illegible] or limitation of any kind, granting for this purpose powers of attorney to Public Defenders and Attorneys with the usual powers of the procedural power of attorney.

10.-    To request from any Public Register all kinds of entries, registrations, certifications or any other document; to request copies of any instruments granted by the company, even of this power of attorney.

11.-    To exercise, waive and revoke powers conferred and awarded and revoke powers of representation of the Company, with the powers indicated among these powers, and may grant powers to Public Defenders and Attorneys with the powers indicated in the general power of attorney.

12.-    And to sign and award as many documents, public or private, affecting the interests of the Company under any title, event or affect, or by virtue of the powers granted.

IN WITNESS WHEREOF I REGISTER THE DECISION REGARDING GRANTING POWERS OF ATTORNEY. Taken from a copy of the instrument notarized by MADRID Notary VALLEJO ZAPATERO RAFAEL, on JUNE 15, 1999, bearing the number 2759 of his Protocol. Copy presented at this Registry on JUNE 24, 1999 with the number 6364, according to the presentation entry 285 of Diary 889.- Madrid, June twenty-eighth, nineteen ninety-nine. [signature]
Fee [illegible]

36    "LABORATORIOS BELMAC S.A." Mr. James Richard Murphy, on behalf and in representation of this Company, as Delegated Board Member thereof, and making use of the powers vested in him by reason of said position, granted the instrument registered whereby it REVOKES the powers of attorney granted on behalf of MR. JOSE LUIS MONTEROE MORAD via the instrument notarized on July 19, 1996, bearing the number 1,917, originating in registration 30 of this sheet. It also revokes the one granted in favor of MR. CLEMENTE GONZALEZ AZPEITIA via the instrument notarized on July 19, 1996, bearing the number 1916, which originated registration 32 of this sheet.- IN WITNESS WHEREOF I REGISTER the decisions expressed above regarding REVOCATION.- TAKEN from a copy of the instrument notarized by MADRID Notary VALLEJO ZAPATERO RAFAEL, on NOVEMBER 29, 1999, bearing the number 5217 of his Protocol. Copy presented at this Registry on DECEMBER 15, 1999 with the number 4036, according to the presentation entry 526 of Diary 931.- Madrid, December twenty-eighth, nineteen ninety-nine. [signature]
Fee [illegible]

36    "LABORATORIOS BELMAC SA", Mr. James Richard Murphy, on behalf and representing this Company as Delegated Board Member thereof and making use of the powers vested in him by said position issued the instrument registered as follows:

POWER OF ATTORNEY is granted to Mr. ADOLFO HERRERA MALAGA, of legal age, married, resident of Madrid, Calle Julio Palacios, 24, with Identification Card Number [illegible] S, so that, on behalf and in representation of "Laboratorios Belmac, S.A.", may use the following powers:

A-545

a)    To operate with Official Funds, Funds of [illegible] [no continuation]

05/08 '04 20:26 FAX 915218782          IBERFORO                              ☑029

Laboratorios Belmac, s.a.

In Zaragoza 09.09.03

Gathered on the 09.09.03, in the facilities of Laboratorios Belmac S.A. located in Poligono Industrial Malpica c / C nº 4, on behalf of Laboratorios Ethypharm, Mr. Igoact and Mr. Brisset, and on the part of Laboratorios Belmac, Mr. Cubedevilla and Mr. Caballero, they agree:

1.- According to the technical document signed on 19.08.2003, by Mr. Adolfo Herrera on behalf of Laboratorios Belmac and by Msr. Christin Faugère on behalf of Laboratorios Ethypharm, dated on 19.08.2003 it began the disassembly of Ethyfarm's machinery that is detailed in point 2 of this document, being concluded on 09.09.2003.

2.- That the retirement machinery by Laboratorios Ethypharm of the facilities of Laboratorios Belmac S.A., has been the following ones:

1 GS HP/F300 Nº FAB. HPT 1188 with the auxiliary equipment.

1 GS HT / M 300 Nº FAB.HTT 1132.

2 VIBRATING CALIBRATOR C'LA MASTRA DE 500 l.

2 DRYERS MACHINES MOD. MN 502

1 PRESSURE DOMB DEVILBISS (Ethypharm decides its destruction).

1 VIBRATING CALIBRATOR BRAND VIBRO WEST MOD. WESTON 505

3.- Laboratorios Belmac S.A. and Ethypharm Laboratorios recognize that in the retirement of the machinery and the reparation of the facilities, there is not any object of vindication by any of the parts.

