**BELMAC, S.A.**. Ambos documentos aparecen firmados, en nombre de **LABORATORIOS BELMAC, S.A.** por D. Adolfo Herrera, Director General de la empresa.

Por el primer acuerdo **LABORATORIOS BELMAC, S.A.** asumía el compromiso de *"fabricar y entregar el producto fabricado en sus instalaciones, detallado en el Anexo, previa orden de pedido por ETHYPHARM, S.A."*. El Anexo contiene la referencia a

> *"Microgránulos de Omeprazol, según patente nº 9207249"*

Como puede constatarse en el Documento nº 3 aportado, este número se corresponde con la patente francesa prioridad de la española.

En la carta de compromiso de compra **LABORATORIOS BELMAC, S.A.** asume la siguiente obligación:

> *"A comprar en exclusiva a ETHYPHARM sus necesidades y las de sus clientes, siempre y cuando ETHYPHARM garantice dicho suministro, en tiempo y forma establecidos en los pedidos, a precios competitivos de mercado y la fabricación del producto (microgránulos de OMEPRAZOL) se realice por BELMAC en sus instalaciones".*

**C)**     **La maquinaria, propiedad de ETHYPHARM, S.A., instalada en la fábrica de LABORATORIOS BELMAC, S.A. para la producción del Omeprazol conforme a la patente ES 9301319**

Con el fin de facilitar la producción del Omeprazol con arreglo a la tecnología propia de **ETHYPHARM, S.A.** mi representada puso a disposición de **LABORATORIOS BELMAC, S.A.**, en su propia planta de Zaragoza, la maquinaria adecuada. Aportamos al respecto:

-     Como <u>DOCUMENTO Nº 7</u>, la declaración jurada de **LABORATORIOS BELMAC, S.A.** el 6 de noviembre de 1992, con la firma de su entonces Director General D. Ángel Pérez de Ayala, reconociendo, entre otros extremos:

CONFIDENTIAL
EP 004890

A-634

*"1. Que LABORATORIOS BELMAC S.A. está negociando con ETHYPHARM, S.A. la firma de un contrato de fabricación y colaboración dentro de la línea de los proyectos de contrato y las relaciones que ambas partes vienen preparando y desarrollando en los últimos meses.*

*2. Que paralelamente a esas negociaciones y durante el desarrollo de las mismas, ETHYPHARM a su exclusivo cargo ha llevado a cabo unas obras e instalaciones dentro de una parte el inmueble propiedad de LABORATORIOS BELMAC, S.A., sito en Polígono de Malpica Calle C, n° 4 (Zaragoza). El coste de esas instalaciones y adaptaciones hasta ahora realizadas alcanza la cifra de Pts. 27.119.843.- más su correspondiente IVA.*

*Que asimismo ETHYPHARM ha instalado una maquinaria que está identificada y reconocida por LABORATORIOS BELMAC, S.A. que es también de la plena y total propiedad de esa primera entidad y que queda recogida en la lista que a este documento se acompaña".*

- Como <u>DOCUMENTO N° 8</u>, el listado de la maquinaria propiedad de **ETHYPHARM, S.A.** y la fotografía de la sala donde se encontraba parte de esta maquinaria.



CONFIDENTIAL
EP 004891

A-635

**D)**    **El reconocimiento explícito por LABORATORIOS BELMAC, S.A. de la tecnología inherente a la patente ES 9301319 de ETHYPHARM, S.A. y del esfuerzo empresarial realizado por la actora en la planta de la demandada**

La ayuda prestada por **ETHYPHARM, S.A.** a **LABORATORIOS BELMAC, S.A.** hizo posible el despegue comercial de esta empresa, merced a su especialización en la fabricación y venta de Omeprazol conforme a la tecnología de **ETHYPHARM, S.A.**. Los documentos que seguidamente se aportan ponen de manifiesto hasta qué punto **LABORATORIOS BELMAC, S.A.** recibió de **ETHYPHARM, S.A.** el soporte necesario para el desarrollo de su actividad industrial.

Como <u>DOCUMENTO Nº 9</u>, aportamos la carta de 20 de marzo de 1997 de D. Clemente González Azpeitia, reconociendo, entre otros extremos, lo siguiente:

> *"Es cierto que cada día, nuestro personal, con la inestimable colaboración del Sr. Bernabé, se adapta mejor a las características de la nueva maquinaria y que, progresivamente, la calidad de los pellets de Omeprazol está mejorando mucho".*

Como <u>DOCUMENTO Nº 10</u>, la declaración firmada por **LABORATORIOS BELMAC, S.A.** el 2 de Marzo de 1998 certificando los siguientes extremos:

> *"ETHYPHARM tiene un acuerdo de fabricación con LABORATORIOS BELMAC, S.A.*
>
> 
>
> *ETHYPHARM es propietaria del método de fabricación, de la tecnología y de la maquinaria empleada para el proceso de fabricación de los lotes de Omeprazol. LABORATORIOS BELMAC, S.A. tiene la autorización para utilizar estas maquinarias y para utilizar el know-how para los clientes de ETHYPHARM.*
>
> *LABORATORIOS BELMAC, S.A. es auditada regularmente por ETHYPHARM para asegurar que GMP es seguido bajo los requisitos de ETHYPHARM"*

CONFIDENTIAL
EP 004892

A-636

-   Como <u>DOCUMENTO Nº 11</u>, la declaración jurada de **LABORATORIOS BELMAC, S.A.**, fechada a 2 de octubre de 1998, en los términos siguientes:

> *"ETHYPHARM ha transmitido a BELMAC muestras sobre el producto:*
>
> *- Cápsulas de omeprazol 20mg (fórmula acuosa).*
>
> *Estas muestras se entregan únicamente con el fin de que Laboratorios Belmac, S.A. pueda verificar inicialmente la calidad del producto.*
>
> *Durante un período de 10 (diez) años, BELMAC, a partir de la fecha de este acuerdo, se compromete a guardar secreto sobre los resultados del análisis y sobre la existencia de estas muestras, y transmitir estos resultados únicamente a colaboradores y a consejeros comprometidos igualmente al secreto profesional".*

### E) El Omeprazol fabricado por LABORATORIOS BELMAC, S.A. bajo la patente de ETHYPHARM, S.A.

Durante el tiempo que duraron las relaciones comerciales entre las partes **LABORATORIOS BELMAC, S.A.** estuvo fabricando Omeprazol bajo la patente ES 9301319 y la maquinaria de **ETHYPHARM, S.A.** para los clientes de la actora (Omeprazol Cinfa, de LABORATORIOS CINFA, S.A. y Omeprazol Leciva, de LABORATORIOS LECIVA, S.A.) y para sus propios clientes (Belmazol, de la misma LABORATORIOS BELMAC, S.A.; Ulcometión, de LABORATORIOS FARMA; Omeprazol Davur, de LABORATORIOS DAVUR, S.L.; Omeprazol Acyfabrik, de LABORATORIOS ACYFABRIK, S.A. y Omeprazol FARMIGEL, de LABORATORIOS FARMIGEL, S.A.). En relación con este Omeprazol fabricado en el pasado por **LABORATORIOS BELMAC, S.A.** aportamos:

-   Como <u>DOCUMENTO Nº 12</u>, un dossier completo o protocolo de la elaboración de la especialidad Omeprazol para uno de los lotes fabricados por **LABORATORIOS BELMAC, S.A.** en marzo de 2001 para **ETHYPHARM, S.A.**. En él puede constatarse el balance final con la indicación de la fórmula de fabricación.

