## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| **ETHYPHARM S.A. FRANCE and** ) | |
| **ETHYPHARM S.A. SPAIN,** ) | |
| ) | **C.A. No.:  04-1300 (SLR)** |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **BENTLEY PHARMACEUTICALS, INC.** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

### PLAINTIFFS' OPPOSITION TO DEFENDANT'S
### MOTION FOR SUMMARY JUDGMENT

Francis J. Murphy, Esquire (No. 223)
MURPHY SPADARO & LANDON
1011 Centre Road, Suite 210
Wilmington, DE 19805
Tel: (302) 472-8100
Fax: (302) 472-8135

*Attorneys for Plaintiffs*

*Of Counsel:*

Dwight P. Bostwick, Esquire
Bruce R. Grace, Esquire
Jonathan D. Fine, Esquire
Baach Robinson & Lewis PLLC
1201 F Street, NW, Suite 500
Washington, DC 20004
Tel: (202) 833-8900
Fax: (202) 466-5738

Dated:  September 15, 2006

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

NATURE AND STAGE OF PROCEEDINGS ........................................................................1

SUMMARY OF ARGUMENT ................................................................................................1

STATEMENT OF FACTS .......................................................................................................3

I.      Bentley's Management Control of Belmac................................................................3

        A.      The Bentley and Belmac Boards of Directors .........................................4

        B.      Bentley's Control over Belmac through Bentley's CEO ..........................5

        C.      Bentley's Control over Belmac through Management Agreements .......................6

        D.      Bentley's Control over Hiring, Compensation and Budgets .................8

II.     Bentley's Control of the Ethypharm Relationship with Belmac ...................................10

        A.      Bentley Takes Control of Laboratories Belmac (1994-1996) ..............................10

        B.      Bentley Responds to Threatened Termination (1997).............................14

        C.      Bentley Confirms Ethypharm's Ownership of Trade Secrets (1998-2000) ..........16

        D.      Bentley Directs the Theft of Ethypharm's Technology and
                Customers (2000-2003) ..........................................................................19

III.    Ethypharm's Reasonable Understanding of Bentley's Role .................................26

ARGUMENT ..........................................................................................................................29

I.      The Controlling Standard of Review ..................................................................29

II.     The Law Applicable to a Subsidiary Corporation's Conduct as Agent for its Parent ..30

        A.      Express Agency .......................................................................................30

                1.      The Arrangement Between Parent and Subsidiary ....................31
                2.      The Relevance of the Arrangement to Plaintiffs' Claims ..................32

        B.      Apparent Agency .....................................................................................36

III.    The Joint Tortfeasor Basis for Liability Precludes Dismissal ............................38

CONCLUSION .......................................................................................................................40

i

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*Amco Ukreservice & Prompriladamco v. America Meter Co.*, 312 F. Supp. 2d 681 (E.D.Pa. 2004) .................................................................................................37

*Bhatnagarv. Surrendra Overseas*, 52 F.3d 1220 (3d Cir. 1995)................................38

*Brug v. Enstar Group, Inc.*, 755 F. Supp. 1247 (D. Del. 1991) ................................39

*CR Bard Inc. v. Guidant Corp.*, 997 F. Supp. 556 (D. Del 1998)............................31

*Ethypharm S.A. France v. Bentley Pharmaceuticals, Inc.*, 388 F. Supp. 2d 426 (D. Del. 2005)..........................................................................................................39

*Gizzi v. Texaco, Inc.,* 437 F.2d 308 (3d Cir. 1971). ................................................36

*IRS v. Gaster*, 42 F.3d 787 (3d Cir. 1994) .............................................................38

*Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil, Inc.*, 456 F. Supp. 831 (D. Del. 1978)..........................................................................................................32, 33

*Lony v. E.I. Du Pont de Nemours & Co.*, 935 F.2d 604 (3d Cir. 1991)...................38

*Phoenix Canada Oil Co. v. Texaco, Inc.*, 842 F.2d 1466 (3d Cir. 1988)....................30, 32, 34

*Publicker Indust., Inc. v. Roman Ceramics Corp.*, 603 F.2d 1065 (3d Cir. 1979)...................32

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000) ...........................30

*Taylor v. Peoples Natural Gas Co.*, 49 F.3d 982 (3d Cir. 1995) ..............................36

*United States v. Bestfoods*, 524 U.S. 51 (1998) ......................................................37

*Williams v. Chrysler Corp.*, 163 F.3d 183 (3d Cir. 1998) .................................29, 30

### STATE CASES

*Chrysler Corp. v. Chaplake Holdings, Ltd.*, 822 A.2d 1024 (Del. 2003) ................................32

*Miles Inc. v. Cookson America, Inc.*, 1994 Del. Ch. LEXIS 221 (Del. Ch. Nov. 7, 1994)........................................................................................................38, 39

## NATURE AND STAGE OF PROCEEDINGS

The complaint filed by plaintiffs Ethypharm S.A. France and Ethypharm S.A. Spain (collectively "Ethypharm") alleges that defendant Bentley Pharmaceuticals, Inc. ("Bentley") misappropriated Ethypharm's trade secrets and interfered with Ethypharm's customer relations. The complaint premised Bentley's liability on two alternative grounds: (i) liability as principal for the conduct of its agent Laboratorios Belmac S.A. ("Belmac"), Bentley's wholly-owned subsidiary; and (ii) liability as a joint tortfeasor engaging in the alleged misconduct together with Belmac.  Earlier in this proceeding, the Court denied Bentley's motion to dismiss "without prejudice to renew if, as discovery proceeds, it becomes evident that defendant cannot be liable either as a joint tortfeasor or under the agency test."  D.I. 27 at 12.  Following extensive discovery limited to the agency and joint tortfeasor allegations, Bentley now renews its motion, seeking summary judgment as to Ethypharm's allegations of agency.  Bentley has not moved for summary judgment, however, as to its liability as a joint tortfeasor.

## SUMMARY OF ARGUMENT

In its brief in support of summary judgment, Bentley contends that it simply acted as a corporate parent exercising ordinary oversight of its subsidiary Belmac.  It denies any appreciable role in Belmac's relationship with Ethypharm, much less in its misappropriation of Ethypharm's proprietary technology and interference with its customers.  According to Bentley, Ethypharm's assertion that Belmac was Bentley's agent in these matters is based on mere "snippets of evidence" consisting of: (i) "overlapping" membership between the Bentley and Belmac boards; (ii) James Murphy's dual role as Bentley's CEO and "a Belmac officer;" (iii) the existence of "sporadic communications" between Ethypharm and Murphy; and (iv) a "handful" of letters written on Bentley letterhead that Murphy sent to Ethypharm in the mid-1990s.  D.I. 65 at 3.  This recitation is so far removed from a fair summary of the evidence as to be disingenuous.

The evidence attained through discovery tells a very different story.  Indeed, what is most surprising about Bentley's brief is how studiously it avoids disclosure of the true facts relating to

agency and the full history of the relationship between the parties.  In truth, Bentley orchestrated every significant aspect (and many insignificant ones) of Belmac's business.  Contrary to Bentley's assertion that Belmac was managed by Belmac's board of directors, it was Bentley's board of directors that directly controlled Belmac.  Belmac's own board never even met.  Bentley imposed a management contract on Belmac that made Bentley directly responsible for all major aspects of running Belmac's business.  Contrary to sworn declarations Bentley has filed with this Court stressing that Belmac's general manager has "significant autonomous authority" to operate Belmac, discovery has shown that Bentley's board (and not Belmac's board) expressly authorized Bentley's CEO Murphy (and not Belmac's general manager) to assume full control over any negotiations involving Belmac, and it had Murphy appointed as the sole authority to act on Belmac's behalf.  Bentley never amended or revoked the authority it vested in its CEO.  This is direct evidence of agency.

The evidence also refutes Bentley's assertion that Murphy's interaction with Ethypharm only involved "sporadic communications" and that he only sent a "handful" of letters to Ethypharm on Bentley letterhead.  In fact, James Murphy was intimately involved in every important contact with Ethypharm, and he was consulted by Belmac personnel whenever he was not directly involved.  In every instance he held himself out as Bentley's CEO.  He did so orally when he attended meetings, handing out his Bentley CEO card; he did so in every written communication; he did so consistently and repeatedly, not just sporadically.

Just as he was the central figure for Bentley in the ongoing negotiations with Ethypharm as to its venture with Belmac, Murphy was intimately involved, as well, in the termination of that relationship and in the decision to have Bentley go it alone in the microgranulation pharmacology business, abandoning Ethypharm but exploiting Ethypharm's trade secrets and customers.  Discovery has shown that Bentley, acting through its CEO, masterminded the coordinated action that simultaneously unfolded on November 14, 2001, when: (i) Bentley announced that "through its Spanish subsidiary" it had filed for four new patents relating to Ethypharm's proprietary

technology; (ii) Belmac sent Ethypharm a notice of termination that had been thoroughly vetted with Bentley; and (iii) Belmac signed a deal with one of Ethypharm's principal customers to replace Ethypharm as the customer's supplier.

In short, the evidence revealed in discovery, that Bentley was the principal calling the shots for its agent Belmac – and especially directing them in reference to the matters that give rise to the instant case – represents anything but "snippets." It is more than sufficient to defeat summary judgment. It is, in fact, overwhelming.

## STATEMENT OF FACTS

**I.    Bentley's Management Control of Belmac**

In its brief, Bentley asserts that its wholly owned Spanish subsidiary's management and operation is completely independent from Bentley. This central fact is hotly disputed. The evidence shows that Bentley and Belmac operate far outside corporate norms and that Bentley exerts an extraordinary degree of direction and control over its subsidiary, particularly with respect to the claims in this lawsuit.

Bentley is a Delaware corporation with its principal place of business in Exeter, New Hampshire. Before January 1996, Bentley was known as Belmac Corporation, and it had its headquarters in Tampa, Florida.[1] Bentley is traded on the New York Stock Exchange as "BNT."[2] Bentley describes itself in press releases as an "international" company that acts "through its wholly-owned Spanish subsidiary."[3] Similarly, in presentational materials to third parties, Bentley refers to Belmac, its wholly-owned Spanish subsidiary, as a "Division" of Bentley's overall operations, under the managerial control of Bentley in the United States.[4] This representation – not the characterization found in Bentley's brief – is precisely accurate. The

---

[1] B1284, ¶ 34; B1310, ¶ 34; B12.
[2] B1285, ¶ 39; B1311, ¶ 39.
[3] B38; B529.
[4] B621, B623, B625; B659-61.

evidence shows that Belmac is merely the operating arm of Bentley, treated like a division of the parent company, under its total domination and control.

In the period pertinent to this action, Bentley derived 99-100% of its revenues from its Spanish subsidiaries, and as much as 56% of Bentley's annual revenues came from omeprazole manufactured with proprietary technology and trade secrets belonging to Ethypharm.[5]  In keeping with this economic reality, Bentley has not functioned as a parent company providing only high level oversight and administrative support to its autonomous subsidiary.[6]  Instead, its Spanish pharmaceutical operations are Bentley's sole business, and Bentley has structured its relationship with Belmac to direct and control its subsidiary's most important operations.

### A.    The Bentley and Belmac Boards of Directors

Bentley's control over the management of Belmac starts with the way the parent company has structured the boards of directors of the two entities.  Bentley, as Belmac's sole shareholder, appoints each member of the Belmac Board.  James Murphy, Bentley's CEO and Chairman of its Board, personally votes the shares on behalf of the parent corporation in making these appointments.[7]  Since at least 2003, there has been a 100% overlap between the top officials of Bentley and the three Board members of Laboratorios Belmac.[8]  From 1995 to 2003, Bentley's two highest officials – its CEO and its CFO –held two of the three positions on Belmac's board.[9]

This overlap in the two boards, however, is the starting point for Bentley's control over Belmac, and not, as Bentley claims, the end point.  In fact, the Belmac board is largely a paper entity.  It ***never*** actually meets.[10]  Instead, its members individually sign certain legal papers once per year.[11]  The Belmac board itself never considers or decides strategy, establishes budgets, considers product development issues, sets compensation, hires or fires, or otherwise manages the

---

[5]  JT-A-1139-40:101-102; JT-A-1138:95; JT-A-1140:105; JT-A-1059:188; B413; B430.
[6]  B1196-1200, ¶ 6d.
[7]  *Id*. at ¶ 6.
[8]  *Id*. at ¶ 6d.; JT-A-1020-21:33-34.
[9]  JT-A-1020:30-32.
[10]  JT-A-1030:73; JT-A-1155:164.
[11]  *Supra* note 10.

company.[12]  All of these functions are carried out by Bentley's board, either directly or under its express authorization.[13]  Bentley's board meets regularly and generates regular board minutes and management reports related to the company as a whole and to Belmac in particular.  The only memorialization of strategy and decision-making with respect to Belmac takes place at Bentley headquarters in the United States – not at Belmac in Spain.  Thus, Bentley's management reports contain a prioritized list of action items relating to its Spanish operations and designate which Bentley official is responsible for such action.[14]

       **B.**       **Bentley's Control over Belmac through Bentley's CEO**

       In the declarations by James Murphy and Adolfo Herrera that Bentley filed with this Court in support of its original motion to dismiss, Bentley asserted that Herrera, as Belmac's GM, has extensive operational authority in running Belmac and that James Murphy's "involvement with Belmac is limited to discussing general strategies with Mr. Herrera and to addressing issues that exceed the power delegated to Mr. Herrera."[15]  These declarations omitted, however, many material facts ultimately uncovered in discovery.  For instance, Bentley's board of directors has formally vested complete authority for negotiating transactions on behalf of Belmac not in Herrera but in Bentley's own CEO, James Murphy.[16]

       On December 8, 1994, just a few days after taking over as Bentley's top official and before Murphy's first trip to meet with Ethypharm's officials, the Bentley board met in the United States.  At that meeting, James Murphy, Chairman of the Bentley board, requested and received express authority from the board to negotiate agreements involving Belmac as agent for the U.S. parent company.[17]  The board minutes read:

> Mr. Murphy asked for authority to negotiate transactions involving the Spanish subsidiary [Laboratorios Belmac].  The [Bentley] Board affirmed that the

---

[12] JT-A-1030:73; JT-A-1155:164; JT-A-1153:154-55; JT-A-1017:20-21.

[13] *See, e.g.*, B375-76; B582-83, ¶ 30; B187.

[14] *See, e.g.*, B358, ¶ 11-14; B582-83, ¶ 30; B591.

[15] B1253, ¶ 12.

[16] B15, B23.

[17] *Supra* note 16.

authority to negotiate has already been vested, but that any agreement must be subject to [Bentley] Board approval.[18]

At his deposition, Murphy confirmed that he had authority as "president of the parent company" to negotiate transactions for Belmac and that his express authority from Bentley's board was never revoked or amended.[19]

It was also Murphy, and not a local Spanish official, who in 1995 was named Belmac's "Consejero Delegado," a position under Spanish law that is vested with sole and absolute authority to act for the company.[20] Hence, any authority Herrera had in running Belmac has been personally delegated to him by Murphy and not by Belmac's non-functioning board. In short, the sworn declarations previously filed by Bentley completely misportray how Belmac was managed.[21]

**C.    Bentley's Control over Belmac through Management Agreements**

In addition to the authority over Belmac that Bentley's board delegated to its president, Bentley also exercised control over the management of its subsidiary through a series of management agreements.[22] Although executed by Murphy and Herrera, neither of these top officials disclosed the existence of these management agreements in their sworn declarations filed with the Court on the subject of the parents' management and control of its subsidiary. Under these management agreements, Bentley provided Belmac with comprehensive management services. The "Management Support Service Agreement" in force from July 1998 to January 2002 called for Bentley to provide the following services, among others:

1.    "Technical Operations," including "Quality control and quality assurance on a day-to-day basis" and "assistance . . . designed to give [Belmac] the information they request on technical issues."

2.    "Marketing and Marketing Services," including "Identification of potential clients and formulation of worldwide lists thereof for [Belmac]" and "availability

---

[18] B23.
[19] JT-A-1033-34:85-86.
[20] B1197, ¶ 4; JT-A-1021:35-36. Murphy still holds this title. B1197, ¶ 4.
[21] B1255-60, ¶¶ 9-23; B1196-1200.
[22] B245-50; B251-68; B563-72.

to respond to inquiries . . . and take charge of relations with the clientele . . . including periodic trips abroad to make personal visits to each client's headquarters."

3. "Corporate Services," including "all the company's catalogs, flyers, and other advertising publicity materials intended to be distributed. . ."

4. "Managerial Services," including:

"a. Formulation of strategic programs for [Belmac].
 b. Determination of [Belmac's] pricing policy.
 c. Development of new product lines and new business opportunities for [Belmac]
 d. Assistance in making financial decisions and formulating financial policy, including foreign currency planning and investment opportunities for [Belmac].
 e. Travel to [Belmac's] headquarters to examine the operations and advise key personnel."

5. "Accounting and Finance," including the "formulation and review of budgets."

6. "Administrative," including "selection of top management personnel for [Belmac]," "formulation of adequate compensation structures," "standards to be applied to all the personnel management and hiring practices," "Establishment on a tactical basis of the operating activities policy in such areas as . . . local legislation."

7. "Product Development," including "Development and testing of all new products."

8. "Quality Assurance," including "Availability to control and supervise the procedures for inspection … and make certain they are in compliance with the specified quality standards."[23]

In short, contrary to Bentley's assertions (and the sworn declarations of Murphy and Herrera) that Belmac's board and GM were fully responsible for managing Belmac's business, these management agreements establish that Bentley controlled all of the top-level managerial functions for Belmac.[24]    Bentley invoiced its Spanish subsidiaries, including Belmac,

---

[23] B252-55; B261-64.

[24] Bentley not only provided top-level management, it also involved itself in the most mundane issues. As one example, Ethypharm's GM in Spain expressed his frustrations over Bentley's involvement in an internal memo dated October 10, 2000, which states:

 Organigramme[Laboratorios Belmac's Organizational chart]: this is no joke, the general manager in Belmac Spain told us this subject has to receive authorisation from Mr. Murphy president of the company in the U.S.!! (B339, ¶ 3.)

