# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ETHYPHARM S.A. FRANCE &  )
ETHYPHARM S.A. SPAIN,  )
 )
                Plaintiffs  )    C.A. No. 04-1300 (SLR)
 )
        v.  )    JURY TRIAL DEMANDED
 )
BENTLEY PHARMACEUTICALS, INC.  )
 )
                Defendant.  )
 )

**DECLARATION OF JAMES R. MURPHY IN SUPPORT OF DEFENDANT
BENTLEY PHARMACEUTICALS, INC.'S MOTION TO DISMISS**

Richard L. Horwitz (#2246)
David E. Moore (#3898)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
Telephone: (302) 984-6000

Of Counsel:
Craig E. Stewart
Marc J. Goldstein
PALMER & DODGE LLP
111 Huntington Avenue
Boston, MA 02199
Telephone: (617) 239-0100

*Attorneys for Defendant*

Dated: November __, 2004

**A56**

I, James R. Murphy, declare under penalty of perjury as follows:

1.      I am the chairman, president, chief executive officer, and a director of Bentley Pharmaceuticals, Inc. ("Bentley"). I have personal knowledge of the facts stated in this declaration, and if called as a witness, could competently testify to them. I make this declaration in support of Bentley's Motion to Dismiss for Failure to Join a Necessary Party.

2.      I have been a director of Bentley since 1993, president since 1994, and chairman and CEO since 1995.

Structure, Organization, and Operations of Bentley Pharmaceuticals, Inc.

3.      Bentley is a specialty pharmaceutical company focusing on the development and licensing of drug delivery technologies and generic and branded pharmaceutical products. Bentley is a Delaware company with its principal place of business in Exeter, New Hampshire.

4.      Bentley owns a 15,700 square foot commercial building on 14 acres of land in Exeter, New Hampshire, which houses its corporate headquarters and a research and development laboratory. Bentley has 17 employees.

Bentley is a drug delivery company applying enabling permeation technology to enhance the absorption of drugs through the skin (such as the transdermal delivery of testosterone and the intranasal spray administration of insulin). Bentley conducts research in the USA for itself and under contract for others.

5.      Bentley has a wholly-owned subsidiary, Pharma de España ("Pharma"). Pharma is a Delaware Corporation which in turn has two wholly-owned subsidiaries

operating outside the United States: Laboratorios Belmac, S.A. ("Belmac") and Bentley API, S.L. Belmac in turn has two subsidiaries of its own: Laboratorios Rimafar, S.L. and Laboratorios Davur, S.L. both Spanish corporations. Each of these subsidiary corporations are separately capitalized, own their own assets (including intellectual and real property), have independent management groups with day-to-day responsibility for operations, and maintain separate employees.

6.    Each of Bentley's subsidiaries separately prepares financial statements, which are audited by Deloitte and Touche S.A., and filed with appropriate entities in Spain. In accordance with Generally Accepted Accounting Principles, Bentley's financial statements incorporate Bentley's activities as well as those of the above wholly-owned subsidiaries. Deloitte and Touche USA audits Bentley's financial statements in the United States.

### Structure and Organization of Bentley's Subsidiary Laboratorios Belmac, S.A.

7.    Even though Belmac is a subsidiary of Bentley, Belmac is capitalized separately from Bentley and operates independently of Bentley. Belmac has its own management team and personnel, assets, expenditures, investments, budget, liabilities, intellectual property, and bank accounts. Belmac is authorized to issue its own stock, may seek its own capital, and is not dependent on Bentley for funding. Belmac elects its own board of directors. Belmac guarantees its own debts.

8.    Belmac has 312 employees in Spain. Belmac pays these employees from its own bank accounts. Belmac hires its own employees and makes employment decisions regarding these employees, including salaries.

