# EXHIBIT P

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2                  DISTRICT OF DELAWARE
 3       - - - - - - - - - - - - - - - -
 4    ETHYPHARM S.A. FRANCE and      :
 5    ETHYPHARM S.A. SPAIN,          :
 6            Plaintiffs,            :
 7    VS.                            :    CASE NO.
 8    BENTLEY PHARMACEUTICALS,       :    04-13000-SLR
 9    INC.,                          :
10            Defendant.             :
11       - - - - - - - - - - - - - - - -
12
13         DEPOSITION OF MICHAEL D. PRICE, a witness
14    called by and on behalf of the Plaintiffs, taken
15    pursuant to the applicable provisions of the
16    Federal Rules of Civil Procedure, before
17    Sandra L. Bray, Registered Diplomate Reporter,
18    CSR Number 103593, and Notary Public in and for
19    Commonwealth of Massachusetts, at the offices of
20    Edwards Angell Palmer & Dodge LLP,
21    111 Huntington Avenue, Boston, Massachusetts, on
22    Tuesday, July 25, 2006, commencing at 9:13 a.m.
23
24
```

A265

Page 2

1  APPEARANCES:
2    Representing the Plaintiffs:
3      BAACH ROBINSON & LEWIS PLLC
4      1201 F Street, NW
5      Suite 500
6      Washington, D.C. 20004
7      BY: JONATHAN D. FINE, ESQUIRE
8           DWIGHT P. BOSTWICK, ESQUIRE
9
10   Representing the Defendant:
11     EDWARDS ANGELL PALMER & DODGE LLP
12     111 Huntington Avenue
13     Boston, Massachusetts 02199
14     BY: JOSEPH P. MINGOLLA, ESQUIRE

Page 4

EXHIBITS, Continued
NO.   DESCRIPTION                          PAGE NO.
13    Copy of E-mail to Mr. Murphy
      from Mr. Fitzgibbons, dated
      11-30-01, and Attachment              171
14    Copy of E-mail to Mr. Bolling,
      et al. from Mr. Fitzgibbons,
      dated 11-17-01                        179
15    Spanish Document and
      Translation                           187
16    Spanish Document, Bates
      Numbers BEL051001-051009              202
17    Spanish Document, Bates
      Numbers BEL051010-051015              203
18    Spanish Document from;
      Ms. Villalobos, dated 12-30-03        205
19    Spanish Document D1-A, Bates
      Numbers BEL051020-051023              205
20    Invoice from Laboratorios
      Belmac S.A.                           206
21    Invoices from Pharma de Espana        210
22    Copy of E-mail, dated 12-12-01        224
23    Contrato de Tranferencia de
      Tecnologia y Cesion de Know
      How, and Translation                  227
24    Bentley Pharmaceuticals
      Board of Directors August 14-15,
      2003 Meeting Minutes                  236

Page 3

INDEX
WITNESS:                 PAGE NO.
MICHAEL D. PRICE
BY MR. FINE              7, 249
BY MR. MINGOLLA          242

EXHIBITS
NO.   DESCRIPTION                          PAGE NO.
1     2001 10-K                            23
2     Document Bates Numbers
      BEL 006982-006987                    33
3     Bentley Pharmaceuticals Inc.
      List of Subsidiaries                 47
4     1999 10-K                            67
5     2000 10-K                            73
6     2002 10-K                            99
7     Fax to Mr. De Basilio from
      Mr. Murphy, dated 1-19-95            106
8     Press Release, dated 10-10-00        111
9     Press Release, dated 11-14-01        121
10    Presentation to Perrigo              125
11    Letter to Mr. De Basilio from
      Mr. Herrera, dated 11-14-01          161
12    Letter to Mr. De Basilio from
      Mr. Herrera, dated 11-14-01          161

Page 5

1        PROCEEDINGS
2        (The Florida driver's license number as
3   identification of the deponent was noted
4   for the record.)
