# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| ETHYPHARM S.A. FRANCE and ETHYPHARM S.A. SPAIN, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civ. No. 04-1300-SLR |
| BENTLEY PHARMACEUTICALS, INC., | ) ) ) | |
| Defendant. | ) | |

## DEFENDANT BENTLEY PHARMACEUTICALS, INC.'S
## REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

John L. Reed (I.D. 3023)
Denise Seastone Kraft (I.D. 2778)
Joseph B. Cicero (I.D. 4388)
**EDWARDS ANGELL PALMER & DODGE LLP**
919 N. Market Street, 15th Floor
Wilmington, DE 19801
(302) 777-7770
(302) 777-7263

**OF COUNSEL:**

Craig E. Stewart
Joseph P. Mingolla
Veronica C. Abreu
**EDWARDS ANGELL PALMER & DODGE LLP**
111 Huntington Avenue
Boston, MA 02199
(617) 239-0100

DATED:  September 22, 2006          *Attorneys for Bentley Pharmaceuticals, Inc.*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES..........................................................................................................ii

SUMMARY OF ARGUMENT.................................................................................................... 1

ARGUMENT ............................................................................................................................. 4

I.     THERE IS NO EVIDENCE FROM WHICH A REASONABLE JURY COULD CONCLUDE THAT BELMAC HAD ACTUAL AUTHORITY TO BIND BENTLEY.................................................................................................................... 4

     A.     Belmac Was Not Controlled By The Bentley Board Of Directors........................ 5

     B.     The Management Agreements Undertaken By Bentley And Belmac For Tax Purposes Do Not Suffice, As A Matter Of Law, To Establish Agency. ........................................................................................................... 6

     C.     Neither Mr. Murphy Nor Anyone Else At Bentley Ever Controlled Belmac's Allegedly Wrongful Conduct. ........................................................... 8

          1.     Mr. Murphy Did Not Direct Belmac's Allegedly Wrongful Conduct In Late 2001 And Early 2002. ............................................... 8

          2.     Mr. Murphy Did Not Control Belmac And Belmac's Relationship With Ethypharm In The 1990s And 2000.................... 11

II.     NO REASONABLE JURY COULD CONCLUDE THAT BELMAC WAS CLOAKED WITH THE APPARENT AUTHORITY OF BENTLEY WHEN IT ENGAGED IN THE ALLEGEDLY WRONGFUL CONDUCT IN LATE 2001 OR EARLY 2002. ....................................................................................................... 13

     A.     Mr. Murphy's Contacts With Ethypharm Do Not Suffice To Create Apparent Agency.................................................................................... 13

     B.     Any Words Or Conduct Of Belmac's General Managers Are Insufficient, As A Matter Of Law, To Bind Bentley. ............................................................. 15

III.     ETHYPHARM'S JOINT TORTFEASOR THEORY HAS NO LEGAL OR FACTUAL SUPPORT. ...................................................................................... 15

CONCLUSION ....................................................................................................................... 20

## TABLE OF AUTHORITIES

*Brug* v. *Enstar Group, Inc.*,
    755 F. Supp. 1247 (D. Del. 1991) ...................................................................17, 18

*C.R. Bard Inc.* v. *Guidant Corp.*,
    997 F. Supp. 556 (D. Del. 1998) ........................................................................12

*Combustion Eng'g, Inc. v. Murray Tube Works, Inc.*, 1984WL2131, at 5 (E.D.
    Tenn. 1984) ..........................................................................................................18

*E.I. duPont de Nemours and Co.* v. *Rhodia Fiber and Resin Intermediates,*
    *S.A.S.*,
    197 F.R.D. 112 (D. Del. 2000) ...........................................................................14

*Finnegan Construction Co.* v. *Robino-Ladd Co.*,
    354 A.2d 142 (Del. Super. Ct. 1976) ..................................................................15

*Japan Petroleum Co. (Nigeria) Ltd.* v. *Ashland Oil, Inc.*,
    456 F. Supp. 831 (D. Del. 1978) ...................................................................*passim*

*Jurimex Kommerz Transit G.M.B.H. et al* v. *Case Corp., No. Civ. A. 00-83-JJF*,
    2006 WL. 1995128 (D. Del. July 17, 2006) ..................................................*passim*

*Laker Airways, Inc.* v. *British Airways, PLC*,
    182 F.3d 843 (11th Cir. 1999) .............................................................................20

*Lewis* v. *Vogelstein*,
    699 A.2d 327 (Del. Ch. 1997) ..........................................................................4, 6

*Mahurkar v. C.R. Bard, Inc.*, 2003WL355636 (N.D. Ill. 1993) .......................................17

*McCabe* v. *Williams*,
    45 A.2d 503 (Del. 1944) ........................................................................................4

*Messina* v. *E.I. du Pont de Nemours & Co.*,
    308 F. Supp. 2d 491 (D. Del. 2004) .....................................................................4

*Miles Inc.* v. *Cookson America Inc. et al.*,
    1994 Del. Ch. LEXIS 221 ...................................................................................19

*Phoenix Canada Oil Co. v. Texaco, Inc.* .......................................................................12, 13
    842 F.2d 1466 (3d Cir. 1988)

*Sahu* v. *Union Carbide Corp.*,
    418 F. Supp. 2d 407 (S.D.N.Y. 2005) ......................................................16, 17, 18

## SUMMARY OF ARGUMENT

Ethypharm's Answering Brief is notable for its failure to address the crucial evidence for purposes of the Rule 19 analysis: the fact that the key agreements ("the March 23, 2000 agreements") governing the manufacture of omeprazole and all other pellet drugs at issue in this case were executed by Ethypharm and Belmac – not Bentley.[1]  Nor does Ethypharm address the fact that those agreements were negotiated, executed and terminated by Mr. Herrera on behalf of Belmac, without any instructions, direction, or control by Mr. Murphy or anyone else at Bentley.

Ethypharm also cannot overcome the reality that neither Mr. Murphy nor anyone else employed at Bentley ever directed Belmac to use Ethypharm technology to manufacture any pellet drug after the omeprazole agreement lapsed on March 23, 2002 or to sell pellet drugs to Ethypharm customers.[2]  The record is devoid of such evidence for the simple reason that there was no "bold scheme" to misappropriate Ethypharm trade secrets or to interfere with Ethypharm's customer relationships.[3]

---

[1] This fact is particularly remarkable in light of Ethypharm's insistence, during the course of this litigation, that its arrangement for Belmac's manufacture of omeprazole and other pellet drugs in Spain was with Mr. Murphy in his capacity as the CEO of Bentley.  (*E.g.*, Answering Brief, D.I. 73, pp. 13-14).  Ethypharm's current claim that its arrangement was in fact with Bentley not only flies in the face of the plain text of the March 23, 2000 agreements, but is also contradicted by the various draft agreements concerning omeprazole and other pellet drugs, which repeatedly include as parties only Belmac or Mr. Murphy as a representative of *Laboratorios Belmac*.  (A-75, 81, 84, 99, 102, 115, 130, 138, 145, 166, 176, 178, 186, 194, 204, 209, 219, 223, 231, 239, 246, 255, 274A, 296, 321, 327, 330, 332, 335).  Ethypharm's *post hoc* characterization of the facts underlying its Complaint is a thinly veiled attempt to create jurisdiction in the United States when the key agreements and undisputed record make clear that its controversy is with Belmac.

