**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ETHYPHARM S.A. FRANCE and<br>ETHYPHARM S.A. SPAIN,<br><br>    **Plaintiffs,**<br><br>  v.<br><br>BENTLEY PHARMACEUTICALS, INC.<br><br>    **Defendant.** | )<br>)<br>)<br>)  **C.A. No.: 04-1300 (SLR)**<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**APPENDIX TO PLAINTIFFS' OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

                     **Pages**

I.  PRIMARY DOCUMENTS ................................................................... B1

II.  DIARIES OF JAMES R. MURPHY .......................................... B749

III. CALENDARS OF JAMES R. MURPHY ................................ B1013

IV. MANAGEMENT FEE CALCULATIONS ............................... B1109

V.  MANAGEMENT FEE INVOICES ........................................ B1149

VI. DECLARATION OF ANTONIO CASTAN ........................... B1196

VII. SELECTED PLEADINGS:

   (1) COMPLAINT .................................................................... B1276

   (2) ANSWER........................................................................... B1307

   (3) BENTLEY'S RESPONSES TO ETHYPHARM'S INTERROGATORIES ...... B1324

<<< Page 1 >>>

MINUTES OF THE ORGANIZATIONAL MEETING

OF THE, BOARD OF DIRECTORS

OF

BELMAC CORPORATION

A meeting of the Board of Directors of BELMAC CORPORATION ("Company")
. was held on June 9, 1994 at the Company's offices in Tampa, Florida, following the annual
meeting of stockholders.

The following directors were present:

Ranald Stewart, Jr.
Donald E. Boultbee
Robert M. Stote
Charles Boiling
James R. Murphy
Chester Thatcher, Jr.

Mr. Post and Mrs. Wardell were provided with prior advance notice of the meeting,
but were unable to attend.

Also present at the invitation of the Company were the Company's legal counselors,
Mark S. Hirsch and Jordan Horvath, of Parker, Chapin, Flattau & Klimpl, and Albert M.
Salem, Jr. and Michael D. Price, CFO, Treasurer and Secretary of the Company.

Mr. Stewart acted as Chairman of the meeting and Mr. Price, at the request of the
Chairman, acted as Secretary of the meeting.

1

<<< Page 2 >>>

Mr. Stewart called the meeting to order and indicated that the first order of business

was to elect officers of the Company for the next year. After discussions, upon motion duly

made, seconded, and unanimously carried, it was

RESOLVED, that Ranald Stewart, Jr. be elected as Chairman of the Board (with Mr. Stewart abstaining from discussion and

the vote) and that Donald E. Boultbee be elected President and

Chief Executive Officer, and that Robert M. Store, M.D. be elected Senior Vice President, Chief Science Officer, and that

Michael D. Price, be elected Vice President, Chief Financial

Officer, Treasurer and Secretary, each to serve in such capacity

until the next organizational meeting of the Board of Directors

and until his successor has been duly elected and qualified.

Mr. Stewart further proposed that the Committees of the Board of Directors be

reconstituted and after discussion, upon motion duly made, seconded and unanimously

carried, it was

RESOLVED, that the Audit Committee for the ensuing year be comprised of James R. Murphy, Chester H. Thatcher, Jr. and Doris Wardell and that the Compensation Committee be comprised of Charles Boiling, James R. Murphy and Chester H.

Thatcher, Jr.

The Board then discussed the need for an Executive Committee and reviewed the

history of the Company that led to the formation of an Executive Committee. Mr. Bolling

expressed his interest in receiving proactive communication via an Executive Committee or

a similar vehicle in order to keep all Board members advised of matters before irrevocable

2

BENTL002866
HIGHLY CONFIDENTIAL

<<< Page 3 >>>

are made or before entering into agreements.  **Redacted**


        nd Boultbee indicated that the current unofficial Management
Committee presently
        performs this function. Mr. Boiling continued to express his concern
that the Company
        should manage its business in accord with stated plans and
strategies as understood by
        management and the Board. After much continued discussion, it was
determined that
        proper controls are now in place and that an Executive Committee is
no longer necessary.

        Mr. Murphy raised the question of whether the Company needs a
Finance Committee
        and Dr. Stote stated that he would like to see a long-term financial
plan so that the
        Company can anticipate cash needs in the future and plan for them
accordingly. Mr.
        Stewart explained the difficulties that the Company has encountered
in raising capital due
        to the weakness in the Company's stock price and agreed that such a
committee would be
        useful. Discussion continued with regard to the Company's stated
strategic plan and Mr.
        Murphy voiced his opinion that the Company should plan for future
inevitable financing.
        After significant discussion, upon motion duly made, seconded and
unanimously carried, it

        was

        RESOLVED, that a Financing Arrangements  Committee  should  be
        established and for the ensuing year be comprised of Donald E.
Boultbee,
        Robert M. Stote, and James R. Murphy.

        The Financing Arrangements Committee's  key  responsibilities
were  defined  as:  to

3

<<< Page 4 >>>

plan working capital needs; to identify sources of raising capital; and to develop action plan
proposals with regard to financing.

Mr. Price then stated that in accordance with the 1991 Stock Option Plan, he would
prepare and execute Stock Option contracts granting options to the newly elected outside
Directors. Mr. Murphy is entitled to receive options to purchase 20,000 shares, and Mr.
Stewart and Mrs. Wardell are each entitled to receive options to purchase 30,000 shares.
Each of the options are granted a term of ten years and shall be exercisable at a price equal
to the closing market value on June 9, 1994.

Mr. Stewart discussed the status of the private placement financing arrangements and
summarized the arrangement reached with Baytree Associates, investment bankers, to
coordinate such financing. Mr. Boultbee added his comments regarding conversations he
had with Mr. Gardner of Baytree and also summarized the cash flow situation in Spain and
the Company's critical need for cash.

The Board then discussed alternative sources of raising capital including the possible
sale of its Spanish assets and the possibility of discounting accounts receivable owned by
Chimos. After significant discussion, upon motion duly made, seconded and unanimously
carried, it was

RESOLVED, that the officers of the Company are authorized to negotiate
and conclude a private placement of up to 3,750,000 units (the "Units"), each

4

BENTL002868
HIGHLY CONFIDENTIAL

<<< Page 5 >>>

unit to include two shares of the Company's Common Stock, $.02
par value
to
(the

per share (the "Common Stock'), and one eighteen-month warrant

purchase Common Stock at an exercise price of $2.00 per share

"Warrants'); and it was further

RESOLVED, that the sales price of the Units shall be $1.60 per
Unit or such
lower amount, as may be necessary to complete the transaction
as a result of
market conditions, as the officers in their discretion shall
determine; and it
was further

RESOLVED, that the Company reserve for issuance 3,750,000
shares of
Common Stock (the "Warrant Shares") for issuance upon exerdse
of the
Warrants; and it was further

RESOLVED, that the Company is authorized to file with the
Securities and
Exchange Commission (the "SEC") a Registration Statement on
Form S-3 to
register the resale by the purchasers of the Units of the
shares included in the
Units and, if required by the purchasers of the Units, the
Warrant Shares; and
it was further

RESOLVED, that the officers of the Company are hereby
authorized to make
an application to the American Stock Exchange (the "Exchange")
for the
listing of the Warrant Shares; and it was further

RESOLVED, that such officers are hereby authorized and directed
to sign
said Registration Statement, application and any listing
agreements or
documents required by the SEC or the Exchange in connection
therewith and
to make such changes in any of same as may be necessary to
conform with the
requirements for registration or listing and to appear (if
requested) before
officials of the SEC and the Exchange; and it was further

RESOLVED, that such officers are hereby authorized by the
Company to
take all other action and to execute and deliver all other
agreements and
instruments and to affix the Company seal thereto, if
requested, that may be
necessary or appropriate to carry out the purpose and intent of
the foregoing
resolutions.

Mr. Boultbee presented a proposal with respect to the
Chimos/LBF merger (see

attached Exhibit "A"). After questions were answered, upon motion
duly made, seconded,

and unanimously carried, it was

BENTL002869
HIGHLY CONFIDENTIAL

<<< Page 6 >>>

RESOLVED, that Chimos S.A. and Laboratoires Belmac S.A. shall be merged into one surviving entity whose name shall be Chimos/LBF S.A. and that the officers of the Company are hereby authorized and directed to take all necessary action to facilitate this merger.

Mr. Boultbee then continued discussion regarding the merged entity, including a strategy to phase Mr. Nicolas out and replace him with Hervé Maissoneuve. Mr. Boultbee proposed that Mr. Nicolas become a consultant to the Company. Various members of the Board voiced their desire to avoid confrontation with or the possibility of irritating Mr. Nicolas. After additional discussion, upon motion duly made, seconded and unanimously carried, it was

RESOLVED, that Donald Boultbee remain as President Director General (PDG) of LBF, and become PDG of Chimos/LBF S.A. until a new strategic plan for France and Europe is approved. Thereafter, the Chairman of Belmac Corporation may appoint a PDG at his discretion.

Mr. Boultbee then discussed the recapitalization of Laboratorios Belmac S.A. such that Shareholders' Equity equal at least 50% of paid in capital. Mr. Boultbee stated that Laboratorios Belmac's shareholders' equity has fallen below this required level and that the Company must take corrective action. After discussion, upon motion duly made, seconded and unanimously carried, it was

RESOLVED, that Donald Boultbee and/or Michael Price be authorized to take the necessary action that may be required to restore the Shareholder's Equity balance to at least 50% of paid in capital in Laboratorios Belmac, Spain. Such action may include reclassifying intercompany loan balances as

6

BENTL002870
HIGHLY CONFIDENTIAL

<<< Page 7 >>>

       additional paid in capital.

         Mr. Boultbee provided the Board with an update of the Spanish situation including:

           •    a verbal offer from a Japanese company to purchase Laboratorios Belmac.

           •    negotiations with Columbia Labs regarding their interest in the factory.

         Mr. Price supplemented Mr. Boultbee's comments based upon his observations from

       his recent trip to Spain.

         The next topic was a review of pending legal matters. Mr. Hirsch discussed the Class

       Action litigation settlement, including the number of shares to be issued (approximately

       701,000).

Redacted

         Mr. Stewart informed the Board that it was his opinion  that an   account   should   be

BENTL002871
HIGHLY CONFIDENTIAL

<<< Page 8 >>>

opened at BVH Bank in Germany in order to facilitate placement of
the Company's shares
in Germany. After discussion, upon motion duly made, seconded, and
unanimously carried,
it was

RESOLVED, that the officers of the Company are hereby
authorized to open
an account at BVH Bank and directed to take all action that is
necessary to
facilitate opening such account.

Mr. Stewart informed the Board that the Company had purchased
200,000 shares of
stock into its Treasury from Wolf Weise in exchange for canceling
the related stock
subscriptions receivable and has resold these treasury shares to
Ilya Margulis in a private
placement transaction. Mr. Stewart then requested that the Board
ratify such action and
after discussion, upon motion duly made, seconded, and unanimously
carried, it was

RESOLVED, that the actions taken by the officers of the Company
with
respect to purchasing 200,000 shares of the Company's Common
Stock by
canceling the related stock subscriptions receivable from Wolf
Weise and
selling such shares to Ilya Margulis at $.675 per share in a
private placement
is hereby ratified.

Mr. Boultbee then reviewed operations of the Company and the
Company's financial
performance.

Messrs. Boultbee and Price discussed Price Waterhouse's
decision to decline to stand
for re-election as the Company's independent accountants and the
possible ramifications for
the Company. They then shared their plans for replacing Price
Waterhouse with other

BENTL002872
HIGHLY CONFIDENTIAL

<<< Page 9 >>>

independent    accountants.

Mr. Stewart brought to the Board's attention the recent problems encountered with
the Pacific Stock Exchange. Mr. Stewart then recommended that the Company request
delisting from the Pacific Stock Exchange. After discussion, upon motion duly made,
seconded, and unanimously carried, it was

RESOLVED, that the officers of the Company are hereby authorized to
request delisting from the Pacific Stock Exchange and to take all action
necessary to facilitate such action.

Mr. Stewart discussed a proposed arrangement with Kim Kennedy whereby Ms.
Kennedy may perform consulting services and supply pharmaceuticals via a strategic alliance
on behalf of Belmac. Mr. Stewart provided a detailed background of the proposed
arrangement and indicated that he is continuing to negotiate with Ms. Kennedy. Once he
has determined the terms acceptable to Ms. Kennedy, Mr. Stewart agreed to re-convene the
Board in order to secure its approval of such an arrangement.

Mr. Stewart also told the Board that Kerry Kennedy (brother of Kim) has indicated
that he is interested in raising capital for the Company as a consultant on a commission
basis; however, no action was taken by the Board.

9

BENTL002873
HIGHLY CONFIDENTIAL

<<< Page 10 >>>

Mr. Boiling inquired about the Company's plans to grow its disposable linen line and
Mr. Boultbee responded by reviewing the Company's strategic plan.

Mr. Stewart also informed the Board that Ken Burnside has suggested that he come
to work for the Company as an Investor Relations representative at the rate of $10,000 per
month. Mr. Thatcher discussed the Company's need for a quality Investor Relations
program. Mr. Hirsch supplemented these comments with caution. No Board action was
taken on this subject.

Mr. Stewart indicated that the next item of business was to approve the minutes of
the Board of Directors' meetings held on October 22, 1993, December 17, 1993, January 7,
1994, March 3, 1994, and April 8, 1994. After discussion regarding the minutes, and minor
modifications thereto, upon motion duly made, seconded, and unanimously carried, it was

RESOLVED, that the minutes of the Board of Directors' meetings held on
October 22, 1993, December 17, 1993, January 7, 1994, March 3, 1994, and
April 8, 1994, respectively, are hereby approved.

