B163

## ANEXO 2

- Documentos, Normas GMP, validaciones
- Fotocopia hoja BELMAC
- Índice de los dossieres de fabricación y control

10

B164

## ANEXO 3

Los elementos para las fabricaciones de ETHYPHARM que además son propiedad de ésta, son los siguientes:

- 1 AUTÓMATA SIEMENS OP 393-II
- 1 CUADRO PROGRAMADOS DE SALAS
- 4 AUTÓMATAS DE SALAS DEPENDIENTES DEL GENERAL
- 8 PAILAS REF. 150 RE + 8 INSUFLADORES DE AIRE CALIENTE REF. 3R
- 4 EQUIPOS DE PULVERIZACIÓN (9 PISTOLA AA3000 + 8 PIES PARA PISTOLA + 4 BOMBAS A PRESIÓN + 4 PEDALES + BOQUILLAS)
- 3 TAMIZ VIBRATORIO WESTON REF. 503-3 + 29 AROS CON MALLAS/ 7 AROS/ SOPORTE MALLAS
- 23 BIDONES DE PLÁSTICO CON ASAS Y TAPADERAS
- 1 MICRONIZADOR FORPLEX 00 + MALLA O,1 mm
- 1 MINITERMÓMETRO ELECTRÓNICO TIPO ABM11.03+SONDA REF.A2864441
- 8 SOPORTES PARA PALAS CORTADORAS DE FLUJO
- 1 DISOLUTEST
- 1 TERMINAL DE PESADA METTLER MULTIRANGE ID5
- 1 IMPRESORA METTLER MULTIRANGE GD46
- 1 BALANZA SUELO EMPOTRABLE KCS 300
- 1 BALANZA METTLER PJ12
- 2 PESAS DE 20 Kgs PARA CALIBRAR BALANZA
- 1 MAQUINA ENCAPSULADORA MOD.COMPAC FORMATO 1,2 Y ACCESORIOS
- 1 SELECCIONADOR DE CÁPSULAS MG2
- 1 ARCHIVADOR
- 1 TABLA DE CALIBRAR T1
- 1 ORDENADOR EPSON Px16
- 1 BALANZA DE PRECISIÓN METLER PM100
- 1 UNA BOMBA PARA DESARROLLOS GALÉNICOS
- 1 AGITADOR INOX JM D-250

Pequeño material:

- 1 ESCALERA
- 3 CALCULADORAS Y MATERIAL DE OFICINA (ARCHIVADORES, CARPETAS)
- 2 CEPILLOS especiales
- 3 PAPELERAS
- 4 PALAS DE MANGO CORTO INOX
- 2 CUBO INOX 101
- 2 FRASCAS INOX
- 4 ESPÁTULA INOX
- RELOJ DE PARED
- 1 EQUIPO ESPECIAL EN PVA PARA LIMPIEZA
- 1 CUCHILLO

11

EP 009187
_CONFIDENTIAL

B165

Hoja1

| CANTIDAD | DESCRIPCIÓN | VALOR | VALOR TOTAL |
|---|---|---|---|
| 1 | Autómata siemens QF 505-0 | 100000 | 100000 |
| 1 | Cuadro programador de salas | 100000 | 100000 |
| 4 | Autómatas de salas dependientes del general | 51254 | 205016 |
| 8 | Pailas ref.150 RE | 1797056 | 14376448 |
| 8 | insufladores de aire caliente | 184000 | 1472000 |
| 4 | Equipos de pulverización | 623000 | 2492000 |
| 5 | Tamiz vibratorio Weston ref 503-3 + accesorios | 394413 | 1785239 |
| 1 | micronizador Forplex 00 + malla 0.1mm | 200000 | 200000 |
| 1 | Minitermómetro electrónico tipo ABM11.03+sonda | 30000 | 30000 |
| 8 | Soportes para pailas cortadoras de flujo | 250000 | 2000000 |
| 1 | Disolutest | 1160406 | 1160406 |
| 1 | Terminal de pesada mettler multirange ID | 182000 | 182000 |
| 1 | Impresora mettler multirange GD46 | 125000 | 125000 |
| 1 | Balanza suelo empotrable KCS 300 | 498000 | 498000 |
| 1 | Balanza mettler PJ12 y accesorios | 618968 | 618968 |
| 2 | Pesas de 20Kg de calibración | 50000 | 100000 |
| 1 | Maquina de encapsulado mod compact form.1,2,3 y acc. | 15921760 | 15921760 |
| 1 | selecionador de cenizas MG2 | 433029 | 433029 |
| 1 | tabla de calibrar T1 | 50000 | 50000 |
| 1 | ordenador Epson PX16 | 263625 | 263625 |
| 1 | Balanza de precisión Mettler PM100 | 255550 | 255550 |
| 1 | Agitador Inox IM D-250 | 384250 | 384250 |
| 1 | Aire Comprimido/Extracción | 623000 | 623000 |
| 3 | Higrometro | 7000 | 21000 |
| 1 | Dañutest | 200000 | 200000 |
| 1 | Instalación GS Tipo HT/T360 y accesorios | 48382332 | 48382332 |
| 1 | Aspirador 360 | 43214 | 43214 |
| 1 | pequeño material | 350000 | 350000 |
| 1 | Barril inox mettler | 64500 | 64500 |
| 1 | Agitador neumático | 454750 | 454750 |
| 1 | Lavavo Fregadero acero | 65000 | 65000 |
| 1 | Contenedor Alcohol | 294000 | 294000 |
| | TOTAL | | 92435337 |

ELEMENTOS PARA LAS FABRICACIONES DE MICROGRANULOS PROPIEDAD DE ETHYPHARM

EP 009188
_CONFIDENTIAL

B166

- Esponja PVA, Pinza sujeta esponja, Palo telescópico

LISTA MATERIAL INSTALACIÓN DESMONTABLE

Fontanería:
- Fregadero
- Lava-ojos
- Fuente

Aire comprimido/extracción:
- Turbina extracción de aire
- Filtro bolsas

Climatización:
- Equipo autónomo de refrigeración

Iluminación:
- Lámparas antideflagrantes

EP 009189
_CONFIDENTIAL

B167

**ANEXO 4**

**Fijo anual:** 30 M Pts

BONUS A BELMAC


A partir de 17 lotes 600.000.- Pts por cada lote
A partir de 27 lotes 700.000.- Pts por cada lote
A partir de 37 lotes 800.000.- Pts por cada lote

13

EP 009190
_CONFIDENTIAL

<u>**ANEXO 5**</u>

# SEGUROS

14

EP 009191
_CONFIDENTIAL

B169



Laboratorios Belmac, s.a.



RECU le
0 8 SEP. 1997

Sr. D. Claude Dubois
Director General
ETHYPHARM, S. A.

Madrid, 03 de Septiembre de 1.997

Estimado señor Dubois:

Como imaginamos ya conocerá la positiva marcha de las fabricaciones de OMEPRAZOL pellets en la planta de Zaragoza, con rendimientos y calidad satisfactorios.

Se están fabricando dos lotes mensuales, de acuerdo con el objetivo y programa que nos fijamos en la reunión de París. En el mes de Agosto hemos realizado un gran esfuerzo, puesto que hemos fabricado dos lotes más, aunque como usted sabe la fábrica se cierra durante ese mes por vacaciones y solo se ha mantenido la actividad de Ethypharm, con el fin, además, de formar y entrenar dos nuevos operarios, incorporados a finales de Julio, de modo que estamos en condiciones de fabricar cuatro lotes por mes en dos turnos, a partir de este mes de Septiembre.

Igualmente hemos contratado los servicios de dos expertos en Aseguramiento de Calidad, que realizaron una auditoría durante el mes de Julio y que en Septiembre están en condiciones de comenzar el programa de acciones que se deben llevar a cabo en colaboración con nuestra Dirección de Fábrica.

De acuerdo con el ofrecimiento realizado en París, hemos reducido al 50% en estos meses los cargos establecidos en nuestro acuerdo vigente, como muestra de buena voluntad para compartir, entre las dos compañías, el esfuerzo a realizar.

Creemos, por tanto, haber cumplido con los compromisos adquiridos, con usted y el Sr. Debregeas y esperamos que la actividad alcance el ritmo deseado en los próximos meses.

Hemos recibido un borrador de contrato, enviado por el Sr. Basilio, que estamos estudiando, así como nuestro Presidente Sr. Murphy y del que les enviaremos nuestros comentarios y eventualmente un texto alternativo en los próximos días.

Dado que el mencionado borrador, no recoge las condiciones económicas que deben regir a partir de este mes de Septiembre y que siguiendo lo acordado en la última reunión económica mantenida con el Sr. Basilio, estimamos deben ser las siguientes:

**BELMAC**   *Montearagón, 9 - 1.ª pta - 28033 MADRID - Tel.: 388 72 01 - Fax: 388 76 47*
*Fábrica: Polígono Malpica, c/C, 4, 50016 ZARAGOZA - Tel.: (976) 57 17 84 - Fax (976) 57 26 63*

EXHIBIT
Dubois
6
ms 7.13.06

CONFIDENTIAL
EP 002462



Laboratorios Belmac, s.a.

1) - Una cantidad fija anual, de 35 millones de Ptas. repartidas en 12 mensualidades (a pagar los días 30 de cada mes), como compensación de los gastos fijos de estructura que BELMAC debe mantener para asegurar los compromisos de fabricación estimados en principio.

2) - Una cantidad variable, por lote fabricado, con el siguiente esquema:

| | |
|---|---|
| OMEPRAZOL: | 600.000 Ptas. |
| ASPIRINA: | 200.000 Ptas. |
| PIROXICAM: | 400.000 Ptas. |
| LANSOPRAZOL: | 400.000 Ptas. |
| INDOMETACINA: | 400.000 Ptas. |

La forma de pago sería a 30 días de la fecha de la factura emitida por BELMAC, por cada lote.

Los cálculos se han establecido sobre una base de jornada de trabajo de 15 horas/día (dos turnos) por 220 días al año.

Esto garantizaría la fabricación de 40 lotes de Omeprazol y una cantidad a convenir del resto de los productos, sin incrementar la maquinaria existente en la actualidad.

Nos parece fundamental llegar a un rápido acuerdo sobre este aspecto económico, antes de pasar a tratar otros aspectos contractuales.

Con este motivo, les enviamos nuestros mejores saludos, que rogamos haga extensivos al Sr. Debregeas.

Fdo.: Clemente González Azpeitia.

c.c.: Sr. J. Murphy y Sr. A. Basilio

**BELMAC**   Montearagón, 9 - 1.ª pta - 28033 MADRID - Tel.: 388 72 01 - Fax: 388 76 47
Fábrica: Polígono Malpica, c/C, 4. 50016 ZARAGOZA - Tel.: (976) 57 17 84 - Fax: (976) 57 26 63

CONFIDENTIAL
EP 002463

B171

Laboratorios Belmac, S.A.

