In the event of a breach of the present undertaking ETHYPHARM reserves the right to claim for damages.

EP 008629

4/8/98        Send Copy Contract to Javier
Action        Passport office
Items
       *      Call Yungfai — market wave

              Call Stadia
                 · need documents
                 · Ethypharm Solvent Newing Document
                 · Final Contract
                 · Relaxibvs contract
                 · Closing 16th

       *      Fax Ethypharm to Delta
              BOD mtg.    20th
              Press Rel     22nd

              Prepare
                    Info Comp Conv.
                    Info for Meguro President

       *      Call Laurie — Ethypharm

Mtg. Spain

Ethypharm

concern for patent

only 1 machine Ethypharms

Organic Formulation – now

Aqueous Formulation –

Schwarz - Purchased CEPA

- Generics

- Registrations

Plan de Fomento – ⟨Medinova⟩

Present Research
Present Financials

Omeprazole 12 Generics submitted

Our Generic 1st Qtr, 2000

Price increase

Mio Relax –

BMS

ARICAMOL – Amend Budget

Otc

Relaxylis
Onicolitex
Octogen
Resorbic
Loperamida

WASSERMAN CHIESI – PASSA Clou'n Dec 99
End Manuf.

4/14/99    Spain Agenda & Meeting

1. Status of Pending Registrations

2. Status of Exports
   60 Russia
   20 D.R., Morro'
      Egypt - 8 month to Reg, 80 Million
      Hong Kong 3 month  "  "   80 Million

3. Purchase of Another Pdt imperative
      Or Spend Same Amt on 2nd Sales force

4. Collaborations For Iontree Tech
      Suggest we put pdt on Mkt 1st

Fernando  5. Development of new Pdts
      Diclofenac  - ? Juan Carlos
      Onicofitex
      Patents

6. Collaborations w/ other Cos.
      Generic Co. - Tammaron
      Etc

HIGHLY CONFIDENTIAL

B245

En Madrid  ,  a  uno de  Mayo  de  1998

### R E U N I D O S

**DE UNA PARTE**

**1. BENTLEY PHARMACEUTICALS INC.**, sociedad extranjera con domicilio social en 4830 West Kennedy Blvd., Suite 548 , Tampa , FL 33609, en su nombre y representación , **D. CLEMENTE GONZALEZ AZPEITIA** de nacionalidad española , mayor de edad , con N.I.F. 2.009.837 , en su calidad de Mandatario verbal de la misma, ( De ahora en adelante el Prestador ).

**Y DE OTRA PARTE**

**2. LABORATORIOS BELMAC  , S. A.**, sociedad española , con domicilio social en Madrid , calle Montearagón , 9 – 1° con C.I.F  N°  A – 78964038  y en su nombre y representación , **D. JAMES R. MURPHY** , de nacionalidad norteamericana, mayor de edad  ,  con pasaporte n° 100791160  extendido en Massachusetts, Estados Unidos , en su calidad de Presidente y Consejero Delegado  ( De ahora en adelante la Compañía española  )

Ambas se reconocen capacidad y legitimación para otorgar el presente contrato .



**POR CUENTO**

La Compañia española tiene interés en recibir determinados servicios especializados y en el prestador está en condiciones de prestar los mencionados servicios, las partes contratantes tienen convenido formalizar por escrito dicho contrato de servicios y en consecuencia, lo llevan a efecto con arreglo a lo expuesto y a las siguientes cláusulas :

**1. OBJETO**

El objeto del presente Contrato de Servicios es definir  la naturaleza de los servicios y los honorarios a pagar por y respecto de tales servicios .

**2. SERVICIOS  QUE SE PRESTAN**

A partir de la fecha de la celebración del siguiente Contrato  , el Prestador está en condiciones  de prestar en el futuro a la Compañía los  siguientes servicios :

CONFIDENTIAL

BEL000507



2M7608197



1. Asesoramiento en la búsqueda de oportunidades de negocio y nuevos productos.

2. Asesoramiento en áreas de venta , marketing y estrategias comerciales tales como evolución de fármacos a nivel mundial , introducción en mercados nacionales o extranjeros para fomento de exportaciones, créditos comerciales, operaciones triangulares, lanzamiento de nuevos productos , actividades especiales de promoción como Convenciones, Congresos de carácter internacional , etc .

3. Asesoramiento en la adecuación de la fabricación de productos farmacéuticos a las normas internacionales de GMP ( Good Manufacturing Practices ) .

4. Asesoramiento en la gestión de patentes , marcas , know-how , licencias , etc.

5. Asesoramiento profesional en la gestión comercial y administrativa , elaboración de presupuestos, análisis de clientes así como estudio de rentabilidad y demás actividades complementarias .

6. Mantenimiento y actualización de archivos informáticos en relación con las gestiones comerciales , técnicas y contables que facilitan el control , análisis y seguimiento de la información relacionada con dichas gestiones .

A efectos de la prestación de los servicios mencionados , la Compañía española correrá con todos los gastos accesorios que sean necesarios . En particular los de desplazamiento y alojamiento necesarios para el cumplimiento de las obligaciones derivadas del presente contrato .

### 3. VENCIMIENTO

El presente contrato permanecerá en vigor durante ochos meses ( desde el día 1 de mayo de 1998 hasta el 31 de diciembre de 1998 ) . No obstante , se considerará automáticamente prorrogado por periodos de un ( 1 ) año , a menos que una de las partes contratantes notifique por escrito a la otra su vencimiento por lo menos con un mes de anticipación a la fecha en que termine el periodo correspondiente .

### 4. RETRIBUCIÓN

Como contraprestación por los servicios mencionados en el presente Contrato y durante el periodo de tiempo mencionado en el punto anterior , la Compañía española se obliga a pagar al Prestador la cantidad de CUARENTA MILLONES ( 40.000.000 ) DE PESETAS .

El pago se hará efectivo por trimestres vencidos en el plazo de 30 días a contar desde la fecha de recepción de la factura .

Los honorarios a pagar por la Compañía española serán abonados integramente , libres de toda deducción o retención salvo las que la Compañía española esté obligada a hacer por ley .

CONFIDENTIAL

B247

Estos honorarios no incluyen los impuestos indirectos que legalmente se devenguen sobre los servicios prestados en virtud de este contrato , los cuales se liquidarán de acuerdo a lo que disponga la ley aplicable .

La retribución será revisable anualmente , en función de las variaciones que experimente el Indice sobre Precios al Consumo español .

**5. OTRAS OBLIGACIONES**

En caso de vencimiento del presente contrato por haber transcurrido el periodo de tiempo indicado en la Cláusula 3ª del mismo , ambas partes contratantes renuncian a cualquier indemnización que pueda corresponderles en virtud de ello , y no podrán efectuar reclamación alguna .
En caso de incumplimiento por fraude o negligencia de una de las partes contratantes, de sus deberes según el presente Contrato, la otra parte tendrá derecho rescindirlo mediante notificación escrita a la primera, sin indemnización alguna y sin perjuicio, en su caso, del derecho a demandarla por daños y perjuicios.

**6. CONFIDENCIALIDAD**

La Compañía española no revelará ni permitirá que transcienda ningún secreto comercial o información confidencial obtenido del Prestador en relación con la asistencia y los servicios que se presten según el presente contrato.

**7. LEY**

Toda controversia, cuestión o reclamación resultante de la ejecución o interpretación del presente contrato se resolverá definitivamente de acuerdo con la legislación española y con sometimiento igualmente a la jurisdicción española .

