B1261

Executed on this 3rd day of November, 2004 at Exeter, New Hampshire.

_James R. Murphy_
James R. Murphy

CERTIFICATE OF SERVICE

I hereby certify that I caused a true copy of the above document to be
served upon the attorney of record for each other party by mail on
November ___, 2004.

_____

- 9 -

A-109

B1262

# EXHIBIT C

B1263

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ETHYPHARM S.A. FRANCE & ETHYPHARM S.A. SPAIN, | ) ) ) | |
| Plaintiffs | ) ) | C.A. No. 04-1300 (SLR) |
| v. | ) ) ) | JURY TRIAL DEMANDED |
| BENTLEY PHARMACEUTICALS, INC. | ) ) ) | |
| Defendant. | ) ) ) | |

## DECLARATION OF ADOLFO HERRERA IN SUPPORT OF DEFENDANT BENTLEY PHARMACEUTICALS, INC.'S MOTION TO DISMISS

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
Telephone: (302) 984-6000

*Attorneys for Defendant*

Of Counsel:
Craig B. Stewart
Marc J. Goldstein
PALMER & DODGE LLP
111 Huntington Avenue
Boston, MA 02199
Telephone: (617) 239-0100

Dated: November 4, 2004

1

B1264

I, Adolfo Herrera, declare under penalty of perjury as follows:

1.      I am the general manager of Laboratorios Belmac, S.A ("Belmac"). I have been the general manager since June 1999. I have personal knowledge of the facts stated in this declaration, and if called as a witness, could competently testify to them. I make this declaration in support of Bentley's Motion to Dismiss for Failure to Join a Necessary Party.

### Structure and Organization of Laboratorios Belmac, S.A.

2.      Laboratorios Belmac, S.A. ("Belmac") is a Spanish corporation that was incorporated in 1988, originally known as Rimafar, S.A. In 1992, Bentley acquired Rimafar and subsequently renamed the Spanish company Laboratorios Belmac, S.A. Belmac is a wholly owned subsidiary of Bentley. Belmac manufactures and distributes pharmaceutical products.

3.      Even though Belmac is a wholly owned subsidiary of Bentley, Belmac is capitalized separately from Bentley and conducts its day-to-day operations independently of Bentley. Belmac has its own management team and personnel, assets, expenditures, investments, budget, liabilities, intellectual property, and bank accounts. Belmac has the authority to issue its own stock, may seek its own capital and is not dependent on Bentley for funding. Belmac elects its own board of directors during its general shareholders' meeting. Belmac is responsible for its own borrowing. Bentley has never guaranteed Belmac's debts.

4.      Belmac has 312 employees in Spain. Belmac pays these employees from its own bank accounts. Belmac hires its own employees and makes employment decisions regarding these employees, including salaries.

2

A-43

B1265

5.    As the general manager of Belmac, I have significant autonomous authority over the operations of Belmac. The extent of my authority is contained in the delegation of power from the Belmac board of directors, which is required under Spanish law. In June and November 1999, the Belmac board authorized me to exercise the following powers, among others:

(a)    execute and comply with contracts related to Belmac's business;

(b)    enter into encumbrances, liens and any other guarantees;

(c)    open and maintain bank accounts;

(d)    buy and sell all kinds of goods and intellectual property up to 20 million pesetas per transaction;

(e)    enter into joint ventures;

(f)    represent the company before the Spanish Ministry of the Economy and Treasury; and

(g)    institute and defend legal actions and claims;

6.    The Belmac board had granted similar delegations of powers to myself and my predecessors throughout the time that Belmac interacted with the Spanish company Ethypharm S.A. ("Ethypharm").

7.    I am responsible for negotiating contracts with raw material suppliers, purchasers of pharmaceutical products, and joint ventures. I make employment decisions, including establishing salaries. I review and approve patent applications and manage the application

3

A-44

B1266

process. I am responsible for interaction with the various Spanish regulatory authorities. I represent Belmac's legal interests before courts and public authorities.

8.    Throughout my tenure I have maintained, and continue to maintain, day-to-day control over the operations of Belmac and need not seek authorization or direction in the day-to-day operation of the Zaragoza plant from the Belmac board or Bentley. Indeed, I need not and generally do not consult with Belmac's board or Bentley unless I will exceed the delegation of responsibility.

9.    Belmac prepares its own financial statements, which are audited by Deloitte and Touche S.A., a Spanish company. These financial statements are filed with the proper authorities in Spain. Belmac negotiates its own agreements and contracts and does not need Bentley's approval to do so unless the size of those contracts will exceed the thresholds established in the delegation of responsibilities.

10.    Belmac owns an 80,000 square foot facility in Zaragoza, Spain, which houses its manufacturing plant, warehouse, research and development laboratory, and office space.

## Directors and Officers of Belmac and Bentley

11.    One of the three directors and all of the senior management team of Belmac are distinct from Bentley. The members of Belmac's board are: James Murphy, Michael Price and myself. The senior management officers of Belmac are: Ignacio Moreno Alonso (Commercial Director), Juan Carlos Asensio (Technical Director), Esther Sánchez Gómez (Finance Director), Antonio Cabodevilla Iinchsta (Industrial Operations Director), Paloma Rodríguez-Yrizabal Sánchez-Cendal (Financial Controller), Jorge Espinoso Fernandez (Secretary and Lawyer) and myself. These officers are in charge of Belmac's operations. Belmac's board of directors has

4



B1267

not made any decisions on the company's operations in the last few years. In fact, since 1999, Belmac's board of directors has only met when required by Spanish law. Bentley's board of directors does not control or direct Belmac's operations.

### Belmac's Relationship with Ethypharm and Belmac's Production of Omeprazole

12.     Commencing in 1992, Belmac entered into an arrangement with Ethypharm regarding the production of omeprazole. Omeprazole is a pharmaceutical product used to prevent ulcers and to treat other conditions where the stomach produces too much acid. In order to be effective, the omeprazole compound must be protected from degradation by stomach acids in order to reach the intestine, where the medicine is required, and some methods for coating the omeprazole are patented.

13.     From 1992 through March 2000, Belmac and Ethypharm did business pursuant to an oral agreement through which Belmac dedicated a portion of its pharmaceuticals manufacturing plant in Zaragoza, Spain, to the manufacture of omeprazole for Ethypharm. In the beginning of the relationship, Ethypharm provided Belmac with Ethypharm's patented manufacturing process for making omeprazole and provided Belmac with some of its own machinery for manufacturing omeprazole micro-pellets. The relationship was advantageous for Ethypharm because it had no facilities to manufacture pharmaceuticals in Spain and it could not export omeprazol from France and, therefore, relied upon Belmac to perform the qualification, manufacturing and exporting of omeprazole from Spain on behalf of itself to Ethypharm customers. Belmac had to prepare its technical operating guide in order to obtain the Spanish Ministry of Health approval to manufacture and commercialize omeprazole in Spain based on Ethypharm's manufacturing process.

