109.    In reasonable reliance upon these false statements and omissions by Bentley's agent, Ethypharm did not immediately initiate legal proceedings in response to Bentley's agent's theft, misuse and misappropriation of Ethypharm's valuable intellectual property and trade secrets.

110.    Since approximately March 23, 2002, by use of the stolen Ethypharm machinery, processes, technology, trade secrets and know-how, Bentley, through its agent, Belmac S.A., has generated significant revenues from the sale of Omeprazole. In 2002, Bentley had sales of Omeprazole within Spain of $14.8 million. In 2003, these sales increased to $19.9 million.

111.    As a result of these fraudulent acts by Bentley and its agent, Belmac S.A., and Ethypharm's reasonable reliance, Ethypharm has suffered damages in an amount to be determined at trial.

112.    As a result of Bentley's malicious, willful, and fraudulent conduct, plaintiffs are entitled to punitive damages in an amount not less than $40 million.

## COUNT 2
### (Violation of 6 Del. C. § 2001 et seq)

113.    Plaintiff repeats and re-alleges paragraphs 1 through 112 as if fully set forth herein.

114.    Ethypharm's process, "know-how" and the other intellectual property and trade secrets described herein are trade secrets under 6 Del. C. § 2002(4). As a result of its research and development efforts, Ethypharm developed a unique process and specialized equipment to manufacture Omeprazole to its particular set of standards. Among the other technical, analytical know-how that Bentley and its agent, Belmac S.A. have stolen, misappropriated and misused are trade secrets associated with quality assurance, production, improvements, procedures used to

25

B1301

comply with GMP regulations, regulatory and other studies, pellet technology, confidential formulae and analytic procedures used to obtain registration with the requisite health authorities, confidential information relating to marketing approval techniques, customer contacts/lists and pricing information.

115.    Ethypharm derived value from its access to Ethypharm's intellectual property and confidential trade secrets, generating substantial profits between 1991 and 2002.

116.    At least part of this value was derived from the access to the proprietary nature of the Ethypharm's process, and its access to other trade secrets and intellectual property owned by Ethypharm that allowed Bentley and Belmac S.A. consistently to manufacture its product to precise specifications and to produce it in such a way that created advantages over competing products.    Bentley and Belmac S.A. also improperly used Ethypharm's trade secrets and intellectual property to develop improvements and new products such as Lansoprazole without compensation to Ethypharm.

117.    The specific processes, trade secrets and intellectual property owned by Ethypharm was not generally known or readily ascertainable by proper means.    The process results from Ethypharm's individual research and development efforts.

118.    Ethypharm took steps to ensure the continued confidentiality of its processes, intellectual property and trade secrets, imposing secrecy obligations on its own employees and providing the processes, analytical procedures, formulae, and other intellectual property to Bentley and its agent, Belmac S.A., on the condition that they maintain its confidentiality.

119.    Bentley, through its agent, Belmac S.A., was aware that the trade secrets and information provided to it by Ethypharm between 1991 and 2002 was proprietary.    Belmac S.A. had an affirmative obligation to preserve the confidentiality of that information.

114034

120.    Belmac S.A. was also aware that under its arrangement with Ethypharm, Belmac S.A.'s use of the manufacturing process and its trade secrets and intellectual property was strictly limited to products manufactured at Ethypharm's request.

121.    In the face of its knowledge of these restrictions, Belmac S.A. decided to use Ethypharm's proprietary process, trade secrets and intellectual property to manufacture Omeprazole for Belmac S.A.'s own sale and to make new products and improvements to existing products without compensation to Ethypharm.

122.    Subsequent to its unilateral termination of the manufacturing contract with Ethypharm, Belmac S.A. continued to manufacture Omeprazole using the processes, intellectual property and trade secrets it had acquired while manufacturing Omeprazole for Ethypharm under the contract.  At that time, Belmac S.A. was in possession of Ethypharm's manufacturing equipment, the Omeprazole formulae, and the technical specifications for Ethypharm's proprietary manufacturing process.

123.    Such conduct constituted misappropriation of trade secrets, technical know-how, trade secrets and other proprietary information.

124.    By virtue of the conduct of Belmac S.A., acting as Bentley's agent, Bentley is liable to Ethypharm for the damages that Ethypharm has suffered as a result of Bentley's actions in an amount to be determined at trial.

## COUNT 3
### (Unjust Enrichment)

125.    Plaintiff repeats and re-alleges paragraph 1 through 124 as if fully set forth herein.

126.    Belmac's misappropriation of Ethypharm's technology, trade secrets and intellectual property allowed it to enter the marketplace and compete on an equal footing with

Ethypharm and others, without incurring the considerable expense of developing an efficient and effective manufacturing process of its own. According to reports filed with the Securities and Exchange Commission, Omeprazole was a substantial component of Bentley's business and produced a significant share of its revenues.

127.    Further, Belmac S.A.'s actions deprived Ethypharm of the opportunity to benefit from its Omeprazole production process. Hijacking Ethypharm's technology, trade secrets and intellectual property effectively destroyed Ethypharm's ability to sell the product it had developed, effectively destroyed Ethypharm's Spanish subsidiary, and made it impossible for Ethypharm to recoup its research and development expenses and to profit from its innovation.

128.    Bentley was thereby unjustly enriched at the expense of Ethypharm and is required in equity and good conscience to compensate Ethypharm for the use of Ethypharm's property and for the losses Ethypharm incurred and continues to incur as a result of Bentley's wrongful conduct.

129.    By virtue of Bentley's conduct, and the conduct of its subsidiary Belmac S.A., acting on its behalf, Bentley is liable to Ethypharm for the damages that Ethypharm suffered as a result of Bentley's actions (including the actions of Belmac S.A. acting as Bentley's agent), and for the benefits conferred upon Bentley by its misappropriation and misuse of Ethypharm's property, in an amount to be determined at trial.

**COUNT 4**
**(Intentional Interference with Actual and Prospective Business Relationships)**

130.    Plaintiff repeats and re-alleges paragraph 1 through 129 as if fully set forth herein.

131.    From approximately 1992 to 2002 and before, Ethypharm worked to cultivate relationships with a number of companies to be in a position to sell Omeprazole and similar

114034

products that were manufactured using Ethypharm's machinery, technology, processes, formulae, analytical methods and know-how.