4.- Both companies recognize not to have anything but that to complain to each other which they sign in Zaragoza on 09.09.2003.

LAB. BELMAC, S.A.                                    LAB. ETHYPHARM

Mr Cubedevilla                                       Mr. Igonet

2/2

**BELMAC**                                                                A-547

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ETHYPHARM S.A. FRANCE & ETHYPHARM S.A. SPAIN, | ) ) ) |
| Plaintiffs | ) ) C.A. No. 04-1300 (SLR) |
| v. | ) **JURY TRIAL DEMANDED** ) |
| BENTLEY PHARMACEUTICALS, INC. | ) ) |
| Defendant. | ) ) |

## DECLARATION OF ADOLFO HERRERA IN SUPPORT OF DEFENDANT BENTLEY PHARMACEUTICALS, INC.'S MOTION TO DISMISS

Richard L. Horwitz (#2246)
David E. Moore (#3898)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE  19899-0951
Telephone:  (302) 984-6000

Of Counsel:
Craig E. Stewart
Marc J. Goldstein
PALMER & DODGE LLP
111 Huntington Avenue
Boston, MA 02199
Telephone: (617) 239-0100

*Attorneys for Defendant*

Dated:  November 4, 2004

1

I, Adolfo Herrera, declare under penalty of perjury as follows:

1.    I am the general manager of Laboratorios Belmac, S.A ("Belmac"). I have been the general manager since June 1999. I have personal knowledge of the facts stated in this declaration, and if called as a witness, could competently testify to them. I make this declaration in support of Bentley's Motion to Dismiss for Failure to Join a Necessary Party.

### Structure and Organization of Laboratorios Belmac, S.A.

2.    Laboratorios Belmac, S.A. ("Belmac") is a Spanish corporation that was incorporated in 1988, originally known as Rimafar, S.A. In 1992, Bentley acquired Rimafar and subsequently renamed the Spanish company Laboratorios Belmac, S.A. Belmac is a wholly owned subsidiary of Bentley. Belmac manufactures and distributes pharmaceutical products.

3.    Even though Belmac is a wholly owned subsidiary of Bentley, Belmac is capitalized separately from Bentley and conducts its day-to-day operations independently of Bentley. Belmac has its own management team and personnel, assets, expenditures, investments, budget, liabilities, intellectual property, and bank accounts. Belmac has the authority to issue its own stock, may seek its own capital and is not dependent on Bentley for funding. Belmac elects its own board of directors during its general shareholders' meeting. Belmac is responsible for its own borrowing. Bentley has never guaranteed Belmac's debts.

4.    Belmac has 312 employees in Spain. Belmac pays these employees from its own bank accounts. Belmac hires its own employees and makes employment decisions regarding these employees, including salaries.

2

A-549

5.      As the general manager of Belmac, I have significant autonomous authority over the operations of Belmac.  The extent of my authority is contained in the delegation of power from the Belmac board of directors, which is required under Spanish law.  In June and November 1999, the Belmac board authorized me to exercise the following powers, among others:

      (a)      execute and comply with contracts related to Belmac's business;

      (b)      enter into encumbrances, liens and any other guarantees;

      (c)      open and maintain bank accounts;

      (d)      buy and sell all kinds of goods and intellectual property up to 20 million pesetas per transaction;

      (e)      enter into joint ventures;

      (f)      represent the company before the Spanish Ministry of the Economy and Treasury; and

      (g)      institute and defend legal actions and claims;

6.      The Belmac board had granted similar delegations of powers to myself and my predecessors throughout the time that Belmac interacted with the Spanish company Ethypharm S.A. ("Ethypharm").

7.      I am responsible for negotiating contracts with raw material suppliers, purchasers of pharmaceutical products, and joint ventures.  I make employment decisions, including establishing salaries.  I review and approve patent applications and manage the application

3

process. I am responsible for interaction with the various Spanish regulatory authorities. I represent Belmac's legal interests before courts and public authorities.

8.     Throughout my tenure I have maintained, and continue to maintain, day-to-day control over the operations of Belmac and need not seek authorization or direction in the day-to-day operation of the Zaragoza plant from the Belmac board or Bentley. Indeed, I need not and generally do not consult with Belmac's board or Bentley unless I will exceed the delegation of responsibility.