CONFIDENTIAL
EP 004893

- Como <u>DOCUMENTO Nº 13</u>, las fichas técnicas correspondientes a las autorizaciones de comercialización concedidas por la Agencia Española del Medicamento para las especialidades Belmazol 20 mg. (primera autorización 1993, revisión 2001) y Omeprazol Cinfa 20 mg. (aprobación mayo 2000). En ambos consta la formulación básica que se corresponde esencialmente con la patente de **ETHYPHARM, S.A.:** *"Sacarosa, almidón de maíz, manitol, carboximetilalmidón de sodio, laurilsulfato sódico, povidona, hipromelosa, ftalato de hipromelosa, aceite de soja parcialmente hidrogenado, talco".*

- Como <u>DOCUMENTO Nº 14</u>, a título de ejemplo, copia de los dos acuerdos de producción suscritos por **LABORATORIOS BELMAC, S.A.** con otros dos laboratorios para la elaboración del Omeprazol. En ellos se declara expresamente que *"dichos microgránulos han sido fabricados bajo la patente y tecnología de ETHYPHARM".*

**CUARTO.-    LA RUPTURA UNILATERAL DE LAS RELACIONES COMERCIALES POR PARTE DE LABORATORIOS BELMAC, S.A.**

**A)    La resolución del contrato de fabricación en noviembre de 2001 por LABORATORIOS BELMAC, S.A.**

En noviembre de 2001 **LABORATORIOS BELMAC, S.A.** decidió rescindir unilateralmente el contrato de fabricación suscrito entre las partes, con efectos a 23 de marzo de 2002. Aportamos como <u>DOCUMENTO Nº 15</u>, la comunicación dirigida el 14 de noviembre de 2001 por **LABORATORIOS BELMAC, S.A.** a **ETHYPHARM, S.A.** anunciando la extinción del contrato de fabricación.

**B)    Las negociaciones emprendidas y el compromiso contraído por LABORATORIOS BELMAC, S.A. de cesar en toda explotación de la patente y maquinaria de ETHYPHARM, S.A. a partir del 23 de marzo de 2002**

Como es evidente, la decisión de **LABORATORIOS BELMAC, S.A.** de resolver unilateralmente el contrato suscitó el correspondiente conflicto entre las partes. Piénsese que la comunicación recibida por **ETHYPHARM, S.A.**

CONFIDENTIAL
EP 004894

A-638

implicaba, de un lado, que mi representada no podría atender los pedidos que ya había recibido de sus clientes; y de otro, que **LABORATORIOS BELMAC, S.A.** se proponía seguir fabricando el Omeprazol conforme a la tecnología y maquinaria de **ETHYPHARM, S.A.** en su propio beneficio y sin tener que comprarlo a la actora. De la negociación emprendida al respecto se llegó al compromiso siguiente:

(a)  **LABORATORIOS BELMAC, S.A.** atendería los pedidos de **ETHYPHARM, S.A.** que hubiesen sido aceptados con anterioridad.

(b)  La maquinaria propiedad de **ETHYPHARM, S.A.** cedida a **LABORATORIOS BELMAC, S.A.** sería utilizada exclusivamente para la fabricación de los propios pedidos de Omeprazol de **ETHYPHARM, S.A.**.

(c)  **LABORATORIOS BELMAC, S.A.** cesaría a partir del 23 de marzo de 2002 en toda fabricación de Omeprazol para sí misma y para sus propios clientes, en la medida en que la autorización de **ETHYPHARM, S.A.** para la explotación de la patente nº 9301319 se consideraba asimismo revocada; y

(d)  Como la actividad de **LABORATORIOS BELMAC, S.A.** en torno al Omeprazol necesariamente se vería disminuida, **ETHYPHARM, S.A.** procedería a la retirada paulatina de la maquinaria cedida.

De este modo **LABORATORIOS BELMAC, S.A.** desde el 23 de Marzo de 2002 sólo podía fabricar lotes de Omeprazol con destino a los clientes de **ETHYPHARM, S.A.**. Las marcas que corresponden a estos lotes eran:

-  Omeprazol CINFA de LABORATORIOS CINFA, S.A.

-  Omeprazol LECIVA de LABORATORIOS LECIVA, S.A.

Aportamos en prueba de lo anterior:

-  Como <u>DOCUMENTO Nº 16</u>, la carta de 18 de Abril de 2002 de **ETHYPHARM, S.A.** a **LABORATORIOS BELMAC, S.A.** puntualizando que después de la ruptura de la relación contractual la maquinaria propiedad de mi

CONFIDENTIAL
EP 004895

A-639

representada sólo podría ser utilizada para la fabricación de sus propios pedidos y que cualquier actividad de **LABORATORIOS BELMAC, S.A.** en torno al Omeprazol, que no fuese estrictamente el cumplimiento de tales pedidos, constituiría una violación de la patente ES 9301319.

- Como <u>DOCUMENTO Nº 17</u>, la carta de 31 de Mayo de 2002 de **ETHYPHARM, S.A.** a **LABORATORIOS BELMAC, S.A.** expresando su preocupación por la posible fabricación por estos laboratorios de Omeprazol con destino a sus propios clientes, con violación de la patente en cuestión.

- Como <u>DOCUMENTO Nº 18</u>, la carta de 10 de Junio de 2002 de **LABORATORIOS BELMAC, S.A.** asumiendo el compromiso de atender los pedidos pendientes utilizando la maquinaria propiedad de **ETHYPHARM, S.A.** sólo para la fabricación de los mismos.

C)       <u>La retirada final, después de varios intentos, de la maquinaria de **ETHYPHARM, S.A.** en septiembre de 2003</u>

Una vez completados los pedidos pendientes de Omeprazol formulados por **ETHYPHARM, S.A.**, mi representada quiso retirar de **LABORATORIOS BELMAC, S.A.** la maquinaria para evitar que pudiese seguir siendo utilizada por la demandada con burla de sus derechos. De los contratiempos surgidos por **ETHYPHARM, S.A.** hasta la devolución de esta maquinaria es buena muestra la documentación que seguidamente se aporta:

- Como <u>DOCUMENTO Nº 19</u>, acompañamos la carta de 11 de Junio de 2002 dirigida por **ETHYPHARM, S.A.** anunciando la retirada inminente de la maquinaria en cuestión.

- Como <u>DOCUMENTO Nº 20</u>, una selección de la correspondencia cruzada entre las partes en el mes de Septiembre a propósito de la negativa de **LABORATORIOS BELMAC, S.A.** a la retirada de esta maquinaria por supuestos inconvenientes técnicos.

- Como <u>DOCUMENTO Nº 21</u>, el acta notarial extendida por el Notario de Zaragoza D. Juan Miguel Belloch Fernández de Palencia el 12 de Septiembre de

CONFIDENTIAL
EP 004896

A-640

2002 dando fe de la negativa de **LABORATORIOS BELMAC, S.A.** de dar acceso a su fábrica a los técnicos y transportistas de **ETHYPHARM, S.A.** para retirar la maquinaria de su propiedad.

-    Como <u>DOCUMENTO Nº 22</u>, la carta de **LABORATORIOS BELMAC, S.A.** ratificando su posición de que la maquinaria no podrá retirarse antes del 14 de Octubre de 2002.

-    Como <u>DOCUMENTO Nº 23</u>, el acuerdo firmado entre las partes el <u>9 de septiembre de 2003</u> que refleja el desmontaje y retirada de la maquinaria de **ETHYPHARM, S.A.** entre el 19 de agosto de 2003 y dicha fecha. En este acuerdo, como es obvio, las partes reconocían que "*en relación con la retirada de la maquinaria y con la reparación de las instalaciones no tienen nada que reclamarse*".

Es decir, que desde el 23 de marzo de 2002 hasta el 19 de agosto de 2003 **LABORATORIOS BELMAC, S.A.** pudo seguir utilizando dicha maquinaria para sus propios intereses.