Laboratorios Belmac did, indeed, send its own organizational chart to Bentley for review and approval on October 30, 2000, prior to sending it to Ethypharm. The fact that something as minor

approximately $8 million dollars for the comprehensive management services it provided.[25] While this money was invoiced, Belmac's debt was ultimately forgiven by Bentley in exchange for additional stock in Belmac, despite the fact that Bentley already owned 100% of Belmac's stock. No money changed hands.[26] Bentley and Belmac relied, however, on the fact that Bentley was invoiced to comprehensively manage its subsidiary to justify significant tax benefits.[27]

When these facts came out in discovery, Bentley attempted to downplay their significance, asserting that these management agreements were a mere accounting practice and tax scheme. Yet whatever their tax purpose, the evidence shows that these services were billed for and rendered. That Bentley did, indeed, provide these extensive management services is confirmed by records Bentley produced only after discovery ended. These records, kept to justify its tax benefits, reflect that top Bentley officials spent between 30% and 80% of their time managing the operations of Laboratorios Belmac.[28] Having relied upon the fact that Bentley managed its Spanish subsidiary for years to obtain enormous tax benefits, Bentley should not now be heard to claim that these agreements were just a sham to save taxes and thereby disavow providing these services in order to support its summary judgment motion. Indeed, one wonders how the tax authorities in the United States and Spain would view Bentley's current position.

### D.    Bentley's Control over Hiring, Compensation and Budgets

That Murphy acted for Bentley and not simply as Belmac's President is further confirmed by the fact that he, like other Bentley personnel that provided Belmac management, was

---

and uncontroversial as a basic organizational chart of Belmac required the approval of the CEO and Chairman of the Board of the parent company in the U.S. is compelling evidence of Bentley's total control over its agent Belmac.

[25]  B1149-95.

[26]  B1243-44, ¶ 46; B1250-51, ¶ 46.

[27]  JT-A-1079:266-67.

[28]  B1109-48. These documents were only produced to plaintiffs after repeated requests and after the close of phase 1 discovery. They show that Stote, Bentley's Chief Technical Officer, regularly spent 80% of his time providing management services to Belmac, and he has never held a position at Belmac. Murphy regularly spent 50% of his time managing Belmac's operations as his personal daily diaries confirm. B749-1102; B1013-1108.

compensated solely by Bentley.[29]  When Murphy acted for Belmac, he did so under Bentley's express authorization, for Bentley's benefit, and Bentley paid him handsomely.[30]

Bentley not only paid its own personnel to manage Belmac, but it controlled decisions regarding hiring, firing, compensation, and bonuses for top Belmac employees.  Since 1994, Bentley's CEO has hired or fired each of the general managers of Belmac.[31]  In addition, decisions regarding the salary of the Spanish GMs are made each year by the Bentley board of directors following review and approval by the Bentley compensation committee.[32]  The Bentley board also regularly awards Bentley stock or stock options to dozens of top employees of its Spanish subsidiary.[33]

As with compensation, bonuses, and awards of stock, the Bentley board – and not the Belmac board – meets to approve Belmac's annual budget.[34]  The Bentley board also formally approves the budget for studies and research and development, the very work product that Bentley and Belmac have derived from the misappropriation of Ethypharm's trade secrets.[35]

In its brief in support of summary judgment, Bentley stresses that Belmac's business is centered in Spain, that Belmac employs hundreds of workers, operates the manufacturing and distribution facilities, has bank accounts, raises financing, and obtains a host of government authorizations to conduct its business.  This evidence misses the point.  Ethypharm does not dispute that Belmac is Bentley's operating arm or that the business of manufacturing and selling products produced with Ethypharm's technology is centered in Spain.  The agency issue presented is not *where* the manufacturing operations take place but *who* has control over those

---

[29]  JT-A-1029:69; JT-A-1124:39.

[30]  B23; JT-A-1033-34:85-86; Bentley paid Murphy up to $900,000 per year in compensation, bonuses and options; Belmac paid Murphy nothing.  JT-A-1027-28:60-64; JT-A-1065:210-11.

[31]  JT-A-1016-17:17-20.

[32]  JT-A-1017-18:20-23; B195; B200.

[33]  JT-A-1018:23; JT-A-659-60:107-12; B275-76.

[34]  JT-A-1153:154.

[35]  JT-A-1152-53:150-54.

operations.  The total control that Bentley, as principal, exercises over Belmac, its agent, has been thoroughly exposed by the evidence reluctantly disgorged by Bentley in discovery.

## II.    Bentley's Control of the Ethypharm Relationship with Belmac

The evidence of Bentley's control as principal over Belmac is not limited to the Bentley board resolutions, management agreements, and decision-making structures that Bentley has imposed upon its wholly-owned Spanish subsidiary, it is especially demonstrated in the close control that Bentley exercised over the relationship with Ethypharm.  This is hardly surprising. Bentley quite naturally was most directly involved in the relationship that was the very core of its business.

### A.    Bentley Takes Control of Laboratories Belmac (1994-1996)

In the early 1990s, Ethypharm looked to establish relationships with one or more companies outside France to manufacture omeprazole and other drugs using its proprietary pellet technology.[36]  As part of this effort, Ethypharm approached and began a relationship with a small company in Spain called Rimafar.[37]

The local nature of the venture began to change in 1992 when a U.S. company, then known as Belmac Corporation, purchased Rimafar and changed Rimafar's name to Laboratorios Belmac.[38]  Belmac Corporation subsequently changed its own name to Bentley in 1996.  Neither Belmac Corporation ("Bentley"), Laboratorios Belmac ("Belmac"), nor its predecessor Rimafar had any experience in pellet technology or the manufacture or sale of omeprazole, lansoprazole, or other microgranulated products.  As all parties recognized for years, Ethypharm was the sole owner of this pellet technology.[39]

Control over the Belmac-Ethypharm relationship shifted fundamentally beginning in late 1994 when James Murphy became the top executive of Bentley.  One of Murphy's first acts as

---

[36] JT-A-253:169.
[37] JT-A-61:12-13.
[38] JT-A-60:8-9.
[39] JT-A-61:11; *see*, *e.g.*, B203; B99-106; B137-40; B285; B309.

Bentley's top official was to schedule a series of meetings with Ethypharm officials in France and Spain to redefine, modify, and expand the Belmac-Ethypharm relationship.[40]  Around the same time, Murphy fired the GM of Belmac, citing "philosophical differences in corporate direction."[41] Murphy then obtained authorization from the Bentley board of directors to assume full authority for all negotiations on Belmac's behalf, and, shortly thereafter, he assumed, and has at all times retained, formal legal authority over Belmac as its "Consejero Delegado."[42]

Patrice Debregeas, CEO of Ethypharm France, and Adolfo de Basilio, GM of Ethypharm Spain, testified that Murphy introduced himself at his first meetings as the head of Bentley, Belmac's parent company in the United States.[43]  Murphy spoke of Bentley's new plans and the strategies Bentley wished to implement through Belmac.[44]

Ethypharm's understanding that Bentley was intervening directly to restructure the operations of Belmac and assume control of the Ethypharm relationship is confirmed by contemporaneous written records.  For example, on December 6, 1994, just prior to his first meetings, Murphy wrote to Ethypharm on parent company letterhead.  Expressly identifying himself as President of Bentley (then called Belmac Corporation), Murphy wrote:

> During my visit to Paris, I am most anxious to speak about opportunities to expand our collaborative relationship in the areas of manufacturing, microgranulation of products [omeprazole]… and other ways in which our companies can grow and prosper together.[45]

Murphy has admitted that he was "acting on behalf of both companies, both entities" (Bentley and Belmac) during these contacts with Ethypharm.[46]

---

[40] B12-14; B31-36.
[41] B1335.
[42] B23; B1197, ¶ 4; JT-A-1021:35-36.
[43] JT-A-267:227-28; JT-A-341:67-68.
[44] JT-A-341:67-69.
[45] B12.
[46] JT-A-1033:84.

Following their first meeting, Bentley sent Ethypharm a Letter of Intent.[47]  Consistent with the representations to Ethypharm regarding Bentley's decision to take control over the Ethypharm relationship, the Letter of Intent stated:

> This letter of intent is presented to Ethypharm by [Bentley], in good faith, to ensure that [Bentley] will employ its best efforts to enter and conclude negotiations for the establishment of a Joint-Venture relationship for the purpose of establishing a mutually synergistic business relationship between our respective companies.

> It is the intention of both parties to enter a mutual secrecy agreement to ensure the proprietary rights of each party.

> Based upon the guidance and negotiation of our respective lawyer to encompass the best interest of both parties, a contract for occupancy of space by Ethypharm in the Zaragoza facility will be entered into.

> [Bentley] wishes to establish a Joint-Venture with Ethypharm to research and develop a number of pharmaceutical products including but not limited to, … omeprazole.[48]

As yet another example, on January 19, 1995, Murphy sent Ethypharm a draft press release describing the status of their discussions.[49]  Again, the press release came under cover of a letter on parent company letterhead from Murphy as President and CEO of the parent company. Bentley's draft joint press release described "the first stage agreement to establish a joint venture with Ethypharm of France (a leading European drug delivery company) in the Belmac manufacturing facilities in Zaragosa, Spain."[50]  The press release referenced omeprazole and indicated that the recently entered agreements with Ethypharm would allow Bentley, the U.S. parent company, to "join the ranks of other major multinational companies committed to the Spanish market" and "will also further expand the manufacturing relationship which it already

---

[47]  B39.

[48]  B39.  These events took place before the parent company changed its name from Belmac Corporation to Bentley.  Hence, the letterhead and its text refer still to the parent as "Belmac Corporation."  There is no dispute, however, that references to Belmac Corporation, as opposed to Laboratorios Belmac, are to the parent company in the U.S. and not to the Spanish subsidiary. In all such instances, we have substituted the name Bentley for Belmac Corporation to avoid confusion.

[49]  B37-38.

[50]  B38.

has with Ethypharm in novel dosage forms by training more Belmac personnel to fulfill an increasing demand in contract manufacturing based upon Ethypharm technologies." Bentley – at that time still named Belmac Corporation – identified itself in the press release as "an international pharmaceutical and health care company based in Tampa, Florida."[51]

During his initial meetings with Ethypharm in 1994 and 1995, exercising the negotiation authority granted him by Bentley's board of directors, Murphy orally agreed to modify the existing arrangement with Ethypharm regarding the manufacture and sale of omeprazole in a number of important respects, including the following:

- Belmac staff would be increased and restructured to accommodate Ethypharm's needs;
- Belmac would come to agreement with Ethypharm regarding prices to be paid for rent and improvements to the Belmac plant.
- Products manufactured by Belmac for Ethypharm would have Ethypharm's name on the boxes.
- Agreements were reached regarding "free sales certificates" for export of products manufactured for Ethypharm.[52]

Ethypharm responded to the receipt of Bentley's draft press release and Letter of Intent by attempting to memorialize in writing the terms of the agreements that Ethypharm had entered into orally with Murphy. The parties exchanged a number of drafts of global agreements and engaged in additional discussions concerning them.[53] As part of the negotiation, Murphy sent Ethypharm hand-marked, revised drafts of the proposed agreements.[54]

No global agreement was ever signed.[55] However, Ethypharm moved forward with the relationship and continued to provide Belmac access to confidential know-how and technology

---

[51] *Id*.

[52] JT-A-287-89:305-13; B31-36. While certain aspects of Bentley's proposed "joint venture" were not agreed to, it is beyond dispute that Murphy negotiated, modified and orally agreed to these central aspects of the Ethypharm-Belmac relationship.

[53] JT-A-289:314-16; B40-47; B51-65; B66-82.

[54] B40-47; JT-A-1041-42:117-21.

[55] JT-A-1050:153.

relating to microgranulation based upon the oral agreements entered between Ethypharm and Bentley's top official, James Murphy.[56]

### B.    Bentley Responds to Threatened Termination (1997)

At the end of 1996, an audit uncovered numerous critical deficiencies relating to the manner in which Belmac was manufacturing omeprazole and other microgranulated products for Ethypharm.[57]    In addition, the relationship was not sufficiently profitable for Ethypharm. Ethypharm decided to terminate the relationship, take its technology, know-how and machinery relating to omeprazole and other microgranulated products, and look for another contract manufacturer.  As a result, on January 20, 1997, Adolfo de Basilio, Ethypharm's GM in Spain, sent a termination letter to his counterpart, Clemente Gonzalez-Azpetia, who was then the Belmac GM.[58]  Because Murphy had told Ethypharm that Bentley was in control of decision-making for its Spanish subsidiary, Basilio duly requested Gonzalez-Azpetia to "transmit these decisions to your mother company in the U.S."[59]

As anticipated, the response to Ethypharm's letter did not come from Belmac but from Bentley, the mother company.  On Bentley letterhead and expressly writing in his capacity as "Chairman & CEO of Bentley," Murphy responded directly to Ethypharm's termination letter. His January 28, 1997 response begins by acknowledging the continued existence of an agency relationship:

> I am writing with regard to the fax that I received from your Spanish office.  I am confused because, ***ever since I assumed control of Laboratorios Belmac***, I have received nothing but extremely positive comments from your Spanish staff . . . . .[60]

Murphy's admission that he, as the top official from Bentley, "assumed control" of the subsidiary powerfully reinforced Ethypharm's understanding that Bentley, not Belmac, was calling the shots in this relationship.  Murphy asked in this letter to meet directly with Ethypharm officials to solve

---

[56] JT-A-292:326-28.
[57] B111-14.
[58] B115-16.
[59] *Id*.
[60] B117-18.  Emphasis added.

all problems between Ethypharm and Belmac.  Accepting this invitation, Claude Dubois, the GM of Ethypharm France, traveled to the United States to meet with Murphy, the CEO and Chairman of Bentley, on February 5, 1997.[61]  Murphy attended the meeting alone.[62]

The February 5, 1997 meeting was a defining moment for the relationship between the two organizations.  Following the exchange of proposals from both sides regarding how to solve the problems of their respective Spanish subsidiaries, James Murphy, on behalf of Bentley, and Claude Dubois, on behalf of Ethypharm France, entered into another oral agreement.[63]  Dubois memorialized the terms of this oral agreement in correspondence following the meeting.[64]  Dubois testified that this oral agreement with Murphy formed the basis of the continued relationship with Bentley and Belmac for years to come.[65]  Following this oral agreement, the subsidiaries of Bentley and Ethypharm took immediate action to implement the decisions of their parent companies.[66]  Ethypharm continued (unsuccessfully) to urge that the oral agreement be reflected in a single written agreement but, in the absence of such a written agreement, the parties continued to abide by their oral understandings.

In April 1997, Murphy had planned to fly from the U.S. to continue discussions with Ethypharm but, at the last minute, he could not attend.[67]  As a result, he expressly delegated the authority to continue the negotiations to Belmac's GM Gonzalez-Azpetia.[68]  Notwithstanding this delegation of authority, Bentley continued to direct and control all significant decision-making.

---

[61]  B119-24; JT-A-464:128-29.

[62]  B119-24.

[63]  JT-A-445-46:52-55;  JT-A-464-68:128-144.   Murphy's notes and Dubois' notes from the February 5, 1997 (B119-24) meeting are very similar and demonstrate unequivocally that Murphy was negotiating the terms of a new arrangement with Ethypharm as he had been authorized to do by Bentley's board of directors.

[64]  B125-34; B141-43.

[65]  JT-A-467-69:140-46.

[66]  B133-36.

[67]  JT-A-469:146.

[68]  B144; JT-A-469-70:146-50.

For example, Murphy's contemporaneous handwritten notes of a telephone call with the Belmac

GM on August 28, 1997, relating to negotiations with Ethypharm, stated:

> 8/28/97        <u>Spain</u>   Phone Call
>
> Ethypharm – many changes
>
> Issues:  1. microgranulation in future limitation
>              2. Exclusivity --
>              3. Omeprazole
>              4. Too restrictive
>              5. Any change in  shareholders clause
> **TELL *them***:
>              We have previously spent tremendous amt of time and money in contract
>              attempts we will not review such a restrictive and ludicrous contract that
>              includes control of Belmac shareholders etc. until a new more reasonable
>              version is received and they become current on their bills.[69]

Murphy admits that this passage means that Murphy was instructing the Belmac GM regarding

what to "tell" Ethypharm in response to Ethypharm's contract proposals.[70]  As his extensive diary

notes from 1994 through 2002 repeatedly confirm, Murphy never surrendered the negotiation

authority that Bentley's board had conferred on him in late 1994.[71]

## C.      Bentley Confirms Ethypharm's Ownership of Trade Secrets (1998–2000)

On September 2, 1997, Ethypharm Spain sent Belmac yet another draft global agreement

and outlined in detail the events of the past year, including a description of the role Murphy, as

Bentley's CEO, played in the decision-making process.[72]  The letter again confirmed the

understanding, shared by all parties, that Belmac was manufacturing omeprazole, lansoprazole,

and other microgranulated products "with Ethypharm technology, know-how, machinery and

patents."[73]  The very next day, the Belmac GM responded, stating that he had sent the draft

agreement to Murphy at the parent company for his review and comment.[74]

---

[69] B147.
[70] JT-A-1050:151-53.
[71] B749-1012.  These excerpts from Murphy's diaries relate to Ethypharm and omeprazole.
[72] B148-68.
[73] B149; B152.
[74] B169-72.

In the early spring of 1998, because Bentley was contemplating being acquired by another company, Bentley became more active in seeking to formalize the terms of its relationship with Ethypharm.[75]  For this reason, Murphy from Bentley along with a few officials from Belmac, traveled to Ethypharm's offices in France on April 2, 1998, to discuss the status of the relationship.[76]  The meeting took place in English so Murphy could participate fully.  Most of the Belmac officials, who were Spanish speakers, could not.[77]

At the meeting, Ethypharm again reiterated its long-held understanding that Bentley and Belmac had orally agreed that all the technology, know-how, and trade secrets relating to omeprazole were the sole property of Ethypharm and that neither Bentley nor Belmac would compete with Ethypharm in the manufacture and sale of omeprazole.[78]  Gerard Leduc, then the number two official at Ethypharm, handed out copies of a typed one-page document memorializing these understandings and asked Murphy to confirm its contents.[79]

In front of the entire group of Bentley, Belmac, and Ethypharm officials attending the meeting, Murphy agreed that Belmac was using Ethypharm's trade secrets to manufacture omeprazole and other microgranulated products and confirmed that neither Bentley nor Belmac would compete with Ethypharm in the manufacture or sale of these products.[80]  Murphy also agreed to provide written confirmation of his statements in a letter sent on Bentley letterhead. Murphy's own handwritten notes of this meeting, although cryptic, clearly reflect that he promised to take this action.  Murphy's notes read:

> Draft Letter – BNT – non-compete
>                    Using knowledge of Ethypharm[81]

---

[75]  JT-A-633:50-52.