9.    Adolfo Herrera is the general manager of Belmac. He has significant autonomous authority over the operations of Belmac. The extent of Mr. Herrera's

- 3 -

**A58**

authority is contained in the delegation of power from the Belmac board of directors to the Belmac general manager, which is required under Spanish law.  In June and November 1999, the Belmac board authorized Mr. Herrera to exercise the following powers, among others:

    (a)    execute and comply with contracts related to Belmac's business;

    (b)    enter into encumbrances, liens and any other guarantees;

    (c)    open and maintain bank accounts;

    (d)    buy and sell all kinds of goods and intellectual property up to 20 million pesetas per transaction;

    (e)    enter into joint ventures;

    (f)    represent the company before the Spanish Ministry of the Economy and Treasury; and

    (g)    institute and defend legal cases and claims;

10.    The Belmac board had granted similar delegations of powers to Mr. Herrera and previous general managers throughout the time that Belmac interacted with Ethypharm.

11.    As a result of this significant delegation of responsibility, Mr. Herrera maintained and continues to maintains day-to-day control over the operations of Belmac and did not and does not have to seek my authorization or direction in the day-to-day operation of the plant or in Belmac's dealings with Ethypharm.  Indeed, Mr. Herrera need not consult with Belmac's board or Bentley unless he will exceed the delegation of responsibility.

- 4 -

**A59**

12.    Since 1994, I have held, and still hold, the title of President of Belmac. As Belmac's President, I only address(ed) major issues that exceed the power delegated to Mr. Herrera and that therefore require(d) my signature. I hold the title of President so that Bentley can have some oversight over Belmac, which produces a significant portion of Bentley's revenue. Nevertheless, my involvement with Belmac is limited to discussing general strategies with Mr. Herrera and to addressing issues that exceed the power delegated to Mr. Herrera. I am not, and was not, involved in Belmac's operations. Prior to Mr. Herrera's appointment as general manager of Belmac, I spent one week out of every few months in Spain in my capacity as Belmac's President. Since Mr. Herrera's appointment, however, I have only gone to Spain three or four times per year in my capacity as Belmac's President.

13.    Belmac prepares its own financial statements, which are audited by Deloitte and Touche, S.A., a Spanish company. These financial statements are filed with the proper authorities in Spain. Belmac negotiates its own agreements and contracts and does not need Bentley's approval to do so.

14.    Belmac owns an 80,000 square foot facility in Zaragoza, Spain, which houses its manufacturing plant, warehouse, research and development laboratory, and office space.

### Directors and Officers of Belmac and Bentley

15.    The officers of Bentley are: Michael McGovern (vice chairman), Dr. Robert Stote (senior vice president and chief medical officer), Michael D. Price (vice president, chief financial officer, treasurer and secretary), and Robert Gyurik (vice president of pharmaceutical development). In addition to the officers, the following are

- 5 -

directors of Bentley: Miguel Fernandez, John W. Spiegel, Mike McGovern, Edward Robinson, and F. Ross Johnson.

16.     While both I and Michael Price are also officers of Belmac, Belmac's board of directors also includes Adolfo Herrera.  In addition, all of the senior management team of Belmac is distinct from Bentley.  Bentley's board of directors does not control or direct Belmac's operations.

**Belmac is not an Agent of Bentley**

17.     Belmac is not an agent of Bentley.  Belmac does not have either express or apparent authority to act on Bentley's behalf.  Bentley is a shareholder of Belmac. Bentley did not and does not now direct or control the day-to-day operations of Belmac. Belmac controls its own day-to-day operations, including the manufacture of omeprazole.

**Belmac's Relationship with Ethypharm and its Responsibility for Production of Omeprazole**

18.     Belmac, not Bentley, entered into agreements with Ethypharm regarding the production of omeprazole, including any confidentiality or nondisclosure agreements. Bentley never entered into an agreement with Ethypharm regarding the production of omeprazole.  The terms of any agreements between Belmac and Ethypharm were negotiated by representatives of Belmac, specifically the Belmac general managers, not Bentley.  Belmac never acted on Bentley's behalf during these negotiations and Bentley never granted Belmac the authority to act on Bentley's behalf in negotiations or contracting with Ethypharm.  Bentley did not have any rights, obligations, or duties under these agreements as it was not a signatory to them.

19.     Neither I nor any other Bentley employee was involved on behalf of Bentley in the negotiations of the terms and conditions of the March 23, 2000

- 6 -

**A61**

manufacturing contract between Belmac and Ethypharm. Similarly, neither I nor any other Bentley employee was involved on behalf of Bentley in subsequent discussions between Belmac and Ethypharm in January and February 2002 regarding the expiration of that agreement.