5        MICHAEL D. PRICE, having duly sworn or
6   affirmed that his testimony would be the truth,
7   the whole truth, and nothing but the truth,
8   testified as follows:
9                  * * *
10       MR. FINE: Okay. Thank you. Before
11  we begin, I'd like to put a brief statement on
12  the record. Actually, could we go off the
13  record for a second?
14       (Discussion off the record)
15       MR. FINE: As I just discussed with
16  Mr. Mingolla, I'd like to put a brief statement
17  on the record, that Ethypharm months ago
18  requested some documents relating to
19  intercompany transactions, including documents
20  relating to the forgiveness of approximately 6.7
21  million euros -- that's $8 million about -- in
22  credits extended to Laboratorios Belmac by
23  Bentley Pharmaceuticals during time periods
24  relevant to this litigation. In order to depose

Page 6

1  Bentley's executives and officers, including
2  Mr. Price, Bentley first agreed to produce
3  documents on this subject last Thursday evening,
4  and Ethypharm received a few documents
5  purporting to relate to the loan forgiveness
6  issue yesterday. They're in Spanish, and we
7  haven't had the opportunity to understand them
8  adequately. Ethypharm has agreed to go ahead
9  with this deposition and ask questions in this
10 area, but to the extent that our ability to
11 explore the area has been compromised, Ethypharm
12 reserves all its rights, including the right to
13 recall Mr. Price or Mr. Murphy or others for
14 further questioning on this subject.
15       MR. MINGOLLA: And if I may at this
16 point just interject and note that I will
17 refrain from commenting completely on the
18 substance of Mr. Fine's representation. We, of
19 course, will disagree that the documents were
20 requested months ago, that we responded actually
21 before the deadline set forth in the rules, and
22 we will address that issue, if need be, in due
23 course outside of the deposition.
24              * * *

Page 7

1       EXAMINATION BY MR. FINE:
2  Q. Okay. Mr. Price, thank you for coming here
3     today. I really appreciate it. And I'd like to
4     go over a couple of sort of basics about a
5     deposition before we really start. Have you
6     ever been deposed before?
7  A. I have.
8  Q. You have. How many times?
9  A. I would guess a half a dozen.
10 Q. Okay. Basically -- were those in U.S. matters?
11 A. They were U.S. matters.
12 Q. The basic format of a deposition is that I'll
13    ask you questions and you answer them under
14    oath. Do you understand that?
15 A. I do.
16 Q. Okay. And for the benefit of our court
17    reporter, you have to answer my questions orally
18    because she can't take down a nod of the head or
19    uh-huh or huh-uh. That's sometimes unclear. So
20    if you could give a clear answer --
21 A. Okay.
22 Q. -- verbally rather than nodding your head, that
23    would be terrific. And if you need a break at
24    any time today, just let me know, and we'll see

Page 8

1     what we can do about taking a break. The
2     purpose of this isn't to torture. And the only
3     caveat on that is that we won't take a break
4     between a question and your answer, but we can
5     take a break after those.
6         And I'd ask you -- by agreement of the
7     parties, we've agreed for these depositions not
8     to discuss or if the witness, which is you in
9     this instance, would not discuss the substance
10    of your testimony with lawyers during the
11    deposition during a break, that would be good.
12 A. Okay.
13 Q. You're now employed by Bentley Pharmaceuticals,
14    Incorporated; is that correct?
15 A. That's correct.
16 Q. What is your present position or positions with
17    them?
18 A. I am vice president, chief financial officer,
19    secretary, and treasurer.
20 Q. Do you have any other positions with Bentley?
21 A. Not with Bentley Pharmaceuticals, no.
22 Q. Do you serve on Bentley's board of directors?
23 A. I do not.
24 Q. You do not. Have your positions with Bentley

Page 9

1     changed since you were first employed there?
2  A. They have.
3  Q. When were you first employed?
4  A. In March of 1992.
5  Q. And what positions did you hold in 1992?
6  A. I was hired in March of 1992 as the director of
7     SEC reporting.
8  Q. I'm sorry. Was that SEC?
9  A. As in Securities and Exchange Commission
10    reporting.