[2] A-622.

[3] Belmac continued to manufacture omeprazole and other pellet drugs after March 23, 2002 pursuant to its own patented technology, which it developed independently of Ethypharm's technology.  (A-553-55; JTA-676).  Belmac began developing its own technology when, back in the early 1990s, it became clear that Ethypharm's technology did not work to produce stable omeprazole pellets.  A-553.  In fact, as far back as June 1998, Ethypharm's general manager, Mr. Basilio, wrote a letter to Belmac *asking Belmac* what formula and process Belmac used to produce omeprazole – questions which would have been unnecessary if Belmac had indeed been using Ethypharm technology to manufacture such drugs.  (C-12-15).  In September 1998, Mr. Basilio signed a confidentiality agreement promising to keep secret the information which Belmac forwarded to Ethypharm about Belmac's own technology in response to Basilio's June 1998 inquiry.  (*See* A-59–63).  The March 23, 2000 agreement for omeprazole also makes clear that Belmac is entitled to continue to produce omeprazole for its own customers, consistent with Belmac's development of its own technology.  (*See* A–1– 6).  To the extent that any dispute of fact exists with respect to the ownership of such technology, such a dispute is between Ethypharm and Belmac, not Bentley.  Regardless of any such controversy between Belmac and Ethypharm, undisputed facts material to this Rule 19 motion

To circumvent the lack of evidence of any actual control by Bentley of Belmac's allegedly wrongful conduct[4], Ethypharm disingenuously argues that the Rule 19 inquiry should not focus on "late 2001 and early 2002" and on the March 23, 2000 agreements between Ethypharm and Belmac.[5]  Ethypharm's own allegations, however, linchpin the commencement of the alleged conspiracy to misappropriate trade secrets and interfere with Ethypharm customer relationships on the termination of the March 23, 2000 omeprazole agreement in "late 2001 and early 2002."[6]  Ethypharm cannot now disavow its allegations – after the deadline for amending the Complaint has passed and discovery been conducted – in order to run away from the undisputed evidence that Bentley did *not* direct or control Belmac's allegedly wrongful conduct during the time frame critical to Ethypharm's claims.[7]

Ethypharm attempts to dismiss the March 23, 2000 agreements as being nothing more than minor contracts "signed locally in Spain," that merely "served to memorialize various aspects of their arrangements in order to comply with Spanish legal requirements."[8]  This argument is utter nonsense.  The purpose and nature of Ethypharm's business with Belmac was, since its inception, to *manufacture*, market and sell omeprazole and other pellet drugs in Spain.[9]  The March 23, 2000 agreements were not some side-show to a broader, more extensive business relationship between Ethypharm and Belmac – or Bentley, for that matter.  The agreements *were* the business relationship; they embodied all of the agreed terms of that relationship – which was

---

show that: (1) Neither Mr. Murphy nor anyone else at Bentley ever instructed Mr. Herrera or anyone else at Belmac about what technology Belmac should use to manufacture omeprazole or other pellet drugs at any time, including "in late 2001 or early 2002;" and (2) Belmac's general managers were never instructed by Mr. Murphy or by anyone else employed at Bentley to sell omeprazole or other pellet drugs to Ethypharm or Ethypharm customers.  (A-622, ¶¶ 8-9).

[4] A-622.
[5] Answering Brief, D.I. 73, p. 34.
[6] Complt., D.I. 1, ¶¶ 88-89, 135-36.
[7] A-622; *see* Scheduling Order, D.I. 36, ¶ 3 (deadline for amending pleadings was 9/15/06).
[8] Answering Brief, D.I. 73, p. 35.
[9] When asked to explain why Ethypharm entered into a business arrangement with Belmac's predecessor, Rimafar, in 1991, Ethypharm's chairman stated "[we] were forced to find a way to manufacture [omeprazole and other pellet drugs] in Spain."  (JTA-831).  The undisputed record confirms that Ethypharm's business with Belmac continued to be the manufacture and sale of omeprazole and other drugs throughout the parties' relationship.  (*See, e.g.*, A-297, ¶ 3; JTA-631).

between Ethypharm and Belmac, not Bentley. And they were the *only* agreements whose terms the parties reduced to writing and executed.[10] Ethypharm's litigation disavowal of the March 23, 2000 agreements is nothing more than an attempt to keep this case in the United States by sweeping under the rug the inconvenient truth revealed by the plain text of those agreements: Ethypharm's dispute is with Belmac, and must be litigated in the courts of Spain.[11]

Knowing that its dispute is against Belmac, Ethypharm attempts to create the impression that Bentley was the puppet master pulling the strings on Belmac's allegedly wrongful conduct. To create such a guise of control, Ethypharm conjures up an elaborate conspiracy theory based on speculative inferences which do not withstand scrutiny. A jury is not entitled to make the unreasonable inferences advanced by Ethypharm, which amount to nothing more than speculative, "metaphysical doubt[s]" about the evidence. *Jurimex Kommerz Transit G.M.B.H. et al v. Case Corp.*, No. Civ. A. 00-83-JJF, 2006 WL 1995128, at *3 (D. Del. July 17, 2006) (hereinafter, "*Jurimex III*"). Ethypharm's conjecture of conspiracy cannot defeat summary judgment. *See id*.

.