There being no further business to come before the meeting, upon motion duly made,
seconded and unanimously carried, the meeting was adjourned.

JMichael D. Price'~

Secretary

10

BENTL002874
HIGHLY CONFIDENTIAL

<<< Page 11 >>>

FRANCE

To simplify and reduce costs, a legal restructuring of our French domiciled compaiiies will
be effected by 6/30/94.

Currently, Chimos and Belmac Spain are subsidiaries of a French based holding company,
LBF (Laboratoires Belmac France). The plan is to structure both Belmac Spain and
Chimos to become direct subsidiaries of Belmac Tampa.

The most convenient method is for LBF to absorb Chimos in France. As Chimos is our
active trading company, we need to retain that name.

Proposal #1: That the name of the surviving company in France be "Chimos LBF S.A."

The President Directeur G6n6ral (PDG) of LBF is Donald Boultbee. Denis
Nicolas is PDG of Chimos. Denis proposes that he be named PDG of
Chimos LBF -- the title would otherwise automatically be left with Don, as
LBF is the acquiring company, hence the survivor.

Proposal #2: That Donald Boultbee remain as PDG of LBF, and become PDG of Chimos
LBF S.A. until a new strategic plan for France and Europe is approved.
Thereafter, Chairman, Belmac Corporation Tampa may appoint a PDG at his
discretion.

BENTL002875
HIGHLY CONFIDENTIAL

 **BELMAC CORPORATION**

*archiv*
*Belmac*

Sr. Adolfo de Basilio
Director General
Ethypharm
Marques de la Ensenada, 16.
Centro Colon (1220). 28004 Madrid

6 Dec. 1994

Fax 011 34 1 319 91 59

Dear Sr. Basilio,

Thank you for you rapid response and communication on monday. I appreciate your interest in Belmac. I wish to inform you of my visit to France on 12 Dec. 1994. I will be arriving via Continental Airlines at 8:300 AM from Boston and will remain in Paris until 2:00 on 13 December therafter, I will travel to Madrid and will be available to meet in Madrid on the 14th or 15th with Technimede representatives.

Can you suggest a hotel in the Paris area?

During my visit to Paris I am most anxious to speak about opportunities to expand our collaborative relationship in the areas of manufacturing, microgranulation of products, erythromycin, Portugal, and other ways in which our companies can grow and prosper together.

Sincerely,

James R. Murphy
President

*Jim Murphy*

One Urban Centre   Suite 550   4830 West Kennedy Boulevard   Tampa, Florida 33609-2517
813-286-4401   Fax 813-286-4402



EP 009094

07/12/'94      11:58     ETHYPHARM                     34 1 3199159 01
                                                       07 DEC '94 11:55



**éthypharm**

| TELEFAX | Fecha: 7.12.74 |
|---------|----------------|
| Mai 2800 | N.° de Fax: | N.° de hoja: 1 |
| | A: Mme Debragras Nathalie | de: Cd de Basilio |
| | EMPRESA: ( ) ETPHY ( ) | Empresa: ETPHY |
| | DEPARTAMENTO: | Departamento: |

Post-it™                                              ⟶ P1

---

FAX: 07/351/1. 942 38 24          FECHA/DATE: 07-12-94

A/TO: Dr. Ruas da Silva           CIA/FIRM: TECNIMEDE
COPIA A/COPY TO:

DE/FROM: Adolfo de Basilio

PAGS: 1

REF:

TEXTO:

Hemos tenido una conversación con el Dr. Murphy, Presidente de Belmac USA, para comunicarle el interés de un joint venture entre nuestras compañías. El Presidente de ETHYPHARM ha sido informado y está favorablemente interesado en el proyecto.

El Sr. Murphy va adelantar su viaje que estaba previsto para la segunda semana de Enero, va a estar en Europa la semana del 12 de Diciembre.

Se desplazará desde Florida hasta París para tener una reunión previa con ETHYPHARM y tratar de temas que implican a las 2 compañías. Posteriormente, de París se desplazará a Madrid donde desea entrevistarse los días 14 ó 15 con los responsables de TECNIMEDE.

Pensamos que puede ser una buena oportunidad para nuestras respectivas compañías el resultado de esta reunión.

En espera de la conformidad de su presencia en esta reunión, le saluda atentamente,

Adolfo de Basilio

---

*Rogamos llamen al 3085681 si hay problemas de recepción*
*Please phone (1)3085681 if reception problems*

Registro Mercantil de Madrid n°. 1. Tomo 1011, Gen 978, Sec. 3, Folio 132, H. 70446-1, N.I.F. A78186041

EP 006593

TO: Dr. Ruas da Silva
FROM: Adolfo de Basilio
DATE: 12/7/94

We have had a conversation with Dr. Murphy, President of Belmac, U.S.A., in order to express our interest in a joint venture between our compaines. The president of Ethypharm has been informed and is favorably interested in such a project.

Mr. Murphy has advanced his trip which was originally planned for the second week of January and will be in Europe the Week of the 12th of December.

He will leave from Florida to Paris for a meeting with Ethypharm and deal with issues regarding the two companies. Later, he will leave Paris for Madrid where he wishes to meet on the 14th or 15th with the people in charge of Tecnimede.

We think that the results of these meetings could be a good opportunity for our respective companies.

We await your presence at these meetings, with kind regards,


Adolfo de Basilio

<<< Page 1 >>>

DIRECTORS                MINUTES    OF    A    MEETING    OF    THE    BOARD    OF

of

BELMAC                CORPORATION

A meeting of the Board of Directors of Belmac
Corporation (the "Company") was
convened on December 8, 1994. Members present at the Company's
offices in Tampa were:

> Ranald Stewart, Jr.
> Randolph W. Arnegger
> Donald E. Boultbee
> James R. Murphy
> Robert H. Stote
> Chester H. Thatcher, Jr.
> Doris E. Wardell

Also present at the meeting, at the request of the Company,
was Michael D. Price, Vice
President, Chief Financial Officer, Treasurer, and Secretary of the
Company and the Company's
legal counsel, Mark Hirsch, of Parker Chapin Flattau & Klimpl, LLP.

Messrs. Bolling and Post were provided with the proper
advance notice of the meeting,
but were unable to attend as they were both out of the country.

Mr. Stewart acted as Chairman of the meeting and Mr. Price,
at the request of the
Chairman, acted as Secretary of the meeting.

Mr. Stewart called the meeting to order and indicated that
the first order of business was
review and approval of the minutes of Board meetings held on
September 8-9, 1994 and
November 14, 1994. After discussion regarding the minutes and minor
modifications thereto,



BENTL002832
HIGHLY CONFIDENTIAL

<<< Page 2 >>>

upon motion duly made, seconded, and unanimously carded, it was

RESOLVED, that the minutes of the Board of Directors' meetings held on September

8-9, 1994 and November 14, 1994, respectively, are hereby approved.

Mr. Stewart then provided a status report of pending legal and settlement issues:

Ayers – Mr. Stewart provided an update on the Ayers matter by telling the Board

members that although the jury awarded Ayers damages of $516,000, no judgment has been

entered in the case. He also indicated that the Judge has been ill and is again reviewing the

motions (for a new trial and for a judgment for the Company notwithstanding the verdict) that

have been filed by the Company.

ALZA – Mr. Stewart asked Mr. Price to provide an update on the ALZA situation, and

Mr. Price responded by summarizing recent conversations he has had with ALZA's CFO in an

attempt to reach a mutually acceptable solution, and indicated that discussions are still in the

preliminary stage.

Barshbarger – Mr. Stewart indicated that a trial date in February has now

Redacted

BENTL002833
HIGHLY CONFIDENTIAL

<<< Page 3 >>>

Moody – Mr. Stewa~ relayed to the Board members that the Moody trial had recently
been concluded and that the Judge awarded Moody $55,000 and had requested the attorneys to
submit to him briefs on the remaining issue of the value of stock options being claimed by
Moody. He indicated that the briefs have been submitted and that we are awaiting the Judge's
ruling on this final issue.

Tripodi – Mr. Stewart indicated that depositions had been scheduled in this matter,
however, they were not taken and have not been rescheduled as of this date.

Colmar – Mr. Stewart asked Mr. Price to update the Board members on this matter,
which he did by indicating that this matter has been settled by the payment of the reduced
amount of $12,500 and that Colmar had dismissed the action.

Class Action lifigaton – Mr. Price updated the Board members on this matter, saying that
the Class members in the suit have now been identified and the shares to be awarded have been
allocated and are in the process of being issued.

Rossignol – Mr. Murphy distributed a copy of a proposed letter to be mailed to
Rossignol, asking for payment due the Company related to Rossignol's receipt of payments for
a product to which the Company has Royalty rights. Minor modifications to the
    d.  Redacted

<<< Page 4 >>>

Board members also    The
Redacted

    discussed the need to record the Note Receivable and instructed Mr.
Price to do so.

    Status reports were then presented to the Board, beginning
with a report on operations
    in Spain by Mr. Murphy. Mr. Murphy described his recent visit to
Spain and summarized
    findings and developments that are underway, including negotiations
to reduce the prices being
    paid for raw materials, to return the OTC inventory to the supplier,
and with various companies
    that have expressed an interest in collaborative arrangements such
as joint ventures, investment
    or outright purchase of the Spanish subsidiary or its assets.

    Mr. Murphy continued his presentation with an update on the
developments in France,
    including the growth in sales, the recent discussions with Genzyme
Corporation with respect to
    the Company's marketing of their product, Ceradase and a possible
joint venture arrangement.
    Mr. Murphy described the Company's plan in the event of Mr.
Nicolas' retirement (possibly at
    the end of 1994), whereby Mr. Maissoneuve may be hired on a full
time basis and Mr. Nicolas
    would serve as a consultant. Mr. Murphy indicated that the Company
could use the services of
    Mr. Noel on a part time basis, but would not need Mr. Renaux, the
pharmacist.

    Dr. Stote then provided an update on recent developments in
the partnership with
    Maximed, including a discussion of product formulation issues,
applicator issues, manufacturing
    issues and management issues with regard to Mr. Cohen. Discussion
ensued whereby members
    of management described their views that they had been misled by
Cohen during the due

BENTL002835
HIGHLY CONFIDENTIAL

<<< Page 5 >>>

diligence phase of this project. Dr. Stote then informed the other Board members about a memo
sent by Cohen, presenting an ultimatum and threat to pursue remedies.

Redacted

Messrs. Arnegger, Boultbee, Murphy, and Stote and Mrs. Wardell voted in favor of
filing the lawsuit against Cohen and/or his related companies and delaying service of same, Mr.
Stewart voted against filing the lawsuit, and Mr. Thatcher did not vote (stating that he did not
know how to vote).

Dr. Stote continued his presentation with an update on developments within the
disposable linens business. He also discussed strategies that include possible joint venture
opportunities and a second manufacturer. Dr. Store concluded by stating that the key issues
facing this business opportunity are manufacturing and costs.

Dr. Stote then provided an update on R & D activities. Dr. Stote recommended that the
Company should attempt to locate a partner to share in the future development of Biolid. A
review of the Form 10-Q was performed and it was determined that existing disclosure with

5

BENTL002836
HIGHLY CONFIDENTIAL

<<< Page 6 >>>

respect to this product development and other Company developments continues to be fair and
adequate.

Mr. Murphy provided a brief update with respect to Alphanon and described discussions
that are taking place with Sandoz.

Mr. Price provided a brief update with respect to the Environmental Remediation
program financing that the Company is involved with through Belmac Health Corp. He
reviewed two letters received recently from the State which described costs that had been
disallowed for reimbursement and his plans to address this issue.

The meeting was then recessed at 5:00 pm until 9:00 am on Friday, December 9, 1994
in order that Committee Meetings could be convened.

The meeting reconvened at 9:00 am on Friday, December 9, 1994, and it was noted that
all members and guests present on the prior day had returned and had been joined by Albert
Salem, legal counsel.

Mr. Price stated that the private placement financing had been completed in December 1994 and
included the sale of approximately 7.2 million shares of common stock and also included
issuance of warrants to purchase common stock, generating approximately $3.0 million in
proceeds. Mr. Price indicated that in accordance with representations made to investors, the

6

BENTL002837
HIGHLY CONFIDENTIAL

<<< Page 7 >>>

Company is obligated to file a Registration Statement on Form S-3, and that perhaps the
Company should consider registering for sale the shares of common stock underlying stock
options of employees which are exet'cisable at prices under $3.00 per share. After discussion,
upon motion duly made, seconded and unanimously carded, it was,

RESOLVED, that the Company is authorized to file with the Securities and Exchange
Commission a Registration Statement on Form S-3 to register for resale by the purchasers in the
recently completed private placement of the shares and shares underlying the warrants, as well
as shares underlying stock options held by employees that are exercisable at prices less than
$3.00 per share, and that such officers of the Company are hereby authorized and directed to
sign said registration statement required by the SEC in connection therewith and to make such
changes in any of same as may be necessary to conform with the requirements for registration
and to appear (if requested) before officials of the SEC.

Mr. Murphy then gave a report of the Financial Arrangements Committee, describing
possible sources of cash, which included Chimos receivables, a possible joint venture
arrangement with Genzyme, possible sale of our Spanish company or joint venture arrangement
in Spain, receivables due from the State of Florida, and an Initial Public Offering whereby one
or more of the Company's subsidiaries may be spun off.