Mr. Claude Dubois
Director General
ETHYPHARM S.A.

Madrid, 3 September 1997

Dear Mr. Dubois:

As we imagine you already know the positive development of the manufacturing of OMEPRAZOL pellets in the plant of Zaragoza, with satisfactory productivity and quality.

Two batches a month are being manufactured, in accordance with the objective and program agreed to during the meeting in Paris. In August we have made a considerable effort, as we have manufactured two more batches, although as you know, the factory closes during that month for vacations and only Ethypharm's activity has been maintained, with the purpose, in addition, to form and train two new workers, hired at the end of July, so that we are in position to manufacture four batches per month in two shifts, beginning this September.

Also, we have hired the services of two experts in Quality Assurance, who conducted an audit during July and who can begin in September the action program that they must carry out in collaboration with our Factory Management.

In agreement with the offer made in Paris, during these months we have reduced by 50% the costs established in our agreement currently in force, as a show of good will to share, between both companies, the effort that needs to be made.

We believe, therefore, that we have complied with the acquired commitments, with you and Mr. Debregeas and we hope that the activity reaches the desired rate in the following months.

We have received a draft of a contract, sent by Mr. Basilio, that we, as well as our President Mr. Murphy, are reviewing and we will send you our comments and eventually an alternative version in a few days.

Given that the above mentioned draft, does not reflect the economic conditions that must prevail as of this month of September and that following what we agreed during the last economic meeting held with Mr. Basilio, we consider that they must be the following:

CONFIDENTIAL
EP 002462

B172

1) - A. fixed annual amount of 35 million Pesetas distributed in 12 monthly payments (to be paid the 30th of each month), as compensation for the fixed structural expenses that BELMAC has to maintain to ensure the manufacturing agreements agreed to initially.

2) - A variable amount, per manufactured batch, with the following scheme:

| | |
|---|---|
| OMEPRAZOL: | 600,000 Pesetas |
| ASPIRINE: | 200,000 Pesetas |
| PIROXICAM: | 400,000 Pesetas |
| LANSOPRAZOL: | 400,000 Pesetas |
| INDOMETACINE: | 400,000 Pesetas |

The form of payment would be 30 days from the date of the invoice issued by BELMAC, for each batch.

The figures have been made on the basis of a work day of 15 hours/day (two shifts) for 220 days per year.

This would guarantee the manufacture of 40 batches of Omeprazol and a quantity to be agreed for the rest of the products, without increasing the existing machinery at the present time.

It appears essential to us to reach a quick agreement on this economic aspect, before moving on to other contractual matters.

For this reason, we send you our best greetings, which we ask that you share with Mr. Debregeas

[Signature]

Signed: Clemente Gonzalez Azpeitia

CONFIDENTIAL
EP 002463

19 SEPT. '01.

B173

SPANISH MGMT. MEETING - AMSTERDAM
PATENTS

Omeprazole & Lansoprazole - PCT - Oct.
AQUEOUS Pellets

Paracetamol - PCT - 8 month extension
until rpt. patent search

Omeprazole tablets - PCT will be - Nov.
Omeprazole organic - Spain Feb. 2021
                    National only

CPE 215

NE  , Active



**éthypharm**

*Direction Générale et Médicale*
*194, Bureaux de la Colline*
*92213 SAINT-CLOUD - FRANCE*
*Visioconférence (33) 01 41 12 00 75*
*Tél. (33) 01 41 12 17 20*
*Fax (33) 01 41 12 17 30*

**LABORATORIOS BELMAC**
**Monteragón 9,1°**
**MADRID 28033**
**SPAIN**

Ref : VP/1097/106                    Saint-Cloud, 14 October 1997
Re : Audit Report

_For the attention of Mr. Clemente GONZALES AZPEITA_

Dear Mr. GONZALES,

You will find hereby the report of the External Audit conducted by Mrs. Marcelle GAVOILLE on September 23rd and 24th, 1997.

We would like to have your remarks and comments as usual and we await the detailed plan of the actions necessary to confirm the progress towards G M P Standards compliance.

With best personal regards,

Sincerely yours,

Claude DUBOIS
V.P. Operations

Copies :          - Mr. S. MURPHY       Bentley USA
(letter only)     - Mr. A. de BASILIO   Ethypharm SPAIN
                  - Mrs. M. GAVOILLE    Ethypharm Houdan FRANCE



Siège social et unité de production : 21, rue St-Matthieu - 78550 HOUDAN - FRANCE
Tél. (33) 01 30 88 17 20 - Télex 698003 F ETHYPHA - Telefax (33) 01 30 88 17 30
Visioconférence (33) 01 30 46 17 00
S.A. au capital de 9 600 000 F - RCS Versailles B 311 999 933 - APE 244 C - Siret 311 999 833 00032



EP 003266

<<< Page 1 >>>

MINUTES   OF   A   MEETING   OF   THE   BOARD   OF
DIRECTORS

of

BENTLEY PHARMACEUTICALS, INC.

A meeting of the Board of Directors of Bentley
Pharmaceuticals, Inc. (the

"Company") was held on November 13, 1997 at the offices of
InterBank Capital Group,
630 Fifth Avenue, New York, New York. The following Board members
were present:

James R. Murphy
Robert M. Stote
Michael D. Price
Randolph W. Arnegger
Charles L. Bolling
Ehud D. Laska

Also present, at the request of the Company, were Jordan
Horvath of Parker
Chapin Flattau and Klimpl, LLP and Michael Mc Govern.

Mr. Murphy acted as Chairman of the Meeting and Mr. Price,
at the request of the
Chairman, acted as Secretary of the Meeting.

Mr. Murphy called the meeting to order and introduced Mr. Mc
Govern to the

members of the Board. Discussion then centered on the current
number of directors and
it was determined that it would be advisable to increase the
number of directors to seven.
Upon motion duly made, seconded and unanimously carried, it was

RESOLVED, pursuant  to  the  Company's  By-Laws,
, the number of directors is hereby  increased  to  seven.



BENTL002671
HIGHLY CONFIDENTIAL

<<< Page 2 >>>

Mr. Murphy then made reference to Mr. Mc Govern's background, a summary of
which had previously been distributed (see Exhibit A), and nominated Mr. Mc Govern to
fill the newly created vacant Board seat until the next Annual Meeting of Stockholders.
Upon being seconded and unanimously carried, it was

RESOLVED, that Mr. Michael Mc Govern is
hereby duly appointed to fill the newly created vacant seat
on the Board of Directors of the Company to serve in such
capacity until the next Annual Meeting of Stockholders of
the Company.

The next order of business was to approve the minutes of the Board of Directors'
meetings held on June 6, 1997, June 12, 1997, July 18, 1997 and August 12, 1997. After
discussion and correction of the spelling of a name, upon motion duly made seconded
and unanimously carried, it was

RESOLVED, that the minutes of the Board of
Directors' meetings held on June 6, 1997, June 12, 1997,
July 18, 1997 and August 12, 1997 are hereby approved.

Mr. Murphy then updated the Board members on the status of the Schwarz
transaction informing them, that even though the exclusivity period had expired, that
Schwarz is continuing to work with the Company in a cooperative fashion. Messrs.
Murphy and Price continued by stating that Schwarz' management is obviously
concerned that the Company has not finalized its financing arrangements, but are hopeful
that the Company can do so in the near future and will be in position to close the
transaction by the end of the year.

2

BENTL002672
HIGHLY CONFIDENTIAL

<<< Page 3 >>>

Mr. Murphy then suggested that, for continuity purposes, discussion of Agenda
Item No. 7 (Update on the Financing) should follow. Mr. Laska summarized InterBank's
distribution of the Financing Memorandum, feedback and resulting modification of the
Company's strategy to close the Schwarz transaction first (due to urgency with respect to
expiring exclusivity). Mr. Murphy added a description of Galen Associates, an equity
investor, which had expressed an interest in possibly acting as an equity sponsor that
would give debt lenders the necessary comfort to complete the transaction.

Mr. Ziad Abdelnour of InterBank was invited into the meeting for an update with
respect to financing efforts. He described his approach to identifying possible
lenders/investors and mentioned the players that are still interested.

Dr. Stote, in response, expressed his concerns with respect to timing of the
financing. Mr. Abdelnour responded to Dr. Stote's comments, stating that he was
confident that Cerberus would be able to act quickly.

Redacted

BENTL002673
HIGHLY CONFIDENTIAL

<<< Page 4 >>>

Mr. Murphy then returned to Agenda Item No. 5 and summarized the negotiated
terms of the proposed acquisition of the Wyeth-Ayerst products, Donnatal and Serax, and
referred to the term sheets for each product, which had been distributed earlier.

Mr. Murphy then provided a brief update on the two SmithKline Beecham
products, Urospas and Fastin, in which the Company has expressed an interest, indicating
that the Company is no longer interested in Fastin due to litigation surrounding weight
reduction products.

Mr. Murphy then asked Mr. Price to provide a report on the Warrant Exercise
incentive program. Mr. Price responded that approximately 1,400,000 Series A Warrants
had been tendered to date, resulting in new capital of approximately $2,800,000. Messrs.
Price and Mc Govern indicated that Mr. Jack Perry (Trustee) is taking steps to exercise
the 2,000,000 Warrants held by the Estate of his late brother, Richard Perry. Mr. Price
then distributed copies of the Notice and Prospectus Supplement, which are required to
extend the Warrant Discount Period. After discussion, upon motion duly made, seconded
and unanimously carried, it was

RESOLVED, that the Series A Warrant Discount
Period is hereby extended to the close of business on
Friday, December 5, 1997, subject to approval of the
American Stock Exchange and those persons so exercising
shall be afforded a delivery guarantee of three trading
days;

and it was further

BENTL002674
HIGHLY CONFIDENTIAL

<<< Page 5 >>>

                                              RESOLVED,  that  such  officers  of  the  Company
    are
                                  hereby authorized and directed  to  take  all  action
  and  to
                                  execute and deliver all  agreements  and  instruments
  and  to
                                  affix the Company's seal thereto  if  required,  that
  may  be
                                  necessary or appropriate to carry out the purpose  and
  intent
                                  of the foregoing resolution.

Mr. Murphy then informed the members of the board that the Company will need
to create and fill a Sales/Marketing position soon and that Fred Icken, Schwarz Pharma's
Director of Corporate Development plans to retire soon and may be available as a
consultant. Mr. Murphy also relayed that Mr. Amegger is interested in this position on a
full time basis. Dr. Stote then reminded the members of the Board that it has been the
Company's policy to consider a minimum of three candidates for such a position. No
action was taken at this time.