En cumplimiento de lo acordado , ambas partes firman y ratifican el presente contrato, en la fecha y lugar que consta en el mismo, a los efectos pertinentes .

Fdo. James R. Murphy                    Fdo. Clemente González Azpeitia

**LA COMPAÑÍA ESPAÑOLA**        **BENTLEY PHARMACEUTICALS, INC.**

=====================================

ES PRIMERA COPIA DE SU MATRIZ que, con el número de orden al principio indicado obra en mi protocolo general co-

CONFIDENTIAL

BEL000509

B248

In Madrid, May 1, 1998

## PARTIES

### PARTY OF THE FIRST PART

**1. BENTLEY PHARMACEUTICALS INC.**, a foreign company with its corporate domicile at 4830 West Kennedy Blvd., Suite 548, Tampa, FL 33609, and acting in its name and behalf **Mr. CLEMENTE GONZÁLEZ AZPEITIA**, of Spanish nationality, of legal age, with N.I.F. 2,009,837, in his capacity as Verbal Agent thereof (hereinafter, the Provider).

### PARTY OF THE SECOND PART

**2. LABORATORIOS BELMAC, S.A.**, a Spanish company with its domicile in Madrid at Montearagón 9-1°, with C.I.F. N° A-78964038, and acting in its name and behalf **Mr. JAMES R. MURPHY**, of United States nationality, of legal age, with Passport N° 100791160, issued in Massachusetts, United States, in his capacity as President and Delegate Director (hereinafter, the Spanish company).

Both acknowledge each other's capacity and standing to execute this agreement.

### WHEREAS

The Spanish Company has an interest in receiving certain specialized services and the provider is in a position to provide said services, the contracting parties have agreed to formalize this service agreement in writing; accordingly, they do so in accordance with the foregoing and the following clauses:

### 1. PURPOSE

The purpose of this Service Agreement is to define the nature of the services and the fees payable for and in respect of said services.

### 2. SERVICES PROVIDED

Commencing as of the date on which this Agreement is signed, the Provider is in a position to provide the following services to the Company in the future:

CONFIDENTIAL

BEL000507

1. Advising on the search for business opportunities and new products.

2. Advising on sales, marketing, and commercial strategies such as the pharmaceutical market's worldwide evolution, introduction to national or foreign markets to stimulate exports, trade credits, triangulation transactions, new product launches, special promotional activities such as conventions, international professional meetings, etc.

3. Advising on how to bring pharmaceutical manufacturing into compliance with international GMP (Good Manufacturing Practices) standards.

4. Advising on applications for patents, trademarks, know-how, licenses, etc.

5. Professional advising on commercial and administrative management, budgeting, customer analysis, profitability studies, and all complementary activities.

6. Maintenance and updating of computer files relating to commercial, technical, and accounting practices which will facilitate the control, analysis, and monitoring of the information relating thereto.

For the intents and purposes of the provision of the aforementioned services, the Spanish Company shall bear all of the necessary expenses accessory thereto, and in particular, the travel and lodging expenses required for performance of the obligations stemming from this agreement.

## 3. EXPIRATION

This agreement shall remain in force for eight months (from May 1, 1998 to December 31, 1998). Nevertheless, it shall be deemed to be automatically renewed for one (1) year terms unless either contracting party advises the other in writing of its expiration at least one month in advance of the date on which the term then under way will expire.

## 4. CONSIDERATION

As consideration for the services mentioned in this Agreement and during the period of time stipulated in the preceding provision, the Spanish Company undertakes to pay the Provider the sum of FORTY MILLION (40,000,000) PESETAS.

Said payment shall be made for each completed quarter, within the 30 days following the date of receipt of the invoice.

The fees payable by the Spanish Company shall be paid in full, free and clear of all deductions or withholdings other than those the Spanish Company is obligated to make by law.

CONFIDENTIAL

Said fees do not include the legally incurred indirect taxes on the services provided by virtue of this agreement; they shall be paid as required by the applicable laws.

The consideration shall be subject to annual review on the basis of the variation in the Spanish Consumer Price Index.

## 5. OTHER OBLIGATIONS

In the event this agreement terminates due to the expiration of the term stipulated in Clause 3 hereof, both contracting parties waive any indemnification to which they might be entitled by virtue thereof and may not make any claim whatsoever.

In the event of default due to fraud or negligence of its contractually prescribed duties by one of the contracting parties, the other party shall be entitled to rescind the agreement by written notice to the first, without paying any indemnification whatsoever and without prejudice to its right to sue for damages, if any.

## 6. CONFIDENTIALITY

The Spanish Company shall not disclose or permit the disclosure of any trade secret or confidential information obtained from the Provider in relation to the assistance and the services provided pursuant to this agreement.

## 7. LAW

All disputes, issues, or claims arising from the performance or construction of this agreement shall be definitively resolved in accordance with Spanish legislation and likewise in submission to Spanish jurisdiction.

In compliance with the foregoing, both parties sign and ratify this agreement, on the date and at the place indicated herein, for the pertinent intents and purposes.

[signed] James R. Murphy                    [signed] Clemente González Azpeitia
**THE SPANISH COMPANY**                     **BENTLEY PHARMACEUTICALS, INC.**

THIS IS THE FIRST OFFICIAL COPY OF ITS ORIGINAL, with the number indicated at the beginning, which is on file in my general protocol (text cut off)

CONFIDENTIAL

BEL000509

## CONTRATO DE SERVICIOS DE APOYO A LA GESTION

1 de julio de 1998

### REUNIDOS

DE UNA PARTE,

1) **BENTLEY PHARMACEUTICAL, Inc.**

sociedad existente y constituida con arreglo a la legislación del Estado de Florida en los Estados Unidos y con domicilio social en 4830 w. Kennedy Blvd., Suite 548, Tampa, Florida 33409, EE.UU. (en adelante, denominada "USCO");

Y DE LA OTRA,

2) **LABORATORIOS BELMAC, S.A.**

sociedad existente y constituida con arreglo a la legislación española y con domicilio social en Montearagón 9, Madrid 28033, España (en adelante, denominada el "Cliente"),

### MANIFIESTAN

A) Que USCO y sus filiales constituyen un grupo multinacional de empresas farmacéuticas y que el Cliente forma parte de dicho grupo;

B) Que el Cliente continuamente necesita asesoramiento y asistencia en las áreas de operaciones técnicas, comercialización, financiación, planificación, contabilidad y de sistemas de información;

C) Que los departamentos de servicios de USCO están dotados de personal muy experimentado y por ello han sido seleccionados como unidad central para prestar y coordinar la prestación al cliente de diversos servicios útiles y beneficiosos en las áreas mencionadas;

D) Que USCO está dispuesta a prestar los servicios al Cliente, y este desea utilizarlos, lo que llevan a efecto con arreglo a las siguientes

### CLAUSULAS

I. **Contratación de los servicios de USCO**

1. Por el presente Contrato el Cliente contrata a USCO para prestar servicios en las áreas que se especifican a continuación durante la vigencia de este Contrato. El Cliente pide a USCO que preste tales servicios de manera

CONFIDENTIAL
CONFIDENTIAL

BEL005353



PAPEL EXCLUSIVO PARA DOCUMENTOS NOTARIALES

25    PTA.

2S6126678

2

continua sin que ulteriormente se le solicite de manera concreta, o en cualquier momento en que USCO reciba una solicitud o pedido del Cliente en tal sentido.