5

B1268

14.     Shortly after Belmac began to manufacture omeprazole, Belmac observed that Ethypharm's patented process was not adequate to guarantee the quality of the pellets. Belmac then proceeded to develop its own omeprazole manufacturing process. Belmac used its own funds to finance the manufacture of omeprazole and the necessary clinical trials of the omeprazole manufacturing process that Belmac developed. Eventually, Belmac developed a successful organic process and formulation for manufacturing omeprazole. Through its continued research and development efforts, Belmac also developed a successful aqueous formulation and process for manufacturing omeprazole. Belmac has applied for patents on both its organic and aqueous omeprazole processes and formulations. Bentley had no involvement in these matters.

15.     From time to time, Belmac and Ethypharm signed confidentiality or nondisclosure agreements. A copy of one such confidentiality agreement, dated September 30, 1998, is attached hereto as "Exhibit C." Bentley was not a party to the confidentiality or nondisclosure agreements between Belmac and Ethypharm regarding omeprazole.

16.     As a result of its newly developed processes for the manufacture of omeprazole, Belmac filed amendments to its initial submission to the Spanish Ministry of Health, and obtained new approvals for the manufacture of omeprazole in Spain. In addition, Belmac owns and maintains the registration files for more than forty compounds that Belmac filed with the Spanish Ministry of Health. The Spanish Ministry of Health's approvals of Belmac's filings for omeprazole were issued in Belmac's name for the manufacture and distribution of omeprazole in Spain. Copies of the Certificates of Approval from the Spanish Ministry of Heath are attached hereto as "Exhibit D."

6

A-47

B1269

17.    Throughout its arrangement with Ethypharm, Belmac used Ethypharm equipment to manufacture omeprazole in Zaragoza for Ethypharm's customers. In addition, Belmac later purchased its own equipment, which it used to manufacture omeprazole for its own customers.

18.    As Belmac's general manager, I negotiated and signed the first and only integrated written agreement between Belmac and Ethypharm for Belmac's manufacture of omeprazole for Ethypharm and its customers ("Manufacturing Agreement"). A copy of the Manufacturing Agreement, dated and signed on March 23, 2000, is attached hereto as "Exhibit E." The Manufacturing Agreement explicitly states that it "shall not limit the manufacture of [omeprazole] on the part of BELMAC for its own market and that of its clients." The Manufacturing Agreement was for a term of two years, and was extendible unless one of the parties gave notice of termination four months prior to the agreement's expiry.

19.    In addition to the Manufacturing Agreement, I also negotiated and signed a Letter of Purchase Undertaking on March 23, 2000 (also attached hereto as "Exhibit F").

20.    In November 2001, Belmac determined that it would not renew its Manufacturing Agreement with Ethypharm. As a result, I wrote a letter to Ethypharm on November 14, 2001 giving notice of Belmac's intent to terminate the Manufacturing Agreement. A copy of this letter is attached hereto as "Exhibit G." In that letter, I expressed my willingness to negotiate with Ethypharm for Belmac's continued supply of omeprazole to Ethypharm after the expiration of the Manufacturing Agreement.

21.    In February 2002, I engaged in negotiations with Ethypharm regarding the possibility of Belmac's continued supply of omeprazole to Ethypharm after the expiration of the Manufacturing Agreement in March 2002. During these negotiations, Belmac offered to supply

7



B1270

its own omeprazole product to Ethypharm after the expiration of the parties' Manufacturing Agreement in March 2002. Ethypharm declined our offer. At Ethypharm's request, Belmac continued to manufacture omeprazole for Ethypharm's customers for some time after the above-mentioned expiration.

22.    In September 2002, Ethypharm asked that Belmac allow it to retrieve its machinery. At that time, however, Belmac was continuing to use Ethypharm's equipment to supply Ethypharm customers at Ethypharm's request. Moreover, the removal of Ethypharm's equipment required substantial disruption of the on-going manufacturing at the Zaragoza facility, including the removal of a wall to extract the large equipment. Belmac's representatives explained this to Ethypharm and noted that the machines had to be removed at a time when the Zaragoza plant was in its seasonal shut down. Belmac's representatives offered Ethypharm a choice between December 2002 and August 2003, the earliest dates in which the plant was scheduled to be shut down. Ethypharm finally removed its machinery in September 2003, after Belmac had finished manufacturing omeprazole for Ethypharm's customers at Ethypharm's request. On September 9, 2003, Antonio Cabodevilla, the industrial operations manager of Belmac's Zaragoza plant, signed an agreement with Ethypharm documenting the removal of Ethypharm's equipment from Belmac's plant. That agreement contained a release stating that neither Belmac nor Ethypharm had further claims against the other.

23.    The terms of any agreements between Belmac and Ethypharm were negotiated by either myself or other representatives of Belmac, not by Bentley. Bentley had no role in the day-to-day operations of Belmac and did not participate in the business relationship between Belmac and Ethypharm from 1999 to 2002. Previous contacts and negotiations between Belmac and Ethypharm were conducted on behalf of Belmac by Belmac's prior general managers, Angel

8

B1271

Pérez de Ayala and Clemente González Azpeitia. Since 1999, any agreements signed on behalf of Belmac were executed by Belmac management and employees and Bentley never entered into any agreement with Ethypharm regarding the production of omeprazole.

24.    Belmac never acted on Bentley's behalf during its negotiations or interactions with Ethypharm. During these negotiations and interactions, I never represented to Ethypharm that I was speaking, negotiating, or contracting on behalf of Bentley rather than Belmac. Bentley never granted Belmac the authority to act on Bentley's behalf in negotiations or contracting with Ethypharm. Bentley did not have any rights, obligations, or duties under the Manufacturing Agreement, nor under the confidentiality and non-disclosure agreements with Ethypharm, as it was not a signatory to them.

25.    Neither Mr. James Murphy, Bentley's President and Chief Executive Officer, nor any other Bentley employee was involved on behalf of Bentley in the negotiations of the terms and conditions of the Manufacturing Agreement between Belmac and Ethypharm. Similarly, neither Mr. Murphy nor any other Bentley employee was involved on behalf of Bentley in subsequent discussions between Belmac and Ethypharm in January and February 2002 regarding the expiration of that agreement. I was responsible for those negotiations on behalf of Belmac.

26.    Before, during, and after the Manufacturing Agreement with Ethypharm, Belmac manufactured and produced omeprazole in the Zaragoza facility. Belmac, not Bentley, controlled the manufacture of omeprazole in the Zaragoza facility during the contract with Ethypharm and continues to control the production of omeprazole at the Zaragoza facility. In addition, Belmac has always controlled, and continues to control, its production of lansoprazole and related pharmaceutical products. At no time did Bentley ever manufacture omeprazole for

9

B1272

Ethypharm, nor did it control Belmac's manufacture and production of omeprazole, lansoprazole, or related pharmaceutical products. Instead, I and Belmac's other general managers have always had supervisory control over the day-to-day manufacturing operations of the Zaragoza plant.