132.   From approximately 1992 to 2002, Ethypharm entered into economic relationships with a number of third party customers who wished to purchase Omeprazole and similar products were manufactured using Ethypharm's machinery, technology, processes, formulae, analytical methods and know-how.

133.   Throughout the period from 1992 to 2002, Ethypharm also permitted Bentley and its agent, Belmac S.A., to develop certain economic relationships with Ethypharm's prospective clients based upon the arrangement whereby Ethypharm would obtain economic benefits from the sale of Ethypharm's Omeprazole to third party customers by Bentley and its agent, Belmac S.A.

134.   Throughout the period from 1992 to 2002, Bentley and its agent, Belmac S.A., knew of Ethypharm's efforts to cultivate customers and of the economic relationships that Ethypharm developed with third parties who were purchasing – and who were interested in making future purchases – of Omeprazole and other products that were manufactured using Ethypharm's machinery, technology, processes, formulae, analytical methods and know-how.

135.   In or around March of 2002, Bentley and its agent, Belmac S.A., intentionally and improperly interfered with Ethypharm's actual and prospective economic relationships by stealing Ethypharm's proprietary machinery, know-how, technology, processes, formulae and analytical methods to manufacture Omeprazole just as they had for the past decade but without acknowledging Ethypharm's proprietary rights and without paying Ethypharm any royalty or other form of payment.

29

114034

B1305

136.    Since approximately March of 2002, Bentley and its agent, Belmac S.A. has damaged Ethypharm by such interference.    Hijacking Ethypharm's technology effectively destroyed Ethypharm's ability to sell the product it had developed, effectively destroyed Ethypharm's Spanish subsidiary, and made it impossible for Ethypharm to recoup its research and development expenses and to profit from its innovation. Bentley and its agent, Belmac S.A., on the other hand, have watched their profits and revenues soar as a result of the sales of the hijacked Omeprazole to actual and prospective customers of Ethypharm.

137.    By virtue of Bentley's conduct, and the conduct of its subsidiary Belmac S.A., acting on its behalf, Bentley is liable to Ethypharm in an amount to be determined at trial for the damages that Ethypharm suffered as a result of Bentley's intentional and improper interference with Ethypharm's actual and prospective customers.

## RELIEF SOUGHT

WHEREFORE, plaintiff demands judgment against the defendant as follows:

(a)    On each of Counts 1 through 4, awarding plaintiffs:  (1) actual, compensatory, and consequential damages in an amount to be determined but in no event less than $40 million; (2) injunctive relief; and (3) punitive damages in an amount to be determined but in no event less than $40 million;

(b)    On each of Counts 1 through 4, awarding plaintiffs their attorneys' fees, costs, expenses, pre-judgment and post-judgment interest, and such other and further relief as the Court deem just and proper.

114034

## JURY DEMAND

Plaintiff hereby provides notice of its demand for a trial by jury.


Dated: September 27, 2004                    Respectfully submitted,


                                             MURPHY SPADARO & LANDON

OF COUNSEL:

Dwight P. Bostwick, Esquire                  Francis J. Murphy, Esquire (No. 223)
Bruce R. Grace, Esquire                      1011 Centre Road, Suite 210
Baach, Robinson & Lewis PLLC                 Wilmington, DE 19805
1201 F Street, NW, Suite 500                 Tel: (302) 472-8100
Washington, DC 20004                         Fax: (302) 472-8135
Tel: (202) 833-8900                          E-Mail: Fmurphy@msllaw.com
Fax: (202) 466-5738

114034

OCT 2 1 2005

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ETHYPHARM S.A. FRANCE &　　　　　)
ETHYPHARM S.A. SPAIN,　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　Plaintiffs　　　　　　　)　　C.A. No. 04-1300 (SLR)
　　　　　　　　　　　　　　　　　)
　　　v.　　　　　　　　　　　　　)　　**JURY TRIAL DEMANDED**
　　　　　　　　　　　　　　　　　)
BENTLEY PHARMACEUTICALS, INC.　　)
　　　　　　　　　　　　　　　　　)
　　　　　Defendant.　　　　　　　)
　　　　　　　　　　　　　　　　　)

## ANSWER

Defendant Bentley Pharmaceuticals, Inc. ("Bentley") answers the correspondingly numbered paragraphs of the plaintiffs' Complaint for itself, and not on behalf of its non-party subsidiary Belmac S.A. ("Belmac S.A."), as follows:

### OVERVIEW OF THIS LAWSUIT

1.　　　This paragraph summarizes plaintiffs' contentions and states conclusions of law that do not require a response from Bentley.  To the extent a response is deemed to be required, admits that omeprazole is used in the treatment of heart burn/acid reflux, and denies the remaining allegations.

2.　　　Bentley lacks knowledge or information sufficient to form a belief as to the truth of the matters asserted, and therefore denies.

3.　　　Bentley lacks knowledge or information sufficient to form a belief as to the truth of the matters asserted, and therefore denies.

4.      Denies that "Bentley Corporation" is Defendant's legal name, and admits that Bentley Pharmaceuticals, Inc. is a Delaware corporation which is engaged in the pharmaceutical industry.

5.      Denies.

6.      This paragraph and its sub-paragraphs state conclusions of law that do not require a response from Bentley.  To the extent a response is deemed to be required, denies as to this paragraph and subparagraphs (a)-(e).

7.      Bentley admits that Belmac S.A. manufactured omeprazole product for Ethypharm at its facility in Zaragoza, Spain.  Except as stated herein, denies.

8.      Denies allegations as to the first sentence.  Denies the second sentence because Bentley lacks knowledge or information sufficient to form a belief as to the truth of the matters asserted.  Denies as to the third sentence.

9.      Denies.

10.     Denies.

11.     Denies.

12.     Denies.

13.     Denies.

14.     Admits as to the first sentence.  Denies as to the second sentence.

15.     Denies.

2

B1309

16.    Denies.

17.    Denies.

18.    Denies.

19.    Denies.

20.    Denies.

21.    Denies.

22.    Denies.

23.    To the extent this paragraph alleges the bases on which plaintiffs purport to
bring this lawsuit, no response is required. In all other respects, denies.