9.     Belmac prepares its own financial statements, which are audited by Deloitte and Touche S.A., a Spanish company. These financial statements are filed with the proper authorities in Spain. Belmac negotiates its own agreements and contracts and does not need Bentley's approval to do so unless the size of those contracts will exceed the thresholds established in the delegation of responsibilities.

10.     Belmac owns an 80,000 square foot facility in Zaragoza, Spain, which houses its manufacturing plant, warehouse, research and development laboratory, and office space.

**Directors and Officers of Belmac and Bentley**

11.     One of the three directors and all of the senior management team of Belmac are distinct from Bentley. The members of Belmac's board are: James Murphy, Michael Price and myself. The senior management officers of Belmac are: Ignacio Moreno Alonso (Commercial Director), Juan Carlos Asensio (Technical Director), Esther Sánchez Gómez (Finance Director), Antonio Cabodevilla Ilincheta (Industrial Operations Director), Paloma Rodríguez-Yrizabal Sánchez-Cendal (Financial Controller), Jorge Espinoso Fernandez (Secretary and Lawyer) and myself. These officers are in charge of Belmac's operations. Belmac's board of directors has

4



A-551

not made any decisions on the company's operations in the last few years. In fact, since 1999, Belmac's board of directors has only met when required by Spanish law. Bentley's board of directors does not control or direct Belmac's operations.

**Belmac's Relationship with Ethypharm and Belmac's Production of Omeprazole**

12.     Commencing in 1992, Belmac entered into an arrangement with Ethypharm regarding the production of omeprazole. Omeprazole is a pharmaceutical product used to prevent ulcers and to treat other conditions where the stomach produces too much acid. In order to be effective, the omeprazole compound must be protected from degradation by stomach acids in order to reach the intestine, where the medicine is required, and some methods for coating the omeprazole are patented.

13.     From 1992 through March 2000, Belmac and Ethypharm did business pursuant to an oral agreement through which Belmac dedicated a portion of its pharmaceuticals manufacturing plant in Zaragoza, Spain, to the manufacture of omeprazole for Ethypharm. In the beginning of the relationship, Ethypharm provided Belmac with Ethypharm's patented manufacturing process for making omeprazole and provided Belmac with some of its own machinery for manufacturing omeprazole micro-pellets. The relationship was advantageous for Ethypharm because it had no facilities to manufacture pharmaceuticals in Spain and it could not export omeprazol from France and, therefore, relied upon Belmac to perform the qualification, manufacturing and exporting of omeprazole from Spain on behalf of itself to Ethypharm customers. Belmac had to prepare its technical operating guide in order to obtain the Spanish Ministry of Health approval to manufacture and commercialize omeprazole in Spain based on Ethypharm's manufacturing process.

5



A-552

14.     Shortly after Belmac began to manufacture omeprazole, Belmac observed that Ethypharm's patented process was not adequate to guarantee the quality of the pellets. Belmac then proceeded to develop its own omeprazole manufacturing process. Belmac used its own funds to finance the manufacture of omeprazole and the necessary clinical trials of the omeprazole manufacturing process that Belmac developed. Eventually, Belmac developed a successful organic process and formulation for manufacturing omeprazole. Through its continued research and development efforts, Belmac also developed a successful aqueous formulation and process for manufacturing omeprazole. Belmac has applied for patents on both its organic and aqueous omeprazole processes and formulations. Bentley had no involvement in these matters.

15.     From time to time, Belmac and Ethypharm signed confidentiality or nondisclosure agreements. A copy of one such confidentiality agreement, dated September 30, 1998, is attached hereto as "Exhibit C." Bentley was not a party to the confidentiality or nondisclosure agreements between Belmac and Ethypharm regarding omeprazole.

16.     As a result of its newly developed processes for the manufacture of omeprazole, Belmac filed amendments to its initial submission to the Spanish Ministry of Health, and obtained new approvals for the manufacture of omeprazole in Spain. In addition, Belmac owns and maintains the registration files for more than forty compounds that Belmac filed with the Spanish Ministry of Health. The Spanish Ministry of Health's approvals of Belmac's filings for omeprazole were issued in Belmac's name for the manufacture and distribution of omeprazole in Spain. Copies of the Certificates of Approval from the Spanish Ministry of Heath are attached hereto as "Exhibit D."