QUINTO.-    **LA    EXPLOTACIÓN    INCONSENTIDA    POR LABORATORIOS BELMAC, S.A. DE LA PATENTE Y TECNOLOGÍA DE ETHYPHARM, S.A. ENTRE EL 23 DE MARZO DE 2002 Y EL 19 DE DICIEMBRE DE 2002**

A)    **La aparición en el mercado de productos de Omeprazol fabricados por LABORATORIOS BELMAC, S.A. con posterioridad al 23 de marzo de 2002**

Mi representada comprendió muy pronto que la razón por la que **LABORATORIOS BELMAC, S.A.** había resuelto el contrato no era otra que seguir fabricando el Omeprazol con la patente y tecnología propias de **ETHYPHARM, S.A.** sin necesidad de comprarlo a la actora. Aportamos al respecto y como <u>DOCUMENTO Nº 24</u>, una fotocopia de la selección de productos farmacéuticos de Omeprazol, fabricados por **LABORATORIOS BELMAC, S.A.**, que pudo encontrar esta parte en el mercado en octubre de 2002. Por la fecha de caducidad que presentan estos lotes de Omeprazol, es claro

CONFIDENTIAL
EP 004897

que habían sido fabricados con posterioridad a 23 de marzo de 2002. El cuadro referente a estos productos es el siguiente:

| Marca | Laboratorio | Lote | Caducidad | | Fabricación |
|---|---|---|---|---|---|
| Belmazol | BELMAC, S.A. | S 12 | 07 | 2005 | Julio 2002 |
| Ulcometion | ANTIBIÓTICOS FARMA, S.A. | S 07 | 07 | 2005 | Julio 2002 |
| Omeprazol Davur | LABORATORIOS DAVUR, S.L. | S 30 | 07 | 2004 | Julio 2002 |
| Omeprazol Acyfabrik | LABORATORIOS ACYFABRIK, S.A. | S 05 | 07 | 2004 | Julio 2002 |
| Omeprazol Farmygel | LABORATORIOS FARMYGEL, S.A. | S 14 | 09 | 2004 | Septiembre 2002 |

Se hace constar expresamente a estos efectos:

(a)    Que la letra "S" que figura en el lote hace referencia al año de fabricación 2002.

(b)    Que la caducidad máxima permitida de ordinario, para esta clase de especialidades farmacéuticas, en el caso de los productos con marca (Belmazol y Ulcometion), es de tres años: de ahí que aquellos lotes que lleven como fecha de caducidad "07 2005" hayan sido fabricados en Julio de 2002.

(c)    Que la caducidad máxima permitida de ordinario, para esta clase de especialidades farmacéuticas, en el caso de los medicamentos genéricos (Omeprazol Davur, Omeprazol Acyfabrik y Omeprazol Farmygel), es de dos años: de ahí que los lotes cuya fecha de caducidad sea de 2004 hayan sido fabricados en 2002 y en el mes que se indica a su lado.

La conclusión que se infiere de este relato es bien clara: **LABORATORIOS BELMAC, S.A.** aprovechándose de los medios y tecnología facilitados por **ETHYPHARM, S.A.**, estaba fabricando su propio Omeprazol para terceras empresas empleando para ello la propia maquinaria y patente de esta última.

CONFIDENTIAL
EP 004898

A-642

**B)**     <u>Las diligencias de comprobación de hechos practicadas en Zaragoza en la planta de LABORATORIOS BELMAC, S.A. el 19 de diciembre de 2002</u>

**ETHYPHARM, S.A.**, con el fin de verificar si **LABORATORIOS BELMAC, S.A.** seguía haciendo uso de la formulación reivindicada en la patente de invención ES 9301319 y si seguía fabricando Omeprazol para terceros en la propia maquinaria de **ETHYPHARM, S.A.** solicitó la práctica de diligencias preliminares en la planta de la demandada en Zaragoza. De la sustanciación y resolución de estas diligencias debemos destacar los siguientes aspectos:

(a)     La petición de diligencias de comprobación de hechos fue admitida por el Juzgado de Primera Instancia nº 72 de Madrid mediante <u>Auto de 5 de noviembre de 2002</u>. La decisión del Juzgado comprende la autorización para que actúe en dichas diligencias en calidad de *práctico* D. Domingo Bernabé, de **ETHYPHARM, S.A.** y la designación como perito de D. Rafael Sánchez Guillermo, en su condición de Licenciado en Farmacia. El Juzgado acordó que las diligencias se practicasen por exhorto.

(b)     El Juzgado de Primera Instancia nº 14 de Zaragoza, llevó a cabo la práctica de las diligencias en la fábrica y oficinas de **LABORATORIOS BELMAC, S.A.**, en el Polígono Industrial de Malpica el <u>19 de diciembre de 2002</u> a partir de las 11.00 horas. En las diligencias participaron D. Rafael Sánchez Guillermo, como perito independiente, D. Domingo Bernabé, como *práctico* de **ETHYPHARM, S.A.** y el letrado que suscribe la presente demanda. El Secretario Judicial extendió la correspondiente acta manuscrita que posteriormente transcribió al ordenador. Después de la práctica de las diligencias los autos fueron remitidos de vuelta al Juzgado de Primera Instancia de Madrid.

(c)     **ETHYPHARM, S.A.** solicitó inmediatamente ante el Juzgado de Primera Instancia de Madrid la entrega del testimonio judicial necesario para la preparación de la demanda principal. **LABORATORIOS BELMAC, S.A.**, sin embargo, se personó ante el Juzgado de Primera Instancia nº 72 de Madrid para oponerse a la entrega de este testimonio, promoviendo el correspondiente incidente. Celebrada la Vista el 3 de febrero de 2003, el incidente fue resuelto por <u>Auto del Juzgado de 19 de enero de 2005, notificado el 10 de febrero de este año</u>.

CONFIDENTIAL
EP 004899

A-643

El Juzgado de Primera Instancia nº 72 de Madrid desestima la oposición y ordena la entrega del testimonio a mi representada.

Aportamos en prueba de estos extremos:

-   Como <u>DOCUMENTO Nº 25,</u> copia del escrito de petición de diligencias de comprobación de hechos presentado en octubre de 2002.

-   Como <u>DOCUMENTO Nº 26,</u> copia del Auto del Juzgado de Primera Instancia nº 72 de Madrid de 5 de noviembre de 2002 y de la providencia de 18 del mismo mes, por el que se estima la petición de diligencias y se acuerda la remisión del correspondiente exhorto.

-   Como <u>DOCUMENTO Nº 27,</u> copia del Auto de 19 de enero de 2005 del Juzgado de Primera Instancia nº 72 de Madrid desestimatorio de la oposición presentada por **LABORATORIOS BELMAC, S.A.** y por el que se ordena la entrega del testimonio de las diligencias practicadas en Zaragoza a **ETHYPHARM, S.A.**.

-   Como <u>DOCUMENTO Nº 28,</u> el testimonio original expedido por el Juzgado de Primera Instancia nº 72 de Madrid de las diligencias practicadas en Zaragoza. El testimonio fue expedido y entregado a esta parte <u>el 15 de febrero de 2005.</u> Así consta en su última página con la firma del Secretario Judicial.

**C)**    <u>La verificación técnica de la infracción: informe pericial que se aporta en relación con la documentación aprehendida en Zaragoza</u>    ,

**ETHYPHARM, S.A.,** una vez recibido el testimonio de las diligencias practicadas en Zaragoza, encomendó el análisis de la documentación aprehendida al perito D. Rafael Sánchez que había intervenido en las mismas. El análisis de esta documentación se resume en los puntos siguientes:

(a)    El perito comienza en su dictamen por <u>paginar y enunciar</u> el contenido específico de la documentación obrante en el <u>testimonio judicial.</u> Lo hace, como es lógico, en el ANEXO I de su informe, que constituye la fotocopia íntegra del

CONFIDENTIAL
EP 004900

A-644

testimonio. Esta paginación es la siguiente:

- Folios 1 a 21: Acta manuscrita de las diligencias practicadas en Zaragoza y transcripción a máquina;

- Folios 22 a 28: fotocopias de las páginas más relevantes de los lotes de micropellets de Omeprazol que estaban siendo fabricados en el momento de la inspección;

- Folios 29 a 33: fotocopia de las páginas más relevantes de los lotes de micropellets de Omeprazol correspondientes a los productos fabricados por **LABORATORIOS BELMAC, S.A.** que habían sido adquiridos por **ETHYPHARM, S.A.** en octubre de 2002: Omeprazol Cinfa, Omeprazol Leciva, Belmazol, Ulcometión, Omeprazol Davur, Omeprazol Acyfabrik y Omeprazol Farmigel;

- Folios 34 a 211: los dossieres de fabricación completos de estos mismos lotes de Omeprazol;

- Folios 242 bis a 246: comunicaciones oficiales de la Agencia Española del Medicamento;

- Folios 247 a 284: fotocopias de prospectos y cartonajes del Omeprazol hallado en el almacén.

A requerimiento del Juzgado, el perito procederá a efectuar esta misma paginación sobre el testimonio judicial aportado.