[76]  *Id.*; JT-A-634:54-55; JT-A-470-71:152-53.  Bentley argues that Murphy's interactions with Ethypharm took place at Ethypharm's request.  This is not true.  This 1998 meeting, the meetings in 1994, 1995 and 2000 were all held at Bentley's request to advance Bentley's agenda.

[77]  JT-A-634:56-57.

[78]  JT-A-456-57:95-98.

[79]  B214; JT-A-456-57:95-98; JT-A-292:325-28.

[80]  *Supra* note 79.

[81]  B211.

- 17 -

BNT is the NYSE symbol for Bentley.[82]

Following the meeting, Ethypharm sent the one-page certification that Leduc had earlier circulated to both Bentley and Belmac on April 2, 1998.[83] Murphy never disavowed this certification or the oral confirmation he gave at the April 2, 1998, meeting but he failed to send the requested confirmation letter to Ethypharm as promised.[84] Ethypharm continued to rely, however, on Murphy's oral agreement regarding non-competition and Ethypharm's ownership of trade secrets, and in providing additional omeprazole trade secrets shortly after the meeting.[85]

The first hint of any challenge to Ethypharm's proprietary rights took place in 1999 when Ethypharm discovered that Belmac's GM had been quoted in several pharmaceutical periodicals stating, in essence, that Belmac owned the technology, know-how, and machinery relating to omeprazole and other microgranulated products.[86] These public statements were directly at odds with the repeated assurances from Bentley and Belmac that the technology and trade secrets at issue were the sole property of Ethypharm.[87] When he learned of these public statements, Patrice Debregeas, the President and CEO of Ethypharm, sent a letter directly to James Murphy at Bentley stating:

> [Ethypharm] places great value in its intellectual property. …As you surely know, and, as evidenced by numerous documents, this is the sole property of Ethypharm, and Belmac has only been authorized by Ethypharm to use this property to supply Ethypharm's customers.[88]

---

[82] B1285, ¶ 39; B1311, ¶ 39. Contrary to the testimony of Ethypharm witnesses, the content of the one page document handed out at the meeting which identified Murphy as Bentley's representative, and Murphy's own notes, Murphy testified the reference to "BNT" (the NYSE symbol for Bentley) means Belmac in this instance. Ethypharm believes a jury would not find Murphy credible on this – or on the many other material issues of fact that are hotly disputed.

[83] B239-41; B212-14.

[84] JT-A-456-58:95-102.

[85] JT-A-292:327-28.

[86] B283-99.

[87] *See, e.g.,* B203; B214; B137-40; B145-46.

[88] B283-86; B291; JT-A-398:118-19.

Murphy wrote back the very next day.  As always, he did so as Chairman and CEO of Bentley on Bentley letterhead.[89]  His April 9, 1999 letter begins:

> I have received your letter concerning reference to Ethypharm technology and understand your concerns.  Our intentions have always been to promote the [omeprazole] in a fashion that would maximize market potential and obviously advance the best interests of both of our companies.

He then requested a meeting with Ethypharm officials to "discuss how both companies can prosper from joint announcements and even collaborate in more lucrative relations."[90]  In short, Murphy's letter confirmed once again: (i) Bentley's continued control over Belmac's relationship with Ethypharm; (ii) Bentley's continued direct dealings with Ethypharm concerning that relationship; and (iii) Bentley's continued acknowledgment that the know-how, technology, and trade secrets used to manufacture omeprazole were the sole property of Ethypharm.[91]

### D.    Bentley Directs the Theft of Ethypharm's Technology and Customers (2000-2003)

Contrary to the assurances of Bentley's CEO that he wished only to advance the mutual interests of Bentley and Ethypharm, the events over the next three years demonstrated that his strategy was to promote only Bentley's interests.  In September 2000, Murphy flew to Paris to meet with Ethypharm's new GM in France, Pierre Germain.[92]  Upon his return, Murphy sent Germain a fax dated October 6, 2000, describing the substance of their recent discussions.[93]  As always, Murphy wrote on Bentley letterhead under his title as Chairman and CEO of Bentley.  In his fax, Murphy set forth a new proposal for Ethypharm:

> My thoughts for collaborating in Spain are as follows:
>
> 1.    Bentley will assume the administrative oversight of the operation and guarantee Ethypharm income, through royalties equal in value to the current profit that Ethypharm is currently deriving from the Spanish organization.

---

[89]  B309.
[90]  *Id.*
[91]  *Id.*
[92]  B346.
[93]  *Id.*

2.    Ethypharm will be in a better position because you will also receive the additional profit resulting from the elimination of expenses attributable to personnel, operations, and overhead.

3.    Laboratorios Belmac will act on the behalf of Ethypharm to increase business through our business development and manufacturing groups. Lab. Belmac will bear the burden of personnel, overhead, expenses associated with the operation. The growth in new business above the current base business will be divided between our organizations with 30% of the net profit to Ethypharm and 70% to Lab. Belmac.[94]

As with previous correspondence to and from Murphy, this fax confirmed that Bentley remained firmly in control of the strategy and decision-making relating to Ethypharm. More importantly, it provided the first hint that Murphy was searching for a way to terminate Ethypharm's direct involvement in the manufacture and sale of omeprazole in Spain by having Bentley take over all administrative responsibilities and putting the relationship on a royalty basis. Murphy's proposal also demonstrates that Murphy recognized that Belmac could not terminate the Ethypharm relationship while continuing to use Ethypharm's proprietary trade secrets without authorization from, and a substantial payment (30% gross royalty) to, Ethypharm.

Ethypharm rejected Bentley's new proposal, and following further meetings between the principals in November 2000,[95] Bentley became increasingly concerned that Ethypharm might withdraw its proprietary pellet technology and terminate the relationship as it had threatened to do in 1997.[96] Such an act would have devastating consequences to Bentley, a publicly traded company in the U.S. with 35-56% of its annual revenues dependant on products manufactured with Ethypharm's technology. Belmac's GM testified that this fear of a termination by Ethypharm prompted him to discuss with Murphy the possibility of preemptively terminating the relationship while continuing to manufacture omeprazole based on Belmac's purportedly new advances in the Ethypharm technology.[97]

---

[94]  *Id.*
[95]  *See infra* notes 136-41.
[96]  JT-A-668:143-45.
[97]  *Id.*

In its summary judgment brief, Bentley incorrectly asserts that Ethypharm and Murphy had no contact after 2000.[98]  This is not the issue in any event.  The issue is whether Bentley was actively involved in the decision to terminate the Ethypharm relationship and abscond with Ethypharm's technology and customers during this period.  And on that issue the evidence turned up in discovery is compelling.

From early 2001 to November of 2001, Murphy repeatedly considered and discussed whether to terminate the relationship with Ethypharm and manufacture omeprazole and other microgranulated products without Ethypharm's permission.[99]  That Bentley continued to take the leading role is reflected in Murphy's own handwritten notes and Bentley records.[100]  On February 16, 2001, for example, Murphy made a note showing that he was considering severing ties with Ethypharm and announcing Belmac's purported omeprazole advancements.  The note stated:

> "Action Items – ...
>  Ethypharm – Meeting – Severe [sic] Tie
> ? Announce omeprazole".[101]

At the same time, Bentley's Operation Update of February 2001, provided to Bentley's board of directors, stated:  "Ethypharm – negotiations terminated due to lack of full commitment from Ethypharm."[102]

Murphy's notes of a meeting with Herrera on March 27, 2001 outline numerous steps being taken in Spain – including the pursuit of four Spanish patents – to try to obtain an allegedly independent legal foundation for the manufacture and sale of omeprazole and lansoprazole.[103]  Two months later, Murphy wrote a handwritten note dated May 23, 2001, reflecting his consideration of a date in the fall of 2001 for terminating the Ethypharm relationship.[104]

---

[98]  *See, e.g.*, B455-87; B495-96; B498-99.
[99]  JT-A-668:143-45; *see, e.g.,* B438, B448; B451-54; B489-90; B494.
[100]  *Supra* note 99; *see, e.g.*, B358, ¶¶ 11-14.
[101]  B438.
[102]  B442, ¶ 1e.
[103]  B447-48.
[104]  B454.

Around this time, Gerard Leduc of Ethypharm France, unaware that Bentley considered "negotiations terminated," sent a draft global contract to Bentley.[105]  In his June 8, 2001 cover letter that enclosed the draft, Leduc proposed that he and Murphy, as two top officials of the parent companies, meet "alone, or if necessary, assisted by one of our lawyers, [to] discuss this draft of agreement" in light of the fact that relations at their respective Spanish subsidiaries had become strained.[106]  On August 10 and September 17, 2001, Ethypharm wrote again to Murphy requesting a response to this proposal.[107]  Murphy did not respond, either to agree to meet Leduc or to tell him he should only deal with Belmac officials.

Instead, Murphy was actively discussing with his subordinates in Spain whether to terminate the Ethypharm relationship preemptively and continue production of omeprazole built on the foundation of Ethypharm's knowledge and customer base.[108]  Murphy's handwritten notes of a discussion with Herrera on July 13, 2001, read:

> "Ethypharm
> $1.5 mil more profit if Break
> 23 Nov cancel contract (4 months before)"[109]

Murphy admits that these handwritten notes show that he expected $1.5 million more in profit from the manufacture of omeprazole if he were to "break" the existing manufacturing relationship with Ethypharm.[110]  The notes also set a specific target date of November 23, 2001, for the cancellation of the existing arrangement with Ethypharm.

Nor was Bentley's plan confined to Belmac's operations in Spain.  On June 15, 2001, Herrera faxed a letter to Murphy at Bentley discussing a "development plan" relating to the registration of omeprazole and lansoprazole in the United States.[111]  And, in October 2001, in advance of the termination notice to be sent to Ethypharm, Bentley considered adopting complex

---

[105] B455-87.
[106] B457.
[107] B495-96; B498-99.
[108] JT-A-668:143-45; B497; B500.  *See also supra* notes 99 to 104.
[109] B489.
[110] JT-A-1067-68:220-22.
[111] B488.

new tax planning structures "for the intellectual property currently under development in Spain."[112]

Bentley's plans culminated in coordinated action on November 14, 2001. On that date, Belmac sent a notice to Ethypharm indicating that it was terminating the current relationship regarding the manufacture of omeprazole.[113] While insisting at his deposition that it was his idea to terminate the Ethypharm contract, Herrera ultimately admitted that he consulted with Murphy over a six-month period and obtained his authorization prior to sending the November 14, 2001 letter:

> Q:    Did you ever have to get authorization from Mr. Murphy before providing information to Ethypharm?
> A:    When I decided not to continue the manufacturing contracts and supply contracts [with Ethypharm] that were current, because it was an important topic for the company, I communicated to Mr. Murphy my decision and I consulted with him.[114]

Herrera testified that he discussed all of the factors relating to this decision with Murphy as early as April or May of 2001 because it "was a very important topic."[115]

On the same date its subsidiary sent its termination notice, Bentley, the parent company, issued a press release relating to developments based on Ethypharm's misappropriated trade secrets:

> **BENTLEY PHARMACEUTICALS FILES FOUR NEW PATENTS FOR IMPROVED ORALLY-DELIVERED PRODUCTS, INCLUDING OMEPRAZOLE AND LANSOPRAZOLE**
> Nov 14, 2001
>
> NORTH HAMPTON, NH, Nov. 14 – Bentley Pharmaceuticals, Inc. (AMEX: BNT), a drug delivery company with a commercial presence in Europe, announced today that through its wholly-owned Spanish subsidiary, Laboratorios Belmac, it has submitted four new patents over the past year for improved formulations of orally delivered products. . . .[116]

---

[112]  B506-10, B506.
[113]  B523-28.
[114]  JT-A-666:135.
[115]  JT-A-668-69:143-46, 145.
[116]  B529.

The press release quoted "James R. Murphy, Chairman and CEO" of Bentley at length about how these developments would "help Bentley . . . effectively compete in what is becoming a crowded generic market" and how Bentley "intends to commercialize [these products] in the U.S. markets by licensing to other pharmaceutical companies."[117]

Also on November 14, 2001, Belmac signed an agreement relating to the exchange of omeprazole trade secrets and the manufacture of omeprazole with Pharmalliance, one of Ethypharm's main existing omeprazole customers in Spain.[118] Thus, Bentley simultaneously implemented the three key elements of its plan to convert Ethypharm's proprietary technology: (i) the termination of the Ethypharm contract; (ii) the misappropriation of trade secrets in the guise of "new" patents; and (iii) the recruitment of Ethypharm's major customers.

In their depositions, both Herrera and Murphy testified that it was a "coincidence" that these related events took place on the same day.[119] A jury is entitled to reject this flimsy explanation (and almost certainly would). On summary judgment, however, it is not the Court's province to decide issues of material fact. It is enough to decide that a reasonable jury could properly draw the inference this was no "coincidence" and that, just as it had directed every aspect of the ongoing negotiations with Ethypharm, so, too, had Bentley orchestrated the termination of the Ethypharm relationship and the theft of its proprietary technology.

After the termination, Bentley's close control over the matters at issue in the Complaint remained evident. On December 12, 2001, in response to the November 14 letter and Belmac's failure to supply omeprazole to Ethypharm's customers, Ethypharm wrote to Belmac:

> As our subcontractor using our technology to produce our product namely Omeprazol, you have a clear obligation to deliver suitable product on a timely basis . . . .
>
> Your recent letter[ ] of November 14, 2001 . . . only underscores the fact that your non-performance was a deliberate attempt to damage Ethypharm, damage our customer base, and possibly set the stage to compete with Ethypharm for the

---

[117] *Id.*
[118] B530-32.
[119] JT-A-1072:240; JT-A-670:153-54.

continued business of our licensees using Ethypharm's core technologies, know-how and customer base.[120]

Consistent with prior practice, Belmac's GM sent a draft proposed response to Murphy for his review.[121]  In poorly translated English, the December 26, 2001, cover fax stated:

> Dear Mr. Murphy:
>
> Together you will find a draft of the letter that we have prepared to send to Ethypharm, as answering to its written.
> Please, inform me if you agreed with it, and so, to proceed to send it[122]

Belmac then delayed sending any response to Ethypharm until January 2, 2002, after Murphy had the opportunity to review and approve its contents.[123]

On January 3, 2002, Murphy writing from his Bentley e-mail address and identifying the subject as "Bentley," wrote the following to an administrator at Laboratorios Belmac:

> Dear Concha,
>
> Please remind Adolfo [the General Manager of Laboratorios Belmac] to send me the complete omeprazole dossiers for generic filing in the USA
> Jim Murphy[124]

Consistent with its press release announcing plans to pursue the marketing of competitive products, this e-mail further demonstrates that Bentley wanted the omeprazole dossiers that were based upon Ethypharm trade secrets for Bentley's own use in the United States.

On January 22, 2002, Bentley sent an "Operations Update" to all members of the Bentley board of directors which "highlights many of the key activities that are discussed at [Bentley] management meetings."[125]  The first section of the "Operations Update" related to "Spain Activities" and included the following item:

> e.    Ethypharm customers for omeprazole in process of recontracting with Lab. Belmac.[126]

---

[120]  B548-50.
[121]  B556-58.
[122]  B556.
[123]  B573-77.
[124]  B578.
[125]  B595-99, B596.
[126]  B596.

The "Ethypharm customers" referenced in the Bentley Operations Update are those such as Pharmalliance, that Belmac had recruited while still with Ethypharm and with which on November 14, 2001, and December 6, 2001, it signed agreements relating to the manufacture of omeprazole.[127]  All of these "Ethypharm customers" were still under contract with Ethypharm. As recognized by its own letter giving four months notice of termination, Belmac was obligated by written contract to manufacture omeprazole for Ethypharm's customers until at least March 23, 2002.[128]  Instead, it abandoned that obligation and recruited these customers away from Ethypharm, a practice that Bentley's management and board of directors approved and ratified.[129]

## III.    Ethypharm's Reasonable Understanding of Bentley's Role

The Ethypharm-Belmac venture was extremely profitable for all parties.  For instance, in 2001, Ethypharm's omeprazole accounted for 56% of Bentley's reported net sales of $26.4 million,[130] or approximately $14.7 million.  From this stark fact alone, coupled with Murphy's repeated representations, Ethypharm fully understood that Bentley had a serious and ongoing interest in the Ethypharm relationship and in issues relating to omeprazole, lansoprazole, and pellet technology.