20.     Before, during, and after the contract with Ethypharm to manufacture omeprazole, Belmac manufactured and produced omeprazole in the Zaragoza facility. Belmac, not Bentley, controlled the manufacture of omeprazole in the Zaragoza facility during the contract with Ethypharm and continues to control the production of omeprazole at the Zaragoza facility. Bentley did not and does not participate in the manufacture and production of omeprazole in Zaragoza.

21.     Belmac developed its own omeprazole manufacturing process in Spain without Bentley's involvement. Belmac used its own funds to finance the manufacture of omeprazole and the necessary clinical trials of the omeprazole manufacturing process that Belmac developed.

22.     Belmac has filed for five Spanish patents and two Patent Cooperation Treaty patents (with effects in Spain). Four of these seven patents relate to the production of omeprazole. Three of those seven patents have been granted and Belmac is the owner of those patents. When the remaining patents are granted, Belmac will be the patent holder. Bentley does not own any patents pertaining to the manufacture of omeprazole, lansoprazole, or related products in Spain.

23.     Belmac owns and maintains the registration files for more than 40 compounds that Belmac filed with the Spanish Ministry of Health. The Spanish Ministry

of Health's approvals of Belmac's omeprazole compounds were issued in Belmac's name, not Bentley's, for the manufacture and distribution of omeprazin in Spain.

**Jim Murphy's Interactions with Ethypharm**

24.     When I have directly interacted with Ethypharm, it has been in two distinct contexts. First, at various times in the past Ethypharm would request information or meetings with me regarding the Belmac-Ethypharm relationship in my capacity as the President of Belmac. To the extent I participated in these issues, it was solely in my capacity as an officer of Belmac and not on behalf of Bentley. Second, the only times in which I interacted with Ethypharm on behalf of Bentley was between 1995 and 2000, when I discussed or corresponded with Ethypharm on behalf of Bentley concerning possible direct business collaboration between the two companies. These contacts were sporadic and did not concern the omeprazole business between Ethypharm and Belmac.

25.     The October 6, 2000 fax cited in Ethypharm's Complaint pertained to Ethypharm's contemplated closure of its Spanish operations. At that time, Ethypharm had already started to lay personnel off. Bentley was considering the purchase of Ethypharm's Spanish operations or, in the alternative, running Ethypharm's existing operations in Spain. Ethypharm had a number of customers who bought omeprazole and this fax involved a proposal to switch the servicing of their customers to Belmac's operations.

26.     Likewise, I wrote the January 28, 1997 fax cited in Ethypharm's complaint in my capacity as President of Belmac and not in my capacity as an officer of Bentley.

27.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

- 8 -

**A63**

Executed on this 3rd day of November, 2004 at Exeter, New Hampshire.

James K. Murphy

CERTIFICATE OF SERVICE

I hereby certify that I caused a true copy of the above document to be served upon the attorney of record for each other party by mail on November ___, 2004.

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ETHYPHARM S.A. FRANCE &
ETHYPHARM S.A. SPAIN,

        Plaintiffs

        v.

BENTLEY PHARMACEUTICALS, INC.

        Defendant.

)
)
)
)
)
)
)
)
)
)
)

C.A. No. 04-1300 (SLR)

JURY TRIAL DEMANDED

DECLARATION OF ADOLFO HERRERA IN SUPPORT OF DEFENDANT
BENTLEY PHARMACEUTICALS, INC.'S MOTION TO DISMISS

Richard L. Horwitz (#2246)
David E. Moore (#3898)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
Telephone: (302) 984-6000

*Attorneys for Defendant*

Of Counsel:
Craig E. Stewart
Marc J. Goldstein
PALMER & DODGE LLP
111 Huntington Avenue
Boston, MA 02199
Telephone: (617) 239-0100

Dated: November 4, 2004

1

I, Adolfo Herrera, declare under penalty of perjury as follows:

1.      I am the general manager of Laboratorios Belmac, S.A ("Belmac"). I have been the general manager since June 1999. I have personal knowledge of the facts stated in this declaration, and if called as a witness, could competently testify to them.  I make this declaration in support of Bentley's Motion to Dismiss for Failure to Join a Necessary Party.