11 Q. And who hired you?
12 A. I was hired by Mark Ayers, who was the CFO at
13    the time.
14 Q. And what was your salary at that time?
15 A. I think my beginning salary was $60,000 per
16    year.
17 Q. Did you receive a bonus that year that you
18    recall?
19 A. I think I got a modest bonus of $500 or
20    something like that.
21 Q. Did you receive any other compensation that
22    year?
23 A. I received stock options upon my hiring.
24 Q. Approximately how many?

Page 238

1  Q. Was -- is Mr. Herrera now a vice president of
2     Bentley Pharmaceuticals, Incorporated?
3  A. I think he is a -- I would have to go verify his
4     title, but I think he is a vice president. He
5     could either be general managing director or
6     vice president. I don't recall.
7  Q. Was he appointed a vice president before this
8     date?
9  A. Not to my knowledge.
10 Q. Okay. When was he told that he was appointed to
11    the position of vice president of Bentley
12    Pharmaceuticals, Incorporated?
13 A. I don't know.
14 Q. Okay. Did you take the minutes of this board
15    meeting?
16 A. I did.
17 Q. And is there a signed version of these minutes?
18 A. There should be a signed version. I don't
19    know -- that's why I said it appears to be a set
20    of minutes from that meeting, because I don't
21    know why this wouldn't be signed, unless this
22    was just pulled off -- was this an electronic
23    copy that was pulled off the computer?
24 Q. These were produced to us as the minutes of the

Page 239

1     board of directors of Bentley Pharmaceuticals,
2     Incorporated. So I'm at as much of a loss as
3     you are.
4  A. Okay. I'm not sure why there's no signature on
5     there.
6  Q. Do you think that your signature is not on there
7     because this copy of the minutes is not
8     accurate?
9  A. The typical process is that I draft the minutes,
10    and at the next meeting or as soon as possible
11    thereafter, the draft minutes are shared with
12    the other members of the board, they get a
13    chance to review them, read them, point out any
14    corrections that need to be made to them, and
15    approve them either without corrections or with
16    corrections. At which point, I go back to my
17    office, make any change that may be necessary,
18    print off a final set of minutes, and put them
19    in the minute book.
20 Q. Is there a minute book that contains all of the
21    board of directors meetings of Bentley
22    Pharmaceuticals, Incorporated?
23 A. There is.
24 Q. Where is that kept?

Page 240

1  A. That's kept in a locked file cabinet right
2     outside of my office.
3  Q. And you have no reason to doubt that the
4     portions of these minutes on Page 3 and Page 4
5     relating to the appointment of Mr. Herrera as
6     vice president of Bentley Pharmaceuticals, Inc.
7     are inaccurate; do you?
8  A. I have no reason to think that, no.
9        MR. FINE: Thank you. For the record,
10    we'd like to indicate that we have not been
11    provided with copies of any of the documents
12    relating to time allocations for management fees
13    or royalties or any other allocations owing from
14    Laboratorios Belmac to Bentley and, in specific,
15    relating to the time allocation estimates
16    created by Ms. Melia that have been mentioned in
17    this deposition and would like those.
18       We also have not been provided with
19    copies of any of the management services
20    agreements relating to management fees or
21    royalties or other intercompany transactions
22    between Laboratorios Belmac and Bentley
23    Pharmaceuticals and would like those, nor have
24    we been provided any documents relating to

Page 241

1     transfer pricing studies relating to
2     intercompany transactions, management fees,
3     royalties or time allocations between
4     Laboratorios Belmac and Bentley Pharmaceuticals
5     and would like any documents relating to that
6     issue.
7        Nor have we been provided with any
8     budget line items or budget documents relating
9     to intercompany allocations for management fees,
10    royalties or transfer pricing between
11    Laboratorios Belmac and Bentley Pharmaceuticals
12    and would like those.
13       And I have no further questions.
14       MR. BOSTWICK: One other brief comment
15    about the minutes. The board minutes we've been
16    showing to witnesses and everybody said those
17    are the board minutes, this is the first time
18    we've heard there are signed versions, which I
19    don't think were produced to us. We're going to
20    have to rely, of course, on the minutes that
21    have been produced to us. If there's any
22    variation, you know, we need to receive those.