---

[10] Even the so-called draft "global contracts," which Ethypharm references in its brief but admits were never signed, are also *manufacturing* contracts – just like the March 23, 2000 agreements that Ethypharm now relegates to the status of the "other abbreviated certificates and memoranda." (*See* Answering Brief, D.I. 73, pp. 13, 22, 35; A-1-44, 295-325). Ms. Joannesse, the Ethypharm in-house lawyer who drafted the "global agreement" which Ethypharm sent to Mr. Murphy on June 8, 2001, described that draft as a "technology license and *manufacturing* [draft] agreement" which "concerns the different products that are manufactured by Belmac: Omeprazole, Piroxicam, Vincamine, Aspirine, Indomethacin, and Lanzoprazole" – the *very same* drugs and business arrangement governed by the executed March 23, 2000 manufacturing agreements. (JTA-752-753) (emphasis added). Ms. Joannesse also admitted that the draft global agreement "it's to realize the relationship between Ethypharm and – and *Belmac*," which the draft describes as a "cooperat[ion] since 1990 for the *manufacture*" of those pellet drugs. (A-297; JTA-752) (emphasis added). Ms. Joannesse admitted, consistent with the plain text of the draft "global" agreement, that only Ethypharm and Belmac are listed as parties, and Mr. Murphy is listed only as "Executive Director" of *Belmac*, not as a representative of Bentley. (A-296, 321; JTA-753). The primary distinction between the so-called "global" draft agreements and the agreements which Ethypharm and Belmac actually signed on March 23, 2000, is that Ethypharm's draft "global" agreements attempted to claim that all of the technology used by Belmac to manufacture those pellet drugs belonged to Ethypharm; a term which Belmac consistently rejected since it was untrue. (*See* A-298).

3

## ARGUMENT

Courts have made it clear that to survive a summary judgment motion, the non-moving party must do more than show "some metaphysical doubt as to the material facts." *Jurimex III*, 2006 WL 1995128, at *3. The mere existence of *some* evidence in support of the non-movant will not suffice to support a denial of a motion for summary judgment; rather, there must be enough evidence to enable a jury to *reasonably* find for the non-movant on that issue. *Id.* Mere speculation cannot support a jury finding. *See Messina v. E.I. du Pont de Nemours & Co.*, 308 F. Supp. 2d 491, 495 n. 10 (D. Del. 2004). Ethypharm lacks evidence sufficient to withstand summary judgment on its agency and newly resurrected joint tortfeasor theories.[12]

## I.    THERE IS NO EVIDENCE FROM WHICH A REASONABLE JURY COULD CONCLUDE THAT BELMAC HAD ACTUAL AUTHORITY TO BIND BENTLEY.

As Ethypharm admits, the crucial issue for purposes of the agency analysis is whether Bentley controlled Belmac's "decision to terminate the Ethypharm relationship [in late 2001 and early 2002] and to [allegedly] abscond with Ethypharm's technology and customers during this period."[13] Ethypharm contends that despite undisputed testimony that Belmac – and its conduct at issue – was controlled and implemented by Belmac's general manager, the jury can infer that Belmac was in fact controlled by Bentley because: (1) Bentley's board was updated on the

---

[11] A-1-44; Opening Brief, D.I. 65, p. 9 (noting that the March 23, 2000 agreements clearly state that any dispute arising out of those agreements must be litigated in the courts of Madrid, Spain).

[12] Ethypharm also claims that Bentley can be held liable "under a third theory of agency liability," ratification. Answering Brief, D.I. 73, p. 38 n. 153. Ethypharm cannot establish ratification, however, because it cannot prove that Bentley had full knowledge of *all* material facts concerning Belmac's allegedly wrongful acts. *See McCabe v. Williams*, 45 A.2d 503, 506 (Del. 1944); *Lewis v. Vogelstein*, 699 A.2d 327, 334 (Del. Ch. 1997). The evidence, at best, shows that Bentley: (1) knew that Belmac had applied for patents based upon its own omeprazole technology, had terminated the March 23, 2000 agreement with Ethypharm, had begun to supply omeprazole to former Ethypharm customers who approached Belmac, and (2) did not override the decisions which Mr. Herrera took on behalf of Belmac. (B-520, 591). Ethypharm cannot point to *any* evidence that Mr. Murphy or anyone else at Bentley ever knew that Belmac manufactured omeprazole with anything other than Belmac's independently developed technology after March 23, 2002 – much less with technology allegedly stolen from Ethypharm. Nor is there any evidence that anyone at Bentley thought that Belmac sold omeprazole or other pellet drugs manufactured with Ethypharm's allegedly misappropriated trade secrets to former Ethypharm customers. Because there is no evidence that Bentley knew of any alleged misappropriation of trade secrets by Belmac or any wrongful interference with Ethypharm customer relationships, it cannot, as a matter of law, establish ratification.

[13] Answering Brief, D.I. 73, p. 21.

business of Belmac; (2) Belmac's board, which was not required to meet in person under the laws of Spain, conducted its business in writing; (3) Belmac entered into management agreements with Bentley, for tax-planning purposes, which allocated certain costs to Belmac; and (4) Mr. Murphy had some interactions with Ethypharm and had the *authority*, as Belmac's President, to control Belmac's relationship with Ethypharm, which he *could* have chosen to – but did *not*[14] – exercise. These arguments fail as a matter of law.

### A.    Belmac Was Not Controlled By The Bentley Board Of Directors.

Ethypharm attempts to create the aura of actual agency by claiming that certain evidence supports the inference that Bentley's board of directors ran the operations of Belmac and directed Belmac's allegedly wrongful conduct in late 2001 and early 2002.[15]  This attempt, based on nothing other than Ethypharm's "metaphysical doubt," is undercut by the very evidence upon which Ethypharm relies, as well as the remaining undisputed evidence which it fails to mention.

The undisputed record shows that Belmac's operations are run by Belmac's general manager – not by the Bentley board or Mr. Murphy.[16]  While Bentley has approved employment decisions concerning Belmac's general manager, Belmac's general manager hires and fires all other Belmac employees.[17]  Under Spanish law, Belmac's board is not required to hold in-person meetings.[18] Instead, Belmac's board satisfied its obligations under Spanish law by issuing formal written resolutions and by delegating to Belmac's general manager control over the day-to-day operations of the company.[19]

Nor do the reports to the Bentley board cited by Ethypharm support the inference that Bentley's board "set the strategic agenda" for, and controlled, Belmac's alleged scheme to misappropriate Ethypharm trade secrets and to interfere with Ethypharm's customer

---

[14] A-622.
[15] Answering Brief, D.I. 73, pp. 4-5, 30-31.
[16] A-612; JTA-86, 622-624, 630-632, 662, 665.
[17] A-549 at ¶ 4; JTA-118, 665, 1017, 1019.
[18] *See* C-2, ¶ 4.
[19] C-18-39.

relationships.[20]  Both the text of those reports and undisputed testimony about them shows that

they are mere *updates* which the Bentley board periodically received on, among a variety of other

matters, the business of Belmac.[21]  The record is devoid of any evidence that these reports

embody a "strategic agenda" set by Bentley for Belmac.  Quite the opposite: undisputed

testimony shows that "the [Bentley] board of directors had asked [for] a summary report of a

recurring nature to keep them *advised* of operational matters" at Bentley and its subsidiaries.[22]

The Board did not itself draft these reports or determine their content.[23]  Notably, there is no

evidence that anyone at Bentley ever *acted* on the contents of these reports to assume a

controlling role in directing Belmac's allegedly wrongful conduct.  No jury could reasonably

infer that Bentley's board exercised[24] control over Belmac's allegedly wrongful conduct from the

mere fact that the parent company was kept apprised of the business of Belmac or otherwise had

an "interest" in the business of its subsidiary.[25]

> **B.     The Management Agreements Undertaken By Bentley And Belmac For Tax
> Purposes Do Not Suffice, As A Matter Of Law, To Establish Agency.**

Ethypharm next attempts to transfuse its anemic agency theory by arguing that certain

management agreements[26] prove that Bentley controlled Belmac's operations.  This argument is

unavailing for several reasons.  First, it is undisputed that these management agreements were

---

[20] Answering Brief, D.I. 73, pp. 25-26, 31.