Mr. Price then provided a financial report, including a review of cash flows for the next
four months, historical performance for the nine months ended 9/30/94 compared to budget,

7

<<< Page 8 >>>

projections for the fourth quarter of 1994 and the 1995 proposed budget. Discussion ensued
primarily directed at identifying opportunities to reduce operating costs, including personnel,
office space and outside contracts. The Board agreed that the Company should not provide a
matching contribution to the Company's 401(k) pension plan.

Mr. Boultbee then presented a Compensation Committee report and a request was made
to the Committee to award stock options to Ms. Teresa Kaiser and Mr. Murphy. Mr. Murphy
excused himself from t_he meeting so that the subject of his compensation could be discussed in
his absence. Discussion ensued about the 1991 Stock Option Plan and Mr. Boultbee suggested
that the Management Committee establish criteria for awarding options. Mr. Price instructed
Mr. Boultbee that the responsibility for establishing such criteria and for administering the 1991
Stock Option Plan rests with the Compensation Committee. It was agreed that the Compensation
Committee would consider the requests and report its decision at a later date.

Mr. Murphy returned to the meeting at this time.

A report of the Audit Committee was deemed not necessary at this time due to the fact
that all members of the Board joined the Audit Committee in its meeting with representatives
from Deloitte & Touche LLP on Thursday, December 8, 1994 at 5:00 pm for a presentation by
them and a question and answer period.

The Board members revisited the subject of authority levels and reviewed the resolution

8

<<< Page 9 >>>

passed by the Board in September 1994. After discussion, upon motion duly made, seconded
and unanimously carded, it was

RESOLVED, that any executive officer of the Company may authorize expenditures up
to $25,000 without express approval of another officer; that any executive officer may authorize
expenditures greater than $25,000 (single transaction or cumulative on an annual basis) only with
the express approval of the Management Committee; and that no officer of the Company may
authorize expenditures (single transaction or cumulative on an annual basis) greater than
$100,000 without the express approval of the Board of Directors.

Mr. Murphy asked for authority to negotiate transactions involving the Spanish
subsidiary. The Board affirmed that the authority to negotiate has already been vested, but that
any agreement must be subject to Board approval.

The composition of the Board of Directors was the next topic of conversation. It was
agreed that a proper mix of inside directors and outside directors exists.

Committee membership was then discussed and after discussion, the Board agreed that
the composition of the Financial Arrangements Committee should be restructured. Mr. Thatcher
tendered his resignation from the Financial Arrangements Committee. Upon motion duly made,
seconded and unanimously carded, it was

9

BENTL002840
HIGHLY CONFIDENTIAL

<<< Page 10 >>>

RESOLVED, that the Board of Directors hereby accepts the resignation from the
Financial Arrangements Committee tendered by Mr. Thatcher and appoints Mr. Arnegger to
such position.

The Board members then briefly discussed the Public Relations/Investment liaison
position and the future strategy of the Company with respect to this matter.

The next topic of discussion was Richard Surber. Mr. Stewart was asked to describe the
existing relationship with Mr. Surber, to which he replied that the Company is doing nothing
with him. This statement prompted Mr. Price to describe the appropriate accounting treatment
of the unamortized balance that remains capitalized on the Company's Balance Sheet if there
remains no future benefit related to compensation paid to Surber. Mr. Stewart stated that the
Company does not need to issue the options to R. Surber as are called for in his Consulting
Agreement. Extensive discussion continued.

Mr. Salem excused himself from the meeting at this time, citing an unavoidable conflict
in his schedule.

Mr. Hirsch returned the discussion to the Mr. Surber issue. After additional discussion,
a motion was put forth, and seconded, to cancel the consulting agreement with Richard Surber.
Messrs. Arnegger and Stote and Mrs. Wardell voted in favor of the motion and Messrs. Stewart,
Thatcher and Boultbee voted in opposition to the motion. Mr. Murphy abstained from the vote

10

BENTL002841
HIGHLY CONFIDENTIAL

<<< Page 11 >>>

wanting more discussion on the issue prior to calling for a vote. The motion did not pass and

discussion of the issue was resumed. Mr. Stewart was asked to describe the benefits that could

be realized from association with Mr. Surber. Mr. Stewart responded, that Mr. Surber and his

affiliates have a public company shell that the Company could use to speed up an IPO spin-off

of one of its subsidiaries, such as Spain, France, or Belmae Healthcare

Redacted

scussion, a motion was again put forth, and seconded, to terminate the consulting

agreement with Richard Surber. All members present at the meeting, with the exception of Mr.

Stewart who abstained, voted in favor of the motion.

Mr. Stewart proposed that the Board members consider restructuring the Company and

possibly changing its name. Additional discussion ensued with respect to alternative suggestions

for restructuring the Company and improving its prospects for success, however, no action was

taken at this time.

Mr. Price informed the Board members that the Company must file a Listing Application

with the American Stock Exchange in the near future in order to enable it to issue shares of

Common Stock that it has obligated itself to issue. Upon motion duly made, seconded, and

unanimously carded, it was

RESOLVED, that the officers of the Company are hereby authorized to make an

application to the American Stock Exchange for the listing shares for issuance for various

11

BENTL002842
HIGHLY CONFIDENTIAL

<<< Page 12 >>>

        purposes, including for a Regulation D f'mancing up to a number
that will not subject the listing
        application to a heightened level of review.

        There being no further business to come before the meeting,
upon motion duly made,
        seconded, and unanimously carded, the meeting was adjourned.

                                Mich~a~l D. Price,

Secret,'~'y
                                /

12

BENTL002843
HIGHLY CONFIDENTIAL

<<< Page 1 >>>

MINUTES    OF    A    MEETING    OF    THE    BOARD    OF
DIRECTORS

of

BELMAC                    CORPORATION

A meeting of the Board of Directors of Belmac Corporation
(the "Company") was held
      on December 29, 1994. Members participating via telephonic
connection were:

                    James R. Murphy
                    Robert M. Stote
                    Randolph W. Arnegger
                    Charles L. Boiling
                    Doris E. Wardell

            Also connected telephonically, at the request of the
Company, was Michael D. Price,
            Vice President, Chief Financial Officer, Treasurer, and
Secretary of the Company and the
            Company's legal counsel, Mark Hirsch, of Parker Chapin Flattau &
Klimpl, LLP.

            Proper timely advance notice of the meeting was sent by the
Company to Messrs.
            Stewart, Thatcher and Boultbee, but each was unavailable for the
meeting.

            Mr. Murphy acted as Chairman of the meeting and Mr. Price, at
the request of the
            Chairman, acted as Secretary of the meeting.

            Mr. Murphy called the meeting to order and indicated that the
first order of business was
                    anald Stewart, Jr., the Company's Chairman of the Board.
  Redacted

BENTL002826
HIGHLY CONFIDENTIAL

<<< Page 2 >>>

**Redacted**

1 in moving this matter toward as amicable a

Discussion of this matter continued at length.

Upon motion duly made, seconded and unanimously carded, it was

RESOLVED, that upon the execution of the above referenced letter by Mr. Stewart, Mr. James R. Murphy shall be appointed CEO of the Company (with Mr. Murphy abstaining from the vote on this matter), and it was further

RESOLVED, that Mr. Murphy is hereby authorized to execute the above referenced letter on behalf of the Company without any substantive changes whatsoever, except for immaterial language changes, and it was further

2

BENTL002827
HIGHLY CONFIDENTIAL

<<< Page 3 >>>

RESOLVED, that Mr. Murphy is hereby authorized to execute the above referenced Consulting Agreement with Mr.. Stewart on behalf of the Company, which embodies the intent and spirit of the discussion which has taken place during this meeting, and it was further

RESOLVED, that Mr. Stewart's signature shall be removed from all corporate banking and other accounts in the name of the Company.

There being no further business to come before the meeting, upon motion duly made, seconded, and unanimously carried, the meeting was adjourned.

Secretary

3

BENTL002828

HIGHLY CONFIDENTIAL



**James R. Murphy**
Chairman
Chief Executive Officer

*Traded on the AMEX: BNT*
65 Lafayette Road, 3rd Floor, North Hampton, NH 03862-2403
Tel 603.964.8006                                              Fax 603.964.6889
e-mail: jmurphy431@aol.com                         http://www.bentleypharm.com

EXHIBIT NO. 1

EP 009250

múltiples estudios y les propuse que si nos pueden hacer uno en
el plazo de 1 mes por 40.000 libras (Murphy quiere una).
Esperamos la respuesta de SAFT a este punto. Por otro lado, son
propietarios de ESAME que son los que organizan las reuniones
anuales con el Ministerio de Sanidad, nos dieron la convocatoria
de la próxima reunión que tendrá lugar el 31 de Marzo a la que
asistirán todos los altos cargos del Ministerio de Sanidad.
Aunque no vayamos a trabajar con ellos como intermediarios, no
podremos prescindir de ellos.


BELMAC

Reunión con Murphy 16/1/95.

Murphy nos informa de su cena con Debregeas e Igonet. Muchas de
las cosas que comenta ya las habíamos discutido en Madrid. Nos
informa de la compra de la Sociedad en EEUU entre ETHYPAHRM y
BELMAC para el desarrollo y/o comercialización de los parches
transdérmicos.  Inicialmente    se  trabajará con Nicotina,
Nitroglicerina y Estrógenos.
La Eritromicina amorfa (BIOLID) sigue siendo prioritaria. Tienen
sachet y quieren pasarlo a comprimidos de microgránulos. Entre
los planes del Sr. Murphy está el desarrollar la Espironolactona
y reabrir el departamento de desarrollo Galénico en Zaragoza.
Para ello ha dado orden de compra de diversos aparatos de
laboratorio, entre otros, un cromatógrafo de gases y estufas de
humedad controlada. Bernabé hará las pruebas con estos productos
y  Paloma  Iguacel  proporcionará  los  datos  necesarios,
documentación ya existente y perfil desado del producto.
Hay otro producto que deberá ser contemplado que es una
Azaquinona activa (Quinolone Quinone) frente al micobacterium que
requiere también algún tipo de desarrollo. Las próximas fechas
de reuniones con Murphy son 20 y 21 en París, 22 en Madrid y el
31 tiene con la subdirectora de Farmacia y Medicamentos (Carmen
Collado), antiguo puesto de García Alonso. Hemos ofrecido a
BELMAC Ibuprofeno y Doxiciclina que no les ha interesado.
En CHIMOS Francia tienen 6 personas trabajando con renta de 24
M. de dólares. La previsión para 1995 es de 37 M. de dólares.
Esperan alcanzar 100 M. de dólares en breve. Son fabricantes y
distribuidores como UQUIFA. Debemos utilizarlos para la compra
de excipientes y principio activo ya que podría ser muy
ventajoso. Mandaremos lista para que nos den cotización.
Nos informa de un grupo de exportadores formado por 4 ó 5
compañías entre las que están Francia, España y Belmac USA para
Centro y Sudamérica. Otro de los acuerdos a los que llegamos es
que colaboraremos en el desarrollo de registros y exportación de
productos.


Reunión con Monterde 18/1/95.

Ethypharm después de los acuerdos derivados de las reuniones con
Murphy se establecerá como·laboratorio farmacéutico, y a partir
de ahora todos los envíos de las fabricaciones de Ethypharm
saldrán con el anagrama ETHYPHARM. Una vez que Ethypharm obtenga
la ficha de laboratorio y que firme el acuerdo de alquiler con
BELMAC , que está redactando el Sr. Pérez Sendino, se colocará
el anagrama en la entrada de Zaragoza. Debido al incremento de

EP 009203
HIGHLY CONFIDENTIAL

fabricaciones en ETHYPHARM España, necesitaremos aumento de
personal, a lo cual ya ha dado su consentimiento el Sr. Murphy
y se establecerían 2 turnos o la situación más conveniente. Al
no estar Pérez de Ayala, Monterde recupera la capacidad que había
perdido y le comunicamos que deberá tener excipientes suficientes
para las nuevas fabricaciones (No conceden el derecho a tener un
despacho en sus instalaciones de Zaragoza.
La Eritromicina la sintetizan en el S.P.N.E. de Francia.

Otro de los acuerdos alcanzado con Murphy es que Ethypharm podría
exportar desde Belmac y que cuando tengamos un cliente que quiere
producto terminado podamos utilizar su certificado de libre
venta, y en este caso le daremos la exportación a Belmac.
En particular existe la posibilidad de exportar MHB a China en
cajas terminadas con el siguiente detalle de costo:

```
     6 pts ------ estuche
   0,8 pts ---- prospecto
    14 pts ------ frasco
  16,5 pts ---- tapa
     2 pts ------ etiqueta
 0,365 pts --- cápsulas (Capsugel les da nuestro precio)
```

Hemos pedido a J. C. Asensio que haga un listado de apratos y
material necesario para poner en funcionamiento el área de
desarrollo así como para validaciones pertinentes. Proponemos a
Mateo Gasca como responsable de desarrollos y sustituirlo en la
fábrica.
J. C. Asensio deberá viajar a Houdan para aprender técnicas de
trabajo habituales en Ethypharm.

## MURPHY / TECNIMEDE

De la reunión celebrada con el Dr. Ruas da Silva de TECNIMEDE que
se desplazó desde Lisboa el día 11 de Enero para reunirse con
Murphy exclusivamente, se concluyó que Tecnimede y Belmac harán
un JOINT-VENTURE para fabricaciones, registros, etc.. para lo que
van a firmar:

- acuerdo secreto
- productos que intervienen en el J.V.
- registro de estos productos en España
- fabricaciones de los productos en Belmac
- exportación a diversos países
- establecerán un desarrollo conjunto y entre ambos
  solicitarán el estatus de laboratorio investigador dentro
  del plan de FOMENTO.