Messrs. Murphy and Price described the transition plan with respect to the
Schwarz acquiskion, including consideration of moving the Company's headquarters to
Wisconsin and personnel needs.

Mr. Arnegger provided information with respect to Contract Sales Organizations
(CSOs) and described how they operate. Mr. Murphy followed up with a description of
Syncom, a CSO that is considering going public, describing it as an acquisition or merger
candidate. No further action was taken at this time.

<<< Page 6 >>>

Mr. Murphy informed the members of the Board that the due diligence for the two
Wyeth-Ayerst products has not been completed and will require time and resources when
undertaken.

Mr. Murphy distributed a preliminary draft of the 1998 budget for Laboratorios
Belmac for review. Mr. Price explained that this draft was preliminary, and had not been
reviewed nor approved. Mr. Murphy explained that the final budget for Laboratorios
Belmac would be reviewed and incorporated in the final budget for discussion at the next
meeting of the Board of Directors. Mr. Murphy continued his discussion of the Spanish
operations, describing market conditions, expected continuation of increasing
competition and unfavorable devaluation of currency.

Mr. Murphy continued, describing the acquisition in Spain of Finedal for a
purchase price of one times trailing 12 months sales, with a provision that the Company
is entitled to a return of its money in the event that complications develop. After
discussion upon motion duly made, seconded and unanimously carried, it was

RESOLVED, that the action taken by the Company
to purchase the product, Finedal, for one times trailing
12
months sales is hereby ratified.

Mr. Murphy then presented his idea regarding the Conrex technology and patent
opportunities, suggesting that the acquisition of Conrex can be accomplished via an off-
balance sheet company. Mr. Murphy continued, indicating that a meeting has been
scheduled for the end of November. Mr. Murphy also stated that Robert Gyurik has

BENTL002676
HIGHLY CONFIDENTIAL

B181

<<< Page 7 >>>

indicated that he is available to work on this project. Discussion continued and questions were answered. Mr. Murphy indicated that Research and Development expense to the Company could be avoided by structuring the transaction as a joint venture or off-balance sheet company. Mr. Laska suggested that the Company consider a management contract with rights to market the products. Discussion continued; however, no action was taken at this time.

Mr. Murphy reminded the members of the Board that the Employment Agreements for the three executive officers expire in June 1998 and Mr. Laska responded that the Compensation Committee should meet before the expiration of the Employment Agreements. After discussion, upon motion duly made, seconded and unanimously carried, it was

RESOLVED, that Mr. Michael Mc Govern is hereby appointed to membership on the Compensation Committee and the Finance Committee.

Mr. Murphy once again suggested that an Employee Stock Purchase Plan be placed in service. The suggestion was discussed at length; however, no action was taken with respect to this subject.

Mr. Murphy informed the members of the Board that the proposed Consulting Agreement between the Company and InterBank has not yet been finalized or executed.

BENTL002677
HIGHLY CONFIDENTIAL

B182

<<< Page 8 >>>

Mr. Murphy then presented a proposal regarding compensation adjustment for
Clemente Gonzalez (see Exhibit B) to the members of the Board. Mr. Laska requested a
copy of Dr. Gonzalez' employment agreement and suggested that his new agreement
expire at the same time as U. S. management's Employment Agreements.

The meeting was then recessed in order to accommodate a meeting of the
Compensation Committee of the Board. Upon the conclusion of the Compensation
Committee meeting, the Board Meeting was reconvened. The Compensation Committee
presented Mr. Murphy's proposal for Mr. Gonzalez' compensation adjustment, along
with its recommendation to the members of the Board that the proposal be approved, and
after discussion, upon motion duly made, seconded and unanimously carried, it was

RESOLVED, that Clemente Gonzalez is hereby
awarded a salary increase of 10% and a bonus equivalent to
that awarded in the prior year (in pesetas).

Mr. Murphy thanked the members of the Board for approving Dr. Gonzalez'
adjustment and told the members of the Board that he has been introduced to a PR firm
named Kinexsys by Patrick DiGiacomo, and that Kinexsys has presented a proposal to
the Company that involves PR services in exchange for $4,500 per month and 100,000
warrants. Mr. Laska volunteered to perform a Black-Scholes valuation analysis in order
to value the warrants for accounting purposes.

Mr. Price then provided an update of legal issues:

BENTL002678
HIGHLY CONFIDENTIAL

<<< Page 9 >>>

Harshbarger: Harshbarger's attorney has recently withdrawn from the case, citing very irreconcilable differences; Ms. Keisha Solomon had provided helpful information in her deposition in August; and there has been no recent activity on behalf of Mr. Harshbarger.

Maximed: The Court of Appeals has sided with Bentley in its appeal and has remanded the case back to the lower court for a judgment; and the Company is continuing to reserve $50,000 per quarter related to this investment.

Mr. Murphy informed the members of the Board that Mr. Robert Gyurik had assisted the Company with its due diligence with respect to the Schwarz acquisition, and in lieu of cash, had agreed to accept warrants as compensation for services rendered.

Upon motion duly made, seconded and unanimously carried, it was

RESOLVED, that the grant on August 12, 1997 to Robert Gyurik of warrants to purchase 1,000 shares of the Company's Common Stock at $2.875 per share is hereby ratified.

Mr. Price then explained that Walter Light had contacted the Company and inquired about the possibility of being granted an incentive to exercise his existing warrants, similar to that granted to the Series A warrant Holders. After discussion, upon motion duly made, seconded and unanimously carried, it was

RESOLVED, that the Company is authorized to extend an offer to Mr. Light to reduce the exercise price of his 350,000 warrants from $2.50 each to $2.00 each until the close of business on December 5, 1997, in exchange for his decision to exercise all 350,000 warrants simultaneously.

If the 350,000 warrants are not exercised by such date, the

9

BENTL002679
HIGHLY CONFIDENTIAL

<<< Page 10 >>>

described in terms of the warrants shall revert to such terms the original warrant agreements.

Mr. Murphy informed the members of the Board that Plexus Ventures had agreed to accept shares of the Company's Common Stock in lieu of cash as compensation for services rendered in connection wkh its advisory services related to the acquisitions.

Atter discussion, upon motion duly made, seconded, and unanimously carried, it was

RESOLVED, that the Company is hereby authorized, in lieu of cash, to issue such number of shares of the Company's Common Stock to Plexus Ventures as are equivalent to the fair market value of services provided by Plexus Ventures, as compensation for its advisory services in connection with the proposed acquisitions.

Mr. Price informed the members of the Board that the Company plans to file a Listing Application with the American Stock Exchange in the near future and requested authorization to file such application and include thereon all shares of the Company's Common Stock previously authorized by the Board for issuance and shares of the Company's Common Stock underlying options or warrants previously authorized by the Board for issuance. Upon motion duly made, seconded and unanimously carried, it was

RESOLVED, that the officers of the Company are hereby authorized by the Company to make an application to the American Stock Exchange for the listing of shares of the Company's Common Stock; and it was further

RESOLVED, that such officers are hereby authorized and directed to sign said application and any listing agreements or documents required by said Exchange in connection therewith and to make such changes in any of same as may be necessary to conform the with the requirements for listing, and to appear (if requested) before officials of such Exchange; and it was further

10

<<< Page 11 >>>

RESOLVED, that the foregoing shares of Common Stock be, and they hereby are, duly authorized for issuance

and when issued and delivered in exchange for payment thereon in accordance with the terms described above, such

shares shall be fully paid and non-assessable shares of Common Stock of the Company and the holder thereof shall not be liable for any calls or assessments thereon or

for any payment in respect thereof; and it was further

RESOLVED, that such officers are hereby authorized by the Company to take all other action and to execute and deliver all other agreements and instruments and to affix the Company's seal thereto if required, that may be necessary or appropriate to carry out the purpose and intent of the foregoing resolutions.

Mr. Murphy informed members of the Board that Dreyfus has recently filed a

Form 13-G, in which they stated that they had accumulated 483,000 shares of the

Company's Common Stock and that in telephone conversations with them, had learned

that they have increased their holdings further.

Mr. Murphy then indicated that the last item of business was scheduling of the

next Board meeting. After discussion, it was agreed that the next regularly scheduled

Board meeting would be held on January 19-20, 1998 in Milwaukee, WI and that the

following regularly scheduled Board meeting would be held March 16-19, 1998 in Spain.

There being no further business to come before the meeting, upon motion duly

made, seconded and unanimously carried the meeting was adjourned.

Price, Secretary

11

BENTL002681
HIGHLY CONFIDENTIAL

<<< Page 12 >>>

Exhibit    A

Michael McGovern, J.D., CPA. Mr. McGovern, age 53, is President and principal
        stockholder of McGovern Enterprises, Inc. For the past twenty-two years, Mr.
        McGovern has provided corporate, financial and real estate consulting services to
        executives and businesses throughout the United States. He serves as Chairman of
        Specialty Surgicenters, Inc., and as a Director on the corporate boards of North Fulton
        Baneshares, Inc., Suburban Lodges of America, Inc., Career Publishing Network, L.L.C.,
        Training Solutions Interactive, Inc., and Reynolds Development Company.

        Mr. McGovern h~. been responsible for in excess of $50 million in real estate investments
        and serves as President of McGovern Realty Corp., and as General Partner of six real
        estate limited partnerships in Georgia and Florida. Prior to forming McGevern
        Enterprises, Inc., Mr. McGovern served as president of FSC Advisory Corp., and was a
        certified public accountant with Deloitte Haskins & Sells, CPAs (now Deloitte & Touche,
        LLP.) He is also a member of the State Bar of Georgia and the American Bar
        Association. He received his B.S. and M.S. in Accounting, as well as his Jufis Doctor,
        from the University of Illinois.

BENTL002682
HIGHLY CONFIDENTIAL

<<< Page 13 >>>

Exhibit    B

BENTLEY        PHARMACEUTICALS,        INC.

TO:                                                              COMPENSATION
COMMITI'EE MEMBERS

SUBJECT:        FROM:                                    JAMES R. MURPHY
                DR. CLEMENTE GONZALEZ

                DATE:                                    11 NOV. 1997

        As you know, Dr. Clemente's employment contract calls for an
annual review and bonus
                calculation as of August 1997. Somehow it had been overlooked
since the review comes
                just after the compensation committee meets during the annual
meeting.

        Last year he recieved approval from the Compensation Committee
for a salary adjustment
                increasing his base compensation by 10% and was, granted a
$25,000 bonus.

        Growth this year was also significant especially when
considering the intensive competitive
                pressures in the Spanish market. Therefore, I recommend the
identical adjustment and
                bonus for his contribution to the Spanish growth.