2.    Además de los servicios que se mencionan y especifican en el presente Contrato, el Cliente podrá solicitar a USCO que preste servicios especiales adicionales, y USCO se compromete a satisfacer tal solicitud en la medida que le sea posible. Los servicios especiales adicionales se prestarán con arreglo a un contrato separado, y no serán facturados al Cliente según el presente Contrato de Servicios de Apoyo a la Gestión.

II.    Servicios

Durante la vigencia del presente Contrato y sujeto a los términos y condiciones establecidos en el mismo, USCO realizará los siguientes servicios en favor del Cliente:

1.    En el área de Operaciones Técnicas, USCO prestará la siguiente asistencia al Cliente:

a.    Asistencia en el estudio e inspección de todas las reclamaciones presentadas contra el Cliente al amparo de garantías.

b.    Coordinación de las pruebas que se practiquen sobre todos los productos defectuosos devueltos.

c.    Se encargará del control de calidad y del aseguramiento de la calidad de un día para otro.

d.    Asistencia al Cliente para dar a todos los clientes la información que pidan sobre aspectos técnicos.

e.    El personal de operaciones técnicas de USCO viajará al extranjero para practicar inspecciones sobre el terreno cuando ello sea preciso con motivo de reclamaciones de los clientes.

2.    En las áreas de Comercialización y Servicios de Comercialización, USCO prestará al Cliente la siguiente asistencia:

a.    Identificación de posibles clientes y llevar así como desarrollar listas o relaciones de los mismos para el Cliente en todo el mundo.

b.    Asistencia al Cliente para el cobro de deudas mediante la determinación de las condiciones de pago adecuadas en función de los requisitos o limitaciones que rijan en cada país.

c.    Disponibilidad para evacuar consultas respecto del proceso de facturación.

CONFIDENTIAL
CONFIDENTIAL

BEL005354

B253

3

    **d.**    Disponibilidad para evacuar consultas sobre comunicación y ocuparse de las relaciones con los clientes en representación del Cliente, incluyendo viajes en el extranjero para realizar visitas personales de manera periódica a la sede de cada cliente.

**3.**    En el área de <u>Servicios de la Empresa</u> USCO prestará al Cliente la siguiente asistencia:

    **a.**    Estudio y servicios de asesoría en relación con todos los catálogos, volantes y demás textos de publicidad de la empresa destinados a ser distribuidos por el Cliente.

**4.**    En el área de <u>Servicios de Dirección</u>, USCO prestará al Cliente la siguiente asistencia:

    **a.**    Desarrollo de programas estratégicos para el Cliente.

    **b.**    Determinación de la política de fijación de precios del Cliente.

    **c.**    Desarrollo de nuevas líneas de productos y nuevas oportunidades de negocio para el Cliente.

    **d.**    Asistencia para tomar decisiones financieras y de política financiera, incluyendo la planificación en materia de moneda extranjera y de oportunidades de inversión para el Cliente.

    **e.**    Desplazamiento a la sede del cliente para estudiar operaciones y asesorar al personal clave.

**5**    Áreas de <u>Contabilidad y Finanzas</u>, USCO prestará al Cliente la siguiente asistencia:

    **a.**    Desarrollo, gestión y reconciliación de las cuentas de inversiones financieras entre sociedades del grupo para el Cliente.

    **b.**    Actuar como enlace a efectos del desarrollo de nuevos sistemas, procedimientos y controles.

    **c.**    Determinación de las políticas contables, incluyendo el desarrollo de sistemas de información financiera y asesoramiento sobre los sistemas de contabilidad, elaboración y revisión de presupuestos.

    **d.**    Disponibilidad para asistir a negociaciones con bancos en representación del cliente.

    **e.**    Garantizar créditos al Cliente según se requiera.

    **f.**    Disponibilidad para prestar asistencia en las relaciones con los auditores externos y todas las autoridades administrativas y fiscales.

CONFIDENTIAL
CONFIDENTIAL

BEL005355

2S6126679

4

g. Desplazamiento a la sede del Cliente, según sea preciso, para prestar asistencia en las mencionadas operaciones financieras y contables.

6. En el área <u>Administrativa</u>, USCO prestará al Cliente la siguiente asistencia:

    a. Disponibilidad para evacuar consultas respecto de las pautas a aplicar en relación con todas las prácticas en materia de personal y contratación de personal.

    b. Selección de personal de alta dirección para el Cliente.

    c. Formulación de estructuras retributivas adecuadas incluyendo aumentos de las remuneraciones, gratificaciones, pensiones y otras prestaciones.

    d. Disponibilidad para prestar asistencia en relación con todas las necesidades del Cliente en materia de seguros, salvo las prestaciones sanitarias para los empleados, en función de lo que requiera la legislación local.

    e. Establecimiento sobre una base táctica de la política de actividades operativas en áreas tales como utilización de almacenes y servicio a los clientes.

    f. Desplazamiento a la sede del Cliente, según sea preciso, para dar formación y prestar asistencia en relación con las actividades anteriores.

7. En el área de <u>Desarrollo de Productos</u>, USCO prestará al Cliente la siguiente asistencia:

    a. Se encargará de coordinar la adquisición, circulación, almacenamiento y envíos de existencias a nivel mundial.

    b. Disponibilidad para prestar asistencia en todas las relaciones con proveedores.

    c. Desarrollo y prueba de todos los nuevos productos.

8. En el área de <u>Sistemas de Información</u> USCO prestará al Cliente la siguiente asistencia:

    a. Asesoramiento y formación del personal del Cliente en la utilización de equipos informáticos y software.

    b. Poner a disposición su ordenador central y operadores para las necesidades financieras y otras relacionadas con la elaboración de informes.

    c. Asesoramiento relativo a la idoneidad de los sistemas informáticos

CONFIDENTIAL
CONFIDENTIAL

BEL005356

para su utilización en las operaciones del Cliente.

    d.    Desplazamiento a la sede del Cliente, según sea preciso, para prestar asistencia en las actividades anteriores.

9.    En el área de <u>crédito</u>, USCO prestará al Cliente la siguiente asistencia:

    a.    Colaboración en los cobros a clientes del Cliente.

    b.    Análisis de las condiciones y límites de crédito a clientes del Cliente.

    c.    Disponibilidad para prestar asistencia en relación con todas las preguntas que formulen los clientes del Cliente respecto de los saldos de sus cuentas.

    d.    Desplazamiento a la sede del Cliente según sea preciso para prestar asistencia en relación con las actividades anteriores.

10.    En el área de <u>Gestión de Existencias</u>, USCO prestará al Cliente la siguiente asistencia:

    a.    Control, coordinación y manejo de las relaciones con proveedores.

    b.    Determinación y control de los niveles adecuados de existencias.

    c.    Desplazamiento a la sede del Cliente, según sea preciso para prestar asistencia en relación con las actividades anteriores.

11.    En el área de <u>Aseguramiento de la Calidad</u>, USCO prestará al Cliente la siguiente asistencia:

    a.    Disponibilidad para controlar y supervisar los procedimientos de inspección de las existencias del Cliente y para asegurar que éstas cumplen las normas de calidad especificadas.

    b.    Análisis de informes sobre incumplimiento relativos a elementos que no alcancen un nivel de calidad aceptable.

    c.    Mantenimiento de las especificaciones de proveedores.

12.    En el área de <u>Operaciones</u>, USCO prestará al Cliente la siguiente asistencia:

    a.    Evaluación de la eficacia de las operaciones de almacenaje del Cliente.

    b.    Análisis del número y valor de los recuentos cíclicos que realice el Cliente y determinación de los problemas que puedan existir, aportando soluciones adecuadas.

    c.    Desplazamiento a la sede del Cliente, según sea preciso para prestar asistencia en relación con las actividades anteriores.