27.    Belmac has filed the following patents in Spain:

(a)    Patent Application No. 200100825: "Improved process for the manufacturing of stable and gastroprotected omeprazole pellets, pellets obtained thereof and other applications." This invention provides for a new formulation of omeprazole pellets. It is applicable both in human and veterinary medicine. Belmac filed this patent application before the Spanish Patent and Trademark Office ("Oficina Española de Patentes y Marcas") on April 6, 2001. This application was published by the Spanish Patent and Trademark Office on October 16, 2003. This patent has not been granted yet.

(b)    Patent Application No. 200002653: "Novel dispersible and soluble galenic paracetamol formulation, method for its preparation and its applications." The novel galenic paracetamol formulation consists of a base mixture of paracetamol and citric acid and can be used in human and veterinary medicine. Belmac filed this patent application before the Spanish Patent and Trademark Office on November 3, 2000. This patent was granted on September 4, 2003.

10

(c)     Patent Application No. 200002685: "Method for vacuum production of controlled release pharmaceuticals and/or gastrointestinal resistant pharmaceuticals." This method comprises pelletizing of an active principle by vacuum drying a mixture incorporating pharmaceutical excipients. The excipients confer gastrointestinal resistance on the pharmaceuticals. This method is especially appropriate for active principles such as omeprazole, diclofenac, aspirin, and ibuprophen. Belmac filed this patent application before the Spanish Patent and Trademark Office on November 7, 2000, and the patent was granted on November 11, 2003.

(d)     Patent Application No. 200002797: "Novel galenic omeprazole tablets formulation, method for its preparation and its applications in human and veterinary medicine." The tablets made with this formulation consist of a core including the omeprazole, an isolation layer and a gastrointestinal resistant layer. Belmac filed this patent application before the Spanish Patent and Trademark Office on November 22, 2000 but it has not been granted yet.

(e)     Patent Application No. PCT/ES01/00402: "Novel dispersible and soluble galenic parecetamol formulation, method for its preparation and its applications." Belmac filed this patent application on October 24, 2001 via Patent Cooperation Treaty on the basis of the Spanish patent 200002653. Belmac designated the following countries in the application: Austria, Belgium, Switzerland, Cyprus, Germany, Denmark, Spain,

11

B1274

Finland, France, United Kingdom, Greece, Ireland, Italy, Luxembourg, Monaco, Netherlands, Portugal, Sweden and Turkey (to be examined by the European Patent Office) and Japan, Poland and United States (to be granted by the corresponding national patent offices). This patent was issued to Belmac as European Patent EP 1331001 B1 on July 21, 2004.

(f)     Patent Application No. 200300976: "Formulation of pellets of anti-ulcer and acid-labil bencimidazole compounds." The pellets made with this formulation consist of inert sugar/starch granules covered by three layers. They remain stable over time and are suitable for oral administration. Belmac filed this patent application before the Spanish Patent and Trademark Office on April 29, 2003. The patent has not yet been granted.

(g)     Patent Application No. PCT/EP2004/050618: "Pellet formulation of acid-labil anti-ulcer benezimidazole compounds." Belmac filed this patent application with the European Patent Office on April 27, 2004, via the Patent Cooperation Treaty on the basis of the Spanish priority 200300976. This patent has not yet been granted.

28.     As noted above, Belmac is the patent holder of three applications: No. PCT/ES01/00402, issued as EP 1331001 B1; No. 200002685; and No. 200002653. When the remaining patent applications are granted, Belmac will be the patent holder.

29.     Belmac has no authority to act as Bentley's agent and has not done so. Bentley has not provided explicit or apparent authority for Belmac to act on Bentley's behalf. Bentley is a shareholder in Belmac, which is Bentley's wholly-owned subsidiary. Bentley did not and does

12

A-53

not now direct or control the day-to-day operations of Belmac. Belmac controls its own day-to-day operations, including the manufacture of omeprazole, lansoprazole, and other pharmaceutical products.

30.     Belmac does not own any property in Delaware or elsewhere in the United States. Belmac has never conducted business or performed any work or service in Delaware or elsewhere in the United States. Belmac does not derive any revenue from services or products used or consumed in Delaware or elsewhere in the United States.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 4th day of November, 2004 at Madrid, Spain.

_____
Adolfo Herrera

13                                                    A-54

B1276

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| ETHYPHARM S.A. France and ETHYPHARM S.A. Spain, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | C.A. No.:   0 4 – 1 3 0 0 |
| v. | ) ) | JURY TRIAL DEMANDED |
| BENTLEY PHARMACEUTICALS, INC. | ) ) | |
| Defendant | ) ) ) | |

### COMPLAINT

Plaintiffs, Ethypharm S.A. France and Ethypharm S.A. Spain (collectively referred to as "Ethypharm"), by their undersigned attorneys, as and for their Complaint against defendant, Bentley Pharmaceuticals, Inc. ("Bentley"), allege as follows:

### OVERVIEW OF THIS LAWSUIT

1.    In this action, plaintiff Ethypharm seeks $40 million in compensatory, restitutionary, and punitive damages by reason of Bentley's malicious and fraudulent misappropriation by theft and deception of Ethypharm's valuable trade secrets, know-how, and proprietary processes to manufacture valuable pharmaceutical products such as Omeprazole, a medication used in the treatment of heart burn/acid reflux. Ethypharm also seeks an injunction prohibiting Bentley and its agents from continuing to use Ethypharm's intellectual property and from continuing falsely to represent to the public that they own certain valuable trade secrets, know-how and proprietary processes used to produce, manufacture and sell Omeprazole and

1

other products using Ethypharm's proprietary pellet technology including Lansoprazole when Bentley has, in fact, stolen these valuable assets from Ethypharm.

2.    Ethypharm is a privately held drug delivery company founded in 1978. Ethypharm's stock-in-trade is its confidential know-how, proprietary processes, and technology used in the formulation, clinical testing, and manufacture of pharmaceutical products.

3.    Drugs manufactured using the Ethypharm know-how and processes are often registered, licensed, and manufactured through partnerships, joint ventures, or by arrangements with independent companies. Under such arrangements, Ethypharm provides the processes, technology and know-how, and the independent company provides the production capacity and, in some instances, access to distribution networks. Under these arrangements, Ethypharm is compensated for the use of its valuable intellectual property by means of royalties or other methods of payment.

4.    Bentley Corporation ("Bentley") is a Delaware corporation in the pharmaceutical industry.

5.    In the early 1990's, Ethypharm entered into an arrangement with Bentley, directly and through Bentley's agent, a wholly-owned Spanish subsidiary of Bentley called Belmac S.A.

6.    Under this arrangement, Ethypharm provided Bentley, either directly or through its agent, Belmac S.A., with access to intellectual property and trade secrets including Ethypharm's proprietary pellet technology used in the production, manufacture and sale of Omeprazole and other products. The intellectual property and trade secrets at issue include, but are not limited to, the following:

        (a)    The process, know-how and machinery necessary for the manufacture of
               Omeprazole and other products including Lansoprazole;

(b)     Specifications, trade secrets, and technical, analytical know-how associated with quality assurance, production and improvements of Omeprazole and other products including Lansoprazole;

(c)     Know-how and trade secrets including procedures, studies and instructions necessary for Bentley and its agent, Belmac S.A., to obtain full compliance with GMP regulations relating to the manufacture of Omeprazole and other products such as Lansoprazole;

(d)     Know-how and trade secrets relating to the confidential formulae and analytic procedures necessary for Bentley and its agent, Belmac S.A., to obtain registration with the requisite health authorities for Omeprazole and other products such as Lansoprazole; and

(e)     Know-how and trade secrets relating to marketing approval techniques, customer contacts/lists and pricing information for Omeprazole and other products such as Lansoprazole.