### JURISDICTION AND VENUE

24.    Denies based on its First Defense because Belmac S.A., a citizen of a foreign
nation, is a necessary and indispensable party that has not and cannot be joined because it
would destroy this Court's diversity jurisdiction.

25.    Denies because plaintiffs' claims under 6 DEL. C. § 2001 et seq., the Delaware
Trade Secrets Act, involve questions of state law which do not confer jurisdiction on this
Court.

26.    Denies because plaintiffs have no claim against Bentley and therefore venue is
not proper.

3

B1310

## THE PARTIES

27.    Denies because Bentley lacks knowledge or information sufficient to form a belief as to the truth of the matters asserted.

28.    Denies because Bentley lacks knowledge or information sufficient to form a belief as to the truth of the matters asserted.

29.    Admits, with the exception that the correct street address for Bentley's designated agent for service of process is 1209 Orange Street, Wilmington, DE 19801.

## FACTUAL ALLEGATIONS

### Corporate History of Bentley and Relationship Between Bentley and Belmac

30.    Admits.

31.    Denies.

32.    Admits that officers of Belmac Corporation visited Spain and France and met with employees of Belmac S.A. and Ethypharm.  Denies the remainder of the paragraph.

33.    Denies.

34.    Admits.

35.    Admits.

36.    Denies.

4

37.    As to the first sentence, admits that Bentley's filings with the Securities and Exchange Commission ("SEC") include the profits of its foreign subsidiaries, including Belmac S.A., in accordance with regulations promulgated by the SEC.  As to the second sentence, denies because Bentley lacks knowledge or information sufficient to form a belief as to the meaning of the phrase "[i]n recent years."

38.    Denies.

39.    Admits as to the first sentence.  Denies as to the second sentence.

40.    Admits that Bentley is domiciled in the United States and is therefore subject to United States law; otherwise denies the argumentative allegations of this paragraph.

41.    As to the first sentence, denies because Bentley lacks knowledge or information sufficient to form a belief as to the meaning of the phrase "[d]uring the period relevant to this Complaint."  Denies as to the second sentence.  Further answering, Bentley says that during the period from 1995-2002, Belmac S.A. had two General Managers.

42.    As to the first sentence, admits that occasionally the General Managers of Belmac S.A. traveled to the United States to meet with Mr. Murphy and admits that Belmac S.A.'s current General Manager, Adolfo Herrera, contacts Mr. Murphy by telephone frequently; otherwise denies.  Admits as to the second sentence.

43.    Denies.

5

44. Admits that James Murphy corresponded in writing with Mr. Debrégeas in January 1997, which correspondence speaks for itself; otherwise denies.

45. Denies.

46. Denies.

### The Arrangement Between Bentley/Belmac S.A. and
### Ethypharm for the Manufacture of Omeprazole

47. As to the first and second sentences, denies because Bentley lacks knowledge or information sufficient to form a belief as to the truth of the matters asserted. As to the third sentence, denies the allegations that Bentley or Belmac S.A. stole or misappropriated Ethypharm's intellectual property, know-how and trade secrets, including those related to its pellet technology. To the extent that this paragraph alleges the bases on which plaintiffs purport to bring this lawsuit, no response is required. Should a response be deemed required, denies.

48. Denies because Bentley lacks knowledge or information sufficient to form a belief as to the truth of the matters asserted.

49. Denies.

50. Denies the first sentence. Further answering, in February 1992, Rimafar S.A. ("Rimafar") was acquired by Bentley and was subsequently renamed as Laboratorios Belmac, S.A.

51. Denies.

6

52.    Denies because Bentley lacks knowledge or information sufficient to form a belief as to the meaning of the phrase "[d]uring this period of time," and denies that Belmac was Bentley's agent.

53.    Denies.

54.    Denies.

55.    Denies because lacks knowledge or information sufficient to form a belief as to the meaning of "this arrangement" and "proprietary trade secrets and intellectual property," allegedly provided by plaintiffs.  Further answering, Bentley denies that plaintiffs provided any assistance, guidance, education and training to its employees.

56.    Denies.

57.    Denies.

58.    Denies.

59.    Denies.

60.    Denies.

61.    Denies that "Ethypharm then sold the Omeprazole to . . . Bentley's agent, Belmac S.A."  Denies that Ethypharm sold the omeprazole to distributors other than Belmac S.A. because Bentley lacks knowledge or information sufficient to form a belief as to the truth of the matter asserted.

7

62.    Denies as to the first and third sentences.  As to the second sentence, admits that employees of Belmac S.A. signed confidentiality agreements with Ethypharm, which documents speak for themselves.

63.    Denies.

### Bentley's False, Misleading, Incomplete, and Deceptive Public Statements About the Ownership of the Machinery, Technology, Processes and Know-How Used in the Manufacture of Omeprazole

64.    Denies.

65.    Admits that Bentley filed a Form 10-K for the fiscal year ending December 31, 1998 with the SEC, which document speaks for itself.

66.    Admits that Bentley filed Form 10-K Reports for fiscal years between 1998 and 2003 with the SEC, which documents speak for themselves; otherwise denies.

67.    As to the first sentence, Bentley admits that in 2002, omeprazole accounted for 49% of Bentley's net sales and otherwise denies.  As to the second sentence, admits that Bentley filed a Form 10-K for the fiscal year ending on December 31, 2002 with the SEC, which document speaks for itself.  As to the third sentence, admits that Bentley filed a Form S-3 with the SEC on February 15, 2002, which document speaks for itself; otherwise denies.

68.    Denies.

69.    Admits that Bentley filed a Form 10-K with the SEC for the fiscal year ending on December 31, 2000, which document speaks for itself.  Otherwise denies.

8

70.     Denies.

71.     Denies.

72.     Admits as to the factual allegations in the first sentence.  As to the second sentence, denies because Bentley lacks knowledge or information sufficient to form a belief as to the truth of the matter asserted.

73.     Admits that Mr. Debrégeas wrote a letter to Mr. Murphy in April 1999, which document speaks for itself; otherwise denies.

74.     Admits that Mr. Debrégeas wrote a letter to Mr. Murphy in April 1999, which document speaks for itself; otherwise denies.

75.     Admits that Mr. Debrégeas wrote a letter to Mr. Murphy in April 1999, which document speaks for itself; otherwise denies.