6

A-553

17.    Throughout its arrangement with Ethypharm, Belmac used Ethypharm equipment to manufacture omeprazole in Zaragoza for Ethypharm's customers. In addition, Belmac later purchased its own equipment, which it used to manufacture omeprazole for its own customers.

18.    As Belmac's general manager, I negotiated and signed the first and only integrated written agreement between Belmac and Ethypharm for Belmac's manufacture of omeprazole for Ethypharm and its customers ("Manufacturing Agreement"). A copy of the Manufacturing Agreement, dated and signed on March 23, 2000, is attached hereto as "Exhibit E." The Manufacturing Agreement explicitly states that it "shall not limit the manufacture of [omeprazole] on the part of BELMAC for its own market and that of its clients." The Manufacturing Agreement was for a term of two years, and was extendible unless one of the parties gave notice of termination four months prior to the agreement's expiry.

19.    In addition to the Manufacturing Agreement, I also negotiated and signed a Letter of Purchase Undertaking on March 23, 2000 (also attached hereto as "Exhibit F").

20.    In November 2001, Belmac determined that it would not renew its Manufacturing Agreement with Ethypharm. As a result, I wrote a letter to Ethypharm on November 14, 2001 giving notice of Belmac's intent to terminate the Manufacturing Agreement. A copy of this letter is attached hereto as "Exhibit G." In that letter, I expressed my willingness to negotiate with Ethypharm for Belmac's continued supply of omeprazole to Ethypharm after the expiration of the Manufacturing Agreement.

21.    In February 2002, I engaged in negotiations with Ethypharm regarding the possibility of Belmac's continued supply of omeprazole to Ethypharm after the expiration of the Manufacturing Agreement in March 2002. During these negotiations, Belmac offered to supply

7

A-554

its own omeprazole product to Ethypharm after the expiration of the parties' Manufacturing
Agreement in March 2002. Ethypharm declined our offer. At Ethypharm's request, Belmac
continued to manufacture omeprazole for Ethypharm's customers for some time after the above-
mentioned expiration.

22.    In September 2002, Ethypharm asked that Belmac allow it to retrieve its
machinery. At that time; however, Belmac was continuing to use Ethypharm's equipment to
supply Ethypharm customers at Ethypharm's request. Moreover, the removal of Ethypharm's
equipment required substantial disruption of the on-going manufacturing at the Zaragoza facility,
including the removal of a wall to extract the large equipment. Belmac's representatives
explained this to Ethypharm and noted that the machines had to be removed at a time when the
Zaragoza plant was in its seasonal shut down. Belmac's representatives offered Ethypharm a
choice between December 2002 and August 2003, the earliest dates in which the plant was
scheduled to be shut down. Ethypharm finally removed its machinery in September 2003, after
Belmac had finished manufacturing omeprazole for Ethypharm's customers at Ethypharm's
request. On September 9, 2003, Antonio Cabodevilla, the industrial operations manager of
Belmac's Zaragoza plant, signed an agreement with Ethypharm documenting the removal of
Ethypharm's equipment from Belmac's plant. That agreement contained a release stating that
neither Belmac nor Ethypharm had further claims against the other.

23.    The terms of any agreements between Belmac and Ethypharm were negotiated by
either myself or other representatives of Belmac, not by Bentley. Bentley had no role in the day-
to-day operations of Belmac and did not participate in the business relationship between Belmac
and Ethypharm from 1999 to 2002. Previous contacts and negotiations between Belmac and
Ethypharm were conducted on behalf of Belmac by Belmac's prior general managers, Angel

8

A-555

Pérez de Ayala and Clemente González Azpeitia. Since 1999, any agreements signed on behalf of Belmac were executed by Belmac management and employees and Bentley never entered into any agreement with Ethypharm regarding the production of omeprazole.

24.    Belmac never acted on Bentley's behalf during its negotiations or interactions with Ethypharm. During these negotiations and interactions, I never represented to Ethypharm that I was speaking, negotiating, or contracting on behalf of Bentley rather than Belmac. Bentley never granted Belmac the authority to act on Bentley's behalf in negotiations or contracting with Ethypharm. Bentley did not have any rights, obligations, or duties under the Manufacturing Agreement, nor under the confidentiality and non-disclosure agreements with Ethypharm, as it was not a signatory to them.