(b)    El dictamen contiene asimismo, como una consideración de carácter general, la descripción y explicación del contenido y alcance de la patente de invención ES 9301319. El perito confirma que se trata de una patente cuyas reivindicaciones 1 a 6 se refieren a una formulación o producto farmacéutico. D. Rafael Sánchez advierte que la reivindicación 1 o principal contiene las características esenciales de la formulación patentada y las reivindicaciones 2 a 6, dependientes de la 1, ciertas características adicionales. Sus palabras al respecto son las siguientes:

CONFIDENTIAL
EP 004901

A-645

*"- Las características esenciales de la formulación patentada en la patente Española de Ethypharm nº 9301319, recogidas en la reivindicación 1 son las siguientes:*

- *Formulación estable de omeprazol en forma de gránulos*
- *Que contenga un núcleo neutro a base de azúcar y almidón*
- *Y una capa activa a base de una dilución de omeprazol en manitol, en cantidades sensiblemente iguales*

*- Las características adicionales a estas características esenciales vienen protegidas en las reivindicaciones 2 a 6 dependientes de la reivindicación 1. La formulación puede comprender además:*

- *Un 10% en peso de carboximetilalmidón en la capa activa (reivindicación 2)*
- *Un 5% de un tensioactivo tipo laurilsulfato sódico en la capa activa (reivindicación 3)*
- *Manitol sobre la superficie de la capa activa en forma de capa complementaria de protección (reivindicación 4)*
- *Un agente ligante del tipo de la hidroxipropilmetilcelulosa (reivindicación 5)*
- *Un recubrimiento gastrorresistente del tipo Ftalato de hidroxipropilmetilcelulosa y talco (reivindicación 6)"*

(c)    Las    diligencias    tenían    por    objeto,    inicialmente,    verificar    si **LABORATORIOS BELMAC, S.A.** seguía utilizando en diciembre de 2002 la maquinaria proporcionada por **ETHYPHARM, S.A.** en la .fabricación de Omeprazol para pedidos que no fuesen los pendientes de la actora. En el Acta que figura unida al testimonio consta que la Comisión judicial se personó en la Sala de elaboración de los microgránulos y de fabricación de los micropellets, donde se hallaba en funcionamiento la maquinaria proporcionada por **ETHYPHARM, S.A..** A instancias de esta parte se fotocopiaron parte de los dossieres correspondientes a los micropellets en fabricación: lotes Z 104, Z 112 y Z 093. El Director de Fabricación de **LABORATORIOS BELMAC, S.A.,** D. Francisco Poderos, manifestó desconocer quién era el *"destinatario"* de estos lotes. Analizada por el perito la documentación llega a la conclusión de que los lotes en fabricación en diciembre de 2002 se corresponden con la patente de **ETHYPHARM, S.A..** D. Rafael Sánchez examina reivindicación a reivindicación:

*"a) La formulación de los lotes de OMEPRAZOL están comprendidos en la reivindicación 1 de la patente ETHYPHARM, S.A. porque:*

CONFIDENTIAL
EP 004902

*- El producto producido por LABORATORIOS BELMAC, S.A. es una formulación en forma de gránulos estables;*

*- Los gránulos contienen un núcleo neutro de azúcar y almidón (como puede comprobarse en el balance final de la página 24 del ANEXO I);*

*- Los gránulos contienen, además del núcleo neutro, una capa activa de una mezcla de OMEPRAZOL y manitol (misma página); en dicha capa activa las cantidades de OMEPRAZOL y manitol son sensiblemente iguales (5 kilos de OMEPRAZOL; 5 kilos de manitol: ver, por ejemplo, pág. 23 del ANEXO I);*

*b) La formulación de los lotes de OMEPRAZOL está comprendida además en la reivindicación 2 de la patente ETHYPHARM, S.A. porque tiene una capa activa que contiene el carboximetilalmidón (Explotab). Así aparece en las páginas 23, 24, 26, 28, 29, 30, 31, 32 y 33.*

*c) La formulación de los lotes de OMEPRAZOL está comprendida además en la reivindicación 3 de la patente ETHYPHARM, S.A. porque la capa activa de OMEPRAZOL contiene laurisulfato sódico. Así aparece en las páginas 23, 24, 26, 28, 29, 30, 31, 32 y 33.*

*d) La formulación de los lotes de OMEPRAZOL está comprendida además en la reivindicación 4 de la patente ETHYPHARM, S.A. porque la capa activa de OMEPRAZOL cuenta con una capa complementaria de protección compuesta por manitol. Así se deduce de los balances finales de las páginas 24, 26 y 28, donde se observa una cantidad final de manitol superior a la relación empleada en la formación de los microgránulos.*

*e) La formulación de los lotes de OMEPRAZOL están comprendidos además en la reivindicación 5 de la patente ETHYPHARM, S.A. porque para unir la capa activa al núcleo neutro, se emplea un ligante en forma de solución (así se comprueba en el balance final que aparece en el, folio 24); dicho ligante es del tipo hidroxipropilmetilcelulosa (Farmacoat o hipromelosa).*

*f) La formulación de los lotes de OMEPRAZOL está comprendida además en la reivindicación 6 de la patente ETHYPHARM, S.A. porque la formulación presenta una capa externa gastroprotectora compuesta por ftalato de hidroxipropilmetilcelulosa (HP 50) y talco. Así aparece en las páginas 24, 26 y 28".*

Se designan a efectos de prueba los archivos de **LABORATORIOS BELMAC, S.A.** para conocer el destinatario final de estos lotes en fabricación.

CONFIDENTIAL
EP 004903

A-647

(d)    Las diligencias tenían por objeto, en segundo lugar, constatar la <u>fecha de</u> <u>fabricación y la formulación</u> de los lotes de Omeprazol procedentes de **LABORATORIOS BELMAC, S.A.** que había adquirido **ETHYPHARM, S.A.** en el mercado. Se trataba de determinar si habían sido fabricados con posterioridad al <u>23 de marzo de 2002</u>, fecha en que la demandada tenía que cesar en la utilización de la tecnología propia de esta parte. A instancias de la actora fueron fotocopiados en la planta de **LABORATORIOS BELMAC, S.A.** los dossieres de fabricación de los lotes antes citados de Omeprazol Cinfa, Omeprazol Leciva, Belmazol, Ulcometión, Omeprazol Davur, Omeprazol Acyfabrik y Omeprazol Farmigel. Analizados por el perito estos lotes se confirma que todos fueron fabricados por **LABORATORIOS BELMAC, S.A.** <u>entre el 16 de junio de 2002 y el 2 de septiembre de 2002</u> y que la formulación referente a estos lotes es sustancialmente la misma que la de la patente de **ETHYPHARM, S.A.** ES 9301319. Particularmente el perito aborda esta cuestión en la forma siguiente:

> "- *El producto producido por LABORATORIOS BELMAC, S.A. es una formulación en forma de gránulos estables;*
>
> - *En el prospecto de estos lotes que figura en las páginas 73, 106, 153, 182 y 208 aparece la fórmula completa que es sustancialmente idéntica a la de la patente 9301319 de ETHYPHARM, S.A.;*
>
> - *Los gránulos contienen, además de un núcleo neutro, una capa activa de una mezcla de OMEPRAZOL y manitol (como se puede comprobar en las páginas 29, 30, 31 y 32);*
>
> - *En dicha capa activa las cantidades de OMEPRAZOL y manitol son sensiblemente iguales (5 kilos en cada una: páginas 29, 30, 31 y 32);*
>
> *Además, la documentación refleja que las reivindicaciones 2 a 3 de la patente también están siendo infringidas:*
>
> - *La formulación de los lotes de OMEPRAZOL está comprendida además en la reivindicación 2 de la patente ETHYPHARM, S.A. porque tiene una capa activa que contiene el carboximetilalmidón (Explotab). Así aparece en las páginas 29, 30, 31, 32 y 33 del ANEXO I.*
>
> - *La formulación de los lotes de OMEPRAZOL está comprendida además en la reivindicación 3 de la patente ETHYPHARM, S.A. porque la capa activa de OMEPRAZOL contiene laurisulfato sódico. Así aparece en las páginas 29, 30, 31, 32 y 33 del ANEXO I.*

CONFIDENTIAL
EP 004904

> *Si se dispusiese del balance final de estos lotes de fabricación (páginas 33 de 33 del Protocolo de fabricación) podríamos verificar la presencia de los componentes relativos a las reivindicaciones 4 a 6".*

En cuanto a las reivindicaciones 4 y 6, el perito no puede pronunciarse al faltar los dossieres íntegros de los lotes Z 022, Z 030, Z 033, Z 029 y Z 051.