From 1994 until 2002, Murphy personally met with, corresponded with, or telephoned most of Ethypharm's top officials in France and Spain.[131]  Every official of Ethypharm deposed in this litigation testified to his or her clear understanding that Bentley was directing and controlling the decisions with regard to the Ethypharm relationship.[132]  Ethypharm's officials also testified that Murphy introduced himself as the top official of Bentley, stressed his role as Bentley's Chairman and CEO, and made it clear that he was imposing Bentley's strategic goals upon Belmac.  For example:

---

[127]  B530-32; B553-55.
[128]  B523-28.
[129]  B596.
[130]  B430, B431a.
[131]  JT-A-1031-32:77-78.
[132]  *See, e.g.,* JT-A-289:316; JT-A-338:57; *infra.*

Patrice Debregeas, at the time the President and CEO of Ethypharm France and President of Ethypharm Spain, testified:

> Q:    Mr. Debregeas, I'm trying to understand the core of your belief that Bentley Pharmaceuticals, Inc. is responsible for the actions taken by Laboratorios Belmac. And so would you tell me why you believe that Bentley Pharmaceuticals, Inc., is responsible for these actions.
> A:    The chairman and CEO of Bentley declared to me repeatedly that he's in charge, he's the boss, he assumes responsibility.[133]

Gerard Leduc, the General Manager at Ethypharm France during the relevant period, summed up his understanding as follows:

> Bentley, for me, is like my headquarters in [Paris], as the place where decisions are made, not the place where products are made.[134]

Claude Dubois, the General Manager of Ethypharm France, testified:

> Q:    Did you also understand that Mr. Murphy was president of Laborotorios Belmac?
> A:    No, its possible but I always considered Mr. Murphy as the chairman and CEO of – of Belmac Corporation [the former name of the parent company in the U.S.] and then Bentley Pharmaceuticals.[135]

James Murphy's central role, as Bentley's Chairman and CEO, and the subordinate role of Belmac's local officials in Spain, was vividly portrayed at a restaurant meeting among the parties in Paris on November 22, 2000.[136] Murphy attended the restaurant meeting with Herrera, the Belmac GM. Gerard Leduc, Pierre Germain, and Yves Liorzou attended from Ethypharm France, and Adolfo de Basilio attended from Ethypharm Spain.[137] At the restaurant, the top officials of the parent companies –Murphy, Leduc, and Germain – sat alone at one table. The General Managers of the two Spanish subsidiaries sat at another table with Liorzou.[138] The top officials discussed and agreed upon matters of central importance to the two parent companies – the status of the draft omnibus contract, the scope of the Belmac license, whether to supply

---

[133] JT-A-414:182.
[134] JT-A-860:150.
[135] JT-A-445:50-51.
[136] JT-A-936-38:166-75; JT-A-906-09:47-61; JT-A-872:200-01; B381-84; B379-80.
[137] *Supra* note 136.
[138] *Id.*

Belmac with trade secrets relating to an updated aqueous formulation of omeprazole, and whether to install additional equipment in the Belmac plant for omeprazole manufacturing.[139]  Meanwhile, the GMs of the two Spanish subsidiaries, sitting at the other table, discussed "logistics."[140]  As the Ethypharm participants to the restaurant meeting testified, it was clear that the officials from the Spanish subsidiaries had no authority to agree on important issues whereas the officials from the parent companies had clear authority to – and did – decide these issues on behalf of their subsidiaries.[141]

In sum, Ethypharm's reasonable understanding that Bentley was directing and controlling the decision-making relating to the claims in this lawsuit was reinforced by the following:

(1)    As he was authorized to do by the Bentley board of directors, Murphy, as Bentley's Chairman and CEO, directly negotiated the terms of the oral agreements relied upon by Ethypharm for almost a decade.[142]

(2)    Murphy corresponded with Ethypharm for nearly a decade and, during that time – on every occasion and not just "sporadically" – he wrote to Ethypharm on Bentley letterhead. On virtually all of these occasions, he also identified himself as the CEO and Chairman of Bentley.[143]

(3)    When introducing himself, Murphy gave out business cards to Ethypharm officials identifying himself as Bentley's CEO.[144]

(4)    Murphy admitted under oath that he could not think of a single fact that would have led Ethypharm officials to understand that there was a point in the Ethypharm relationship

---

[139]  *Supra* note 136.
[140]  JT-A-907:50-51; JT-A-908:56-57.
[141]  JT-A-909:59-61; JT-A-658:103-05.
[142]  JT-A-467:139-40; JT-A-292:325-28; B381-82.
[143]  *See, e.g.*, B117-18; B144; B309; B346.  There is a single occasion on which Murphy used no letterhead at all.  B51.
[144]  JT-A-905:42-44; JT-A-462:119-20; JT-A-269:235.  *See also* JT-A-1039:106-07.

where Murphy had "taken off his Bentley hat" and was dealing with Ethypharm solely in his capacity as a Belmac official.[145]

(5)  Ethypharm officials were often told that Belmac officials could not respond directly to Ethypharm without receiving the approval of Murphy and the parent company. Belmac's two General Managers since 1994 both admitted under oath that they had, in fact, told Ethypharm officials that they could not act without approval from Murphy.  Both sought to explain their testimony by claiming that they were lying to Ethypharm officials as a "negotiation tactic" when they said they needed Bentley's approval.  The jury is entitled to decide whether the Spanish GMs were lying at the time or whether they are lying now in the context of this lawsuit.[146]

(6)  Belmac's GM, while asserting that he made many important decisions about the operations of Belmac by himself, acknowledged:  (1) there were standing weekly telephone calls with Murphy at Bentley to discuss important matters, including the relationship with Ethypharm and issues relating to omeprazole, lansoprazole, and other microgranulated products; and (2) he could not think of a single instance where Belmac and Bentley disagreed.[147]

## ARGUMENT

## I.     The Controlling Standard of Review

The evidence that Bentley, through its Board of Directors and CEO, actively managed and controlled the conduct of its subsidiary Belmac in all of its dealings with Ethypharm is overwhelming.  It is important to keep in mind, however, that the standard for deciding Bentley's motion for summary judgment is not whether the evidence against that motion is overwhelming but whether it is so deficient that no reasonable jury could credit it.  *Williams v. Chrysler Corp.*, 163 F.3d 183, 186 (3d Cir. 1998).  Measured under this more modest standard, Bentley's motion can only be characterized as bankrupt.

---

[145]  JT-A-1083:282-83.
[146]  JT-A-666:135-36; JT-A-132-33: 136-38.
[147]  JT-A-108-09:40-43; JT-A-112:55-56; B749-1012.

This is especially so in light of related principles that apply in the summary judgment setting. First, Bentley's exposition of the facts consistently resolves in its own favor the inherent credibility issues that the evidence presents, when all such credibility determinations must be construed in Ethypharm's favor as the non-movant. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) (court must "disregard all evidence favorable to the moving party that the jury is not required to believe.") Thus, when James Murphy asserts that the Ethypharm officials he dealt with always understood that he was Belmac's president, the Court is obliged to reject that assertion and to accept instead the contrary testimony of each and every Ethypharm witness who said that Murphy held himself out as Bentley's CEO expressly acting in Bentley's interests. And when Belmac's general managers claimed that they were lying as a negotiation tactic when they repeatedly told their Ethypharm counterparts that they needed parent corporation approval for their decisions, the Court is similarly obliged to reject that self-serving explanation and accept that the GMs were telling the truth then and are lying now.

Second, it is not just Ethypharm's version of the hard facts that the Court is obliged to accept, it is also all reasonable inferences that can be drawn from those facts. *Id.*; *Williams*, 163 F.3d at 186. Here, proof that Bentley, through its Board of Directors and CEO, closely managed and controlled all significant aspects of its subsidiary's relationship with Ethypharm in the years leading up to the termination of that relationship plainly supports a permissible inference that it exercised similar tight control over the decision to terminate and misappropriate Ethypharm's technology and customers.

## II.    The Law Applicable to a Subsidiary Corporation's Conduct as Agent for its Parent

### A.    Express Agency

The parties are in essential agreement as to the black-letter test for express agency in the parent-subsidiary corporation setting. As the Third Circuit has stated the applicable law in *Phoenix Canada Oil Co. v. Texaco, Inc.*, 842 F.2d 1466, 1477 (3d Cir. 1988):

> Unlike the alter ego/piercing the corporate veil theory, when customary agency is alleged the proponent must demonstrate a relationship between the corporations and the cause of action.  Not only must an arrangement exist between the two corporations [parent and subsidiary] so that one acts on behalf of the other and within usual agency principles, but the arrangement must be relevant to the plaintiff's claim of wrongdoing.

This requires the Court to "focus its inquiry on (i) the arrangement between the parent and subsidiary, the authority given in that arrangement, and (ii) the relevance of that arrangement to the plaintiff's claim."  *CR Bard Inc. v. Guidant Corp.,* 997 F. Supp. 556, 560 (D. Del 1998).

### 1.    The Arrangement Between Parent and Subsidiary.

Bentley characterizes its "arrangement" with its subsidiary Belmac and the "authority given in that arrangement" as merely involving "sufficient oversight over its subsidiary to fulfill its obligations under the Securities and Exchange Commission's regulations."  D.I. 65 at 2.  That characterization is preposterous.  Nothing in the SEC regulations requires a parent corporation to exercise the pervasive direction and control of all important management decisions, particularly those affecting Ethypharm, that Bentley imposed on Belmac.  The nature and degree of the control that Bentley exercised is the quintessence of agency.

- An independent corporation is managed by its board of directors.  Belmac's own board never even met.  Instead, Belmac was managed by Bentley's CEO under express authorization from Bentley's Board of Directors.  It was Bentley's board to whom Murphy reported, and it was Bentley's board that, in turn, set the strategic agenda for Belmac.

- Bentley imposed detailed management agreements on Belmac under which Bentley directly controlled strategic planning, technical operations, marketing, determination of pricing, development of new products and business lines, financial planning, budgeting, selection of top management personnel, compensation, and, in short, virtually every significant matter concerning the ongoing management of Belmac's business.  Bentley

then paid its own officials, including Murphy, to fill most of Belmac's key management needs.

- Bentley's Board of Directors expressly authorized its Chairman and CEO to take direct personal responsibility for negotiating all transactions on behalf of Belmac, a responsibility that he especially discharged in reference to Belmac's most important transaction, its dealings with Ethypharm.

If this level of direct management and control qualified as normal oversight by a parent corporation, it would be hard to conceive of circumstances where a claim of agency would ever be sustained.

### 2.    The Relevance of the Arrangement to Plaintiffs' Claims.

Bentley next argues that, in all events, this extensive managerial control had no "close connection" with Ethypharm's misappropriation and interference claims in this case. Bentley's argument is implausible on its face and untenable under the evidence. *Chrysler Corp. v. Chaplake Holdings*, *Ltd.*, 822 A.2d 1024 (Del. 2003), is instructive and fully supports Ethypharm's position in this case. In *Chrysler Corp.*, the court found sufficient evidence of agency where the parent's chairman had significant influence over its subsidiary. The court held the subsidiary was "acting at the behest of, or at the very least with the tacit approval of, [the parent company]." *Id.* at 1035. The Third Circuit has also found evidence of agency on facts similar to those present here. *See*, *e.g.*, *Phoenix*, 842 F.2d 1466 (agency relationship may be demonstrated by parent negotiating and drafting subsidiary's contracts and issuing joint press release); *Publicker Indust., Inc. v. Roman Ceramics Corp.*, 603 F.2d 1065 (3d Cir. 1979) (evidence of apparent agency where the parent initiated negotiations with the third party and signed correspondence to it, leading the third party to think of the two companies as the same entity).

*Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil, Inc.*, 456 F. Supp. 831 (D. Del. 1978), a case relied upon by Bentley, provides another useful illustration of the "close

connection" requirement. The Court found no principal-agent relationship on the facts there presented, but its underlying analysis strongly supports finding such a relationship here. In *Japan Petroleum*, the plaintiff had supplied offshore drilling equipment to the U.S. oil company's Nigerian subsidiary, and it sued when the equipment was returned at the end of the lease in damaged condition. The Court agreed that the parent company was directly involved with managing the subsidiary with respect to numerous important issues. The equipment lease, however, was not one of them. The Court found that the leasing contract had been negotiated by the subsidiary's local manager of operations "with no prior consultation" with its U.S. parent. The Court characterized the lease as one of the "routine matters" that the subsidiary dealt with independently from any involvement by the parent. *Id.* at 845. Although the plaintiff sought $6.3 million in damages to its drilling equipment, the claim amounted to less than one-thousandth of the parent's (Ashland Oil) $6.7 billion in annual revenues during that period.[148] It was, in short, not a matter to which Ashland Oil had paid any parental attention.

In sharp contrast here, Bentley exercised its greatest control over the very issue in dispute: the relationship between Ethypharm and Bentley's subsidiary Belmac, the termination of that relationship, and the subsequent misappropriation of Ethypharm's proprietary technology and interference with its customers. Far from being a "routine" matter of only local concern and, hence, left entirely to the subsidiary's local manager, the Ethypharm relationship was the very core of Bentley's business and of Bentley's future. It accounted for more than half of Bentley's annual revenues.[149] Bentley therefore exercised its greatest level of control over how it managed, and ultimately terminated, that relationship. The analysis in *Japan Petroleum* thus provides eloquent support for a finding of agency here. It defies credibility that Bentley would exercise such close control over Belmac's strategic decision-making in every other aspect of its business

---

[148] *A Welcome for Ethanol Plant,* N.Y. Times, Aug. 8, 1980, at D1.

[149] Bentley's revenues in 2000 were roughly $18 million. B309d-e (2000 10K). For comparison purposes, a dispute that would have been worth one-thousandth of this revenue, as the drilling lease was for Ashland Oil, would have amounted to only $18,000.

- 33 -

but allow Belmac to have independent control over this critical aspect. The evidence unequivocally demonstrates that Bentley has not permitted Belmac to make important decisions concerning Ethypharm without Bentley's detailed input, decision, and approval.

In its zeal to prevail on summary judgment, Bentley repeatedly suggests that the Court must confine its focus to events occurring in "late 2001 and 2002" when the misappropriation and tortious interference took place. Bentley's attempt to compress the relevant inquiry is unprecedented. In *Phoenix*, the Third Circuit held that it was reversible error for a trial court presented with a breach of contract that took place during 1973 and 1974 not to review evidence that the parent company participated in the negotiation and renegotiation of the contract as far back as 1965. The Court recognized the common sense proposition that evidence of "significant events" from prior or subsequent years "may bear on the creation of, or absence of, an agency relationship between the subsidiaries and the parents. . . ." *Phoenix*, 842 F.2d at 1478.

As in *Phoenix*, Bentley's extensive involvement in the Ethypharm relationship in each year dating back to 1994 is powerful evidence of its fundamental interest in the matter and supports the inference that its interest did not abruptly end just before Belmac supposedly made an independent decision to terminate it. Here, the evidence is replete as to Bentley's direct control over all aspects of the Ethypharm relationship, beginning when Bentley seized managerial control over Belmac and expressly instructed Bentley's own CEO to take over ongoing negotiations with Ethypharm and persisting for year after year as Bentley's CEO refined the contents of the oral agreements under which the parties operated, resolved disputes, confirmed on behalf of both Bentley and Belmac that Ethypharm's proprietary interests were entitled to protection, and explored how the venture might continue (or be ended) going forward.

Nor should the Court confine its inquiry to the March 23, 2000 written agreement between Ethypharm and Belmac. This two-page manufacturing agreement was never intended to contain the sum and substance of the parties' understandings. As Bentley has admitted, the "unwritten arrangement" between Ethypharm and Belmac spanned nearly a decade and was

reflected in oral agreements that were constantly being modified.[150]   The March 23, 2000 agreement, like other abbreviated certificates and memoranda signed locally in Spain, served to memorialize various aspects of their arrangements in order to comply with Spanish legal requirements.   Bentley focuses on the March 2000 two-page agreement rather than the acknowledged decade long "unwritten arrangement" between the parties because it was Murphy, as Bentley's CEO, that negotiated and agreed to all the important terms of this "unwritten arrangement" in 1994, 1995, 1997, 1998, 1999 and 2000.

In short, Bentley's myopic focus on the March 2000 agreement and its attempt to avoid any meaningful recitation or review of the pre-2000 evidence by asserting that it is too remote is directly contrary to Third Circuit law and should not be countenanced.   But the Court is not limited to drawing inferences about Bentley's involvement in Ethypharm's misappropriation and interference claims based solely on its historic control over the Ethypharm relationship.   The evidence of Bentley's direct involvement in the 2000-2002 events giving rise to Ethypharm's claims is inescapable.   It is shown in Murphy's handwritten notes, correspondence, and consultations with Belmac's general manager formulating a plan for terminating the Ethypharm relationship; it is shown in Murphy's attempt first to change the basis for the relationship to a royalty arrangement with Ethypharm removed from any local involvement; it is reflected in Bentley's role in trying to develop patents and other intellectual property relating to omeprazole that were purportedly independent of Ethypharm and that would allow Bentley to license pharmaceutical companies in its U.S. market.   And it is especially shown in the non-coincidence of the coordinated three-prong action taken by Bentley in November 2001 when it simultaneously:  (i) approved Belmac's termination of its Ethypharm contract; (ii) announced the filing of its own patents "through its Spanish subsidiary" and its efforts to market competing products in the United States; and (iii) allowed Belmac to recruit Ethypharm's customers and sign

---

[150]  D.I. 65 at 9.

agreements with them before the ink was dry on the termination notice. On these facts, a reasonable jury would be permitted to find (and, we predict, will find) that Bentley's fingerprints were all over this misconduct and that Belmac acted entirely as its agent.

### B.    Apparent Agency

The evidence concerning apparent agency is equally powerful.[151] From the moment in late 1994, when Bentley named James Murphy as its new President and he flew to Europe to introduce himself to Ethypharm as Bentley's top official appointed to implement new plans and strategies through its subsidiary in Spain, every action he took reinforced Ethypharm's reasonably held belief that Bentley, through Murphy, was in control of Belmac and was pursuing Bentley's strategic goals. From 1994 through 2002, more than a half dozen Ethypharm officials held face to face meetings with Murphy in Spain, France, and the United States. Every single one of these witnesses testified that Murphy held himself out as Bentley's top official in negotiations and discussions with Ethypharm. He consistently introduced himself as such; he gave each Ethypharm official a business card from Bentley with his title listed as Bentley's CEO and Chairman of the Board; he routinely corresponded with them on Bentley letterhead showing his title as Bentley's CEO and Chairman; he frequently met alone with Ethypharm officials, and without any prior consultation with Belmac employees, to discuss and decide important issues relating to Belmac. Bentley also told the public in press releases that it acted "through its Spanish subsidiary." These facts reinforced Ethypharm's reasonable belief that Bentley, through its CEO, controlled decision-making for Belmac with respect to its relationship with Ethypharm.

---

[151] The Third Circuit articulated the standard for apparent agency in *Taylor v. Peoples Natural Gas Co.*, 49 F.3d 982, 989 (3d Cir. 1995) ("It is well settled that apparent authority (1) 'results from a manifestation by a person that another is his agent' and (2) 'exists only to the extent that it is reasonable for the third person dealing with the agent to believe that the agent is authorized.') (quoting Restatement (Second) of Agency § 8 cmts. a & c (1958)). Courts have repeatedly held that the determination of whether an apparent agency exists requires a fact-driven inquiry to be conducted by a jury. *See, e.g., Gizzi v. Texaco, Inc.,* 437 F.2d 308, 310 (3d Cir. 1971).