### Structure and Organization of Laboratorios Belmac, S.A.

2.      Laboratorios Belmac, S.A. ("Belmac") is a Spanish corporation that was incorporated in 1988, originally known as Rimafar, S.A.  In 1992, Bentley acquired Rimafar and subsequently renamed the Spanish company Laboratorios Belmac, S.A.  Belmac is a wholly owned subsidiary of Bentley.  Belmac manufactures and distributes pharmaceutical products.

3.      Even though Belmac is a wholly owned subsidiary of Bentley, Belmac is capitalized separately from Bentley and conducts its day-to-day operations independently of Bentley.  Belmac has its own management team and personnel, assets, expenditures, investments, budget, liabilities, intellectual property, and bank accounts.  Belmac has the authority to issue its own stock, may seek its own capital and is not dependent on Bentley for funding.  Belmac elects its own board of directors during its general shareholders' meeting.  Belmac is responsible for its own borrowing.  Bentley has never guaranteed Belmac's debts.

4.      Belmac has 312 employees in Spain.  Belmac pays these employees from its own bank accounts.  Belmac hires its own employees and makes employment decisions regarding these employees, including salaries.

2

**A67**



5.     As the general manager of Belmac, I have significant autonomous authority over the operations of Belmac.  The extent of my authority is contained in the delegation of power from the Belmac board of directors, which is required under Spanish law.  In June and November 1999, the Belmac board authorized me to exercise the following powers, among others:

      (a)     execute and comply with contracts related to Belmac's business;

      (b)     enter into encumbrances, liens and any other guarantees;

      (c)     open and maintain bank accounts;

      (d)     buy and sell all kinds of goods and intellectual property up to 20 million pesetas per transaction;

      (e)     enter into joint ventures;

      (f)     represent the company before the Spanish Ministry of the Economy and Treasury; and

      (g)     institute and defend legal actions and claims;

6.     The Belmac board had granted similar delegations of powers to myself and my predecessors throughout the time that Belmac interacted with the Spanish company Ethypharm S.A. ("Ethypharm").

7.     I am responsible for negotiating contracts with raw material suppliers, purchasers of pharmaceutical products, and joint ventures.  I make employment decisions, including establishing salaries. I review and approve patent applications and manage the application

3

**A68**

process. I am responsible for interaction with the various Spanish regulatory authorities. I represent Belmac's legal interests before courts and public authorities.

8.    Throughout my tenure I have maintained, and continue to maintain, day-to-day control over the operations of Belmac and need not seek authorization or direction in the day-to-day operation of the Zaragoza plant from the Belmac board or Bentley. Indeed, I need not and generally do not consult with Belmac's board or Bentley unless I will exceed the delegation of responsibility.

9.    Belmac prepares its own financial statements, which are audited by Deloitte and Touche S.A., a Spanish company. These financial statements are filed with the proper authorities in Spain. Belmac negotiates its own agreements and contracts and does not need Bentley's approval to do so unless the size of those contracts will exceed the thresholds established in the delegation of responsibilities.

10.   Belmac owns an 80,000 square foot facility in Zaragoza, Spain, which houses its manufacturing plant, warehouse, research and development laboratory, and office space.

Directors and Officers of Belmac and Bentley

11.   One of the three directors and all of the senior management team of Belmac are distinct from Bentley. The members of Belmac's board are: James Murphy, Michael Price and myself. The senior management officers of Belmac are: Ignacio Moreno Alonso (Commercial Director), Juan Carlos Asensio (Technical Director), Esther Sánchez Gómez (Finance Director), Antonio Cabodevilla Ilincheta (Industrial Operations Director), Paloma Rodríguez-Yrizabal Sánchez-Cendal (Financial Controller), Jorge Espinosa Fernandez (Secretary and Lawyer) and myself. These officers are in charge of Belmac's operations. Belmac's board of directors has

4

A69

not made any decisions on the company's operations in the last few years. In fact, since 1999, Belmac's board of directors has only met when required by Spanish law. Bentley's board of directors does not control or direct Belmac's operations.