23       MR. MINGOLLA: I guess I will briefly
24    respond. I will not attempt to respond at

## Page 242

```
 1    length in entirety to the categories of
 2    documents that Dwight and Jonathan just
 3    mentioned. We will certainly look into these
 4    issues and see whether they fall within the
 5    scope of the most recent document request that
 6    was served on the eve of the depositions. I can
 7    represent to you that some of the documents you
 8    said have not been produced have, in fact, been
 9    produced to you. So -- but, again, rather than
10    clutter the transcript of Mr. Price's deposition
11    with a point-by-point response, I will just say
12    we'll address that in due course as well. We
13    can go off the record for a minute. I just need
14    about three minutes just to check my notes.
15           MR. FINE: Sure.
16           (Recess taken from 4:27 p.m. to
17    4:30 p.m.)
18    EXAMINATION BY MR. MINGOLLA:
19 Q. Mr. Price, would you please get your copy of
20    Exhibit 13 in front of you?
21 A. Okay.
22 Q. You have it? And I'd like you to turn to Page
23    3. This is what Mr. Fine asked you some
24    questions about earlier this afternoon. Are you
```

## Page 243

```
 1    there?
 2 A. I am.
 3 Q. And I'm looking at an area entitled New Patents.
 4    Do you see that?
 5 A. I do.
 6 Q. And remember earlier this afternoon you were
 7    asked questions pertaining to the entries under
 8    Action which reads, "Jordan and Bob G to review
 9    patent issue. Jordan to have more oversight on
10    patents"? Do you see that?
11 A. I do.
12 Q. Do you remember those questions?
13 A. I do.
14 Q. In connection with that testimony, you mentioned
15    that Bentley had been spending a lot of money on
16    patent prosecutions. Do you remember that
17    statement?
18 A. I do.
19 Q. Where were those patent prosecutions taking
20    place?
21 A. In the U.S.
22 Q. Were those expenses that were incurred by
23    Bentley in connection with U.S. patents?
24 A. They were.
```

## Page 244

```
 1 Q. And were those expenses incurred in connection
 2    with the Philadelphia law firm you mentioned a
 3    few minutes ago?
 4 A. That's correct, Synnesvedt & Lechner.
 5 Q. If you would have in front of you Exhibits 16,
 6    17, 18, and 19.
 7 A. Okay.
 8 Q. Do you have those documents in front of you?
 9 A. I do.
10 Q. And each of those documents is in Spanish; is
11    that right?
12 A. Each of them are in Spanish.
13           MR. FINE: Objection. The witness has
14    said he can't recall anything or testify to
15    those documents.
16 Q. Mr. Price, could you briefly look at those
17    documents and let me know if those are in any
18    language other than Spanish?
19 A. They all appear to be in Spanish to me.
20 Q. You do not speak Spanish; is that correct?
21 A. I do not.
22 Q. Do you read Spanish?
23 A. There are words that have the same Latin roots
24    both in English and Spanish, and those words I
```

## Page 245

```
 1    could probably guess what the meaning is, but
 2    no, I don't read Spanish.
 3 Q. Were you involved in the creation of any of the
 4    Exhibits 16 through 19?
 5 A. I have not.
 6 Q. Earlier this afternoon in connection with
 7    Mr. Fine's questions about the consulting
 8    arrangement, you mentioned that you spent time
 9    looking at sales trends and financial results of
10    the Spanish operations. Do you remember that?
11 A. I do.
12 Q. And why would you be spending time looking at
13    sales trends and financial results of the
14    Spanish operations?
15 A. Because I'm primarily the spokesman for the
16    company with respect to institutional investors
17    or retail investors. So when they call in and
18    ask questions about what's going on with the
19    company, I have to be able to, first of all,
20    understand what has been happening and what's
21    expected to happen.
22 Q. At several points today, you've made reference
23    to the consolidation of results.
24 A. Yes.
```