[21] B-595-596 (report entitled "Operations Update," asks board members to contact drafter "if you have any questions relating to any specific activity."); JTA-517.

[22] JTA-517, 533 (emphasis added).

[23] *Id.*

[24] Ethypharm claims that "Bentley has not permitted Belmac to make important decisions concerning Ethypharm without Bentley's detailed input, decision, and approval."  Answering Brief, D.I. 73, p. 34. This claim is belied by Ethypharm's failure to find a *single* document among the nearly 117,000 pages produced by Bentley, or to secure any deposition testimony, showing that Bentley ever gave Belmac *any* – much less detailed – direction or instruction concerning Ethypharm or Belmac's allegedly wrongful conduct.

[25] Answering Brief, D.I. 73, p. 34.

[26] Ethypharm claims that "[t]hese documents were only produced to plaintiffs after repeated requests and after the close of phase 1 discovery."  (Answering Brief, D.I. 73, p. 8 n. 28).  Ethypharm neglects to mention, however, that these management agreements were produced among Bentley's first document productions, several *months* before Phase 1 depositions.  Certain spreadsheets concerning attributions pursuant to the management agreements were not originally picked up by the search which Bentley had conducted pursuant to the search criteria to which the parties had agreed in a joint stipulation filed with

undertaken for tax allocation purposes.[27]  They attributed certain overhead expenses to Belmac and allocated to Belmac an estimated percentage of time which Mr. Murphy, Mr. Price and Dr. Stote spent on matters which could reasonably be claimed to benefit Belmac.[28]  Bentley did not "impose" these agreements on Belmac as a means for controlling it.[29]  Rather, Belmac obtained substantial tax benefits under Spanish law by expensing the management fees for the benefits it received, thereby reducing its taxable income in Spain.[30]

Second, even if these management agreements could give rise to a reasonable inference that Bentley controlled certain aspects of Belmac's business – which they cannot – that would still not suffice to raise a triable issue concerning agency.  Nothing in these management agreements indicates that Bentley directed <u>the specific conduct at issue</u> – namely, Belmac's alleged misappropriation of Ethypharm trade secrets and interference with Ethypharm customer relationships in late 2001 and early 2002.  *See Jurimex III*, 2006 WL 1995128, at *3 (agency cannot be established unless parent controls the subsidiary's specific conduct <u>at issue</u>).

Lastly, this Court has concluded that strikingly similar arrangements do not suffice to create a genuine issue of material fact with regard to agency.  In *Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil, Inc.*, 456 F.Supp. 831, 842-43, 845 (D. Del. 1978), this Court concluded that no agency relationship existed as a matter of law and granted summary judgment under Rule 19.  In that case, the parent reviewed the subsidiary's budgets, provided consulting services to the subsidiary, and was substantially more involved in the subsidiary's operations than Bentley ever was in the operations of Belmac.  *Id.*  The parent in *Japan Petroleum* also charged its foreign subsidiary "a percentage amount to cover general overhead expenses, including such items as directors' salaries and insurance premiums" – an arrangement similar to Belmac and Bentley's

---

court.  (D.I. 50).  When Bentley was alerted, during depositions, to the documents which had not been picked up by the electronic search, it promptly produced them.
[27] C-5-6, 9-10.
[28] C-6, 9-10.
[29] *Id.*
[30] C-10.

management fee agreements. *Id.* at 845. Far from viewing such an arrangement as evidence of agency, the *Japan Petroleum* court deemed it a "factor[] which indicate[s] . . . that there is no agency relationship." *Id.* at 843. The management fee agreements between Bentley and Belmac are likewise insufficient to raise a triable issue of fact with regard to agency.

### C.    Neither Mr. Murphy Nor Anyone Else At Bentley Ever Controlled Belmac's Allegedly Wrongful Conduct.

In its Response, Ethypharm had no answer to the argument that it cannot withstand summary judgment on agency because it cannot prove that the alleged *agent* – here, Mr. Herrera and those working under him at Belmac – had the authority to act on Bentley's behalf when it engaged in the allegedly wrongful conduct in late 2001 and early 2002. Lacking this critical evidence, Ethypharm smokescreens the issue by arguing that Mr. Murphy, acting on behalf of Bentley, was the puppet master who controlled Belmac's allegedly wrongful conduct. This theory fails even when all the evidence is viewed, and the reasonable inferences drawn, in a light most favorable to Ethypharm.

### 1.    Mr. Murphy Did Not Direct Belmac's Allegedly Wrongful Conduct In Late 2001 And Early 2002.

Lacking any evidence that Mr. Murphy or anyone else at Bentley directed Belmac's allegedly wrongful conduct, Ethypharm attempts to paint Mr. Herrera as a pawn who merely implemented Mr. Murphy's instructions. Undisputed testimony, however, shows that Belmac undertook each act underlying the alleged misappropriation of Ethypharm trade secrets and interference with Ethypharm client relationships under Mr. Herrera's leadership – and without any direction or instructions from Mr. Murphy or anyone else at Bentley.[31]  *See Japan Petroleum Co.*, 456 F. Supp. at 845 (parent's lack of involvement in crucial agreement is strong evidence that parent did not control the subsidiary's conduct at issue).

---

[31] A-622; Opening Brief, D.I. 65, pp. 26-28.

Faced with this reality, Ethypharm concocts an elaborate conspiracy theory which it claims proves that Bentley was the mastermind of Belmac's allegedly unlawful conduct. Bentley's alleged controlling role in the conspiracy can be reasonably inferred, claims Ethypharm, from the fact that on November 14, 2001: (1) *Belmac* gave notice to Ethypharm that it would not renew the March 23, 2000 omeprazole agreement; (2) *Belmac* signed an agreement with a former Ethypharm customer who asked Belmac – not Bentley – to supply omeprazole to it; and (3) *Belmac's* omeprazole and lansoprazole patent applications, which were based upon technology which Belmac independently developed, were announced by Bentley in a press release. Ethypharm then argues that Mr. Herrera's updates to Mr. Murphy concerning Belmac's business, which were embodied in several entries in Mr. Murphy's diaries, must be seen as confirming that Mr. Murphy "masterminded" Belmac's allegedly wrongful conduct. The inferences urged by Ethypharm are not only unreasonable; they are rendered literally incredible by the undisputed evidence.