Entre los productos que se desarrollarían en ese J.V. por parte
de Belmac están DIOLID y AZAQUINONA.
Por parte de Tecnimede patente de un producto comprada a la
C.E.I. Los países de exportación de Tecnimede actualmente son
Marruecos, Túnez y Libia que ha sido cambiado por Argelia.
Tecnimede tiene desarrollada una Vinpocetina Retard.
Para sus fabricaciones Tecnimede ofrece de 10 a 15 millones de
comprimidos de diferentes productos que podrían fabricarse en
Zaragoza.

EP 009204
HIGHLY CONFIDENTIAL

`Referente a la Vinpocetina tiene una patente europea presentada hace un año que está en discusión.

Está realizando un estudio de biodisponibilidad con 16 voluntarios.

Tecnimede está desarrollando con una empresa sueca Cefalosporinas de segunda y tercera generación. Tiene 10 registros de antitumorales.

Belmac por su parte tiene proyectos de adquirir una línea de antibióticos. Hemos sabido en esa reunión que Tecnimede vendió un MHB a FREDA FARMACORE.

El QC de Tecnimede es el nº 2 portugués, el nº 1 es IBERFAR (a pesar de estar fuera de normas GMP).

EP 009205
HIGHLY CONFIDENTIAL

multiple studies I proposed to them if they can do one in a period of one month for 40,000 pounds (Murphy wants one). We hope the response of SAFT is soon. On the other hand, the are owners of ESAME which are the ones that organize annual meetings with the Health Ministry, they gave us the program for the meeting which will take place March 31, and to which all high officials of the Health Ministry will attend. Even though we will not work with them as intermediaries, we cannot do without them.

BELMAC

Meeting with Murphy 1/16/95

Murphy informs us of his dinner with Debregeas and Igonet. Many of the things he comments on we had already discussed in Madrid. He informs us of the purchase of the Company in the U.S. between ETHYPHARM and BELMAC for the development and commercialization of transdermic poles. Initially, they will work with Nicotine, Nitroglycerin and Estrogens.

The amorphous Eritromicin (BIOLID) continues to be a priority. They have sachet and they want to change it to microgranule tablets. Among Mr. Murphy's plans is the development of Espironolactona and the re-opening of the development department of Galénico in Zaragoza. For this, he has given purchase orders for different laboratory apparatuses, including among others a gas chromatograph and stoves with humidity control. Barnabé will test these products and Paloma Iguacel will provide the necessary data, existing documentation, and the desired product. There is another product that should be considered that is active Azaquinona (Quinolone Quinone) as opposed to the microbacterium that also requires some type of development. The next meeting dates with Murphy are the 20th and 21st in Paris, the 22nd in Madrid, and the 31st he has [a meeting] with the assistant director of Pharmacy and Medicines (Carmen Collado), former position of García Alonso. We have offered Ibuprofen and Doxiciclin to BELMAC but it has not interested them. In CHIMOS France they have 6 people working with the sales of 24 million dollars. The forecast for 1995 is 37 million dollars. They hope to reach 100 million dollars soon. They are manufacturers and distributors like UQUIFA. We must use them for the purchase of excipients and active principals since it could be very advantageous. We will send a list so they give us an estimate. He informs us of a group of exporters formed by 4 or 5 companies, including France, Spain, and Belmac USA for Central and South America. Another one of the agreements we reached is that we will collaborate in the development of registries and exportation of products.

Meeting with Monterde 1/18/95

Ethypharm, after the agreements resulting from the meetings with Murphy, will establish itself as a pharmaceutical laboratory, and from now on all shipments of Ethypharm production will go out with an anagram ETHYPHARM. Once Ethypharm obtains the laboratory card and it signs the rental agreement with BELMAC, which Mr. Pérez Sendino is writing, the anagram will be placed at the Zaragoza entrance.

Due to the increase in productions at ETHYPHARM Spain, we will need to increase personnel, to which Mr. Murphy has already given his consent, and two shifts will be established, or whatever situation is most convenient. Since Mr. Pérez de Ayala is not present, Monterde returns to the capacity that he had lost and we communicate to him that he will need to have sufficient excipients for the new production. They give us the right to have an office in their Zaragoza plant.

Eritromicin is synthesized in the "S.P.N.E." of France.

Another one of the agreements reached with Murphy is that Ethypharm can export from Belmac and when we have a client that wants a finished product, we can use its free sale certificate, and in this case we will give the exportation to Belmac. Specifically, there is a possibility of exporting MHB to China in finished boxes with the following cost detail:

> 6 pts------------case
> 0,8 pts----------leaflet
> 14 pts---------- bottle
> 16,5 pts-------- lid
> 2 pts------------labels
> 0,365 pts------capsules (Capsugel gives our price to them)

We have requested that J.C. Asensio makes a list of apparatuses and material necessary to put into operation the development area as well as for relevant authorizations. We propose to Mateo Gasca, as the person in charge of developments, and to replace him in the factory. J.C. Asensio will have to travel to Houdan to learn the techniques of the regular work at Ethypharm.

MURPHY/TECNIMEDE

The conclusion of the meeting with Dr. Ruas da Silva of TECNIMEDE who came from Lisboa on January 11 to meet exclusively with Murphy, was that Tecnimede and Belmac will form a JOINT VENTURE for production, registries, etc. for which they will sign:
> -secrecy agreement
> -products that are part of the J.V.
> -registration of these products in Spain
> -manufacturing of the products in Belmac
> -export to various countries
> -they will establish a joint development and between them they will request the status of investigating laboratory within the FOMENTO plan.

Among the products they will develop in this J.V. on the part of Belmac are DIOLID and AZAQUINONA. On the party of Tecnimede, patent of a product purchased from the C.E.I. The export countries of Tecnimede at the moment are Morocco, Tunisia, and Lybia which has been changed for Algeria. Tecnimede has developed a Vinpocetina Retard. For its productions, Tecnimede offers 10 to 15 million tablets for different products that can be manufactured in Zaragoza.

In reference to the Vinpocetina, it has a European patent that was submitted a year ago and is under review. It is doing a bioavailability study with 16 volunteers. Tecnimede is developing with a Swedish company Cefalosporinas of second and third generation. It has 10 registrations of antitumors. Belmac on the other had has projects to acquire a line of antibiotics. We learned in that meeting that Tecnimede sold a MHB to FREDA FARMACORE. The "QC" of Tecnimede is Portuguese number 2, number 1 is IBERFAR (in spite of being outside the GMP norms).

BELMAC CORPORATION

One Urban Centre
Suite 550
4830 West Kennedy Blvd.
Tampa, FL 33609-2517

Phone  (813)  286-4401
Fax     (813)  286-4402

TO THE ATTENTION OF:    Sr. Adolfo de Basilio
                        Director General
                        Ethypharm

FAX NUMBER:             011 34 1 319 91 59

FROM THE OFFICE OF:     James R. Murphy
                        President & CEO

DATE:                   19 Jan. 1995

• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •

Dear Adolfo,

Pursuant to the spirit of our recent discussions, attached is a public disclosure which we
wish to release concerning our intent to work closely together for mutual benefit.
Please review the announcement which has been designed to be only the basic framework
of our future relationship. I look forward to developing a strong bond between our
companies and thank you for your sincere interest and assistance in Laboratorios
Belmac.

Thank You

Jim

EXHIBIT
MURPHY
11
7/19/06    8LB

EP 003317

01/19/95  16:51  ☎813 286 4394          BELMAC CORP                    ☒002

For Immediate Release

## BELMAC ANNOUNCES FORMATION OF JOINT-VENTURE WITH ETHYPHARM IN ESTABLISHING DRUG DELIVERY RESEARCH & DEVELOPMENT

TAMPA, FLORIDA, JANUARY __, 1995–LABORATORIOS BELMAC S.A., a wholly-owned Spanish subsidiary of Belmac Corporation, announced today the first stage agreement to establish a joint venture with Ethypharm of France (a leading European drug delivery company) in the Belmac manufacturing facilities in Zaragosa, Spain.

The initial agreement involves the establishment of a combined research effort at the Belmac Laboratories to develop new oral dosage forms of well-established products in addition to Belmac's amorphous form of erythromycin. Other products include an extended release formulation of spironolactone and omeprazole.

Belmac further agreed to enter the export market with a number of its Spanish-produced products and Ethypharm products.

This agreement represents a major commitment by Belmac in the establishment of the Company's recognition under the Spanish system of "Planos de Fomentos". Acceptance under this system will allow Belmac to join the ranks of other major multinational companies committed to the Spanish market, enabling priority status in the review and approval of Regulatory Dossiers submitted to the Ministry of Health.

Under the agreement, Belmac will also further expand the manufacturing relationship which it already has with Ethypharm in novel dosage forms by training more Belmac personnel to fulfill an increasing demand in contract manufacturing based upon Ethypharm technologies.

Belmac Corporation is an international pharmaceutical and health care company based in Tampa, Florida.

FOR FURTHER INFORMATION, CONTACT:
Jill Perrone or Michael Price
(813) 286-4432  (813) 286-4401

EP 003318

# LETTER OF INTENT

This letter of intent is presented to Ethypharm by Belmac Corporation, in good faith, to ensure that Belmac Corporation will employ its best efforts to enter and conclude negotiations for the establishment of a Joint-Venture relationship for the purpose of establishing a mutually synergistic business relationship between our respective companies.

It is the intention of both parties to enter a mutual secrecy agreement to ensure the proprietary rights of each party.

Based upon the guidance and negotiation of our respective lawyer to encompass the best interests of both parties, a contract for occupancy of space by Ethypharm in the Zaragoza facility will be entered into.

Belmac wishes to establish a Joint-Venture with Ethypharm to research and develop a number of pharmaceutical products including but not limited to, Erythromycin(amorphous, and base compounds), spironolactone, and omeprazole. Additional compounds of mutual interest will be added to this collaboration by amendment to the initial research collaboration agreement.

It is further understood that business opportunities in the United States, specifically the acquisition of a transdermal delivery company is a potential opportunity of mutual interest and will be persued in a joint effort for the benefit of both parties. It is the intent of both companies to develop the transdermal products for the Spanish market as well and to perform at least a portion of the research and development within the Belmac/Ethypharm facilities in Zaragoza. A non-circumvention agreement for disclosure of the identity of this transdermal company becomes part of this letter of understanding and intent.

Whereas Belmac Corp. has intent in the development and commercialization of Erythromycin products, the proprietary rights of Belmac to the Amorphous Erythromycin remains unencumbered and no license or other rights are hereby granted nor implied by the endorsement of this letter of intent. It is understood that a first right of refusal is granted to Belmac and is hereby part of this agreement for the territories of Spain, Latin America, South America, and the United States for the galenic forms of Erythromycin base products owned by Ethypharm.

EXHIBIT
Murphy
12
7/19/06     SLC

EP 009199

DRAFT 21 MARCH 1995          **B40**

## MANUFACTURING AGREEMENT

In Madrid, on ___ March 1995

### GATHER TOGETHER

- Mr. James R. Murphy, on behalf and in representation of LABORATORIOS BELMAC, S.A. (hereinafter referred to as "BELMAC"), with corporate domicile at Paseo de la Castellana, 149, 28046 Madrid; he uses the faculties and powers granted to him as Executive Director of BELMAC.

- Mr. Patrice Debregeas, on behalf and in representation of ETHYPHARM, S.A. (hereinafter referred to as "ETHYPHARM"), with corporate domicile at Marqués de la Ensenada, 16, 28004 Madrid and on behalf and in representation of ETHYPHARM, S.A. (hereinafter referred to as "ETHYPHARM FRANCE"), with corporate domicile at 21 Rue Saint Matthieu, Houdan 78550, France. He uses faculties and powers granted to him as Chairman of both ETHYPHARM and ETHYPHARM FRANCE.

### THEY STATE

I.   That ETHYPHARM is interested in contracting BELMAC for the manufacture, encapsulation and/or conditioning (hereinafter to be referred to as "the manufacture") of certain products as described in Annex 1 (hereinafter referred to as "the products") for the purpose of their delivery to third parties (hereinafter referred to as "the client" or "the clients") (Ethypharm clients),

II.  That BELMAC is interested in the manufacture of the products for their eventual delivery to the clients.

The parties, having regard for that stated above, with the express intention of reflecting their respective obligations in a written and binding agreement, and mutually acknowledging each party's capacity thereon, have decided to subscribe to the present agreement (hereinafter, the "Agreement") in accordance with the following.

### CLAUSES

1.   <u>Object</u>

The object of the Agreement is to establish the terms and conditions which will be applied to the business relationship

CONFIDENTIAL



EXHIBIT
MURPHY
13
7/19/06

BEL006397

DRAFT 21 MARCH 1995

BELMAC owns the manufacturing facility and operates under the observance of the currently promulgated Spanish GMP procedures within that section of the facility where ETHYPHARM products are manufactured.

whereby BELMAC will manufacture products as requested by ETHYPHARM.

**B41**

2.    Resources

The manufacture of the products will take place at BELMAC's laboratory located in Zaragoza and will be carried out by BELMAC personnel.

The equipment used in manufacturing the products will be pro- vided by ETHYPHARM. ETHYPHARM FRANCE, as ultimate owner of the know-how employed in manufacturing the products authorises ETHYPHARM to use said know-how. ETHYPHARM, in turn, authoris- es BELMAC to use this know-how to manufacture the products under the terms and provisions of the Agreement.