BENTL002683
HIGHLY CONFIDENTIAL

<<< Page 1 >>>

MINUTES   OF   A   MEETING   OF   THE   BOARD   OF
DIRECTORS

of

BENTLEY PHARMACEUTICALS, INC.

A meeting of the Board of Directors of Bentley
Pharmaceuticals, Inc. (the

"Company") was held on November 13, 1997 at the offices of
InterBank Capital Group,
630 Fifth Avenue, New York, New York. The following Board members
were present:

James R. Murphy
Robert M. Stote
Michael D. Price
Randolph W. Arnegger
Charles L. Bolling
Ehud D. Laska

Also present, at the request of the Company, were Jordan
Horvath of Parker
Chapin Flattau and Klimpl, LLP and Michael Mc Govern.

Mr. Murphy acted as Chairman of the Meeting and Mr. Price,
at the request of the
Chairman, acted as Secretary of the Meeting.

Mr. Murphy called the meeting to order and introduced Mr. Mc
Govern to the

members of the Board. Discussion then centered on the current
number of directors and
it was determined that it would be advisable to increase the
number of directors to seven.
Upon motion duly made, seconded and unanimously carried, it was

RESOLVED, pursuant   to   the   Company's   By-Laws,
the number of directors is hereby  increased   to   seven.

EXHIBIT
MURPHY
2
7/19/06   SLB

BENTL002671
HIGHLY CONFIDENTIAL

B189

<<< Page 2 >>>

Mr. Murphy then made reference to Mr. Mc Govern's background, a summary of
which had previously been distributed (see Exhibit A), and nominated Mr. Mc Govern to
fill the newly created vacant Board seat until the next Annual Meeting of Stockholders.
Upon being seconded and unanimously carried, it was

RESOLVED, that Mr. Michael Mc Govern is
hereby duly appointed to fill the newly created vacant seat
on the Board of Directors of the Company to serve in such
capacity until the next Annual Meeting of Stockholders of
the Company.

The next order of business was to approve the minutes of the Board of Directors'
meetings held on June 6, 1997, June 12, 1997, July 18, 1997 and August 12, 1997. After
discussion and correction of the spelling of a name, upon motion duly made seconded
and unanimously carried, it was

RESOLVED, that the minutes of the Board of
Directors' meetings held on June 6, 1997, June 12, 1997,
July 18, 1997 and August 12, 1997 are hereby approved.

Mr. Murphy then updated the Board members on the status of the Schwarz
transaction informing them, that even though the exclusivity period had expired, that
Schwarz is continuing to work with the Company in a cooperative fashion. Messrs.
Murphy and Price continued by stating that Schwarz' management is obviously
concerned that the Company has not finalized its financing arrangements, but are hopeful
that the Company can do so in the near future and will be in position to close the
transaction by the end of the year.

2

BENTL002672
HIGHLY CONFIDENTIAL

<<< Page 3 >>>

Mr. Murphy then suggested that, for continuity purposes, discussion of Agenda
Item No. 7 (Update on the Financing) should follow. Mr. Laska summarized InterBank's
distribution of the Financing Memorandum, feedback and resulting modification of the
Company's strategy to close the Schwarz transaction first (due to urgency with respect to
expiring exclusivity). Mr. Murphy added a description of Galen Associates, an equity
investor, which had expressed an interest in possibly acting as an equity sponsor that
would give debt lenders the necessary comfort to complete the transaction.

Mr. Ziad Abdelnour of InterBank was invited into the meeting for an update with
respect to financing efforts. Be described his approach to identifying possible
lenders/investors and mentioned the players that are still interested.

Dr. Stote, in response, expressed his concerns with respect to timing of the
financing. Mr. Abdelnour responded to Dr. Stote's comments, stating that he was
confident that Cerberus would be able to act quickly.

Redacted

BENTL002673
HIGHLY CONFIDENTIAL

<<< Page 4 >>>

Mr. Murphy then returned to Agenda Item No. 5 and summarized the negotiated terms of the proposed acquisition of the Wyeth-Ayerst products, Donnatal and Serax, and referred to the term sheets for each product, which had been distributed earlier.

Mr. Murphy then provided a brief update on the two SmithKline Beecham products, Urospas and Fastin, in which the Company has expressed an interest, indicating that the Company is no longer interested in Fastin due to litigation surrounding weight reduction products.

Mr. Murphy then asked Mr. Price to provide a report on the Warrant Exercise incentive program. Mr. Price responded that approximately 1,400,000 Series A Warrants had been tendered to date, resulting in new capital of approximately $2,800,000. Messrs. Price and Mc Govern indicated that Mr. Jack Perry (Trustee) is taking steps to exercise the 2,000,000 Warrants held by the Estate of his late brother, Richard Perry. Mr. Price then distributed copies of the Notice and Prospectus Supplement, which are required to extend the Warrant Discount Period. After discussion, upon motion duly made, seconded and unanimously carried, it was

RESOLVED, that the Series A Warrant Discount Period is hereby extended to the close of business on Friday, December 5, 1997, subject to approval of the American Stock Exchange and those persons so exercising shall be afforded a delivery guarantee of three trading days;

and it was further

BENTL002674
HIGHLY CONFIDENTIAL

<<< Page 5 >>>

are

and  to

and  to

may  be

intent

                    RESOLVED, that such officers of the Company
hereby authorized and directed to take all action
execute and deliver all agreements and instruments
affix the Company's seal thereto if required, that
necessary or appropriate to carry out the purpose and
of the foregoing resolution.

         Mr. Murphy then informed the members of the board that the
Company will need
         to create and fill a Sales/Marketing position soon and that Fred
Icken, Schwarz Pharma's
         Director of Corporate Development plans to retire soon and may be
available as a
         consultant. Mr. Murphy also relayed that Mr. Amegger is
interested in this position on a
         full time basis. Dr. Stote then reminded the members of the Board
that it has been the
         Company's policy to consider a minimum of three candidates for
such a position. No
         action was taken at this time.

         Messrs. Murphy and Price described the transition plan
with respect to the
         Schwarz acquisition, including consideration of moving the
Company's headquarters to
         Wisconsin and personnel needs.

         Mr. Arnegger provided information with respect to Contract
Sales Organizations
         (CSOs) and described how they operate. Mr. Murphy followed up
with a description of
         Syncom, a CSO that is considering going public, describing it as
an acquisition or merger
         candidate. No further action was taken at this time.

BENTL002675
HIGHLY CONFIDENTIAL

<<< Page 6 >>>

Mr. Murphy informed the members of the Board that the due diligence for the two
Wyeth-Ayerst products has not been completed and will require time and resources when
undertaken.

Mr. Murphy distributed a preliminary draft of the 1998 budget for Laboratories
Belmac for review. Mr. Price explained that this draft was preliminary, and had not been
reviewed nor approved. Mr. Murphy explained that the final budget for Laboratories
Belmac would be reviewed and incorporated in the final budget for discussion at the next
meeting of the Board of Directors. Mr. Murphy continued his discussion of the Spanish
operations, describing market conditions, expected continuation of increasing
competition and unfavorable devaluation of currency.

Mr. Murphy continued, describing the acquisition in Spain of Finedal for a
purchase price of one times trailing 12 months sales, with a provision that the Company
is entitled to a return of its money in the event that complications develop. After
discussion upon motion duly made, seconded and unanimously carried, it was

RESOLVED, that the action taken by the Company
to purchase the product, Finedal, for one times trailing

12

months sales is hereby ratified.

Mr. Murphy then presented his idea regarding the Conrex technology and patent
opportunities, suggesting that the acquisition of Conrex can be accomplished via an off-
balance sheet company. Mr. Murphy continued, indicating that a meeting has been
scheduled for the end of November. Mr. Murphy also stated that Robert Gyurik has

BENTL002676
HIGHLY CONFIDENTIAL

<<< Page 7 >>>

indicated that he is available to work on this project.
Discussion continued and questions
were answered. Mr. Murphy indicated that Research and Development
expense to the
Company could be avoided by structuring the transaction as a
joint venture or off-balance
sheet company. Mr. Laska suggested that the Company consider a
management contract
with rights to market the products. Discussion continued;
however, no action was taken
at this time.

Mr. Murphy reminded the members of the Board that the
Employment
Agreements for the three executive officers expire in June 1998
and Mr. Laska responded
that the Compensation Committee should meet before the expiration
of the Employment
Agreements. After discussion, upon motion duly made, seconded and
unanimously
carried, it was

RESOLVED, that Mr. Michael Mc Govern is
hereby appointed to membership on the Compensation
Committee and the Finance Committee.

Mr. Murphy once again suggested that an Employee Stock
Purchase Plan be
placed in service. The suggestion was discussed at length;
however, no action was taken
with respect to this subject.

Mr. Murphy informed the members of the Board that the
proposed Consulting
Agreement between the Company and InterBank has not yet been
finalized or executed.

BENTL002677
HIGHLY CONFIDENTIAL

B195

<<< Page 8 >>>

Mr. Murphy then presented a proposal regarding compensation adjustment for

Clemente Gonzalez (see Exhibit B) to the members of the Board. Mr. Laska requested a

copy of Dr. Gonzalez' employment agreement and suggested that his new agreement

expire at the same time as U. S. management's Employment Agreements.

The meeting was then recessed in order to accommodate a meeting of the

Compensation Committee of the Board. Upon the conclusion of the Compensation

Committee meeting, the Board Meeting was reconvened. The Compensation Committee

presented Mr. Murphy's proposal for Mr. Gonzalez' compensation adjustment, along

with its recommendation to the members of the Board that the proposal be approved, and

after discussion, upon motion duly made, seconded and unanimously carried, it was

RESOLVED, that Clemente Gonzalez is hereby awarded a salary increase of 10% and a bonus equivalent to

that awarded in the prior year (in pesetas).

Mr. Murphy thanked the members of the Board for approving Dr. Gonzalez'

adjustment and told the members of the Board that he has been introduced to a PR firm

named Kinexsys by Patrick DiGiacomo, and that Kinexsys has presented a proposal to

the Company that involves PR services in exchange for $4,500 per month and 100,000

warrants. Mr. Laska volunteered to perform a Black-Scholes valuation analysis in order

to value the warrants for accounting purposes.

Mr. Price then provided an update of legal issues:

BENTL002678
HIGHLY CONFIDENTIAL

<<< Page 9 >>>

recently

irreconcilable

very

and

Mr.

with

to

is

this

Harshbarger: Harshbarger's attorney has withdrawn from the case, citing differences; Ms. Keisha Solomon had provided helpful information in her deposition in August; there has been no recent activity on behalf of Harshbarger.

Maximed: The Court of Appeals has sided Bentley in its appeal and has remanded the case back the lower court for a judgment; and the Company continuing to reserve $50,000 per quarter related to investment.