CONFIDENTIAL

CONFIDENTIAL

BEL005357



2S6126680

6

**III.** **Servicios no comprendidos en este contrato**

1. El presente Contrato no incluye otras actividades de investigación y desarrollo que no sean las de desarrollo de productos enumeradas más arriba en la estipulación II.7.c. Si en el futuro se emprendieran actividades de investigación y desarrollo, éstas se regirán por un contrato separado.

**IV.** **Honorarios**

1. Como precio de los servicios a prestar por USCO según el presente Contrato, el Cliente acepta y se compromete a pagar honorarios a USCO.

   El importe de los honorarios estará determinado por la parte que corresponda al Cliente del importe total de los costes soportados por USCO en la prestación de los servicios a la totalidad del grupo, formado por USCO y sus filiales tanto nacionales como internacionales (en adelante, el "Grupo"). La participación del Cliente en el importe total de los costes sujetos a distribución se calculará con arreglo a las disposiciones siguientes.

2. El importe total de los costes sujetos a distribución según el presente Contrato se calculará de la siguiente manera:

   Con arreglo a un método generalmente aceptado de contabilidad de costes, USCO totalizará, por categoría, todos los costes directos e indirectos que soporte en la prestación de servicios a sus filiales, incluyendo todos los costes de personal, viajes y equipo, todos los gastos abonados a terceros y todos los gastos generales.

3. El criterio de distribución de costes que se aplicará para la imputación al Cliente de su parte de los costes netos que soporte USCO en la prestación de los servicios comprendidos en el presente Contrato será el siguiente:

   La participación del Cliente en el coste de los servicios que se describen arriba se determinará multiplicando el coste íntegro que soporte USCO en relación con los correspondientes Departamentos por el tiempo que cada persona de cada Departamento dedique a las actividades del Cliente dividido por el tiempo total de trabajo de cada persona en cada Departamento.

4. Si los honorarios que se facturen están sujetos a IVA o a un impuesto similar, los importes correspondientes serán de cuenta del Cliente. En el bien entendido de que ambas partes harán todo lo posible para recuperar dichos importes.

**V.** **Pagos**

1. La facturación al Cliente se realizará mensualmente, sobre la base de la información financiera efectiva del mes anterior. La factura se emitirá dentro

CONFIDENTIAL

CONFIDENTIAL



de los treinta primeros días del mes siguiente y el Cliente deberá pagar la factura dentro de los sesenta días siguientes.

2. Todas las cantidades que sean pagaderas por cualquiera de las dos partes según el presente Contrato se pagarán en Dólares USA.

3. Los pagos fuera de plazo estarán sujetos a un cargo en concepto de intereses, al tipo LIBOR en vigor más 0.75%.

**VI.** **Registros contables y documentación de los costes**

1. Con el objeto de facilitar la imputación de costes, USCO utilizará un sistema de cálculo de costés en conformidad con lo que requiera un método aceptable de contabilidad de costes.

   En particular, USCO llevará libros y registros fieles y exactos con el grado de detalle que sea necesario para identificar los costes relacionados con la prestación de servicios que se especifican en la Cláusula II anterior.

2. Todos los libros y registros contables serán auditados anualmente por un Auditor externo.

**VII.** **Garantía**



1. USCO prestará los servicios con un alto grado de profesionalidad y sólo empleará personal calificado.

2. En virtud del presente Contrato, la responsabilidad de USCO por incumplimiento significativo de lo estipulado en el mismo se limitará a aquellos casos en que la otra parte pueda demostrar que ha existido negligencia grave o dolo por parte de USCO o de alguno de sus empleados, en el bien entendido que USCO no será responsable en ningún caso de los daños consecuentes o del lucro cesante que sufra el Cliente o algún tercero, y en el bien entendido, asimismo, que el importe de los daños y perjuicios que se reclamen por todos los casos de incumplimiento del Contrato que puedan ocurrir en el transcurso de un año natural en relación con el Cliente no excederán el importe de los honorarios a pagar por el Cliente a USCO respecto del año durante el cual haya ocurrido el incumplimiento.

3. La responsabilidad de USCO por actos torticeros cometidos por ésta o sus empleados se limitará a aquellos respecto de los cuales el Cliente pueda demostrar que USCO o uno o más empleados de ésta han actuado de manera dolosa o con negligencia grave. La responsabilidad de USCO por actos torticeros cometidos por agentes externos que no hayan formalizado un contrato de servicios estándar con USCO y hayan sido contratados por USCO para ayudar a prestar los servicios se limitará al importe de los daños y perjuicios que USCO pueda recuperar del agente externo.

CONFIDENTIAL

CONFIDENTIAL

BEL005359



2S6126681

**VIII. Período de Vigencia y Rescisión**

1. El presente Contrato entrará en vigor el 1 de Julio de 1998.

2. Permanecerá en vigor durante un periodo de, al menos, tres años, salvo que sea rescindido con arreglo a las disposiciones siguientes.

3. El Contrato continuará en vigencia una vez cumplido el periodo de tiempo mencionado, quedando prorrogado tácitamente durante periodos sucesivos de un año, salvo que alguna de las dos partes ponga término al mismo mediante notificación escrita a efectuar con 90 días de anticipación. La notificación será enviada al presidente u órgano representativo encargado de dirigir la actividad ordinaria de la otra parte.

4. Cualquiera de las dos partes podrá poner término al presente Contrato con efecto inmediato en caso de incumplimiento reiterado de la otra parte de las obligaciones significativas que ha asumido según este Contrato o en caso de existencia de cualquier otra causa grave. La carga de la prueba de que existe tal causa justificada corresponde a aquella parte que desee rescindir el Contrato.

**IX. Modificaciones**

1. Ambas partes estudiarán continuamente este Contrato para determinar si sus términos son razonables, especialmente en lo que se refiere a la adecuada imputación de los costes.

2. Si en algún momento las partes contratantes determinan que el presente Contrato no refleja un justo equilibrio de los intereses de ambas partes, especialmente si se producen cambios considerables de las responsabilidades dentro del grupo de sociedades, este Contrato será modificado para adecuarlo a las nuevas circunstancias. Las partes contratantes convendrán las modificaciones que se requieran a la vista de las nuevas circunstancias.

3. Cualquier cambio, modificación o renuncia al presente Contrato o a alguna disposición del mismo sólo será vinculante para las partes contratantes si se hace por escrito o es confirmada por escrito por sus representantes legalmente facultados para ello.

**X. Legislación aplicable**

El presente Contrato y los derechos y obligaciones de las partes contratantes se regirán e interpretarán de acuerdo con la legislación del Estado de Florida en los Estados Unidos de América.

CONFIDENTIAL

CONFIDENTIAL

BEL005360

**XI.**  **Jurisdicción competente**

Todo litigio derivado del presente Contrato se someterá a la jurisdicción de los Tribunales de Tampa

**XII.**  **Invalidez parcial**

Si se determinara que alguno de los términos o condiciones de este Contrato carece de validez, el Contrato se interpretará como si dicho término o condición no figurara en el mismo.

**XIII.**  **Encabezamientos**

Los títulos o encabezamientos utilizados en este Contrato únicamente están destinados a facilitar la lectura y no se utilizarán a efectos de interpretar el significado o intención del mismo.

**EN TESTIMONIO DE LO CUAL,** las partes firman el presente Contrato el día 1 de julio de 1998.

Fdo.:  Adolfo Herrera Málaga
actuando en nombre y representación de
BENTLEY PHARMACEUTICAL, Inc.