7.     Under this arrangement, Bentley, either directly or through its agent, Belmac S.A., manufactured Ethypharm's Omeprazole product for Ethypharm at a facility owned by Bentley directly, or by its agent, Belmac S.A., using Ethypharm's proprietary trade secrets and intellectual property.

8.     Ethypharm received 100% of the Omeprazole manufactured by Bentley and its agent, Belmac S.A., under this arrangement. Ethypharm then sold the Omeprazole product to various distributors and pharmaceutical companies that Ethypharm cultivated at its expense. Bentley and its agent, Belmac S.A., made money under this arrangement by purchasing some of the Omeprazole it had manufactured at a favorable cost from Ethypharm to resell at substantial

profit under Belmac's own trade name, Belmazol, or to sell to distributors under other trade names.

9.      This arrangement was extremely profitable for Bentley. From approximately 1992 through 2002, Bentley dramatically increased in value based in large part on the substantial revenues generated from the Omeprazole manufactured under this arrangement with Ethypharm.

10.      From approximately 1992 through 2002, Bentley, directly and through its agent, Belmac S.A., occupied a position of trust with respect to Ethypharm. During this decade-long period, Bentley, directly and through its agent, Belmac S.A., had full access to Ethypharm's machinery, as well as to Ethypharm's know-how, formulae, trade secrets, analytical methods, as well as Ethypharm's proprietary pellet technology process.

11.      Privately, Bentley and its agent, Belmac S.A., clearly and repeatedly acknowledged to Ethypharm throughout the period from 1992 through 2002 that the machinery, technology, processes, formulae, trade secrets, know-how, customer lists, pricing information, and analytical methods were solely the property of Ethypharm, and were to be used solely to manufacture Omeprazole for Ethypharm.

12.      Publicly, Bentley and its agent, Belmac S.A., told a very different -- and false -- story regarding the ownership of the Omeprazole technology. They told this story in an effort to falsely inflate Bentley's value.

13.      At various times from 1992 through 2002, Bentley and its agent, Belmac S.A., falsely represented to the industry, to consumers, and to its own shareholders that they were the owners of the technology, the know-how, and equipment used to develop and to manufacture the Omeprazole. At the time they made these public statements, Bentley and its agent, Belmac S.A.,

114034

4

knew the statements were false, misleading and directly contrary to private assurances and commitments made to their business partner, Ethypharm.

14.    During the period 1996 to 2002, Bentley's share price increased from $3.00 to more than $10.00. This increasing share price was driven, in part, by the false representations regarding Omeprazole made by Bentley and its agent, Belmac, S.A., and, in part, by substantial revenues generated from the Omeprazole manufactured under the arrangement with Ethypharm.

15.    In or around late 2001 or early 2002, Bentley and its agent, Belmac S.A., embarked on a bold scheme to steal machinery, know-how, trade secrets, technology, processes, formulae, and analytical methods relating to Ethypharm's pellet technology.   Through this scheme, Bentley and its agent, Belmac S.A., sought to use Ethypharm's proprietary machinery, know-how, trade secrets, technology, processes, formulae and analytical methods to manufacture Omeprazole just as it had for the past decade but without acknowledging Ethypharm's proprietary rights.  Instead, Bentley and its agent, Belmac S.A., planned to keep for their own account all the Omeprazole manufactured through the misuse and misappropriation of Ethypharm's intellectual property and trade secrets.  Bentley and its agent, Belmac S.A., also planned to use the stolen intellectual property and trade secrets relating to Ethypharm's pellet technology to manufacture and sell other products including, but not limited to, Lansoprazole.

16.    To facilitate this scheme, in or around March of 2002, Bentley, directly and through its agent, Belmac S.A., ceased, with few exceptions, to produce Omeprazole for Ethypharm.   Nevertheless, Bentley continued to produce Omeprazole using the Ethypharm machines, confidential know-how, trade secrets, formulae, and processes.  Bentley abused its position of trust with Ethypharm and misappropriated Ethypharm's valuable know-how and trade secrets for its own profit and use.

5

17.     In a further effort to facilitate this scheme, Bentley, directly and through its agent, Belmac S.A., falsely and fraudulently stated to Ethypharm on repeated occasions that: they would not take direct or indirect action to prejudice Ethypharm's rights; they would not compete unfairly with Ethypharm; and they would not use Ethypharm's machinery, technology, trade secrets and processes to manufacture Ethypharm's formulation of Omeprazole except for limited supplies for Ethypharm's existing customers.

18.     Relying on these false representations, Ethypharm allowed Bentley and its agent, Belmac S.A., to keep Ethypharm's machines to permit certain levels of manufacturing to continue for Ethypharm's customers only. Secretly, however, Bentley and its agent, Belmac S.A., planned to, and did, use Ethypharm's machinery, technology, trade secrets, and processes to manufacture Ethypharm's formulation of Omeprazole for Bentley and/or Belmac S.A.'s direct sales to their own customers (and customers they planned to steal from Ethypharm) without providing any royalty or other payment to Ethypharm. Bentley and its agent, Belmac S.A., also misused and misappropriated Ethypharm's trade secrets in creating new or modified products including, but not limited to, Lansoprazole.

19.     At the same time they were providing false assurances to Ethypharm, Bentley and its agent, Belmac S.A., continued falsely to advise the pharmaceutical industry, the consuming public, the investing public, and its own shareholders that Bentley and its agent, Belmac S.A., were manufacturing Omeprazole and developing other products such as Lansoprazole using Ethypharm's trade secrets including Ethypharm's pellet technology.

20.     Bentley enticed Ethypharm to provide access to Ethypharm's essential intellectual property, trade secrets, machinery, customer and pricing information and then betrayed Ethypharm by misappropriating Ethypharm's intellectual property, trade secrets and

114034                                  6

machinery and using these for its own purposes and without compensation to Ethypharm. By these acts of bad faith, Bentley unjustly enriched itself, and seriously harmed Ethypharm.

21.    Bentley, either directly or through its agent, Belmac S.A., continues to this day to use the stolen and misappropriated Ethypharm technology, know-how, trade secrets and processes to manufacture Omeprazole and other products including, but not limited to, Lansoprazole.

22.    Bentley continues to this day to misrepresent to the pharmaceutical industry, the consuming public, the investing public, and its own shareholders the true ownership of the intellectual property, trade secrets, technology, know-how, and processes of Omeprazole and other products.