76.     Admits that Mr. Murphy responded to Mr. Debrégeas' April 1999 letter from the office of Bentley Pharmaceuticals, Inc. in New Hampshire, which document speaks for itself; otherwise denies.

77.     Admits that Mr. Murphy responded to Mr. Debrégeas' letter of April 1999, which document speaks for itself; otherwise denies.

78.     Denies.  Further answering, Bentley states that Mr. Murphy's response to Mr. Debrégeas' letter of April 1999 speaks for itself.

79.     Denies the first clause of the first sentence, and admits the remainder of the paragraph.

B1316

80.    Denies.

81.    Denies.  Further answering, Bentley notes that it had no "correction" to make because its public statements regarding Belmac S.A.'s manufacture of omeprazole were not misleading or false.

82.    Denies.

83.    Denies.

### Bentley's Fraud on Ethypharm, Its Theft of Ethypharm's Customers, Its Intellectual Property and the Unlawful Use of Ethypharm's Machinery

84.    Denies.

85.    Denies.

86.    Denies.

87.    Denies.

88.    Denies.

89.    Denies.

90.    Denies.

91.    Denies.

92.    Denies.

93.    Denies.

10

B1317

94.     Denies as to the first sentence.  As to the second and third sentences, admits.

95.     Denies.

96.     Denies.

**COUNT 1**
**(Fraud)**

97-112.     Bentley states that Count 1 was dismissed by this Court and Bentley is

therefore not required to answer the allegations contained in this Count.

**COUNT 2**
**(Violation of 6 Del. C. § 2001 et seq)**

113.     Bentley restates its responses to paragraphs 1 through 112.

114.     As to the first and second sentences, denies because Bentley lacks

knowledge or information sufficient to form a belief as to the truth of the matters

asserted.  As to the third sentence, denies.

115.     Denies because Bentley lacks knowledge or information sufficient to form

a belief as to the truth of the matters asserted.

116.     Denies.

117.     As to the first sentence, denies because Bentley lacks knowledge or

information sufficient to form a belief as to the meaning of the phrase "trade secrets and

intellectual property owned by Ethypharm."  As to the second sentence, denies because

11

Bentley lacks knowledge or information sufficient to form a belief as to the truth of the matter asserted.

118.     Denies.

119.     Denies.

120.     Denies because Bentley lacks knowledge or information sufficient to form a belief as to the meaning of the phrase "trade secrets and intellectual property."

121.     Denies.

122.     Denies as to the first sentence.  As to the second sentence, admits that on March 23, 2002, Belmac S.A. was in possession of Ethypharm's manufacturing equipment, the omeprazole formulae, and the technical specifications for Ethypharm's alleged proprietary manufacturing process.

123.     Denies.

124.     Denies.

## COUNT 3
### (Unjust Enrichment)

125–129.  Bentley states that Count 3 was dismissed by this Court and Bentley is therefore not required to answer the allegations contained in this Count.

## COUNT 4
### (Intentional Interference with Actual and Prospective Business Relationships)

130.     Bentley restates its responses to paragraphs 1 through 129.

12

131.    Denies because Bentley lacks knowledge or information sufficient to form a belief as to the truth of the matters asserted.

132.    Denies because Bentley lacks knowledge or information sufficient to form a belief as to the truth of the matters asserted.

133.    Denies.

134.    Denies.

135.    Denies.

136.    Denies.

137.    Denies.

### FIRST DEFENSE

Plaintiffs' Complaint fails to join a necessary and indispensable party pursuant to Rule 19(a) and (b) and must therefore be dismissed.

### SECOND DEFENSE

Count 4 of plaintiffs' Complaint is preempted by the Delaware Uniform Trade Secrets Act, 6 Del. C. § 2001 et seq.

### THIRD DEFENSE

Plaintiffs' claims are barred by the doctrine of estoppel.

B1320

## FOURTH DEFENSE

Plaintiffs' claims are barred by the doctrine of laches.

## FIFTH DEFENSE

Plaintiffs' claims are barred by the doctrine of waiver.

## SIXTH DEFENSE

If it is determined that Belmac S.A. was acting as Bentley's agent in its dealings with Ethypharm relevant to plaintiffs' Complaint, Bentley reserves the right to assert all defenses to which Belmac S.A. is entitled, including, but not limited to, the defense that the technology used by Belmac S.A. to produce omeprazole pellets before and after the expiry of its arrangement with Ethypharm in March 2002 was independently developed by Belmac S.A.

## SEVENTH DEFENSE

Bentley intends to rely upon such other and further defenses as may become available or apparent during discovery proceedings in this case, and reserves the right to amend its answer to assert any such defense.

## JURY DEMAND

Bentley demands a trial by jury on all claims.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Craig E. Stewart
Veronica C. Abreu
PALMER & DODGE LLP
111 Huntington Avenue
Boston, MA 02199
Telephone: (617) 239-0100

Dated:  August 5, 2005

By:  /s/ David E. Moore
      Richard L. Horwitz (#2246)
      David E. Moore (#3898)
      Hercules Plaza, 6th Floor
      1313 North Market Street
      P.O. Box 951
      Wilmington, DE  19899-0951
      Telephone:  (302) 984-6000
      rhorwitz@potteranderson.com
      dmoore@potteranderson.com

*Attorneys for Defendant*

704309

15

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### <u>CERTIFICATE OF SERVICE</u>

I, David E. Moore, hereby certify that on October 20, 2005, the attached

document was hand delivered to the following persons and was electronically filed with

the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the

following and the document is available for viewing and downloading from CM/ECF:

Francis J. Murphy, Jr.
Murphy, Spadaro & Landon
1011 Centre Road
Suite 210
Wilmington, DE 19805

I hereby certify that on October 20, 2005, I have Federal Expressed the

documents to the following non-registered participants:

Dwight P. Bostwick
Bruce R. Grace
Baach, Robinson & Lewis PLLC
1201 F Street, NW
Suite 500
Washington, DC 20004

By: */s/ David E. Moore*
Richard L. Horwitz
David E. Moore
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, Delaware 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