25.    Neither Mr. James Murphy, Bentley's President and Chief Executive Officer, nor any other Bentley employee was involved on behalf of Bentley in the negotiations of the terms and conditions of the Manufacturing Agreement between Belmac and Ethypharm. Similarly, neither Mr. Murphy nor any other Bentley employee was involved on behalf of Bentley in subsequent discussions between Belmac and Ethypharm in January and February 2002 regarding the expiration of that agreement. I was responsible for those negotiations on behalf of Belmac.

26.    Before, during, and after the Manufacturing Agreement with Ethypharm, Belmac manufactured and produced omeprazole in the Zaragoza facility. Belmac, not Bentley, controlled the manufacture of omeprazole in the Zaragoza facility during the contract with Ethypharm and continues to control the production of omeprazole at the Zaragoza facility. In addition, Belmac has always controlled, and continues to control, its production of lansoprazole and related pharmaceutical products. At no time did Bentley ever manufacture omeprazole for

9

A-556

Ethypharm, nor did it control Belmac's manufacture and production of omeprazole, lansoprazole, or related pharmaceutical products. Instead, I and Belmac's other general managers have always had supervisory control over the day-to-day manufacturing operations of the Zaragoza plant.

27.    Belmac has filed the following patents in Spain:

    (a)    Patent Application No. 200100825: "Improved process for the manufacturing of stable and gastroprotected omeprazole pellets, pellets obtained thereof and other applications." This invention provides for a new formulation of omeprazole pellets. It is applicable both in human and veterinary medicine. Belmac filed this patent application before the Spanish Patent and Trademark Office ("Oficina Espanola de Patentes y Marcas") on April 6, 2001. This application was published by the Spanish Patent and Trademark Office on October 16, 2003. This patent has not been granted yet.

    (b)    Patent Application No. 200002653: "Novel dispersible and soluble galenic paracetamol formulation, method for its preparation and its applications." The novel galenic paracetamol formulation consists of a base mixture of paracetamol and citric acid and can be used in human and veterinary medicine. Belmac filed this patent application before the Spanish Patent and Trademark Office on November 3, 2000. This patent was granted on September 4, 2003.

10

A-557

(c)     Patent Application No. 200002685: "Method for vacuum production of
controlled release pharmaceuticals and/or gastrointestinal resistant
pharmaceuticals." This method comprises pelletizing of an active
principle by vacuum drying a mixture incorporating pharmaceutical
excipients. The excipients confer gastrointestinal resistance on the
pharmaceuticals. This method is especially appropriate for active
principles such as omeprazole, diclofenac, aspirin, and ibuprophen.
Belmac filed this patent application before the Spanish Patent and
Trademark Office on November 7, 2000, and the patent was granted on
November 11, 2003.

(d)     Patent Application No. 200002797: "Novel galenic omeprazole tablets
formulation, method for its preparation and its applications in human and
veterinary medicine." The tablets made with this formulation consist of a
core including the omeprazole, an isolation layer and a gastrointestinal
resistant layer. Belmac filed this patent application before the Spanish
Patent and Trademark Office on November 22, 2000 but it has not been
granted yet.

(e)     Patent Application No. PCT/ES01/00402: "Novel dispersible and soluble
galenic parecetamol formulation, method for its preparation and its
applications." Belmac filed this patent application on October 24, 2001
via Patent Cooperation Treaty on the basis of the Spanish patent
200002653. Belmac designated the following countries in the application:
Austria, Belgium, Switzerland, Cyprus, Germany, Denmark, Spain,

11

Finland, France, United Kingdom, Greece, Ireland, Italy, Luxembourg, Monaco, Netherlands, Portugal, Sweden and Turkey (to be examined by the European Patent Office) and Japan, Poland and United States (to be granted by the corresponding national patent offices). This patent was issued to Belmac as European Patent EP 1331001 B1 on July 21, 2004.

(f) Patent Application No. 200300976: "Formulation of pellets of anti-ulcer and acid-labil bencimidazole compounds." The pellets made with this formulation consist of inert sugar/starch granules covered by three layers. They remain stable over time and are suitable for oral administration. Belmac filed this patent application before the Spanish Patent and Trademark Office on April 29, 2003. The patent has not yet been granted.