(e)    Durante la práctica de las diligencias la comisión judicial se personó asimismo en las Salas de encapsulado y acondicionamiento de **LABORATORIOS BELMAC, S.A.** y en el propio almacén. En el Acta y en la documentación aprehendida constan referencias a los lotes de Omeprazol Davur que habían sido encapsulados y acondicionados recientemente y a los productos Ulcometión, Omeprazol Davur, Omeprazol Acyfabrik, Belmazol 20 mg. y Omeprazol Farmygel que se encontraban en el almacén y de los que se intervinieron las correspondientes muestras. El perito ha podido comprobar por la fecha de caducidad y por la fórmula que aparece en estos prospectos, que el Omeprazol habría sido fabricado con posterioridad a marzo de 2002 y conforme a la formulación de la patente ES 9301319.

(f)    Finalmente, en las diligencias se requirió a **LABORATORIOS BELMAC, S.A.** para que aportase un dossier de fabricación de Omeprazol de los que fabricaba en el pasado bajo la patente y maquinaria de **ETHYPHARM, S.A.**. Consta fotocopiado en el testimonio un lote fabricado en marzo de 1998 cuyo balance final, según confirma el perito, coincide esencialmente con la patente de **ETHYPHARM, S.A.** ES 9301319 y también con el dossier de fabricación que le fue entregado al perito y que constituye el ANEXO III de su informe. Interesa destacar que D. Rafael Sánchez analiza en su informe si el balance final que aparece reflejado en estos dossieres se corresponde con la formulación de la patente de **ETHYPHARM, S.A.**, señalando al respecto:

> *"...los componentes utilizados en la elaboración, son:*
>
> *a) De un lado, los componentes esenciales de la patente de ETHYPHARM comprendidos en las reivindicaciones 1 a 6: NHB (OMEPRAZOL); NEUTROS (Sacarosa y Almidón); MANITOL; EXPLOTAB (Carboximetilalmidón Sódico); LAURILSULFATO*

CONFIDENTIAL
EP 004905

A-649

*SÓDICO; FARMACOAT (Hidroxipropilmetilcelulosa); HP 50
(Ftalato de Hidroxipropilmetilcelulosa).*

*b) De otro lado, aparecen también en este dossier de fabricación los
siguientes componentes: PVP K30 (Polivinilpirrolidona); MYVACET
(Plastificante a base de aceite de soja hidrogenado); ALCOHOL
ISOPROPÍLICO; ALCOHOL ETÍLICO y CLORURO DE METILENO
(Diclorometano). De estos componentes el ALCOHOL
ISOPROPÍLICO, el ALCOHOL ETÍLICO y el CLORURO DE
METILENO desaparecen por evaporación durante el proceso de
fabricación de la formulación y no forman parte de su composición
final. Con respecto al PVP, es uno de los componentes ligantes
equivalente al FARMACOAT 606 (Hidroxipropilmetilcelulosa). El
MYVACET es un plastificante normalmente utilizado en la industria
farmacéutica".*

(g)    Por último, conviene añadir, que el Juzgado requirió a **LABORATORIOS
BELMAC, S.A.** la exhibición de cierta documentación adicional: los pedidos de
Omeprazol recibidos por esta empresa a partir del 24 de marzo de 2002; las
facturas de venta de diversas especialidades de Omeprazol a partir de esa misma
fecha; los albaranes de entrega de Omeprazol fabricados para las firmas
ANTIBIÓTICOS FARMA, LABORATORIOS DAVUR, LABORATORIOS
ACYFABRIK y LABORATORIOS FARMYGEL con posterioridad al 24 de
marzo de 2002 y los contratos de fabricación y venta y/o las licencias relativas a
la autorización farmacéutica, suscritos a partir de esa fecha por la demandada.
Consta en Acta la manifestación del Director Técnico de esta empresa en el
sentido de que esta documentación se hállaba en la sede social en Madrid de
**LABORATORIOS BELMAC, S.A.**.

Aportamos como DOCUMENTO Nº 29, el dictamen original emitido por D.
Rafael Sánchez Guillermo con los Anexos que lo integran. Repárese en la
manifestación que contiene dicho informe:

*"Manifiesto que en lo relativo, tanto a los reconocimientos y
comprobaciones previas, como al dictamen que se emite, he actuado, y
en su caso actuaré, con la mayor objetividad posible, tomando en
consideración tanto lo que pueda favorecer como lo que pueda
perjudicar a cualquiera de las dos partes y que conozco las sanciones
penales en que pudiera incurrir si incumplo mis deberes como perito".*

CONFIDENTIAL
EP 004906

A-650

**SEXTO.-**     **LA PERSISTENCIA POR LABORATORIOS BELMAC, S.A. EN LA INFRACCIÓN CON POSTERIORIDAD A LA PRÁCTICA DE LAS DILIGENCIAS DE COMPROBACIÓN DE HECHOS EN DICIEMBRE DE 2002**

**A)**     **Las cápsulas de Omeprazol fabricadas por LABORATORIOS BELMAC, S.A. con posterioridad al 19 de diciembre de 2002**

En el período transcurrido entre la práctica de las diligencias en diciembre de 2002 y la resolución del incidente por el Juzgado de Primera Instancia n° 72 de Madrid en febrero de 2005, **LABORATORIOS BELMAC, S.A.** ha seguido fabricando Omeprazol conforme a la formulación de la patente ES 9301319. Presumiblemente esta fabricación se llevó a cabo en la maquinaria propiedad de **ETHYPHARM, S.A.** hasta el 9 de septiembre de 2003 en que fueron retiradas. Nos referimos, en particular, a los siguientes productos:

-    Un lote de Belmazol 20 mg. Cápsulas Omeprazol (S1) cuya fecha de caducidad es enero de 2005, por lo que habría sido fabricado en enero de 2003.

-    Un lote de Davur 20 mg. (V 008) con fecha de caducidad a enero de 2006, por lo que habría sido fabricado en enero de 2004.

-    Un lote de Belmazol 20 mg. (V 003) con fecha de caducidad a diciembre de 2006, por lo que habría sido fabricado en diciembre de 2004.

-    Un lote de Omeprazol Farmygel (V 034) con fecha de caducidad a septiembre de 2006.

Aportamos, como DOCUMENTO N° 30, las fotocopias del estuche y prospectos de estos productos. Los originales fueron utilizados, como enseguida se indicará, para un análisis técnico. En ellos puede ser leída la referencia a **LABORATORIOS BELMAC, S.A.** como fabricante. Designamos a efectos de prueba, no sólo los dossieres de fabricación obrantes en los archivos de **LABORATORIOS BELMAC, S.A.**, sino también la propia *muestrateca* de la demandada en cuanto a las cápsulas correspondientes a estos lotes.

CONFIDENTIAL
EP 004907

A-651

B)      <u>La inexistencia de cambio alguno en la formulación: falta de
        nuevos registros sanitarios obtenidos por LABORATORIOS
        BELMAC, S.A. para la comercialización de Omeprazol</u>

El mantenimiento por **LABORATORIOS BELMAC, S.A.** de la misma fórmula
de fabricación del Omeprazol que la facilitada por **ETHYPHARM, S.A.** en su
día se demuestra a las claras por la inexistencia de nuevos registros sanitarios
obtenidos al respecto por la demandada. Aportamos al respecto:

-       Como <u>DOCUMENTO Nº 31</u>, la impresión en papel de las páginas del sitio
        de Internet <www.belmac.com> relativas al Belmazol fabricado por la
        demandada. En ellas figuran las dos fichas técnicas autorizadas por la Agencia
        Española del Medicamento a esta empresa. Estas fichas son las siguientes:
        Belmazol 20 mg. (Primera autorización enero de 1993, revisión febrero de 2001) y
        Belmazol 10 mg. (junio/septiembre 2003). Se recordará que la primera ficha
        técnica es la obtenida durante el período de relaciones entre **ETHYPHARM, S.A.**
        y **LABORATORIOS BELMAC, S.A.**. Pues bien, la formulación de la última
        ficha técnica obtenida por **LABORATORIOS BELMAC, S.A.** para el
        Omeprazol es idéntica a la anterior. El único cambio perceptible es en el
        recubrimiento de la cápsula de gelatina (la adición de óxido de hierro) que no
        afecta a la formulación en sí del producto.