In the declaration he filed in this case, Murphy asserted that it was always clear to Ethypharm officials when he was taking off his "Bentley hat" and only wearing his "Belmac hat." While the law recognizes that officials holding positions in both a parent and subsidiary company may "change hats" and represent only the interests of one entity, there is no presumption as to which hat the official is wearing, where the circumstances are inconsistent with the norms of corporate behavior. *United States v. Bestfoods,* 524 U.S. 51, 69-70 (1998). When questioned in depth about his assertion that he clearly wore only "one hat" at a time, Murphy admitted that he could not think of a single thing he ever did in any meeting that would have led any Ethypharm official to understand that he was "taking off his Bentley hat" before dealing with Belmac or omeprazole matters:

> Q:  Can you give me a specific factual example of what you did to clarify when you were acting only in the capacity as Laboratorios Belmac?
>
> A:  I can't think of any specific one in 1995.
>
> Q:  Can you give me a specific action that you took, a statement that you made or something that you did that would clarify for Mr. Dubois that there was a moment in time in the [1997 meeting in the U.S.] where you had taken off your Bentley hat and you were only Laboratorios Belmac?
>
> A:  I can't think of a single thing within that discussion.
>
>     . . .
>
> Q:  I understand you may have talked about different topics, but how – is there a specific statement you made or something you did or said that would let [Ethypharm] know that at a certain moment you had taken off your Bentley hat and you were acting – and I'm reading your affidavit – solely in your capacity as officer of Belmac and not on behalf of Bentley?
>
> A:  I can't think of anything specific.[152]

Ethypharm's witnesses unanimously testified that they believed that when they dealt with James Murphy they were dealing with Bentley, and Murphy cannot point to a single thing that would have caused them to believe otherwise. As recognized in *Amco Ukrservice & Prompriladamco v. Am. Meter Co.,* 312 F. Supp. 2d 681, 696 (E.D. Pa. 2004), "[w]hether the doctrine of apparent authority applies in a given case is almost never suited for summary

---

[152] JT-A-1082-83:280-83.

judgment because it closely turns on both the principal's manifestations and the reasonableness of the third party's beliefs." This evidence clearly raises a triable issue of fact on apparent agency.[153]

### III. The Joint Tortfeasor Basis for Liability Precludes Dismissal

Separate from liability based upon agency, plaintiffs have also adequately pleaded liability based upon Bentley's status as a joint tortfeasor. In its earlier opinion on Bentley's motion to dismiss, this Court recognized plaintiffs' right to pursue liability based on Bentley's status as a joint tortfeasor and expressly permitted the parties to take discovery on this issue along with agency issues.[154] Bentley has not made a timely motion for summary judgment on this theory of liability. Therefore, even if summary judgment were granted as to agency, this action may not be dismissed.[155]

One basis for joint tortfeasor liability under Delaware law is described in *Miles Inc. v. Cookson Am., Inc.*, 1994 Del. Ch. LEXIS 221 (Del. Ch. Nov. 7, 1994) (Exhibit A). Under circumstances remarkably similar to those presented in this case, then Judge Hartnett (later Justice on the Delaware Supreme Court) held a parent company jointly and severally liable under the Delaware Uniform Trade Secrets Act as a result of its participation in its subsidiary's misappropriation of trade secrets. The *Miles* court found joint tortfeasor liability not based on

---

[153] Even if this Court finds that Bentley did not direct and control Belmac with respect to the present litigation, Bentley can be held liable under a third theory of agency liability by its ratification of Belmac's tortious acts. *See IRS v. Gaster*, 42 F.3d 787, 793 (3d Cir. 1994) ("Consent sufficient to establish an agency relationship exists . . . where a principal ratifies acts done on her behalf after the fact.")

[154] D.I. 27 at 12; D.I. 36 at 2.

[155] Moreover, despite its assertion in its "summary of argument" that the Court can "send this case to Spain where it belongs" D.I. 65 at 2, Bentley has also not moved to dismiss on *forum non conveniens* grounds. Such a motion would now be untimely in any event, where not filed early in the proceeding and extensive discovery has already taken place. *See Lony v. E.I. Du Pont de Nemours & Co.*, 935 F.2d 604, 614 (3d Cir. 1991). And as a substantive matter, a *forum non* dismissal would be improper because the pending Spanish suit is solely a suit against Belmac for infringement of a Spanish patent (not theft of trade secrets or tortious interference). *See Bhatnagarv. Surrendra Overseas*, 52 F.3d 1220 (3d Cir. 1995). The appropriate forum to sue Bentley for its own conduct is Delaware.

traditional agency principles but "upon the totality of the circumstances and the interrelationship and knowledge existing between [the parent company] and [the subsidiary]." *Id.* at *51. The court relied on evidence that: (i) a parent company official hired the subsidiary's president and retained contractual control over where and in what capacity he would work; (ii) the parent had approved the subsidiary's plan to enter into the competitive area of business that resulted in theft of the plaintiff's trade secrets; (iii) the parent had approved the subsidiary's budget to expand into the new field and helped it secure financing; and (iv) the parent and subsidiary shared the same board of directors. *Id.* at *49-50. Very similar evidence – and far more – exists in the present case.

A second basis for joint tortfeasor liability is that Bentley "aided and abetted" its subsidiary in its misappropriation of trade secrets and its tortious conduct.[156] This theory of joint tortfeasor liability is similar but distinguishable from that presented in *Miles*. For aiding and abetting, Ethypharm only must show that Bentley was aware of the conduct at issue and gave assistance to it. *Brug v. Enstar Group, Inc.*, 755 F. Supp. 1247, 1256 (D. Del. 1991). Evidence supporting those elements is fully documented in the statement of facts.

---

[156] As the Court has recognized, the complaint adequately alleges liability based on both agency and joint tortfeasor status. *Ethypharm S.A. France v. Bentley Pharms., Inc.*, 388 F. Supp. 2d 426, 431 n.5 (D. Del. 2005). While a complaint must plead facts and not legal theories, if the Court deems it necessary, plaintiffs are prepared to amend their complaint to more fully allege the basis for joint tortfeasor liability, both under the criteria recognized by *Miles* and under the concept of aiding and abetting.

**<u>CONCLUSION</u>**

For the foregoing reasons, plaintiffs respectfully request that the motion for summary judgment be denied.

Dated:  September 15, 2006                              Respectfully submitted,


                                                          /s/ Francis J. Murphy_____
                                                          Francis J. Murphy, Esquire (No. 223)
                                                          MURPHY SPADARO & LANDON
                                                          1011 Centre Road, Suite 210
                                                          Wilmington, DE 19805
                                                          Tel: (302) 472-8100
                                                          Fax: (302) 472-8135
                                                          Email:  Fmurphy@msllaw.com

                                                          *Attorneys for Plaintiffs*

*Of Counsel:*

Dwight P. Bostwick, Esquire
Bruce R. Grace, Esquire
Jonathan D. Fine, Esquire
Baach Robinson & Lewis PLLC
1201 F Street, NW, Suite 500
Washington, DC 20004
Tel: (202) 833-8900
Fax: (202) 466-5738

# EXHIBIT A

LEXSEE 1994 DEL. CH. LEXIS 221

**MILES INC., Plaintiff, v. COOKSON AMERICA, INC., and COOKSON PIGMENTS, INC., Defendants.**

**Civil Action # 12,310**

**COURT OF CHANCERY OF DELAWARE, NEW CASTLE**

*1994 Del. Ch. LEXIS 221*

**July 21, 1994, Submitted**
**November 7, 1994, Decided**

**SUBSEQUENT HISTORY:**  [*1]

Redacted: November 15, 1994.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff manufacturer brought an action against defendant competitor, alleging that the competitor misappropriated the manufacturer's trade secrets in violation of the Delaware Uniform Trade Secrets Act, specifically Del. Code Ann. tit. 6, ch. 20.

**OVERVIEW:** The manufacturer argued that the specific methods, techniques, and processes it used to manufacture high performance organic pigments were trade secrets as defined by *Del. Code Ann. tit. 6, § 2001(4)*. The court found the manufacturer met its burden of showing that the combination of processes it used to make the pigments were trade secrets because the processes were not generally known and were not readily ascertainable by proper means, it derived actual and potential economic value because the processes were not generally known, and it took reasonable efforts to maintain the secrecy of the processes including requiring employees to sign nondisclosure agreements. The court determined that the competitor misappropriated trade secrets. The court reasoned that the competitor had hired five of the manufacturer's employees, that the competitor's development time was so short that it would have been impossible without the use of the manufacturer's trade secrets, and that the competitor had unsuccessfully attempted to manufacturer the pigments previously before it had hired the manufacturer's employees.

**OUTCOME:** The court entered judgment in favor of the manufacturer.

**LexisNexis(R) Headnotes**

*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Trade Secrets*
[HN1] See *Del. Code Ann. tit. 6, § 2001(4).*

*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Trade Secrets*
[HN2] See *Del. Code Ann. tit. 6, § 2001(2).*

*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Trade Secrets*
[HN3] See *Del. Code Ann. tit. 6, § 2001(1).*

*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Trade Secrets*
*Trade Secrets Law > Misappropriation Actions > Elements > Existence & Ownership*
[HN4] A plaintiff alleging misappropriation of a trade secret carries the burden of proving the existence of the trade secret. If plaintiff fails to meet this burden, the court's inquiry ends and judgment must be entered for defendants.

*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Trade Secrets*
[HN5] To qualify for trade secret status, a process must meet all the requirements of *Del. Code Ann. tit. 6, § 2001(4)*. One of the requirements of § 2001(4) is that it be the subject of efforts that are reasonable under the circumstances to maintain its secrecy. *Del. Code Ann. tit. 6, § 2001(4)(b).*

*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Trade Secrets*
*Trade Secrets Law > Factors > Competitive Advantage*

***Trade Secrets Law > Factors > Economic Value***
[HN6] An alleged trade secret derives actual or potential independent economic value if a competitor cannot produce a comparable product without a similar expenditure of time and money.

***Trade Secrets Law > Factors > Novelty***
***Trade Secrets Law > Factors > Ready Availability***
***Trade Secrets Law > Nonprotected Information > Reverse Engineering***
[HN7] It is well-established that if a method, technique or process in question can be found in the public domain or public literature, it is considered to be generally known and readily ascertainable and thus, cannot qualify as a trade secret. Reverse engineering time is a factor in determining whether a process is readily ascertainable, as is the complexity and detail of the data involved. While novelty is not a requirement for trade secrets to the same extent as for patentability, some novelty is required.

***Criminal Law & Procedure > Appeals > Reversible Errors > Discovery***
***Trade Secrets Law > Civil Actions > Discovery***
***Trade Secrets Law > Protected Information > Combinations & Compilations***
[HN8] A plaintiff alleging misappropriation of trade secrets need not prove that every element of a method, technique or process is unascertainable from the public domain. The overall combination of the principles and details used to make the product can qualify as a trade secret. Processes alleged to be generally known or readily ascertainable must be known or ascertainable by proper means. Proper means include: (1) discovery by independent invention; (2) discovery by reverse engineering; (3) discovery pursuant to a license from the owner of the trade secret; (4) observation of the item in public use or on public display; and (5) obtaining the alleged trade secret from the published literature.

***Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Trade Secrets***
***Trade Secrets Law > Civil Actions > Evidence***
***Trade Secrets Law > Misappropriation Actions > General Overview***
[HN9] Misappropriation of trade secrets may be proven by circumstantial evidence.

***Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Trade Secrets***
***Trade Secrets Law > Misappropriation Actions > Elements > Improper Means***
[HN10] *Del. Code Ann. tit. 6, § 2001(2)(a)* provides that

for there to be a violation of the Uniform Trade Secrets Act there must be acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means.

***Trade Secrets Law > Civil Actions > Remedies > Injunctive Relief > Duration***
***Trade Secrets Law > Civil Actions > Remedies > Injunctive Relief > Threatened Misappropriation***
***Trade Secrets Law > Misappropriation Actions > Elements > Existence & Ownership***
[HN11] See *Del. Code Ann. tit. 6, § 2002.*

***Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Trade Secrets***
[HN12] See *Del. Code Ann. tit. 6, § 2003.*

***Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Trade Secrets***
***Trade Secrets Law > Civil Actions > Remedies > Injunctive Relief > General Overview***
***Trade Secrets Law > Protection of Secrecy > General Overview***
[HN13] The purpose of an injunction in a trade secrets case is to protect the secrecy of the misappropriated information, eliminate the unfair advantage obtained by the wrongdoer, and reinforce the public policy of commercial morality. A court must tailor the injunctive relief to remedy the specific harm alleged. The type and scope of the injunction granted and the duration of the injunction are matters left to the sound discretion of the court.

***Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Trade Secrets***
***Trade Secrets Law > Civil Actions > Remedies > Injunctive Relief > General Overview***
[HN14] An injunction should last for as long as necessary to eliminate any commercial advantage or lead time with respect to good faith competitors that a person has obtained through misappropriation. A court, depending on the circumstances of the case, may choose to start the injunction from the date of judgment or the date of misappropriation. Innocent third parties such as customers, to the extent possible should be left unaffected by a grant of injunctive relief.

***Trade Secrets Law > Civil Actions > Remedies > Injunctive Relief > General Overview***
***Trade Secrets Law > Nonprotected Information > Reverse Engineering***
***Trade Secrets Law > Protected Information >***

*Manufacturing Processes*

[HN15] A court has a choice of imposing either a production injunction, which would preclude a defendant from producing the misappropriated product for a specific period of time, or a use injunction, which would preclude a defendant from using certain misappropriated processes for a specific period of time but would not preclude a defendant from producing the particular product by other lawful means. A production injunction may be imposed where the misappropriated information is inextricably connected to the defendant's manufacture of the product. An inextricable connection is shown where the misappropriated information forms such an integral and substantial part of a comprehensive manufacturing process or technology that, absent the misappropriated trade secrets, the defendant would not be able independently to manufacture or design a comparable product. A production injunction should last for as long as it would have taken defendant independently to develop or reverse engineer a technology for commercial production of the product.

**COUNSEL:**

Paul E. Crawford, Esquire, Stanley C. Macel, Esquire, and James T. Moore, Esquire, CONNOLLY, BOVE, LODGE & HUTZ, Wilmington; OF COUNSEL: Joseph C. Gil, Esquire, MILES INC., Pittsburgh, PA, Attorneys for Plaintiff.

Josy W. Ingersoll, Esquire, YOUNG, CONAWAY, STARGATT & TAYLOR, Wilmington; OF COUNSEL: James Galbraith, Esquire, Walter E. Hanley, Jr., Esquire, Joseph Kirk, Esquire, KENYON & KENYON, New York, NY and John F. Bomster, Esquire, ADLER POLLOCK & SHEEHAN, Providence, RI, Attorneys for Defendants.

**JUDGES:** HARTNETT, Justice sitting as Vice Chancellor pursuant to Del. Const. Art. IV § 13 (2). n1

n1 The trial commenced before Vice Chancellor Hartnett was appointed a Justice of the Delaware Supreme Court. He presided over the balance of the trial following his appointment to the Delaware Supreme Court.

**OPINION BY:** HARTNETT

**OPINION:**

DECISION AFTER TRIAL

HARTNETT, Justice, sitting as Vice Chancellor pursuant to Del. Const. Art. IV § 13(2) n1

n1 The trial commenced before Vice Chancellor Hartnett was appointed a Justice of the Delaware Supreme Court. He presided over the balance of the trial following his appointment to the Delaware Supreme Court.

Plaintiff Miles Inc. (Miles), a manufacturer of high performance organic pigments, sued defendants for the alleged misappropriation [*2] of its trade secrets in violation of the Delaware Uniform Trade Secrets Act, 6 Del. C., Ch. 20. The defendants are Cookson America, Inc. and its wholly owned subsidiary Cookson Pigments, Inc. (collectively "Cookson"). After trial the Court finds that Cookson hired six former Miles' employees in 1989 and used the former employees' knowledge of Miles' methods, techniques and processes ("processes") to manufacture and sell high performance pigments of their own in direct competition with Miles' products. The Court further finds that these processes were trade secrets of Miles and that Cookson misappropriated them.

**THE TRIAL**

I.

First to be considered is the issue of whether certain pretrial deposition testimony should be considered by the Court. At the end of the 15-day trial, Miles sought to introduce as evidence part of the pretrial deposition testimony of Dr. Martin Wienkenhoever, an employee of Miles who was deposed as a Chancery Court Rule 32(a)(2) witness.

Defendants objected to the introduction of the evidence on the grounds that Dr. Wienkenhoever had already testified in person at the trial on behalf of Miles for almost three days and that the Chancery Rules did not provide [*3] for the introduction of the deposition as evidence.

Before trial, in accordance with the instruction of the Court, 1,174 documents were pre-numbered for possible introduction at trial, but only 215 documents were actually introduced as evidence. Before the trial commenced, the defendants designated part of the pretrial deposition testimony of Dr. Wienkenhoever as "DX 422, 423, 424, 425, 426, 422, 428, and 429." At the end of the trial, however, defendants indicated they would designate as evidence only a small portion of the deposition testimony of Dr. Wienkenhoever and sought to introduce that designated portion as part of their evidence. Upon discovering that Miles intended to counterdesignate large portions of Dr. Wienkenhoever's deposition testimony in response, defendants changed their minds and decided not to introduce any portion of Dr. Wienkenhoever's deposition testimony as evidence. Miles then attempted to introduce its "counter designated" portions of Dr. Wienkenhoever's deposition as its evidence.

Miles, in support of its introducing the counter-designated portions of the depositions of Dr. Wienkenhoever as its evidence, cited *Burke v. State, Del. Supr., 484 A.2d 490 (1980).* [*4]

In Burke, the Court held that under D.R.E. 106, if portions of a transcript were used to impeach a witness, the entire transcript could be admitted at the request of the other side. *Id. at 497.* That, however, is not the situation here because defendants decided not to seek to introduce any part of Dr. Wienkenhoever's deposition transcript as their evidence. In the absence of some special showing of unfairness or prejudice to Miles, therefore, the deposition testimony of Dr. Wienkenhoever could not be admitted as evidence.

Unfortunately, the issue here is made more complicated because Miles claims that it was misled when defendants indicated in their portion of the pretrial order that they would designate portions of the deposition testimony of Dr. Wienkenhoever as their evidence. Miles, therefore, urged that its proposed designation of portions of Dr. Wienkenhoever's deposition testimony is merely a "counter designation" to that portion of the depositions that it was led to believe would be introduced by defendants.

Assuming, arguendo, that this Court could, in its discretion and in the interest of justice, admit the deposition testimony [*5] as evidence, the burden is upon Miles to show that it was misled and that it has suffered prejudice as a result.

Miles has not sustained that burden. Defendants, in their portion of the pretrial order, merely stated: "[Defendants] may rely on testimony from the depositions of 1 or more of the following witnesses: (1) Martin Wienkenhoever ...". Defendants at trial chose not to introduce any deposition testimony of Dr. Wienkenhoever.

Miles also has not shown that, after examining its witness, Dr. Wienkenhoever, for almost three days at the beginning of the trial, it will suffer any prejudice because his pretrial depositions cannot be introduced either under Chancery Rule 32(a)(2) or D.R.E. 106.

While it is unclear if Miles still seeks to introduce the deposition testimony of Dr. Wienkenhoever (it was not referred to in the post–trial briefs), it is clear that it cannot be introduced.

II.

At trial each side relied on the testimony of an expert witness, both of whom were qualified as experts.