**Belmac's Relationship with Ethypharm and Belmac's Production of Omeprazole**

12.    Commencing in 1992, Belmac entered into an arrangement with Ethypharm regarding the production of omeprazole. Omeprazole is a pharmaceutical product used to prevent ulcers and to treat other conditions where the stomach produces too much acid. In order to be effective, the omeprazole compound must be protected from degradation by stomach acids in order to reach the intestine, where the medicine is required, and some methods for coating the omeprazole are patented.

13.    From 1992 through March 2000, Belmac and Ethypharm did business pursuant to an oral agreement through which Belmac dedicated a portion of its pharmaceuticals manufacturing plant in Zaragoza, Spain, to the manufacture of omeprazole for Ethypharm. In the beginning of the relationship, Ethypharm provided Belmac with Ethypharm's patented manufacturing process for making omeprazole and provided Belmac with some of its own machinery for manufacturing omeprazole micro-pellets. The relationship was advantageous for Ethypharm because it had no facilities to manufacture pharmaceuticals in Spain and it could not export omeprazol from France and, therefore, relied upon Belmac to perform the qualification, manufacturing and exporting of omeprazole from Spain on behalf of itself to Ethypharm customers. Belmac had to prepare its technical operating guide in order to obtain the Spanish Ministry of Health approval to manufacture and commercialize omeprazole in Spain based on Ethypharm's manufacturing process.

5

**A70**

14.    Shortly after Belmac began to manufacture omeprazole, Belmac observed that Ethypharm's patented process was not adequate to guarantee the quality of the pellets. Belmac then proceeded to develop its own omeprazole manufacturing process. Belmac used its own funds to finance the manufacture of omeprazole and the necessary clinical trials of the omeprazole manufacturing process that Belmac developed. Eventually, Belmac developed a successful organic process and formulation for manufacturing omeprazole. Through its continued research and development efforts, Belmac also developed a successful aqueous formulation and process for manufacturing omeprazole. Belmac has applied for patents on both its organic and aqueous omeprazole processes and formulations. Bentley had no involvement in these matters.

15.    From time to time, Belmac and Ethypharm signed confidentiality or nondisclosure agreements. A copy of one such confidentiality agreement, dated September 30, 1998, is attached hereto as "Exhibit C." Bentley was not a party to the confidentiality or nondisclosure agreements between Belmac and Ethypharm regarding omeprazole.

16.    As a result of its newly developed processes for the manufacture of omeprazole, Belmac filed amendments to its initial submission to the Spanish Ministry of Health, and obtained new approvals for the manufacture of omeprazole in Spain. In addition, Belmac owns and maintains the registration files for more than forty compounds that Belmac filed with the Spanish Ministry of Health. The Spanish Ministry of Health's approvals of Belmac's filings for omeprazole were issued in Belmac's name for the manufacture and distribution of omeprazole in Spain. Copies of the Certificates of Approval from the Spanish Ministry of Heath are attached hereto as "Exhibit D."

6

**A71**



17.     Throughout its arrangement with Ethypharm, Belmac used Ethypharm equipment to manufacture omeprazole in Zaragoza for Ethypharm's customers.  In addition, Belmac later purchased its own equipment, which it used to manufacture omeprazole for its own customers.

18.     As Belmac's general manager, I negotiated and signed the first and only integrated written agreement between Belmac and Ethypharm for Belmac's manufacture of omeprazole for Ethypharm and its customers ("Manufacturing Agreement").  A copy of the Manufacturing Agreement, dated and signed on March 23, 2000, is attached hereto as "Exhibit E."  The Manufacturing Agreement explicitly states that it "shall not limit the manufacture of [omeprazole] on the part of BELMAC for its own market and that of its clients."  The Manufacturing Agreement was for a term of two years, and was extendible unless one of the parties gave notice of termination four months prior to the agreement's expiry.

19.     In addition to the Manufacturing Agreement, I also negotiated and signed a Letter of Purchase Undertaking on March 23, 2000 (also attached hereto as "Exhibit F").

20.     In November 2001, Belmac determined that it would not renew its Manufacturing Agreement with Ethypharm.  As a result, I wrote a letter to Ethypharm on November 14, 2001 giving notice of Belmac's intent to terminate the Manufacturing Agreement.  A copy of this letter is attached hereto as "Exhibit G."  In that letter, I expressed my willingness to negotiate with Ethypharm for Belmac's continued supply of omeprazole to Ethypharm after the expiration of the Manufacturing Agreement.