As mentioned in Bentley's Opening Brief, undisputed testimony shows that Mr. Herrera made the decision to not renew the March 23, 2000 omeprazole agreement without any direction from Mr. Murphy or anyone else at Bentley.[32] Likewise, it is undisputed that, in "late 2001 and early 2002," it was Mr. Herrera who decided to use Belmac's independently developed technology to manufacture omeprazole, directed Belmac to apply for patents on that technology, and merely "informed [Mr. Murphy] that [Belmac was] developing [its] own formulations" and applying for such patents.[33] Mr. Murphy never directed Mr. Herrera to take these actions.[34] Mr. Murphy and Mr. Herrera testified that Belmac applied for these patents pursuant to Belmac's own strategy – not Bentley's – and nothing in the record contradicts that testimony or otherwise

---

[32] JTA-668, 1060.
[33] A-550-551; JTA-669-670, 1073.
[34] *Id.* When asked about Belmac's development and registration of its technology for omeprazole in Spain, Mr. Herrera stated that "this is my plan that I specifically have designed, and I'm communicating it to my president at Laboratorios Belmac [Mr. Murphy]." (JTA-670). When asked whether "that's a plan that involves Bentley as well as Laboratorios Belmac, correct?" Mr. Herrera unequivocally answered "No." *Id.*

shows that Bentley directed Belmac to apply for those patents.[35]  Moreover, it is undisputed that Bentley issued the November 14, 2001 press release reporting on Belmac's omeprazole and lansoprazole patent applications based upon information which Belmac forwarded to Bentley – not, as Ethypharm surmises, as part of a grand Bentley strategy.[36]  Lastly, Mr. Herrera's undisputed testimony makes clear that Belmac entered into the November 14, 2001 agreement with Pharmalliance, the former Ethypharm customer, at the request of Pharmalliance itself – not at the direction of Bentley.[37]

While Ethypharm repeatedly quotes entries in Mr. Murphy's diaries as evidence of Mr. Murphy's control of Belmac's allegedly wrongful conduct, it neglects to mention that Mr. Murphy's undisputed testimony explains that these diary entries reflect Mr. Herrera's *updates* to him concerning Belmac's business.[38]  For example, when asked about whether such a diary entry meant that "you and Adolfo [Herrera] were discussing and considering on July 13th, 2001, that you would cancel the supply agreement and let stand the [March 23, 2000] manufacturing agreement?" Mr. Murphy responded, "Adolfo [Herrera] was *alerting* me of . . . *his* decisions."[39]  Far from supporting an inference that Mr. Murphy was the puppet master directing Belmac's allegedly wrongful conduct, Mr. Murphy's undisputed testimony concerning his diary entries confirms that Mr. *Herrera* was the only "mastermind" behind Belmac's disputed conduct.

Faced with undisputed evidence that every decision underlying Belmac's allegedly

---

[35] A-553, 557-559; JTA-1073.
[36] JTA-1073.  When asked "Do you feel that it's fair to say that Laboratorios Belmac was acting in concert with Bentley Pharmaceutical's strategy in filing these four new patents [referenced in the press release] for omeprazole and lansoprazole?" Mr. Murphy responded "No. Laboratorios Belmac was conducting its own strategy." (*Id*).  Ethypharm further probed: "And Bentley Pharmaceuticals had no input, no direction or control over Laboratorios Belmac's strategy to file four new patents for improved orally delivered product, including omeprazole and lansoprazole, correct?"  Mr. Murphy's response, which is undisputed, was: "There is nobody within Bentley Pharmaceuticals that has expertise in oral drug delivery processes or products or patents to be able to guide or interact with Laboratorios Belmac. Hence, Laboratorios Belmac out of necessity must act on its own and with its advisors and its own patent counsels."  (*Id*).  Mr. Murphy further added that Belmac's filing of the four patents described in the press release "is not designed by Bentley headquarters in the U.S." (*Id*).  Nothing in the record disputes this testimony.
[37] JTA-670, 1060, 1063.
[38] JTA-1067-68.
[39] JTA-1068.

wrongful conduct was made by Mr. Herrera and not Mr. Murphy, Ethypharm next argues that Mr. Murphy's failure to override Mr. Herrera's decisions evince Bentley's control over Belmac's actions.[40]  This conjecture defies logic.  The only inference which reasonably can be drawn from Mr. Murphy's failure to reject Mr. Herrera's decisions is that Mr. Murphy did *not* issue any instructions or control Mr. Herrera's decisions concerning Belmac's allegedly wrongful conduct.

No reasonable jury could credit Ethypharm's speculative conspiracy theory and the unreasonable inferences upon which it is based, given the undisputed evidence which shows that Belmac engaged in the allegedly wrongful conduct without *any* actual direction or control by Bentley.  Courts have repeatedly granted summary judgment under Rule 19 where, as here, there is no evidence that the parent exercised *actual* control over the actions of the subsidiary which are at issue.  *See Jurimex III*, 2006 WL 1995128, at *3; *Japan Petroleum Co.*, 456 F.Supp. at 841 (control must be *actual*, participatory, and total).  Ethypharm's conspiracy theory is nothing but a "metaphysical doubt" which falls far short of meeting the stringent standard of actual, participatory, and total control.  As a result, Bentley is entitled to summary judgment.

## 2. Mr. Murphy Did Not Control Belmac And Belmac's Relationship With Ethypharm In The 1990s And 2000.

Ethypharm first argues that Mr. Murphy controlled Belmac's allegedly wrongful conduct because: (1) back in 1994, Bentley's board "vested complete authority for negotiating transactions on behalf of Belmac" in him as Bentley's CEO; and (2) Mr. Murphy was a "Consejero Delegado" member of Belmac's board of directors.[41]  This argument collapses under scrutiny.  A jury cannot reasonably infer that Mr. Murphy *exercised* any control over Belmac's allegedly wrongful conduct from the mere fact that he possessed the *authority* to do so.  *See Japan Petroleum*, 456 F.Supp. at 841 (agency can only be established by evidence that control was *actual*, participatory, and total).

---

[40] Answering Brief, D.I. 73, p. 29.