For the purposes of the Agreement, the term "know-how" shall be deemed to include the industrial procedures and methods which are detailed in Annex 2 as well as the technology per- taining to the production guidebooks. within the standard operating procedures (SOPS)

3.    Term

The effectiveness of the Agreement will be retroactively ap- plied as from 1 January 1995, and will expire on 1 January 2000, unless previously rescinded by any party following that stated here below.

Any party may, after 31 December 1995, unilaterally terminate the Agreement by certified letter sent to the other party, provided that a notice of at least six-months in advance of the termination date is observed.

In the case that one party breaches any of its obligations as set out under the Agreement, the other party may unilaterally terminate the Agreement by certified letter, without prejudice to any other actions that the non-defaulting party may exer- cise and particularly to a claim for damages. In this case no advance notice shall be observed.

4.    Manufacture of the products

The manufacture of the products shall be made with strict observance of the Spanish regulations in force, as well as of the know-how provided by ETHYPHARM.

The manufacture will be undertaken by BELMAC personnel and at BELMAC's premises, but supervised by ETHYPHARM and without prejudice to ETHYPHARM's faculties of inspection as set out in clause 11.    at least one employee

- 2 -

CONFIDENTIAL

BEL006398

21/03 '95 18:06  Ψ03 1 5709704

DRAFT 21 MARCH 1995                    **B42**

BELMAC, as a pharmaceutical laboratory will assume, vis-a-vis third parties, the liability derived from the manufacture of the products in the terms provided by the law. Notwithstanding that stated previously, BELMAC may claim that ETHYPHARM is liable in those cases in which the defect or error in the manufacture of the products stems from the equipment or know-how provided by ETHYPHARM.

- Products shipped (carton) will be labeled with a statement that acknowledges ETHYPHARM technology and manufacturing by BELMAC.

**6.    Exclusivity**

The obligations assumed by each party in the Agreement will be of an exclusive nature, so:

**6.1**    ETHYPHARM cannot request a different laboratory to manufacture the products (for itself or for clients) except:

-    in those cases wherein BELMAC cannot meet the terms and delivery dates requested by ETHYPHARM.

-    in those cases where the manufacture is requested to ETHYPHARM FRANCE or to any company in which ETHYPHARM FRANCE holds more than 50% of its share capital.

                                        patents
**6.2**    BELMAC cannot manufacture products with the know-how
protected → provided by ETHYPHARM for clients other than those provided by ETHYPHARM. However, the parties recognise that this exclusivity obligation:

-    will not preclude BELMAC from manufacturing the products with technology other than ETHYPHARM's, or unless legally mandated by Spanish law.

-    will only be applied to the so-called "active sales" (those promoted by BELMAC), but not the so-called "passive sales" (those in which the client approaches BELMAC regarding the manufacture of the product without any prior sales effort on the part of BELMAC).

**7.    Procedure - Invoicing**

**7.1**    Clients provided by ETHYPHARM and resident in Spain:

The procedure will be the following:

b) →    The client will send a letter to BELMAC, according to
Finished products    the sample attached in Annex 5, requesting from BELMAC
(capsules):    the manufacture of certain products and acknowledging that such manufacture will be done with ETHYPHARM's know-how and that the products will be sold and invoiced to them by ETHYPHARM.

- 3 -

→ a) Raw Materials (bulk ETHYPHARM...) Ethypharm will place orders with BELMAC and Belmac w...

CONFIDENTIAL

DRAFT 21 MARCH 1995

**B43**

For those cases deemed necessary in accordance with that provided in Royal Decree 1564/1992 of 18 December, the client and BELMAC will formalise a "Contrato de Fabricación por Terceros" in respect to the specific product/s. The "Contrato de Fabricación por Terceros" will need to be authorised by the Spanish Ministry of Health prior to the manufacture of the product/s. The parties expressly acknowledge that BELMAC will bear no responsibility with regard to obtaining this approval from the Ministry of Health.

Once the product is manufactured, the same will be delivered directly to the client *and only to a third party who is a legal pharmaceutical company authorised to receive finished pharmaceutical products.*

**6)** The following invoices will be issued:

. BELMAC will invoice ETHYPHARM every month the following, ~~two amounts (without taxes) for the provision of manufacturing services~~:

~~- a fixed monthly amount of _____ pesetas~~ ~~equivalent to production units~~ ("unidades de producción") *the products being manufactured (work in progress).*
~~- a variable amount~~ which will be determined by the production *units* effectively reached in each month, at the price of _____ pesetas per unit.

*A*
~~This~~ monthly invoice~~s~~ will be payable upon *no* ____ days from the invoice's date *for the actual number of batches manufactured during the period at the mutually agreed upon price.*
. BELMAC will invoice ETHYPHARM every year, on 1 January, a fixed amount of _____ pesetas (without taxes) as compensation of liability incurred as a result of the provision of manufacturing services.

. ETHYPHARM will invoice BELMAC every year, on 1 January, a fixed amount of _____ pesetas (without taxes) as compensation for use of know-how and rental of equipment.

The last two invoices will be payable ____ days after the date of the invoice. The parties expressly accept that the payment to be made will be determined by offsetting those invoices due on the same date, with a view to avoiding unnecessary transfers of funds.

**4.2.** Clients provided by ETHYPHARM and resident abroad:

We may distinguish two situations:

\* If the product can be legally (as per the corresponding foreign and Spanish health regulations) sold to the

*These two invoices will be payable upon ____ days from the invoice date. The amount stated in the two above repeated invoices 4 based upon the expected production level for 1995 will be revised by mutual agreement.*

CONFIDENTIAL

client by ETHYPHARM, then the procedure described in 6.1 will be followed.

If the product cannot be legally (as per the corresponding foreign and Spanish health regulations) sold to the client by ETHYPHARM, then the following procedure will be observed:

a) If necessary, BELMAC's export of the product to the client must be authorised by the Health authorities of the country of destiny, being the client obliged to provide BELMAC with copy of such authorization prior to the manufacture. The parties expressly acknowledge that BELMAC will bear no responsibility for obtaining this authorization.

b) Once the product is manufactured, the same will be delivered directly to the client*and only to a third party who is a legal pharmaceutical company authorised to receive finished pharmaceutical products.*

c) The following invoices will be issued when the product leaves BELMAC's factory:

. BELMAC will invoice the client for the sale of the products. The price to be paid by the client will be determined by ETHYPHARM.

. ETHYPHARM will invoice BELMAC for the following three items: use of know-how, rental of equipment and brokerage fees. The price (without taxes) to be paid by BELMAC will be determined in accordance with the formula set forth in Annex 4.

Both invoices will be payable on the same date. Furthermore, in this particular case, 7.2, ETHYPHARM accepts that BELMAC will not be obliged to pay ETHYPHARM the corresponding invoice until BELMAC has received payment from the client of the corresponding invoice.

7.3    Passive Sales (~~as defined in clause 5.2~~ *those cases in which the client approaches Belmac without any prior sales effort by Belmac*)

The procedure will be the following:

a) The sale of the product will be covered by a "Contrato de Fabricación por Terceros" or export license (if necessary), as the case may be.

b) Once the product is manufactured, the same will be delivered directly to the client.

c) The following invoices will be issued when the products leave BELMAC's laboratory:

- 5 -

CONFIDENTIAL

. BELMAC will invoice the client for the sale of the products. The price to be paid will be freely negotiated between BELMAC and the client.

. ETHYPHARM will invoice BELMAC for the use of know-how and rental of equipment. The price (without taxes) to be paid by BELMAC will be determined in accordance with the formula set forth in Annex 5.

## 8.    Adjustment of prices

The prices for finished and semi-finished products as detailed in clause 6 above will be adjusted (increased or decreased) every year, effective from 1 April 1995, per the evolution of the Consumer Price Index ("Indice de Precios al Consumo - I.P.C.") applicable for each year as published by the National Institute of Statistics ("Instituto Nacional de Estadística"). In case of any delay in the publishing of the Index, the rates will be retroactively applied and any difference will then be adjusted.

## 9.    Equipment

The equipment to be used by BELMAC in manufacturing the products and which belongs to ETHYPHARM is described in Annex 3.

BELMAC will bear all necessary ordinary maintenance costs for the equipment. However, those costs or expenses which imply the need to repair the equipment and cannot be considered ordinary maintenance, will be assumed by ETHYPHARM, except in cases in which the repair is due to the improper or negligent use on the part of BELMAC.

## 10.    Transfer of know-how

In case the Agreement is in force until 31 December 1999, or is unilaterally terminated by ETHYPHARM before such date without the termination being based on BELMAC's breaching its obligation under the Agreement, then BELMAC will have the option to acquire from ETHYPHARM the right to use the know-how for the products for the sum of _____ pesetas. BELMAC shall notify ETHYPHARM of its decision to exercise this option at least 30 days before the termination of the Agreement. On the termination date, the parties will formalise the necessary contract for transfer of know-how.

## 11.    Inspection of the laboratory

BELMAC will allow ETHYPHARM's representatives access to its laboratory in order to check that the manufacture of the prod-

- 6 -

CONFIDENTIAL

DRAFT 21 MARCH 1995

**B46**

ucts is being done in accordance with the Agreement, provided in every case that ETHYPHARM notifies BELMAC of its intention to do so at least 24 hours before the the visit takes place.

## 12.  Confidentiality

The information exchanged by the parties pursuant to this Agreement will be kept confidential.  In the event that the Agreement is terminated, all confidential data will be returned to the other party within thirty days after receiving the notice to rescind.

## 13.  Governing law

The Agreement shall be interpreted and construed in accordance with the provisions of Spanish law.

## 14.  Arbitration

All disputes or conflicts arising from the Agreement will be definitively resolved by means of arbitration by one arbitrator, under the auspices of the Spanish Arbitration Court, in accordance with its Regulations and by-laws, to which the conduct of the arbitration and the appointment of the arbitrator is entrusted.  The parties set forth their agreement to honour any award rendered.

## 15.  Taxes and other expenses

All taxes and expenses derived from the execution of the Agreement, including V.A.T., will be supported by the parties according to law.

## 16.  Notices

The notifications or communications derived from this Agreement should be sent to the following persons at the following addresses and fax numbers:

    a)    For BELMAC:
          address:
          attention:
          fax number:

    b)    For ETHYPHARM:
          address:
          attention:
          fax number:

- 7 -

CONFIDENTIAL

BEL006403

21/03 '95 18:11

DRAFT 21 MARCH 1995

**B47**

c)    For ETHYPHARM FRANCE:
      address:
      attention:
      fax number:

In witness thereof, the parties sign this document at the
place and on the date mentioned above.

ETHYPHARM FRANCE

ETHYPHARM

BELMAC

Name:

Name:

Name:

Title:

Title:

Title:

- 8 -

CONFIDENTIAL

BEL006404

B48

04/04/95   14:55   ☎813 286 4394        BELMAC CORP        →→→ ETHYPHARM S.A.        ☒001

# Belmac Corporation
One Urban Centre
Suite 550
4830 W. Kennedy Blvd.
Tampa, FL 33609-2517

Tel. (813) 286-4401

Fax  (813) 286-4402

**To Attention:**  Sr. Adolfo de Basilio

**Company:**  Ethypharm

**Fax Number:**  011 34 1 319 91 59

**From:**  James R. Murphy
President & CEO

**Date:**  April 4, 1995

*************************************************************************

Dear Adolfo,

1.  I have been notified that we have received the initial Ministry of Industry authorization that was of primary concern last week.  I assume we are proceeding quickly to a final resolution of this particular issue.

2.  I would like an opportunity to see the memo of understanding which will actually describe the intent and scope of activities between our companies. Could you fax me a copy so that I can provide input into the concept?

3.  Could you please let me know the status of the contract and the time schedules that are anticipated for review and approvals by all the necessary parties?

4.  I will be in Madrid arriving on the morning of the 17th April and intend to return to the U.S. on the morning of the 20th.  I hope we can complete all the outstanding issues prior to this time.

Best Regards

Jim

EXHIBIT
MURPHY
15
7/19/06

EP 003320

60                                                                              B49

Bill McGaxee - Stockholder

5-2-95   Ethypharm  Patrice Debregeas   011 33 1 41 12 17 20

        1. Contract

        2. Problems w/ Omeprazole

        3. Transdermal Company

5-2-95   Hamik Babian        (818) 366 - 3867    Fax 818 368-9265
                            PhD polymer Chemist
        Breast Implant prothesis - Hydrogel  patented
        Mentor Corp - previous affiliation (Salt H₂O) filled
        Baxter  "   -   "      "
        How Far out Gos Mktg -
        Phys + Chem
        England 80K Surgery
        USA 2 Mil Surgery
        Price - less costly slightly
        Safety - very good
        March 30th Letter →

EXHIBIT
MURPHY
17
7/19/06        SLB

B50

☑001

**BELMAC CORPORATION**
One Urban Centre, Suite 550
4830 West Kennedy Blvd.
Tampa, FL 33609-2517

FAX NO.:    (813) 286-4402
Telephone:  (813) 286-4401

## FACSIMILE COVER SHEET

*archiv Belmac*

**DATE:**      June 26, 1995

**TO:**        Adolfo de Basilio, Director General

**Company:**   Ethypharm

**FAX NO.:**   011-34-1-319-91-59

**FROM:**      James R. Murphy, President & CEO

TOTAL NUMBER OF PAGES, <u>INCLUDING</u> THIS COVER PAGE: __1__

Dear Adolfo:

Due to a death in my family, I had to depart Europe sooner than I expected.  Therefore, I did not have the opportunity to meet with Mr. De Bregeas to discuss further negotiations regarding the contract.  It would be greatly appreciated if you could please do everything possible to obtain a signed contract.