Mr. Murphy informed the members of the Board that Mr. Robert Gyurik had assisted the Company with its due diligence with respect to the Schwarz acquisition, and in lieu of cash, had agreed to accept warrants as compensation for services rendered.

Upon motion duly made, seconded and unanimously carried, it was

RESOLVED, that the grant on August 12, 1997 to Robert Gyurik of warrants to purchase 1,000 shares of Company's Common Stock at $2.875 per share is hereby ratified.

the

Mr. Price then explained that Walter Light had contacted the Company and inquired about the possibility of being granted an incentive to exercise his existing warrants, similar to that granted to the Series A warrant Holders. After discussion, upon motion duly made, seconded and unanimously carried, it was

RESOLVED, that the Company is authorized to extend an offer to Mr. Light to reduce the exercise price of 350,000 warrants from $2.50 each to $2.00 each until the close of business on December 5, 1997, in exchange for his decision to exercise all 350,000 warrants simultaneously.

If the 350,000 warrants are not exercised by such date, the

9

BENTL002679
HIGHLY CONFIDENTIAL

<<< Page 10 >>>

described in      terms of the warrants shall revert to such terms

the original warrant agreements.

Mr. Murphy informed the members of the Board that Plexus Ventures had agreed

to accept shares of the Company's Common Stock in lieu of cash as compensation for

services rendered in connection wkh its advisory services related to the acquisitions.

Atter discussion, upon motion duly made, seconded, and unanimously carried, it was

RESOLVED, that the Company is hereby authorized, in lieu of cash, to issue such number of shares

of the Company's Common Stock to Plexus Ventures as are equivalent to the fair market value of services provided

by Plexus Ventures, as compensation for its advisory services in connection with the proposed acquisitions.

Mr. Price informed the members of the Board that the Company plans to file a

Listing Application with the American Stock Exchange in the near future and requested

authorization to file such application and include thereon all shares of the Company's

Common Stock previously authorized by the Board for issuance and shares of the

Company's Common Stock underlying options or warrants previously authorized by the

Board for issuance. Upon motion duly made, seconded and unanimously carried, it was

RESOLVED, that the officers of the Company are hereby authorized by the Company to make an application to the American Stock Exchange for the listing of shares of

the Company's Common Stock; and it was further

RESOLVED, that such officers are hereby authorized and directed to sign said application and any listing agreements or documents required by said Exchange in connection therewith and to make such changes in any of same as may be necessary to conform with the requirements for listing, and to appear (if requested) before officials of such Exchange; and it was further

10

B198

<<< Page 11 >>>

RESOLVED, that the foregoing shares of Common Stock be, and they hereby are, duly authorized for

issuance

and when issued and delivered in exchange for payment thereon in accordance with the terms described above,

such

shares shall be fully paid and non-assessable shares of Common Stock of the Company and the holder thereof shall not be liable for any calls or assessments

thereon or

for any payment in respect thereof; and it was further

hereby

RESOLVED, that such officers are

and to

authorized by the Company to take all other action

instruments

execute and deliver all other agreements and

that

and to affix the Company's seal thereto if required,

purpose

may be necessary or appropriate to carry out the

and intent of the foregoing resolutions.

Mr. Murphy informed members of the Board that Dreyfus has recently filed a

Form 13-G, in which they stated that they had accumulated 483,000 shares of the

Company's Common Stock and that in telephone conversations with them, had learned

that they have increased their holdings further.

Mr. Murphy then indicated that the last item of business was scheduling of the

next Board meeting. After discussion, it was agreed that the next regularly scheduled

Board meeting would be held on January 19-20, 1998 in Milwaukee, WI and that the

following regularly scheduled Board meeting would be held March 16-19, 1998 in Spain.

There being no further business to come before the meeting, upon motion duly

made, seconded and unanimously carried the meeting was adjourned.

Price, Secretary

11

BENTL002681
HIGHLY CONFIDENTIAL

<<< Page 12 >>>

Exhibit    A

Michael McGovern, J.D., CPA. Mr. McGovern, age 53, is President and principal
stockholder of McGovern Enterprises, Inc. For the past twenty-two years, Mr.
McGovern has provided corporate, financial and real estate consulting services to
executives and businesses throughout the United States. He serves as Chairman of
Specialty Surgicenters, Inc., and as a Director on the corporate boards of North Fulton
Baneshares, Inc., Suburban Lodges of America, Inc., Career Publishing Network, L.L.C.,
Training Solutions Interactive, Inc., and Reynolds Development Company.

Mr. McGovern h~. been responsible for in excess of $50 million in real estate investments
and serves as President of McGovern Realty Corp., and as General Partner of six real
estate limited partnerships in Georgia and Florida. Prior to forming McGevern
Enterprises, Inc., Mr. McGovern served as president of FSC Advisory Corp., and was a
certified public accountant with Deloitte Haskins & Sells, CPAs (now Deloitte & Touche,
LLP.) He is also a member of the State Bar of Georgia and the American Bar
Association. He received his B.S. and M.S. in Accounting, as well as his Jufis Doctor,
from the University of Illinois.

BENTL002682
HIGHLY CONFIDENTIAL

B200

<<< Page 13 >>>

Exhibit    B

BENTLEY        PHARMACEUTICALS,        INC.

TO:                                          COMPENSATION
COMMITI'EE MEMBERS

FROM:                                        JAMES R. MURPHY
SUBJECT:    DR. CLEMENTE GONZALEZ

DATE:                                        11 NOV. 1997

As you know, Dr. Clemente's employment contract calls for an
annual review and bonus
calculation as of August 1997. Somehow it had been overlooked
since the review comes
just after the compensation committee meets during the annual
meeting.

Last year he recieved approval from the Compensation Committee
for a salary adjustment
increasing his base compensation by 10% and was, granted a
$25,000 bonus.

Growth this year was also significant especially when
considering the intensive competitive
pressures in the Spanish market. Therefore, I recommend the
identical adjustment and
bonus for his contribution to the Spanish growth.

BENTL002683
HIGHLY CONFIDENTIAL

I    WELCOME Spain & Labs. BELMAC
II   Time Schedule for meeting
III  Begin w/ Introductions

Belmac Staff

- Dr. Clemente Gonzalez, MD
  - General Director
  - Savior and Founder of
    the Organization
  - Special Expertise in Mktg
- Dr. Fernando Berenguer, MD
  - Former General Director
    of Prim (major distributor
    of medical pads and
    form officer of the Spanish
    Association of Pharmaceut
    industry.
  - Currently responsible for
    all Corp. Develops. Activities

- Jose Maria Esteves
  - is a CPA and Attorney
    And has total responsibility
    for Lab. Belmac Financial
    Dept.

- DR. ADOLFO HERRERA Has been
  recently hired to assume
  control of out
  Administration Activities
  and manufacturing building

ESTEBER Sinclair
LAURA Dawson
JUAN CHAPEL
Bob Feldman

IGNACIO

Sr. Moreno
has responsibility for oun sales
organization which has had
an impresive performance
for the past 3 years increasing sales of our
parts

History

The Agenda for this meeting

\*

History

Bentley purchased the Spanish Co.
in 1992 from Rhone which was
the BP Subsidiary (Natterman)
together w/ a portfolio of
12 mature Spanish pdts.

Company list Approximately
4 - 5 millin USD / year it
until 1997 when the
Company was totally restructured.
New management was established
and a strategy of Established
Acquisition of Additional pdts.
Contract manufactures and
a committment to expand
beyond borders of Spain
by way of export was Adopted.



Laboratorios Belmac, S.A.

D. Clemente González Azpeitia, in name and in representation of LABORATORIOS BELMAC, S.A., with registered office in Montearagón, Nº 9 28033 MADRID (Spain), and with Tax Identification Number A-78964038, as GENERAL MANAGER.

## HEREBY CERTIFIES THAT:

ETHYPHARM has a manufacturing agreement with LABORATORIOS BELMAC, S.A.

ETHYPHARM owns the manufacturing method, the technology and is the owner of the machinery employed for the manufacturing process of Omeprazole pellets. LABORATORIOS BELMAC, S.A. has the authorization to employ these machines and to use the Know-how for ETHYPHARM's clients.

LABORATORIOS BELMAC, S.A. is audited regularly by ETHYPHARM to assure that GMP are followed under ETHYPHARM's Q.A. requirements.

In Madrid on March 2nd of 1.998

**B**

**LABORATORIOS BELMAC, S.A.**

Fdo.: Clemente Gonzalez Azpeitia
Director General

Dr. Clemente González Azpeitia
General Manager

**BELMAC**  Montearagón, 9 - 1ª fase 28033 MADRID · Tel.: 388 72 01 · Fax: 388 76 47
Fábrica: Polígono Malpica, 1 50000 ZARAGOZA - Tel.: (976) 52 17 84 - Fax: (976) 57 26 53



EP 004355

B204

3/18/8  Spain

Mr Baumann - Mktg issues + Market research
new ptts -
Existing ptts -

Problem - Zaragoza
Mr Cana   COO Facilities
Adolpho
Process - Copy

Legal action from Asha ? risk
Process improvement
Ethypharm proprietly
"Not Allowed to give Copy"

Not purchasing Ethypharm technology
- Nor patent
- Can not improve Phion

Paul Monroe      51818 #13
Honkey Corp      BMW 36k mil
                 03 qur 8325
                 BLK lthr
                 95 YG
                 5 speed
1 800 32 smart   Ask 44,000 k - Bids
                                 Accepted

HIGHLY CONFIDENTIAL

BENTL001459

B205

# ETHYPHARM

*Marqués de la Ensenada, 16. 28004 Madrid–España*
*Tel: (1) 308 56 81  Fax: (1) 319 91 59*

| **FAX:** 3.88.76.47 | Date: 31.03.98 | Pgs: 1 |
|---|---|---|
| DE: Srta. Ana Vaquero | A:Srta. Laura | |
| | CIA: Belmac | |

Ref:  Viaje a París

**Tal y como acordamos esta mañana te adjunto datos del Hotel dónde se van a alojar en París.**

**Un saludo.**

Ana Vaquero

EP 003259

B206

# ETHYPHARM
Marqués de la Ensenada, 16. 28004 Madrid-España
Tel: (1) 308 56 81 Fax: (1) 319 91 59

FAX: 3.88.76.47                     Date: 31.03.98   Pages: 1
From: Ms. Ana Vaquero               To: Ms. Laura

                                    Company: Belmac

RE: Trip to Paris

As agreed this morning, I attach the information of the hotel where you are going to stay
in Paris.