Fdo.: Clemente González Azpeitia
actuando en nombre y representación de
LABORATORIOS BELMAC, S.A.

=====================================

ES PRIMERA COPIA DE SU MATRIZ que, con el número de orden al principio indicado obra en mi protocolo general corriente de instrumentos públicos, en donde queda anotada. Y para la sociedad "LABORATORIOS BELMAC, S.A.", la expido en siete folios de papel exclusivo para documentos notariales, serie 2S., números 6126675, 6126676, 6126677, 6126678, 6126679, 6126680 y el del presente, que signo, firmo, rubrico y sello, y en un folio más de igual serie número 6125891, que rubrico y sello, en MADRID, a veintitrés de diciembre de mil novecientos noventa y ocho. DOY FE.

D. A. 3.ª L. 8/89.- Documento no sujeto
(Instrumento sin cuantía)

CONFIDENTIAL
CONFIDENTIAL

BEL005361

B260

## *MANAGEMENT SUPPORT SERVICE AGREEMENT*

July 1, 1998

### PARTIES

**PARTY OF THE FIRST PART,**

1) **BENTLEY PHARMACEUTICALS, Inc.**

    a company existing and incorporated in accordance with the laws of Florida State, United States, with its domicile at 4830 W. Kennedy Blvd., Suite 548, Tampa, Florida 33409, USA (hereinafter referred to as "USCO");

**PARTY OF THE SECOND PART,**

2) **LABORATORIOS BELMAC, S.A.**

    a company existing and incorporated in accordance with the laws of Spain, with its domicile at Montearagón 9, Madrid 28033, Spain (hereinafter referred to as "Client"),

### REPRESENTATIONS

A) USCO and its subsidiaries are a multinational group of pharmaceutical companies and the Client is a member of said group;

B) The Client continuously needs advising and assistance in the areas of technical operation, marketing, financing, planning, accounting, and information/computing systems;

C) USCO's service departments have highly experienced personnel, wherefore they have been chosen as the core unit for providing and coordinating the provision of a range of useful and beneficial services to the Client in the aforementioned areas;

D) USCO is willing to provide the services to the Client, and the latter wishes to make use of them, which they shall do in accordance with the following

### CLAUSES

1. **Retention of USCO's services**

    1. The Client hereby retains USCO to provide services in the areas specified below during the term of this agreement. The Client asks USCO to provide said services on a continuous basis without the need for concrete subsequent requests, or at any time when USCO receives a request or order to that effect from the Client.

CONFIDENTIAL

BEL005353

2S6126678

2. In addition to the services mentioned above and specified herein, the Client may ask USCO to provide additional special services, and USCO undertakes to fulfill said requests insofar as it can do so. The additional special services shall be provided in accordance with a separate contract and shall not be billed to the Client under this Management Support Services Agreement.

## II. Services

During the term of this Agreement and subject to the terms and conditions prescribed therein, USCO shall provide the following services to the Client:

1. In the Technical Operations area, USCO shall provide the following assistance to the Client:

   a. Assistance in the examination and inspection of all claims filed against the Client under warranties.

   b. Coordination of the tests performed on all defective products which are returned.

   c. USCO will be responsible for quality control and quality assurance on a day-to-day basis.

   d. Assistance to the Client designed to give all clients the information they request on technical issues.

   e. USCO's technical operations personnel shall travel abroad to perform on-site inspections when necessary in response to client's claims.

2. In the Marketing and Marketing Services areas, USCO shall provide the following assistance to the Client:

   a. Identification of potential clients and formulation of worldwide lists thereof for the Client.

   b. Assistance to the Client in collection of debts through the determination of appropriate payment terms based on the requirements or constraints in force in each country.

   c. Availability to respond to inquiries on the billing process.

CONFIDENTIAL

BEL005354

    **d.**  Availability to respond to inquiries on communication and take charge of relations with the clientele as the Client's representative, including periodic trips abroad to make personal visits to each client's headquarters.

**3.**  In the <u>Corporate Services</u> area, USCO shall provide the following assistance to the Client:

    **a.**  Study and advising regarding all the company's catalogs, flyers, and other advertising and publicity materials intended to be distributed by the Client.

**4.**  In the <u>Managerial Services</u> area, USCO shall provide the following assistance to the Client:

    **a.**  Formulation of strategic programs for the Client.

    **b.**  Determination of the Client's pricing policy.

    **c.**  Development of new product lines and new business opportunities for the Client.

    **d.**  Assistance in making financial decisions and formulating financial policy, including foreign currency planning and investment opportunities for the Client.

    **e.**  Travel to the Client's headquarters to examine operations and advise key personnel.

**5.**  In the <u>Accounting and Finance</u> area, USCO shall provide the following assistance to the Client:

    **a.**  Formulation, management, and reconciliation of the intercompany financial investment accounts among group members for the Client.

    **b.**  Act as liaison for purposes of the development of new systems, procedures, and controls.

    **c.**  Determination of accounting policies, including the development of financial information systems and advising on the accounting systems, formulation and review of budgets.

    **d.**  Availability to assist in negotiations with banks as the Client's representative.

    **e.**  Guarantee credits taken by the Client, as required.

    **f.**  Availability to provide assistance in relations with external auditors and all administrative and tax authorities.

CONFIDENTIAL

BEL005355

2S6126679

    **g.** Travel to the Client's headquarters when necessary to provide assistance in relation to the aforementioned financial and accounting operations.

**6.** In the <u>Administrative</u> area, USCO shall provide the following assistance to the Client:

    **a.** Availability to respond to inquiries regarding the standards to be applied to all the personnel management and hiring practices.

    **b.** Selection of top management personnel for the Client.

    **c.** Formulation of adequate compensation structures, including pay increases, gratifications, pensions, and other benefits.

    **d.** Availability to provide assistance in relation to all the Client's insurance needs, except for health benefits for the employees, in accordance with the requirements of local legislation.

    **e.** Establishment on a tactical basis of the operating activities policy in such areas as warehouse utilization and local legislation.

    **f.** Travel to the Client's headquarters when necessary to provide training and assistance in relation to the foregoing activities.

**7.** In the <u>Product Development</u> area, USCO shall provide the following assistance to the Client:

    **a.** It shall be responsible for coordinating the acquisition, movement, storage, and shipping of stocks worldwide.

    **b.** Availability to provide assistance in all relations with suppliers.

    **c.** Development and testing of all new products.

**8.** In the <u>Information/Computing Systems</u> area, USCO shall provide the following assistance to the Client:

    **a.** Advising and training for the Client's personnel in the use of computing equipment and software.

    **b.** Place a mainframe computer and operators at the Client's disposal for financial and other needs related to the production of reports.

    **c.** Advising on the suitability of information/computing systems for use in the Client's operations.

CONFIDENTIAL

**BEL005356**

    **d.** Travel to the Client's headquarters when necessary to provide assistance in the foregoing activities.

9. In the Credit area, USCO shall provide the following assistance to the Client:

    **a.** Cooperation regarding collections from the Client's customers.

    **b.** Analysis of the credit terms and limits for the Client's customers.

    **c.** Availability to provide assistance in relation to all the questions asked by the Client's customers regarding the balances in their accounts.