23.    Bentley has enjoyed, and continues to enjoy, the benefits and protections of a Delaware corporation and of a publicly traded company in the United States while unjustly enriching itself through the direction, orchestration and ratification of all of the conduct at issue in this Complaint. Bentley is sued here based on its own conduct and the conduct of its Spanish subsidiary -- Belmac S.A. -- which, at all times relevant to this Complaint, has acted as Bentley's agent with actual and/or apparent authority in its interactions and communications with Ethypharm. Bentley has directed, orchestrated, and controlled the transactions complained of in the causes of action set forth in this Complaint. All of Belmac S.A.'s acts at issue here were undertaken at Bentley's direction and/or on behalf of Bentley. Moreover, Bentley, as principal in this principal-agent relationship, has ratified all of the conduct at issue in this Complaint that was taken by its agent, Belmac S.A. In addition, Bentley is sued as a joint tort-feasor.

7

114034

## JURISDICTION AND VENUE

24.    This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 (a)(2), because the matter in controversy exceeds $75,000 and the suit is between a citizen of a foreign state and a citizen of the State of Delaware.

25.    Alternatively, this Court has jurisdiction pursuant to 6 DEL. C. § 2001 et seq. (Uniform Trade Secrets Act).

26.    Venue is proper in this District under 28 U.S.C. §§ 1391(a) and 1391(c).

## THE PARTIES

27.    Plaintiff Ethypharm S.A. France is, and at all relevant times was, organized under the laws of the Republic of France, with its principal office in France. Ethypharm S.A. France is a drug delivery company primarily engaged, directly and through its subsidiaries, in the business of developing proprietary drug delivery systems and formulating, clinically testing, registering, manufacturing, marketing and licensing pharmaceutical products based on its drug delivery systems, in Europe and around the world.

28.    Ethypharm S.A. Spain is a majority owned subsidiary of Ethypharm S.A. France, organized under the laws of Spain, with its principal office in Madrid. Plaintiffs Ethypharm S.A. France and Ethypharm S.A. Spain are referred to in this Complaint collectively as "Ethypharm."

29.    Defendant Bentley Pharmaceuticals, Inc. ("Bentley") is incorporated under the laws of Delaware, with its principal place of business in Exeter, New Hampshire. Bentley's designated agent for service of process is The Corporation Trust Company, Corporation Trust Center, 1201 Orange Street, Wilmington, DE 19801.

114034

8

B1284

## FACTUAL ALLEGATIONS

### Corporate History of Bentley and Relationship Between Bentley and Belmac

30.    Bentley was incorporated in Florida in 1974 as Belmac Corporation.

31.    In 1992 or before, Belmac Corporation began to operate in Spain, both directly and through its Spanish subsidiary, and agent, Laboratorios Belmac, S.A. ("Belmac S.A.").

32.    Officers of Belmac Corporation, including James Murphy, visited Spain and France, and met directly with trading partners of Belmac Corporation in Spain and in France, including meeting with Ethypharm.

33.    Belmac Corporation and Belmac S.A. had at that time a close relationship. Belmac S.A. acted as an agent for its disclosed principal, Belmac Corporation.

34.    On January 1, 1996, Belmac Corporation changed its name to Bentley Pharmaceuticals, Inc. ("Bentley").

35.    In 1999, through a merger with a Delaware subsidiary, Bentley effected a change of domicile to Delaware.

36.    From the time of its name change in 1996 through to the present, Bentley has continued to act in Spain, both directly and through its agent, Belmac S.A.

37.    Documents filed with the Securities and Exchange Commission indicate that profits of Bentley and Belmac S.A. are combined for reporting purposes. In recent years, Belmac S.A. has generated up to 99% of Bentley's profits and revenues.

38.    James Murphy, who is the Chairman, President, and CEO of Bentley also acts as the General Manager of Belmac S.A. This, among other features of the close relationship between the two entities, has allowed Bentley to control and/or ratify the decisions of its agent, Belmac S.A. with respect to the conduct at issue in this Complaint.

9

114034

B1285

39.    Bentley is traded on the New York Stock Exchange. Its stock price is largely determined by the success or failure of the operations in Spain of Bentley directly, and the operations of Bentley's agent, Belmac S.A.

40.    By domiciling itself in the United States, even though virtually all of its revenues and profits derive from its Spanish operations, Bentley avails itself of the benefits and protections of U.S. and Delaware law and obtains greater and easier access to U.S. investors than would be possible if it were domiciled in Spain.

41.    During the period relevant to this Complaint, Belmac S.A. had three successive General Managers. With respect to the conduct at issue in this Complaint, the General Managers of Belmac S.A. reported to, and took direction from, James Murphy, Chairman and Chief Executive Officer of Bentley in the United States.

42.    The General Managers of Belmac S.A. frequently contacted James Murphy of Bentley by telephone and frequently traveled to the United States to meet with him. In addition, James Murphy traveled to Spain to meet with the General Managers of Belmac S.A. and traveled to France to meet with Ethypharm.

43.    When Ethypharm raised questions relating to its ongoing relationship with Belmac S.A., the General Managers of Belmac S.A. in Madrid often told Ethypharm that they could not provide an answer until after they had spoken with James Murphy of Bentley in the United States by telephone or until after they had an opportunity to meet and discuss this matter in the United States with James Murphy of Bentley.

44.    James Murphy, in January 1997, at a time when he was Chairman and Chief Executive Officer of Bentley, corresponded with Patrice Debrégeas, the Chief Executive Officer of Ethypharm, about the relationship between Ethypharm, Bentley, and Laboratorios Belmac

S.A. In that correspondence, Mr. Murphy expressly confirmed that he had "assumed control" of Belmac S.A. He also referred to Belmac S.A.'s actions as being actions that confirmed Bentley's good faith, and Bentley's level of commitment and cooperation with Ethypharm.

45.    By this January 1997 letter, Mr. Murphy confirmed the nature of the relationship between Bentley and Belmac S.A. as it has existed throughout the period relevant to this Complaint; namely, that: (1) Belmac S.A. acts as an agent for Bentley; (2) Bentley has a direct relationship with Ethypharm; and (3) Bentley controls and/or ratifies Belmac S.A.'s actions.

46.    The course of direct dealing between Bentley and Ethypharm, including the January 1997 letter, establish that Bentley is the principal in all transactions at issue in this Complaint.

### The Arrangement Between Bentley/Belmac S.A. and Ethypharm for the Manufacture of Omeprazole

47.    In 1991, Ethypharm obtained a patent in Spain for a "stable formula of Omeprazole gastro protected micro granules and the process for obtaining it" (Spanish Patent No. 9301319 ("the Spanish Patent")). Both before and after 1991, Ethypharm also acquired, as a result of significant effort and expense, intellectual property and trade secrets including but not limited to proprietary information and know-how relating to production, manufacturing, sale, quality assurance, pellet technology, registration and marketing techniques as well as customer lists and pricing information. Bentley's theft and misappropriation of Ethypharm's intellectual property, know-how and trade secrets including those related to its pellet technology is the focus of this lawsuit; this Complaint makes no claim for patent infringement.

11

**B1287**

48.     In 1991, Ethypharm began negotiating with Bentley (during this period, Bentley's name was Belmac Corporation) to manufacture Omeprazole by obtaining access to Ethypharm's intellectual property, know-how and trade secrets.