688783

## Answers to Complaints
1:04-cv-01300-SLR Ethypharm SA France, et al v. Bentley Pharm.

### U.S. District Court

### District of Delaware

Notice of Electronic Filing

The following transaction was received from Moore, David Ellis entered on 10/20/2005 at 3:39 PM
EDT and filed on 10/20/2005

| | |
|---|---|
| **Case Name:** | Ethypharm SA France, et al v. Bentley Pharm. |
| **Case Number:** | 1:04-cv-1300 |
| **Filer:** | Bentley Pharmaceuticals Inc. |
| **Document Number:** | 30 |

**Docket Text:**
ANSWER to Complaint with Jury Demand by Bentley Pharmaceuticals Inc..(Moore, David)

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=10/20/2005] [FileNumber=115269-0
] [5a4e5c089b433295546e5ea8380fbdca26d4610f5413ff0686dc49adfc0fb3d7693
225a2116b032f8290caeb18594f70b28d95b6e38644acda66a11eae38cae2]]

**1:04-cv-1300 Notice will be electronically mailed to:**

Veronica C. Abreu     vabreu@palmerdodge.com

David Ellis Moore     dmoore@potteranderson.com, ntarantino@potteranderson.com

Francis J. Murphy , Jr     fmurphy@msllaw.com,

Craig E. Stewart     cstewart@palmerdodge.com

**1:04-cv-1300 Notice will be delivered by other means to:**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ETHYPHARM S.A. FRANCE and<br>ETHYPHARM S.A. SPAIN,<br><br><br>Plaintiffs,<br><br>v.<br><br>BENTLEY PHARMACEUTICALS, INC.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civ. No. 04-1300-SLR |

### DEFENDANT'S RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES LIMITED TO THE ISSUES OF AGENCY AND JOINT TORTFEASOR STATUS

Pursuant to Fed. R. Civ. P. 33, defendant Bentley Pharmaceuticals, Inc. ("Bentley") provides the following Response (the "Response") to Plaintiffs' First Set of Interrogatories Limited to the Issues of Agency and Joint Tortfeasor Status (the "Interrogatories").

### GENERAL OBJECTIONS

1.    Bentley is providing this Response without waiver of or prejudice to its right, at any later time, to raise objections to (a) any further demand or discovery involving or relating to the matters raised in the Interrogatories, or (b) the relevance, materiality, or admissibility of (i) the Interrogatories or any part thereof or (ii) statements made in this Response to the Interrogatories or any part thereof.

2.    Bentley's Response shall not be deemed to be an acknowledgement that any statement or characterization in a particular Interrogatory is accurate or complete.

B1325

3.     Bentley's Response undertakes to provide information only to the extent required by Rules 26 and 33 of the Federal Rules of Civil Procedure. Bentley objects to the Interrogatories and to the "Definitions" contained therein to the extent that they purport to impose any obligations that differ from, exceed, or conflict with those set forth in the Federal Rules of Civil Procedure or any other applicable rule.

4.     Bentley objects to the Interrogatories to the extent they seek information beyond that permitted in the Order of the Court dated November 29, 2005.

5.     Bentley objects to the Interrogatories, including Instruction No. 8 thereto, to the extent they seek information prior to February 8, 1992 – the date that Bentley's predecessor, Belmac Corporation, acquired Belmac S.A.'s predecessor, Laboratorios Rimafar. Unless otherwise specified in a Response to a specific Interrogatory, the answers set forth below provide information from February 8, 1992 onward.

6.     Bentley objects to the Interrogatories to the extent that they seek information protected by the attorney-client or work-product privileges or otherwise protected from disclosure by law.

7.     Bentley objects to the Interrogatories to the extent they purport to require Bentley to produce original documents and things at the offices of Plaintiffs' counsel. Bentley, through its counsel, will make mutually agreeable arrangements with Plaintiffs' counsel for the production and copying of requested documents.

8.     Bentley objects to Plaintiffs' definition of the terms "Bentley," "Defendant," "You" or "Your" because the definition includes "controlled companies," "subsidiaries" and "agents" of Bentley. Given that this case involves a dispute over whether Bentley's subsidiary Belmac acted as Bentley's agent within the meaning of applicable law, Plaintiffs' definition of these terms

- 2 -

B1326

leads to confusion and ambiguity in every Interrogatory in which they are used. Nothing in the following responses is intended to waive Bentley's position that Belmac was never acting as Bentley's agent in undertaking any of the conduct which is at issue in this action.

9.   Bentley objects to Plaintiffs' use of the phrase "Bentley's Spanish subsidiaries" as overbroad, because the allegations in the Complaint pertain to "Bentley and its agent, Belmac" (*i.e.*, Compl. ¶¶ 6 and 15). Therefore, in answering Plaintiffs' Interrogatories, Bentley will interpret references to "Bentley's Spanish subsidiaries" to refer to Laboratorios Belmac, S.A. ("Belmac") and to its predecessor, Laboratorios Rimafar.

10.   Bentley objects to each Interrogatory to the extent it attempts to elicit information and the production of documents that would require it to violate foreign laws, court orders, rules, agreements with third parties, or other obligations. Bentley will not produce such information or documents.

11.   Bentley reserves its right to supplement its Responses

### INTERROGATORIES

### INTERROGATORY NO. 1:

Identify every officer, director, employee or agent of Bentley that has communicated with any officer, director, employee or agent of any of Bentley's Spanish subsidiaries regarding any of the following subjects:

   a)   Any contemplated or actual written or oral arrangement with Ethypharm regarding the manufacture, production and/or sale of Omperazole [sic];

   b)   The decision in or around 2000 or 2001 to discontinue the longstanding written and/or oral arrangements with Ethypharm regarding the manufacture, production and/or sale of Omeprazole;

   c)   The use of Ethypharm's trade secrets, know-how, proprietary process, specifications, studies, procedures, confidential formulae, customer lists and/or machinery to produce, manufacture and/or market Omeprazole, Lanzsoprazole or any other pharmaceutical products;

- 3 -

    d)    The supply of Omeprazole to customers that had or were purchasing Omeprazole from Ethypharm ("Ethypharm's customers").