(g) Patent Application No. PCT/EP2004/050618: "Pellet formulation of acid-labil anti-ulcer benczimidazole compounds." Belmac filed this patent application with the European Patent Office on April 27, 2004, via the Patent Cooperation Treaty on the basis of the Spanish priority 200300976. This patent has not yet been granted.

28.    As noted above, Belmac is the patent holder of three applications: No. PCT/ES01/00402, issued as EP 1331001 B1; No. 200002685; and No. 200002653. When the remaining patent applications are granted, Belmac will be the patent holder.

29.    Belmac has no authority to act as Bentley's agent and has not done so. Bentley has not provided explicit or apparent authority for Belmac to act on Bentley's behalf. Bentley is a shareholder in Belmac, which is Bentley's wholly-owned subsidiary. Bentley did not and does

12

A-559

not now direct or control the day-to-day operations of Belmac. Belmac controls its own day-to-day operations, including the manufacture of omeprazole, lansoprazole, and other pharmaceutical products.

30.     Belmac does not own any property in Delaware or elsewhere in the United States. Belmac has never conducted business or performed any work or service in Delaware or elsewhere in the United States. Belmac does not derive any revenue from services or products used or consumed in Delaware or elsewhere in the United States.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 4th day of November, 2004 at Madrid, Spain.

_____
Adolfo Herrera

**13**                                   A-560



**TRANSPERFECT|TRANSLATIONS**
THE LEADER IN INTERNATIONAL COMMUNICATIONS

## AFFIDAVIT OF ACCURACY

This is to certify that the document, **Confidentiality agreement between Belmac and Ethypharm regarding documentation, production method, validation and analysis method on Omeprazole 20 mg, September 30, 1998,** has been translated from Spanish into English by staff members of TransPerfect Translations familiar with both the Spanish into English languages and is to the best of our knowledge, ability and belief, a true and accurate translation.



Susan Christian
TransPerfect Translations, Inc.
15 Broad St., Suite 305
Boston, MA 02109

Sworn to before me this
3rd day of November 2004

Signature, Notary Public
Commonwealth of Massachusetts
Commission Expires August 14, 2009

A-561

13

## CONFIDENTIALITY AGREEMENT

BETWEEN:

**\*ETHYPHARM ESPAÑA** with headquarters at Marqués de la Ensenada, 16, 28004 Madrid, represented by its Managing Director, Mr.. Adolfo de Basilio

Hereinafter **ETHYPHARM,**

party of the first part,

AND:

\*BELMAC, with headquarters at Montearagón, 9, 28033 Madrid, represented by its Managing Director, Mr. Clemente González Azpeitia.

Hereinafter BELMAC,

party of the second part.

[initials]

**BELMAC** has provided to **ETHYPHARM** the following documentation obtained from the Registration of the medication BELMAZOL 20 mg (omeprazole pellets):

-    Production method and validation of the same.
-    Analysis method and validation of the same.

This information is only provided so that ETHYPHARM can give deliver it to its customers listed in Appendix A and continue its business relationship with them.
For a period of 10 (ten) years, and in any case, during all commercial collaboration, ETHYPHARM, commencing on the date of this agreement, agrees to keep this information confidential and only provide it to collaborators and advisers that are also committed to the professional secrecy.

However, this obligation shall not be applicable:

\* To information in the public domain at the time provided by BELMAC.

\* Or to information that, after disclosure, becomes part of the public domain without having been disclosed by the ETHYPHARM or its collaborators.

\* Or information that ETHYPHARM can show was in its possession when BELMAC transmitted it to it, unless this information was acquired directly or indirectly under another confidentiality agreement.

Also and as a result of this business relationship, **BELMAC** and **ETHYPHARM** may continue to exchange confidential information, which shall be kept as such by both parties, during the ten-year period referenced above.

In the event of a disagreement between the parties on the interpretation and performance of the clauses of this confidentiality agreement, **BELMAC** and **ETHYPHARM** shall seek the means necessary to resolve the problem amicably.
If there is no agreement on resolving the conflict, **ETHYPHARM** and **BELMAC** shall submit their disputes to Spanish Courts.

In two counterparts                    Date: September 30, 1998

[signature]                            [signature]
For **ETHYPHARM**                       For **BELMAC**
                                       [stamp:] **LABORATORIOS BELMAC, S.A.**
                                       Montearagón, No. 9 1st Floor
                                       28033 MADRID

A-563

<u>Appendix A</u>

For illustration purposes, but not limited:
  - Leciva, S.A. Czech Republic

BELMAC shall be informed immediately of any changes to this appendix.