-       Como <u>DOCUMENTO Nº 32</u>, aportamos el listado completo de
        especialidades farmacéuticas concedidas por la Agencia Española del
        Medicamento que puede ser consultado a través de la página web de este
        Organismo público. En ella no figura ninguna especialidad farmacéutica concedida
        a **LABORATORIOS BELMAC, S.A.** con posterioridad a junio de 2003.

C)      <u>La irrelevancia de las patentes posteriores obtenidas por
        LABORATORIOS BELMAC, S.A. en relación con el
        Omeprazol</u>

Esta parte ha tenido conocimiento de que **LABORATORIOS BELMAC, S.A.** ha
obtenido el registro de una patente de invención para *"un procedimiento
mejorado para la obtención de pellets de Omeprazol estables y*

CONFIDENTIAL
EP 004908

A-652

*gastrorresistentes, pellets así obtenidos y aplicaciones"*. Esta patente fue solicitada el 6 de abril de 2001 y ha sido concedida recientemente por la Oficina Española de Patentes y Marcas. Su relevancia a efectos de la cuestión que se debate en este procedimiento es nula, al margen de las cuestiones jurídicas que se expondrán en su momento, si se toma en cuenta el propio análisis efectuado por el perito D. Rafael Sánchez en su dictamen. Según el perito, la patente de **LABORATORIOS BELMAC, S.A.** *estaría comprendida en la propia patente nº 9301319 de ETHYPHARM por las siguientes razones:*

> *"a) La patente se refiere a unos procedimientos para la obtención de pellets de Omeprazol estables cuya formulación es sustancialmente idéntica a la protegida en las reivindicaciones 1 a 6 de la patente de ETHYPHARM. Particularmente, la formulación comprende los siguientes componentes esenciales:*
>
> - *Neutros (Sacarosa y almidón)*
> - *Omeprazol*
> - *Manitol (en concetración sustancialmente idéntica al Omeprazol)*
> - *Carboximetilalmidón*
> - *Laurisulfato sódico*
>
> *b) Los únicos componentes presentes en la formulación de la patente ES 2192929 con respecto a la patente de ETHYPHARM serían los siguientes:*
>
> - *Polivinilpirrolidona (que es un ligante equivalente al Farmacoat o hidroxipropilmetilcelulosa reivindicado en la patente de ETHYPHARM)*
> - *Alcohol Isopropílico (que desaparece durante el proceso de fabricación y por lo tanto no forma parte de la composición final de la formulación)*
>
> *c) Estos componentes estaban siendo utilizados ya con anterioridad a la fecha de solicitud de la patente de BELMAC, tal como demuestra el dossier que se aporta como ANEXO III".*

Aportamos como <u>DOCUMENTO Nº 33</u>, el texto de la patente 2192929 de **LABORATORIOS BELMAC, S.A.** tal y como puede ser obtenido a través de la base de datos de la Oficina Española de Patentes y Marcas.

CONFIDENTIAL
EP 004909

A-653

**D)**        **La verificación técnica adicional que se aporta en relación con el Omeprazol actual fabricado por LABORATORIOS BELMAC, S.A.**

Aunque las evidencias e indicios apuntan a que **LABORATORIOS BELMAC, S.A.** ha seguido fabricando su Omeprazol con arreglo a la formulación reivindicada en la patente ES 9301319 y merced a la tecnología proporcionada por **ETHYPHARM, S.A.**, mi representada ha querido someter las últimas cápsulas de Omeprazol adquiridas en el mercado a un análisis técnico.

Aportamos al respecto y como <u>DOCUMENTOS Nº 34, 35 y 36</u>, los informes emitidos por el Profesor Robert Rosset en abril de este año analizando, respectivamente, una tableta de Omeprazol de los lotes adquiridos por **ETHYPHARM, S.A.** y citados anteriormente en este escrito. El resultado final o conclusión en todos, después de analizado el microgránulo de Omeprazol por la técnica de la espectrometría por infrarrojos es inequívoco: el porcentaje de Omeprazol y manitol utilizado coincide sustancialmente con las cantidades reivindicadas en la patente ES 9301319:

| Medicamento | Lote | Fecha caducidad | Omeprazol en % | Manitol en % |
|---|---|---|---|---|
| BELMAZOL 20 mg | S1 | 01.2005 | 52,1 | 47,9 |
| DAVUR 20 mg | V008 | 01.2006 | 52 | 48 |
| BELMAZOL 20 mg | V003 | 12.2006 | 44,4 | 55,6 |

**SÉPTIMO.-**    **LOS DAÑOS Y PERJUICIOS QUE SE DERIVAN DE LA VIOLACIÓN DE LA PATENTE DE ETHYPHARM, S.A. Y DEL COMPORTAMIENTO DESLEAL DE LABORATORIOS BELMAC, S.A.**

**A)**        **El margen que representaba para ETHYPHARM, S.A. la venta del Omeprazol fabricado por LABORATORIOS BELMAC, S.A.**

Las relaciones entre **ETHYPHARM, S.A.** y **LABORATORIOS BELMAC, S.A.** a propósito del Omeprazol partían del establecimiento de un precio por la

CONFIDENTIAL
EP 004910

A-654

venta del producto fabricado por la demandada. Este precio variaba según se trate de Omeprazol correspondiente a un pedido de **ETHYPHARM, S.A.**, Omeprazol fabricado para el consumo interno de **LABORATORIOS BELMAC, S.A.** (sus propios productos o pedidos de sus clientes) y el Omeprazol con destino a la exportación. El margen, como es natural, variaba a lo largo de los años. Esta parte ha efectuado el correspondiente promedio en 250 Euros por kilo de Omeprazol transformado en microgránulos. Anunciamos desde ahora la presentación de un informe contable, que no estaba disponible al tiempo de interposición de la demanda, confirmando este dato.

B)      <u>La cuantificación del daño en la fabricación y venta de Omeprazol a partir del 23 de marzo de 2002</u>

*La indemnización por daños y perjuicios deberá ser calculada sobre la base de las unidades vendidas y kilogramos de Omeprazol fabricados por parte de* **LABORATORIOS BELMAC, S.A.** *a partir del 23 de marzo de 2002 y hasta la fecha en que se lleve a efecto la sentencia que se dicte.* A efectos de prueba esta parte efectúa las siguientes manifestaciones:

-       Aportamos, antes que nada, como <u>DOCUMENTOS Nº 37 y 38</u>, las certificaciones expedidas por la empresa especializada IMS HEALTH, S.A. sobre *unidades vendidas y facturación total de las especialidades de Omeprazol en los años 2002, 2003 y 2004.*

-       Designamos los archivos de **LABORATORIOS BELMAC, S.A.** en cuanto a su deber de exhibición. Por medio de OTROSÍ DIGO se solicita específicamente que **LABORATORIOS BELMAC, S.A.** aporte al Juzgado una certificación, con el visto bueno de su auditor, comprensiva de los siguientes extremos: (i) especialidades farmacéuticas de Omeprazol fabricadas por **LABORATORIOS BELMAC, S.A.** *para sus propios productos o para terceros y con destino a la exportación a partir del 23 de marzo de 2002* (ii) kilogramos de Omeprazol fabricados desde el 23 de marzo de 2002 para las referidas especialidades farmacéuticas.

-       Proponemos como prueba, también por OTROSÍ DIGO, la designación por el Juzgado de un perito contable para que a la vista de la facturación, libros

CONFIDENTIAL
EP 004911

A-655

oficiales, documentos contables y cualquier otro documento necesario, tanto de la compañía **ETHYPHARM, S.A.** como de la demandada **LABORATORIOS BELMAC, S.A.**, certifique: (i) cuál era el precio medio que **LABORATORIOS BELMAC, S.A.** pagaba a **ETHYPHARM, S.A.** en relación con la fabricación y venta de especialidades farmacéuticas de Omeprazol (ii) cuál era el precio que hubiera debido pagar **LABORATORIOS BELMAC, S.A.** a **ETHYPHARM, S.A.** en relación con la fabricación y venta por **LABORATORIOS BELMAC, S.A.** de especialidades de Omeprazol a partir del 23 de marzo de 2002.