After six days of foundation testimony, Miles presented Dr. Frederick Ehrich as its expert witness. He has

had many years of experience as a pigment chemist and testified that in his opinion defendants [*6] had misappropriated Miles' trade secrets.

Defendants' expert witness Max Saltzman, although not a chemist, has had many years of experience in color technology. He testified that no expropriation of Miles' trade secrets occurred.

The Court recognizes the inherent conflict of interest that an expert witness brings to the witness stand. Matter of *Shell Oil Co., Del. Supr., 607 A.2d 1213, 1222 (1992).* Nevertheless, the testimony of both expert witnesses was entitled to some credibility. For various reasons, including Dr. Ehrich's long career as a pigment chemist, his testimony was more persuasive.

In addition, both sides relied on fact witnesses who testified at great length as to the similarity or dissimilarity of the methods, techniques, or processes (collectively "processes") used by Miles in producing the pigments that it claims were copied by Cookson as compared with the process for the production of pigments produced by Cookson.

**THE FACTS**

III.

The facts, as set forth, are the Court's findings based upon all the competent evidence presented at trial. They are, however, only a summary of the voluminous facts adduced during the fifteen days of trial. [*7]

Plaintiff Miles is the successor in interest to the claim of misappropriation of trade secrets because of its 1992 merger with Mobay Corporation, the original plaintiff in this action. Miles is a wholly–owned subsidiary of Bayer AG, a German corporation. Miles initially produced pigments at Haledon, New Jersey, but Miles now has moved its pigment manufacturing facilities to its Bushy Park, South Carolina, plant.

Defendant Cookson Pigments, Inc. ("Cookson Pigments"), a Delaware corporation, is a wholly–owned subsidiary of Cookson Investments, Inc., which in turn is a wholly–owned subsidiary of defendant Cookson America, Inc. (Cookson America), a Delaware corporation. "Cookson," as used herein, refers to Cookson Pigments and Cookson America together.

In June of 1988, Cookson America acquired 50% of the stock of Heubach, Inc. (Heubach), a pigment manufacturer. In June of 1989, it acquired the remaining stock of Heubach and changed the name of that company to Cookson pigments, Inc. Heubach had acquired its pigment business from E.I. duPont de Nemours & Co. in 1984. Cookson America is a holding company rather than

an operating company. Cookson PLC., an English company, is the parent company [*8] of Cookson America.

Cookson pigments manufactures pigments at its Newark, New Jersey plant. In June of 1989, Mr. Edward Schober and Mr. Rainer Heubach, both of Heubach/Cookson Pigments, submitted a proposal to Cookson America suggesting that Cookson pigments enter the high performance organic pigment market. In July or August of 1989, Cookson America provided $8 million in funds for renovation and expansion of Cookson pigments' Newark plant for the purpose of manufacturing high performance organic pigments. Cookson America treated the funds provided as a loan, to be paid back with interest. Cookson America agreed to make the loan before Cookson Pigments had developed any of the high performance organic pigments at issue in this lawsuit. Cookson pigments' proposal to enter the high performance organic pigment field also included a plan to hire the technical personnel deemed necessary to manufacture high performance pigments.

**THE FORMER EMPLOYEES OF MILES**

IV.

In 1989, Cookson pigments hired five employees and one consultant formerly employed by Miles (collectively, the "Former Employees"). All of the Former Employees worked in some capacity in the high performance pigment field [*9] while employed at Miles and continued to do so when they began work at Cookson Pigments. Cookson Pigments also hired Mr. Frank Tomasella, a non–Miles employee, to work as a high performance pigment chemist in 1989.

Edward Schober was the Manager of pigment Marketing for Miles when he was hired by Cookson America in March of 1989. Mr. Schober became President of Cookson Pigments when the purchase of the remaining half of Heubach by Cookson America was consummated in July 1989. Mr. Schober had over forty years of experience working in the pigment industry, principally in the marketing area and had worked for several different pigment manufacturing companies, including BASF, Tenneco, Himont, and Mobay. Mr. Schober received an increase in salary of almost $30,000 when he began working for Cookson Pigments.

Dr. Lawrence Lerner was the Manager of Pigment Research and Process Development for Miles when he was hired in March of 1989 to become Manager of Research and Development at Cookson Pigments. Dr. Lerner did not actually begin working for Cookson Pigments until September of 1989, however. Dr. Lerner had extensive experience working with organic pigments. As part of his responsibilities [*10] at Miles, Dr. Lerner was responsible for all technical information relating to the high performance pigments of Miles at issue in this suit. Dr. Lerner received an increase in salary of approximately $20,000 when he began working for Cookson Pigments.

John Santimauro was a former Manager of Pigment Research and Process Development at Mobay. He retired in 1983 and was serving as a consultant to Miles in the pigment field when he was hired by Cookson Pigments in April of 1989 to serve as a consultant on the production of high performance organic pigments. Mr. Santimauro had over forty years experience in the field of pigments. All of his experience was accumulated at Miles and its predecessor companies. While working for Miles, Mr. Santimauro received $500 a day for a minimum of 25 days per year. Cookson Pigments paid Mr. Santimauro $700 a day for a minimum of 75 days for his consulting work at Cookson Pigments.

Robert Fix is a chemist who worked on high performance pigments while employed by Miles. At Miles, Mr. Fix concentrated on the class of pigments known as perylenes but he also worked on the class of pigments known as phtalocyanines. Mr. Fix was hired by Cookson Pigments in [*11] May of 1989 to work in the high performance pigment field. Mr. Fix primarily worked on perylenes upon commencing work at Cookson Pigments but also did some work with other pigments.

Rajesh Patel is a chemist who worked on high performance pigments while employed by Miles. At Miles, Mr. Patel's work concentrated on quinacridones pigments but he also worked on other pigments. In September of 1989, Mr. Patel began working at Cookson Pigments where he primarily worked on quinacridones.

Mr. Lance Smerak was the National Sales Manager at Miles until 1988. He was serving as the Business Manager of the Pigments section at Miles when he was hired by Cookson Pigments in 1989 to become its National Sales Manager.

**THE RETAINED DOCUMENTS**

V.

Some of the Former Employees (Santimauro, Lerner, Patel, and Smerak) possessed documents belonging to Miles when they began working for Cookson Pigments (collectively referred to as the "Retained Documents"). As part of their employment agreements with Miles (or Miles' predecessors Mobay, Harmon Colors, and Allied), the Former Employees had agreed to return all of Miles' documents in their possession upon the cessation of their employment. Although some [*12] of the Retained Documents are many years old, others are dated as re-

cently as the late 1980s.

"Batch sheets" is a term Miles uses to refer to documents that describe in detail the processes it used to make particular high performance pigments. Batch sheets list the best processing measures/parameters for a particular product. Some of the Retained Documents were batch sheets describing Miles' methods, techniques and processes used in the manufacture of certain of the pigments at issue in this suit.

Step block diagrams are Miles' documents that reveal how various equipment used in the manufacture of high performance pigments relate to each other and reveal the amounts of chemicals used in the manufacturing process. Some step block diagrams were included among the Retained Documents.

The Retained Documents included documents containing handwritten notes on various stages of procedures used to manufacture high performance organic pigments. They also included documents containing the names of Miles' high performance pigment customers, the types of pigments each customer bought, the amounts of pigments each customer bought, and the prices paid for a particular high performance pigments. [*13]

## HIGH PERFORMANCE PIGMENTS

VI.

Color, transparency, brightness, and dispersibility are important characteristics of a high performance pigment. Because of their particular qualities or properties, high performance pigments have the ability to withstand severe environmental conditions. High performance pigments undergo extensive testing under the difficult environmental conditions of Florida weather ("Florida tests") prior to being ready for sale in the marketplace. Florida tests for pigments typically range from one to four years, depending on the particular pigment.

Quality high performance pigments are coveted by large manufacturers such as DuPont, Ciba–Geigy, Sherwin Williams, PPG Industries, and BASF for use in automobile paints and in plastics. These manufacturers formulate their paints by incorporating various pigments into sprayable liquids. Because of the technical expertise, time, effort and resulting expense required to develop quality high performance pigments, only a few companies manufacture high performance pigments for sale in the marketplace. The high performance pigments at issue in this case fall into one of three general classes: (1) perylenes; (2) quinacridones; [*14] or (3) copper phthalocyanines. Miles was the only manufacturer offering all of these three classes of high performance pigments to the domestic marketplace before Cookson Pigments entered

all three markets in 1991.

## 1. PERYLENES

The class of pigments known as perylenes includes colors such as bright red, maroon, and violet. The manufacture of all Miles' perylene pigments starts with the same intermediate material (Pigment Red 179 (PR–179)) but then the manufacturing process is altered to create parties of different size and shape and ultimately, different properties and characteristics. Miles is the recognized domestic market leader for the production of perylenes.

The Miles' perylene pigments at issue in this suit are its products R-6436 and R-6424. R-6436 is the best-selling perylene pigment on the domestic market. Recently, Cookson Pigments has offered its own perylene pigments as counteroffers to these Miles products. A counteroffer is a pigment that, while not an exact match, is offered to customers as a usable alternative or substitute for a competitor's particular pigment. Cookson Pigments' HP-5179 is offered as a counteroffer for Miles' R-643E and Cookson Pigments' HP-5180 [*15]  is offered as a counteroffer for Miles' R-6424.

[Text redacted by the Court.]

Each of the six steps of the process involves several sub-steps. During each step, specific chemicals are made to react together at specific temperatures for specific amounts of time before the process continues to the next step.

[Text redacted by the Court.]

## 2. QUINACRIDONES

The second general class of high performance pigments at issue in this lawsuit are the quinacridones. Quinacridone pigments include the colors of bright red, magenta, and violet. Different chemical processes are used to manufacture quinacridone pigments than are used to manufacture perylene pigments. Three types of quinacridones are at issue in this suit: (1) unsubstituted quinacridones; (2) dichloroquinacridones; and (3) dimethyl quinacridones.

A major difference in the manufacture of Miles' unsubstituted quinacridones, dichloroquinacridones, and dimethyl quinacridones is the particular starting material used. The chemical dimethylsuccinyl succinate (DMSS) is used in the manufacture of all three types of quinacridones but is combined with different chemicals to form different starting materials, depending on what type of quinacridone is being manufactured.

For Miles' unsubstituted quinacridones, [*16] dianilinoterephtalic acid (DATA) is the starting material pro-

duced; for dichloroquinacridones, dichloroanilino terephtalic acid (DCTA) is the starting material produced; and for dimethyl quinacridones, ditoluidinoterephtalic acid (DTTA) is the starting material produced.

Cookson Pigments markets its HP-4330 quinacridone as a counteroffer to Miles' RV-6909, an unsubstituted quinacridone.

Cookson Pigments markets its HP-4500, a dimethyl quinacridones as a counteroffer to Miles' RV-6832, a dimethyl quinacridone. As to the manufacture of its dimethyl quinacridone RV-6832, Miles apparently only claims misappropriation of Step 1, the production/synthesis of DTTA.

### 3. COPPER PHTALOCYANINE BLUES

The third general class of high performance pigments at issue in this suit are copper phtalocyanine blues. Miles' claims of misappropriation relating to production of copper phtalocyanines appear to focus on the finishing step used to make copper phtalocyanine high performance pigments. [Text redacted by the Court.]

Cookson Pigments markets its phtalocyanine blue BT-684-D pigment as a counteroffer to Miles' B-4714 pigment. Cookson Pigments markets its phtalocyanine blue BT-788-D pigment as a counteroffer to Miles' B-4806 [*17] pigment. B-4714 and 3-4806 are Miles' leading sellers among its copper phtalocyanine blue pigments. [Text redacted by the Court.]

### COOKSON PIGMENTS' ENTRY INTO THE HIGH PERFORMANCE ORGANIC PIGMENT FIELD

VII.

Cookson Pigments did not manufacture any of the high performance organic pigments at issue in this suit in 1989 when it hired the Former Employees, although it was manufacturing certain high performance inorganic pigments. After Mr. Schober was hired in March of 1989, he and Mr. Heubach developed a plan for Cookson Pigments to enter the high performance organic pigment market. This plan involved the renovation and equipping of an existing building at the Newark, New Jersey plant and the hiring of a group of experienced pigment chemists, including a group leader. Cookson Pigments intended to develop and have available for marketing commercial products in the high performance organic pigment field during 1991. Messrs. Schober and Heubach recognized a unique opportunity for Cookson Pigments during this period because they believed that the pigment market was expanding its use of high performance organic pigments. Mobay and Ciba-Geigy had both announced plans

to move their pigment manufacturing operations. [*18] This would potentially create a shortage in the supply of high performance organic pigments in the marketplace for a brief period of time commencing in 1991. Mr. Schober, therefore, envisioned a "window of opportunity" to become available in 1991 whereby Cookson Pigments could enter the high performance organic pigment market.

In March or April of 1989, Messrs. Schober and Heubach met with John Kilpatrick, a Vice-President of Cookson America. Mr. Kilpatrick had hired Mr. Schober. They met to discuss the particular high performance organic pigments Cookson Pigments proposed to manufacture. In June of 1989 Cookson Pigments, under the direction of Mr. Schober, submitted a business proposal to Cookson America that requested the funds necessary to begin producing high performance organic pigments. In July of 1989, Cookson America provided $8 million for plant renovation.

Cookson Pigments began research on the manufacture of high performance organic pigments in mid-1989. Mr. Fix arrived in May of 1989 and was assigned to work on the manufacture of high performance organic pigments. Mr. Santimauro provided handwritten instructions to Mr. Fix delineating the steps to be taken to develop certain [*19] high performance organic pigments. Mr. Fix kept a notebook in which he recorded the results of his various experiments.

Dr. Lerner and Mr. Patel began to work at Cookson Pigments in September of 1989. Patel was assigned to work primarily on quinacridones. Cookson Pigments also hired a third chemist, Frank Tomasella, who had not worked for Miles, to assist in the manufacture of high performance organic pigments. Mr. Tomasella worked approximately one year before leaving to pursue a job with a pharmaceutical company.

When Dr. Lerner took over as Cookson Pigments' Manager of Research and Development of Pigments in September of 1989, he directed Mr. Fix to begin using new notebooks. The chemists working on high performance organic pigments were instructed to begin making reference to public domain literature and the prior art when performing experiments. Dr. Lerner stated his reason for ordering new notebooks was his concern that Miles would claim misappropriation.

John Galligan, Cookson Pigments' business manager for coatings from early 1989 until September of 1993, testified that as early as 1988, customers asked him if Cookson Pigments was going to enter the phtalocyanine blue, quinacridone, [*20] and perylene markets. Joint visits by Messrs. Galligan, Schober, and Heubach to customers in May or June of 1989 confirmed the interest of

these customers in having another company from which to purchase these high performance pigments.

Cookson Pigments was able to offer to the market the high performance organic pigments at issue during mid–1991.

**MILES EXPRESSION OF CONCERN**

VIII.

Miles became concerned when Cookson Pigments hired six of its former employees in 1989 and then proceeded with plans to enter the high performance organic pigment market in direct competition with Miles. Its concern was heightened when it learned that the Former Employees were performing the same jobs at Cookson Pigments that they performed at Miles.

On July 5, 1989, Miles wrote to Mr. Rainer Heubach of Cookson Pigments to express its concern over the recent hiring of certain of its employees who worked with pigments. The letter was referred to Cookson America's in-house corporate counsel, Mr. Stephen Howard. Howard attempted to allay Miles' concerns in a letter dated July 14, 1989.

On July 11, 1990, Miles sent a letter to all of the Former Employees with a copy to Mr. Howard. The letter expressed continued [*21] concerns that Miles' proprietary information was at risk in the manufacture of various perylene and quinacridone pigments by Cookson Pigments. On July 23, 1990, Mr. Howard again attempted to reassure Miles that its confidential information was not being used by Cookson Pigments. He also stated that an independent review of the situation had begun. Additional letters between the parties were then exchanged.

On October 15, 1990, following completion of a so-called "independent" investigation by Kenyon & Kenyon defendants' trial counsel), Mr. Howard informed Miles of his conclusion that no confidential obligations owed by the Former Employees to Miles had been breached and that Cookson pigments' soon–to–be–introduced high performance pigments were being manufactured from information gleaned from the public domain, not from Miles' confidential information. At the time of this October 15, 1990 letter, Mr. Howard was aware that some of the Former Employees had Miles' documents in their possession. These documents were turned over to representatives of Kenyon & Kenyon.

Miles evidently was not satisfied with the explanations provided by Mr. Howard because this suit for misappropriation of [*22] trade secrets was filed on October 10, 1991.

**THE PARTIES' CONTENTIONS**

IX.

Miles contends that the overall processes and the individual steps it uses to make the perylene pigments and quinacridone pigments at issue are its trade secrets that have been misappropriated by defendants.

[Text redacted by the Court.]

Miles concedes that certain individual steps of the manufacturing processes it employs may be known as part of the thousands of publicly disclosed options for the making of high performance pigments. However, it contends that the unique combinations of processes it uses for making high performance pigments are not disclosed in the literature. Miles alleges that Cookson Pigments used confidential information contained in the Retained Documents or obtained from the knowledge learned by the Former Employees while they worked at Miles to manufacture the Cookson Pigments' high performance pigments at issue in this suit.

Cookson Pigments counters by arguing that it only used information available from public sources to manufacture its high performance pigments. Cookson Pigments cites various American and European patents, treatises, and books and alleges that the steps it uses to make the pigments at issue [*23] are fully disclosed in the literature. Defendants categorically deny the misappropriation of any of Miles' trade secrets.

**THE APPLICABLE STATUTORY LAW**

X.

This suit is brought pursuant to the Delaware Uniform Trade Secrets Act, 6 Del. C., Ch. 20 (The Act).

[HN1] *6 Del. C. § 2001(4)* provides:

"Trade secret" shall mean information, including a formula, pattern, compilation, program, device, method, technique or process, that:

a. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

[HN2]
*6 Del. C. 2001(2)* provides:

"Misappropriation" shall mean:

a. Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

b. Disclosure or use of a trade secret of another without express or implied consent by a person who:

1. Used improper means to acquire knowledge of the trade secret; or 2. At the time of disclosure [*24] or use, knew or had reason to know that his knowledge of the trade [secret] was:

A. Derived from or through a person who had utilized improper means to acquire it;

B. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

C. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

3. Before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

[HN3] *6 Del. C. § 2001(1)* provides:

"Improper means" shall include theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means.

### THE BURDEN ON MILES

XI.