21.     In February 2002, I engaged in negotiations with Ethypharm regarding the possibility of Belmac's continued supply of omeprazole to Ethypharm after the expiration of the Manufacturing Agreement in March 2002.  During these negotiations, Belmac offered to supply

7

A72

its own omeprazole product to Ethypharm after the expiration of the parties' Manufacturing Agreement in March 2002. Ethypharm declined our offer. At Ethypharm's request, Belmac continued to manufacture omeprazole for Ethypharm's customers for some time after the above-mentioned expiration.

22.    In September 2002, Ethypharm asked that Belmac allow it to retrieve its machinery. At that time, however, Belmac was continuing to use Ethypharm's equipment to supply Ethypharm customers at Ethypharm's request. Moreover, the removal of Ethypharm's equipment required substantial disruption of the on-going manufacturing at the Zaragoza facility, including the removal of a wall to extract the large equipment. Belmac's representatives explained this to Ethypharm and noted that the machines had to be removed at a time when the Zaragoza plant was in its seasonal shut down. Belmac's representatives offered Ethypharm a choice between December 2002 and August 2003, the earliest dates in which the plant was scheduled to be shut down. Ethypharm finally removed its machinery in September 2003, after Belmac had finished manufacturing omeprazole for Ethypharm's customers at Ethypharm's request. On September 9, 2003, Antonio Cabodevilla, the industrial operations manager of Belmac's Zaragoza plant, signed an agreement with Ethypharm documenting the removal of Ethypharm's equipment from Belmac's plant. That agreement contained a release stating that neither Belmac nor Ethypharm had further claims against the other.

23.    The terms of any agreements between Belmac and Ethypharm were negotiated by either myself or other representatives of Belmac, not by Bentley. Bentley had no role in the day-to-day operations of Belmac and did not participate in the business relationship between Belmac and Ethypharm from 1999 to 2002. Previous contacts and negotiations between Belmac and Ethypharm were conducted on behalf of Belmac by Belmac's prior general managers, Angel

8

A73

Pérez de Ayala and Clemente González Azpeitia. Since 1999, any agreements signed on behalf of Belmac were executed by Belmac management and employees and Bentley never entered into any agreement with Ethypharm regarding the production of omeprazole.

24.    Belmac never acted on Bentley's behalf during its negotiations or interactions with Ethypharm. During these negotiations and interactions, I never represented to Ethypharm that I was speaking, negotiating, or contracting on behalf of Bentley rather than Belmac. Bentley never granted Belmac the authority to act on Bentley's behalf in negotiations or contracting with Ethypharm. Bentley did not have any rights, obligations, or duties under the Manufacturing Agreement, nor under the confidentiality and non-disclosure agreements with Ethypharm, as it was not a signatory to them.

25.    Neither Mr. James Murphy, Bentley's President and Chief Executive Officer, nor any other Bentley employee was involved on behalf of Bentley in the negotiations of the terms and conditions of the Manufacturing Agreement between Belmac and Ethypharm. Similarly, neither Mr. Murphy nor any other Bentley employee was involved on behalf of Bentley in subsequent discussions between Belmac and Ethypharm in January and February 2002 regarding the expiration of that agreement. I was responsible for those negotiations on behalf of Belmac.

26.    Before, during, and after the Manufacturing Agreement with Ethypharm, Belmac manufactured and produced omeprazole in the Zaragoza facility. Belmac, not Bentley, controlled the manufacture of omeprazole in the Zaragoza facility during the contract with Ethypharm and continues to control the production of omeprazole at the Zaragoza facility. In addition, Belmac has always controlled, and continues to control, its production of lansoprazole and related pharmaceutical products. At no time did Bentley ever manufacture omeprazole for

9

**A74**

Ethypharm, nor did it control Belmac's manufacture and production of omeprazole, lansoprazole, or related pharmaceutical products. Instead, I and Belmac's other general managers have always had supervisory control over the day-to-day manufacturing operations of the Zaragoza plant.