Ethypharm then details Mr. Murphy's contacts with Ethypharm, most of which occurred years before Belmac's allegedly wrongful conduct, as evidence that it was Mr. Murphy, acting as "the top executive of Bentley," who exercised ultimate authority over Belmac's relationship with Ethypharm.[42]  Even if Mr. Murphy had acted as a representative of Bentley in each of his interactions with Ethypharm, which he did not, this evidence falls far short of supporting a finding of agency.  (*See* Opening Brief, pp. 26-30; *C.R. Bard Inc. v. Guidant Corp.*, 997 F.Supp. 556, 560 (D. Del. 1998) ("only the *precise conduct* shown to be instigated by the parent is attributed to the parent") (quotations omitted and emphasis added)).

Ethypharm claims that *Phoenix Canada Oil Co. v. Texaco, Inc.* stands for the proposition that Mr. Murphy's interactions with Ethypharm, most of which took place years before the alleged wrongful conduct, are legally relevant to the agency analysis.  That is not so.  In the years preceding the alleged breach of contract, the parent company in *Phoenix Canada Oil* was involved in the negotiation, drafting, and renegotiation of the *very* contract which was at issue in that case.  842 F.2d 1466, 1478 (3d Cir. 1988).  In sharp contrast, neither Mr. Murphy nor anyone else at Bentley was involved in the negotiation, execution, and termination of the March 23, 2000 agreement whose termination triggered Ethypharm's claims of wrongdoing.  Nor is there any evidence that Mr. Murphy was involved in directing Belmac's conduct which is at issue.  Therefore, unlike the parent's conduct in *Phoenix Canada*, Mr. Murphy's prior interactions with Ethypharm are not germane to the analysis of whether Bentley directed Belmac's wrongful conduct in "late 2001 and early 2002."

Moreover, while Ethypharm goes to great lengths to catalogue Mr. Murphy's occasional involvement in Belmac's oral arrangement with Ethypharm, it cannot point to a single executed agreement concerning omeprazole or other pellet drugs which names Mr. Murphy or Bentley as a party – for the simple reason that such an agreement does not exist.  In contrast, the undisputed

---

[41] Answering Brief, D.I. 73, pp. 5-6.
[42] Answering Brief, D.I. 73, pp. 10-20.

record shows that the *only* executed agreements governing Belmac's manufacture and sale of omeprazole and other pellet drugs for Ethypharm – the March 23, 2000 agreements – were negotiated, executed, and (as to the omeprazole agreement) terminated[43] by Mr. Herrera on behalf of Belmac, not Bentley.[44]   Neither Mr. Murphy nor anyone else at Bentley was ever involved in the negotiation and execution of these agreements, nor gave Mr. Herrera any instructions or directions concerning the contracts' negotiation and execution.[45]   Quoting selective portions of Mr. Herrera's testimony, Ethypharm attempts to create the impression that Mr. Murphy directed the termination of the March 23, 2000 omeprazole agreement.   But a complete quotation from the very evidence upon which Ethypharm relies undercuts that argument.   Although Mr. Herrera mentioned that he had "a conversation with my president [Mr. Murphy]" *after* he had decided to not renew the March 23, 2000 omeprazole agreement, he repeatedly made clear that it was "my [Mr. Herrera's] decision" to terminate that agreement.[46]   This testimony is undisputed.

## II.   NO REASONABLE JURY COULD CONCLUDE THAT BELMAC WAS CLOAKED WITH THE APPARENT AUTHORITY OF BENTLEY WHEN IT ENGAGED IN THE ALLEGEDLY WRONGFUL CONDUCT IN LATE 2001 OR EARLY 2002.

### A.   Mr. Murphy's Contacts with Ethypharm Do Not Suffice To Create Apparent Agency.

As mentioned in section I.C.2, *Phoenix Canada Oil* makes it clear that contacts between an official of the parent company and the plaintiff which took place years prior to the allegedly wrongful conduct are only relevant to the agency analysis if they directly involved the contract or other conduct at issue.  *See* 842 F.2d at 1478.  Mr. Murphy was never involved in the negotiation

---

[43] Mr. Herrera gave notice of non-renewal concerning the omeprazole agreement.  (A-45-48).  The March 23, 2000 agreements concerning the other pellet drugs were not terminated by Belmac.  (*Id*).

[44] A-1-44; JTA-663, 739, 1050.

[45] *Id.*

[46] JTA-668.  Mr. Herrera's testimony was corroborated by Mr. Murphy:
"Q. And it's your testimony that Mr. Herrera made this decision around – shortly before [the November 14, 2001] letter was sent?
A.  I'm assuming. That's when [Mr. Herrera] notified me."  When asked when Mr. Herrera "told you he had decided to terminate the [March 23, 2000] agreement," Mr. Murphy responded "I believe it was probably in one of [Mr. Herrera's] periodic *updates* of what's going on in Spain."  JTA-1060.  (emphasis added)

of the March 23, 2000 agreements with Ethypharm, or otherwise had any contact with Ethypharm when the alleged misappropriation of trade secrets and interference with customer relationships occurred in "late 2001 and early 2002." His prior, sporadic contacts with Ethypharm are insufficient, as a matter of law, to support a finding of apparent agency. *See id.*

Notably, Ethypharm has no answer to Bentley's argument that the alleged apparent authority of Mr. Murphy cannot logically be stretched to cloak the persons who actually undertook the allegedly wrongful conduct in "late 2001 and early 2002"– Mr. Herrera and those working under him at Belmac.[47] In fact, Ethypharm's own witnesses admitted that, in all his contacts with Ethypharm, Mr. Murphy never once said or did anything to give anyone at Ethypharm the impression that Mr. Herrera and those working under him at Belmac had the authority to bind Bentley.[48] This undisputed fact alone torpedoes Ethypharm's agency theory as a matter of law. *See Jurimex III*, 2006 WL 1995128 at *4 ("Plaintiffs must point to words or actions of the *principal*" demonstrating that the alleged agent subsidiary had apparent authority to take the "acts 'relevant to the plaintiff's claim of wrongdoing.'") (emphasis added).