If you should have any questions, please do not hesitate to contact me.

Sincerely,

*Bob State*

Robert M. State for James R. Murphy

This facsimile may contain privileged and confidential information intended only for the use of the individual or entity named above.  If the reader of this facsimile is not the intended recipient or the employee or agent responsible for delivering it to the intended recipient you are hereby notified that any dissemination or copying of this facsimile is strictly prohibited.  If you have received this facsimile in error, please immediately notify us by telephone and return the original facsimile to us at the above address via the U.S. Postal Service.      Thank you.



EXHIBIT
MURPHY
18
7/19/06

EP 003329

B51

17 JUL '95  08:55  ETHYPHARM154  ☎ 572 13 39  ETHYPHARM  5721338ac P.16/32

# FAX MESSAGE

TO:         Patrice Debregeas
COMPANY:    ETHYPHARM
FROM:       James Murphy
DATE:       13th of July of 1995
FAX No.:    33.1.30.88.17.30
SUBJECT:

Total number of pages, including this cover sheet: 1
If you have any problem with the reception of this fax, please call (34.1) 572.06.62. and ask for
LAURA.

With this cover sheet I enclose the contract with some modifications.

Please call me back after you review it.

Best regards,

James Murphy

EXHIBIT
MURPHY
19
7/19/06

EP 009008

17 JUL '95 00:55 ETHYPHARM55   ☎ 572 13 39   ETHYPHARM   572133940 p. 17/5##2
17 JUL '95 00:00

## AGREEMENT

BETWEEN THE UNDERSIGNED :

ETHYPHARM SA - with coporate domicilo at Marques de la Ensenada, 16
28004 MADRID - SPAIN

Hereinafter called ETHYPHARM

Represented by its President : Mr Patrice DEBREGEAS

OF THE ONE PART,

AND :

LABORATORIOS BELMAC S.A. with corporate domicile at Paseo de la
Castellana 149 - 28046 MADRID - SPAIN   Monte Aragon, 9-1º Pl

Hereinafter called BELMAC

Represented by its Executive Director : Mr James R. MURPHY

OF THE OTHER PART

B53

17 JUL '95  00:56   ETHYPHARM 57.      2 372 17 39      ETHYPHARM      5721339AE P.10/5 31
                                                                     17 JUL '95  08:04

BELMAC/ETHYPHARM
13-JUL1995

BELMAC

## CLAUSE 1 - OBJECT

The object of the Agreement is to establish the terms and conditions which will be applied, from date of signature of the present Agreement, to the business relationship whereby ~~ETHYPHARM~~ will manufacture and/or encapsulate and/or condition *its Ethypharm* products ~~supplatices based on BELMAC~~ and with the help of technicians hired from *and* ~~BELMAC~~ and will deliver its products to its customers inside and outside Spain. *Belmac Ethypharm will consider production of additional products that would not cause harm to Belmac personnel in facilities and overhead expect to belmac products that Belmac considers detrimental.*

## CLAUSE 2 - RESOURCES

### 2.1. Location

The manufacture and/or encapsulation and/or conditioning of the products will take place in the ~~premises leased by BELMAC to ETHYPHARM in the~~ BELMAC's factory located in Zaragoza (Spain) and will be carried out by, according to the case, ETHYPHARM's ~~technicians or~~ BELMAC's personnel trained by ETHYPHARM for that purpose.

ETHYPHARM will also use in common with BELMAC sections of BELMAC's factory which are not part of the ~~leased~~ premises such as warehousing, transportation.

The cost of use of said sections is included in the sum paid by ETHYPHARM to BELMAC as per clause 8 below.

### 2.2. Equipment

It is hereby recalled, that any and all machinery and equipment needed to manufacture, and/or encapsulate and/or condition the products bought or provided by ETHYPHARM will remain the exclusive property of ETHYPHARM and may not be used by BELMAC unless *special provisions are separately negotiated.*

Machinery and equipment bought in common by BELMAC and ETHYPHARM are considered as property of both parties at the prorata of their contribution in the investment.

### 2.3. Documentation

All and any documentation, procedures and Know How communicated or transmitted by ETHYPHARM to BELMAC or its personnel are considered as ETHYPHARM's sole property, which is acknowledged by BELMAC. *unless the information is known to the general properties of the manufacturing industry or freely available or publicly Know.*

~~the medical premises in order to carry out in accordance with GMP regulations the~~

EP 009010

the related expenses in order to carry out, in accordance with GMP regulations the manufacture and/or encapsulation and/or condition of its products.

ETHYPHARM shall pay all the fees and expenditure relative to the above mentioned items.

17 JUL '95  00:56  ETHYPHARM:39        ☎ 372 13 39        ETHYPHARM        57213390C p.19/3 #3
: 17 JUL '95  00:01G

BELMAC/ETHYPHARM
EU-34911993

Water, electricity, gas and communications used by ETHYPHARM during the term of this Agreement shall be paid by BELMAC and are included in the sums paid by ETHYPHARM to BELMAC in accordance with Clause 8 below.

ETHYPHARM shall comply with reasonable regulations and stipulations regarding using and entering BELMAC's factory site and regulations about safety and security drawn up by BELMAC.

*Ethypharm will be provided with an office for a supervising Ethypharm employee and will have Belmac permission to install a telephone for Ethypharm's exclusive use. Communications on the Ethypharm phone will be paid by Ethypharm.*

## CLAUSE 3 - TERM

*this* ~~( with 3 months prior notice)~~

The effectiveness of the Agreement will be retroactively applied as from 1 January ~~be renewed, is conceded,~~ *every two (2) years each expiration,* 1993, and will expire on 1 January 2000, *from the end of each* ~~(.)~~ *expiration date, a* ~~a new Contract may be negotiated~~

~~At the end of this initial period ending on January 1, 2000, this Agreement will be~~ ~~automatically renewed per periods of three (3) years unless terminated by any of the~~ ~~parties twelve (12) months prior to the end of the initial period as defined hereinabove~~ ~~or any of the renewal periods, by registered mail.~~

Each party reserves the right to cancel this Agreement if the other party commits a material breach of its obligations and fails to remedy this breach within ninety (90) days of the notification of said breach by registered letter. This can be done without prejudice to any other actions that the non-defaulting party may exercise and particularly to a claim for damages.

*the space dedicated to*    *to    so*

Upon termination of this Agreement ETHYPHARM shall return the premises that it ~~rents in~~ BELMAC ~~factory~~ in a sanitary and reasonably good condition. ETHYPHARM is entitled upon termination or at any time during the Agreement to move out any furniture, equipment, apparatus, machinery that ETHYPHARM purchased or provided.

As regards equipment, machinery or any other items bought in common by BELMAC and ETHYPHARM, each party will have the possibility of acquiring full possession of said equipment, machinery or items at a price agreed upon between the parties and taking into consideration the use, state and financial amortization.

## CLAUSE 4 - MANUFACTURE, ENCAPSULATION AND CONDITIONING OF THE PRODUCTS

3

**B56**

BELMAC/ETHYPHARM
RJ - 14/7/1995

The manufacture and/or encapsulation and/or conditioning of the products shall be made with strict observance of the spanish regulations in force, as well as ETHYPHARM's know how.

The above mentioned activities including the quality control involved at each production stages, will be undertaken either by ETHYPHARM's technicians or by BELMAC's personnel trained by ETHYPHARM at premises rented by ETHYPHARM to BELMAC as described in Clause 1 hereinabove.

ETHYPHARM's will be responsible for the supervision of the manufacture, and/or encapsulation and/or conditioning of the products by BELMAC's personnel.

## CLAUSE 5 - PERSONNEL

BELMAC's personnel trained and hired by ETHYPHARM will remain under the direction and management control of BELMAC.

BELMAC shall handle in accordance with the spanish regulations in force on labor management, the employment, recruitment, dismissal and resignation of the personnel trained hired by ETHYPHARM as well as their salary, welfare benefits, labor insurance, labor protection, labor discipline and other matters.

ETHYPHARM will have the possibility to select the members of BELMAC's personnel it wishes to enroll and only those duly accepted by ETHYPHARM shall be considered as part of the personnel hired by ETHYPHARM.

ETHYPHARM will also have the right to ask BELMAC to take disciplinary actions against those members who violate any of the obligations imposed by ETHYPHARM on BELMAC's personnel or who do not give enough satisfaction in the execution of the tasks for which ETHYPHARM has decided to enroll them. In the event a substituted employee is wanted, Belmac will provide another state technician who is currently employed by Belmac.

Members of BELMAC's personnel hired by ETHYPHARM will be clearly identified in a separate document annexed to this Agreement and which may be modified only by written agreement between the parties.

Moreover said members will be bound by the Confidentiality Clause subscribed by BELMAC as per Clause 11 hereunder and BELMAC shall be fully responsible for the compliance of the members of its personnel with said clause.

Cost of training said personnel is included in the sum paid by ETHYPHARM to BELMAC as per Clause 8 below.

6

17 JUI '95  00:57   ETHYPHARM    £ 872 13 39    ETHYPHARM    S721339ac P.21/£2 #5
                                                                17 JUI '95  00:02?

BELMAC/ETHYPHARM
RJ - 207/1995

## CLAUSE 6 - INSURANCE AND INCIDENT

During the term of this Agreement, BELMAC shall guarantee ETHYPHARM that the premises rented by ETHYPHARM and any party of BELMAC's factory where ETHYPHARM's products or equipment may be kept, equipment, personnel and goods (whether raw material, semi finished or finished goods) are covered by proper insurances against, among which but not limited to : theft, flood, fire, civil liability and any other unforeseeable events , whose occurrence and consequence may cause prejudice to ETHYPHARM.

BELMAC will also be responsible for ETHYPHARM's products or equipment kept in sections of BELMAC's factory used in common by BELMAC and ETHYPHARM.

ETHYPHARM will contract an insurance cover in order to guarantee BELMAC and BELMAC's personnel from any damages which may directly arise from the manufacture and/or encapsulation and/or conditioning of ETHYPHARM's products in the rented premises.

Each party shall provide the other party with evidence that the necessary insurance policies have been contracted and that they are maintained in force. Costs of said insurance policies shall be borne by the party who contracted them.

If, at any time during the term of this Agreement, the leased premises encounter any kind of mishap (fire or anything which damages facilities), which is not ETHYPHARM's fault and cannot be repaired or rebuilt within ninety (90) days, ETHYPHARM may terminate this Agreement. ETHYPHARM reserves the right to claim for damages linked to loss of turnover.

If at any time during the term of this Agreement, the leased premises encounter any kind of mishap (fire ...... ) which is not Belmac's fault but arises out of Ethyphem Activities and cannot be repaired or rebuilt in 90 days, Belmac reserving the right to claim damages linked to loss of turnover

## CLAUSE 7 - SHIPPING AND INVOICING OF ETHYPHARM PRODUCTS

### 7.1: General Conditions

ETHYPHARM has submitted to the spanish Health Authorities a dossier in order to be recognized as « pharmaceutical laboratory ».

7

EP 009014

BELMAC/ETHYPHARM
RJ- 24/7/1995

Meanwhile, _during this transitory period_ BELMAC, as pharmaceutical laboratory, will assume vis a vis a third parties, the liability derived from the manufacture, encapsulation, conditioning and shipping of ETHYPHARM's products in the terms provided by spanish law and regulations in that respect. ETHYPHARM guarantees BELMAC for any claim and damages ~~in accordance with the terms of claus 6 herein above~~ _arising from Ethypharm's technology or equipment._

_Thereafter, Ethypharm will assume full responsibility and liability derived from manufacture, encapsulation, conditioning or Ethypharm's products._

**7.2. Shipments**

ETHYPHARM's products shipped by BELMAC during the transitory period stipulated in the above paragraph will be clearly identified as ~~belonging to or~~ _belong Ethypharm's technology but_ originating from ETHYPHARM. Consequently, labels and documents accompanying shipments shall be in the name of ETHYPHARM ~~that acknowledges origin from Belmac See Accordingly, after approval by Spanish Health authorities as Ethypharm as a pharmaceutical laboratory which may be in the name of Ethypharm only.~~

**7.3. Invoicing**

Any and all orders relative to ETHYPHARM's products will be considered as placed with ETHYPHARM even if addressed to BELMAC. _All orders will be placed to Ethypharm either but in the event Belmac receives a request_

BELMAC will transmit without delay and in any case within a maximum of two (2) open days orders or any communication received by BELMAC and relative to ETHYPHARM's products. Any communication identified as being « Urgent » shall _but received during_ be transmitted to ETHYPHARM within a ~~maximum of three (3) hours.~~ _respectively, some of the time would have_

BELMAC will provide ETHYPHARM with administrative services such as the preparation of all documents needed to accompany ETHYPHARM's products among which, but not limited to, invoices to ETHYPHARM's customers.

The price to be paid by ETHYPHARM's customers and mentioned on the invoices prepared by BELMAC will be determined by ETHYPHARM.

Payments will be made by ETHYPHARM's customers directly on ETHYPHARM's bank account that ETHYPHARM will indicate to BELMAC.

Copy of each invoice prepared by BELMAC and addressed to ETHYPHARM's customers will be sent to ETHYPHARM within a maximum of two (2) open days from date of issuing said invoice.