Regards,

                              Ana Vaquero

EP 003259

B207

ex 01 MA? .059 : 5.75 63 69 ETHYPHARM ST CLOUD 33 1 41121719 10/03/98 19:13 N4 4795 Pg1 1 1
33 01 45 63 69 92



# ROYAL HOTEL
## 33, avenue de FRIEDLAND 75008 - PARIS
### TEL = 33.(0).1.43.59.08.14
### FAX = 33.(0).1.45.63.69.92
## http ://www.hroy.com/royal-hotel
## E-mail : rh@hroy.com

| | | |
|---|---|---|
| A l'attention de | : | ETHYPHARM |
| De la part de | : | JEROME / RESERVATION |
| Nom du client | : | Mr BERENGER |
| | | Mr BASILIO |
| | | Mr HERRERA |
| | | Mr MURTHY |
| | | Mr GONZALES |
| Date | : | 30 MARS 1998 |
| Date de séjour | : | du 01 AVRIL au 03 AVRIL 1998 |
| Type de chambre | : | 5 CHAMBRES STANDARD |
| Tarif confirmé | : | 995 Francs |

Madame,

Nous vous remercions de l'intérêt que vous portez au Royal Hôtel et c'est avec plaisir que nous vous confirmons votre réservation ci-dessus.

Nous restons à votre entière disposition pour de plus amples informations

Nous vous prions d'agréer, Madame, l'expression de nos sentiments les meilleurs.

EP 003260

B208

[logo]
**ROYAL HOTEL**
**33, avenue de FRIEDLAND 75008 – PARIS**
**PHONE = 33.(0).1.43.59.08.14**
**FAX = 33.(0).1.45.63.69.92**
**http://www.hroy.com/royal-hotel**
**e-mail: rh@hroy.com**

| To the attention of: | ETHYPHARM |
| From: | JEROME / RESERVATIONS |
| Client name: | MR. BERENGER |
| | MR. DASILIO |
| | MR. HERRERA |
| | MR. MURPHY |
| | MR. GONZALES |
| | |
| Date: | MARCH 30, 1998 |
| Date of stay: | From APRIL 01 to APRIL 03, 1998 |
| Room type: | 5 STANDARD ROOMS |
| Confirmed rate: | 995 francs |

Dear Madam,

Thank you for your interest in Royal Hotel. We are pleased to confirm your reservation above.

We remain available to provide any further information you might require.

Best regards.

EP 003260

B209



```
31/03 '98 MAR 15:14 FAX 3199159          ETHYPHARM S.A.                    @001

                              *************************
                         ***    REPORTE DE TX    ***
                              *************************


            TRANSMISION OK

            N° TX/RX                3481
            TELEFONO CONEXION                +34 913887647
            SUBDIRECCION
            ID CONEXION             LAB.BELMAC
            HORA COM                31/03 15:13
            TP USADO                00'55
            PAG.                    2
            RESULTADO               OK
```

EP 003261

B210



02 April 1998

Ethypharm                    Mr Basile    Mr Bernard Deinube
                             Mr DuBois

Omeprazole only sold in Spain
        - Not large enough market to
                 Many

Longer Term
Ugifa - selling of Pellet
        One more
   contract for supply of
One YR Review

Raw        ┌ DMF from Nobel  And raw material
Material   │ DMF from Esteve
           └ DMF from Ugifa

        Nobel raw material Not problem,
            for Spain, but Central S. Am.

        20 BATCH = Break even
           if Assured more

        Raw Material

*LLQUIFA        NOBEL        *ESTEVE      *CHEMO
                (Turkey)
Gastro Res   95          95
Residue      20%         5%
Dissoluble   75%         90

        * Non influence

EXHIBIT
Murphy
27
7/19/06        81B

HIGHLY CONFIDENTIAL

BENTL001473

Ethypharm Problems Solved

1) Good RM/S Reliab.
2) Good Formulation (stable?)

* 40 K/Mg
* 55 K/Mg other

Future

New relationship

Ethypharm supply raw material
20-24 Batches
Enter 18 Batches supply
Enter today

Action Plan

Switch to Aquesp

Draft Letter - BNT: Non-Compete
using knowledge
of Ethypharm

HIGHLY CONFIDENTIAL

Fax émis par : 33141121797    ETHYPHARM ST CLOUD    A4->A4  03/04/98  17:00  Pg: 1/10

**B212**

### ETHYPHARM
*Marques de la Ensanada 16*
*28004 Madrid*

*Tél.* : 34 91 308 56 81
*Fax* : 34 91 3 19 91 59

**Date** : 03/04/1998
**Nb pages** :

| **From** : Adolfo de Basilio | **To** : C. Gonzalez |
| **Fax** : 38876 47 | **Company** : Belmac |

### MESSAGE

Señor
A continuación pasamos la carta que Ethypharm propone para su firma por Belmac y Bentley y el borador de contrato para Omeprazol.

Saludos

Adolfo de Basilio



EXHIBIT

03/04 '98 17:03    N° TX/RX7597    P.001
CONFIDENTIAL

**BEL000257**

B213

**ETHYPHARM**
Marques de la Ensenada 16
28004 Madrid

Tel: 34 91 308 56 81
Fax: 34 91 3 19 91 59

Date: 04/03/1998
No. Pages:
From: Adolfo de Basilio

To: C. Gonzalez

Fax: 38876 47

Company: Belmac

## MESSAGE

Sir,

Attached is the letter that Ethypharm proposes for signature by Belmac and Bentley and the draft of the contract for Omeprazol.

Regards,

Adolfo de Basilio

(handwriting illegible)

BEL000257

**B214**

D. Clemente GONZALES AZPEITA, in the name and in representation of LABORATORIOS BELMAC S.A., with registered office in Monteraragon, N°9 28033 MADRID (Spain) and with tax identification Number A- 78964038, as General Manager

Mr James R. MURPHY in the name and representation of BENTLEY PHARMACEUTICALS INC. - with registered office in One Urban Centre, Suite 548, 4830 Wes Kennedy Boulevard, TAMPA - FLORIDA 33609-2562 - USA as Chairman and Chief Executive Officer

### HEREBY CERTIFIES THAT

ETHYPHARM  S.A. (Spain) (« ETHYPHARM »)  has a manufacturing agreement with LABORATORIOS  BELMAC  S.A.  for  manufacturing  omeprazole  pellets  in LABORATORIOS BELMAC S.A.'s plant in Zaragoza.

LABORATORIOS BELMAC S.A. is audited regularly by ETHYPHARM to assure that GMP are followed under ETHYPHARM's Q.A. requirements.

ETHYPHARM owns, among other elements,  the manufacturing  and control methods, processes, the technology and know-how (« the Information ») for a certain number of products in pellets among which Omeprazole pellets and its derivatives (« the Products ») and is the owner of the machinery and certain control equipment employed by LABORATORIOS BELMAC S.A. for the manufacturing of said Products.

Said  Information   has been transmitted  to  LABORATORIOS  BELMAC  S.A.  by ETHYPHARM only for the purpose of manufacturing the Products for ETHYPHARM's customers including LABORATORIOS BELMAC S.A. within the framework of  agreements between the parties.

As a consequence, LABORATORIOS BELMAC S.A., and any of its related companies, among which BENTLEY PHARMACEUTICALS Inc.,  undertakes not to divulge the Information to third parties and not to use any of the Information and machinery for any other purpose than the manufacturing of the Products for ETHYPHARM's customers.

LABORATORIOS BELMAC S.A. recognizes that all the information and machinery is the sole property of Ethypharm and that LABORATORIOS BELMAC S.A. shall stop using it and return it immediately to ETHYPHARM upon termination of the collaboration between LABORATORIOS BELMAC S.A. and ETHYPHARM.

In the event of a breach of the present undertaking ETHYPHARM reserves the right to claim for damages.

CONFIDENTIAL



BEL000256

Fax émis par : 33141121797    ETHYPHARM ST CLOUD    04->04 03/04/98 17:00  Pg:  3/10

B215

# Supply Contract

**BETWEEN THE UNDERSIGNED :**

■  **ETHYPHARM S.A. Spain**, Centro Colon (1220), 28004 MADRID, SPAIN

Represented by its President : Mr. Patrice DEBREGEAS

Hereinafter called **ETHYPHARM**

**OF THE FIRST PART**

**AND :**

■

Represented by its:

Hereinafter called **THE LABORATORY**

**OF THE SECOND PART**



BEL000258

B216

## ETHYPHARM
### Marques de la Ensanada 16
### 28004 Madrid

Tél. : 34 91 308 56 81
Fax : 34 91 3 19 91 59

Date : 03/04/1998

Nb pages :

| From : Adolfo de Basilio | To : C. Gonzalez |
|---|---|
| Fax : 38876 47 | Company : Belmac |

### MESSAGE

Señor
A continuación pasamos la carta que Ethypharm propone para su firma por Belmac y Bentley y el borador de contrato para Omeprazol.

Saludos

Adolfo de Basilio



BEL000259

B217

## ETHYPHARM
Marques de la Ensenada 16
28004 Madrid

Tel: 34 91 308 56 81
Fax: 34 91 3 19 91 59

Date: 04/03/1998
No. Pages:
From: Adolfo de Basilio

To: C. Gonzalez

Fax: 38876 47

Company: Belmac

### MESSAGE

Sir,
Attached is the letter that Ethypharm proposes for signature by Belmac and Bentley and the draft of the contract for Omeprazol.

Regards,
[Signature]

Adolfo de Basilio

BEL000259

Fax émis par : 33141121797        ETHYPHARM ST CLOUD    04->04  03/04/98  17:00  Pg:  3/10

B218

# Supply Contract

BETWEEN THE UNDERSIGNED :

■    **ETHYPHARM S.A. Spain**, Centro Colon (1220), 28004 MADRID, SPAIN

Represented by its President : Mr. Patrice DEBREGEAS

Hereinafter called **ETHYPHARM**

OF THE FIRST PART

AND :

■

Represented by its:

Hereinafter called **THE LABORATORY**

OF THE SECOND PART

CONFIDENTIAL

BEL000260

B219

ETHYPHARM has developed the pharmaceutical formulation of the Product defined in Annex A and hereinafter called "the Product".

THE LABORATORY has been granted a marketing authorisation for the Product, hereinafter referred to as "the Marketing Authorisation" in ......................

THE LABORATORY is interested in receiving all its needs in the Product from ETHYPHARM for its distribution in the Territory. ETHYPHARM agrees to supply THE LABORATORY with the Product for ........................, hereinafter referred to as "the Territory", under the conditions set forth in the present Contract provided THE LABORATORY undertakes to order all its supplies in Product for the Territory exclusively from ETHYPHARM and comply with the terms of the present Contract.

## Therefore, it has been agreed as follows :

## Article I - Supply.

During the period of this Contract ETHYPHARM will supply for the Territory, such quantities of the Product as will be required by THE LABORATORY.