    **d.** Travel to the Client's headquarters when necessary to provide assistance in relation to the foregoing activities.

10. In the Stock Management area, USCO shall provide the following assistance to the Client:

    **a.** Control, coordination, and handling of relations with suppliers.

    **b.** Determination and control of the appropriate levels of stocks.

    **c.** Travel to the Client's headquarters when necessary to provide assistance in relation to the foregoing activities.

11. In the Quality Assurance area, USCO shall provide the following assistance to the Client:

    **a.** Availability to control and supervise the procedures for inspection of the Client's stocks and make certain that they are in compliance with the specified quality standards.

    **b.** Analysis of reports on noncompliance by items which do not have an acceptable level of quality.

    **c.** Maintenance of the suppliers' specifications.

12. In the Operations area, USCO shall provide the following assistance to the Client:

    **a.** Evaluation of the effectiveness of the Client's storage operations.

    **b.** Analysis of the number and value of cyclical counts made by the Client, and determination of problems which might exist, as well as provision of adequate solutions.

    **c.** Travel to the Client's headquarters when necessary to provide assistance in relation to the foregoing activities.

CONFIDENTIAL

BEL005357

B265

2S6126680

### III. Services not included in this agreement

1. This Agreement does not include other areas of research and development distinct from those of product development which are listed above in Clause II.7.c. If research and development activities are undertaken in the future, they shall be regulated by a separate contract.

### IV. Fees

1. As the price for the services to be provided by USCO pursuant to this Agreement, the Client accepts and undertakes to pay fees to USCO.

   The amount of said fees shall be determined by the Client's share in the total amount of cost incurred by USCO to provide the services to the entire group, comprised of USCO and its domestic and international subsidiaries (hereinafter, the "Group"). The Client's share in the total amount of cost subject to distribution shall be calculated on the basis of the following provisions.

2. The total amount of cost subject to distribution pursuant to this Agreement shall be calculated as follows:

   Based on a generally accepted cost accounting method, USCO shall add up, by category, all the direct and indirect costs incurred to provide services to its subsidiaries, including all the personnel, travel, and equipment costs, all the expenses paid to third parties, and all the general expenses.

3. The cost distribution criterion which shall be applied to determine the Client's share of the net costs incurred by USCO to provide the services included in this Agreement shall be as follows:

   The Client's share in the cost of the services described above shall be determining by multiplying the entire cost incurred by USCO in relation to the Departments in question by the time each person from each Department devotes to the Client's activities, divided by the total work time of each person in each Department.

4. If the fees that are billed are subject to VAT or a similar tax, the Client shall be responsible for the amounts in question, upon the understanding that both parties shall do everything in their power to recover said amounts.

### V. Payments

1. The Client shall issue monthly invoices based on the effective financial information for the preceding month. The invoices shall be issued during the first thirty days of the following month, and the Client must pay each invoice within the following sixty days.

CONFIDENTIAL

BEL005358



2. All amounts which are payable by either of the two parties pursuant to this Agreement shall be paid in U.S. Dollars.

3. Late payments shall be subject to interest at the prevailing LIBOR rate plus 0.75%.

## VI. Accounting records and documentation of costs

1. To facilitate attribution of costs, USCO shall make use of a cost calculation system consistent with what is required by an acceptable cost accounting method.

   In particular, USCO shall keep true and exact books and records with the degree of detail required to identify the costs related to the provision of the services specified in Clause II, above.

2. All the accounting books and records shall be audited by an external auditor each year.

## VII. Warranty

1. USCO shall provide its services with a high degree of professionalism and shall use only well qualified personnel.

2. By virtue of this Agreement, USCO's liability for material default on the provisions thereof shall be limited to the cases in which the other party can demonstrate that there has been serious negligence or fraud on the part of USCO or any of its employees, upon the understanding that USCO shall not be liable in any event for consequential damages or lost profit suffered by the Client or any third party, and likewise on the understanding that the value of the damages claimed in all cases of default on the Agreement which may occur in the course of a calendar year in relation to the Client shall not exceed the amount of fees payable to USCO by the Client in respect of the year in which said default occurred.

3. USCO's liability for injurious acts committed by it or its employees shall be limited to those in respect of which the Client can demonstrate that USCO or one or more of its employees have acted fraudulently or with serious negligence. USCO's liability for injurious acts committed by external agents who have no standard service contract with USCO and have been retained by USCO to help provide the services shall be limited to the amount of the damages USCO can recover from the external agent.

CONFIDENTIAL

BEL005359

2S6126681

### VIII. Term and Rescission

1. This Agreement shall enter into force on July 1, 1998.

2. It shall remain in force for a term of at least three years, unless it is rescinded in accordance with the following provisions.

3. The Agreement shall continue in force upon the expiration of the aforementioned term, being tacitly renewed for successive terms of one year, unless either of the parties terminates it by written notice to be given 90 days in advance. Said notice shall be sent to the president/chairman or the representative organ responsible for directing the other party's regular activity.

4. Either of the parties may terminate this Agreement effective immediately in the event of the other party's repeated default on the material obligations it has assumed pursuant hereto, or in the event of the existence of any other serious cause. The burden of proving the existence of said cause falls on the party wising to rescind the Agreement.

### IX. Amendment

1. Both parties shall continually review this Agreement to determine whether its terms are reasonable, especially in relation to the appropriate attribution of costs.

2. If at any time the contracting parties determine that this Agreement does not reflect a fair equilibrium between the interests of both parties, and especially if material changes occur in the responsibilities within the group of companies, this Agreement shall be amended to make it reflect the new circumstances. The contacting parties shall agree on the required changes in the light of said new circumstances.

3. Any change, amendment, or waiver of this Agreement or any provision thereof shall be binding on the contracting parties only if it is made in writing or confirmed in writing by their representatives legally empowered to do so.

### X. Applicable legislation

This Agreement and the rights and obligations of the contracting parties shall be governed and construed in accordance with the legislation of the State of Florida, United States of America.

CONFIDENTIAL

BEL005360

B268

## XI. Competent Jurisdiction

All litigation arising from this Agreement shall be subject to the jurisdiction of the Courts of Tampa.

## XII. Partial invalidity

If it is determined that any of the terms or conditions of this Agreement is invalid, the Agreement shall be construed as if said term or condition were not a part of it.

## XIII. Headings

The titles or headings used in this Agreement are inserted only to facilitate its reading and shall not be used for the purpose of interpreting its meaning or intent.

**IN WITNESS WHEREOF,** the parties sign this Agreement on July 1, 1998.

[signed] Adolfo Herrera Málaga
acting in the name and behalf of
BENTLEY PHARMACEUTICAL, Inc.

[signed] Clemente González Azpeitia
acting in the name and behalf of
LABORATORIOS BELMAC, S.A.

THIS IS THE FIRST OFFICIAL COPY OF ITS ORIGINAL, with the number appearing at the beginning thereof which is on file in my current general protocol of public instruments, in which it is registered. And for the "LABORATORIOS BELMAC, S.A." company, I issue on seven pages of paper to be used exclusively for notarial documents, Series 2S, numbers 6126675, 6126676, 6126677, 6126678, 6126679, 6126680, and this page, which I mark, sign, initial, and seal, plus an additional page with serial number 6125891, which I initial and seal, in MADRID on the twenty third day of December, nineteen ninety eight. I BEAR WITNESS.

[signed] illegible

D.A. 3 L. 8/89. Document not subject (instrument with no value).

CONFIDENTIAL

BEL005361

B269

<<< Page 1 >>>

MINUTES OF THE ORGANIZATIONAL MEETING

OF   THE    BOARD    OF    DIRECTORS    OF

BENTLEY         PHARMACEUTICALS,~         INC.