49.     James Murphy, as an officer of Bentley (then known as Belmac Corporation) visited Spain and France to meet with representatives of Ethypharm to discuss a cooperative venture in which Bentley would assist Ethypharm in the manufacture of Omeprazole.

50.     In this period, under the supervision of James Murphy, Bentley (then known as Belmac Corporation) purchased a Spanish corporation called Rimafar S.A. to act as Bentley's agent in Spain. The Spanish corporation was renamed as Laboratorios Belmac, S.A. ("Belmac S.A.").

51.     Bentley (then known as Belmac Corporation) purchased Rimafar S.A. (renaming it Belmac S.A.) in large part because of the business opportunity offered by Ethypharm, in particular the manufacture of Omeprazole for Ethypharm using Ethypharm's valuable intellectual property and trade secrets.

52.     During this period of time, neither Bentley nor its agent, Belmac S.A., had any manufacturing facilities certified by the Spanish authorities as suitable for the manufacture of Omeprazole. Moreover, neither Bentley nor its agent, Belmac S.A., had the machinery, processes, technology, or know-how necessary for the production, manufacture or sale of Omeprazole.

53.     In the 1992 time period, Bentley, directly and through its agent, Belmac S.A., entered into an arrangement with Ethypharm whereby Ethypharm would assist Bentley in obtaining the necessary certifications from the Spanish authorities for the manufacture of Omeprazole. In addition, Ethypharm would provide Bentley and its agent, Belmac S.A., the

machinery, know-how, trade secrets, processes, and technology necessary for the manufacture of Omeprazole.

54.     For its part, Bentley, directly and through its agent, Belmac S.A., agreed to manufacture Omeprazole exclusively for Ethypharm.

55.     In accordance with this arrangement, Ethypharm, over course of the next decade, provided on-site and off-site assistance, guidance, education and training of Bentley and Belmac employees over all aspects of the production, manufacture and sale of Omeprazole. In so doing, Ethypharm provided access to its proprietary trade secrets and intellectual property relating to its pellet technology while stressing the importance of, and receiving assurances regarding the maintenance of confidentiality with respect to Ethypharm's intellectual property and trade secrets.

56.     In accordance with this arrangement, Ethypharm did supply to Bentley, through its agent, Belmac S.A., intellectual property and trade secrets including Quality Assurance procedures and instructions necessary to enable Bentley, through its agent, Belmac S.A., to manufacture Omeprazole in full compliance with GMP regulations in force in Spain.

57.     In accordance with this arrangement, Ethypharm did communicate to Bentley, through its agent, Belmac S.A., other proprietary and confidential information and trade secrets, including formulae, clinical studies, and analytical methods necessary for Belmac S.A. to obtain the necessary regulatory approvals for the marketing of Omeprazole and other products.

58.     In accordance with this arrangement, Ethypharm did communicate to Bentley, through its agent, Belmac S.A., other proprietary and confidential information and trade secrets, including utilization, production and manufacturing techniques, technical and analytical know-

13

how, pellet technology and know-how, marketing approval techniques and know-how, customer and pricing information.

59.     Under this arrangement, Ethypharm provided the raw material necessary to manufacture the Omeprazole to Bentley's agent, Belmac S.A., which then produced the drugs using the Ethypharm machinery, know-how, trade secrets, processes, and technology.

60.     Under this arrangement, neither Bentley nor its agent, Belmac S.A., were authorized to manufacture Ethypharm's Omeprazole for its own use or to develop, produce or manufacture other products using Ethypharm's intellectual property and trade secrets. 100% of the Omeprazole manufactured by Bentley or its agent, Belmac S.A., under this arrangement was provided to Ethypharm.

61.     Ethypharm then sold the Omeprazole to distributors, including to Bentley's agent, Belmac S.A.

62.     Under this arrangement, Bentley and its agent, Belmac S.A., clearly and repeatedly confirmed and acknowledged that the machinery, know-how, processes, and technology used in the manufacturing of Omeprazole were proprietary to Ethypharm and were not the property of Bentley or Belmac S.A. As one example, Belmac S.A. employees working on various aspects of the manufacture of Omeprazole were required to, and did, sign confidentiality statements acknowledging that Ethypharm -- and not Bentley or Belmac S.A. -- was the sole owner of the technology, know-how, process and formulae of the Omeprazole. As another example, the General Manager of Belmac S.A. signed contracts with third party customers acknowledging that the know-how and technology that Belmac S.A. used to manufacture Omeprazole were the sole property of Ethypharm.

14

114034

63.     Upon information and belief, Belmac S.A. entered into its manufacturing arrangements with Ethypharm at Bentley's direction, as part of a unified business strategy, conceived and implemented by Bentley, to increase the global distribution of pharmaceutical products manufactured by Bentley companies using pellet technology and other trade secrets owned by Ethypharm. At all times relevant to this Complaint, Belmac S.A. has acted as Bentley's agent with actual and/or apparent authority in its interactions and communications with Ethypharm. All of Belmac S.A.'s acts at issue here were undertaken at Bentley's direction and/or on behalf of Bentley. Moreover, Bentley, as principal in this principal-agent relationship, has ratified all of the relevant conduct in this Complaint that was taken by Belmac S.A.

### Bentley's False, Misleading, Incomplete, and Deceptive Public Statements About the Ownership of the Machinery, Technology, Processes and Know-How Used in the Manufacture of Omeprazole

64.     Bentley's manufacture of Omeprazole for Ethypharm using Ethypharm's machinery, processes, and know-how is by far the single largest contributor to Bentley's revenues and profits.

65.     In Bentley's Form 10-K Annual Report for the fiscal year ending December 31, 1998, for example, Bentley stated that:

> The percentage of the Registrant's [Bentley] total revenues for the year ended December 31, 1998 attributable to its operations in Spain and the United States are approximately 99% and 1%, respectively.     The Registrant's pharmaceutical operations in Spain are a result of its 1992 acquisition of Rimafar S.A. (subsequently renamed and referred to herein as Laboratorios Belmac S.A.)

66.     Bentley's Form 10-K Annual Reports for subsequent fiscal years, through and including the fiscal year ending December 31, 2003, contain substantially identical statements to the effect that virtually all of Bentley's revenue are generated by its Spanish operations.

67.     Within Bentley's Spanish operations, Omeprazole was by far the single most important drug. For example, in Bentley's Form 10-K Annual Report for the fiscal year ending December 31, 2002, Bentley noted that Omeprazole accounted for approximately 49% of Bentley's net sales in 2002. In a Form S-3 filed with the S.E.C. on February 15, 2002, Bentley stated that Omeprazole accounted for 56% of Bentley's net sales in 2001.

68.     For years, and to this day, Bentley has been lying to the public and to Bentley's shareholders to create the false and misleading impression that Bentley, rather than Ethypharm, holds a proprietary interest in the technology, trade secrets, know-how and the production, manufacturing, regulatory and marketing procedures relating to the manufacture and sale of Omeprazole.