## OBJECTION TO INTERROGATORY NO. 1:

In addition to the General Objections set forth above, Bentley further objects to Interrogatory No. 1 on the ground that it is vague and ambiguous because (i) it fails to indicate the entity whose "arrangements" with Ethypharm are requested; (ii) it fails to indicate the entity whose "decision in or around 2000 or 2001" is the subject of the Interrogatory; and (iii) Plaintiffs have not defined or otherwise identified what they allege to be their "trade secrets." Bentley further objects to Interrogatory No. 1 on the ground that it is overbroad, as it purports to apply to "any other pharmaceutical products." Bentley further objects to Interrogatory No. 1 to the extent that it purports to be a single "interrogatory" – each subpart of Interrogatory No. 1 constitutes a "discrete subpart" within the meaning of Fed. R. Civ. P. 33(a) and, accordingly, constitutes four separate interrogatories.

## RESPONSE TO INTERROGATORY NO. 1:

Subject to and without waiving the foregoing objections, Bentley states that James R. Murphy (director since 1993, President of Bentley since 1994; Chairman and CEO of Bentley since 1995); Michael D. Price (director from 1995 until 2004; CFO, Vice President and Treasurer of Bentley since 1993; Secretary of Bentley since 1992); and Jordan A. Horvath, Esq. (former outside counsel to the Company and General Counsel of the Company from August 2000 through April 2004) are or were officers, directors and/or employees of Bentley who communicated with any of Bentley's Spanish subsidiaries concerning one or more of the subjects set forth in Interrogatory No. 1.

**INTERROGATORY NO. 2:**

Identify every officer, director, employee or agent of Bentley's Spanish subsidiaries that has communicated with any officer, director, employee or agent of Bentley regarding any of the following subjects:

a)   Any contemplated or actual written or oral arrangement with Ethypharm regarding the manufacture, production and/or sale of Omperazole [sic];

b)   The decision in or around 2000 or 2001 to discontinue the longstanding written and/or oral arrangements with Ethypharm regarding the manufacture, production and/or sale of Omeprazole;

c)   The use of Ethypharm's trade secrets, know-how, proprietary process, specifications, studies, procedures, confidential formulae, customer lists and/or machinery to produce, manufacture and/or market Omeprazole, Lanzsoprazole or any other pharmaceutical products;

d)   The supply of Omeprazole to customers that had or were purchasing Omeprazole from Ethypharm ("Ethypharm's customers").

**OBJECTION TO INTERROGATORY NO. 2:**

In addition to the General Objections set forth above, Bentley objects to Interrogatory No. 2 on the ground that it is vague and ambiguous because (i) it fails to indicate the entity whose "arrangements" with Ethypharm are requested; (ii) it fails to indicate the entity whose "decision in or around 2000 or 2001" is the subject of the Interrogatory; and (iii) Plaintiffs have not defined or otherwise identified what they allege to be their "trade secrets." Bentley further objects to Interrogatory No. 2 on the ground that it is overbroad, as it purports to apply to "any other pharmaceutical products" and to all of Bentley's Spanish subsidiaries. Bentley further objects to Interrogatory No. 2 to the extent that it purports to be a single "interrogatory" – each subpart of Interrogatory No. 2 constitutes a "discrete subpart" within the meaning of Fed. R. Civ. P. 33(a) and, accordingly, constitutes four separate interrogatories.

**RESPONSE TO INTERROGATORY NO. 2:**

Subject to and without waiving the foregoing objections, Bentley states that Adolfo Herrera (General Manager of Belmac from 1999 to the present); Clemente González Azpeitia (General Manager of Belmac from 1995 until June 1999); Ángel Pérez de Ayala (General Manager of Belmac from 1991 until 1995); Ignacio Álvarez (employee of Belmac since April 2002); and Fernando Berenguer (deceased) are officers, directors and/or employees of Belmac who communicated with Bentley concerning one or more of the subjects set forth in Interrogatory No. 2.

**INTERROGATORY NO. 3:**

Describe the circumstances of each contact, communication or discussion identified in Interrogatory Nos. 1 and 2.

**OBJECTION TO INTERROGATORY NO. 3:**

In addition to the General Objections set forth above, Bentley further objects to Interrogatory No. 3 on the ground that it is vague and ambiguous because (i) it fails to indicate the entity whose "arrangements" with Ethypharm are requested; (ii) it fails to indicate the entity whose "decision in or around 2000 or 2001" is the subject of the Interrogatory; and (iii) Plaintiffs have not defined or otherwise identified what they allege to be their "trade secrets." Bentley further objects to Interrogatory No. 3 on the ground that it is overbroad and unduly burdensome. Bentley further objects to Interrogatory No. 3 to the extent that it purports to be a single "interrogatory" – each subpart of Interrogatory Nos. 1 and 2 constitutes a "discrete subpart" within the meaning of Fed. R. Civ. P. 33(a) and, accordingly, Interrogatory No. 3 constitutes eight separate interrogatories.

**RESPONSE TO INTERROGATORY NO. 3:**

Subject to and without waiving the foregoing objections, Bentley states that the answer to Interrogatory No. 3 may be derived or ascertained from the business records to be made available for inspection and designation for copying, including but not limited to correspondence, business journals of Mr. Murphy, and minutes of the meetings of Bentley's board of directors, and that the burden of deriving or ascertaining the answer is substantially the same for Ethypharm as for Bentley.

**INTERROGATORY NO. 4:**

Identify every officer, director, employee or agent of Bentley that has traveled to Europe or elsewhere for a trip, that in whole or in part, referred or related to Belmac's dealings with Ethypharm and/or the manufacture, production and/or sale of Omeprazole for Ethypharm and fully describe the circumstances of each trip.

**OBJECTION TO INTERROGATORY NO. 4:**

In addition to the General Objections set forth above, Bentley further objects to Interrogatory No. 4 on the ground that it is vague in the use of the phrase "or elsewhere," overbroad and unduly burdensome.

**RESPONSE TO INTERROGATORY NO. 4:**

Subject to and without waiving the foregoing objections, Bentley states that the answer to Interrogatory No. 4 may be derived or ascertained from the business records to be made available for inspection and designation for copying, including business journals of Mr. Murphy and minutes of the meetings of Bentley's board of directors, and that the burden of deriving or ascertaining the answer is substantially the same for Ethypharm as for Bentley.