[two sets of initials]



**TRANSPERFECT | TRANSLATIONS**
THE LEADER IN INTERNATIONAL COMMUNICATIONS

## AFFIDAVIT OF ACCURACY

This is to certify the document, **Resolution Modifying the Marketing Authorization of Belmazol, June 17th, 2004,** has been translated from Spanish into English by staff members of TransPerfect Translations familiar with both the Spanish into English languages and is to the best of our knowledge, ability and belief, a true and accurate translation.



Susan Christian
TransPerfect Translations, Inc.
15 Broad St., Suite 305
Boston, MA 02109

Sworn to before me this
22nd day of October 2004

Signature, Notary Public
Commonwealth of Massachusetts
Commission Expires August 14, 2009

A-565

| MINISTRY | Spanish Drug and | DEPARTMENT OF THE |
|----------|------------------|-------------------|
| OF HEALTH | Health Products | SPANISH DRUG AND |
| AND CONSUMPTION | Agency | HEALTH PRODUCTS |
|  |  | AGENCY |

[illegible stamp]

*REF.: MUH/GEST/PGL*

[stamp]
SPANISH DRUG AND HEALTH
PRODUCTS AGENCY
GENERAL REGISTRY
JUNE 23, 2004
OUTGOING No. [illegible]

**TO THE LEGAL REPRESENTATIVE OF**
**LABORATORIOS BELMAC, S.A.**
**Calle Teide No. 4 – ground floor. Polígono**
**Empresarial La Marina. 28700 SAN**
**SEBASTIAN DE LOS REYES-MADRID**

**Date: 6/17/04**

**RESOLUTION MODIFYING THE MARKETING AUTHORIZATION OF**
**THE PHARMACEUTICAL SPECIALTY**
**"BELMAZOL, 20 mg capsules" No.: 59.829**

**THE DIRECTOR OF THE SPANISH DRUG AND HEALTH PRODUCTS AGENCY**

After studying the request for modification Type II, Subtype 202, consisting of **"changes of excipients which do not affect bioavailability. Specification of gastro-resistance ≥ 90%; in the terms set forth in Addendum II,"** of the marketing authorization, of the pharmaceutical specialty **"BELMAZOL, 20 mg capsules"** No. 59.829

In light of the provisions of Law 30/1992, of November 26, of the Legal Status of Public Administrations and Common Administrative Procedure, as amended by Law 4/1999 of January 13; Law 25/1990 of December 20, on Drugs; Royal Decree 767/1993 of May 21, regulating the evaluation, authorization, registration and conditions for dispensation of pharmaceutical specialties and other drugs for human use manufactured industrially; Royal Decree 520/1999 of March 26, approving the Bylaws of the Spanish Drug Agency, and other applicable regulations, and after examining the appropriate technical reports,

**DECIDES:**

**ONE.-** To grant the authorization for the modification consisting of **"changes of excipients which do not affect bioavailability. Specification of gastro-**

[letterhead]

A-566

[logo]

resistance ≥ 90%; in the terms set forth in Addendum II" of the aforementioned pharmaceutical specialty.

TWO.- On the same date, a copy of this resolution is sent to the General Department of Pharmacy and Health Products for the purposes set forth in the first paragraph of the instruction of December 13, 2002.

THREE.- As addendum to this resolution, we enclose:
*Addendum II of Conditions for Authorization and Requisites for Dispensation of the Pharmaceutical Specialty.*

This Resolution, which puts an end to the administrative proceeding, may be appealed by Appeal for Review with the Director of the Spanish Drug and Health Products Agency within the term of one month, pursuant to article 116 of Law 30/1992 of November 26 of the Legal Status of the public Administrations and Common Administrative Procedure, or an Administrative Appeal may be filed with the Central Court of Administrative Appeal, within the term of two months from the day following the communication of this Resolution, pursuant to the Law Regulating the Administrative Jurisdiction of July 13, 1998, without prejudice to any other appeal that may be filed.

[stamp]
Spanish Drug and Health Products Agency
Ministry of Health and Consumption

[signature]
Signed: Maria del Val Diez Rodrigálvarez

R.N. 59.829
6/17/04

Ministry of Health and Consumption
Spanish Drug and Health Products Agency

A-567