## FUNDAMENTOS DE DERECHO

### -I-

### PRESUPUESTOS PROCESALES

1.       Jurisdicción y clase de juicio

El artículo 22.1 de la Ley Orgánica del Poder Judicial, en cuanto a la competencia de los Tribunales españoles para conocer del presente litigio, en relación con el artículo 36 de la Ley de Enjuiciamiento Civil 1/2000 de 7 de Enero (en adelante, la Ley 1/2000).

El artículo 125.1 de la Ley de Patentes, en la redacción dada el mismo por la Disposición Final Quinta de la Ley 1/2000, según la cual:

> *"Los litigios civiles que puedan surgir al amparo de la presente Ley se resolverán en el juicio que corresponda conforme a la Ley de Enjuiciamiento Civil".*

El artículo 249.1.4º de la Ley de Enjuiciamiento Civil 1/2000, en cuanto a la clase de juicio aplicable y al ámbito del Juicio Ordinario, a cuya sustanciación se atribuyen,

> *"4º. Las demandas en materia de competencia desleal, propiedad industrial, propiedad intelectual y publicidad, siempre que no versen exclusivamente sobre reclamaciones de cantidad, en cuyo caso se*

CONFIDENTIAL
EP 004912

A-656

*tramitarán por el procedimiento que les corresponda en función de la cuantía que se reclame".*

## 2.    Competencia objetiva

El apartado 2 del artículo 86 ter de la Ley Orgánica del Poder Judicial (según modificación introducida mediante Ley Orgánica 8/2003 de 9 de julio para la Reforma Concursal), respecto de la competencia de los Juzgados de la Mercantil en materia de propiedad industrial, a cuyo tenor,

> *"2. Los juzgados de lo mercantil conocerán, asimismo, de cuantas cuestiones sean de la competencia del orden jurisdiccional civil, respecto de:*
>
> *a) Las demandas en las que se ejerciten acciones relativas a competencia desleal, propiedad industrial, propiedad intelectual y publicidad, así como todas aquellas cuestiones que dentro de este orden jurisdiccional se promuevan al amparo de la normativa reguladora de las sociedades mercantiles y cooperativas".*

## 3.    Competencia territorial

El ordinal 13°, del apartado 1° del artículo 52 de la Ley de Enjuiciamiento Civil, a cuyo tenor:

> *"En materia de patentes y marcas, será competente el Tribunal que señale la legislación especial sobre dicha materia".*

El apartado 2° del artículo 125 de la Ley de Patentes, según el cual:

> *"Será competente el Juez de 1ª Instancia de la ciudad sede del Tribunal Superior de Justicia de la Comunidad Autónoma correspondiente al domicilio del demandado".*

## 4.    Legitimación

Está legitimada activamente para ejercitar la presente acción la compañía demandante **ETHYPHARM, S.A.**, como titular de la Patente objeto de la acción, de conformidad con lo dispuesto en el artículo 62 de la Ley de Patentes de 20 de Marzo de 1986, en relación con el artículo 10 de la Ley 1/2000.

CONFIDENTIAL
EP 004913

Está legitimada la demandada pasivamente para soportar esta acción en su condición de compañía responsable de la fabricación y venta de productos que vulneran los derechos de exclusiva que se derivan de tal registro de propiedad industrial.

**5.       Postulación**

Es preceptiva la representación por Procurador y la asistencia de Letrado, al tratarse de un Juicio Ordinario no exento de Postulación, conforme a lo dispuesto en los artículos 23 y 31 de la Ley 1/2000.

**6.       Actividad probatoria**

El artículo 328 de la Ley 1/2000, en cuanto al deber de exhibición documental entre partes, según el cual,

> *"1. Cada parte podrá solicitar de las demás la exhibición de documentos que no se hallen a disposición de ella y que se refieran al objeto del proceso o a la eficacia de los medios de prueba.*
>
> *2. A la solicitud de exhibición deberá acompañarse copia simple del documento y, si no existiere o no se dispusiere de ella, se indicará en los términos más exactos posibles el contenido de aquél."*

-II-

**DERECHOS QUE SE DERIVAN DE LA TITULARIDAD POR LA ACTORA DE LA PATENTE ES 9301319 Y VIOLACIÓN DE LOS MISMOS EN LA FABRICACIÓN Y VENTA POR LA DEMANDADA DE OMEPRAZOL**

**1.-       Noción y regulación de la patente**

La Ley española de Patentes de 20 de marzo de 1986 reconoce en su Preámbulo que la legislación en esta materia *"influye decisivamente en la organización de la economía, al constituir un elemento fundamental para impulsar la innovación tecnológica"*, añadiendo:

CONFIDENTIAL
EP 004914

A-658

> *"Una ley de patentes que proteja eficazmente los resultados de nuestra investigación, constituye un elemento necesario dentro de la política española de fomento de la investigación y el desarrollo tecnológico".*

Del régimen general de las patentes en nuestro país, conviene destacar como punto de partida:

(a)    Que conforme a lo dispuesto en el artículo 4 de la Ley, son patentables las *invenciones nuevas que impliquen una actividad inventiva y sean susceptibles de aplicación industrial.*

(b)    Que conforme a lo dispuesto en el artículo 49, la patente *tiene una duración de 20 años improrrogables, contados a partir de la fecha de la presentación de la solicitud y produce sus efectos desde el día en que se publica la mención de que ha sido concedida.*

(c)    Que tradicionalmente las patentes pueden comprender reivindicaciones relativas al producto y reivindicaciones relativas al procedimiento de fabricación del mismo. En el sector farmacéutico, las patentes de *producto* son viables a partir del 7 de octubre de 1992, en virtud de lo dispuesto en la Disposición Transitoria Primera, según la cual:

> *"1. No serán patentables las invenciones de productos químicos y farmacéuticos antes del 7 de octubre de 1992.*
>
> *2. Hasta esa fecha no tendrá vigencia ninguno de los artículos contenidos en la presente Ley en los que se disponga la patentabilidad de invenciones de productos químicos y farmacéuticos ni aquellos otros preceptos que se relacionen indisolublemente con la patentabilidad de los mismos.*
>
> *3. Lo dispuesto en los apartados anteriores no afecta a las invenciones de procedimiento o aparatos para la obtención de productos químicos o farmacéuticos, ni a los procedimientos de utilización de productos químicos, todos los cuales podrán ser patentados conforme a las normas de la presente Ley desde la entrada en vigor de la misma".*

2.-    <u>Alcance del derecho de exclusiva en el caso de las patentes de producto</u>

El régimen jurídico de la patente de invención, al igual que sucede con cualquier

CONFIDENTIAL
EP 004915

A-659

modalidad de propiedad industrial, se basa en el *ius prohibendi* o *ius excludendi alios*. El titular registral de una patente disfruta de un derecho de exclusiva que le permite proceder contra cualquier empresa que pretenda explotar el objeto reivindicado sin su consentimiento. El propio artículo 50 de la Ley de Patentes concreta este régimen de exclusiva o monopolio legal en los términos siguientes:

> *"La patente confiere a su titular el derecho a impedir a cualquier tercero que no cuente con su consentimiento:*
>
> *a) La fabricación, el ofrecimiento, la introducción en el comercio o la utilización de un producto objeto de la patente o la importación o posesión del mismo para uno de los fines mencionados.*
>
> *b) La utilización de un procedimiento objeto de la patente o el ofrecimiento de dicha utilización, cuando el tercero sabe o las circunstancias hacen evidente que la utilización del procedimiento está prohibida sin el consentimiento del titular de la patente.*
>
> *c) El ofrecimiento, la introducción en el comercio o la utilización del producto directamente obtenido por el procedimiento objeto de la patente o la importación o posesión de dicho producto para alguno de los fines mencionados."*

Cualquier acto de ofrecimiento o de utilización del objeto que no cuente con el consentimiento de su titular constituirá una violación de la exclusiva. Obviamente, en el caso de una patente de *producto* farmacéutico, la protección se extiende a la formulación en sí del producto *cualquiera que sea el procedimiento de fabricación que se utilice*. Si el resultado de ese procedimiento sigue siendo la misma formulación, la violación subsiste.