The first issue to be addressed is whether any of Miles' methods, techniques and processes are trade secrets. [HN4] A plaintiff alleging misappropriation of a trade secret carries the burden of proving the existence of the trade secret. *Acuson Corp. v. Aloka Co. Ltd., Cal. Ct. App., 10 U.S.P.Q.2d 1814, 1817 n.6 (1989); Boeing Co. v. Sierracin Corp., Wash. Supr., 738 P.2d 665, 674 (1987)* [*25] (*en banc*). If plaintiff fails to meet this burden, this Court's inquiry ends and judgment must be entered for defendants.

### 1. METHODS, TECHNIQUES AND PROCESSES.

Miles argues that the specific methods, techniques and processes it uses to manufacture high performance organic pigments are trade secrets as defined by the Act. The Act states that a trade secret includes a method, technique or process (collectively "process"). The Court finds from all the evidence that Miles' processes are clearly involved in this litigation. There are, however, additional requirements to be met before a process is afforded trade secret status.

### 2. REASONABLE EFFORTS TO MAINTAIN SECRECY

[HN5] To qualify for trade secret status, a process must meet all the requirements of *6 Del. C. § 2001(4)*. One of the requirements is that it be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *6 Del. C. § 2001(4)(b)*.

Dr. Martin Wienkenhower, Miles' Director of Research and Development from mid–1989 to March 1993, testified regarding the efforts taken by Miles to maintain the secrecy of the processes it used to manufacture high performance pigments. Employees were not [*26] permitted to take documents such as step–block diagrams and batch sheets out of the plant. All employees signed agreements when they began working at Miles that upon cessation of employment, they would surrender all documents in their possession and would keep Miles' proprietary information secret. Messrs. Lerner, Santimauro, Fix, Patel, Schober, and Smerak all signed such agreements when they accepted employment with Miles' predecessors.

Dr. Wienkenhower also justified that Miles' manufacturing plants were fenced and that guards were posted at the plant gates. When a visitor attempted to gain access to the plant, the guards called in to the plant to see if the particular person was expected. If so, a guard normally would escort the visitor to the employee of Miles that the visitor was scheduled to meet. During Dr. Wienkenhower's tenure at Miles, contractors who performed work inside Miles' plants were required to sign secrecy agreements obligating them to keep secret everything they saw or learned while working inside the plant.

Defendants did not seriously contend at trial or in their post–trial briefing that Miles failed to take reasonable measures to protect the secrecy of Miles' [*27] alleged trade secrets. The Court finds Miles' alleged trade secrets were the subject of efforts that were reasonable under the circumstances to maintain their secrecy.

### 3. ACTUAL OR POTENTIAL INDEPENDENT

## ECONOMIC VALUE

To qualify as a trade secret the method, technique or process "must derive independent economic value, actual or potential, from not being generally known". *6 Del. C. § 2001(4)(a).*

[HN6] An alleged trade secret derives actual or potential independent economic value if a competitor cannot produce a comparable product without a similar expenditure of time and money. *Electro-Craft Corp. v. Controlled Motion Inc., Minn. Supr., 332 N.W.2d 890, 900-01 (1983).* This requirement of *6 Del C. § 2001(4)(a)* involves the notion of competitive advantage. Id. It focuses on whether a plaintiff would lose value and market share if a competitor could enter the market without substantial development expense. *Id. at 901.*

The Court finds that Miles has met its burden as to this prong of the trade secret definition. Miles invested millions of dollars in research and development in its quest to manufacture quality high performance pigment [*28] organic pigments. Miles' best-selling peryene pigment, R-6436, took almost five years to develop. See *Gourmeta, Inc. v. Weilenmann, N.D. Ill., 1993 U.S. Dist. Lexis 1201 (1993)* (finding process to constitute trade secret where numerous experiments performed to optimize product).

Much trial and error (and resulting expense) went into researching and developing Miles' perylene, quinacridone, and phtalocyanine blue pigments at issue in this lawsuit. The processes used to produce these pigments derive independent economic value because they are not generally known.

If a competitor of Miles could copy those processes and begin making comparable products of its own without incurring similar developmental expense, the competitor would be advantaged and Miles would be disadvantaged. Finally, the fact that Miles was the only participant in all three of the high performance organic pigment markets before Cookson Pigments entered all three markets in 1991 indicates the independent economic value and competitive advantage the processes for making the pigments at issue in this action provide for Miles.

Defendants did not seriously argue at trial or in their post-trial [*29] briefing that the alleged trade secrets of Miles did not derive independent economic value. The Court concludes Miles has met its burden of showing its processes for making the high performance organic pigments at issue in this suit derive actual or potential independent economic value.

## 4. NOT GENERALLY KNOWN AND NOT READILY ASCERTAINABLE BY PROPER MEANS

[HN7] It is well-established that if a method, technique or process in question can be found in the public domain or public literature, it is considered to be generally known and readily ascertainable and thus, cannot qualify as a trade secret. *Acuson Corp. v. Aloka Co. Ltd., Cal. Ct. App., 10 U.S.P.Q.2d 1814, 1821 (1989); Electro-Craft Corp., 332 N.W.2d at 899-900;* Uniform Trade Secrets Act, Comments (1979). Reverse engineering time is a factor in determining whether a process is readily ascertainable, as is the complexity and detail of the data involved. *Electro-Craft Corp., 332 N.W.2d at 899* (citations omitted). While "novelty is not a requirement for trade secrets to the same extent as for patentability", some novelty is required. Id., [*30] citing *Clark v. Bunker, 9th Cir., 453 F.2d 1006, 1009 (1972);* see *Dionne v. Southeast Foam Converting, Va. Supr., 397 S.E.2d 110 (1990).*

[HN8] A plaintiff alleging misappropriation of trade secrets need not prove that every element of a method, technique or process is unascertainable from the public domain. *Boeing Co. v. Sierracin Corp., Wash. Supr., 738 P.2d 665, 675 (1987),* citing *Hayes-Albion Corp. v. Kuberski, Mich. Supr., 364 N.W.2d 609 (1984).* The overall combination of the principles and details used to make the product can qualify as a trade secret. *Electro-Craft Corp., 332 N.W.2d at 899; Boeing Co., 738 P.2d at 675.*

Processes alleged to be generally known or readily ascertainable must be known or ascertainable by proper means. Proper means include: (1) discovery by independent invention; (2) discovery by reverse engineering; (3) discovery pursuant to a license from the owner of the trade secret; (4) observation of the item in public use or on public display; and (5) obtaining the alleged trade secret [*31] from the published literature. Uniform Trade Secrets Act, § 1, Comments (1979).

Defendants argue that the processes used by Miles to manufacture Miles' high performance organic pigments at issue in this suit were generally known and readily ascertainable because they were disclosed in the public literature, particularly in certain United States and European patents. Defendants introduced as exhibits a number of different patents and other literature that purportedly disclose the specific methods, techniques and detailed processes used by Miles. Defendants argue that experienced pigment chemists, such as the Former Employees, could easily sort out the options in the literature that made no sense on their face and then could concentrate on the few options set forth in the patents that present definite possibilities of success.

Miles contends, however, that while the literature discloses some of the specific techniques and processes it uses, the patent literature mentions thousands of options for making high performance organic pigments, and

therefore the literature does not disclose how to manufacture a particular pigment. For example, the literature plainly discloses four possible [*32] finishing methods for a perylene pigment. Miles, however, argues that the literature does not disclose how to make its R–6436, a perylene pigment, or its B–4714, a phtalocyanine blue pigment. Miles claims as its trade secrets the totality or combination of the specific processes used to make the individual pigment at issue.

The Court finds Miles has satisfied its burden of showing that the unique combination of methods, techniques and detailed processes that it uses to manufacture the high performance pigments at issue in this suit are not generally known and are not readily ascertainable by proper means. The Court does not accept Miles' argument that a pigment chemist seeking to duplicate a rival's pigment would have to consider all the thousands of options in the literature for producing high performance pigments — an experienced pigment chemist could reject many options out of hand based on his experience and training. See Wilmington Trust Co. v. Consistent Asset Mgt. Co. Inc., Del. Ch., C.A. No. 8867–NC, Allen, C. (Mar. 25, 1987). The Court, however, finds that the literature introduced as evidence does not disclose the combination of specific detailed methods, techniques [*33] or processes used by Miles to manufacture the pigments at issue here. These combinations are not generally known or readily ascertainable from the literature cited by Cookson and therefore deserve protection as trade secrets.

Because Miles has shown that the combination of processes used by it to make its high performance pigments at issue in this suit are not generally known and are not readily ascertainable by proper means, that they derive actual and potential economic value from not being generally known, and that reasonable efforts under the circumstances were taken to maintain the secrecy of the processes, the Court finds that the particular processes are trade secrets deserving of protection.

## THE EVIDENCE SHOWING MISAPPROPRIATION OF TRADE SECRETS

### XII.

Next to be addressed is the issue of whether Miles' trade secrets were misappropriated. *6 Del. C. § 2001(2)* defines misappropriation:

"Misappropriation" shall mean:
  (a) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
  (b) Disclosure or use of a trade secret of another without express or implied consent by a person who:
    1. Used [*34] improper means to acquire knowledge of the trade secret; or
    2. At the time of disclosure or use, knew or had reason to know that his knowledge of the trade [secret] was:
    A. Derived from or through a person who had utilized improper means to acquire it;
    B. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
    C. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
    3. Before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

[HN9] Misappropriation of trade secrets may be proven by circumstantial evidence. *Data General Corp. v. Grumman Systems Support Corp., D. Mass., 825 F. Supp. 340, 360 (1993); Lamb–Weston, Inc. v. McCain Foods, Ltd., 9th Cir., 941 F.2d 970, 973 (1991).*

Upon review of all the admissible evidence, the Court finds that defendants misappropriated trade secrets of Miles relating to the manufacture of the high performance pigments at issue in this suit.

## 1. THE HIRING OF THE FORMER EMPLOYEES [*35]

Cookson hired six former employees of Miles within a six–month span in 1989. All of the Former Employees worked in the high performance pigment field in some capacity for Miles. Several of them had full knowledge of the processes used by Miles to produce high performance pigments. John Santimauro and Larry Lerner were recognized experts in the high performance pigment field. Edward Schober had forty years experience in the pigment field.

The Former Employees were hired as a team by Cookson as part of its plan to enter the high performance organic pigment market. Although the job market for older chemists was sparse, all of the Former Employees were given substantial salary in-

creases by Cookson. Cookson America's John Kilpatrick hired Edward Schober to become President of Cookson Pigments. John Santimauro, a noted expert in the organic pigments field, began consulting for Miles in the high performance pigment field following his 1983 retirement as Manager of Miles' Pigment Research and Process Development. He was hired by Cookson to perform the same type of consulting work he performed at Miles. Robert Fix primarily worked on perylenes upon commencing work at Cookson Pigments and at [*36] Miles he had primarily concentrated on perylenes. Rajesh Patel primarily worked on quinacridones upon commencing work for Cookson Pigments and his work at Miles primarily concentrated on quinacridones. Lance Smerak had been National Sales Manager at Miles until 1988. He was hired as National Sales Manager for Cookson Pigments in 1989.

The Former Employees were placed in the very positions they occupied at Miles, despite that Cookson Pigments had a group of existing chemists who could have been used to perform research on high performance organic pigments. Dr. Gerald Aldridge, a Cookson Pigments' chemist at the time of the hiring of the Former Employees, actually performed some work on high performance pigments in 1989.

[Text redacted by the Court.]

## 2. THE WINDOW OF OPPORTUNITY – SHORT PRODUCT DEVELOPMENT TIME

As previously discussed, when Dr. Schober began working for Cookson in March of 1989, he envisioned a "window of opportunity" in 1991 in the high performance organic pigment industry. He knew Mobay and Ciba–Geigy had announced plans to move their pigment manufacturing facilities in 1991. He believed that such moves would likely create a temporary shortage in the high performance pigment market and that [*37] Cookson Pigments could be in a position to use this shortage to promote its new products if the new products were available in 1991. Because of this brief "window of opportunity", it was essential that Cookson Pigments be able to manufacture high performance pigments quickly.

Cookson Pigments did not manufacture any of the high performance pigments at issue in this suit prior to the hiring of the Former Employees. There was evidence indicating that Cookson pigments' existing chemists had made unsuccessful attempts to manufacture high performance organic pigments prior to the hiring of the Former Employees.

The parties differ as to how long it took Cookson Pigments to develop the pigments at issue in this suit.

Miles focuses on the fact that within nine months of the beginning of research by the Former Employees, Cookson Pigments provided lab samples of the perylenes and quinacridones at issue to its customers for evaluation. Within four months of beginning this research, Cookson Pigments had produced a lab sample match (Cookson Pigments' BT–684–D) for Miles' B–4714 phtalocyanine blue pigment. BT–684–D had been produced by Cookson even before Dr. Lerner arrived at Cookson Pigments. [*38] Four months was a very short time for a lab to produce such a sample even with the knowledge of Miles' former employees.

Cookson, on the other hand, prefers to focus on the time period it took for it to have a product ready for commercial marketing. Cookson asserts it took almost two years before it produced commercial versions of its perylene pigments, one-and-a-half years before it produced its quinacridone pigments, and one year before it produced its phtalocyanine pigments. Most of the time delay, however, was due to the one year or more of testing that is required before a pigment may be commercially sold.

It took Miles almost five years to develop as a commercial product, its best-selling perylene pigment, R–6436. [Text redacted by the Court.]  These long periods of development, involving countless hours of research and experiments, serve as a stark contrast to Cookson Pigments' amazingly short development of all of its high performance organic pigments.

It is likely that some high performance pigments could be initially produced over a shorter period of time than others. It is not likely that it would take five years to produce every high performance pigment as a commercial product. Cookson Pigments, however, [*39] was able to build a new facility and produce for commercial sale all the high performance pigments at issue within a two-year span. Lab samples of all these pigments were produced and made available within nine months of commencement of the research by the Former Employees.

The Court finds from all the competent evidence, including the expert opinion of Dr. Ehrich, that such a short development time by Cookson for the organic pigments at issue would have been impossible without the use of Miles' trade secrets.

## 3. THE RETAINED DOCUMENTS AND JOHN SANTIMAURO'S INSTRUCTIONS

Messrs. Lerner, Santimauro, Patel, and Smerak kept the Retained Documents in their possession when they ceased working for Miles and began working for Cookson Pigments, despite that such a retention was a breach of their employment agreements with Miles. The Retained

Documents included information concerning Miles' batch processes for making certain of the pigments at issue. While some of the Retained Documents were old and perhaps outdated, some were dated in the late 1980s and represented current proprietary information of Miles.

John Santimauro began working for Cookson Pigments in April 1989. Mr. Fix began [*40] working for Cookson Pigments in May 1989. Mr. Santimauro issued detailed handwritten instructions to Mr. Fix regarding certain experiments to be run relating to perylenes and quinacridones. The instructions included ratios, temperatures, and reaction times for the steps of the particular processes.

It is clear that the process variables contained in Mr. Santimauro's handwritten instructions followed closely Miles' processes and followed almost exactly some of the Miles' processes as reflected in the Retained Documents. Mr. Fox's initial instructions from Mr. Santimauro relating to perylenes and quinacridones were practically identical to the Miles' process descriptions contained in the Retained Documents.

Mr. Santimauro testified that his instructions could have been written from his memory rather than from the Retained Documents. While this is doubtful, even if it were so, he must necessarily have relied on Miles' secret processes. *Hayes-Albion Corp. v. Kuberski, Mich. Supr., 364 N.W.2d 609 (1984).* Although only about half of Mr. Santimauro's handwritten instructions to Mr. Fix were recovered, many of the details and ratios contained in the handwritten [*41] instructions that were produced are identical to the details and ratios contained in the Retained Documents.

The Court finds that Cookson Pigments' tentative plant processes for making certain of the high performance pigments at issue were based upon Mr. Santimauro's written instructions to Mr. Fix, which in turn were based upon the Retained Documents. Tentative plant processes are processes prepared to enable the performance of experiments in the plant using actual manufacturing equipment after successfully carrying out the experiments in the lab.

**4. THE ARRIVAL OF DR. LERNER AT COOKSON PIGMENTS**

Although he was hired in March of 1989, Dr. Larry Lerner did not begin working for Cookson Pigments until September of 1989. Between March and June 1989, he completed some duties at Miles and then left Miles' plant at the end of June 1939. During the interim period between June and September, Dr. Lerner asserts he performed research of the pigment literature to insure that his work at Cookson Pigments would be based on the lit-

erature and not on Miles' trade secrets. At the time of his literature search, Dr. Lerner knew which Miles' pigments Cookson Pigments planned to target, however. [*42]

Upon commencing work at Cookson Pigments, Dr. Lerner instructed Mr. Fix to begin using new notebooks to record his experimental results and to relate his experiments to the literature. Although Dr. Lerner knew that Mr. Santimauro had given Mr. Fix procedures concerning production of perylenes and quinacridone intermediates, Dr. Lerner testified that he never asked Mr. Santimauro how he came up with those procedures. Dr. Lerner testified he instructed Mr. Fix to begin new notebooks because he wanted to make sure that "whatever experiments were done were based" on the literature, thus avoiding any accusations that Cookson Pigments was using Miles' proprietary technology. Dr. Lerner's review of Mr. Fix's old notebooks showed that there "were no references at all" to the public literature. Mr. Fix was then instructed to take "whatever notebooks he had and file them away and start new notebooks." Dr. Lerner also wanted Mr. Fix to start a new experimental program from scratch. Id.

This scenario of the substitution of new notebooks and a new experimental program is an indication that Mr. Fix was using Miles' proprietary information to conduct pigment research and experiments prior to [*43] the September arrival of Dr. Lerner. Otherwise, there would have been no reason to switch notebooks and begin anew. Mr. Fix's early experiments were based on the handwritten instructions of Mr. Santimauro, which in turn necessarily were based on Miles' secret processes. Such evidence strongly indicates the misappropriation of Miles' proprietary information.

**5. DR. LERNER'S SELECTION OF PUBLIC LITERATURE**

Dr. Lerner conducted two searches of the public literature in his attempt to relate Cookson Pigments' development of high performance pigments to that literature. The first search was conducted prior to his September 1989 starting date with Cookson Pigments. The second search was conducted after he began working for Cookson Pigments. Dr. Lerner had full knowledge of all the Miles' processes at issue in this litigation and he knew which Miles' pigments Cookson Pigments was targeting. Only a few of the patents discovered in the literature searches could have been used by Cookson Pigments in manufacturing its perylene and quinacridone pigments.