27.    Belmac has filed the following patents in Spain:

(a)    Patent Application No. 200100825: "Improved process for the manufacturing of stable and gastroprotected omeprazole pellets, pellets obtained thereof and other applications." This invention provides for a new formulation of omeprazole pellets. It is applicable both in human and veterinary medicine. Belmac filed this patent application before the Spanish Patent and Trademark Office ("Oficina Española de Patentes y Marcas") on April 6, 2001. This application was published by the Spanish Patent and Trademark Office on October 16, 2003. This patent has not been granted yet.

(b)    Patent Application No. 200002653: "Novel dispersible and soluble galenic paracetamol formulation, method for its preparation and its applications." The novel galenic paracetamol formulation consists of a base mixture of paracetamol and citric acid and can be used in human and veterinary medicine. Belmac filed this patent application before the Spanish Patent and Trademark Office on November 3, 2000. This patent was granted on September 4, 2003.

10

A75

(c)    Patent Application No. 200002625: "Method for vacuum production of controlled release pharmaceuticals and/or gastrointestinal resistant pharmaceuticals." This method comprises pelletizing of an active principle by vacuum drying a mixture incorporating pharmaceutical excipients. The excipients confer gastrointestinal resistance on the pharmaceuticals. This method is especially appropriate for active principles such as omeprazole, diclofenac, aspirin, and ibuprophen. Belmac filed this patent application before the Spanish Patent and Trademark Office on November 7, 2000, and the patent was granted on November 11, 2003.

(d)    Patent Application No. 200002797: "Novel galenic omeprazole tablets formulation, method for its preparation and its applications in human and veterinary medicine." The tablets made with this formulation consist of a core including the omeprazole, an isolation layer and a gastrointestinal resistant layer. Belmac filed this patent application before the Spanish Patent and Trademark Office on November 22, 2000 but it has not been granted yet.

(e)    Patent Application No. PCT/ES01/00402: "Novel dispersible and soluble galenic parecetamol formulation, method for its preparation and its applications." Belmac filed this patent application on October 24, 2001 via Patent Cooperation Treaty on the basis of the Spanish patent 200002653. Belmac designated the following countries in the application: Austria, Belgium, Switzerland, Cyprus, Germany, Denmark, Spain,

11

**A76**

Finland, France, United Kingdom, Greece, Ireland, Italy, Luxembourg, Monaco, Netherlands, Portugal, Sweden and Turkey (to be examined by the European Patent Office) and Japan, Poland and United States (to be granted by the corresponding national patent offices). This patent was issued to Belmac as European Patent EP 1331001 B1 on July 21, 2004.

(f)     Patent Application No. 200300976: "Formulation of pellets of anti-ulcer and acid-labil bencimidazole compounds." The pellets made with this formulation consist of inert sugar/starch granules covered by three layers. They remain stable over time and are suitable for oral administration. Belmac filed this patent application before the Spanish Patent and Trademark Office on April 29, 2003. The patent has not yet been granted.

(g)     Patent Application No. PCT/EP2004/050618: "Pellet formulation of acid-labil anti-ulcer benezimidazole compounds." Belmac filed this patent application with the European Patent Office on April 27, 2004, via the Patent Cooperation Treaty on the basis of the Spanish priority 200300976. This patent has not yet been granted.

28.     As noted above, Belmac is the patent holder of three applications: No. PCT/ES01/00402, issued as EP 1331001 B1; No. 200002685; and No. 200002655. When the remaining patent applications are granted, Belmac will be the patent holder.

29.     Belmac has no authority to act as Bentley's agent and has not done so. Bentley has not provided explicit or apparent authority for Belmac to act on Bentley's behalf. Bentley is a shareholder in Belmac, which is Bentley's wholly-owned subsidiary. Bentley did not and does

12

A77



not now direct or control the day-to-day operations of Belmac. Belmac controls its own day-to-day operations, including the manufacture of omeprazole, lansoprazole, and other pharmaceutical products.

30.    Belmac does not own any property in Delaware or elsewhere in the United States. Belmac has never conducted business or performed any work or service in Delaware or elsewhere in the United States. Belmac does not derive any revenue from services or products used or consumed in Delaware or elsewhere in the United States.

.   I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 4th day of November, 2004 at Madrid, Spain.

_____
Adolfo Herrera

13

A78