*E.I. duPont de Nemours and Co. v. Rhodia Fiber and Resin Intermediates, S.A.S.*, 197 F.R.D. 112 (D. Del. 2000) provides an apposite contrast between a situation where apparent authority exists based on contacts between plaintiff and an officer of the parent company, and the present case, where it does not. In that breach of contract case, individuals who had allegiances to both the parent and subsidiary corporation were involved in the negotiation of the contract which was ultimately signed by the subsidiary and became members of the board of the joint venture formed by that contract. *Id.* at 116-17. The court found that the subsidiary had apparent authority to bind the parent because employees of both companies were actively involved in the negotiations of the *executed* agreement and also actively participated in the joint venture created by that contract. *Id.* at 122. In contrast, the manufacturing agreements which Belmac executed

---

[47] Opening Brief, D.I. 65, pp. 31-37.
[48] JTA-402, 754, 779, 1082.

with Ethypharm on March 23, 2000 were negotiated, executed and cancelled exclusively by Belmac's general manager, and not by Mr. Murphy or anyone else having allegiances to both Bentley and Belmac. More importantly, the precise acts at issue here – namely, Belmac's alleged use of Ethypharm's purported trade secrets to manufacture and sell omeprazole to Ethypharm customers and others starting in late 2001 or early 2002 – were undisputedly undertaken by Belmac under the exclusive direction of Mr. Herrera, in a timeframe when Mr. Murphy was no longer in contact with anyone at Ethypharm. Mr. Murphy's contacts with Ethypharm in the 1990s and 2000, which had nothing to do with either the only executed agreements governing Belmac's manufacture and sale omeprazole and other pellet drugs for Ethypharm, or with Belmac's allegedly wrongful conduct, do not suffice to create apparent authority to bind Bentley.

### B.    Any Words Or Conduct Of Belmac's General Managers Are Insufficient, As A Matter Of Law, To Bind Bentley.

Ethypharm next points to Mr. Herrera's words to support its theory that Belmac was cloaked with the apparent authority of Bentley when it engaged in the allegedly wrongful conduct in "late 2001 and early 2002." Courts have made it crystal clear, however, that only "words or actions of the *principal*" can cloak the alleged agent with the apparent authority of its parent company. *Jurimex III*, 2006 WL 1995128 at * 4. Acts or representations of the alleged agent are insufficient, as a matter of law, to establish apparent agency. *See Finnegan Constr. Co. v. Robino-Ladd Co.*, 354 A.2d 142, 144 (Del. Super. Ct. 1976). Ethypharm therefore invites this Court to commit reversible legal error by considering Mr. Herrera's isolated comments that he had to check with Mr. Murphy before responding to Ethypharm[49] as evidence of apparent agency.

## III.   ETHYPHARM'S JOINT TORTFEASOR THEORY HAS NO LEGAL OR FACTUAL SUPPORT.

Ethypharm argues, without citation, that the Court is barred from dismissing this action because Bentley has "not made a timely motion for summary judgment on [the joint tortfeasor]

theory of liability."[50]  To the contrary, Bentley's motion is "for summary judgment and dismissal *of all remaining counts of the Complaint* in this action *for failure to join an indispensable party*." (D.I. 64, p.1 (emphasis added)).  Its motion is not limited to any specific theories as to why Belmac is or is not an indispensable party.

Moreover, Bentley's motion for summary judgment is, as expressly permitted by this Court, a *renewal* of its motion to dismiss the case for failure to join an indispensable party under Rule 19.[51]  As noted by this Court, Ethypharm never raised, in its opposition brief, a joint tortfeasor defense as a ground for denial of Bentley's motion to dismiss under Rule 19.[52] Consistent with Ethypharm's failure to raise that defense in its opposition to Bentley's motion to dismiss, this Court ruled that "defendant's motion to dismiss for failure to join an indispensable party is denied pending discovery *on the issue of agency*."[53] As a result, Bentley focused its Opening Brief to this renewed  motion on the only theory which Ethypharm advanced in its opposition brief to Bentley's original motion: that Belmac was Bentley's agent and is therefore not an indispensable party under Rule 19.  Ethypharm has now decided to oppose Bentley's renewed motion on the additional ground, never raised in its original opposition brief, that Bentley is a "joint tortfeasor."[54]  Bentley has every right to rebut that argument.[55]

Courts have been skeptical of plaintiffs who attempt to circumvent a failure to pierce the corporate veil by arguing that a parent company is liable under a joint tortfeasor theory.  *Sahu v.*

---

[49] Answering Brief, D.I. 73, p. 29.  Mr. Herrera testified that he made these comments to bide his time in his negotiations with Ethypharm – not because he actually needed authorization from Mr. Murphy.  JTA-666.

[50] Answering Brief, D.I. 73, p. 38.

[51] Memorandum Opinion, D.I. 27, p.12 (denying Bentley's motion to dismiss "without prejudice to renew").

[52] Memorandum Opinion, D.I. 27, p.9 n. 5.

[53] Memorandum Opinion, D.I. 27, p. 18.

[54] Answering Brief, D.I. 73, pp. 38-39.

[55] Bentley certainly was not required in its Opening Brief to anticipate and rebut a defense theory which the plaintiffs did not pursue in their opposition to Bentley's original motion to dismiss.  If, however, the Court finds that Ethypharm is somehow prejudiced by Bentley's failure to anticipate the "joint tortfeasor" argument which Ethypharm failed to raise in its original opposition, any such prejudice could be easily remedied by this Court allowing Ethypharm to file a surreply brief limited to the issue of joint tortfeasor status.

*Union Carbide Corp.*, 418 F.Supp.2d 407, 412 (S.D.N.Y. 2005) (granting summary judgment on joint tortfeasor theory because "[t]his claim is an attempt to circumvent corporate veil piercing requirements" which plaintiff had not met).   This Court should be equally skeptical of Ethypharm's attempt to circumvent its failure to find any evidence that Belmac was Bentley's agent by dressing up that same claim in joint tortfeasor clothes.  *See id.*

Even if this Court chooses to entertain Ethypharm's opposition argument that Belmac is not a necessary and indispensable party because Bentley can be held liable on a joint tortfeasor theory, Bentley is still entitled to summary judgment under Rule 19.  As Bentley explains in its Opening Brief, the undisputed facts demonstrate that "it was Belmac, *not Bentley*, that engaged in the alleged wrongful conduct."[56]  It is axiomatic that a defendant cannot be held liable as a joint tortfeasor unless the defendant *itself* engages in the alleged wrongful conduct or provides *substantial* assistance by *consciously participating* in the wrongful conduct.  *See Mahurkar v. C.R. Bard, Inc.*, 2003WL355636, at * 5 (N.D. Ill. 1993); *Brug v. Enstar Group, Inc.*, 755 F.Supp. 1247, 1256 (D. Del. 1991) (no liability as joint tortfeasor where defendant's corporate positions provided them with the opportunity to participate in the allegedly wrongful conduct).

The record is devoid of any evidence that Bentley itself engaged in the allegedly wrongful conduct.  As Bentley emphasized in its Opening Brief, it has never: (1) entered into an agreement with Ethypharm for the manufacture of omeprazole and other pellet drugs; (2) manufactured omeprazole or any pellet drug for or on behalf of Ethypharm; (3) received any machinery from Ethypharm or technical protocols containing Ethypharm trade secrets; and (4) sold any omeprazole or other pellet drug to Ethypharm or its customers.[57]  More importantly, there is no evidence that Bentley itself ever misappropriated any alleged Ethypharm trade secrets or interfered with Ethypharm's customer relationships.