ETHYPHARM will be entitled to check by all means the documents issued by BELMAC on ETHYPHARM's account.

~~As a consequence, ETHYPHARM, or an independent public accountant selected by ETHYPHARM, at its expense, are hereby granted the right and privilege, at any time~~

B59

17 JUL '95  00:50  ETHYPHARM#1    # 973 13 39    ETHYPHARM    57213990 c p 23/32 87
17 JUL '95  00:030

BELMAC/ETHYPHARM
RJ-1C07/195

but upon reasonable notice during normal business hours, to audit and review at ETHYPHARM's expense, all books, accounts and all other records and matters pertaining to or reflecting BELMAC's business in connection with the services rendered by BELMAC under the present Agreement;

## CLAUSE 8 - RENTAL FEES

During the valid term of this Agreement, ETHYPHARM shall pay to BELMAC every month a fixed monthly amount of three million five hundred thousand (3,500,000 pts) pesetas (without taxes) for BELMAC of sections of BELMAC's factory not included in the rented premises and the administrative services provided by BELMAC to ETHYPHARM.

ETHYPHARM will pay said invoices at 30 days date of invoice.

## CLAUSE 9 - EXCLUSIVITY

ETHYPHARM warrants that it will not manufacture its products in any other factory in Spain as long as the present Agreement remain in force and except for, for example, any of the following reasons:

1) BELMAC refuse to renew the lease of the premises rented by ETHYPHARM or renew the lease at conditions ten per cent higher the market conditions for leases of the same type in Spain.

2) The premises that BELMAC is ready to rent to ETHYPHARM are not sufficient anymore to meet the orders placed for ETHYPHARM's products and no satisfactory solution can be found by the parties.

3) BELMAC commits a material breach of its obligations.

4) The quality of the services rendered by BELMAC are not anymore up to the standard normally expected for such services as noted by the audit of an independent expert whose fees will be settled by the party in default.

5) Authorizations to BELMAC to act as pharmaceutical laboratory are withdrawn or not renewed by the competent authorities.

EP 009016

17 JUI '95. 00:59   ETHYPHARM02    ☎ 572 13 39    ETHYPHARM    5721333oC P.24/3°°⁸
⸱ 17 JUI '95. 09:59°⁹

BELMAC/ETHYPHARM
81-147/1985.

6)  in case of total or partial destruction of the premises rented or sections of BELMAC's factory used by ETHYPHARM in common with BELMAC.

## CLAUSE 10 - NON COMPETITION

BELMAC warrants that during the validity of the present Agreement :

1) BELMAC will not either directly or indirectly work on products identical or similar to ETHYPHARM's products.

2) BELMAC's personnel trained by ETHYPHARM or having access to confidential information on ETHYPHARM's products will be used as breaching the obligation of confidentiality of clause 10 hereinafter if working on products identical or similar to ETHYPHARM's products for BELMAC or for any third parties.

3) BELMAC will not put at the disposal of third parties involved in the exploitation of medicines any and all parts of its factory and/or services.

## CLAUSE 11 - CONFIDENTIALITY

All the information exchanged by the parties pursuant to this Agreement will be considered strictly confidential and will not be divulged by the party who received the information to third parties without the prior written agreement of the other. The subsidiaries, licensees of overseas agents of each party outside the Territory are considered as third parties.

In the event of termination of this Agreement, all confidential data (among which but not limited to  all data relative to the manufacturing processes, quality and analytical procedures of ETHYPHARM's products) will be returned to the other party within thirty (30) days after receiving the notice to rescind.

This obligation of Confidentiality  shall continue in effect for five (5) years beyond the expiry of this Agreement for any reason.

## CLAUSE 12 - ARBITRATION

All disputes or conflicts arising from the Agreement will be definitively resolved by means of arbitration in law by one arbitrator, under the auspices of the spanish arbitration court, in accordance with its regulations and by-laws, to which the conduct

10

EP 009017

BELMAC/ETHYPHARM
RJ-5471/1995

of the arbitration and the appointment of the arbitrator is entrusted. The parties set forth their agreement to honour any award rendered.

## CLAUSE 13 - GOVERNING LAW

The Agreement shall be interpreted and construed in accordance with the provisions of Spanish law.

## CLAUSE 14 - NOTICES

The notifications or communications derived from this Agreement including those stipulated in 7.3. hereinabove should be sent to the following addresses and fax numbers :

a) For BELMAC :

address :

attention :

fax number

b) For ETHYPHARM :

address :

attention :

fax number :

Any modification to the above mentioned addresses, contact person or fax numbers may only be made by means of an Addendum to the present Agreement.

## CLAUSE 15 - LANGUAGE

11

EP 009018

**B62**

BELMAC/ETHYPHARM

............

This Agreement shall be executed and effective both in Spanish and in English versions. In the event of a dispute as to the interpretation of the Agreement, the English version shall prevail.

## CLAUSE 16 - TRANSFER

*is entitled to*

BELMAC ~~may not~~ transfer its rights or obligations arising from this Agreement without the prior written consent of ETHYPHARM, *however, Ethypharm may seek to terminate the Agreement without threesmonths prior notice.*

## CLAUSE 17 - COSTS AND FEES

All taxes and expenses derived from the execution of the Agreement, including V.A.T. will be supported by the parties according to law.

Signed at Madrid

Date :

For ETHYPHARM S.A.

Mr Patrice DEBREGEAS

President

For BELMAC S.A.

Mr James R. MURPHY

Executive Director

12

EP 009019

HQ MACHIETHYPHARM
RJ - 14/7/1995

## ANNEX A TO THE AGREEMENT

## BETWEEN BELMAC AND ETHYPHARM S.A. (SPAIN)

### PRODUCTS MANUFACTURED BY ETHYPHARM

(additional products may be added to this initial list by separate addendum to this Agreement).

13

EP 009020

17 JUI '95  08:59   ETHYPHARM+4        ☎ 372 12 33        ETHYPHARM    5721339ac P.29/321
                                                                       17 JUI '95  08:84
BELMAC/ETHYPHARM
B.I.:247/1995

## ANNEX B TO THE AGREEMENT

## BETWEEN BELMAC AND ETHYPHARM S.A. (SPAIN)


## DETAILS OF INVESTMENT MADE BY ETHYPHARM (as per Whereas 2)

1) Investment

2) Equipment

3) Documentation transmitted to BELMAC

14

EP 009021

17 JUL '95  08:52  ETHYPHARM 04      × 373 13 35      ETHYPHARM      57213398 P.29/3212
17 JUL '95  08:04

BELMAC&ETHYPHARM
RD-16/7/1995

## ANNEX C TO THE AGREEMENT

## BETWEEN BELMAC AND ETHYPHARM S.A. (SPAIN)

### DETAILS OF PREMISES LEASED BY BELMAC TO ETHYPHARM (as per Clause 2.0)

15

EP 009022

To De Basilio

From Virginie Guerin (ET St Cloud)

August 28th, 1995

Mr. De Basilio,


Please find attached copy of the Belmac contract as it was sent to Mr. Murphy.

Best regards.

Virginie Guerin.

B67

28 AOT '95  15:06   ETHYPHARM ST CLOUD 41 12 17 30                    P.1/16



# *Ethypharm*

## FAX FRONT PAGE

**To:** Mr A. de BASILIO
**Company:** ETHYPHARM ESPAGNE
**Fax number:** 19 34 1 308 56 81

**From:** Virginie GUERIN
**Company:** ETHYPHARM (Saint Cloud)
**Telephone:** 33 1 41. 12. 17. 20
**Fax number:** 33 1 41. 12. 17. 30

**Date:** August 28th, 1995
**Pages:** 16

*Ref VG/0895/285*

Monsieur de Basilio,

Nous vous prions de bien vouloir trouver ci joint une copie du contrat Belmac tel qu'il a été envoyé à M. Murphy.

Sincéres salutations,

Virginie GUERIN

EP 003342

B68

28 AOT '95  15:06   ETHYPHARM ST CLOUD 41 12 17 30                 P.2/16

# AGREEMENT

BETWEEN THE UNDERSIGNED :

ETHYPHARM SA  - with coporate domicile at Marques de la Ensenada, 16
28004 MADRID - SPAIN

Hereinafter called ETHYPHARM

Represented by its President : Mr Patrice DEBREGEAS

OF THE ONE PART,

AND :

LABORATORIOS BELMAC S.A. with corporate domicile at Paseo de la
Castellana 149 - 28046 MADRID - SPAIN

Hereinafter called BELMAC

Represented by its Executive Director : Mr James R. MURPHY

OF THE OTHER PART

EP 003343

B69

BELMAC/ETHYPHARM
RJ - 3/07/1995

WHEREAS :                                                           4

1) ETHYPHARM and BELMAC have been cooperating for the past three (3) years for the manufacture and/or encapsulation and/or conditioning at BELMAC's premises of some of ETHYPHARM's products, listed in the attached Annex A, sold by ETHYPHARM to its customers in Spain and on markets outside Spain.

This cooperation, based on trust, has never been confirmed through a formal Agreement signed by both parties.

2) ETHYPHARM rents in BELMAC's factory located at Zarragoza (Spain), premises that have been outfitted and equipped to carry out the manufacture and/or encapsulation and/or conditioning of ETHYPHARM's products in order to comply with GMP regulations in force in Spain at ETHYPHARM's expenses (hereinafter referred to as the « premises »). As a consequence, said premises have been GMP approved by the Spanish Health Authorities in September 1992.

Machinery and equipments used to manufacture and control ETHYPHARM's products have been purchased by ETHYPHARM and consequently remains ETHYPHARM's property.

Details relative to the investment made by ETHYPHARM at BELMAC's premises are indicated in Annex B to this Agreement.

3) ETHYPHARM is also renting from BELMAC technicians that have been trained locally by ETHYPHARM to manufacture and/or encapsulate and/or condition ETHYPHARM 's products at the premises mentioned in 2) hereinabove.

4)  So as to prepare the above described cooperation, ETHYPHARM has communicated to BELMAC confidential information among which, but not limited to, documentation relative to manufacturing processes, quality and analytical procedures (listed in Annex B).

The parties, having regard for that stated above, with the express intention of reflecting their respective obligations in a written and binding agreement, and mutually acknowledging each party's capacity thereon, have decided to subscribe the present agreement (hereinafter, « the Agreement ») in accordance with the following clauses.

2

EP 003344

BELMAC/ETHYPHARM
RJ - 3/07/1995

## CLAUSE 1 - OBJECT

The object of the Agreement is to establish the terms and conditions which will be applied, from date of signature of the present Agreement, to the business relationship whereby **ETHYPHARM** will manufacture and/or encapsulate and/or condition its products at premises rented to **BELMAC** and with the help of technicians hired from **BELMAC** and will deliver its products to its customers inside and outside Spain.

## CLAUSE 2 - RESOURCES

### 2.1. Location

The manufacture and/or encapsulation and/or conditioning of the products will take place in the premises leased by **BELMAC** to **ETHYPHARM** in **BELMAC**'s factory located in Zaragoza (Spain) and will be carried out by, according to the case, **ETHYPHARM**'s technicians or **BELMAC**'s personnel trained by **ETHYPHARM** for that purpose.

**ETHYPHARM** will also use in common with **BELMAC**, sections of **BELMAC**'s factory which are not part of the leased premises such as warehousing, transportation.

The cost of use of said sections is included in the sum paid by **ETHYPHARM** to **BELMAC** as per clause 8 below.

### 2.2. Equipment

It is hereby recalled, that any and all machinery and equipment needed to manufacture, and/or encapsulate and/or condition the products bought or provided by **ETHYPHARM** will remain the exclusive property of **ETHYPHARM** and may not be used by **BELMAC**.

Machinery and equipment bought in common by **BELMAC** and **ETHYPHARM** are considered as property of both parties at the prorata of their contribution in the investment.

### 2.3. Documentation

All and any documentation, procedures and Know How communicated or transmitted by **ETHYPHARM** to **BELMAC** or its personnel are considered as **ETHYPHARM**'s sole property, which is acknowledged by **BELMAC**.

3

EP 003345

28 AOT '95  15:07   ETHYPHARM ST CLOUD 41 12 17 30                              P.5/16

BELMAC/ETHYPHARM
RJ - 3/07/1995

Consequently, said documentation, procedures and Know How may not be used by **BELMAC** or its personnel for any other purpose than that described in the present Agreement.

2.4. Premises

**ETHYPHARM** recognizes that **BELMAC** owns the premises that it rents in **BELMAC**'s factory. Details of the premises leased by **BELMAC** to **ETHYPHARM** shall be detailed in Annex C to this Agreement.

The works carried out by **ETHYPHARM** at **BELMAC**'s premises have enabled said premises to be GMP approved by the Spanish Health Authorities in September 1992

2.4.1.  Obligations of **BELMAC**

**BELMAC** shall ensure **ETHYPHARM** of the continuous supply of fundamental facilities needed to carry out the object of this Agreement such as water, electricity, gas and communications.

**BELMAC** will also be responsible for keeping the leased premises so as **ETHYPHARM** may be in a good sanitary, safe and steadily workable conditions during the term of this Agreement.

**BELMAC** will allow **ETHYPHARM**, its employees, representatives and visitors to have convenient and continuous access to the premises rented by **ETHYPHARM**.

**BELMAC** shall pay the relevant taxes imposed on rent by the spanish authorities while **ETHYPHARM** possesses the rented site.

**BELMAC** recognizes that it may not use said premises for its own business or that of third parties. **BELMAC** may not have the premises rented by **ETHYPHARM** audited or visited by its customers without the prior written agreement of **ETHYPHARM**'s quality assurance manager.