## Article II - Exclusivity.

The counterpart of the engagement of guaranteed supplies by ETHYPHARM to THE LABORATORY under article I above is that THE LABORATORY will take all its supplies exclusively from ETHYPHARM or from another supplier designated by ETHYPHARM for all its needs of the Product in the Territory in order to guarantee the quality of the Product. Moreover, THE LABORATORY may not directly or indirectly manufacture microgranules constituting the Product.

## Article III - Orders.

III.1. THE LABORATORY will place its orders at least four (4) months in advance according to its predicted annual requirement, revised every six (6) months.

The said predicted annual requirement will be communicated by THE LABORATORY for information purposes, sixty (60) days before the start of each calendar year and will not constitute a firm commitment by THE LABORATORY.

- 2 -

BEL000261

**B220**

Each order placed by **THE LABORATORY** will bear the exact quantity ordered, the delivery date and the address at which the Product must be sent.

The orders will be considered as firm and irrevocable and will bind **ETHYPHARM** as soon as accepted in writing.

**ETHYPHARM** shall accept and deliver all the orders according to the program established by **THE LABORATORY** unless the quantities ordered are substantially different from the quantities indicated in **THE LABORATORY's** forecasts for the year of the Contract and provided that **ETHYPHARM** receives the order a minimum of four (4) months before the delivery date.

**THE LABORATORY** shall at all times keep adequate stock of the Product to meet the market demand in the Territory. These adequate stocks shall be sufficient for covering the estimated requirement for at least four (4) months.

III.2.  In the event of being unable to fulfil its obligations as supplier, for whatever reason, **ETHYPHARM** undertakes to inform **THE LABORATORY** with the minimum delay possible and to find another supplier within a maximum of sixty (60) days. The latter will deliver the order within thirty (30) days on the same terms and conditions.

III.3. Technical and pharmaceutical responsibility and obligations of the parties will be fully detailed in an "Agreement on Contract Manufacturing of Drug" to be established between the technicians of the parties.

## Article IV - Prices.

The supply price of the Product invoiced by **ETHYPHARM** to **THE LABORATORY** will be determined by mutual agreement between the parties according to the conditions set out in Annex B hereto.

## Article V - Liability.

**ETHYPHARM** shall accept responsibility for any claims covered by and limited to the guarantees specified in the insurance policy annexed hereto arising out of latent or hidden defects in the Product which could not have been reasonably discovered by **THE LABORATORY's** inspection but will not be held responsible for any side effect currently unknown inherent to the characteristics of the Product which is manufactured strictly in accordance with the provisions defined by the registration files accepted by the local Regulatory Authorities.

- 3 -

**CONFIDENTIAL**

**BEL000262**

B221

## Article VI - Indemnity.

**THE LABORATORY** shall be exclusively liable for any damages, claims or losses from which **THE LABORATORY** may suffer by reason of improper packaging, storage, re-packaging, distribution, promotion, marketing and advertising of the Product in the Territory. **ETHYPHARM** will, however, be responsible as to the good manufacturing practice and good storage facilities in its plant and warehouses until the goods are collected by **THE LABORATORY.**

## Article VII - Product recall and adverse reactions.

Each party shall use reasonable endeavours to obtain and record written medical confirmation and relevant details of all suspected or alleged reactions to the Product (hereinafter called "Adverse Reactions") and shall ensure by means of a written log that all such cases and the dossier relative to it is uniquely identified and retrievable.

## Article VIII - Quality.

VIII.1.  **ETHYPHARM** shall be responsible for ensuring that, when released by **ETHYPHARM**, the Product accord to the specifications set out in Annex A hereto. If the Product is found not to comply with the specifications by local testing authori-ties, within one (1) month from receipt by **THE LABORATORY** of the Product, **THE LABORATORY** shall have the right to demand a refund or replacement thereof and to return the defective quantity to **ETHYPHARM** at **ETHYPHARM**'s expense. In case of disagreement between the parties as to the compliance of the Product with the specifications, the parties agree to have the Product controlled by an independent expert chosen by the parties and acceptable to the local testing authori-ties. The results of such retesting will be binding and the party found in default will bear the costs of retesting and replacement of the Product.

VIII.2.  **THE LABORATORY** and the competent Authorities of the Territory will have the right to inspect **ETHYPHARM**'s production of the Product, at any time, following reasonable notice and during office hours.

## Article IX - Insurance.

**ETHYPHARM** and **THE LABORATORY** warrant that they hold adequate products liability insurance in respect of any claims which may be brought against **ETHYPHARM** or THE

- 4 -

CONFIDENTIAL

BEL000263

**B222**

**LABORATORY** in relation to the Product and will supply each other with a copy of the relevant policy on request.

## Article X - Duration.

This Contract shall be effective immediately upon its signature and shall remain into effect for a period of ten (10) years from the date of first launch of the Product in the Territory.      *new techol-*

At the end of this initial period of ten (10) years, this Contract will be automatically renewed per periods of three (3) years unless terminated by any of the parties twelve (12) months prior to the end of the initial period or any of the renewal period by registered mail.

## Article XI - Termination.

Each party reserves the right to cancel this Contract at any time and without indemnification if the other party commits a material breach of its obligations and fails to remedy this breach within ninety (90) days of the notification of said breach by registered letter.

## Article XII - Confidentiality.

All the information relative to the Product or to the know-how communicated by **ETHYPHARM** to **THE LABORATORY**, will be considered by **THE LABORATORY** as strictly confidential and will not be divulged by **THE LABORATORY** to third parties without prior agreement in writing by **ETHYPHARM**. The subsidiaries, licensees, or overseas agents of **THE LABORATORY** outside the Territory are considered as third parties.

This obligation shall continue for five (5) years beyond the expiry of this Contract for any reason. Nevertheless, it will not apply to information which must be given to physicians for sales purposes or to the authorities for the purpose of registering the Product in the Territory.

## Article XIII- Contractual relationship.

XIII.    This Supply Contract constitutes the whole agreement between the parties and replaces any former agreement relative to the same subject. Modifications to this Contract will be made in writing only, and will have to be accepted and signed by both parties.

XIII.    If one of the provisions of the present Supply Contract interferes with local legislation in force in the Territory, then this particular provision will be modified by the parties in order to comply with local legislation. This modification will not affect the other provisions of this Contract.

- 5 -

CONFIDENTIAL

**BEL000264**

< émis par : 33141121797          ETHYPHARM ST CLOUD    A4->A4  03/04/98  17:00   Pg:  8/10

B223

## Article XIV - Jurisdiction.

In the event of difficulties between the parties as to the interpretation of this Agreement, the parties agree to submit these difficulties to the Rules of Conciliation and Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the Rules and decisions of the ICC. The arbitrator (s)' decisions shall be binding on both parties hereto.

The applicable law will be Spanish law and arbitration place will be Madrid (Spain). The arbitration proceedings will be conducted in English language.

## Article XV - Transfer.

**THE LABORATORY** may not transfer its rights or obligations arising from this Contract without the prior written consent of **ETHYPHARM**.

## Article XVI - Costs and fees.

The costs and fees of any possible registration or legalisation of this Contract are to be borne by **THE LABORATORY**.

Signed in                                        Date :
For :                                            For : **ETHYPHARM S.A. Spain**
                                                 Patrice DEBREGEAS
                                                 President

- 6 -

CONFIDENTIAL

BEL000265

**B224**

## Annex B to the Supply Contract between

..................................... and ETHYPHARM S.A. Spain

The supply exclusivity defined in Article II means that **THE LABORATORY** will take exclusively from **ETHYPHARM** all its requirements of the Product.

1.1.    The supply price of the Product, delivered in ............. , is expressed ........... and fixed at :

- 20 mg :                        ............... per thousand doses taxes excluded.

This price includes ............................ .

Moreover, it is valid for minimum batches of doses corresponding to ...............................

1.2.    Should **THE LABORATORY** wish to order a smaller quantity than the standard batch above mentioned **ETHYPHARM** may apply a supplement of 30 % of the price if the quantity lies between 50 % and 100 % of a normal batch and a supplement of 50 % of the price if the quantity ordered is less than 50 % of the normal batch.

2.    All payments will be made by ............... within .............. from date of shipment of goods from **ETHYPHARM** (date of AWB for example).

3.    The price set out in this Annex is guaranteed until .............. and will vary each year in accordance with the salary increase of the "Convenio de la Industria Quimica" in Spain.

- 8 -

CONFIDENTIAL

BEL000266

B225

ETHYPHARM has developed the pharmaceutical formulation of the Product defined in Annex A and hereinafter called "the Product".

THE LABORATORY has been granted a marketing authorisation for the Product, hereinafter referred to as "the Marketing Authorisation" in .......................

THE LABORATORY is interested in receiving all its needs in the Product from ETHYPHARM for its distribution in the Territory. ETHYPHARM agrees to supply THE LABORATORY with the Product for ........................, hereinafter referred to as "the Territory", under the conditions set forth in the present Contract provided THE LABORATORY undertakes to order all its supplies in Product for the Territory exclusively from ETHYPHARM and comply with the terms of the present Contract.

## Therefore, it has been agreed as follows :

### Article I - Supply.

During the period of this Contract ETHYPHARM will supply for the Territory, such quantities of the Product as will be required by THE LABORATORY.

### Article II - Exclusivity.

The counterpart of the engagement of guaranteed supplies by ETHYPHARM to THE LABORATORY under article I above is that THE LABORATORY will take all its supplies exclusively from ETHYPHARM or from another supplier designated by ETHYPHARM for all its needs of the Product in the Territory in order to guarantee the quality of the Product. Moreover, THE LABORATORY may not directly or indirectly manufacture microgranules constituting the Product.

### Article III - Orders.

III.1. THE LABORATORY will place its orders at least four (4) months in advance according to its predicted annual requirement, revised every six (6) months.

The said predicted annual requirement will be communicated by THE LABORATORY for information purposes, sixty (60) days before the start of each calendar year and will not constitute a firm commitment by THE LABORATORY.

- 2 -

CONFIDENTIAL

BEL000267

**B226**

[HANDWRITTEN NOTATIONS]

Illegible
Omeprazole microgranules
Independent from where it manufactures
Illegible
Without Ethypharm's conformity

BEL000267

**B227**

Each order placed by **THE LABORATORY** will bear the exact quantity ordered, the delivery date and the address at which the Product must be sent.

The orders will be considered as firm and irrevocable and will bind **ETHYPHARM** as soon as accepted in writing.

**ETHYPHARM** shall accept and deliver all the orders according to the program established by **THE LABORATORY** unless the quantities ordered are substantially different from the quantities indicated in **THE LABORATORY**'s forecasts for the year of the Contract and provided that **ETHYPHARM** receives the order a minimum of four (4) months before the delivery date.