A meeting of the Board of Directors of BENTLEY
PHARMACEUTICALS, INC.
(the "Company") was held on July 29, 1998, at 10:30 a.m. local
time, at the Castellana Inter-
Continental Hotel, paseo de la Castellana, 49, Madrid, Spain,
following the Annual Meeting of
Shareholders.

The following directors were present:

James IL Murphy
Robert M Stote
Michael D. Price
Charles L. Boiling
Robert J. Gyurik
Michael McGovem

Also present at the invitation of the Company was the
Company's legal counsel, Jordan
Horvath, of Parker Chapin Flattau & Klimpl, LLP, and the following
officers and employees of
the Company's Spanish subsidiary, Laboratorios Belmac S.!L: Clemente
Gonzalez, Fernando
Berenguer, Adolfo Herrerra, Jose Maria Esteve, Ignado Moreno, Ester
Sanchez and Laura
Peterson.

Mr. Murphy acted as Chairman of the meeting and Mr. Price, at
the request of the
Chairman, acted as Secretary of the meeting.



EXHIBIT
HERRERA
6
7/21/06

BENTL002613
HIGHLY CONFIDENTIAL

<<< Page 2 >>>

Mr. Murphy called the meeting to order and invited the Spanish management team to make a presentation to the members of the Board. Members of the team provided a detailed report with respect to historical and projected product sales through the year 2001, projects underway, strategies, upcoming challenges, etc. After the presentation and questions and discussion with the Board, Mr. Murphy thanked the Spanish team and they excused themselves from the meeting.

Mr. Murphy then indicated that the next order of business was to approve the minutes of the Board of Directors' meetings held on March 24, 1998 and April 24, 1998. After discussion, and upon motion duly made, seconded, and unanimously carried (with Mr. Gyurik abstaining because he was not a member of the Board at the time, nor present at such meetings), it was

RESOLVED, that the minutes of the Board of Directors' meetings held on March 24, 1998 and April 24, 1998 are hereby approved.

1Vfinutes of the Compensation Committee meetings held on December 26, 1997 and March 24, 1998 were presented for approval, and after discussion, upon motion duly made, seconded and carried, it was (by Messrs. Boiling and McGovem, the two members of the Compensation Committee)

2

<<< Page 3 >>>

of    the

March 24,

RESOLVED, that the minutes of the meetings
Compensation Committee held on December 26, 1997 and
1998 are hereby approved.

Mr. Murphy then indicated that the next order of business
was to elect officers of the
Company for the next year. After discussion, upon motion duly made,
seconded, and
unanimously carded, it was

Chairman

Mr.

Stote, MD be

(with Dr.

be elected

Secretary

Melia be

capacity until the

until his or

RESOLVED, that James R. Murphy be elected as
of the Board, President, and Chief Executive Officer (with
Murphy abstaining from the vote), and that Robert M.
elected Senior Vice President, and Chief Science Officer
Stote abstaining from the vote), and that Michael D. Price
Vice President, Chief Financial Officer, Treasurer, and
(with Mr. Price abslaining from the vote), and that Elaine
elected Assistant Secretary, each to serve in such
next organizational meeting of the Board of Directors and
her successor has been duly elected and qualified.

Mr. Price proposed that the Committees of the Board of
Directors be reconstituted and
after discussion, upon motion duly made, seconded and unanimously
carried, it was

Messrs.

RESOLVED, that the Compensation Committee and the
Audit Committee for the ensuing year be comprised of
Charles L. Boiling, Robert J. Gyurik and Michael McGovern.

The Finance Committee was not reconstituted by the Board.

3

BENTL002615
HIGHLY CONFIDENTIAL

<<< Page 4 >>>

Mr. Price then presented to the Board members a financial report, which included a draft of the balance sheet and statement of operations for the second quarter of 1998. Mr. Price explained significant fluctuations and answered the Board's questions. Mr. Price provided a breakdown of the costs included in the Company's non-recurring charge related to the abandoned Schwarz acquisition, which was recorded in the second quarter. Mr. Price continued with explanations of variances from budget and cash balances. Upon conclusion, upon motion duly made, seconded, and unanimously carried, it was

RESOLVED, that the finance report is hereby accepted as presented.

Mr. Price informed the members of the Board that the Company's Directors and Officers Liability Insurance policy was due to expire on August 7, 1998 and that he was in the process of renewing the policy. Mr. Price informed the members of the Board that he expected a reduction in the premium and was authorized by the members of the Board to renew the policy for the same level of coverage if the renewal premium does not exceed $100,000.

The Board of Directors was informed about the complexity of income taxes in Spain. It was agreed that Mr. Price would present the issues to Javier Santos and Jaime Fernandez and request their assistance and guidance with respect to developing a plan that both complies with Spanish tax law and ~ the Company's exposure to Spanish

BENTL002616
HIGHLY CONFIDENTIAL

<<< Page 5 >>>

The discussion then turned to the subject of whether the Company should institute a
program to purchase shares of its Common Stock in the open market. After discussion, no
action was taken with respect to this matter.

The Board then addressed a written request on behalf of investors to consider
extending the life of the Class A Warrants beyond their scheduled February 1999 expiration
date and/or reducing the strike price of such warrants. After discussion, no action was
taken; however, it was agreed that the Board would revisit this issue again before such
warrants are due to expire.

Mr. Murphy then discussed the July 22, 1998 draft of the letter of intent to acquire
the Conrex technology (attached as Exhibit A) and informed the members of the Board that
Ms. Hsieh is looking for additional compensation in the form of stock and participation in
the profits, and that he expects to receive a written proposal from her later in the week.

After a discussion with respect to various alternative ways to structure the transaction, it
was agreed that Mr. Murphy would work with Jordan Horvath to draft the framework of
the eventual agreement.

Dr. Stote then informed the members of the Board about an opportunity to acquire

5

BENTL002617
HIGHLY CONFIDENTIAL

<<< Page 6 >>>

the product, Urex, with annual sales of approximately $1 million from 3M for $2.6 million.

Dr. Stote indicated that this opportunity is in the preliminary proposal stage only. After discussion, no action was taken with respect to this matter.

Mr. Murphy then informed the members of the Board that he had participated in an initial meeting with PolyMedica, which had approached the Company about possible merger opportunities. Mr. Murphy continued by stating that Confidentiality Agreements and data had been exchanged, and that a follow up meeting would probably take place on the following Friday or Monday. Mr. Murphy concluded by agreeing to keep all apprised of developments. Dr. Store expressed his enthusiasm for the opportunity with PolyMedica.

Mr. Murphy then informed the members of the Board that the Company's primary contact at Dominick & Dominick is now Peter Ley instead of Robert Friedman.

Redacted

Mr. Price informed the members of the Board that the Company had filed a Listing Application with the American Stock Exchange to list its Series B Warrants for trading and that he expected the application to be approved in the near future.

BENTL002618
HIGHLY CONFIDENTIAL

<<< Page 7 >>>

As a consequence of abandoning the Schwarz acquisition, it no longer being necessary to reserve a pool of stock purchase options for such purpose (see Minutes of the Board of Directors' Meeting held on April 24, 1998), upon motion duly made, seconded and unanimously carried, it was

RESOLVED, that the pool of stock purchase options, which was reserved for issuance in connection with the proposed Schwarz acquisition, is hereby released and no such options are hereafter reserved for such purpose.