69.     For example, in Bentley's Form 10-K Annual Report for the fiscal year ended December 31, 2000, Bentley made the following incomplete, misleading, and deceptive statement about Omeprazole:

> the Registrant [Bentley] has developed and is in the process of registering its own pharmaceutical products in Spain. Among the products Laboratorios Belmac manufactures and/or distributes, each of which is registered with Spain's Ministry of Health, are: Belmazol(R). Belmazol, whose generic name is Omeprazole, is used primarily for hyperacidity problems related to ulcers and, secondarily, for the treatment of gastroesophageal reflux disease. Omeprazole is a proton pump inhibitor, which inhibits the hydrogen/potassium ATPase enzyme system at the secretory surface of gastric parietal cells. Because this enzyme system is regarded as an acid pump within the gastric mucosa, it has been characterized as a gastric acid pump inhibitor in that it blocks the final step of acid production. This compound has been used in combination with antibiotics for the treatment of ulcers when it is suspected that Helicobacter pylori bacteria are the etiologic agent.

70.     Even though Bentley thought it important to describe in great detail the technical basis for Omeprazole's efficacy, Bentley omitted a key material fact -- Bentley was and is

B1292

manufacturing Omeprazole using Ethypharm's machinery, processes, trade secrets and know-how. Instead, Bentley gives the false impression that the Omeprazole manufactured for Ethypharm and subsequently sold under the trade name Belmazol is "its own pharmaceutical product . . ."

71.     This Form 10-K Annual Report is consistent with Bentley's long history of falsely representing that it holds a proprietary interest in the technology, processes, machinery, and know-how necessary to manufacture Omeprazole.

72.     For example, in April 1999, Patrice Debrégeas, President of Ethypharm, wrote directly to James Murphy, who was then Chairman and Chief Executive Officer of Bentley Pharmaceuticals, Inc. Mr. Debrégeas wrote to Mr. Murphy after reviewing various articles and advertisements relative to Belmazol and Belmac technology, which had then recently been published in Spanish newspapers.

73.     In his April 1999 letter to Mr. Murphy, Mr. Debrégeas noted that these advertisements and articles "state that Belmac is the owner of the technology, the know-how and equipment used to develop and to manufacture the [Belmazol] product."

74.     Mr. Debrégeas went on to state as follows concerning the true status of the ownership of this valuable intellectual property:

> As you surely know, and, as evidenced by numerous documents, this is the sole property of Ethypharm, and Belmac has only been authorized by Ethypharm to use this property to supply Ethypharm's customers.

75.     Mr. Debrégeas also went on in the same letter to note that he was confident that Bentley, "as a public company" would wish to correct any misunderstanding regarding the ownership of the Omeprazole technology, know-how and manufacturing formula and process.

17

76.     On the following day, Mr. Murphy, writing in his capacity as Chairman and Chief
Executive Officer of Bentley Pharmaceuticals, Inc., a Delaware corporation, and writing from
the New Hampshire headquarters of Bentley, responded directly to Mr. Debrégeas.

77.     Mr. Murphy did not dispute Mr. Debrégeas' statement that Ethypharm owned the
technology, know-how, and equipment used to develop and manufacture Belmazol. To the
contrary, Mr. Murphy acknowledged these facts by stating, "I have received your letter
concerning reference to Ethypharm technology and understand your concerns."

78.     Mr. Murphy conceded that Bentley had purposefully concealed Ethypharm's
ownership of the Omeprazole intellectual property. He said:

> Honoring your wishes since that time, we have been careful not to disclose
> Ethypharm name in our public announcement.

(Emphasis in original.)

79.     Contrary to the implication in Mr. Murphy's letter regarding Ethypharm's
"wishes", Ethypharm at no time suggested to or otherwise consented to Bentley making
misleading, false, and deceptive statements concerning the ownership of the technology,
know-how, and equipment used to develop and manufacture Belmazol and other
Omeprazole products.

80.     Mr. Debrégeas' letter expressly demanded that Bentley, as a public
company, cease and desist from misleading the public as to the true ownership of the
Omeprazole intellectual property.

81.     Neither Mr. Murphy, Bentley, nor Belmac S.A. ever made any correction
following Mr. Debrégeas' letter but, instead, continued to make misleading and false statements
to the public.

18

114034

82.    By making misleading, false, and incomplete statements in its public filings with the Security and Exchange Commission, Bentley created and continues to create the misleading impression that it -- and not Ethypharm -- is the owner of the technology, know-how, trade secrets and equipment used to develop and manufacture Belmazol.

83.    By making these false, deceptive, and incomplete statements, Bentley gives the impression that the drug that accounts for by far the most significant portion of its revenues is a drug that it owns when, in fact, Bentley well knows that Ethypharm is the owner of the technology, the know-how, the trade secrets, the processes, and the equipment used to develop and to manufacture Belmazol and other products such as Lansoprazole.

### Bentley's Fraud on Ethypharm, Its Theft of Ethypharm's Customers, Its Intellectual Property and the Unlawful Use of Ethypharm's Machinery

84.    In or around late 2001 or early 2002, Bentley and its agent, Belmac S.A., embarked on a bold scheme to steal Ethypharm's machinery, know-how, trade secrets, technology (including pellet technology), processes, formulae, and analytical methods. Through its scheme, Bentley and its agent, Belmac S.A., sought to use Ethypharm's proprietary machinery, know-how, trade secrets, technology, processes, formulae and analytical methods to manufacture Omeprazole just as it had for the past decade but without acknowledging Ethypharm's proprietary rights and without compensation to Ethypharm. Through this scheme, Bentley and its agent, Belmac S.A., also sought to use Ethypharm's trade secrets, intellectual property and know-how including its pellet technology in order to develop, produce and manufacture other products including, but not limited to, Lansoprazole.

85.     Until on or about March 23, 2002, Bentley, directly and through its agent, Belmac S.A., continued to manufacture Omeprazole for Ethypharm using the Ethypharm technology, trade secrets, processes, machinery, formulae, techniques, and data.

86.     Until on or about March 23, 2002, Bentley, directly and through its agent, Belmac S.A., purchased 100% of its requirements for Omeprazole from Ethypharm, and in so doing compensated Ethypharm for its use of the Ethypharm machinery, technology, trade secrets, processes, and know-how.

87.     To facilitate the scheme to steal Ethypharm's intellectual property, on or about March 23, 2002, Bentley, directly and through its agent, Belmac S.A., continued to manufacture Omeprazole using, without authority or compensation, Ethypharm's technology, machinery, trade secrets, processes, and know-how, yet ceased to purchase Omeprazole from Ethypharm.

88.     After approximately March 23, 2002, and perhaps prior to this time, Belmac S.A. wrongfully misappropriated Ethypharm's technology, trade secrets, machinery, processes, and know-how.

89.     In a further effort to facilitate this scheme, Bentley, directly and through its agent, Belmac S.A., falsely and fraudulently stated to Ethypharm on repeated occasions in late 2001 and early 2002 that: they would not take direct or indirect action to prejudice Ethypharm's rights; they would not compete unfairly with Ethypharm; and they would not use Ethypharm's machinery, technology, and processes to manufacture Ethypharm's formulation of Omeprazole except for limited supplies for Ethypharm's existing customers.