Further answering, Bentley states that in 1995 Messrs. Murphy and Price met with representatives of Ethypharm (specifically, Messrs. Debregas and Leduc) in Paris. During that meeting, Mr. Murphy advised the Ethypharm representatives that Belmac had excess manufacturing capacity, and that Bentley was looking to obtain some products (other than omeprazole) for marketing and to utilize some of that excess capacity for producing products other than omeprazole.

At another meeting, Mr. Murphy met with Messrs. Debregas and Leduc at Ethypharm's office in St. Cloud, France. While there, he was introduced to Ethypharm's new general manager, Pierre Germain. During their meeting, Messrs. Murphy and Germain discussed the problems that Belmac and Ethypharm had had in terms of communication, as well as the outstanding amounts that Ethypharm owed to Belmac.

Further answering, Bentley states that Mr. Murphy met with Mr. Germain in Paris at least two other times. In the first meeting, Mr. Murphy attempted to promote collaboration between Belmac and Ethypharm on drug delivery mechanisms (not involving omeprazole). At the second meeting (which took place in a restaurant), and knowing of Ethypharm's interest in becoming a publicly traded company, Mr. Murphy suggested to Mr. Germain that Bentley and Ethypharm ought to explore merger (or, alternatively, Bentley's acquisition of Ethypharm).

Further answering, Bentley states that Mr. Murphy had a lunch meeting with Mr. Leduc, during which Mr. Leduc accused Belmac of attempting to collaborate with other companies concerning the manufacture and/or marketing of omeprazole for those other companies.

**INTERROGATORY NO. 5:**

Identify every officer, director, employee or agent of any of Bentley's Spanish subsidiaries that has traveled to the United States or elsewhere for a trip, that in whole or in part, referred or related to Belmac's dealings with Ethypharm and/or the manufacture, production and/or sale of Omeprazole for Ethypharm and fully describe the circumstances of each trip.

**OBJECTION TO INTERROGATORY NO. 5:**

In addition to the General Objections set forth above, Bentley further objects to Interrogatory No. 5 on the ground that it is overbroad and unduly burdensome.

**RESPONSE TO INTERROGATORY NO. 5:**

Subject to and without waiving the foregoing objections, Bentley states that Mr. Herrera, in his capacity as General Manager of Belmac, has traveled to the United States to meet Mr. Murphy and to inform him of developments at Belmac. On some of those occasions, Mr. Herrera may have referred to Belmac's dealings with Ethypharm.

**INTERROGATORY NO. 6:**

Identify every member of the following boards of directors from 1991 to the present, including any and all additional corporate affiliations, jobs, duties, employment, or involvement they may have: Bentley Pharmaceuticals, Inc.; Laboratorios Belmac, S.A.; Pharma de Espana; Bentley API, SL; Laboratorios Rimafar, SL; and Laboratorios Davur, SL.

**OBJECTION TO INTERROGATORY NO. 6:**

In addition to the General Objections set forth above, Bentley further objects to Interrogatory No. 6 on the ground that it is vague, ambiguous, overbroad and unduly burdensome.

**RESPONSE TO INTERROGATORY NO. 6:**

Subject to and without waiving the foregoing objections, Bentley responds that from 1991 on, the following individuals have served on the Board of Directors of Bentley Pharmaceuticals, Inc. (with the years of service as a director listed in parentheses):

Marc S. Ayers (1991-1992) – CFO until 1992

Charles L. Bolling (1991-2004)

Thomas Davis (1991-1993)

Eldon E. Post (1991-1994)

Jean-Francois Rossignol (1991-1993) – Chairman and CEO until 1993; President until 1992

Ranald Stewart, Jr. (1991-1995) – CEO in 1994

Chester Thatcher, Jr. (1991-1995)

Michael M. Harshbarger (1993-1994) – President and Chief Operating Officer until 1993

James R. Murphy (1993-present) – President of Bentley since 1994, Chairman and CEO since 1995

Denis Nicolas (1993-1994)

Dr. Robert M. Stote (1993-2004) – Sr. Vice President, Chief Science Officer since 1992

Randolph W. Arnegger (1994-1998)

Donald E. Boultbee (1994) – President and CEO from 1993-1994

Doris E. Wardell (1994-1997)

Michael D. Price (1995-2004) – CFO, Vice President/Treasurer since 1993, Secretary of Company since 1992

Ehud D. Laska (1997)

Michael McGovern (1997-present) – Vice Chairman of Bentley since 1999

Robert Gyurik (1998-2004) – Vice President of Pharmaceutical Development
since 1999

Russell Cleveland (1999-2001)

Miguel Fernandez (1999-present)

William A. Packer (1999-2004)

John W. Spiegel (2002-present)

F. Ross Johnson (2004-present)

Edward J. Robinson (2004-present)

With respect to Belmac, the following individuals have served on the Board of Directors
(with the years of service as a director listed in parentheses):

James R. Murphy (1994-present)

Michael D. Price (1994-present)

Adolfo Herrera (2000-present) – General Manager of Belmac since 1999

Clemente González Azpeitia (1995-1999)

Ángel Pérez de Ayala (1992-1994)

José Maria Esteve (1996-2001)

**INTERROGATORY NO. 7:**

From 1991 to the present, describe the process used and the specific facts and circumstances
surrounding each occasion where each general manager and Board Member for Bentley's
Spanish subsidiaries has been hired and fired.

**OBJECTION TO INTERROGATORY NO. 7:**

In addition to the General Objections set forth above, Bentley further objects to
Interrogatory No. 7 on the ground that it is overbroad and unduly burdensome.

- 11 -

**RESPONSE TO INTERROGATORY NO. 7:**

      Subject to and without waiving the foregoing objections, Bentley states that there have

been three general managers of Laboratorios Belmac since Bentley first purchased Belmac's

predecessor, Laboratorios Rimafar.  The first general manager, Angel Perez de Ayala, served

until 1995, at which point he was asked to resign by Mr. Murphy due to philosophical

differences regarding corporate direction.  Mr. Murphy promoted de Ayala's successor,

Clemente González Azpeitia, who had been marketing manager at Belmac.  Mr. González

Azpeitia served as general manager at Belmac until June 1999, at which time he requested

reassignment to focus upon marketing activities and recommended that Adolfo Herrera be

appointed to replace him as general manager.  Following Mr. González Azpeitia's suggestion,

Mr. Murphy promoted Mr. Herrera as general manager in July 1999, in which position Mr.