**3.-**      **La infracción de una patente *por equivalencia***

A la hora de considerar si el producto infractor constituye una violación de la patente, carecen de toda importancia las variantes que hayan podido ser introducidas pero que no supongan cambio alguno en el resultado. También contempla nuestro ordenamiento jurídico la violación de patente por *equivalencia*.

En efecto, se entiende por doctrina de los equivalentes aquélla que postula una interpretación amplia del contenido de la invención patentada para evitar la utilización inconsetida por terceros de soluciones técnicas que, sin estar

CONFIDENTIAL
EP 004916

comprendidas en el tenor literal de las reivindicaciones de la patente, presentan variantes insustanciales respecto de los elementos comprendidos en la misma. La doctrina parte de la necesidad de proteger la patente más allá de lo que sus reivindicaciones expresan *ad pedem literae*. En virtud de esta doctrina, se entienden protegidos por la patente no sólo los elementos mencionados explícitamente en las reivindicaciones, sino también aquellos otros elementos o modos de realización alternativos pero que resulten equivalentes.

En la actualidad esta doctrina de los equivalentes cuenta con un sustento legal que no admite ninguna duda. Entre otras disposiciones normativas, nos permitimos citar al respecto:

- El artículo 60.1 de la Ley de Patentes, según el cual,

> *"1. La extensión de la protección conferida por la patente o por la solicitud de patente se determina por el contenido de las reivindicaciones. La descripción y los dibujos sirven, sin embargo, para la interpretación de las reivindicaciones".*

- El artículo 69.1 del Convenio de 5 de Octubre de 1973 sobre concesión de patentes europeas, que entró en vigor en España a partir del 1 de Octubre de 1986, a cuyo tenor,

> *"El alcance de la protección que otorga la patente europea o la solicitud de patente europea, estará determinado por el tenor de las reivindicaciones. No obstante, la descripción y los dibujos servirán, para interpretación éstas".*

- El protocolo interpretativo del Convenio sobre la patente europea, que forma parte integrante del mismo, que contiene la siguiente manifestación:

> *"El artículo 69 <u>no deberá interpretarse en el sentido de que el alcance de la protección que otorga la patente europea haya de entenderse según el significado estricto y literal del texto de las reivindicaciones</u> y que la descripción y los dibujos sirven únicamente para disipar las ambigüedades que pudieran contener las reivindicaciones. Tampoco debe interpretarse en el sentido de que las reivindicaciones sirven únicamente de línea directriz y que la protección se extiende también a lo que, según opinión de una persona de oficio que haya examinado la descripción y los dibujos, el titular de la patente haya querido proteger. El artículo 69 debe, en cambio, interpretarse en el sentido de que*

CONFIDENTIAL
EP 004917

A-661

> *define, entre estos extremos, una posición que asegura a la vez una protección equitativa al solicitante y un grado razonable de certidumbre a terceros."*

Los equivalentes constituyen hoy una doctrina consolidada en la jurisprudencia española. Los tribunales han venido a establecer que cuando los cambios no afectan a la noción global de la invención o al principio esencial que la inspira, sino que representan la mera sustitución de unos elementos por otros, la infracción permanece.

La Sala 1ª del Tribunal Supremo pareció acercarse a la doctrina del "concepto inventivo general" en su sentencia de 13 de diciembre de 1989, en la que declaró que:

> *"Nadie puede aprovechar una idea ajena para presentarla como propia so pretexto de haber introducido en su esquema o en su utilización pequeñas e insustanciales modificaciones".*

La Sección 15ª de la Audiencia Provincial de Barcelona se pronunció sobre la doctrina de los equivalentes, en un primer momento, en su sentencia de 15 de marzo de 2000 (JUR 2000/182856), señalando al respecto:

> *"CINQUE La part actora, tant en els aclariments demanats als perits, com en les últimes manifestacions efectuades en la segona instancia, centra la qüestió en el que considera l'equivalència entre l'òrgan de guiatge de les espires, tal com es reivindica a la patent d'invenció número 541.248, de SUPERBA i l'organ de guiatge de les espires previst a la maquina HB1 de MOTOCONO, en les seves tres versions.*
>
> *Es refereix, en definitiva, a l q u e conceptua una violació per equivalencia, i cita, entre d'altres, la Sentencia de la Sala Contenciosa Administrativa del Tribunal Suprem, de 5 de desembre de 1967, en el sentit que no pot evitar-se el joc del principi dels equivalents, a la llum del qual en la protecció de qualsevol invenció registrada s'hi entenen compreses totes les variants de foma, matèria, grandària, disposició d'elements i fins i tot qualsevol substitució d'aquests elements per uns altres, quan amb aixo no s'alteri el principi fonamental de la invenció descrita, reivindicada i emparada per la patent o el model d'utilitat preexistent en el registre.*
>
> *La par-t actora sosté que l'equivalencia entre els òrgans de guiatge de les espires no queda desmentida pel fet que en el cas de SUPERBA l'òrgan de guiatge sigui d'una sola peca (sable) i en el de*

CONFIDENTIAL
EP 004918

A-662

> *MOTOCONO en dues peces separades (sable o coiler + guia aplicadora) perquè les dues solucions compleixen la mateixa funció, operen de la mateixa manera i obtenen el mateix resultat."*

Pero es en la <u>sentencia de la Audiencia Provincial de Barcelona (Sección 15ª) de 18 de septiembre de 2000 (AC 2054)</u> donde se estableció definitivamente el principio de los equivalentes. Los términos en los que se pronuncia la sentencia son los siguientes,

> *"Como regla puede afirmarse que, a tenor de lo que dispone el artículo 26 de la Ley de Patentes las reivindicaciones definen el objeto por el que se solicita la protección, por lo que, según el 60.1 «la extensión de la protección conferida por la patente o por la solicitud de la patente se determina por el contenido de las reivindicaciones».*
>
> *Ahora bien, la protección eficaz del derecho de los inventores, no tolera que pueda burlarse el monopolio mediante la introducción en invento de cualquier modificación irrelevante, que destruya la absoluta igualdad entre el mismo y el nuevo procedimiento, dando lugar a la doctrina de «los equivalentes», entendiendo por tales las «variantes de forma, materia, tamaño, disposición de elementos e incluso toda sustitución de esos elementos por otros, cuando con ello no se altere el principio fundamental de la invención descrita, reivindicada y amparada por la patente o el modelo de utilidad» (sentencia de la Sala 3ª de 10 de junio de 1968 [RJ 1968\3155]), o «cuando dos medios cumplen la misma función para conseguir idéntico resultado pese a que los modos de realización sean diferentes»; cumpliendo la misma función «cuando proceden de la misma idea fundamental» es decir, cuando aplican el mismo principio de la misma manera», siendo idéntico el resultado cuando «es de la misma naturaleza y de la misma calidad» (decisión de 15 de junio de 1994 en el recurso T 697/1992 de la Oficina Europea de Patentes).*
>
> *En nuestras sentencias de 3 de enero (AC 2000\685) y 10 de febrero actual –Bayer vs. Impx (caso del ciprofloxacino), y Pfizer vs. Chemo Ibérica (caso del fluconazol)–, en supuestos que presentan ciertas similitudes, hacíamos nuestra la posición mantenida por el Tribunal Supremo en las sentencias de 13 de octubre de 1975 (RJ 1975\3420) y 13 de octubre de 1982 (RJ 1982\5761), entendiendo que el concepto de procedimiento químico o farmacéutico se delimita por la concurrencia de tres elementos: la sustancia básica de la que se parte; los medios de actuación sobre esa sustancia; y el producto final o resultado."*

Esta jurisprudencia ha sido ratificada en la <u>sentencia reciente de la Sección 15ª de la Audiencia Provincial Barcelona de 14 octubre 2002</u> (JUR 2004\14120), a cuyo

CONFIDENTIAL
EP 004919