Dr. Lerner testified concerning the "fresh look" he took in the Fall of 1990 at Cookson Pigments' production of quinacridone intermediates. [*44] The Court finds, however, that before this fresh look, Cookson Pigments' production of DTTA was based on certain

Retained Documents.

The Court also finds that Dr. Lerner's testimony concerning his literature searches tends to prove rather than disprove that a misappropriation of Miles' trade secrets occurred. It is clear that Dr. Lerner knew exactly what to look for when he conducted his literature searches. This was due to his intimate knowledge of Miles' processes. He could target his searches accordingly. The searches, therefore, appear to be mere attempts designed to hide the earlier misappropriation by Cookson Pigments.

## 6. THE SIMILARITIES OF THE PARTIES' PROCESSES

### (a). PERYLENES

Miles introduced numerous charts and testimony comparing the methods, techniques or processes ("processes") used by each party to produce the competing perylene pigments at issue. The Court finds that the marked similarities between the parties' overall processes and the individual steps and substeps for making R–6436 and HP–5179, respectively, leads to the conclusion that Cookson Pigments used Miles' trade secrets as to the manufacture of Miles' HP–5179.

Although many of the process steps [*45] and substeps used to make R–6424 and HP–5180 are identical (or very nearly so) in terms of temperature, ratio, or reaction time, certain process steps and substeps for these perylene pigments differ. For example, many of the process steps and substeps used to manufacture R–6424 and HP–5180 differ somewhat as to temperature, reaction time, and ratio of chemicals. [Text redacted by the Court.]

These differences, however, do not preclude a finding that Cookson misappropriated trade secrets of Miles in Cookson's manufacture of its HP–5180.

[Text redacted by the Court.]

The copying of the initial steps of the initial steps of the Miles processes serves as the basis for a finding of misappropriation as to the manufacture of HP–5180 by Cookson.

### (b). QUINACRIDONES

Miles claims the overall processes and the individual steps comprising those processes used for making Miles' quinacridone pigments at issue are trade secrets that have been misappropriated by Cookson, largely through the copying of the processes set forth in certain Retained Documents.

Cookson Pigments argues that the processes it uses to manufacture the quinacridone pigments at issue are derived from publicly available sources, including certain

Miles' patents. Cookson Pigments also [*46] cites some differences in the parties' processes as evidence that Miles' trade secrets were not misappropriated.

[Text redacted by the Court.]

Despite some differences in the manufacturing processes of RV–6909 versus HP–4330, the Court finds upon review of all the competent evidence that Miles has adequately shown misappropriation of the beginning processes used by Cookson to manufacture its HP–4330. The processes shown to be misappropriated include the manufacture of DATA, ring closure of DATA, drowning, and the [Text redacted by the Court.] process.

Cookson Pigments offers its HP–4202 as a counteroffer for Miles' RV–6843, a dichloroquinacridone, and Miles' RV–6909, an unsubstituted quinacridone.

Nevertheless, the Court finds that Miles has adequately shown the misappropriation from Miles of the processes used by Cookson to manufacture its HP–4202.

[Text redacted by the Court.]

Miles' claim that Cookson misappropriated Miles' Trade Secrets in Cookson's manufacture of a dimethyl quinacridone is limited to the manufacture of DTTA, the starting material. Miles alleges Cookson Pigments copied Miles' DTTA process to manufacture HP–4500, offered as a counterpart to Miles' RV–6832. The evidence shows misappropriation of this step.

### (c). PHTHALOCYANINES

[Text redacted by the Court.]

### SUMMARY OF EVIDENCE    [*47]    OF MISAPPROPRIATION

#### XIII.

From all the competent evidence, the Court concludes that Cookson Pigments and its parent, Cookson America, have misappropriated certain trade secrets of Miles.

As to the perylene pigments at issue, Cookson has misappropriated Miles' overall processes used to produce Miles' R–6436 and R–6424 pigments.

As to its HP–4330 pigment, Cookson has misappropriated the combination of Miles' processes used for the manufacture of DATA, ring closure of DATA, drowning, and [Text redacted by the Court.] of the resulting chemical mixture.

As to its MP–4202 pigment, Cookson has misappropriated the combination of Miles' processes used for the manufacture of DCTA, ring closure of DCTA, drowning and [Text redacted by the Court.] Cookson, in manufacturing its HP–4202 pigment, also has misappropriated

certain of Miles' processes used to manufacture Miles' RV–6909 because Cookson has used an unsubstituted quinacridone component (Cookson's HP-4330, which is the counterpart to Miles' RV-6909) in the manufacture of Cookson's HP-4202.

As to its HP-4500, Cookson has misappropriated Miles' processes used for the manufacture of DTTA.

The Court also finds that Miles has not satisfied its burden of proving the misappropriation of its business [*48] information in the form of customer lists and pricing information.

The Court, therefore, concludes that Cookson misappropriated certain of Miles' trade secrets pursuant to *6 Del. C. § 2001(2)(a)*, *2001(2)(b)(2)(A)*, and *2001(2)(b)(2)(C)*.

## THE KNOWLEDGE OF COOKSON AS TO THE MISAPPROPRIATION

XIV.

[HN10] *6 Del. C. § 2001(2)(a)* provides that for there to be a violation of the Uniform Trade Secrets Act there must be "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." Cookson Pigments and defendant Cookson America are persons pursuant to *6 Del. C. § 2001(3)*.

Here, the unique combinations of Miles' techniques and processes used to manufacture the perylene pigments at issue, the processes used to manufacture the quinacridones at issue, [Text redacted by the Court.] Cookson knew or had reason to know that those trade secrets were being used in the manufacture of the Cookson Pigments' high performance pigments at issue here.

Mr. Fix's initial instructions from Mr. Santimauro relating to perylenes and quinacridones were practically identical to Miles' process descriptions contained in the Retained Documents. Even if Mr. Santimauro relied on [*49] his memory to write the instructions, his memory clearly was based on Miles' trade secrets. Mr. Santimauro was obligated not to reveal Miles' trade secrets. *Hayes-Albion Corp. v. Kuberski, Mich. Supr., 364 N.W.2d 609 (1984)*.

The Court finds that Cookson knew that the trade secrets of Miles, acquired by improper means, were used to manufacture pigments for Cookson Pigments. The Court therefore finds defendants have misappropriated trade secrets of Miles pursuant to *6 Del. C. § 2001(2)(a)*.

## THE LIABILITY OF COOKSON AMERICA

XV.

Defendant Cookson America argues that it cannot be held liable for any misappropriation either as an active participant in the alleged misappropriation or under a theory of piercing the corporate veil. Miles, however, argues that Cookson America is jointly and severally liable for the misappropriation of Miles' trade secrets.

John Kilpatrick, a Vice–President of Cookson America at the time, hired Edward Schober in March of 1989 to serve as President of Cookson Pigments. Mr. Kilpatrick signed the employment agreement in his capacity as a Cookson America Vice–President. The contract signed by Mr. Schober gave Cookson America control [*50] over where he would work and in what capacity. Cookson America also approved the hiring of Larry Lerner and other key personnel for Cookson Pigments.

Cookson Pigments' plan for hiring a team of high performance pigment chemists to enter the high performance organic pigment field was submitted to and approved by Cookson America in mid-1989. In March or April of 1989, Cookson America knew about the "window of opportunity" that would exist in the high performance pigment market in 1991 or 1992. In July 1989, Cookson America approved $8 million in funds for the capital expansion needed for Cookson Pigments to enter the high performance pigment field. The funds were approved prior to any development of the high performance pigments at issue in this suit. All subsidiaries of Cookson America, including Cookson Pigments, share the same board of directors. Some directors of Cookson America sit on the board of directors common to all of the subsidiaries. Cookson America owns all of the stock of Cookson Investments, which, in turn, owns all of the stock of Cookson Pigments.

When Miles expressed initial concern in 1989 to Heubach/Cookson Pigments over the hiring of the Former Employees, Stephen [*51] Howard, in-house counsel for Cookson America, responded by letter. Mr. Howard continued to respond to Miles' further expressions of concern.

Based upon the totality of the circumstances, and the interrelationship and knowledge existing between Cookson America and Cookson Pigments, the Court finds that Cookson America must be held jointly and severally liable with Cookson Pigments for any misappropriation of Miles' trade secrets.

## APPROPRIATE RELIEF

XVI.

The final issue to be determined is the appropriate relief. [HN11] *6 Del. C. § 2002* provides:

(a) Actual or threatened misappropriation may be enjoined. Upon application to the

court, an injunction shall be terminated when the trade secret has ceased to exist, but the injunction may be continued for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation.

(b) If the court determines that it would be unreasonable to prohibit future use, an injunction may condition future use upon payment of a reasonable royalty for no longer than the period of time the use could have been prohibited.

(c) In appropriate circumstances, affirmative acts to protect [*52] a trade secret may be compelled by court order.

[HN12] *6 Del. C. § 2003* provides:

(a) In addition to or in lieu of injunctive relief, a complainant may recover damages for the actual loss caused by misappropriation. A complainant also may recover for the unjust enrichment caused by misappropriation that is not taken into account in computing damages for actual loss.

(b) If wilful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any award made under subsection (a) of this section.

Miles argues it is entitled to injunctive relief, monetary damages, exemplary damages, and attorneys' fees.

**INJUNCTIVE RELIEF**

XVII.

The Court finds that Miles is entitled to injunctive relief pursuant to *6 Del. C. § 2002(a).*

[HN13] "The purpose of an injunction in a trade secrets case is to protect the secrecy of the misappropriated information, eliminate the unfair advantage obtained by the wrongdoer, and reinforce the public policy of commercial morality." *General Electric Co. v. Sung, D. Mass., 843 F. Supp. 776, 778 (1994),* citing *Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470, 481 (1974).* [*53] A court must tailor the injunctive relief "to remedy the specific harm alleged". *Lamb-Weston, Inc. v. McLain Foods, LTD., 9th Cir., 941 F.2d 970, 974 (1991).* The type and scope of the injunction granted and the duration of the injunction are matters left to the sound discretion of the court. See *Hayes*

*Albion Corp. v. Kuberski, Mich. App., 311 N.W.2d 122, 129-30 (1981),* aff'd in part, rev'd in part, *Mich. Supr., 364 N.W.2d 609 (1984);* Rockwell Graphic Systems, Inc. v. DEV Industries, Inc., N.D. Ill., No. 84C6746, July 29, 1993, WL 286484 (1993).

[HN14] In injunction should last for "as long as necessary to eliminate any commercial advantage or 'lead time' with respect to good faith competitors that a person has obtained through misappropriation." Uniform Trade Secrets Act, § 2, Comments (1979); *Hayes-Albion Corp. v. Kuberski, Mich. Supr., 364 N.W. 2d 609 (1984);* Rockwell Graphic Systems, at 8 (injunction should not last for a period of time longer than that required to duplicate the product by lawful means). A court, depending on the circumstances of the case, [*54] may choose to start the injunction from the date of judgment or the date of misappropriation. Rockwell Graphic; *Viscofan, S.A. v. U.S. Int'l Trade Comm'n, Fed. Cir., 787 F.2d 544, 551 (1986); General Electric, 843 F. Supp. at 780.* Innocent third parties (such as customers), to the extent possible should be left unaffected by a grant of injunctive relief. *Hayes-Albion, 364 N.W.2d at 618.*

[HN15] A Court has a choice of imposing either a production injunction, which would preclude a defendant from producing the misappropriated product for a specific period of time, or a use injunction, which would preclude a defendant from using certain misappropriated processes for a specific period of time but would not preclude a defendant from producing the particular product by other lawful means. *General Electric, 843 F. Supp. at 779.*

A production injunction may be imposed where the misappropriated information is "inextricably connected" to the defendant's manufacture of the product. *Id. at 780.* An inextricable connection" is shown where the misappropriated [*55] information forms "such an integral and substantial part of a comprehensive manufacturing process or technology that, absent the misappropriated trade secrets, the defendant would not be able independently to manufacture or design a comparable product." Id. A production injunction should last for as long as it would have taken defendant "independently to develop or reverse engineer a technology for commercial production" of the product in question. Id.

XVIII.

Miles argues that it is entitled to five-year production injunctions against Cookson's manufacture of HP-5179, HP-5180, and HP-4330 because the processes used by Cookson Pigments to manufacture those high performance pigments are "inextricably connected" to the misappropriated trade secrets. Miles asserts that the requested five-year period corresponds to the normal time for inde-

pendent development of such pigments.

Miles argues it is entitled to a permanent use injunction against Cookson's use of Miles' trade secrets in connection with the dichloroquinacridone component of Cookson Pigments' manufacture of its HP-4202 pigment, a permanent use injunction as to Cookson's manufacture of DTTA for Cookson Pigment's HP-4500 [*56] pigment, and a permanent use injunction against Cookson Pigments' use of the [Text redacted by the Court.] for the production of any phtalocyanine pigments.

Finally, Miles argues it is entitled to an injunction prohibiting the Former Employees from doing any future work for Cookson Pigments on any high performance pigment intended as a Cookson counteroffer to any high performance pigment of Miles.

XIX.

The Court finds that the processes used by Cookson Pigments to manufacture its perylene pigments HP-5179 and HP-5180 are "inextricably connected" with the misappropriated trade secrets and therefore, a production injunction as to them would be an appropriate remedy.

The Court is not convinced, however, that a five-year production injunction is appropriate. While Miles demonstrated that it took almost five years for it to develop its R-6436 pigment, the counterpart to Cookson Pigments' HP-5179, Miles has not shown it took five years for it to develop its R-6424 pigment, the counterpart to Cookson Pigments' HP-5180. Nor is the Court convinced that it would have taken Cookson more than three years to have developed a counterpart to Miles' R-6436 pigment using only public information available in 1989.

The Court, [*57] therefore, finds that a three-year production injunction starting from the date of judgment is appropriate relief as to the manufacture by Cookson Pigments of its HP-5179 and HP-5180.

The Court further finds that a production injunction is also appropriate relief as to the manufacture by Cookson Pigments of its HP-4330 pigment because of the Court's finding that Cookson misappropriated the processes for the manufacture of the starting material DATA, the processes for ring closure of DATA, drowning processes and [Text redacted by the Court.] processes. These misappropriated processes are inextricably connected to Cookson Pigments' production of its HP-4330 pigment. A two-year production injunction against Cookson Pigments' manufacture of HP-4330, starting from the date of judgment, is, therefore, appropriate relief as to Cookson Pigments' HP-4330.

Similarly, a two-year production injunction starting from the date of judgment will be imposed against Cookson's manufacture of its HP-4202. The processes found to be misappropriated are inextricably connected to the production of HP-4202. Some of the processes found to be misappropriated as to HP-4330 are also used to manufacture HP-4202.

A two-year use injunction will [*58] be imposed upon Cookson's use of Miles' processes in the manufacture of DTTA for Cookson Pigments' HP-4500, and a two-year use injunction will be imposed upon Cookson's use of Miles' [Text redacted by the Court.] for production of any phtalocyanine pigments.

The Court finds that Miles is not entitled to an injunction prohibiting the Former Employees from working on any high performance pigment intended as a future counteroffer to any high performance pigment of Miles. Miles is adequately protected by the grant of the above injunctions. It would be inappropriate to prohibit the Former Employees from using their general knowledge and experience of high performance pigments, as well as future knowledge gained from research and experiments, to help Cookson manufacture pigments that may compete with Miles' pigments.

**MONETARY DAMAGES**

XX.

Miles concedes it is inappropriate to use unjust enrichment as a measure of damages here because Cookson made no profit through the end of 1993 from the pigments in question. Instead, Miles seeks its alleged lost profits that it defines as consisting of "both the loss of revenue because of sales made by Cookson of misappropriated products and loss of the contribution of misappropriated [*59] products to Miles' profit and loss figures." (Miles Opening Brief, at 46.) Miles asserts its actual losses can be determined by "applying the Miles' loss figures to Cookson's sales figures." Id. Miles further claims either over $6 million in damages using a total contribution figure or over $1.6 million in damages using a gross profit margin figure. Miles' evidence as to is damages, however, consisted primarily of conclusionary suppositions.

The Court therefore finds from all the competent evidence that Miles has failed to sustain its burden of proving that it suffered any actual monetary damage because of defendants' misappropriation of Miles' trade secrets. See *6 Del. C. § 2003(a)*. Because Miles is not entitled to monetary damages pursuant to *6 Del. C. § 2003(a)*, Miles also is not entitled to exemplary damages pursuant to *6 Del. C. § 2003(b)*.

**ATTORNEYS' FEES**

XXI.

1994 Del. Ch. LEXIS 221, *59

The Court concludes that Cookson America and Cookson Pigments wilfully and maliciously misappropriated Miles' trade secrets. Miles is therefore entitled to its reasonable attorneys fees incurred in litigating this dispute. *6 Del. C. § 2004.* Miles should promptly submit a request for reasonable attorney fees and [*60] justification for them by affidavit.

Plaintiff may submit a proposed order.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ETHYPHARM S.A. FRANCE & | ) | |
| ETHYPHARM S.A. SPAIN, | ) | |
| | ) | |
| Plaintiffs | ) | C.A. No. 04-1300 (SLR) |
| | ) | |
| v. | ) | |
| | ) | |
| BENTLEY PHARMACEUTICALS, INC. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**CERTIFICATE OF SERVICE**

I, Francis J. Murphy, Esq., do hereby certify that on this 15th day of September,
2006, I have caused the following documents to be served in the manner indicated on the
parties listed below: **Plaintiff's Opposition to Defendant's Motion for Summary
Judgment and supporting papers.** Per Court's Order, supporting papers are being served
on local counsel for purposes of transcription.

**By E-File**
John L. Reed, I.D. No. 3023
Denise Seastone Kraft, I.D. No. 2778
Edwards Angell Palmer & Dodge LLP
919 N. Market Street, 15th Floor
Wilmington, DE  19801

**By Email**
Craig E. Stewart, Esq.
Veronica C. Abreu, Esq.
Joseph P. Mingolia, Esq.
Palmer & Dodge LLP
111 Huntington Avenue
Boston, MA  02199

MURPHY SPADARO & LANDON

/s/ Francis J. Murphy
Francis J. Murphy, I.D. #223
1011 Centre Road, Suite 210
Wilmington, DE  19805
Tel:  (302) 472-8100
Fax:  (302) 472-8135
E-Mail: Fmurphy@msllaw.com
Attorney for Plaintiffs