---

[56] *E.g.,* Opening Brief, D.I. 65, p. 2, Motion for Summary Judgment, D.I. 64, p.1.

[57] *E.g.*, Opening Brief, D.I. 65, pp. 4, 8.

Nor did Bentley ever consciously participate in Belmac's allegedly wrongful conduct[58] so as to justify liability for "aiding or abetting."  As explained in Bentley's Opening Brief, each act critical to Belmac's alleged misappropriation of Ethypharm trade secrets and interference with Ethypharm customer relationships was undertaken by Belmac under the direction of its general manager, Mr. Herrera.[59]  Such Belmac acts included: (1) Belmac's negotiation of, entry into, and termination of the March 23, 2000 agreement for the manufacture of omeprazole for Ethypharm and Ethypharm customers in Spain; (2) Belmac's receipt of Ethypharm's equipment, which was installed in Belmac's plant in Zaragoza, Spain; (3) Belmac's receipt of technical protocols and dossiers which contained Ethypharm's alleged trade secrets; (4) Belmac's manufacture and marketing of omeprazole and other pellet drugs in its facility in Zaragoza with its own funds, technicians and technology; (5) Belmac's application for and receipt of Spanish patents in its own name concerning omeprazole and other pellet drugs; (6) Belmac's attainment of the requisite authorizations from the Spanish Ministry of Health to manufacture and market omeprazole and other pellet drugs in Spain; and (7) Belmac's sale of omeprazole to a few former Ethypharm customers in allegedly wrongful interference with Ethypharm's business relationships.[60]  There is no evidence that Bentley ever provided substantial assistance to Belmac with regard to these acts, or otherwise *consciously participated* in any of these acts.[61]

Under such circumstances, courts have consistently dismissed theories of "aiding and abetting" joint liability.  *See Sahu,* 418 F.Supp.2d at 414-15 (plaintiff cannot establish "aiding and abetting" liability as a matter of law because parent company was never *substantially* involved in the subsidiary's conduct at issue, "[e]ven if [the parent] played a role in or approved these decisions"); *Brug,* 755 F.Supp. at 1256; *Combustion Eng'g, Inc. v. Murray Tube Works, Inc.*, 1984WL2131, at *5 (E.D. Tenn. 1984) (frequent contact between "persons in charge" of a parent

---

[58] Opening Brief, D.I. 65, pp. 16-17, 19-20.
[59] Opening Brief, D.I. 65, pp. 8, 16.
[60] Opening Brief, D.I. 65, pp. 8, 19-20.
[61] Opening Brief, D.I. 65, pp. 8, 16.

company and the officers of its wholly-owned subsidiaries does not suffice to show that a parent is the joint tortfeasor of the subsidiary).

Ethypharm's reliance on *Miles Inc. v. Cookson Am. Inc. et al.*, 1994 Del. Ch. LEXIS 221, an opinion which has never been cited, fails to support its argument that there is evidence that Bentley was Belmac's joint tortfeasor sufficient to withstand a Rule 19 motion for summary judgment. Unlike the instant case, the plaintiffs in *Miles* sued both the parent and its subsidiary for misappropriation of trade secrets. *Id.* at *1-2. The plaintiffs in *Miles* did not rely on a joint tortfeasor theory as a basis for suing *only* the parent company and for conferring diversity jurisdiction where it otherwise would not exist. *Id.* As a result, the *Miles* court was not faced with the possibility of issuing a judgment that is inconsistent with a foreign judgment against the absent joint tortfeasor.

Moreover, *Miles* is distinguishable on its facts. Unlike Mr. Murphy, the Vice-President of the parent company in *Miles* himself signed, as a representative of the parent company, the key agreements underlying the misappropriation of trade secrets. *Id.* at *49. Moreover, those agreements expressly gave the parent company control over the work of one of the key players in the misappropriation of trade secrets. *Id.* at *49-50. No such contracts exist here: it is undisputed that Mr. Murphy never executed any agreement, either in his capacity as Bentley's CEO or in his capacity as President of Belmac, concerning Belmac's manufacture, sale, or marketing of omeprazole or other pellet drugs for Ethypharm. Nor can Ethypharm point to a single term in the March 23, 2000 agreement executed by Ethypharm and Belmac which gives Bentley any right or obligation, much less any control over Belmac's manufacture, sale, or marketing of omeprazole and other pellet drugs in Spain. The crux of this case's similarity to *Miles* therefore boils down to overlapping board members between the parent and subsidiary – a factor which is insufficient, as a matter of law, to hold the parent company liable. *See Japan Petroleum*, 456 F.Supp., at 841. For all these reasons, Ethypharm's joint tortfeasor theory is no barrier to Bentley's motion for

19

summary judgment under Rule 19.[62]

## CONCLUSION

For the foregoing reasons and for the reasons set forth in Bentley's Opening Brief, this Court should grant Bentley's Motion for Summary Judgment and dismiss the remaining two counts of Ethypharm's Complaint for failure to join a necessary and indispensable party under Rule 19.

**EDWARDS ANGELL PALMER & DODGE LLP**

  _/s/ Joseph B. Cicero_
John L. Reed (I.D. 3023)
Denise Seastone Kraft (I.D. 2778)
Joseph B. Cicero (I.D. 4388)
919 N. Market Street, 15th Floor
Wilmington, DE  19801
302.777.7770
302.777.7263
jreed@eapdlaw.com
dkraft@eapdlaw.com
jcicero@eapdlaw.com

*Attorneys for Bentley Pharmaceuticals, Inc.*

**OF COUNSEL:**

Craig E. Stewart
Veronica C. Abreu
Joseph P. Mingolla
**EDWARDS ANGELL PALMER & DODGE LLP**
111 Huntington Avenue
Boston, MA  02199
(617) 239-0100

DATED:  September 22, 2006

---

[62] Even if Ethypharm could prove that Bentley and Belmac were joint tortfeasors, which it cannot, this Court should still dismiss this case under Rule 19 because Belmac is an "active participant" in the alleged misconduct. *Laker Airways, Inc. v. British Airways, PLC*, 182 F.3d 843, 848 (11th Cir. 1999) (holding under Rule 19 that the absent joint tortfeasor was a necessary party because the "absent party emerge[d] as an active participant in the allegations made in the complaint that are critical to the disposition of the important issues in the litigation") (internal quotations omitted).  As mentioned in Bentley's Opening Brief, Ethypharm's pending lawsuit against Belmac in Spain further supports a finding that Belmac is an indispensable party under Rule 19.