2.4.2. Obligations of **ETHYPHARM**

**ETHYPHARM** is responsible for the installation, cleaning and maintenance of the rented premises in order to carry out in accordance with GMP regulations the manufacture and/or encapsulation and/or condition of its products.

**ETHYPHARM** shall pay all the fees and expenditure relative to the above mentioned items.

4

EP 003346

28 AOT '95  15:07   ETHYPHARM ST CLOUD 41 12 17 30                    P.6/16

BELMAC/ETHYPHARM
RJ - 3/07/1995

Water, electricity, gas and communications used by **ETHYPHARM** during the term of this Agreement shall be paid by **BELMAC** and are included in the sums paid by **ETHYPHARM** to **BELMAC** in accordance with Clause 8 below.

**ETHYPHARM** shall comply with reasonable regulations and stipulations regarding using and entering **BELMAC**'s factory site and regulations about safety and security drawn up by **BELMAC**.

### CLAUSE 3 - TERM

The effectiveness of the Agreement will be retroactively applied as from 1 January 1995, and will expire on 1 January 2000.

At the end of this initial period ending on January 1, 2000, this Agreement will be automatically renewed per periods of three (3) years unless terminated by any of the parties twelve (12) months prior to the end of the initial period as defined hereinabove or any of the renewal periods, by registered mail.

Each party reserves the right to cancel this Agreement if the other party commits a material breach of its obligations and fails to remedy this breach within ninety (90) days of the notification of said breach by registered letter. This can be done without prejudice to any other actions that the non-defaulting party may exercise and particularly to a claim for damages.

Upon termination of this Agreement, **ETHYPHARM** shall return the premises that it rents in **BELMAC**'s factory in a sanitary and reasonably good condition. **ETHYPHARM** is entitled upon termination or at any time during the Agreement to move out any furniture, equipment, apparatus, machinary that **ETHYPHARM** purchased or provided.

As regards equipment, machinary or any other items bought in common by **BELMAC** and **ETHYPHARM**, each party will have the possiblity of acquiring full possession of said equipment, machinary or items at a price agreed upon between the parties and taking into consideration the use, state and financial amortization.

### CLAUSE 4 - MANUFACTURE, ENCAPSULATION AND CONDITIONING OF THE PRODUCTS

5

EP 003347

BELMAC/ETHYPHARM
RJ - 3/07/1995

The manufacture and/or encapsulation and/or conditioning of the products shall be made with strict observance of the spanish regulations in force, as well as **ETHYPHARM**'s know how.

The above mentioned activities including the quality control involved at each production stages, will be undertaken either by **ETHYPHARM**'s technicians or by **BELMAC**'s personnel trained by **ETHYPHARM** at premises rented by **ETHYPHARM** to **BELMAC** as described in Clause 1 hereinabove.

**ETHYPHARM**'s will be responsible for the supervision of the manufacture, and/or encapsulation and/or conditioning of the products by **BELMAC**'s personnel.

### CLAUSE 5 - PERSONNEL

**BELMAC**'s personnel trained and hired by **ETHYPHARM** will remain under the hierarchical control of **BELMAC**.

**BELMAC** shall handle in accordance with the spanish regulations in force on labor management, the employment, recruitment, dismissal and resignation of the personnel hired by **ETHYPHARM** as well as their salary, welfare benefits, labor insurance, labor protection, labor discipline and other matters.

**ETHYPHARM** will have the possibility to test the members of **BELMAC**'s personnel it wishes to enroll and only those duly accepted by **ETHYPHARM** shall be considered as part of the personnel hired by **ETHYPHARM**.

**ETHYPHARM** will also have the right to ask **BELMAC** to take disciplinary actions against those members who violate any of the obligations imposed by **ETHYPHARM** on **BELMAC**'s personnel or who do not give anymore satisfaction in the execution of the tasks for which **ETHYPHARM** has decided to enroll them.

Members of **BELMAC**'s personnel hired by **ETHYPHARM** will be clearly identified in a separate document annexed to this Agreement and which may be modified only by written agreement between the parties.

Moreover said members will be bound by the Confidentiality Clause subscribed by **BELMAC** as per Clause 11 hereunder and **BELMAC** shall be fully responsible for the compliance of the members of its personnel with said clause.

Cost of hiring said personnel is included in the sum paid by **ETHYPHARM** to **BELMAC** as per Clause 8 below.

6

EP 003348

28 AOT '95  15:08   ETHYPHARM ST CLOUD 41 12 17 30                    P.8/16
BELMAC/ETHYPHARM
RJ - 3/07/1995

## CLAUSE 6 -INSURANCE AND INCIDENT

During the term of this Agreement, BELMAC shall guarantee ETHYPHARM that the premises rented by ETHYPHARM and any party of BELMAC's factory where ETHYPHARM's products or equipment may be kept, equipment, personnel and goods (whether raw material, semi finished or finished goods) are covered by proper insurances against, among which but not limited to : theft, flood, fire, civil liability and any other unforeseeable events , whose occurrence and consequence may cause prejudice to ETHYPHARM.

BELMAC will also be responsible for ETHYPHARM's products or equipment kept in sections of BELMAC's factory used in common by BELMAC and ETHYPHARM.

ETHYPHARM will contract an insurance cover in order to guarantee BELMAC and BELMAC's personnel from any damages which may directly arise from the manufacture and/or encapsulation and/or conditioning of ETHYPHARM's products in the rented premises.

Each party shall provide the other party with evidence that the necessary insurance policies have been contracted and that they are maintained in force. Costs of said insurance policies shall be borne by the party who contracted them.

If, at any time during the term of this Agreement, the leased premises encounter any kind of mishap (fire or anything which damages facilities), which is not ETHYPHARM's fault and cannot be repaired or rebuilt within ninety (90) days, ETHYPHARM may terminate this Agreement. ETHYPHARM reserves the right to claim for damages linked to loss of turnover.

## CLAUSE  7 - SHIPPING AND INVOICING OF ETHYPHARM PRODUCTS

7.1. General Conditions

ETHYPHARM has submitted to the spanish Health Authorities a dossier in order to be recognized as « pharmaceutical laboratory ».

7

EP 003349

BELMAC/ETHYPHARM
RJ - 3/07/1995

Meanwhile, **BELMAC**, as pharmaceutical laboratory, will assume vis a vis third parties, the liability derived from the manufacture, encapsulation, conditioning and shipping of **ETHYPHARM**'s products in the terms provided by spanish law and regulations in that respect. **ETHYPHARM** guarantees **BELMAC** for any claim and damages in accordance with the terms of clause 6 hereinabove.

7.2. Shipments

**ETHYPHARM**'s products shipped by **BELMAC** during the transitory period stipulated in the above paragraph will be clearly identified as belonging to or originating from **ETHYPHARM**. Consequently, labels and documents accompanying shipments shall be in the name of **ETHYPHARM**.

7.3. Invoicing

Any and all orders relative to **ETHYPHARM**'s products  will  be considered as placed with **ETHYPHARM** even if addressed to **BELMAC**.

**BELMAC** will transmit without delay and in any case within a maximum of two (2) open days orders or any communication received by **BELMAC** and relative to **ETHYPHARM**'s products. Any communication identified as being « Urgent » shall be transmitted to **ETHYPHARM** within a maximum of three (3) hours.

**BELMAC** will provide **ETHYPHARM** with administrative services such as the preparation of all documents needed to accompany **ETHYPHARM**'s products among which, but not limited to, invoices to **ETHYPHARM**'s customers.

The price to be paid by **ETHYPHARM**'s customers and mentioned on the invoices prepared by **BELMAC** will be determined by **ETHYPHARM**.

Payments will be made by **ETHYPHARM**'s customers directly on **ETHYPHARM**'s bank account that **ETHYPHARM** will indicate to **BELMAC**.

Copy of each invoice prepared by **BELMAC** and addressed to **ETHYPHARM**'s customers will be sent to **ETHYPHARM** within a maximum of two (2) open days from date of issuing said invoice.

**ETHYPHARM** will be entitled to check by all means the documents issued by **BELMAC** on **ETHYPHARM**'s account.

As a consequence,  **ETHYPHARM**, or an independent public accountant selected by **ETHYPHARM**, at its expense, are hereby granted the right and privilege, at any time

8

EP 003350

28 AOT '95  15:09  ETHYPHARM ST CLOUD 41 12 17 30                    P.10/16

BELMAC/ETHYPHARM
RJ-3/07/1995

but upon reasonable notice during normal business hours, to audit and review at
**ETHYPHARM**'s expense, all books, accounts and all other records and matters
pertaining to or reflecting **BELMAC**'s business in connection with the services
rendered by **BELMAC** under the present Agreement ;

## CLAUSE 8 – RENTAL FEES

During the valid term of this Agreement, **ETHYPHARM** shall pay to **BELMAC**
every month a fixed monthly amount of three million five hundred thousand
(3.500.000 pts) pesetas (without taxes) for the rent, the use in common with
**BELMAC** of sections of **BELMAC**'s factory not included in the rented premises and
the administrative services provided by **BELMAC** to **ETHYPHARM**.

**ETHYPHARM** will pay said invoices at 30 days date of invoice.

## CLAUSE 9 - EXCLUSIVITY

**ETHYPHARM** warrants that it will not manufacture its products in any other factory
in Spain as long as the present Agreement remain in force and except for, for example,
any of the following reasons:

1) **BELMAC** refuse to renew the lease of the premises rented by **ETHYPHARM** or
renew the lease at conditions ten per cent higher the market conditions for leases of
the same type in Spain.

2) The premises that **BELMAC** is ready to rent to **ETHYPHARM** are not sufficient
anymore to meet the orders placed for **ETHYPHARM**'s products and no satisfactory
solution can be found by the parties.

3) **BELMAC** commits a material breach of its obligations.

4) The quality of the services rendered by **BELMAC** are not anymore up to the
standard normally expected for such services as noted by the audit of an independent
expert whose fees will be settled by the party in default.

5) Authorizations to **BELMAC** to act as pharmaceutical laboratory are withdrawn or
not renewed by the competent authorities.

9

EP 003351

**B77**

BELMAC/ETHYPHARM
RJ - 3/07/1995

6) in case of total or partial destruction of the premises rented or sections of BELMAC 's factory used by ETHYPHARM in common with BELMAC.

## CLAUSE 10 - NON COMPETITION

BELMAC warrants that during the validity of the present Agreement :

1) BELMAC will not either directly or indirectly work on products identical or similar to ETHYPHARM's products,

2) BELMAC 's personnel trained by ETHYPHARM or having access to confidential information on ETHYPHARM's products will be sued as breaching the obligation of confidentiality of clause 10 hereinafter if working on products identical or similar to ETHYPHARM's products for BELMAC or for any third parties.

3) BELMAC will not put at the disposal of third parties involved in the exploitation of medicines any and all parts of its factory and/or services.

## CLAUSE 11 - CONFIDENTIALITY

All the information exchanged by the parties pursuant to this Agreement will be considered strictly confidential and will not be divulged by the party who received the information to third parties without the prior written agreement of the other. The subsidiaries, licensees or overseas agents of each party outside the Territory are considered as third parties.

In the event of termination of this Agreement, all confidential data (among which but not limited to all data relative to the manufacturing processes, quality and analytical procedures of ETHYPHARM's products) will be returned to the other party within thirty (30) days after receiving the notice to rescind.

This obligation of Confidentiality shall continue in effect for five (5) years beyond the expiry of this Agreement for any reason.

## CLAUSE 12 - ARBITRATION

All disputes or conflicts arising from the Agreement will be definitively resolved by means of arbitration in law by one arbitrator, under the auspices of the spanish arbitration court, in accordance with its regulations and by-laws, to which the conduct

10

EP 003352

28 AOT '95  15:10   ETHYPHARM ST CLOUD 41 12 17 30                    P.12/16

BELMAC/ETHYPHARM
RJ - 3/07/1995

of the arbitration and the appointment of the arbitrator is entrusted. The parties set forth their agreement to honour any award rendered.

## CLAUSE 13 - GOVERNING LAW

The Agreement shall be interpreted and construed in accordance with the provisions of Spanish law.

## CLAUSE 14 -NOTICES

The notifications or communications derived from this Agreement including those stipulated in 7.3. hereinabove should be sent to the following addresses and fax numbers :

a) For **BELMAC** :

address :

attention :

fax number

b) For **ETHYPHARM** :

address :

attention :

fax number :

Any modification to the above mentioned addresses, contact person or fax numbers may only be made by means of an Addendum to the present Agreement.

## CLAUSE 15 - LANGUAGE

11

EP 003353

28 AOT '95  15:11   ETHYPHARM ST CLOUD 41 12 17 30                P.13/16

BELMAC/ETHYPHARM
RJ - 3/07/1995

This Agreement shall be executed and effective both in Spanish and in English versions. In the event of a dispute as to the interpretation of the Agreement, the English version shall prevail.

## CLAUSE 16 - TRANSFER

**BELMAC** may not transfer its rights or obligations arising from this Agreement without the prior written consent of **ETHYPHARM**.

## CLAUSE 17 - COSTS AND FEES

All taxes and expenses derived from the execution of the Agreement, including V.A.T. will be supported by the parties according to law.

Signed at Madrid

Date :

For **ETHYPHARM S.A.**              For **BELMAC S.A.**

**Mr Patrice DEBREGEAS**            **Mr James R. MURPHY**

President                           Executive Director

12

EP 003354