**THE LABORATORY** shall at all times keep adequate stock of the Product to meet the market demand in the Territory. These adequate stocks shall be sufficient for covering the estimated requirement for at least four (4) months.

III.2.  In the event of being unable to fulfil its obligations as supplier, for whatever reason, **ETHYPHARM** undertakes to inform **THE LABORATORY** with the minimum delay possible and to find another supplier within a maximum of sixty (60) days. The latter will deliver the order within thirty (30) days on the same terms and conditions.

III.3.  Technical and pharmaceutical responsibility and obligations of the parties will be fully detailed in an "Agreement on Contract Manufacturing of Drug" to be established between the technicians of the parties.

## Article IV - Prices.

The supply price of the Product invoiced by **ETHYPHARM** to **THE LABORATORY** will be determined by mutual agreement between the parties according to the conditions set out in Annex B hereto.

## Article V - Liability.

**ETHYPHARM** shall accept responsibility for any claims covered by and limited to the guarantees specified in the insurance policy annexed hereto arising out of latent or hidden defects in the Product which could not have been reasonably discovered by **THE LABORATORY**'s inspection but will not be held responsible for any side effect currently unknown inherent to the characteristics of the Product which is manufactured strictly in accordance with the provisions defined by the registration files accepted by the local Regulatory Authorities.

- 3 -

CONFIDENTIAL

**BEL000268**

[HANDWRITTEN NOTATIONS]

And Ethypharm
Illegible
Ignacio = omeprazol price

BEL000268

### Article VI - Indemnity.

THE LABORATORY shall be exclusively liable  for any damages, claims or losses from which THE LABORATORY may suffer by reason of improper packaging, storage, re-packaging, distribution, promotion, marketing and advertising of the Product in the Territory. ETHYPHARM will, however, be responsible as to the good manufacturing practice and good storage facilities in its plant and warehouses until the goods are collected by THE LABORATORY.

### Article VII - Product recall and adverse reactions.

Each party shall use reasonable endeavours to obtain and record written medical confirmation and relevant details of all suspected or alleged reactions to the Product (hereinafter called "Adverse Reactions") and shall ensure by means of a written log that all such cases and the dossier relative to it is uniquely identified and retrievable.

### Article VIII - Quality.

VIII.1.  ETHYPHARM shall be responsible  for ensuring that, when released by ETHYPHARM, the Product accord to the specifications set out in Annex A hereto. If the Product is found not to comply with the specifications by local testing authori- ties, within one (1) month from receipt by THE LABORATORY of the Product, THE LABORATORY shall have the right to demand a refund or replacement thereof and to return the defective quantity to ETHYPHARM at ETHYPHARM's expense. In case of disagreement between the parties as to the compliance of the Product with the specifications, the parties agree to have the Product controlled by an independent expert chosen by the parties and acceptable to the local testing authori- ties. The results of such retesting will be binding and the party found in default will bear the costs of retesting and replacement of the Product.

VIII.2.  THE LABORATORY and the competent Authorities of the Territory will have the right to inspect ETHYPHARM's production of the Product, at any time, following reasonable notice and during office hours.

### Article IX - Insurance.

ETHYPHARM and THE LABORATORY warrant that they hold adequate products liability insurance in respect of any claims which may be brought against ETHYPHARM or THE

- 4 -

CONFIDENTIAL

BEL000269

[HANDWRITTEN NOTATIONS]

Illegible
Let's fix arbitration, illegible

BEL000269

**B231**

**LABORATORY** in relation to the Product and will supply each other with a copy of the relevant policy on request.

## Article X - Duration.

This Contract shall be effective immediately upon its signature and shall remain into effect for a period of ten (10) years from the date of first launch of the Product in the Territory.

At the end of this initial period of ten (10) years, this Contract will be automatically renewed per periods of three (3) years unless terminated by any of the parties twelve (12) months prior to the end of the initial period or any of the renewal period by registered mail.

## Article XI - Termination.

Each party reserves the right to cancel this Contract at any time and without indemnification if the other party commits a material breach of its obligations and fails to remedy this breach within ninety (90) days of the notification of said breach by registered letter.

## Article XII - Confidentiality.

All the information relative to the Product or to the know-how communicated by **ETHYPHARM** to **THE LABORATORY**, will be considered by **THE LABORATORY** as strictly confidential and will not be divulged by **THE LABORATORY** to third parties without prior agreement in writing by **ETHYPHARM**. The subsidiaries, licensees, or overseas agents of **THE LABORATORY** outside the Territory are considered as third parties.

This obligation shall continue for five (5) years beyond the expiry of this Contract for any reason. Nevertheless, it will not apply to information which must be given to physicians for sales purposes or to the authorities for the purpose of registering the Product in the Territory.

## Article XIII- Contractual relationship.

**XIII.** This Supply Contract constitutes the whole agreement between the parties and replaces any former agreement relative to the same subject. Modifications to this Contract will be made in writing only, and will have to be accepted and signed by both parties.

**XIII.** If one of the provisions of the present Supply Contract interferes with local legislation in force in the Territory, then this particular provision will be modified by the parties in order to comply with local legislation. This modification will not affect the other provisions of this Contract.

CONFIDENTIAL

**BEL000270**

[HANDWRITTEN NOTATIONS]

4 years and … illegible
12 months
4 years and … illegible

BEL000270

**B233**

## Article XIV - Jurisdiction.

In the event of difficulties between the parties as to the interpretation of this Agreement, the parties agree to submit these difficulties to the Rules of Conciliation and Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the Rules and decisions of the ICC. The arbitrator (s)' decisions shall be binding on both parties hereto.

The applicable law will be Spanish law and arbitration place will be Madrid (Spain). The arbitration proceedings will be conducted in English language.

## Article XV - Transfer.

**THE LABORATORY** may not transfer its rights or obligations arising from this Contract without the prior written consent of **ETHYPHARM**.

## Article XVI - Costs and fees.

The costs and fees of any possible registration or legalisation of this Contract are to be borne by THE LABORATORY.

Signed in
For :

Date :
For : **ETHYPHARM S.A. Spain**
Patrice DEBREGEAS
President

- 6 -

CONFIDENTIAL

**BEL000271**

[HANDWRITTEN NOTATIONS]

On bench
Illegible

BEL000271

**B235**

## Annex A to the Supply Contract Between

## ................................ and ETHYPHARM S.A. Spain

**OMEPRAZOLE 20 mg** per dose in the form of microgranules according to the specification established by the analytical dossier.

- 7 -

**BEL000272**

[HANDWRITTEN NOTATIONS]

To the following formulation:
Formulation

BEL000272

B237

## Annex B to the Supply Contract between

·····························and ETHYPHARM S.A. Spain

The supply exclusivity defined in Article II means that **THE LABORATORY** will take exclusively from **ETHYPHARM** all its requirements of the Product.

1.1.  The supply price of the Product,  delivered in ............ , is expressed .......... and  fixed at :

- 20 mg :                      .............. per thousand doses taxes excluded.

This price includes ........................... .
Moreover,  it  is  valid  for  minimum  batches  of  doses  corresponding  to  ...........................

1.2.  Should **THE LABORATORY** wish to order a smaller quantity than the standard batch above mentioned **ETHYPHARM** may apply a supplement of 30 % of the price if the quantity lies between 50 % and 100 % of a normal batch and a supplement of 50 % of the price if the quantity ordered is less than 50 % of the normal batch.

2.  All payments will be made by .............. within .............. from date of shipment of goods from **ETHYPHARM** (date of AWB for example).

3.  The price set out in this Annex is guaranteed until ............... and will vary each year in accordance with the salary increase of the "Convenio de la Industria Quimica" in Spain.

- 8 -

CONFIDENTIAL

BEL000273

B238

[HANDWRITTEN NOTATIONS]

Illegible
Payment conditions
Maximum and minimum conditions

BEL000273

B239

# ETHYPHARM

*Marqués de la Ensenada, 16. 28004 Madrid–España*
*Tel: (1) 308 56 81  Fax: (1) 319 91 59*

| FAX: | Date: 06.04.98 | Pgs: 2 |
|---|---|---|
| DE: Adolfo De Basilio | A: Sr. Murphy CIA: ꞵelmac | |
| Ref: | | |

We are pleased to send you the last minute modifications made by Mr. Leduc to the text that we sent last friday.

Please send your comments/corrections or send it back duly signed in a letter with your heading.

Thank you, Best regards.



Adolfo De Basilio



EXHIBIT:
Dubois
20
m.s. 7.12.06

EP 003262

D. Clemente GONZALES AZPEITA, in the name and in representation of LABORATORIOS BELMAC S.A., with registered office in Monteraragon, N°9 28033 MADRID (Spain) and with tax identification Number A- 78964038, as General Manager

Mr James R. MURPHY in the name and representation of BENTLEY PHARMACEUTICALS INC. - with registered office in One Urban Centre, Suite 548, 4830 Wes Kennedy Boulevard, TAMPA - FLORIDA 33609-2562 - USA as Chairman and Chief Executive Officer

## HEREBY CERTIFIES THAT

ETHYPHARM S.A. (Spain) (« ETHYPHARM ») has a manufacturing agreement with LABORATORIOS BELMAC S.A. for manufacturing omeprazole pellets and a certain number of other products developed by ETHYPHARM in LABORATORIOS BELMAC S.A.'s plant in Zaragoza.

LABORATORIOS BELMAC S.A. is audited regularly by ETHYPHARM to assure that GMP are followed under ETHYPHARM's Q.A. requirements.

ETHYPHARM owns, in addition to patents relating to formulation and processed and among other elements, the manufacturing and control methods, processes, the technology and know-how (« the Information ») for a certain number of products in pellets among which Omeprazole pellets and its derivatives (« the Products ») and is the owner of the machinery and certain control equipment employed by LABORATORIOS BELMAC S.A. for the manufacturing of said Products.

Said Information has been transmitted to LABORATORIOS BELMAC S.A. by ETHYPHARM only for the purpose of manufacturing the Products for ETHYPHARM's customers including LABORATORIOS BELMAC S.A. within the framework of agreements between the parties and under strict confidentiality terms.

As a consequence, LABORATORIOS BELMAC S.A., and any of its related companies, among which BENTLEY PHARMACEUTICALS Inc., undertakes not to divulge the Information to third parties and not to use any of the Information and machinery for any other purpose than the manufacturing of the Products for ETHYPHARM's customers .

LABORATORIOS BELMAC S.A. recognizes that all the information and machinery is the sole property of Ethypharm and that LABORATORIOS BELMAC S.A. shall stop using it and return it immediately to ETHYPHARM upon termination of the collaboration between LABORATORIOS BELMAC S.A. and ETHYPHARM.

EP 008628