Mr. Murphy then informed the members of the Board that the Company had granted a total of 56,000 stock purchase options to various members of the Spanish team and 10,000 stock purchase options to Elaine Melia under the 1991 Stock Option Plan and asked that the Board ratify the issuance of such stock purchase options to the following employees:

Clemente Gonzalez          10,000

Fernando Berenguer          8,000

Adolfo Herrerra          7,000

Jose Luis Monterde          5,000

Jose Luis Esteve          5,000

Ignacio Moreno          5,000

BENTL002619

HIGHLY CONFIDENTIAL

<<< Page 8 >>>

| | |
|---|---|
| Pedro Vasquez | 5,000 |
| Iuan Carlos Asensio | 1,500 |
| Antonio Cabodevilla | 1,500 |
| Luis Mateo Gasca | 1,500 |
| Laura Peterson | 1,500 |
| Carlos Moran | 1,000 |
| Ester Sanchez Gomez | 1,000 |
| Felisa Ramos | 1,000 |
| Sonia Peim Rama | 1,000 |
| Paloma Rodriguez | 1,000 |
| Elaine Melia | 10,000 |

Upon motion duly made, seconded and unanimously carried, it was

66,000          RESOLVED, that the issuance of an aggregate of

Option Plan      stock purchase options under the Company's 1991 Stock

approved; and   to the employees named above is hereby ratified and

                RESOLVED, that the officers of the Company are
of such         authorized to enter into stock option agreements with each

or              employees and to take all such other acts as are necessary

                advisable in connection with such issuance.

                Mr. Murphy then indicated that the final item of business was
a discussion of John

                Chappell. Mr. Murphy stated that he would like to see John Chappell
join the Board, but

                cited the potential conflict of interest that would be created,
specifically, John's firm, Plexus

                Ventures' consulting arrangement with the Company. Mr. Murphy then
presented the

BENTL002620
HIGHLY CONFIDENTIAL

B277

<<< Page 9 >>>

tea'ms of an amendment to the original consulting agreement with Plexus Ventures and upon
motion duly made, seconded and unanimously carried, it was

RESOLVED, that the amendment to Plexus Ventures' consulting agreement through July 12, 1998 is hereby approved.

There being no further business to come before the meeting, upon motion duly made,
seconded and unanimously carried, the meeting was adjourned.

Michael D. Price, Secretary

BENTL002621
HIGHLY CONFIDENTIAL

<<< Page 10 >>>

Ex~ibi~ A
Page 1 of 3

LETTER    OF    INTENT

Mrs. Phyllis Hsieh and Mr. Yungtai Hsu                                      July 22, 1998

Conrex Pharmaceutical Corporation
300 Kimberton Road, Suite
Phoenixville, PA 19460

Dear Mrs. Hsieh and Mr. Hsu,

This letter is intended to set forth our mutual understanding with respect to the interest of Bentley Pharmaceuticals, Inc. ("Bentley") to acquire ("the Acquisition") all the Conrex Pharmaceutical Corporation's |"Conrex") transdermal technologies, formulas, patents and scientific data ("Technologies") for enhancing the penetration and/or absorption of pharmaceutical products subject to the conditions contained herein.

i. The Acquisition shall be subject to ~a) the execution by the parties of a definitive Acquisition Agreement which shall contain the terms we negotiate and agree to regarding the Acquisition and various customary terms and conditions (the "Acquisition Agreement"); (b) approval by the Bentley Board of Directors of the terms, the execution and performance of the Acquisition Agreement; (c) the satisfactory completion of due diligence by Bentley staff members; (d) the approval of any person or entity whose approval is required to release any encumbrance on the technologies including without limitation all major creditors and stockholders; (e) the review and assignability of any licenses that have been issued; (f) assignment of all regulatory files including but not limited to the Drug Master File (DMF); and (g) the satisfaction of Bentley and its counsel and other representatives with the results of any investigation into the regulatory, scientific, and patent status of all enhancement technology being acquired.

2. For a period commencing on the date hereof and ending at the close of business August 10, 1998 (the "Diligence Period"), Conrex shall provide Bentley and its advisors access, during business hours, to the data and records of Conrex and shall permit Bentley and its advisors to confer with Conrex' employees, agents, attorneys, consultants and such other persons as Bentley shall determine in order to make an appropriate investigation into the scientific review and status of all applications and research and development of the Technologies. Such investigation shall include, without limitation, a review of all regulatory and scientific documents, laboratory studies," research notebooks, formulations, product specifications, manufacturing processes, patents, suppliers, current as well as potential collaborative ventures and all licensing agreements related to the penetration enhancement of pharmaceuticals and cosmetics. Bentley will pay a $10,000 deposit to be credited

BENTL002622
HIGHLY CONFIDENTIAL

against the
    purchase price upon the signing of this Letter of Intent or which
becomes fully
    refundable in the event Bentley determines the technology or patents
are
    unacceptable.

    3. Contingent upon successful completion of Due Diligence by
Bentley, the
    parties hereto will enter into a definitive Acquisition Agreement to
purchase
    all rights to enhancement technology as it relates to potential
pharmaceutical
    industry application (Prescription and OTC) as defined by a document
authored by
    Dr. John E. Bailey of the Food and Drug Administration ~FDA). It is
understood
    that Conrex will maintain all rights to the cosmetic applications
as.defined in
    the same document of Dr. John E. Bailey.

BENTL002623
HIGHLY CONFIDENTIAL

<<< Page 11 >>>

Page 2

Page Two
Ms. Phyllis Hsieh and Mr. Yungtai Hsu
July 22, 1998

Conrex Pharmaceutical The Acquisition Agreement will include the terms and conditions for purchasing all rights to United States patent no. 5,029,252 and any other related patents, patent extensions, proprietary documents in the united States and other countries as well as all scientific studies, formulations, laboratory studies, research notebooks, regulatory documents, filings and other regulatory correspondence, includin- any patents pending and the transfer of Drug Master File (DMF) to Bentley.

In consideration for the purchase of all rights associated with the pharmaceutical applications, Bentley will pay:

A. $1,000,000 cash, to be paid at the closing.

B. 100,000 shares of Common Stock of Bentley, which will be registered for resale at the next, appropriate filing.

C. Warrants to purchase a total of 400,000 shares of Common Stock of Bentley, which Warrants shall be exercisable for a period of three to seven years from the date of closing, with exercise prices of:

a term of 3 years    100,000 Warrants with an exercise price of $4.00 for
a term of 5 years    100,000 Warrants with an exercise price of $5.00 for
a term of 5 years    100,000 Warrants with an exercise price of $6.00 for
100,000 Warrants with an exercise price of $7.00 for a term of 7 years

D. Phyllis ~sieh will be appointed to the Bentley Scientific Advisory Board ~or a period of two (2) years from the date of closing and will receive compensation of one-thousand dollars ($1,000.00) retainer per month for her services in providing new collaborative/licensing opportunities for transdermal products. Scientific Board meetings will be compensated at a rate of $3,000 per meeting. In the event a new lead is introduced by Phyllis Hsieh that results in a collaboration, she will be additional compensated at a rate of 2% of the amount represented in each collaboration and based upon the TOTAL amount received by Bentley and/or it's affiliates. It is further understood that Phyllis will provide a list of those leads at the time of closing and that list is of those companies with bone-fide interest in a specific product(s) documented by copies of correspondence and not a list of all companies that have been introduced to or explored the Conrex Technologies.

4. In order to induce Bentley to spend the time and the money necessary for the investigation referred to in section 2 above, Conrex agrees that during the Diligence Period, Conrex will not execute any agreement or enter into discussions or negotiations of any type with respect to the sale of this technology, or any interest therein, or with respect to any option, or right of

BENTL002624
HIGHLY CONFIDENTIAL