90.     In reasonable reliance upon these false statements and omissions by Bentley and its agent, Belmac S.A., Ethypharm permitted Bentley and its agent, Belmac S.A., to keep Ethypharm's machines at Belmac S.A.'s manufacturing plant.

20

114034

91.    In reasonable reliance upon these false statements and omissions by Bentley and its agent, Belmac S.A., Ethypharm continued to utilize Belmac S.A. with the understanding that Bentley and its agent, Belmac S.A., would be manufacturing limited amounts of Omeprazole as necessary to service certain of Ethypharm's customers.

92.    In reasonable reliance upon these false statements and omissions by Bentley and its agent, Belmac S.A., Ethypharm did not immediately initiate legal proceedings in response to the misappropriation of Ethypharm's valuable intellectual property.

93.    Bentley's public description in S.E.C. filings of its strategic plans for manufacturing and marketing Omeprazole products and its current overwhelming reliance upon revenue from the sale of Omeprazole products corroborates Bentley's interest in these transactions with Ethypharm.

94.    Since approximately March 23, 2002, by use of the stolen Ethypharm machinery, processes, technology, trade secrets and know-how, Bentley, through its agent, Belmac S.A., has generated significant revenues from the sale of Omeprazole. In 2002, Bentley had sales of Omeprazole within Spain of $14.8 million. In 2003, these sales increased to $19.9 million.

95.    Since March 23, 2002, largely as a result of revenues generated by the sale of Omeprazole and the promise of new products such as Lansoprazole using Ethypharm's stolen intellectual property and trade secrets, Bentley has operated at a profit, and has seen its stock nearly triple in price from a low of $4.40 in fiscal year 2001 to a high of $18.80 in fiscal year 2003.

96.    On information and belief, Bentley plans to continue to sell Omeprazole using the stolen Ethypharm processes, trade secrets, technology, formulae, analytic procedures, and know-how into the future, thereby generating significant revenues for itself.

114034

## COUNT 1
### (Fraud)

97.    Plaintiffs repeat and re-allege paragraphs 1 through 96 as if fully set forth herein.

98.    Bentley, through its agent, Belmac S.A., has, since approximately March 2002, manufactured Omeprazole wrongfully using Ethypharm's intellectual property and trade secrets. Bentley, through its agent, Belmac S.A., has also misappropriated Ethypharm's intellectual property and trade secrets in order to develop other products such as Lansoprazole.

99.    Bentley, both directly and through its agent, Belmac S.A., has made various false, misleading, and incomplete statements to Ethypharm to the effect that: they would not take direct or indirect action to prejudice Ethypharm's rights; they would not compete unfairly with Ethypharm; and they would not use Ethypharm's machinery, technology, and processes to manufacture Ethypharm's formulation of Omeprazole except for limited supplies for Ethypharm's existing customers. These false statements and assurances were made on numerous occasions throughout the relationship and, in particular, from January 2002 through April of 2002.

100.    As one example, Adolpho Herrera, General Manager of Belmac, S.A., sent a letter dated January 2, 2002 to Ethypharm falsely stating that Belmac S.A. had never and would never compete unfairly or prejudicially against Ethypharm.

101.    As another example, representatives from Bentley and its agent, Belmac S.A., met on or about February 21, 2002 with Ethypharm representatives at Ethypharm's offices outside Paris in St. Cloud, France for a few hours. Adolpho Herrera, General Manager of Belmac S.A., and Berenguer Zuniga were present for Belmac S.A. and its principal, Bentley.  Ethypharm

B1298

representatives included Patrice Debregeas, Gerard Leduc, Roseline Joannesse and U.S. counsel, Lawrence G. Meyer, Esquire.

102.    At this February 21, 2002 meeting, Ethypharm repeated a previously expressed concern that Bentley and its agent, Belmac S.A., were damaging Ethypharm by stealing its core technologies, know-how, trade secrets and customer base relating to Ethypharm's Omeprazole product. Ethypharm also insisted that Bentley and its agent, Belmac S.A., return Ethypharm's machinery. Finally, Ethypharm representatives, including U.S. counsel, stated that, under the circumstances, it appeared that in order to protect its valuable assets, Ethypharm would be forced to bring a lawsuit against Bentley in the United States.

103.    At this February 21, 2002 meeting, and in response to the concerns raised by Ethypharm representatives, Adolpho Herrera of Belmac S.A. falsely represented numerous times that Bentley and its agent, Belmac S.A., were not using Ethypharm's machinery for their own purposes; that they were not using Ethypharm's technology; that they had their own technology and machinery; and that Ethypharm's machinery was in the way. With Mr. Zuniga remaining silent and indicating his tacit agreement on all points, Mr. Herrera falsely assured Ethypharm that Bentley and its agent, Belmac S.A., did not and would not take steps to unfairly compete with Ethypharm and they had not and would not engage in unauthorized or improper use of Ethypharm machinery, technology, know-how, trade secrets or processes to manufacture Ethypharm's formulation of Omeprazole or for any other improper purpose.

104.    As yet another example, around February of 2002, Adolpho Herrera, General Manager of Bentley's agent, Belmac S.A., had lunch with Adolpho De Basillo of Ethypharm at a restaurant and falsely stated that Ethypharm's concern about the theft and misuse of its machinery and intellectual property was nonsense; that Bentley and Belmac S.A. were not using

23

114034

Ethypharm's machinery, technology or know-how for their own purpose, and that Ethypharm could have their machinery back at any time. In fact, Ethypharm made arrangements to recover its machinery and was blocked from doing so by Bentley and its agent, Belmac S.A.

105.    Ethypharm's concerns about the theft and misuse of its customers and intellectual property were also set forth directly to James Murphy at Bentley in the United States. On or about April 18, 2002, Gerard Leduc of Ethypharm sent a letter to James Murphy enclosing a statement of Ethypharm's concerns. James Murphy never contradicted the false statements of Bentley's agent to the effect that neither Bentley nor Belmac S.A. were acting to compete unfairly by stealing Ethypharm's intellectual property and Ethypharm's customers.

106.    In addition to their affirmative false statements and assurances, Bentley and its agent, Belmac S.A., omitted material facts during their numerous contacts with Ethypharm during this late 2001, early 2002 time period; namely, that they were planning to, and did, use Ethypharm's proprietary machinery, know-how, technology, processes, formulae and analytical methods to manufacture Omeprazole just as they had for the past decade but without acknowledging Ethypharm's proprietary rights.

107.    In reasonable reliance upon these false statements and omissions by Bentley and its agent, Belmac S.A., Ethypharm permitted Bentley and its agent, Belmac S.A., to keep Ethypharm's machines at Belmac S.A.'s manufacturing plant.

108.    In reasonable reliance upon these false statements and omissions by Bentley's agent, Ethypharm continued to utilize Belmac S.A. with the understanding that Bentley and its agent, Belmac S.A., would be manufacturing limited amounts of Omeprazole as necessary to service certain of Ethypharm's customers.

24