Herrera continues to this day.

**INTERROGATORY NO. 8:**

Identify all "previous general managers" of Belmac referenced by paragraph 10 of the James
Murphy Declaration and describe the "delegation of powers" referenced in the same paragraph
granted with respect to each of the previous managers from 1991 to the present.

**RESPONSE TO INTERROGATORY NO. 8:**

      Subject to and without waiving the foregoing General Objections, Bentley states that the

"previous general managers" referenced by paragraph 10 of Mr. Murphy's Declaration are Angel

Perez de Ayala and Clemente González Azpeitia.  The terms of the specific delegation of powers

may be derived or ascertained from the business records, including proxies ("Escritura de

Poder") to be made available for inspection and designation for copying, since the burden of

deriving or ascertaining the answer is substantially the same for Ethypharm as for Bentley.

## INTERROGATORY NO. 9:

Paragraph 11 of the James Murphy Declaration states that "Mr. Herrera need not consult with Belmac's board or Bentley unless he will exceed the delegation of responsibility." Describe all occasions when any general manager of Belmac has consulted with or sought suggestions, authorization or direction from anyone at Bentley (including James Murphy) regarding Belmac's business relationship with Ethypharm from 1991 to the present regardless of whether the delegation of responsibility was exceeded.

## OBJECTION TO INTERROGATORY NO. 9:

In addition to the General Objections set forth above, Bentley further objects to Interrogatory No. 9 as vague, ambiguous, and overbroad, particularly the Interrogatory's reference to "[seek] suggestions" from anyone at Bentley.

## RESPONSE TO INTERROGATORY NO. 9:

Subject to and without waiving the foregoing objections, Bentley states that no general manager of Belmac has ever sought "authorization" from Mr. Murphy or anyone else at Bentley concerning any dealings with Ethypharm. Further answering, Bentley states that Mr. Herrera conferred with Mr. Murphy concerning: whether to formalize in writing the relationship between Belmac and Ethypharm; Mr. Herrera's decision to enter into a Manufacturing Agreement with Ethypharm in or about March 2000; Mr. Herrera's subsequent decision not to extend that Agreement in or around November 2001; and Mr. Herrera's offer, after the expiration of the Manufacturing Agreement in March 2002, for Belmac to supply its own omeprazole to Ethypharm. Further answering, Bentley states that Mr. Herrera also informed Mr. Murphy about litigation between Belmac and Ethypharm in Spain.

## INTERROGATORY NO. 10:

With regard to paragraph 3 of the Adolfo Herrera Declaration, which states that "Belmac elects its own board of directors during its general shareholders' meeting," please identify the "shareholders" of Belmac from 1991 to the present, and the number of votes each may cast in electing Belmac's directors.

**RESPONSE TO INTERROGATORY NO. 10:**

Subject to and without waiving the foregoing General Objections, Bentley states that since its acquisition of Belmac in 1992, Belmac has been a wholly-owned subsidiary of Bentley Pharmaceuticals, Inc. and its wholly-owned affiliate, Pharma de España. Of the 1,360,376 shares of Belmac, 373,478 are owned by Pharma de España and 986,898 are owned by Bentley Pharmaceuticals, Inc.

**INTERROGATORY NO. 11:**

Identify and describe any direct communications between any employee of Bentley Pharmaceuticals, Inc. (including but not limited to James Murphy) and Ethypharm (including but not limited to communications with Patrice Debregas, Gerard Leduc or Adolpho de Basilio).

**OBJECTION TO INTERROGATORY NO. 11:**

In addition to the General Objections set forth above, Bentley further objects to Interrogatory No. 11 on the ground that it is overbroad and unduly burdensome.

**RESPONSE TO INTERROGATORY NO. 11:**

Subject to and without waiving the foregoing objections, Bentley states that Mr. Murphy, from time to time, has had direct communications with Ethypharm, and Bentley incorporates by reference its response to Interrogatory No. 4. Further answering, Bentley states that other direct communications may be derived or ascertained from business records, including correspondence and Mr. Murphy's business journals, and that the burden of deriving or ascertaining the answer is substantially the same for Ethypharm as for Bentley. Further answering, Bentley states that Dr. Robert Stote (Bentley's Chief Science Officer) recalls participating in a meeting at Belmac's facilities in Spain with Messrs. Murphy and Herrera and at least one Ethypharm representative, but does not recall any specifics about the meeting.

- 14 -

**INTERROGATORY NO. 12:**

Identify each individual that formally or informally assisted in the oral or written translation of documents, instructions, or communications between and among Bentley and Bentley's Spanish subsidiaries from 1991 to the present.

**OBJECTION TO INTERROGATORY NO. 12:**

Bentley further objects to Interrogatory No. 12 as vague, ambiguous and not reasonably calculated to lead to the discovery of admissible evidence.

DATED: February 28, 2006              **EDWARDS ANGELL PALMER & DODGE LLP**


                                      */s/ John L. Reed*
                                      John L. Reed (I.D. 3023)
                                      Denise Seastone Kraft (I.D. 2778)
                                      Joseph B. Cicero (I.D. 4388)
                                      919 N. Market Street, 15th Floor
                                      Wilmington, DE 19801
                                      (302) 777-7770
                                      (302) 777-7263
                                      jreed@eapdlaw.com
                                      dkraft@eapdlaw.com
                                      jcicero@eapdlaw.com


**OF COUNSEL:**

Craig E. Stewart
Veronica C. Abreu
Joseph P. Mingolla
**EDWARDS ANGELL PALMER & DODGE LLP**
111 Huntington Avenue
Boston, MA 02199
(617) 239-0100

AS TO ANSWERS:

VERIFICATION

I, James Murphy, state on this 27th day of February, 2006, under the pains and penalties of perjury, that I have been authorized to sign these interrogatory answers on behalf of the defendant in this action, that I have read these answers and know their contents. These answers are based on, and necessarily are limited by, the information presently recollected. I reserve the right to make changes in these answers if it appears that omissions or errors have been made, or more accurate or recollected information becomes available. Subject to these limitations, these answers are true to the best of my knowledge, information and belief.

James Murphy

15